Case No. 24-8024

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

CUSTODIA BANK, INC.,

Appellant,

v.

FEDERAL RESERVE BOARD OF GOVERNORS et al.,

Appellees.

On Appeal from the U. S. District Court for the District of Wyoming

The Honorable Scott W. Skavdahl, District Judge

District Court No. 1:22-CV-125-SWS

## APPELLANT'S REPLY BRIEF

## ORAL ARGUMENT REQUESTED

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

Michelle S. Kallen
Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Avenue NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

*Counsel for Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................ 1

ARGUMENT .................................................................................................. 2

I.    The MCA limits the Fed's discretion over access to covered
      services ................................................................................................ 2

      A.    "Shall" means "shall" ................................................................ 3

      B.    The MCA's mandatory access provision extends to all
            eligible "Nonmember Depository Institutions" ........................... 6

      C.    The title of Section 248a does not enable the Board to
            circumvent the MCA .................................................................. 12

      D.    Section 342 does not supersede the MCA's mandate .................. 13

      E.    The Toomey Amendment neither confirms old power nor
            creates new power to circumvent the MCA's mandate ............... 15

      F.    The Board's effort to circumvent the MCA's mandate by
            outsourcing master account decisions to Reserve Banks
            raises serious constitutional questions ...................................... 16

II.   Appellees' policy arguments underscore the wisdom of
      Congress's decision to constrain federal agency power in the
      dual banking system ......................................................................... 18

      A.    Appellees' strawman concerns about Custodia's business
            at best reveal ignorance and at worst are disingenuous ............. 18

      B.    Appellees have a plethora of risk-mitigation tools ..................... 22

      C.    Regulatory litigation is not an alternative to congressional
            policymaking ............................................................................ 25

III.  Custodia is entitled to a master account under both mandamus
      and the APA ...................................................................................... 28

CONCLUSION ............................................................................................. 29

## TABLE OF AUTHORITIES

CASES

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................. 17

*Cantero v. Bank of America, N. A.*, 144 S. Ct. 1290 (2024) ............................ 25

*Canup v. Chipman-Union, Inc.*, 123 F.3d 1440 (11th Cir. 1997) ................... 16

*Clark v. Martinez*, 543 U.S. 371 (2005) ............................................ 17

*Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 144 S. Ct. 2440 (2024) ................................................................. 28

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) ................................ 8

*Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923) ................................................... 14

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017) ................................. 4, 9, 10, 14

*Gares v. Willingboro Township*, 90 F.3d 720 (3d Cir. 1996) ........................... 9

*General Electric Co. v. Gilbert*, 429 U.S. 125 (1976) .................................... 8

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................ 29

*Jewell v. United States*, 749 F.3d 1295 (10th Cir. 2014) ................................. 4

*Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162 (2016) .......................................................................... 3

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ...................... 28

*Richison v. Ernest Group, Inc.*, 634 F.3d 1123 (10th Cir. 2011) ........................ 6

*Smith v. Spizzirri*, 601 U.S. 472 (2024) .............................................. 3

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018) ........................ 4

*In re Southern Industrial Banking Corp.*, 872 F.2d 1257 (6th Cir. 1989) .......................................................................... 25

*United States Forest Service v. Cowpasture River Preservation Ass'n*, 590 U.S. 604 (2020) ............................................................ 11

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) ............................... 8

*Western Minnesota Municipal Power Agency v. FERC*, 806 F.3d 588 (D.C. Cir. 2015) ............................................................................. 9

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ........................ 16

## STATUTES

12 U.S.C. § 248a(c)(2) ....................................................... 2, 3, 4, 9, 12, 23

12 U.S.C. § 248a(e) ................................................................................. 4

12 U.S.C. § 248c(b)(1)(B)(ii) .................................................................. 16

12 U.S.C. § 342 ..................................................................................... 13

12 U.S.C. § 461(b)(1)(A)(i) .................................................................... 9

12 U.S.C. § 461(b)(2)(A) ........................................................................ 15

Wyo. Stat. Ann. § 13-12-103(c) ............................................................ 21

Wyo. Stat. Ann. § 13-12-105(a) ............................................................ 21

Wyo. Stat. Ann. § 13-12-106(a) ............................................................ 21

Wyo. Stat. Ann. § 13-12-107 ................................................................ 21

## LEGISLATIVE MATERIALS

Banks and Banking—Modernization of Provisions, 2000 Vermont Laws P.A. 153 (H. 374) (1999) ..................................................... 27

Financial Institutions—Banks—Loans And Credit, 1999 Conn. Legis. Serv. P.A. 99-158 (H.B. 6817) .................................................. 26-27

Financial Institutions—Bank Charter, 1997 Me. Legis. Serv. 1st Sp. Sess. Ch. 398 (H.P. 1319) (L.D. 1869) ...................................... 27

iii

## OTHER AUTHORITIES

Baher Azmy, *Squaring the Predatory Lending Circle: A Case for States as Laboratories of Experimentation*, 57 Fla. L. Rev. 295 (2005) .................................................................................. 26

Board of Governors of Federal Reserve, *84th Annual Report 1997* (1998), https://tinyurl.com/38nxsmvc ....................................... 5, 8

Penny Crosman, *American Banker Honors Six Top Innovators and Female Fintech Leaders*, Am. Banker (June 21, 2023) ............................ 19

Joyetter Feagaimaalii-Luamanu, *Territorial Bank of American Samoa Opens Its Doors*, Pacific Island Rep. (Oct. 4, 2015), https://web.archive.org/web/20210819210759/http://www.pirep ort.org/articles/2016/10/04/territorial-bank-american-samoa-opens-its-doors ............................................................... 26

Federal Reserve, *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* (July 20, 2023), https://www.federalreserve.gov/paymentsystems/files/psr_guid e.pdf .......................................................................... 23

Federal Reserve Bank of Dallas, Circular No. 81-155 (July 30, 1981) ....................................................................... 5, 7

Federal Reserve Financial Services, *Federal Reserve Banks Operating Circular No. 1: Account Relationships* (eff. Sept. 1, 2023), http://tinyurl.com/ecftjvuu ..................................... 10

Esther L. George, President and Chief Exec. Officer, Fed. Reserve Bank of Kan. City, *Perspectives on 150 Years of Dual Banking*, Speech to the Conference of State Bank Supervisors (May 22, 2012), https://www.kansascityfed.org/documents/2644/speech es-2012-george-ga-csbs-05-22.pdf ..................................... 25-26

*Hearing Before the Wyoming Select Committee on Blockchain, Financial Technology and Digital Innovation Technology* (May 21, 2024) (statement of Caitlin Long), https://tinyurl. com/s7ebvf22 ................................................................. 10

*Hearing Before the Wyoming Select Committee on Blockchain, Financial Technology and Digital Innovation Technology* (Sept. 17, 2024) (statement of Caitlin Long), https://tinyurl.com/4wcchaxp ................................................................ 21, 22

Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453 (2023) ................................................................ 5, 26

Herminia Ibarra, *et al.*, *Women Rising: The Unseen Barriers*, Harv. Bus. Rev. (Sept. 2013), https://hbr.org/2013/09/women-rising-the-unseen-barriers ........................................................... 19

J.L. Jackson & Willis J. Winn, *Foreword to Federal Reserve Bank of Cleveland 1980 Annual Report* (1981) .................................... 5, 7

Anatoli Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Federal Reserve Bank of Richmond 23 (July/Aug. 1985), https://tinyurl.com/4bsx7wvu ................................................... 7, 11

Adam J. Levitin, *Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency*, 101 Tex. L. Rev. 877 (2023) ................................................. 20

Office of the Comptroller of the Currency, *OCC-Supervised Minority Depository Institutions*, https://tinyurl.com/4czc7t8u (last accessed Sept. 16, 2024) ........................................................ 19

Remarks by Fed Chairman Alan Greenspan (May 3, 1997), https://tinyurl.com/4r3kevnz ................................................. 18, 20

SEC, *Remarks Before the 2024 AICPA & CIMA Conference on Banks & Savings Institutions: Accounting for Crypto-Asset Safeguarding Obligations—A Facts-Based Analysis* (Sept. 9, 2024), https://www.sec.gov/newsroom/speeches-statements/munter-speech-safeguarding-crypto-assets-09-09-24 ..................................... 22

David C. Wheelock, *Overview: The History of the Federal Reserve* (Sept. 13, 2021), https://tinyurl.com/5dewvzt9 ............................................... 2

Wyo. Div. of Banking, *SPDI Examination Manuals* (2021), https://tinyurl.com/2tw2ptz8 ................................................. 20, 22

Wyo. Rules & Regs. 021.0002.20 § 8 (a)(iii) .................................... 22

## INTRODUCTION

In the decades preceding the 1980 passage of the Monetary Control Act (MCA or Statute), the Fed exercised discretion over which depository institutions had access to crucial Fed services—services that distinguish banks from "mere vaults." In picking winners and losers, the Fed granted access to its member banks and denied equal access to nonmember depository institutions. Congress made a deliberate, unambiguous decision to rescind that discretion in the MCA and make certain covered services mandatory. The Fed, courts, and commentators all agreed at the time—and in the subsequent three decades—that the MCA's equal access mandate was broad, applying to all eligible depository institutions.

Appellees now attempt a rearguard action to seize back the very power Congress rescinded. They ask this Court to hold that "shall" means "might"—depending on agency whim. Their recount of history omits the critical three-decade period after 1980 when everyone agreed what the MCA required. And their effort to abrogate Congress's judgment mandating equal access for nonmember depository institutions triggers serious constitutional problems. That is not how the English language works; that is not how history works; and, as Judge Bacharach recognized, that is not how the MCA works. The decision below should be reversed.

1

<u>ARGUMENT</u>

In this statutory interpretation case, the Federal Reserve Board of Governors (Board) dedicates its brief to responding to Custodia's legal arguments about the MCA. The Federal Reserve Bank of Kansas City (FRBKC), by contrast, dedicates its brief to strawman policy objections underlying Custodia's—and Judge Bacharach's—plain reading of the Statute. Neither the Board's legal arguments nor FRBKC's parade of policy horribles justify affirmance.

## I.  The MCA limits the Fed's discretion over access to covered services

Before 1980, the Fed exercised gatekeeping power to crucial Fed services—such as check clearing services and electronic payments—favoring Fed-member depository institutions. Custodia Opening Br. 7–8; David C. Wheelock, *Overview: The History of the Federal Reserve* (Sept. 13, 2021), https://tinyurl.com/5dewvzt9. Dissatisfied with the Fed picking winners and losers, Congress required in the MCA that Fed services be equally available and equally priced for member and nonmember depository institutions alike: "[a]ll Federal Reserve bank services covered by the fee schedule [in Section 248a(b)] *shall be available* to nonmember depository institutions *and such services* shall be priced at the same fee schedule applicable to member banks." 12 U.S.C. § 248a(c)(2) (emphasis added). The MCA's plain text, the Statute's historical context, and the Fed's own contemporaneous understanding all

2

confirm that the Fed lacks the discretion to deny eligible depository institutions.

### A. "Shall" means "shall"

Notwithstanding the MCA's use of "shall," Appellees contend that Section 248a(c)(2) is discretionary because it is (in their view) *only* a pricing provision. *See, e.g.*, Board Br. 34–35; FRBKC Br. 36. Appellees base this reading on Section 248a(c)(2)'s introductory clause, which states that "[t]he schedule of fees prescribed pursuant to this section shall be based on the following principles". *See* Board Br. 29 (quoting 12 U.S.C. § 248a(c)(2)). According to the Board, that clause takes the "mandatory access" directive that "'[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions,'" and converts it into a mere "equitable fee-setting principle" for the Board to "take into consideration" when setting fees. *Id.* at 29, 34. There are four fatal flaws with this approach.

*First*, Appellees' position is irreconcilable with Congress's use of "shall." The Supreme Court has made clear time-and-again that "'shall' imposes a *mandatory* duty." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (emphasis added); *Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024). That plain-text reading is particularly powerful here because Congress used "may" in adjacent portions of Section 248a, "reinforc[ing] the conclusion that it knowingly selected the mandatory term 'shall' in crafting" the open-access

provision in Section 248a(c)(2). *South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018); *see* 12 U.S.C. § 248a(c)(2), (e). This is not the first time the federal government told this Court "that 'shall' does not always signify a mandatory intent." *Jewell v. United States*, 749 F.3d 1295, 1298 (10th Cir. 2014) (emphasis omitted). As in *Jewell*, this Court should refuse to "disturb the age-old precept that 'shall' means 'shall.'" *Id.* at 1299.

*Second*, Congress's use of "and" in Section 248a(c)(2) connotes two separate mandates—the first of which is access, not pricing. The words "shall be available to nonmember depository institutions" identify *who* is entitled to access the covered services (nonmember depository institutions, including state-chartered nonmembers) and the words "shall be priced at the same fee schedule" identify *how* those services must be priced (according to the same fee schedule applicable to member banks). *Accord Fourth Corner Credit Union v. Fed. Rsrv Bank of Kan. City*, 861 F.3d 1052, 1068 (10th Cir. 2017) (Bacharach, J.).

*Third*, Appellees are simply wrong that placement of a mandatory access provision in a broader pricing directive renders that provision discretionary. If Congress provided, in setting fees for entrance to a national park, that "all U.S. citizens shall be permitted access to the park and park entrance fees shall be set to recover reasonable costs," the National Park Service would not have "equitable discretion" to deny entrance to U.S. citizens. Here, Congress

4

addressed its concerns about equal access to Fed services *in tandem with* its related concerns about equal pricing for those services.

**Fourth**, Appellees' current view that these two directives are not mandates but mere "considerations" is belied by the Fed's longstanding practice. Until recently, Reserve Banks rarely—if ever—denied master account applications, and instead "relied on the fact that the depository institution had been vetted by some other federal or state bank supervisor" (as Custodia was). Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 463 (2023). Indeed, statements from Reserve Banks shortly after the MCA's passage reflect their understanding that master accounts and other services would be available to "each chartered institution." Board of Governors of Federal Reserve, *84th Annual Report 1997*, at 248 (1998), https://tinyurl.com/38nxsmvc; *see also* J.L. Jackson & Willis J. Winn, *Foreword to Federal Reserve Bank of Cleveland 1980 Annual Report* at 2 (1981) ("Cleveland Foreword") ("Our services will now be available to *all* depository institutions."); Federal Reserve Bank of Dallas, Circular No. 81-155 (July 30, 1981) ("Dallas Circular") ("available to all depository institutions in the District").[1]

---

[1] The Board's reliance on its 2022 Guidelines for denying master accounts, *see* Board Br. 27, can neither be squared with the Board's contemporaneous understanding of the MCA nor with the Statute's plain text.

The Fed's newly-minted and atextual reading of the MCA cannot survive.

## B.    The MCA's mandatory access provision extends to all eligible "Nonmember Depository Institutions"

Appellees argue they are empowered to pick and choose who can access services covered by the MCA—all made available through "master accounts," *see* Custodia Br. 12–14—because the word "all" appears before the term "services" but does not appear again before the term "nonmember depository institution." *E.g.*, Board Br. 37 (arguing the MCA's mandate applies to "nonmember banks as a class, not to all banks in that class"). Appellees are wrong.

As an initial matter, the Board's nonmember bank "class" theory was improperly raised for the first time on appeal and thus waived. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011). Appellees' theory, moreover, is belied by (i) the Fed's own contemporaneous understanding; (ii) the MCA's plain text; (iii) the dual-banking system's respect for state charters; and (iv) the history leading up to the MCA.

*First*, Appellees' restrictive reading of "nonmember depository institutions" contravenes the Fed's contemporaneous understanding that the

---

The Board lacks authority to promulgate the Guidelines in first place, much less discriminate against state-chartered depository institutions.

MCA applied to all depository institutions. Appellees point to historical practice that predates the MCA to argue that "the historical record demonstrates that Federal Reserve Banks have considered risk in providing their accounts and services." Board Br. 10, 21–28. But Appellees' pre-MCA sources simply reflect the Fed's favoritism that Congress enacted the MCA to end.[2]

Appellees cannot overcome the mountain of evidence revealing the Fed's understanding from 1980 until this past decade. The Board's 1980 regulatory implementation, 1980 policies, 1984 policies, and 1990 policies all reflect the Board's understanding that the MCA required it to make covered services available to "all depository institutions." Custodia Br. 34–38; *see also* Congressional Br. 19–20. Individual Reserve Banks likewise confirmed this understanding. *See, e.g.*, Dallas Circular (describing services as "available to all depository institutions in the District"); Cleveland Foreword (stating that

---

[2] Leading up to the MCA, the Department of Justice Antitrust Division investigated efforts by the commercial banking industry—aided by the Fed's discriminatory access policy—to quelch competition from small thrift institutions. Anatoli Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Federal Reserve Bank of Richmond 23 (July/Aug. 1985), https://tinyurl.com/4bsx7wvu. At the same time, the Fed faced a membership exodus that was causing revenue loss for the Treasury. The MCA resolved both issues, as equal access alleviated the anticompetitive behavior and selling Fed services to all depository institutions increased Treasury revenue. *Id.* Indeed, the Department of Justice closed its investigations after the MCA was enacted. *Id.*

in light of the 1980 MCA, "[o]ur services will now be available to all depository institutions").[3]

When it created "master accounts" in 1998, the Fed emphasized this new account would be available to "each chartered institution." 1997 Board of Governors Annual Report, at 248. The discovery of agency discretion in the MCA is a recent (and unexplained) phenomenon. Because the Fed's about-face "flatly contradicts the position which the agency had enunciated at [multiple] earlier date[s], closer to the enactment of the governing statute," this Court should reject it. *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142–43 (1976); *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991) (quoting *Gilbert*); *cf. Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power," courts are rightly skeptical.).

*Second*, Appellees' approach contravenes the MCA's plain text. Section 248a requires that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions." It does not say that such services "shall be available to the nonmember depository

---

[3] The Board's limited post-MCA sources say nothing of discretion to deny master accounts to eligible depository institutions. The example of FedWire limitations (Board Br. 24–25) addresses a single payment service, not access to a master account itself, and highlights one of the Fed's many risk-management tools. *See* Section II(A), *infra*.

institutions *of the Fed's choosing*." As Judge Bacharach explained, even without the restrictive modifier "all," "the phrase 'nonmember depository institutions' is an inclusive term that includes all nonmember depository institutions." *Fourth Corner*, 861 F.3d at 1069 (Bacharach, J.); *cf. W. Minn. Mun. Power Agency v. FERC*, 806 F.3d 588, 592 (D.C. Cir. 2015) (concluding terms "states" and "municipalities" include all states and municipalities because of the absence of language qualifying or restricting those terms); *Gares v. Willingboro Twp.*, 90 F.3d 720, 726 (3d Cir. 1996) (interpreting the plain meaning of the phrase "prevailing plaintiffs" to include all prevailing plaintiffs).

The error of Appellees' reading is also apparent from the statutory definition of "depository institution." Congress defined "depository institution" as "*any* bank which is eligible to make application to become an insured bank." 12 U.S.C. § 461(b)(1)(A)(i) (emphasis added). Replacing "depository institution" in Section 248a(c)(2) with its statutory definition is instructive: "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to *any* bank which is eligible to make application to become an insured bank."[4] Appellees' argument that Congress intentionally omitted "all" from Section 248a(c)(2) defies English grammar: had Congress added "all," the

---

[4] "Nonmember" is not relevant for this illustration and is omitted here.

Statute's plain text would nonsensically read "shall be available to *all any* bank;" and defies logic: use of "any" in Congress's definition of "depository institution" negates the need for the additional "all." [5]

*Third*, Appellees ask this Court to infer from the omission of the single word "all" that Congress intended to confer on Reserve Banks discretionary policymaking power to upend state bank charters.  Appellees do not dispute that the services covered by the MCA are central to an institution's ability to function.  As Judge Moritz put it, "a depository institution" without a master account "is nothing more than a vault." *Fourth Corner*, 861 F.3d at 1053 (Moritz, J.). [6]  Granting Reserve Banks power to deny access to covered services

---

[5] The term "all" before "Federal Reserve bank services," by contrast, is important because, unlike the term "depository institution," "service" is not a defined term.  It was important for Congress to clarify that Section 248a's mandate applied to all services set forth in the fee schedule.

[6] Appellees suggest that a correspondent relationship is an adequate substitute.  That is wrong.  First, Fed approval is required to obtain a direct correspondent relationship.  Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular No. 1: Account Relationships* § 2.7 (eff. Sept. 1, 2023), http://tinyurl.com/ecftjvuu.  Second, Custodia proved that accessing the payment system via indirect correspondent relationships is unstable and cost-prohibitive.  Amid significant federal regulatory pressure on its partner banks during its two years of operating, Custodia has been debanked multiple times by no fault of its own.  Operating without a master account has cost Custodia more than $8 million and counting (plus significant lost business)—a crushing sum for a small bank.  *Hearing Before the Wyoming Select Committee on Blockchain, Financial Technology and Digital Innovation Technology* (May 21, 2024), https://tinyurl.com/s7ebvf22 (statement of Caitlin Long).  *See* Custodia Opening Br. 13–14 n.10.  Third, not all services covered by the MCA are available with a correspondent relationship.

through depriving state-chartered institutions a master account in effect grants Reserve Banks veto power over a state's chartering decision. Congress would not have granted Reserve Banks sweeping authority to disembowel state charters simply by omitting "all" from Section 248a(c)(2). The Supreme Court has long "require[d] Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power[.]" *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020).

*Fourth*, the Board's claim to agency power cannot be squared with Congress's rationale for the MCA. The Board argues that any reading other than a grant of agency power would yield a "bizarre result" that the MCA's mandate applies to nonmember depository institutions and not member institutions. Board Br. 25. The history underlying the MCA explains precisely why Congress's mandate focused on nonmember depository institutions. The MCA was designed to combat the Fed's long history of discriminating against nonmember depository institutions. Kuprianov, *The Monetary Control Act*, at 23. *See also* Custodia Br. at 7–8 (discussing origins of the MCA). There was no problem of the Fed denying access to member depository institutions, so there was no need to issue a mandate as to members.

### C.    The title of Section 248a does not enable the Board to circumvent the MCA

The Board points to a title and introductory language in Section 248a to argue that "the statute does not contain any commands directed to Reserve Banks." Board Br. 33. Under its theory, by assigning the Reserve Banks the task of denying master accounts, the Board can circumvent the MCA's mandate. This reasoning is doubly flawed.

Congress wrote the operative mandate in passive voice: "[a]ll [covered] Federal Reserve bank services . . . *shall be available*" <u>and</u> such services "*shall be priced* at the same fee schedule . . .*" 12 U.S.C. § 248a(c)(2) (emphasis added). This framing stands in contrast to the Board's favored section, 248a(a), which states, "*the Board shall* publish . . . a proposed schedule of fees." Board Br. 33. Unlike Section 248a(a), Section 248a(c)(2) is not specifically directed to the Board. Congress could have directed Section 248a(c)(2) to the Board stating, "*the Board* shall make the services available" or "*the Board* shall price the services . . ." as it did in Section 248a(a). Instead, by choosing passive voice in Section 248a(c)(2), Congress sought to assure availability and pricing no matter which Fed entity decided eligibility or set the pricing schedule.

The general placement of the provision in a subchapter entitled "Board of Governors of the Federal Reserve System," moreover, should not be read as

12

a roadmap for the Board to avoid Section 248a(c)(2)'s plain language by outsourcing denial of services to Reserve Banks. Board Br. 33–34.

### D.    Section 342 does not supersede the MCA's mandate

Appellees argue that, because Section 342 confers discretion on Reserve Banks to receive certain deposits, Reserve Banks must have discretion to deny access to any service covered by the MCA. Not so. Section 342 is not about master accounts and, in any event, was amended by the MCA.

The MCA and Section 342 address different things. The MCA sets forth a list of services for moving money, addressing who has access to those services through master accounts and on what terms. Section 342, by contrast, addresses deposits: the form of money stored in an account (lawful money, checks, notes, etc.). *See* 12 U.S.C. § 342 ("Any Federal reserve bank may receive from any of its member banks, or other depository institutions . . . deposits of current funds in lawful money, national-bank notes, Federal reserve notes . . . ."). This provision says nothing about who has access to an account in the first instance. Whereas the Section 248a services are about *moving* money, Section 342 is about *storing* money.

Nor does Section 342 encompass the universe of services under the MCA. Whereas Section 342 provides discretionary authority to receive certain instruments as deposits, Section 248a addresses a large array of payment services—including: (i) currency and coin services, (ii) wire transfer services,

(iii) automatic clearinghouse services, (iv) settlement services, and (v) any new payment mechanisms—that are separate and apart from the form of deposits. *See* Congressional Br. 2 & n.2.  Under Appellees' reasoning, however, Reserve Banks can deny access to all services covered by the MCA (all contingent on a master account)—including those not covered by Section 342—simply because Section 342 permits Reserve Banks to receive certain instruments as deposits. Reserve Banks' limited authority over a subset of services pertaining to storing (but not moving) money is not a master key to regulatory override of the MCA.

Appellees' reliance on *Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923), is misplaced.  *See* Board Br. 41–42.  *Farmers*, which predated the MCA by nearly half a century, addressed discretion over the types of monetary instruments Reserve Banks may accept. 262 U.S. at 655, 662.  As Judge Bachrach explained, the fact that Reserve Banks need not accept every method of deposit says nothing of whether they have discretion to deny all services to eligible applicants.  *Fourth Corner*, 861 F.3d at 1074.

Even if Section 342 could be read to confer discretion over the services covered by the MCA—it cannot—the MCA governs.  Section 342 dates to 1913. *See* Congressional Br. 3.  Congress passed the MCA 67 years later in 1980. Had Section 342 entrusted Reserve Banks with discretion to deny access to the

services listed in the MCA—it did not—Congress rescinded any discretion in the MCA.

Moreover, the Board's approach to Section 342 is incongruous with the MCA's reserve requirement. Section 461 requires "each depository institution" to "maintain reserves against its transaction accounts" for purposes of "implementing monetary policy." 12 U.S.C. § 461(b)(2)(A); *see also* Congressional Br. 9–10. If Congress requires depository institutions to maintain reserves in an account with a Reserve Bank, it is difficult to imagine that Congress also envisioned letting Reserve Banks foreclose access to the very master account needed to hold those required reserves. Understanding Section 342's discretion to apply to the form of deposits, rather than reading into Section 342 an overarching power over master accounts, aligns with Section 461's reserve requirement.

### E. The Toomey Amendment neither confirms old power nor creates new power to circumvent the MCA's mandate

Nothing in the Toomey Amendment supports Appellees' argument. As the plain text and Senator Toomey both make clear, *see* Toomey Br., this amendment neither confirms old power nor creates new power. It states, "the Board shall create and maintain a public, online, and searchable database that contains . . . a list of every entity that submits an access request for a reserve bank master account and services," including whether the request was

15

"approved, rejected, pending, or withdrawn." 12 U.S.C. § 248c(b)(1)(B)(ii). This plain text merely calls for reporting applications that were rejected. It says nothing of authority to reject or rationale for the rejection.

As Senator Toomey and members of the Banking Committee explain, the Toomey Amendment was enacted as a transparency measure after the Board and FRBKC ignored attempts at oversight by the Senate Banking Committee about questionable Fed activity surrounding master accounts. Toomey Br. 7–9; Congressional Br. 21. Nothing in Congress's oversight effort suggests Congress sought to accord or authorize Fed discretion over master accounts such that Reserve Banks could effectively veto a state charter. *See Canup v. Chipman-Union, Inc.*, 123 F.3d 1440, 1443 (11th Cir. 1997) ("Congress" would "speak more clearly if it intended such a radical change in the application . . . of its . . . statutes."); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress" does not "hide elephants in mouseholes").

### F. The Board's effort to circumvent the MCA's mandate by outsourcing master account decisions to Reserve Banks raises serious constitutional questions

The Board tells this Court it "need not and should not reach any constitutional issues." Board Br. 59. Custodia agrees. Principles of constitutional avoidance require rejecting Appellees' reading of the MCA.

If Appellees are correct that they have sweeping discretion to deny master account applications to eligible institutions, the Board's outsourcing

16

discretion to Reserve Banks raises serious constitutional questions.  As Amici explain, if the Board can design accounts that gatekeep the MCA's covered services then grant an unaccountable, privately-owned agency appendage power to foreclose access to those accounts and associated services, such gymnastics would violate the Constitution's Appointments Clause.  *See* Clement Br. 15–21.  Under the Board's framing, Reserve Banks have "significant authority" to suffocate state-chartered banks by denying them access to the payment system.  Such power to effectively veto a state banking charter by blocking its access to a public good vital to banking is not the role of a "lesser function[ary]." *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976).  Nor is it consistent with due process principles for economically self-interested Reserve Banks—controlled by competitors of entities seeking master accounts—to decide master account applications.  Custodia Opening Br. 55–57.

Appellees' reading of the MCA creates significant constitutional problems.  Custodia's reading does not.  Fundamental principles of constitutional avoidance, therefore, caution against the district court's unconstitutional interpretation of the MCA.[7] *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005).

---

[7] Appellees' waiver argument confuses constitutional avoidance with causes of action.  Board Br. 59–62; FRBKC Br. 55–56.  Custodia's appeal does

## II. Appellees' policy arguments underscore the wisdom of Congress's decision to constrain federal agency power in the dual banking system

Although the legal issue in this case is statutory interpretation, FRBKC dedicates most of its brief to inaccurate policy arguments. Appellees are wrong about Custodia's position: Custodia's argument would not entitle any depository institution to "unfettered, unconditional use of Reserve Bank services." FRBKC Br. 3. They are wrong about risk: the Fed has a plethora of risk-mitigation tools. And their misrepresentations about Custodia's business model demonstrate the dangers of consolidating power over banking in an unaccountable federal agency.

Fed Chair Alan Greenspan described one of the many benefits of the dual-banking system: it "not only fosters and preserves innovation but also constitutes our main protection against overly zealous and rigid federal regulation and supervision." Remarks by Fed Chairman Alan Greenspan (May 3, 1997), https://tinyurl.com/4r3kevnz. This case is a perfect illustration.

### A. Appellees' strawman concerns about Custodia's business at best reveal ignorance and at worst are disingenuous

When Custodia first applied for a master account, FRBKC was not only supportive, but provided positive feedback on Custodia's business model. It

---

not pursue relief under the Appointments Clause or the Due Process Clause. Instead, Custodia highlights the serious constitutional questions that arise from Appellees' approach.

called Custodia's management experience "impressive" and "extensive." JA1516–17. Custodia's risk management was "strong." Custodia presented "relatively low" "liquidity risk," and had "adequate" capital. *See* JA1516–17 (collecting sources). Then, when federal "emerging crypto policy" shifted, FRBKC Br. 41, federal regulators began "coordinated efforts to 'debank' the digital asset industry." Verrilli Br. 4–6 (detailing anti-digital-asset efforts); FRBKC Br. 41 (citing same Joint Statement highlighted in Verrilli amicus brief).

It was only after federal banking regulators began a "campaign to isolate the digital asset industry from the greater national economy," Verrilli Br. 6, that FRBKC changed its tune to conform to the Board's politically-determined outcome. Its view that Custodia's management experience was "impressive" and "extensive" suddenly shifted to "lack[ing.]"[8] JA1517. Its description of

---

[8] Custodia is one of a tiny handful of woman-owned banks in the United States, merely 0.4% of the industry. *See* Office of the Comptroller of the Currency, *OCC-Supervised Minority Depository Institutions*, https://tinyurl.com/4czc7t8u (last accessed Sept. 16, 2024). Custodia's CEO was a highly decorated officer of two Fed-regulated banks. *See* Penny Crosman, *American Banker Honors Six Top Innovators and Female Fintech Leaders,* Am. Banker (June 21, 2023) (naming Custodia's CEO Caitlin Long one of the banking industry's top three innovators of the year). Invoking lack of "experience" as an excuse to foreclose opportunity is all too familiar to women in male-dominated industries. *See, e.g.*, Herminia Ibarra, *et al.*, *Women Rising: The Unseen Barriers*, Harv. Bus. Rev. (Sept. 2013), https://hbr.org/2013/09/women-rising-the-unseen-barriers (describing claim that executives "just can't find women with the right skill set and experience"

Custodia's risk management as "strong" became "insufficient." JA1516. Its conclusion that Custodia's "liquidity risk is relatively low" turned into insufficient "liquidity risk management practices." JA1516. And FRBKC's original conclusion that Custodia had "sufficient capital" shifted to "lack[ing] . . . a robust capital requirement framework." JA1517. Custodia's business did not change; the political winds shifted, and the weight of the federal regulatory infrastructure was deployed to crush a small Wyoming bank. It is this "overly zealous . . . federal regulation and supervision" that the dual-banking system was designed to counteract. *See* Remarks by Chairman Greenspan.

Appellees' and Amici's framing of Custodia as "totally unregulated" is false. Board Br. 47. Wyoming drafted a 772-page examination manual for SPDIs in consultation with Appellees. Wyo. Div. of Banking, SPDI Examination Manuals (2021), https://tinyurl.com/2tw2ptz8. This is more detailed guidance than any provided by federal banking agencies on digital assets and provides greater protection for consumers than other regulatory regimes in the United States. *See, e.g.*, Adam J. Levitin, *Not Your Keys, Not Your Coins, Unpriced Credit Risk in Cryptocurrency*, 101 Tex. L. Rev. 877, 884 (2023) ("New York and Wyoming have special cryptocurrency-specific

---

as an example of implicit, "second generation bias" that holds back women in corporate settings).

regulatory regimes, but only Wyoming's little-used regime offers any real protection for exchange customers.") (footnote omitted).

Custodia is and has always been subject to robust regulation by the Wyoming Division of Banking (WDB), which FRBKC President Esther George noted earned her respect. *See* JA1741 ("I personally thought [the WDB] took a thoughtful approach to developing the framework"). For example, to comply with Wyoming law, Wyo. Stat. Ann. § 13-12-106(a), Custodia maintains a full reserve business model wherein Custodia holds $1.08 in cash for every $1.00 of deposits. This means that if all customers simultaneously withdrew their deposits, Custodia would have enough cash on hand to cover all withdrawals. *Id.* § 13-12-105(a). By law, Custodia makes no loans using customer deposits. *Id.* § 13-12-103(c). Contrary to Amici's allegation, Wyoming law subjects SPDIs to all federal anti-money laundering laws. *Id.* § 13-12-107. Since Custodia earned its SPDI charter, the WDB has examined Custodia multiple times and Custodia remains in good standing with its regulator. *Hearing Before the Wyoming Select Committee on Blockchain, Financial Technology and Digital Innovation Technology* (Sept. 17, 2024) (statement of Caitlin Long) ("September 2024 Testimony"), https://tinyurl.com/4wcchaxp.[9] Custodia's

---

[9] Consistent with state banking practices, the Division's supervisory examination manual incorporates and builds upon federal regulations and was written by the WDB in consultation with FRBKC. It expressly follows "existing bank supervisory manuals from the Federal Financial Institutions

multi-year, safe operating history counters Appellees' hyperbole that Custodia is so risky that it threatens financial system stability.[10]

FRBKC's repeated suggestions that Custodia "has no chief compliance officer," FRBKC Br. 38, 45, are also false. As required by Wyoming law, Custodia always has maintained a compliance officer. *See* Wyo. Rules & Regs 021.0002.20 § 8 (a)(iii). That Appellees ignore state banking laws lays bare their anti-state bias. Far from attempting to avoid federal supervision, Custodia sought federal oversight by applying for FDIC insurance and applying to become a member bank. *See* Custodia Opening Br. 15–16, 18 n.13, 20–21. The Fed has reviewed every Custodia-originated payment and knows Custodia has a clean compliance record. *See* September 2024 Testimony.

## B.    Appellees have a plethora of risk-mitigation tools

A master account does not confer "unfettered" access to the federal payment system and it is not available to just anyone. A master account holder must be legally eligible, *see* Custodia Br. 29 n.16 (summarizing eligibility

---

Examination Council, Federal Reserve Board, and Office of the Comptroller of the Currency." Wyo. Div. of Banking, SPDI Examination Manuals (2021).

[10] Appellees' actions reveal that their fearmongering about risk is a *litigation position*, because the Fed has let a large, systemically-important bank enter the very business it deemed too risky when Custodia applied. SEC, *Remarks Before the 2024 AICPA & CIMA Conference on Banks & Savings Institutions: Accounting for Crypto-Asset Safeguarding Obligations—A Facts-Based Analysis* (Sept. 9, 2024) (statement of Paul Munter, Chief Accountant), https://www.sec.gov/newsroom/speeches-statements/munter-speech-safeguarding-crypto-assets-09-09-24.

criteria), and must comply with all applicable federal laws (including anti-money laundering laws). Appellees' briefs mislead by ignoring the numerous risk-mitigation mechanisms already available to the Fed.

*First*, the MCA itself expressly confers methods to address risk. Section 248a(c)(2) states, "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks." These existing tools are described in the Policy on Payment System Risk. *See generally* Federal Reserve, *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* (July 20, 2023), https://www.federalreserve.gov/paymentsystems/files/psr_guide.pdf (last accessed Sept. 16, 2024). For example, the Fed can:

- Require depository institutions to maintain an extra balance in their account to offset any losses and for items in transit.

- Require depository institutions to maintain a "net debit cap" of zero so that the account acts like a consumer debit card, and if the account hits a zero balance, transactions will be rejected.

- Limit the amount of money depository institutions can hold in their accounts.

- Require depository institutions to preposition any funds to be transferred (instead of allowing their accounts to go into overdraft).

- Prohibit depository institutions from accessing the discount window.

Custodia voluntarily proposed that FRBKC apply such risk-mitigation measures, which were rejected without reason. SJA1021.

*Second*, the MCA does not prohibit the Fed from limiting access to services not included in the list of covered services in Section 248a(b).  Covered services under Section 248a(b) include check clearing, wire transfer, automated clearinghouse, settlement, securities safekeeping, and Federal Reserve float.  *See* Verrilli Br.19–21 (describing covered services).  But the Fed can limit access to the numerous services not covered by the MCA; for example, by limiting access to the Fed's discount window or other lender of last resort facilities.

*Third*, Reserve Banks can decline certain deposits.  It is precisely this distinction between deposits and access to master account (moving versus storing money) that proves fatal to Appellees' reliance on Section 342.  *See* Section I(D), *supra*.

*Fourth* (and critically), Appellees' framing of the purported necessity for a *federal* regulator ignores *states'* crucial role in the dual-banking system.  Appellees repeatedly refer to Custodia as lacking a "federal prudential supervisor"—FRBKC Br. 2, 15, 21, 33, 53 (using term "federal supervisor" or "federal prudential supervisor" a dozen times)—as if to suggest that Custodia is unregulated.[11]  That suggestion is false and contravenes the Supreme

---

[11] Amici supporting Appellees likewise ignore state regulation.  *See* Fed. Rsrv. Banks Br. 4–15; Bank Pol'y Inst. Br. 8–17; Indep. Cmty. Bankers of Am. Br. 15–20.

Court's recent reminder that "[t]he United States maintains a dual system of banking, made up of parallel federal and state banking systems" which "co-exist and compete." *Cantero v. Bank of Am., N. A.*, 144 S. Ct. 1290, 1294–95 (2024).

The WDB's regulation of Custodia includes: (1) gatekeeping at the chartering and licensing stages; (2) performing examinations to evaluate safety and soundness, identify risks, assess adequacy of corporate governance, and ascertain compliance with state and federal laws and regulations (including consumer and anti-money laundering regulations); and (3) exercising enforcement authority. Custodia's oversight by a state supervisor as opposed to a "federal supervisor" is inherent in the dual-banking system. *See* Clement Br. 8–15; Wyo. Sec'y of State Br. 12–14.

## C.   Regulatory litigation is not an alternative to congressional policymaking

Far from discounting the role of states in chartering and regulating banks, Congress has continually reaffirmed the dual-banking system. *In re S. Indus. Banking Corp.*, 872 F.2d 1257, 1260 (6th Cir. 1989) (describing "Congress' longstanding concern for maintaining a dual banking system in the United States"). This system has facilitated important financial innovation, such as "adjustable rate mortgages, home equity loans, and interstate banking." Esther L. George, President & CEO, Federal Reserve Bank of

Kansas City, *Perspectives on 150 Years of Dual Banking*, Speech to the Conference of State Bank Supervisors, at 5 (May 22, 2012), https://www.kansascityfed.org/documents/2644/speeches-2012-george-ga-csbs-05-22.pdf. "[S]tates will often react to social and economic problems more immediately and responsively than the federal government." Baher Azmy, *Squaring the Predatory Lending Circle: A Case for States as Laboratories of Experimentation*, 57 Fla. L. Rev. 295, 394 (2005).

The Board claims "the growth of novel charters" required the Board to undertake risk-mitigation (i.e., veto) measures, Board Br. 27. There is nothing "novel" about states creating new bank types. State-owned banks were "novel" when the Bank of North Dakota was created in 1919; New York's unique "private banker" charter dates back to 1931; and territorial banks arose in 2016. Joyetter Feagaimaalii-Luamanu, *Territorial Bank of American Samoa Opens Its Doors*, Pacific Island Rep. (Oct. 4, 2015), https://web.archive.org/web/20210819210759/http://www.pireport.org/articles/2016/10/04/territorial-bank-american-samoa-opens-its-doors; *see also* Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 489 & n.320 (2023). All these banks hold master accounts despite their "novel" charters without federal supervisors or FDIC insurance. Nor are banks without FDIC insurance "novel." Connecticut, Maine, and Vermont all enacted non-FDIC insured bank charters in the late 1990s. *See* Financial

Institutions—Banks—Loans And Credit, 1999 Conn. Legis. Serv. P.A. 99-158 (H.B. 6817) (codified at Conn. Gen. Stat. Ann. § 36a-70 (2024)); Financial Institutions—Bank Charter, 1997 Me. Legis. Serv. 1st Sp. Sess. Ch. 398 (H.P. 1319) (L.D. 1869) (codified at Me. Rev. Stat. Ann. tit. 9-B, § 1231 (2023)); Banks and Banking—Modernization of Provisions, 2000 Vermont Laws P.A. 153 (H. 374) (1999) (codified at Vt. Stat. Ann. tit. 8, § 12604 (2012)). The Fed's argument that only federal supervision can prevent financial risk is wrong, and at the very least cannot override the dual-banking system or the plain text of the MCA.[12]

For its part, FRBKC invokes policy risk it perceives with the digital asset industry. If FRBKC's parade of horribles is correct—it is not—those arguments are properly raised before Congress, not before this Court. With superficial edits, FRBKC could reformat its brief into a policy petition to Congress.

If Congress thinks states will abuse the dual-banking system, *see* Board Br. 47, it is the role of Congress to—not a mere agency—to amend the MCA.

---

[12] Appellees' focus on FDIC insurance is misplaced. As Wyoming explained, Custodia is required to be fully reserved (versus 8–12% reserved for most banks), and Custodia does not make loans with customer deposits. Wyo. Br. 3–4; Wyo. Sec'y of State Br. 15–16. In fact, Custodia has voluntarily committed to a reserve of 108%. JA529–30, 1386, 2066. FDIC insurance, therefore, adds little to the safety of Custodia's business model.

An agency's policy convictions, however strong, cannot justify an expansion of agency power beyond the plain text of the operative statute.  The Supreme Court, this past term, made crystal clear that a federal agency cannot rewrite a statute. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440 (2024); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

## III. Custodia is entitled to a master account under both mandamus and the APA

The parties agree that Custodia is entitled to a master account if its interpretation of the MCA is correct.  As FRBKC concedes, "[i]f the final decision in this lawsuit is that Custodia is entitled to a master account, then Custodia will get a master account."  FRBKC Br. 55–56.

The Board, for its part, continues to contest application of the APA, arguing that no final agency action occurred.  Because the Board is wrong that "Congress vested decision-making authority over master accounts directly in Reserve Banks," *see* Section I(D), *supra*, it is also wrong that the decision necessarily fell with FRBKC and that (i) the Board's Approval Email was not a final agency action, Board Br. 56; and (ii) mandamus relief is unavailable as to the Board, *id.* 58.  And, even if the Board were correct that it can outsource decision-making authority over the MCA's covered services to the Reserve Banks, the parties' dispute over whether the Board was in fact the real

decisionmaker[13] is a factual question properly resolved by a factfinder at trial, not at summary judgment.

*　　*　　*

"Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  Appellees ask this Court to judicially expand the MCA to consolidate power over the banking industry in the federal government.  This Court should return the healthy balance that Congress set in the dual-banking system and reverse the decision below.

## CONCLUSION

The decision below should be reversed.

---

[13] Abundant record evidence demonstrates that the Board was actually the decisionmaker and FRBKC executed its wishes.  JA2069–75 (collecting record evidence).

Respectfully submitted,

JENNER & BLOCK, LLP

Dated: September 18, 2024

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

By: */s/ Michelle S. Kallen*

Michelle S. Kallen
Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Avenue NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

*Counsel for Appellant*

30

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 6,490 words. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)–(6) and 10th Cir. R. 32(A), because it was prepared in a proportionally spaced typeface using Microsoft Word in Century font size 13.

/s/ *Michelle S. Kallen*
Michelle S. Kallen

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2024, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Michelle S. Kallen*
Michelle S. Kallen

<u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that (1) all required privacy redactions have been made; (2) any paper copies of this document submitted to the Court are exact copies of the version electronically filed; and (3) the electronic submission was scanned for viruses using the latest version of a commercial virus scanning program, and according to that program, this document is virus free.

<u>/s/ *Michelle S. Kallen*    </u>
Michelle S. Kallen