# KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006

Tel: +1 202 737 0500
Fax: +1 202 626 3737
kslaw.com

Jeffrey S. Bucholtz
Direct Dial: +1 202 626 2907
jbucholtz@kslaw.com

January 14, 2025

**VIA CM/ECF**

Christopher M. Wolpert
Clerk of Court
United States Court of Appeals for the Tenth Circuit
The Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257

> Re:  ***Custodia Bank v. Federal Reserve Board of Governors, et al.,***
> **No. 24-8024 (to be argued Jan. 21, 2025)**

Dear Mr. Wolpert,

Appellees submit this Rule 28(j) letter to notify the Court of a new decision regarding the statutory interpretation issue on which this appeal turns.

Last week, the District Court for the Southern District of New York granted motions to dismiss filed by defendants the Board of Governors and the Federal Reserve Bank of New York ("FRBNY") in *Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York (BSJI II)*, No. 1:23-cv-06414 (S.D.N.Y. Jan. 8, 2025) (attached). Appellees' briefs cited a previous decision denying Banco San Juan Internacional ("BSJI")'s motion for preliminary injunction. *See* Board Br. (Dkt.104) 34, 42-43; FRBKC Br. (Dkt.105) 11-12, 46-47; *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank (BSJI I)*, 700 F. Supp. 3d 86 (S.D.N.Y. 2023).

BSJI alleged that FRBNY wrongfully terminated its master account after determining that BSJI's account posed undue risk related to Bank Secrecy Act and anti-money laundering concerns. Slip Op. 1, 7-15. BSJI advanced the same absolute-

January 14, 2025
Page 2

entitlement theory as Custodia based on 12 U.S.C. § 248a. *Id.* at 20 ("BSJI contends that the Federal Reserve Act provides BSJI with an unqualified statutory right to have a master account."). Like the district court here, the *BSJI* court rejected that "faulty premise." *Id.* The court carefully analyzed the Federal Reserve Act and held that Reserve Banks have discretion over master accounts:

> Section 248a prevents price discrimination once the regional Federal Reserve bank grants a master account to a nonmember. *See* 12 U.S.C. §§ 248a(c)(2), 342 … . But section 248a does not command Federal Reserve banks 'to provide specific services to nonmembers.' *BSJI I*, 700 F. Supp. 3d at 100. Rather, Federal Reserve banks have the discretion to provide, or not to provide, Federal Reserve bank services to any depository institution. 12 U.S.C. § 342.

Slip Op. 29. The *BSJI* court emphasized that the absolute-entitlement theory is untenable: "No [Federal Reserve Act] provision instructs Federal Reserve Banks to provide *all* available services to *all* depository institutions while ignoring *any and all* risk factors pertaining to individual applicants for such services." *Id.* at 24.

Respectfully submitted,

*/s/Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Defendant-Appellee*
*Federal Reserve Bank of Kansas City*

*/s/ Joshua P. Chadwick*
Joshua P. Chadwick

*Counsel for Defendant-Appellee*
*Board of Governors of the Federal*
*Reserve System*

Cc: All counsel of record (via CM/ECF)

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the length limitations set forth in Fed. R. App. P. 28(j) because it contains 342 words, as counted by Microsoft Word, excluding the items that may be excluded.

*/s/ Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Defendant-Appellee*
*Federal Reserve Bank of Kansas City*

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

BANCO SAN JUAN INTERNACIONAL, INC.,

                    Plaintiff,              23-cv-6414 (JGK)

        - against -                         OPINION AND ORDER

THE FEDERAL RESERVE BANK OF NEW
YORK, ET AL.,

                    Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

    The plaintiff, Banco San Juan Internacional, Inc. ("BSJI"),
a Puerto Rico International Banking Entity, brought this action
against the defendants, the Federal Reserve Bank of New York
("FRBNY") and the Board of Governors of the Federal Reserve
System ("Board"), alleging that the defendants wrongfully
terminated BSJI's master account with the FRBNY (the "Master
Account").

    Alleging that this account closure violated various federal
laws, BSJI seeks relief against the FRBNY and the Board pursuant
to the Administrative Procedure Act ("APA"), the Mandamus Act,
the Declaratory Judgment Act ("DJA"), and the Due Process Clause
of the Fifth Amendment. In addition, BSJI alleges that the FRBNY
breached a contractual duty of care and an implied covenant of
good faith and fair dealing when the FRBNY terminated BSJI's
Master Account.

Central to this dispute, the parties adopt differing interpretations of the Federal Reserve Act ("FRA"). BSJI argues that it has a right to a master account pursuant to 12 U.S.C. § 248a. The defendants disagree and contend that pursuant to 12 U.S.C. § 342, the FRBNY "may" grant a master account to a depository institution but is not required to do so.

Both the FRBNY and the Board now move to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Because the defendants' interpretation of the FRA is correct, and for the additional reasons explained below, BSJI's claims are **dismissed without prejudice.**

## I. Factual Background

Unless otherwise noted, the following facts are taken from the Amended Complaint ("AC"), ECF No. 124, and are accepted as true for purposes of the present motions to dismiss.

### A. The Parties

The Federal Reserve System was established in 1913 by the Federal Reserve Act, codified at 12 U.S.C. §§ 221 et seq. The system consists of the Board, the Federal Open Market Committee ("FOMC"), and twelve regional Federal Reserve banks. § 222. The regional Federal Reserve banks serve financial institutions in their respective districts. Id.

### 1. The FRBNY

Federal Reserve banks, including the FRBNY, are federal instrumentalities incorporated as private corporations pursuant to the FRA. 12 U.S.C. §§ 221 & 341; United States ex rel. Kraus v. Wells Fargo & Co., 943 F.3d 588, 592 (2d. Cir. 2019) ("Kraus").[1] Congress has authorized the Federal Reserve banks to carry out certain banking functions. §§ 341-61. In relevant part, Congress vested in the Federal Reserve banks the authority to accept or reject deposits from depository institutions. § 342. Section 342 of the FRA provides that "[a]ny Federal Reserve bank may receive from any of its member banks, or other depository institutions . . . deposits of current funds in lawful money . . . ." Id.

Federal Reserve banks maintain such deposits in accounts called "master accounts" held in the name of the depository institutions. AC ¶ 2. As deposit accounts, master accounts are governed by 12 U.S.C. § 342. A master account grants the account holder direct access to Federal Reserve bank services. See AC ¶ 2; Fed. Res. Banks, Operating Circular No. 7, Fedwire® Securities Serv. ¶ 5.1 (eff. May 1, 2024) ("OC 7"). Depository institutions without master accounts may access such services by setting up "a Correspondent – Respondent relationship" with a

---

[1] Unless otherwise noted, this Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

correspondent bank that has a master account. Brennan Decl., Ex. B at 6–8, ECF No. 132-2 ("Operating Circular 1" or "OC 1").[2] All master account holders pay fees for Federal Reserve bank services pursuant to the same fee schedule. See 12 U.S.C. § 248a; OC 7 ¶ 13.0.

Federal Reserve banks issue Operating Circulars that govern the relationship between a Federal Reserve bank and a master account holder. See, e.g., OC 1; OC 7. Pursuant to the terms of Operating Circular 1, account holders create a master account by executing a master account agreement ("MAA") with their regional Federal Reserve bank. OC 1; Brennan Decl., Ex. A, ECF No. 132-1 (BSJI's MAA). By incorporating "the provisions of Operating Circular 1" and related documents, the MAA sets the terms under which a depository institution can access, and the Federal Reserve bank can operate, the depository institution's master account. Brennan Decl., Ex. A. These terms include the Federal Reserve bank's right to terminate a master account "at any time." OC 1 at 7.

In addition to the terms set forth in Operating Circular 1, a subset of high-risk account holders, including BSJI, agree to enhanced risk-mitigation provisions. Brennan Decl., Ex. C, ECF No. 132-3. For example, BSJI agreed that "to limit the Risks

---

[2] Throughout this Opinion and Order, exhibit page numbers accompanied by a star (*) refer to ECF-generated page numbers, and exhibit page numbers unaccompanied by a star refer to the page numbers on the original documents.

the Customer poses to [FRBNY], [FRBNY] may suspend or terminate
the Customer's access to one or more Financial Services [or]
close the Customer's Master Account . . . at any time by giving
written notice to the Customer." Id. at 10. Risk, in this
context, "means the existence of, or the possibility of,
financial, legal, compliance, operational, reputational, or
other harm to the Bank . . . posed by the Customer." Id. at 2.

### 2. The Board

In contrast to the powers vested in the Federal Reserve
banks, the Board lacks the authority to provide banking
services. See, e.g., 12 U.S.C. §§ 342, 343, 347, 347c, 347d,
355(1). Instead, the Board provides guidance to and generally
oversees Federal Reserve bank activities, including with respect
to master accounts. § 248(j). However, in providing such
guidance, the Board is not authorized to open or terminate a
master account and does not handle the administration of any
institution's master account. See §§ 248(j), 342. Rather, the
Board sets forth principles to guide "the level of due diligence
and scrutiny to be applied by reserve banks to different types
of institutions." 87 Fed. Reg. 51109.

In August 2022, after notice and comment, the Board
published Guidelines for Evaluating Account and Service Requests
("Guidelines") that involve any of six categories of risk. 87
Fed. Reg. 51099. The Board issued the Guidelines based on its

general authority to supervise the operations of the Federal Reserve banks. See 12 U.S.C. § 248(j). The Guidelines subject institutions that are not federally insured and operate outside the scope of the federal banking agencies' supervisory framework to the strictest level of review. 87 Fed. Reg 51110. Principle 5 of the Guidelines specifically directs that a Federal Reserve bank's "provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism, financing, fraud, cybercrimes, economic and trade sanctions violations, or other illicit activity." 87 Fed. Reg. 51109.

### 3. BSJI

Puerto Rican law provides for the establishment of International Banking Entities ("IBEs"), Act No. 52 of 1989, and International Financial Entities ("IFEs"), Act No. 273 of 2012. BSJI is an IBE founded in 2011, AC ¶¶ 1, 20, 26, that opened its Master Account with the FRBNY in April 2012, Brennan Decl., Ex. F at 1-2, ECF No. 134-6. BSJI offers traditional banking products and services as well as structured financial solutions and products, with the aim of attracting United States and foreign investors to Puerto Rico. AC ¶¶ 20, 26.[3]

---

[3] On December 12, 2024, counsel for BSJI represented that as of that date, BSJI had ten open accounts with $20,000 in total assets. Transcript 15, ECF No. 148.

BSJI does not have federal deposit insurance or a prudential federal supervisor. Brennan Decl., Ex. F at 1–2. Rather, BSJI is licensed and regulated by the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF"). AC ¶ 20; see also id. ¶ 78. BSJI is therefore subject to the strictest level of review under the Board's Guidelines and must adhere to the FRBNY's Account and Financial Services Handbook (the "Handbook"). Brennan Decl., Ex. F at 1–2. For continued master account access, BSJI must demonstrate that it has implemented an effective compliance program through "the submission of independent consultants' assessment reports of BSJI's compliance program" that meet the Handbook's requirements. Id.

### B. The Dispute

#### 1. Master Account Suspension

In February 2019, the Federal Bureau of Investigation ("FBI") searched BSJI's offices and the Government subsequently seized over $53 million from BSJI and related accounts.[4] The Government then brought a civil forfeiture action against BSJI and further investigated BSJI's compliance with the Bank Secrecy

---

[4] U.S. Dep't of Just., Bank of San Juan Internacional, Inc. and the U.S. Att'y's Off. for the Dist. Of P.R. Resolve Pending Litig. and Related Matters (Feb. 11, 2020), https://www.justice.gov/usao-pr/pr/bank-san-juan-internacional-inc-and-us-attorney-s-office-district-puerto-rico-resolve ("USAO-PR Press Release").

Act ("BSA"). USAO-PR Press Release. Shortly thereafter, the FRBNY temporarily suspended BSJI's Master Account. AC ¶ 71.

Following the temporary suspension, in April 2019, BSJI retained a team at FTI Consultants ("FTI") to assess and improve BSJI's BSA and anti-money laundering ("AML") compliance programs. Id. ¶¶ 75, 78. In July 2019, the FRBNY informed BSJI that it would consider providing BSJI limited access to the FRBNY's services once BSJI convinced the FRBNY that no sanctioned or otherwise illicit transactions were, or would be, processed through BSJI's accounts at the FRBNY. Id. ¶ 82.

On February 11, 2020, the Government announced that BSJI had agreed to pay a fine and improve its AML policies. USAO-PR Press Release. Two days later, BSJI met with the FRBNY. Id. ¶ 87. At that meeting, the FRBNY told BSJI that the FRBNY intended to impose new master account-related obligations on all IBEs, allegedly observing that BSJI would be well-positioned to meet the new obligations because of BSJI's proactive steps. Id.

On March 16, 2020, BSJI and the FRBNY executed the "Supplemental Terms." The Supplemental Terms required enhanced risk-mitigation measures and reconfirmed the FRBNY's right to close BSJI's account. Brennan Decl., Ex. C at *11, *14. Specifically, BSJI agreed as follows:

> In addition to the Bank's rights under OC 1 and other operating circulars, to limit the Risks the Customer poses to the Bank, the Bank

> may suspend or terminate the Customer's access
> to one or more Financial Services, close the
> Customer's Master Account, impose conditions
> that must be satisfied before the Bank will
> process certain or all types of Financial
> Services transactions, or restrict or
> otherwise adopt risk-management measures with
> respect to Financial Services or the
> Customer's Master Account at any time by
> giving written notice to the Customer.

Id. at *11 (emphasis added).

On April 22, 2020, the FRBNY informed BSJI that the FRBNY would restore BSJI's access to the Master Account in a phased approach. Id. ¶ 88. Specifically, the FRBNY informed BSJI that the "FRBNY will consider providing BSJI with broader access to Federal Reserve financial services if FRBNY is satisfied that BSJI is in full compliance with the requirements of the Handbook." Id. BSJI started taking the requested steps, including by hiring two independent consulting firms, K2 and Chain Bridge Partners LLC. Id. ¶ 89.

On May 8, 2020, BSJI submitted the first set of documents required by the Handbook and the first phase of the FRBNY's account-restoration plan. Id. ¶ 90. Over the next seven months, BSJI also engaged AML RightSource ("RightSource"), a fourth independent consultant, to perform an independent audit review of BSJI's BSA, AML, and Office of Foreign Assets Control ("OFAC") compliance programs for the upcoming period from October 1, 2020 to September 30, 2021. Id.

9

By December 3, 2020, BSJI completed the phase-one
requirements imposed by the FRBNY's restoration plan. Id. ¶ 91.
Accordingly, the FRBNY restored BSJI's Master Account and
"unrestricted access to the Fedwire Securities Service"
effective December 14, 2020. Id. BSJI claims that by the end of
this account-suspension period lasting twenty-two months, BSJI
transformed its compliance programs and governance structure
into a "top-tier system beyond that of its immediate peer
group." Id. ¶¶ 92-93.

### 2. BSJI's Noncompliance

In 2021, as the COVID-19 pandemic continued, the FRBNY
provided K2 and BSJI with accommodations for several filing
deadlines. Id. ¶ 97. In June 2021, pursuant to the revised
deadlines, K2 produced to the FRBNY three BSA, AML, and OFAC
reports. Id.

The 2021 accomodated deadlines allegedly caused some
confusion at BSJI with respect to the filing deadline for the
next set of annual submissions. Id. ¶¶ 98-99. BSJI sought
clarification from the FRBNY; the FRBNY did not respond to two
emails. Id. ¶¶ 100-04.

On July 18, 2022, the FRBNY notified BSJI that BSJI had
breached the Supplemental Terms by failing to submit on time
three required assessments attesting to the effectiveness of its
compliance programs. Brennan Decl., Ex. D at *2, ECF No. 132-4.

10

The FRBNY explained, "Consistent with the [FRBNY's] practices of assessing, managing, and mitigating risk under the Handbook . . . we have concluded BSJI poses undue risk to the [FRBNY] due to, among other things, this noncompliance." Id. Accordingly, the FRBNY informed BSJI that it would close BSJI's Master Account in September 2022. AC ¶ 107.

BSJI responded on July 19, 2022, pointing out that it had twice requested guidance on the missed deadlines, and clarified that BSJI was preparing the required reports. Id. ¶ 109. On September 15, 2022, BSJI sent the FRBNY a letter enclosing two of BSJI's three past-due annual assessment reports and stating that the third would be submitted the following week. Brennan Decl., Ex. E at *2, ECF No. 132-5. On September 19, 2022, the FRBNY suspended closure, purportedly to review BSJI's past-due reports. Id. at *2–3; see also AC ¶ 115.

On January 25, 2023, BSJI sent two letters to the FRBNY describing its efforts at compliance and seeking a meeting. Id. ¶ 118. The FRBNY did not respond to either of BSJI's January 25, 2023 letters. Id.

### 3. S-2677 & Account Closure

Meanwhile, in January 2023, the Board issued "S-2677," a guidance memorandum directing the Federal Reserve banks to scrutinize heavily Tier 3 institutions like BSJI because such institutions inherently present "high risk." Id. ¶ 120. Around

the same time, the Reserve Bank Accounts and Services Function ("RBAS"), the FRBNY's "first line of defense," requested that the Compliance Function ("Compliance"), the FRBNY's "second line of defense," provide its views on the compliance risks posed by BSJI. Brennan Decl., Ex. F at 1, ECF No. 134-6.

On March 31, 2023, Compliance provided a thorough report on BSJI's compliance risks, including a review of BSJI's compliance reports and the observations by K2, BSJI's consultant. See id. In the report, Compliance noted that BSJI did not file any Suspicious Activity Reports on any transaction activity reviewed by K2, id. at 6, which was particularly concerning given: (1) the "large inflows from shell companies in high-risk jurisdictions, owned by related parties of BSJI's owners," id. at 12; (2) inconsistent documentation regarding large payments to various individuals, id. at 14-16; (3) missing account information, id.; and (4) BSJI's failure to provide an explanation for suspicious wire transfers, id. at 15.

Compliance ultimately determined that BSJI posed undue risk under Principle 5 of the Board's Guidelines and that this risk could not be effectively mitigated with additional controls. Id. at 16-17. After reviewing transactions among BSJI's owner's family members, id. at 12-17, BSJI's responses, id. at 11, and inconsistencies in reporting transactions, id. at 12, Compliance concluded as follows:

> Given the programmatic weaknesses in BSJI's
> compliance program, as evidenced by the
> serious and persistent issues identified in
> K2's reports, the significant number of red
> flags identified in BSJI's transaction
> activity, and the high concentration of
> suspicious transactions with parties related
> to BSJI, Compliance does not believe that
> additional controls would be an effective way
> of managing the undue risk posed by BSJI.

Id. at 16-17.

On April 6, 2023, the FRBNY informed the Board that it intended to close BSJI's Master Account and submitted two pre-decisional memoranda describing the FRBNY's reasons for the intended account closure. AC ¶ 155. On April 12, 2023, having reviewed the FRBNY's pre-decisional analyses of BSJI's existing access, the Board advised the FRBNY: "We have no concerns with the Reserve Bank's application of the Guidelines to BSJI's [access] and with it moving forward with its intended action to terminate BSJI's access based on this analysis." Brennan P.I. Decl., Ex. 20 at *2, ECF No. 52-20; see also AC ¶ 156. BSJI alleges that other entities, including BSJI's paid consultants, reached different conclusions with respect to BSJI. See AC ¶¶ 124-32.

On June 20, 2023, BSJI and the FRBNY held a conference call. Id. ¶ 140. During the call, the FRBNY provided an additional rationale for account closure: BSJI had processed transactions involving related-party shell companies in high-

risk jurisdictions. Id. A week later, on June 27, 2023, BSJI

responded by letter, stating that none of BSJI's accounts

involve shell companies, and that due to BSJI's enhanced due

diligence, BSJI knows and understands each of its customers'

businesses. Id.

On June 30, 2023, the FRBNY informed BSJI that the FRBNY

was moving forward with closing BSJI's Master Account on July

31, 2023. Id. ¶ 142. The FRBNY explained that it had reviewed

BSJI's June 27, 2023 letter as well as prior communications,

including the June 20, 2023 telephone call, but was unpersuaded.

Brennan Decl., Ex. H at *2–3, ECF No. 132-8. The FRBNY explained

that during the telephone call:

> [The FRBNY] provided a detailed explanation of
> our significant AML concerns related to BSJI's
> transaction    activity.    We    noted    our
> observations that much of BSJI's transaction
> activity consists of the rapid movement of
> funds on behalf of high-risk entities located
> in high-risk jurisdictions that are controlled
> by close relatives of BSJI's owner . . . .
> These transactions often lack a clear business
> purpose and in some instances are suggestive
> of layering. We further detailed during our
> call that . . . [BSJI's customers] engage in
> high-risk transaction typologies associated
> with illicit activity.

Id. The FRBNY told BSJI that the FRBNY would consider extending

the closure date if BSJI needed time to wind down its account

use, id. at *3, which would provide BSJI with an opportunity to

seek a correspondent commercial banking relationship to continue

14

operations. The FRBNY requested that BSJI make any such

extension request by July 6, 2023. Id. at *4.

### C. Procedural History

Instead of seeking an extension, BSJI brought this action

on July 25, 2023, six days before the scheduled account-closure

date. ECF No. 1. On October 24, 2023, this Court denied BSJI's

motion for a preliminary injunction. ECF No. 106. The Court

assumes familiarity with the October 24, 2023 Memorandum Opinion

& Order denying the plaintiff's request for a preliminary

injunction and the procedural history leading up to that

decision. See Banco San Juan Internacional, Inc. v. The Fed.

Reserve Bank of New York, 700 F. Supp. 3d 86 (2023) ("BSJI I"),

ECF No. 106.

On October 30, 2023, BSJI filed an interlocutory appeal,

ECF No. 107, which it later moved to withdraw. On February 12,

2024, the Second Circuit Court of Appeals granted BSJI leave to

withdraw the interlocutory appeal. ECF No. 115.

On February 29, 2024, BSJI filed the Amended Complaint, ECF

No. 121, which it corrected on March 7, 2024, ECF No. 124. The

defendants now move to dismiss the Amended Complaint for lack of

subject-matter jurisdiction pursuant to Rule 12(b)(1) and for

failure to state a claim pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure. ECF Nos. 130 & 135. On

December 12, 2024, the Court heard oral argument on the present motions. Transcript ("Tr."), ECF No. 148.

## II. Legal Standard

### A. Rule 12(b)(1)

To prevail against a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept as true the material factual allegations in the complaint. See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). However, the Court does not draw all reasonable inferences in the plaintiff's favor. Id. Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings to determine whether jurisdiction exists. See Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the Court is guided by that body of decisional law that has developed under Rule 56. See id.

### B. Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d

16

184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

To survive a motion to dismiss, the plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## C. BSJI I

In BSJI I, this Court concluded that BSJI had not demonstrated a likelihood of success on its claims. 700 F. Supp. 3d at 98–103. In so concluding, this Court rejected many of the same arguments that BSJI now raises in opposition to the defendants' motions to dismiss. Id.

The FRBNY argues that BSJI I provides sufficient justification to dismiss the Amended Complaint. FRBNY's Mem. of Law ("FRBNY Br.") 11, passim, ECF No. 131. But because initial rulings at the preliminary-injunction stage are tentative by their nature, courts "in most cases" decline to give binding effect to such rulings under the law-of-the-case doctrine. Cayuga Indian Nation of New York v. Seneca Cnty., 978 F.3d 829, 834 (2d Cir. 2020); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998). Preliminary-injunction rulings therefore do not "foreclose[] the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions." Goodheart Clothing Co. v. Laura Goodman Enters., Inc., 962 F.2d 268, 274 (2d Cir. 1992).

Because a district court's "legal conclusions . . . are subject to change after a full hearing and the opportunity for more mature deliberation," Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953), BSJI I is not binding under the law-of-the-case doctrine. Accordingly, for purposes of

the defendants' present motions to dismiss, the parties'
arguments are considered de novo under the legal standards
applicable at the pleadings stage. However, BSJI I is highly
persuasive authority. See Belbacha v. Bush, 520 F.3d 452, 458
(D.C. Cir. 2008). Decided on a substantially similar factual
record, BSJI I ruled on many issues of pure law with the benefit
of full briefing and oral argument. See Sherley v. Sebelius, 689
F.3d 776, 782 (D.C. Cir. 2012).

### III. BSJI's Claims

BSJI brings the following claims against the FRBNY and the
Board, seeking to have its Master Account and direct access to
Federal Reserve services restored.

In Counts I through IV, BSJI brings claims under federal
law against both the FRBNY and the Board. Count I challenges the
account-closure decision as allegedly unlawful final agency
action pursuant to the APA's judicial-review provisions,
codified at 5 U.S.C. §§ 701 et seq. AC ¶¶ 166-73. In particular,
BSJI alleges that section 248a of the FRA provides BSJI with an
unqualified right to a master account, and that in any event,
both defendants acted arbitrarily and capriciously in
terminating BSJI's Master Account. Id. Count II seeks to compel
the defendants, pursuant to the Mandamus Act, codified at 28
U.S.C. § 1361, "to reinstate BSJI's master account access and
Federal Reserve services." AC ¶¶ 174-81. Count III, brought

pursuant to the Declaratory Judgment Act ("DJA"), codified at 28
U.S.C. § 2201, seeks a declaration that the Master Account
closure violated BSJI's purported statutory right to a master
account. Id. ¶¶ 182-89. Count IV alleges that both defendants
violated the Due Process Clause of the Fifth Amendment to the
United States Constitution. Id. ¶¶ 190-93.

In Counts V and VI, BSJI brings claims under New York state
law against the FRBNY only. Count V alleges that by terminating
BSJI's Master Account, the FRBNY breached a contractual duty of
care imposed by Operating Circular 1. Id. ¶¶ 194-99. Based
largely on the same allegations as Count V, Count VI alleges
that the FRBNY breached an implied covenant of good faith and
fair dealing under New York common law. Id. ¶¶ 200-07.

Each of BSJI's claims, and the defendants' arguments for
dismissing them, are addressed in turn. Because BSJI's federal-
law claims all concern the FRA, that statute is addressed first.

### IV. The Federal Reserve Act

BSJI's federal-law claims all rely on a faulty premise.
Namely, BSJI contends that the Federal Reserve Act provides BSJI
with an unqualified statutory right to have a master account.
But the FRA provides no such right. Rather, "12 U.S.C. § 342
makes clear that Federal [R]eserve banks are authorized to
maintain Master Accounts, but are not required to do so." BSJI
I, 700 F. Supp. 3d at 98.

**A. Section 342**

Section 13 of the FRA, codified at 12 U.S.C. § 342, governs master accounts. Appearing in subchapter IX, titled "Powers and Duties of Federal Reserve Banks," section 342 provides Federal Reserve banks with the authority to receive deposits from nonmembers as well as members of the Federal Reserve system. See §§ 341-61. Section 342 provides in relevant part: "Any Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money . . . ." § 342 (emphasis added). Section 342, however, does not require Federal Reserve banks to grant a master account to any depository institution that seeks one. Id. Instead, the statute provides that Federal Reserve banks "may receive" deposits from nonmember depository institutions, not that they "shall." Id.[5] Section 342 therefore grants to Federal Reserve banks the discretion to grant, deny, or close any institution's master account or request for a master account. Id.

This interpretation has endured for over a century. In 1923, the Supreme Court held that "may" as used in section 342 merely "confers authority" to act and does not mean "shall." Farmers' & Merchs.' Bank of Monroe v. Fed. Reserve Bank of

---

[5] The term "nonmember depository institution" is defined at 12 U.S.C. § 461.

Richmond, 262 U.S. 649, 662 (1923) ("Farmers'") (Brandeis, J.)
(construing the right to receive checks for collection). After
Farmers', Congress in 1980 amended section 342 to allow Federal
Reserve banks to accept deposits from non-member depository
institutions. Depository Institutions Deregulation and Monetary
Control Act of 1980 ("MCA"), Pub. L. 96-221. Congress, however,
did not amend the operative phrase in section 342—"may receive"—
which has existed since 1913. See id. Therefore, the Supreme
Court's 1923 interpretation of "may receive" remains binding.
Farmers', 262 U.S. at 662. Just as with checks, id., Federal
Reserve banks "may receive"—but are not required to receive—
"deposits" from "member banks[] or other depository
institutions." § 342.

    Congress recently reaffirmed this longstanding
interpretation of section 342. On December 23, 2022, the
President signed into law the National Defense Authorization Act
for Fiscal Year 2023 ("NDAA"). NDAA, Pub. Law No. 117-263
(2022). The NDAA amended the FRA by inserting section 11C,
titled "Master Account and Services Database." Id. tit. LVII, §
5708. This amendment, codified at 12 U.S.C. § 248c, confirmed
that Federal Reserve banks may "reject" applications from
depository institutions. See § 248c(b)(1). The amendment
requires the Board to "create and maintain a public, online, and
searchable database" that includes "a list of every entity that

submits an access request for a reserve bank master account and services . . . including whether . . . a request was approved, <u>rejected</u>, pending, or withdrawn." <u>Id.</u> (emphasis added).

Section 248c(b)(1) supports the FRBNY's position: "an access request for a reserve bank master account" may be "rejected" by the Federal Reserve bank processing the request. <u>Id.</u> Moreover, section 248c(b)(1) does not specify or otherwise limit the reasons based on which a Federal Reserve bank can "reject[]" a master account-access request. <u>See</u> <u>id.</u> And by affirming that section 342 grants broad discretion to Federal Reserve banks, section 248c(b)(1) also reinforces the FRBNY's discretion to terminate master accounts. In sum, pursuant to section 342 of the FRA, a Federal Reserve bank "may" grant, deny, or close, in the Federal Reserve bank's discretion, any master account.[6]

### B. Section 248a

In response, BSJI contends that section 248a(c)(2) of the FRA requires Federal Reserve banks to provide master accounts to

---

[6] BSJI argues that this interpretation produces "nonsensical results" by placing "nonmember depository institutions on par with the United States" because both are "subject to the FRBNY's discretion" to accept or reject deposits. Opp. 14-15. But a different FRA provision, section 391, provides that the Secretary of the Treasury has the authority to "direct[]" that Treasury funds "be deposited in Federal reserve banks, which banks, when required by the Secretary of the Treasury, shall act as fiscal agents of the United States." 12 U.S.C. § 391.

every depository institution that requests such an account.

Section 248a(c)(2) provides in full:

> All Federal Reserve bank services covered by
> the fee schedule shall be available to
> nonmember depository institutions and such
> services shall be priced at the same fee
> schedule applicable to member banks, except
> that nonmembers shall be subject to any other
> terms, including a requirement of balances
> sufficient for clearing purposes, that the
> Board may determine are applicable to member
> banks.

12 U.S.C. § 248a(c)(2).

BSJI misreads this provision. "Section 248a(c)(2) is directed to the Board, not Federal [R]eserve banks, and is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System." BSJI I, 700 F. Supp. 3d at 99. BSJI's arguments to the contrary, rejected once in BSJI I, again fail to persuade. No FRA provision instructs Federal Reserve banks to provide all available services to all depository institutions while ignoring any and all risk factors pertaining to individual applicants for such services. Id.

### 1. The Statute

Section 248a makes no "reference to Master Accounts, much less commands the Board to direct the opening of a master account for every institution that seeks one regardless of risk." Id. Section 248a(a) instead instructs the Board to "put

into effect a schedule of fees for [Federal Reserve bank]
services." 12 U.S.C. § 248a(a). Section 248a(b) defines the
"[c]overed services" and includes in a catchall provision "any
new services which the Federal Reserve System offers." §
248a(b), (b)(8). Section 248a(c), titled "Criteria applicable,"
sets forth the "principles" upon which the "schedule of fees
prescribed pursuant to" section 248a "shall be based." § 248a(c)
("The schedule of fees prescribed pursuant to this section shall
be based on the following principles:"). Subparagraphs (c)(1)
through (c)(4) enumerate those pricing principles. § 248a(c)(1)–
(4).

"[P]laced in the context of the entire statutory
structure," see Nat. Res. Def. Council, Inc. v. Muszynski, 268
F.3d 91, 98 (2d Cir. 2001), section 248a(c)(2) directs only that
the non-discriminatory fee schedule promulgated by the Board be
applied to the services that "shall be available to nonmember
institutions." See 12 U.S.C. § 248a(c)(2); accord Greater
Buffalo Press, Inc. v. Fed. Reserve Bank of New York, 866 F.2d
38, 40 (2d Cir. 1989) (stating that the FRA made check clearing
services "available to all banks, regardless of whether or not
they were member banks") (emphasis added). Section 248a(c)(2)
nowhere commands that Federal Reserve bank services "shall be
provided" to all depository institutions regardless of risk.

Moreover, a master account can be "available" to an institution even where a Federal Reserve bank ultimately refuses to open or maintain a master account for that institution. In 1980, the year Congress enacted section 248a, "available" meant "[s]uitable; useable; accessible; obtainable; present or ready for immediate use." Available, Black's Law Dictionary (5th ed. 1979). Therefore, in making services "available" pursuant to section 248a(c)(2), Federal Reserve banks must provide to nonmembers the opportunity to use, access, or obtain Federal Reserve bank services. See BSJI I, 700 F. Supp. 3d at 99. But such availability is sufficient; section 248a does not command Federal Reserve banks to provide their services to all depository institutions that apply. See id. at 99–100.

Section 248a's placement within the FRA's statutory structure corroborates the absence of any such mandate. When Congress enacted the MCA in 1980, Congress inserted section 248a into subchapter II of the FRA, codified at 12 U.S.C. §§ 241-52. The MCA also amended section 342 in subchapter IX of the FRA, codified at 12 U.S.C. §§ 341-64. Subchapter II—home to section 248a—is titled "Board of Governors of the Federal Reserve System," while subchapter IX—home to section 342—is titled "Powers and Duties of Federal Reserve Banks." Plainly, Congress directed section 248a at the Board, and section 342 at Federal Reserve banks. See Dubin v. United States, 599 U.S. 110, 120–21

26

(2023) (finding that titles and headings help resolve "doubt about the meaning of a statute").

Additionally, in modifying the FRA, the MCA inserted section 248a <u>and also</u> amended section 342. MCA, Pub. L. 96-221. In amending section 342, Congress allowed—but did not require— the Federal Reserve banks to accept deposits from nonmember depository institutions. <u>Id.</u> If Congress sought to require Federal Reserve banks to provide master accounts to all depository institutions that requested one, the amended section 342 would so provide. <u>BSJI I</u>, 700 F. Supp. 3d at 100. Section 342, however, "does not even state that the services covered by the fee schedule shall be available to 'all nonmember depository institutions.'" <u>Id.</u> at 99.

Read together with subchapter II's title, section 248a instructs the Board to "put into effect a schedule of fees" for "Federal Reserve bank services" based on the pricing principles set forth in section 248a(c). 12 U.S.C. § 248a(a), 248a(c). In turn, pursuant to the second and third clauses of section 248a(c)(2), any pricing and service terms must not discriminate between members and nonmembers based on their membership status. § 248a(c)(2). Section 248a, however, is wholly silent as to how Federal Reserve banks should evaluate and process a depository institution's initial or continuing request for Federal Reserve bank services. <u>See</u> § 248a.

For master accounts, section 342 supplies that standard.
And section 342 appears where it logically should: in the
subchapter titled "Powers and Duties of Federal Reserve Banks."
See BSJI I, 700 F. Supp. 3d at 100. Section 248a, directed to
the Board, does not override the principal section dealing with
the Federal Reserve banks' authority to open, withhold, or close
master accounts: section 342.

BSJI counters that the NDAA, enacted in 2022, supports
BSJI's position because section 248c(a)(3) defines "Reserve bank
master account and services" as "an account in which a Federal
reserve bank— (A) receives deposits for an entity . . . ; or (B)
provides any service under section 248a(b) of this title . . .
." 12 U.S.C. § 248c(a)(3). BSJI emphasizes the reference to
section 248a(b), contending that this reference reflects the
congressional view that section 248a overrides section 342.

BSJI's argument fails because section 248a(b), referred to
in the NDAA, merely enumerates "[t]he services which shall be
covered by the schedule of fees" promulgated by the Board. 12
U.S.C. § 248a(b). That fee schedule applies whenever a Federal
Reserve bank provides its services to a depository institution
with a master account. § 248a(c)(2). But section 248a(c)(2) does
not override section 342, the section that addresses access to
master accounts.

28

BSJI also argues that requiring BSJI to rely on correspondent banking relationships subverts section 248a's "equal pricing directive" by "expos[ing] a nonmember to significant additional costs." BSJI Ltr. at *2, ECF No. 150. But BSJI misconstrues section 248a's "equal pricing directive." Master account holders, irrespective of their membership status, pay the fees set forth in the nondiscriminatory schedule promulgated by the Board. See 12 U.S.C. § 248a(a), (c)(2). Where nonmembers are denied a master account, however, nothing in section 248a prevents correspondent banks from charging fees to facilitate access. See id.

Placed in different parts of the FRA, section 248a serves a different purpose from section 342. Section 248a prevents price discrimination once the regional Federal Reserve bank grants a master account to a nonmember. See 12 U.S.C. §§ 248a(c)(2), 342; Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta, 713 F.2d 1221, 1227 (6th Cir. 1983). But section 248a does not command Federal Reserve banks "to provide specific services to nonmember[s]." BSJI I, 700 F. Supp. 3d at 100. Rather, Federal Reserve banks have the discretion to provide, or not to provide, Federal Reserve bank services to any depository institution. 12 U.S.C. § 342.

**2. Case Law**

In opposition, BSJI again relies on an opinion from Judge
Bacharach of the Court of Appeals for the Tenth Circuit. In his
Fourth Corner opinion, Judge Bacharach opined that section
248a(c)(2) imposes a nondiscretionary duty on Federal Reserve
banks to provide a master account for all depository
institutions. See Fourth Corner Credit Union v. Fed. Reserve
Bank of Kan. City, 861 F.3d 1052, 1064–80 (10th Cir. 2017).
Judge Bacharach's solo nonprecedential opinion, however, "is
neither controlling (even in the Tenth Circuit), nor
persuasive." BSJI I, 700 F. Supp. 3d at 100.

In Fourth Corner, the appellate panel considered the
district court's dismissal of a complaint filed by the plaintiff
Fourth Corner Credit Union. 861 F.3d at 1053 (Moritz, J.). The
credit union's complaint sought an injunction directing the
Federal Reserve Bank of Kansas City ("FRBKC") to open a master
account for the credit union, even though the credit union
sought to provide banking services to marijuana-related
businesses. Id. Before the district court, the credit union
alleged that it would follow the law concerning marijuana-
related businesses. Id. at 1054. But the district court refused
to accept that allegation and granted the FRBKC's motion to
dismiss. Id. On that record, unable to form consensus, the
appellate panel vacated the district court's order and remanded

30

with instructions to dismiss the complaint without prejudice. Id. at 1053 (per curiam).

Each panel member also wrote separately. Judge Moritz would have affirmed the dismissal with prejudice because, in her view, the credit union alleged that it "would use the court's equitable relief to facilitate illegal activity." Id. at 1055 (Moritz, J.). Judge Matheson would have vacated the dismissal and remanded with instructions to dismiss the amended complaint without prejudice on prudential ripeness grounds. Id. at 1064 (Matheson, J.). Only Judge Bacharach would have decided the appeal on the merits and then reversed the dismissal of the amended complaint, finding that Fourth Corner had a statutory right to a master account pursuant to 12 U.S.C. § 248a(c)(2). Id. at 1064–80 (Bacharach, J.). For the reasons explained above, however, Judge Bacharach's nonprecedential interpretation of section 248a(c)(2) is unpersuasive.

Moreover, after Judge Bacharach issued his 2017 opinion, Congress passed 12 U.S.C. § 248c. Enacted on December 23, 2022, section 248c(b)(1)(B) explicitly recognizes that Federal Reserve banks may "reject[]" a depository institution's "access request for a reserve bank master account and services." 12 U.S.C. § 248c(b)(1)(B), (b)(1)(B)(ii). Section 248c therefore confirms that section 342 (not section 248a) addresses the administration of master accounts by Federal Reserve banks. And section 342

31

"confers authority" on Federal Reserve banks to open, withhold, or close master accounts. <u>See</u> <u>Farmers'</u>, 262 U.S. at 662; <u>BSJI I</u>, 700 F. Supp. 3d at 100.

BSJI also relies on <u>Custodia Bank, Inc. v. Fed. Reserve Bd. of Governors</u>, 640 F. Supp. 3d 1169 (D. Wy. 2022) ("<u>Custodia I</u>"), but the ultimate decision in that case does not support BSJI's position. In that case, the plaintiff claimed that the FRBKC unreasonably delayed in processing the depository institution's application for a master account. 640 F. Supp. 3d at 1178. In <u>Custodia I</u>, the court denied in large part the motions to dismiss filed by the FRBKC and the Board. <u>Id.</u> at 1196. In so ruling, the court found that a "full statutory interpretation of" the FRA "is better left for another day" after "further development of [the] facts." <u>Id.</u> at 1185; <u>see also</u> <u>Custodia Bank, Inc. v. Fed. Reserve Bd. of Governors</u>, No. 22-cv-125, 2023 WL 11160063, at *3–8 (D. Wy. June 8, 2023) ("<u>Custodia II</u>") (denying in large part the motions by the FRBKC and the Board to dismiss the amended complaint).

BSJI argues that, like in <u>Custodia I</u>, further factual development is needed. But BSJI concedes that the merits turn primarily on the interpretation of sections 342 and 248a. <u>See</u> BSJI's Mem. Opp. ("Opp.") 7, ECF No. 140 (agreeing "that the merit of BSJI's Mandamus Act, Declaratory Judgment, and Due Process claims primarily turns on a matter of statutory

interpretation"). Statutory interpretation is an issue of law. United States v. Rood, 281 F.3d 353, 355 (2d Cir. 2002).

Moreover, at the preliminary-injunction stage, the Court ordered the FRBNY to provide BSJI with limited discovery. Tr. of Tel. Conf. 8-9, ECF No. 41. Namely, the FRBNY was ordered to produce decisional memoranda and relevant communications between the FRBNY and the Board concerning the FRBNY's July 2022 and June 2023 account-closure decisions. Id. BSJI then received those core decisional documents. ECF Nos. 61, 64, 65. Assisted by those documents, BSJI has alleged sufficient facts upon which the legal questions presented in this case can be decided.

In any case, following discovery, the Custodia Bank court ultimately concluded that there were "no genuine dispute[s] of material fact," denied the plaintiff's motion for judgment as a matter of law, and granted the FRBKC's motion for summary judgment. Custodia Bank, Inc. v. Fed. Reserve Bd. of Governors, 728 F. Supp. 3d 1227, 1234, 1245-46 (D. Wyom. 2024) ("Custodia III"), appeal docketed, No. 24-8024 (10th Cir. to be argued Jan. 21, 2025). In Custodia III, after a thorough analysis of the relevant statutory provisions and legislative history, the court ultimately concluded: "The plain language of the relevant statutes can only reasonably be read to give the Federal Reserve

Banks discretion in granting or denying requests for master accounts." Id. at 1245.[7]

In sum, nothing in section 248a(c)(2) disturbs the discretion conferred on Federal Reserve banks pursuant to section 342. And it is undisputed that the FRBNY made a master account "available" to BSJI as required by section 248a(c)(2): BSJI obtained the Master Account in April 2012. Brennan Decl., Ex. F at 1–2. But when BSJI's heightened risk profile and noncompliance created undue risk, the FRBNY exercised its discretion and closed BSJI's Master Account. Brennan Decl., Ex. H at *2–3. The FRBNY was not required by law to keep BSJI's Master Account open. The FRBNY's account-closure decision thus did not violate any statutory right provided by the FRA.

### V. Article III Standing

At the threshold, the Board argues that BSJI's claims against the Board must be dismissed because BSJI lacks Article III standing to assert such claims. Board's Mem. of Law ("Bd. Br.") 10–13, ECF No. 131. Specifically, the Board contends that the Amended Complaint fails to plead plausibly causation and redressability. Id. BSJI responds that it has standing to sue

---

[7] Similarly, in PayServices Bank v. Fed. Reserve Bank of San Francisco, the court concluded that the Federal Reserve Bank of San Francisco had the statutory discretion to deny the plaintiff's request for a master account. No. 23-cv-305, 2024 WL 1347094, at *6–11 (D. Idaho Mar. 30, 2024), appeal docketed, No. 24-2355 (9th Cir. argued Dec. 4, 2024).

the Board, based primarily on its interpretation of the FRA.
Opp. 34-36.

Article III of the United States Constitution "confines the
federal judicial power to the resolution of 'Cases' and
'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423
(2021). For there to be an Article III case or controversy, the
plaintiff must have standing. Id. Thus, "Article III standing
must be decided before the merits." All. for Env't Renewal, Inc.
v. Pyramid Crossgates Co., 436 F.3d 82, 87 (2d Cir. 2006); Steel
Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998).

The "irreducible constitutional minimum of standing
contains three elements:" (1) "injury in fact," (2) causation:
"a causal connection between the injury and the conduct
complained of," and (3) redressability: a likelihood, rather
than speculation, "that the injury will be redressed by a
favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555,
560-61 (1992). At the pleadings stage, because "[t]he plaintiff,
as party invoking federal jurisdiction, bears the burden of
establishing these elements," Spokeo, Inc. v. Robins, 578 U.S.
330, 338 (2016), "the complaint's factual allegations of
standing must be plausible and nonconclusory." Lugo v. City of
Troy, 114 F.4th 80, 87 (2d Cir. 2024). The plaintiff must also
establish standing for each claim brought and "for each form of

35

relief that is sought." See Davis v. Fed. Election Comm'n, 554

U.S. 724, 734 (2008).

## A. Causation

BSJI fails to plead causation against the Board. Put

differently, the injury alleged by BSJI is not "fairly traceable

to the challenged action of the" Board. See Lujan, 504 U.S. at

560-61 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S.

26, 41-42 (1976)). Rather, based on the facts alleged and

documents incorporated by the Amended Complaint, the only

possible inference is that "the independent action of some third

party"—the FRBNY—caused BSJI's alleged injury. See Simon, 426

U.S. at 41-42.

With respect to the statute, under the FRA, "[t]he Board

exercises supervision over reserve banks, but does not have the

statutory authority to receive deposits, open or close Master

Accounts, or perform other banking services." BSJI I, 700 F.

Supp. 3d at 104 (citing 12 U.S.C. §§ 248(j) & 342). In short,

the Board lacks the statutory authority to close a master

account. See § 248(j) (authorizing and empowering the Board

"[t]o exercise general supervision over [the] Federal reserve

banks").

BSJI's factual allegations support this statutory

conclusion. The Board is alleged to have issued a guidance

memorandum, AC ¶ 120, and advised the FRBNY that the Board

"ha[s] no concerns" with the FRBNY's "application of the Guidelines" and "with its intended action to terminate BSJI's access," Brennan P.I. Decl., Ex. 20 at *2; AC ¶ 156. Having cast the Board in an advisory role only, BSJI has failed to allege facts showing that the Board was involved in the FRBNY's final account-closure decision.

Likewise, while a Federal Reserve bank "can terminate [the] MAA at any time" pursuant to the terms of Operating Circular 1, "the Board is not a party to the MAA" and therefore lacks the same power to terminate BSJI's Master Account. BSJI I, 700 F. Supp. 3d at 104-05; OC 1. Operating Circular 1 states that "[e]ach [MAA] is subject to approval by the . . . Reserve Bank," OC 1 at 5, and notes that the "Reserve Bank may terminate a [MAA] . . . at any time," id. at 7.

Based on BSJI's allegations, the Board at most played a general supervisory role and "advise[d]" the FRBNY. AC ¶¶ 154-56. Thus, the alleged causal connection depends on how the FRBNY would have responded to the Board's approval or rejection of the FRBNY's "pre-decisions." See Simon, 426 U.S. at 40-46. But because section 342 provides the FRBNY with the ultimate authority to close BSJI's Master Account, the FRBNY's response is "sufficiently uncertain to break the chain of causation between the plaintiff['s] injury and the challenged Government action." Allen v. Wright, 468 U.S. 737, 759 (1984). Simply put,

one cannot be accused of doing what one has no power to do. Cf.
Marino v. Town of Branford, No. 17-cv-1828, 2018 WL 691715, at
*2 (D. Conn. Feb. 2, 2018) (holding that a plaintiff can seek
relief only from "the party with the power to suspend and revoke
the plaintiff's license"). Because BSJI blames the Board for the
FRBNY's decision to close BSJI's Master Account, BSJI fails to
allege causation: a fairly traceable link between the Board's
conduct and the injury alleged. See Allen, 468 U.S. at 757-59.

### B. Redressability

BSJI also fails to plead redressability against the Board.
Because the Board lacks any authority to open and maintain a
Master Account for BSJI, or to order the FRBNY to do so, "it is
entirely speculative" whether a court order directed at the
Board would redress BSJI's alleged injury. See Allen, 468 U.S.
at 758. The redressability requirement prevents judicial
overreach in exactly this kind of scenario. See id. at 759-60
(stating that lawsuits challenging "the particular programs
agencies establish to carry out their legal obligations . . .
are rarely if ever appropriate for federal-court adjudication");
Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221, 229-30
(2d Cir. 2012); Coal. of Watershed Towns v. U.S. Env't Prot.
Agency, 552 F.3d 216, 218 (2d Cir. 2008).

This is not a case where BSJI seeks to invalidate any of
the decisions that were within the Board's purview, for example,

the Board's promulgation of the Guidelines. Therefore, BSJI has
failed to establish redressability.

* * *

Without causation and redressability, BSJI lacks Article
III standing to sue the Board. Because "a federal court may
resolve only a real controversy with real impact on real
persons," TransUnion LLC, 594 U.S. at 424, BSJI's claims brought
against the Board are **dismissed without prejudice** for lack of
standing. Carter v. HealthPort Techs., LLC, 822 F.3d 47, 54 (2d
Cir. 2016).[8]

## VI. Federal-Law Claims

Both the Board and the FRBNY argue that BSJI's APA,
Mandamus Act, and DJA claims fail for lack of subject-matter
jurisdiction. FRBNY Br. 11–17; FRBNY's Reply ("FRBNY Rep.") 2–6,
ECF No. 142; Bd. Br. 14–16, 22; Board's Reply ("Bd. Rep.") 3–5,
ECF No. 143. The FRBNY also argues that each of BSJI's federal-
law claims fails on the merits; the Board agrees with respect to
the APA and due process claims. FRBNY Br. 17–20; FRBNY Rep. 6–9;
Bd. Br. 16–22. BSJI disagrees with both defendants, relying on
its interpretation of the FRA. Opp. 17–19; 28–34.

---

[8] The Board's other jurisdictional arguments are considered as alternative
grounds for dismissal. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584–
85 (1999). For purposes of completeness, the Board's arguments for dismissal
based on BSJI's failure to state a claim are also addressed below.

Although the Court has subject-matter jurisdiction to adjudicate this case, see Lyndonville Sav. Bank & Tr. Co. v. Lussier, 211 F.3d 697, 701 (2d Cir. 2000); 12 U.S.C. § 632, BSJI's APA, Mandamus Act, and DJA claims are precluded from review by statute and thus subject to dismissal for lack of subject-matter jurisdiction. Moreover, BSJI's APA and due process claims warrant dismissal on the merits. Each claim is addressed in turn.

### A. APA Claims

Both defendants argue that the Court lacks subject-matter jurisdiction over BSJI's APA claim because master account-closure decisions are "committed to agency discretion by law." FRBNY Br. 11–14; FRBNY Rep. 2–5; Bd. Br. 14–16; Bd. Rep. 3–5. The FRBNY also asserts that the FRBNY is not an "agency" subject to judicial review under the APA. FRBNY Br. 11–14. Both defendants argue, in the alternative, that BSJI's APA claim fails on the merits. FRBNY Br. 17–19; FRBNY Rep. 6–8; Bd. Br. 16–21. BSJI counters with the presumption of reviewability, argues that the FRBNY is an "agency" under the APA, and contends that BSJI has pled a plausible APA claim. Opp. 28–32.

### 1. Committed to Agency Discretion

The APA precludes judicial review of "agency action" that is "committed to agency discretion by law." 5. U.S.C. § 701(a)(2). This "very narrow exception" applies "in those rare

40

instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971). Otherwise said, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985). Section 701(a)(2) "expressly foreclose[s]" judicial review and thus erects a jurisdictional bar. Vela-Estrada v. Lynch, 817 F.3d 69, 71 (2d Cir. 2016).

To show that the APA's judicial-review provisions apply to a defendant agency, a plaintiff "must specify some statute or regulation" that meaningfully limits the agency's discretion. Lunney v. United States, 319 F.3d 550, 558 (2d Cir. 2003). In deciding whether section 701(a)(2) applies, courts must carefully examine "the statute on which the claim of agency illegality is based." Webster v. Doe, 486 U.S. 592, 600 (1988). However, "statutory limitations on judicial review of agency action should be interpreted narrowly." Sharkey v. Quarantillo, 541 F.3d 75, 84 (2d Cir. 2008).

Examining the FRA, Congress has provided "no meaningful standard against which to judge" both defendants' "exercise of discretion." See Heckler, 470 U.S. at 830.

### (a) The FRBNY

With respect to the FRBNY, section 342 states merely that
Federal Reserve banks "may" receive deposits. 12 U.S.C. § 342.
Therefore, even if the FRBNY is a federal agency, section 342
provides "no meaningful standard" that courts can apply in
reviewing a Federal Reserve bank's decision to close a
depository institution's master account. See Farmers', 262 U.S.
at 662. And BSJI has failed to identify any other FRA provision
that provides a meaningful standard against which to judge the
FRBNY's decision to close BSJI's Master Account. The FRA
"therefore forecloses judicial review under the APA." BSJI I,
700 F. Supp. 3d at 102.

BSJI responds that the Board's "regulations . . . and
informal agency guidance" provide courts with a meaningful
standard to apply. See Salazar v. King, 822 F.3d 61, 76 (2d Cir.
2016). But in Salazar, the applicable statute and the agency's
implementing regulations, using the term "shall," imposed
nondiscretionary obligations that courts could enforce easily.
Id. at 65. By contrast, in this case, both section 342 and the
relevant Board regulations leave "decisions regarding individual
access requests" to the "discretion of the individual Reserve
Banks." 87 Fed. Reg. 51106.

Although "the Board exercises significant supervisory
authority over the Reserve Banks," McKinley v. Bd. of Governors

42

of Fed. Reserve Sys., 647 F.3d 331, 333 (D.C. Cir. 2011), the
relevant Board regulations and guidance documents merely guide—
and do not override—the Federal Reserve banks' discretion to
close master accounts. Principle 5, which directs Federal
Reserve banks to "not create undue risk to the overall economy,"
87 Fed. Reg 51110, "fairly exudes deference to" the Federal
Reserve banks that are empowered, pursuant to section 342, to
make the final account-closure decision. See Webster, 486 U.S.
at 600. And S-2677, which directs the Federal Reserve banks to
scrutinize heavily Tier 3 institutions like BSJI, leaves
untouched the FRBNY's discretion to carry out the heavy scrutiny
in any given case. See AC ¶ 120.

Therefore, BSJI has failed to enunciate any meaningful
standard in the FRA or the Board's administrative materials
"against which to judge the [FRBNY's] exercise of discretion."
Cf. Heckler, 470 U.S. at 830; Hirshfield v. United States, No.
99-cv-1828, 2001 WL 579783, at *15 (S.D.N.Y. May 30, 2001).
Accordingly, the FRBNY's decision to close BSJI's Master Account
"is committed to agency discretion by law" and thus
jurisdictionally precluded from review under the APA. 5 U.S.C. §
701.

### (b) The Board

BSJI's APA claim also fails at the threshold against the
Board. As the source of the Board's purported authority to close

BSJI's Master Account, BSJI has identified only the Board's power "[t]o exercise general supervision over [the] Federal reserve banks," 12 U.S.C. § 248(j). But section 248(j)'s grant of "general supervis[ory]" authority provides "no meaningful standard against which to judge the agency's exercise of discretion." Heckler, 470 U.S. at 830. Therefore, to the extent the Board possesses any discretion to control or override the FRBNY's account-closure decisions, that discretion is also "committed to agency discretion by law." 5 U.S.C. § 701. Accordingly, because there is no waiver of "the federal government's sovereign immunity," BSJI's APA claim against the Board is also jurisdictionally precluded from review. Lunney, 319 F.3d at 558; Webster, 486 U.S. at 601.

### 2. "Agency"

Moreover, the FRBNY is not an "agency" subject to APA review.[9] Therefore, with respect to the FRBNY, the "strong presumption that Congress intends judicial review of administrative action," Sharkey, 541 F.3d at 84, does not apply. See New York v. Atl. States Marine Fisheries Comm'n, 609 F.3d 524, 533 (2d Cir. 2010) ("ASMFC").

The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or

---

[9] It is undisputed that the Board is "an agency of the United States." Kraus, 943 F.3d at 604.

subject to review by another agency." 5 U.S.C. § 701(b)(1). With
this definition, the APA "confers agency status on any
administrative unit with substantial independent authority in
the exercise of specific functions." Soucie v. David, 448 F.2d
1067, 1073 (D.C. Cir. 1971). This definition of "agency" is
"restrictive." ASMFC, 609 F.3d at 531. Simply because "an
organization makes decisions does not always mean that it is a
government agency." Dong v. Smithsonian Inst., 125 F.3d 877, 881
(D.C. Cir. 1997) (quoting Pub. Citizen Health Rsch. Grp. v.
Dep't of Health, Educ. & Welfare, 668 F.2d 537, 543 (D.C. Cir.
1981)). Rather, substantial independent authority is "final and
binding" authority. Id.

In considering whether an entity possesses substantial
independent authority, given "the myriad organizational
arrangements for getting the business of the government done,"
courts must examine "each new arrangement" anew "in its own
context." Washington Rsch. Project, Inc. v. Dep't of Health,
Educ., and Welfare, 504 F.2d 238, 246 (D.C. Cir. 1974). Such an
inquiry examines the "structure, function, and mandate" of the
entity. ASMFC, 609 F.3d at 531.

Starting with structure, like the other Federal Reserve
banks, the FRBNY is a "private corporation." See Am. Oversight
v. U.S. Dep't of Health and Hum. Servs., 101 F.4th 909, 921
(D.C. Cir. 2024); 12 U.S.C. § 341 ("[A] Federal reserve bank

45

[is] a body corporate . . . .”). When Congress founded “the Fed

in 1913,” the legislature, “following other major advanced

economies, decided to leave governance of money and credit, at

least in part, in private hands.” Kraus, 943 F.3d at 597. In

doing so, Congress went “out of its way to formally separate the

[Federal Reserve banks] from the government.” Id. Accordingly,

Federal Reserve banks “are not part of any executive department

or agency.” Id.; see also U.S. Shipping Bd. Emergency Fleet

Corp. v. W. Union Tel. Co., 275 U.S. 415, 425–26 (1928)

(“Instrumentalities like . . . the federal reserve banks . . .

are not departments of the Government.”); Scott v. Fed. Reserve

Bank of Kansas City, 406 F.3d 532, 535 (8th Cir. 2005) (“The

[FRBKC] is a private, independent entity independently run by

its own board of directors. It is not run by the [Board] or any

other part of the executive branch.”). And this structure has

endured. Even as Congress, during the twentieth century,

“transferred functional ownership and control of the [Federal

Reserve banks] to the Treasury and to the Board,” Congress

“considered the status of the [Federal Reserve banks] on

multiple occasions and decided not to convert them formally into

government agencies.” Kraus, 943 F.3d at 598.

Function and mandate reinforce that the FRBNY is not an

agency under the APA. “The individual Federal Reserve Banks,”

including the FRBNY, “serve as the foundation for the Federal

Reserve System." Fasano v. Fed. Reserve Bank of N.Y., 457 F.3d 274, 277–78 (3d Cir. 2006). As such, "[t]he individual Federal Reserve Banks carry out the monetary policy . . . formulated" by the FOMC. Id. In so doing, Federal Reserve banks work together with the Board "to assist in achieving national economic goals through [the Reserve System's] influence on the availability and cost of bank reserves, bank credit, and money." Reuss v. Balles, 584 F.2d 461, 462 (D.C. Cir. 1978).

In this system, the Board possesses substantial independent authority. See generally Dong, 125 F.3d at 881–83. The Board's powers include the authority to "levy assessments on the Federal Reserve Banks to pay expenses," Fasano, 457 F.3d at 278 (citing 12 U.S.C. § 243), "and issue governing regulations," id. (citing 12 U.S.C. § 248-1). By contrast, Federal Reserve banks do not "have the authority to promulgate regulations with the force and effect of law." Kraus, 943 F.3d at 597 (citing Scott, 406 F.3d at 536 & 12 U.S.C. § 248(k)). Instead, the directors of the Federal Reserve banks "perform the duties usually appertaining to the office of directors of banking associations." 12 U.S.C. § 301. By functioning this way, Federal Reserve banks realize "Congress's goal of insulating them from political pressure." Fasano, 457 F.3d at 277.

In the master-account context, Federal Reserve banks are empowered to make discretionary decisions that further national

47

economic goals, such as avoiding "undue risk to the overall
economy by facilitating activities such as money laundering." 87
Fed. Reg. 51109. But unlike the Board, which makes "final and
binding" decisions concerning the nation's economic and monetary
policies, see Dong, 125 F.3d at 881, Federal Reserve banks make
banking decisions as private corporations that are "formally
separate" from the "sovereign" government, see Kraus, 943 F.3d
at 597. Therefore, the FRBNY's authority to make such banking
decisions, including decisions with respect to master accounts,
does not render the FRBNY a government agency under the APA. See
Dong, 125 F.3d at 881; Pub. Citizen Health Rsch. Grp., 668 F.2d
at 543.

Likewise, the Board's oversight of the Federal Reserve
banks differs in kind from the type of government control that
can confer agency status on the controlled entity under the APA.
See Forsham v. Harris, 445 U.S. 169, 180 n.11 (1980). The
Board's regulations and policy statements "do not impose the
detailed and day-to-day supervision which would make the
[Federal Reserve banks] government agencies." Cf. Pub. Citizen
Health Rsch. Grp., 668 F.2d at 544. This is by design: "Congress
did not intend to give the federal government direction over the
daily operation of the Reserve Banks." Lewis v. United States,
680 F.2d 1239, 1241 (9th Cir. 1982) (citing H.R. Report No. 69,
63 Cong. 1st Sess. 18-19 (1913)). Rather, the Board "loosely

oversees the Federal Reserve Banks' operations." <u>Fasano</u>, 457 F.3d at 278.

In opposition, BSJI points to two cases where district courts decided that the relevant Federal Reserve bank was an "agency" pursuant to the APA: <u>Lee Const. Co. v. Fed. Reserve Bank of Richmond</u>, 558 F. Supp. 165 (D. Md. 1982), and <u>Flight Int'l Grp. v. Fed. Reserve Bank of Chicago</u>, 583 F. Supp. 674 (N.D. Ga. 1984), <u>vacated by settlement</u>, 597 F. Supp. 462 (Mem.) (N.D. Ga. 1984). But <u>Lee</u> and <u>Flight Int'l</u> are neither binding nor persuasive.

Both the <u>Lee</u> and <u>Flight Int'l</u> courts overlooked Congress's decision to "formally separate" Federal Reserve banks from the federal government, <u>Kraus</u>, 943 F.3d at 597, with the aim of "insulating them from political pressure," <u>Fasano</u>, 457 F.3d at 277. Moreover, both the <u>Lee</u> and <u>Flight Int'l</u> courts applied the <u>Soucie</u> test without the benefit of clarifying cases such as <u>Dong</u>, 125 F.3d at 881–83, and <u>ASMFC</u>, 609 F.3d at 531. These later cases clarified that the APA's definition of "agency" is "restrictive," <u>ASMFC</u>, 609 F.3d at 531, and that simply because "an organization makes decisions does not always mean that it is a government agency," <u>Dong</u>, 125 F.3d at 881.

More recently, considering the Federal Reserve banks' structure, function, and mandate in other contexts, the Second Circuit Court of Appeals has held that Federal Reserve banks are

49

federal instrumentalities, not federal agencies. See Kraus, 943 F.3d at 597-98 (under the False Claims Act); Starr Int'l Co., Inc. v. Fed. Reserve Bank of New York, 742 F.3d 37, 40-41 (2d Cir. 2014) (in emergency lending). And in a case before the D.C. Circuit Court of Appeals involving the Freedom of Information Act, which incorporates the APA's general definition of "agency," the Board conceded against interest "that the Federal Reserve Banks, including the FRBNY, are not federal agencies." McKinley, 647 F.3d at 336.

In sum, the FRBNY's "structure, function, and mandate," ASMFC, 609 F.3d at 531, all support the conclusion that the FRBNY is a private corporation formally separated from the federal government that does not wield any "authority of the Government of the United States," 5 U.S.C. § 701(b)(1); accord PayServices Bank, 2024 WL 1347094, at *11-13. Because the FRBNY is not an "agency" within the meaning of 5 U.S.C. § 701(b)(1), BSJI's APA claim against the FRBNY must be **dismissed** for lack of subject-matter jurisdiction.

### 3. Merits

BSJI's APA claim also fails on the merits against both defendants.[10] Pursuant to section 706(2) of the APA, courts must "hold unlawful and set aside agency action[s]" that are

---

[10] To the extent that BSJI's claims against the defendants must be dismissed for lack of jurisdiction, the defendants' arguments that such claims should be dismissed on the merits are considered for purposes of completeness.

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A)–(B), (E). However, in doing so, "a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm"). Where the "agency examines the relevant [information] and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action." Karpova v. Snow, 497 F.3d 262, 268 (2d Cir. 2007).

### (a) The FRBNY

The FRBNY's conclusions regarding BSJI "were plainly reached after a thorough review of the evidence and pertinent factors." BSJI I, 700 F. Supp. 3d at 103. First, both RBAS and Compliance provided views on the risks posed by BSJI. Brennan Decl., Ex. F. Second, the FRBNY sought the Board's auxiliary opinion. AC ¶¶ 155–56. And third, the FRBNY reviewed BSJI's submissions. See Brennan Decl., Ex. H at *2–3. The FRBNY then provided to BSJI detailed reasons for closing BSJI's Master Account. Id. In short, the FRBNY "examine[d] the relevant data" and "set out a satisfactory explanation including a rational connection between the facts found and the choice made" to close

BSJI's Master Account, namely, undue risk. <u>See</u> <u>Karpova</u>, 497 F.3d at 268.

That BSJI's paid consultants detected no issues with BSJI's compliance programs, AC ¶¶ 124-28, does not render plausible BSJI's assertion that the FRBNY acted arbitrarily and capriciously or otherwise not in accordance with law. And BSJI's bald assertion that the FRBNY conspired with the Board "to deprive novel bank charters of master accounts," <u>See</u> <u>id.</u> ¶¶ 121-22, is not supported by the nonconclusory facts asserted in and documents incorporated by the Amended Complaint. The Court's duty to accept as true BSJI's allegations and to draw all reasonable inferences in BSJI's favor, <u>McCarthy</u>, 482 F.3d at 191, does not extend to claims that lack facial plausibility. <u>Iqbal</u>, 556 U.S. at 678.

Where the agency bases its decision "on a consideration of the relevant factors and whe[re] there has been [no] clear error of judgment, . . . [t]he court is not empowered to substitute its judgment for that of the agency." <u>Citizens to Pres. Overton Park</u>, 401 U.S. at 416. Nothing in the Amended Complaint plausibly suggests that the FRBNY failed to provide an adequate basis for the account-closure decision or committed a clear error of judgment. Rather, the FRBNY considered the relevant factors, including BSJI's noncompliance, and exercised its

statutory discretion to close BSJI's Master Account. BSJI's APA claim against the FRBNY must also be **dismissed** for this reason.

### (b) The Board

The thrust of the Board's argument for dismissing BSJI's APA claim on the merits is that section 342 of the FRA provides the FRBNY with discretion to act, not the Board. Bd. Br. 16–21. In short, the Board's argument is that no APA claim properly lies against the Board. Id.

The Board's statutory argument is fatal to BSJI's APA claim against the Board. "The APA authorizes only a challenge to a final action of an agency." Lunney, 319 F.3d at 554 (citing 5 U.S.C. §§ 701(a), 704). An agency's decision is not final when it is "tentative" and does not "complete[] [the] decisionmaking process." See Franklin v. Mass., 505 U.S. 788, 796–97 (1992). In this case, as provided by section 342 of the FRA, the FRBNY made the final decision to close BSJI's Master Account, not the Board. Accordingly, BSJI's APA claim against the Board merits dismissal for failure to identify any final agency action made by the Board. See Franklin, 505 U.S. at 796–97; John Doe, Inc. v. Drug Enf't Admin., 484 F.3d 561, 565 (D.C. Cir. 2007); accord Custodia III, 728 F. Supp. 3d at 1235–37. Therefore, in any event, BSJI's APA claims against both defendants should be **dismissed** for failure to state a claim.

### B. Mandamus Act Claims

Both defendants argue that BSJI's Mandamus Act claims should be dismissed for lack of subject-matter jurisdiction. FRBNY Br. 15-16; Board Br. 21. BSJI disagrees, asserting that it has adequately pleaded its Mandamus Act claims. Opp. 17.

Pursuant to the Mandamus Act, district courts "have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. To obtain relief in the nature of mandamus, a plaintiff must show that: "[1] there is a clear right to the relief sought; [2] the Government has a plainly defined and peremptory duty to perform the act in question; and [3] there is no other adequate remedy available." Benzman v. Whitman, 523 F.3d 119, 133 (2d Cir. 2008). These requirements, however, are not elements of a cause of action; rather, these "three threshold requirements are jurisdictional." See Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 189 (D.C. Cir. 2016); Duamutef v. Immigr. & Nat'y Serv., 386 F.3d 172, 180 (2d Cir. 2004); Sprecher v. Graber, 716 F.2d 968, 973 (2d Cir. 1983).

At the threshold, the FRBNY argues that it is not an "agency" of the United States, a statutory prerequisite for mandamus jurisdiction. The Mandamus Act, enacted in 1962, contains no definitions. See 28 U.S.C. § 1361. Because "28

54

U.S.C. § 451 provides the definitions for Title 28," that general provision supplies the definition of "agency" under the Mandamus Act. Cf. Cohen v. Empire Blue Cross and Blue Shield, 176 F.3d 35, 42 (2d Cir. 1999); Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1080 (Fed. Cir. 2001). Section 451, enacted in 1948, defines "agency" in relevant part to include "any corporation in which the United States has a proprietary interest." 28 U.S.C. § 451. In 1948, "proprietary" meant "[b]elonging to ownership" where, in turn, "ownership" meant "complete dominion, title, or proprietary right." Proprietary, Ownership, Black's Law Dictionary (4th ed. 1951).

Applying these definitions to the FRBNY, the FRBNY is not an "agency" under section 451. A Federal Reserve bank "is owned solely by commercial banks within its district;" the "United States does not own stock in" Federal Reserve banks. Scott, 406 F.3d at 535 (citing 12 U.S.C. §§ 282, 287, 341). The United States therefore does not have a "proprietary interest" in the FRBNY. Cf. Scott, 406 F.3d at 535–38; In re Hoag Ranches, 846 F.2d 1225, 1227–29 (9th Cir. 1988). Accordingly, the FRBNY is not an "agency" under the Mandamus Act. 28 U.S.C. § 451.[11] Hence,

---

[11] Although "§ 451 is not an all-embracing definition," Acron Invs., Inc. v. Fed. Sav. & Loan Ins. Corp., 363 F.2d 236, 239 (9th Cir. 1966), "a law's terms are best understood by the company they keep." United States v. Taylor, 596 U.S. 845, 856 (2022).

there is no jurisdiction to grant BSJI's request for relief against the FRBNY pursuant to the Mandamus Act.

In any event, BSJI's Mandamus Act claim fails against both defendants because there is no clear right to the relief sought by BSJI. See Sprecher, 716 F.2d at 973. Section 248a of the FRA does not impose a duty on the FRBNY to open and maintain a master account for any depository institution that requests such an account. Rather, master account-closure decisions are committed to the discretion of Federal Reserve banks pursuant to section 342. Because the action that BSJI seeks to compel from the defendants is not subject to "positive command, plainly described, and free from doubt, . . . the Mandamus Act does not confer jurisdiction upon this [C]ourt." Keane v. Chertoff, 419 F. Supp. 2d 597, 599 (S.D.N.Y. 2006).

Under the Mandamus Act, jurisdiction "is limited to actions seeking to compel the performance of a nondiscretionary duty." Duamutef, 386 F.3d at 180 (emphasis in original). Because the FRA does not impose a nondiscretionary duty on either defendant to maintain a master account for BSJI, the Court lacks the "power to adjudicate" BSJI's claim to relief in the nature of mandamus. See Steel Co., 523 U.S. at 89. Accordingly, BSJI's Mandamus Act claims against both defendants must be **dismissed** for lack of subject-matter jurisdiction.

**C. DJA Claims**

The defendants also argue that the Court lacks subject-matter jurisdiction over BSJI's DJA claims because neither the DJA nor the FRA provides BSJI with a private right of action. FRBNY Br. 16–17; FRBNY Rep. 5–6; Bd. Br. 22. BSJI disagrees, asserting that BSJI has adequately alleged a DJA claim pursuant to the Mandamus Act and the APA. Opp. 18–19.

Pursuant to the DJA, federal courts may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). But "the operation of the [DJA] is procedural only." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937). By enacting the DJA, "Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." Skelly Oil Co. v. Phillips Petrol. Co., 339 U.S. 667, 671 (1950). Thus, where the substantive statute at issue does not provide a cause of action, "the DJA cannot expand the statute's authority by doing so." Chevron Corp. v. Naranjo, 667 F.3d 232, 245 (2d Cir. 2012). Moreover, district courts retain broad discretion to decline jurisdiction under the DJA. Sunvestment Energy Grp. v. Nat. Grid USA Servs. Co., 116 F.4th 106, 114 (2d Cir. 2024); Wilton v. Seven Falls Co., 515 U.S. 277, 287–89 (1995).

BSJI seeks the declaration of a "substantive claim of right" purportedly found in section 248a(c)(2) of the FRA. Cf. In re Joint E. & S. Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993). But because the DJA provides only a remedy, BSJI may seek a declaration under the FRA only "if there is a private cause of action under that statute." Cf. Johnson v. JPMorgan Chase Bank, 488 F. Supp. 3d 144, 157 (S.D.N.Y. 2020); see also United States v. Doherty, 786 F.2d 491, 498-99 (2d Cir. 1986) (discussing the DJA's purpose). And the FRA does not afford BSJI a private right of action. PayServices Bank, 2024 WL 1347094, at *6; accord Scriven v. Barnum, No. 24-cv-1805, 2024 WL 1769318, at *1 (E.D.N.Y. Apr. 24, 2024) (finding that "there is no private right of action under the Federal Reserve Act"); but see White v. Keely, 814 F.3d 883, 888 (7th Cir. 2016) (interpreting 12 U.S.C. § 503 as creating a limited private right of action to sue directors and officers of member banks). Indeed, with respect to its DJA claims, BSJI "do[es] not even argue that there exists an implied cause of action under the [FRA]." Cf. Johnson, 488 F. Supp. 3d at 157; see also Alexander v. Sandoval, 532 U.S. 275, 286 (2001) (instructing courts to determine whether statutes provide "not just a private right but also a private remedy").

The lack of any applicable private right of action under the FRA requires dismissal of BSJI's DJA claims. Chevron Corp.,

667 F.3d at 245; Johnson, 488 F. Supp. 3d at 157. And because BSJI seeks the declaration of a nonexistent right pursuant to a nonexistent right of action, BSJI's DJA claims are properly dismissed for lack of jurisdiction rather than for failure to state a claim. See Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1181–82 (2d Cir. 1978).

Recognizing that the DJA "is not an independent source of federal jurisdiction," Schilling v. Rogers, 363 U.S. 666, 677 (1960), BSJI purports to bring its DJA claims pursuant to the APA and the Mandamus Act. But "[t]he APA is not an independent grant of subject matter jurisdiction." Lunney, 319 F.3d at 557. And for the reasons explained above, the Mandamus Act does not confer subject-matter jurisdiction in this case. Moreover, neither statute provides a cause of action that would permit BSJI to seek a declaration of BSJI's rights under section 248a(c)(2) of the FRA. In short, BSJI cannot use those statutes to bootstrap its request for a declaration. See Keane, 419 F. Supp. 2d at 599.

In sum, because the FRA does not provide BSJI with a private right of action, PayServices Bank, 2024 WL 1347094, at *6, and BSJI has failed to identify any other "statutory authorization or mandate from Congress" to review the account-closure decision, cf. Wan Shih Hsieh, 569 F.2d at 1181–82,

BSJI's DJA claims must be **dismissed** for lack of subject-matter jurisdiction.

### D. Due Process Claim

In Count IV, BSJI's sole remaining federal-law claim, BSJI alleges that the defendants violated the Due Process Clause of the Fifth Amendment by, among other things, failing to provide "a meaningful opportunity to be heard[] before terminating [BSJI's] master account." AC ¶¶ 190–93. The FRBNY and the Board argue that Count IV should be dismissed for failure to state a claim. FRBNY Br. 17, 19–20; FRBNY Rep. 6–8; Bd. Br. 22; Defs' Ltr., ECF No. 151. Relying again on section 248a, BSJI opposes dismissal. Opp. 17–18; BSJI Ltr. *1–2.

"The Due Process Clause of the Fifth Amendment prohibits the United States . . . from depriving any person of property without due process of law." Dusenbery v. United States, 534 U.S. 161, 167 (2002). Generally, "individuals whose property interests are at stake are entitled to "notice and an opportunity to be heard." Id. (citing United States v. James Daniel Good Real Prop., 510 U.S. 43, 48 (1993)).

BSJI's due process claim fails for two reasons: (1) BSJI fails to allege a valid cause of action; and (2) BSJI had no property interest in a master account.[12]

---

[12] The parties have not raised the argument whether the Fifth Amendment's strictures apply to the FRBNY, a federal instrumentality.

### 1. No Cause of Action

Liberally construing BSJI's opposition and supplemental
briefs, BSJI purports to bring its due process claim pursuant to
an implied right of action found in section 248a of the FRA, or
in the alternative, requests the creation of a remedy by
extending Bivens v. Six Unknown Named Agents of Fed. Bureau of
Narcotics, 403 U.S. 388 (1971). Opp. 17; BSJI Ltr. *1. Both
attempts to identify a valid cause of action fail.

With respect to the FRA, "Congress has specified that
federal reserve banks such as FRBNY may be sued . . . ." Starr
Int'l Co., 742 F.3d at 40 (citing 12 U.S.C. § 341). Mere
authorization to be sued, however, does not create a cause of
action. See Osborn v. Bank of the U.S., 22 U.S. 738, 823 (1824).
And in interpreting statutes, "courts must refrain from creating
a cause of action whenever there is even a single sound reason
to defer to Congress." Nestlé USA, Inc. v. Doe, 593 U.S. 628,
635 (2021). In this case, because section 248a does not create
an unqualified right to a master account, the section does not
provide an implied right of action. Indeed, section 248a does
not even suggest what the elements of such a cause of action
might be.

With respect to Bivens, "the purpose of Bivens is to deter
the officer." Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471,
485 (1994) (emphasis in original). Therefore, to allow a Bivens

claim against federal agencies or instrumentalities, rather than individual federal officers, "would mean the evisceration of the <u>Bivens</u> remedy, rather than its extension." <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 69–70 (2001). Accordingly, an extension of <u>Bivens</u> is unwarranted in this case.[13]

In sum, BSJI has failed to identify a valid cause of action to sue for alleged violations of the Due Process Clause of the Fifth Amendment. BSJI's due process claims against both defendants therefore merit dismissal for failure to state a claim. <u>See</u> <u>Lyndonville Sav. Bank & Tr. Co.</u>, 211 F.3d at 701.

### 2. No Property Interest

Moreover, BSJI has failed to identify any property interest protected by the due process clause. Protected property interests include government benefits to which qualified persons are entitled by statute. <u>See, e.g.</u>, <u>Goldberg v. Kelly</u>, 397 U.S. 254, 262 (1970). "To have a property interest in a benefit," however, a person must "have a legitimate claim of entitlement to it" pursuant to "an independent source." <u>See</u> <u>The Bd. of</u>

---

[13] BSJI relies on <u>Nat'l Ass'n of Indus. Bankers v. Weiser</u>, --- F. Supp. 3d ---, 2024 WL 3169735, at *6 (D. Colo. June 18, 2024), <u>appeal docketed</u>, No. 24-1293 (10th Cir. July 22, 2024). But <u>Weiser</u> is inapposite. <u>Weiser</u> addressed 12 U.S.C. § 1831d, a provision of "the Federal Deposit Insurance Act," not the Federal Reserve Act. <u>Id.</u> at *1, *6. Moreover, the <u>Weiser</u> court did not, as BSJI contends, find an implied right of action in section 1831d. <u>Id.</u> at *6. Rather, the plaintiffs in <u>Weiser</u> raised "a claim in equity under <u>Ex parte Young</u>, 209 U.S. 123 (1908)." <u>Id.</u> In this case, BSJI has not sued a state officer, and thus cannot rely on <u>Ex parte Young</u>. <u>See</u> 209 U.S. at 155–56 (holding that federal courts may enjoin <u>state officers</u> from enforcing state laws in violation of the United States Constitution).

Regents of State Colls. V. Roth, 408 U.S. 564, 577–78 (1972);

Perry v. Sindermann, 408 U.S. 593, 599–600 (1972).

In this case, section 248a(c)(2) of the FRA is the only "independent source" that BSJI has identified as providing BSJI with a protected property interest. That section, however, does not provide BSJI with an unqualified right to a master account. Rather, the FRA vests the FRBNY with discretion to grant, deny, or close any master account. 12 U.S.C. § 342. And "a benefit is not a protected entitlement" if "officials may grant or deny it in their discretion." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005). Therefore, BSJI's due process claim fails to allege any entitlement to relief.[14] Accord PayServices Bank, 2024 WL 1347094, at *14–15. Accordingly, BSJI's due process claim against both defendants should be **dismissed** for failure to state a claim.

### VII. State-Law Claims

BSJI alleges that the FRBNY's decision to close BSJI's Master Account breached both a contractual duty of good care supplied by Operating Circular 1, AC ¶¶ 194–99, and the implied covenant of good faith and fair dealing under New York law, id. ¶¶ 200–07. The FRBNY argues that both claims fail to allege a

---

[14] It is therefore unnecessary to decide what process would be due if BSJI possessed a property interest. See Mathews v. Eldridge, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.").

plausible entitlement to relief. FRBNY Br. 20-22; FRBNY Rep. 8-9. Because BSJI "specifically agreed that the FRBNY had the right to terminate" BSJI's Master Account, <u>BSJI I</u>, 700 F. Supp. 3d at 100, BSJI's state-law claims fail against the FRBNY.

### A. The MAA

BSJI alleges that the MAA, which is governed by New York law and incorporates Operating Circular 1, imposes upon the FRBNY a "duty of care." AC ¶ 196; Opp. 19-22. According to BSJI, section 7.1 of Operating Circular 1, titled "duty of care," imposes liability on the FRBNY for "actual damages incurred by the Account Holder and proximately caused by the Reserve Bank's lack of good faith and failure to exercise ordinary care." Opp. 19-22.

BSJI's argument is without merit. Section 7.1 of Operating Circular 1 provides:

> [A] Reserve Bank shall be liable only to an Account Holder and only for actual damages incurred by the Account Holder and proximately caused by the Reserve Bank's lack of good faith and failure to exercise ordinary care. A Reserve Bank is not liable for lost profits, claims by third parties, or consequential or incidental damages, even if the Reserve Bank has been informed of the possibility of such damages.

OC 1 at 14. Read in context, section 7.1 expressly limits the types of damages that the FRBNY can be held liable for independent of section 7.1. For example, as the FRBNY noted at

oral argument, when the FRBNY "messe[s] up check clearing," the customer may be able to sue for breach of contract. Tr. 45–46. In that instance, section 7.1 would limit recovery to "actual damages incurred" and "proximately caused by the [FRBNY's] lack of good faith and failure to exercise ordinary care." OC 1 at 14. The section therefore <u>limits</u> any duty of care imposed on the FRBNY independent of the MAA. The section does not, as BSJI contends, impose upon the FRBNY a generalized duty of care above and beyond any specific obligation otherwise owed to BSJI. Indeed, the section goes on to absolve the FRBNY from other types of damages for which BSJI might sue the FRBNY.

In any event, section 2.10 of Operating Circular 1 provided the FRBNY with the unqualified contractual right to close BSJI's account "at any time by notice to [BSJI]." OC 1 at 7. Thus, the MAA provided the FRBNY with the express right to terminate BSJI's Master Account "at any time by notice." <u>Id.</u> Moreover, by executing the Supplemental Terms, BSJI reconfirmed that "the Bank may suspend or terminate [BSJI's] access, . . . close [BSJI's] Master Account, [or] impose conditions" related thereto "at any time by giving written notice to [BSJI]." Brennan Decl., Ex. C at *11, *14. "Under New York law, where the parties to a contract have agreed to a written termination clause," as the FRBNY and BSJI did in this case, "it must be enforced as

written." <u>Joseph Victori Wines, Inc. v. Vina Santa Carolina</u>
<u>S.A.</u>, 933 F. Supp. 347, 352 (S.D.N.Y. 1996).

In response, BSJI points out that New York law requires the
terminating party to exercise good faith where a contractual
termination right is exercised in the terminating party's "sole
discretion." <u>See, e.g.</u>, <u>Ahmen Elkoulily, M.D., P.C. v. N.Y.</u>
<u>State Cath. Healthplan, Inc.</u>, 61 N.Y.S.3d 83, 87 (App. Div.
2017). But Operating Circular 1 provides the FRBNY with an
<u>unqualified</u> contractual right, <u>see</u> OC 1 at 7, that was
reaffirmed by the Supplemental Terms, Brennan Decl., Ex. C at
*11, *14. Under New York law, where the contract provides an
<u>unqualified</u> termination right, "courts 'do not ordinarily read
implied limitations into unambiguously worded contractual
provisions designed to protect contracting parties." <u>In Touch</u>
<u>Concepts, Inc. v. Cellco P'ship</u>, 949 F. Supp. 2d 447, 470
(S.D.N.Y. 2013). Because the MAA permitted the FRBNY to
terminate BSJI's Master Account "at any time by notice to
[BSJI]," a right reaffirmed by the Supplemental Terms, the FRBNY
did not breach any contractual duty by exercising that express
termination right. <u>Joseph Victori Wines</u>, 933 F. Supp. at 353.

### B. Implied-Covenant Claim

BSJI's implied-covenant claim is duplicative of its breach-
of-contract claim. <u>Gillespie v. St. Regis Residence Club</u>, 343 F.
Supp. 3d 332, 341 (S.D.N.Y. 2018). "New York law . . . does not

recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life and Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002). To survive a motion to dismiss, an implied-covenant claim must be: (1) "based on allegations different than those underlying the accompanying breach of contract claim;" In re Refco Inc. Sec. Litig., 826 F. Supp. 2d 478, 496 (S.D.N.Y. 2011); and (2) the relief sought must be separate from "the damages allegedly resulting from the breach of contract." ARI and Co. v. Regent Int'l Corp., 273 F. Supp. 2d 518, 521-22 (S.D.N.Y. 2003).

In this case, BSJI's implied-covenant claim is based on the same facts underlying its breach-of-contract claim. Compare AC ¶ 198 (alleging facts in support of duty-of-care claim) with AC ¶ 205 (alleging substantially similar facts in support of implied-covenant claim). Therefore, BSJI's implied-covenant claim is subject to dismissal for failure to state a claim. See Quintanilla v. WW Int'l, Inc., 541 F. Supp. 3d 331, 352-53 (S.D.N.Y. 2021) (dismissing implied-covenant claim because it was "duplicative of [the] claim for breach of contract").

Moreover, under New York law, "the implied covenant of good faith cannot create duties that negate explicit rights under a contract." LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.,

725 F.3d 184, 195 (2d Cir. 2013); Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 91 (N.Y. 1983). The FRBNY had the unqualified contractual right to close BSJI's account "at any time by notice." OC 1 at 7. BSJI cannot now invoke the implied covenant to counteract the unqualified termination provision in the MAA to which BSJI agreed. Antartica Star I, LP v. Gibbs Int'l, Inc., 15-cv-2630, 2017 WL 590314, at *6 (S.D.N.Y. Feb. 14, 2017) (dismissing implied-covenant claim where "sophisticated parties" had agreed to "language [in] the termination clause" that was "unqualified"). BSJI complains merely that the FRBNY exercised rights under the MAA; "such behavior is not actionable." CIBC Bank & Tr. Co. v. Banco Cent. do Brasil, 886 F. Supp. 1105, 1118 (S.D.N.Y. 1995). Accordingly, BSJI's implied-covenant claim must be **dismissed.**

### CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the defendants' motions to dismiss are **granted.** All of BSJI's claims are **dismissed without prejudice** as discussed above.

At oral argument, counsel for BSJI indicated that BSJI may wish to file a second amended complaint. Tr. 16. The time to file a motion to amend, attaching a copy of the second amended complaint and explaining how the second amended complaint solves

the deficiencies noted in this opinion, is **January 27, 2025.** The

defendants may respond by **February 10, 2025.** The plaintiff may

reply by **February 17, 2025.** If the plaintiff does not file any

such motion by **January 27, 2025,** the Court will issue an order

directing that judgment be entered dismissing the Amended

Complaint for the reasons explained in this Opinion.

The Clerk is directed to close ECF Nos. 130 & 135.

**SO ORDERED.**

Dated:      New York, New York
            January 8, 2025

                                    _____
                                        John G. Koeltl
                                **United States District Judge**