No. 24-8024

# In the United States Court of Appeals for the Tenth Circuit

―――――――――――――

CUSTODIA BANK, INC.,
PLAINTIFF-APPELLANT

*v.*

FEDERAL RESERVE BOARD OF GOVERNORS, ET AL.,
DEFENDANTS-APPELLEES

―――――――――――――

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(CIV. NO. 22-125; THE HONORABLE SCOTT W. SKAVDAHL, J.)*

―――――――――――――

**PETITION FOR REHEARING EN BANC
BY APPELLANT CUSTODIA BANK, INC.**

―――――――――――――

KANNON K. SHANMUGAM
MASHA G. HANSFORD
NATHAN W. RAAB
DAVID T. WONG
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

## TABLE OF CONTENTS

Page

Introduction and Rule 40(b) statement ................................................. 1

Background ............................................................................................. 2

Reasons for granting the petition ......................................................... 7

    A.    The question presented is exceptionally important ....................... 7

    B.    The panel's decision is incorrect ..................................................... 12

Conclusion ............................................................................................. 18

## TABLE OF AUTHORITIES

### CASES

*Briscoe* v. *Bank of Commonwealth of Kentucky*, 36 U.S. 257 (1837) ............... 7

*Buckley* v. *Valeo*, 424 U.S. 1 (1976) ...................................................... 10

*Fourth Corner Credit Union* v. *Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017) ........................................... 1, 2, 3, 6, 8, 16

*Gregory* v. *Ashcroft*, 501 U.S. 452 (1991) .............................................. 16

*Kamen* v. *Kemper Financial Services*, 500 U.S. 90 (1991) .............................. 12

*Kennedy* v. *Braidwood Management, Inc.*, 606 U.S. 748 (2025) ..................... 17

*Lebron* v. *National Railroad Passenger Corp.*, 514 U.S. 374 (1995) ............................................................................... 11

*Lewis* v. *BT Investment Managers, Inc.*, 447 U.S. 27 (1980) ........................... 9

*Lopez* v. *Davis*, 531 U.S. 230 (2001) ................................................... 13

*Lucia* v. *SEC*, 585 U.S. 237 (2018) ...................................................... 10

(i)

Page

Cases—continued:

*Melcher* v. *Federal Open Market Committee*,
644 F. Supp. 510 (D.D.C. 1986) ........................................................10

*National Association of Industrial Bankers* v. *Weiser*,
159 F.4th 694 (10th Cir. 2025) ..........................................................8

*PayServices Bank* v. *Federal Reserve Bank of San Francisco*,
Civ. No. 23-305, 2024 WL 1347094 (D. Idaho Mar. 30, 2024)........................9

*PayServices Bank* v. *Federal Reserve Bank of San Francisco*,
No. 24-2355 (9th Cir. filed Apr. 15, 2024) ........................................9

*United States* v. *Arthrex, Inc.*, 594 U.S. 1 (2021) ................................11

*Utility Air Regulatory Group* v. *EPA*, 573 U.S. 302 (2014)............................16

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. Art. II ..................................................................1, 5, 6, 9

§ 2, cl. 2.....................................................................7, 9, 10, 11, 12

12 U.S.C.:

§ 221..................................................................................13

§ 248(j)................................................................................15

§ 248a..........................................................................3, 5, 6, 15, 16

§ 248a(b)..............................................................................12, 13

§ 248a(c)(2)....................................................................3, 12, 13, 14, 15, 16

§ 248c(b)(1) ............................................................................15

§ 341..................................................................................10

§ 342..............................................................................3, 6, 13

Page

Statutes and rules—continued:

§ 461(b)(1)(A)(i) ....................................................................3, 12, 14

Wyo. Rev. Stat. § 13-12-103(b) ................................................4

2019 Wyo. Sess. Laws ch. 92, § 1(a)(viii) ..............................4

Fed. R. App. P. 40(b)(2)(D)......................................................7

10th Cir. R. 35.1......................................................................1

## MISCELLANEOUS

Wishal Chawla, *How Wyoming Became a Crypto Hub*,
  CryptoBriefing.com (Sept. 11, 2021) <tinyurl.com/WYcryptohub> ...........4

*FDIC State Tables* <tinyurl.com/statetables>
  (last visited Dec. 14, 2025)...................................................8

H.R. Rep. No. 95-1590 (1978) ................................................14

Julie Andersen Hill, *Opening a Federal Reserve Account*,
  40 Yale J. Reg. 454 (2023) ..................................................3

Interview with Federal Reserve Governor Christopher
  J. Waller by Eleanor Terrett (Oct. 21, 2025)
  <tinyurl.com/WallerInterview> ...................................7, 12, 15, 17

Arthur E. Wilmarth Jr., *The Expansion of State Bank Powers, the
  Federal Response, and the Case for Preserving the Dual Banking
  System*, 58 Fordham L. Rev. 1133 (1990) ........................................8

*Wyoming Wants to Become America's Crypto Capital*, The Economist
  (Sept. 14, 2023) <tinyurl.com/WYcryptocapital> ........................................4

## INTRODUCTION AND RULE 40(B) STATEMENT

To move money from place to place, American banks must hold "master accounts" with the Federal Reserve.  Because a master account is "indispensable" for a bank's day-to-day operations, see *Fourth Corner Credit Union* v. *Federal Reserve Bank of Kansas City*, 861 F.3d 1052, 1064 (10th Cir. 2017) (opinion of Bacharach, J.), closing a bank's master account—or refusing to open one—all but sentences the bank to death.

Yet in this case, a divided panel held that the Fed's master account decisions are wholly discretionary—thus giving regional Federal Reserve Bank presidents plenary power, with no judicial review, over whether a bank shall live or die.  Whether that holding, issued over Judge Tymkovich's dissent, was correct presents a question of exceptional importance.  *See* 10th Cir. R. 35.1. *First*, it profoundly affects States' authority to charter their own banks:  when the Fed denies a master account to a state-chartered financial institution, it effectively vetoes a bank charter that State regulators have approved.  And *second*, it raises serious constitutional questions about the Fed's structure by interpreting the applicable statutes to confer that unreviewable power on mid-level Fed officials—regional bank presidents—who are not appointed as either principal or inferior officers under Article II of the Constitution.

Review is also warranted because the panel's decision was incorrect, for the reasons Judge Tymkovich gave in dissent and that Judge Bacharach previously set out in *Fourth Corner*.  The panel's interpretation disregarded the

plain text of the Monetary Control Act (MCA), which requires the Fed to offer its payment services to eligible nonmember institutions. It also departed from 35 years of history: for decades, the Fed did not interpret the MCA as conferring the power to debank financial institutions. Finally, the panel's holding invaded the States' core regulatory prerogatives and put the Fed in constitutional quicksand. Courts usually try to avoid such outcomes, not create them.

The petition for rehearing en banc should be granted.

## BACKGROUND

1.    The Federal Reserve System, commonly known as the "Federal Reserve" or "Fed," consists of a seven-member Board of Governors; the Federal Open Market Committee; and twelve regional Federal Reserve Banks. Op. 7. Together, the Fed operates much of our Nation's payment infrastructure, including its wire transfer and ACH networks. Op. 8.

To use the Fed's payments services, a financial institution must deposit funds in a "master account" with its local Federal Reserve Bank. Op. 10. And because the Fed's services are so important, master accounts "are vital for functioning banks." Diss. Op. 5. Without a master account, a bank cannot transfer funds electronically, making it "nothing more than a vault." *Fourth Corner Credit Union* v. *Federal Reserve Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (opinion of Moritz, J.).

2

No statute expressly authorizes the Fed to offer master accounts. *See* Op. 11 n.4. Rather, the Fed has created those accounts "pursuant to its authority to take deposits and provide services." *Id.* That authority is governed by two statutory provisions. The first, from the 1913 Federal Reserve Act, authorizes regional Federal Reserve Banks to collect deposits: "Any Federal reserve bank may receive from any of its member banks, or other depository institutions . . . deposits of current funds in lawful money." 12 U.S.C. § 342. The second, from the 1980 Monetary Control Act, instructs the Federal Reserve Board to set a fee schedule for the services it provides. 12 U.S.C. § 248a. Those services "shall be available to nonmember depository institutions" and "shall be priced at the same fee schedule applicable to member banks." 12 U.S.C. § 248a(c)(2). The term "nonmember depository institution" includes "any bank which is eligible" for FDIC insurance but is not a member of the Federal Reserve System. 12 U.S.C. § 461(b)(1)(A)(i).

For decades, the Fed gave a master account to every legally eligible bank that asked for one. *See Fourth Corner*, 861 F.3d at 1071-1072 (opinion of Bacharach, J.); J.A. 766-767. In 2015, however, the Fed began repeatedly denying or ignoring master account applications by disfavored banks. *See* Julie Andersen Hill, *Opening a Federal Reserve Account*, 40 Yale J. Reg. 454, 471-496 (2023).

3

2.      Plaintiff Custodia Bank, Inc., is a financial institution that primarily serves digital asset companies.  Op. 11.  It is headquartered in Cheyenne, Wyoming, and holds a Wyoming Special Purpose Depository Institution (SPDI) charter.  *Id.*  That charter authorizes Custodia to "[p]rovide payment services" and "[c]arry on a nonlending banking business."  Wyo. Rev. Stat. § 13-12-103(b).

Custodia's Wyoming home is no accident.  Wyoming has long sought investment by digital asset firms.  *See Wyoming Wants to Become America's Crypto Capital*, The Economist (Sept. 14, 2023) <tinyurl.com/WYcryptocapital>.  To encourage that investment, Wyoming enacted its SPDI statute, which created a tailored regulatory regime for banks like Custodia and thus "provide[d] a necessary and valuable service to blockchain innovators."  2019 Wyo. Sess. Laws ch. 92, § 1(a)(viii) (legislative findings).  That choice, in turn, brought Custodia and similar businesses to Wyoming.  Buoyed by its comprehensive legal framework for digital assets, Wyoming has become "America's leading crypto hub."  Wishal Chawla, *How Wyoming Became a Crypto Hub*, CryptoBriefing.com (Sept. 11, 2021) <tinyurl.com/WYcryptohub>.

3.      On October 29, 2020, Custodia applied for a master account.  J.A. 87.  The Federal Reserve Bank of Kansas City (hereafter the "Kansas City Fed") told Custodia that it "was legally eligible" for the account and that "there were 'no showstoppers' with its application."  Op. 12.  In internal

4

memorandums, its staff deemed Custodia's capital "adequate" and its liquidity risk "low," while praising its "strong" risk management and "impressive" executive team. J.A. 693-694. But when officials from the Board of Governors intervened, the Kansas City Fed changed its tune. *Id.* On January 27, 2023, the Kansas City Fed denied Custodia's master account application. J.A. 1947. Since then, Fed officials have exerted "regulatory pressure" against Custodia's banking partners, apparently in an effort to debank Custodia entirely. *See, e.g.*, J.A. 2097.

Custodia sued the Kansas City Fed and the Board of Governors in the United States District Court for the District of Wyoming. Op. 17.[1] It argued that, under Section 248a, the Kansas City Fed lacked discretion to deny its master account application. *Id.* On the defendants' motion, the district court dismissed some of Custodia's claims—including a claim that the Fed's structure violated Article II of the Constitution—and subsequently entered summary judgment for defendants on Custodia's Section 248a claim against them. Op. 15-19.

A divided panel of this Court affirmed. Op. 48. The majority determined that, under the Federal Reserve Act, the regional Reserve Banks possessed

---

[1] Custodia first filed its lawsuit in June 2022, after its application had been pending for 19 months but before the Kansas City Fed acted on it. Op. 15. When the Kansas City Fed denied the application, Custodia filed an amended complaint challenging that denial. Op. 17.

"discretionary authority" over a depository institution's application.  Op. 30 (citing 12 U.S.C. § 342).  The majority was not persuaded by the MCA's mandate that all services be provided to nonmember depository institutions—a category that undisputedly includes Custodia—because, in its view, that Act was "concerned with  .  .  .  the [Reserve Banks'] *pricing* of services," rather than their *provision* of services.  *Id.* (emphasis added) (citing 12 U.S.C. § 248a).

Judge Tymkovich dissented, adopting Judge Bacharach's position from *Fourth Corner*.  Diss. Op. 11 (citing 861 F.3d at 1068).  He explained that the MCA—which directs the Fed to "provide universal access" to banking services "at equal prices"—stripped the Fed of any authority to deny Custodia master account access.  *Id.* at 13.  The majority's contrary position, he added, raised "constitutional concerns" that it was "bound to avoid."  *Id.* at 25.  By granting presidents of the regional Reserve Banks "unreviewable discretion" over account applications like Custodia's, the majority made those individuals "Officers of the United States," raising "thorny question[s]" under Article II of the Constitution.  *Id.* at 27-28.

Nor, Judge Tymkovich continued, would giving Custodia a master account create excessive risk for the Fed.  Rather, the Fed could address that "policy concern[]" through other tools—for instance, limits on Custodia's access to credit.  *Id.* at 25.  Fed officials have since admitted those tools could, in

fact, adequately manage Custodia's risks. *See* Interview with Christopher J. Waller by Eleanor Terrett at 8:05-8:40 (Oct. 21, 2025) <tinyurl.com/WallerInterview> (Waller Interview).

## REASONS FOR GRANTING THE PETITION

This case is a compelling candidate for en banc review. Leaving in place the panel majority's interpretation of the MCA would gut the States' power to charter banks such as Custodia (and thus Wyoming's statute authorizing those charters) and would raise serious constitutional questions under the Appointments Clause. The panel majority's decision is also incorrect, as Judges Tymkovich and Bacharach have explained. Indeed, the deep division on this Court is itself a reason to grant rehearing en banc, so as to allow all members of the Court an opportunity to weigh in on the question presented.

### A.    The Question Presented Is Exceptionally Important

Rehearing en banc is warranted to resolve a "question[] of exceptional importance":  whether, by statute, the Fed has plenary discretion to deny banks master account access. *See* Fed. R. App. P. 40(b)(2)(D).

1.    The panel's decision implicates a longstanding state prerogative— the power to charter banks without approval by the Federal Government.

States have long enjoyed the authority to charter their own banks. In fact, for much of our history, *only* States used that "important power":  the Federal Government chartered only two banks before the Civil War. *Briscoe*

v. *Bank of Commonwealth of Kentucky*, 36 U.S. 257, 318 (1837); *see* Arthur E. Wilmarth Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1153 (1990).  Even today, about four-fifths of banks hold state charters, and bank regulation remains "squarely within" the States' remit.  *National Association of Industrial Bankers* v. *Weiser*, 159 F.4th 694, 712 (10th Cir. 2025) (citation omitted); *see FDIC State Tables* <tinyurl.com/statetables> (last visited Dec. 14, 2025) (listing 4,379 FDIC-insured banks, of which 3,473 are state-chartered, as of September 30, 2025).

Yet the panel's decision permits the Fed to reduce state charters to nothing—all but erasing the States' historic chartering privileges.  A bank charter has no value unless its holder can access the payment system; without payment-system access, a bank is just a "vault."  *Fourth Corner*, 861 F.3d at 1053 (opinion of Moritz, J.).  But payment-system access requires master-account access, which the panel left to the Fed's unreviewable discretion.  Op. 25.  The panel's holding thus gives the Fed a veto over state charters.  If the Fed thinks certain banks—or entire categories of banks—should not be chartered, it can deny those banks a master account.

Indeed, that is precisely what happened here.  In 2019, Wyoming granted Custodia a charter under its SPDI statute, which it drafted to effectuate its policy that banks focused on digital assets deserved charters.  Op. 11;

*see* p. 4, *supra.* But because the Fed has denied Custodia a master account—evidently because it distrusts SPDIs in general—Custodia cannot use those powers. The panel's decision thus functionally preempts Wyoming's SPDI statute: unless the Fed cooperates, SPDIs like Custodia cannot exercise their charter rights.[2]

A State's power to charter banks is "of profound local concern." *Lewis* v. *BT Investment Managers, Inc.*, 447 U.S. 27, 38 (1980). Given the implications of the question presented for state authority, en banc review is warranted.

2.     The question is also exceptionally important because the panel's holding threatens the Federal Reserve System's constitutionality. The panel's statutory interpretation creates serious Article II problems by making the presidents of regional Federal Reserve Banks "officers"—likely "principal officers"—"of the United States."

Under Article II of the Constitution, presidents of regional Federal Reserve Banks cannot perform duties that would make them "Officers of the United States." U.S. Const. Art. II, § 2, cl. 2. That is because the

---

[2] Nor is this problem unique to Wyoming. In 2023, for example, the Federal Reserve Bank of San Francisco denied a master account to an Idaho bank, PayServices. PayServices also sued, and its case is currently pending before the Ninth Circuit. *See PayServices Bank* v. *Federal Reserve Bank of San Francisco*, Civ. No. 23-305, 2024 WL 1347094, at *4 (D. Idaho Mar. 30, 2024), *appeal filed*, No. 24-2355 (9th Cir. Apr. 15, 2024).

Appointments Clause "prescribes the exclusive means" of appointing officers of the United States:  only the President may appoint "principal" officers, and "[o]nly the President, a court of law, or a head of department" may appoint "inferior" officers.  *Lucia* v. *SEC*, 585 U.S. 237, 244 & n.3 (2018).  Presidents of regional Federal Reserve Banks, however, are not selected in any of these ways.  Instead, six members of each Reserve Bank's board "appoint" the Bank's president, "with the approval of the Board of Governors of the Federal Reserve System."  12 U.S.C. § 341.  Accordingly, regional presidents cannot perform duties reserved for officers of the United States, whether principal or inferior.  *See Melcher* v. *Federal Open Market Committee*, 644 F. Supp. 510, 520 (D.D.C. 1986).

By giving the regional presidents unbounded discretion over Custodia's master account application, the panel ran headlong into the Appointments Clause.  *First*, the panel's holding makes the regional presidents at least "inferior" officers.  To qualify as an "inferior" officer, a federal official must (1) "occupy a 'continuing' position established by law" and (2) "'exercise[] significant authority pursuant to the laws of the United States.'"  *Lucia*, 585 U.S. at 245 (quoting *Buckley* v. *Valeo*, 424 U.S. 1, 126 (1976) (per curiam)).  And under the panel's statutory holding, regional presidents tick both boxes:  they hold a "continuing" position, and they wield the "significant" power to decide which banks can access the payment system.  *Id.*

*Second*, the panel's holding likely makes the regional presidents "principal" officers. A "principal officer" is an officer with no superior, and thus with the "power to render a final decision" himself. *United States* v. *Arthrex, Inc.*, 594 U.S. 1, 14 (2021) (citation omitted). Regional presidents, per the panel, fit that bill too: they make "final decision[s]" on master account applications, without further review. Op. 23. The panel's decision thus apparently promoted regional presidents to principal-officer status, and so raised a serious Appointments Clause concern.

The panel did not acknowledge those difficulties. Instead, it tried to dodge them, suggesting that Custodia had forfeited the "argu[ment] that the appointment process for a Reserve Bank president violates the Appointments Clause" by failing to brief it on appeal. Op. 46. But Custodia's briefs specifically argued that the "delegation to Reserve Banks" effected by the Fed's interpretation of the MCA was "improper under the Appointments . . . Clause[]." Br. of Appellant 55-56; *see* Reply Br. of Appellant 17-18. And even if Custodia had forfeited a freestanding Appointments Clause claim, it would not have thereby forfeited a constitutional-avoidance argument supporting its *statutory* claim that the MCA did not delegate such power. *See Lebron* v. *National Railroad Passenger Corp.*, 514 U.S. 374, 379 (1995). Nor would any such forfeiture have empowered the panel to interpret the MCA in ways that created constitutional problems. Rather, "[h]aving undertaken to decide"

whether the MCA gave Custodia a right to a master account, the panel was obliged to decide that question "proper[ly]"—without ignoring the Appointments Clause. *Kamen* v. *Kemper Financial Services*, 500 U.S. 90, 99 (1991).

For all these reasons, rehearing en banc is warranted.

## B.    The Panel's Decision Is Incorrect

The panel also erred on the merits, as Judges Tymkovich and Bacharach have recognized. The panel's statutory interpretation conflicts with the text of the MCA—which gives Custodia the right to a master account—and ignores Fed officials' admission that they have sufficient tools to "control" master account holders' risk. *See* Waller Interview at 4:17-55. It also departs from the Fed's historic views and contravenes principles of state sovereignty and constitutional avoidance.

1.    The MCA instructs the Fed to develop a fee schedule for certain "payment services." 12 U.S.C. § 248a(b). It then tells the Fed how it must provide and price those services: "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks." 12 U.S.C. § 248a(c)(2).

"Depository institution" is itself a defined phrase. It includes "any bank which is eligible" to apply for FDIC insurance. 12 U.S.C. § 461(b)(1)(A)(i). A "nonmember depository institution" is thus a bank that is eligible for FDIC

12

insurance but that has not joined the Federal Reserve System.  *Cf.* 12 U.S.C. § 221 (defining "member bank").

As Judge Tymkovich explained, that language resolves this case, imposing a nondiscretionary duty on the Fed to provide Custodia with a master account.  Diss. Op. 10-17.  Custodia is a "nonmember depository institution," as it is eligible to apply for FDIC insurance.  12 U.S.C. § 248a(c)(2).  The Fed therefore "shall" provide it—*i.e.*, carries a "discretionless obligation[]" to provide it, *Lopez* v. *Davis*, 531 U.S. 230, 241 (2001)—with the "bank services covered by [its] fee schedule."  12 U.S.C. § 248a(c)(2).  And the Fed cannot fulfill that obligation unless it gives Custodia a master account, for a master account is both a "service" under Section 248a(c)(2) and necessary to access the other "services" that provision mentions.  Hence, Section 248a entitles Custodia to a master account:  as a "nonmember depository institution," it "shall" receive one.  12 U.S.C. § 248a(c)(2).

In holding otherwise, the panel began by observing that, under the 1913 Federal Reserve Act, the Fed could refuse deposits from banks like Custodia.  Op. 29-30 (citing 12 U.S.C. § 342).  But the 1980 MCA amended the Federal Reserve Act, and it did so precisely to *remove* the Fed's discretionary authority over "payment services."  12 U.S.C. § 248a(b).  So the Federal Reserve Act does not show that, today, the Fed retains discretion over Custodia's master account.

The panel also found it significant that, on the whole, the MCA focuses more on pricing for payment services than on the availability of those services. Op. 30-32. But the relevant language from the MCA unequivocally addresses service availability, providing that "all" applicable services "shall be available" and then specifying how the services "shall be priced." 12 U.S.C. § 248a(c)(2). There is no basis to read that express availability mandate to mean something other than what it says; as Judge Tymkovich noted, "[c]ontext does not override the plain text of the statute." Diss. Op. 15.

The panel also asserted that Section 248a(c)(2) "does not say that services must be available to *all* nonmember depository institutions," just that those services must be available to nonmember institutions "*as a class*." Op. 32. But Section 248a(c)(2) incorporates Section 461's definition of "depository institution," which covers "*any* bank which is eligible" to apply for FDIC insurance. 12 U.S.C. § 461(b)(1)(A)(i) (emphasis added). As Judge Tymkovich explained, Section 248a(c)(2) thus requires the Fed to make its payment services available to "*any*" bank eligible for them—*i.e.*, to all nonmember banks. Diss. Op. 11. The panel's reading, by contrast, adds a word to the MCA, reading it to say that "[a]ll Federal Reserve Bank services . . . shall be available to [*some*] nonmember depository institutions." 12 U.S.C. § 248a(c)(2). By analogy, suppose that Congress instructed schools to provide "all listed services to students with disabilities." A school could not assert unlimited

14

discretion to deny services to disabled students because it had provided all listed services to *one* disabled student, and so had made the services available to disabled students "as a class."  Op. 32.

The panel also attempted to distinguish Section 248a by emphasizing that it speaks to the Board of Governors, not regional Reserve Banks.  Op. 30-31.  But the Board can set general policies that Reserve Banks must apply when making master account decisions.  12 U.S.C. § 248(j).  Just so here:  Section 248a(c)(2) directs the Board to set a policy—statutory access to master accounts—that the Reserve Banks must heed.  Once an account is open, the Fed can deploy the many tools available to it to manage accountholder risk.  *See* Waller Interview at 4:17-55.

Finally, the Toomey Amendment says nothing about the Fed's discretion to withhold account access.  Op. 33-34 (discussing 12 U.S.C. § 248c(b)(1)).  As the Amendment's principal sponsor—former Senator Patrick J. Toomey—explained, Congress passed the Amendment merely to "gather information" about the Fed's account administration practices.  Diss. Op. 20 (citing Toomey Br. 12).

In short, "[Section] 248a(c)(2) contains two clear commands:  (1) provide universal access, and (2) at equal prices."  Diss. Op. 13.  The panel's contrary reading was incorrect.

2.    Statutory context—including decades of regulatory history, plus principles of federalism and constitutional avoidance—confirms Judges Tymkovich and Bacharach's reading of Section 248a(c)(2).

As Judge Bacharach explained in *Fourth Corner*, the panel's reading of Section 248a(c)(2) departs from decades of Federal Reserve practice. *See* 861 F.3d at 1070. Before 2015, the Fed "uniformly interpreted" the MCA to "extend Federal Reserve services to all 'depository institutions.'" *Id.* Indeed, between the passage of the MCA and 2015, the Fed *never* denied *any* legally eligible bank a master account. J.A. 766-767. Only in 2015 did the Fed "discover . . . an unheralded power to regulate a significant portion of the American economy." *Utility Air Regulatory Group* v. *EPA*, 573 U.S. 302, 324 (2014) (citation omitted). "[W]e typically greet" such discoveries "with a measure of skepticism." *Id.*

So too, the panel's reading of Section 248a conflicts with States' historic authority to charter banks and with principles of constitutional avoidance, for the reasons given above. *See* pp. 7-12, *supra.* As to the States, the panel gave the Fed an effective veto over States' bank chartering decisions—the kind of interference with traditional state functions that requires clear congressional authorization. *See Gregory* v. *Ashcroft*, 501 U.S. 452, 460 (1991). Likewise, principles of "constitutional avoidance" dictate that a court "should not read [a] statute in a way that makes the current method of appointment . . .

16

unconstitutional if [the court] can reasonably read it otherwise." *Kennedy* v. *Braidwood Management, Inc.*, 606 U.S. 748, 775 (2025).

To justify its contrary interpretation, the panel pointed to two Fed policy documents it read (really, stretched) to say that "Reserve Banks have discretion with respect to master account access." Op. 41. But one of those documents is from 2023, postdating the Fed's denial of Custodia's application and saying nothing about the Fed's longstanding practices. And the other—from 1998—just states the truism that banks cannot access master accounts without approval by a Reserve Bank; it says nothing about why a Reserve Bank can withhold such approval. *Id.*

The panel also emphasized that, from 1980 onwards, the Fed has understood itself to have "the authority to protect its payment systems from risk." Op. 40. But the Fed admits it can easily protect itself under Custodia's reading of the MCA; for instance, it can block banks from using master account features that it deems particularly risky. Waller Interview at 4:17-4:55, 8:05-8:40. In the words of one Fed governor, the Fed can "tailor" the "structure" of its master accounts to fit the "risk profile" of each bank, and thus "control" the risk to which it is exposed. *Id.* at 4:17-4:55.

In any event, authority to protect against risk is not a blank check. The panel's decision vests absolute, unreviewable power in the Fed to debank

banks.  Congress did not give the Fed that boundless authority, and the en banc Court should say so.

## CONCLUSION

The petition for rehearing en banc should be granted.

Respectfully submitted,

/s/ *Kannon K. Shanmugam*

KANNON K. SHANMUGAM
MASHA G. HANSFORD
NATHAN W. RAAB
DAVID T. WONG
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

DECEMBER 15, 2025

**CERTIFICATE OF COMPLIANCE
WITH TYPEFACE AND WORD-COUNT LIMITATIONS**

I, Kannon K. Shanmugam, counsel for petitioner Custodia Bank, Inc. and a member of the Bar of this Court, certify that this petition complies with Federal Rule of Appellate Procedure 40(d)(3) and Tenth Circuit Rule 32 because it is proportionally spaced, has a typeface of 14 points or more, and contains 3,899 words, excluding the parts exempted by Fed. R. App. P. 32(f).

/s/ *Kannon K. Shanmugam*

KANNON K. SHANMUGAM

DECEMBER 15, 2025

# APPENDIX

FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

**October 31, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

CUSTODIA BANK, INC.,

     Plaintiff - Appellant,

v.

FEDERAL RESERVE BOARD OF
GOVERNORS; FEDERAL RESERVE
BANK OF KANSAS CITY,

     Defendants - Appellees.

------------------------------

AMERICANS FOR PROSPERITY
FOUNDATION-WYOMING; STATE OF
WYOMING; THE DIGITAL CHAMBER;
GLOBAL BLOCKCHAIN BUSINESS
COUNCIL-USA; FORMER SENATOR
PATRICK J. TOOMEY; BLOCKCHAIN
ASSOCIATION; SENATOR CYNTHIA
M. LUMMIS; SENATOR STEVE
DAINES; REPRESENTATIVE WARREN
E. DAVIDSON, Members of the U.S.
Senate Banking Committee and U.S. House
Financial Services Committee;
WYOMING SECRETARY OF STATE;
PROFESSOR DAVID ZARING;
INDEPENDENT COMMUNITY
BANKERS OF AMERICA; CONSUMER
BANKERS ASSOCIATION; AMERICAN
BANKERS ASSOCIATION; FEDERAL
RESERVE BANKS; THE BANK POLICY
INSTITUTE; THE CLEARING HOUSE

No. 24-8024

ASSOCIATION, LLC; WYOMING
BANKERS ASSOCIATION,

       Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 1:22-CV-00125-SWS)**

_____

Ian Heath Gershengorn, Jenner & Block LLP, Washington, D.C. (Michelle S. Kallen,
Laurel L. Rimon, Emanuel Powell III and Maria LaBella, Jenner & Block, LLP,
Washington, D.C.; Scott E. Ortiz, Williams, Porter, Day & Neville, P.C., Casper,
Wyoming; and Ryan Scarborough and Jamie Wolfe, Williams & Connolly LLP,
Washington, D.C., with him on the briefs) for Plaintiff-Appellant.

Jeffrey S. Bucholtz, King & Spalding LLP, Washington, D.C. (Christine M. Carletta and
E. Caroline Freeman, King & Spalding LLP Washington, D.C.; Andrew Z. Michaelson,
King & Spalding LLP, New York, New York; Billie LM Addleman and Erin E. Berry,
Hirst Applegate, LLP, Cheyenne, Wyoming; and Jared Lax, King & Spalding LLP,
Denver, Colorado, with him on the brief) for Defendant-Appellee Federal Reserve Bank
of Kansas City.

Joshua P. Chadwick, Senior Special Counsel (Mark Van Der Weide, General Counsel;
Richard M. Ashton, Deputy General Counsel; Yvonne F. Mizusawa, Senior Counsel;
Yonatan Gelblum, Senior Counsel; and Katherine Pomeroy, Senior Counsel, Board of
Governors of the Federal Reserve System, Washington, D.C., with him on the brief) for
Defendant-Appellee Board of Governors of the Federal Reserve System.

Michael Pepson, Americans for Prosperity Foundation, Arlington, Virginia, filed an
Amicus Curiae Brief on Behalf of Americans for Prosperity Foundation-Wyoming in
Support of Plaintiff-Appellant.

Bridget Hill, Attorney General; Devin Kenney, Senior Assistant Attorney General; and
Karl Anderson, Supervising Attorney General, Wyoming Attorney General's Office,
Cheyenne, Wyoming, filed an Amicus Brief on Behalf of the State of Wyoming in
Support of Plaintiff-Appellant.

Paul D. Clement, Counsel of Record; Erin E. Murphy; C. Harker Rhodes IV; and Kevin
Wynosky (supervised by principals of the firm who are members of the Virginia bar),
Alexandria, Virginia, filed an Amici Curiae Brief on Behalf of the Digital Chamber and
Global Blockchain Business Council-USA in Support of Plaintiff-Appellant.

Brent R. Baker, Counsel of Record, Buchalter, Salt Lake City, Utah, and Nicolas Morgan, Investor Choice Advocates Network, Los Angeles, California, filed an Amicus Curiae Brief on Behalf of Former Senator Patrick J. Toomey in Support of neither party.

Donald B. Verrilli, Jr. and Kathleen Foley, Munger, Tolles & Olson LLP, Washington, D.C., filed an Amicus Curiae Brief on Behalf of Blockchain Association in Support of Plaintiff-Appellant.

Chris Land, General Counsel, Office of Senator Cynthia M. Lummis, United States Senate, Washington, D.C., filed an Amici Curiae Brief on Behalf of the Members of the United States Senate Banking Committee and United States House Financial Services Committee in Support of Plaintiff-Appellant.

Colin R. Crossman, Cheyenne, Wyoming, filed an Amicus Curiae Brief on Behalf of the Wyoming Secretary of State in Support of Plaintiff-Appellant.

David Oscar Markus, Markus/Moss PLLC, Miami, Florida, filed an Amicus Curiae Brief on Behalf of Professor David Zaring in Support of Defendants-Appellees.

Jonathan K. Youngwood, Simpson Thacher & Bartlett LLP, New York, New York, filed an Amici Curiae Brief on Behalf of Federal Reserve Banks in Support of Defendants-Appellees.

Mark W. Mosier, Randy Benjenk, and Jeffrey Luther, Covington & Burling LLP, Washington, D.C., filed an Amici Curiae Brief on Behalf of the Bank Policy Institute and the Clearing House Association L.L.C. in Support of Defendants-Appellees.

Jonathan S. Franklin, Norton Rose Fulbright US LLP, Washington, D.C., filed an Amici Curiae Brief on Behalf of Independent Community Bankers of America, Consumer Bankers Association, and American Bankers Association in Support of Defendants-Appellees.

Greyson E. Tuck, Gerrish Smith Tuck, PC, Memphis, Tennessee, filed an Amicus Curiae Brief on Behalf of Wyoming Bankers Association in Support of Defendants-Appellees.

_____

Before **TYMKOVICH**, **EBEL**, and **ROSSMAN**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

3

For over one hundred years, the Federal Reserve has served as our nation's central bank, providing important financial services to banks while maintaining the safety and stability of our financial system. Plaintiff Custodia Bank is a Wyoming-chartered bank that is not a member of the Federal Reserve. Custodia requested an account (known as a "master account") with the Federal Reserve Bank of Kansas City ("FRBKC"), one of the twelve regional Reserve Banks that, along with the Board of Governors ("Board") and the Federal Open Market Committee, make up the Federal Reserve System (the "Fed"). Despite agreeing that Custodia was statutorily eligible for an account, FRBKC denied the request because it determined Custodia's crypto-focused business model introduced undue risk into the Fed's payment systems and services. In response, Custodia filed this suit against both FRBKC and the Board arguing the Fed does not have any discretion over who gets access to Fed accounts and services and must grant access to all eligible institutions no matter the risk they pose to the federal financial system. We conclude the plain language of the relevant statutes grants Federal Reserve Banks discretion to reject master account access requests from eligible entities and, therefore, we reject Custodia's attempt to impair the Fed's ability to safeguard our nation's financial system through the exercise of discretion to reject master account access. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's judgment in favor of Defendants on all claims.

This case turns on the interpretation of three distinct statutory provisions. First, § 342 of the Federal Reserve Act ("FRA"), originally enacted in 1913, provides

4

that "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions, . . . deposits."  12 U.S.C. § 342.  Second, § 248a of the Depository Institutions Deregulation and Monetary Control Act ("MCA"), enacted in 1980, directs the Board to (1) establish a fee schedule to charge for the services the Fed provides to banks, which the Fed had previously provided for free; and (2) extend the availability of those services to banks that are not members of the Fed, where those services had previously been provided only to member banks.  Included in a list of "pricing principles" that the Board's fee schedule must adhere to is the following clause: "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks."  Id. § 248a(c)(2). Third, in 2022 Congress enacted the "Toomey Amendment," which requires the Board to create a database listing all entities that have requested a master account and whether each request was "approved, rejected, pending, or withdrawn."  Id. § 248c(b)(1)(B).  The Board must also specify whether each entity is one of three types of institution—all of which are statutorily eligible for an account.  Id. § 248c(b)(1)(C).

Custodia argues that § 248a of the MCA requires the Fed to provide a master account to every eligible nonmember depository institution that requests access because § 248a(c)(2) provides that Fed services "shall be available to nonmember depository institutions," and a master account is necessary to use those services.  We disagree and conclude, like the district court and the two other courts to have

5

considered the issue, that "§ 248a does not do the lifting Custodia demands of it." Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors, 728 F. Supp. 3d 1227, 1241 (D. Wyo. 2024).

Rather, it is § 342 of the FRA that addresses the Fed's authority to open master accounts by granting the Reserve Banks authority to receive deposits, and it makes this authority discretionary. The Toomey Amendment confirms this understanding. By requiring the Board to report on master account application rejections while simultaneously addressing only those entities that are eligible for master accounts, the Toomey Amendment clearly contemplates that Reserve Banks may reject applications for master accounts from eligible entities.

The later-enacted § 248a in the MCA does not override the discretion Congress granted in § 342 of the FRA to the regional Reserve Banks. Indeed, § 248a does not address master account access at all. Each of the items listed in subsection §248a(c)—including the "shall be available" clause of (c)(2)—are pricing principles that the Board must comply with when it publishes the schedule of fees. But the Board does not make master account access decisions—individual Reserve Banks do. Thus, this provision prescribing how the Board must go about pricing services says nothing about account access provided by Reserve Banks. Congress "does not . . . hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). To conclude that Congress, in the MCA, significantly altered Reserve Banks' longstanding discretion over account access by mandating master account access for all eligible institutions in a clause tucked away in a list of pricing

principles directed at the Board and not at Reserve Banks would be to find an elephant in a mousehole. Finally, § 248a(c)(2) does not provide that services shall be available to "all" nonmember depository institutions, just that they shall be available to nonmember depository institutions in general, as a class. Congress was deliberate with its use of "all" in the FRA and MCA, and its choice not to include that modifier before "nonmember depository institutions" in subsection (c)(2) signals it did not intend to mandate automatic access for all qualifying nonmember depository institutions.

Accordingly, Custodia is not automatically entitled to a master account. We affirm the judgment of the district court in favor of Defendants on all claims.

## I.    BACKGROUND[1]

### A. The Federal Reserve System

The Federal Reserve consists of the Federal Reserve Board of Governors ("the "Board"), the Federal Open Market Committee, and twelve regional Federal Reserve Banks ("the "Reserve Banks"). Fed. Rsrv. Sys., The Fed Explained: What the Central Bank Does 2 (11th ed. 2021) [hereinafter The Fed Explained]. The Board exercises "broad oversight responsibility for the operations and activities of the Reserve Banks." Id. at 8; see 12 U.S.C. § 248(j). Much like a private corporation,

---

[1] The parties have stipulated that "all evidence and discovery between Custodia, FRBKC, and the Board's administrative record may be relied upon by all parties including any court hearing in this case throughout the remainder of this litigation," and this stipulation was approved by the District Court. Custodia Bank, 728 F. Supp. 3d at 1234.

each Reserve Bank is run by its own nine-member board of directors, which appoints a president to serve as the chief executive of the Reserve Bank and run day-to-day operations.  The Fed Explained at 9.

"[E]ach Reserve Bank acts as a 'bank for banks.'  In that capacity, it offers (and charges for) services to these depository institutions similar to those that ordinary banks provide their individual and business customers: the equivalent of checking accounts; loans; coin and currency; safekeeping services; and payment services," including check clearing and settlement, wire transfers, and automated clearinghouse services.  Id. at 11; see Julie Andersen Hill, Opening a Federal Reserve Account, 40 Yale J. on Reg. 453, 462 (2023).  In order to provide these services, Reserve Banks are authorized to provide accounts for, and receive deposits from, depository institutions.[2]  See 12 U.S.C. § 342.

A depository institution can be either federally chartered or state-chartered.  A federally chartered institution is required to be a member of the Federal Reserve, while a state-chartered institution can choose whether it wants to apply to be a member of the Federal Reserve or not.  A state-chartered Federal Reserve member institution is subject to the supervision and regulation of the Federal Reserve in addition to the supervision of the relevant banking regulator in the state that issued its charter.

---

[2] A bank is one type of depository institution.  See 12 U.S.C. § 461(b)(1)(A). The distinction between a bank and other types of depository institutions, such as credit unions or savings associations, is not relevant in this case, so we use the terms "bank" and "depository institution" interchangeably.

Until the enactment of the MCA in 1980, most services provided by the regional Reserve Banks were available only to Fed member banks. Subcomm. on Domestic Monetary Pol'y of the House Comm. on Banking, Fin. & Urb. Affs., 98th Cong., Report on the Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System, at 3 (Comm. Print 1984) [hereinafter Domestic Monetary Policy Report]. This meant that a member bank could use the Fed's services to, for instance, transfer funds between it and any other member bank. By contrast, a nonmember bank would have to use a private payment services provider or partner with a member bank that had Fed access to execute such a transaction. Id.

Prior to the enactment of the MCA, the Fed also offered its services free of charge. It funded the provision of services by charging interest on the statutorily required reserves that member banks had to hold in Fed accounts. Id.; see 38 Stat. 251, Section 19(b). In 1980, Congress passed the MCA, which contained several significant changes to the Federal Reserve System. Pub. L. No. 96-221, 94 Stat. 132 (1980). Three changes are relevant to this case. First, the MCA extended reserve requirements to nonmember institutions. See 12 U.S.C. § 461(b)(2)(D). Second, it allowed nonmember institutions to use all of the Fed's services. Id. § 248a(c)(2); id. § 342. Third, it directed the Fed to charge for these services and to do so without discriminating between members and nonmembers. 12 U.S.C. § 248a.

9

**B. Master accounts**

A master account is a depository institution's bank account with the Fed, held at one of the twelve regional Reserve Banks.[3]  To use the Fed's services, a depository institution needs a master account.  See <u>Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City</u>, 861 F.3d 1052, 1053 (10th Cir. 2017) (Op. of Moritz, J.).  If a depository institution does not have a master account, then it can access the Fed's payment systems by partnering with another institution in a "correspondent relationship," in which the correspondent institution acts as an intermediary to facilitate Fed service transactions for the respondent institution that lacks master account access.  See <u>Hill</u>, <u>supra</u>, at 460.  Alternatively, institutions without master accounts can use payment services offered by private competitors to the Fed, such as

---

[3] As the Board explains, a master account is

> a record of financial transactions that reflects financial rights and obligations of an account holder and the Reserve Bank with respect to each other, where opening and closing balances are determined.  All credits and debits resulting from the use of Federal Reserve services [are] booked to this one account at one Reserve Bank for each separately chartered institution.

<u>Interstate Branching: New Account Structure</u>, Fed. Rsrv. Bd., https://www.federalreserve.gov/generalinfo/isb/qanda.htm (last updated Sept. 27, 2002).  Historically, a depository institution could have multiple accounts with the Fed.  <u>Hill</u>, <u>supra</u>, at 462.  For instance, an institution might have a "clearing account" for temporarily holding transactions as well as a "reserve account" for holding required reserves at the Fed.  <u>Id.</u>  Additionally, a depository institution with broad geographic scope might have had accounts with multiple Reserve Banks around the country.  In 1998, the Fed changed its account structure to consolidate these multiple accounts into a single "master" account for each institution.  See <u>id.</u>  Each institution now has a single master account through which it accesses all Fed services.

the Clearing House Interbank Payments System, which competes with the Federal Reserve's Fedwire service.

The statutory requirements to be eligible for a master account are simple: a bank must be chartered under either state or federal law and be "engaged in the business of receiving deposits, other than trust funds."[4]  12 U.S.C. § 1813(a).  It is undisputed that Custodia is statutorily eligible for a master account.

### C. Custodia Bank

Custodia was founded in 2020 to provide banking services for digital asset companies and to serve as a bridge between digital assets and the U.S. dollar payment system for institutional customers.[5]  It is chartered in Wyoming under the state's Special Purpose Depository Institution (SPDI; pronounced "speedy") charter, which was established by state statute in 2019.  H.B. 74, 65th Leg., Gen. Sess. (Wyo. 2019); Wyo. Stat. Ann § 13-12-101, et seq.  Like a traditional bank, a SPDI can

---

[4] No statutory provision expressly refers to "master accounts" (or any other type of Federal Reserve account).  Rather, master accounts are a creation of the Fed pursuant to its authority to take deposits and provide services.  The parties agree that an entity is eligible for a master account if it is a "nonmember depository institution." The definition of "depository institution" includes "any bank which is eligible to make application to become an insured bank under section 5 of [the Federal Deposit Insurance Act.]"  12 U.S.C. § 461(b)(1)(A)(i).  In turn, a bank is eligible to make an application to become an insured bank under that section if it is "engaged in the business of receiving deposits, other than trust funds," and is "incorporated under the laws of any State."  Id. § 1813(a).

[5] A digital asset is a "digital representation of value" recorded on a "cryptographically secured distributed ledger," such as a blockchain.  26 U.S.C. § 6045(g)(3)(D) (providing the Internal Revenue Service definition of "digital asset"); see also Wyo. Stat. Ann. § 34-29-101 (providing the Wyoming definition of "digital asset").  Digital assets include things like cryptocurrencies (including stablecoins) and non-fungible tokens (NFTs).

receive deposits of U.S. dollars and provide payment services to its customers. Wyo. Stat. Ann. § 13-12-103(b)(iii)–(v). Unlike a traditional bank, a SPDI cannot make loans and must have all customer deposits of U.S. dollars 100% backed by liquid assets such as U.S. dollars or similar high-quality liquid assets. Id. §§ 13-12-103(c), 13-12-105.

In addition to handling U.S. dollars, a SPDI can provide digital asset custody services where it holds digital assets in custody or trust for customers and undertakes transactions with those assets on behalf of the customer. Id. § 13-12-103(b)(vii)(A). SPDIs under a Wyoming charter are subject to regulation and supervision by the Wyoming Division of Banking, id. § 13-12-119, and are required under Wyoming law to "comply with all applicable federal laws, including those relating to anti-money laundering, customer identification and beneficial ownership," id. § 13-12-107.

As permitted by its SPDI charter, Custodia plans to hold U.S. dollar deposits in its Fed master account and, separately, to provide custody for digital assets. Since it is not permitted to make loans, Custodia intends to make money by charging its customers transaction fees.

## D. Custodia's master account application

After receiving its SPDI charter from the state of Wyoming, Custodia applied for a master account with defendant FRBKC in October 2020. In January 2021, FRBKC confirmed that Custodia was legally eligible for a master account and told Custodia there were "no showstoppers" with its application. To alleviate potential

12

concerns with Custodia being supervised only by Wyoming regulators, Custodia also applied to become a member of the Federal Reserve system, and thus subject to Federal supervision, in August 2021.

While Custodia's applications were pending, the Board published a final rule establishing guidelines for Reserve Banks to "utilize in evaluating requests for access to Reserve Bank master accounts and services" ("Guidelines"). Guidelines for Evaluating Account and Services Requests. 87 Fed. Reg. 51,099, 51,099 (Aug. 19, 2022). The rule was intended to standardize and clarify the master account application review process in light of increasingly common requests for master accounts from banks with "novel charter types" like Custodia. See id. The Guidelines establish a framework classifying applicants into three tiers to determine the level of scrutiny Reserve Banks are to apply in evaluating an application. Id. at 51,109–10. Institutions that are federally insured fall into Tier 1 and receive the least amount of scrutiny. "[I]nstitutions that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency" fall into Tier 2 and receive an intermediate level of scrutiny. Id. at 51,109. Institutions, like Custodia, that are not federally insured and are not subject to supervision by a federal banking agency fall into Tier 3 and "generally receive the strictest level of review." Id. at 51,110.

In addition to the Guidelines, the Board also sent out an "S-Letter" (an internal guidance document) elaborating on procedures for Reserve Banks to follow in implementing the Guidelines ("S-Letter 2667"). Among other things, S-Letter 2667

13

provides that "[a]ny Reserve Bank that is considering denying any access request, . . . should consult [the Board] prior to communicating any decision to the requesting institution." (J.A. 1814.)

In January 2023, applying the new Guidelines, FRBKC denied Custodia's application for a master account. On the same day, the Board denied Custodia's application for membership in the Federal Reserve.[6] In denying Custodia's master account application, FRBKC explained that Custodia's novel and "unprecedented" business model that was "narrowly focused on crypto-asset activities" presented heightened risks that were "highly likely [to be] inconsistent with safe and sound banking practices." (J.A. 1949–50.) Without Custodia having supervision by a federal banking agency or stronger processes to address these risks, FRBKC determined that it would be too risky to grant Custodia a master account.

Pursuant to S-Letter 2667, FRBKC consulted with the Board and provided its analysis of Custodia's master account application prior to issuing the denial. In response, the Board sent an email to FRBKC President Esther George explaining that it had "reviewed the Reserve Bank's record documenting application of the Guidelines in evaluating [Custodia's] access request" and had "no concerns with the Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision to deny the request." (J.A. 1102.)

---

[6] The Board's decision to deny Custodia's application for membership in the Federal Reserve is not at issue in this case.

## II.    PROCEDURE

### A. Initial complaint

In June 2022, nineteen months after submitting its master account application, Custodia filed the present suit in the U.S. District Court for the District of Wyoming. Though its application was submitted to FRBKC, Custodia sued not only FRBKC but also the Board, alleging that the Board was involved in the decision to deny Custodia's master account application.  In its initial complaint, Custodia brought eight claims based on two basic arguments: (1) Defendants violated the law by failing to act on Custodia's application, and Custodia was entitled to a decision on the application within a reasonable time under either the Administrative Procedure Act ("APA") or the Mandamus Act; and (2) Defendants are statutorily required to grant Custodia's application—that is, FRBKC has no authority or discretion to deny an application for a master account from an entity that is statutorily eligible for such an account.

FRBKC and the Board each filed motions to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), which the district court granted in part and denied in part.  Relevant here, the court concluded that Custodia had stated a plausible claim that it was statutorily entitled to a master account, and that a final answer to the statutory entitlement question should await further factual development during discovery.  However, the district court granted the motions to dismiss three claims based on the United States Constitution.  First, the court concluded Custodia had not plausibly alleged a violation of the Nondelegation

15

Doctrine[7] because making master account access decisions is not a legislative power. Second, Custodia had alleged that, if FRBKC has discretion to deny master account access to eligible entities, then such decision-making authority violates the Due Process Clause by vesting FRBKC's board of directors, which is largely chosen by and partially composed of self-interested executives from competitor banks, with regulatory authority over Custodia.  The district court concluded there was no due process violation because master account application decisions are made by a Reserve Bank's president, not the board, and a Reserve Bank's president is chosen only by the six directors who are prohibited by statute from being representatives of competitor banks.  Third, the court concluded there was no violation of the Appointments Clause because (1) it is a Reserve Bank's president who makes master account application decisions and (2) a Reserve Bank president is appointed with the approval of the Board, which satisfies the Appointments Clause.  See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 512 n.13 (2010) ("We have previously found that the department head's approval satisfies the Appointments Clause . . . .").

---

[7] The nondelegation doctrine bars Congress from delegating legislative power to another branch of government without providing "an intelligible principle to which the person or body authorized to [act] is directed to conform."  See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (2001) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)) (alteration in original).

**B. Custodia's application is denied and Custodia responds by filing an amended complaint**

In January 2023, FRBKC denied Custodia's application for a master account. In response to the denial of its application, Custodia amended its complaint to allege the three claims at issue in this appeal, each of which relies on Custodia's asserted entitlement to a master account under § 248a(c)(2). First, Custodia alleges the Board violated the APA by denying Custodia's application when § 248a(c)(2) entitles Custodia to a master account.[8] Second, Custodia claims it is entitled to a writ of mandamus against both Defendants compelling them to approve its application. Third, Custodia claims it is entitled to a declaratory judgment that Defendants have a statutory obligation to provide it with a master account. In essence, Custodia is claiming that once it submitted a qualifying application for a master account, it had an absolute right for that application to be approved by FRBKC.

Defendants once again each filed motions to dismiss. The district court once again concluded Custodia had stated a plausible claim that it was statutorily entitled to a master account and, therefore, the court denied the motions to dismiss the amended complaint.[9]

---

[8] In its initial complaint, Custodia had brought a claim under the APA against both the Board and FRBKC. In its amended complaint, Custodia did not reassert an APA claim against FRBKC.

[9] The one exception to this was Custodia's request for a writ of mandamus against the Board. Since the Mandamus Act grants relief only when there is no other adequate remedy, the court granted the motion to dismiss the mandamus claim against the Board because it concluded Custodia had another remedy against the Board under the APA.

17

**C. The district court enters judgment in favor of Defendants**

The case proceeded to discovery, after which Custodia filed a motion for an order granting its petition for review on its APA claim pursuant to Federal Rule of Appellate Procedure 15 and for judgment as a matter of law on its mandamus claim pursuant to Federal Rule of Civil Procedure 56(a).[10]  The Board and FRBKC each opposed Custodia's motion, and FRBKC additionally filed its own cross-motion for summary judgment on the mandamus claim against it.  Custodia Bank, 728 F. Supp. 3d at 1231–32.

In the ruling at issue in this appeal, the district court denied Custodia's motion and granted FRBKC's motion for summary judgment, thereby disposing of all claims against both Defendants.  Id.  First, the district court explained that the merits analysis was the same under both the APA and the Mandamus Act: the dispositive question was whether Custodia was statutorily entitled to a master account or whether, instead, the defendants had discretion in granting master accounts to eligible

---

[10] Custodia did not specifically move for judgment on its request for declaratory relief.  The district court had previously concluded, in its order largely denying Defendants' motions to dismiss Custodia's amended complaint, that, while the DJA provides an additional remedy for a valid federal cause of action, it does not provide a stand-alone cause of action.  See Hanson v. Wyatt, 552 F.3d 1148, 1157 (10th Cir. 2008) ("The Declaratory Judgment Act does not create substantive rights." (cleaned up)); Nero v. Oklahoma, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022) (unpublished) ("[T]he Declaratory Judgment Act does not provide an independent federal cause of action.").  Custodia does not dispute this conclusion. We also note that Custodia's DJA claim simply requests a declaration "that the Board and/or [FRBKC] has a statutory obligation to provide Custodia with a master account," so the claim turns entirely on the same question of statutory interpretation that resolves the mandamus claim.  (J.A. 433.)  Therefore, we do not separately analyze Custodia's DJA claim.

18

entities.  Id. at 1234.  However, the court held that Custodia's APA claim against the Board failed for lack of jurisdiction because it was FRBKC who had denied the application and there was no final agency action by the Board.  Id. at 1237.  Finally, the district court ruled that "[t]he plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts."  Id. at 1245.  Therefore, Custodia was not entitled to a master account and Defendants were entitled to judgment in their favor on each of Custodia's claims.  Custodia now appeals this ruling.

## III.    STANDARD OF REVIEW

We "review a district court's grant of summary judgment de novo, using the same standard applied by the district court."  Cillo v. City of Greenwood Vill., 739 F.3d 451, 461 (10th Cir. 2013) (citing Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013)).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, we "view facts in the light most favorable to" the non-moving parties and resolve "all factual disputes and reasonable inferences in their favor."  Cillo, 739 F.3d at 461 (quoting Tabor, 703 F.3d at 1215).  This standard applies to our review of the district court's judgment in favor of FRBKC on Custodia's mandamus claim.  Rios v. Ziglar, 398 F.3d 1201, 1206 (10th Cir. 2005) (explaining that a district court's determination of whether the legal prerequisites for mandamus are met is reviewed de novo).  We also review de novo the district court's dismissal of Custodia's APA claim against the Board for

lack of subject-matter jurisdiction.  <u>Farrell-Cooper Mining Co. v. United States Dep't of Interior</u>, 864 F.3d 1105, 1109 (10th Cir. 2017).

Under the APA, a court will "hold unlawful and set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  For a plaintiff to be eligible for mandamus relief, the government must owe a clear nondiscretionary duty to the plaintiff and the plaintiff must have no other adequate remedy.  <u>See</u> <u>Rios</u>, 398 F.3d at 1206; 28 U.S.C. § 1361.

## IV.    DISCUSSION

Each of Custodia's claims relies on its assertion that it is statutorily entitled to a master account and that FRBKC has no discretion to deny its compliant request for a master account.[11]  Thus, this case turns on the statutory interpretation of the three relevant provisions of the FRA and the MCA identified in the introductory section of this opinion.  We briefly address the jurisdictional issue of whether Custodia identified a "final agency action" taken by the Board, as required for APA review, before turning to the statutory interpretation issue required to resolve the remaining claims.

---

[11] For its APA claim, Custodia alleges that the Board's involvement in the denial of Custodia's master account application was unlawful because Custodia is statutorily entitled to a master account.  Custodia does not challenge the reasons given for its application being denied or allege the Board violated the APA for any reason other than failing to comply with Custodia's alleged statutory right to a master account.  <u>See</u> <u>Custodia Bank</u>, 728 F. Supp. 3d at 1238.  For its Mandamus Act claim, Custodia alleges Defendants have a nondiscretionary duty to grant its master account access request because Custodia is statutorily entitled to a master account.  Defendants do not dispute that mandamus relief would be appropriate if Custodia were to prevail on its statutory entitlement theory.

**A. Custodia's APA claim against the Board fails for lack of a final agency action**

In its amended complaint, Custodia asserts a claim under the APA against the Board (but not FRBKC), alleging the Board's involvement in FRBKC's denial of Custodia's master account application was unlawful because Custodia is entitled to a master account. Where, as here, review of an agency action is not expressly provided for by statute, judicial review under the APA is available only for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. To be "final," an agency action must (1) "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted); see Ctr. for Native Ecosystems v. Cables, 509 F.3d 1310, 1329 (10th Cir. 2007).

Custodia argues the Board took a final agency action by sending an email to the FRBKC president stating the Board had "no concerns with the Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision to deny the request." (J.A. 1102.) But this email fails the second prong of the Bennett test because it did not determine any rights or obligations or have any legal consequences. Rather, it was only an intermediate advisory step along the path to FRBKC's final denial of the request. See Miami Tribe of Oklahoma v. United States, 198 F. App'x 686, 690 (10th Cir. 2006) (unpublished) (explaining that legal opinion

21

letter from Department of the Interior to the National Indian Gaming Commission (NIGC) was not a final agency action because Congress vested authority to decide the relevant issue with NIGC).[12]  The email itself refers to "[FRBKC's] decision to deny the request."  (J.A. 1102.)  When the Board communicated its view on FRBKC's decision in the no-concerns email, it was still up to FRBKC to "mov[e] forward with its plan" to deny the request.  (Id.); see Sinclair Wyo. Refin. Co., LLC v. United States Env't Prot. Agency, 72 F.4th 1137, 1143 (10th Cir. 2023) ("[A]n agency action must 'itself [be] the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope' of their statutory rights or duties." (quoting Kansas ex rel. Schmidt v. Zinke, 861 F.3d 1024, 1034 (10th Cir. 2017)).

We recognize that an agency action can, in certain cases, "qualif[y] as final agency action even if the ultimate impact of that action rests on . . . a decision by another administrative agency[] or conduct by a regulated party."  Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce, 128 F.4th 1089, 1110 (9th Cir. 2025).  But the action must still determine rights or obligations or have legal consequences by "alter[ing] the legal regime to which the [agency or other entity] is subject."  Bennett, 520 U.S. at 169; see id. at 178.  And there is nothing in the record to suggest that the Board's no-concerns email "alter[ed] the legal regime to which

---

[12] We cite all unpublished decisions only for their persuasive value.  See 10th Cir. R. 32.1(A).

[FRBKC] [was] subject."  Bennett, 520 U.S. at 169.  The final decision was still entirely up to FRBKC.

Our conclusion is reinforced by the relevant statutes and regulations.  With respect to the provision of accounts and services, the Board exercises only "general supervision over [the] Federal reserve banks."  12 U.S.C. § 248(j).  Pursuant to this authority, the Board published the Guidelines to establish consistent procedures for Reserve Banks to follow when evaluating master account access requests.  87 Fed. Reg. at 51,100.  However, the Guidelines make clear that "[d]ecisions on individual requests for access to accounts and services are made by the Reserve Bank."  Id. at 51,102.  Thus, while the Board exercises supervisory authority and can offer its input on Reserve Bank decisions, the ultimate decisions remain up to the Reserve Bank.  To be sure, in this case the Board was undoubtedly involved in FRBKC's evaluation of Custodia's master account application, as FRBKC coordinated that evaluation with the Board's evaluation of Custodia's Fed membership application to avoid duplicative inquiries or conflicting analyses.  But Custodia points to nothing in the record that would allow us to conclude that it was not FRBKC who made the final decision on Custodia's master account application in this case.  Therefore, the Board's no-concerns email did not determine any rights or obligations or carry legal consequences for Custodia and, thus, did not constitute final agency action.[13]

---

[13] Custodia also argues that the question of who made the final decision is a question of fact that should be decided by the district court in the first instance, so remand on that question is appropriate.  We disagree—review under the APA is based on the administrative record, which has already been filed in this case, so

**B. Custodia is not statutorily entitled to a nondiscretionary award of a master account from FRBKC**

This issue requires us to interpret three specific provisions of three different statutes. Because each of these provisions relates explicitly or implicitly to the Fed's authority to provide access to master accounts, we interpret them together. Our primary task in reviewing these provisions is "to determine congressional intent, using traditional tools of statutory interpretation." M.S. v. Premera Blue Cross, 118 F.4th 1248, 1266 (10th Cir. 2024) (quoting Potts v. Ctr. for Excellence in Higher Educ., Inc., 908 F.3d 610, 613 (10th Cir. 2018)). We begin by looking at the statutory text "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Potts, 908 F.3d at 613 (quoting Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr., 821 F.3d 1250, 1258 (10th Cir. 2016)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Ceco Concrete, 821 F.3d at 1258 (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)). We

> consider how "important terms in the statute . . . relate to each other" to determine "[t]he plain meaning of the statutory text," Babb v. Wilkie, 589 U.S. 399, 404 (2020), because "[s]tatutory language 'cannot be construed in a vacuum,'" Sturgeon v. Frost, 577 U.S. 424, 438 (2016) (quoting Roberts v. Sea-Land Servs., Inc., 566 U.S. 93, 101 (2012)).

---

remand would not lead to new factual development, and it is appropriate for us to decide this question in this appeal. See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985).

United States v. Davey, No. 24-3132, 2025 WL 2405322, at *4, --- F.4th --- (10th Cir. Aug. 20, 2025) (alterations in original).

"If the language is plain and unambiguous, 'our inquiry must cease and the plain meaning of the statute controls.'" Ceco Concrete, 821 F.3d at 1258 (quoting Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc., 764 F.3d 1199, 1225 (10th Cir. 2014)).  If, on the other hand, the language is ambiguous, then we may look to the broader context and purpose of the statute to discern congressional intent.  See Nat'l Credit Union, 764 F.3d at 1225–26.

### 1.  Relevant statutory provisions

With these principles in mind, we begin by outlining the three relevant statutory provisions before explaining why their plain language grants Reserve Banks discretion to reject master account applications from eligible entities.

First, § 342 of the FRA provides: "Any Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks . . . ."  12 U.S.C. § 342 (emphasis added).  Defendants argue, and we agree, that this provision governs Reserve Banks' authority with respect to approving or denying master accounts because Reserve Banks use master accounts to receive deposits.

Second, § 248a of the MCA provides:

### § 248a. Pricing of services

**(a) Publication of pricing principles and proposed schedule of fees; effective date of schedule of fees**

Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.

**(b) Covered services**

The services which shall be covered by the schedule of fees under subsection (a) are--
> (1) currency and coin services;
> (2) check clearing and collection services;
> (3) wire transfer services;
> (4) automated clearinghouse services;
> (5) settlement services;
> (6) securities safekeeping services;
> (7) Federal Reserve float; and
> (8) any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds.

**(c) Criteria applicable**

The schedule of fees prescribed pursuant to this section shall be based on the following principles:
> (1) All Federal Reserve bank services covered by the fee schedule shall be priced explicitly.
> (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

26

(3) Over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services priced, including interest on items credited prior to actual collection, overhead, and an allocation of imputed costs which takes into account the taxes that would have been paid and the return on capital that would have been provided had the services been furnished by a private business firm, except that the pricing principles shall give due regard to competitive factors and the provision of an adequate level of such services nationwide.

(4) Interest on items credited prior to collection shall be charged at the current rate applicable in the market for Federal funds.

Id. § 248a (emphasis added).  This is the core of Custodia's argument.  Custodia relies on this brief clause in subsection (c)(2) that we have underlined for emphasis—"[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions"—to argue that this one isolated clause in a provision dealing with equitable pricing establishes a mandatory, nondiscretionary duty for Reserve Banks to approve master account applications from all nonmember depository institutions who are statutorily eligible.[14]  The profound impact and

---

[14] Custodia relies heavily on Judge Bacharach's separate opinion in Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City, in which he concluded that § 248a(c)(2) mandates master account access for all eligible nonmember depository institutions.  861 F.3d 1052, 1068 (10th Cir. 2017) (Op. of Bacharach, J.).  While Judge Bacharach's opinion is relevant to our analysis in this case, it is not controlling authority because that case resulted in a three-way split decision between the three-judge panel, and the other two judges each voted to dispose of the case without reaching the issue of the plaintiff's statutory entitlement to a master account.  See id. at 1053 (per curiam); id. at 1058 (Op. of Moritz, J.) ("I would not decide whether the Credit Union is entitled to a master account under 12 U.S.C. § 248a."); id. at 1058, 1063 (Op. of Matheson, J.) (concluding "[t]he issues the Credit Union raises are not yet fit for judicial decision" and the case should be dismissed on ripeness grounds); see also United States v. Guillen, 995 F.3d 1095, 1114–15 (10th Cir. 2021) ("[A] concurring opinion in a splintered . . . decision . . . produces a determinate holding[] when it is 'a logical subset' of the other opinion(s) concurring in the judgment.").  Here, Judge Bacharach's separate opinion on this issue is not a

importance that Custodia attaches to this single isolated clause tucked deep into a

statutory provision that deals with a fairly isolated schedule of fees is indeed

remarkable and non-intuitive.

Third is the Toomey Amendment, enacted in 2022 as part of the National

Defense Authorization Act for Fiscal Year 2023, Public Law 117-263, which requires

the Board to publish a database of all entities holding or applying for master

accounts.  It provides, in relevant part:

> The Board shall create and maintain a public, online, and searchable database
> that contains--
>> **(A)** a list of every entity that currently has access to a reserve bank
>> master account and services, including the date on which the access
>> was granted to the extent the date is knowable;
>> **(B)** a list of every entity that submits an access request for a reserve
>> bank master account and services after enactment of this section (or
>> that has submitted an access request that is pending on December 23,
>> 2022), including whether, and the dates on which, a request--
>>> **(i)** was submitted; and
>>> **(ii)** was approved, <u>rejected</u>, pending, or withdrawn; and
>> **(C)** for each list described in subparagraph (A) or (B), the type of
>> entity that holds or submitted an access request for a reserve bank
>> master account and services, including whether such entity is--
>>> **(i)** an insured depository institution, as defined in section
>>> 1813 of this title;
>>> **(ii)** an insured credit union, as defined in section 1752 of this
>>> title; or
>>> **(iii)** a depository institution that is not an insured depository
>>> institution or an insured credit union.

<u>Id.</u> § 248c(b)(1) (emphasis added).  Defendants argue, and we agree, that, "by its

plain terms, the law specifically contemplates that requests for master accounts"

---

logical subset of the opinions of the other two panel judges, so it does not produce a
determinate holding.

from depository institutions that are not insured, like Custodia, may be rejected.

(J.A. 492)

### 2.  Analysis

We begin with § 342.  As we read this provision, § 342 grants Reserve Banks the authority to issue master accounts, using the term "may," which makes this authority discretionary.  Though the statute does not expressly mention accounts ("master" or otherwise), a Reserve Bank's authority to open a master account has always been implied from the authority to receive deposits—which comes from § 342—because a master account is necessary to hold any such funds received.  See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y., 762 F. Supp. 3d 247, 266 (S.D.N.Y. 2025) ("Section [342] governs master accounts.").  And the Supreme Court has confirmed what the ordinary meaning of the word "may" in § 342 suggests: the authority to receive deposits is discretionary.  See Farmers' & Merchants' Bank of Monroe v. Fed. Rsrv. Bank of Richmond, 262 U.S. 649, 662 (1923) ("[N]either section [342], nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection.  The act merely confers authority to do so.").  It follows that a Reserve Bank's authority to open an account to receive such funds is also discretionary.  See Banco San Juan Internacional, 762 F. Supp. 3d at 266–67.  To be sure, opening an account and receiving deposits into that account are not precisely the same thing.  But it makes little sense to suggest that a

29

Reserve Bank would be obligated to open an account but then have discretion to render that account useless by rejecting all deposits into it.

Next, the single sentence tucked deep and innocuously inside § 248a of the MCA does not override the discretionary authority that Congress granted to Reserve Banks in § 342 of the FRA. First, the plain language of § 248a says nothing about master account access nor the authority of Reserve Banks to establish or to decline to establish any kind of account, nor even the ability of a Reserve Bank to receive funds. Rather, § 248a is concerned with an entirely different subject—the pricing of services. And subsection (c)(2) simply provides that those services must be provided to both member and nonmember banks on equal terms and with nondiscriminatory pricing. See Banco San Juan Internacional, 762 F. Supp. 3d at 269 ("[A]ny pricing and service terms must not discriminate between members and nonmembers based on their membership status. Section 248a, however, is wholly silent as to how Federal Reserve banks should evaluate . . . a depository institution's initial . . . request for Federal Reserve bank services.").

Compellingly, § 248a is not even directed to Reserve Banks, which have the authority to grant or deny master accounts. See 12 U.S.C. § 248a(a) ("[T]he Board shall publish . . . a proposed schedule of fees . . . .") (emphasis added). Rather, it is addressed to the Board; and the Board does not make master account access decisions—Reserve Banks do. The items listed in subsection (c)(2) are simply pricing principles that the Board must adhere to when establishing the schedule of fees. Id. § 248a(c) ("The schedule of fees . . . shall be based on the following

30

principles: . . .").  Thus, this provision prescribing how the Board must go about pricing services says nothing about account access, which is controlled by Reserve Banks.  As the district court observed, "[t]he plain language Congress employed in 12 U.S.C. § 248a does not expressly require anything from or provide instruction to the Federal Reserve Banks."  Custodia Bank, 728 F. Supp. 3d at 1242.

Second, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001).  To conclude that Congress removed Reserve Bank discretion over master account access in a clause tucked away in a list of principles for the Board (rather than Reserve Banks) to follow in pricing services would be akin to finding an elephant in a mousehole.  From the enactment of the FRA in 1913 until the enactment of the MCA in 1980, the only arguable authority for issuing accounts came from § 342, which provides that such authority is discretionary.  "Accepting Custodia's contention here would mean that Congress, in the [MCA] in 1980, greatly altered the details of the regulatory scheme first initiated in 1913 by requiring Federal Reserve Banks to provide master accounts to all eligible depository institutions requesting one, and also that Congress did so in a provision (and a subchapter) directed at the Board of Governors and without expressly saying as much."  Custodia Bank, 728 F. Supp. 3d at 1244.

We find it particularly unlikely that Congress intended to depart from the discretion afforded by § 342 when, in the MCA, Congress amended § 342 but

retained its discretionary nature.  The MCA's amendment to § 342 demonstrates that Congress considered the issue of nonmember banks making deposits to use Fed services, knew the receipt of deposits was a discretionary action on the part of Reserve Banks, see Farmers' & Merchants' Bank, 262 U.S. at 662,[15] and chose to leave that discretion unchanged.  It would make no sense for Congress simultaneously to remove that discretion in an isolated clause of a separate provision directed at a different entity (the Board).

Third, the plain language of § 248a(c)(2) does not say that services must be available to all nonmember depository institutions, just that they must be available to nonmember depository institutions in general, as a class.  In the very same sentence, Congress chose to use the word "all" before "Federal Reserve Bank services," but omitted it before "nonmember depository institutions."  As the district court observed, this "signal[s] [Congress] intended to treat the two phrases differently." Custodia Bank, 728 F. Supp. 3d at 1243.  Indeed, Congress's repeated use of qualifiers with respect to the term "depository institution(s)" in the FRA and MCA suggests it was intentional with such usage.  For instance, later in § 248a, Congress refers to "[a]ll depository institutions."  12 U.S.C. § 248a(e).  Similarly, § 461, which establishes the reserve requirements applicable to depository institutions, uses modifiers such as "all" and "every" when referring to depository institutions.  See id.

---

[15] "We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."  Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184–85 (1988).

§ 461(b)(2)(D) ("Any reserve requirement imposed under this subsection shall be uniformly applied to all transaction accounts at all depository institutions."); id. § 461(b)(4)(A) ("The Board may . . . impose a supplemental reserve requirement on every depository institution.").  In contrast, § 248a(c)(2), notably, does not refer to "all" or "every" nonmember depository institution, just nonmember depository institutions as a class.  That services shall be available to nonmembers as a class does not automatically entitle each nonmember to a master account.[16]

Finally, the Toomey Amendment underlines our conclusion that Congress envisioned that Reserve Banks would reject some master account applications from eligible entities.  The Toomey Amendment amended the FRA and MCA to require the Board to maintain a public database listing every application for a master account and whether the application was "approved, rejected, pending, or withdrawn."  12 U.S.C. § 248c(b)(1).  The Board must also specify whether each applicant is one of three entity types: (i) "an insured depository institution", (ii) "an insured credit union", or (iii) "a depository institution that is not an insured depository institution or an insured credit union."  Id. § 248c(b)(1)(C).  Crucially, each of those entity types is

---

[16] The MCA's history underscores this understanding.  Before 1980, Reserve Banks needed to be told to make payment services available to nonmember depository institutions as a class.  Just as in the nineteenth century, if a law school was instructed that admission "shall be available to women who had graduated from college," that would mean the law school should consider women just as they considered men, but it would not mean that every woman who graduated college and applied got into that law school.  The need to change prior practice demonstrates that the purpose of including this provision was to open up eligibility to a class that had been categorically denied, not the more drastic change to create an absolute, nondiscretionary entitlement to enrollment for every applicant.

eligible for a master account.  See supra note 4.  Thus, Congress expressly addressed only eligible entities, yet still anticipated Reserve Banks could reject such applications.[17]

For these reasons, we conclude the plain language of the three statutory provisions grants Reserve Banks the discretion to reject master account applications from eligible entities.

### C. Even if the statutes were considered ambiguous, we would reach the same conclusion

Even if we were to find these statutes ambiguous, expanding our inquiry would lead to the same result.  First, our interpretation is reinforced by each clause's placement in the statutory scheme.  The title of § 248a, which Custodia relies on, is "Pricing of services," suggesting that § 248a(c)(2) is concerned not with mandating access, but pricing.  See Pub. L. No. 96-221, § 107, 94 Stat. 132, 140–41 (1980).  And the provision is located in a subchapter entitled "Board of Governors of the Federal Reserve System," reinforcing that it is directed to the Board, not Reserve Banks, which have the authority to grant or deny an application for a master account.  In contrast, § 342, which directly supports the position of Defendant-Appellee

---

[17] The dissent's argument is that the Toomey Amendment did not evidence Congress' expectation and approval of Reserve Banks rejecting some applications; rather, argues the dissent, Congress suspected Reserve Banks were improperly rejecting applications, despite Congress' intention that the banks should have no discretion to reject any such applications, and Congress wanted to monitor when this was happening.  But it would seem oddly indirect for Congress, if it intended for Reserve Banks to approve all applications without discretion, to amend the statute simply to monitor these wrongful rejections instead of directly instructing the Reserve Banks to approve all eligible applications.

FRBKC, is found in a subchapter entitled "Powers and Duties of Federal Reserve Banks," which is precisely the issue presented in this appeal.

Furthermore, while we have already explained that the plain language of § 248a(c)(2) demonstrates it is a pricing principle rather than an access command, this conclusion is reinforced by looking at the other pricing principles listed in § 248a(c).  The canon of noscitur a sociis—literally, "a word is known by the company it keeps"—can be employed by courts to clarify the meaning of ambiguous words and phrases by reference to other associated words and phrases.  See Yates v. United States, 574 U.S. 528, 543 (2015); 2A Sutherland Statutes and Statutory Construction § 47:16 (7th ed. 2007).  The canon encourages reading ambiguous phrases in context to "limit the disruptive potential of overly broad or general terms in a statute," NISH v. Rumsfeld, 348 F.3d 1263, 1267 (10th Cir. 2003), and to "avoid the giving of unintended breadth to the Acts of Congress," Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307 (1961).  Here, each of the other three items listed in § 248a(c) is clearly related to pricing, rather than scope of power.  See 12 U.S.C. § 248a(c)(1) (providing that services "shall be priced explicitly"); id. § 248a(c)(3) (providing that pricing must account for all costs actually incurred in providing services as well as the taxes and return on capital that a private business firm would have for providing those same services); id. § 248a(c)(4) (specifying the interest rate for items credited prior to collection).  This suggests that the "shall be available" clause in § 248a(c)(2) is also a pricing principle, not a master account access mandate.

**D. Contrary arguments raised by Custodia are not availing**

Custodia raises several arguments against our conclusion, but none are availing.  First, Custodia argues our interpretation renders the "services . . . shall be available to nonmember depository institutions" clause in § 248a(c)(2) meaningless.  But a look at the context in which Congress passed the MCA reveals the clause's class-based meaning: it directs the Board to ensure that the services enumerated in § 248a(b) are available to both classes of depository institutions, member and nonmember.  Prior to the enactment of the MCA, only member banks were subject to a federal (as opposed to state) reserve asset requirement.  This imposed opportunity costs on member banks because they could not earn interest on their reserve amounts.  See Domestic Monetary Policy Report at 10.  As a form of partial compensation for member banks shouldering this burden, the Fed provided services to those banks free of charge.  Gary C. Zimmerman, The Pricing of Federal Reserve Services Under the MCA, Econ. Rev., Winter 1981, at 23 (1981).  As a policy, the Fed did not provide most services to nonmember banks.  Id. at 22.

As interest rates rose in the 1970's, this arrangement became less appealing to member banks, as the reserve requirements forced them to forgo the higher profits available if they could have invested their reserves.  Domestic Monetary Policy Report at 10.  Member banks began leaving the Fed, impairing the Fed's ability to effectuate its monetary policy.  Id.

Congress passed the MCA, in part, to stem the tide of banks withdrawing their membership.  It did so by imposing reserve requirements on all banks, both member

36

and nonmember, thus eliminating the financial incentive to withdraw from Fed membership.  To make the imposition of a reserve requirement more palatable to nonmember institutions, Congress also lowered the amount of funds required to be held in reserve and opened access to Fed services to nonmember institutions.  See id. at 11 ("In return for the posting of reserves, non-member institutions were given access to Federal Reserve . . . services.").  However, it was expected that the reduced revenue from lower reserve requirements and the increase in use of Fed services would lead to a significant reduction in Fed earnings and, consequently, the federal Treasury.[18]  Id.  Congress addressed these concerns in § 248a by directing the Fed to charge for its services.  See Domestic Monetary Policy Report at 11.

With this context in mind, § 248a(c)(2) has clear meaning without reading it to remove Reserve Bank discretion to approve or reject a master account application: it simply generally directs the Board to open access to Fed services to both classes of institutions, members and nonmembers.  And the Board has done just that.  Services are widely available to nearly all nonmember depository institutions.  Yet that general motive did not mean that Congress intended to eliminate all discretion by the Reserve Banks to regulate the authorization of master accounts, which remained, as

---

[18] Moreover, there were concerns that increased availability of the Fed's free services would stifle private sector competition in the provision of those services. Id.; Anatoli Kuprianov, The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market, Federal Reserve Bank of Richmond 33 (July/Aug. 1985).

before, an essential arrow in the Reserve Bank's quiver of arrows to keep the banking system safe and sound.[19]

Second, Custodia argues that the lack of the word "all" before "nonmember depository institutions" is not probative of congressional intent and § 248a(c)(2) "would have the same meaning regardless of whether the word 'all' preceded the phrase 'nonmember depository institutions.'" Fourth Corner, 861 F.3d at 1069 (Op. of Bacharach, J.). Custodia reasons that the word "all" placed before "nonmember depository institutions" would be an indefinite adjective. Id. (citing Bryan A. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 60 (2016)). And drafters of statutes are often advised to use indefinite adjectives only when necessary. See William P. Statsky, Legislative Analysis and Drafting 184 (2d ed. 1984). Therefore, Custodia argues, we should not read any significance into the absence of such an adjective.[20]

---

[19] To make its point, the dissent suggests the statute should be rewritten, but that is not only beyond the power of the courts, it is also an implicit recognition that the original language used by Congress does not support the position that nonmember depository institutions have an absolute right to a master account.

[20] The dissent accepts Custodia's reading of § 248a(c)(2), suggesting that despite not including the word "all," Congress meant that all nonmember depository institutions would have nondiscretionary access to master accounts, rather than just that such language qualified nonmember depository institutions for eligibility to apply for master account access. The analogy the dissent draws actually makes clear why its conclusion is errant. As the dissent says, the statements "ducks are birds" and "all ducks are birds" are equivalent. Without including the word "all," there would still be no question that it was implied—adding "all" would be superfluous because it would not change the statement's meaning. To the contrary, in the context of distinguishing between services being available to nonmembers as a class and being automatically granted to every nonmember, if "all" had been included (which it wasn't), it would carry significant meaning, such that we doubt Congress would leave

While this general guidance might be relevant in certain cases, it is clear Congress did not follow this principle in § 248a.  As noted earlier, Congress started the very sentence Custodia relies on with "[a]ll Federal Reserve bank services."  12 U.S.C. § 248a(c)(2) (emphasis added).  And later in the same provision, Congress refers to "[a]ll depository institutions."  Id. § 248a(e).  Congress was deliberate with its use of "all" in this provision, and we find it probative of Congress's intent that it chose not to use "all" before "nonmember depository institutions."

Third, Custodia argues our interpretation is contradicted by statements in the legislative history that describe the MCA as providing "open access to [Fed] services to all depository institutions on the same terms and conditions as member banks." H.R. Rep. No. 96-842, at 71 (1980) (Conf. Rep.); see also id. at 69; 126 Cong. Rec. 7072 (1980).  But these statements do not clearly address the question presented in this case.  These statements do not evince any intention to establish unregulated master account access to nonmember depository institutions.  Rather, they simply reinforce the statutory language prohibiting discrimination against nonmembers in pricing and service terms.[21]

Fourth, Custodia points to statements by the Board and various Reserve Banks as evidence that Defendants have historically understood the MCA to mandate an

_____

it out if Congress had intended that all qualifying banks would automatically get access to master accounts.  There is no reason to think Congress intended to expand the meaning of this provision so drastically.

[21] Indeed, Custodia's position would elevate nonmembers above members, granting them guaranteed unencumbered access to the exchange of funds when member banks do not have such a privilege.

unregulated absolute right of nonmember institutions to establish a master account. Custodia argues that Defendants are claiming a newly discovered power that conflicts with their longstanding interpretation and that should, therefore, be viewed with skepticism.  Not only is this contention contradicted by the record, but, as with the legislative history from Congress, the statements cited by Custodia shed little light on the question presented in this case.

The Fed's historical practices demonstrate that it has always understood that it had the authority to protect its payment systems from risk.[22] The view advanced by Custodia creates a danger of Reserve Banks having no discretion with respect to master account access, thereby impairing the Reserve Bank's ability to carry out their duty to safeguard our financial system from risky institutions.  But the Fed's discretion to protect the financial system is long established.  See 12 U.S.C § 248; United States v. Wells Fargo & Co., 943 F.3d 588, 600 (2d Cir. 2019) (noting that Reserve Banks "operate in the public interest, and, specifically, in furtherance of [the Federal Reserve] system's functions of . . . promoting the stability of the financial system, promoting the soundness of individual financial institutions, [and] fostering payment and settlement system safety"); cf. Trump v. Wilcox, 145 S. Ct. 1415, 1415

---

[22] We recognize that, until recently, the Fed has generally not exercised its discretion to deny account access.  See Hill, supra, at 463.  But it has also not been faced with access requests from novel institutions like Custodia.  Custodia lacks both federal insurance and a federal supervisor.  As of November 2023, 540 institutions held master accounts with FRBKC, and only one of them lacked both federal insurance and a federal supervisor.  And the one outlier was a century-old institution that had insurance and a federal supervisor when it first received its account.

(2025) ("The Federal Reserve . . . follows in the distinct historical tradition of the First and Second Banks of the United States."). For example, in 1985 the Fed adopted policies governing the use of its wire transfer service, Fedwire, that evinced the Board's view that it had the authority to deny access to services—even those expressly listed in § 248a(b)—to an individual institution based on its assessment of that institution's risk to the system.

Similarly, since master accounts were first established in 1998, the Fed's official master account policy, contained in Operating Circular 1, has consistently stated that Reserve Banks have discretion with respect to master account access.  See Fed. Rsrv. Fin. Servs., Federal Reserve Banks Operating Circular 1: Account Relationships § 2.3 (eff. Jan. 2, 1998) ("All master accounts are subject to Reserve Bank approval."); Fed. Rsrv. Fin. Servs., Federal Reserve Banks Operating Circular 1: Account Relationships § 2.6 (eff. Sept. 1, 2023) ("A Reserve Bank has discretion in deciding whether to provide a Financial Institution with access to a Master Account and may require a Financial Institution to provide additional information and documentation to the Reserve Bank to support its decision making.").

Custodia refers to numerous statements that describe the MCA as directing the Board to make Fed services "available to all depository institutions."  Federal Reserve Bank Services; Proposed Fee Schedules and Pricing Principles, 45 Fed. Reg. 58,689, 58,690 (Sept. 4, 1980); see also Fourth Corner, 861 F.3d at 1070–72 (Op. of Bacharach, J.) (citing additional statements by the Fed).  When read in the context described above, however, these statements say nothing about any congressional

41

intent to remove Reserve Bank discretion over access for individual entities deemed risky.  Indeed, any such change would be breathtaking in scope, limiting Reserve Banks' regulatory authority to ensure the safety of the banking system.  We read the MCA to direct the Board to make Fed services generally available to all depository institutions, as opposed to restricting the availability of services generally to member institutions only.  And statements about services being "available to all depository institutions" are perfectly consistent with this understanding of the statute.  Custodia points to no statements that actually touch on the issue of discretion with respect to individual entities.

The same is true of the federal cases and academic commentary cited by Custodia.  See Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y., 866 F.2d 38, 40 (2d Cir. 1989) (stating that the MCA made "check clearing services . . . available to all banks, regardless of whether or not they were member banks"); Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta, 713 F.2d 1221, 1222-23 (6th Cir. 1983) (stating that, pursuant to the MCA, "services . . . formerly provided to member banks only will be available to all banks, regardless of whether or not they are members"); Elijah Brewer III, The Depository Institutions Deregulation and Monetary Control Act of 1980, Econ. Perspectives, Sept.–Oct. 1980, at 3–4 (stating that the MCA requires the Fed to "grant all depository institutions access to [Federal Reserve] services"); Fourth Corner, 861 F.3d at 1073 (Op. of Bacharach, J.) (citing other academic commentary).  Each of these statements says only that the MCA directed

42

the Board to stop discriminating against nonmember banks as a group; it says nothing about discretion to deny access to individual entities.

In fact, the only courts to have specifically decided the issue presented in this case have concluded, as we do, that Reserve Banks have discretion to deny master account access to particular eligible entities.  See Banco San Juan Internacional, 762 F. Supp. 3d at 268 ("No FRA provision instructs Federal Reserve banks to provide all available services to all depository institutions while ignoring any and all risk factors pertaining to individual applicants for such services." (emphasis in original)); PayServices Bank v. Fed. Rsrv. Bank of S.F., 2024 WL 1347094, at *11 (D. Idaho Mar. 30, 2024) (unreported) ("[Section] 342 makes clear that Federal Reserve Banks are authorized to accept deposits, and thus open master accounts.  Critically, however, they are not required to do so.  Nothing in § 248a(c)(2) upends this discretion.").

Fifth, Custodia argues that the Toomey Amendment is solely about transparency in the master account application process and says nothing about substantive authority to reject individual applications.[23]  Custodia explains that applications can be rejected on the basis that the applicant is not legally eligible for an account (i.e., not a depository institution), so the Amendment's acknowledgement

---

[23] This argument is supported by amici who were among the drafters of the Toomey Amendment.  But post-enactment statements of the subjective intent of some drafters cannot override the plain language enacted by Congress.  See Bostock v. Clayton Cnty., 590 U.S. 644, 653 (2020) ("[T]he limits of the drafters' imagination supply no reason to ignore the law's demands.  When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest.").

of rejections says nothing about rejecting applications from eligible entities. But this ignores the fact that Congress in the Toomey Amendment expressly required the Board to list the "type of entity" which was denied a master account, and it provided three possible groups of entities, each of which were categories of entities who, as a category, were legally eligible for master accounts. Thus, the plain text of § 248c contemplates the rejection of master account access requests from eligible entities.

Sixth, Custodia contends that the canon of constitutional avoidance counsels against our conclusion. Specifically, Custodia argues that, if Reserve Banks have discretion to deny master account access to eligible entities, then such a statutory scheme violates (1) the Due Process Clause and (2) the Appointments Clause of the U.S. Constitution. Custodia raised these same arguments to the district court as stand-alone claims in its original complaint. The district court dismissed them both under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, reasoning that Custodia had not pled plausible violations of either clause.

Custodia first contends that, if FRBKC has discretion to deny master account access to eligible entities, then such decision-making authority violates the Due Process Clause by vesting FRBKC's board of directors, which is largely chosen by and partially composed of self-interested executives from competitor banks, with regulatory authority over Custodia.[24] See Ass'n of Am. Railroads v. U.S. Dep't of

---

[24] Specifically, a Reserve Bank's nine-member board is made up of three classes of directors with three directors in each class. 12 U.S.C. § 302. Class A directors are representatives of member banks. Id. Class B and Class C directors are "elected to represent the public" and cannot be representatives of member banks. Id.;

44

Transp., 821 F.3d 19, 27 (D.C. Cir. 2016).  We agree with the district court that this system raises no due process concerns because master account application decisions are made by a Reserve Bank's president, not its board, and Reserve Bank presidents are elected only by those directors who are not representatives of competitors.  See 12 U.S.C. §§ 302, 303, 341.[25]

As for Custodia's Appointments Clause argument, that was waived.  Custodia raised this argument in its initial complaint.  That claim was then dismissed by the district court, and Custodia did not reassert it in its amended complaint after that dismissal.

We have previously explained that "we do not require a party to reallege a cause of action on which the district court has conclusively ruled" in order to preserve a claim for appellate review.  Davis v. TXO Prod. Corp., 929 F.2d 1515, 1518 (10th Cir. 1991).  However, a plaintiff waives its "objections to the ruling of the court on indefiniteness, incompleteness or insufficiency, or more technical defects in pleadings" by failing to re-assert a claim in an amended complaint.  Id. at 1517–18.

---

id. § 303.  Class A and Class B directors are elected by the Reserve Bank's member banks, while Class C directors are chosen by the Board.  Id. § 302.

[25] Another potential problem for Custodia in raising this claim is that Custodia must first establish that it has a property or liberty interest in a master account before it can show a due process violation.  See Martin Marietta Materials, Inc. v. Kansas Dep't of Transp., 810 F.3d 1161, 1171–72 (10th Cir. 2016) ("To be entitled to procedural due process, [Custodia] must prove it has either a protected property or liberty interest.").  Defendants make this argument.  (Aple. Bd. Br. 63–64.)  Because we conclude Custodia has no statutory entitlement to a master account, Custodia may be unable to establish such a liberty or property interest.  See Martin Marietta, 810 F.3d at 1178 (explaining that there is no liberty or property interest where the outcome of the process is within the governing body's discretion).

In dismissing Custodia's Appointments Clause claim in this case, the district court concluded that (1) "the factual allegations in Custodia's complaint support that" it is a Reserve Bank's president, not the board, that makes master account application decisions (J.A. 384); and (2) the appointment process for Reserve Bank presidents does not violate the Appointments Clause.  Despite having the opportunity to reassert its claim that the appointment of Reserve Bank <u>directors</u> violates the Appointments Clause by adding factual allegations to its subsequent amended complaint, Custodia did not do so.  Because the district court dismissed Custodia's argument about the appointment process for directors on the ground that the factual allegations were insufficient to implicate directors, Custodia waived its argument about the directors by failing to re-assert it in its amended complaint.  See <u>Davis</u>, 929 F.2d at 1517–18. Instead, Custodia proceeded to seek to compel FRBKC's president to grant it an account and never mention Appointments Clause issues in any of the remaining proceedings in the district court.

To the extent Custodia now argues that the appointment process for a Reserve Bank <u>president</u> violates the Appointments Clause—an argument that was "conclusively ruled" on by the district court—Custodia has also waived that argument by failing adequately to brief it on appeal.  See <u>United States v. Cooper</u>, 654 F.3d 1104, 1128 (10th Cir. 2011) ("It is well-settled that '[a]rguments inadequately briefed in the opening brief are waived.'" (quoting <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 679 (10th Cir. 1998)).  Custodia's Opening Brief raised Appointments Clause concerns only with the appointment process for Reserve Bank

directors.  It never makes any mention of the appointment process for a Reserve

Bank's president.  Further, Custodia's Reply Brief still fails to make any argument as

to how the appointment process for a Reserve Bank's president violates the

Appointments Clause or why the district court's conclusion to the contrary was

wrong.  See Perry v. Woodward, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) ("This

court . . . will not craft a party's arguments for him.").  We are unwilling to rely on

Custodia's bare assertion of Appointments Clause concerns when (1) Defendants

were unable to respond to the argument due to Custodia's inadequate briefing, and

(2) Custodia has not offered any explanation as to how the district court's well-

reasoned analysis was wrong.[26]

---

[26] Custodia also finds it objectionable, from a policy perspective, for Reserve Banks to have discretion to deny master account access.  But Custodia does not establish that any such discretion violated any constitutional provisions, nor that such discretion was abused in this case.  Further, Custodia's policy concerns are more than counterbalanced by the comparable danger of Reserve Banks having no discretion with respect to master account access and therefore no ability to carry out their duty to safeguard our financial system from risky institutions.  See United States v. Wells Fargo & Co., 943 F.3d 588, 600 (2d Cir. 2019) (noting that Reserve Banks "operate in the public interest, and, specifically, in furtherance of [the Federal Reserve] system's functions of . . . promoting the stability of the financial system, promoting the soundness of individual financial institutions, [and] fostering payment and settlement system safety").  In the end, we simply follow the text, which directs our holding in this case.

## V.     CONCLUSION

We agree with the district court that "[t]he plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts." <u>Custodia Bank</u>, 728 F. Supp. 3d at 1245.  Accordingly, we hold that Custodia is not statutorily and automatically entitled to a master account.  We AFFIRM the district court's judgment in favor of Defendants on all claims.

24-8024, *Custodia Bank, Inc. v. Federal Reserve Board of Governors; Federal Reserve Bank of Kansas City*

**TYMKOVICH**, Circuit Judge, dissenting.

The Federal Reserve and its predecessors, the First and Second Banks of the United States, have tested the boundaries of our constitutional order since the founding.  No lesser men than Alexander Hamilton and Thomas Jefferson debated the necessity and legality of a national bank to implement America's monetary policy.  The Fed has proven an important part of America's economic policy, but still, it exists on the boundaries of our tripartite system.  By claiming unreviewable discretion over access to the nation's financial system, the Fed has gone too far.

In adopting the Fed's interpretation of the law, the majority endorses a reading of federal law that allows unappointed bank officials to exercise significant yet unreviewable executive authority.  I doubt our Constitution allows that, and I think the solution here is simpler.  Through the Depository Institutions Deregulation and Monetary Control Act (MCA), Congress mandated access for all nonmember depository institutions.  This interpretation is more faithful to the MCA's plain text and skirts an avoidable constitutional quagmire.

I would reverse.

# I.    Background

## A.    History and Structure of the Federal Reserve

In all its forms, the central bank of the United States has faced legal and political challenges.  Some of our nation's earliest and most important debates surrounded the Fed's predecessors.  These debates still echo through this case.

### 1.    The First and Second National Banks

The First Bank of the United States was chartered in 1791 amid political and legal controversy.  The First Bank, like the modern regional Federal Reserve Banks, was quasi-private.  The federal government appointed five directors and private shareholders appointed twenty more.  Alexander Hamilton proposed the bank and argued it was the cornerstone of a strong national economy and necessary to cement the states into a national bond.  *See* Bray Hammond, *Banks and Politics in America: From the Revolution to the Civil War* 114–15 (1957).  Thomas Jefferson believed that the Bank was not only unnecessary, but a dangerous and unconstitutional expansion of federal power.  *Id.* at 117.  As to the constitutional question, James Madison and Attorney General Edmund Randolph agreed with Jefferson.  *Id.* at 115–17.  The factions that formed in this debate outlined America's first political parties.

The Second Bank of the United States was chartered in 1816.  Once again, the President appointed five of the bank's twenty-five directors.  This time, challenges to the bank's constitutionality made it to the Supreme Court.  Chief Justice Marshall agreed with Hamilton and ruled that the Constitution's Necessary and Proper Clause gave Congress the authority to charter and administer a national bank.  *See*

*McCulloch v. Maryland*, 17 U.S. 316, 353 (1819).  But that did not save the Second Bank from political controversy.  Eventually, President Andrew Jackson, still believing the Second Bank was unconstitutional, vetoed legislation to renew the Second Bank's charter.  Disagreements over the constitutionality of the national bank firmed the lines between the Whigs, Republicans, and Democrats.

### 2.    *The Federal Reserve System*

The modern Federal Reserve System began in 1913 when Congress passed the Federal Reserve Act.  12 U.S.C. § 221 *et seq*.  The FRA created twelve regional Reserve Banks and a Federal Reserve Board in Washington, D.C.  Congress later added the Federal Open Market Committee (FOMC), completing the Federal Reserve System.

The Federal Reserve Board, now called the Board of Governors, is not itself a bank, but an independent federal agency made up of seven members appointed by the President and confirmed by the Senate.  The Board oversees the twelve regional banks and guides their day-to-day activities through notice-and-comment rulemaking. *See generally* 12 U.S.C. § 248.

The regional banks each serve as a "bank for banks" in their region.  They hold deposits, lend to member banks, and serve as the bank for the U.S. Treasury.  Each regional bank is run by a board of nine directors.  Three A-Class directors and three B-Class directors are chosen by the member banks—state and national banks who own stock in their regional bank.  Three C-Class directors are chosen by the Board of Governors.  The A-Class and B-Class directors elect a chair from the C-Class

directors, subject to approval from the Board of Governors.  The chair serves as the

president and chief executive of the regional bank, and serves as a rotating member

of the FOMC, the part of the Fed that sets the target federal funds rate and authorizes

open market operations to achieve it.[1]  Once the regional bank president is chosen, he

can be removed by either the bank's board of directors or the Board of Governors.

### B.    *Master Accounts and Payment Services*

The regional banks provide the banking services to banks in their region.  The

Kansas City Fed serves District 10: Wyoming, Colorado, Nebraska, Kansas,

Oklahoma, and parts of New Mexico and Missouri.  For member banks in those

states, the Kansas City Fed is their principal federal regulator, performing on-site

evaluations.  The Kansas City Fed also holds deposits; lends short-term cash; issues,

transfers, and redeems government securities; and provides integral payment services

between banks.

The Federal Reserve payment services are essential to most bank business.  In

fact, any time money moves from one bank to another, the Federal Reserve Banks are

involved.  These payment services include wire transfer services, automated

clearinghouse services, check clearing services, and settlement services.  As an

---

[1] The FOMC is made up of the seven Governors and five regional bank presidents—the New York Fed President has a permanent seat, and the other 11 banks rotate through the four seats.  The FOMC is not relevant here except noting that regional bank presidents serve on the committee.

example, the Fed's clearinghouse services allow companies to direct deposit their employees' paychecks.  In 2024, Federal Reserve payment services processed more than $4.5 trillion per day.  *Fedwire Funds Service – Annual Statistics*, The Fed. Rsrv., https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/annual-stats.html (last visited Oct. 10, 2025).  Before the Fed provided these services, banks had to move physical currency between themselves; now, the Fed simply records credits and debits between the banks.

The Fed records all these transactions in a bank's master account.  Before 1998, some banks had multiple accounts with multiple regional banks.  Then the Fed consolidated all reserve and clearing accounts into a single master account.  Master accounts are the official records of banks' rights and obligations to each other.  Settlement in a master account is the only way to settle a U.S. dollar transaction other than the exchange of physical currency.

Master accounts, and the payment services accessible through them, are vital for functioning banks.  Without such access, a depository institution is merely a vault.  Without their own master accounts, banks can only access these services through a correspondent banking relationship or expensive third-party service providers.  Without a master account, a bank's business is "effectively crippl[ed]." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J., concurring).

### C.    *Custodia Bank*

Unsurprisingly, Custodia Bank wants a master account.  Custodia is a Wyoming-chartered Special Purpose Depository Institution (SPDI; pronounced "speedy").  Wyoming created SPDIs to encourage innovation in digital asset banking. SPDIs specialize in digital asset management.[2]  Under Wyoming law, they can provide custodial services, asset servicing and management, and typical business cash management.  *See* Wyo. Stat. Ann. § 13-12-103(b) (2025).  But they cannot loan money and must keep 100% of reserves in cash or high-quality assets like treasury bonds.  Wyo. Stat. Ann. §§ 13-12-103(c), 105(a) (2025).  Custodia's goal as a SPDI is to provide the full suite of banking services to the cryptocurrency industry. Custodia wants not only to be a safe depository for digital assets like cryptocurrencies, but also to provide traditional banking services to digital asset companies.

To illustrate, consider a hypothetical company.  HypoCo creates a new hypothetical cryptocurrency, HypoCoin.  Under Wyoming law, Custodia could provide a safe depository for the company's reserves of HypoCoin and, with a master account, could facilitate HypoCo's payroll services, bill payment, and large dollar transfers for capital purchases.  The two services would be completely separate, but together would make Custodia a one-stop-shop for digital asset companies.

---

[2] *See generally Special Purpose Depository Institutions*, Wyo. Div. of Banking, https://wyomingbankingdivision.wyo.gov/banks-and-trust-companies/special-purpose-depository-institutions (last visited Oct. 10, 2025).

Custodia applied for a master account in October 2020.[3]  At the time, applications for a master account were done on a one-page form and, according to the Fed, were usually processed in five to seven business days.  Custodia's took twenty-seven months.  Discovery revealed early optimism about Custodia's application.  The Kansas City Fed told Custodia early on there were "no show-stoppers" in its application.  App. 1721–23.

The Kansas City Fed changed its tune over time.  In August 2022, the Board of Governors issued guidance to the regional banks for evaluating account and service requests.  Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51099 (Aug. 19, 2022).  The guidelines list six principles for guiding access decisions.  Regarding the level of scrutiny the regional banks should apply, the guidelines create a three-tiered review framework:

1.  Tier 1: Eligible institutions that are federally insured . . .

2.  Tier 2: Eligible institutions that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency.  In addition, (i) if such an institution is chartered under federal law, it has a holding company that is subject to Federal Reserve oversight (by statute or commitments); and (ii) if such an institution is chartered under state law and has a holding company, that holding company is subject to Federal Reserve oversight (by statute or commitments) . . .

3.  Tier 3: Eligible institutions that are not federally insured and are not considered in Tier 2.

_____

[3] Custodia separately applied for membership in the Federal Reserve System and Federal Deposit Insurance Corporation insurance.

7

*Id.* at 51109–10. Custodia fell into Tier 3 and was subject to "the strictest level of review." *Id.* at 51110.

Then, in November 2022, FTX Trading Ltd., a fraudulent cryptocurrency exchange company, failed. Shortly thereafter, the Board of Governors communicated to the Kansas City Fed that Custodia's application should be denied. The Kansas City Fed sent the Board of Governors a draft denial letter, which the Board redlined and returned.

On January 27, 2024, the Kansas City Fed sent Custodia the letter denying its master account application. On the same day, the Board of Governors denied Custodia's membership application.

### D.    *Custodia's Lawsuit*

Custodia filed suit before its application was denied. Its first complaint alleged eight causes of action stemming from the Kansas City Fed's inaction. The Fed defendants moved to dismiss, but the district court declined to dismiss Custodia's Mandamus and APA claims.

After Custodia's application was denied by the Kansas City Fed, it amended its complaint and alleged three claims. *First*, Custodia alleges the Board of Governors violated the APA by denying Custodia's application in violation of the Federal Reserve Act and the Monetary Control Act. *Second*, Custodia seeks relief under the Mandamus Act to compel the Kansas City Fed to grant its application. *Finally*, Custodia seeks declaratory relief that the Kansas City Fed and the Board of Governors lack discretion to deny its application.

The Fed defendants again moved to dismiss.  In this motion, they conceded that Custodia was legally eligible for a master account, but argued it is within their (absolute) discretion to deny an application.  The district court declined to dismiss Custodia's APA claim against the Board, its Mandamus claim against the Kansas City Fed, and its declaratory relief claim.

After discovery, both Custodia and the Kansas City Fed moved for judgment as a matter of law.  This time, the district court ruled for the defendants.  It concluded, *first*, the APA claim against the Board of Governors failed for lack of jurisdiction.  It ruled that there was no final agency action and, so, no statutory jurisdiction.  *Second*, the district court found that Custodia was not entitled to mandamus relief because the Kansas City Fed had discretion over whether to issue master accounts under 12 U.S.C. § 342.  *Finally*, the district court held its statutory interpretation would also preclude relief for Custodia under the APA, even if it possessed jurisdiction.

## II.    Discussion

This case, at its core, turns on statutory interpretation.  No amount of policy argument or economic theory changes the fundamental question: does the Kansas City Fed have statutory discretion to deny a master account to a legally eligible depository institution?

The text tells the story.

There is no single statute that covers master accounts so the parties each put forth their own theory about what statutory provision controls.  Custodia claims the

9

Monetary Control Act (MCA) is a statutory command that requires a master account "*shall* be available to nonmember depository institutions."  12 U.S.C. § 248a(c)(2) (emphasis added).  On the other hand, the Kansas City Fed claims the Federal Reserve Act (FRA), 28 U.S.C. § 342, has always given it discretion over accepting deposits.  It contends it would only make sense for it to have discretion over deposit *accounts*.  The Kansas City Fed bolsters its argument by claiming that a statute passed in 2022, the Toomey Amendment, 12 U.S.C. § 248c, specifically recognizes its ability to reject master account applications.

Custodia has the better reading of the MCA and that reading controls the outcome.  The Fed's interpretation, adopted by the majority, is certainly plausible.  But what the majority calls "context," I would dub misdirection.  Section 248a's text is clear and we need go no further, although in context my interpretation avoids significant constitutional problems.  I start by interpreting the MCA and then address the majority's approach and concerns.

### A.    *Interpreting the MCA*

The MCA provides the clearest textual basis for Custodia's claims.  After all, it says "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions* and such services shall be priced at the same fee schedule applicable to member banks."  12 U.S.C. § 248a(c)(2).  This isolated reading of the text is compelling.  Before today, the only other Court of Appeals judge to explicitly reach the issue (in a concurrence) found that § 248a controls*. Fourth Corner Credit Union*, 861 F.3d at 1068 (Bacharach, J., concurring).

10

In a case also arising in this circuit, *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, Judge Bacharach, writing separately, concluded a credit union hoping to service marijuana-related businesses was entitled to a master account. *Id.* First, he concluded the district court should have presumed that Fourth Corner would follow the law in line with its promises. *Id.* at 1065. Second, and relevant here, he determined "§ 248a(c)(2) *unambiguously* entitles Fourth Corner to a master account." *Id.* at 1068 (emphasis added). Custodia argues that we should do the same. I agree.

*First*, it is undisputed that Custodia is *eligible* for a master account. Section 248a adopts its definition of "depository institution" from 12 U.S.C. § 461(b)(1). 12 U.S.C. § 248a(e). Custodia falls under § 461(b)(1)(A)(i): "any insured bank as defined in section 3 of the Federal Deposit Insurance Act or any bank which is eligible to make application to become an insured bank under section 5 of such Act." It is eligible to apply for insurance under the FDIA because it is a "state bank . . . engaged in the business of receiving deposits, other than trust funds . . . incorporated under the laws of [Wyoming]." 12 U.S.C. § 1813(2)(A)–(B); *see also* Wyo. Stat. Ann. § 13-12-103(b)(vii)(E) (2025) (confirming SPDIs may receive deposits under Wyoming law).

It is no trivial fact that Custodia falls under § 461's broad definition. Replacing "nonmember depository institutions" in § 248a with § 461(b)(1)(A)(i)'s definition shows just how broadly § 248a(c)(2) was meant to sweep. The modified statute reads, "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to [*any* bank which is eligible to make application to become an insured

11

bank].” 12 U.S.C. § 248a(c)(2); § 461(b)(1)(A)(i) (emphasis added).  Section 248a

sweeps broadly and covers Custodia.

     *Second*, Custodia argues, as Judge Bacharach explained, that § 248a controls

access to master accounts.  Section 248a covers an enumerated list of services:

> (1) currency and coin services;
> (2) check clearing and collection services;
> (3) wire transfer services;
> (4) automated clearinghouse services;
> (5) settlement services;
> (6) securities safekeeping services;
> (7) Federal Reserve float; and
> (8) any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds.

12 U.S.C. § 248a(b)(1)–(8).  Custodia argues that master accounts are either covered

by “any new services,” § 248a(b)(8), or are a prerequisite for those services.  It

would then follow that regional banks cannot deny nonmember institutions a master

account without violating § 248a.

     I find this interpretation compelling.  None of the enumerated services are

“accounts,” master or otherwise.  Nor does the Fed contend that it charges a fee for

master accounts as § 248a(c)(3) requires.  *See* 28 U.S.C. § 248a(c)(3) (“Over the long

run, fees shall be established on the basis of all direct and indirect costs actually

incurred in providing the Federal Reserve services priced.”).  It makes sense to think

of the master account as the means of accessing the services, not as an end in and of

itself.  In *Fourth Corner*, both Judge Moritz and Judge Bacharach recognized that a

master account is required to access Fed services, and that the services are what the

credit union wanted.  See *Fourth Corner Credit Union*, 861 F.3d at 1053 (Moritz, J., concurring) ("A master account is, put simply, a bank account for banks.  It gives depository institutions access to the Federal Reserve System's services, including its electronic payments system.  In the Credit Union's words, 'Without such access, a depository institution is nothing more than a vault.'"); *id.* at 1071 (Bacharach, J., concurring) ("To purchase these services, a master account is required.").  Here too, Custodia's business model hinges on access to the payment services, not just a master account.

The Fed defendants point out that a master account is not technically required to access the payment systems.  They argue that Custodia can access the payment systems through a correspondent relationship with another bank by transacting through that bank's master account.  But I am not persuaded that access through an intermediary bank satisfies § 248a(c)(2).  Relying on intermediaries (who may or may not provide a long-term relationship) does not guarantee the uniform access to payment services that the MCA intended.

Master accounts are necessary to access the payment systems.  To deny a financial institution a master account is to deny access to the payment systems.  The Kansas City Fed cannot get around statutorily mandated access to payment systems by damming the river upstream.

*Finally*, Custodia asserts that § 248a(c)(2) contains two clear commands: (1) provide universal access, and (2) at equal prices.  I agree.  The word "shall" issues a command beyond the Fed's discretion.  See *Lopez v. Davis*, 531 U.S. 230,

241 (2001) ("Congress used 'shall' to impose discretionless obligations . . . ."); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").  The statute clearly states, "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions* and such services *shall be priced at the same fee schedule* applicable to member banks."  12 U.S.C. § 248a(c)(2) (emphasis added).  The plain reading of the statute is that the two uses of "shall" create two nondiscretionary commands for the Kansas City Fed.  "If the statutory language is plain, we must enforce it according to its terms."  *King v. Burwell*, 576 U.S. 473, 486 (2015).  The first command, the one Custodia is interested in, creates nondiscretionary access for nonmember depository institutions.  And the second requires the Fed to charge equal prices for those services.

The Kansas City Fed's alternative reading of this provision is unpersuasive.  It first argues that the only command in the statute is to price the services equally for member and nonmember institutions.  By adopting that reading, the majority reads the phrase "shall be available to nonmember institutions" entirely out of the statute.  That, I'm convinced, we cannot do.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 533 U.S. 167 (2001))).  The sentence contains two commands—access and fair pricing.

14

The Fed then invites us to zoom out and view the provision in broader context. It argues that § 248a as a whole is only about the pricing of services and (c)(2) is not a command for the Kansas City Fed, but a principle that the Board of Governors must follow.  First, it points to the heading of § 248a, "Pricing of services."  While the headings in the U.S. Code are not law, they can provide context for the text's meaning.  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) ("Although section headings cannot limit the plain meaning of a statutory text . . . 'they supply cues' as to what Congress intended.").  Plus, the provision is directed at the Board of Governors.  Section 248a(a) states "*the Board shall* publish for public comment a set of pricing principles in accordance with this section" and "*the Board shall* begin to put into effect a schedule of fees for such services which is based on those principles."  Under this view, the 248a(c)(2) command is just a principle for the Board of Governors to remember when pricing.  The Fed finally concludes, given this context, § 248a(c)(2) only requires access to nonmember institutions *as a class*.  They point out that the statute says, "*all* Federal Reserve Bank Services," but does not say "*all*" nonmember depository institutions.  *See* 12 U.S.C. § 248a(c)(2) (emphasis added).

The majority accepts the Fed's contextual interpretation; I would not.  Context does not override the plain text of the statute.  Certainly, statutory titles and headings can provide "cues"—but they are just that.  *Yates v. United States*, 574 U.S. 528, 540 (2015).  The plain meaning cannot be undone by headings and titles.  *Merit Mgmt. Grp., LP*, 583 U.S. at 380.  True, § 248a(a) contains commands to the Board, but

15

§ 248a(c)(2) is a clear principle of law.  I find it strange to rule that the Board of Governors is bound by that principle, but the Kansas City Fed is not.[4]

Lastly, the presence or absence of "all" does not change the plain meaning of the provision.  I agree with Judge Bacharach in *Fourth Corner* that "the statute would have the same meaning regardless of whether the word 'all' preceded the phrase 'nonmember depository institutions.'" *Fourth Corner Credit Union*, 861 F.3d at 1069 (Bacharach, J., concurring).  If Congress had included "all," it would have been an indefinite adjective.  *Id.* (citing Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 60 (2016)).  Statutory drafters are often discouraged from using pronominal indefinite adjectives unless necessary.  As one commentator advises:

    a. Use adjectives such as "each," "every," "any," "*all*," "no," and "some" (technically known as "pronominal indefinite adjectives") *only when necessary*.

    b. If the subject of the sentence is plural, *it is almost never necessary* to use this kind of adjective.

William P. Statsky, *Legislative Analysis and Drafting* 184 (2d ed. 1984) (emphases added).  Pennsylvania codified this rule.  101 Pa. Code § 15.142(c).  ("Use adjectives such as 'each,' 'every,' 'any,' 'all,' 'no,' and 'some' (technically known as 'pronominal indefinite adjectives') only where necessary.  If the subject of the

---

[4] Recall that the Board of Governors regulates the regional banks but does not provide the services.  Applying the § 248a(c)(2) command only to the Board would direct it away from the institution able to fulfill it.  Plus, that would allow the Kansas City Fed to do something the Board of Governors cannot permit it to do.

sentence is plural, it is almost never necessary to use such an adjective"); *see also Fourth Corner Credit Union*, 861 F.3d at 1069–70 (collecting corroborating sources).

Whether a speaker says, "all ducks are birds" or simply "ducks are birds," we would understand he means the same thing. Here too, the statute means every nonmember depository institution shall have access. To mandate access to nonmember institutions as a class but allow discretion over individual institutions gives the Kansas City Fed license to ignore the statute by denying all nonmembers on the back end.

The majority's reading also renders the language superfluous. The MCA not only created § 248a(c)(2), it also amended § 342. The amendments to § 342 added "nonmember bank[s]" to the list of institutions from whom regional banks "may receive . . . deposits." 12 U.S.C. § 342; *see infra* Section II.B (explaining the MCA's amendments to § 342 in greater detail). Thus, reading § 248a(c)(2) as merely opening access to nonmember banks would make it superfluous alongside § 342. *See TRW Inc.*, 534 U.S. at 31.

Section 248a(c)(2) contains a clear statutory command. The Federal Reserve System's payment services "*shall be available* to nonmember depository institutions." 12 U.S.C. § 248a(c)(2) (emphasis added). The plain meaning of this provision is that the Kansas City Fed may not deny Custodia a master account because doing so would unlawfully prevent it from accessing those services.

### B.     The Majority's Contextual Argument

Instead of starting with § 248a, the majority begins its analysis with a provision of the Federal Reserve Act, 12 U.S.C. § 342.  Section 342 provides that "[a]ny Federal Reserve bank *may* receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money . . . ."  12 U.S.C. § 342 (emphasis added).  The Fed defendants argue, and the majority agrees, that this gives them discretion over deposits and, by logical extension, deposit accounts.  Indeed, the Supreme Court "has repeatedly observed that the word 'may' *clearly* connotes discretion."  *Biden v. Texas*, 597 U.S. 785, 787 (2022) (internal quotations omitted).

The Supreme Court explored the Fed's discretion in *Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923).  In that case, the Court held that "neither section [342], nor any other provision of the Federal Reserve Act, imposes upon Reserve Banks any obligation to receive checks for collection.  The act merely confers authority to do so."  *Id.* at 662.  The majority reads *Farmers'* as confirmation that the Fed has broad discretion over deposits and that includes deposit accounts.  It also argues that statutory amendments have only affirmed this discretion.

The history does not support this broad assertion.  When the MCA was passed, it made only minor amendments to § 342.  In fact, one of the only changes was to add "other depository institutions" to the list of parties it *may* receive deposits from. Depository Institutions Deregulation and Monetary Control Act (MCA), Pub. L. No.

96-221, § 105(a)(1), 94 Stat. 132, 139 (1980).  Meanwhile, Congress placed § 248a in a new section that is not linked to the discretion of regional banks.  The Supreme Court has noted that the FRA "appears to have been drawn with great care.  Throughout the Act Congress clearly distinguished between what the board and the Reserve Banks 'shall' do and what they 'may' do."  *Farmers' & Merchants' Bank of Monroe*, 262 U.S. at 663.  The majority argues that if Congress had intended to limit the bank's discretion, it would have done so in the section granting that discretion.

Once again in 2022, Congress amended the FRA.  This amendment, the Toomey Amendment, also supports discretion in the majority's eyes.

> "The Board shall create and maintain a public, online, and searchable database that contains . . . a list of every entity that submits an access request for a reserve bank master account and services after enactment of this section (or that has submitted an access request that is pending on the date of enactment of this section), including whether, and the dates on which, a request . . . was approved, *rejected*, pending, or withdrawn."

12 U.S.C. § 248c(b)(1)(B)(ii).  The majority believes that with this amendment, Congress once again considered and blessed the Fed's ability to reject master account applications.

The majority's overarching theory is that § 342 gives the Fed broad discretion over deposits and Congress affirmed that discretion when it passed the MCA and the Toomey Amendment.  To find that Custodia has an absolute entitlement to a master account based solely on § 248a(c)(2) would be squeezing an elephant into a mousehole.  Certainly, this argument has some merit.  After all, this is how the

district court in this case ruled, and two other district courts agreed. *See PayServices Bank v. Fed. Rsrv. Bank of S.F.*, No. 1:23-CV-00305-REP, 2024 WL 1347094 (D. Idaho Mar. 30, 2024) (appeal docketed); *see also Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 762 F. Supp. 3d 247 (S.D.N.Y. 2025).

But respectfully, I disagree. The discretion the majority identifies in § 342 is not the heart of that statute. Section 342 is simply the background legal principle that gives the regional banks legal authority to accept deposits—"words of authorization merely." *Farmers' & Merchants' Bank of Monroe*, 262 U.S. at 662. No doubt Congress can pass additional laws changing the Fed's discretion. It did so in 1916, further allowing the Fed to accept deposits in maturing bills. *See* Federal Reserve Act Amendments, Pub. L. No. 64-270, 39 Stat. 752 (1916). Section 248a limits the Kansas City Fed's discretion in light of § 342's backdrop. I agree that the placement of this provision is imperfect, but that does not make the statutory language any less clear. Besides, as I explain below, the MCA is no mousehole.

Further, the Toomey Amendment does not affirm any powers of the Kansas City Fed. In the majority's view, the Toomey Amendment underlines its conclusion that Congress expected the Fed would reject some master account applications. But I do not believe the Amendment changed anything. Congress passed the Toomey Amendment because it believed rejections were happening and merely wanted to gather information. *See* Former Senator Patrick J. Toomey Amicus Br. 12 ("The focus was consistently, and exclusively, on promoting transparency as to which institutions held and had applied for master accounts."); *see also* Members of the

20

U.S. Senate Banking Committee and U.S. House Financial Services Committee Amicus Br. 20 ("It is unreasonable to construe the Toomey Amendment as modifying § 248a(c)(2) or implying Congressional intent for § 342 to override the mandatory language of § 248a(c)(2)."). I read the Toomey Amendment only to require transparency in the existing framework. Whether the Fed denies a master account because it believes a bank is statutorily ineligible, or is exercising unlawful discretion, it must disclose its decision to the public.

The reading the Fed advances and the majority endorses is certainly a plausible one, but it is not the best reading of the statute. The clear, unambiguous meaning of "*shall* be available" cannot be explained away. 12 U.S.C. § 248a(c)(2).

### C.      *Of Elephants and Mouseholes*

An important influence on the majority's constricting interpretation of § 248a is its belief that Congress would not make a change to the Fed's discretion in a "single sentence tucked deep and innocuously inside . . . the MCA." Majority Op. 30. In the majority's view, limiting the Fed's discretion risks financial instability by inhibiting its ability to safeguard our financial system. Congress would not make such a change in a relatively obscure statutory section—that would be like finding an elephant in a mousehole. But the Fed has many tools in its belt to protect against harmful banking practices; granting it *unreviewable* discretion over deposit accounts would itself be an elephant that does not fit within the MCA mousehole. So this may be the rare case in which there are *two* elephants and *two* mouseholes. Regardless of the consequences, we must interpret the law.

21

This case presents a choice between a nondiscretionary entitlement for Custodia (and any other eligible depository institution) and unreviewable discretion for the Kansas City Fed. At oral argument, counsel for the Kansas City Fed suggested it disclaimed unreviewable discretion. But that is not the clear logic of its position. Custodia seeks relief under the Mandamus Act, and mandamus is only available to compel nondiscretionary acts. 28 U.S.C. § 1361. By granting the Kansas City Fed *any* discretion, we preclude mandamus relief. When pressed at oral argument to give us another way the Kansas City Fed's discretion would be subject to judicial review, counsel could not.

The district courts that have agreed with the Kansas City Fed's position, moreover, have found the regional banks' discretion to be beyond judicial review. Both the Southern District of New York and the District of Idaho recognized that if master account decisions are discretionary, they are beyond APA review and mandamus relief. In *Banco San Juan Internacional, Inc. v Federal Reserve Bank of New York*, the court ruled that master accounts were governed by § 342 and were subject to the bank's discretion. 762 F. Supp. 3d at 266–67. As a result, it ruled that Banco San Juan's "APA, Mandamus Act, and DJA claims are precluded from review by statute." *Id.* at 274. It then dismissed Banco San Juan's due process claims because the bank failed to identify a valid cause of action. *Id.* at 283. Finally, the court dismissed Banco San Juan's state-law claims because the bank had conceded that the New York Fed had a discretionary right to terminate master accounts. *Id.* at 284. The district court in *PayServices Bank v. Federal Reserve Bank of San*

22

*Francisco* likewise recognized that "[t]he success of [PayServices' APA, Mandamus, and Due Process] claims depends on the existence of a nondiscretionary duty." 2024 WL 1347094, at *6. At oral argument before the Ninth Circuit, counsel for the San Francisco Fed confirmed his argument was that there was "no opportunity for judicial review." Oral Argument at 18:58, *PayServices Bank v. Federal Rsrv. Bank of S.F.*, No. 24-2455 (9th Cir. argued Dec. 12, 2024).

The Kansas City Fed's attempt to temper its legal claim misses the larger consequence of its theory. There is really no way around the fact that *any* discretion becomes *unreviewable* discretion.

Either outcome would come with significant consequences for our financial system and our federal structure. The majority concludes that the better view is Fed discretion. But the MCA is no mousehole—it upended the bargain between the federal reserve and nonmember banks. As one scholar aptly explains, "Congress struck a compromise in the Monetary Control Act of 1980: All depository institutions would be subject to federally established reserve requirements and in return all depository institutions would get access to the Federal Reserve's payment services." Julie Andersen Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, 109 Iowa L. Rev. 117, 168 (2023). Even the Fed's own publications recognize that the MCA "changed the way the Fed provided services." *Federal Reserve System: The First 100 Years*, Fed. Rsrv. Bank of Phila. (Jan. 2021), https://www.philadelphiafed.org/-/media/FRBP/Assets/Institutional/Education/Publications/federal-reserve-system-the-

first-100-years.pdf.  Mandating that Custodia have access to Fed payment systems is perfectly in line with the policy changes Congress intended in the MCA. The MCA was passed in 1980 and, to my knowledge, the Fed denied a master account for the first time in 2015.  *See Fourth Corner Credit Union*, 861 F.3d at 1053 (Moritz, J., concurring).  During those 30 years, the Fed used other tools to mitigate potential risk to the financial system.  It still has general discretion over deposits and can reject deposits it views as risky.[5]  Section 241(c)(2) also explicitly leaves open all other requirements that member banks are subject to.  12 U.S.C. § 248a(c)(2) ("[N]onmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.").  The Fed can require banks to maintain extra balances, limit the total deposits, limit the size of transfers, and deny access to other services not covered under § 248a, like the discount window.  *See generally Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit*, Bd. of Governors of the Fed. Rsrv. Sys. (July 20, 2023), https://www.federalreserve.gov/paymentsystems/files /psr_guide.pdf.  The Fed has managed risky banks with master accounts for years, and I am confident it still can. Indeed, recent history has amply demonstrated that traditional banks can be no less

---

[5] Of course, the Fed cannot deny all deposits and de facto prevent Custodia from accessing payment services.  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly.").

risky than innovative banks.  The Fed's policy concerns can be handled through policy innovation rather than shutting the door to innovative banks and insulating itself from judicial review.

### D.    *Constitutional Avoidance*

Finally, the majority's interpretation of the law, though plausible, raises a host of constitutional concerns that we are bound to avoid.  *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice.  If one of them would raise a multitude of constitutional problems, the other should prevail.").  I agree with Custodia and its amici that giving unreviewable discretion to the Kansas City Fed would push the boundaries of executive power.  So I adopt the interpretation that limits the Fed's discretion and evades any constitutional issues thereby.

The executive power in Article II of the Constitution is "vested in a President of the United States of America."  U.S. Const. art. II, § 1, cl.1.  The Constitution "provides for executive officers to 'assist the supreme Magistrate in discharging the duties of his trust.'"  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (quoting 30 *Writings of George Washington* 334 (J. Fitzpatrick ed. 1939)).  These officers must still be accountable to the people, by being accountable to the President.  *See generally*, Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* 161–69 (2020) ("Unless the President has the power to remove executive officers 'at pleasure'—to use

Gouverneur Morris's term—he cannot exercise control of the executive branch, cannot 'take care' that the laws be faithfully executed, and is deprived of a portion of 'the executive power.'").  They must meet the appointment and removal requirements set forth by the Constitution and Supreme Court case law.

The Supreme Court's clearest articulation of the distinction between superior officers, inferior officers, and employees comes from *Lucia*.  In *Lucia*, the Court ruled that SEC Administrative Law Judges are officers of the United States, not mere employees.  *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 249 (2018).  The *Lucia* majority held that the ALJs were officers under *Buckley v. Valeo*'s "significant authority" test.  *Id.*  The Court did not reach the question of whether the ALJs were inferior or superior officers because the ALJs were unconstitutionally appointed regardless of that distinction.  *Id.* at 245–46.  In this case, the President of the Kansas City Fed is certainly not a constitutionally appointed superior officer, and if he is an inferior officer, the appointment and removal process are suspect.  Like *Lucia*, we are concerned with the line between officer and employee.

Principal officers who occupy a "continuing position established by law" and "exercise significant authority pursuant to the laws of the United States," *Lucia*, 585 U.S. at 245 (citation modified), must be appointed by the President and confirmed by the Senate, *see* U.S. Const. art. II, § 2, cl. 2.  Inferior officers also occupy a continuing position and exercise significant authority but may be appointed by, and must be subject to, a principal officer.  *See Edmond v. United States*, 520 U.S. 651, 662–63 (1997).  All other executive officials are employees whose "duties [are]

26

'occasional or temporary' rather than 'continuing and permanent.'" *Lucia*, 585 U.S. at 245 (quoting *United States v. Germaine*, 99 U.S. 508, 511–12 (1878)). The Constitution "cares not a whit about who" appoints employees. *Id.*

The majority's decision that the Kansas City Fed and its president may deny master accounts makes it much more likely that they are inferior officers of the United States. "The exercise of 'significant authority pursuant to the laws of the United States' marks . . . the line between officer and nonofficer." *Edmond*, 520 U.S. at 662 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)). If the Kansas City Fed President is an inferior officer, then we must question whether the appointment and removal process is constitutional. Recall that the bank president is chosen from among the C-Class directors appointed by the Board of Governors by the A- and B-Class directors chosen by the private member banks. The Governors may be principal officers, but whether they are properly appointing regional bank presidents is a tricky legal question. The bank president can also be removed by *either* the board of directors or the Board of Governors. Since "executive power include[s] a power to oversee executive officers through removal," *Free Enter. Fund*, 561 U.S. at 492, I am skeptical of an attempt to delegate the removal power to private board members.

I do not mean to suggest that the entirety of the Federal Reserve System is unconstitutional. The Supreme Court has made clear "[t]he Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States." *Trump v. Wilcox*, 145

27

S. Ct. 1415, 1415 (2025).  But if the Fed's independence is constitutional only because it "follows in the distinct historical tradition of the First and Second Banks of the United States," *id.*, the Fed would be wise not to expand its power beyond its historical limits.  As scholars have put it, "[m]oving money around . . . seems quite like what the First and Second Banks did," but "to the extent that Congress has given the Fed regulatory authority for this purpose . . . , the argument that the President does not enjoy removal authority is much harder to make."  Aditya Bamzai & Aaron L. Nielson, *Article II and the Federal Reserve*, 109 Cornell L. Rev. 843, 906–07 (2024).

We can avoid these thorny questions if we conclude, as I think we must, that the Bank President is merely an employee of the United States.  So we must favor the interpretation of the statute that prohibits the Kansas City Fed President from exercising "significant executive authority."  *Lucia*, 585 U.S. at 245.

We are bound by the ordinary language of the statute and, in my view, *shall* means *shall*.  Section § 248a(c)(2) mandates access to the Fed's payment services for all nonmember depository institutions.  By denying Custodia a master account, the Kansas City Fed has unlawfully denied it access to those services which are vital to its business.  That, it cannot do.

## III.   Conclusion

This case comes clothed in 21st Century terms: cryptocurrency, digital assets, instant wire transfers, and master accounts.  But there is nothing new about this issue.  Courts have probed the legality of our nation's central bank and interpreted the

relevant statutes since the founding. It remains true that "where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy." *Marbury v. Madison*, 5 U.S. 137, 166 (1803). The Monetary Control Act unambiguously provides that the Federal Reserve's payment services "*shall be available*" to nonmember institutions like Custodia. 12 U.S.C. § 248a(c)(2). Under the Mandamus Act, the district court has the power to order a federal actor to perform a nondiscretionary duty.