**No. 24-8024**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

CUSTODIA BANK, INC.,
*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, ET AL.,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the
District of Wyoming, No. 1:22-CV-125-SWS (Skavdahl, J.)

---

**BRIEF FOR THE BANK POLICY INSTITUTE AND THE CLEARING
HOUSE ASSOCIATION L.L.C. AS *AMICI CURIAE*
IN OPPOSITION TO PLAINTIFF-APPELLANT'S PETITION FOR
REHEARING EN BANC**

---

Mark W. Mosier
Randy Benjenk
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1(a), The Bank Policy Institute certifies that it is not a subsidiary of any other corporation.  BPI is a non-profit trade group and has no shares or securities that are publicly traded.

Under Federal Rule of Appellate Procedure 26.1(a), The Clearing House Association L.L.C. certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF INTEREST ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

ARGUMENT ........................................................................... 3

I.    Reserve Banks Must Be Empowered to Protect Banking and Payment Systems from Risks Master Account Applicants May Present. .................... 3

    A.    The Financial System Depends on Well-Functioning Payment Services. ............................................................... 3

    B.    Master Accountholders Pose Significant Risks to the Financial System. ............................................................... 4

        1.    Master Account Overdrafts Create Credit Risk Threatening Losses to Taxpayers. ........................... 4

        2.    Cyberattacks Against Accountholders May Disrupt the Financial System. ............................................ 5

        3.    A Master Accountholder May Facilitate Criminal Activity Through Payment Systems. ................................... 7

II.   Federal Reserve Guidelines Appropriately Allow Reserve Banks to Consider the Presence of Comprehensive Federal Supervision. ................... 8

III.  The Panel's Decision Does Not Frustrate the Dual Banking System. ......... 12

CONCLUSION ........................................................................ 14

CERTIFICATE OF COMPLIANCE ......................................................... 15

CERTIFICATE OF SERVICE ............................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

12 U.S.C. § 289 ................................................................................5

12 U.S.C. § 1820 .............................................................................9

**Regulatory Materials**

12 C.F.R. § 304.3 ............................................................................9

31 C.F.R. § 1010.810 .....................................................................10

Board of Governors of the Federal Reserve System, Expansion of Fedwire
Funds Service and National Settlement Service Operating Hours,
89 Fed. Reg. 39613 (May 9, 2024) .......................................7

Guidelines for Evaluating Account and Service Requests,
87 Fed. Reg. 51099 (Aug. 19, 2022) ...........................8, 13

**Other Authorities**

1 Kenneth M. Lapine et al., Banking Law § 1.04 (Matthew Bender 2024) ............12

Antonis Kotidis & Stacey L. Schreft, *Cyberattacks and Financial
Stability: Evidence from a Natural Experiment*, Board of Governors of
the Federal Reserve System (Mar. 23, 2022),
https://www.federalreserve.gov/econres/feds/files/2022025pap.pdf ...................6

Board of Governors of the Federal Reserve System, *Commercial Bank
Examining Manual* § 5300.1 (Oct. 2023),
https://www.federalreserve.gov/publications/files/cbem.pdf ..............................9

Board of Governors of the Federal Reserve System, *Fedwire Funds
Services* (last visited Jan. 19, 2026), https://www.federalreserve.gov/
paymentsystems/fedfunds_about.htm.....................................................3

Board of Governors of the Federal Reserve System, *Master Account and
Services Database: Requests for Access* (last visited Jan. 19, 2026),
https://www.federalreserve.gov/paymentsystems/master-account-and-
services-database-access-requests.htm ................................11

Chair Jerome Powell, Remarks at Press Conference (Dec. 15, 2021), https://www.federalreserve.gov/mediacenter/files/ FOMCpresconf20211215.pdf................................................................5

FDIC, *Banker Resource Center: Information Technology (IT) and Cybersecurity* (last updated Aug. 11, 2025), https://www.fdic.gov/resources/bankers/information-technology/ ...................10

Federal Reserve, *Fedwire Funds Service - Annual Statistics* (last updated Jan. 23, 2025), https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/annual-stats.html ...........................................3

Federal Reserve System, *Federal Reserve Policy on Payment System Risk* (July 20, 2023), https://www.federalreserve.gov/paymentsystems/ files/psr_policy.pdf ........................................................................5

Federal Reserve System, *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* (effective July 20, 2023), https://www. federalreserve.gov/paymentsystems/files/psr_guide.pdf......................................5

## STATEMENT OF INTEREST[1]

*The Bank Policy Institute* is a nonpartisan public policy, research, and advocacy group representing universal banks, regional banks, and major foreign banks doing business in the United States.  The Institute produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues.

*The Clearing House Association L.L.C.,* established in 1853, is a nonpartisan advocacy organization that represents the interests of its member banks by developing and promoting policies to support a safe, sound, and competitive banking system that serves customers, communities, and economic growth.  Its sister company, The Clearing House Payments Company L.L.C., operates core U.S. payments system infrastructure.

*Amici* have an interest in the petition because it presents important issues concerning access to master accounts at Federal Reserve Banks, which many of *amici*'s members hold.

---

[1] No party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money intended to fund preparing or submitting the brief.  No person other than *amici*, their members, and their counsel contributed money intended to fund preparing or submitting this brief.  All parties have consented to *amici*'s motion for leave to file this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The panel correctly interpreted the Federal Reserve Act as providing the Federal Reserve Banks with discretion to grant or deny master accounts. *Amici* file this brief to explain why Congress would confer that discretion. Far from accidental, Congress's policy choice is necessary to protect Reserve Banks, taxpayers, financial institutions, and the financial system from undue risk.

With a master account comes direct access to critical Reserve Bank payment services. And that access carries a host of risks for Reserve Banks, other institutions, and the financial system. To take a few examples: a master accountholder in weak financial health may overdraft its account before failing, leaving the Federal Reserve—or taxpayers—on the hook. Or, due to flawed cybersecurity risk management practices, an accountholder might suffer a crippling cyberattack, triggering cascading liquidity shortages. Or an accountholder with insufficient compliance controls might end up facilitating illicit activities through Reserve Bank payment services.

As a matter of sound policy, Reserve Banks must protect against these risks and others. Discretion to deny master account access based on individual risk profiles, pursuant to the Federal Reserve's reasonably designed Guidelines, is a critical tool for doing so. And such discretion does not threaten the dual banking system, as Custodia contends.

2

In short, it is critical that Reserve Banks retain discretion to deny master account access posing potential systemic risk.  For that reason, and the others given by the panel and by Defendants-Appellees, the Court should deny Custodia's petition for rehearing en banc.

## ARGUMENT

### I.    Reserve Banks Must Be Empowered to Protect Banking and Payment Systems from Risks Master Account Applicants May Present.

Reserve Bank master accountholders can pose serious risks to Reserve Banks, taxpayers, other institutions, and the whole financial system.  It makes perfect sense that Congress afforded Reserve Banks discretion to deny master account access to institutions that may pose risks to the safety and soundness of the banking system.

### A.    The Financial System Depends on Well-Functioning Payment Services.

The Reserve Banks' Fedwire Funds Service allows financial institutions to electronically, immediately, finally, and irrevocably transfer funds between themselves.[2]  Fedwire is a critical component of financial market infrastructure; it facilitated $1.13 *quadrillion* in transfers in 2024 alone.[3]

---

[2] Board of Governors of the Federal Reserve System, *Fedwire Funds Services* (last visited Jan. 19, 2026), https://www.federalreserve.gov/paymentsystems/fedfunds_about.htm.  Financial institutions may also use Fedwire to execute funds transfers on behalf of clients, including other financial institutions, as discussed in this brief.

[3] Federal Reserve, *Fedwire Funds Service - Annual Statistics* (last updated Jan. 23, 2025), https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/annual-stats.html.

Given its importance, Fedwire must remain highly resilient. A serious disruption—perhaps occasioned by simultaneous problems at multiple institutions—could cause extended payment backlogs. If banks do not receive anticipated Fedwire payments from counterparties, they may face liquidity issues. In turn, consumer and business customers could be prevented from sending and receiving time-sensitive payments, causing cascading liquidity issues affecting the macroeconomy.

**B.    Master Accountholders Pose Significant Risks to the Financial System.**

Master accountholders' direct access to Reserve Bank services, particularly Fedwire, can pose risks threatening disruption of the financial system and macroeconomy. Discretionary denial of master account access—resulting in some applicants needing to access Reserve Bank services through an appropriately regulated and supervised correspondent bank, *see infra* Part III—is a critical tool for mitigating these risks.

**1.    Master Account Overdrafts Create Credit Risk Threatening Losses to Taxpayers.**

Eligible master accountholders may obtain credit from Reserve Banks through overdrafts to their accounts, which help "foster the smooth operation of the payment

system."[4]  But because extending credit carries risk of loss, such overdrafts present risk to Reserve Banks.

If, for instance, an institution fails with its master account overdrawn and insufficient collateral pledged to the Reserve Bank, "the Federal Reserve may be obligated to cover the payment and bear any resulting losses," which may be "significant."[5]  Taxpayers may ultimately bear those losses, because the Federal Reserve otherwise remits funds to the Treasury Department as required by law.[6]  To mitigate these risks, it is essential that master accounts are available only to creditworthy institutions subject to robust capital requirements and risk management controls.

### 2.    Cyberattacks Against Accountholders May Disrupt the Financial System.

Central bankers and economists have routinely highlighted the risk to the financial system posed by cyberthreats.[7]  Absent effective cybersecurity risk management, financial institutions can experience disruptions, outages, and other

---

[4] Federal Reserve System, *Federal Reserve Policy on Payment System Risk* (July 20, 2023), https://www.federalreserve.gov/paymentsystems/files/psr_policy.pdf.

[5] Federal Reserve System, *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* 7 (effective July 20, 2023), https://www.federalreserve. gov/paymentsystems/files/psr_guide.pdf.

[6] 12 U.S.C. § 289.

[7] *See, e.g.,* Chair Jerome Powell, Remarks at Press Conference 22-24 (Dec. 15, 2021), https://www.federalreserve.gov/mediacenter/files/FOMCpresconf20211215. pdf.

stress that may impact their ability to operate.  And a broad cyberattack against master accountholders may cause significant disruptions within the financial system.

This risk is not theoretical.  In 2022, Federal Reserve researchers analyzed disruptions caused by an actual cyberattack against a technology provider that serviced banks.  The attack interrupted many banks' ability to send payments over Fedwire, triggering liquidity shortages even at banks not themselves attacked, which received fewer payments and were thus left with insufficient liquidity in their master accounts to send their own payments.  It took Federal Reserve intervention to stave off serious destabilization.[8]

As this example illustrates, a large cyberattack can disrupt the efficiency of the broader payment system and trigger widespread liquidity issues.  If an accountholder lacks adequate cybersecurity risk management practices or business continuity planning, it may be more likely to be significantly impaired by such an attack.

There are other risks, too.  A successful cyberattack may result in the initiation of unauthorized or altered payments that appear legitimate, undermining public confidence in the integrity of the financial system.  It may even transmit a virus or

---

[8] *See* Antonis Kotidis & Stacey L. Schreft, *Cyberattacks and Financial Stability: Evidence from a Natural Experiment*, Board of Governors of the Federal Reserve System (Mar. 23, 2022), https://www.federalreserve.gov/econres/feds/files/2022025pap.pdf.

6

other malware to a Reserve Bank or Fedwire itself. Such an event could potentially close Fedwire for all customers, resulting in serious disruption to the financial system and macroeconomy.

Reserve Banks must be empowered to evaluate a master account applicant's cybersecurity controls and the cybersecurity regulation and examination framework to which the applicant is subject. If such controls or regulatory framework are lacking, it is critical that Reserve Banks have discretion to deny master account access to minimize the likelihood of serious disruptions.

### 3. A Master Accountholder May Facilitate Criminal Activity Through Payment Systems.

It is crucial that master accountholders comply with laws and regulatory standards related to anti-money laundering, sanctions, and terrorist financing. Absent adequate compliance controls, wire transfers through Fedwire may move large sums in short order to finance illicit activity. Even a single compliance failure could mean that millions of dollars fund terrorism, human trafficking, the drug trade, and more.[9]

Any institution with direct Fedwire access thus poses a risk that it or its customers may facilitate financial criminal activities, harming both victims and the

---

[9] Financial institutions can "send and receive individual funds transfers up to one penny less than $10 billion in value" through Fedwire. Board of Governors of the Federal Reserve System, Expansion of Fedwire Funds Service and National Settlement Service Operating Hours, 89 Fed. Reg. 39613, 39614 (May 9, 2024).

integrity of Reserve Banks and the services they provide (including Fedwire).[10] Reserve Banks must be permitted to guard against this risk by evaluating master account applicants' compliance controls or the applicable regulatory and examination frameworks and denying access when they are inadequate.

## II.   Federal Reserve Guidelines Appropriately Allow Reserve Banks to Consider the Presence of Comprehensive Federal Supervision.

The Federal Reserve Board has issued Guidelines to steer Reserve Banks' evaluation of account and service access requests.[11]  These Guidelines employ a tiered review methodology reasonably designed to guard against the risks discussed above.

Under this methodology, institutions that are federally insured and federally supervised—"Tier 1" institutions—generally face less intensive, more streamlined review.   Meanwhile, institutions lacking deposit insurance and not subject to comprehensive federal regulation or supervision—"Tier 3" institutions—generally receive the strictest review.  This methodology appropriately recognizes that the primary indicator for identifying institutions posing the greatest risk is the presence of direct federal regulation and supervision.  The federal bank regulatory framework

---

[10] Institutions indirectly accessing Fedwire through correspondent banks also pose such risks, but correspondents' own risk-management programs help to mitigate them.  *See infra* p. 13.

[11] *See* Guidelines for Evaluating Account and Service Requests, 87 Fed. Reg. 51099, 51099-54110 (Aug. 19, 2022).

imposes a comprehensive system of legal, compliance, and risk management obligations on institutions.  And routine and expansive examination by federal agencies—which apply consistent standards and best practices learned from supervision of thousands of institutions nationally—in turn helps ensure compliance with such obligations.

The robust supervisory framework to which Tier 1 institutions are subject addresses each of the key risk areas discussed above.  Tier 3 institutions, by contrast, may not be subject to the same level of regulation and supervision and may therefore pose meaningfully greater risk.

*Credit Risk.*  Tier 1 institutions are subject to stringent capital, liquidity, and asset composition requirements, which are monitored through examinations every 12 to 18 months[12] and through quarterly reports.[13]  That monitoring—which specifically addresses master account overdrafts—mitigates Tier 1 institutions' credit risk to Reserve Banks.[14]  Tier 3 institutions, however, may or may not be subject to similar reviews by state supervisors.

---

[12] *See* 12 U.S.C. § 1820(d).

[13] *See* 12 C.F.R. § 304.3.

[14] *See* Board of Governors of the Federal Reserve System, *Commercial Bank Examining Manual* § 5300.1, at 29 (Oct. 2023), https://www.federalreserve.gov/publications/files/cbem.pdf.

*Cybersecurity Risk.*    Federally regulated institutions face stringent IT examinations that ensure they "maintain diligence in identifying, assessing, and mitigating cybersecurity risks," including risks to Fedwire.[15]  This framework also includes business continuity planning requirements designed to ensure institutional resiliency following a cyberattack, thereby reducing the risk of system-wide contagion.  Tier 3 institutions, though, may or may not face similar cybersecurity regulation and supervision by state authorities.

*Illicit Activities.*    Tier 1 institutions are subject to stringent examinations addressing compliance with Bank Secrecy Act anti-money laundering requirements and Office of Foreign Assets Control economic sanctions regulations.  Tier 3 institutions are generally subject to these requirements too, but may be subject to compliance examinations by the Internal Revenue Service rather than federal banking agencies with deep experience assessing the safety and soundness of financial institutions.[16]  This distinction is critical, as the absence of robust ongoing supervision increases the risk that Tier 3 institutions' controls for preventing financial crimes may be inadequate or deteriorate over time.

---

[15] FDIC, *Banker Resource Center: Information Technology (IT) and Cybersecurity* (last updated Aug. 11, 2025), https://www.fdic.gov/resources/bankers/information-technology/.

[16] *See* 31 C.F.R. § 1010.810(b)(8).

The Guidelines thus emphasize the importance of a federal supervisory framework that gives Reserve Banks a baseline assurance that Tier 1 institutions are subject to stringent, uniform regulation and ongoing supervision to ensure compliance. The Federal Reserve has appropriately concluded, therefore, that Tier 1 institutions pose the least risk to Reserve Banks, the Reserve Bank payment system, and the financial system broadly—and that Tier 3 institutions may pose greater risk and therefore warrant greater scrutiny.

That does not mean, however, that Tier 1 institutions' applications are automatically granted—or, as Custodia has claimed, that Tier 3 institutions' applications are "presumptively denied." Custodia Br. 18-19.[17] But given that Tier 3 institutions may not face the consistent, uniform, and robust supervision to which Tier 1 institutions are subject, Reserve Banks must scrutinize Tier 3 institutions more closely to guard against risks that master account access may present. And it is crucial that Reserve Banks retain discretion to deny master account access when those risks are substantial and cannot be otherwise contained.[18]

---

[17] Tier 3 institutions have obtained master accounts both before and after the Guidelines. *See* Board of Governors of the Federal Reserve System, *Master Account and Services Database: Requests for Access* (last visited Jan. 19, 2026), https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm.

[18] Custodia cites (Pet. 6-7, 12, 15, 17) a Federal Reserve Governor's comments suggesting that the Federal Reserve may yet develop other, less potent risk

### III.    The Panel's Decision Does Not Frustrate the Dual Banking System.

In the "dual banking" system of the United States, "banks may be regulated by the federal government, a state government, or both."[19]  Contrary to Custodia's contentions (Pet. 6-8), denying master account access to institutions posing serious risks does not threaten the dual banking system.

To begin, Reserve Banks' discretion to deny master account access is not an outright prohibition on such access for state-chartered banks.  The vast majority of state-chartered banks are Tier 1 institutions under the Guidelines.  Indeed, hundreds of state-chartered banks have master accounts.

Institutions lacking master accounts, moreover, may generally access Reserve Bank services indirectly through traditional correspondent banking relationships.  For example, a respondent bank may instruct its correspondent bank to send a payment on its behalf using Fedwire.  Indeed, even some Tier 1 institutions, both federally and state chartered, forgo master accounts, choosing to use correspondent banks for convenience or other reasons.  And institutions do not need master accounts to access various other Reserve Bank services, including check or

---

mitigation tools.  But any such tools may not substitute for discretion to deny direct access in especially serious cases.

[19] 1 Kenneth M. Lapine et al., Banking Law § 1.04 (Matthew Bender 2024).

automated clearinghouse services—though under the Guidelines, Reserve Banks may deny that indirect form of access if it poses undue risk.[20]

Allowing Reserve Banks to require risky institutions to use correspondent banks to access Reserve Bank services does not imperil dual banking. Correspondent banking, after all, has been carried on for well over a century. And "state nonmember banks existed all around the country between 1913 and 1980—when none of them had Fed accounts."[21]

Affording Reserve Banks such discretion helps preserve the safety and security of the financial and payment systems. Channeling risky institutions' access to Reserve Bank services, like Fedwire, through a correspondent bank adds an additional layer of oversight, control, and accountability, as correspondent banks are typically federally supervised institutions. That safeguard protects Reserve Banks and other payment system participants against the serious risks that banks lacking federal supervision may pose.

---

[20] *See* 87 Fed. Reg. at 51106 n.1.
[21] S.J.A.100 (Expert Report of Morgan Ricks).

## CONCLUSION

The Court should deny the petition for rehearing en banc.


Dated: January 20, 2026                    Respectfully submitted,

                                           */s/ Mark W. Mosier*
                                           Mark W. Mosier
                                           Randy Benjenk
                                           COVINGTON & BURLING LLP
                                           850 Tenth Street, N.W.
                                           Washington, D.C. 20001
                                           (202) 662-6000

                                           *Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because it contains 2,587 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify, pursuant to Section II.J of this Court's CM/ECF User's Manual, that all required privacy redactions have been made and that any hard copies the Court may require will be exact copies of the ECF submission.

I further certify that the attached brief amicus curiae complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: January 20, 2026             By: */s/ Mark W. Mosier*
                                    Mark W. Mosier

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: January 20, 2026          By: */s/ Mark W. Mosier* _____

                                                  Mark W. Mosier