FILED  
United States Court of Appeals  
Tenth Circuit  

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

March 13, 2026

Christopher M. Wolpert  
Clerk of Court

_____

CUSTODIA BANK, INC.,

    Plaintiff - Appellant,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, et al.,

    Defendants - Appellees.

------------------------------

AMERICANS FOR PROSPERITY FOUNDATION-WYOMING, et al.,

    Amici Curiae.

No. 24-8024  
(D.C. No. 1:22-CV-00125-SWS)  
(D. Wyo.)

_____

**ORDER**
_____

Before **HARTZ, TYMKOVICH, BACHARACH, PHILLIPS, McHUGH, MORITZ, EID, CARSON, ROSSMAN,** and **FEDERICO,** Circuit Judges.[*]

_____

This matter is before the court on the *Petition for Rehearing En Banc by Custodia Bank, Inc.*; the *Response to Petition for Rehearing En Banc by Appellee Federal Reserve Board; Defendant-Appellee Federal Reserve Bank of Kansas City's Response to Petition*

---

[*] The Honorable Jerome A. Holmes and the Honorable Scott M. Matheson, Jr. are recused in this matter.

for Rehearing En Banc; and *Appellant's Motion for Leave to File a Reply Brief in Support of Petition for Rehearing En Banc*, which was accompanied by a proposed reply.

As an initial matter, Appellant's motion for leave to file a reply in support of the petition is GRANTED. The Clerk's Office shall file Appellant's reply as of the date it was submitted to the court. In addition, the pending motions for leave to file amicus briefs are GRANTED. All amicus briefs submitted in connection with the court's consideration of whether to grant en banc rehearing will be filed as of the date they were submitted.

The petition, responses, and proposed reply were circulated to all non-recused judges of the court who are in regular active service, and a poll was called. The poll did not carry. Consequently, the petition is DENIED.

Judges Hartz, Tymkovich and Eid voted to grant en banc rehearing. Judge Tymkovich has filed a separate dissent from the denial of en banc rehearing, which is joined by Judge Eid.

Entered for the Court,

PER CURIAM

No. 24-8024, *Custodia Bank, Inc. v. Federal Reserve Board of Governors, et al.*

**TYMKOVICH**, Circuit Judge, dissenting from the denial of rehearing en banc.

At issue is the critical question of whether Congress has given the Federal Reserve Banks unfettered discretion to deny a state-chartered bank's master account application. The majority held that it has such power, but I disagree. Without a master account, a bank cannot operate in the modern banking system. By endorsing unreviewable discretion to deny accounts, we effectively hand the Reserve Banks a veto over states' chartering power. The constitutional ramifications of allowing unappointed bank officials to wield such significant and unreviewable executive authority are too weighty to brush aside. This case's implications for the continuing viability of our state-federal dual banking system carry exceptional importance. These issues warrant scrutiny and merit our full court's consideration.

I respectfully dissent from the denial of rehearing en banc.

# I.

Custodia Bank is a Wyoming-chartered Special Purpose Depository Institution (SPDI). Its stated mission is "to provide banking services for digital asset companies and to serve as a bridge between digital assets and the U.S. dollar payment system for institutional customers." Majority Op. 11. By virtue of its state charter, Custodia is legally eligible for a master account with the Federal Reserve Bank of Kansas City. A master account is a financial institution's bank account with the Federal Reserve and is required for access to Reserve Bank services. *See Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (opinion of

Moritz, J.). Among those services are the Reserve Banks' wire and electronic transfer systems, which allow depository institutions to move money. Thus, a master account is "indispensable" for a bank's operations, *Fourth Corner Credit Union*, 861 F.3d at 1064 (opinion of Bacharach, J.), and being denied one is akin to a death sentence.

Custodia applied for a master account with the Reserve Bank in October 2020. In January 2021, the Bank confirmed Custodia was eligible and told it there were "no showstoppers" with its application. While the application was pending, the Federal Reserve Board of Governors published guidelines for the Reserve Banks to use in evaluating master account requests. Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51099 (Aug. 19, 2022). Under those guidelines, Custodia was subject to the strictest level of review. Though the Reserve Bank typically moves quickly on master account applications, it sat on Custodia's for years. Then, in January 2024, the Bank sent Custodia a letter denying its application.

Custodia sued the Federal Reserve Board under the Administrative Procedure Act, 5 U.S.C. § 706(2), and the Reserve Bank under the Mandamus Act, 28 U.S.C. § 1361. The district court determined, and the majority agrees, that the APA claim failed for lack of final agency action, and the Reserve Bank has discretion over master accounts and is therefore not subject to mandamus. I do not agree that Reserve Banks have discretion over account applications and would have allowed the mandamus claim to go forward.

## II.

The case comes down to a single question. Has Congress given Reserve Banks discretion to deny eligible institutions' applications for master accounts? The answer lies in statutory interpretation.

The Reserve Banks started issuing master accounts in 1998 to consolidate and simplify accounting for depository institutions. One consequence of master accounts' relative youth in the Reserve System is that no statute mentions them by name. But the Depository Institutions Deregulatory and Monetary Control Act of 1980 (MCA) requires the Board to create a fee schedule for Reserve Bank services and specifies "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions* and such services *shall be priced at the same fee schedule* applicable to member banks." 12 U.S.C. § 248a(c)(2) (emphases added). A plain reading of this language reveals two nondiscretionary commands to the Reserve Banks—access to services and equal pricing for them. And when "statutory language is plain, we must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 483 (2015). The statute produces a simple syllogism: all eligible nonmember institutions are entitled to services, access to services requires a master account, so every eligible nonmember institution is entitled to a master account.

Custodia is undisputably eligible for a master account. Section 248a adopts the definition of "depository institution" from 12 U.S.C. § 461(b)(1). And Custodia falls under § 461(b)(1)(A)(i) as a bank eligible to become an insured bank under

3

section 5 of the Federal Deposit Insurance Act. Custodia's FDIA-eligibility is secured by its status as a Wyoming-chartered bank "engaged in the business of receiving deposits." 12 U.S.C. § 1312(2)(A)–(B); *see also* Wyo. Stat. Ann. § 13-12-103(b)(vii)(E) (2025) (confirming SPDIs may receive deposits under Wyoming law).

To me, the case is clear. Custodia is an eligible nonmember depository institution, it has applied for a master account, and the Reserve Bank lacks discretion to deny it one. I would go no further.

## III.

But the majority embraced a contextual interpretation advanced by the Reserve Bank. The theory has a few key steps, which I briefly recount. It begins with a reading of the Federal Reserve Act (FRA) as having always given the Banks discretion over accepting deposits, *see* 12 U.S.C. § 342. From there, it says discretion over deposits only makes sense if the Banks also have discretion over deposit *accounts*. Next, it rejects the idea that the MCA constrained that discretion as an "elephant in a mousehole." Majority Op. 7. Finally, the majority does not consider its interpretation's constitutional implications because, in its view, Custodia waived that argument. I disagree at each step.

First, the discretion the majority identifies in § 342 is not the heart of that statute. The statute does not use the word discretion and the only clause that can be read to confer it says the Banks "may receive . . . deposits of current funds in lawful money, [etc.]." 12 U.S.C. § 342. Instead of a grant of broad discretion, § 342 merely establishes the background principle that gives the Reserve Banks authority to accept

4

deposits—"words of authorization merely." *Farmers' & Merchants' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 662 (1923). So I'm unconvinced that the statute gives the Banks unconstrained discretion to accept or reject deposits without reason or explanation.

Second, whatever discretion § 342 grants over deposits does not necessarily entail discretion over accounts. The majority notes that forcing the Reserve Banks to issue accounts and then scrutinize every deposit for potential threats to financial stability would be cumbersome. That may be so, but the statute only discusses deposits, *see* 12 U.S.C. § 342, and courts interpret statutes' language, not their predicted policy impacts, *Burrage v. United States*, 571 U.S. 204, 218 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might 'accord with good policy.'" (quoting *Comm'r v. Lundy*, 516 U.S. 235, 252 (1996))). Section 342 is silent on efficiency, and I would not read beyond the text to bring it into play.

Third, if § 342 conferred the discretion the majority claims, the MCA is the later-in-time statute and eliminated that discretion through § 248a. Congress undoubtedly has the authority to modify the Reserve Banks' discretion. It did so in 1916 by allowing the Banks to accept deposits in maturing bills. *See* Federal Reserve Act Amendments, Pub. L. No. 64-270, 39 Stat. 752 (1916). While the 1916 amendments expanded discretion, § 248a constrained it.

The majority's attempt to limit § 248a's command by reference to the Toomey Amendment is also unconvincing. That provision, passed in 2022, requires the

5

Reserve Board to establish a "public, online, and searchable database" tracking all master account requests and listing whether the request "was approved, rejected, pending, or withdrawn." 12 U.S.C. § 248c(b)(1)(B)(ii). According to the majority, the Amendment recognized the Banks could reject account applications and thereby affirmed their discretion. But that ignores the very good nondiscretionary reason a Reserve Bank can deny an application—the applicant is not statutorily eligible for an account. And it neglects the transparency function the database plays by forcing the Reserve Banks to identify applications they reject for any reason, permissible or not. Ultimately, I read the Amendment as supporting that transparency objective through the database requirement, nothing more.[1]

Fourth, the majority counsels against my reading of § 248a as "find[ing] an elephant in a mousehole." Majority Op. 31. I agree that § 248a(c)(2)'s placement in a part of the MCA dealing with pricing schedules and primarily directed at the Reserve Board is imperfect. But the placement does not make the statutory language

---

[1] I reach this interpretation based solely on the statutory text. But to the extent that a reader might be persuaded by legislative history, I note the Amendment's sponsor has endorsed a reading in line with transparency objectives and repudiates any interpretation that confers (or "affirms") discretion over master accounts. *See* Br. for Former Senator Patrick J. Toomey as Amicus Curiae in Supp. of Neither Party 12 ("The focus was consistently, and exclusively, on promoting transparency as to which institutions held and had applied for master accounts."); Br. for Senator Cynthia M. Lummis & Former Senator Patrick J. Toomey as Amici Curiae in Supp. of the Pet. for Reh'g En Banc 9 ("The effort to pass the Amendment was bipartisan, and it was ultimately supported by a broad range of both Republicans and Democrats across both the House and Senate, who recognized the importance of providing transparency in line with other federal regulators.").

any less clear. Besides, the MCA is no mousehole. It upended the bargain between the Federal Reserve and nonmember banks through a compromise: "[a]ll depository institutions would be subject to federally established reserve requirements and in return all depository institutions would get access to the Federal Reserve's payment services." Julie Andersen Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, 109 Iowa L. Rev. 117, 168 (2023). Even the Federal Reserve has recognized the MCA "changed the way the Fed provided services." *Federal Reserve System: The First 100 Years*, Fed. Rsrv. Bank of Phila. (Jan. 2021). Mandating that eligible nonmember institutions, like Custodia, have access to the Reserve Bank payment services conforms with the policy changes Congress made in the MCA.

Finally, the majority is as convinced as I am that the relevant statutes are unambiguous—we just disagree on what they mean. Perhaps we should take that as a cue that things are not quite so clear as they appear to each of us. If that is so, we must interpret any ambiguity to avoid creating a constitutional problem. *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). The majority's interpretation does the opposite. Giving the Reserve Banks unreviewable discretion to deny master accounts makes it likely that Reserve Bank presidents wield "significant authority pursuant to the laws of the United States" and are officers of the United States thereby. *Edmond v. United States*, 520 U.S. 651, 662 (1997). But the processes for appointing and removing Reserve Bank presidents—which involve boards of directors composed of private citizens selected, in part, by private member banks, *see* 12 U.S.C. §§ 304–05,

7

341—do not align with the Constitution's procedures for Article II officers, *see* U.S. Const. art. II, § 2, cl. 2. My interpretation avoids this conflict by limiting the Bank presidents' authority such that they are not "officers" in the constitutional sense.

Rather than endorse this simple solution, the majority skirts avoidance by holding Custodia waived the argument. I agree that Custodia waived any stand-alone Appointments Clause challenge to the constitutionality of the Bank president's selection by failing to present it in the opening brief. But that does not prevent us from considering the appointments issue for our statutory interpretation. Instead, as *Clark* explained, we "*must* consider the necessary consequences" of our interpretative choice and avoid a constitutional quagmire. 543 U.S. at 380–81 (emphasis added). Applying the canon of constitutional avoidance only when a party raises it might allow us to adopt constitutionally questionable interpretations when no party does. That does not align with our duty to get the law right.

## IV.

A final note on two issues raised by the Federal Reserve defendants but not treated by the majority in depth.

The Reserve Bank seeks to undercut my syllogism linking service access to master accounts by claiming a master account is not *technically* necessary. In support, it points to the possibility for Custodia to establish a correspondent relationship with a third-party institution to transact through its master account.

But I do not believe that possibility meets § 248a's mandate. First, there is no assurance that Custodia can convince another bank to agree to a correspondent

8

relationship. That burden is especially heavy on Custodia given the stigma attached to having its account application denied. Even if it succeeds, a correspondent relationship places it at the mercy of another private institution that might condition access or terminate it on a whim. But even more troubling, the Reserve Banks claim discretion to terminate a correspondent relationship at any time. Fed. Rsrv. Banks, Operating Circular No. 1 § 210 (Sep. 1, 2023), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf. And correspondent relationships do not provide access to the full suite of Reserve Bank services. *Id.* § 2.7 ("Correspondent – Respondent relationships cannot be established for FedWire® Funds Service transactions, Fed Funds checks, and Custodial Inventory Program transactions, which must settle in a Financial Institution's *own* Master Account." (emphasis added)). So the only way to guarantee full service access for all eligible institutions is for the Reserve Banks to grant them master accounts upon request.

Lastly, the Reserve Bank argues it cannot guarantee financial-system stability without discretion over master accounts. But the Banks have other tools to mitigate potential risk. A reserve bank can still reject deposits it concludes are risky. Under 12 U.S.C. § 342, and § 248a(c)(2), the Banks can impose on nonmembers all requirements that apply to members. On the other hand, the Reserve Banks first started issuing master accounts in 1998 and, to my knowledge, denied an application for the first time in 2015. *See Fourth Corner Credit Union*, 861 F.3d at 1053 (opinion of Moritz, J.). That suggests the Fed has managed risky banks with master

9

accounts for years, and I am confident it still can. The Fed can handle its policy concerns with policy innovation rather than slamming the door shut to innovative banks and insulating itself from judicial review.

## V.

Holding that the Reserve Banks have unreviewable discretion over master accounts places us on the wrong side of the statutes and, likely, that of the Constitution as well. The case's consequences for the financial industry and its impact on the state-federal balance in banking regulation make it exceptionally important. I would grant the petition for rehearing en banc, and respectfully dissent from its denial.