No. 24-8024

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

CUSTODIA BANK, INC.,

*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, ET AL.,

*Defendants-Appellees.*

On Appeal from the U.S. District Court for the District of Wyoming
No. 1:22-cv-00125 (Hon. Scott W. Skavdahl)

# BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION
# IN SUPPORT OF PETITION FOR REHEARING EN BANC BY
# CUSTODIA BANK, INC.

Stephanie L. Brooker
Nick Harper
  *Counsel of Record*
Matt Gregory
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
nharper@gibsondunn.com

*Counsel for Amicus Curiae
the Blockchain Association*

December 22, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Tenth Circuit Rule 26.1, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ............................................................1

INTRODUCTION.................................................................................2

ARGUMENT .....................................................................................4

I.    Businesses Need Access To Safe And Reliable Banking Services That Only The Federal Reserve Provides .....................................................................4

II.    For Years, The Digital-Asset Industry Was Debanked By Federal Regulators .........................................6

III.    The Panel Majority's Decision Gives The Fed Unprecedented Power ...........................................11

IV.    The Federal Reserve Does Not Need Unchecked Power Over Master Accounts To Manage Risk ...................13

CONCLUSION .................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Oregon v. Ice*,
    555 U.S. 160 (2009)................................................................ 12

*In re S. Indus. Banking Corp.*,
    872 F.2d 1257 (6th Cir. 1989)............................................. 11

**Statutes**

12 U.S.C. § 248a(c)(2) ..................................................... 3, 6, 13

Wyo. Stat. Ann. § 13-12-65(a) .................................................9

Wyo. Stat. Ann. § 13-12-101....................................................9

**Rules**

Fed. R. App. P. 40(b)(2)(D) .........................................................4

**Other Authorities**

*Chairman Hill, Oversight Chair Meuser Issue Final Staff
    Report on Biden's Debanking of Digital Assets*, House.gov
    (Dec. 1, 2025), https://tinyurl.com/4nu8wd9a ......................7

*Embracing New Technologies and Players in Payments*, Fed.
    Reserve (Oct. 21, 2025), https://tinyurl.com/mren5we5................... 14

FDIC Off. of Inspector Gen., *FDIC Strategies Related to
    Crypto-Asset Risks* (Oct. 2023),
    https://tinyurl.com/2x59s533 ...............................................8

*FDIC Releases Documents Related to Supervision of Crypto-
    Related Activities* (Feb. 5, 2025),
    https://tinyurl.com/yc2twt7n ...............................................8

iv

*FedNow Service*, FRBServices.org,
  https://tinyurl.com/bdezx9h5 .................................................................. 5

Fed. Reserve, *Fedwire® Funds Service - Monthly Statistics*,
  https://tinyurl.com/3wffb8m3 .............................................................. 5

Fed. Reserve Fin. Servs., *FRB Operating Circular No. 3*
  (Mar. 18, 2024), https://tinyurl.com/ypfnuy9s.................................... 5

*Fedwire Funds Service*, FRBServices.org,
  https://tinyurl.com/5fwb782b .............................................................. 5

*Guide to the Federal Reserve's Payment System Risk Policy
  on Intraday Credit*, Fed. Reserve (July 20, 2023),
  https://tinyurl.com/2p8x6mbd ............................................................ 14

*Guidelines for Evaluating Account and Services Requests*, 87
  Fed. Reg. 51,099 (Aug. 19, 2022) ...................................................... 13

*Joint Statement on Crypto-Asset Risks to Banking
  Organizations* (Jan. 3, 2023),
  https://tinyurl.com/55zuyktm ............................................................... 8

*Joint Statement on Liquidity Risks to Banking Organizations Resulting
  from Crypto-Asset Market Vulnerabilities* (Feb. 23, 2023),
  https://tinyurl.com/36yve8b7 ................................................................ 8

*Policy Statement on Section 9(13) of the Federal Reserve Act*,
  90 Fed. Reg. 59,731 (Dec. 22, 2025)............................................. 14, 15

*Staff Accounting Bulletin No. 121*,
  87 Fed. Reg. 21,015 (Apr. 11, 2022)..................................................... 9

Staff of H. Comm. on Fin. Servs., *Operation Choke Point 2.0: Biden's
  Debanking of Digital Assets* (Dec. 2025),
  https://tinyurl.com/4j76by9u ............................................................... 10

Staff of H. Comm. on Oversight & Gov't Reform, 113th Cong., *Federal
  Deposit Insurance Corporation's Involvement in "Operation Choke
  Point,"* at 3 (Dec. 8, 2014), https://tinyurl.com/yjsdb6fr....................... 7

Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133 (1990)..........................................12

## INTEREST OF *AMICUS CURIAE*

The Blockchain Association is the leading nonprofit membership organization dedicated to promoting a pro-innovation policy environment for digital assets. The Association works to achieve regulatory clarity and educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace. The Association represents more than 130 companies that reflect the diversity of the blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others.

Any effective regulatory regime for digital assets must ensure that digital-asset firms have access to essential banking services on equal footing with other lawful businesses. The panel's decision in this case threatens to endow federal agencies—which recently engaged in a coordinated shadow campaign to debank digital-asset firms—with plenary discretion to veto safe, state-approved banking models that cater

specifically to digital-asset firms.  The Blockchain Association has a strong interest in supporting en banc review of that harmful decision.[1]

## INTRODUCTION

Millions of Americans hold and use digital assets, and thousands of U.S. companies operate in the digital-asset industry or accept digital assets as a form of payment.  Yet federal agencies recently waged war with the industry, pulling the levers of government power in a misguided attempt to push digital assets to the periphery of the national economy. This case involves a particularly troubling aspect of that campaign.  In recent years, federal banking agencies sought to debank the digital-asset industry by exerting pressure on federally supervised banks.  In this case, the Federal Reserve seeks a lever to exert similar pressure over state-chartered banks such as Custodia Bank.

The Federal Reserve asserts, and the panel majority blessed, plenary discretion to deny access to "master accounts"—a Federal Reserve

---

[1] No party or counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparation of this brief.  No person other than amicus, its members, or its counsel made any monetary contributions to fund the preparation or submission of this brief.  All parties have consented to the filing of this brief.

service permitting electronic settlement of bank transactions that is "vital for functioning banks."  Diss. Op. 5.  The apparent motivation for the denial here was that the applicant, Custodia Bank, hopes to provide services related to digital assets—an industry the Federal Reserve and other federal banking regulators sought to excommunicate from the U.S. financial system.

As Judge Tymkovich persuasively explained in dissent, the panel majority's decision contradicts the plain text of the governing statute, which requires that the Fed's payment services "shall be available to non-member depository institutions."  12 U.S.C. § 248a(c)(2).  That text "issues a command beyond the Fed's discretion" to grant master accounts—which are necessary to facilitate the Fed's payment services—to *all* eligible institutions.  Diss. Op. 13.

The practical consequences of the panel majority's decision are even more concerning.  The decision ratifies the Fed's misuse of its payment services to further an impermissible policy goal—debanking the digital-asset industry.  In so doing, the decision upsets the balance of federal-state power in the banking sector.  States have traditionally chartered banks in parallel with the federal government.  But the panel decision

effectively gives the Fed veto power over chartering judgments by state regulators.  That subversion of the Nation's traditional dual banking system will stifle innovation, and it provides a blueprint for federal regulators to debank disfavored groups in the future without interference from their state counterparts.  Nor is the Fed's heavy-handed approach necessary to protect national payment systems, as the Fed has many other risk-mitigation tools.

The panel majority's decision requires correction—or at least review—by the full Court.  The question whether federal regulators can intrude on state prerogatives and debank lawful businesses based on their own discretionary whims is "of exceptional importance."  Fed. R. App. P. 40(b)(2)(D).  Custodia's petition should be granted.

## ARGUMENT

### I. Businesses Need Access To Safe And Reliable Banking Services That Only The Federal Reserve Provides

An efficient and accessible banking system is vital to the modern economy.  Companies rely on banks for essential transactions—for example, to pay employees and vendors, and to receive payments from customers.  Virtually no modern businesses could operate effectively without a banking relationship.  And that is equally true for many digital-asset

firms, which (at least today) generally need to pay employees and vendors in fiat currencies like U.S. dollars.

In today's economy, the Federal Reserve provides the infrastructure for these critical banking services. It does so in large part by providing private banks with access to Federal Reserve "master accounts." Master accounts "are vital to functioning banks." Diss. Op. 5. In the old days, "banks had to move physical currency between themselves" to settle transactions. *Id.* A master account allows a bank to transfer and settle funds electronically; "the Fed simply records credits and debits between the banks." *Id.* Master accounts also enable banks to use other Fed services, including Fedwire and FedNow, which facilitate trillions of dollars a day in secure, time-sensitive transactions; automated clearinghouse (ACH) services; and services allowing banks to deposit checks drawn on accounts at other financial institutions.[2]

---

[2] *See* Fed. Reserve Fin. Servs., *FRB Operating Circular No. 3* § 12.0 (Mar. 18, 2024), https://tinyurl.com/ypfnuy9s; *Fedwire Funds Service*, FRB-Services.org, https://tinyurl.com/5fwb782b; *FedNow Service*, FRB-Services.org, https://tinyurl.com/bdezx9h5; Fed. Reserve, *Fedwire® Funds Service - Monthly Statistics*, https://tinyurl.com/3wffb8m3.

Banks like Custodia that are denied master accounts can use these critical services (if at all) only through a "'correspondent'" bank, which "'imposes additional costs and counterparty credit risk, injects settlement risk[,] … and exposes institutions to existential risks if the correspondent bank terminates the relationship.'"  J.A. 1452.  Businesses forced to rely on banks without master-account access face similar problems.  Partnering with those banks results in increased fees that drive up operating costs, threaten profitability, and harm consumers.

That is why Congress provided in the Monetary Control Act of 1980 ("MCA") that "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available* to nonmember depository institutions." 12 U.S.C. § 248a(c)(2) (emphasis added).  Only direct master-account access can fulfill that congressional command.

## II.    For Years, The Digital-Asset Industry Was Debanked By Federal Regulators

Even though the Federal Reserve's banking services are the lifeblood of the modern financial system, not all industries and businesses have had access to those services on equal footing.  The root cause of that

problem has been efforts by the federal government—including the Fed—
to debank lawful businesses.

Over the last fifteen years, federal banking regulators have increas-
ingly targeted disfavored industries or groups by seeking to cut them off
from critical banking services. In the 2010s, the federal government im-
plemented Operation Choke Point—a coordinated pressure campaign de-
signed to "foreclose bank access to legal and legitimate merchants" like
firearms dealers and payday lenders. *See* Staff of H. Comm. on Oversight
& Gov't Reform, 113th Cong., *Federal Deposit Insurance Corporation's
Involvement in "Operation Choke Point*," at 3 (Dec. 8, 2014), https://ti-
nyurl.com/yjsdb6fr.

The digital-asset industry is one of the latest victims. In a well-
documented campaign termed Operation Choke Point 2.0, the federal
government under the prior Administration "used vague rules, excessive
discretion, informal guidance, and aggressive enforcement actions to
pressure banks away from serving digital asset clients" and engaging
with digital assets. *Chairman Hill, Oversight Chair Meuser Issue Final
Staff Report on Biden's Debanking of Digital Assets*, House.gov (Dec. 1,
2025), https://tinyurl.com/4nu8wd9a.

The FDIC, for example, issued letters to regulated banks directing them to "'pause all crypto asset-related activities'" and "'not proceed with any crypto-asset activity'" pending supervisory feedback that never came. FDIC Off. of Inspector Gen., *FDIC Strategies Related to Crypto-Asset Risks* 11 (Oct. 2023), https://tinyurl.com/2x59s533. In disclosing these "pause letters" in response to a FOIA lawsuit, the current Acting FDIC Chair acknowledged that the "result" of the FDIC's campaign was that "the vast majority of banks simply stopped trying" to move forward with "crypto- or blockchain-related activity." *FDIC Releases Documents Related to Supervision of Crypto-Related Activities*, FDIC.gov (Feb. 5, 2025), https://tinyurl.com/yc2twt9n.

Other federal regulators pursued like measures. For example, the Federal Reserve, OCC, and FDIC issued joint policy statements expressing "significant safety and soundness concerns with business models that are concentrated in" digital assets and warning of "liquidity risks associated with" digital-asset deposits.[3]  Around the same time, the SEC

---

[3] *Joint Statement on Crypto-Asset Risks to Banking Organizations* 2 (Jan. 3, 2023), https://tinyurl.com/55zuyktm; *Joint Statement on Liquidity Risks to Banking Organizations Resulting from Crypto-Asset Market Vulnerabilities* 1 (Feb. 23, 2023), https://tinyurl.com/36yve8b7.

launched a wave of unlawful enforcement actions against digital-asset firms and issued informal "guidance" that made it cost-prohibitive for financial institutions to hold digital assets on their balance sheets.  *See Staff Accounting Bulletin No. 121*, 87 Fed. Reg. 21,015 (Apr. 11, 2022).

The Federal Reserve compounded the debanking problem by denying master accounts.  Whereas other regulatory actions discouraged existing federally regulated banks from engaging with crypto firms and digital assets, the Fed's assertion of plenary discretion to deny master accounts allowed it to prevent States from approving upstart banks to fill the void.

This case provides a vivid illustration.  Custodia sought to provide necessary custody and payments services to the digital-asset industry through an innovative banking model approved for precisely that purpose by the Wyoming legislature and state regulators.  *See* Wyo. Stat. Ann. § 13-12-101, *et seq*.  Under that conservative regulatory regime, Custodia (unlike most banks) was required to back 100% of its customer deposits with high-quality liquid reserves and therefore could not make loans using those deposits.  *Id.* § 13-12-105(a).  Obtaining a Federal Reserve

master account was critical to Custodia's business plan; without it, Custodia could not provide the payments services that its customers need.

The Kansas City Fed informed Custodia that "there were 'no show-stoppers' with its [master account] application." Diss. Op. 12. Yet Custodia's application languished for years, until the Federal Reserve's Board directed the Kansas City Fed to reverse course, sending them a redlined denial letter and a clear message: the digital-asset industry is unwelcome in the banking sector. *See id.* at 8.

These coordinated federal debanking actions have had "immense harmful consequences for the digital asset ecosystem." Staff of H. Comm. on Fin. Servs., *Operation Choke Point 2.0: Biden's Debanking of Digital Assets* 21, House.gov (Dec. 2025), https://tinyurl.com/4j76by9u. Fearing reprisals from hostile regulators, banks abruptly closed accounts of digital-asset firms with little notice, which "strained companies' ability to meet payment deadlines." *Id.* at 22. That, in turn, inhibited innovation in the digital-asset space and pushed lawful businesses offshore. *See id.* at 23.

## III.  The Panel Majority's Decision Gives The Fed Unprecedented Power

The panel majority's decision to leave the Fed's denial in place and approve the agency's asserted plenary discretion to deny master accounts will profoundly alter the balance of power between state and federal regulators.  It will encroach on States' traditional authority to charter banks, preventing States from serving as a counterweight to the massive discretionary power that federal banking agencies hold over the financial system and from acting as laboratories of innovation for banking services.

Congress has long sought to "maintain[] a dual banking system in the United States" under which federal and state regulators have parallel authority to charter banks.  *In re S. Indus. Banking Corp.*, 872 F.2d 1257, 1260 (6th Cir. 1989).  The dual banking system provides a crucial check on the federal government's power to push disfavored industries and groups out of the financial system.  Federal banking agencies have vast supervisory power over federally chartered banks and state-chartered banks that insure their deposits through the FDIC.  As shown above, in recent years federal agencies have increasingly abused that power to pressure banks to exile politically disfavored industries from the banking

system.  The availability of a state charter like the one Custodia obtained here is an important limit on the ability of the federal government to cut off access to the financial system altogether.

The dual banking system also allows States to serve as "laboratories for devising solutions to difficult … problems," as they have done for centuries in banking.  *Oregon v. Ice*, 555 U.S. 160, 171 (2009).  Services now regarded as mundane began as revolutionary innovations at the state level—including electronic funds transfers and ATM machines.  *See* Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1156 (1990).  Wyoming's pathbreaking efforts to charter a digital-asset bank fall squarely within that tradition.

The panel majority's decision subverts the dual banking system by giving the Fed effective veto power over state-chartered banks.  That will undermine innovation in financial services and limit access to banking services, while rendering toothless a crucial state-law check on federal power over the banking system.  The majority's decision effectively blesses the Fed's 2022 guidelines, which give federally supervised banks streamlined, largely automatic access to vital services, while reserving

the strictest scrutiny and discretionary denials for those banks outside of direct federal control.  *See* Diss. Op. 7-8 (discussing *Guidelines for Evaluating Account and Services Requests*, 87 Fed. Reg. 51,099 (Aug. 19, 2022)).  That consolidation of power gives federal agencies a chokehold over the U.S. financial system, providing a blueprint to debank whatever disfavored groups they please in the future.

## IV.   The Federal Reserve Does Not Need Unchecked Power Over Master Accounts To Manage Risk

The panel majority suggested that the Federal Reserve's unilateral and discretionary power to deny access to master accounts is necessary to protect national "payment systems from risk."  Maj. Op. 40.  But the Fed has multiple other tools at its disposal to ensure the safety and soundness of its payment systems.

The MCA itself permits the Fed to subject "nonmembers … to any other terms, including a requirement of balances sufficient for clearing purposes," that the Fed applies to member banks.  12 U.S.C. § 248a(c)(2). The Fed therefore can (among other things): require depository institutions to maintain an extra balance in their account; reject transactions if the bank's balance hits zero; limit the amount of money banks can hold;

deny banks' access to the discount window; and deny access to services *not* covered by Section 248a(b).  *See Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit*, Fed. Reserve (July 20, 2023), https://tinyurl.com/2p8x6mbd.  In addition, state regulators can (as here) impose their own restrictions to ensure banks' safety and soundness.  The dual banking system created by Congress assumes that state regulators are up to the task.

Even the Federal Reserve has begun to acknowledge that its erstwhile alarmism about digital assets is overstated.  In October 2025, for example, Fed Governor Christopher J. Waller acknowledged the Fed can "tailor the services of [master] accounts to the needs of these firms and the risks they present to the Federal Reserve Banks and the payment system."  *Embracing New Technologies and Players in Payments*, Fed. Reserve (Oct. 21, 2025), https://tinyurl.com/mren5we5.  And just days ago, the Fed issued a policy statement recognizing that state-chartered banks with "high-quality liquid assets equal to 100 percent of the bank's demand deposits and other short-term liabilities"—in other words, banks with Custodia's exact business model—may "minimiz[e] the risk of deposit runs and contagion."  *Policy Statement on Section 9(13) of the*

*Federal Reserve Act*, 90 Fed. Reg. 59,731, 59,732 (Dec. 22, 2025).  These acknowledgments that the Fed has an adequate toolkit to manage risks of innovative banking models underscore that the agency has no need for unchecked authority to deny master accounts.

## CONCLUSION

The petition for rehearing en banc should be granted.

December 22, 2025                     Respectfully submitted,

                                      */s/ Nick Harper*
                                      Stephanie L. Brooker
                                      Nick Harper
                                         *Counsel of Record*
                                      Matt Gregory
                                      M. Christian Talley
                                      GIBSON, DUNN & CRUTCHER LLP
                                      1700 M Street, N.W.
                                      Washington, D.C.  20036
                                      (202) 955-8500
                                      nharper@gibsondunn.com

                                      *Counsel for Amicus Curiae*
                                      *the Blockchain Association*

15

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations.  This brief was prepared using a proportionally spaced type (New Century Schoolbook, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and 10th Circuit Rule 32(b), this brief contains 2,573 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

December 22, 2025                     Respectfully submitted,

                                     */s/ Nick Harper*
                                     Nick Harper

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    All required privacy redactions have been made per 10th Cir. R. 25.2;

(2)    If required to file hard copies, they will be exact copies of the ECF submissions;

(3)    The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, CrowdStrike Falcon, and according to the program are free of viruses.

December 22, 2025                    Respectfully submitted,

_/s/ Nick Harper_____
Nick Harper