Case No. 24-8024

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

## CUSTODIA BANK, INC.,

*Appellant,*

v.

## FEDERAL RESERVE BOARD OF GOVERNORS et al.,

*Appellees.*

---

On Appeal from the U. S. District Court for the District of Wyoming

The Honorable Scott W. Skavdahl, District Judge

District Court No. 1:22-CV-125-SWS

---

## APPELLANT'S OPENING BRIEF ON THE MERITS

## ORAL ARGUMENT REQUESTED

---

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

Michelle S. Kallen
Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Avenue NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

*Counsel for Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF RELATED CASES ...............................................1

INTRODUCTION ..............................................................................2

JURISDICTION .................................................................................4

STATEMENT OF THE ISSUES ........................................................4

STATEMENT .....................................................................................5

    A.    The Federal Reserve's place in the dual-banking system ..............5

        1.    The Monetary Control Act and Section 248a .......................7

        2.    Wyoming's special-purpose bank charter ............................9

        3.    A master account is necessary for access to covered Fed services ......................................................................... 12

    B.    Custodia's master account application and this case ................. 14

        1.    Initial complaint, first motions to dismiss, and denial of Custodia's master account application ............... 17

        2.    Amended complaint ............................................................ 21

        3.    Second motion to dismiss .................................................. 21

    C.    The dismissal decision ................................................................. 22

STANDARD OF REVIEW ............................................................... 23

SUMMARY OF ARGUMENT .......................................................... 24

ARGUMENT ..................................................................................... 26

I.    Denying Custodia's master account application is contrary to the Monetary Control Act and the dual-banking system ..................... 27

    A.    The Monetary Control Act's plain language does not empower the Fed to deny master accounts to disfavored state-chartered banks ................................................................. 27

i

B. The district court's conclusion is belied by the contemporaneous understanding of the MCA by both Congress and the Fed ................................................................ 34

C. The Fed's newly-asserted power is contradicted by decades of the Fed's own practices ................................. 37

D. The district court's reading undermines the MCA's design to facilitate equal access to the Fed's services across state- and federally-chartered banks ...................................... 38

E. No other federal statute overrides Section 248a(c)(2)'s clear command ................................................................ 41

    1. Section 342 does not grant Reserve Banks discretion to deny disfavored state-chartered banks master accounts .................................................................... 41

    2. The Toomey Amendment does not grant discretion to deny disfavored state-chartered banks master accounts .................................................................... 44

II. Custodia should be granted access to a master account by writ of mandamus and pursuant to the APA ................................... 46

A. Custodia is entitled to a writ of mandamus against FRBKC ...................................................................... 46

B. The Board is subject to the APA and should be compelled to provide Custodia access to a master account ......................... 48

    1. The Board's permission for FRBKC to issue the denial letter was a final agency action under the APA ...................................................................... 49

    2. Custodia is entitled to relief under the APA or, at the very least, a remand to resolve the question of disputed fact of the Board's involvement .......................... 53

C. The Defendants cannot circumvent judicial review ................... 55

D. Custodia is entitled to declaratory relief ..................................... 57

CONCLUSION ................................................................................... 57

STATEMENT REGARDING ORAL ARGUMENT ......................................... 58

CERTIFICATE OF COMPLIANCE ................................................................. 59


## ATTACHMENTS PURSUANT TO 10TH CIR. R. 28.2(A)(1)

Order Granting in Part and Denying in Part Defendants' 12(b)(6) Motions to Dismiss Complaint (D. Wyo. Nov. 11, 2022), ECF No. 102 .......................................................................................................... A.1

Order on Defendants' Motions to Dismiss First Amended Complaint (D. Wyo. June 8, 2023), ECF No. 164 .................................... A.39

Order on Dispositive Motions (D. Wyo. Mar. 29, 2024), ECF No. 31 ............................................................................................................ A.55

Judgment (D. Wyo. Mar. 29, 2024), ECF No. 318 ........................................ A.82

## <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps">Cases</span>

*Air One Helicopters, Inc. v. FAA*, 86 F.3d 880 (9th Cir. 1996) ....................... 51

*Ass'n of American Railroads v. United States Department of Transportation*, 821 F.3d 19 (D.C. Cir. 2016) ............................................ 57

*Badgerow v. Walters*, 596 U.S. 1 (2022) ........................................................... 39

*Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016) ........................................ 56

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................. 49

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................. 56

*Cantero v. Bank of America, N.A.*, 144 S. Ct. 1290 (2024) ..................... 2, 6, 41

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) .............................................. 57

*Chemical Weapons Working Group, Inc. (CWWG) v. United States Department of the Army*, 111 F.3d 1485 (10th Cir. 1997) .................. 52, 53

*Cherry v. USDA*, 13 Fed. App'x 886 (10th Cir. 2001) ......................... 51, 52, 53

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986) ............................... 51

*City of Colorado Springs v. Solis*, 589 F.3d 1121 (10th Cir. 2009) ................. 51

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985) .............................. 28

*Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015) ...................................................................... 56

*Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239 (10th Cir. 2016) ...................................................................................................... 46

*Estate of Smith v. Heckler*, 747 F.2d 583 (10th Cir. 1984) ............................ 47

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017) .......................... 2, 3, 6, 13, 14, 27, 28, 29, 30, 31, 32, 42, 43, 55

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York*, 866 F.2d 38 (2d Cir. 1989) ............................................................ 36

*Heckler v. Ringer*, 466 U.S. 602 (1984) ............................................ 47

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) .................... 27

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).................................. 38

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983)................................................................. 36

*Mallard v. United States District Court*, 490 U.S. 296 (1989) ........ 48

*Marquez-Ramos v. Reno*, 69 F.3d 477 (10th Cir. 1995).................... 24

*New Mexico Cattle Growers Ass'n v. United States Fish & Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001) ...................................... 24

*Northern Pacific Railroad Co. v. Territory of Washington ex rel. Dustin*, 142 U.S. 492 (1892) ......................................................... 47

*National Rifle Ass'n of America v. Vullo*, 144 S. Ct. 1316 (2024) .................. 55

*Northpark National Bank v. Bankers Trust Co.*, 572 F. Supp. 520 (S.D.N.Y. 1983) .............................................................................. 36

*Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998) ............................................................................................. 33

*Posadas v. National City Bank of New York*, 296 U.S. 497 (1936)................ 45

*Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115 (2016) ............................................................................................. 33

*Smith v. Spizzirri*, 144 S. Ct. 1173 (2024) ................................. 27, 28

*Total Aviation Services, Inc. v. United Jersey Bank*, 626 F. Supp. 1087 (E.D.N.Y. 1986) ................................................................... 36

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ...................................... 32

*Tulsa Airports Improvement Trust v. FAA*, 839 F.3d 945 (10th Cir. 2016) ............................................................................................. 52

*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987 (10th Cir. 2011) ............... 23

*United States Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016) ........................................................................... 49, 53

*United States ex rel. Rahman v. Oncology Associates, P.C.*, 198 F.3d 502 (4th Cir. 1999) .............................................................. 47

*United States v. Abdenbi*, 361 F.3d 1282 (10th Cir. 2004) ........................... 47

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) ........................... 38

*Yates v. United States*, 574 U.S. 528 (2015) ...................................... 33

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. V ............................................................... 56

U.S. Const. art. II, § 2, cl. 2 .................................................... 56

5 U.S.C. § 702 ..................................................................... 48

5 U.S.C. § 706 ..................................................................... 46

5 U.S.C. § 706(2)(A) ............................................................... 24

12 U.S.C. § 248(a) .................................................................. 5

12 U.S.C. § 248(j) .................................................................. 5

12 U.S.C. § 248a .................................................................... 4

12 U.S.C. § 248a(b) ............................................................... 28

12 U.S.C. § 248a(b)(8) ......................................................... 24, 30

12 U.S.C. § 248a(c) ............................................................... 44

12 U.S.C. § 248a(c)(2) ................................................. 2, 9, 24, 28, 32

12 U.S.C. § 248c(b)(1)(B) ...................................................... 26, 44

12 U.S.C. § 302 .................................................................... 56

12 U.S.C. § 342 ............................................................. 12, 18, 42

12 U.S.C. § 461(b)(1)(A) ............................................................. 29

12 U.S.C. § 461(b)(2)(D) ............................................................. 8

12 U.S.C. § 632 ................................................................... 4, 46

12 U.S.C. § 1813 ..................................................................... 29

28 U.S.C. § 1291 ...................................................................... 4

28 U.S.C. § 1331 ................................................................... 4, 45

28 U.S.C. § 1361 .............................................................. 4, 24, 46

Depository Institutions Deregulation and Monetary Control Act,
    Pub. L. No. 96-221, § 105, 94 Stat. 132 (1980) ...................... 8, 43

Federal Reserve Act, Pub. L. No. 63-43, § 13, 38 Stat. 251 (1913) ............... 12

Wyo. Stat. Ann. § 13-12-101, *et seq.* ............................................ 10

Wyo. Stat. Ann. § 13-12-105 ....................................................... 10

Wyo. Stat. Ann. § 13-12-105(a) .................................................... 11

Wyo. Stat. Ann. § 13-12-107 ....................................................... 10

Wyo. Stat. Ann. § 34-29-104 ....................................................... 10

## LEGISLATIVE MATERIALS

126 Cong. Rec. 7070 (1980) ........................................................ 40

126 Cong. Rec. 7072 (1980) ........................................................ 34

*Federal Reserve Requirements: Hearings on S. 353 and Proposed
    Amendments, S. 85, and H.R. 7 Before the S. Comm. On
    Banking, Hous., & Urb. Affs.*, 96th Cong. (1980) ..................... 7–8

H.B. 74, 65th Leg., Gen. Sess. (Wyo 2019) ....................................... 10

H.R. Rep. No. 95-1590 (1978) ...................................................... 8

H.R. Rep. No. 96-842 (1980) (Conf. Rep.) ......................................... 34

Subcomm. On Domestic Monetary Policy of the House of Representatives Comm. On Banking, Finance and Urban Affairs, 98th Cong., Report on the Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System (Comm. Print 1984)........................................ 7, 8

OTHER AUTHORITIES

*Appointment and Removal of Federal Reserve Bank Members of the FOMC*, 2019 WL 1594453 (O.L.C. Oct. 23, 2019)....................................6

*Avanti Statement on its Application to Become an FDIC-Insured Bank*, Custodia (Nov. 5, 2021), https://tinyurl.com/3586ebdx.................... 18

Elijah Brewer III, *The Depository Institutions Deregulation and Monetary Control Act of 1980*, Econ. Perspectives, Sept.–Oct. 1980 ............................................................................................... 35

Lynn Elaine Browne, *The Evolution of Monetary Policy and the Federal Reserve System Over the Past Thirty Years: An Overview*, New Eng. Econ. Rev., Jan.–Feb. 2001 ....................................... 35

Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that legal?*, Brookings (Nov. 14, 2018), http://tinyurl.com/569enyb5 ........................................................ 13

CRS, R45190, *From Slip Law to United States Code: A Guide to Federal Statutes for Congressional Staff* (updated June 2023), https://tinyurl.com/5c2spwpp ....................................................... 33

CRS, R45726, *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress* (May 17, 2019), https://tinyurl.com/26v68aym ........................................................5

*Database: Existing Access*, Bd. of Governors of Fed. Rsrv. Sys., https://tinyurl.com/unh8tnsd (last updated June 21, 2024).........................9

Gerald P. Dwyer, *The Demise of the Dual Banking System, Am. Inst. for Econ. Rsch.* (May 22, 2024), https://tinyurl.com/4d855vnd ..................................................... 40

*FDIC State Tables*, FDIC, https://tinyurl.com/5c2spwpp (last visited June 26, 2024).......................................................................6

viii

Federal Reserve Bank Services; Proposed Fee Schedules and
Pricing Principles, 45 Fed. Reg. 58,689 (Sept. 4, 1980) ................... 9, 34–35

*Federal Reserve's Key Policies for the Provision of Financial
Services*, Bd. of Governors of the Fed. Rsrv. Sys.,
https://tinyurl.com/mr2sx6s2 (last updated Oct. 28, 2016) ................ 37–38

Fed. R. Civ. P. 56(a) ........................................................................ 23

Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular
No. 1: Account Relationships* (eff. Sept. 1, 2023),
http://tinyurl.com/ecftjvuu ......................................................... 5, 13

Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular
No. 1: Account Relationships* (Redline) (eff. Sept. 1, 2023),
https://tinyurl.com/5583n8j2 ........................................................ 19

Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does*
(11th ed. 2021), http://tinyurl.com/n8fkxy3m ................................. 5

Joshua N. Feinman, *Reserve Requirements: History, Current
Practice and Potential Reform*, Fed. Rsrv. Bull. at 575 (1993),
https://tinyurl.com/3z3zrr9b .......................................................... 7

FFIEC, Bank Secrecy Act/ Anti-Money Laundering Examination
Manual 1 (2014), https://tinyurl.com/58ucrk9x ............................... 10

Esther L. George, *Perspectives on 150 Years of Dual Banking*,
Conference of State Bank Supervisors State-Federal
Supervisory Forum (May 22, 2012), https://tinyurl.
com/2errwc43 ............................................................................. 7, 40

Guidelines for Evaluating Account and Services Requests, 87 Fed.
Reg. 51,099 (Aug. 19, 2022) ......................................................... 18

Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale
J. on Reg. 453 (2023) ................................................................ 12, 14

*Interstate Branching: New Account Structure*, Fed. Rsrv. Bd.,
https://tinyurl.com/mrxs9y7a (last updated Sept. 27, 2002) ....... 12, 30, 42, 55

J.L. Jackson & Willis J. Winn, *Federal Reserve Bank of Cleveland
1980 Annual Report* (1981) ......................................................... 35

Anatoli Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Econ. Rev., July–Aug. 1985 ................................................................. 35

Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. Chi. L. Rev. 357 (2016) ........................................................... 15

*Policies: The Federal Reserve in the Payments System*, Bd. of Governors of the Fed. Rsrv. Sys. (revised 1990), https://tinyurl.com/3xnk5ywv (last updated Aug. 11, 2020) ...................... 37

*Policies: Principles for the Pricing of the Federal Reserve Bank Services*, Bd. of Governors of the Fed. Rsrv. Sys. (issued 1980), https://tinyurl.com/45fwsbpy (last updated Nov. 20, 2008)........................ 37

*Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks*, Bd. of Governors of the Fed. Rsrv. Sys. (issued 1984), https://tinyurl.com/342y5yzh (last updated Nov. 20, 2008) ................................................................. 37

Kenneth J. Robinson, *Depository Institutions Deregulation and Monetary Control Act of 1980*, Fed. Rsrv. History (Mar. 1980), https://tinyurl.com/584prv2z ........................................ 39

*Select Committee on Blockchain, Financial Technology and Digital Innovation Technology* (May 21, 2024) (statement of Caitlin Long), https://tinyurl.com/s7ebvf22 ...................................... 14, 16

*Special Purpose Depository Institutions*, Wyo. Div. of Banking, https://tinyurl.com/mw52uphr (last visited June 26, 2024) ...................... 10

Julie L. Stackhouse, *Why America's Dual Banking System Matters*, Fed. Rsrv. Bank of St. Louis (Sept. 18, 2017), https://tinyurl.com/4asdvdec .................................................... 41

Wyo., Dep't of Audit, Division of Banking, *Special Purpose Depository Institutions: Updated Capital Requirement Guidance* (July 7, 2021), http://tinyurl.com/yp5f5ncn ............................... 11

Wyo. Div. of Banking, SPDI Examination Manuals (2021), https://tinyurl.com/yc4x2ec6........................................................ 11

Wyo. Rules & Regs. 021.0002.19 § 4 ................................................. 10

x

Wyo. Rules & Regs. 021.0002.20 § 9 .................................................. 11

David Yaffe-Bellany, *How Sam Bankman-Fried's Crypto Empire Collapsed*, N.Y. Times (Nov. 14, 2022) ........................................ 16

Gary C. Zimmerman, *The Pricing of Federal Reserve Services Under the MCA*, Econ. Rev., Winter 1981 (1981) ....................................... 35

## STATEMENT OF RELATED CASES

Pursuant to 10th Cir. R. 28.2(C)(3), Appellant states that there are no prior or related appeals.

## INTRODUCTION

"The United States maintains a dual system of banking, made up of parallel federal and state banking systems.  That dual system allows privately owned banks to choose whether to obtain a charter from the Federal Government or from a state government."  *Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1294 (2024).  This case is about whether Congress in the Monetary Control Act (MCA or the Act) empowered the Federal Reserve to undermine that system by denying certain state-chartered institutions a "master account," effectively "crippling the[ir] . . . business operations."  *Fourth Corner Credit Union v. Federal Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).

Congress did not give the Fed that power.  To the contrary, the MCA reflects Congress's intent to stop the Fed from discriminating against disfavored depository institutions (like state-chartered banks) in providing access to pivotal Fed services.  Congress made that clear: "*All Federal Reserve bank services* covered by the fee schedule [set forth in the statute] *shall be available* to nonmember depository institutions . . . ."  12 U.S.C. § 248a(c)(2) (emphasis added).  As Judge Bachrach said, the statute does not leave the fate of state-chartered depository institutions to the whim of the Fed: Section "248a(c)(2) unambiguously entitle[s] all nonmember institutions to a master account."  *Fourth Corner*, 861 F.3d at 1070 (Bacharach, J.).

2

Notwithstanding this clear statutory command, the Federal Reserve Board of Governors (the Board) and the Federal Reserve Bank of Kansas City (FRBKC) denied Custodia Bank (Custodia)—a state-chartered, state-regulated depository institution—a master account, claiming sweeping authority to treat state-chartered, state-regulated institutions as third-class entities unworthy of a core feature of a bank.  In so doing, the Board and FRBKC effectively overruled Wyoming's assessment that the State provided robust supervision through its regulatory system, which includes a strict 100% reserve requirement that ensures state banks like Custodia have sufficient cash on hand even if all customers were to cash out their accounts simultaneously.

The MCA's plain text unambiguously prohibits the Fed's overruling state regulators in that fashion.  The critical provision, Section 248a(c)(2), is broad: it covers "*all* Federal Reserve bank services" listed in the statute, which encompasses master accounts.  And Section 248a(c)(2) is mandatory: it provides that those services "shall" be "available to nonmember depository institutions" like Custodia.  It is thus no surprise that for decades following enactment of the MCA, "the Board of Governors had uniformly interpreted [the Act] to extend Federal Reserve services to all 'depository institutions.'" *Fourth Corner*, 861 F.3d at 1070 (Bacharach, J.).  The district court was wrong to decide otherwise.

Nor is there any basis to conclude that the Fed's actions here are immune from judicial review when the Fed defies a congressional command. Mandamus relief is available against FRBKC (at minimum), and the APA provides a remedy against the Board.

The decision below should be reversed.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 and 12 U.S.C. § 632. The district court also had mandamus jurisdiction under 28 U.S.C. § 1361. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered its final order on March 29, 2024 and Custodia filed a timely notice of appeal on April 26, 2024.

## STATEMENT OF THE ISSUES

1. Whether 12 U.S.C. Section 248a permits the Federal Reserve Board of Governors and Federal Reserve Banks to deny an eligible depository institution a master account.

2. Whether Custodia is entitled to mandamus relief against Defendants for their refusal to provide Custodia a master account given Section 248a's statutory command.

3. Whether the Board violated the Administrative Procedure Act in orchestrating the denial of Custodia's master account application.

4.     Whether Custodia is entitled to a declaration that the Board and FRBKC have a statutory obligation to provide Custodia a master account.

## STATEMENT

### A.    The Federal Reserve's place in the dual-banking system

Over centuries, the American banking system evolved into a system of cooperative federalism that respects distinct and equal state and federal roles, commonly called the "dual-banking system."[1]  The federal side is controlled by federal regulators, including the Federal Reserve System (the Federal Reserve or the Fed).  Established by the Federal Reserve Act of 1913, the Federal Reserve System consists of a seven-member Board of Governors, the Federal Open Market Committee, and twelve regional Federal Reserve Banks (each serving a specific district).[2]  The Board supervises the regional banks and regulates Fed member banks.  The Board oversees the Reserve Banks' payment systems and issuance of accounts for accessing them.  12 U.S.C. § 248(a),(j); Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular 1: Account Relationships* § 2.6 (eff. Sept. 1, 2013), http://tinyurl.com/ecftjvuu (*Operating Circular 1*).  The "Reserve Banks exhibit some features of private

---

[1] CRS, R45726, *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress*, 4–5 (May 17, 2019), https://tinyurl.com/26v68aym.

[2] Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* 2 (11th ed. 2021), http://tinyurl.com/n8fkxy3m.

enterprises, but they are fiscal agents of the United States." *Appointment and Removal of Federal Reserve Bank Members of the FOMC*, 2019 WL 1594453, at *5 n.3 (O.L.C. Oct. 23, 2019).

"The Federal Reserve System classifies financial institutions as either member banks or nonmember depository institutions.  Member banks own shares of a Federal Reserve Bank and elect most members of the board of directors.  Nonmember depository institutions do not." *Fourth Corner*, 861 F.3d at 1068 n.7 (Bacharach, J.).  Member banks include national banks, which must become members of the Federal Reserve System, and state-chartered banks that may voluntarily elect to become members.

The choice of whether to obtain a charter from the federal government or from a state lies with the bank.  *Cantero*, 144 S. Ct. at 1294.  "Banks with federal charters, called national banks, are subject primarily to federal oversight and regulation.  And banks with state charters, called state banks, are subject to additional state oversight and regulation." *Id.* at 1295.  By design, "[t]hose two banking systems co-exist and compete." *Id.*  As of March 31, 2024, there were 3,307 state-chartered banks and 705 nationally-chartered banks.  *FDIC State Tables*, FDIC, https://tinyurl.com/5c2spwpp (last visited June 26, 2024).

For more than a century-and-a-half, Congress and courts have maintained and reinforced the dual-banking system, trusting both state and

federal regulators to protect the Nation's banking system.  J.A.753 ¶ 26.  As
FRBKC's President observed, the dual-banking system "has remained firmly
anchored in the modern world of banking and finance"—it has "survived for
150 years" and "has proven to be so durable and responsive to our dynamic
economy."  Esther L. George, *Perspectives on 150 Years of Dual Banking*,
Conference of State Bank Supervisors State-Federal Supervisory Forum (May
22, 2012), https://tinyurl.com/2errwc43 (*Perspectives on 150 Years of Dual
Banking*).

### 1.    The Monetary Control Act and Section 248a

Before 1980, Congress permitted the Fed to gatekeep access to its
payment system services.  Subcomm. On Domestic Monetary Policy of the
House Comm. On Banking, Finance and Urban Affairs, 98th Cong., *Report on
the Role and Activities of the Federal Reserve System in the Nation's Check
Clearing and Payments System* 3 (Comm. Print 1984) (*Domestic Monetary
Policy Report*).  In the 1970s, many state member banks withdrew from
Federal Reserve membership as they faced substantially higher reserve
requirements than state nonmember banks (largely because of rising interest
rates).  *Id.* at 10; Joshua N. Feinman, *Reserve Requirements: History, Current
Practice and Potential Reform*, Fed. Rsrv. Bull. at 575, 577–78 (1993),
https://tinyurl.com/3z3zrr9b.  The Board feared an "avalanche in loss of
members."  *Federal Reserve Requirements: Hearings on S. 353 and Proposed*

*Amendments, S. 85, and H.R. 7 Before the S. Comm. On Banking, Hous., & Urb. Affs.*, 96th Cong. 5 (1980) (Statement of Paul Volcker).  At the same time, the Board confronted an unprecedented revenue crisis.  Domestic Monetary Policy Report at 11.

Congress enacted the Depository Institutions Deregulation and Monetary Control Act of 1980 to address payment access and the unequal treatment of member and nonmember banks.[3]  Reserve requirements were now "uniformly applied" to all depository institutions, 12 U.S.C. § 461(b)(2)(D).  Fed services were now priced equally for members and nonmembers alike; and, in return, the Fed was required to provide all depository institutions (state non-member banks, federally chartered banks, thrifts, credit unions) direct access to Fed payment system services in the same manner and on the same terms as member banks.  As the Committee Reports made clear, the MCA was designed to initiate "wide access to Federal Reserve services for nonmember banks" and to ensure "that a basic level of services is available to *all* banks throughout the country on a nondiscriminatory basis."  H.R. Rep. No. 95-1590, at 20 (1978) (emphasis added).

Section 248a(c)(2) is at the heart of this case.  Consistent with the goals of the MCA, it sets forth a fee schedule for Fed services and states: "[a]ll

---

[3] Pub. L. No. 96-221, § 105, 94 Stat. 132, 139–40 (1980) (*Monetary Control Act*).

Federal Reserve bank services covered by the fee schedule [in Section 248a(b)] *shall be available* to nonmember depository institutions *and such services* shall be priced at the same fee schedule applicable to member banks."  12 U.S.C. § 248a(c)(2) (emphasis added).

From the start, the Board and the Reserve Banks understood the MCA to require direct access for all depository institutions.[4]  The Fed's 1980 regulatory implementation of the MCA stated the statute "requires the Board of Governors of the Federal Reserve System to begin putting into effect a schedule of fees for services . . . and to make such services covered by the fee schedule available to all depository institutions."  Federal Reserve Bank Services; Proposed Fee Schedules and Pricing Principles, 45 Fed. Reg. 58,689, 58,690 (Sept. 4, 1980).

### 2.    Wyoming's special-purpose bank charter

In keeping with the States' roles as innovators in the dual-banking system, Wyoming enacted an enabling statute to allow qualified applicants to obtain a banking charter for Special Purpose Depository Institutions (SPDIs)

---

[4]  Until recently, the Fed routinely granted master accounts to institutions that were not federally insured. *Database: Existing Access*, Bd. of Governors of Fed. Rsrv. Sys., https://tinyurl.com/unh8tnsd (last updated June 21, 2024) (select "Not Federally Insured" under "Federal Deposit Insurance"; then follow "Submit" hyperlink) (listing 430 existing master account holders that have no federal insurance, of which more than 300 have no federal regulator).

in 2019.[5]  H.B. 74, 65th Leg., Gen. Sess. (Wyo. 2019); Wyo. Stat. Ann. § 13-12-101, *et seq.*

SPDIs take deposits, facilitate U.S. dollar payments for customers, and provide digital asset custody services; they do not lend.  Their profits come from service fees.  *Special Purpose Depository Institutions*, Wyo. Div. of Banking, https://tinyurl.com/mw52uphr (last visited June 26, 2024).  SPDIs hold customer deposits in U.S. dollars—not in digital assets; they hold customers' digital assets separately in custody or trust.  Wyo. Stat. Ann. §§ 13-12-105, 34-29-104; Wyo. Rules & Regs. 021.0002.19 § 4.  SPDIs must "comply with all applicable federal laws, including those relating to anti-money laundering," (AML) "customer identification and beneficial ownership."  Wyo. Stat. Ann. § 13-12-107.[6]  The Wyoming Division of Banking (the State regulator) works in collaboration with the federal government on AML, combatting the financing of terrorism (CFT), and economic sanctions laws.[7]

---

[5] Both FRBKC and the Board worked hand-in-hand with Wyoming to develop the SPDI regulatory regime, meeting approximately 100 times between 2017 and 2019.  J.A.675–76.

[6] When the SPDI charter was developed, FRBKC officials expressed favorable views about the SPDI framework and Wyoming's supervision.  *See, e.g.*, J.A.1740–41 (FRBKC official testifying that Wyoming "took a thoughtful approach to developing the [SPDI] framework"); J.A.1688–91 (FRBKC official testifying that Wyoming bank examiners were "skilled in their job").

[7] *See, e.g.*, FFIEC, Bank Secrecy Act/ Anti-Money Laundering Examination Manual 1 (2014), https://tinyurl.com/58ucrk9x (describing "collaborative effort" with "state banking agencies").  The Federal Financial

The Wyoming Division of Banking developed a robust, 772-page supervisory examination manual. Wyo. Div. of Banking, SPDI Examination Manuals (2021), https://tinyurl.com/2tw2ptz8. To qualify as a SPDI, a depository institution must be *considerably safer* than most banks, including national banks. A SPDI's assets must be "managed prudently, consistent with safe and sound banking practices, in a manner that [a]ddresses interest rate risk, including repricing, basis, yield curve and option risk; [p]revents mismatching; and [a]ccounts for potential stress scenarios." Wyo. Rules & Regs. 021.0002.20 § 9(d)(i)–(iii); *SPDI Examination Manuals*, *supra*. A SPDI must invest 100% of its U.S. dollar demand deposits in either cash-on-hand or high-quality liquid assets, altogether prohibiting it from making any loans. Wyo., Dep't of Audit, Division of Banking, *Special Purpose Depository Institutions: Updated Capital Requirement Guidance* (July 7, 2021), http://tinyurl.com/yp5f5ncn; Wyo. Stat. Ann. § 13-12-105(a). This 100% reserve requirement means that if all customers seek to withdraw funds from their accounts simultaneously, the bank has the cash on-hand to cover all withdrawals.

---

Crimes Enforcement Network may also enforce federal AML and CFT laws against SPDIs and the Office of Foreign Assets Control can enforce the federal economic sanctions laws.

### 3.    A master account is necessary for access to covered Fed services

Though charters can be State- or Federally-issued, the Fed is the sole gatekeeper of the covered services listed in Section 248a(b).  J.A.753 ¶ 27.[8]  The concept of a "master account" was devised by the Board almost two decades after the MCA was passed.  Before master accounts, "some banks held more than one Federal Reserve account, and some banks had accounts at more than one Federal Reserve Bank."  Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 462 (2023).  In 1998, the Board created a "new account structure" which consolidated the various accounts in "a single (master) account at a designated Reserve Bank."  *Interstate Branching: New Account Structure*, Fed. Rsrv. Bd., https://tinyurl.com/mrxs9y7a (last updated Sept. 27, 2002) (*Interstate Branching: New Account Structure*).[9]

---

[8] Originally, the Fed was charged with providing its financial services only to "its member banks" and "the United States."  Federal Reserve Act, Pub. L. No. 63-43, § 13, 38 Stat. 251, 263 (1913).  In the MCA, Congress, expanded the list of covered entities to include a "nonmember bank or trust company or other depository institution."  12 U.S.C. § 342.

[9] A master account is a bookkeeping service: "a record of financial transactions that reflects financial rights and obligations of an account holder and the Reserve Bank with respect to each other, where opening and closing balances are determined.  All credits and debits resulting from the use of Federal Reserve services [are] booked to this one account at one Reserve Bank for each separately chartered institution. . . .  Reserve administration also [is] managed through this account."  *Id.*

Today, "[a] master account is required to purchase services that are indispensable for all financial institutions." *Fourth Corner*, 861 F.3d at 1064 (Bacharach, J.). It enables a bank to access covered services listed in Section 248a(b) such as wire transfer services, automated clearinghouse services, settlement services, securities safekeeping, and Federal Reserve float services. *See Operating Circular 1* §§ 2.3, 4.1–.3. Without a master account, an institution cannot obtain access to the Fed's payment systems. *Fourth Corner*, 861 F.3d at 1053 (Moritz, J.). "[A] depository institution" without a master account "is nothing more than a vault." *Id.* (quotation marks omitted); Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that legal?*, Brookings (Nov. 14, 2018), http://tinyurl.com/569enyb5 (a financial institution without a master account "can't really function as a financial institution" and "becomes instead a kind of storage locker").

A bank without a master account can only access the covered Fed services indirectly through a correspondent relationship—a bank with a master account that can serve as the "middleman." Using a correspondent is both expensive and existentially risky, as Custodia has experienced.[10] Denial

---

[10] There are two types of correspondent banking relationships: direct and indirect. The Fed's approval is required to obtain a direct correspondent relationship. Operating Circular 1 § 2.7. The Fed can stymie disfavored institutions either by denying approval for their direct correspondents, or by applying regulatory pressure to indirect correspondents. In fact, Custodia's indirect correspondent relationships have been subject to regulatory

of a master account could "effectively crippl[e]" a bank's business operations. *Fourth Corner*, 861 F.3d at 1053 (Moritz, J.).

The process of opening master accounts has long reflected its ministerial nature. "Following the [MCA], banks opening an account at the Federal Reserve encountered a process like that of customers opening standard bank accounts[.]" *Hill*, *supra*, at 455 (footnotes omitted). An institution completed "a one-page form" that identified the applicant, "list[ed] the people to whom the Federal Reserve Bank should direct questions," and committed to be "bound by the Federal Reserve's account policies." *Id.*; *see* J.A.87 (Custodia's master account application). The Reserve Banks' forms noted that "[p]rocessing may take 5–7 business days." *Hill*, *supra*, at 456 (quotation marks omitted); J.A.87.

## B. Custodia's master account application and this case

Plaintiff-Appellant Custodia Bank, Inc. is a Wyoming-chartered SPDI that specializes in U.S. dollar payment services and digital-asset custody. J.A.402–06 ¶¶ 3, 8, 14. Consistent with Wyoming's regulatory requirements,

---

chokeholds. *See* J.A.2096–97 (explaining closure of Custodia partner bank due to "regulatory pressure"). Custodia's CEO testified that Custodia recently lost a second indirect correspondent account due to "regulatory pressure," not any fault of Custodia, and noted these account closures were "costly, enormously disruptive internally and set [Custodia] back many months." *Select Committee on Blockchain, Financial Technology and Digital Innovation Technology* (May 21, 2024) (statement of Caitlin Long), https://tinyurl.com/s7ebvf22 [Long Hr'g Test].

Custodia employs a "safe banking" or "full reserve" business model: it holds a reserve of cash equal to 100% of its deposit liabilities and is prohibited from lending deposits. *See* Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. Chi. L. Rev. 357, 417–19 (2016). Custodia proposed to hold "customer deposits of U.S. dollars in cash in a Federal Reserve master account," which are separate from digital assets. J.A.417 ¶ 50. This means that Custodia itself is not exposed to volatility of digital asset prices because it holds all digital assets in bailment on behalf of customers in trust. *Id.* As a SPDI, Custodia is regulated by Wyoming's Division of Banking.

Soon after obtaining the SPDI charter, Custodia applied for a master account. J.A.87 (Custodia's Oct. 29, 2020 application).[11] Though not required by the terms of the one-page master account application, Custodia worked productively with FRBKC staff to address questions during the application process. J.A.1881–92, 1912–17 (FRBKC describing Custodia's "liquidity risk" as "relatively low"). FRBKC's head of Supervision and Risk Management informed Custodia in January 2021 there were "no show-stoppers" with Custodia's application. J.A.1721–23; J.A.1743. At the recommendation of the Board's general counsel, Custodia separately applied for membership in the

---

[11] The financial institution name is listed as "Avanti Financial Group, Inc."—Custodia's previous name.

Federal Reserve System. J.A.1797–98. Membership applications have different legal standards than a master account application. J.A.1802. The Board eventually linked the two denials, both in time and substance. J.A.1807–08 (email from FRBKC staffer asking Board staff for "help" to "make sure that we are not getting out of sync with the membership side"); J.A.1810 (Board meeting notes stating "[s]upervisory [r]eview" will "[f]eed into membership and Master Account applications").

Although master account applications are routinely processed in "5–7 business days," J.A.87, Defendants stalled Custodia's application for 27 months, J.A.402. During this time, FTX collapsed.[12] Two weeks later, the Board communicated its expectations to FRBKC that Custodia's application be denied. *See* J.A.1894 (Board staffer stating "the current path is leaning towards denial"); J.A.1898 (FRBKC staffer discussing "a call from the Board" that prompted "next steps" of "delivering the message" about "the denial" to Custodia). When FRBKC sent the Board a draft denial memorandum on Custodia's application, the Board heavily revised the memorandum. J.A.1900

---

[12] In November 2022, FTX, a fraudulent digital asset exchange, plunged from $32 billion valuation to Chapter 11 bankruptcy following a spike in customer withdrawals that exposed an $8 billion hole in FTX's accounts. *See* David Yaffe-Bellany, *How Sam Bankman-Fried's Crypto Empire Collapsed*, N.Y. Times (Nov. 14, 2022). Custodia's business differs markedly from that of FTX. Long Hr'g Test, *supra* note 10.

(email with Board feedback); J.A.1902–11 (draft memo with edits and comments); J.A.1919 (email with edits from Board); J.A.1920–29 (line edits). The edits included a request to flag "the high volatility of the crypto industry," J.A.1903, even though Custodia would only provide trust services for digital assets and thus would not be exposed to their volatility. The Board also requested that FRBKC insert language regarding Custodia's so-called risks that contravened FRBKC's positive assessments. J.A.693–94 ¶ 54 (*e.g.* "strong" risk management became "significant risk management gaps," "impressive" and "extensive" management team became "lack of collective depth of relevant banking experience," among many other examples).

### 1. *Initial complaint, first motions to dismiss, and denial of Custodia's master account application*

*Initial complaint.* After 19 months with "no clear end to Custodia's application saga in sight," Custodia initiated this case. J.A.44–45 ¶ 7. Custodia alleged eight causes of action related to Defendants' failure to decide Custodia's master account application: (1) violation of the APA; (2) relief under the Mandamus Act; (3) violation of separation of powers and Due Process Clause; and (4) relief under the Declaratory Judgment Act. Custodia alleged alternative claims based on a statutory access to a master account: (5) the Fifth Amendment to the U.S. Constitution; (6) the Appointments Clause; (7) the Mandamus Act; and (8) the Declaratory Judgment Act.

*First motions to dismiss.* Defendants moved to dismiss.  J.A.88–89; J.A.153–54.  FRBKC argued that, because it was not an agency, neither the APA nor the Mandamus Act applied.  J.A.181–83, 204.  The Board argued it was not a proper defendant because authority to deny master account applications rested solely with Reserve Banks.  J.A.122.  Both defendants argued Section 13 of the Federal Reserve Act, 12 U.S.C. § 342, gave them complete discretion to deny master accounts.  J.A.122–31; J.A.188–97.

*The Guidelines.*  On August 19, 2022, the day before Defendants moved to dismiss, the Board finalized *Guidelines for Evaluating Account and Service Requests* (the Guidelines), which set forth entirely new instructions on deciding master account applications.

Citing the Board's general supervision authority over the operations of Reserve Banks, the Board's Guidelines created an extensive chartering-like process classifying banks into three tiers.  Guidelines, 87 Fed. Reg. 51,099, 51,109 (Aug. 19, 2022).  State-chartered banks like Custodia that are neither federally-insured nor subject to federal supervision are placed in Tier 3.[13]  *Id.* at 51,110.  Master account applications from Tier 3 institutions are strictly scrutinized and presumptively denied.  *Id.* at 51,106–10; J.A.682 (citing

---

[13] Custodia applied for FDIC insurance, but it was not available.  *Avanti Statement on its Application to Become an FDIC-Insured Bank*, Custodia (Nov. 5, 2021), https://tinyurl.com/3586ebdx.

discovery from FRBKC staff stating that "approval isn't anticipated if Tier 3 route is taken").[14]

The Board also drafted an "S-Letter," non-public guidance on implementing the Guidelines. The S-Letter required Reserve Banks to notify the Board when a Tier 3 institution applies for a master account and to consult directly with the Board, including before communicating a decision on a Tier 3 institution's master account. J.A.1811 (01/17/2023 letter).

*Decision on the first motions to dismiss.* The district court largely denied Defendants' first motions to dismiss. J.A.359. The court held that Custodia "stated a plausible claim for relief under the APA against both [d]efendants," reasoning, "Custodia's claim for mandamus relief plausibly functions in a complementary fashion to § 706(1) of the APA." J.A.376–77. As to the interpretation of Section 248a(c)(2), the district court "conclude[d] Custodia . . . stated a plausible claim to compel legally-required action," J.A.374, noting "Judge Bacharach's opinion may plausibly be the law on this matter in this

---

[14] The Board also amended Operating Circular 1 in 2023, purporting for the first time to give Reserve Banks "discretion in deciding whether to provide a Financial Institution with access to a Master Account" and allowing them to "require a Financial Institution to provide additional information and documentation to the Reserve Bank to support its decision making." Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular 1: Account Relationships* (Redline) (eff. Sept. 1, 2023), https://tinyurl.com/5583n8j2 (reflecting edits between the 2021 and the 2023 versions).

case," *id.* The court, however, granted Defendants' motions on Custodia's constitutional claims except partly as to Custodia's due process claim. J.A.380, 383, 389–90.

*The events of January 27, 2023*. Multiple events took place on January 27, 2023. First, the Board (after leaking to Bloomberg two days earlier) notified Custodia it had denied Custodia's membership application. J.A.1935. A few hours later—and more than two years after Custodia filed its application—FRBKC issued Custodia the master account denial letter. J.A.1947; J.A.1949 (classifying Custodia as Tier 3, and expressly relying on information Custodia provided outside its master account application, but as part of Custodia's separate membership application). And that afternoon, Defendants jointly moved to dismiss Custodia's complaint. J.A.397; J.A.695–96 (timeline, including press leaks).

One day earlier, on January 26, 2023, the Director of the Board's Division of Banking Operations and Payment Systems sent an email giving FRBKC final Board approval to move forward with denial of Custodia's master account application. J.A.1102 (Board Approval Email). The email highlighted the Board's Guidelines and policy (set forth in S-Letter 2667) requiring Reserve Banks to consult with the Board when deciding Tier 3 master account applications. J.A.1102. The email explained, "[w]e have no concerns with the

Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision to deny the request for a master account." J.A.1102.

### 2.    *Amended complaint*

Custodia amended its complaint alleging three causes of action: (1) an APA claim against the Board; (2) a claim under the Mandamus Act to compel Defendants to "promptly rescind the denial of Custodia's master account application and instead grant the application so that Custodia can access Federal Reserve bank services"; and (3) a declaratory judgment claim. J.A.429 ¶ 87; J.A.433 ¶ 101.

### 3.    *Second motion to dismiss*

Defendants again moved to dismiss. Though Defendants conceded that Custodia was legally eligible for a master account, they asserted they had discretion to deny Custodia's application. J.A.449–52; J.A.482–87.

*Second motion to dismiss decision.* The district court granted in part and denied in part the motions. J.A.601. The court left "a full statutory interpretation . . . for another day" because "the facts alleged by Custodia could weigh heavily on the Court's analysis." J.A.610. The court held Custodia "stated a plausible claim for relief under the Mandamus Act, 28 U.S.C. § 1361, against FRBKC." J.A.614. It dismissed the Mandamus Act claim as to the Board "because the APA provides an adequate remedy." J.A.614.

The Board filed its Administrative Record (J.A.641), and FRBKC and Custodia engaged in extensive discovery, which confirmed the allegations in Custodia's complaint. Discovery showed the Board was intricately involved in denying Custodia's master account application—more than two dozen Board staff provided significant edits to the memorandum recommending denial of Custodia's application. *Supra* pages 16–17. Discovery also demonstrated that the Board and FRBKC coordinated the denial of a master account with the Board's denial of Custodia's application for membership. *Supra* pages 15–16.[15]

## C.     The dismissal decision

At the close of discovery, Custodia moved for judgment as a matter of law contending the Fed lacked discretion to deny Custodia's master account application. J.A.1480. FRBKC moved for summary judgment. J.A.1257. The Board opposed Custodia's motion and asked the court to hold that Custodia's APA claims failed as a matter of law. J.A.1200. The district court denied Custodia's motion and held that Defendants were entitled to judgment as a matter of law.

The court dismissed the APA claim against the Board for lack of jurisdiction. It reasoned that the Board Approval Email was not agency action.

---

[15] The court entered an order approving a stipulated agreement that all evidence, discovery, and the Board's administrative record "may be relied upon by all parties including any court hearing in this case throughout the remainder of this litigation," including an appeal. J.A.656.

J.A.1457–58.  Further, it held that the email merely implemented the Board's Guidelines and S-Letter, and therefore was not final agency action.  J.A.1458–60.

The court then addressed the claim for mandamus relief against FRBKC. Though the court recognized "it [wa]s undisputed that Custodia was 'eligible' to obtain a master account," J.A.1461, it held Custodia was not statutorily entitled to a master account under the "plain language" of the Federal Reserve Act.  J.A.1473.  The district court therefore denied Custodia's motion and held that FRBKC was entitled to judgment as a matter of law as to Custodia's mandamus claim.  J.A.1474–75.  It also asserted it would have dismissed the APA claim against the Board for the same reasons if the Board Approval Email constituted final agency action.  J.A.1460 n.5.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of summary judgment de novo, applying the same legal standard as the district court." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In applying this standard, this Court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Twigg*, 659 F.3d at 997.

23

The same standard applies to APA and mandamus claims. *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001); *Marquez-Ramos v. Reno*, 69 F.3d 477, 478–79 (10th Cir. 1995). Under the APA, the court will "hold unlawful and set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Mandamus Act allows district courts "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

## SUMMARY OF ARGUMENT

In the Monetary Control Act, Congress required "[a]ll Federal Reserve bank services covered by [a statutory] fee schedule *shall be available* to nonmember depository institutions . . . ." 12 U.S.C. § 248a(c)(2) (emphasis added). This language creates a clear mandatory duty for the Fed to make the services identified by Congress available to all depository institutions, whether state-chartered or otherwise. A master account is a "new service" encompassed by the MCA's list of covered services in 12 U.S.C. § 248a(b)(8) and, at the very least, it is a prerequisite for access to the other covered services. Neither the Board nor Reserve Banks can withhold access to the covered services in Section 248a(b) by depriving depository institutions of a master account.

Far from empowering the Board or Reserve Banks to effectively veto state-chartering decisions for innovative banks like Custodia, the MCA

24

reaffirmed Congress's long-held respect for the dual-banking system. Under that system, States and the Federal Government share the power to charter banks, and depository institutions can choose their chartering authority without federal interference. Defendants' assertion of power to deny state-chartered banks master accounts after second-guessing the state-chartering authority's risk assessment is antithetical to the dual-banking system.

It also cannot be squared with the contemporaneous understanding of the MCA and the Fed's own practices. When the MCA was passed, both Congress and the Fed confirmed that Section 248a(c)(2) was mandatory and applied to all nonmember depository institutions. The Fed maintained this understanding for decades. Its recent reinterpretation of the MCA that "discovered" power to second-guess state charters as part of the master account application process must be greeted with skepticism.

Neither the Fed's nor the district court's apparent policy disagreement with the dual-banking system justifies a different reading of the MCA. A presumption that state charters must be subject to additional federal scrutiny amounts to a frontal attack on the dual-banking system and on the very purpose of the MCA: to give all depository institutions open and nondiscriminatory access to Fed services.

Other statutory provisions do not override the MCA's clear command. Section 342 grants Reserve Banks discretionary authority to

receive certain instruments; it does not address who receives an account in the first place. And Section 248c, the Toomey Amendment, simply created additional Fed transparency by requiring the Board to record applications that were "approved, rejected, pending, or withdrawn." 12 U.S.C. § 248c(b)(1)(B). It said nothing of the conditions under which applications could be rejected.

Finally, both the Mandamus Act and the APA provide Custodia vehicles to vindicate Section 248a(c)(2)'s statutory command. Custodia is entitled to a writ of mandamus against FRBKC, the entity tasked with issuing Custodia a denial letter. Custodia is entitled to APA relief from the Board (a federal agency) because the Board orchestrated the denial of Custodia's master account application.

The decision below should be reversed, and the Court should order that Custodia's application for a master account be granted.

## <u>ARGUMENT</u>

Custodia alleged three causes of action: (1) an APA claim against the Board; (2) a mandamus claim against both Defendants; and (3) a claim for declaratory relief. All three claims turn on the interpretation of Section 248a. Section I establishes that the Monetary Control Act does not empower the Board or the Reserve Banks to discriminate against certain state-chartered banks by denying master accounts. Section II shows why mandamus relief is

available and why the Board is liable under the APA. The decision below should be reversed.

## I. Denying Custodia's master account application is contrary to the Monetary Control Act and the dual-banking system

As Judge Bacharach observed in *Fourth Corner*, the text of "§ 248a(c)(2) unambiguously entitles [eligible depository institutions] to a master account," and the plain meaning of the text "is supported by (1) repeated interpretations by the Board of Governors and regional Federal Reserve Banks, (2) the legislative history, and (3) the longstanding interpretation of this statute by other courts and academics." 861 F.3d at 1068. This is thus the easy case in which "text, structure, and purpose all point to the same conclusion": defendants wrongfully denied Custodia a master account. *Smith v. Spizzirri*, 144 S. Ct. 1173, 1176 (2024).

### A. The Monetary Control Act's plain language does not empower the Fed to deny master accounts to disfavored state-chartered banks

Statutory analysis starts with the text. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). And where the statutory text is clear, "it ends there as well." *Id.* Under the language employed by Congress in the MCA, Custodia was wrongfully denied a master account.

Section 248a(c)(2) states in relevant part: "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee

schedule applicable to member banks . . . ." 12 U.S.C. § 248a(c)(2). These

services include:

> (1) currency and coin services;
> (2) check clearing and collection services;
> (3) wire transfer services;
> (4) automated clearinghouse services;
> (5) settlement services;
> (6) securities safekeeping services;
> (7) Federal Reserve float; and
> (8) *any new services* which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds.

12 U.S.C. § 248a(b) (emphasis added). The text of Section 248(c)(2) thus "does

two things: It ensures universal access to certain bank services and provides

uniform pricing for them." *Fourth Corner*, 861 F.3d at 1068 (Bacharach, J.).

For present purposes, three aspects of the text are critical. *First*, the

provision is mandatory. Congress used the word "shall," making clear that the

covered services "shall" be "available to nonmember depository institutions."

As the Supreme Court recently emphasized, "the use of the word 'shall' 'creates

an obligation impervious to … discretion.'" *Spizzirri*, 144 S. Ct. at 1177

(citation omitted); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)

(use of the word "shall" creates a mandatory obligation that leaves "no place

for the exercise of discretion"). Section 248a(c)(2) "commands Federal Reserve

Banks to make all services covered by 'the fee schedule' available to

'nonmember depository institutions.'" *Fourth Corner*, 861 F.3d at 1068

28

(Bacharach, J.). And, as Judges Bacharach and Moritz both recognized, a master account is *required* to access the services covered by the fee schedule. *Id.* at 1068–69 (Bacharach, J.); *id.* at 1053 (Moritz, J.). The district court's reasoning that Section 248a(c)(2) permits denial of master accounts to disfavored depository institutions (like state-chartered banks) "flies in the face of Congress's unambiguous command." *Id.* at 1069 (Bacharach, J.).

*Second*, it is undisputed (and has never been disputed) that Custodia is a "nonmember depository institution" covered by the text.[16]

*Third*, the text makes clear that the provision of a master account is a service within the scope of Section 248a(c)(2)'s command. To be sure, Section 248a does not mention "master accounts" by name. *Cf.* J.A.1467 (noting "the express language of § 248a does not say anything about a master account"). That is because "master accounts" did not exist until 1998, nearly two decades after the MCA.

But the inclusion of master accounts in the scope of Section 248a(c)(2) is nonetheless clear from the text. Congress's definition of "[t]he services which

---

[16] A "depository institution" is any insured bank as defined in Section 3 of the Federal Deposit Insurance Act or any bank which "is eligible to make application to become an insured bank. 12 U.S.C. § 461(b)(1)(A). A bank "is eligible to make application to become an insured bank" if it is duly chartered under federal or state law and "is engaged in the business of receiving deposits, other than trust funds." 12 U.S.C. § 1813. Custodia undisputedly meets these definitions.

shall be covered by the schedule of fees" includes "any new services which the Federal Reserve System offers." 12 U.S.C. § 248a(b)(8). Providing a master account is precisely the sort of "new service" encompassed by this provision.

The Board itself effectively agreed. The Board describes a master account as "a flexible new approach to providing accounting services . . . geared to meet the needs of depository institutions for consolidated account management and flexible information as they branch interstate" and to "provide improved accounting services for those institutions that do not expect to participate in interstate branching." *Interstate Branching: New Account Structure*. By the Board's own description, a master account provides "improved accounting services," *id.*, meeting the definition of Section 248a(b)(8).

Even setting Section 248a(b)(8) aside, Section 248a(c)(2) still requires issuance of a master account to Custodia for the reasons set forth by Judge Bacharach. The language of Section 248a(c)(2) ensures universal access to certain bank services and requires uniform pricing. *See supra* (quoting *Fourth Corner*, 861 F.3d at 1068). Because the Fed chose to provide the covered services exclusively through master accounts, "all services offered by the Federal Reserve System are conditioned on the issuance of master accounts," and "none of the fee schedule's services would be available" absent a master account. *Fourth Corner*, 861 F.3d at 1068–69. Indeed, the Board called

30

Custodia's master account application an "access request" and a "request for a master account *and access to services*." J.A.1102 (emphasis added). Without a master account, Custodia cannot access the services described in Section 248a. Thus, either as a new service under the Act, or because it is a pre-requisite for accessing all other services that must be provided under the Act, a master account is within the scope of Section 248a(c)(2).

The district court offered an alternative (mis)reading of the text. Conflating the pricing provision of Section 248a(c)(2) and the access requirement, the district court concluded that "Congress was instructing the Board of Governors" in Section 248a "to create a non-discriminatory pricing schedule, not instructing the Federal Reserve Banks that they must provide master accounts to all eligible depository institutions." J.A.1468. The district court found "it significant that Congress chose to include the word 'all' before 'Federal Reserve bank services covered by the fee schedule' but not before 'nonmember depository institutions' in § 248a(c)(2)." J.A.1469. Judge Bacharach rejected this very reasoning, and this Court should do the same.

1.    As Judge Bacharach explained, "the statute would have the same meaning regardless of whether the word 'all' preceded the phrase 'nonmember depository institutions.' In either case, regional Federal Reserve Banks would be obligated to make the designated services available to all nonmember depository institutions." *Fourth Corner*, 861 F.3d at 1069. That is because

31

"even without the word 'all,' the phrase 'shall be available to nonmember depository institutions' means 'shall be available to each and every nonmember depository institution.'" *Id.* That is, even without the restrictive modifier "all," "the phrase 'nonmember depository institutions' is an inclusive term that includes all nonmember depository institutions." *Id.* (footnote omitted); *see also id.* at 1070 (citing cases). Indeed, for that reason, "drafters of statutes are often cautioned against unnecessarily inserting the adjective 'all' before a plural noun (like 'nonmember depository institutions')." *Id.* (citing multiple drafting advice examples). Omission of the word "all" simply cannot justify the district court's misreading of the text.

2.    The district court's reduction of Section 248a(c)(2) to a mere pricing term renders key statutory language superfluous. Section 248a(c)(2) states "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions *and* such services shall be priced at the same fee schedule applicable to member banks . . ." 12 U.S.C. § 248a(c)(2) (emphasis added). If the statute were only about pricing, there would be no need for the phrase "shall be available." Pricing and availability are separate requirements in the statute. The district court's reading, however, renders the term "shall be available" superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citing "cardinal principle of statutory

32

construction" against rendering statutory language "superfluous, void, or insignificant" (quotation marks omitted)).

3.    The district court held that Section 248a applies only to the Board, and not to Reserve Banks, because it was codified in a subchapter of the U.S. Code entitled "Board of Governors of the Federal Reserve System." These headings are not part of the MCA itself and have not been enacted into law. *See* CRS, R45190, *From Slip Law to United States Code: A Guide to Federal Statutes for Congressional Staff*, 5 (updated June 2023), https://tinyurl.com/5c2spwpp ("As a general rule, the U.S. Code is an unofficial restatement of the Statutes at Large organized by topic for ease of access."). And, although statutory titles and headings sometimes "supply cues," about congressional intent, they cannot override the plain text or meaning of a statute.    *Yates v. United States*, 574 U.S. 528, 540 (2015); *see also Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (same).

*    *    *

With statutory language as clear as Section 248a(c)(2), a court's task "begins and ends" with the text.    *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016).    In any event, the contemporaneous understanding of Congress, the Fed, and courts; the consistent interpretation of the Board; and the structure and purpose of the MCA confirm the plain meaning of Section 248a(c)(2)'s text.

33

**B.    The district court's conclusion is belied by the contemporaneous understanding of the MCA by both Congress and the Fed**

Defendants' recent proclamation of authority to second-guess state charters that apply for master accounts is belied by the contemporaneous understanding of Congress and the Fed when the MCA was passed.

There was no dispute in Congress that the language that eventually became Section 248a would allow open access of Fed services to *all depository institutions*, regardless of chartering authority.  *See* H.R. Rep. No. 96-842, at 71 (1980) (Conf. Rep.) (stating MCA "includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and open access to these services to all depository institutions* on the same terms and conditions as member banks" (emphasis added)); *id.* at 69 (MCA "provides certain Federal Reserve requirements *for all depository institutions*" (emphasis added)); 126 Cong. Rec. 7072 (1980) (Senate floor debate reiterating that the MCA would apply to "every depository institution in the country").

Likewise, the Board and the Reserve Banks themselves understood the MCA to require access to all depository institutions.  The Fed's 1980 regulatory implementation of the MCA stated the Act "requires the Board of Governors of the Federal Reserve System to begin putting into effect a schedule of fees for services . . . and to make such services covered by the fee schedule available to all depository institutions."  Federal Reserve Bank Services; Proposed Fee

Schedules and Pricing Principles, 45 Fed. Reg. 58,689, 58,690 (Sept. 4, 1980);

*see also, e.g.*, J.L. Jackson & Willis J. Winn, *Federal Reserve Bank of Cleveland 1980 Annual Report* at 2 (1981) (in light of the MCA, "[o]ur services will now be available to all depository institutions").  Commentators agreed.[17]

The process for opening master accounts reflected its ministerial nature. A master account application requires simply that an institution complete a one-page form identifying the applicant, listing a point of contact, and committing the applicant to be bound by the Fed's account policies.  *See supra* page 14.[18]  The Fed's form itself states applications are generally processed in 5–7 business days.  *See id.*

---

[17] Elijah Brewer III, *The Depository Institutions Deregulation and Monetary Control Act of 1980*, Econ. Perspectives, Sept.–Oct. 1980, at 3–4 (MCA requires the Fed to "grant all depository institutions access to [Federal Reserve] services"); Lynn Elaine Browne, *The Evolution of Monetary Policy and the Federal Reserve System Over the Past Thirty Years: An Overview*, New Eng. Econ. Rev., Jan.–Feb. 2001, at 3, 8 (MCA required the Fed to make services "available to all depository institutions"); Anatoli Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Econ. Rev., July–Aug. 1985, at 23 (MCA required Federal services be "made available to all depository institutions on equal terms"); Gary C. Zimmerman, *The Pricing of Federal Reserve Services Under the MCA*, Econ. Rev., Winter 1981, at 22 (1981) (MCA "provides for access by all depository institutions to major [Federal Reserve] services").

[18] By combining Custodia's master account application review and the membership review, the Board and FRBKC effectively conflated the minimal master account application standard with the far higher membership standard.  In so doing, they impermissibly added criteria to the master account standard flouting the text of Section 248a.

Both the Second and Sixth Circuits agreed with Congress and the Fed's contemporaneous understanding that Section 248a applied to all banks. *Greater Buffalo Press, Inc. v. Federal Rsrv. Bank of New York*, 866 F.2d 38, 40 (2d Cir. 1989) (observing that the MCA provided that "check clearing services were now to be made available *to all banks*, regardless of whether or not they were member banks" (emphasis added)); *Jet Courier Servs., Inc. v. Federal Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1223 (6th Cir. 1983) (under Section 248a, "services such as check clearing formerly provided to member banks only will be made available to all banks, regardless of whether or not they are members"). District court decisions reached the same conclusion. *See Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087, 1090 (E.D.N.Y. 1986) (describing check processing under Section 248a as "a statutorily mandated act"); *Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520, 522–23 (S.D.N.Y. 1983) (noting that "the Monetary Control Act of 1980" required "render[ing of certain] services to all banks in the United States").

Defendants' newly-asserted power to discriminate against state-chartered banks in issuing master accounts cannot be squared with the uniform contemporaneous understanding of the MCA.

36

### C. The Fed's newly-asserted power is contradicted by decades of the Fed's own practices

Following the MCA, the Board and the Reserve Banks consistently read Section 248a(c)(2) to mandate access to all depository institutions (including nonmember banks). Directly following the MCA, the Board's policies stated, "[s]ervices covered by the fee schedules are available to *all depository institutions.*" *Policies: Principles for the Pricing of the Federal Reserve Bank Services*, Bd. of Governors of the Fed. Rsrv. Sys. (issued 1980), https://tinyurl.com/45fwsbpy (last updated Nov. 20, 2008) (emphasis added).

In 1984, Board policies explained, "[t]he Monetary Control Act of 1980 . . . has expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis." *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks*, Bd. of Governors of the Fed. Rsrv. Sys. (issued 1984), https://tinyurl.com/342y5yzh (last updated Nov. 20, 2008). And, in 1990, the Fed's policies stated, "Federal Reserve payment services are available to all depository institutions." *Policies: The Federal Reserve in the Payments System*, Bd. of Governors of the Fed. Rsrv. Sys. (revised 1990), https://tinyurl.com/3xnk5ywv (last updated Aug. 11, 2020). The Fed's operative policies still state that the MCA "gave *all depository institutions* access to the Federal Reserve's payment services." *Federal Reserve's Key*

37

*Policies for the Provision of Financial Services*, Bd. of Governors of the Fed. Rsrv. Sys., https://tinyurl.com/mr2sx6s2 (last updated Oct. 28, 2016) (emphasis added).

"When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," courts "typically greet its announcement with a measure of skepticism." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks and citation omitted). Skepticism of this newly-asserted power is particularly warranted here, given the chorus of Fed officials over the last three decades who have recognized that the MCA prohibits the Fed from discriminating against disfavored institutions by denying them access to Fed services. *See supra* page 37; *see generally INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." (internal quotation marks omitted)).

### D.  The district court's reading undermines the MCA's design to facilitate equal access to the Fed's services across state- and federally-chartered banks

The district court based its decision in part on "policy considerations," reasoning "[i]f Custodia's position was correct, it would effectively mean that every depository institution chartered under the laws of a state, *regardless of*

38

*how soundly crafted*, is entitled to a master account allowing it direct access to the federal financial system." J.A.1472–73 (emphasis added). The district court envisioned "a 'race to the bottom' among states and politicians to attract business by reducing state chartering burdens through lax legislation." J.A.1473.

The district court's concern amounts to a frontal attack on the premise that undergirds the dual-banking system created by Congress. That system reflects the presumption that state and federal regulators are equally capable of (and equally trusted to) regulate effectively and in good faith. The district court's apparent policy disagreement with the dual-banking system does not give the court a "warrant to redline the [MCA]." *Badgerow v. Walters*, 596 U.S. 1, 11 (2022).

By design, the MCA "require[d] all depository institutions to hold reserves and grant[] them access to the discount window [t]o provide for a more level regulatory playing field across institutions." Kenneth J. Robinson, *Depository Institutions Deregulation and Monetary Control Act of 1980*, Fed. Rsrv. History (Mar. 1980), https://tinyurl.com/584prv2z. It did not distinguish between state- and federally-chartered banks.[19]

---

[19] Similarly, the Chairman of the Senate Banking Committee in 1980 explained, "the fact is that the Federal Government does not replace the State chartering of banks" and "[t]he Federal Government does not replace

The district court found it concerning (as a matter of policy) that "unless Federal Reserve Banks possess discretion to deny or reject a master account application, state chartering laws would be the only layer of insulation for the U.S. financial system." J.A.1473. But this layer of insulation by the States is precisely how the dual-banking system works. The system entrusts States to issue charters in good faith (with robust risk analysis) and to properly regulate state-chartered banks. *See supra* pages 10–11 (describing risk mitigation in SPDI framework).[20]

FRBKC's President explained why the district court's "race to the bottom" policy concern is wrong. *Perspectives on 150 Years of Dual Banking* (expressly rejecting "claim that providing banks a choice of regulator reduces bank safety and soundness and the stability of the financial system by creating a 'race to the bottom'"). She explained, "I have never seen this among the bank regulators in my 30 years at the Federal Reserve." *Id.*

---

examination and supervision of State banks by the State examiners and the State instructors under State control." 126 Cong. Rec. 7070 (1980).

[20] Below, Defendants suggested they must be able to review the sustainability of a state-chartered bank's business model. J.A.449–52. Adopting the Board's newly-asserted power to deny master accounts based on its judgment of whether a business model will likely succeed will squelch innovation and cause "the demise of the dual banking system." *See generally* Gerald P. Dwyer, *The Demise of the Dual Banking System*, Am. Inst. for Econ. Rsch. (May 22, 2024), https://tinyurl.com/4d855vnd.

Far from encouraging a "race to the bottom," States facilitate responsible innovation through their chartering powers. "States take pride in their state-chartered banks, and over time, state banks have taken the lead in safe and sound product innovations, including variable-rate mortgages and home equity loans." Julie L. Stackhouse, *Why America's Dual Banking System Matters*, Fed. Rsrv. Bank of St. Louis (Sept. 18, 2017), https://tinyurl.com/4asdvdec. Our nation's "two banking systems co-exist and compete," with state banks subject to "additional state oversight and regulation" that must be respected by the federal system. *Cantero*, 144 S. Ct. at 1295. Neither the Fed nor the district court can veto the States' chartering decisions based on their own unsupported policy judgments in direct contravention of the equal access guaranteed by the MCA.

### E.    No other federal statute overrides Section 248a(c)(2)'s clear command

With the meaning of Section 248a(c)(2) clear, Defendants and the district court searched high and low to create ambiguity. But the grab-bag of provisions does not support the district court's decision.

#### 1.    Section 342 does not grant Reserve Banks discretion to deny disfavored state-chartered banks master accounts

Below, Defendants argued the MCA does not principally govern master accounts. Instead, they insisted "master accounts are governed by [the Federal

41

Reserve Act] § 13, 12 U.S.C. § 342." J.A.122; J.A.450.[21] That is wrong as a matter of statutory interpretation, and it is belied by the Board's longstanding public position.

Contrary to its argument to the district court, the Board has long described the MCA as "the *principal statute* governing access to Federal Reserve services and, by extension, the types of institutions eligible to hold a Federal Reserve account." *Interstate Branching: New Account Structure*, at n.1 (emphasis added) (Board Q&A describing "new account structure" of master accounts). The Board cannot take one stance before the public and a different stance before this Court. In any event, the Board's representation to the public was correct: the MCA (not Section 342) governs master accounts.

As Judge Bacharach reasoned, any discretion accorded by Section 342 "does not encompass the issuance of master accounts." *Fourth Corner*, 861 F.3d at 1074. Sections 248a and 342 govern different services. Section 342 addresses deposits: the form of money placed in an account. *Id.* ("Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection."). It grants Reserve Banks legal authorization

---

[21] Section 342 states, "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions . . . deposits of current funds in lawful money, national-bank notes, Federal reserve notes . . . ." 12 U.S.C. § 342.

to receive deposits via cash, check, etc.  This ability to receive deposits into an account, however, presupposes the existence of the account itself.  In other words, Section 342 does not address who receives an account in the first place.  The subject of "which institutions can access Federal Reserve services[] . . . is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions." *Id.*  Section 342's discussion of receiving deposits, therefore, says nothing about the power to deprive a financial institution of a master account in the first instance.

Understanding Section 342 as granting only legal authorization to receive certain instruments also aligns with the MCA's history.  Before 1980, only Federal Reserve members could place deposits with the central bank.  When Congress drafted Section 248a, it also amended Section 342, adding the words "or other depository institution."  Monetary Control Act § 105(a).  This provision was designed to grant the Fed *threshold authority* to receive deposits from non-member banks (authority which it did not have before the MCA).  Language about discretionary authority to refuse to take deposits in connection with *non-covered services* (such as discount window lending or daylight overdraft credit) certainly did not override Section 248a's statutory mandate to provide *covered services*, including a master account.  Construing Section 248a(c)(2) as subject to the discretionary authority in Section 342 renders Section 248a(c)(2)'s mandatory language surplusage.  Reading Section

342 subject to Section 248a(c)(2), however, retains Reserve Banks' discretion under Section 342 to refuse deposits in connection with non-covered services.

### 2. The Toomey Amendment does not grant discretion to deny disfavored state-chartered banks master accounts

The district court "respectfully deviate[d] from Judge Bacharach's opinion in *Fourth Corner* based in large part on certain legislation enacted by Congress since then, which was not available for Judge Bacharach's consideration in 2017." J.A.1467. This legislation—the "Toomey Amendment"—was part of the 2023 National Defense Authorization Act, codified as 12 U.S.C. § 248c, and it requires the Board to "create and maintain a public, online, and searchable database that contains . . . a list of every entity that submits an access request for a reserve bank master account and services," including whether the request was "approved, rejected, pending, or withdrawn." 12 U.S.C. § 248c(b)(1)(B)(ii).

Nothing in this provision accords the Fed new power, nor does it confirm any preexisting power to deny master accounts to disfavored institutions. As described by the amendment's author, Senator Patrick Toomey, the provision simply demanded transparency in response to criticism about the Fed's opacity on master accounts. *See* J.A.542 (explaining, "[t]he purpose of the Amendment was understood by those involved in its drafting to relate exclusively to increasing transparency surrounding the master account application process,

and not to augment or otherwise comment on the substantive authority or discretion of the Board, or the regional Federal Reserve Banks … to approve or reject master account applications"). The provision sought to hold the Federal Reserve System "*more accountable . . .* not to opine on any preexisting authority Congress may have given." J.A.553–54.

Indeed, the plain language of the Toomey Amendment says nothing of the circumstances under which master account applications are properly rejected; it merely states that rejections must be recorded. There is no conflict between Section 248a's command that master accounts be accessible to *eligible depository institutions* (like Custodia) and the Toomey Amendment—much less the sort of "irreconcilable conflict" necessary for a finding that the Toomey Amendment modified Section 248a's access requirement by implication. *Posadas v. National City Bank of N.Y.*, 296 U.S. 497, 503 (1936).[22] The Toomey Amendment does not circumscribe Section 248a—either expressly or by implication.

The district court reached this exact conclusion at the motion to dismiss stage, holding Section "248c cannot be read as Congress's imprimatur on Federal Reserve Banks holding carte blanche to grant or deny master account

---

[22] Custodia does not dispute that master accounts may be denied to depository institutions that do not meet the statutory requirements of a master account application, including legal eligibility.

applications." J.A.612. It then reversed itself at the summary judgment stage with little explanation. J.A.1460–75. The district court had it right the first time and should not have reopened a question it had already resolved. *See Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) ("Law of the case doctrine . . . preclude[es] the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court.").

## II. Custodia should be granted access to a master account by writ of mandamus and pursuant to the APA

If Custodia and Judge Bacharach are correct that there *is* a clear duty to issue master accounts to eligible depository institutions like Custodia, the case should be remanded with instructions for the district court to enter an order compelling Defendants to rescind denial of Custodia's master account application and to grant the application. The Mandamus Statute, 28 U.S.C. § 1361, and the APA, 5 U.S.C. § 706, provide the requisite authority.

### A. Custodia is entitled to a writ of mandamus against FRBKC

The common-law writ of mandamus, codified in 28 U.S.C. § 1361, allows district courts by mandamus "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."[23] Because the MCA imposes a clear nondiscretionary duty to provide Custodia access to

---

[23] The district court had jurisdiction to issue mandamus relief pursuant to 12 U.S.C. §§ 632, 1331, 1361. *Supra* page 3.

a master account, "mandamus is appropriate" and "the court should compel performance, thus effectuating the congressional purpose." *Est. of Smith v. Heckler*, 747 F.2d 583, 591 (10th Cir. 1984). Indeed, FRBKC's motion for summary judgment did not dispute it could be subject to mandamus (under 28 U.S.C. § 1361); FRBKC argued only that issuance of master accounts is discretionary. *See, e.g.*, J.A.1216–39; J.A.1301–14. Any argument to the contrary is waived on appeal. *See United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. 2004).

Here, the right to mandamus relief against FRBKC is clear. That is because, irrespective of its agency status, FRBKC is at the very least an "entity . . . responsible for carrying out an official act or duty": deciding master account applications. *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 510 (4th Cir. 1999) (collecting cases where writ issued to entities—public *or private*—tasked with a "clear public duty"); *see also, e.g.*, *Heckler v. Ringer*, 466 U.S. 602, 616–17 (1984).[24] FRBKC's president is also an officer of the United States subject to the Court's mandamus power. J.A.430 ¶ 89.

---

[24] These decisions align with longstanding precedent recognizing that the mandamus statute merely codified the common-law writ without narrowing its scope. *Northern Pac. R.R. Co. v. Territory of Wash. ex rel. Dustin*, 142 U.S. 492, 499 (1892).

Custodia's request for mandamus relief is not, as Defendants claimed below,[25] duplicative of its APA claim. The claims are complementary. If the Court agrees with Defendants that the Board was not responsible for Custodia's denial and that FRBKC is not an agency subject to the APA, mandamus relief must lie against FRBKC for wrongfully denying Custodia's master account application: Custodia is entitled to mandamus relief insofar as it "lack[s] adequate alternative means" to obtain relief against Defendants. *Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 309 (1989) (ordering lower court to provide mandamus relief on remand where plaintiff had no alternative remedy available). This Court should reverse and remand for the district court to exercise mandamus jurisdiction and ensure Custodia receives a master account, as the MCA commands.

## B. The Board is subject to the APA and should be compelled to provide Custodia access to a master account

The Court should likewise grant relief against the Board.[26] Under the APA, "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review[.]" 5 U.S.C. § 702. The district court held the Board "is undisputedly a governmental agency," but it concluded there could be no

---

[25] J.A.453.

[26] If this Court grants mandamus relief against FRBKC, it need not—but still can—address the availability of relief against the Board.

judicial review under the APA, because there was no final agency action by the Board.  J.A.606.  This was error.

### 1.    The Board's permission for FRBKC to issue the denial letter was a final agency action under the APA

"[T]wo conditions must be satisfied for agency action to be 'final'" for APA purposes.  *Bennett v. Spear*, 520 U.S. 154, 177 (1997).  "First, the action must mark the consummation of the agency's decisionmaking process . . . [S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow[.]"  *Id.* at 177–78 (internal quotation marks and citations omitted).  Courts take a "pragmatic" approach to the question of finality under the APA.  *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016).  Applying that pragmatic approach, the Board email permitting FRBKC to deny Custodia's master account application, J.A.1102 (Board Approval Email), was final agency action.

1.    The Board Approval Email was the culmination of the Board's extensive orchestration of the denial of Custodia's master account application.

In that email, the Board's Director of the Division of Banking Operations and Payment Systems gave FRBKC's President the Board's approval to release the jointly-edited denial of Custodia's master account application.  J.A.1102.  The email laid out the process by which FRBKC was expected to—and in fact did—involve the Board in the decision to deny Custodia's master account

49

application.  The Board conveyed its "expect[ation]" (set forth in the Guidelines and S-letter) that Reserve Banks "consult" with Board staff and the Board's "policy establishing implementation procedures for the Guidelines (S-letter 2667)."  *Id.*  The email noted that Board staff reviewed FRBKC's "pre-decisional analysis of Custodia Bank's request for a master account and access to services."  *Id.*  The email expressed "no concerns" with FRBKC conveying the denial to Custodia.  *Id.*

Discovery revealed that, leading up to this ultimate approval, the Board was intimately involved in the master account decision.  Consistent with the Board's S-Letter requiring Reserve Banks to "consult" with Board staff regarding master account applications, FRBKC provided its recommendation memorandum for Board staff to review and edit.  J.A.1813; J.A.1931.  Senior FRBKC executives even sought to "buy some time" for the Board to get up to speed.  J.A.1356.  More than two dozen staff from four different Board divisions provided feedback on that memorandum, including tracked edits and comment bubbles.  J.A.1990 ¶ 79; J.A.1515–18 ¶¶ 52–56.  FRBKC then shared a revised version of its memorandum with the Board.  This version incorporated the Board's revisions, and FRBKC did not act until after the Board gave FRBKC the "go-ahead" to deny Custodia's master account application in the Board Approval Email.  J.A.1996 ¶ 96, 1518 ¶ 56, 1878, 1880, 1634 (transcript).

2.    The district court held that the Board Approval Email was not a final agency action for two reasons: (1) the email is not an "agency action;" and (2) the Board Approval Email constituted "only the Board of Governors' implementation decision pursuant to a broader agency plan." J.A.1458.  The district court was wrong on both counts.

*Agency action*.    Analogizing to an unpublished, non-precedential decision, *Cherry v. USDA*, 13 Fed. App'x 886 (10th Cir. 2001), the district court erroneously held that Custodia failed to meet its burden of identifying final agency action apparently because the Board Approval Email here "cannot be said to be an agency action as defined by § 551(13)."  J.A.1458.

For one thing, this Court and sister circuits have consistently held that agency letters can be final agency action.  *City of Colo. Springs v. Solis*, 589 F.3d 1121, 1131 (10th Cir. 2009) (Department of Labor letter); *Air One Helicopters, Inc. v. FAA*, 86 F.3d 880, 882 (9th Cir. 1996) (letter was final agency action when "there [wa]s no question it would be futile for [the plaintiff] to attempt to persuade the [agency] to change the position it clearly sets forth in the letter[]"); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436–37 (D.C. Cir. 1986) (letter was final agency action when it "gave no indication that it was subject to further agency consideration or possible modification").  It is well established that "[a] communication need not be formal to constitute a final

51

agency action." *Tulsa Airports Improvement Tr. v. FAA*, 839 F.3d 945, 949 (10th Cir. 2016).

For another, *Cherry* is inapplicable. The plaintiff there challenged an agency letter demanding he remove equipment from a millsite. *Cherry*, 13 Fed. App'x at 889. The letter "did not determine the validity of [the plaintiff's] millsite claim"—because the decision about whether the millsite owner had an approved plan in place had been "made long ago," 14 years earlier. *Id.* at 891. Here, by contrast, the Board Approval Email was the culmination of years of analysis, consultation, a meeting about Custodia with the Board's Vice Chair right before the first draft denial memo appeared, and revisions thereof by Board staff. It marked the consummation of the Board's conclusion that Custodia be denied a master account.

*Implementation decision.* The district court also erroneously concluded that the Board Approval Email was not final agency action because it was instead an "implementation decision" that carried out the broader agency plan provided in the Board's master account Guidelines. J.A.1458.

This holding fundamentally misstates this Court's precedent. The operative question is whether the action "constitute[s] a 'final disposition . . . in a matter,' rather than the implementation of a 'final disposition' already made." *Chem. Weapons Working Grp., Inc. (CWWG) v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997) (quoting 5 U.S.C. § 551(6) (ellipsis in

52

original)).  In *Chemical Weapons* (the case cited by the district court), for example, this Court held that the decision to destroy chemical weapons merely implemented an environmental impact statement promulgated years earlier that outlined the plan to destroy the weapons.  *Id.* at 1494–95.  Similarly in *Cherry*, the letter demanding the millsite owner to remove his equipment from the requested site implemented the earlier decisions denying his request.  13 Fed. App'x at 891.

Here, in contrast, the Board's Guidelines and S-letter were not prior decisions *on Custodia's application* but rather decisions about the review process of master applications writ large.  Adopting the district court's broad approach effectively insulates any master account application decision from APA review—including on master account applications yet to be submitted—by categorizing each as merely implementing the Board's general guidance for application review.  This has no basis in this Court's precedent.  Applying the Supreme Court's "pragmatic" approach, *Hawkes Co.*, 578 U.S. at 599, the Board Approval Email was final agency action, and the Board is not insulated from APA review.

   2. **Custodia is entitled to relief under the APA or, at the very least, a remand to resolve the question of disputed fact of the Board's involvement**

Because the Board engaged in final agency action and its decision to deny Custodia's master account application violated its clear statutory duty under

Section 248a, the district court erred by not setting aside the Board's decision. This Court should reverse and remand for the district court to grant Custodia relief under the APA. However, to the extent this Court disagrees that the Board Approval Email constituted final agency action, the dispute over who controlled the Custodia master account process "is a question of fact" (as the district court recognized) that should be remanded to a factfinder. J.A.1462. The district court held that "the limited areas of disputed facts are not material to the determinations in this case." J.A.1454. That was error.

Discovery revealed that the Board was intimately involved in the process of denying Custodia's master account, and that the decision did not lie solely with FRBKC. *See supra* pages 16–17. At the very least, there is a genuine dispute of fact as to the extent of the Board's involvement and whether the Board indeed dictated the decision to deny Custodia's master account application.

To the extent this Court concludes that the Board did not engage in final agency action and that there is no disputed fact as to the Board's involvement, mandamus relief is available against the Board. Section 248a requires the Board to provide access to master accounts to eligible depository institutions like Custodia. *Supra* Part I. Should this Court agree that the Board's involvement in Custodia's master account application process was not final agency action, Custodia would have no "avenue[] of relief" despite the Board

54

owing "a clear nondiscretionary duty." *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995) (quotation marks omitted).

### C.    The Defendants cannot circumvent judicial review

The unique nature of the Federal Reserve System cannot insulate the Board or the Reserve Banks from judicial review of orders denying master account applications.  The Board established master accounts to consolidate the various accounts in a single (master) account at a designated Reserve Bank.  *Interstate Branching: New Account Structure*.  Access to that account serves as the gateway to Fed services.  *See Fourth Corner*, 861 F.3d at 1068–69 (Bacharach, J.) ("[A]ll services offered by the Federal Reserve System are conditioned on the issuance of master accounts").  That, however, does not absolve the Board of Congress's mandate in Section 248a(c)(2).

Agencies cannot insulate themselves from judicial review by delegating statutory mandates to "federal instrumentalities" they claim "stand apart from the government."  J.A.173.  As the Supreme Court reminded us this term, "a government official cannot do indirectly what she is barred from doing directly."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316, 1328 (2024).  The Board cannot circumvent a statutory requirement by outsourcing gatekeeping to the Reserve Banks.

Beyond statutory impropriety, such delegation to Reserve Banks has constitutional consequences.  If the Board is correct that final decisionmaking

authority to deny master account applications indeed lies with Reserve Banks (and not with the Board), such delegation is improper under the Appointments and the Due Process Clauses of the Constitution. U.S. Const. art. II, § 2, cl. 2; U.S. Const. amend. V. The adjudication of master account applications is an exercise of "significant authority pursuant to the laws of the United States" that only an "Officer of the United States," properly appointed under the Appointments Clause, may hold. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). The Board cannot delegate this task to the Reserve Banks, whose boards are comprised primarily of members of the public and stockholding banks.[27] Delegation of such "significant" "degree of authority" is "inconsistent with the classifications of lesser functionaries or employees." *Bandimere v. SEC*, 844 F.3d 1168, 1175 (10th Cir. 2016) (quoting *Freytag v. Commissioner*, 501 U.S. 868, 881 (1991) (internal quotation marks omitted)).

Reliance on the unique nature of the Federal Reserve System to shield master account decisions from judicial review raises serious due process problems. The Supreme Court has long since recognized "handing off regulatory power to a private entity is 'legislative delegation in its most obnoxious form.'" *Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015)

---

[27] FRBKC's board consists of three members "chosen and representative of the stockholding banks," three members who "represent the public," and three members designated by the Board. 12 U.S.C. § 302.

(Alito, J., concurring) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)).  "[C]onfer[ring] such power undertakes an intolerable and unconstitutional interference with personal liberty and private property" and thus operates as a "clear[] … denial of rights safeguarded by the due process clause of the Fifth Amendment."  *Carter*, 298 U.S. at 311.  If the Board is correct that it indeed handed the decision regarding who can access the services identified in Section 248a to the Reserve Banks, such delegation of regulatory power to an "economically self-interested entity" like FRBKC (comprised of representatives of banks with economic interests potentially in conflict with those entities seeking master accounts) is impermissible under the Due Process Clause.  *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 27 (D.C. Cir. 2016).

## D.    Custodia is entitled to declaratory relief

Custodia established it is entitled to relief under the APA and mandamus given the Board's and FRBKC's failure to adhere to the MCA's statutory mandate.  Custodia is therefore entitled to relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

## <u>CONCLUSION</u>

The decision below should be reversed, and the Court should order that Custodia's application for a master account be granted.

## STATEMENT REGARDING ORAL ARGUMENT

Custodia requests oral argument because this case raises precedent-setting questions as to the dual-banking system and the Fed's authority to discriminate against certain state-chartered banks through the master account application process.

Respectfully submitted,

JENNER & BLOCK, LLP

Dated: June 26, 2024

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

By: */s/ Michelle S. Kallen*

Michelle S. Kallen
Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Avenue NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

*Counsel for Appellant*

58

<u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,651 words. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) and 10th Cir. R. 32(A), because it was prepared in a proportionally spaced typeface using Microsoft Word in Century font size 13.

/s/ *Michelle S. Kallen*
Michelle S. Kallen

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

---

CUSTODIA BANK, INC.,

      Plaintiff,

   v.

FEDERAL RESERVE BOARD OF
GOVERNORS, and FEDERAL RESERVE
BANK OF KANSAS CITY,

      Defendants.

Case No. 22-CV-125-SWS

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' 12(b)(6) MOTIONS TO DISMISS

---

This matter comes before the Court on Defendants' motions to dismiss (ECF 48, 50). Plaintiff filed a consolidated opposition to both motions (ECF 58), and Defendants replied (ECF 96, 97). Plaintiff supplemented its opposition (ECF 98), and Defendant Board of Governors responded to the supplement (ECF 99). The Court has also reviewed and considered the amici briefs from the State of Wyoming (ECF 88), State Senator Rothfuss and State Representative Olsen (ECF 89), and Members of the U.S. Senate Banking Committee and U.S. House of Representatives Financial Services Committee (ECF 92), all of which oppose Defendants' motions to dismiss. The Court heard arguments from counsel on October 28, 2022. (ECF 100.) Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court determines the motions to dismiss must be granted in part and denied in part.

## BACKGROUND

Plaintiff Custodia Bank is a Wyoming depository institution that is unlike a traditional bank because it is "designed to provide custody services for digital assets such as Bitcoin via their trust departments" and "provide a bridge connecting digital asset companies to the U.S. payments system," which would allow, for example, a Custodia customer to use a cryptocurrency like Bitcoin "to make a direct transfer, a purchase, or an investment, rather than having to first convert the" cryptocurrency into U.S. Dollars. (Compl. (ECF 1) ¶ 29.)   Custodia is state-chartered as a Special Purpose Depository Institution (SPDI), a unique-to-Wyoming financial institution intended to facilitate cryptocurrency banking that is prohibited from making loans.  (Compl. ¶ 28.)  It is also chartered to allow the traditional banking service of U.S. Dollar deposit-taking.  (*Id.* ¶ 4.) As a state-chartered institution, it is subject to Wyoming's banking regulatory system and is not required to be insured by the Federal Deposit Insurance Corporation (FDIC).  (*Id.* ¶¶ 2, 18, 23, 26.)  In August 2021, Custodia also applied to Defendant Federal Reserve Board of Governors for membership in the Federal Reserve, which would subject Custodia to oversight and regulation by the Federal Reserve Board (in addition to the state's banking regulatory system).  (*Id.* ¶¶ 4, 24.)

On October 29, 2020, Custodia applied to Defendant Federal Reserve Bank of Kansas City (FRBKC) to obtain a Federal Reserve "master account," which is "put simply, a bank account for banks" that "gives deposit institutions access to the Federal Reserve System's services, including its electronic payments system." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).

A.2

"Without such access, a depository institution is nothing more than a vault."  *Id.* at 1053

(Moritz, J.) (internal quotation marks omitted).

> The master account is both a record of financial transactions that reflects the
> financial rights and obligations of an account holder and the Reserve Bank
> with respect to each other, and the place where opening and closing balances
> are determined.  For each institution, all credits and debits resulting from the
> use of Federal Reserve services at any Federal Reserve office are booked to
> this single master account at one Reserve Bank.

*Id.* at 1064 n.1 (Bacharach, J.).  A master account also enables its holder to access various

services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including

wire transfer services, automated clearinghouse services, settlement services, securities

safekeeping, and Federal Reserve float services.  Except for certain unique circumstances,

any financial institution can have only one master account with its Federal Reserve Bank.

Custodia asserts, "Direct access to the Federal Reserve is vital to Custodia's ability

to operate effectively and efficiently in pursuit of its core mission to offer a secure,

compliant bridge between digital assets and the United States dollar payment system."

(Compl. ¶ 3.)  Custodia currently accesses the Federal Reserve through an intermediary

("correspondent") bank that has a master account, but this arrangement "is much costlier

and introduces counterparty credit risk and settlement risk that would" be avoided with its

own master account.  (*Id.* ¶ 8.)  A master account "would allow Custodia to access directly

the Federal Reserve, sharply reduce its costs, and bring new products and options to users

of financial services."  (*Id.* ¶ 3.)

Now two years later, FRBKC has yet to grant or deny Custodia's application for a

master account.   Custodia alleges, "Upon information and belief, the [FRBKC's]

consideration and impending approval of Custodia's application was derailed when, in spring 2021, the [Defendant Federal Reserve Board of Governors] asserted control over the decision-making process." (Compl. ¶ 6.) Custodia sues for an order compelling Defendants to "promptly decide" the application. (*Id.* ¶ 81.) Alternatively, Custodia also says that if FRBKC denies the application, the Court should "issue a writ of mandamus" ordering Defendants to grant the application. (*Id.* ¶ 130.) Defendants have moved to dismiss Custodia's complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6), asserting Custodia has failed to state any claim on which the Court can grant relief.

## STANDARD FOR 12(b)(6) MOTION TO DISMISS

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, assumed to be true, must "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In the context of a 12(b)(6) motion to dismiss, this plausibility standard requires the plaintiff to plead facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts the nonmoving party's well-pled factual allegations as true and construes them in the light most favorable to the nonmoving party, but it is not bound to accept an asserted legal conclusion as true. *Hall v.*

*Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991); *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

The Court starts with Custodia's primary causes of action before moving to its alternative claims.

**1.**   **Claim I - Violation of Administrative Procedure Act (APA) for Unreasonable Delay of Agency Action**

In its first claim for relief, Custodia contends the Administrative Procedures Act (APA) allows it to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and Defendants have unlawfully withheld or unreasonably delayed the decision on Custodia's application for a master account.  (Compl. ¶¶ 61-81.)  Defendant FRBKC argues it is not an "agency" for purposes of the APA, but even if it was, Custodia has not suffered an "unreasonable delay" under the APA.  (ECF 51 pp. 25-32.[1])  Defendant Federal Reserve Board of Governors argues that while it is an "agency" for APA purposes, it is not the entity that decides Custodia's application and Custodia has not suffered an unreasonable delay under the APA.  (ECF 49 pp. 32-41.)

**1.1**   **Whether FRBKC is an Agency Subject to the APA**

The APA defines an agency, with certain exceptions not applicable here, as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."  5 U.S.C. § 551(1); 5 U.S.C. 701(b)(1).  Simply put, the law is

---

[1]  Pinpoint citations to documents in the court record are to the page number assigned by the CM/ECF system at the top of each page rather than the page number assigned by counsel at the bottom of the pages.

currently unsettled on whether a Federal Reserve Bank is an "agency" for APA purposes. Neither the Tenth Circuit nor the U.S. Supreme Court have decided the question, and other federal district courts are divided on the matter.  For example:

- *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 154 F. Supp. 3d 1185, 1187 (D. Colo. 2016) ("Despite its name, the Bank is not a federal agency. Rather, it is a private corporation created by an Act of Congress and run by its own board of directors."), *reversed and remanded with instructions on other grounds*, 861 F.3d 1052 (10th Cir. 2017).

- *Lee Const. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165, 179 (D. Md. 1982) ("All in all, while the issue is a close one, it would seem that a consideration of each and every one of the relevant factors tips the balance in favor of holding that the Bank is an 'agency' for purposes of judicial review under the APA.  For the most part, that conclusion comports with the decisions of other Courts which have held that Federal Reserve Banks are agencies or instrumentalities of the United States for other purposes.")

- *Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chicago*, 583 F. Supp. 674, 678 (N.D. Ga.) ("There can be no doubt that the Federal Reserve Bank of Chicago is an 'authority' of the government of the United States. As a member bank of the Federal Reserve System, it performs important governmental functions and exercises powers entrusted to it by the United States government.  [Collecting cases.]  Because the Bank is an authority of the United States government and is not listed among the exclusions of section 551, the Court determines that the Bank is an agency subject to review of its action under the Administrative Procedure Act.  How the Bank can contend otherwise in good faith escapes the Court."), *vacated sub nom. Flight Int'l, Inc. v. Fed. Rsrv. Bank of Chicago*, 597 F. Supp. 462 (N.D. Ga. 1984) (expressly stating the prior opinion carries no precedential value).

There is no controlling precedent and precious little persuasive authority on the question in the Tenth Circuit.  Moreover, the "law on the simple question of what is an agency is quite complex."  *McKinney v. Caldera*, 141 F. Supp. 2d 25, 31 (D.D.C. 2001).

But in *Lee Const. Co.*, the District of Maryland persuasively concluded that to determine whether the Federal Reserve Banks were APA agencies, it would be necessary for a court "to review the organizational structure of Federal Reserve Banks and their

**A.6**

function within the Federal Reserve System in order to determine whether or not such Banks possess sufficient indicia of 'agency' status to be considered agencies for purposes of the APA." *Lee Const. Co.*, 558 F. Supp. at 176; *see New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010) ("courts have emphasized 'the need to examine the structure, function, and mandate' of the entity in question in determining whether it falls within the definition set out in the APA") (quoting *McKinney*, 141 F. Supp. 2d at 33). This Court agrees those factors, and others, weigh on the decision of whether FRBKC is an "agency" for APA purposes. However, that level of information and detail is not part of the record at this stage of the proceedings. At this point, the Court is confident in stating FRBKC exercises, at the least, quasi-agency functions that may render it subject to the APA, but a definitive decision on the matter must wait for further factual development addressing the various factors the Court will have to examine to determine whether FRBKC is a federal agency for APA purposes. For now, the Court has little trouble concluding that, accepting the allegations of the complaint as true and construing them in the light most favorable to the non-moving party, Custodia has stated a plausible claim that FRBKC is subject to the APA.

### 1.2    Whether the Board of Governors is a Proper Defendant

The Board of Governors contends the decision on Custodia's master account application rests with FRBKC. Custodia asserts, "Upon information and belief, [FRBKC's] consideration and impending approval of Custodia's application was derailed when, in spring 2021, the Board [of Governors] asserted control over the decision-making process." (Compl. ¶ 6.) While this allegation is made "upon information and belief," the

plausibility standard of 12(b)(6) "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citations omitted).  Here, several factors combine to make it reasonable to infer the Board of Governors has involved itself in some manner to interfere with or delay Custodia's application:

(1)   More than a year and a half has passed since "Tara Humston, [FRBKC's] head of Supervision and Risk Management, informed Custodia that there were 'no showstoppers' with its master account application." (Compl. ¶ 36.)

(2)   FRBKC confirmed in a January 2022 letter "that Custodia meets the legal eligibility requirements for receiving a master account."  (*Id.*; *see also* Compl. ¶ 43.)

(3)   In a March 2022 meeting (i.e., after FRBKC asserted there were "no showstoppers" and confirmed Custodia was legally eligible for a master account), FRBKC then "informed Custodia that it had not started processing Custodia's master account application." (Compl. ¶ 40.)

*See also* 12 U.S.C. § 248 (setting forth the broad authority of the Board of Governors to oversee and supervise the Federal Reserve Banks).

Custodia has plausibly alleged the Board of Governors has participated in or interfered with the consideration and decision of Custodia's master account application.

**1.3** **Whether Custodia has Stated a Plausible Claim of Unreasonably Delayed Agency Action**

Knowing that the Board of Governors is an agency subject to the APA and accepting for purposes of this Order that FRBKC is likewise, the next question is whether Custodia has stated a plausible claim of unreasonable delay under the APA against the Defendants. This inquiry breaks down into multiple sub-inquiries.

**1.3.1** **A one-year statutory deadline does not apply to deciding Custodia's master account application, but such decision can still be "unreasonably delayed" under the APA.**

Custodia contends a one-year statutory deadline from 12 U.S.C. § 4807(a) applies to its master account application, which the Defendants have exceeded.  (Compl. ¶¶ 6, 46, 74, 87, 107.)  Defendants argue § 4807 does not apply, and therefore Custodia cannot state a claim for unreasonable delay under the APA.

Section 4807 provides:

(a)    In general: Each Federal banking agency shall take final action on any application to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency.

(b)    Waiver by applicant authorized: Any person submitting an application to a Federal banking agency may waive the applicability of subsection (a) with respect to such application at any time.

12 U.S.C. § 4807.  Section 4801(1) says the term "Federal banking agencies" has the definition given to it by 12 U.S.C. § 1813.  And § 1813 says "Federal banking agency" means "the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, or the Federal Deposit Insurance Corporation."  12 U.S.C. § 1813(z).  It does not include a Federal Reserve Bank as a "Federal banking agency."

Here, it is undisputed that Custodia submitted its application to FRBKC, not to one of the "Federal banking agencies" identified in 12 U.S.C. § 1813(z). Accordingly, Custodia's application for a master account submitted to FRBKC is not bound by the one-year limitation of § 4807(a). Custodia's arguments that Federal Reserve Banks must be inherently included as "Federal banking agencies" is unpersuasive and would require the Court to read words into § 4801 or § 1813(z) that do not exist, which the Court may not do. Chapter 48 of Title 12 was codified as part of the Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103-325, 108 Stat. 2160 ("Riegle Act"), and when it was passed, Congress certainly knew what Federal Reserve Banks were and could have included them in the definition of "Federal banking agencies" as part of § 4801 if it wanted to. Indeed, it referenced "Federal reserve bank" several times in other parts of the Riegle Act. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009). Custodia's assertion that deciding its master account application is subject to the one-year limitation of § 4807(a) is legally unsustainable and fails to state a claim on which relief can be granted.

Nonetheless, again presuming the application of the APA to this issue for now, the decision may be subject to a "reasonable time" deadline; the expiration of a concrete statutory deadline is not necessary for agency action to be unreasonably delayed. "[I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions—such as the APA's general admonition that

agencies conclude matters presented to them 'within a reasonable time,' *see* 5 U.S.C. § 555(b)—a court must compel only action that is delayed unreasonably." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999).  Section 555(b) provides, "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b); *see also Telecomm. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("section 706(1) coupled with section 555(b) does indicate a congressional view that agencies should act within reasonable time frames").  Under this "within a reasonable time" standard, it rests in the Court's "discretion to decide whether agency delay is unreasonable." *Forest Guardians*, 174 F.3d at 1190.

Custodia has stated a plausible claim of unreasonable delay that survives dismissal. Specifically, the "Master Account Agreement" completed by Custodia and submitted to FRBKC notes that "[p]rocessing may take 5-7 business days.  Please contact the Federal Reserve Bank to confirm the date that the master account will be established." (ECF 1-2.) This suggests that a standard financial institution can expect a decision on their master account application in a matter of days, whereas Custodia's application has been pending for two years.  Further, Custodia alleges in its complaint, "In early 2021, a representative of [FRBKC] moreover informed Custodia there were 'no showstoppers' with Custodia's application" (Compl. ¶¶ 5, 36), thus suggesting the application had been considered and was on track to be granted.  Custodia also alleges FRBKC confirmed in a January 2021 letter that Custodia was legally eligible for a master account.  (*Id.* ¶¶ 36, 43.)  After all that, FRBKC then informed Custodia in March 2022 that it had not even started processing the

**A.11**

master account application (which may or may not have occurred due to the Board of Governors' involvement).  (*Id.* ¶ 40.)  Considered together, the Court has little difficulty concluding Custodia has asserted a plausible cause of action for unreasonable delay against both Defendants.

### 1.3.2  Only legally-required action can be compelled under the law, and Custodia has stated a plausible claim to compel legally-required action.

"[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).  The Defendants argue that issuing a master account is discretionary and, therefore, cannot be compelled.  This issue, too, is unsettled in the law and, at least at this juncture, the Court concludes Custodia has stated a legally valid claim to relief.

The Defendants contend FRBKC has complete discretion to issue or deny a master account pursuant to 12 U.S.C. § 342, which says in part:

> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, … deposits of current funds in lawful money, national-bank notes, Federal reserve notes, [etc.].

Section 342 is located in Subchapter IX of Chapter 3 of Title 12 of the U.S.C.  Subchapter IX is titled, "Powers and Duties of Federal Reserve Banks."  To effectuate this deposit-taking function, Federal Reserve Banks use the master account to keep a record of each institution's debits and credits.  No provision of the Federal Reserve Act, including § 342, "imposes upon reserve banks any obligation to receive" deposits.  *Farmers' & Merchants'*

**A.12**

*Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923). "The act merely confers authority to do so." *Id.*

The Defendants contend the discretion to receive or reject deposits necessarily carries with the discretion to grant or deny master accounts. (ECF 51 p. 33; ECF 49 pp. 32-35.) This argument presents as logical and may yet carry the day, but at least one judge of the Tenth Circuit has disagreed in a published opinion.

In *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), Judge Bacharach determined 12 U.S.C. § 248a requires Federal Reserve Banks to issue master accounts to eligible depository institutions that apply. That section (part of the Depository Institutions Deregulation and Monetary Control Act of 1980), says in part:

**(a)  Publication of Pricing Principles and Proposed Schedule of Fees; Effective Date of Schedule of Fees.**
Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.
…
**(c)  Criteria applicable.**
The schedule of fees prescribed pursuant to this section shall be based on the following principles:
> …
> (2)  All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. § 248a(a), (c)(2).  Judge Bacharach concluded the only way the "Federal Reserve

bank services covered by the fee schedule" can be made available to nonmember

depository institutions is by granting them a master account.  *See Fourth Corner*, 861 F.3d

at 1071 (Bacharach, J.) ("The plain text of § 248a(c)(2) indicates that nonmember

depository institutions are entitled to purchase services from Federal Reserve Banks.  To

purchase these services, a master account is required.  Thus, nonmember depository

institutions, such as Fourth Corner, are entitled to master accounts.").  In distinguishing §

342 from § 248a, Judge Bacharach opined:

> Section 342 addresses the types of monetary instruments that Federal
> Reserve Banks may receive for deposit or collection….  But § 342 does not
> address which institutions can access Federal Reserve services; that subject
> is governed instead by § 248a(c)(2), which establishes open access to Federal
> Reserve services for all nonmember depository institutions.  As a result, §
> 342 does not affect Fourth Corner's entitlement to a master account.

*Fourth Corner*, 861 F.3d at 1074.  That is, he agreed § 342 affords to a Federal Reserve

Bank the discretion to take or refuse deposits, but concluded such discretion was separate

and apart from the issuance of master accounts.  *See id.* at 1073-74 ("But this discretion

does not encompass the issuance of master accounts."); *see also* Mot. Dismiss Hr'g Tr.

31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of

funds with Federal Reserve Banks and the services of § 248a are distinct), 57:7-58:9 (ECF

101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over

deposit-taking even after a master account is opened).

The Defendants spill much ink explaining why Judge Bacharach's opinion in *Fourth

Corner* cannot win the day in this case.  (ECF 49 pp. 37-41; ECF 51 pp. 33-36.)  They

**A.14**

point out *Fourth Corner* was a three-way split decision between the three-judge panel, and Judge Bacharach was effectively the odd man out as he voted to reverse the dismissal of the complaint while the other two judges voted to uphold the dismissal. *See Fourth Corner*, 861 F.3d at 1053. All true. Nonetheless, it's worth noting that the other two judges did not reach the merits of the § 248a versus § 342 statutory interpretation question (because they found dismissal warranted), so we don't currently know if they would have seen it the same as Judge Bacharach or not.

The Defendants also note that Section 248a is found in Subchapter II of Chapter 3 of Title 12, and Subchapter II is titled "Board of Governors of the Federal Reserve System." Indeed, § 248 begins, "The Board of Governors of the Federal Reserve System shall be authorized and empowered: [list of duties]." 12 U.S.C. § 248. Thus, Judge Bacharach appears convinced that Congress effectively mandated Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions that apply in a Subchapter that sets forth the duties of a completely different entity (the Board of Governors). The Court agrees it appears a strange place for Congress to stick such a requirement that would seemingly govern the Federal Reserve Banks. Of course, the title of a statute, along with the title of the subchapter the statute resides in, might matter only if the Court first determines the statute is ambiguous, and even then it might matter only very little. "[U]nder the general rules of statutory interpretation, the title to a statutory provision is not part of the law itself, although it can be used to interpret an ambiguous statute." *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 n.4 (10th Cir. 1998) (quoting *Johnston v. Commissioner of Internal Revenue*, 114 F.3d 145, 150 (10th Cir. 1997), and giving "little

weight" to the title of the Americans With Disabilities Act); *see Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 529 (1947) ("For interpretative purposes, [statutory headings and titles] are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain."). Thus, the title of Subchapter II and the location of § 248a within the statutory code likely offer relatively little toward refuting Judge Bacharach's opinion.

To cut short what could become an unnecessarily long recap of the Defendants' objections to Judge Bacharach's opinion in *Fourth Corner*, the Court concludes Custodia has stated a plausible claim to compel legally-required action for two reasons. First, Judge Bacharach's opinion may plausibly be the law on this matter in this case. *See* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with a Federal Reserve Bank and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

Second, and more immediately significant, a full statutory interpretation of the matter is better left for another day. In this particular case, the facts alleged by Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a) in granting Custodia's master account application. For example, if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little because it may be that FRBKC

failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes, as Custodia has plausibly suggested). Thus, because the development of facts underlying or refuting certain allegations may prove particularly relevant to any statutory interpretation of § 342 versus § 248, the Court will not undertake a complete analysis at this stage of the proceedings without further development of those facts.

The Defendants' requests to dismiss Custodia's "Claim for Relief I - Violation of APA, 5 U.S.C. § 706(a) Claim for Unreasonable Delay of Agency Action Against All Defendants" will be denied.

**2.**    **Claim II - Compel Action under the Mandamus Act**

Custodia's second cause of action seeks a writ of mandamus compelling action from the Defendants under 28 U.S.C. § 1361, which provides:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

"Mandamus is the traditional writ designed to compel government officers to perform nondiscretionary duties." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005). In a mandamus action, the Court should

> measure the allegations in the complaint against the statutory and constitutional framework to determine whether the particular official actions complained of fall within the scope of the discretion which Congress accorded the administrators.... In other words, even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated.

A.17

*Carpet, Linoleum & Resilient Tile Layers, Loc. Union No. 419, Bhd. of Painters & Allied Trades, AFL-CIO v. Brown*, 656 F.2d 564, 566 (10th Cir. 1981) (quoting *Davis Associates, Inc. v. Sec., Dep't of Housing and Urban Development*, 498 F.2d 385, 389 & n.5 (1st Cir. 1974)).

Under Judge Bacharach's view in *Fourth Corner*, Custodia has stated a claim of both unreasonable delay of a decision on its master account application and legal entitlement to a master account. Therefore, the Court finds Custodia's request for mandamus relief should not be dismissed. In short, "there may well exist statutory or regulatory standards delimiting the scope or manner in which" the Defendants may exercise their discretion (if any) over Custodia's master account application, and assuming the truth of Custodia's allegations, those standards may have been ignored or violated in this case. That is, applying Judge Bacharach's reasoning, Custodia has plausibly alleged the Defendants have "failed to discharge a duty owed to plaintiffs which Congress has directed them to perform." *Carpet, Linoleum & Resilient Tile Layers, etc. v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981).

Custodia's claim for mandamus relief plausibly functions in a complementary fashion to § 706(1) of the APA, which allows the Court to compel agency action that is unlawfully withheld or unreasonably delayed. Additionally, Custodia's claim for mandamus relief plausibly functions as an alternative claim to its APA claim as it relates to FRBKC, if the Court ultimately determines FRBKC is not an agency for APA purposes (as FRBKC currently asserts).

**A.18**

After having found Custodia stated a plausible claim for relief under the APA against both Defendants, it finds Custodia's claim for mandamus relief is also plausible and should not be dismissed.

**3.     Claim III (in part) - Violation of Due Process Based on Entitlement to Master Account and Unreasonable Delay**

As part of its third claim, Custodia contends it has been denied due process because it has a legal entitlement to and property interest in a master account.  The Defendants disagree and argue Custodia cannot prevail on a due process claim as a matter of law because it lacks a property interest in a master account.  (ECF 51 pp. 41-42; ECF 49 p. 48.)

"[T]o prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest."  *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007) (quoting *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000)).  "An individual has a property interest in a benefit for purposes of due process protection only if he has a 'legitimate claim of entitlement' to the benefit, as opposed to a mere 'abstract need or desire' or 'unilateral expectation.'"  *Id.* at 1078-79 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  The Court determined above that if Judge Bacharach's opinion in *Fourth Corner* is a correct interpretation of the law, then Custodia appears entitled to a master account under 12 U.S.C. § 248a.

Therefore, at this early stage of the proceedings, Custodia has plausibly alleged a legitimate claim of entitlement to a master account sufficient to support a due process claim.  Similarly, because Custodia has plausibly alleged an unreasonable-delay claim

**A.19**

under the APA, it has stated a sufficient due process claim.  (*See* Compl. ¶ 100; ECF 49 pp. 4-50.)

**4.** **Claim III (in part) - Violation of Separation of Powers (Nondelegable Doctrine)**

Also within its third cause of action, Custodia contends that if Defendants' claim is true that the Federal Reserve Banks have unbounded and unreviewable discretion under 12 U.S.C. § 342 to issue or deny master accounts, then Congress violated the nondelegation doctrine (separation of powers) by delegating its legislative power to the Federal Reserve Banks with no guidance ("intelligent principles").  Article I of the U.S. Constitution begins, "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).  That is, the people's representatives in Congress must make the law rather than delegate that power to the executive or judicial branches.  The U.S. Supreme Court has long "recognized, however, that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  In particular, Congress "may confer substantial discretion on executive agencies to implement and enforce the laws."  *Gundy*, 139 S. Ct. at 2123 (citing *Mistretta*, 488 U.S. at 372).  "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'"  *Id.* (quoting *Mistretta*, 488 U.S. at 372).

Because the nondelegation doctrine bars Congress from delegating "powers which are strictly and exclusively legislative," *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825), to the other Branches, it's not uncommon for a court facing a delegation challenge to first ask "whether the statute has delegated legislative power to the agency." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001). "Whether the statute delegates legislative power is a question for the courts[.]" *Id.* at 473. The Defendants argue a decision on a master account application is not the exercise of legislative authority. (ECF 51 pp. 42-43; ECF 49 pp. 52-54.)

Black's Law Dictionary defines "legislative power" as "[t]he power to make laws and to alter them." *Legislative Power*, <u>Black's Law Dictionary</u> (11th ed. 2019); *see Gundy*, 139 S. Ct. 2116, 2133 (Gorsuch, J., dissenting) ("When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'") (footnotes omitted). Similarly, "legislation" is "[t]he process of making or enacting a positive law in written form." *Legislation*, <u>Black's Law Dictionary</u> (11th ed. 2019); *see Loving v. United States*, 517 U.S. 748, 758 (1996) ("the lawmaking function belongs to Congress").

The Court starts where Custodia's Claim III starts—presuming the Defendants' interpretation of § 342 is correct for purposes of this discussion. Even with such a presumption, the boundless discretion to grant or deny a master account application is not "legislative power." Decisions on master account applications do not involve lawmaking

or rulemaking or enacting generally applicable regulations. Under Defendants'
interpretation of § 342, Congress has passed a law instructing Federal Reserve Banks they
may grant or deny master applications as they see fit, and granting or denying master
applications, even with unbridled discretion, is not legislative action. It simply does not
result in the passage of a generally applicable pronouncement governing future actions.
*See United States v. Hutchinson*, 573 F.3d 1011, 1032 n.4 (10th Cir. 2009) ("Additionally,
he claims that 21 U.S.C. § 851(a), the statute that allows the prosecutor to establish a prior
conviction by information, violates the constitutional doctrine prohibiting the delegation
of legislative power because it does not prescribe an 'intelligible principle' for the
executive to follow in deciding whether to seek a sentencing enhancement on this basis.
But allowing prosecutors discretion to seek (or not seek) sentencing enhancements involves
no delegation of *legislative* power: such a decision is an exercise of the prerogative power
committed to the *executive* department, and is no different than the discretion possessed by
prosecutors to bring (or not bring) criminal charges in the first instance.") (internal citations
omitted). Therefore, Congress cannot be said to have trespassed upon the nondelegation
doctrine by enacting § 342 because the decision on a master account application is not a
legislative function.

Custodia has not set forth a plausible separation-of-powers claim based on violation
of the nondelegation doctrine, and this claim must be dismissed under Rule 12(b)(6).

**5.      Claim IV - Declaratory Judgment Based on Unreasonable Delay**

In its fourth claim for relief, Custodia seeks a judgment declaring the Board of
Governors "and/or" FRBKC "must decide Custodia's master account application within a

reasonable period of time." (Compl. ¶ 109.) FRBKC accurately argues the Declaratory Judgment Act provides a remedy for valid federal causes of action and does not offer a separate cause of action. (ECF 51 p. 47); *see Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022) (unpublished) ("the Declaratory Judgment Act does not provide an independent federal cause of action") (citing *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671–74 (1950)). "To maintain an action for a declaratory judgment, then, [Custodia] must assert a valid federal cause of action—one that exists independent of any request for declaratory relief." *Nero*, 2002 WL 14423872, at *2. As the Court determined above Custodia has asserted plausible claims of unreasonable delay under the APA and the Mandamus Act, its action for a declaration that a master account application must be decided within a reasonable period of time is valid.

Therefore, while Custodia's claim for declaratory judgment is not properly understood as a stand-alone cause of action (and cannot truly be an "alternative" to Claims I and II, despite Custodia's pleading), it is a viable request for relief that will not be dismissed at this time.

**6.    Claim V - Violation of Due Process Based on Decision-Making by Interested Parties (Bias)**

Next, Custodia asserts that FRBKC's Board of Directors is comprised of officials from other banks who "are or may be competitors with all other banks requesting master accounts." (Compl. ¶ 114.) Custodia says:

> To the extent that [FRBKC's] Board of directors finally adjudicates the rights of would-be competitors like Custodia, the current master application review regime works "an intolerable and unconstitutional interference with personal

liberty and private property" by vesting "self-interested" actors with "regulatory authority over [their] rivals."

(Compl. ¶ 115 (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), and *Assoc. of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 27 (D.C. Cir. 2016)).

The Defendants assert the decision on a master account application is made by the president of FRBKC, not its Board of Directors.  (ECF 49 p. 50; ECF 51 p. 44.)  Custodia's factual allegations agree.  Custodia alleges that after learning in March 2022 that FRBKC had allegedly not started processing Custodia's master account application (despite it being almost a year-and-a-half old at that point), Custodia sent a letter to FRBKC's president, Esther George, in which it "urged Ms. George to consider Custodia's application." (Compl. ¶¶ 40-41.)  Custodia has not alleged Ms. George is biased against it or is an official from a competing bank.  Statutory law precludes six of the nine FRBKC directors from being officers, directors, or employees of any bank.  *See* 12 U.S.C. § 303.  These six directors are the Class B and Class C directors.  *See id.*  More importantly, these six Class B and Class C directors select FRBKC's president (having selected Ms. George as relevant here), with the approval of the Board of Governors.  12 U.S.C. § 341.  Thus, six non-officers, non-directors, and non-employees of any bank chose Ms. George to be FRBKC's president, and it is Ms. George (who is not alleged to be biased or Custodia's competitor) who the complaint's well-pled allegations plausibly suggest is to make the decision on Custodia's master account application.

Moreover, even if FRBKC's Board of Directors was making the decision on Custodia's master account application, two-thirds of the directors (the Class B directors

and the Class C directors) are not potential competitors of Custodia (because they are not officers, directors, or employees of a bank).

Custodia has not stated a plausible claim of violation of due process based on bias or regulation by a competitor.  This cause of action is not tethered to the relevant factual allegations or the statutory law.  Accordingly, it will be dismissed under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

## 7.    <u>Claim VI - Violation of the Appointments Clause</u>

In its sixth cause of action, which it identifies as an alternative claim to Claims I and II, Custodia asserts "the Federal Reserve System's process for deciding master account applications violates the United States Constitution's Appointments Clause."  (Compl. ¶ 118.)

> Under the Constitution, "[t]he executive Power" is vested in the President, who has the responsibility to "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; § 3.  The Appointments Clause provides that he may be assisted in carrying out that responsibility by officers nominated by him and confirmed by the Senate ["principal officers"], as well as by other officers not appointed in that manner but whose work, we have held, must be directed and supervised by an officer who has been ["inferior officers"].  § 2, cl. 2.

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1976 (2021) (first alteration in original).

The Appointments Clause states:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2 cl. 2.  The Appointments Clause thus "lays out the permissible methods of appointing 'Officers of the United States,' a class of government officials distinct from mere employees." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2049 (2018).

Essentially, Custodia alleges that a decision on its master account application constitutes the exercise of executive power, which must be done by the U.S. President, or a principal officer appointed by the President upon the advice and confirmation of the Senate.

> Under this framework, only principal officers—people with presidential appointments and Senate confirmation—can render final decisions about master accounts.  Adjudicating master account applications unquestionably involves exercising "significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, because such adjudications "bind[] the government or third parties for the benefit of the public."  *Officers of the U.S.*, 31 Op. O.L.C. at 77.

(ECF 58 p. 43.)  As neither the president of FRBKC nor its board of directors are appointed by the U.S. President with Senate confirmation, Custodia asserts the Appointments Clause precludes them from deciding master account applications.  As noted above, the factual allegations in Custodia's complaint support that the master account application is decided by the president of FRBKC as opposed to FRBKC's board of directors.

Similar to the nondelegation doctrine discussed earlier, the first question to address for this claim is whether a decision on a master account application constitutes the exercise of "executive power."  FRBKC contends it is not, arguing the decision is "an essentially commercial decision," and "Custodia can point to no court that has held that a Reserve Bank's grant or denial of a master account—a bank account—somehow implicates [] 'executive Power.'" (ECF 51 p. 46.)  The Supreme Court has described executive power

A.26

as the authority to administer and enforce laws "or appoint the agents charged with the duty of such enforcement." *Buckely v. Valeo*, 424 U.S. 1, 139 (1976) (quoting *Springer v. Philippine Islands*, 277 U.S. 189, 202 (1928)), *superseded by statute on other grounds as recognized in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Relatedly, the Supreme Court has said the executive power of the government is "the general administrative control of those executing the laws, including the power of appointment and removal of executive officers." *Myers v. United States*, 272 U.S. 52, 164 (1926); *see also* U.S. Const. art. II, § 3 (assigning the U.S. President the responsibility to "take Care that the Laws be faithfully executed").

As applied here, the Court finds Custodia has plausibly alleged that FRBKC's president is exercising executive power when deciding a master account application. Whether deciding the application under § 342 (as the Defendants claim) or under § 248a (as Custodia claims), the complaint sufficiently asserts the decision constitutes the execution and enforcement of the Federal Reserve Act (and other laws and federal regulations with the force of law) when granting or denying a master account. *See Arthrex*, 141 S. Ct. at 1979 ("Today, thousands of officers wield executive power on behalf of the President in the name of the United States."); *but see United States v. Wells Fargo & Co.*, 943 F.3d 588, 597–98 (2d Cir. 2019) ("Although, in the intervening decades, Congress has transferred functional ownership and control of the [Federal Reserve Banks] to the Treasury and to the Board … Congress has carefully retained the formal separation of the [Federal Reserve Banks] from the executive branch.") (internal citations and footnotes omitted). The Court does not here decide as a matter of law whether decisions on master

A.27

account applications are executive functions, but it finds Custodia has plausibly alleged such.

Next, the Court considers whether a plausible violation of the Appointments Clause has been alleged concerning the master account decision by the FRBKC president.  That largely depends on whether the FRBKC president is a principal officer (requiring appointment by the U.S. President with confirmation by the Senate), an inferior officer (who, by appropriate law, may be appointed directly by the President, courts, or department heads), or a nonofficer (a government employee not subject to the Appointments Clause).  "The exercise of 'significant authority pursuant to the laws of the United States' marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley,* the line between officer and nonofficer."  *Edmond v. United States*, 520 U.S. 651, 662 (1997); *see Buckley*, 424 U.S. at 126 ("any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article").  Under the circumstances of this case, Custodia has plausibly alleged FRBKC's president (who also serves as its CEO) exercises significant authority pursuant to the laws of the United States.  *See, e.g.*, 12 U.S.C. § 341 (Federal Reserve Bank president shall also be the chief executive officer of the Federal Reserve Bank); *Job Description: President and CEO*, Fed. Rsrv. Bank of Kansas City (May 2022) ("The President and CEO of the Federal Reserve Bank of Kansas City is responsible for the overall performance of the Bank and represents the Tenth District economy in national policy discussions…. The

A.28

President's responsibilities fall into three broad areas: a policymaker and policy advisor; the CEO of the organization; and a contributor to Federal Reserve System leadership.")[2]. Indeed, that FRBKC's president holds final decision-making authority over the master account application demonstrates her exercise of significant authority. *See Bandimere v. Sec. & Exch. Comm'n*, 844 F.3d 1168, 1183-84 (10th Cir. 2016) ("final decision-making power is relevant in determining whether a public servant exercises significant authority"); (ECF 51 p. 46 (FRBKC noting the decision on a master account application is "one with significant implications")). It's fair to say Federal Reserve Bank presidents "perform more than ministerial tasks." *Freytag v. Comm'r*, 501 U.S. 868, 881 (1991). Accordingly, the FRBKC president is plausibly a principal officer or an inferior officer subject to the Appointments Clause.

The Board of Governors says that to the extent the master account application decision is an executive function, FRBKC's president is an inferior officer appointed in conformity with the Appointments Clause. (ECF 49 pp. 57-59; ECF 96 p. 30.) "Our cases have not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond*, 520 U.S. at 661. Custodia's argument that only a principal officer may exercise final decision-making authority (and, correspondingly, that the exercise of final decision-making authority establishes someone as a principal officer) is misplaced. *See Bandimere*, 844 F.3d at 1183-84 (stating final

---

[2]   Available at: https://www.kansascityfed.org/about-us/presidential-search/. The Court takes judicial notice of this document prepared by Defendant FRBKC. *See S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1192 (D.N.M. 2013) (court has discretion to take judicial notice of adjudicative facts, which are simply the facts of a particular case, at any stage of the proceeding, including a motion to dismiss without conversion to summary judgment).

decision-making authority weighs on whether a public servant is an officer versus a nonofficer and describing how inferior officers can have final decision-making power). Therefore, that FRBKC's president has final say over Custodia's master account application does not singularly determine whether she is or must be a principal officer as opposed to an inferior officer for purposes of the Appointments Clause.

> We held in *Edmond v. United States*, 520 U.S. 651, 662–663, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997), that "[w]hether one is an 'inferior' officer depends on whether he has a superior," and that "'inferior officers' are officers whose work is directed and supervised at some level" by other officers appointed by the President with the Senate's consent.

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010).

The Board of Governors, which is appointed by the U.S. President and confirmed by the Senate, argues that it supervises FRBKC's president and was required to approve her appointment, thus making her an inferior officer. The law accords with this contention. Federal Reserve Bank presidents are appointed by the Federal Reserve Bank's board of directors, and their appointment requires the approval of the Board of Governors. 12 U.S.C. § 341 (*Fifth*) ("The president shall be the chief executive officer of the bank and shall be appointed by the Class B and Class C directors of the bank, with the approval of the Board of Governors of the Federal Reserve System, for a term of 5 years[.]"). The Board of Governors supervises the Federal Reserve Banks, including their presidents, and has the authority to suspend or remove a Federal Reserve Bank president. *See, e.g.*, 12 U.S.C. § 248(a), (f), (j); 12 U.S.C. § 248b; *but see Scott v. Fed. Rsrv. Bank of Kansas City*, 406 F.3d 532, 535 (8th Cir. 2005) (FRBKC "is a private, independent entity independently run by its own board of directors. It is not run by the Federal Reserve Board of Governors

**A.30**

or any other part of the executive branch."). Thus, FRBKC's president's "work is directed and supervised at some level" by other officers appointed by the President and confirmed by the Senate. Accordingly, assuming for purposes of this Order that she is an "officer" of the Executive Branch, she is an inferior officer.

Finally, assuming the FRBKC president is an inferior officer, her appointment by the FRBKC's board of directors with approval by the Board of Governors accords with the Appointments Clause. Giving Custodia's cause of action every reasonable inference, the Court assumes for purposes of this Order that the Federal Reserve System is a "department" because it is a "free-standing, self-contained entity in the Executive Branch." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511 (2010). The Court further assumes that the Board of Governors is the "head" of the Federal Reserve System.[3] *See Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 16 (D.D.C. 2001) ("The Board administers the Federal Reserve System"), *aff'd sub nom. Trans Union LLC v. F.T.C.*, 295 F.3d 42 (D.C. Cir. 2002)); *Free Enter. Fund*, 561 U.S. at 512-13 (a multimember body may be the head of a department for purposes of the Appointments Clause). With that foundation of inferences in Custodia's favor, appointment of FRBKC's president by the board of directors with approval of the Board of Governors satisfies the Appointments Clause. *See Free Enter. Fund*, 561 U.S. at 512 n.13 ("We have previously found that the department head's approval [as opposed to direct appointment by the department head] satisfies the Appointments Clause[.]") (collecting cases). Therefore, Custodia has failed

---

[3] Determining the Federal Reserve System is not a "department" and the Board of Governors is not its "head" would arguably render the Appointments Clause inapplicable, thus eliminating this cause of action.

to state a plausible claim for relief based on the Appointments Clause, and Claim VI will be dismissed.

**8.**    **Claims I through VI are justiciable but Claims VII and VIII are not.**

The Court will next discuss the Defendants' arguments that Custodia's lawsuit is not justiciable, at least not currently.  (*See* ECF 49 pp. 41-47; ECF 51 pp. 49-57.)  This analysis will build off the prior examinations of Claims I through VI (which are justiciable) and then address Claims VII and VII (which are not justiciable).

In this case, justiciability refers to Custodia's legal standing to bring its lawsuit and whether its causes of action are ripe for adjudication.  *See Flast v. Cohen*, 392 U.S. 83, 95 (1968) (explaining justiciability is "a concept of uncertain meaning and scope" and concerns a variety of subjects).  "[J]usticiability implicates the court's jurisdiction." *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004).

> A motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) may take one of two forms.  A facial attack looks only to the factual allegations of the complaint in challenging the court's jurisdiction.  A factual attack goes beyond the factual allegations of the complaint and presents evidence in the form of affidavits or otherwise to challenge the court's jurisdiction.

*Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010) (citing *Stuart v. Colorado Interstate Gas Co.,* 271 F.3d 1221, 1225 (10th Cir. 2001)). The Defendants here present a facial challenge to justiciability based on the allegations of the complaint.  Therefore, the Court applies "the same standards under Rule 12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action." *Id.*

### 8.1   Custodia has standing to assert Claims I through VI.

The Court's authority to adjudicate live cases and controversies "includes the requirement that litigants have standing." *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021) (quoting *California v. Texas*, —— U.S. ——, 141 S. Ct. 2104, 2113 (2021)).

> To have standing, a plaintiff must establish three things: (1) he suffered an "injury in fact"—"an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is likely the injury will be "redressed by a favorable decision."

*Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61(1992) (internal quotation marks and citations omitted)).  "The party invoking federal jurisdiction has the burden of establishing the elements of standing."  *Southwest Envtl. Ctr. v. Sessions*, 355 F. Supp. 3d 1121, 1128 (D.N.M. 2018).

Custodia's complaint satisfies the elements for standing to sue as to Claims I through VI (all considered above).  First, it alleges Custodia's continued need to use the master account of an intermediary ("correspondent") bank to access the Federal Reserve System while waiting for the last two years for a decision on its own master account application "is much costlier and introduces counterparty credit risk and settlement risk that would" be avoided with its own master account.  (Compl. ¶ 8.)  The complaint asserts that Custodia's own master account "would allow Custodia to access directly the Federal Reserve, sharply reduce its costs, and bring new products and options to users of financial services."  (*Id.* ¶ 3.)  These allegations of increased costs due to the delay of its own master account adequately assert a concrete, particularized, actual, and currently ongoing injury-

in-fact to Custodia.  "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"  *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S. Ct. 973, 983 (2017) (citing *McGowan v. Maryland,* 366 U.S. 420, 430–431 (1961)).

Second, the complaint sufficiently alleges Custodia's injury is fairly traceable to the challenged delay.  Specifically, as the Court already determined Custodia has stated a plausible claim for unreasonable delay under the APA and if Judge Bacharach's statutory interpretation in *Fourth Corner* applies here and entitles Custodia to a master account, Custodia's increased costs from having to use an intermediary bank during the unreasonable delay would be fairly traceable to one or both Defendants' actions causing the unreasonable delay.

Third, Custodia has adequately asserted its injury of increased costs would be redressed by a court decision in its favor.  That is, if the Court ruled in Custodia's favor on Claim I (APA), Claim II (Mandamus) or Claim III (Due Process entitlement) and compelled FRBKC to issue a master account as the remedy, Custodia would then be saved the additional costs it is currently incurring.  Accordingly, Custodia has carried its burden of establishing the elements of standing at this stage of the proceedings.

FRBKC relies on the unpublished case of *TNB USA Inc. v. Fed. Rsrv. Bank of New York*, No. 1:18-CV-7978 (ALC), 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020), in support of its argument against Custodia's legal standing.  (ECF 51 pp. 50-57.)  Similar to this case, the plaintiff's master account application in *TNB* was still pending at the time suit was filed.  *TNB*, 2020 WL 1445806, at *6.  Dissimilar to this case, the plaintiff there argued the

A.34

Federal Reserve Bank had constructively denied the application by reason of the delay. *Id.*

Significantly, the district court in *TNB* said:

> As discussed above, I do not think that the FRBNY has constructively or formally decided on TNB's application. Accepting this premise, the current injuries TNB is enduring are those emanating from the FRBNY's *delay* in deciding on the application. But the FRBNY's delay is not TNB's cause of action. TNB is suing the FRBNY specifically over its *refusal* to provide TNB an account….
>
> Because the alleged injury is the FRBNY's denial, not delay, the current delay-induced injuries TNB cites are not the relevant injuries for the standing analysis. Further, because the denial has not occurred, TNB has no qualifying imminent injury and thus this case must be dismissed on standing grounds.

*Id.* at *7. *TNB* is materially different from this case. Here, Custodia has specifically alleged a claim for the delay in deciding its application. Further, as set forth above, Custodia has asserted delay-induced injuries sufficient for constitutional standing. The Court finds the decision in *TNB* carries little applicability to this case.

Custodia has carried its burden of establishing the elements of Article III standing concerning Claims I through VI, and dismissal of those causes of action on standing grounds is not warranted.

### 8.2    Claims I through VI are constitutionally and prudentially ripe for adjudication.

The Defendants' arguments that this lawsuit is constitutionally unripe largely echo their arguments as to standing. (*See* ECF 49 pp. 44-45; ECF 51 pp. 49-52.) FRBKC further argues Custodia's claims are prudentially unripe. (ECF 51 pp. 52-57.)

The ripeness doctrine originates "both from Article III limitations on judicial power and prudential reasons for refusing to exercise jurisdiction." *N. Mill St., LLC v. City of*

*Aspen*, 6 F.4th 1216, 1224 (10th Cir. 2021) (quoting *Utah Republican Party v. Cox*, 892 F.3d 1066, 1092 (10th Cir. 2018)).  "The purpose of the ripeness doctrine is to prevent the premature adjudication of abstract claims."  *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019) (quoting *Tex. Brine Co. v. Occidental Chem. Corp.*, 879 F.3d 1224, 1229 (10th Cir. 2018)).  "Article III and prudential ripeness are both "concerned with whether a case has been brought prematurely, but they protect against prematureness in different ways and for different reasons."  *N. Mill St.*, 6 F.4th at 1224-25 (quoting *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003)).  "A claim is not constitutionally ripe for adjudication pursuant to Article III "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1065 (10th Cir. 2012) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Even where a claim is ripe under Article III's requirement of a live case or controversy, the Court may decline to consider the issue under the prudential ripeness doctrine.  This doctrine requires the Court to balance "the fitness of the issue for judicial review" against "the hardship to the parties from withholding review."  *Texas Brine Co., LLC & Occidental Chem. Corp.*, 879 F.3d 1224, 1229 (10th Cir. 2018)

Claims I through VI are ripe for consideration.  Based on Custodia's plausible claim of injury due to unreasonable delay, combined with the over two-year period since Custodia applied for a master account, Custodia's first six causes of action are grounded in events that have already transpired along with injuries that have occurred and continue to occur.  Claims I through VI do not concern contingent future events.  Moreover, their

current fitness for judicial review is weighty (see discussions above) and the hardship to Custodia from withholding review would be severe.  Consequently, the Court concludes Claims I through VI are both constitutionally and prudentially ripe for adjudication at the current time.

### 8.3    Custodia lacks standing to pursue Claims VII and VIII, and these causes of action are not ripe for adjudication.

The result is different concerning Claims VII and VIII.  In these causes of action, Custodia seeks mandamus relief (Claim VII) and declaratory judgment (Claim VIII) "only in the event that Defendants deny Custodia's application for a master account."  (Compl. ¶¶ 130, 139.)  Custodia does not allege such a denial has occurred, even constructively.  Thus, Custodia has not suffered an injury of having its master account application denied, and these claims expressly rest upon a future event that may never come to pass.  Consequently, Custodia lacks standing to sue the Defendants on Claims VII and VIII, and these claims are not constitutionally ripe for adjudication.  Claims VII and VIII must be dismissed as non-justiciable.

### CONCLUSION AND ORDER

In Claim I, Custodia alleges a plausible claim of unreasonable delay under the APA.  In part of Claim III, Custodia alleges a plausible violation of due process based on an alleged property interest in and legal entitlement to a master account.  Claims II and IV complement these causes of action in seeking mandamus and declaratory judgment.  Consequently, these claims survive dismissal.

In the remainder of Claim III, Custodia does not allege a plausible separation-of-powers violation based on the nondelegable doctrine, which will be dismissed.  Likewise, Claim V fails to state a plausible violation of due process based on bias and Claim VI fails to state a plausible violation of the Appointments Clause, both of which will be dismissed. Finally, Claims VII and VIII will be dismissed because Custodia does not have standing to pursue them and they are not ripe for adjudication.

**IT IS THEREFORE ORDERED** that Defendants' motions to dismiss (ECF 48, 50) are **GRANTED IN PART AND DENIED IN PART** for the reasons discussed herein. Claims I, II, IV, and part of Claim III (alleging a due process violation) state plausible causes of action for relief.  Claims V, VI, VII, VIII, and the remainder of Claim III (alleging a nondelegable doctrine violation) do not state plausible claims on which relief can be granted and are hereby dismissed.

**DATED**: November 11<u>th</u>, 2022.

Scott W. Skavdahl
United States District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

---

CUSTODIA BANK, INC.,

               Plaintiff,

     v.

FEDERAL RESERVE BOARD OF
GOVERNORS, and FEDERAL RESERVE
BANK OF KANSAS CITY,

               Defendants.

Case No. 22-CV-125-SWS

---

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

---

This matter comes before the Court on the Defendants' motions to dismiss Plaintiff's amended complaint (ECF 124, 126). Plaintiff filed a consolidated opposition to both motions (ECF 135), former-Senator Patrick Toomey submitted an amicus brief (ECF 151), and Defendants replied (ECF 159, 160). The Court has also considered the amended amicus brief from the State of Wyoming (ECF 163). Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court will deny FRBKC's motion and will grant in part and deny in part the Board of Governors' motion.

## BACKGROUND

Plaintiff Custodia Bank is a Wyoming depository institution "specializing in payment services and crypto-asset custody." (Am. Compl. ¶ 3.) It operates under a

A.39

"Special Purpose Depository Institution" (SPDI) bank charter granted in October 2020.

(*Id.* ¶¶ 8, 14.) "SPDI banks do not lend money; instead, they specialize in taking deposits,

facilitating payments for customers, and other incidental services.  SPDI banks were

designed to provide a bridge connecting crypto-asset companies to the U.S. payments

system (for example, to pay their staff in U.S. dollars)." (*Id.* ¶ 37.)

> SPDI banks were also designed to provide custody services for crypto-assets
> via their trust departments, analogous to the custody services provided by the
> trust departments of custody banks for the trillions in securities held by
> retirement plans and mutual funds.  SPDI banks allow, for example, a
> customer to use his or her Bitcoin held in the trust department of an SPDI
> bank to make a direct transfer, a purchase, or an investment, rather than
> having to first convert the Bitcoin into U.S. dollars.

(*Id.*)  As a state-chartered institution, SPDI banks are regulated by the Wyoming Division

of Banking.  (*Id.* ¶ 36.)

In October 2020, Custodia applied to Defendant Federal Reserve Bank of Kansas

City (FRBKC) to obtain a Federal Reserve "master account" (Am. Compl. ¶ 21), which is

"put simply, a bank account for banks" that "gives deposit institutions access to the Federal

Reserve System's services, including its electronic payments system."  *Fourth Corner*

*Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017)

(Moritz, J.).  "Without such access, a depository institution is nothing more than a vault."

*Id.* at 1053 (Moritz, J.) (internal quotation marks omitted).

> The master account is both a record of financial transactions that reflects the
> financial rights and obligations of an account holder and the Reserve Bank
> with respect to each other, and the place where opening and closing balances
> are determined.  For each institution, all credits and debits resulting from the
> use of Federal Reserve services at any Federal Reserve office are booked to
> this single master account at one Reserve Bank.

*Id.* at 1064 n.1 (Bacharach, J.). A master account also enables its holder to access various services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including wire transfer services, automated clearinghouse services, settlement services, securities safekeeping, and Federal Reserve float services. *See Fourth Corner*, 861 F.3d at 1053 (Moritz, J.) (noting a master account "gives depository institutions access to the Federal Reserve System's services, including its electronic payments system").

Absent a master account, "Custodia cannot directly access the Federal Reserve and cannot offer the same custodial services for crypto-assets that incumbent banks like BNY Mellon presently provide." (Am. Compl. ¶ 2.) "Without a master account, if Custodia is able to operate at all, it is as a second-class citizen, relegated to dependency on and fealty to an intermediary bank [which does have a master account]." (*Id.*)

> Having a master account means that SPDI banks do not have to use an intermediary ["correspondent"] bank in order to access the Federal Reserve banking system for clearing U.S. dollar transactions. Eliminating the "middleman" cuts costs, lowers risk (including counterparty credit risk), and provides SPDI bank customers with more efficient and customizable payment services that can be programmed using software. It does not mean that SPDI banks hold crypto-assets within their master accounts. Custodia would hold no crypto-assets on its balance sheet or within its master account.

(*Id.* ¶ 38; *see also* ¶ 4.) Custodia would hold only "customer deposits of U.S. dollars in cash in a Federal Reserve master account," which would be separate from crypto-assets. (*Id.* ¶ 50.) "This means that Custodia will not be exposed to the volatility of crypto-asset prices because it will hold all crypto-assets in bailment on behalf of a customer in its trust department." (*Id.*) Custodia's own Federal Reserve master account is significantly important to its success as a business. *See Fourth Corner*, 861 F.3d at 1053 (Moritz, J.)

A.41

(noting that when plaintiff credit union was denied a master account by FRBKC in that case, it "effectively crippl[ed] the Credit Union's business operations").

In August 2021, Custodia also applied to Defendant Federal Reserve Board of Governors for membership in the Federal Reserve, which would subject Custodia to oversight and regulation by the Federal Reserve Board (in addition to the state's banking regulatory system). (Am. Compl. ¶ 47.) "It is not necessary to be a member bank in order to receive a master account …. Custodia, however, took this additional step to demonstrate to [FRBKC] and the Board its willingness to submit to full federal supervision and accountability." (*Id.*)

On January 27, 2023, the Board of Governors denied Custodia's application for membership into the Federal Reserve. (Am. Compl. ¶¶ 62-70.) A few hours later, FRBKC denied Custodia's master account application. (*Id.*) FRBKC's denial came 27 months after Custodia had applied for a master account, whereas the master account application itself notes that processing a master account application "may take 5-7 business days." (*Id.* Ex. 1 (ECF 121 p. 37).)

In its amended complaint, Custodia challenges the denial of its master account application. It contends that while the application was submitted to and the denial came from FRBKC, FRBKC "can exercise no discretion over Custodia's master account application without the approval or, at the very least, the nonobjection of the Board [of Governors]." (Am. Compl. ¶ 4.) Regardless of which entity is actually making the final decision, though, Custodia asserts Defendants "had no discretion to deny Custodia's master account application." (*Id.* ¶ 5.) Custodia argues that because it was legally-eligible for a

master account, "12 U.S.C. § 248a requires that Custodia be able to access all 'Federal Reserve bank services'" and therefore "Defendants had a non-discretionary duty to grant Custodia's master account application and not to discriminate against Custodia in its ability to access all bank services using that account." (*Id.*)

Custodia sets forth three causes of action in its amended complaint. Its first claim is asserted only against the Board of Governors under the Administrative Procedure Act (APA) and alleges the Board of Governors' agency action "in denying Custodia's master account application is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (Am. Compl. ¶ 84 (quoting 5 U.S.C. § 706(2)). Custodia's second claim is asserted against both Defendants and seeks a writ of mandamus compelling Defendants to "promptly rescind the denial of Custodia's master account application and instead grant the application so that Custodia can access Federal Reserve bank services." (*Id.* ¶ 87.) The final claim seeks a declaratory judgment "that the Board and/or [FRBKC] has a statutory obligation to provide Custodia with a master account to permit Custodia to use that master account to access Reserve Bank services in a non-discriminatory manner." (*Id.* ¶ 101.)

Defendants have moved to dismiss Custodia's amended complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6), asserting Custodia has failed to state any claim on which the Court can grant relief.

## STANDARD FOR 12(b)(6) MOTION TO DISMISS

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone

is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, assumed to be true, must "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In the context of a 12(b)(6) motion to dismiss, this plausibility standard requires the plaintiff to plead facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court accepts the nonmoving party's well-pled factual allegations as true and construes them in the light most favorable to the nonmoving party, but it is not bound to accept an asserted legal conclusion as true.  *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991); *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

Much of the parties' arguments on these motions to dismiss the amended complaint track their arguments on the earlier motions to dismiss the original complaint.  The Court's analysis will also track much of its prior order on those motions to dismiss (ECF 102), and the reader is encouraged to consult that order for additional discussion.

### Claim I - Administrative Procedure Act (APA)

Custodia's APA claim is asserted against only the Board of Governors, which is undisputedly a governmental agency.  Custodia alleges the Board of Governors' action in denying the master account application was arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with the law, and the Board of Governors should be compelled to issue a master account.  (Am. Compl. ¶¶ 84-85.)

The Board of Governors' entire argument for dismissal is that Custodia's interpretation of 12 U.S.C. § 248a as mandating the issuance of master accounts to eligible institutions is legally erroneous.  (ECF 127 pp. 19-33.)  The Court already considered this argument it its prior order on dismissal and determined that Custodia has stated a plausible claim for relief under the APA, and that earlier discussion continues to apply in large part here.  The Court quotes its earlier order at length:

> The Defendants contend FRBKC has complete discretion to issue or deny a master account pursuant to 12 U.S.C. § 342, which says in part:
>
>> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, … deposits of current funds in lawful money, national-bank notes, Federal reserve notes, [etc.].
>
> Section 342 is located in Subchapter IX of Chapter 3 of Title 12 of the U.S.C. Subchapter IX is titled, "Powers and Duties of Federal Reserve Banks."  To effectuate this deposit-taking function, Federal Reserve Banks use the master account to keep a record of each institution's debits and credits.  No provision of the Federal Reserve Act, including § 342, "imposes upon reserve banks any obligation to receive" deposits.  *Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923). "The act merely confers authority to do so." *Id.*
>
> The Defendants contend the discretion to receive or reject deposits necessarily carries with [it] the discretion to grant or deny master accounts. (ECF 51 p. 33; ECF 49 pp. 32-35.)  This argument presents as logical and may yet carry the day, but at least one judge of the Tenth Circuit has disagreed in a published opinion.
>
> In *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), Judge Bacharach determined 12 U.S.C. § 248a requires Federal Reserve Banks to issue master accounts to eligible depository institutions that apply.  That section (part of the Depository

A.45

Institutions Deregulation and Monetary Control Act of 1980), says in part:

> **(a)    Publication of Pricing Principles and Proposed Schedule of Fees; Effective Date of Schedule of Fees.**
> Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.
> …
> **(c)    Criteria applicable.**
> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>
> > …
> > (2)    All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. § 248a(a), (c)(2). Judge Bacharach concluded the only way the "Federal Reserve bank services covered by the fee schedule" can be made available to nonmember depository institutions is by granting them a master account. *See Fourth Corner*, 861 F.3d at 1071 (Bacharach, J.) ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks. To purchase these services, a master account is required. Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts."). In distinguishing § 342 from § 248a, Judge Bacharach opined:

> Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection.… But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions. As a result, § 342 does not affect Fourth Corner's entitlement to a master

**A.46**

account.

*Fourth Corner*, 861 F.3d at 1074. That is, he agreed § 342 affords to a Federal Reserve Bank the discretion to take or refuse deposits, but concluded such discretion was separate and apart from the issuance of master accounts. *See id.* at 1073-74 ("But this discretion does not encompass the issuance of master accounts."); *see also* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with Federal Reserve Banks and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

The Defendants spill much ink explaining why Judge Bacharach's opinion in *Fourth Corner* cannot win the day in this case. (ECF 49 pp. 37-41; ECF 51 pp. 33-36.) They point out *Fourth Corner* was a three-way split decision between the three-judge panel, and Judge Bacharach was effectively the odd man out as he voted to reverse the dismissal of the complaint while the other two judges voted to uphold the dismissal. *See Fourth Corner*, 861 F.3d at 1053. All true. Nonetheless, it's worth noting that the other two judges did not reach the merits of the § 248a versus § 342 statutory interpretation question (because they found dismissal warranted), so we don't currently know if they would have seen it the same as Judge Bacharach or not.

The Defendants also note that Section 248a is found in Subchapter II of Chapter 3 of Title 12, and Subchapter II is titled "Board of Governors of the Federal Reserve System." Indeed, § 248 begins, "The Board of Governors of the Federal Reserve System shall be authorized and empowered: [list of duties]." 12 U.S.C. § 248. Thus, Judge Bacharach appears convinced that Congress effectively mandated Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions that apply in a Subchapter that sets forth the duties of a completely different entity (the Board of Governors). The Court agrees it appears a strange place for Congress to stick such a requirement that would seemingly govern the Federal Reserve Banks. Of course, the title of a statute, along with the title of the subchapter the statute resides in, might matter only if the Court first determines the statute is ambiguous, and even then it might matter only very little. "[U]nder the general rules of statutory interpretation, the title to a statutory provision is not part of the law itself, although it can be used to interpret an ambiguous statute." *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 n.4 (10th Cir. 1998) (quoting *Johnston v. Commissioner of Internal Revenue*, 114 F.3d 145, 150 (10th Cir. 1997), and giving "little weight" to

the title of the Americans With Disabilities Act); *see Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 529 (1947) ("For interpretive purposes, [statutory headings and titles] are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain."). Thus, the title of Subchapter II and the location of § 248a within the statutory code likely offer relatively little toward refuting Judge Bacharach's opinion.

To cut short what could become an unnecessarily long recap of the Defendants' objections to Judge Bacharach's opinion in *Fourth Corner*, the Court concludes Custodia has stated a plausible claim to compel legally-required action for two reasons. First, Judge Bacharach's opinion may plausibly be the law on this matter in this case. *See* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with a Federal Reserve Bank and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

Second, and more immediately significant, a full statutory interpretation of the matter is better left for another day. In this particular case, the facts alleged by Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a) in granting Custodia's master account application. For example, if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little because it may be that FRBKC failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes, as Custodia has plausibly suggested). Thus, because the development of facts underlying or refuting certain allegations may prove particularly relevant to any statutory interpretation of § 342 versus § 248, the Court will not undertake a complete analysis at this stage of the proceedings without further development of those facts.

(ECF 102 pp. 12-17.)

While several factual developments have occurred since the Court's earlier order, including the denial of Custodia's master account application, the Court remains of the opinion that a full statutory interpretation of the matter is more appropriate after further

A.48

development of important facts.  For example, Custodia applied to FRBKC for its master

account and received its denial from FRBKC.  And while this lawsuit has been pending,

the Board of Governors published and adopted guidelines for Federal Reserve Banks to

use "in evaluating requests for master accounts."  Guidelines for Evaluating Account and

Services Requests, 87 Fed. Reg. 51,099, 51,106 (Aug. 19, 2022).  If the decision to deny

the master account was truly only that of FRBKC, then Custodia's Claim I must fail.

Nonetheless, the alleged occurrence of certain events, and the timing of those events,

plausibly suggests the Board of Governors had at least some hand in controlling the

outcome of Custodia's master account application.  (*See, e.g.*, Am. Compl. ¶¶ 62-70

(alleging the denial of Custodia's master account application, the denial of its Federal

Reserve membership application, and the White House's statement on risks of crypto-

assets all occurred on the same date and all included similar language); *see also* ECF 102

pp. 7-8 (summarizing several factors making it "reasonable to infer" the Board of

Governors involved itself into Custodia's master account application).)

Also since the Court's prior order on dismissal, Congress enacted 12 U.S.C. § 248c.

The Board of Governors relies on this new statute in part to advance its statutory

interpretation argument, but the Court is not convinced.  Section 248c requires the Board

of Governors to create and publish a public database that identifies every entity currently

with access to a Federal Reserve master account and every entity that has applied for a

master account along with whether the request was approved, rejected, pending, or

withdrawn.  12 U.S.C. § 248c(b).  The Board of Governors argues that because § 248c

requires a public list of any "rejected" master account applications, whether to grant such

an application must be discretionary.  (ECF 127 pp. 31-32.)  The Court does not see it so cut-and-dried.  It is public knowledge that master account applications have been "rejected" or denied for non-discretionary reasons in the past.  For example, in *Fourth Corner*, the district court dismissed the credit union's lawsuit after determining FRBKC could not have issued a master account in that case because doing so would have aided the credit union in providing banking services to marijuana-related businesses, which would have violated federal drug laws.  *Fourth Corner*, 861 F.3d at 1053-54 (Moritz, J.).  Thus, at the time Congress passed § 248c, it was known that Federal Reserve Banks had "rejected" master account applications in the past, but § 248c cannot be read as Congress' imprimatur on Federal Reserve Banks holding carte blanche to grant or deny master account applications.  (*See* ECF 151 pp. 12-14, 17-18.)  Section 248c does not, expressly or impliedly, carry the statutory construction load the Board of Governors asserts it does.

In short, based mostly on Judge Bacharach's opinion in *Fourth Corner*, Custodia has asserted a plausible cause of action under the APA in Claim I against the Board of Governors.  And determining the Board of Governors' actual conduct related to this lawsuit, if any, will help determine whether the claim might be successful.  Consequently, the Board of Governors' request to dismiss Custodia's APA claim will be denied.

## Claim II - Compel Action under the Mandamus Act

Custodia's second cause of action seeks a writ of mandamus compelling action from both Defendants under 28 U.S.C. § 1361, which provides:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

"Mandamus is the traditional writ designed to compel government officers to perform nondiscretionary duties." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005).

In considering whether Claim II plausibly alleges a claim for mandamus relief, the Court returns to its prior dismissal order, wherein it wrote the following:

In a mandamus action, the Court should

> measure the allegations in the complaint against the statutory and constitutional framework to determine whether the particular official actions complained of fall within the scope of the discretion which Congress accorded the administrators.... In other words, even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated.

*Carpet, Linoleum & Resilient Tile Layers, Loc. Union No. 419, Bhd. of Painters & Allied Trades, AFL-CIO v. Brown*, 656 F.2d 564, 566 (10th Cir. 1981) (quoting *Davis Associates, Inc. v. Sec., Dep't of Housing and Urban Development*, 498 F.2d 385, 389 & n.5 (1st Cir. 1974)).

Under Judge Bacharach's view in *Fourth Corner*, Custodia has stated a claim of both unreasonable delay of a decision on its master account application and legal entitlement to a master account. Therefore, the Court finds Custodia's request for mandamus relief should not be dismissed. In short, "there may well exist statutory or regulatory standards delimiting the scope or manner in which" the Defendants may exercise their discretion (if any) over Custodia's master account application, and assuming the truth of Custodia's allegations, those standards may have been ignored or violated in this case. That is, applying Judge Bacharach's reasoning, Custodia has plausibly alleged the Defendants have "failed to discharge a duty owed to plaintiffs which Congress has directed them to perform." *Carpet, Linoleum & Resilient Tile Layers, etc. v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981).

(ECF 102 p. 18.) The question of unreasonable delay is no longer at issue because the

master account application has since been denied, but if Judge Bacharach's (and Custodia's) interpretation of § 248a is correct, then granting a master account may be a nondiscretionary duty.

The Court deviates from its prior order, though, in determining that Custodia cannot state a claim for mandamus relief under the Mandamus Act against the Board of Governors. "To be eligible for mandamus relief [under § 1361], the petitioner must establish (1) that he has a clear right to relief, (2) that the respondent's duty to perform the act in question is plainly defined and peremptory, and (3) that he has no other adequate remedy." *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005) (citation omitted). However, under 5 U.S.C. § 706(1), the APA permits Custodia to "compel agency action unlawfully withheld." Because there is no dispute the Board of Governors is an agency, the APA provides Custodia a means to its requested remedy if it prevails against the Board of Governors on administrative review. "The statutory remedy provided by § 706(1) is an adequate remedy available to Plaintiff[] that precludes mandamus relief." *Tista v. Jaddou*, 577 F. Supp. 3d 1219, 1231 (D.N.M. 2021).

Thus, Custodia has stated a plausible claim for relief under the Mandamus Act, 28 U.S.C. § 1361, against FRBKC. However, relief under the Mandamus Act is not available to Custodia against the Board of Governors because the APA provides an adequate remedy. Custodia's Mandamus Act claim will be dismissed as to the Board of Governors.

## Claim III - Declaratory Judgment

In the final cause of action in its amended complaint, Custodia seeks a declaratory judgment holding "the Board and/or [FRBKC] has a statutory obligation to provide

Custodia with a master account and to permit Custodia to use that master account to access Reserve Bank services in a non-discriminatory manner." (Am. Compl. ¶ 101.) The Declaratory Judgment Act provides a remedy for valid federal causes of action and does not offer a separate cause of action. *See Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022) (unpublished) ("the Declaratory Judgment Act does not provide an independent federal cause of action") (citing *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671–74 (1950)). "To maintain an action for a declaratory judgment, then, [Custodia] must assert a valid federal cause of action—one that exists independent of any request for declaratory relief." *Nero*, 2002 WL 14423872, at *2. As the Court determined above Custodia has asserted a plausible claim under the APA against the Board of Governors and a plausible claim under the Mandamus Act against FRBKC, its request for a declaration of entitlement to a master account is valid.

Custodia's claim for declaratory judgment is not properly understood as a stand-alone cause of action, but it is a viable request for relief that will not be dismissed at this time.

## CONCLUSION AND ORDER

In Claim I, Custodia alleges a plausible claim for relief under the APA against the Board of Governors. In Claim II, Custodia alleges a plausible claim for relief under the Mandamus Act against FRBKC. Claim II does not state a viable claim for relief against the Board of Governors, and it will be dismissed as to that Defendant. Custodia's request for declaratory relief in Claim III is a proper remedy demand but is not appropriately considered a separate cause of action.

In hopes of avoiding a repeat of past confusion (*see* ECF 112), the Court here notes that Claim I will proceed against the Board of Governors as a judicial review action in conformity with the APA (and this Court's local rules), and the Board of Governors must prepare and file the administrative record.  Claim II will proceed against FRBKC as a standard civil action in conformity with the Federal Rules of Civil Procedure (and this Court's local rules), with FRBKC now owing an answer to the amended complaint.

**IT IS THEREFORE ORDERED** that Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss (ECF 124) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss the Amended Complaint (ECF 126) is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted solely as to Claim II, which is dismissed only as against the Board of Governors.  The remainder of the motion to dismiss is denied.

**DATED**: June ___8th___, 2023.

Scott W. Skavdahl
United States District Court Judge

A.54

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

CUSTODIA BANK, INC.,

      Plaintiff,

  v.

FEDERAL RESERVE BOARD OF
GOVERNORS, and FEDERAL RESERVE
BANK OF KANSAS CITY,

      Defendants.

Case No. 22-CV-125-SWS

---

## ORDER ON DISPOSITIVE MOTIONS

---

Plaintiff Custodia Bank is a Wyoming-chartered depository institution. In October 2020, it applied to Defendant Federal Reserve Bank of Kansas City (FRBKC) to obtain a Federal Reserve "master account," which is essentially a bank account for banks. In January 2023, Custodia's request for a master account was denied. In this lawsuit, Custodia contends FRBKC was statutorily required to grant the master account request, and Defendant Federal Reserve Board of Governors (the Board) hijacked FRBKC's consideration of the request and forced FRBKC to improperly deny the master account.

Custodia brings one cause of action against the Board (a federal agency) for violation of the Administrative Procedures Act (APA), alleging its actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and asking the Court to compel the Board to issue a master account to Custodia (Claim I). Custodia's

cause of action against FRBKC seeks a writ of mandamus compelling it to grant a master account to Custodia (Claim II).

Custodia has filed a motion for judgment as a matter of law, arguing it is entitled to a master account as a matter of statutory construction.  (ECF 233.)  FRBKC has filed a cross-motion for summary judgment, contending Custodia is not entitled to a writ of mandamus because the law does not require it to grant a master account to Custodia.  (ECF 272.)  The Board has not filed its own dispositive motion, but it opposes Custodia's motion and asks the Court to find Custodia's APA claim fails as a matter of law.  (ECF 271.)

The Court has reviewed the extensive briefing and thousands of pages of exhibits submitted by the parties, as well as the administrative record lodged by the Board as to Claim I.  (ECF 178, 234, 236, 271, 273, 274, 277, 295, 296, 310, 311.)  The Court has also considered the several amicus briefs.  (ECF 251, 257, 259, 286.)  The Court agrees with the parties that no genuine dispute of material fact precludes the Court from rendering judgment as a matter of law.  And the Court concludes Custodia's dispositive motion must be denied and Defendants are entitled to judgment as a matter of law in their favor.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Custodia is state-chartered as a Special Purpose Depository Institution (SPDI), a unique-to-Wyoming financial institution intended to facilitate cryptocurrency banking that is unlike other banks in that it is generally prohibited from extending loans.  (Am. Compl.

---

[1] While the Court cites to Custodia's amended complaint for much of this background, which is unusual at the summary-judgment stage, the parties' briefing does not raise a genuine dispute of any material fact concerning these allegations.

¶¶ 36-37.[2])  "SPDI banks were designed to provide a bridge connecting crypto-asset companies to the U.S. payments system (for example, to pay their staff in U.S. dollars)." (*Id.* ¶ 37.)

> SPDI banks were also designed to provide custody services for crypto-assets via their trust departments, analogous to the custody services provided by the trust departments of custody banks for the trillions in securities held by retirement plans and mutual funds.  SPDI banks allow, for example, a customer to use his or her Bitcoin held in the trust department of an SPDI bank to make a direct transfer, a purchase, or an investment, rather than having to first convert the Bitcoin into U.S. dollars.

(*Id.*)  As a state-chartered depository institution, Custodia is regulated by the Wyoming Division of Banking.  (*Id.* ¶ 36.)  And as a SPDI bank, it is not required to be insured by the Federal Deposit Insurance Corporation (FDIC), but it is eligible to seek such deposit insurance because it is authorized and expected to take deposits.  (*Id.* ¶ 40.)

In October 2020, Custodia applied to FRBKC to obtain a Federal Reserve master account (*id.* ¶ 21), which is "put simply, a bank account for banks" that "gives deposit institutions access to the Federal Reserve System's services, including its electronic payments system."  *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).  "Without such access, a depository institution is nothing more than a vault."  *Id.* at 1053 (Moritz, J.) (internal quotation marks omitted).

> The master account is both a record of financial transactions that reflects the financial rights and obligations of an account holder and the Reserve Bank with respect to each other, and the place where opening and closing balances are determined.  For each institution, all credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to

---

[2]  ECF 121.

this single master account at one Reserve Bank.

*Id.* at 1064 n.1 (Bacharach, J.).  A master account also enables its holder to access various services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including wire transfer services, automated clearinghouse services, settlement services, securities safekeeping, and Federal Reserve float services.  *See id.* at 1053 (Moritz, J.) (noting a master account "gives depository institutions access to the Federal Reserve System's services, including its electronic payments system").

Absent a master account, "Custodia cannot directly access the Federal Reserve and cannot offer the same custodial services for crypto-assets that incumbent banks like BNY Mellon presently provide." (Am. Compl. ¶ 2.)  "Without a master account, if Custodia is able to operate at all, it is as a second-class citizen, relegated to dependency on and fealty to an intermediary bank [which does have a master account]." (*Id.*)

> Having a master account means that SPDI banks do not have to use an intermediary ["correspondent"] bank in order to access the Federal Reserve banking system for clearing U.S. dollar transactions.  Eliminating the "middleman" cuts costs, lowers risk (including counterparty credit risk), and provides SPDI bank customers with more efficient and customizable payment services that can be programmed using software.  It does not mean that SPDI banks hold crypto-assets within their master accounts.  Custodia would hold no crypto-assets on its balance sheet or within its master account.

(*Id.* ¶ 38; *see also* ¶ 4.)  For a while, and perhaps still, Custodia indeed accessed the Federal Reserve banking system through a correspondent bank with a master account.  However, "[d]oing so imposes additional costs and counterparty credit risk, injects settlement risk given the inability to ensure simultaneous settlements, and exposes institutions to existential risks if the correspondent bank terminates the relationship." (ECF 234 p. 18.)

A.58

Accordingly, Custodia's own Federal Reserve master account is significantly important to its business. *See Fourth Corner*, 861 F.3d at 1053 (Moritz, J.) (noting that when plaintiff credit union was denied a master account by FRBKC in that case, it "effectively crippl[ed] the Credit Union's business operations").

In August 2021, Custodia also applied to the Board of Governors for membership in the Federal Reserve, which would subject Custodia to oversight and regulation by the Federal Reserve Board (in addition to the state's banking regulatory system). (Am. Compl. ¶ 47.) "It is not necessary to be a member bank in order to receive a master account .... Custodia, however, took this additional step to demonstrate to [FRBKC] and the Board its willingness to submit to full federal supervision and accountability." (*Id.*)

On January 27, 2023, the Board denied Custodia's application for membership into the Federal Reserve. (*Id.* ¶¶ 62-70.) A few hours later, FRBKC conveyed the denial of Custodia's master account application. (*Id.*; ECF 236-84.) In this lawsuit, Custodia has not challenged the Board's membership denial or the reasons underlying the master account denial.

## STANDARD OF ANALYSIS

Custodia's Claim I is alleged only against the Board and concerns review of administrative action with a demand to compel agency action, and Claim II is alleged only against FRBKC and concerns a request for writ of mandamus. Despite the different postures of each claim, each party seeks judgment as a matter of law in its favor (ECF 234 p. 9; ECF 271 p. 55; ECF 273 p. 11), agreeing Custodia's claims are resolved in this case based on questions of law with no genuine dispute of material fact affecting the legal

decisions. The Court agrees, finding the limited areas of disputed facts are not material to the determinations in this case. Additionally, the parties stipulated that all evidence and discovery between Custodia, FRBKC, and the Board's administrative record "may be relied upon by all parties including any court hearing in this case throughout the remainder of this litigation," and this stipulation was approved by the Court. (ECF 220.) This stipulation is logical because Custodia seeks the same relief, compelling a master account, in both Claim I and Claim II, and therefore any distinction between the APA and the Mandamus Act is ultimately irrelevant, with the only difference in this case being which Defendant must comply with the potential writ. *See Hernandez–Avalos v. I.N.S.,* 50 F.3d 842, 844 (10th Cir.) (noting that the Mandamus Act and the APA are "merely different means of compelling an agency to take action [that] by law it is required to take"), *cert. denied,* 516 U.S. 826 (1995). Accordingly, the Court does not separately analyze the matter under the APA versus the Mandamus Act. *See New Mexico Health Connections v. United States Dep't of Health & Human Servs.,* 946 F.3d 1138, 1161 (10th Cir. 2019) ("[t]he court employs summary judgment to 'decid[e], as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review") (quoting *Calloway v. Harvey,* 590 F. Supp. 2d 29, 36 (D.D.C. 2008)).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the record and all reasonable inferences that might be drawn from it in the light most favorable to the party opposing summary judgment. *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Trust,* 744 F.3d 623, 628 (10th Cir. 2014). "Cross-

motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

## DISCUSSION

"To be eligible for mandamus relief, the petitioner must establish (1) that he has a clear right to relief, (2) that the respondent's duty to perform the act in question is plainly defined and peremptory, and (3) that he has no other adequate remedy." *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005) (citing *Johnson v. Rogers,* 917 F.2d 1283, 1285 (10th Cir. 1990)). If the petitioner can establish these requirements, the Court may exercise its discretion to grant the requested writ of mandamus. *Id.* (citing *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995)).

> The court's jurisdiction over a mandamus petition depends on the character of the government's duty to the petitioner. [*Marquez-Ramos*, 69 F.3d at 479] ("[T]he question of whether a particular act is discretionary or ministerial rises to the jurisdictional level."). "The test for jurisdiction is whether mandamus would be an appropriate means of relief." *Carpet, Linoleum & Resilient Tile Layers v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981). If the duty is "ministerial, clearly defined and peremptory," mandamus is appropriate. *Id.* at 566 (quoting *Schulke v. United States,* 544 F.2d 453, 455 (10th Cir. 1976)).

*Rios*, 398 F.3d at 1206–07. *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (a claim for mandamus under the APA "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take").

1.   **Custodia has not challenged a final agency action of the Board of Governors and Claim I under the APA must be dismissed.**

The first issue to take up concerns the Board's contention that it never took any final

agency action on Custodia's request for a master account that would be subject to judicial review and Custodia's disagreement with that contention.  (ECF 234 p. 57; ECF 271 pp. 50-53; ECF 295 pp. 30-34.)  There is no dispute that the Board of Governors is a federal agency.  The APA grants federal courts the authority to review the "final agency action" of an agency.  5 U.S.C. § 704.  Therefore, a petitioner must challenge a "final agency action" in order to have statutory (prudential) standing to seek judicial review under the APA.  The finality of an agency action is jurisdictional.  *See Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997).

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]"  5 U.S.C. § 551(13); *see also* 5 U.S.C. § 701(b)(2) (noting that "agency action" means as defined by § 551).

> In *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), we distilled from our precedents two conditions that generally must be satisfied for agency action to be "final" under the APA.  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.*, at 177–178, 117 S.Ct. 1154 (internal quotation marks and citation omitted).

*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  The petitioner has "the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)."  *Colorado Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000).  Whether an agency's conduct constitutes "final agency action" under the APA is a question of law.  *Id.*  Courts take a

"pragmatic" approach to finality. *Hawkes Co.*, 578 U.S. at 599.

In this case, Custodia identifies as the final agency action an email sent from the Board to FRBKC, where the Board stated it has reviewed FRBKC's "pre-decisional analysis of Custodia Bank's request for a master account" and has "no concerns" with FRBKC's intent to deny the master account application. (ECF 234 p. 57 (citing to Administrative Record Bates Number FRB-AR-000002).) Custodia says the Board identified this no-concerns email as the relevant final agency action. (*Id.* (citing ECF 178).) In its Notice of Lodging of the Administrative Record, the Board stated the email "is the final agency action at issue as required by Local Rule 83.6(b)(1)(A), and that final agency action is followed by the three documents to which it directly refers." (ECF 178 p. 1.) Custodia relies on this statement by the Board to show it is the final agency action to be reviewed by the Court. The Board says not so fast—it lodged the administrative record and designated the last-in-time event (the no-concerns email) as the final agency action only to comply with the Court's requirements and the District of Wyoming's local civil rules, but that doesn't automatically mean the no-concerns email holds any legal significance as a "final agency action;" instead, the no-concerns email fails to meet the legal test for final agency action. (ECF 271 pp. 50-53.) Custodia responds that this no-concerns email "gave the Kansas City Fed the green light to deny Custodia's account application," which "indisputably affected Custodia's substantive rights." (ECF 295 p. 30.)

The no-concerns email does not constitute final agency action warranting judicial review under the APA for two reasons. First, the email is not an "agency action" because

it is not "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). In the similar case of *Cherry v. U.S. Dep't of Agriculture*, 13 F. App'x 886 (10th Cir. 2001), the U.S. Forest Service sent the plaintiff a letter demanding he remove his equipment from a millsite because he lacked an approved operating plan, and it warned him "that failure to remove his equipment or obtain an approved operating plan would place him in violation of 36 C.F.R. § 261.10." *Id.* at 889. The plaintiff tried to challenge the letter under the APA, but the Tenth Circuit concluded the letter was not an agency action under the § 551(13) definition because it was not a rule, order, license, sanction, relief, or the equivalent or denial thereof, or a failure to act. *Id.* at 890. Like there, the no-concerns email here cannot be said to be an agency action as defined by § 551(13).

Second, the January 26, 2023 no-concerns email constitutes only the Board of Governors' implementation decision pursuant to a broader agency plan, which is also not a final action. *See Chemical Weapons Working Group, Inc., v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997) (concluding the Army's decision to commence trial incinerations to test destruction of chemical weapons was not reviewable as a final agency action under the APA because it was instead the act of implementing its broader plan of chemical weapons disposal).

> An implementation decision is one that merely carries out a broader agency plan that marked the consummation of the relevant decision-making process. Therefore, despite being the *outcome* of some decision-making process, the decision does not represent the agency's "last word on the matter in question." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (discussing the APA's final action standard for purposes of applying the "final action" standard of § 307 of the Clean Air

Act).

*County Comm'rs of County of Sierra v. United States Dep't of the Interior*, 614 F. Supp. 3d 944, 953 (D.N.M. 2022) (italics in original) (concluding a decision to translocate two wolves was an implementation decision conducted by the U.S. Fish and Wildlife Service pursuant to a broader agency plan). The no-concerns email itself points to the *Guidelines for Evaluating Account and Services Requests* previously announced by the Board on August 15, 2022 (and published on August 19, 2022, at 87 Fed. Reg. 51099), as well as S-letter 2667, a policy enacted by the Board requiring Federal Reserve Banks to consult with Board staff on certain requests for master accounts. The no-concerns email was the implementation of these *Guidelines* and S-letter as they pertained to Custodia's master account application. The no-concerns email did not decide to impose the *Guidelines* considerations or S-letter policy; those decisions were made several months before the no-concerns email. And Custodia has not challenged the *Guidelines* or S-letter 2667 in this case. The no-concerns email merely implemented these broader plans as they related to Custodia's application.[3]

Custodia has not carried its burden of "identifying specific federal conduct and

---

[3]  To be sure, "not all agency decisions made pursuant to a broader agency plan are unreviewable implementation decisions." *County Comm'rs of County of Sierra*, 614 F. Supp. 3d at 954. "When a decision has independent legal force because it substantially changes, modifies, or imposes conditions upon an agency's previous disposition of a matter, and such changes have 'clear and definite' legal consequences, the decision can no longer be viewed as 'mere implementation' and should be subjected to judicial review under the APA." *Id.* Custodia has not argued such in this case, and there is no evidence suggesting the no-concerns email substantially changed the Board's previous disposition of a matter.

explaining how it is 'final agency action' within the meaning of section 551(13)."[4]

*Colorado Farm Bureau Fed'n*, 220 F.3d at 1173. Because the no-concerns email does not

constitute a final agency action, Custodia lacks standing under the APA to challenge it.

Consequently, this Court lacks jurisdiction to address the merits of Custodia's Claim I

alleged under the APA against the Board of Governors, and it must be dismissed.[5]

**2.**      <u>**Custodia is not statutorily entitled to a master account.**</u>

The Federal Reserve Act of 1913 established the Federal Reserve System, which

consists of the Board of Governors of the Federal Reserve System, the Federal Open

Market Committee (FOMC), and twelve regional Federal Reserve Banks that each serve

their respective district. *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New*

*York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *1 (S.D.N.Y. Oct. 27, 2023). In the

Federal Reserve Act, Congress also authorized the Federal Reserve Banks to carry out

certain banking functions, including accepting or rejecting deposits from depository

institutions (i.e., to act as a centralized bank for the depository institutions in the district).

---

[4] As an alternative argument, Custodia in its reply brief contends "the Board's participation in the master account process meets the requirement that there be final agency action" and then lists a myriad of alleged agency actions performed by the Board in an attempt to show this participation. (ECF 295 pp. 31-33.) This will not do the trick for two reasons. First, the Court has not permitted the Board to file a sureply, so the Court does not rely on this new argument found in Custodia's reply brief. *See Pippin v. Burlington Res. Oil And Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) (unless the district court allows a sureply from the non-moving party, "the court can avoid error only by not relying on the new materials and arguments in the movant's reply brief"). Second, in this spaghetti-at-the-wall tactic, Custodia does not demonstrate how any of the alleged agency actions, including the overarching claim that the Board "participated" in the master account process, are "final" because Custodia fails to explain how these actions "mark[] the consummation of the agency's decisionmaking process" or "determine[] [Custodia's] legal rights such that legal consequences will flow therefrom." *Cherry*, 13 Fed. App'x at 890.

[5] Even if Custodia was correct in alleging the Board had performed a final agency action subject to judicial review under the APA, the merits of that claim would rise and fall with Custodia's statutory-construction argument, discussed next.

*Id.*  The Federal Reserve Banks record and maintain such deposits in master accounts.  *Id.*

> The master account is both a record of financial transactions that reflects the financial rights and obligations of an account holder and the Reserve Bank with respect to each other, and the place where opening and closing balances are determined.  For each institution, all credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to this single master account at one Reserve Bank.

*Fourth Corner*, 861 F.3d at 1064 n.1 (Bacharach, J.) (quoting Bd. of Governors of the Fed.

Reserve   Sys.,   *Reserve   Maintenance   Manual*   5   (Nov.   2016),   available   at

https://www.federalreserve.gov/monetarypolicy/files/reserve-maintenance-manual.pdf).

In this case, it is undisputed that Custodia was "eligible" to obtain a master account.

Upon Custodia's application, FRBKC consulted with the Board's legal advisors, and they

determined in January 2022 that "Custodia met the [Federal Reserve Act's] definition of a

'depository institution' and was therefore 'eligible' to request a Reserve Bank account and

services."  (ECF 273 p. 27; *see also* ECF 236-9.)

The real dispute at the heart of this case is whether FRBKC must grant a master

account to Custodia because it was legally eligible or whether FRBKC possessed the

discretion to deny Custodia's master account application despite its eligibility.  Custodia

contends that because it was legally eligible to request and obtain a master account,

FRBKC was required by law to grant the request.  FRBKC says legal eligibility is only a

threshold determination and it retains discretion under the law whether to issue master

accounts to eligible depository institutions.  The parties rely on their interpretations of

different provisions of the Federal Reserve Act to press their arguments.  Custodia has not

challenged the reasons given by FRBKC for denying its master account application in this

lawsuit.

### 2.1   Dispute Concerning Which Defendant Denied Custodia's Master Account Application

Custodia applied to FRBKC for a master account.  (Am. Compl. ¶ 21.)  The master account denial was conveyed to Custodia by FRBKC, not the Board of Governors, and was signed by the then-President and CEO of FRBKC.  (ECF 236-84.)  In its amended complaint, Custodia asserted "the Board orchestrated the denial of Custodia's master account application," the Board's action "in denying Custodia's master account application" was unlawful, and the master account denial was "part of a larger effort coordinated by the Board (in conjunction with the White House) in response to its decision that de novo banks should not be permitted to engage with crypto-assets."  (Am. Compl. ¶¶ 82, 84, 62.)  In briefing, the Defendants contend FRBKC is the entity that denied the master account application, with legal and appropriate input from the Board.  (ECF 271 pp. 45-50; ECF 273 pp. 25-35.)  In response, Custodia reasserted that "the Board controlled the Custodia master account process."  (ECF 295 p. 33.)

This dispute is a question of fact.  The extensive evidence presented by the parties as part of their motions practice weighs toward a factual finding that it was FRBKC that denied Custodia's master account application.  (*See* ECF 273 pp. 36-37 and the citations to the record therein.)  Nonetheless, the Court need not make any factual determination on this dispute.  For purposes of considering Custodia's request for a writ of mandamus in Claim II alleged against FRBKC, the Court will assume without deciding that FRBKC denied the master account application.  The Court notes, though, that if Custodia is correct

that it was actually the Board that denied the application, such could amount to a final

agency action sufficient to vest jurisdiction for judicial review.  And regardless, because

Custodia's bases for compelling a master account in Count I and Count II are identical—

that the Federal Reserve Act commands Custodia receive a master account—the following

statutory construction analysis would control the outcome for both causes of action.

## 2.2     Statutory Interpretation Principles

When construing federal statutes, the Court's goal is to "ascertain the congressional

intent and give effect to the legislative will."  *Ribas v. Mukasey*, 545 F.3d 922, 929 (10th

Cir. 2008) (quotation omitted).

> In conducting this analysis, we first turn to the statute's plain language.
> *United States v. West*, 671 F.3d 1195, 1199 (10th Cir. 2012).  We give
> undefined terms their ordinary meanings, considering "both the specific
> context in which the word is used and the broader context of the statute as a
> whole." *Theis*, 853 F.3d at 1181.
>
> In determining whether statutory language is ambiguous, we look to "the
> language itself, the specific context in which that language is used, and the
> broader context of the statute as a whole." *Keller Tank Servs. II, Inc. v.
> Comm'r*, 854 F.3d 1178, 1196 (10th Cir. 2017) (quotation omitted).  A statute
> is ambiguous if it "is capable of being understood by reasonably well-
> informed persons in two or more different senses." *Allen v. Geneva Steel Co.
> (In re Geneva Steel Co.)*, 281 F.3d 1173, 1178 (10th Cir. 2002).

*In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018).  "It is well established that 'when the

statute's language is plain, the sole function of the courts—at least where the disposition

required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S.

Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union

Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).

### 2.3    **Statutory Analysis**

Custodia contends 12 U.S.C. § 248a(c)(2) requires that all legally-eligible depository institutions receive a master account. Section 248a was enacted as part of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA). As its name implies, the DIDMCA had two overarching principles:

(1)    Phase out certain restrictions on depository institutions, including state-law restrictions on interest rates because those restrictions had precluded banks from paying a market rate of interest on deposits and lenders from charging a market rate of interest on loans. *See Moyer v. Citicorp Homeowners, Inc.*, 799 F.2d 1445, 1446 (11th Cir. 1986).

(2)    Increase the Federal Reserve's control over the money supply by requiring even nonmember depository institutions to meet certain reserve requirements based on the size of their deposits. *See Texas State Bank v. United States*, 423 F.3d 1370, 1373 (Fed. Cir. 2005).

As part of the DIDMCA, § 248a, entitled "Pricing of services," provides in part:

**(a)    Publication of Pricing Principles and Proposed Schedule of Fees; Effective Date of Schedule of Fees.**
Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.

**(b)    Covered services.**
The services which shall be covered by the schedule of fees under subsection (a) are—

(1)     currency and coin services;
(2)     check clearing and collection services;
(3)     wire transfer services;
(4)     automated clearinghouse services;
(5)     settlement services;
(6)     securities safekeeping services;
(7)     Federal Reserve float; and
(8)     any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds.

**(c)     Criteria applicable.**
The schedule of fees prescribed pursuant to this section shall be based on the following principles:

(1)     All Federal Reserve Bank services covered by the fee schedule shall be priced explicitly.

(2)     All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

...

12 U.S.C. § 248a.

Relying largely on Judge Bacharach's concurring opinion in *Fourth Corner*, Custodia contends § 248a(c)(2) requires that all legally-eligible depository institutions receive a master account. Specifically, Custodia says the language, "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions" requires every eligible depository institution to receive a master account because it is only through a master account that a depository institution can access the identified bank services. Judge Bacharach concluded the only way the "Federal Reserve bank services covered by the fee schedule" can be made available to nonmember depository institutions is by granting them a master account. *Fourth Corner*, 861 F.3d at

1071 ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks.  To purchase these services, a master account is required.  Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts.").  Custodia asserts § 248a(c)(2) "unambiguously commands Defendants to grant access to all services covered by 'the fee schedule' to 'nonmember depository institutions.'  As a nonmember depository institution deemed eligible by both the Board and the Kansas City Fed, Custodia must be granted a master account." (ECF 234 p. 43.)

Unsurprisingly, the Defendants see it differently.  They contend the various Federal Reserve Banks have the discretion to grant or deny a master account application under 12 U.S.C. § 342, which says in part:

> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, … deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items ….[6]

To effectuate this deposit-taking function, Federal Reserve Banks use the master account to keep a record of each depository institution's debits and credits.  No provision of the Federal Reserve Act, including § 342, "imposes upon reserve banks any obligation to receive" deposits.  *Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923).  "The act merely confers authority to do so." *Id.* The Supreme Court in *Farmers' and Merchants' Bank* observed that the Federal Reserve

---

[6] Relevant here, the DIDMCA amended § 342 by adding "other depository institutions" to the list of entities from which Federal Reserve Banks may receive deposits.  Public Law No. 96-221 (HR 4986), § 105, 94 Stat. 132 (1980) (codified at 12 U.S.C. § 342).

Act "appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the board and the Reserve Banks 'shall' do and what they 'may' do." *Id.* at 663. The Defendants contend the discretion to receive or reject deposits necessarily carries with it the discretion to grant or deny master accounts.

Judge Bacharach's opinion in *Fourth Corner* is well-reasoned and insightful, and it offers a helpful starting point on this issue. It is, however, not controlling authority because *Fourth Corner* was a three-way split decision between the three-judge panel, and Judge Bacharach was effectively the odd man out as he voted to reverse the dismissal of the complaint while the other two judges voted to uphold the dismissal. *See Fourth Corner*, 861 F.3d at 1053; *see also Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *8 (S.D.N.Y. Oct. 27, 2023) (noting that Judge Bacharach's opinion is not controlling even in the Tenth Circuit).

Having carefully examined the relevant statutory language and considered the many arguments presented, the Court concludes § 248a does not do the lifting Custodia demands of it. The Court respectfully deviates from Judge Bacharach's opinion in *Fourth Corner* based in large part on certain legislation enacted by Congress since then, which was not available for Judge Bacharach's consideration in 2017. The Court concludes the statutory language is clear and unambiguous, and the Federal Reserve Act does not support Custodia's position for several reasons.

First, the express language of § 248a does not say anything about a master account, and it certainly does not instruct Federal Reserve Banks to grant a master account to every eligible depository institution that asks for one. The language employed by Congress in §

248a establishes that it is directed to the Board of Governors, not the Federal Reserve Banks. Subsection 248a(a) instructs "the Board" to "publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles." The remainder of Section 248a sets forth those pricing principles and provides further instruction to the Board of Governors. *See, e.g.*, § 248a(d) ("The Board shall require reductions in the operating budgets of the Federal Reserve banks …). The plain language Congress employed in 12 U.S.C. § 248a does not expressly require anything from or provide instruction to the Federal Reserve Banks.

Second, it makes logical sense that § 248a is directed to the Board of Governors because that statute is found in Subchapter II of Chapter 3 of Title 12, and Subchapter II is titled "Board of Governors of the Federal Reserve System." Indeed, § 248 begins, "The Board of Governors of the Federal Reserve System shall be authorized and empowered: [list of duties]." 12 U.S.C. § 248. And § 248a is titled, "Pricing of services." The titles of § 248a and Subchapter II persuasively suggest Congress was instructing the Board of Governors to create a non-discriminatory pricing schedule, not instructing the Federal Reserve Banks that they must provide master accounts to all eligible depository institutions. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*, p. 221 (2012) ("The title and headings are permissible indicators of meaning."). Custodia's assertion that Congress intended to mandate Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions in a subchapter that sets forth the duties of a completely different entity (the Board of Governors) is a leap too far.

Third, the plain language of § 248a sets forth two primary directives: (1) require the

Board to establish a fee schedule for Federal Reserve Bank services that is the same for both member depository institutions and nonmember depository institutions, and (2) require the Board to ensure those services are available to both member depository institutions and nonmember depository institutions. Contrary to Custodia's position, there is no language in § 248a requiring the services be provided to *every* nonmember depository institution. *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *8 (S.D.N.Y. Oct. 27, 2023) ("the purpose of the statutory section is to prevent price discrimination when a service is offered to a nonmember institution, not to require the Federal reserve banks to provide specific services to nonmember banks") (citing *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983)). The Court finds it significant that Congress chose to include the word "all" before "Federal Reserve bank services covered by the fee schedule" but not before "nonmember depository institutions" in § 248a(c)(2). Thus, Congress did not signal its intent that all Federal Reserve bank services be available to *all* nonmember depository institutions. Indeed, by including "all" prior to "Federal Reserve bank services" but not prior to "nonmember depository institutions" within the same provision, Congress signaled it intended to treat the two phrases differently. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("We have often noted that when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning.") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also Rule of the Last Antecedent*, Black's Law Dictionary 1532–1533 (10th ed. 2014) ("qualifying words or

phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing").

> The inclusion of "all" with respect to the Federal Reserve services and exclusion of "all" regarding which depository institutions suggests that there be no discretion over which services must be priced according to the fee schedule, but that discretion remains in providing depository institutions access to such services, such as retaining discretion in granting master accounts.

(ECF 286 p. 16, Amicus Br. of Prof. David Zaring.)

Fourth, concluding the Federal Reserve Banks possess discretion to grant or deny master accounts is harmonious with recent federal legislation. In December 2022, as part of the National Defense Authorization Act for Fiscal Year 2023, Public Law 117-263, Congress enacted and the President signed into law 12 U.S.C. § 248c. That statute instructs the Board of Governors to create and maintain a public database identifying every entity that currently possesses a master account at a Federal Reserve Bank as well as every entity that has submitted an application for a master account.   12 U.S.C. § 248c(b)(1). Significantly, the Board's database must also show whether each new master account application "was approved, rejected, pending, or withdrawn." *Id.* § 248c(b)(1)(B)(ii). If Congress intended the DIDMCA to remove a Federal Reserve Bank's discretion to deny a master account application, there would be no reason for Congress to now require a public database indicating which master account applications have been granted and which have been denied.   "This amendment confirms that Federal reserve banks may 'reject' applications from depository institutions ...." *Banco San Juan Internacional*, 2023 WL

7111182, at *7. If, as Custodia contends, Federal Reserve Banks lack discretion to deny a master account application as a matter of law, § 248c(b)(1)(B)(ii)'s "rejected" option would be unnecessary and superfluous, but courts may not "construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous." *Bridger Coal Co./Pac. Mins., Inc. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Labor*, 927 F.2d 1150, 1153 (10th Cir. 1991). To avoid immediately rendering the "rejected" option of § 248c(b)(1)(B)(ii) meaningless, the Court must conclude the Federal Reserve Banks were not stripped of their discretion to deny master account applications.

Fifth, reading § 248a to not strip the Federal Reserve Banks of their pre-DIDMCA discretion in issuing master accounts is also consistent with the text of 12 U.S.C. § 342. As quoted above, § 342 states a Federal Reserve Bank "may receive" deposits from member banks and nonmember depository institutions. The Supreme Court has noted this confers the authority to receive such deposits on the Federal Reserve Banks, but it also vests them with the discretion to accept or reject the deposits. *Farmers' & Merchants' Bank*, 262 U.S. at 662. This discretion to receive or reject deposits necessarily carries with it the discretion to grant or deny master accounts. The Court agrees with the interpretation recently set forth by the Southern District of New York, concluding that § 342 "makes clear that Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so," and the statute "provides that Federal reserve banks 'may' open accounts, not that they shall." *Banco San Juan Internacional*, 2023 WL 7111182, at *7. Construing § 248a and § 342 in this manner reads them in harmony with each other. *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1189 (10th Cir. 2013) ("Statutes

A.77

must be read as a whole and in relation to one another.  When two related statutes appear to conflict, courts have a duty to construe them harmoniously and give each effect.") (citations omitted).

Sixth, Congress "does not ... hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).  The "no-elephants-in-mouseholes" canon of statutory construction "recognizes that Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.'" *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 680 (2020) (quoting *Whitman*, 531 U.S. at 468).  The Defendants' briefing described the Federal Reserve Banks' exercise of discretion in granting access to accounts and services dating back to the Federal Reserve Act of 1913. (ECF 271 pp. 17-21; ECF 273 pp. 14-16.)  Accepting Custodia's contention here would mean that Congress, in the DIDMCA in 1980, greatly altered the details of the regulatory scheme first initiated in 1913 by requiring Federal Reserve Banks to provide master accounts to all eligible depository institutions requesting one, and also that Congress did so in a provision (and a subchapter) directed at the Board of Governors and without expressly saying as much.  A better example of hiding an elephant in a mousehole would be difficult to find.  The Court finds it highly unlikely that Congress intended such a significant change in the Federal Reserve Banks' procedures, not to mention the access to the national banking system, via such implicit terms in a statute directed at a different entity.

Seventh and finally, important policy considerations support this construction of the relevant statutes.  If Custodia's position was correct, it would effectively mean that every

depository institution chartered under the laws of a state, regardless of how soundly crafted, is entitled to a master account allowing it direct access to the federal financial system. Thus, unless Federal Reserve Banks possess discretion to deny or reject a master account application, state chartering laws would be the only layer of insulation for the U.S. financial system. And in that scenario, one can readily foresee a "race to the bottom" among states and politicians to attract business by reducing state chartering burdens through lax legislation, allowing minimally regulated institutions to gain ready access to the central bank's balance sheet and Federal Reserve services. As FRBKC accurately notes, "The Wyoming Division of Banking ('WY DOB') has many purposes and aims, but protecting the *national* financial system and implementing *national* monetary policy are not among them." (ECF 310 pp. 13-14 (emphases in original).) "States lack not only the mission but also the resources to protect national interests." (*Id.* p. 14 n.3.) The potential negative consequences associated with Custodia's proffered interpretation do not suggest Congress intended the DIDMCA to remove the discretion of Federal Reserve Banks when considering master account applications.

### 2.4   Conclusion

The plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts. Accordingly, Custodia cannot prevail on Claim II, wherein it seeks a writ of mandamus compelling the Defendants to provide Custodia a master account. "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes

him a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (citing

*Kerr v. United States Dist. Court*, 426 U.S. 394, 402–03 (1976)).  "The importance of the

term 'nondiscretionary' cannot be overstated—the judiciary cannot infringe on decision-

making left to the Executive branch's prerogative." *Marquez-Ramos v. Reno*, 69 F.3d 477,

479 (10th Cir. 1995).  Having concluded the Federal Reserve Act of 1913, as amended,

grants to the Federal Reserve Banks the discretion to grant or deny a master account

application, the Defendants did not owe Custodia any non-discretionary duty to issue a

master account upon request.  Consequently, FRBKC is entitled to judgment as a matter of

law in its favor against Custodia's Claim II.[7]

## CONCLUSION AND ORDER

Claim I of Custodia's amended complaint must be dismissed because Custodia fails

to challenge a final agency action as required under the APA.  As for Claim II, the relevant

statutes establish that the Federal Reserve Banks possess the discretion to grant or deny

master account requests.  Therefore, Custodia is not entitled to its requested writ of

mandamus compelling FRBKC to issue it a master account, and summary judgment on

Claim II must be granted in FRBKC's favor.

**IT IS THEREFORE ORDERED** that Plaintiff's Petition for Review on its APA

Claim and its Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim

(ECF 233, ECF 238) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's petition for review under the APA

---

[7] If the Court possessed jurisdiction for APA review in Claim I, judgement as a matter of law would be warranted in the Board of Governors' favor based on the same reasoning.

A.80

alleged against Defendant Board of Governors (Claim I) is **DISMISSED WITHOUT PREJUDICE FOR LACK OF JURISDICTION**.

**IT IS FURTHER ORDERED** that Defendant FRBKC's Cross-Motion for Summary Judgment (ECF 272) is **GRANTED**.  Judgment as a matter of law is granted in Defendant FRBKC's favor and against Plaintiff on the statutory mandamus claim (Claim II).

**IT IS FURTHER ORDERED** that Plaintiff's cause of action requesting declaratory judgment (Claim III) is **DISMISSED**.  The Declaratory Judgment Act offers a remedy for valid federal causes of action and does not provide an independent cause of action, and Plaintiff has not prevailed on its other causes of action.

**IT IS FURTHER ORDERED** that Defendant FRBKC's Motion to Strike Reports and Exclude Testimony of Professor Peter Conti-Brown (ECF 267) and Motion to Strike Reports and Exclude the Testimony of Katie S. Cox (ECF 269) are **DENIED AS MOOT**. The Court reviewed and considered the reports and depositions of these experts, provided as exhibits in support of Custodia's arguments (ECF 236-1, 236-26, 236-47, 296-7, 296-15), in ruling on the pending motions.

**ORDERED**: March 29th, 2024.

Scott W. Skavdahl
United States District Court Judge

**A.81**

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

CUSTODIA BANK, INC.,

       Plaintiff,

    v.

FEDERAL RESERVE BOARD OF
GOVERNORS, and FEDERAL RESERVE
BANK OF KANSAS CITY,

       Defendants.

Case No. 22-CV-125-SWS

## JUDGMENT

In conformity with the Court's Order on Dispositive Motions (ECF 317), which is fully incorporated herein by this reference,

**Judgment as a matter of law** is hereby entered in favor of Defendant Federal Reserve Bank of Kansas City and against Plaintiff Custodia Bank, Inc. on Plaintiff Custodia's cause of action seeking a writ of mandamus (Claim II).

**It is ordered and adjudged** that Plaintiff Custodia's petition for review under the Administrative Procedure Act (Claim I) asserted against Defendant Federal Reserve Board of Governors is **dismissed without prejudice for lack of jurisdiction**, and Plaintiff Custodia's cause of action for declaratory judgment under the Declaratory Judgment Act (Claim III) is **dismissed**.

**DATED:** March _29th_, 2024.

Entered:    Margaret Botkins
              Clerk of Court

By: _____
         Elayna Thorsell
         Deputy Clerk of Court

**A.82**