VOLUME III of X (Pages J.A.459 – J.A.660)

Case No. 24-8024

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

CUSTODIA BANK, INC.,

Appellant,

v.

FEDERAL RESERVE BOARD OF GOVERNORS et al.,

Appellees.

On Appeal from the U. S. District Court for the District of Wyoming

The Honorable Scott W. Skavdahl, District Judge

District Court No. 1:22-CV-125-SWS

## JOINT APPENDIX

Joshua P. Chadwick
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street & Constitution Ave. NW
Washington, DC 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

Michelle S. Kallen
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com

*Counsel for Appellant*

Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street and Constitution Ave.
NW
Washington, DC 20551
(202) 263-4835
yvonne.f.mizusawa@frb.gov
yonatan.gelblum@frb.gov
katherine.pomeroy@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Andrew Z. Michaelson
KING & SPALDING LLP
1185 Ave. of the Americas, 34th Fl.
New York, NY 10036
(212) 556-2100
amichaelson@kslaw.com

Billie LM Addleman
Erin E. Berry
HIRST APPLEGATE, LLP
PO Box 1083
Cheyenne, WY 82001
(307) 632-0541
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Christine M. Carletta
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
ccarletta@kslaw.com
cfreeman@kslaw.com

Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE,
P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

*Counsel for Appellant*

Jared Lax
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
jlax@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

# TABLE OF CONTENTS

## Volume I of X

District Court Docket Report, *Custodia Bank Inc. v. Federal Reserve Board of Governors et al,* No. 1:22-cv-00125 (D. Wyo.) .................................................................................... J.A.1

Complaint (D. Wyo. June 7, 2022), ECF No. 1 ................................. J.A.41

Exhibit 1 to Complaint (D. Wyo. June 7, 2022), ECF No. 1-2 ......... J.A.86

Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 48 .................................................................... J.A.88

Defendant Board of Governors of the Federal Reserve System's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 49 ................................................................................. J.A.91

Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 50 ..... J.A.153

Defendant Federal Reserve Bank of Kansas City's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 51 ...... J.A.157

## Volume II of X

Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's Complaint (D. Wyo. Sept. 13, 2022) ECF No. 58 ................................................................................. J.A.216

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss Complaint (D. Wyo. Oct. 4, 2022) ECF No. 96 ..................... J.A.269

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss (D. Wyo. Oct. 4, 2022) ECF No. 97 ............................................................................. J.A.304

Plaintiff Custodia Bank, Inc.'s Notice of Submission of Supplemental Authority (D. Wyo. Oct. 12, 2022) ECF No. 98 ................................................................................................ J.A.340

Defendant Board of Governors of the Federal Reserve System's Response to Plaintiff's Notice and Submission of Supplemental Authority (D. Wyo. Oct. 19, 2022) ECF No. 99 ................................................................................................ J.A.353

Order Granting in Part and Denying in Part Defendants' 12(b)(6) Motions to Dismiss Complaint (D. Wyo. Nov. 11, 2022) ECF No. 102 ............................................................... J.A.359

Joint Motion of Defendants Federal Reserve Bank of Kansas City and Federal Reserve Board of Governors to Dismiss the Complaint as Moot (D. Wyo. Jan. 27, 2023) ECF No. 116 .................................................................................................. J.A.397

First Amended Complaint (D. Wyo. Feb. 28, 2023) ECF No. 121 .................................................................................................. J.A.401

Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss First Amended Complaint (D. Wyo. Mar. 28, 2023) ECF No. 124 ............................................................... J.A.438

## Volume III of X

Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss the First Amended Complaint (D. Wyo. Mar. 28, 2023) ECF No. 126 ................. J.A.459

Defendant Board of Governors of the Federal Reserve System's Memorandum of Points and Authorities in Support of Its Motion to Dismiss the First Amended Complaint (D. Wyo. Mar. 28, 2023) ECF No. 127 ............... J.A.462

Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint (D. Wyo. Apr. 11, 2023) ECF No. 135 ......................................... J.A.497

Brief of Amicus Curiae Former Senator Patrick J. Toomey in
    Support of Neither Party (D. Wyo. Apr. 20, 2023) ECF
    No. 151 .................................................................................. J.A.537

Defendant Federal Reserve Bank of Kansas City's Reply in
    Support of Its Motion to Dismiss First Amended
    Complaint (D. Wyo. May 2, 2023) ECF No. 159 .................. J.A.559

Defendant Board of Governors of the Federal Reserve
    System's Reply in Support of Its Motion to Dismiss the
    Amended Complaint (D. Wyo. May 2, 2023) ECF No. 160
    ............................................................................................. J.A.572

Order on Defendants' Motions to Dismiss First Amended
    Complaint (D. Wyo. June 8, 2023) ECF No. 164 ................. J.A.601

Defendant Federal Reserve Bank of Kansas City's Answer to
    Custodia's First Amended Complaint (D. Wyo. June 22,
    2023) ECF No. 166 ................................................................. J.A.617

Defendant Board of Governors of the Federal Reserve
    System's Notice of Lodging of the Administrative Record
    (D. Wyo. Aug. 21, 2023) ECF No. 178 .................................. J.A.641

Second Amended Scheduling Order (D. Wyo. Nov. 13, 2023)
    ECF No. 211 ........................................................................... J.A.644

Order Granting Joint Motion and Stipulation to Align and
    Consolidate APA and Summary Judgment Briefing (D.
    Wyo. Nov. 28, 2023) ECF No. 220 ....................................... J.A.656

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA
    Claim and Its Motion for Judgment as a Matter of Law
    on Its Statutory Mandamus Claim (D. Wyo. Dec. 22,
    2023) ECF No. 238 ................................................................. J.A.657

Proposed Order (D. Wyo. Dec. 22, 2023) ECF No. 238-1 .............. J.A.660

**Volume IV of X**

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 239 ................................................................................ J.A.661

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 240 ................................................................................ J.A.725

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 240-1 ................................................................ J.A.740

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 240-3 ................................................................................ J.A.811

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 240-5 ........................................................ J.A.858

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 240-9 ................................................................................ J.A.879

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 240-10 ........................................................ J.A.881

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 240-11 ...................................................... J.A.912

### Volume V of X

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 240-15 ................................................................................ J.A.919

Exhibit Z, Katie S. Cox's Expert Report (Oct. 20, 2023) ECF No. 240-26 ................................................................ J.A.921

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 240-31 ..................................................... J.A.971

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 240-37 ......... J.A.978

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 240-38 ..................................................................................... J.A.983

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 240-40 ......................................................... J.A.986

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 240-45 .................................................................... J.A.988

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 240-47 .................................................... J.A.1043

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 240-53 ..................... J.A.1051

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 240-54 .......... J.A.1056

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 240-64 ......................................................................... J.A.1058

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 240-65 ........................ J.A.1061

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 240-67 ................................... J.A.1062

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 240-68 ................................... J.A.1065

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 240-69 ........................... J.A.1068

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-71 ................................... J.A.1071

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 240-75 ................................... J.A.1081

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 240-77 ........................... J.A.1087

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-78 ................................... J.A.1089

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 240-80 ........................ J.A.1099

Exhibit CC, Email from Matthew Eichner with the subject line "Custodia response: S-Letter - 2667 with no concerns identified" (Jan. 26, 2023) ECF No. 240-81 ........ J.A.1101

Exhibit CD, Letter from Caitlin Long to the Office of the
    Inspector General of the Federal Reserve Board of
    Governors (Mar. 8, 2023) ECF No. 240-82 ......................... J.A.1103

Exhibit CE, Email from Amy LaFave with the subject line
    "Correspondence from Federal Reserve Bank of Kansas
    City President Esther George" (Jan. 27, 2023) ECF No.
    240-83 .................................................................................. J.A.1117

Exhibit CF, Letter from The Federal Reserve Bank of Kansas
    City to Caitlin Long (Jan. 27, 2022) ECF No. 240-84 ........ J.A.1119

Order Granting Unopposed Motion to Amend the Scheduling
    Order (D. Wyo. Dec. 26, 2023) ECF No. 241 ...................... J.A.1127

Amicus Curiae Brief of the State of Wyoming (D. Wy. Jan. 18,
    2024) ECF No. 251 ............................................................. J.A.1129

## Volume VI of X

Amici Curiae Brief in Support of Plaintiff filed by Amicus
    Parties Blockchain Association, Payment System
    Scholars (D. Wy. Jan. 19, 2024) ECF No. 257 .................... J.A.1137

Amici Curiae Brief in Support of Plaintiff's Motion for
    Judgment as a Matter of Law filed by Amicus Parties
    United States House of Representatives Financial
    Services Committee Members, United States Senate
    Banking, Housing and Urban Affairs Committee
    Members (D. Wy. Jan. 19, 2024) ECF No. 259 .................. J.A.1173

Defendant Board of Governors of the Federal Reserve
    System's Opposition to Plaintiff's Petition for
    Administrative Procedure Act Review (D. Wyo. Jan. 26,
    2024) ECF No. 271 ............................................................. J.A.1200

Federal Reserve Bank of Kansas City's Cross-Motion for
    Summary Judgment (D. Wyo. Jan. 26, 2024) ECF No.
    272 ...................................................................................... J.A.1257

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 282 ... J.A.1260

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 283 ........ J.A.1318

Amicus Brief in Support of Defendants filed by Amicus David Zaring  (D. Wy. Feb. 9, 2024) ECF No. 286 ....................... J.A.1331

### Volume VII of X

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 299 ....................................................................... J.A.1349

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 300 ....................................................................... J.A.1402

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 300-7 ............................... J.A.1407

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 300-8 .................................................... J.A.1414

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 300-15 .................................................... J.A.1418

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 27, 2024) ECF No. 313 ...................................... J.A.1423

Order on Dispositive Motions (D. Wyo. Mar. 29, 2024) ECF No. 317 ................................................................. J.A.1449

Judgment (D. Wyo. Mar. 29, 2024) ECF No. 318 ........................ J.A.1476

Plaintiff Custodia Bank, Inc.'s Notice of Appeal (D. Wyo. Apr. 26, 2024) ECF No. 321 ....................................................... J.A.1477

### UNDER SEAL
### Volume VIII of X

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 233 ........................................................... J.A.1480

Proposed Order (D. Wyo. Dec. 20, 2023) ECF No. 233-1 ........... J.A.1483

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 234
............................................................................... J.A.1484

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 236
............................................................................... J.A.1548

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 236-1 .................................................. J.A.1563

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 236-3 ........................................................................ J.A.1634

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 236-5 ....................................... J.A.1681

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 236-9 ............................................................................ J.A.1702

### Volume IX of X

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 236-10 ....................................... J.A.1704

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 236-11 .................................. J.A.1735

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 236-15 .................................................................. J.A.1742

Exhibit Z, Katie S. Cox's Expert Report (Oct. 20, 2023) ECF No. 236-26 ......................................................... J.A.1744

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 236-31 .................................. J.A.1794

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 236-37 ....... J.A.1801

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 236-38 .................................................................. J.A.1806

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 236-40 ....................................... J.A.1809

Exhibit AS, S-2677 Letter from the Board of Governors of the
    Federal Reserve System to the President and First Vice
    President of each Federal Reserve Bank (Jan. 17, 2023)
    ECF No. 236-45 .................................................................. J.A.1811

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec.
    4, 2023) ECF No. 236-47 .................................................... J.A.1866

Exhibit BA, List of individuals from the Board who had
    contact with individuals from the Federal Reserve Bank
    of Kansas City about Custodia's master account,
    excerpted from the binder used by Judith Hazen to
    prepare as the Federal Reserve Bank of Kansas City's
    30(b)(6) deposition witness, ECF No. 236-53 ..................... J.A.1874

Exhibit BB, List of individuals involved with non-traditional
    accounts, like Special Purpose Depository Institutions,
    while working at the Federal Reserve Board of
    Governors, created during the Federal Reserve Bank of
    Kansas City's 30(b)(6) deposition, ECF No. 236-54 ........... J.A.1879

Exhibit BL, Email from Jeff Imgarten with the subject line
    "Initial Draft of Commitments/Conditions for Custodia
    Bank-Supplemental Information" (Nov. 14, 2022 ) ECF
    No. 236-64 ......................................................................... J.A.1881

Exhibit BM, Potential Membership Application
    Commitments Summary, ECF No. 236-65 ........................ J.A.1884

Exhibit BO, Email from Jeff Imgarten with the subject line
    "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022)
    ECF No. 236-67 ................................................................. J.A.1893

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No.
    236-68 ................................................................................ J.A.1894

Exhibit BQ, Email from Jason Hinkle with the subject line
    "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF
    No. 236-69 ......................................................................... J.A.1899

Exhibit BS, draft Executive Summary to Esther George with
    the subject line "Custodia Bank, Inc. (fka Avanti Bank
    & Trust) Master Account Recommendation" (Jan. 2023)
    ECF No. 236-71 ................................................................. J.A.1902

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No.
    236-75 ................................................................................ J.A.1912

Exhibit BY, Email from Matthew Malloy with the subject line
    "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF
    No. 236-77 .......................................................................... J.A.1918

Exhibit BZ, draft Executive Summary to Esther George with
    the subject line "Custodia Bank, Inc. (fka Avanti Bank
    & Trust) Master Account Recommendation" (Jan. 2023)
    ECF No. 236-78 ................................................................. J.A.1920

Exhibit CB, Email from Judith Hazen with the subject line
    "Custodia Bank Master Account Request" (Jan. 24,
    2023) ECF No. 236-80 ....................................................... J.A.1930

Exhibit CD, Letter from Caitlin Long to the Office of the
    Inspector General of the Federal Reserve Board of
    Governors (Mar. 8, 2023) ECF No. 236-82 ......................... J.A.1932

Exhibit CE, Email from Amy LaFave with the subject line
    "Correspondence from Federal Reserve Bank of Kansas
    City President Esther George" (Jan. 27, 2023) ECF No.
    236-83 ................................................................................ J.A.1946

Exhibit CF, Letter from The Federal Reserve Bank of Kansas
    City to Caitlin Long (Jan. 27, 2022) ECF No. 236-84 ........ J.A.1948

## Volume X of X

Defendant Federal Reserve Bank of Kansas City's Cross-
    Motion for Summary Judgment and Opposition to
    Plaintiff's Petition for Review and Motion for Judgment
    as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 273
    ............................................................................................ J.A.1956

Declaration of Andrew Michaelson in Support of Defendant
Federal Reserve Bank of Kansas City's Cross-Motion for
Summary Judgment and Opposition to Plaintiff's
Petition for Review and Motion for Judgment as a
Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 274 ........ J.A.2014

Errata to ECF No. 274 (D. Wyo. Feb. 2, 2024) ECF No. 277 ...... J.A.2027

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the
Federal Reserve Bank of Kansas City's Cross-Motion for
Summary Judgment and Reply Brief in Support of
Custodia's Petition for Review on Its APA Claim and Its
Motion for Judgment as a Matter of Law on Its
Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024)
ECF No. 295 ........................................................................ J.A.2029

Declaration of Ryan Scarborough in Support of Plaintiff
Custodia Bank, Inc.'s Omnibus Opposition to the
Federal Reserve Bank of Kansas City's Cross-Motion for
Summary Judgment and Reply Brief in Support of
Custodia's Petition for Review on Its APA Claim and Its
Motion for Judgment as a Matter of Law on Its
Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024)
ECF No. 296 ........................................................................ J.A.2082

Exhibit CX, Excerpts from the deposition of Peter Conti-
Brown (Dec. 14, 2023) ECF No. 296-7 ............................... J.A.2087

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov.
30, 2023) ECF No. 296-8 .................................................... J.A.2094

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec.
19, 2023) ECF No. 296-15 .................................................. J.A.2098

Defendant Federal Reserve Bank of Kansas City's Reply in
Support of Its Cross-Motion for Summary Judgment (D.
Wyo. Feb. 23, 2024) ECF No. 310 ...................................... J.A.2103

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2024, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Michelle S. Kallen
Michelle S. Kallen

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that (1) all required privacy redactions have been made and (2) any paper copies of this document submitted to the Court will be identical copies of the version electronically filed.

<u>/s/ Michelle S. Kallen   </u>
Michelle S. Kallen

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the Federal Reserve System*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

|  |  |  |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-00125-SWS |
| v. | ) | |
| | ) | |
| BOARD OF GOVERNORS OF | ) | |
| THE FEDERAL RESERVE SYSTEM & | ) | |
| FEDERAL RESERVE BANK | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendant Board of Governors of the Federal Reserve System ("Board") hereby moves to

dismiss this action pursuant to Rule 12 of the Federal Rules of Civil Procedure.

In support of its motion, the Board respectfully refers the Court to its accompanying

Memorandum of Points and Authorities in Support.

**J.A.459**

Dated:  March 28, 2023

Respectfully submitted,

 /s/ *Joshua P. Chadwick*

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the Federal Reserve System*

**J.A.460**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2023, I electronically filed the foregoing using the

court's CM/ECF system, which will send notification of such filing to all parties of record.

By:   /s/ *Joshua P. Chadwick*
      Joshua P. Chadwick

      *Counsel for Defendant Board of Governors*
      *of the Federal Reserve System*

**J.A.461**

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-00125-SWS |
| v. | ) | |
| | ) | |
| BOARD OF GOVERNORS OF | ) | |
| THE FEDERAL RESERVE SYSTEM & | ) | |
| FEDERAL RESERVE BANK | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 2

    A.    Defendants Have Determined That Custodia's Monoline, Cryptocurrency-Focused Business Model Presents Substantial Risks ........................................................... 2

        1.    Custodia seeks Reserve Bank access to provide cryptocurrency services amid significant upheaval .......................................................... 2

        2.    The Board's Order denying Custodia's application for Federal Reserve System membership identifies the clear and substantial risks presented by Custodia's business model .......................................... 6

    B.    Recent Board Guidance and Amendments to the Federal Reserve Act Confirm That the Federal Reserve Retains Authority to Deny Access to Reserve Bank Master Accounts and Services ............................................... 9

    C.    Custodia's Amended Complaint Contends That the Board Has a Non-Discretionary Duty to Require and Enforce Plenary Access to Reserve Bank Accounts and Services Regardless of Risk ................................................. 10

ARGUMENT ............................................................................................... 11

I.    The Federal Reserve Act Does Not Require the Board to Mandate That Custodia Receive a Reserve Bank Master Account and Services ................................................ 12

    A.    The Plain Text of Section 248a Does Not Grant Custodia a Right to a Master Account and Services ......................................................................... 13

    B.    Custodia's Construction of Section 248a Would Lead to Absurd Results and Ascribes to Congress an Unlikely Intent ............................................... 18

    C.    Custodia's Construction of Section 248a Is Inconsistent with Recent Board Guidance and Amendments to the Federal Reserve Act ................................... 21

II.    Because Custodia Lacks a Right to a Master Account, Its Complaint Must be Dismissed ......................................................................................... 24

CONCLUSION .............................................................................................. 25

CERTIFICATE OF SERVICE

i

## TABLE OF AUTHORITIES

Page

**Cases**

*7-Eleven, Inc. v. National Union Insurance Co. of Pittsburgh, Pa.*,
  33 F. App'x 703 (5th Cir. 2002) ...................................................................... 15

*Andresen v. Maryland*,
  427 U.S. 463 (1976) ......................................................................................... 15

*Board of County Commissioners v. EEOC*,
  405 F.3d 840 (10th Cir. 2005) ........................................................................ 24

*Board of Governors of the Federal Reserve System v. First Lincolnwood Corp.*,
  439 U.S. 234 (1978) ......................................................................................... 22

*Bob Jones University v. United States*,
  461 U.S. 574 (1983) ......................................................................................... 24

*Cannon v. University of Chicago*,
  441 U.S. 677 (1979) ......................................................................................... 24

*Duncan v. Walker*,
  533 U.S. 167 (2001) ......................................................................................... 24

*First Bank & Trust Co. v. Board of Governors of the Federal Reserve System*,
  605 F. Supp. 555 (E.D. Ky. 1984) .................................................................. 12

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*,
  861 F.3d 1052 (10th Cir. 2017) ...................................................................... 20

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of N.Y.*,
  866 F.2d 38 (2d Cir. 1989) .............................................................................. 13

*Hamric v. Wilderness Expeditions, Inc.*,
  6 F.4th 1108 (10th Cir. 2021) ......................................................................... 17

*Hillsborough County v. Automated Medical Laboratories, Inc.*,
  471 U.S. 707 (1985) ......................................................................................... 22

*In re Cooper Tire & Rubber Co.*,
  568 F.3d 1180 (10th Cir. 2009) ...................................................................... 25

*In re McDaniel*,
  973 F.3d 1083 (10th Cir. 2020) ................................................................. 15, 16

ii

**J.A.464**

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*,
    713 F.2d 1227 (6th Cir. 1983) .................................................. 13, 16

*Kidd v. Equitable Life Assurance Society of U.S.*,
    32 F.3d 516 (11th Cir. 1994) ....................................................... 15

*King v. Burwell*,
    576 U.S. 473 (2015)............................................................. 19, 20

*Lambert v. Saul*,
    980 F.3d 1266 (9th Cir. 2020) ..................................................... 22

*Loughrin v. United States*,
    573 U.S. 351 (2014)................................................................ 18

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
    571 U.S. 191 (2014)................................................................ 25

*Merit Management Group, LP v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018) ............................................................. 16

*Navajo Nation v. Dalley*,
    896 F.3d 1196 (10th Cir. 2018) ................................................... 15

*Nelson v. United States*,
    40 F.4th 1105 (10th Cir. 2022) ................................................... 18

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004)................................................................. 24

*Prime Care of Northeast Kansas, LLC v. Humana Insurance Co.*,
    447 F.3d 1284 (10th Cir. 2006) ................................................... 24

*Salt Lake Tribune Publishing Co. v. Management Planning, Inc.*,
    390 F.3d 684 (10th Cir. 2004) .................................................... 21

*Smith v. United States*,
    508 U.S. 223 (1993)................................................................ 15

*Sullivan v. University of Kansas Hospital Authority*,
    844 F. App'x 43 (10th Cir. 2021) ................................................. 25

*Texas Office of Public Utility Counsel v. FCC*,
    183 F.3d 393 (5th Cir. 1999) ..................................................... 16

iii

**J.A.465**

*Utah Power & Light Co. v. ICC,*
   747 F.2d 721 (D.C. Cir. 1984) ........................................................ 16

*W. Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ............................................................... 21

*Whitman v. American Trucking Associations, Inc.,*
   531 U.S. 457 (2001) ................................................................. 21

*WildEarth Guardians v. NPS,*
   703 F.3d 1178 (10th Cir. 2013) ................................................... 22

*Williams v. Taylor,*
   529 U.S. 362 (2000) ................................................................. 24

**Statutes**

5 U.S.C. § 706(2) ........................................................................ 11, 24

12 U.S.C. § 225a ........................................................................ 19

12 U.S.C. § 248(j) ...................................................................... 12

12 U.S.C. § 248a .................... 11, 12, 13, 15, 16, 18, 19, 21, 22, 23, 24, 25

12 U.S.C. § 248a(a) .................................................................. 12, 13

12 U.S.C. § 248a(b) ................................................................... 17, 23

12 U.S.C. § 248a(c) ............................................................. 12, 14, 15, 16, 25

12 U.S.C. § 248a(c)(1), (3)-(4) ...................................................... 15

12 U.S.C. § 248a(c)(2) ............................. 11, 14, 15, 16, 17, 18, 25

12 U.S.C. § 248a(c)(3) ............................................................... 16

12 U.S.C. § 248c .................................................................... 10

12 U.S.C. § 248c(a)(3) ............................................................... 23

12 U.S.C. § 248c(b)(1) ............................................................... 23

12 U.S.C. § 248c(b)(1)(A) ........................................................... 10

12 U.S.C. § 248c(b)(1)(B) ........................................................... 10

**J.A.466**

12 U.S.C. § 248c(b)(1)(C) ............................................................. 23

12 U.S.C. § 461(b)(1)(A)(i) ........................................................... 20

12 U.S.C. § 1813(a)(2) .................................................................. 20

12 U.S.C. § 1815(a) ...................................................................... 20

12 U.S.C. § 1831p-1 ..................................................................... 19

28 U.S.C. § 1361 .......................................................................... 25

28 U.S.C. § 2201 .......................................................................... 25

28 U.S.C. § 2412(b) ...................................................................... 18

Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq* ............... 12, 19, 22, 24

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023,
     Pub. L. No. 117-263, § 5708, 136 Stat. 2395, 3419 (Dec. 23, 2022)
     (to be codified at 12 U.S.C. § 248c) ............................... 10, 21, 23

Monetary Control Act of 1980, Pub. L. No. 96-221,
     § 107, 94 Stat. 132, 140 ......................................... 12, 13, 16, 19, 20

**Regulations**

12 C.F.R. Part 261 .......................................................................... 6

12 C.F.R. § 303.14(a) ..................................................................... 20

**Regulatory Materials**

Guidelines for Evaluating Account and Services Requests,
     86 Fed. Reg. 25,865 (May 11, 2021) (Proposed)....................... 21, 22
     87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice) ........... 21
     87 Fed. Reg. 51,099 (Aug. 19, 2022) (Final)...................... 9, 19, 22
     87 Fed. Reg. 68,691 (Nov. 16, 2022) (Proposed Amendments).............. 10

**News Articles**

Bob Van Voris, et al., *Sam Bankman-Fried Prosecutors Allege Plot to Shape Crypto Policy*,
     L.A. Times, Feb. 23, 2023 ............................................................. 3

Candice Choi, *Crypto Crisis: A Timeline of Key Events*,
     Wall St. J., last updated Mar. 24, 2023 ......................................... 3

**J.A.467**

David Benoit et al., *Signature Bank is Shut by Regulators After SVB Collapse*,
Wall St. J., Mar. 12, 2023 ................................................................................ 4

Ephrat Livni, *Amid Crypto Downturn, Two Big Names Cut Deal*,
N.Y. Times, Sept. 9, 2022 .............................................................................. 3

Manya Saini et al., *Silvergate Capital Shares Sink as Crypto-Related Deposits
Plunge by $8 Billion*, Colorado Springs Gazette, Jan. 5, 2023 ......................... 3

Mike Freeman, *San Diego's Silvergate Bank to Close Because of Crypto Losses*,
San Diego Union Tribune, Mar. 8, 2023 ......................................................... 3

**Other Authorities**

Board of Governors of the Federal Reserve System, Federal Deposit Insurance
Corporation, Office of the Comptroller of the Currency, Joint Statement on Crypto-
Asset Risks to Banking Organizations (Jan. 3, 2023), https://www.federalreserve.gov/
newsevents/pressreleases/files/bcreg20230103a1.pdf ...................................... 5

Federal Reserve Bank Operating Circular 1, Account Relationships
(Jan. 2, 1998), web.archive.org/web/20000116011948/http://www.frbservices.org/
Industry/pdf/Oc1.pdf....................................................................................... 17, 22

Federal Reserve Bank Operating Circular 1, Account Relationships
(Aug. 16, 2021), https://www.frbservices.org/binaries/content/assets/crsocms/
resources/rules-regulations/081621-operating-circular-1.pdf.............................. 17, 22, 23

Federal Reserve Board, Press Release dated Nov. 3, 2022 (2023 fee schedule),
https://www.federalreserve.gov/newsevents/pressreleases/other20221103a.htm ........... 14

Federal Reserve Board, Press Release dated Jan. 27, 2023 (Policy Statement),
https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230127a.htm.............. 5

Federal Reserve Board, Press Release dated Mar. 24, 2023 (Order),
https://www.federalreserve.gov/newsevents/pressreleases/
orders20230324a.htm.......................................................................... 6, 7, 8, 9

Federal Reserve Board, Supervision and Regulation Letter 22-6 Regarding
Engagement in Crypto-Asset- Related Activities by Federal Reserve-Supervised
Banking Organizations (Aug. 16, 2022) (EFC No. 98-02)................................. 4

Financial Stability Oversight Council, Report on Digital Asset Financial Stability
Risks and Regulation (Oct. 3, 2022), https://home.treasury.gov/news/press-
releases/jy0986................................................................................................ 4

**J.A.468**

Financial Stability Oversight Council, Report Fact Sheet (Oct. 3, 2022),
    https://home.treasury.gov/system/files/261/Fact-Sheet-Report-on-Digital-Asset-
    Financial-Stability-Risks-and-Regulation.pdf .................................................................. 5

Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation,
    Board of Governors of the Federal Reserve System, Office of Thrift Supervision,
    Interagency Supervisory Guidance on Counterparty Credit Risk Management,
    (June 29, 2011), http://www.federalreserve.gov/newsevents/pressreleases/
    files/bcreg20110705a1.pdf.......................................................................................... 19

Office of the Comptroller of the Currency, OCC Interpretive Letter No. 1179 (Nov. 18, 2021),
    https://www.occ.gov/topics/charters-and-licensing/interpretations
    -and-actions/2021/int1179.pdf ...................................................................................... 4

William Strunk, Jr. & E.B. White,
    The Elements of Style 7-8 (3d ed. 1979) ...................................................................... 15

**J.A.469**

## INTRODUCTION

Displeased with the substantive result of the master account decision that was the genesis of this lawsuit, Custodia now claims in its Amended Complaint that the Federal Reserve Act *guarantees* it a different outcome. Custodia's fundamental contention is that no entity within the Federal Reserve System may exercise any discretion in adjudicating master account requests, but must simply act in a ministerial capacity to rubber stamp approval without giving a moment's notice to the risks presented. But it is more than just that. Custodia not only claims that the Federal Reserve must give no *thought* to the risks that Custodia or other institutions present before granting an account, but asserts that the Board of Governors of the Federal Reserve System has an affirmative obligation to exercise its supervisory authority over the Federal Reserve Bank of Kansas City to *force* it to provide a Reserve Bank master account and services to Custodia (and to all other comers regardless of risk). Custodia makes this claim even though the Board separately and unanimously determined, in a detailed, 86-page decision on Custodia's Federal Reserve membership application, that Custodia's planned operations are inconsistent with safe and sound banking practices, contrary to the purposes of the Federal Reserve Act, and pose substantial risks to the Federal Reserve and to the U.S. financial system. In the course of making its claims, Custodia conspicuously makes no effort to challenge the substantive *reasons* for the denial of its account request. This is telling, and should give the Court substantial pause before adopting a proposed reading of the Federal Reserve Act that does not flow from ordinary principles of statutory construction, contradicts the express interpretation of the federal agency Congress has charged with its administration, and may have grave, far-reaching consequences.

Notably, Custodia makes its claim of absolute entitlement even as the cryptocurrency industry on which it pins its entire business model suffers extreme volatility and loss, and the depository institutions with the closest ties to these activities have collapsed into liquidation or

federal receivership. And it makes these claims within months of Congress having amended the Federal Reserve Act—with full knowledge of the Board's Account Access Guidelines—to define "Reserve Bank master accounts and services" for the first time without altering in any way the discretion in this area that has long been understood to reside within the Federal Reserve System (and making clear that access denials are to be expected).

Against this backdrop, Custodia has substantially narrowed its Amended Complaint to focus squarely on the responsibilities of the Board and not on the Reserve Bank. Indeed, given that Congress has now defined "Reserve Bank master accounts and services" in the Federal Reserve Act and that the Board indisputably does not itself perform these functions, Custodia's core assertion is that "it is incumbent upon the Board to exercise its *supervisory authority* so as to ensure" that Custodia receives access. Am. Compl. ¶ 81 (emphasis added); *see also id.* (alleging Reserve Bank is merely "responsible for communicating the decision"). This focus on the Board's role invites the Court to accept Custodia's allegations about Board control for purposes of this motion, address the threshold statutory interpretation question at issue with the benefit of the recent Federal Reserve Act amendment, and dismiss without the need for further proceedings that are unlikely to illuminate the question of whether the Board is obligated to exercise its supervisory authority in the particular way that Custodia wishes. The Board respectfully requests that the Court do so and dismiss the complaint.

## BACKGROUND

### A.   Defendants Have Determined That Custodia's Monoline, Cryptocurrency-Focused Business Model Presents Substantial Risks

#### 1.   Custodia seeks Reserve Bank access to provide cryptocurrency services amid significant upheaval.

Custodia is pursuing a Reserve Bank master account so that it may "directly access the

2

**J.A.471**

Federal Reserve" to offer services for crypto-assets. Am Compl. ¶ 2. As a Special Purpose

Depository Institution ("SPDI"), Custodia would "provide a bridge connecting crypto-asset

companies to the U.S. payments system," *id.* ¶ 37, and has sought to issue a "stablecoin"

variation called Avit, *see* ECF No. 49 at 9.

　　While Custodia's request for a Reserve Bank master account was pending, the

cryptocurrency sector entered what the industry has referred to as a "crypto winter," which

"wiped out roughly $2 trillion in market value" by Fall 2022 and resulted in an industry market

capitalization more than two-thirds below its high at the end of 2021. Ephrat Livni, *Amid Crypto*

*Downturn, Two Big Names Cut Deal*, N.Y. Times, Sept. 9, 2022; Candice Choi, *Crypto Crisis: A*

*Timeline of Key Events*, Wall St. J., last updated Mar. 24, 2023. As was widely reported, "the

spectacular collapse of FTX" in November, which was "one of the biggest crypto exchanges in

the world," led to the prosecution of its founder and CEO for misappropriating "billions of

dollars of customer deposits." Bob Van Voris, et al., *Sam Bankman-Fried Prosecutors Allege*

*Plot to Shape Crypto Policy*, L.A. Times, Feb. 23, 2023.

　　In the wake of these developments, Silvergate Bank—which focused its business on

digital assets—suffered a run on crypto-related deposits and was reportedly forced to sell debt

securities earlier than planned to cover these withdrawals. Mike Freeman, *San Diego's Silvergate*

*Bank to Close Because of Crypto Losses*, San Diego Union Tribune, Mar. 8, 2023. Silvergate's

losses, which totaled in the billions of dollars, ultimately led to the bank's decision in early

March 2023 to liquidate. *Id.*; *see also* Manya Saini et al., *Silvergate Capital Shares Sink as*

*Crypto-Related Deposits Plunge by $8 Billion*, Colorado Springs Gazette, Jan. 5, 2023. Days

after Silvergate's announcement, regulators closed New York-based Signature Bank on

March 12, 2023, which press reports noted was "reeling from a bet on crypto banking that

**J.A.472**

foundered after the sector imploded," resulting in a "failure [that] is the third-largest in U.S. history." David Benoit et al., *Signature Bank is Shut by Regulators After SVB Collapse*, Wall St. J., Mar. 12, 2023.

Amid this upheaval and other developments in the crypto-asset sector, banking agencies including the Board, the OCC, and the FDIC issued guidance and policy statements addressing digital asset risks. On August 16, 2022, the Board issued guidance to its supervised entities warning of the "heightened and novel risks posed by crypto-assets," including "risks related to safety and soundness, consumer protection, and financial stability."[1] SR Letter at 2, 1. As a result of these heightened risks, the SR Letter cautioned Board-supervised banks that they should "have in place adequate systems, risk management, and controls to conduct [crypto-asset] activities in a safe and sound manner and consistent with applicable laws."[2] *Id.* at 4.

On October 3, 2022, the Financial Stability Oversight Council,[3] released its Report on Digital Asset Financial Stability Risks and Regulation ("FSOC Report").[4] Among other things, the Report concluded that "[c]rypto-asset activities could pose risks to the stability of the U.S. financial system if their interconnections with the traditional financial system or their overall

---

[1] *See* Board Supervision and Regulation Letter 22-6 Regarding Engagement in Crypto-Asset-Related Activities by Federal Reserve-Supervised Banking Organizations ("SR Letter") (Aug. 16, 2022) (ECF No. 98-02).

[2] The OCC had previously provided guidance in this area indicating that certain crypto custody activities are permissible for national banks, provided that the bank can first demonstrate to supervisors that it can conduct the activities in a safe and sound manner. *See* OCC Interpretive Letter No. 1179 (Nov. 18, 2021), *available at* https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2021/int1179.pdf.

[3] The Council, established by Congress in 2010 and chaired by the Secretary of the Treasury, "is charged . . . with identifying risks to the financial stability of the United States; promoting market discipline; and responding to emerging threats to the stability of the U.S. financial system." *See* https://home.treasury.gov/policy-issues/financial-markets-financial-institutions-and-fiscal-service/fsoc.

[4] *Available at* https://home.treasury.gov/news/press-releases/jy0986.

4

J.A.473

scale were to grow without adherence to . . . appropriate regulation." [5] The FSOC Report

cautioned that "[c]rypto asset prices appear to be primarily driven by speculation rather than

grounded in current fundamental economic use cases," and that many crypto-asset entities have

"risky business profiles and opaque capital and liquidity positions." *Id.*

On January 3, 2023, the Board, OCC, and FDIC issued a Joint Statement on Crypto-Asset

Risks to Banking Organizations (the "Joint Statement")[6] observing that "events of the past year

. . . highlight a number of key risks associated with crypto-assets," including risks of "fraud and

scams," "[l]egal uncertainties," "[i]naccurate or misleading representations and disclosures by

crypto-assets companies," "[s]ignificant volatility," "[s]usceptibility of stablecoins to run risk,"

and "[c]ontagion risk." *Id.* at 1. The Joint Statement emphasized the importance that "risks

related to the crypto-asset sector that cannot be mitigated and controlled do not migrate to the

banking system." *Id.* at 1. "Given the significant risks highlighted by recent failures of several

large crypto-asset companies," the agencies concluded that "issuing or holding as principal

crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized

network . . . is highly likely to be inconsistent with safe and sound banking practices" and further

concluded that there are "significant safety and soundness concerns with business models that

are concentrated in crypto-asset-related activities."[7] *Id.* at 2.

_____

[5] *See* FSOC Report Fact Sheet (Oct. 3, 2022) at 1, *available at* https://home.treasury.gov/system/
files/261/Fact-Sheet-Report-on-Digital-Asset-Financial-Stability-Risks-and-Regulation.pdf.
[6] *Available at* https://www.federalreserve.gov/newsevents/pressreleases/files/
bcreg20230103a1.pdf.
[7] On January 27, 2023, the Board issued a policy statement designed to promote a level playing
field for federally supervised banks, regardless of deposit insurance status. *Available at*
https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230127a.htm. The statement
noted that "the Board has not identified any authority permitting national banks to hold most
crypto-assets, including bitcoin and ether, as principal in any amount," nor "any federal statute or
rule expressly permitting state banks to hold crypto-assets as principal," and, as a result, the
Board "would presumptively prohibit SMBs from engaging in such activity." *Id.* at 8.

J.A.474

     **2.**      **The Board's Order denying Custodia's application for Federal Reserve System membership identifies the clear and substantial risks presented by Custodia's business model.**

On January 27, 2023, the Board issued its final order denying Custodia's application to become a Board-supervised state member bank, without prejudice to future applications.[8] In denying the application, the Board determined that, in light of the risks presented by Custodia's business model, which focused "almost entirely on the crypto-asset sector," Order at 1, among numerous other risks, approval was not consistent with the managerial, financial, and corporate powers factors the Board was required to consider by statute. *Id.* at 86. These risks were magnified by the fact that Custodia does not have FDIC deposit insurance. *Id.* at 2. Indeed, while "[i]nconsistency with any one of these [three] factors is sufficient to [deny] . . . Custodia's application," the Board ultimately determined that each of the three factors, standing alone, warranted denial. *Id.* at 86; *see also id.* at 3 n.7.

On the first, managerial factor, which considers whether the applicant has "risk management systems and controls commensurate with the nature, scope, and risks of the activities in their proposed business plans," *id.* at 3, the Board noted "heightened concerns about banks with business plans focused on a narrow sector of the economy." *Id.* at 3. Here, not only is Custodia "an uninsured depository institution seeking to focus almost exclusively on offering products and services related to the crypto-asset sector," which present heightened "illicit finance" and "safety and soundness risks," but the Board's pre-membership examination identified "significant deficiencies in Custodia's ability to manage the[se] risks," particularly

---

[8] The Board permitted Custodia a period of time to request confidential treatment for information in the Order pursuant to Board's disclosure regulations at 12 C.F.R. Part 261. The Board released the final version of the Order on March 24, 2023. *Available at* https://www.federalreserve.gov/ newsevents/pressreleases/orders20230324a.htm (confidential information redacted).

**J.A.475**

with respect to "overall risk management," Bank Secrecy Act and U.S. sanctions compliance, information technology, internal audit, financial projections, and liquidity risk management. *Id.* at 3-4. Despite these deficiencies, Custodia "proposed to expand its operations soon after approval for membership to focus almost exclusively on novel crypto-asset-related activities and to accept only uninsured deposits," which the Board observed is "an unprecedented business model that presents heightened risks involving activities that no state member bank previously has been approved to conduct." *Id.* at 4.

In addition to its lack of appropriate risk management structures and its novel and risky business model, the Board expressed "concerns with respect to Custodia's ability to be resolved safely and effectively upon failure," which "could contribute to instability and run risk." *Id.* at 5. Indeed, the Board concluded that, "[e]ven if Custodia were able to successfully remediate all issues identified with respect to its ability to safely and soundly conduct its limited day-one activities, conducting only this limited set of activities would not enable it to constitute a viable bank in the medium or long term." *Id.* at 9-10. Accordingly, the Board found that "considerations relating to the managerial factor are so adverse as to present sufficient grounds on their own for warranting denial of the application." *Id.* at 5; *see also id.* at 10, 49.

Similarly, the Board concluded with respect to the financial and corporate powers factors that the relevant considerations were so adverse as to warrant denial. *Id.* at 7, 9, 10, 57, 82. With regard to the financial factor, the Board observed that the crypto-asset markets in which Custodia proposed to concentrate its operations "have exhibited significant volatility," and noted "that the value of most crypto-assets is driven in large part by speculation and sentiment, and is not anchored to a clear economic use case." *Id.* at 6 (citing FSOC Report at 23-28). The Board found that "[r]ecent events, including the bankruptcies of crypto-asset intermediaries Celsius, Voyager,

BlockFi, and FTX, have highlighted that the global and largely unregulated or noncompliant crypto-asset sector lacks stability," *id*. at 6, and determined that, even if the Board approved Custodia's application, it would have to "prohibit Custodia from engaging in a number of those activities" because Custodia did not demonstrate that it "could conduct [them] in a safe and sound manner." *Id*. at 7.

With regard to the corporate powers factor, the Board found that, in addition to focusing "almost exclusively on the crypto-asset sector," Custodia's proposed business model "would aim to create further connections between traditional financial intermediaries and the crypto-asset ecosystem by engaging in crypto-asset-related activities that are novel and unprecedented for state member banks." *Id*. at 7. The Board found that Custodia's business model was "unlike that of any other state member bank," and included "holding bitcoin and ether as principal; issuing instruments like Avits; facilitating the borrowing and lending of crypto-assets; or directly engaging with customers to facilitate the buying and selling of crypto-assets." *Id*. at 58. "Given the speculative and volatile nature of the crypto-asset ecosystem," the Board concluded that this business model is inconsistent "with the purposes of the Federal Reserve Act." *Id*. at 7.

The Board further determined that "admission of an uninsured deposit-taking institution to Federal Reserve membership" would be "unprecedented since the creation of federal deposit insurance in 1933," and that "[t]he absence of deposit insurance coverage at Custodia could increase the firm's risk of runs and contagion." *Id*. at 8. As such, the Board observed that resolution of an institution such as Custodia would have to be "conducted outside of the FDIC's proven and effective receivership process." *Id*. at 8.

Finally, the Board concluded that, because Custodia had "not demonstrated that it could operate in a safe and sound manner," but rather posed "significant risks to its customers in the

J.A.477

event of its potential failure," among other risks, *id*. at 85, 84, the convenience and needs of the community did not militate in favor of approval. FRBKC separately informed Custodia by letter on January 27 that it had denied its master account request and explained the basis for the decision, *see* ECF No. 116 at 1, identifying many similar concerns.

**B.    Recent Board Guidance and Amendments to the Federal Reserve Act Confirm That the Federal Reserve Retains Authority to Deny Access to Reserve Bank Master Accounts and Services**

On August 19, 2022, following two rounds of notice and comment, the Board's "Guidelines for Evaluating Account and Services Requests" became effective. 87 Fed. Reg. 51,099 ("Guidelines"). The Guidelines set forth six principles for use in access decisions and create a three-tiered review framework that "is meant to serve as a guide to the level of due diligence and scrutiny to be applied by Reserve Banks to different types of institutions." *Id.* at 51,109. The Guidelines note that "[a]lthough institutions in a higher tier will on average face greater due diligence and scrutiny than institutions in a lower tier, a Reserve Bank has the authority to grant or deny an access request by an institution in any of the three proposed tiers . . . on a case-by-case, risk-focused basis[.]" *Id.* The three tiers are: "Tier 1: Eligible institutions that are federally insured"; "Tier 2: Eligible institutions that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency"; and "Tier 3: Eligible institutions that are not federally insured and are not considered in Tier 2." *Id.* at 51,109-10. The Board emphasized that "Reserve Banks . . . retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." *Id.* at 51,102.

In November 2022, the Board made a separate proposal to provide additional information regarding the provision of master accounts and services at Federal Reserve Banks. Specifically,

9

the Board proposed to require that Reserve Banks "publish a periodic list of depository institutions with access to Reserve Bank accounts and/or financial services." 87 Fed. Reg. 68,691, 68,691 (Nov. 16, 2022). On December 23, 2022, before the Board finalized its proposal, Congress passed and the President signed into law the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 ("2023 NDAA"), which included among its provisions an amendment to the Federal Reserve Act. Pub. L. No. 117-263 § 5708, 136 Stat. 2395, 3419 (Dec. 23, 2022) (to be codified at 12 U.S.C. § 248c). Specifically, the 2023 NDAA requires that the Board create and "maintain a public, online, and searchable database" of "every entity that currently has access to a reserve bank master account and services," with the date that access was granted. 12 U.S.C. § 248c(b)(1)(A). In addition, the statute requires the Board to create "a list of every entity that submits an access request for a reserve bank master account and services after enactment of this section (or that has submitted an access request that is pending on the date of enactment of this section), including whether, and the dates on which, a request— (i) was submitted; and (ii) was approved, *rejected*, pending, or withdrawn." *Id.* § 248c(b)(1)(B) (emphasis added).

### C.     Custodia's Amended Complaint Contends That the Board Has a Non-Discretionary Duty to Require and Enforce Plenary Access to Reserve Bank Accounts and Services Regardless of Risk

In February 2023, Custodia filed its Amended Complaint challenging the January 27, 2023 decision denying its request for a master account.[9] Am. Compl. ¶ 21. The Amended Complaint rests on two premises. First, Custodia alleges that the Board orchestrated the denial of its master account request. Specifically, Custodia alleges that "[t]he Board exercises ultimate

---

[9] For the limited purposes of this motion, the Board accepts as true Custodia's factual contention that the Board "assert[ed] control over" the Custodia master account decision, *see* Am. Compl. ¶ 46, despite defendants' ongoing disagreement with that allegation.

J.A.479

control over the decision to grant or deny a master account, and exercised that power to assert control over the decision-making process for Custodia's application in particular." *Id.* ¶ 46. Second, Custodia contends that it is entitled to a master account by statute, citing 12 U.S.C. § 248a(c)(2), and claims that the Board must "exercise its supervisory authority" to ensure this result. Am. Compl. ¶¶ 73, 81.

Custodia brings three claims: (1) a claim against only the Board, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), asserting that the Board violated 12 U.S.C. § 248a(c)(2) by "depriving Custodia of access to Federal Reserve bank services," Am. Compl. ¶ 83; (2) a mandamus claim requesting a Court order "compelling the Board and/or Kansas City Fed to rescind the denial of Custodia's master account application and instead to grant the application," *id.* ¶ 94; and (3) a claim under the Declaratory Judgment Act seeking a declaration that, pursuant to 12 U.S.C. § 248a(c)(2), "Custodia has a right, as an eligible, deposit-taking bank, to have a master account." Am. Compl. ¶ 100. Notably, Custodia did not attach FRBKC's decision denying its master account request to its Complaint, much less take issue with any of the well-reasoned bases upon which FRBKC denied the request.

## ARGUMENT

The Amended Complaint fails to state a claim because the Board was under no legal obligation to direct that Custodia be granted a master account. As Custodia asserts, and the Board agrees, the "core issue" presented is whether "Defendants are statutorily required to grant Custodia's master account." Am. Compl. ¶ 12. They are not. Custodia's reliance on section 11A of the Federal Reserve Act, 12 U.S.C. § 248a, is misplaced. That section, as its title suggests, concerns the "Pricing of Services," and nowhere requires the action that Custodia demands. The Board has not acted "contrary to law" in violation of the APA as a result, and Custodia is not

11

entitled to relief under that statute or otherwise.

## I.    The Federal Reserve Act Does Not Require the Board to Mandate That Custodia Receive a Reserve Bank Master Account and Services

The Federal Reserve Act, 12 U.S.C. § 221 *et seq*. ("FRA"), authorizes the Board "[t]o exercise general supervision" over Reserve Banks, 12 U.S.C. § 248(j), without specifically indicating how this general power should be exercised. In certain limited instances, the Act does require the Board to take specific actions relating to Reserve Banks, but mandating the grant of a master account is not among them. As a result, Custodia relies on Section 11A of the FRA, 12 U.S.C. § 248a, which is entitled "Pricing of services" and deals with a different subject. This section provides that that Board "shall publish . . . a set of pricing principles . . . and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions," 12 U.S.C. § 248a(a), and further provides that:

> The schedule of fees prescribed pursuant to this section shall be based on the following principles: . . . (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. § 248a(c).

Section 248a was added to the FRA through the Monetary Control Act of 1980 ("MCA"),[10] which was designed to restore Federal Reserve control over the money supply and "to curb the rising tide of bank flight from the [Federal] Reserve System." *First Bank and Trust Co. v. Bd. of Governors of the Fed. Reserve Sys.*, 605 F. Supp. 555, 565 (E.D. Ky. 1984). Prior to the MCA, Reserve Banks were authorized to accept deposits only from member banks, and they

---

[10] 12 U.S.C. § 248a, section 11A of the Federal Reserve Act, was added by section 107 of the MCA, Pub. L. No. 96-221, 94 Stat. 132, 140.

provided related services to member banks free of charge to "promote . . . membership" in the Federal Reserve System. *Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989). The MCA sought to restore Federal Reserve control over the money supply by requiring nonmember as well as member banks to maintain reserves. To facilitate this goal, it authorized Federal Reserve Banks to open deposit accounts for nonmember banks and provided that nonmember banks would be able to receive Federal Reserve Bank services "at the same fees charged member banks." *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983).

The only imperative of Section 248a is that the Board publish a fee schedule for these services, which were formerly free to member banks, and that the fee schedule "shall be based" on principles relating to availability of services, and the Board has done so. Although the MCA expanded the ability and discretion to make Reserve Bank services "available" to nonmember banks, Section 248a does not guarantee such services to each and every bank, regardless of risk, as Custodia argues.

A.    **The Plain Text of Section 248a Does Not Give Custodia a Right to a Master Account and Services**

Section 248a's text does not give Custodia a right to a master account. It only mandates the establishment of a *fee schedule* for specified services. Moreover, the section is specific about what services it covers but does not refer to master accounts or provide that services must be offered to all institutions. And it expressly anticipates that the Board will limit access to services by setting "terms." The section cannot bear the meaning Custodia ascribes to it.

First, the enacting Congress labeled Section 248a as governing "Pricing of Services," MCA § 107, 94 Stat. 141, and its mandates to the Board concern fee-setting for services. Section 248a(a) requires that the Board publish proposed "pricing principles in accordance with this

13

**J.A.482**

section," and to subsequently "put into effect a schedule of fees for such services which is based on those principles." And Section 248a(c), entitled "[c]riteria applicable," further clarifies that "[t]he schedule of fees prescribed pursuant to this section shall be based on the following principles:" followed by a four-item list. Custodia's construction of the section rests on an isolated reading of one sentence that is structurally part of this list, whose components are expressly designated as *principles for setting fees* for services—not for determining whether any individual institution is entitled to services, much less to a master account, which is not a "priced service" covered by the fee schedule.[11]

Specifically, Custodia relies on an excerpt of one principle on this list stating that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks . . . ." 12 U.S.C. § 248a(c)(2); *see* Am. Compl. ¶ 83. Custodia claims that this phrase independently functions as a mandate requiring access to Reserve Bank services (and, implicitly, master accounts) by every depository institution. But the statute itself expressly states that this sentence serves a different purpose: it is one of four "principles" on which "[t]he schedule of fees prescribed pursuant to this section shall be based," 12 U.S.C. § 248a(c), and this reading is further confirmed when the list is read as a whole, as well as by Section 248a's title.

Custodia's construction of Section 248a(c) is inconsistent with basic rules of grammar and punctuation as well as principles of statutory interpretation because it ignores Section 248a(c)'s introductory language, which expressly designates everything that follows, including subsection (c)(2), as a fee-setting principle. When a list begins with introductory language

---

[11] The Board publishes its fee schedule annually in the Federal Register. *See, e.g.*, https://www.federalreserve.gov/newsevents/pressreleases/other20221103a.htm (2023 fee schedule).

followed by a colon, the colon indicates that the preceding text limits the nature of what follows, which lacks independent force. *See e.g.*, *Andresen v. Maryland*, 427 U.S. 463, 481 (1976) ("[item in] a series that follows [a colon] is limited by what precedes that colon"); *7-Eleven, Inc. v. Nat'l Union Ins. Co. of Pittsburgh, Pa.*, 33 F. App'x 703 (5th Cir. 2002) ("[A colon preceding a list] tells [readers] that everything following the colon will deal exclusively with [what precedes it]."); *Kidd v. Equitable Life Assur. Soc. of U.S.*, 32 F.3d 516, 519 (11th Cir. 1994) ("A colon tells the reader that what follows is closely related to the preceding clause." (quoting William Strunk, Jr. & E.B. White, The Elements of Style 7-8 (3d ed. 1979))).

Custodia's attempt to read Section 248a(c)(2) without regard to the introductory language in Section 248a(c) indicating that what follows are principles for fee-setting rather than independent mandates also violates basic principles of statutory construction. *See Smith v. United States*, 508 U.S. 223, 233 (1993) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute.); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (courts should seek to give effect to every part of a statute). Custodia's argument ignores Congress's express directive as to how Section 248a(c)(2) should be read; Congress designated it as one of four "principles" on which a "schedule of fees . . . shall be based." 12 U.S.C. § 248a(c).

The purpose of Section 248a as setting specific requirements for fees, rather than for mandatory provision of services, is also reflected by the nature of the other items listed in Section 248a(c) as well as the Section's title. The other three listed items relate solely to pricing, requiring explicit pricing, tying fees to actual costs and interest, and basing interest charges on market rates. 12 U.S.C. § 248a(c)(1), (3)-(4). The fact that every other item on this list relates solely to pricing indicates that Section 248a(c)(2) was only intended to relate to pricing of services rather than mandating access to master accounts. *See In re McDaniel*, 973 F.3d 1083,

1098 (10th Cir. 2020) (construing one phrase in a list based on its "common quality" with other list items in accordance with the canon of *noscitur a sociis*). Moreover, the enacting Congress specifically indicated in the title of both the relevant section of the MCA and its codification that the purpose of Section 248a is to govern "Pricing of Services," MCA § 107, 94 Stat. 141, further undermining Custodia's argument that the section governs *access* to such services. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (section headings "supply cues as to what Congress intended" (citation omitted)); *Texas Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 441 n.89 (5th Cir. 1999) ("[T]he section heading enacted by Congress in conjunction with statutory text is considered to come up with the statute's clear and total meaning." (cleaned up)); *Utah Power & Light Co. v. ICC*, 747 F.2d 721, 727 (D.C. Cir. 1984) ("[T]he topical heading . . . indicates the intent of the legislature, because the heading was part of the Act as enacted . . . ."). Indeed, courts construing Section 248a(c) shortly after passage of the MCA found that this provision concerned explicit and equitable pricing of services and not a mandate that such services—much less master accounts—be made available to each and every entity. *See, e.g., Jet Courier Servs.,* 713 F.2d at 1227 ("What is clear [from the MCA] is that the covered services offered by Federal Reserve Banks are to be priced explicitly, are to be made available to nonmember depository institutions at the same fees charged member banks, and that 'over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services.'" (quoting Section 248a(c)(3)).

Second, even if Section 248a(c)(2) were on its own read as some type of independent mandate, it would not grant every depository institution a right to a master account because— even assuming for purposes of this motion that a master account is a service, which it is not—the statute specifically designates only *other* services to which it applies (as spelled out in Section

16

**J.A.485**

248a(b)) and because its plain language does not require a universal right to access those services. The scope of Section 248a(c)(2) is limited to "Federal Reserve bank services covered by the fee schedule," and Section 248a(b) specifically lists which services are "covered by the schedule of fees" without listing master accounts. This omission indicates that even if Section 248a(c)(2) somehow mandated provision of certain services to all depository institutions, which it does not, the mandate would nevertheless only extend to services enumerated in the list, and the list does not include master accounts—which are not "priced services." *See Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1124 (10th Cir. 2021) (Under "the cannon of *expressio unius est exclusio alterius* . . . the enumeration of certain things in a statute suggests that the legislature had no intent of including things not listed or embraced." (cleaned up)). In this regard, it should be noted that, for decades, Reserve Banks have contracted with banks that lack master accounts to provide services identified in Section 248a(b).[12]

Moreover, even if Section 248a(c)(2) could be read as an independent mandate implicating master accounts, its use of "[a]ll" in relation to the services to which it applies but not the depository institutions that may access these services ("[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions") indicates that at most it implicates the provision of "*all* Reserve bank services" to nonmember institutions as a class, but not necessarily to all nonmember banks in that class. Congress's omission of a second "all" is significant, as it signals Congress's intent that services covered by

---

[12] *See, e.g.*, 2021 Operating Circular 1 ("OC-1") at ¶ 2.7, *available at* www.frbservices.org/ binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf; 1998 OC-1 at ¶ 3.1, *available at* web.archive.org/web/20000116011948/http://www.frbservices. org/Industry/pdf/Oc1.pdf ("[Y]ou and a correspondent can provide us with a completed Transaction Settlement Authorization (Appendix 5), instructing us to settle some or all of your transactions in the correspondent's master account.").

the fee schedule be made available to member and nonmember banks alike—as they generally are—but not that each and every nonmember bank, *even those that may present a variety of unmitigated risks*, are entitled to all services. "[W]hen 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the [adjoining] provision—this Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted); *cf. Nelson v. United States*, 40 F.4th 1105, 1115 (10th Cir. 2022) ("The rule against surplusage . . . counsel[s] us to construe 'any statute,' in § 2412(b), in a different and broader manner than the provision's initial, unadorned reference to "statute" in order to give meaning to the term 'any.'").

Lastly, Section 248a(c)(2) itself recognizes that the Board has no duty to grant access to Reserve Bank services to any individual institution. It expressly provides that "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks," 12 U.S.C. § 248a(c)(2). By acknowledging that the Board may impose conditions on access to Reserve Bank services, this language necessarily means that there is no absolute right to obtain covered services—much less master accounts—as Custodia incorrectly claims.

B.   **Custodia's Construction of Section 248a Would Lead to Absurd Results and Ascribes to Congress an Unlikely Intent**

Custodia's argument that Section 248a requires Reserve Banks, without exception, to provide services to nonmember banks must be rejected for another reason—it would lead to an absurd circumstance in which Reserve Banks must do business with any bank regardless of its risk profile or the implication to various federal statutory mandates. It would also abdicate control to states and territories to determine which entities Reserve Banks, which are federal instrumentalities, must do business with, and could expose the Federal Reserve balance sheet to

18

**J.A.487**

forces that would hinder the implementation of national monetary policy. Such extraordinary intent cannot be ascribed to a provision that Congress itself described as one item in a list of pricing principles.

Construing Section 248a as granting an unconditional right of access to Reserve Bank services and master accounts would undermine various provisions of the FRA and other banking laws as well as other federal statutory schemes, in derogation of basic principles of statutory construction. *See King v. Burwell*, 576 U.S. 473, 492 (2015) (statutes should be construed in light of "the remainder of the statutory scheme [to favor readings with] a substantive effect that is compatible with the rest of the law" (cleaned up)). It would force Reserve Banks to take counterparty risks that banks are generally required to limit in order to operate safely. *Compare*, *e.g.*, Guidelines, 87 FR at 51107 ("Provision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber or other risks to the Reserve Bank."), *with* 12 U.S.C. § 1831p-1 (providing for federal banking supervisors to prescribe safety and soundness standards for their regulated institutions); Interagency Supervisory Guidance on Counterparty Credit Risk Management (June 29, 2011).[13] It thus could potentially jeopardize the public fisc in the event an institution the Reserve Bank would consider unsafe to deal with were to default with a balance owed on outstanding transactions. Moreover, by depriving the Federal Reserve System of control over its own balance sheet, it would undermine the Fed's ability to carry out its statutory mandate to regulate the money supply to promote maximum employment and price stability, 12 U.S.C. § 225a, which is an unlikely objective to ascribe to the MCA, the stated purpose of which was "[t]o *facilitate* the implementation of monetary policy," 94 Stat. 132

---

[13] *Available at* www.federalreserve.gov/newsevents/pressreleases/files/bcreg20110705a1.pdf (requiring regulated banks to manage many of the same risks).

**J.A.488**

(emphasis added), not hinder it. *Cf. King*, 576 U.S. at 493 ("We cannot interpret federal statutes to negate their own stated purposes." (citation omitted)). It would also force Reserve Banks to conduct transactions that might undermine various statutory mandates ranging from Bank Secrecy Act provisions meant to prevent money laundering to various foreign sanctions regimes and even federal drug laws. *Cf. Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, 861 F.3d 1052, 1055 (10th Cir. 2017) (Moritz J., concurring) (noting that granting a master account to a bank catering to marijuana businesses would "facilitate illegal activity" in violation of the Controlled Substances Act).

Custodia's interpretation would also largely abdicate federal control over access to the Fed's balance sheet and the entities that Reserve Banks—which are federal instrumentalities that, *inter alia*, facilitate implementation of federal monetary policy and are a source of funding to the public fisc—must do business with. "Depository institutions" have been defined as institutions chartered by any U.S. State, territory, or possession that are "engaged in the business of receiving deposits other than trust funds," 12 U.S.C. §§ 461(b)(1)(A)(i), 1813(a)(2), 1815(a), a definition which in some contexts has been read broadly. *E.g.*, 12 C.F.R. § 303.14(a) ("maintain[ing] one or more non-trust deposit accounts in the minimum aggregate amount of $500,000"). Therefore, under Custodia's construction, any state (or U.S. territory or possession) might vest any business, regardless of how risky or illegal its activities or overall profile are, with an unqualified right to do business with Reserve Banks and access the Federal Reserve's balance sheet as long as it accepts one or more deposits.

This cannot be correct, especially in light of the intricate regulatory regime that applies to member banks and other depository institutions that, unlike Custodia, are subject to federal prudential regulation. "Congress . . . does not alter the fundamental details of a regulatory

J.A.489

scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In the federal agency context, Congress is deemed not to subtly grant broad authority to agencies "to make a 'radical or fundamental change' to a statutory scheme," or otherwise exercise "[e]xtraordinary regulatory authority" through "modest words, vague terms, or subtle devices." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). It would be equally bizarre to impute an intent by Congress to grant such powers to nearly five dozen states and territories, in derogation of multiple federal statutory regimes, based on text that it expressly labeled a pricing principle. *Cf. Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to states that could frustrate purposes of a federal statute absent evidence Congress "plainly intended" it).

### C. Custodia's Construction of Section 248a Is Inconsistent with Recent Board Guidance and Amendments to the Federal Reserve Act

Not only is Custodia's interpretation of 12 U.S.C. § 248a at odds with its text, Congressional intent, and other statutory provisions, but it is also inconsistent with the Board's recently issued Guidelines and with the recently enacted 2023 NDAA.

The Board's Guidelines, issued after notice-and-comment, make clear that decisions regarding whether to grant a master account or make services available to any particular depository institution are discretionary. These Guidelines were the result of a 15-month process, beginning before Custodia filed its original complaint. Specifically, the Board published a Federal Register notice on May 11, 2021, and a supplemental notice on March 8, 2022, and on both occasions sought public comment. 86 Fed. Reg. 25,865 (May 11, 2021); 87 Fed. Reg. 12,957 (Mar. 8, 2022). The original notice stated that the proposed guidelines sought to "ensure that Reserve Banks evaluate a transparent and consistent set of factors when reviewing requests for accounts and services," but that they would not disturb the "discretionary authority to grant or

J.A.490

deny requests." 86 Fed. Reg. at 25,866. And when the final Guidelines were issued, after

consideration of further public comments and a unanimous Board vote, the Board expressly

recognized that Reserve Banks "retain the discretion to deny a request for access to accounts and

services where, in the Reserve Bank's assessment, granting access to the institution would pose

risks that cannot be sufficiently mitigated." 87 Fed. Reg. at 51,102. Accordingly, the Board

explicitly declined to adopt a reading of the FRA that would have mandated that master account

requests be granted in every instance.

The Board's interpretation of the FRA, including Section 248a, should be afforded

deference as the "agency's construction of its own statutory mandate." *Bd. of Governors of the

Fed. Reserve Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 251 (1978). Deference is also

warranted because the Guidelines were issued following notice and comment, with the Board

providing "formal responses to public comments" and using "formalized procedures" associated

with rulemaking. *See Lambert v. Saul*, 980 F.3d 1266, 1275 (9th Cir. 2020) (citing *Hillsborough

Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714-15 (1985)); *WildEarth Guardians v.

NPS*, 703 F.3d 1178, 1188 (10th Cir. 2013) (considering "the agency's expertise, the importance

of the question to the agency's administration of the statute, . . . the degree of consideration the

agency has given the question," and "the presence or absence of notice-and-comment").[14]

---

[14] Notably, even though the Board's Guidelines are recent, they reinforce the Board's
longstanding practice. Dating back at least to 1998, when uniform Operating Circulars applicable
across all Reserve Banks were first issued, all versions of Operating Circular 1, which sets the
terms and conditions applicable to master accounts, make clear that Reserve Bank approval was
required to open a master account, and that the account could be terminated at any time. For
example, the 1998 OC-1 states that "[a]ll master accounts are subject to Reserve Bank approval,"
and notes that "[w]e may close your master account . . . at any time but will endeavor to give you
at least five business days' prior notice." 1998 OC-1 at ¶¶ 2.3, 2.8. Similarly, the most recent
OC-1, issued in August 2021, provides that "[e]ach Master Account Agreement" executed by a
financial institution "is subject to approval by the Financial Institution's Administrative Reserve

22

Moreover, to the extent any doubt remains as to the ability to deny requests for master accounts, that doubt was resolved by the 2023 NDAA. Specifically, that statute requires that the Board "create and maintain a public, online, and searchable database" that includes "a list of every entity that submits an access request for a reserve bank master account and services . . . including whether . . . a request . . . was approved, *rejected*, pending, or withdrawn." 12 U.S.C. § 248c(b)(1) (emphasis added). The term "reserve bank master account and services" is defined as "an account in which a Federal reserve bank – (A) receives deposits for an entity . . . ; or (B) provides any service under section 248a(b)[.]" 12 U.S.C. § 248c(a)(3). Section 248a(b) contains the list of services that Custodia contends must be provided on a mandatory basis to all depository institutions. The statute further indicates that each entry on the list must specify whether the requesting entity was "an insured depository institution," "an insured credit union," or "a depository institution that is not an insured depository institution or an insured credit union." 12 U.S.C. § 248c(b)(1)(C). Thus, by its plain terms, the law specifically contemplates that requests for master accounts and services (including those services set forth in Section 248a from "a depository institution that is not an insured depository institution"—*a category that includes Custodia* (Am. Comp. ¶¶ 40, 55)—may be "rejected."

If it were the case that Reserve Banks were required to provide a "reserve bank master account and services" on a mandatory basis to every depository institution, then there would be no need for the Board to publish a list of the depository institutions "rejected" for such services. The only way that the 2023 NDAA can be read to give effect to all of its provisions is that there

---

Bank," and that "[a] Reserve Bank may terminate a Master Account Agreement . . . at any time." 2021 OC-1 at ¶¶ 2.6, 2.10. This longstanding practice supports the application of deference. *Accord First Lincolnwood Corp.*, 439 U.S. at 248 ("an agency's long-standing construction of its statutory mandate is entitled to great respect").

23

may be rejections of requests for "reserve bank master account and services" from depository institutions. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (quotation omitted)); *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is, however, a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." (quotation omitted)).

Indeed, it is a well-settled principle that "Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts." *Prime Care of Ne. Kan., LLC v. Humana Ins. Co.*, 447 F.3d 1284, 1287 (10th Cir. 2006); *see also Cannon v. Univ. of Chi.*, 441 U.S. 677, 696-98 (1979); *Bd. of Cnty. Comm'rs v. EEOC*, 405 F.3d 840, 845 (10th Cir. 2005); *Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (holding that "Congress' awareness of [agency rulings] when enacting other and related legislation make[s] out an unusually strong case of legislative acquiescence in and ratification by implication"). Given that the Board publicly issued its Guidelines in August 2022 indicating that the FRA does not limit discretion to deny master account requests, it is notable that Congress acted just months later confirming the Board's position.

## II.   Because Custodia Lacks a Right to a Master Account, Its Complaint Must be Dismissed

Claim I alleges that the Board violated the APA because the denial of Custodia's master account request was "patently unlawful" and therefore "not in accordance with law." Am. Compl. ¶¶ 83-84 (quoting 5 U.S.C. § 706(2)). As discussed above, there is no legal requirement dictating that Custodia receive a master account, or that the Board direct that it receive one, and Custodia fails to state an APA claim as a result. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("[T]he only agency action that can be compelled under the APA is action legally *required*." (emphasis in original)).

Similarly, Claim II against the Board must be dismissed because Custodia cannot show that it has "a clear and certain claim to have its master account application granted" by the Board under Section 248a(c)(2), as it claims, Am. Compl. ¶ 90, which is a prerequisite to relief under the Mandamus Act, 28 U.S.C. § 1361. Mandamus "is a drastic remedy, and is to be invoked only in extraordinary circumstances." *In re Cooper Tire & Rubber Co.,* 568 F.3d 1180, 1186 (10th Cir. 2009) (quotation omitted). A plaintiff must establish: "(1) that [it] has a clear right to relief, (2) that the [defendant's] duty to perform the act in question is plainly defined and peremptory, and (3) that [it] has no other adequate remedy." *Sullivan v. Univ. of Kan. Hosp. Auth.,* 844 F. App'x 43, 51 (10th Cir. 2021) (quotation omitted). Here, there is no statute that "commands" the Board to direct the opening of a master account notwithstanding Custodia's contention that it has a "clear and certain claim to have its master account application granted" under 12 U.S.C. § 248a(c). Am. Compl. ¶ 90. To the contrary, the Board has fulfilled its responsibilities under Section 248a by publishing the required pricing principles and schedule of fees with the understanding that accounts and services are generally available to both member and nonmember banks. As discussed above, nothing more is required of the Board, and it cannot be compelled to exercise discretionary power over Reserve Banks to compel an outcome that it does not support.

Finally, Custodia's Claim III, for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, is not an independently viable cause of action because that Act does not create substantive rights. *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) ("Declaratory Judgment Act is "only procedural," and "leav[es] substantive rights unchanged").

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the case be dismissed.

J.A.494

Dated: March 28, 2023

Respectfully submitted,

 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the*
*Federal Reserve System*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2023, I electronically filed the foregoing using the

court's CM/ECF system, which will send notification of such filing to all parties of record.


By:     /s/ *Joshua P. Chadwick*
Joshua P. Chadwick

*Counsel for Defendant Board of Governors*
*of the Federal Reserve System*

Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE, PC
PO Box 10700
Casper, WY 82602
sortiz@wpdn.net

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Phone:   202-434-5000
Fax:       202-434-5029
jvilla@wc.com
rscarborough@wc.com
sharris@wc.com
whermadorfer@wc.com
jwolfe@wc.com

*Attorneys for Plaintiff*

IN  THE  UNITED  STATES  DISTRICT  COURT
FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,
2120 Carey Avenue, Suite 300
Cheyenne, WY 82001

     *Plaintiff*,

     v.

FEDERAL RESERVE BOARD OF
GOVERNORS,
Constitution Ave NW & 20th St NW
Washington, DC 20551

FEDERAL RESERVE BANK
OF KANSAS CITY,
1 Memorial Drive
Kansas City, MO 64108,

     *Defendants*.

Civil Case No.: 1:22-CV-00125-SWS

---

**OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS PLAINTIFF'S AMENDED COMPLAINT**

---

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

I.      Federalism Promotes Innovation in Banking............................................2

II.     The Federal Reserve System is Headed by the Board. ............................3

III.    The Federal Reserve's Adjudication Process for Master Account Applications Has Changed. ............................................................................................4

IV.    Custodia Bank Used Its Wyoming Charter to Apply for a Master Account. ....................6

      A.    Custodia applied for a master account, but Defendants sat on their hands.............6

      B.    The Board denied Custodia's membership application. ...........................9

      C.    Defendants denied Custodia's master account application....................10

STANDARD OF REVIEW ...........................................................................................11

ARGUMENT ...............................................................................................................11

I.      The Court Previously Rejected Defendants' Arguments for Dismissal. ...........................11

II.     Section 248a Entitles Custodia to a Master Account.............................14

      A.    Defendants misread the statutory framework. ......................................14

      B.    Section 248c does not affect Defendants' treatment of master account applications. ...........................................................................................21

            1.    Defendants can reject master account applications from financial institutions that are otherwise ineligible. ...................................21

            2.    Section 248c was designed to promote transparency, not to alter the master account process...................................................25

            3.    Section 248c makes clear that the Board controls the master account application process. ........................................................28

III.    Defendants' Policy Arguments and Smears Against Custodia Should Not Alter the Court's Statutory Analysis. ......................................................28

IV.    The Kansas City Fed Is a Proper Defendant. .......................................30

V.     Custodia's Declaratory Judgment Claims Are Valid.............................33

CONCLUSION ............................................................................................................34

**J.A.498**

## TABLE OF AUTHORITIES

**Page**

### CASES

*Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013) .................................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................................11

*Audubon of Kan., Inc. v. U.S. Dep't of Interior*, 568 F. Supp. 3d 1167 (D. Kan. 2021) ...............11

*Bellwether Cmty. Credit Union v. Chipotle Mex. Grill, Inc.*,
    353 F. Supp. 3d 1070 (D. Colo. 2018) ....................................................................33

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ...........................................................17

*Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*,
    262 U.S. 649 (1923) ..........................................................................................18

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*,
    861 F.3d 1052 (10th Cir. 2017) ...................................................................... *passim*

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38 (2d Cir. 1989)...................16

*Heydon's Case* (1584) 76 Eng. Rep. 637; 3 Co. Rep. 7 a (Exch.) .................................25

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
    58 F. Supp. 3d 1191 (D.N.M. 2014) .......................................................................33

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) .................................................................14

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983)...............16

*Ketcham v. U.S. Nat'l Park Serv.*,
    No. 16-CV-00017-SWS, 2016 WL 4268346 (D. Wyo. Mar. 29, 2016).................................33

*Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167 (10th Cir. 1997) .............................32

*Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292 (D.N.M. 2018) .............................29

*Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017) ......................................................17

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ....................................................12

*Prier v. Steed*, 456 F.3d 1209 (10th Cir. 2006)..............................................................34

*Prime Care of Ne. Kan., LLC v. Humana Ins. Co.*, 447 F.3d 1284 (10th Cir. 2006) ...................27

*Robbins v. Chronister*, 402 F.3d 1047 (10th Cir. 2005) ...................................................27

*Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir. 1988) ....................................................33

*Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005)...................................30

*W. Shoshone Bus. Council ex rel. W. Shoshone Tribe of Duck Valley Rsrv. v. Babbitt*,
    1 F.3d 1052 (10th Cir. 1993) ..............................................................................32

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) .........................................27

*Wild Watershed v. Hurlocker*, 961 F.3d 1119 (10th Cir. 2020).......................................17

### STATUTES, REGULATIONS, AND RULES

12 U.S.C.
    § 25b..........................................................................................................19
    §§ 38–43.......................................................................................................2
    § 222..........................................................................................................4
    §§ 226–228....................................................................................................2
    § 248................................................................................................3, 8, 10
    § 248a.................................................................................................. *passim*
    § 248c...........................................................................................6, 21, 23, 28

**J.A.499**

**Page**

Statutes, Regulations, and Rules—continued:

12 U.S.C.
    § 342.................................................................................8, 12, 13, 18
    § 461.................................................................................................23
    § 1813...............................................................................................23
    § 1831d.......................................................................................3, 4, 19
28 U.S.C. § 1361.......................................................................................30
Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*...........................33, 34
Federal Reserve Act, 63 Cong. ch. 6, 38 Stat. 251 (1913)
    (codified at 12 U.S.C. § 226 *et seq.*)........................................... *passim*
James M. Inhofe National Defense Authorization Act for Fiscal Year 2023,
    Pub. L. No. 117-263, § 5708, 136 Stat. 2395 (Dec. 23, 2022)
    (to be codified at 12 U.S.C. § 248c) ...............................................5
Monetary Control Act, Pub. L. No. 96-221, 94 Stat. 132 (1980) .................15
National Bank Act, ch. 343, 18 Stat. 123 (1874)........................................2
Wy. Admin. R., Banking Div. Ch. 20, § 3................................................20
Wyo Stat.
    § 13-12-103..................................................................................6
    § 13-12-105..................................................................................6
    § 13-12-119..................................................................................6
Bd. of Governors of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services*
    *Requests,* 87 Fed. Reg. 51,099 (Aug. 15, 2022) .............................7
    51,106.........................................................................................8
    51,110.........................................................................................8
Fed. R. Civ. P. 12(b)(6)...........................................................................11

## OTHER AUTHORITIES

168 Cong. Rec. S688–703 (Feb. 15, 2022) (Statement of Sen. Toomey) ......5
*Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*,
    43 Op. O.L.C. __ (Oct. 23, 2019) ...........................................3, 31
Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision*
    *of Financial Services*, https://tinyurl.com/2t8cthms (last updated Oct. 28, 2016) .................15
Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments*
    *System*, https://tinyurl.com/4wfhfnkn (last updated Aug. 11, 2020) ...........15
Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the*
    *Federal Reserve Bank Services* (1980), https://tinyurl.com/mr4cbtjb....................15
Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service*
    *Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2enw3reu .....................15
Samuel L. Bray, *The Mischief Rule*, 109 Geo. L. J. 967 (2021)................25, 26
Kyle Campbell, *Toomey: Fed "Wildly Mischaracterized"Master Account Law for Own*
    *Gain*, Am. Banker (Apr. 3, 2023), https://tinyurl.com/2p8vs9nc....................26, 27
Peter Conti-Brown, *The Fed Wants To Veto State Banking Authorities. But Is That*
    *Legal?* Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd ................4, 14, 19

Page

**Other Authorities—continued:**

Fed. Rsrv., *Fed. Rsrv. Banks Operating Circular 1: Account Relationships*
(Aug. 16, 2021)........................................................................................4, 23

Thomas Franck, *State Bank Regulator Disputes KC Fed's Claim About Fintech Firm*
*Linked to Biden Nominee Raskin* (Feb. 15, 2022), https://tinyurl.com/3kj73xhf ...................24

Julie A. Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*,
Iowa L. Rev. (forthcoming 2023),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4405139........................................ *passim*

Julie A. Hill, *Opening a Federal Reserve Account*, 40 Yale J. Regul. (forthcoming 2023),
https://ssrn.com/abstract=4048081 ................................................................................4, 5, 19

John F. Manning, *What Divides Textualists From Purposovists?*,
106 Colum. L. Rev. 70 (2006) ...............................................................................................25

Press Release, U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual*
*Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on*
*Master Accounts* (Dec. 8, 2022), https://tinyurl.com/57d74r28 ...........................5, 24, 25, 26

Statement from Fed. Rsrv. Bank of Kan. City, https://tinyurl.com/4schdpbw.............................24

Wy. Div. of Banking, SPDI Exam. Manuals (Jan. 2021)............................................................20

**J.A.501**

## INTRODUCTION

As Yogi Berra once memorably observed, "It's like déjà vu all over again." Last fall, the Court entertained briefing and oral argument on Defendants the Federal Reserve Board of Governors' (the "Board") and the Federal Reserve Bank of Kansas City's (the "Kansas City Fed") motions to dismiss Plaintiff Custodia Bank Inc.'s original complaint. That complaint alleged that Defendants had unduly delayed granting Custodia a master account, and the central question facing the Court in resolving the motions to dismiss was whether 12 U.S.C. § 248a entitled Custodia to a master account. The Court granted in part and denied in part Defendants' motions, holding that it was plausible that § 248a entitled Custodia to a master account and that further factual development was warranted before the Court would undertake a complete analysis of the statute. (Order, ECF 102 at 16–17.) On the eve of having to produce discovery that would reveal the extent of the Board's control over the master account process, Defendants denied Custodia's master account application and moved to dismiss this case as moot without producing a single document in discovery. Defendants' maneuver prompted Custodia to amend its Complaint to challenge Defendants' denial as unlawful. (Amended Complaint ("AC"), ECF 121.)

The central question in the Amended Complaint remains the same: Whether Custodia is entitled to a master account under § 248a. In their motions, Defendants retread much of the same ground that the Court already has considered and rejected as a basis for dismissal, and their one new argument, concerning an irrelevant change to the Federal Reserve Act, does not move the needle. Discovery is still necessary to resolve this dispute. And the stakes could not be higher, as Defendants' position—that politically disfavored but eligible state-chartered depository institutions can be unilaterally blocked from accessing the banking system by the Board (or its agents, the Reserve Banks)—spells the demise of the dual-banking system that has prevailed for more than two centuries. The fight over this statutory question turns on states' rights: did Congress

1

grant the Board (or its agents, the Reserve Banks) a veto over State bank chartering decisions without explicitly saying so in statute?  Accordingly, the Court should respond as it did before, by denying Defendants' motions to dismiss and allowing the parties to proceed to long overdue discovery so that the Court can have the full context when it decides this important question.

## BACKGROUND

**I.    Federalism Promotes Innovation in Banking.**

The United States operates a dual banking system that allows banks to be chartered by either the state or federal government.  At the Founding, almost all banks were state chartered. (AC ¶ 22.)  It was not until the passage of the National Bank Act in 1863 that nationally chartered banks started to proliferate.  (*Id.* at ¶ 23;) *see also* 12 U.S.C. §§ 38–43.  In 1913, Congress established the federal banking system as we know it today with the passage of the Federal Reserve Act.  (AC ¶ 24;) *see also* 12 U.S.C. §§ 226–228.

The dual-chartering system's division of regulatory responsibility among state and federal authorities is federalism at its best.  Banks can apply for a national charter from the Office of the Comptroller of the Currency ("OCC") or for a state charter from the relevant state's banking authority.  (AC ¶ 26.)  National banks are primarily regulated by the OCC, while state banks are principally overseen by state regulators.  (*Id.*)  The availability of state charters allows financial institutions to survey various options to select the state that best suits their intended business plans, factoring in geographic and operational concerns such as business models, accessibility of regulators, regulatory philosophies, and costs.  State banking divisions compete and innovate in order to meet the financial needs of their citizens as well as the needs of the state as a whole.  (*Id.* at ¶ 25.)

While the dual-banking system divides the chartering and regulatory responsibilities between the Federal and state governments, it does not create two separate systems for bank

2

services.  The Federal Reserve must provide access to the U.S. dollar payment system to eligible depository institutions on a nondiscriminatory basis.  *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a).  Just because a bank has a state charter does not mean that it uses a state system to clear checks, transfer electronic funds, and provide other banking services.  Instead, state-chartered banks have the right to use the Federal Reserve System for such banking services if they qualify as eligible depository institutions.  The dual-banking system has never segregated national and state-level banking services, or given the Federal Reserve a veto over state-chartered depository institutions' ability to access banking services.

## II.   The Federal Reserve System is Headed by the Board.

The Federal Reserve System controls and executes the nation's monetary policy, operates the U.S. dollar payment system, and serves as America's central bank.  The Federal Reserve's Board of Governors sits atop this system.  The Board exercises "general supervision" over twelve regional Reserve Banks, including the Kansas City Fed.  12 U.S.C. § 248(j).  "The Board oversees the operations of the regional Reserve Banks, including by setting policies for Reserve Banks' lending of money to private banks and provision of other financial services."  *Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*, 43 Op. O.L.C. __, at *3 (Oct. 23, 2019) (*Fed. Rsrv. Bank Members*).  Congress also empowered the Board to "make all rules and regulations necessary to enable [the] board effectively to perform" its statutory duties, including supervising Reserve Banks.  12 U.S.C. § 248(i).  The Board can delegate many functions to Reserve Banks, but retains ultimate authority to review delegated functions.  *Id.* § 248(k).

"The twelve regional Federal Reserve Banks execute the Federal Reserve System's policies."  *Fed. Rsrv. Bank Members*, 43 Op. O.L.C. __, at *3.  As operating arms of the Reserve System, Reserve Banks act as "fiscal agents of the United States empowered by delegation from the Board … to supervise financial institutions and activities."  *Id.* at *8 n.3.

3

**J.A.504**

Once a bank is chartered, the next question is whether it will be a member of the Federal Reserve System. Nationally chartered banks must become members of the Federal Reserve System. 12 U.S.C. § 222. State-chartered banks may choose to become members of the Federal Reserve System, but they are not required to do so. (AC ¶ 27.) The Federal Reserve System cannot discriminate against state-chartered depository banks in the provision of Federal Reserve bank services. *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a).

**III.    The Federal Reserve's Adjudication Process for Master Account Applications Has Changed.**

Master accounts are accounts that banks hold with a Reserve Bank—in effect, "bank account[s] for banks." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Op. of Moritz, J.). Master accounts permit access to a bevy of "indispensable" financial services the Federal Reserve provides. *Id.* at 1064 (Op. of Bacharach, J.). Withholding access to master accounts effectively nullifies a state charter because it is only by holding a master account that banks may directly utilize the Federal Reserve's electronic system for executing debit and credit entries between institutions, clearing checks, transferring securities, and cashing savings bonds. Fed. Rsrv. Banks, Operating Circular 1 at §§ 2.3, 4.1–.3 (Aug. 16, 2021). Put simply, a bank shut out from the Federal Reserve's payment system "can't really function as a financial institution." Peter Conti-Brown, *The Fed Wants To Veto State Banking Authorities. But Is That Legal?* Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd.

The application process for master accounts is opaque. For many years "th[e] process for opening an account was quick" and "Reserve Banks conducted little of their own investigation when considering new account applications." Julie A. Hill, *Opening a Federal Reserve Account*, 40 Yale J. Regul. (forthcoming 2023) (available at SSRN: https://ssrn.com/abstract=4048081), draft at 109. "Instead, the Reserve Banks relied on the fact that the depository institution had been

vetted by some other federal or state bank supervisor," *id.*, and "Reserve Banks provided account and payment services to all legally eligible banks," Julie A. Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023) (available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4405139), draft at 46.   At some point, the Federal Reserve changed the way master account applications are considered without announcing how, why, or when that change occurred.   Today, depository institutions applying for master accounts face a "process more like applying for a bank charter" than "opening a bank account." Hill, *Opening a Federal Reserve Account*, 40 Yale J. Regul. at ____ (forthcoming 2023), draft at 103.   The upshot is that the Federal Reserve has surreptitiously expanded its regulatory remit both by raising the threshold for obtaining an account and by controlling the use of accounts, all without statutory authorization to do so.   *See* Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 1–6.

In December 2022, Congress amended the Federal Reserve Act.   *See* James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 5708, 136 Stat. 2395, 3419 (Dec. 23, 2022) (to be codified at 12 U.S.C. § 248c).   United States Senate Banking Committee Ranking Member Pat Toomey (R-Pa.) had grown frustrated with the Board's lack of transparency regarding the master account application process.   Press Release, U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on Master Accounts* (Dec. 8, 2022), https://tinyurl.com/57d74r28.[1]   Senator Toomey responded by sponsoring an amendment to the

---

[1] *See also* 168 Cong. Rec. S688–703 (Feb. 15, 2022) (Statement of Sen. Toomey) ("[T]his is the kind of stonewalling we are dealing with.   Can't get answers to basic simple questions: Who did you talk to?   When did you talk to them?   What was the nature of the conversation?   And from the Fed: What was the review process?   What led you to change your conclusion?   Do you have a memo from the general counsel laying out the case?").

J.A.506

Federal Reserve Act, which is codified at 12 U.S.C. § 248c.  Under § 248c, the Board is required to "create and maintain a public, online, and searchable database" including "every entity that currently has access to a reserve bank master account and services," as well as "every entity that submits an access request for a reserve bank master account and services" and whether that request was "approved, rejected, pending, or withdrawn."  12 U.S.C. § 248c(b).

## IV.   Custodia Bank Used Its Wyoming Charter to Apply for a Master Account.

In January 2020, Caitlin Long, a 22-year Wall Street veteran, formed Custodia.  That fall, Wyoming's State Banking Board voted 7-0 to grant Custodia an Special Purpose Depository Institution ("SPDI") charter.  (AC ¶ 14.)  Wyoming SPDIs are regulated by the Wyoming Division of Banking.  Wyo. Stat. § 13-12-119.  Like traditional banks, SPDIs must hold capital on top of the assets that back customer deposits.  Unlike traditional banks, SPDIs are generally prohibited from making loans with customer deposits of fiat currency and must back all customer deposits with 100% cash on hand or high-quality liquid assets.  *Id.* §§ 13-12-103, 13-12-105.  SPDIs do not lend money; instead, they specialize in taking deposits of U.S. dollars, facilitating payments for customers, and other incidental services such as custody of digital assets or securities.  As a SPDI bank, Custodia will not hold customers' digital assets in any of its accounts, so Custodia will not be exposed to digital asset price volatility; its customers will retain all digital asset risks.  (*Id.* ¶ 38.)  Custodia will simply maintain customers' digital assets in its trust department, like a safety deposit box for digital assets.  (*Id.* ¶ 50.)  Custodia needs a master account to use the Federal Reserve payment system's electronic fund transfer services for U.S. dollars.  At no point would customers' digital assets touch Custodia's master account.  (*Id.*)

### A.   Custodia applied for a master account, but Defendants sat on their hands.

In October 2020, Custodia filed its master account application with the Kansas City Fed. (AC ¶ 9.)  Custodia submitted some 900 pages of additional information, including Custodia's

J.A.507

business plan, bylaws, policies, insurance agreements, and Wyoming Banking Approval Order. Months passed.  In January 2021, Tara Humston, the Kansas City Fed's head of Supervision and Risk Management, informed Custodia that the application presented "no showstoppers." (*Id.* ¶44.) And in January 2022, the Kansas City Fed confirmed that Custodia meets the legal eligibility requirements for receiving a master account.  (*Id.*)

Nevertheless, Custodia's application remained pending for over two years.  Custodia tried to expedite the process, regularly contacting Defendants and setting up numerous meetings.  (*Id.* ¶ 45.)  Custodia repeatedly offered to provide more information, yet Defendants did virtually nothing on the application.  (*Id.*)  In August 2021, after nearly a year of Defendants' inaction, Custodia applied to become a member bank of the Federal Reserve System to show its willingness to submit to full Federal supervision and accountability.  (*Id.* ¶ 47.)

After waiting for nearly two years for Defendants to act, Custodia filed suit in June 2022. (ECF 1.)  What followed were a series of calculated actions by the Federal Reserve timed to precede litigation deadlines.  The day before Defendants' motions to dismiss were due on August 16, 2022 (*see* ECF 48, 50), the Board issued final guidelines for evaluating master account applications.  Bd. of Governors of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg. 51,099 (Aug. 15, 2022).  The Board promulgated  these "guidelines under its general supervision authority over the operations of the Reserve Banks," and identified "principles to be used by Federal Reserve Banks ... in evaluating requests for master accounts." *Id.* at 51,106.  The Board's guidelines prescribed a tiered framework for evaluating risks of different institutions accessing master accounts, and explained that state chartered, non-member institutions without FDIC insurance—namely, banks like Custodia—"will generally receive the

strictest level of review." 87 Fed. Reg. at 51,110. Defendants then relied on these newly minted guidelines in their motions to dismiss. (*See* ECF 49 at 7, 8, 14, 26, 39; ECF 51 at 7, 42.)

Custodia responded to Defendants' motions to dismiss on September 13, 2022. (ECF 58.) Custodia's opposition was supported by amici the State of Wyoming (ECF 88), State Senator Rothfuss and State Representative Olsen (ECF 89), and Members of the U.S. Senate Banking Committee and U.S. House of Representatives Financial Services Committee (ECF 92). After the motions to dismiss were fully briefed, the Court heard oral argument on October 28, 2022, and on November 11, 2022, the Court issued its Order granting in part and denying in part Defendants' motions to dismiss. (Order, ECF 102.)

Most relevant to the pending motions, the Court held that:

- "Custodia ha[d] plausibly alleged that the Board of Governors has participated in or interfered with the consideration and decision of Custodia's master account application." (Order at 8.)

- "Judge Bacharach's opinion [in *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), which held that eligible institutions are entitled to master accounts under the Federal Reserve Act,] may plausibly be the law on this matter in this case." (Order at 16.)

- "[B]ecause the development of facts underlying or refuting certain allegations may prove particularly relevant to any statutory interpretation of [12 U.S.C.] § 342 versus [12 U.S.C.] § 248, the Court" decided it would "not undertake a complete analysis . . . without further development of those facts." (Order at 17.)

- "Custodia's request for mandamus relief should not be dismissed" because "applying Judge Bacharach's reasoning, Custodia has plausibly alleged the Defendants have failed to discharge a duty owed to plaintiffs which Congress has directed them to perform." (Order at 18 (internal quotation marks omitted).)

- Because "Custodia ha[d] asserted plausible claims of unreasonable delay under the APA and the Mandamus Act, its action for a declaration that a master account application must be decided within a reasonable period of time is valid." (Order at 23.)

J.A.509

**B.     The Board denied Custodia's membership application.**

Following the Court's order, and in keeping with Custodia's claim for undue delay, Custodia served the Kansas City Fed with Requests for Information, Requests for Admissions, and Requests for Production as well as served third-party discovery requests.  Because the claims against the Board fell under the APA, the Board was required to produce an administrative record on February 9, 2023.  (ECF 106; ECF 112.)

Less than a week after the pretrial scheduling conference, and with the due date for its administrative record impending, "the Board staff held an impromptu meeting with Custodia." (AC ¶ 63.)  "Custodia was not informed of the purpose of the meeting."  (*Id.*)  "During the meeting, the Board staff told Custodia that they would recommend that the Board vote to deny Custodia's application for membership in the Federal Reserve."  (*Id.*)  Although banks are generally "given at least one opportunity to address perceived shortcomings in a [membership] application" and are generally given "a week or longer to consider whether to withdraw a [membership] application once the staff conveys their intention to recommend denial," Custodia was given "48 hours to decide whether it would withdraw its [membership] application or face the likely denial."  (*Id.* ¶¶ 63–64.)  Custodia asked for a one-week extension to consider its options.  That request was denied.  (*Id.*)

Custodia responded to the Board staff on January 26, 2023, amid press leaks that the Board's vote to deny its membership application would be a foregone conclusion if it chose not to withdraw.  (*Id.* ¶ 66.)  Custodia did not withdraw its membership application, but it did offer to submit an amended application.  (*Id.*)  Custodia's response also detailed numerous irregularities in the Board's consideration of Custodia's application, which included the Board conducting a full examination before Custodia was even operational (in violation of the Board's own guidance), refusing to review Custodia's updated documentation and information, expanding the scope of

**J.A.510**

Custodia's examination midway through to include activities and products that would not be operational at launch, subjecting Custodia to a higher standard of review applicable to large banks without notifying Custodia in advance, and refusing to review the remediation plan submitted by Custodia that the Board itself, in writing, had requested from Custodia.  (*Id.*)

Less than 24 hours later, on January 27, 2023 the Board voted to deny Custodia's membership application.[2]  (*Id.* ¶ 67.)

### C.    Defendants denied Custodia's master account application.

At approximately the same time as the Board made public its decision on Custodia's membership application, both the Board and the White House released coordinated statements on the risks of crypto-assets.  (*Id.*¶ 68.)  Within a few hours, the Kansas City Fed denied Custodia's master account application.  (*Id.* ¶ 69.)  "The language in the Kansas City Fed's denial echoed the Board's denial of Custodia's membership application and the White House's statement on crypto-assets."  (*Id.*)  By the end of the day, Defendants filed a motion to dismiss this case as moot.  (ECF 116.)

Rather than dismissing the case as moot, the Court allowed Custodia to file its First Amended Complaint on February 28, 2023.  (AC, ECF 121.)  That Amended Complaint includes three claims that present the same central issue as was presented to the Court last fall: Whether Federal bank regulators have discretion to deny a master account to a state-chartered bank that indisputably qualifies as an eligible depository institution.  Custodia respectfully submits that they cannot, given the unequivocal language of 12 U.S.C. § 248(a) and Judge Bacharach's opinion in

---

[2] Custodia is not challenging the Board's denial of Custodia's membership application.  And the Board's rationale for denying Custodia's application for membership in the Federal Reserve System is irrelevant to whether Custodia, as an eligible, state-chartered depository institution, is entitled to a master account under 12 U.S.C. § 248a.

*Fourth Corner*.  Recognizing this similarity, Defendants' motions to dismiss largely rehash arguments from their first motions to dismiss regarding the proper interpretation of § 248a. (*Compare* ECF 49 at 17–26, *with* ECF 127 at 11–25; *Compare* ECF 51 at 20–29, *with* ECF 124 at 6–11.)  The Court has already determined that Custodia is at least plausibly entitled to a master account and, in any event, that discovery will assist the court in interpreting the statute.  (Order at 16–17.)  Nothing has occurred that should affect the Court's analysis.  Defendants' motions should be denied, and Custodia should be permitted to proceed to discovery.

<div align="center">

**STANDARD OF REVIEW**

</div>

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "A claim is plausible if it is accompanied by sufficient factual content to allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" and "the Court accepts as true all well-pleaded allegations."  *Audubon of Kan., Inc. v. U.S. Dep't of Interior*, 568 F. Supp. 3d 1167, 1174 (D. Kan. 2021) (quoting *Iqbal*, 556 U.S. at 678).

<div align="center">

**ARGUMENT**

</div>

## I.   The Court Previously Rejected Defendants' Arguments for Dismissal.

Defendants contend that Custodia's Amended Complaint should be dismissed because 12 U.S.C. § 248a does not entitle Custodia to a master account.  (KC Br. 8–11, Bd. Br. 11–25.)  The Court has already considered these same arguments from Defendants and concluded that they do not justify dismissal of Custodia's claims and that discovery is required before the Court can fully analyze the statutory landscape for master accounts.  (Order at 16–17.)  Such discovery has not yet occurred, and there is no reason for the Court to revisit its prior decision at this time.  Defendants' motions to dismiss should be denied.

<div align="center">

11

</div>

As the Court previously recognized, in order to state a claim for undue delay under the APA, Custodia had to assert credibly that Defendants "failed to take a discrete agency action that [they are] required to take," namely granting Custodia's master account.  (Order at 12 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases omitted))).  After considering the statutory framework for master accounts, the Court concluded that "Judge Bacharach's opinion [in *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017), which held that eligible institutions are entitled to master accounts under the Federal Reserve Act,] may plausibly be the law on this matter in this case" and thus "Custodia ha[d] stated a legally valid claim for relief."  (Order at 12, 16.)  As the Court explained, dismissal was inappropriate because a full statutory interpretation required additional factual development.  (Order at 16) ("[T]he facts alleged by Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a)").  "For example, if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little because it may be that FRBKC failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes, as Custodia has plausibly suggested)." (Order at 16–17.)

Now that Defendants have denied Custodia's application for a master account, whether Defendants have discretion to deny that application is even more squarely before the Court.  The resolution of this issue depends, in part, on whether the master account application process is controlled by § 248a or by § 342.  (Order at 12–17.)  As before, Custodia has made well-pleaded allegations that "the Board of Governors in fact inserted itself into FRKC's consideration of Custodia's application" and the ultimate denial of that application.  (AC ¶¶ 4, 10, 44, 46, 52, 69.)

In direct contradiction of Custodia's well-pleaded allegations evincing control by the Board and even the White House (which must be taken as true), throughout its Motion to Dismiss, the Kansas City Fed argues that it exercised its own discretion to reject Custodia's master account application by way of § 342. (KC Br. 6 n.3, 9–10, 13.) As the Court previously concluded, discovery is required to make clear whether the Kansas City Fed exercised discretion to deny Custodia's master account application or whether the Board stepped in to control the process, as Custodia has plausibly alleged, thereby rendering moot the question whether Congress afforded any such discretion. (Order at 16–17.)

Though the Board "invites the Court to accept Custodia's allegations about Board control for purposes of this motion" to dismiss, (Bd. Br. at 2), the Board introduces extra-record facts and concomitant factual disputes that are not appropriate to resolve at the motion to dismiss stage. For example, Custodia alleges that in order for the bank services covered by § 248a's fee schedule "to be available to nonmember depository institutions, as they must be, those institutions must have a master account." (AC ¶ 73.) The Board contradicts Custodia's well-pleaded allegation and claims that "Reserve Banks have contracted with banks that lack master accounts" to provide the bank services covered by the fee schedule (Bd. Br. at 17), without acknowledging that Operating Circular 1, as cited by the Board (Bd. Br. at n. 12), requires such banks to be able to have master accounts as a prerequisite to establishing their relationships with a Reserve Bank in the first place. As the Court previously recognized and should recognize now, a motion to dismiss is simply not the appropriate posture for resolving these and other factual disputes that are crucial to determining the legal question of whether or not Defendants had discretion to deny Custodia's master account application.

## II.    Section 248a Entitles Custodia to a Master Account.

Even if the Court were to reconsider Defendants' arguments on the merits (it should not), Defendants' statutory analysis is incorrect.  Section 248a prescribes that "[a]ll Federal Reserve Bank services covered by the fee schedule ***shall be available to nonmember depository institutions***."  12 U.S.C. § 248a(c)(2) (emphasis added).  "Shall" denotes a mandatory duty. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018).  The Board develops the fee schedule for Reserve Bank services which include "currency and coin services; checking clearing and collection services; wire transfer services; automated clearinghouse services; settlement services;" and more.  12 U.S.C. § 248a(a–b).  Such services are available to nonmember banks only through a master account.  *Fourth Corner*, 861 F.3d at 1068–69 (Op. Bacharach, J.).  As Judge Bacharach concluded in *Fourth Corner*, eligible state-chartered depository institutions like Custodia are statutorily entitled to master accounts because they "***shall***" be able to access banking services.  12 U.S.C. § 248a(c)(2) (emphasis added); *see* 861 F.3d at 1067–74.  Legal commentators agree.  *See* Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023); Conti-Brown, *The Fed Wants to Veto State Banking Authorities.  But Is that Legal?* (Nov. 14, 2018).  One forthcoming law review article carefully analyzed "the statutory text, the legislative purpose underpinning the statute, and past Federal Reserve Practices," and categorically "conclude[d] that ***the law requires that the Federal Reserve provide accounts*** and payment services ***to all member banks and depository institutions***."  *See* Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 5–6 (emphasis added).

### A.    Defendants misread the statutory framework.

The Board advances three arguments as to why § 248a does not require that Custodia be able to access Reserve Bank services through a master account.  These arguments largely retread

14

the same ground previously considered by the Court in denying Defendants' first motions to dismiss.  None warrant a different outcome.

First, the Board contends that § 248a concerns only "fee-setting for services" and does not address which entities are entitled to those services.  (Bd. Br. 13.)  The Board ignores that a statute can do more than one thing.  As Judge Bacharach explained, "[t]he statutory language does two things:  It ensures universal access to certain bank services and provides uniform pricing for them."  *Fourth Corner*, 861 F.3d at 1068 (Op. of Bacharach, J.).  That was the consensus understanding at the time the Monetary Control Act was passed: "[M]any articles summarizing the Monetary Control Act concluded that the Act required the Federal Reserve to make its payment services available to 'all depository institutions.'"  *See* Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 36.  The Board itself previously recognized that this statutory language "expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services ***to all depository institutions on an equitable basis*.**"  Bd. of Governors of Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (1984) (emphasis added).[3]

---

[3] *See also* Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2enw3reu (acknowledging that the statute "expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis"); Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments System*, https://tinyurl.com/4wfhfnkn (last updated Aug. 11, 2020) (evidencing the Board's own website continues to advise that "Federal Reserve payment services are available to all depository institutions"); Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the Federal Reserve Bank Services* (1980), https://tinyurl.com/mr4cbtjb ("[S]ervices covered by the fee schedule [are] available to all depository institutions."); Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision of Financial Services*, https://tinyurl.com/2t8cthms (last updated Oct. 28, 2016) (noting that the Monetary Control Act gives "all depository institutions access to the Federal Reserve's payment services").

The Board attempts to support this argument by implanting words into the introductory language of § 248a(c). That language provides that "[t]he schedule of fees prescribed pursuant to this section shall be based on the following principles . . . ." According to the Board, this introductory language designates everything that follows as merely "a fee-setting principle." (Bd. Br. at 14–15.) Contrary to the Board's argument, the phrase "fee-setting" does not appear in the provision. Instead, the introductory language makes clear that what follows are "principles" for the schedule of fees. And, one of the "principles" for the schedule of fees is that "[a]ll Federal Reserve bank services" covered by the schedule of fees "***shall*** be available to nonmember depository institutions" like Custodia. 12 U.S.C. § 248a(c)(2) (emphasis added). Other courts have likewise recognized that this section made Federal Reserve bank "services ... ***available to all banks***." *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989) (emphasis added); *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1222–23 (6th Cir. 1983).[4]

Second, the Board argues that, because "master account" is not listed as a service covered by the fee schedule, § 248a cannot entitle Custodia to a master account. (Bd. Br. at 16–17.) But, the Board ignores the catchall provision that requires Federal Reserve Banks to provide nonmember depository institutions with access to "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer

---

[4] The Board also contends that § 248a(c)(2)'s "use of '[a]ll' in relation to the services to which it applies but not the depository institutions that may access these services . . . indicates that at most it implicates the provision of '*all* Reserve bank services' to nonmember institutions as a class, but not necessarily to all nonmember banks in that class." (Bd. Br. 17.) In *Fourth Corner*, Judge Bacharach rejected this argument and explained that the use of "all" preceding "nonmember depository institutions" was unnecessary because "without a restrictive modifier, the phrase 'nonmember depository institutions' is an inclusive term that includes all nonmember depository institutions." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1069–70 (10th Cir. 2017) (Op. of Bacharach, J.) (citations omitted).

of funds" which would include master accounts.  12 U.S.C. § 248a(b)(8).  And, even if master accounts were not considered a covered "new service," § 248a still requires the issuance of master accounts because "all services offered by the Federal Reserve System are conditioned on the issuance of master accounts."  *Fourth Corner*, 861 F.3d at 1068–69 (Op. of Bacharach, J.).

Finally, the Board argues that because it may impose conditions on access to Reserve Bank services, Custodia does not have a right to access services covered by the fee schedule.  (Bd. Br. at 18.)  This is a strawman argument.  It is true that so long as the Board complies with the APA, the Federal Reserve Act, and other relevant sources of law, it can place reasonable restrictions on a depository institution's use of a master account.  That does not change the fact that the Federal Reserve Act requires the Board to provide nonmember depository institutions, like Custodia, access to Reserve Bank services equal to member banks.  12 U.S.C. § 248a(c)(2).  And, in order to have such equal access, Custodia requires a master account.

The Board's invocation of deference for its interpretation of § 248a and its Guidelines (Bd. Br. at 22) does not tilt the scales.  The Supreme Court applies *Chevron* as a last resort, only if the language of a statue is ambiguous and only if all other tools do not resolve ambiguity.  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018).  Section 248a is an "**unambiguous** command to make services in the fee schedule available to nonmember depository institutions," *Fourth Corner*, 861 F.3d at 1069 (Op. of Bacharach, J.) (emphasis added), so *Chevron* deference is inappropriate. Plus, courts do not owe *Chevron* deference to interpretations in non-binding guidance or litigation briefs, least of all when those interpretations contradict prior agency positions and do not parse statutory language or invoke *Chevron*.  *See Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1128 n.9 (10th Cir. 2020); *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017).  "[T]he Federal Reserve's position should carry no weight because it ignores more than a century of its own

interpretations and was not adopted through formal rulemaking." Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 47.

Rather than deal directly with § 248a, the Kansas City Fed instead argues that master accounts "are governed by § 342, which addresses powers Congress granted to the Reserve Banks." (KC Br. at 9.) Under § 342, "[a]ny Federal Reserve bank may receive from any of its member banks, or other depository institutions, . . . deposits of current funds in lawful money, national-bank notes, Federal reserve notes, [etc.]." Judge Bacharach considered § 342 and concluded that it does not grant Reserve Banks discretion over whether to grant master accounts because "[§] 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection. But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions." *Fourth Corner*, 861 F.3d at 1074 (Op. Bacharach, J.) (internal citation omitted). Notably, § 342 does not mention master accounts, and no court has ever concluded that § 342 gives Reserve Banks discretion over master account applications. Rather, § 342 has consistently been interpreted as relating to Reserve Bank's discretion over the types of monetary instruments to accept. *See Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 655, 662 (1923) (explaining that "neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation ***to receive checks for collection***" (emphasis added); Hill, *Federal Reserve Discretion in Payments*, Iowa L. Rev. (forthcoming 2023), draft at 27, 29.

Beyond the express statutory language, the principles of the dual-banking system itself counsel against Defendants' statutory interpretation. The Kansas City Fed contends that "[t]he federal half of our 'dual' banking system would be meaningless if the Board of Governors, a

18

J.A.519

federal agency, were required as an automatic, ministerial matter to give direct access to the Federal Reserve's balance sheet to any entity that obtained any charter that any state saw fit to issue." (KC Br. at 10.)  The Board argues that it would be "absurd" for it to grant every eligible institution a master account.  (Bd. Br. at 18.)  Defendants' arguments upend our nation's dual banking system by essentially giving Federal regulators a veto over state-chartered institutions.

The dual-banking system did not create a primary, national financial system run by the Federal Reserve and fifty subordinate state banking systems.  The dual-banking system predates the Federal Reserve, and is not concerned with the creation of two separate Federal banking and state banking systems, but rather divides the chartering and regulatory responsibility of financial institutions among state and Federal authorities.  "The availability of state charters allows for innovation in the financial services marketplace, permitting states to develop new ideas and competitors subject, of course, to applicable review by federal authorities."  (AC ¶ 25.)  Just as states cannot discriminate against Federally chartered banks, *see, e.g.*, 12 U.S.C. § 25b(b)(1)(A) (preempting state consumer laws that "have a discriminatory effect on national banks"), the Federal Reserve cannot discriminate against state-chartered banks, *see* 12 U.S.C. §§ 248a(c)(2), 1831d(a).

Both in practice and in this litigation, Defendants have tried to use their authority over master accounts to expand their regulatory authority over banking as a whole.  *See* Hill, *Opening a Federal Reserve Account*, 40 Y. J. Reg. at ____, draft at 103–04; Hill, *Federal Reserve Discretion in Payment*, Iowa L. Rev (forthcoming 2023), draft at 6 ("caution[ing] the Federal Reserve to avoid tarnishing its legitimacy by exceeding its congressionally granted power.").  An application for a master account should be just that—an application for a bank account.  It is not a second chartering process.  Peter Conti-Brown, *The Fed Wants to Veto State Banking*

*Authorities. But Is that Legal?* Brookings (Nov. 14, 2018). And despite Defendants' protestations, it need not be. To be entitled to a master account, a depository institution must be eligible for a master account. To be eligible for a master account, a depository institution must have a charter, either from the OCC or from a state division of banking. That chartering authority, as well as a host of other authorities, will then regulate the depository institution once it is in business. State chartering and regulatory requirements are substantial. For example, in order to apply for a SPDI charter, a bank must submit a "detailed business plan" including "[a]ll proposed activities of the special purpose depository institution," "[a] business risk assessment," "[a] comprehensive estimate of operating expenses for the first three (3) years of operation," "[a] complete proposal for compliance," and more. Wy. Admin. R., Banking Div. Ch. 20, § 3. SPDI banks are also subject to increased examination by the Wyoming Division of Banking, including but not limited to "quarterly call reports" and, at least every 12 months for the first three years and at least every 18 months thereafter, a "full-scope examination" covering "traditional bank examination areas and other matters relating to digital asset capital markets activities as warranted based on the SPDI's risk profile." Wy. Div. of Banking, SPDI Exam. Manuals (Jan. 2021) 8–9.

Section 248a presumes the existence of an eligible institution's charter and all the attendant regulators. To prohibit state-chartered banks from accessing the Federal Reserve System denigrates state banking agencies and contravenes the dual-banking system, a hallmark of federalism. Defendants are arguing, in essence, that state banking authorities cannot be trusted to do their job and properly regulate the banks whom they charter. (Bd. Br. at 18–21.) It is a shame the Board, without Congressional authorization and without announcing why, when or how, has recently abandoned long-standing principles of federalism that have guided our country's dual-banking system for centuries.

J.A.521

**B.     Section 248c does not affect Defendants' treatment of master account applications.**

The only intervening statutory change between this Court's previous partial denial of Defendants' motions to dismiss and the current round of briefing is the passage of 12 U.S.C. § 248c.  This statute instructs the Board to create a "Master account and services database" to keep track of the Reserve Banks' responses to master account applications.  While this provision makes clear that decisions on master accounts are within the purview of the Board (as Custodia has alleged was the case with its master account application), it does not otherwise alter the statutory landscape and should not alter the Court's analysis.

Under § 248c, "the Board shall create and maintain a public, online, and searchable database that contains" a list of all entities that have master accounts or have requested access to master accounts, including whether the request "was approved, rejected, pending, or withdrawn." 12 U.S.C. § 248c(b)(1).  Importantly, § 248c was not an amendment to § 248a and does nothing to alter the Congressional command that "all Federal Reserve bank services covered by the fee schedule *shall* be available to nonmember depository institutions."  12 U.S.C. § 248a(c)(2) (emphasis added).  The Board is still mandated to provide banking services to nonmember depository institutions, like Custodia, so § 248c is irrelevant to the Court's analysis of whether or not Defendants were required to grant Custodia's master account application.

**1.     Defendants can reject master account applications from financial institutions that are otherwise ineligible.**

Despite the fact that § 248c does not amend § 248a, the Board contends that § 248c's recognition that master account applications can be "rejected" refutes Custodia and Judge Bacharach's interpretation of § 248a.  (Bd. Br. at 23.)  This is a red herring.  Defendants, of course, can reject master account access requests from *ineligible* financial institutions.  Custodia has never suggested otherwise.  (AC ¶¶ 2, 5, 21, 31, 33, 34, 40, 81, 82, 90, 99, 100 (arguing that Custodia is

21

**J.A.522**

entitled to a master account as an "eligible" depository institution).)  While § 248c recognizes that there may be rejections due to ineligibility, it does not *sub silentio* expand the reasons that Defendants can reject a master account application beyond ineligibility.

There are at least three ways that a financial institution can be ineligible for a master account, giving Defendants justification to reject that institution's master account application. First, the institution could engage or intend to engage in activities illegal under Federal law. Second, the institution could fail to submit a completed application.  Third, the institution could have a charter that does not comply with the Federal Reserve Act's requirements.  Importantly, none of these concerns apply to Custodia.

First, an institution would not be eligible for Federal Reserve banking services if it intended to use those services to violate Federal law.  In *Fourth Corner*, a credit union sought a master account in order to provide banking services to the cannabis industry, an industry made legal under state law but which remained illegal under Federal law.  While each Judge wrote separately, all addressed the concern that the credit union would be using the Federal Reserve to promote activities illegal under Federal law.  *See* 861 F.3d at 1057–58 (Op. of Moritz, J.) (refusing to decide if the credit union was "entitled" to a master account because "[t]he district court correctly declined to facilitate this illegality"); *id*. at 1058 (Op. of Matheson, J.) (finding the dispute unripe because the credit union's changed business plan to engage only in legal activities was "divorced from the factual backdrop that gave rise to the original dispute").  Even Judge Bacharach, who ultimately concluded that the Federal Reserve was mandated to provide a master account to the credit union, rested his analysis on the recognition that the credit union had "promised to obey the law" and that the credit union "would obey the ruling that serving marijuana-related businesses is illegal." *Fourth Corner*, 861 F.3d at 1064–65, 1066 (Op. of Bacharach, J.).  A different result would have

been appropriate if the credit union intended to use Federal Reserve banking services for illegal ends.

Second, an application would be ineligible and Defendants could reject it if the application were incomplete or otherwise missing information necessary for adjudication.  Section 248c itself recognizes this distinction by speaking generally to "***access request[s]***" rather than specifically to completed master account ***applications***.  12 U.S.C. § 248c.  While the master account agreement is only one page, (AC Ex. 1), Federal Reserve Banks Operating Circular 1 sets out extensive requirements for a completed application.  Fed. Rsrv., *Fed. Rsrv. Banks Operating Circular 1: Account Relationships* ("Circ. 1") (Aug. 16, 2021).  For example, among other requirements, the institution must agree to be subject to the regulations and policies of the Federal Reserve (Circ. 1 at 1.0); the institution cannot have an existing account with the Federal Reserve (Circ. 1 at 2.3); the institution must have a business address within the district where the Federal Reserve bank is located (Circ. 1 at 2.5); the institution's board must pass specific resolutions authorizing individuals to conduct business on behalf of the institution (Circ. 1 at 2.6); U.S. branches of foreign banks must execute additional agreements and provide additional information (Circ. 1 at 2.6); and more.  The failure to fulfill any of these or other application requirements would result in a financial institution not being eligible for a master account, and Defendants would have good cause to reject the application.

Third, a nonmember financial institution would be ineligible for a master account if did not fit the definition of a "depository institution" under the Federal Reserve Act.  12 U.S.C. §461(b)(l)(A).  Whether a nonmember bank constitutes a "depository institution" eligible for a master account depends, in part, on the bank's state charter.  12 U.S.C. § 1813(a)(2) (defining "State bank" in reference to the bank incorporation "laws of any State").  In drafting the SDPI

23

**J.A.524**

legislation, "Wyoming worked hand-in-glove with the Kansas City Fed in order to ensure that all SPDI-chartered banks would be eligible to access the Federal Reserve through master accounts." (AC ¶ 8.)  However, some states offer charters that are not designed to comply with the Federal Reserve Act and to provide banks access to Federal Reserve services.

As an example, the Court need look no further than Reserve Trust Company.  The Kansas City Fed rejected Reserve Trust's master account application in 2017 because Reserve Trust was ineligible as it "did not meet the definition of a depository institution."  Statement from Fed. Rsrv. Bank of Kan. City ("KC Fed Statement") (Feb. 7, 2022), https://tinyurl.com/4schdpbw.  Shortly after that denial, and after an ex-Treasury Department official on the board of Reserve Trust personally contacted the Kansas City Fed's President, the denial was rescinded and Reserve Trust was granted a master account.  *Annual Defense Bill*, https://tinyurl.com/57d74r28.  Following Congressional inquiry, the Kansas City Fed issued a statement explaining that the master account was granted because Reserve Trust "changed its business model and the Colorado Division of Banking reinterpreted the state's law in a manner that meant [Reserve Trust] met the definition of a depository institution."  KC Fed Statement, https://tinyurl.com/4schdpbw.  Several days later, in a statement to the press, the Colorado Division of Banking disputed the Kansas City Fed's characterization and made clear that their analysis of the state banking laws had not changed from the time that the Kansas City Fed found Reserve Trust ineligible for a master account.  Thomas Franck, *State Bank Regulator Disputes KC Fed's Claim About Fintech Firm Linked to Biden Nominee Raskin* (Feb. 15, 2022), https://tinyurl.com/3kj73xhf.  Within the next several months, and in recognition of the state's authority over its own bank charter regulations, the Kansas City Fed revoked Reserve Trust's master account.  *Annual Defense Bill*, https://tinyurl.com/57d74r28. Under its state charter, Reserve Trust was not a depository institution and was not eligible for a

J.A.525

master account, so its application was properly rejected initially and its master account was properly rescinded later.

Defendants can and do reject master account applications from ineligible financial institutions. The fact that Defendants can reject applications from ineligible institutions says nothing about whether applications from eligible nonmember depository institutions, like Custodia, can be rejected. That question is answered in § 248a—Reserve bank services **shall** be available to eligible nonmember depository institutions through a master account.

### 2.   Section 248c was designed to promote transparency, not to alter the master account application process.

Reserve Trust does more than just provide an example of Defendants rejecting a master account application for ineligibility; the Reserve Trust saga also inspired the passage of § 248c in December 2022 (notably without changing § 248a). *Annual Defense Bill*, https://tinyurl.com/57d74r28. That is important context for understanding the scope of § 248c.

The Mischief Rule is a longstanding canon of statutory construction that directs courts to consider the problem the legislature was trying to solve and the specific remedy the legislature chose. *See* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L. J. 967, 977 (2021) (citing *Heydon's Case* (1584) 76 Eng. Rep. 637; 3 Co. Rep. 7 a. (Exch.) for the "canonical" statement of the rule). Although this rule is sometimes conflated with purposivism, "textualists recognize that the relevant context for a statutory text includes the mischiefs the authors were addressing." John F. Manning, *What Divides Textualists From Purposovists?*, 106 Colum. L. Rev. 70, 84–85 (2006). It is common for Courts to begin their analysis by noting the mischief and how Congress attempted to solve it. *See, e.g.*, *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642 (2013). That is because considering the mischief the legislature sought to solve helps a court determine a statute's scope,

avoid absurd results, and smoke out "subtle inventions and evasions for continuance of the mischief." Bray, *The Mischief Rule*, 109 Geo. L. J. at 1005 (citations omitted).

Defendants' reversals on Reserve Trust's master account application, and subsequent refusal to respond to Congressional inquiries, led to an increased awareness of the need for transparency and accountability in the master account process. Section 248c was Congress's response to the Board's lack of transparency and was designed to "provide the American people with the information about master account applications that they deserve, but which the Fed has refused to provide." *Annual Defense Bill*, https://tinyurl.com/57d74r28. When asked about Defendants' interpretation of § 248c in their motion to dismiss briefing, the amendment's sponsor Senator Toomey stated that Defendants "wildly mischaracterized" the legislation as newly granting them discretion to reject master account applications. Kyle Campbell, *Toomey: Fed "Wildly Mischaracterized" Master Account Law for Own Gain*, Am. Banker (Apr. 3, 2023), https://tinyurl.com/2p8vs9nc. Senator Toomey went on to explain that "[i]t's ridiculous to suggest that including these categories of outcomes is somehow an acknowledgement or consent or validation of the Fed's rejection of master accounts ... It's simply acknowledging that it happens. It is not in any way endorsing it, or suggesting that it's legitimate. And the Fed lawyers know this very well." *Id.* The drafting and subsequent misrepresentation of § 248c is unfortunately another example of the Board's chicanery. "[Board] staffers consulted on the legislation and insisted on the inclusion of language that was used in their dismissal argument [in this litigation]," but never disclosed to Congress the Board's secret intention to adopt an expansive interpretation of that language for the purposes of this litigation. *Id.* That the Board withheld this information from Congress is striking given that "[t]he same lawyers who were part of that conversation with [the Senate] are now a part of this lawsuit." *Id.* As one Senate staffer put it, "That looks pretty dirty."

*Id.* It appears that Defendants are so concerned about the results of this litigation that they are willing to rely on a single word they wanted added to a statute—"rejected"—despite knowing full well that the statute does not have the meaning that they attempt to give it.

If possible, Defendants' position that § 248c allows them to reject master account applications only looks worse in light of the existing statutory landscape. As the Board explained, "it is a well-settled principle that 'Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts.'" (Bd. Br. at 24 (quoting *Prime Care of Ne. Kan., LLC v. Humana Ins. Co*., 447 F.3d 1284, 1287 (10th Cir. 2006) (citation omitted)).) The only judge to directly address the issue of whether or not the Federal Reserve has discretion to deny master account applications conclusively found that it did not. *Fourth Corner*, 861 F.3d at 1067–73 (Op. of Bacharach, J.). If Congress wanted to make clear that Defendants have discretion to deny master account applications, it is unreasonable to think that it would do so obliquely through a statute requiring the transparent disclosure of an online master account database. After all, it is also a well-settled principle that "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

The idea that a disclosure statute that was born out of need to check the Board's opacity actually expanded the Board's authority is nonsensical. "[W]here applying the plain language would produce an absurd and unjust result which Congress could not have intended, we need not apply the language in such a fashion." *Robbins v. Chronister*, 402 F.3d 1047, 1050 (10th Cir. 2005) (internal quotation marks and citation omitted)). Defendants' argument that § 248c grants them newly increased discretion over master accounts belies the purpose of the statutory addition,

27

J.A.528

as well as textual readings that accord with Judge Bacharach's interpretation of Section 248a. This argument does not countenance a different outcome on Defendants' motions.

### 3.   Section 248c makes clear that the Board controls the master account application process.

While § 248c does nothing to support Defendants' argument that they have discretion to deny master account applications, it does reinforce what § 248a and *Fourth Corner* already made pellucidly clear—the Board controls the master account application process. Section 248c contains the Federal Reserve Act's only explicit reference to master accounts. (KC Br. at 5; Bd. Br. at 2.) It requires the Board to document and publicize its actions with master accounts. It is the Board, not the Reserve Banks, that is charged with maintaining a database of master account applications. 12 U.S.C. § 248c(b)(1). If, as Defendants claim, the Reserve Banks were ultimately responsible for master account applications, Congress would have made the development and maintenance of the master account database a responsibility of the Reserve Banks. Instead, such responsibility over master accounts lies where it belongs, with the Board.

Ultimately, the Court should refuse to dismiss Custodia's claims for the same reasons it previously refused to dismiss Custodia's claims. Defendants present no new arguments, including the passage of § 248c, which would change the analysis.

## III.   Defendants' Policy Arguments and Smears Against Custodia Should Not Alter the Court's Statutory Analysis.

As it did in its first motion to dismiss, the Board devotes pages of its brief warning about the dangers of crypto-assets and denigrating Custodia's business. (Bd. Br. at 2–11.) The "Background" section of the Board's brief devotes only a single sentence to the denial of Custodia's master account application, choosing instead to relay news stories outside the scope of the complaint about events, which occurred after the denial of Custodia's master account application, at other banks whose risky business models fomented the very bank runs that

28

Custodia's non-lending, 108% reserve business model was designed to avoid.  (Bd. Br. at 3.)  This is improper:  Courts do "not consider materials outside of the pleadings when resolving a motion to dismiss, other than those referenced in the Complaint and central to Plaintiff's claim, or court documents of which the Court may take judicial notice." *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1301 (D.N.M. 2018).  Not only would it not be proper to take judicial notice of these news stories, Defendants did not even deign to ask the Court.  Instead, they merely relay this legally and factually irrelevant information, ostensibly in the hopes of poisoning the Court's view of Custodia.

The Board's random sampling of current affairs, such as the run on Silvergate Bank in March (Bd. Br. at 3), has nothing to do with the denial of Custodia's master account application in January or the proper interpretation of 12 U.S.C. § 248a.  The question presented is a narrow issue of statutory interpretation, informed by discovery; it is not a policy question about crypto-assets or bank regulation in general, or even Custodia's business model.  Those political questions are best left to Congress, and Congress has spoken by guaranteeing all eligible depository institutions access to covered services through a master account.  12 U.S.C. §248a.  The Court ought not countenance Defendants' guilt-by-association scaremongering, especially when the State of Wyoming and its Division of Banking are watching over the eligible depository institutions they have chartered.  In fact, Custodia was approved for initial launch by both the Wyoming Division of Banking and an independent compliance consultant in the fall of 2022.  The only authority to have examined Custodia and not clear it on the first attempt is the Federal Reserve, the party Custodia had already sued.

Similarly, as unjustified as it was, Custodia is not challenging the Board's denial of Custodia's membership application.  Yet the Board devotes pages of its brief to summarizing the

**J.A.530**

document and plucking out its most incendiary quotes, ignoring that it contained numerous procedural irregularities, factual inaccuracies that the Board refused to correct, and general bias against digital assets. (Bd. Br. at 6–9.)  The Board's scorched-earth litigation campaign and attempts to sully Custodia and its management team are unbecoming for a governmental agency tasked with serving the American people, not merely winning a lawsuit.  Even if one assumes that the Board's order denying Custodia's membership application was prepared in good faith and not as fodder for litigation (which almost certainly is not the case, given that it is 14 times longer than the longest ever denial order and was released as part of an orchestrated maneuver involving the White House and the Kansas City Fed) (AC ¶¶ 68–70,) the Board's rationale for denying Custodia's application for membership in the Federal Reserve System is irrelevant to whether Custodia is entitled to a master account under 12 U.S.C. § 248a.  These are completely separate applications with different standards governed by different bodies of law.  Nothing in the Board's order denying Custodia's membership application elucidates the proper construction of § 248a.

IV.   **The Kansas City Fed Is a Proper Defendant.**

Custodia's second cause of action seeks a writ of mandamus compelling action from the Defendants under 28 U.S.C. § 1361.  "Mandamus is the traditional writ designed to compel government officers to perform nondiscretionary duties."  *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005).  Under 12 U.S.C. § 248a, Custodia is entitled to a master account, and Defendants have a nondiscretionary duty to provide Custodia a master account.  *Fourth Corner*, 861 F.3d at 1068 (Op. of Bacharach, J.) (concluding that "§ 248a(c)(2) unambiguously entitles [eligible institutions] to a master account").  The Court has already concluded that Custodia's mandamus claim is plausible and that it "functions in a complementary fashion" to Custodia's APA claim.  (*See* Order at 18.)  The Court should so conclude again.

As previously explained, § 248a provides that "[a]ll Federal Reserve Bank services covered by the fee schedule ***shall be available to nonmember depository institutions***." 12 U.S.C. § 248a(c)(2) (emphasis added). Notably, § 248a is written in the passive voice: Section 248a doesn't specify ***who*** should make service available to eligible depository institutions; but it does guarantee that such services ***shall*** be available to eligible depository institutions.

This guarantee applies to the Kansas City Fed just as it does to the Board. The Reserve Banks, acting as "fiscal agents" of the Reserve System, "execute the Federal Reserve System's policies." *Fed. Rsrv. Bank Members,* 43 Op. O.L.C. __, at *3, *8 n.3. Thus, it was the Kansas City Fed who received Custodia's master account application and the Kansas City Fed who communicated with Custodia regarding its master account application, including the ultimate denial. (AC ¶¶ 6, 9, 10, 21, 43–45, 48–49, 51, 69.) It is also the Kansas City Fed who will be the primary point of contact for all of the services listed in § 248a—for example, "check clearing" and "coin services." 12 U.S.C.§ 248a(b)(1)–(8). It would be nonsensical for § 248a to require the listed services "be available" but not require the institution that provides those services to make them available.

The Kansas City Fed argues that Custodia's mandamus claim should be dismissed as duplicative of its APA claim. (KC Br. 12.) That is not correct. Custodia's mandamus claim is an alternative to its APA claim and complements its APA claim. Even if the Court concludes that the Board is not responsible for the decision on Custodia's master account, the Court should still conclude that § 248a and *Fourth Corner* give Custodia and other eligible depository institutions a right to a master account. In that case, mandamus would lie against the Kansas City Fed for wrongfully denying Custodia's master account application. (Order at 18–19.)

31

The Kansas City Fed argues that because APA relief is available against the Board, Custodia's mandamus claim against the Kansas City Fed should be dismissed. (KC Br. at 11–12.) While it is true that the availability of "a remedy under the APA" can preclude a claim for mandamus, (KC Br. at 11–12), that is the case only where "review by other means is possible," *W. Shoshone Bus. Council ex rel. W. Shoshone Tribe of Duck Valley Rsrv. v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993). Here, APA review of the Kansas City Fed's actions is not possible because Custodia has not asserted an APA claim against the Kansas City Fed. Custodia has brought only a mandamus claim against the Kansas City Fed. That was to streamline the case and avoid unnecessary litigation over whether the Kansas City Fed qualifies as an "agency" for purposes of the APA. (Order at 5–7.) Courts dismiss mandamus claims that duplicate APA claims because the relief requested is "essentially" the same. *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997). But without an APA claim against the Kansas City Fed, there is no relief to duplicate, and dismissal of the mandamus claim would leave Custodia without a path to relief from the Kansas City Fed.

For these same reasons, the Kansas City Fed is not merely a "relief defendant." (KC Br. at 13.) Custodia alleged myriad facts against the Kansas City Fed exclusively (AC ¶¶ 6, 9, 21, 40, 42–43, 48–51), and against the Kansas City Fed working in tandem with the Board (*Id*. at ¶¶ 3–4, 10, 20, 44–45, 53, 64, 69, 75, 81.) Given its role acting on master account access requests, and the strategic ambiguity that permeates the agency status of Reserve Banks, the Kansas City Fed is a proper defendant. The Court has confronted the substance of these arguments before. Throughout this case, "the Kansas City Fed and the Board have alternately cited each other as the" party responsible for deciding Custodia's master account application. (*Id*. at ¶ 52.) The Court has recognized that fact discovery will clear up this confusion and simplify the key statutory

32

J.A.533

interpretation question.  (Order at 16–17.)  The Kansas City Fed should not be excused from this

case, if it ever is, until after the parties have taken discovery and the Court has had an opportunity

to make the factual findings necessary to properly interpret the statute.[5]

## V.   Custodia's Declaratory Judgment Claims Are Valid.

In the Amended Complaint, Custodia requests relief under the Declaratory Judgment Act

in the form of "a declaration from this Court that the Board and/or the Kansas City Fed has a

statutory obligation to provide Custodia with a master account and to permit Custodia to use that

master account to access Reserve Bank services in a non-discriminatory manner."  (AC ¶¶ 95–

101.)  Defendants argue that this claim should be dismissed because a claim under the Declaratory

Judgment Act "is not an independently viable cause of action."  (Bd. Br. 25; *see also* KC Br. 14–

15.)  But requests for declaratory judgments are commonly pleaded as claims whereby the

requested remedy is that "the court . . . declare the rights or other legal relations of any interested

party."  *Bellwether Cmty. Credit Union v. Chipotle Mex. Grill, Inc.*, 353 F. Supp. 3d 1070, 1088

(D. Colo. 2018).  This Court previously rejected Defendants' same argument explaining that as

---

[5] In a footnote, the Kansas City Fed claims that if it remains in this case, it should not be subject
to discovery and "the action should proceed on an administrative record under the APA."  (KC Br.
14 n.7.)  The Kansas City Fed's attempts to evade discovery, first by denying the master account
application after Custodia had already served it with discovery requests, and now by trying to
invoke APA protections, signal real concern about what discovery will reveal.  Custodia has stated
a mandamus claim against the Kansas City Fed, which maintains that it is not a government agency
for purposes of the APA (ECF 51 at 13–17.)  There is no justification for proceeding on an
administrative record when the defendant is not an agency, and this Court has already recognized
that discovery is available against the Kansas City Fed (Order at 16; ECF 112 at 4.)  The cases the
Kansas City Fed cites are inapposite.  *See Ketcham v. U.S. Nat'l Park Serv.*, No. 16-CV-00017-
SWS, 2016 WL 4268346, at *2 (D. Wyo. Mar. 29, 2016) (Skavdahl, J.) (insisting on APA review
where the defendant was an agency); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58
F. Supp. 3d 1191, 1239 (D.N.M. 2014) (same); *Sierra Club v. Hodel*, 848 F.2d 1068, 1077 (10th
Cir. 1988) (per curiam) (proceeding on the administrative record where the plaintiff did not attempt
to take discovery of the non-agency defendant that "substantively [was a] third-party
defendant[]"), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956
F.2d 970 (10th Cir. 1992).

**J.A.534**

long as Custodia can state "valid federal causes of action," its claim for Declaratory Judgment is a "viable request for relief that [should] not be dismissed at this time."  (Order at 22–23); *see also Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006) (allowing declaratory relief where there is "some independent basis of jurisdiction").  Custodia has stated a valid APA claim against the Board and a valid mandamus claim against the Board and the Kansas City Fed.  Accordingly, its request under the Declaratory Judgment Act is a viable claim for relief and should not be dismissed.

## CONCLUSION

This Court should deny Defendants' motions to dismiss, ECF Nos. 124 and 126.

Dated: April 11, 2023.

Custodia Bank, Inc., Plaintiff,


/s/ Scott E. Ortiz
Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper, WY 82602

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024

*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify, on the 11th day of April, 2023, a true and correct copy of the foregoing was served on counsel, via the Court's electronic system, addressed to:

Joshua Paul Chadwick
Katherine Pomeroy
Yonatan Gelblum
Yvonne Facchina Mizusawa
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, NW
Washington, DC 20551
202-263-4835
joshua.p.chadwick@frb.gov
katherine.pomeroy@frb.gov
yonatan.gelblum@frb.gov
yvonne.f.mizusawa@frb.gov

Angela Tarasi
Christine Carletta
Jeffrey S. Bucholtz
Joshua Nathaniel Mitchell
King & Spaulding LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
720-535-2319
720-535-2400
atarasi@kslaw.com
ccarletta@kslaw.com
jbucholtz@kslaw.com
jmitchell@kslaw.com

Billie L. M. Addleman
Hirst Applegate LLP
1720 Carey Avenue, Suite 400
PO Box 1083
Cheyenne, WY 82003-1083
307-632-0541
307-632-4999
baddleman@hirstapplegate.com

/s/ Scott E. Ortiz

**J.A.536**

John Buretta (*Pro Hac Vice*)
Benjamin Gruenstein (*Pro Hac Vice*)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
jburetta@cravath.com
bgruenstein@cravath.com

Darin B. Scheer (6-3558)
CROWLEY FLECK PLLP
111 W 2nd St
Casper, WY 82601
Telephone: (307) 265-2279
dscheer@crowleyfleck.com

*Counsel for Amicus Curiae Former Senator Patrick J. Toomey*

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

CUSTODIA BANK, INC.,

      *Plaintiff*,

        v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM &
FEDERAL RESERVE BANK
OF KANSAS CITY,

      *Defendants*.

Civil Case No.: 1:22-CV-00125-SWS

## BRIEF OF *AMICUS CURIAE*
## FORMER SENATOR PATRICK J. TOOMEY
## IN SUPPORT OF NEITHER PARTY

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.........................................................................................ii

INTEREST OF *AMICUS CURIAE* ........................................................................ 1

ARGUMENT.............................................................................................................. 3

I.      The History of the 2023 NDAA Amendment Makes Clear That Its Purpose
        Was To Achieve Transparency in the Master Account Application and
        Maintenance Process ...................................................................................... 4

II.     This Court Should Reject The Arguments that the 2023 NDAA
        Amendment Requiring Disclosure of Master Accounts Should be
        Construed to Imply that Congress Recognized or Affirmed that the Reserve
        Banks Have Substantive Discretion to Reject Master Account Applications........ 13

        CONCLUSION ............................................................................................. 16

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ...............................................16

**Statutes & Rules**

12 C.F.R. § 265.20 ..........................................................................................................15

12 U.S.C. § 241 .................................................................................................................1

12 U.S.C. § 242 .................................................................................................................1

12 U.S.C. § 248(i) .............................................................................................................1

12 U.S.C. § 248(j) .............................................................................................................1

12 U.S.C. § 248(k) ............................................................................................................1

12 U.S.C. § 248b .............................................................................................................11

12 U.S.C. § 248c(b)(1) ......................................................................................................4

12 U.S.C. § 1752 .............................................................................................................12

12 U.S.C. § 1813 .............................................................................................................12

22 U.S.C. § 288 ...............................................................................................................11

Fed. R. App. P. 29(A)(4)(E) .............................................................................................1

Federal Reserve Act:  Public Law 63-43, 63d Congress, H.R. 7837 (Dec. 23, 1913)...................15

Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 68,691 (Nov. 16, 2022) ......................................................................................................................8

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 Amendment to the Federal Reserve Act, Pub. L. No. 117-263 § 5708, 136 Stat. 2395, 3419............1,10,11

Local Civil Rule 83.6 ........................................................................................................1

S.A. 6019 (Sep. 28, 2022), *https://www.congress.gov/117/crec/2022/09/28/168/157/CREC-2022-09-28-pt1-PgS5495-3.pdf*.......................................................................7

**J.A.539**

## Other Authorities

*Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*, 43 Op. O.L.C. __ (Oct. 23, 2019) ............................................................................1,15

*Bank Application Actions*, Federal Deposit Insurance Corp. (Apr. 11, 2023), *https://www.fdic.gov/regulations/applications/actions.html* ....................................8

*OCC Financial Institution Search*, Office of the Comptroller of the Currency (last accessed Apr. 18, 2023), *https://www.occ.treas.gov/publications-and-resources/tools/occ-financial-institution-search/index-occ-financial-institution-search.html*............................................................................................................8

*State Bank Regulator Disputes KC Fed's Claim About Fintech Firm Linked to Biden Nominee Raskin*, CNBC (Feb. 15, 2022), *https://tinyurl.com/4k6jxxxd* ...................6

Statement of Fed. Rsrv. Bank of Kan. City (Feb. 7, 2022), *https://tinyurl.com/ya6fjp9u* ..............5

*The Founding of the Fed*, Federal Reserve Bank of New York (last accessed Apr. 18, 2023), *https://tinyurl.com/3ayk3wu8* .......................................................................15

*Toomey: Fed "wildly mischaracterized" master account law for own gain*, American Banker (Apr. 3, 2023) ..................................................................................................3

*Toomey Wants the Fed More 'Transparent,' Subject to Oversight*, Bloomberg Law (June 30, 2022), *https://tinyurl.com/2p9h8cma* .........................................................7

U.S. Const. art. II, § 2, cl. 2 .....................................................................................15

U.S. House Financial Services Committee, *Waters Secures Key Committee Provisions in 2023 National Defense and Authorization Act* (Dec. 7, 2022), *https://tinyurl.com/59x7d7c6* ...............................................................................9

U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on Master Accounts* (Dec. 8, 2022), *https://tinyurl.com/57d74r28* ...................................5,6,9

U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey Calls for Reforming the Regional Federal Reserve Banks* (Feb. 11, 2022), *https://tinyurl.com/58rs6ab3* ..............................................................................15

U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey on Fed's New Master Account Proposal: More Transparency Needed* (Nov. 4, 2022), *https://tinyurl.com/y4npu2vv* .........................................................................7,8,14

U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey, Scott, Tillis, Lummis Blast Kansas City Fed for Again Stonewalling Congress on Master Account Process* (June 29, 2022), *https://tinyurl.com/2cy8dxv8* ........................................6

**J.A.540**

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* former Senator Patrick J. Toomey served in the U.S. Congress for 18 years, first as the U.S. Representative for Pennsylvania's 15th congressional district from 1999 to 2005, then as a U.S. Senator from 2011 to 2023. Senator Toomey was the principal sponsor of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 Amendment ("2023 NDAA Amendment" or "Amendment") to the Federal Reserve Act, Pub. L. No. 117-263 § 5708, 136 Stat. 2395, 3419. The Amendment requires the Board of Governors of the Federal Reserve System[2] (the "Board of Governors" or "Board") to create and maintain a public, online, searchable database that contains a list of every entity that currently has access to a Federal Reserve System master account and services, and a list of every entity that submits an access request for a master account and services, including whether the request was approved, rejected, pending or withdrawn.

In addition to sponsoring the 2023 NDAA Amendment, during his 12 years on the Senate Committee on Banking, Housing, and Urban Affairs ("Senate Banking Committee"), where he ultimately served as Ranking Member, Senator Toomey conducted significant oversight activity on issues related to the Federal Reserve System. In fact, he proposed the

---

[1] Pursuant to Local Civil Rule 83.6 and Federal Rule of Appellate Procedure 29(A)(4)(E), counsel for *amicus curiae* certifies that this brief was not authored in whole or in part by any party's counsel and that no party, party's counsel or anyone other than *amicus curiae* and his counsel contributed money in connection with the preparation or submission of this brief.

[2] The Federal Reserve System consists of the Board of Governors, the Federal Open Market Committee ("FOMC") and the 12 Reserve Banks. *See* 12 U.S.C. § 248(i)-(k). The Board has seven members, each appointed by the President and confirmed by the Senate for 14-year terms. 12 U.S.C. §§ 241-242. The Board "oversees the operations of the regional Reserve Banks," *Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm.*, 43 Op. O.L.C. __, at *3 (Oct. 23, 2019) ("*Fed. Rsrv. Bank Members*"), and may promulgate "all rules and regulations necessary to enable [the] board effectively to perform" its statutory duties, including the supervision of the Reserve Banks. 12 U.S.C. § 248(i). The Board may delegate certain functions to the Reserve Banks, which "execute the Federal Reserve System's policies" and act as "fiscal agents of the United States empowered by delegation from the Board . . . to supervise financial institutions and activities". *Fed. Rsrv. Bank Members*, 43 Op. O.L.C. __, at *3. However, the Board retains ultimate authority over any delegated functions. 12 U.S.C. § 248(k).

1

**J.A.541**

Amendment in response to one particular sequence of oversight activities that demonstrated to Senator Toomey and his colleagues that greater disclosure was necessary in the master account application and maintenance process: the Senate Banking Committee's inquiry into the master account application of The Reserve Trust Company ("Reserve Trust"), a Colorado-based financial technology company, which had its master account application rejected, approved and subsequently revoked by the Federal Reserve Bank of Kansas City ("Kansas City Fed"), in a short period of time.

After the Board and Kansas City Fed declined to provide the Senate or the public with information related to Reserve Trust and the circumstances surrounding its application, Senator Toomey and his colleagues drafted the Amendment to ensure that this sort of important information regarding master accounts was not withheld from Congress or the public in the future. During the process of drafting the Amendment, Senator Toomey and his colleagues consulted extensively across Congress and with senior attorneys and other staff from the Board. The purpose of the Amendment was understood by those involved in its drafting to relate exclusively to increasing transparency surrounding the master account application process, and not to augment or otherwise comment on the substantive authority or discretion of the Board, or the regional Federal Reserve Banks ("Reserve Banks") to approve or reject master account applications.

Senator Toomey takes no position on Defendants' motion to dismiss, or the ultimate question of whether either the Board or Kansas City Fed possesses, and properly exercised, the discretion to reject Custodia's application for a master account. However, Senator Toomey submits this brief because the arguments advanced by the Board and the Kansas City Fed in this case misconstrue the Amendment as recognizing or bolstering their discretion to reject

J.A.542

master account applications from statutorily eligible depository institutions. As its text makes clear—and as the Board knows from conversations with legislative staff during its drafting—the Amendment was exclusively a transparency measure, requiring the Board to disclose the identity of entities that hold, or have submitted pending or rejected applications for, master accounts. The Amendment does not opine on the question of whether or not other statutory or regulatory authorities do (or do not) allow for discretion in the master account approval process—nor whether such discretion, if it does exist, resides with the Board or with the Reserve Banks.

As the Amendment's sponsor and principal drafter, Senator Toomey is well placed to explain the history, context, meaning and intent of the Amendment. Since retiring from the Senate earlier this year, Senator Toomey has closely followed the application and interpretation of the Amendment—including in this case and in Board rulemakings—and has publicly commented on his view of the provision's proper interpretation.[3] So too does Senator Toomey have a strong interest in ensuring that this Court interprets the Amendment in accordance with Congress's (properly limited) language and intent. For the reasons set forth below, Senator Toomey urges this Court to reject attempts, by the Board and Kansas City Fed, to interpret the Amendment as any indicia of congressional intent to support the existence or scope of any discretion to reject master account applications—an issue which goes to the heart of this case.

## ARGUMENT

In its motion to dismiss, the Board argues that the Amendment's recognition that master account applications can be "rejected," including from "insured depository institutions," serves as

---

[3] See, e.g., *Toomey: Fed "wildly mischaracterized" master account law for own gain*, American Banker (Apr. 3, 2023), *https://tinyurl.com/5ddhttfz*.

J.A.543

an authoritative congressional recognition of Board or Reserve Bank discretion over master account approvals, "resolv[ing]" "any doubt [] as to [its] ability to deny requests for master accounts." (Board of Governors Memorandum in Support of Motion to Dismiss ("Bd. Br."), Mar. 28, 2023, ECF 127 at 23.)  The Board contends that the Amendment's requirement that it create and maintain a list of master account applications, "including whether . . . a request . . . was approved, *rejected*, pending, or withdrawn," 12 U.S.C. § 248c(b)(1) (emphasis added), and listing whether the requesting entity was "an insured depository institution," "an insured credit union," or "a depository institution that is not an insured depository institution or an insured credit union," *id.* § 248c(b)(1)(C), means that "the only way that the 2023 NDAA can be read to give effect to all of its provisions" is to recognize broad discretion to deny master account applications from state-chartered insured depository institutions like Custodia. (Bd. Br. at 23-24.)  The Kansas City Fed relatedly argues that the Amendment's definition of these accounts as "reserve bank master accounts" indicates a congressional grant of such discretion to the Reserve Banks, rather than to the Board. (Kansas City Federal Reserve Memorandum in Support of Motion to Dismiss, Mar. 28, 2023, ECF 124 at 9-10.)

A plain reading of its text does not support either argument that the Amendment authorized, explicitly or implicitly, any substantive Board or Reserve Bank power or discretion to reject applications from statutorily eligible institutions.  Consideration of the purpose of the Amendment, and the facts and circumstances that led to its passage, likewise establishes that the Amendment is, and was drafted as, exclusively a disclosure provision.

I.  **THE HISTORY OF THE 2023 NDAA AMENDMENT MAKES CLEAR THAT ITS PURPOSE WAS TO ACHIEVE TRANSPARENCY IN THE MASTER ACCOUNT APPLICATION AND MAINTENANCE PROCESS**

The Senate Banking Committee witnessed the lack of transparency in the master account approval process first-hand in January 2022 during the Senate vetting and confirmation process

4

J.A.544

for a presidential appointee nominated to serve as vice-chair for banking supervision at the Board. At that time, Senator Toomey was serving as Ranking Member on the Senate Banking Committee, which is principally tasked with vetting presidential nominees to the Board as part of the Senate's constitutional duty to advise and consent on the appointment of principal officers of the United States. During the Senate vetting and confirmation process, Senator Toomey and his colleagues learned that Reserve Trust—a non-depository financial institution—had been denied, and then subsequently granted, a master account by the Kansas City Fed.

In late 2016, Reserve Trust applied for a master account—but the Kansas City Fed rejected its application because it "did not meet the definition of a depository institution," and thus was statutorily ineligible for a master account. (Statement of Fed. Rsrv. Bank of Kan. City ("KC Fed Statement") (Feb. 7, 2022), *https://tinyurl.com/ya6fjp9u*.) A few months later, the previous denial was rescinded and Reserve Trust was granted a master account, becoming, according to Reserve Trust's website, "the first state chartered trust company to obtain a Federal Reserve master account, granting direct access to Federal Reserve clearing, payment, and settlement services." (U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on Master Accounts* ("*Annual Defense Bill*") (Dec. 8, 2022), *https://tinyurl.com/57d74r28*.)

Senator Toomey began seeking information from the Kansas City Fed and the Board about Reserve Trust's application for a master account and the Kansas City Fed's reversal of its previous denial. Even after several follow-up inquiries, the Board and Kansas City Fed largely refused to provide any relevant information. On February 7, 2022, the Kansas City Fed issued a one-page statement explaining that the master account was granted because Reserve Trust "changed its business model and the Colorado Division of Banking reinterpreted the state's law in a manner

that meant [Reserve Trust] met the definition of a depository institution." (KC Fed Statement.) However, just a week later, the Colorado Division of Banking publicly disputed this narrative, stating that its analysis of the state banking laws had not changed from the time that the Kansas City Fed found Reserve Trust statutorily ineligible for a master account, and that the Kansas City Fed had "misrepresent[ed]" its role. (*State Bank Regulator Disputes KC Fed's Claim About Fintech Firm Linked to Biden Nominee Raskin*, CNBC (Feb. 15, 2022), *https://tinyurl.com/4k6jxxxd*.)

By June 2022, the Senate Banking Committee learned that the Kansas City Fed had revoked Reserve Trust's master account. (*Annual Defense Bill*, *supra*.) When Senator Toomey wrote the Kansas City Fed requesting additional information about this—second—reversal, the Kansas City Fed asserted that any information regarding Reserve Trust's master account was confidential supervisory information and refused to turn over relevant documentation to the Senate Banking Committee.

By this point, Senator Toomey and his colleagues on the Senate Banking Committee were concerned about the lack of transparency and accountability represented by this episode. Senator Toomey and his colleagues wrote to the Kansas City Fed several times about these issues, and Senator Toomey raised questions to Chair of the Board Jerome Powell during public hearings. (*See, e.g.*, U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey, Scott, Tillis, Lummis Blast Kansas City Fed for Again Stonewalling Congress on Master Account Process* (June 29, 2022), *https://tinyurl.com/2cy8dxv8*.) One item Senator Toomey sought specifically from the Board during this period was a listing of each institution holding a master account; the Board refused several times to provide this information. Writing to Senator Toomey in June 2022, Chair Powell echoed the Kansas City Fed, asserting that "information regarding which institutions have

6

**J.A.546**

requested or maintain master accounts is considered confidential business information of the requestors and the Reserve Banks . . . [which] the Federal Reserve does not disclose . . . publicly." In an interview on Bloomberg TV at the time, Senator Toomey expressed that the Board took "a position that they're not accountable to anyone," including the Congress. (*Toomey Wants the Fed More 'Transparent,' Subject to Oversight*, Bloomberg Law (June 30, 2022), *https://tinyurl.com/2p9h8cma*.)

The Board and Kansas City Fed's refusal to provide information regarding the master account approval process led Senator Toomey and several of his colleagues to consider legislation requiring greater transparency and disclosures from the Board and/or the Reserve Banks. In September 2022, Senator Toomey introduced the first draft of what ultimately became the 2023 NDAA Amendment,[4] requiring the Board to publicly maintain a listing of institutions that hold master accounts, as well as those that have applied for, been granted, or rejected for a master account. As Senator Toomey publicly stated after introducing the draft Amendment, "[e]vents and information gleaned over the last year have raised significant policy questions about the Fed's approach to awarding master accounts. Access to the Fed's payment system is a highly valuable public good, and Congress has a responsibility to taxpayers to ensure regulators give out public goods fairly, transparently, consistently, and without favoritism." (U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey on Fed's New Master Account Proposal: More Transparency Needed* (Nov. 4, 2022), *https://tinyurl.com/y4npu2vv*.)

In response to the introduction of the draft Amendment, the Board, in November 2022, announced its intention to voluntarily make public a comparatively more limited amount of

---

[4] *See* Congressional Record—Senate, S.A. 6019 (Sep. 28, 2022), *https://www.congress.gov/117/crec/2022/09/28/168/157/CREC-2022-09-28-pt1-PgS5495-3.pdf*.

7

J.A.547

information about master account holders:  a list of depository institutions that currently hold a master account.[5]  As Senator Toomey said in a press release at that time, the Board's proposal "represent[ed] a step in the right direction, but more transparency [was] needed," since it was critically important that the taxpayers "know not only which institutions have been granted master accounts, but also which ones have been denied access." (*Id.*)  This focus—on denied and pending applications—grew out of information gleaned about Reserve Trust, which was denied a master account (only later to have it granted, and then eventually revoked) under opaque circumstances. It was apparent from those events that pending and rejected applications were a source of significant public interest, and that Board and Reserve Bank transparency surrounding this process was lacking.  As Senator Toomey publicly stated at the time, his goal was to promote a regime that aligned the Federal Reserve system with other federal banking regulators:  "Just as the FDIC maintains a public database of applications for deposit insurance and the OCC maintains a public database of bank charter applications, the Fed should adopt a public database for master account applications." (*Id.*)  The FDIC and OCC databases include listings of pending and rejected applications.[6]

In Senator Toomey's public comments and private conversations with the Board and with his colleagues, he and his staff were clear about the purpose of the Amendment: to "provide the American people with the information about master account applications that they deserve, but which the Fed has refused to provide," and to make clear to "[t]he Fed and other regulators [] that if they won't be transparent, Congress will hold them accountable." (*Annual Defense Bill*, *supra*.)

---

[5] *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 68,691 (Nov. 16, 2022).

[6] *See Bank Application Actions*, Federal Deposit Insurance Corp. (Apr. 11, 2023), *https://www.fdic.gov/regulations/applications/actions.html*; *OCC Financial Institution Search*, Office of the Comptroller of the Currency (last accessed Apr. 18, 2023), *https://www.occ.treas.gov/publications-and-resources/tools/occ-financial-institution-search/index-occ-financial-institution-search.html.*

Moreover, during Senator Toomey's many conversations with colleagues, legislative staff, and with the Board, there was not a single instance in which any Member of Congress, legislative staff, or individual from the Board suggested that the Amendment was intended to, or could be interpreted as, opining on either the Board's, or the Reserve Bank's, substantive authority and discretion (or lack thereof) to grant or reject master account applications. The focus was consistently, and exclusively, on promoting transparency as to which institutions held and had applied for master accounts.

The effort to pass the Amendment was bipartisan, and it was ultimately supported by a broad range of both Republicans and Democrats across both the House and Senate, who recognized the importance of providing transparency in line with other federal regulators. (*See, e.g.*, U.S. House Financial Services Committee, *Waters Secures Key Committee Provisions in 2023 National Defense and Authorization Act* (Dec. 7, 2022), *https://tinyurl.com/59x7d7c6*.) During this period, the Board opposed the Amendment, maintaining that it could provide transparency voluntarily and without further legislation. Chair Powell and other senior officials at the Board contacted Senator Toomey and legislative staff to express their concerns about the Amendment. Senior attorneys from the Board were also invited to engage on the text of the Amendment and offer "technical assistance" on the wording of the Amendment. One wording suggestion that the Board attorneys sought was to include the phrase "reserve bank" before the definition of a master account in the Amendment—the first reference to a master account in the Federal Reserve Act's history. The Board attorneys stated that this inclusion was necessary to properly define master accounts, because, once established, the accounts are associated with and managed by the Reserve Banks. They did not suggest that this technical phrasing would carry any substantive or policy weight in establishing whether the Reserve Banks or the Board was ultimately responsible for the approval

9

or issuance of master accounts.  The Board attorneys' suggestion was accepted and the original Amendment was modified to include the phrase "reserve bank master account" in the definitions section.

The Amendment was consciously drafted to avoid opining on any contested questions of the Board's or Reserve Bank's authority—and was intended to garner broad bipartisan support on the less controversial matter of disclosure requirements through the establishment and maintenance of a public database of master accounts.  During the drafting and passage of the Amendment, Senator Toomey and his staff were aware of this litigation and Custodia's application for a master account, as were many of Senator Toomey's colleagues on the Senate Banking Committee.  Three of them—Senators Cynthia Lummis, Steve Daines, and Kevin Cramer—filed an *amicus curiae* brief in this action last year in opposition to Defendants' motions to dismiss, arguing that the Board and Reserve Banks lack any discretionary authority to reject the master account applications of statutorily eligible state-chartered depository institutions.  (ECF 92.)  These Senators were also joined on the brief by four Members of the House of Representatives who voted for the Amendment.  The 2023 NDAA, including the Amendment, passed the Senate 83 to 11 on December 15, 2022, and was signed into law by the President on December 23, 2022.

The Amendment does merely what it says it does and nothing more:  it requires the Board to maintain a public database of master account holders and pending or rejected applicants, without expressing any view about the appropriate reasons for granting or rejecting a master account application.  The very title of the law's section implementing the Amendment is "Section 5708. Master account and services database."  The language of the Amendment is so plain and succinct that it is worth reproducing here in its entirety:

"SEC. 5708. MASTER ACCOUNT AND SERVICES DATABASE.

J.A.550

The Federal Reserve Act is amended by inserting after section 11B (12 U.S.C. 248b et seq.) the following:

"SEC. 11C. MASTER ACCOUNT AND SERVICES DATABASE.

"(a) Definitions.  In this section:

"(1) Access request.  The term 'access request' means a request to a Federal reserve bank for access to a reserve bank master account and services, including any written documentation or  formal indication that an entity intends to seek access to a  reserve bank master account and services.

"(2) Official accountholder.  The term 'official accountholder' means

"(A) a foreign state, as defined in section 25B;

"(B) a central bank, as defined in section 25B, other than a commercial bank;

"(C) a public international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (22 U.S.C. 288 et seq.); and

"(D) any governmental entity for which the Secretary of the Treasury has directed a Federal reserve bank to receive deposits as fiscal agent of the United States under section 15.

"(3) Reserve bank master account and services.  The term 'reserve bank master account and services' means an account in which a Federal reserve bank

"(A) receives deposits for an entity other than an official accountholder; or

"(B) provides any service under section 11A(b) to an entity other than an official accountholder.

"(b) Publishing Master Account and Access Information.

11

**J.A.551**

"(1) Online database.  The Board shall create and maintain a public, online, and searchable database that contains

"(A) a list of every entity that currently has access to a reserve bank master account and services, including the date on which the access was granted to the extent the date is knowable;

"(B) a list of every entity that submits an access request for a reserve bank master account and services after enactment of this section (or that has submitted an access request that is pending on the date of enactment of this section), including whether, and the dates on which, a request

"(i) was submitted; and

"(ii) was approved, rejected, pending, or withdrawn; and

"(C) for each list described in subparagraph (A) or (B), the type of entity that holds or submitted an access request for a reserve bank master account and services, including whether such entity is

"(i) an insured depository institution, as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813);

"(ii) an insured credit union, as defined in section 101 of the Federal Credit Union Act (12 U.S.C. 1752); or

"(iii) a depository institution that is not an insured depository institution or an insured credit union.

"(2) Updates.  Not less frequently than once every quarter, the Board shall update the database to add any new information required under paragraph (1).

"(3) Deadline.  Not later than 180 days after the date of enactment of this section, the Board shall publish the database with the information required under paragraph (1)".

## II. THIS COURT SHOULD REJECT THE ARGUMENTS THAT THE 2023 NDAA AMENDMENT REQUIRING DISCLOSURE OF MASTER ACCOUNTS SHOULD BE CONSTRUED TO IMPLY THAT CONGRESS RECOGNIZED OR AFFIRMED THAT THE RESERVE BANKS HAVE SUBSTANTIVE DISCRETION TO REJECT MASTER ACCOUNT APPLICATIONS

Despite the clear language, context and purpose of the Amendment as exclusively a disclosure provision, in its motion to dismiss, the Board focuses on several isolated words in the Amendment to argue that it represents congressional recognition of broad Reserve Bank discretion to deny master account applications from statutorily eligible state-chartered depository institutions like Custodia. Because, the Board argues, the Amendment requires it to issue a list of master account applications, including those "rejected," and to specify for each application, whether the requesting entity was one of various classes of financial institution including a "a depository institution that is not an insured depository institution" like Custodia, the Board argues that the Amendment cannot be read other than as recognizing a discretionary power to reject applications like Custodia's. (Bd. Br. at 23-24).

Such a reading of the single reference to "rejected" applications is unsupported by the text of the Amendment. By its own terms, the word "rejected" says nothing of the underlying reasons animating such an action—and there is no dispute that master account applications may be denied for certain reasons, for instance, when the institution applying is not statutorily eligible. Moreover, to read this reference, in a statute designed to enhance procedural transparency, as a congressional recognition of such an important and contested substantive concept would produce an outcome plainly at odds with the language and purpose of the statute.

There is a far more logical explanation for the inclusion of these terms. As explained above, the Amendment was drafted in response to the Board's and the Kansas City Fed's refusal to answer inquiries into the master account application of Reserve Trust. It was a measure enacted to hold these institutions *more accountable* (*i.e.*, to ensure that they were exercising their authority

appropriately)—not to opine on any preexisting authority Congress may have given to them, either directly in statute or indirectly through a delegation from the Board. The Amendment's express requirement that the Board disclose information about "rejected" applications was in response to the Reserve Trust situation: one where an institution had been initially denied a master account under circumstances of significant public and congressional interest. As the Reserve Trust case exemplifies, disclosure of the fact of an application's rejection—and public awareness of such— is an entirely separate matter than the reasons for, or the legality of, such a rejection. For instance, with respect to Reserve Trust, the core of congressional interest has been that master accounts be dealt with "fairly, transparently, consistently, and without favoritism." (*Toomey on Fed's New Master Account Proposal*, *supra*.) Requiring the Board to publish information about rejected applications acknowledges that rejections have happened as a matter of fact—without commenting on whether they occur consistent with law.

So too is the phrase "reserve bank master account" in the Amendment unilluminating as to the important issues surrounding whether the Board or Reserve Banks are responsible for approving and issuing master accounts. As explained above, the words "reserve bank" were added before "master account" at the suggestion of the Board staff as a merely technical matter to reflect that, once established, these accounts are associated with the regional Reserve Bank where a master accountholder is located. Never did the Board staff suggest that this change would have any bearing on the question of which part of the Federal Reserve System possessed any ultimate discretion over who might be legally entitled to such an account. And read in the overall context of the Amendment, it makes no sense to attribute undue weight to the phrasing, since the Amendment clearly makes the Board—and not the individual Reserve Banks—exclusively

responsible for creating and maintaining the statutory database of master account holders and rejected, pending, and accepted applications.

Moreover, as the Department of Justice has recognized, the constitutionality of the Reserve Banks depends on supervision by,[7] and subordination to,[8] the Board, a federal agency whose members are Senate-confirmed principal officers properly exercising delegated governmental powers.  This has been Senator Toomey's long-held view.  (*See, e.g.*, U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey Calls for Reforming the Regional Federal Reserve Banks* (Feb. 11, 2022), *https://tinyurl.com/58rs6ab3*.)

Congress specifically authorized delegation of certain Board functions to the Reserve Banks, such as entering into enforcement actions, written agreements, cease-and-desist orders, and certain applications requiring Board approval.[9]  If, as the Kansas City Fed argues, Congress intended to delegate to the quasi-private Reserve Banks, or recognize a previous delegation of, primary authority over the important issue of approving master accounts, this would have been no minor matter.  Congress would not have hidden such a weighty statement on the balance of power within the Federal Reserve system within two definitional words—especially ones only included after being offered by the Board staff as merely "technical" suggestions to address operational

---

[7] The Federal Reserve Act of 1913 allowed for a regional Federal Reserve System, operating under a supervisory board in Washington, D.C., by providing "for the establishment of Federal Reserve Banks, to furnish an elastic currency, to afford means of rediscounting commercial paper, to establish a more effective supervision of banking in the United States, and for other purposes."  Federal Reserve Act: Public Law 63-43, 63d Congress, H.R. 7837 (Dec. 23, 1913); *see also The Founding of the Fed*, Federal Reserve Bank of New York (last accessed Apr. 18, 2023), *https://tinyurl.com/3ayk3wu8*.)

[8] *See, e.g., Fed. Rsrv. Bank Members*, 43 Op. O.L.C. __ (concluding that "Reserve Bank FOMC members are inferior officers under the Appointments Clause because they are subordinates of the Board of Governors . . . the appointments of Reserve Bank FOMC members comport with the Appointments Clause . . . [because] . . . [t]heir selections as Reserve Bank presidents are approved by the Board of Governors, which is the head of the Federal Reserve System and therefore may appoint inferior officers of the United States. U.S. CONST. art. II, § 2, cl. 2".)

[9] *See* 12 C.F.R. § 265.20 (delineating the scope of various delegations to the Reserve Banks).

J.A.555

matters, and not as sources of authority or to settle any disputed matters about master account approval authority or discretion. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes".)

## <u>CONCLUSION</u>

As explained above, the 2023 NDAA Amendment does not—and was not intended to—grant or opine on any substantive rights of the Board, or of the Reserve Banks.  The Amendment was drafted in response to the Board's, and Kansas City Fed's, refusal to address repeated Senate inquiries into the handling of Reserve Trust's master account application.  It was enacted solely as a disclosure measure, meant to ensure greater transparency as to which institutions hold and seek master accounts.  As laid out above, the text of the Amendment is clear on this point, as is the purpose, context, and legislative history.  Accordingly, this Court should reject any arguments attempting to misread the Amendment as opining, in any way, on the substantive discretion of either the Board, or the Reserve Banks, over the requirements for, or the granting of, master accounts.

J.A.556

Dated:  April 20, 2023                    Respectfully submitted,

                                          */s/ Benjamin Gruenstein*
                                          **CRAVATH, SWAINE & MOORE LLP**
                                          John Buretta (*Pro Hac Vice*)
                                          Benjamin Gruenstein (*Pro Hac Vice*)
                                          Worldwide Plaza
                                          825 Eighth Avenue
                                          New York, NY 10019
                                          Telephone: (212) 474-1000
                                          jburetta@cravath.com
                                          bgruenstein@cravath.com


                                          **CROWLEY FLECK PLLP**
                                          Darin B. Scheer (6-3558)
                                          111 W 2nd St
                                          Casper, WY 82601
                                          Telephone: (307) 265-2279
                                          dscheer@crowleyfleck.com


                                          *Counsel for Amicus Curiae Former Senator*
                                          *Patrick J. Toomey*

J.A.557

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 20, 2023, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

Dated:          April 20, 2023

                                    */s/ Benjamin Gruenstein*
                                    Benjamin Gruenstein

**J.A.558**

Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson
Laura Harris
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
*Counsel for Defendant the Federal Reserve Bank of Kansas City*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CUSTODIA BANK, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY,<br><br>*Defendants.* | No. 1:22-cv-00125-SWS |

**DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S
REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

J.A.559

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 3

I.    Custodia's Mandamus Claim Against FRBKC Should Be Dismissed ................ 3

      A.  Section 248a Does Not Entitle Custodia to a Master Account ..................... 3

      B.  FRBKC Is Not a Proper Defendant on Count II ........................................ 5

II.   Count III Must be Dismissed Because the Declaratory Judgment Act Does Not
      Provide a Cause of Action ................................................................................. 9

CONCLUSION..................................................................................................... 9

## INTRODUCTION

Custodia's desire to keep FRBKC in this case as a defendant is inconsistent with the sole legal theory it presses in its Amended Complaint.   Unlike its initial complaint, Custodia's Amended Complaint is laser-focused on the Board of Governors in both its factual allegations and its legal theory.   The Board, it is alleged, "orchestrat[ed]" the denial of Custodia's master account request.   Am. Compl. ¶ 83.   The Board "pull[ed] the strings," leaving FRBKC "no discretion."   *Id.* ¶ 4.   And the Board's denial, according to Custodia, violated 12 U.S.C. § 248a, a provision of the Federal Reserve Act directed to the Board that, on Custodia's interpretation, always and absolutely compels the Board to grant master accounts to all state-chartered depository institutions regardless of any concerns or risks that an institution may present.   *Id.* ¶ 83.

Given Custodia's interpretation of § 248a, it makes sense that Custodia names only the Board—and not FRBKC—as a defendant on its first claim of relief, alleging a violation of the Administrative Procedure Act.   The Board is an APA agency, so if the Board "orchestrated" the denial of Custodia's request—and more to the point, if § 248a compels the Board to grant an account—then the Board is the logical defendant.   Yet Custodia has also named FRBKC as a defendant on Count II, seeking mandamus, and Count III, seeking a declaratory judgment.   Both claims against FRBKC should be dismissed.

Count III is a throwaway; this Court already explained that the Declaratory Judgment Act does not create a cause of action.   ECF No. 102 at 23.   If Custodia had an independent claim against FRBKC, a declaratory judgment would be a form of potential relief Custodia could seek.   But Custodia does not have an independent claim against FRBKC.

Count II fails as a matter of law for the fundamental reason that § 248a does not give Custodia an absolute entitlement to a master account.   The Court therefore should dismiss Count II as to both the Board and FRBKC.   But Count II does not state a viable claim against FRBKC

1

**J.A.561**

even if the Court were to allow that count to proceed against the Board.  If Custodia is correct in its legal theory that § 248a requires the Board to grant it a master account, it may obtain relief against the Board on Count I requiring the Board to grant it a master account.  In that scenario, Custodia would neither need nor be entitled to any relief against FRBKC.

The most Custodia can muster in its Opposition for why FRBKC should remain a defendant is that § 248a might apply to both the Board and FRBKC.  ECF No. 135 at 31.  That suggestion is wrong: § 248a expressly concerns Board powers and obligations, as one would expect given its placement in a subchapter of the Federal Reserve Act directed at the Board.  Ultimately, however, Custodia's suggestion is beside the point.  Section 248a applies expressly and directly to the Board; Custodia touts that fact.  If § 248a applies in any sense to FRBKC, it could do so only derivatively of that provision's direct application to the Board.  In other words, if § 248a does not compel *the Board* to grant accounts to all comers as Custodia claims, then it certainly does not compel *FRBKC*—as distinct from the Board—to do so.

As a result, it defies logic to suggest that Custodia could lose on Count I against the Board but somehow win on Count II against FRBKC.  And FRBKC already made clear that if Custodia prevails on Count I and some action by FRBKC were necessary to effectuate a final judgment requiring the Board to grant Custodia a master account, FRBKC would work with the Board to make that happen.  ECF No. 124 at 13–14.  FRBKC thus does not need to be in this action as a relief defendant, and Custodia has not pleaded a viable substantive claim against FRBKC.

This action was very different when Custodia's initial complaint was the operative pleading.  At that time, Custodia alleged that both the Board and FRBKC were responsible for unreasonably delaying a decision on its master account request, and the Court concluded that discovery into the evaluation and decision-making process was needed to determine which claims,

against which defendant, might be cognizable.  *See* ECF No. 102 at 19–20.  Now, things have

changed.  Custodia's request has been denied, and its Amended Complaint presents only a question

of pure statutory interpretation: does § 248a absolutely entitle it to a master account, regardless of

the concerns its request posed, or whether it was FRBKC or the Board that denied it?  The answer

is no, so the Court should dismiss this action in its entirety.  But again, even if the Court denies

the Board's motion to dismiss, the Court should dismiss FRBKC because Custodia has not pleaded

a viable claim for relief against FRBKC.

## ARGUMENT

### I.   Custodia's Mandamus Claim Against FRBKC Should Be Dismissed.

#### A.   Section 248a Does Not Entitle Custodia to a Master Account.

As explained more fully in the Board's motion to dismiss and reply, Defendants' position

that 12 U.S.C. § 248a does not mandate issuance of master accounts to all state-chartered

depository institutions is supported by the text, context, and history of the Federal Reserve Act and

the Monetary Control Act.  It is, in fact, the *only* interpretation of § 248a that respects *both*

sovereigns' important roles in promoting and ensuring the safety and soundness of our nation's

dual banking system while respecting the Federal Reserve's vital role in the U.S. economy through

conducting the nation's monetary policy and providing an efficient, effective, and safe U.S. and

global payment and settlement system.  The Monetary Control Act's amendments to the Federal

Reserve Act in 1980 were intended to strengthen the Federal Reserve's powers, not eviscerate

them.

In our dual system, states are free to create charters like Wyoming's SPDI regime.  Our

dual system enables states to take novel steps in chartering banks and determining the scope of

state banks' permissible activities, but it does not entitle all such novel banks to directly access the

3

Federal Reserve's balance sheet and payment system regardless of the risks they pose.[1]  Rather, deciding whether to grant direct access to Federal Reserve financial services and the payment system requires a risk-based evaluation of the depository institution that encompasses, among other elements, its business plan, financial condition, and ability to comply with applicable laws and regulations.  As demonstrated by FRBKC's letter to Custodia denying its request for a master account, that is exactly what happened here, and Custodia's proposed business plan presented too much risk.

Custodia seemingly recognizes that its absolutist interpretation of § 248a is untenable, so it volunteers exceptions, such as for banks that will not comply with federal law or that do not provide the Federal Reserve System with certain information.  ECF No. 135 at 22.  But these exceptions have no basis in the text of § 248a.  That Custodia nonetheless felt it necessary to invent them shows that Custodia's legal theory cannot be right.  Custodia's theory would undermine the precisely drawn design of the U.S. financial system, pursuant to which both state and federal banking agencies charter, regulate, and supervise banks, but only the Federal Reserve conducts the nation's monetary policy (including through managing its balance sheet) and fulfills other important federal functions regarding the payment system and financial stability.[2]  The Board's

---

[1] The SPDI regime is novel in many respects, including that it permits an entity to obtain a state banking charter and accept deposits from the general public without any federal oversight or deposit insurance.

[2] Notably, neither proposed intervenor Wyoming nor amicus former Senator Toomey is willing to embrace Custodia's interpretation of § 248a.  *See* ECF No. 140 at 2 n.1 (Wyoming "'is not taking a position on whether federal law even allows Defendants to make a determination against Custodia Bank's master account application, which is a disputed matter in this lawsuit,' nor is it taking a position on whether or not Custodia is entitled to a master account."); ECF No. 151 at 2 (Senator Toomey "takes no position on Defendants' motion to dismiss, or the ultimate question of whether either the Board or Kansas City Fed possesses, and properly exercised, the discretion to reject Custodia's application for a master account").  While Senator Toomey expresses concerns

4

motion to dismiss and reply, which FRBKC adopts, both explain why Custodia's interpretation of § 248a is wrong.

Because the sole legal theory that Custodia advances in Count II against FRBKC—and in the Amended Complaint as a whole—is wrong as a matter of law, the Court should dismiss this action in its entirety.

**B.      FRBKC Is Not a Proper Defendant on Count II.**

Even if the Court finds that Custodia has plausibly alleged that § 248a entitles it to a master account, FRBKC should still be dismissed from Count II because § 248a is expressly directed to the Board—and not to Reserve Banks.  Without a viable, independent cause of action against FRBKC, Count II merely duplicates Custodia's sole legal theory from Count I.

Custodia contends that "[e]ven if the Court concludes that the Board is not responsible for the decision on Custodia's master account, the Court should still conclude that § 248a and *Fourth Corner* give Custodia and other eligible depository institutions a right to a master account."  ECF No. 135 at 31.  That is a non-sequitur and does nothing to justify keeping FRBKC in this case.  Indeed, the entire thrust of Custodia's Amended Complaint is that *it does not matter* which entity was "responsible for the decision on Custodia's master account."  Custodia's view is that it is entitled to an account regardless, and Custodia chose not to challenge the *reasons* for the denial (such as by alleging that the denial was arbitrary and capricious under the APA).  Instead, Custodia's legal theory is that § 248a entitles it to an account even if all the concerns expressed in the denial are valid.  *See* Am. Compl. ¶ 12 ("While the facts of this case may appear complex, the core issue is simple: Defendants are statutorily required to grant Custodia's master account

---

regarding the Reserve Trust Company, *see id.* at 5–6, the Reserve Trust Company's master account request is not at issue in this action.

J.A.565

application.").

Custodia is therefore wrong to contend that FRBKC must remain a defendant so Custodia can take discovery from FRBKC regarding the decision-making process that resulted in the denial. *See* ECF No. 135 at 32–33. That evaluation and decision-making process is irrelevant to the sole legal theory Custodia advances in its Amended Complaint. While Custodia claims the Court previously found that discovery was necessary, that takes the Court's prior decision out of context. At that time, with Custodia's account request still pending, Custodia hedged its bets by pleading different claims against the Board and FRBKC based on different assumptions about who was involved in the decision and through what process. For example, whether Custodia could press an APA unreasonable delay claim *against FRBKC* depended in part on whether FRBKC—or, rather, the Board—was responsible for the allegedly unreasonable delay and the ultimate decision. If discovery concerning the decision-making process showed that the Board was responsible for the delay, then the APA delay claim against FRBKC would fail for that reason. In that event, the Court would not need to decide whether FRBKC is an APA agency. *See* ECF No. 102 at 7. The Court also believed that discovery could shed light on whether FRBKC is an APA agency, in the event that the Court needed to decide that question. *See id*. at 6–7.

In short, while the relative roles of the Board and FRBKC in deciding Custodia's account request may have been relevant under Custodia's original complaint, that is no longer true under the Amended Complaint. Now all that matters is whether the pricing principles in § 248a absolutely entitle Custodia to a master account. No discovery is necessary to decide that pure issue of statutory interpretation.

Nor can Custodia justify keeping FRBKC in the case as a relief defendant. On Custodia's view, whether the Board or FRBKC is the entity that would formally issue a master account is

J.A.566

merely a matter of semantics.  ECF No. 135 at 31 ("Section 248a doesn't specify *who* should make service available to eligible depository institutions; but it does guarantee that such services *shall* be available to eligible depository institutions.").  To the extent Custodia may have had any concern about how relief on Count I would be crafted if some action by FRBKC turned out to be necessary to implement an order requiring the Board to grant an account, FRBKC has already made clear that it would work with the Board if necessary to ensure that relief on Count I would be effective.  ECF No. 127 at 13–14; *see also* Fed. R. Civ. P. 65(d)(2)(A) & (C).

All Custodia can muster in support of its desire to keep FRBKC in the case on Count II is the possibility that § 248a applies not only to the Board *but also* to FRBKC.  But Custodia fails to explain how or why § 248a should be construed to apply to Reserve Banks.  Custodia's Amended Complaint focuses on the Board, contending not merely that § 248a entitles it to an account but that § 248a requires *the Board* to grant the account.  For example, Custodia alleged in paragraph 73 of its Amended Complaint (with bolded emphasis added):

> Defendants' representations that 12 U.S.C. § 342 gives Reserve Banks discretionary authority over master accounts stands in conflict not only with the factual reality but also with the MCA.  Congress empowered **the Board** with authority over master account applications for nonmember depository institutions, like Custodia, by directing **the Board** to ensure that "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions*." 12 U.S.C. § 248a(c)(2).[3]

Moreover, Congress addressed § 248a *to the Board*, both expressly in its text and by placing it in the subchapter governing the Board.  Section 248a directs *the Board* to take certain actions.  *See* § 248a(a) ("the Board shall publish for public comment a set of pricing principles");

---

[3] Whereas Custodia pleads that the *Board* must grant it a master account, it repeatedly relegates FRBKC's role to ministerial functions.  *See, e.g.*, Am. Compl. ¶ 72 (relegating FRBKC's role to the ministerial one of "communicating" the Board's decision); ECF No. 135 at 31 (describing FRBKC as the entity that "received Custodia's master account application" and "communicated with Custodia").

J.A.567

*id.* ("the Board shall … put into effect a schedule of fees for such services"); *id.* § 248a(d) ("The Board shall require reductions in the operating budgets of the Federal Reserve banks").  Under § 248a(c)(2), the Board publishes a pricing schedule so that services are available to nonmember and member depository institutions at the same price, "subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks."  And § 248a is contained in a subchapter titled "Board of Governors of the Federal Reserve System."  *See* 12 U.S.C. §§ 241–252; *compare* 12 U.S.C. §§ 341–361 (subchapter titled "Powers and Duties of Federal Reserve Banks").  If § 248a compels the issuance of master accounts to all comers (which it does not), then it must fall on the Board to make them available.  The Court would direct any relief to the Board, not FRBKC.

Custodia's argument that "APA review of the Kansas City Fed's actions is not possible because Custodia has not asserted an APA claim against the Kansas City Fed," ECF No. 135 at 32, misses the point.  If Custodia had an independently viable mandamus claim against FRBKC, its APA claim against the Board might not foreclose that distinct claim against FRBKC.  But that is irrelevant, because Count II does not state an independently viable cause of action against FRBKC because (1) § 248a does not compel issuance of a master account at all and (2) even if it plausibly could be read to do so, § 248a is directed at the Board, not FRBKC.  Because Custodia's Amended Complaint does not assert an independent cause of action against FRBKC, Count II lies against only the Board, and *that* is duplicative of Count I.

Ultimately, however, it does not matter for purposes of this motion whether § 248a could be thought to apply to FRBKC in some sense as well as to the Board.  Custodia does not contend that § 248a imposes an *independent* obligation on FRBKC—rather than on the Board—and no such contention would be plausible given how clearly and directly § 248a is addressed to the

J.A.568

Board.  If FRBKC has any role to play on Custodia's interpretation of § 248a, it would be only a role secondary to the Board—working with the Board to effectuate the Board's alleged non-discretionary obligation under § 248a to grant a master account to all comers.  As explained above, FRBKC has already committed to work with the Board if necessary to implement relief on Count I.  Because Custodia does not seek—and § 248a would not plausibly provide for—any independent relief against FRBKC, there is no justification for keeping FRBKC in the case as a defendant on Count II.

## II.   Count III Must be Dismissed Because the Declaratory Judgment Act Does Not Provide a Cause of Action.

In Count III, Custodia asserts a claim under the Declaratory Judgment Act.  That Act, however, does not provide a cause of action.  *See Devon Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012); *Utah Hous. Corp. v. Country Pines, Ltd.*, 541 F. Supp. 3d 1288, 1295 n.1 (D. Utah 2021) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)).  This Court already recognized as much, ECF No. 102 at 22–23, so it is unclear why Custodia chose to complicate matters by pleading a request for declaratory relief as if it were a separate cause of action.  Because Custodia has not pleaded a viable cause of action against FRBKC in the Amended Complaint, there is no cause of action to which its request for declaratory relief could serve as an adjunct.  Count III therefore should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint.

Date: May 2, 2023

Respectfully submitted,

_s/ Billie LM Addleman_

Billie LM Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson
Laura Harris
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
jmitchell@kslaw.com
ccarletta@kslaw.com

*Counsel for Defendant the*
*Federal Reserve Bank of Kansas City*

**J.A.570**

**CERTIFICATE OF SERVICE**

      I certify that on the 2nd day of May, 2023, a copy of the foregoing ***Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss*** was served upon all parties to this action via CM/ECF.

                         /s Shannon M. Ward
                         OF HIRST APPLEGATE, LLP
                         Attorneys for Defendant

**J.A.571**

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-00125-SWS |
| v. | ) | |
| | ) | |
| BOARD OF GOVERNORS OF | ) | |
| THE FEDERAL RESERVE SYSTEM & | ) | |
| FEDERAL RESERVE BANK | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
## REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................ 1

ARGUMENT .................................................................................................. 2

I.    Custodia Concedes the Federal Reserve May Restrict Master Account Access and
      "Adjudicate" Master Account Requests .............................................................. 2

II.   The Existence of Dual Chartering Authorities Does Not Mean Custodia Is Entitled to a
      Federal Reserve Master Account ..................................................................... 5

III.  Congress Has Not Directed the Federal Reserve to Rubber Stamp Master Account
      Requests Regardless of Risk ......................................................................... 8

      A.    Section 248a Does Not Eliminate Discretion .................................................... 8

      B.    The Court Should Defer to the Board's Interpretation in the Guidelines ............ 14

      C.    Section 248c's Text and Legislative History Affirm the Longstanding
            Understanding that the Federal Reserve May Reject Account Requests ............... 15

IV.   Custodia is Not Entitled to Mandamus or Other Relief .................................... 21

CONCLUSION .............................................................................................. 22

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page

*Ausmus v. Perdue*,
　908 F.3d 1248 (10th Cir. 2018) ....................................................................... 21

*Barber v. Thomas*,
　560 U.S. 474 (2010) .......................................................................................... 21

*Barnett Bank of Marion County, N.A. v. Nelson*,
　517 U.S. 25 (1996) .............................................................................................. 7

*BedRoc Ltd., LLC v. United States*,
　541 U.S. 176 (2004) .......................................................................................... 16

*Board of Governors of the Federal Reserve System v. First Lincolnwood, Corp.*,
　439 U.S. 234 (1978) .......................................................................................... 14

*Bob Jones University v. United States*,
　461 U.S. 574 (1983) .......................................................................................... 20

*Cantero v. Bank of America, N.A.*,
　49 F.4th 121 (2d Cir. 2022) ............................................................................... 7

*Chevron v. Natural Resources Defense Council, Inc.*,
　467 U.S. 837 (1984) .......................................................................................... 14

*Consumer Product Safety Commission v. GTE Sylvania, Inc.*,
　447 U.S. 102 (1980) .......................................................................................... 21

*EagleMed LLC v. Cox*,
　868 F.3d 893 (10th Cir. 2017) ......................................................................... 16

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*,
　861 F.3d 1052 (10th Cir. 2017) .................................................................... 9, 13

*Kansas Natural Resource Coalition v. DOI*,
　971 F.3d 1222 (10th Cir. 2020) ....................................................................... 21

*Kerr v. United States District Court*,
　426 U.S. 394 (1976) .......................................................................................... 21

*Marquez-Ramos v. Reno*,
　69 F.3d 477 (10th Cir. 1995) ........................................................................... 22

J.A.574

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
   571 U.S. 191 (2014) ........................................................................................ 22

*Neustar, Inc. v. FCC*,
   857 F.3d 886 (D.C. Cir. 2017) ....................................................................... 15

*Oceana, Inc. v. Pritzker*,
   24 F. Supp. 3d 49 (D.D.C. 2014) .................................................................... 14

*Salt Lake Tribune Publishing Co., LLC v. Management Planning, Inc.*
   390 F.3d 684 (10th Cir. 2004) .......................................................................... 7

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance, Co.*,
   559 U.S. 393 (2010) ........................................................................................ 16

*Sturgeon v. Frost*,
   577 U.S. 424 (2016) ........................................................................................ 17

*United States v. Polk*,
   61 F.4th 1277 (10th Cir. 2023) ....................................................................... 18

*Western Shoshone Business Council ex rel. Western Shoshone Tribe of the Duck Valley
Reservation v. Babbitt*,
   1 F.3d 1052 (10th Cir. 1993) .......................................................................... 21

*Wild Watershed v. Hurlocker*,
   961 F.3d 1119 (10th Cir. 2020) ...................................................................... 15

**Statutes**

5 U.S.C. § 706(2) .................................................................................................. 14

12 U.S.C. § 248a ........................................................................................... 4, 5, 8

12 U.S.C. § 248a(c)(2) .............................................................................. 8, 13, 15

12 U.S.C. § 248c ............................................................................ 2, 3, 15, 16, 17, 19, 21

12 U.S.C. § 248c(b)(1)(B) .......................................................................... 15, 16, 17, 18

12 U.S.C. § 248c(b)(1)(C) ................................................................................... 17

12 U.S.C. § 461(c)(1)(A)-(B) ................................................................................ 8

28 U.S.C. § 1361 ................................................................................................. 21

J.A.575

28 U.S.C. § 2201 ............................................................................................. 22

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023,
      Pub. L. No. 117-263, § 5708, 136 Stat. 2395, 3419 (Dec. 23, 2022)
      (codified at 12 U.S.C. § 248c) ........................................................ 15, 18, 19

Monetary Control Act of 1980, Pub. L. No. 96-221,
      § 107, 94 Stat. 132, 140 ...................................... 8, 9, 11, 13, 14, 15

**Regulatory Materials**

Guidelines for Evaluating Account and Services Requests,
      87 Fed. Reg. 51,099 (Aug. 19, 2022) (Guidelines) .................................. 5, 6, 15
      87 Fed. Reg. 68,691 (Nov. 16, 2022) ............................................................ 18

**Other Authorities**

Chester Morrill, Secretary, Board of Governors of the Federal Reserve System,
      Letter X-9187 (Apr. 26, 1935) https://fraser.stlouisfed.org/archival-
      collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-
      nonmember-bank-clearing-accounts-505912 ........................................... 12, 16

Dan Awrey, *Unbundling Banking, Money, and Payments*,
      110 Geo. L.J. 715 (2022) .................................................................... 11

Federal Reserve Banks Operating Circular 1, Account Relationships
      (Aug. 16, 2021) https://www.frbservices.org/binaries/content/assets/crsocms/resources/
      rules-regulations/081621-operating-circular-1.pdf ........................................ 3, 4

Federal Reserve Banks Operating Circular 5, Electronic Access
      (June 30, 2021) https://www.frbservices.org/binaries/content/assets/crsocms/resources/
      rules-regulations/063021-operating-circular-5.pdf ........................................... 4

Federal Reserve Operating Circulars,
      https://www.frbservices.org/resources/rules-regulations/operating-circulars.html ........... 2

Federal Reserve Board, Reserve Requirements
      https://www.federalreserve.gov/monetarypolicy/reservereq.htm
      (last updated Jan. 4, 2022) .................................................................. 8

Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems*
      (2022 draft) ("2022 Hill draft") (Exhibit A) ...................................... 10, 11, 15

Julie Andersen Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*
      (Mar. 30, 2023 draft) ("2023 Hill draft") ...................................... 10, 11, 12, 15

Michael S. Barr, Howell E. Jackson, & Margaret E. Tahyar,
   *Financial Regulation: Law and Policy* (3d ed. 2021)........................................................ 6

Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that Legal?*
   (Nov. 14, 2018) https://www.brookings.edu/research/the-fed-wants-to-veto-state-
   banking-authorities-but-is-that-legal/ ................................................................................. 9

U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual Defense Bill
   Includes Toomey Provision to Require Federal Reserve Transparency on Master
   Accounts*, Dec. 8, 2022 ("Banking Committee Statement") https://www.banking.
   senate.gov/newsroom/minority/annual-defense-bill-includes-toomey-provision-to-
   require-federal-reserve-transparency-on-master-accounts ........................................ 19, 20

J.A.577

## INTRODUCTION

"Does the Federal Reserve retain discretion to deny a master account to a depository institution?" Everyone agrees that is the sole question at issue in this case. Custodia helpfully answers the question in the affirmative in its opposition, advancing a non-exhaustive list of various reasons why the Federal Reserve _**can**_ deny a master account to a depository institution. Opp. at 21-25. Custodia contends that an account may be denied for "at least" these reasons, positing a capacious and malleable conception of "eligibility" that, while serving its own interests, is in no way grounded in any statute and offers no principled standard that would allow account denials to occur in these circumstances but not others. Recall that, for reasons left unsaid, Custodia has elected not to challenge its account denial as arbitrary or capricious in its reasoning, and has instead staked its claims entirely on demonstrating that each and every depository institution has a discretionless entitlement to a master account and services as a matter of law. Custodia has now exposed the unsustainability of this position, strategically conceding that accounts may be denied in a variety of circumstances but conveniently excluding its own. Custodia must live with these strategic choices, which underscore the existence of Federal Reserve discretion and render the Amended Complaint unsustainable.

Custodia seeks to escape dismissal by arguing that the circumstances of its Amended Complaint are the same as they were during the briefing on its original Complaint, and that fact development is still needed to assess the relevant involvement of the Board versus the Reserve Bank. But the circumstances have changed dramatically in recent months. Beyond the well-supported and carefully explained denials of its master account request and its application for Federal Reserve System membership, as well as Congress's amendment of the Federal Reserve Act in the very area at issue, Custodia's Amended Complaint no longer claims that the Reserve

Bank is an APA agency or that it is responsible for the decision to deny Custodia's account request. And the Board has conceded that, for Rule 12 purposes, Custodia's narrowed allegations concerning Board control[1] may be accepted as true. What further proceedings could accomplish in these circumstances is difficult to understand. Notwithstanding Custodia's resort to various policy and obfuscatory "states' rights" arguments, *see* Opp. at 1, what remains is a pure question of law that fails to support Custodia's claimed relief. The Board respectfully requests that the Amended Complaint be dismissed as a result.

## ARGUMENT

### I.   Custodia Concedes the Federal Reserve May Restrict Master Account Access and "Adjudicate" Master Account Requests

Custodia concedes that "[d]efendants can and do reject master account applications from ineligible financial institutions" for a wide variety of reasons after an "adjudication" process. Opp. at 23, 25; *see also id*. at 21 (citing Am. Compl.). Custodia attempts to cabin these concessions by arguing that, "[w]hile § 248c recognizes that there may be rejections due to ineligibility, it does not *sub silentio* expand the reasons that Defendants can reject a master account application beyond ineligibility." Opp. at 22. Custodia then goes on to list various non-statutory bases on which an applicant would be "ineligible" for a master account and services as set forth in Federal Reserve Operating Circulars ("OCs"),[2] Opp. at 21-25, even though this conception of "eligibility" is a creature of Custodia's own creation that involves strategically drawing lines around those access requirements it disfavors. Custodia thereby concedes that it

---

[1] To be precise, Custodia alleges "control by the Board *and even the White House* (which must be taken as true)," Opp. at 13 (emphasis added), but accepting such allegations does not alter the analysis or result.

[2] *Available at* https://www.frbservices.org/resources/rules-regulations/operating-circulars.html.

**J.A.579**

does not in fact have the unqualified statutory right to a master account that it elsewhere claims, *see* Opp. at 14-18, 24, an acknowledgement that is fatal to its Amended Complaint.

In Custodia's telling, Congress's new "[s]ection 248c itself recognizes this distinction by speaking generally to '*access request[s]*' rather than specifically to completed master account applications" when contemplating "rejections." Opp. at 23 (quoting 12 U.S.C. § 248c) (emphasis in original). Custodia further describes its conception that an applicant must supply complete information in order to be "eligible" for a master account, stating that, "[w]hile the master account agreement is only one page . . . , Federal Reserve Banks Operating Circular 1 ["OC-1"] sets out extensive requirements for a completed application." *Id.* (citing OC-1).[3] As examples, Custodia notes that, "among other requirements, the institution must agree to be subject to the regulations and policies of the Federal Reserve (Circ. 1 at 1.0); the institution cannot have an existing account with the Federal Reserve (Circ. 1 at 2.3); the institution must have a business address within the district where the Federal Reserve bank is located (Circ. 1 at 2.5); the institution's board must pass specific resolutions authorizing individuals to conduct business on behalf of the institution (Circ. 1 at 2.6); U.S. branches of foreign banks must execute additional agreements and provide additional information (Circ. 1 at 2.6); and more." Opp. at 23. As Custodia concedes, "[t]he failure to fulfill any of these or other application requirements would result in a financial institution not being eligible for a master account, and *Defendants would have good cause to reject the application*." *Id.* (emphasis added).

Custodia's acknowledgement that the Federal Reserve may impose requirements on applicants for a master account, and that an applicant's failure to meet any one of those terms

---

[3] *Available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf.

**J.A.580**

renders a depository institution "ineligible" for a master account, is entirely inconsistent with its claim that the Federal Reserve lacks discretion to substantively evaluate account requests. As Custodia concedes, Opp. at 23, OC-1 contains many such requirements, and, indeed, there are still more "requirements" that Custodia has not addressed. By way of example, OC-1 provides that the applicant "agrees to be bound by all the provisions, as amended from time to time, of this Circular and of all other Federal Reserve Bank operating circulars[4] that cover services that it obtains from any Reserve Bank," that "[e]ach Master Account Agreement is subject to approval by the Financial Institution's Administrative Reserve Bank," OC-1 ¶ 2.6, and that "[a] Reserve Bank may terminate a Master Account Agreement . . . or any Other Account Agreement at any time by notice to the Account Holder." *Id*. ¶ 2.10. Custodia provides no principled basis or standard for distinguishing among these requirements, rather apparently limiting itself to those it finds acceptable, Opp. at 23, but it is plain from Custodia's concession that the Federal Reserve retains discretion to limit or terminate master account access to applicants that present an excessive risk profile or otherwise fail to meet Federal Reserve requirements.

---

[4] Other Operating Circulars make clear that Reserve Banks may deny or terminate access to services if requirements are not met, contradicting Custodia's claim that it has an unqualified right to "services" under § 248a. For example, Operating Circular 5 ("OC-5"), governing electronic access to services, provides that Reserve Banks "immediately may terminate" a depository institution's electronic connection "if the Reserve Bank, in its sole discretion, determines that continued use of the Electronic Connection poses a risk to the Reserve Bank or others, or the Reserve Bank believes that the Institution or its Service Provider is in violation of this Circular." *Id*. ¶ 7.1. OC-5 further provides that depository institutions accessing Reserve Bank services via electronic connection must take "commercially reasonable security measures . . . necessary to prevent fraud, unauthorized access, or other unauthorized use" and maintain computer equipment and software that "comply with Reserve Bank requirements" as a requirement of electronic access. *Id*. ¶¶ 1.4, 2.0; *available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/063021-operating-circular-5.pdf.

Indeed, the Board itself outlined requirements for master account eligibility in its Guidelines for Evaluating Account and Services Requests,[5] which provide that any Reserve Bank granting an "access request" for a master account or services, Opp. at 23, "may impose (at the time of account opening, granting access to service, or any time thereafter) obligations relating to, or conditions or limitations on, use of the account or services as necessary to limit operational, credit, legal, or other risks posed to the Reserve Banks, the payment system, financial stability or the implementation of monetary policy or to address other considerations." 87 Fed. Reg. at 51,106-07. The Guidelines make clear that "[p]rovision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber or other risks to the Reserve Bank," *id.* at 51,107, and that "[t]he account-holding Reserve Bank may, at its discretion . . . place additional risk management controls on the account and services . . . as it may deem necessary to mitigate risks . . . [or] further restrict the institution's use of accounts and services or may close the account." *Id.*

Failure to meet any one of these requirements, by Custodia's own admission, permits "rejection" of the master account application. Opp. at 22. For this reason alone, Custodia's claim to an unqualified right to a master account under Section 248a must be rejected.

## II.   The Existence of Dual Chartering Authorities Does Not Mean Custodia Is Entitled to a Federal Reserve Master Account

Recognizing that there is discretion in the master account decision-making process does nothing to call into question the existing dual banking system as Custodia suggests. Despite Custodia's unsupportable claim that the Board's interpretation "spells the demise of the dual-banking system," Opp. at 1, the system is alive and well, including in the state of Wyoming. *See,*

---

[5] 87 Fed. Reg. 51,099 (Aug. 19, 2022) ("Guidelines").

*e.g.*, https://www.kansascityfed.org/banking/membership-state-member-banks/tenth-district-federal-reserve-state-member-banks/ (listing 164 state member banks alone in the district supervised by FRBKC, including eighteen in Wyoming, in addition to state non-member banks).[6] The Federal Reserve's exercise of master account discretion in no way infringes on Wyoming's ability to charter banks within the state, nor does it infringe on Wyoming's ability to autonomously regulate its depository institutions. After all, Custodia is, in fact, "a Wyoming-headquartered and chartered bank." Am. Compl. ¶ 3. Custodia also has access to Federal Reserve services through partnership with an existing accountholder. *See id.* ¶ 6. There is no disruption to the dual banking system; Custodia's chief complaint is instead that "launching with a correspondent bank that has a master account" is "more expensive." *Id.* ¶ 7. While direct access to a master account may increase profitability over other means, such access is not necessary to operate by Custodia's own admission and any such increased profitability involves transferring various risks to the Reserve Bank. *See* 87 Fed. Reg. at 51,107 (noting "credit, operational, settlement, cyber [and] other risks to the Reserve Bank"). Because a master account is not required for Custodia to operate as a state-chartered bank, Custodia's claims of an assault on the dual banking system ring hollow.

---

[6] Custodia's argument that the Board "has recently abandoned long-standing principles of federalism that have guided our country's dual-banking system for centuries," Opp. at 20, is equally unavailing. Custodia's characterization of the dual banking system and the National Banking Acts ignores the history of those statutes, the passage of which permitted new or existing banks "to operate under either federal or state jurisdiction according to their choice of charter" and created the dual banking system. Michael S. Barr, Howell E. Jackson, & Margaret E. Tahyar, *Financial Regulation: Law and Policy*, 42 (3d ed. 2021); *id.* at 43 ("Key proponents of the National Banking Acts . . . expected the Acts to induce state banks to convert to national banks. In reality, however, few did.). Despite the many benefits of disparate chartering authorities, nothing about the history of the dual banking system or the National Banking Acts suggests that there is an inviolate right to Reserve Bank master accounts and services.

6

Moreover, Custodia's vague assertion that "[t]he dual-chartering system's division of regulatory responsibility among state and federal authorities is federalism at its best," Opp. at 2, does nothing to support its counterintuitive argument that states and territories have control over which entities may access a federal payment system. The dual banking system has been described as simply a system where "both federal and state governments are empowered to charter banks and to regulate the banks holding their respective charters. Banks may seek a charter from either the state or federal government, and both state and national banks are able to compete—under the constraints of their respective regimes—for consumer business." *Cantero v. Bank of Am., N.A.*, 49 F.4th 121, 125-26 (2d Cir. 2022) (quotations omitted). Nothing about this suggests that there is state regulatory control over federal financial actors whereby states and territories can solely dictate which banks may have direct access to the Federal Reserve's balance sheet, a matter of vital national importance. Indeed, there is abundant precedent demonstrating that when state and federal interests conflict with respect to banking, federal law governs. *See*, *e.g.*, *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 28 (1996) (holding that a federal law granting national banks the authority to sell insurance impliedly preempted a state law that prohibited banks from engaging in this activity); *cf. Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to states that could frustrate purposes of a federal statute absent evidence Congress "plainly intended" it). There is simply no inviolate right under the principles of the dual-banking system that states can charter any type of entity they wish and then have those institutions automatically be granted a Federal Reserve master account without any consideration whatsoever by the Federal Reserve.

III.    **Congress Has Not Directed the Federal Reserve to Rubber Stamp Master Account Requests Regardless of Risk**

A.      **Section 248a Does Not Eliminate Discretion**

Custodia has little response to the indisputable fact that Congress expressly denoted Section 248a(c)(2) to be one item in a list of pricing principles, in a section devoted exclusively to the Board's responsibilities regarding "*Pricing* of services," Board Br. at 13-16, instead reiterating its view that the provision acts as an entirely discretionless mandate. Custodia largely rests this conclusion on various sources recognizing that the Monetary Control Act ("MCA") served to "open access" to depository institutions previously barred from access under the Federal Reserve Act. Opp. at 15 and n.3. But these facts are not in dispute. Indeed, opening Federal Reserve accounts and services to nonmember banks—which had operated without them throughout history until 1980—was a key component of the MCA's objective of restoring Federal Reserve control over the money supply. *See* Board Br. at 12-13.[7] Notably, none of the legislative history, cases, or other various statements on which Custodia relies in any way suggest that this general opening of access to depository institutions, or the setting of a uniform fee structure for services, deprived the Federal Reserve of the ability to assess each potential accountholder for undue risk to the payment system, to the individual Reserve Bank, or to the implementation of national monetary policy before granting it access to its balance sheet. That there is no evidence of intent to hamper the Fed's financial stability or monetary policy

---

[7] Although the MCA standardized reserve requirements for both member and nonmember banks, those reserves need not be held in a Federal Reserve account. Rather, the MCA permits banks to maintain reserves in the form of vault cash or in another institution's account at a Federal Reserve Bank. *See* 12 U.S.C. § 461(c)(1)(A), (B); *see also, e.g., https://www.federalreserve.gov/monetarypolicy/reservereq.htm* ("The Board's Regulation D (Reserve Requirements of Depository Institutions) provides that reserve requirements must be satisfied by holding vault cash and, if vault cash is insufficient, by maintaining a . . . balance directly with a Reserve Bank or with another institution in a pass-through relationship.") (last updated Jan. 4, 2022).

responsibilities should not be surprising, as the statute expressly contemplates the Board's ability to set "terms," and increased control was the very purpose of the MCA, "An Act . . . To *facilitate the implementation of monetary policy,*" 94 Stat. 132 (emphasis added). Any reading that would cede control of the Fed's ability to effectively implement such policy to any individual institution or state or territorial chartering entity cannot be reconciled with Congress's stated purpose.

Although Custodia turns to two commentators to support its position, Opp. at 14, these do little to aid its cause. The first of these is an online article suggesting that Reserve Banks are obligated to open accounts *even for entities with the avowed intention of violating federal law*, a position that is the logical conclusion of Custodia's argument but was appropriately rejected by the Colorado district court and each of the three members of the Tenth Circuit to consider the question. *See* Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that Legal?* (Nov. 14, 2018)[8] (the statute "isn't at all clear that the [Federal Reserve] had the authority to reject Fourth Corner's application," despite the illegality under federal law of its marijuana-focused business model). Although Custodia's brief parts ways with this extreme view for good reason, *see* Opp. at 22-23 (suggesting Reserve Bank vetting and account denial of state-chartered credit union "appropriate if the credit union intended to use Federal Reserve banking services for illegal ends," and citing each of the separate *Fourth Corner* opinions), this only underscores its engagement in an *ad hoc* line-drawing exercise that may serve its own purposes but lacks any principle tethered to the statute for the Federal Reserve or the Court to apply. *See* Section I, *supra*. Indeed, Custodia has gone out of its way to distinguish itself from other entities that have requested but not obtained master accounts, suggesting the Fed retains discretion to vet and

---

[8] *Available at* https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/.

J.A.586

potentially deny accounts to institutions in *those* circumstances, but not here. *See id.*; ECF No.

100-01, Oct. 28, 2022 Hearing Transcript at 52:6-22, 48:5-16 (distinguishing Fourth Corner

Federal Credit Union because "there was some pretty good argument that maybe they were not

in compliance with federal law," and a Connecticut-chartered narrow bank because it "sprung

this pass-through investment entity on the Federal Reserve Bank really with no notice and no

thought on the front end and no participation with them, whether that was an entity that the

Reserve Bank was going to agree to"). This "Rules for thee, not for me" approach cannot

withstand scrutiny and is fundamentally inconsistent with the argument that the Federal Reserve

retains no discretion.

The second commentary, a March 30, 2023 draft paper dated two days after the

Defendants filed their motions to dismiss but before Custodia's opposition was due, fares no

better. On the question of illegality, for example, the draft makes the conclusory assertion that

"Reserve Banks need not launder money," but then supports this conclusion with a circular

citation to the federal criminal statutes prohibiting money laundering. *See* Julie Andersen Hill,

*From Cannabis to Crypto: Federal Reserve Discretion in Payments* (Mar. 30, 2023 draft) ("2023

Hill draft"), at 55 and n.345.[9] This just begs the question: How are Reserve Banks to know

---

[9] A draft article posted by Professor Hill last year reached different conclusions, stating, *inter alia*, that:

- "the text of the Monetary Control Act *is far from a conclusive mandate to provide service to every depository institution*";
- "the Federal Reserve *has discretion to deny some institutions accounts and services*";
- "[t]he Federal Reserve Banks' authority to receive deposits under the Federal Reserve Act *has long been viewed as discretionary*";
- "[i]f the Federal Reserve has the authority to set nondiscretionary terms, then *surely it also has authority to deny access to banks that did not meet those terms*";
- "[t]he legislative history supports the idea that the Monetary Control Act was designed to level the playing field between types of institutions, *rather than treat each individual bank exactly the same regardless of risk*";

10

J.A.587

whether an institution may engage in illicit activity without the ability to undertake such an assessment? And if an institution *intends* to launder money, or engage in some other illicit activity, how could it possibly have been Congress's intent that the Reserve Bank must nonetheless mindlessly open an account for and begin providing services to that institution before *then* setting out to find some other way to try to prevent its payment rails from being used to such ends? These are not academic questions, but real concerns that Reserve Banks face on an ongoing basis.[10] Once again, however, no principled standard is forthcoming.

----

- "[d]enying [the Federal Reserve] the authority to set terms and conditions that would, for example, limit risk and improve function, could *frustrate the purpose of the Monetary Control Act*";
- "*[t]he Federal Reserve's discretion to establish terms and conditions for account access is <u>reinforced</u> by* the Monetary Control Act's amendments"; and
- the statutory "history suggests that *the Federal Reserve retained discretion to set terms and conditions for access* and pricing for its payment services so long as those terms did not discriminate based on membership status. *<u>It does not compel the conclusion that Congress intended to outsource all risk evaluation to other state or federal banking regulators</u>*."

*See* Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (2022 draft), attached as Exh. A hereto, at 34-38 ("2022 Hill draft") (emphases added). Professor Hill further noted that "both the Board and the Reserve Banks have emphasized their discretion to limit access" across many years, concluding that "*[a] complete catalog of these instances would be too voluminous for this [86-page] article*." *Id.* at 39 (emphasis added); *see also, e.g.*, Dan Awrey, *Unbundling Banking, Money, and Payments*, 110 Geo. L.J. 715, 746 (2022) (observing that, "even within th[e] relatively narrow universe of eligible institutions, the Fed has considerable discretion to impose further access restrictions," and that in some circumstances "there is good reason for the Fed to exercise caution").

[10] As Professor Hill observed last year, "since the passage of the Monetary Control Act, the Federal Reserve Board and Reserve Banks have evaluated risks associated with providing account and payment services to individual banks. When individual banks present abnormally high risk, the Federal Reserve Banks have repeatedly stated that they have the authority to withhold services [to] those banks. Indeed, *operating major nation-wide payment systems without imposing risk-related terms and conditions <u>would be foolhardy</u>. Having risk-related terms and conditions without ability to enforce the terms by limiting services <u>would be useless</u>.*" 2022 Hill draft, at 41 (emphases added).

J.A.588

Moreover, the draft article concedes the long history from 1935 and before of Reserve Banks exercising discretion over accounts for entities not subject to the Fed's direct supervision,[11] noting but dismissing in a wholly unconvincing way that both the Board and Reserve Banks had affirmatively recognized that account-opening discretion was both afforded by Congress and fundamental to such account relationships. *See id.* at 49 and n.307; Chester Morrill, Secretary, Bd. of Governors of the Fed. Reserve Sys., Letter X-9187 (Apr. 26, 1935) ("1935 Morrill Letter")[12] (surveying each Reserve Bank chair "with respect to the circumstances and conditions under which clearing accounts of nonmember banks should be accepted under the authority of Section 13 of the Federal Reserve Act, "*including under what circumstances they should be "accept[ed] or refus[ed]*," and concluding that "it is the Board's view that requests for the establishment of clearing accounts by non-member banks *should be passed upon by your directors in the light of all the circumstances surrounding each application*" (emphases added)). The remainder of the draft is largely devoted to the unexceptional point that Reserve Banks historically had little reason to exercise account discretion over member banks, which were previously required to hold reserves at a Federal Reserve Bank and were already subject to extensive vetting and direct supervision by the Federal Reserve Board prior to 1980, and attempting to dismiss the significance of the Fed's articulated discretion in its Operating Circulars and elsewhere (previously referred to as "too voluminous" to catalog, *see* n.9). All of these efforts are aimed at supporting the policy conclusions that discretion should not rest within

---

[11] Under Section 13 of the Federal Reserve Act, non-member banks could obtain limited clearing accounts before the MCA opened regular deposit accounts to them.

[12] *Available at* https://fraser.stlouisfed.org/archival-collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-nonmember-bank-clearing-accounts-505912.

12

J.A.589

the Federal Reserve, and that novel state charters can promote innovation. But the undoubted

benefits of innovation are necessarily tempered by an assessment of illegality or undue risk that

any particular institution may present to national monetary policy, the Federal Reserve's

payment system, or other important federal interests, and evaluation of these concerns is not

something that the Federal Reserve can cede to others given the responsibilities that Congress

has assigned to it. There is no indication that Congress expected or desired such an unlikely and

extraordinary outcome when it sought to enhance control over monetary policy by expanding the

availability of Reserve Bank accounts and services to non-members while at the same time

directing the Board to establish uniform pricing for these services for both members and non-

members alike.

      Although both the draft article and Custodia's brief rely heavily on Judge Bacharach's

separate opinion in *Fourth Corner*, that analysis was notably not joined by the other members of

the panel and suffers from the same overreading of both Section 248a(c)(2) and generalized

statements about Congress's "opening of access." It also fails to identify an administrable

standard grounded in the statute by which the Federal Reserve (or a reviewing court) may assess

whether a particular institution's activities are unduly detrimental to important federal interests.

This reading would render both the Federal Reserve and the federal courts powerless to prevent

any entity from accessing an account and services (and the Fed's balance sheet), regardless of the

risks presented or potential illegality, so long as it was authorized to operate by a single state or

territory, a result assuredly not contemplated by Congress when it sought to restore the Federal

Reserve's control over the money supply in the MCA. In any event, Judge Bacharach's view was

developed in a far more limited context and without the benefit of the Board's published

Guidelines, the recent amendment to the Federal Reserve Act, or a full consideration of the Fed's longstanding assertion and exercise of discretion in practice.

The MCA has fulfilled and continues to fulfill Congress's intention of expanding access to Reserve Bank accounts and services to non-member institutions. And the Board has fulfilled its obligations under the MCA by publishing a pricing schedule that takes into account this expanded access alongside other stated criteria. It is not possible to conclude in these circumstances that the Board has acted "not in accordance with law" in violation of the APA and that its action should be "set aside" pursuant to 5 U.S.C. § 706(2) as Custodia claims.

**B.     The Court Should Defer to the Board's Interpretation in the Guidelines**

Custodia's argument that *Chevron* deference is not appropriate for the Guidelines (Opp. at 17) misses the mark: the Board never contended that the Guidelines carry the full force of law that mandatory *Chevron* deference typically requires. The Guidelines are nonetheless the Board's official position as the agency with expertise and authority as to the Federal Reserve Act. Even if not mandatory, such guidance "deserve[s] considerable deference" when the agency uses a "highly formal process" to adopt the guidance, including "notice[s] in the Federal Register," "accept[ing] public comments," engaging in lengthy "deliberation," and then "publish[ing] a proposed [set of guidelines] for further comment." *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 70 (D.D.C. 2014); *accord Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood, Corp.* 439 U.S. 234, 251 (1978) (deferring to statutory interpretation in pre-*Chevron* Board order). Thus, to the extent there is any ambiguity or uncertainty as to whether the Federal Reserve has the ability to deny requests for master accounts, it should be resolved in favor of the Board's reasonable interpretation. Here, such interpretation came from a unanimous Board, which affirmed in the Guidelines that Reserve Banks "retain the discretion to deny a request for access

14

to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." 87 Fed. Reg. at 51,102. [13]

Although Custodia contends that the Federal Reserve Act is unambiguous that discretion is not allowed, Section 248a(c)(2) does not establish that point. And while Custodia points to the 2023 Hill draft and its assertion that the Board has contradicted its prior positions and therefore should not be afforded deference, [14] the only evidence that the article is able to muster for this proposition is a selection of generalized statements in which the Federal Reserve indicated that certain banking services are "available," and the article eventually concedes that Operating Circular 1, first published in 1998, made clear that master "accounts were subject to" both "approval and termination." 2023 Hill draft at 50-51; *see also* n.9 *supra* (identifying "voluminous" history of Federal Reserve assertion of discretion). Custodia's arguments are insufficient to overcome the Board's reasonable interpretation in its published Guidelines.

**C.    Section 248c's Text and Legislative History Affirm the Longstanding Understanding that the Federal Reserve May Reject Account Requests**

As the Board indicated in its opening brief, the 2023 NDAA created Section 248c within the Federal Reserve Act, which establishes that requests for a "reserve bank master account and services" may be "rejected." 12 U.S.C. § 248c(b)(1)(B). In its opening brief, the Board noted that

---

[13] Custodia urges the Court not to defer to "interpretations in non-binding guidance," but the cases it cites concerned guidance that had not gone through the notice-and-comment process and are otherwise distinguishable from the circumstances presented here. *See* Opp. at 17 (citing *Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1128 n.9 (10th Cir. 2020); *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017)).

[14] *But see* 2022 Hill draft, at 41 (because "the Federal Reserve has the authority to interpret the Monetary Control Act," and "the statute is unclear, courts would likely afford some deference to the Federal Reserve's interpretation that it can impose risk-related terms and conditions on its accounts and payment services"); *see also id.* at 28 (Federal Reserve "believes it has discretion to restrict or deny access to depository institutions that present undue risk. I conclude the Federal Reserve's interpretation of the statute is reasonable."); *id. at* 29 n.199 (citing authority).

this was not a new pronouncement by Congress, but instead affirmed that "discretion in this area [] has long been understood to reside within the Federal Reserve System" such that "access denials are to be expected." Board Br. at 2; *accord* 1935 Morrill Letter, *supra*. Attempting to argue that Section 248c does not mean what it says on its face, Custodia first tries to rewrite the statute, then tries to rewrite its history. Neither is an acceptable method for construing the unambiguous text of Section 248c.

### 1.     Custodia is not permitted to rewrite Section 248c to indicate that "rejections" are only permitted for the reasons picked by Custodia

Custodia argues that the language in Section 248c providing for "reject[ions]" of master account requests is meant to apply only when requests are made by "***ineligible*** financial institutions." Opp. at 21 (emphasis in original). But the word "ineligible" does not appear anywhere in the provision, and this is a transparent attempt to rewrite the statute to suit Custodia's litigation objectives.

It is axiomatic that a court "cannot rewrite an unambiguous statute." *EagleMed LLC v. Cox*, 868 F.3d 893, 904 (10th Cir. 2017) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins., Co.*, 559 U.S. 393, 403 (2010)) (alterations omitted). This prohibition follows from "[t]he preeminent canon of statutory interpretation," which "requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (quotation omitted). Here, the unambiguous language of the statute contemplates that requests for master accounts and services by depository institutions may be "rejected." 12 U.S.C. § 248c(b)(1)(B). Custodia puts forth no reading of the statute that does not require inserting new terms or otherwise rewriting its language.

Custodia's attempt to rewrite Section 248c is not only impermissible because that provision is unambiguous, but such rewriting would make Section 248c internally contradictory. *See*, *e.g.*, *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (noting that an interpretation of a statute cannot be "inconsistent with both the text and context of the statute"). The statute indicates that the Board's forthcoming database must specify whether the requesting entity was "an insured depository institution," "an insured credit union," or "a depository institution that is not an insured depository institution or an insured credit union" (12 U.S.C. § 248c(b)(1)(C))—all of which are indisputably entities eligible to have a master account. And for each such requesting entity, "reject[ion]" is a possibility. 12 U.S.C. § 248c(b)(1)(B). Thus, the statute explicitly contemplates rejections of master account requests from all three types of eligible depository institutions. Custodia's argument that the statute allows for rejections only with respect to "ineligible financial institutions" simply finds no support in the language of the statute.

Finally, while Custodia explains at length its views as to the appropriate circumstances in which master account requests can be rejected (Opp. at 22-25), this explanation is utterly devoid of any connection to the language of Section 248c. Custodia's suggestion that rejections are only allowed for three specific reasons is supposition, not statutory interpretation. The statute does not contain any description of acceptable reasons for a rejection of a master account request, much less the three reasons described by Custodia. Rather, the statute simply makes clear that rejection of an application is an anticipated outcome for any depository institution.

Accordingly, the language of Section 248c is remarkably straightforward: it contemplates rejections of master account requests from any of three categories of depository institutions. There is no basis for rewriting the statute to suit Custodia's ends.

J.A.594

## 2. The legislative history anticipates that master account requests from certain depository institutions may be rejected

Resort to legislative history and statutory purpose ordinarily is not necessary when a statute is unambiguous, as is the case here. *United States v. Polk*, 61 F.4th 1277, 1281 n.6 (10th Cir. 2023). However, even if consulting these extra-textual sources were appropriate, in this case, they are in accord with the statute's plain text. Contrary to the suggestions of Custodia and a former Senator who filed an amicus brief in support of neither party (ECF No. 146-01) ("Amicus Br."), the existing legislative history and statutory purpose establish that Congress believed the Federal Reserve should not automatically be granting master account requests from depository institutions, but instead should be evaluating (and potentially denying) such requests fairly and consistently.

As recounted in its opening brief (at 9-10), after promulgating the Guidelines, the Board made a proposal in November 2022 to require that Federal Reserve Banks publish "two lists: (1) a list of federally-insured depository institutions with access to accounts and services, and (2) a list of non-federally-insured depository institutions with access to accounts and services." 87 Fed. Reg. 68,691, 68,691 (Nov. 16, 2022). The Board did not propose including any entities rejected or denied for a master account on the lists. However, before the Board finalized its proposal, Congress passed and the President signed into law the 2023 NDAA, which requires the Board to create "a list of every entity that submits an access request for a reserve bank master account and services after enactment of this section . . . including whether, and the dates on which, a request— (i) was submitted; and (ii) was approved, *rejected*, pending, or withdrawn." 12 U.S.C. § 248c(b)(1)(B) (emphasis added). Thus, the "rejected" language was a creation of Congress, marking a departure from the Board's original proposal.

18

J.A.595

Lest there be any doubt about the origins of the "rejected" language, that doubt is put to rest by the U.S. Senate Committee on Banking, Housing, and Urban Affairs minority statement preceding the enactment of the 2023 NDAA. That statement made clear that the "rejected" language had not appeared in the Board's proposal and therefore Congress had made a conscious decision to deviate from the Board's proposal:

> [Section 248c's] inclusion in the NDAA is the result of extensive Banking Committee oversight of the Fed's approach to master account applications. In response to that oversight, the Federal Reserve announced on November 4, 2022 that it was seeking public comment on a proposal to periodically publish a list of institutions that have access to master accounts. *However, the Federal Reserve did not propose disclosing information about institutions whose requests for access to master accounts are pending or have been rejected.*[15]

The quote included in the statement underscored this point, noting the desire to publish "not only which institutions have been granted master accounts, *but also which ones have been denied access.*" *Id.* (emphasis added).[16]

Indeed, as the amicus brief acknowledges, members of Congress were keenly aware that there was an ongoing dispute as to whether the Federal Reserve has discretionary authority to reject master account requests from depository institutions. Amicus Br. at 10. Yet rather than adopting the "no discretion" view anywhere in the statute or in the legislative history, Congress

---

[15] *Annual Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on Master Accounts*, Dec. 8, 2022, *available at* https://www.banking.senate.gov/newsroom/minority/annual-defense-bill-includes-toomey-provision-to-require-federal-reserve-transparency-on-master-accounts ("Banking Committee Statement") (emphasis added).

[16] Custodia accuses the Board of "chicanery" with respect to the drafting of Section 248c, stating that it was Board lawyers who added the word "rejected." Opp. at 26-27. Although this diversion is entirely irrelevant to the task at hand, the Banking Committee Statement makes clear that language was added by Congress because the Board's own proposal did not include that concept. And the amicus brief indicates that the drafting suggestion made by Board attorneys was adding the phrase "reserve bank" before the definition of "master account," which merely affirms an unassailable fact that has long been the public position of both the Board and the Reserve Bank; the term "rejected" is never attributed to the Board. Amicus Br. at 9-10.

19

J.A.596

adopted a position that is directly at odds with that view and consistent with the Board's recently published Guidelines. *Cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) ("Congress' awareness of [agency rulings] when enacting other and related legislation make[s] out an unusually strong case of legislative acquiescence in and ratification by implication"). Although the Banking Committee Statement suggested that FRBKC may have improperly exercised discretion with respect to a master account granted to a state-designated depository institution, and therefore provided a mechanism to monitor Federal Reserve account decisions going forward, it notably spoke in discretionary terms. *See* Banking Committee Statement (citing to state regulator "press statement" in which it publicly confirmed entity's "status as a depository institution"); *id.* (stating expectation that Federal Reserve act in a "fair" and "consistent" manner in its account access decisions, terms denoting bounds on the exercise of discretionary authority rather than ministerial function); *see also* Amicus Br. at 7, 14 (same).

If it were the case that the granting of a master account to depository institutions is purely ministerial under the Federal Reserve Act, then Congress could have readily clarified that expectation while it was legislating in an adjacent provision of the statute dealing with a directly related issue in the immediate wake of the Board's publication of its Guidelines' affirming discretion. But instead, Congress confirmed its understanding that the Federal Reserve in fact exercises discretion (consistent with the Board's interpretation of the Federal Reserve Act in its Guidelines), and recognized that, in the exercise of this discretion, a "rejected" application is a possible outcome for depository institutions—just as "approved," "pending," and "withdrawn" applications are possible outcomes. And while the amicus brief now states that the provision was meant to be completely neutral on the question of whether the Federal Reserve can exercise discretion regarding master accounts (Amicus Br. at 10), such post-enactment statements have

20

J.A.597

little utility when all pre-enactment evidence shows that Congress wanted to monitor the Federal Reserve's exercise of discretion and suggested no intention to constrain that discretion. *See, e.g.*, *Ausmus v. Perdue*, 908 F.3d 1248, 1257 n.3 (10th Cir. 2018) ("post-enactment statements by [] members of Congress . . . do not bear on the meaning of the law") (citing *Barber v. Thomas*, 560 U.S. 474, 486 (2010)); *Kansas Nat. Res. Coal. v. DOI*, 971 F.3d 1222, 1237 (10th Cir. 2020) (post-enactment statements constitute "an extremely hazardous basis for inferring the meaning of a congressional enactment") (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980)).

Although ultimately unnecessary to the Court's decision, at bottom both Section 248c and its legislative history serve to affirm the longstanding understanding that the Federal Reserve retains discretion to reject master account requests from depository institutions.

## IV.   Custodia is Not Entitled to Mandamus or Other Relief

Custodia's Claim II for relief under the Mandamus Act, 28 U.S.C. § 1361, is not, as Custodia argues, "an alternative to its APA claim," and does not "complement[] its APA claim." *See* Opp. at 31. Custodia's mandamus claim asks the Court to order that "its master account application [be] granted," Am. Compl. ¶ 91, which is duplicative of the relief sought in its APA claim for "an order compelling the Board to rescind the denial of Custodia's master account application and to grant Custodia's master account application," *id.* ¶ 85. Where review is possible under the APA, mandamus is not available. *E.g.*, *W. Shoshone Bus. Council ex rel. W. Shoshone Tribe of Duck Valley Reserve v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993) (citing *Kerr v. United States District Court*, 426 U.S. 394 (1976)). Moreover, even if Custodia could properly request mandamus relief, such a "drastic remedy," *id.*, would not be warranted here because as discussed above Custodia is not entitled to a master account under the law. Decisions

21

**J.A.598**

that are discretionary in nature cannot be subject to mandamus relief. *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995).

Additionally, Custodia's final claim for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, should be dismissed because it is not an independently viable cause of action. *See Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014). The Court should dismiss Claim III for the same reasons it previously rejected Custodia's "stand-alone cause of action" for declaratory judgment. *See* Order (ECF No. 102) at 23 (permitting only declaratory judgment as a *request for relief*—and not as an independent claim—to remain in light of the decision not to dismiss the APA or Mandamus Act claims).

## CONCLUSION

For the foregoing reasons, and the reasons stated in its opening brief, the Board respectfully requests that the case be dismissed.

Dated: May 2, 2023

<div style="margin-left:30%">

Respectfully submitted,

  /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the*
*Federal Reserve System*

</div>

22

**J.A.599**

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2023, I electronically filed the foregoing using the court's

CM/ECF system, which will send notification of such filing to all parties of record.


By:    /s/ *Joshua P. Chadwick*
Joshua P. Chadwick

*Counsel for Defendant Board of Governors
of the Federal Reserve System*

**J.A.600**

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

CUSTODIA BANK, INC.,

        Plaintiff,

    v.

FEDERAL RESERVE BOARD OF
GOVERNORS, and FEDERAL RESERVE
BANK OF KANSAS CITY,

        Defendants.

Case No. 22-CV-125-SWS

---

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

This matter comes before the Court on the Defendants' motions to dismiss Plaintiff's amended complaint (ECF 124, 126). Plaintiff filed a consolidated opposition to both motions (ECF 135), former-Senator Patrick Toomey submitted an amicus brief (ECF 151), and Defendants replied (ECF 159, 160). The Court has also considered the amended amicus brief from the State of Wyoming (ECF 163). Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court will deny FRBKC's motion and will grant in part and deny in part the Board of Governors' motion.

## BACKGROUND

Plaintiff Custodia Bank is a Wyoming depository institution "specializing in payment services and crypto-asset custody." (Am. Compl. ¶ 3.) It operates under a

J.A.601

"Special Purpose Depository Institution" (SPDI) bank charter granted in October 2020.

(*Id.* ¶¶ 8, 14.) "SPDI banks do not lend money; instead, they specialize in taking deposits,

facilitating payments for customers, and other incidental services.   SPDI banks were

designed to provide a bridge connecting crypto-asset companies to the U.S. payments

system (for example, to pay their staff in U.S. dollars)." (*Id.* ¶ 37.)

> SPDI banks were also designed to provide custody services for crypto-assets
> via their trust departments, analogous to the custody services provided by the
> trust departments of custody banks for the trillions in securities held by
> retirement plans and mutual funds.   SPDI banks allow, for example, a
> customer to use his or her Bitcoin held in the trust department of an SPDI
> bank to make a direct transfer, a purchase, or an investment, rather than
> having to first convert the Bitcoin into U.S. dollars.

(*Id.*)   As a state-chartered institution, SPDI banks are regulated by the Wyoming Division

of Banking.   (*Id.* ¶ 36.)

In October 2020, Custodia applied to Defendant Federal Reserve Bank of Kansas

City (FRBKC) to obtain a Federal Reserve "master account" (Am. Compl. ¶ 21), which is

"put simply, a bank account for banks" that "gives deposit institutions access to the Federal

Reserve System's services, including its electronic payments system." *Fourth Corner*

*Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017)

(Moritz, J.).   "Without such access, a depository institution is nothing more than a vault."

*Id.* at 1053 (Moritz, J.) (internal quotation marks omitted).

> The master account is both a record of financial transactions that reflects the
> financial rights and obligations of an account holder and the Reserve Bank
> with respect to each other, and the place where opening and closing balances
> are determined.   For each institution, all credits and debits resulting from the
> use of Federal Reserve services at any Federal Reserve office are booked to
> this single master account at one Reserve Bank.

*Id.* at 1064 n.1 (Bacharach, J.).  A master account also enables its holder to access various

services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including

wire transfer services, automated clearinghouse services, settlement services, securities

safekeeping, and Federal Reserve float services.  *See Fourth Corner*, 861 F.3d at 1053

(Moritz, J.) (noting a master account "gives depository institutions access to the Federal

Reserve System's services, including its electronic payments system").

      Absent a master account, "Custodia cannot directly access the Federal Reserve and

cannot offer the same custodial services for crypto-assets that incumbent banks like BNY

Mellon presently provide." (Am. Compl. ¶ 2.)  "Without a master account, if Custodia is

able to operate at all, it is as a second-class citizen, relegated to dependency on and fealty

to an intermediary bank [which does have a master account]." (*Id.*)

> Having a master account means that SPDI banks do not have to use an
> intermediary ["correspondent"] bank in order to access the Federal Reserve
> banking system for clearing U.S. dollar transactions.  Eliminating the
> "middleman" cuts costs, lowers risk (including counterparty credit risk), and
> provides SPDI bank customers with more efficient and customizable
> payment services that can be programmed using software.  It does not mean
> that SPDI banks hold crypto-assets within their master accounts.  Custodia
> would hold no crypto-assets on its balance sheet or within its master account.

(*Id.* ¶ 38; *see also* ¶ 4.)  Custodia would hold only "customer deposits of U.S. dollars in

cash in a Federal Reserve master account," which would be separate from crypto-assets.

(*Id.* ¶ 50.)  "This means that Custodia will not be exposed to the volatility of crypto-asset

prices because it will hold all crypto-assets in bailment on behalf of a customer in its trust

department." (*Id.*)  Custodia's own Federal Reserve master account is significantly

important to its success as a business.  *See Fourth Corner*, 861 F.3d at 1053 (Moritz, J.)

(noting that when plaintiff credit union was denied a master account by FRBKC in that case, it "effectively crippl[ed] the Credit Union's business operations").

In August 2021, Custodia also applied to Defendant Federal Reserve Board of Governors for membership in the Federal Reserve, which would subject Custodia to oversight and regulation by the Federal Reserve Board (in addition to the state's banking regulatory system). (Am. Compl. ¶ 47.) "It is not necessary to be a member bank in order to receive a master account .... Custodia, however, took this additional step to demonstrate to [FRBKC] and the Board its willingness to submit to full federal supervision and accountability." (*Id.*)

On January 27, 2023, the Board of Governors denied Custodia's application for membership into the Federal Reserve. (Am. Compl. ¶¶ 62-70.) A few hours later, FRBKC denied Custodia's master account application. (*Id.*) FRBKC's denial came 27 months after Custodia had applied for a master account, whereas the master account application itself notes that processing a master account application "may take 5-7 business days." (*Id.* Ex. 1 (ECF 121 p. 37).)

In its amended complaint, Custodia challenges the denial of its master account application. It contends that while the application was submitted to and the denial came from FRBKC, FRBKC "can exercise no discretion over Custodia's master account application without the approval or, at the very least, the nonobjection of the Board [of Governors]." (Am. Compl. ¶ 4.) Regardless of which entity is actually making the final decision, though, Custodia asserts Defendants "had no discretion to deny Custodia's master account application." (*Id.* ¶ 5.) Custodia argues that because it was legally-eligible for a

master account, "12 U.S.C. § 248a requires that Custodia be able to access all 'Federal Reserve bank services'" and therefore "Defendants had a non-discretionary duty to grant Custodia's master account application and not to discriminate against Custodia in its ability to access all bank services using that account." (*Id.*)

Custodia sets forth three causes of action in its amended complaint. Its first claim is asserted only against the Board of Governors under the Administrative Procedure Act (APA) and alleges the Board of Governors' agency action "in denying Custodia's master account application is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (Am. Compl. ¶ 84 (quoting 5 U.S.C. § 706(2)). Custodia's second claim is asserted against both Defendants and seeks a writ of mandamus compelling Defendants to "promptly rescind the denial of Custodia's master account application and instead grant the application so that Custodia can access Federal Reserve bank services." (*Id.* ¶ 87.) The final claim seeks a declaratory judgment "that the Board and/or [FRBKC] has a statutory obligation to provide Custodia with a master account to permit Custodia to use that master account to access Reserve Bank services in a non-discriminatory manner." (*Id.* ¶ 101.)

Defendants have moved to dismiss Custodia's amended complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6), asserting Custodia has failed to state any claim on which the Court can grant relief.

## STANDARD FOR 12(b)(6) MOTION TO DISMISS

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone

is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, assumed to be true, must "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In the context of a 12(b)(6) motion to dismiss, this plausibility standard requires the plaintiff to plead facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts the nonmoving party's well-pled factual allegations as true and construes them in the light most favorable to the nonmoving party, but it is not bound to accept an asserted legal conclusion as true. *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991); *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

Much of the parties' arguments on these motions to dismiss the amended complaint track their arguments on the earlier motions to dismiss the original complaint. The Court's analysis will also track much of its prior order on those motions to dismiss (ECF 102), and the reader is encouraged to consult that order for additional discussion.

### Claim I - Administrative Procedure Act (APA)

Custodia's APA claim is asserted against only the Board of Governors, which is undisputedly a governmental agency. Custodia alleges the Board of Governors' action in denying the master account application was arbitrary, capricious, an abuse of discretion, or

J.A.606

otherwise not in accordance with the law, and the Board of Governors should be compelled to issue a master account. (Am. Compl. ¶¶ 84-85.)

The Board of Governors' entire argument for dismissal is that Custodia's interpretation of 12 U.S.C. § 248a as mandating the issuance of master accounts to eligible institutions is legally erroneous. (ECF 127 pp. 19-33.) The Court already considered this argument it its prior order on dismissal and determined that Custodia has stated a plausible claim for relief under the APA, and that earlier discussion continues to apply in large part here. The Court quotes its earlier order at length:

> The Defendants contend FRBKC has complete discretion to issue or deny a master account pursuant to 12 U.S.C. § 342, which says in part:
>
>> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, ... deposits of current funds in lawful money, national-bank notes, Federal reserve notes, [etc.].
>
> Section 342 is located in Subchapter IX of Chapter 3 of Title 12 of the U.S.C. Subchapter IX is titled, "Powers and Duties of Federal Reserve Banks." To effectuate this deposit-taking function, Federal Reserve Banks use the master account to keep a record of each institution's debits and credits. No provision of the Federal Reserve Act, including § 342, "imposes upon reserve banks any obligation to receive" deposits. *Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923). "The act merely confers authority to do so." *Id.*
>
> The Defendants contend the discretion to receive or reject deposits necessarily carries with [it] the discretion to grant or deny master accounts. (ECF 51 p. 33; ECF 49 pp. 32-35.) This argument presents as logical and may yet carry the day, but at least one judge of the Tenth Circuit has disagreed in a published opinion.
>
> In *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), Judge Bacharach determined 12 U.S.C. § 248a requires Federal Reserve Banks to issue master accounts to eligible depository institutions that apply. That section (part of the Depository

Institutions Deregulation and Monetary Control Act of 1980), says in part:

> **(a)   Publication of Pricing Principles and Proposed Schedule of Fees; Effective Date of Schedule of Fees.**
> Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.
> …
> **(c)   Criteria applicable.**
> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>> …
>> (2)   All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. § 248a(a), (c)(2). Judge Bacharach concluded the only way the "Federal Reserve bank services covered by the fee schedule" can be made available to nonmember depository institutions is by granting them a master account. *See Fourth Corner*, 861 F.3d at 1071 (Bacharach, J.) ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks. To purchase these services, a master account is required. Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts."). In distinguishing § 342 from § 248a, Judge Bacharach opined:

> Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection.... But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions. As a result, § 342 does not affect Fourth Corner's entitlement to a master

J.A.608

account.

*Fourth Corner*, 861 F.3d at 1074. That is, he agreed § 342 affords to a Federal Reserve Bank the discretion to take or refuse deposits, but concluded such discretion was separate and apart from the issuance of master accounts. *See id.* at 1073-74 ("But this discretion does not encompass the issuance of master accounts."); *see also* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with Federal Reserve Banks and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

The Defendants spill much ink explaining why Judge Bacharach's opinion in *Fourth Corner* cannot win the day in this case. (ECF 49 pp. 37-41; ECF 51 pp. 33-36.) They point out *Fourth Corner* was a three-way split decision between the three-judge panel, and Judge Bacharach was effectively the odd man out as he voted to reverse the dismissal of the complaint while the other two judges voted to uphold the dismissal. *See Fourth Corner*, 861 F.3d at 1053. All true. Nonetheless, it's worth noting that the other two judges did not reach the merits of the § 248a versus § 342 statutory interpretation question (because they found dismissal warranted), so we don't currently know if they would have seen it the same as Judge Bacharach or not.

The Defendants also note that Section 248a is found in Subchapter II of Chapter 3 of Title 12, and Subchapter II is titled "Board of Governors of the Federal Reserve System." Indeed, § 248 begins, "The Board of Governors of the Federal Reserve System shall be authorized and empowered: [list of duties]." 12 U.S.C. § 248. Thus, Judge Bacharach appears convinced that Congress effectively mandated Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions that apply in a Subchapter that sets forth the duties of a completely different entity (the Board of Governors). The Court agrees it appears a strange place for Congress to stick such a requirement that would seemingly govern the Federal Reserve Banks. Of course, the title of a statute, along with the title of the subchapter the statute resides in, might matter only if the Court first determines the statute is ambiguous, and even then it might matter only very little. "[U]nder the general rules of statutory interpretation, the title to a statutory provision is not part of the law itself, although it can be used to interpret an ambiguous statute." *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 n.4 (10th Cir. 1998) (quoting *Johnston v. Commissioner of Internal Revenue*, 114 F.3d 145, 150 (10th Cir. 1997), and giving "little weight" to

the title of the Americans With Disabilities Act); *see Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 529 (1947) ("For interpretive purposes, [statutory headings and titles] are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain."). Thus, the title of Subchapter II and the location of § 248a within the statutory code likely offer relatively little toward refuting Judge Bacharach's opinion.

To cut short what could become an unnecessarily long recap of the Defendants' objections to Judge Bacharach's opinion in *Fourth Corner*, the Court concludes Custodia has stated a plausible claim to compel legally-required action for two reasons. First, Judge Bacharach's opinion may plausibly be the law on this matter in this case. *See* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with a Federal Reserve Bank and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

Second, and more immediately significant, a full statutory interpretation of the matter is better left for another day. In this particular case, the facts alleged by Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a) in granting Custodia's master account application. For example, if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little because it may be that FRBKC failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes, as Custodia has plausibly suggested). Thus, because the development of facts underlying or refuting certain allegations may prove particularly relevant to any statutory interpretation of § 342 versus § 248, the Court will not undertake a complete analysis at this stage of the proceedings without further development of those facts.

(ECF 102 pp. 12-17.)

While several factual developments have occurred since the Court's earlier order, including the denial of Custodia's master account application, the Court remains of the opinion that a full statutory interpretation of the matter is more appropriate after further

J.A.610

development of important facts.  For example, Custodia applied to FRBKC for its master

account and received its denial from FRBKC.  And while this lawsuit has been pending,

the Board of Governors published and adopted guidelines for Federal Reserve Banks to

use "in evaluating requests for master accounts."  Guidelines for Evaluating Account and

Services Requests, 87 Fed. Reg. 51,099, 51,106 (Aug. 19, 2022).  If the decision to deny

the master account was truly only that of FRBKC, then Custodia's Claim I must fail.

Nonetheless, the alleged occurrence of certain events, and the timing of those events,

plausibly suggests the Board of Governors had at least some hand in controlling the

outcome of Custodia's master account application.  (*See, e.g.*, Am. Compl. ¶¶ 62-70

(alleging the denial of Custodia's master account application, the denial of its Federal

Reserve membership application, and the White House's statement on risks of crypto-

assets all occurred on the same date and all included similar language); *see also* ECF 102

pp. 7-8 (summarizing several factors making it "reasonable to infer" the Board of

Governors involved itself into Custodia's master account application).)

Also since the Court's prior order on dismissal, Congress enacted 12 U.S.C. § 248c.

The Board of Governors relies on this new statute in part to advance its statutory

interpretation argument, but the Court is not convinced.  Section 248c requires the Board

of Governors to create and publish a public database that identifies every entity currently

with access to a Federal Reserve master account and every entity that has applied for a

master account along with whether the request was approved, rejected, pending, or

withdrawn.  12 U.S.C. § 248c(b).  The Board of Governors argues that because § 248c

requires a public list of any "rejected" master account applications, whether to grant such

an application must be discretionary. (ECF 127 pp. 31-32.) The Court does not see it so cut-and-dried. It is public knowledge that master account applications have been "rejected" or denied for non-discretionary reasons in the past. For example, in *Fourth Corner*, the district court dismissed the credit union's lawsuit after determining FRBKC could not have issued a master account in that case because doing so would have aided the credit union in providing banking services to marijuana-related businesses, which would have violated federal drug laws. *Fourth Corner*, 861 F.3d at 1053-54 (Moritz, J.). Thus, at the time Congress passed § 248c, it was known that Federal Reserve Banks had "rejected" master account applications in the past, but § 248c cannot be read as Congress' imprimatur on Federal Reserve Banks holding carte blanche to grant or deny master account applications. (*See* ECF 151 pp. 12-14, 17-18.) Section 248c does not, expressly or impliedly, carry the statutory construction load the Board of Governors asserts it does.

In short, based mostly on Judge Bacharach's opinion in *Fourth Corner*, Custodia has asserted a plausible cause of action under the APA in Claim I against the Board of Governors. And determining the Board of Governors' actual conduct related to this lawsuit, if any, will help determine whether the claim might be successful. Consequently, the Board of Governors' request to dismiss Custodia's APA claim will be denied.

## Claim II - Compel Action under the Mandamus Act

Custodia's second cause of action seeks a writ of mandamus compelling action from both Defendants under 28 U.S.C. § 1361, which provides:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

"Mandamus is the traditional writ designed to compel government officers to perform nondiscretionary duties." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005).

In considering whether Claim II plausibly alleges a claim for mandamus relief, the Court returns to its prior dismissal order, wherein it wrote the following:

In a mandamus action, the Court should

> measure the allegations in the complaint against the statutory and constitutional framework to determine whether the particular official actions complained of fall within the scope of the discretion which Congress accorded the administrators.... In other words, even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated.

*Carpet, Linoleum & Resilient Tile Layers, Loc. Union No. 419, Bhd. of Painters & Allied Trades, AFL-CIO v. Brown*, 656 F.2d 564, 566 (10th Cir. 1981) (quoting *Davis Associates, Inc. v. Sec., Dep't of Housing and Urban Development*, 498 F.2d 385, 389 & n.5 (1st Cir. 1974)).

Under Judge Bacharach's view in *Fourth Corner*, Custodia has stated a claim of both unreasonable delay of a decision on its master account application and legal entitlement to a master account. Therefore, the Court finds Custodia's request for mandamus relief should not be dismissed. In short, "there may well exist statutory or regulatory standards delimiting the scope or manner in which" the Defendants may exercise their discretion (if any) over Custodia's master account application, and assuming the truth of Custodia's allegations, those standards may have been ignored or violated in this case. That is, applying Judge Bacharach's reasoning, Custodia has plausibly alleged the Defendants have "failed to discharge a duty owed to plaintiffs which Congress has directed them to perform." *Carpet, Linoleum & Resilient Tile Layers, etc. v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981).

(ECF 102 p. 18.) The question of unreasonable delay is no longer at issue because the

master account application has since been denied, but if Judge Bacharach's (and Custodia's) interpretation of § 248a is correct, then granting a master account may be a nondiscretionary duty.

The Court deviates from its prior order, though, in determining that Custodia cannot state a claim for mandamus relief under the Mandamus Act against the Board of Governors. "To be eligible for mandamus relief [under § 1361], the petitioner must establish (1) that he has a clear right to relief, (2) that the respondent's duty to perform the act in question is plainly defined and peremptory, and (3) that he has no other adequate remedy." *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005) (citation omitted). However, under 5 U.S.C. § 706(1), the APA permits Custodia to "compel agency action unlawfully withheld." Because there is no dispute the Board of Governors is an agency, the APA provides Custodia a means to its requested remedy if it prevails against the Board of Governors on administrative review. "The statutory remedy provided by § 706(1) is an adequate remedy available to Plaintiff[] that precludes mandamus relief." *Tista v. Jaddou*, 577 F. Supp. 3d 1219, 1231 (D.N.M. 2021).

Thus, Custodia has stated a plausible claim for relief under the Mandamus Act, 28 U.S.C. § 1361, against FRBKC. However, relief under the Mandamus Act is not available to Custodia against the Board of Governors because the APA provides an adequate remedy. Custodia's Mandamus Act claim will be dismissed as to the Board of Governors.

## Claim III - Declaratory Judgment

In the final cause of action in its amended complaint, Custodia seeks a declaratory judgment holding "the Board and/or [FRBKC] has a statutory obligation to provide

J.A.614

Custodia with a master account and to permit Custodia to use that master account to access Reserve Bank services in a non-discriminatory manner." (Am. Compl. ¶ 101.) The Declaratory Judgment Act provides a remedy for valid federal causes of action and does not offer a separate cause of action. *See Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022) (unpublished) ("the Declaratory Judgment Act does not provide an independent federal cause of action") (citing *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671–74 (1950)). "To maintain an action for a declaratory judgment, then, [Custodia] must assert a valid federal cause of action—one that exists independent of any request for declaratory relief." *Nero*, 2002 WL 14423872, at *2. As the Court determined above Custodia has asserted a plausible claim under the APA against the Board of Governors and a plausible claim under the Mandamus Act against FRBKC, its request for a declaration of entitlement to a master account is valid.

Custodia's claim for declaratory judgment is not properly understood as a stand-alone cause of action, but it is a viable request for relief that will not be dismissed at this time.

## CONCLUSION AND ORDER

In Claim I, Custodia alleges a plausible claim for relief under the APA against the Board of Governors. In Claim II, Custodia alleges a plausible claim for relief under the Mandamus Act against FRBKC. Claim II does not state a viable claim for relief against the Board of Governors, and it will be dismissed as to that Defendant. Custodia's request for declaratory relief in Claim III is a proper remedy demand but is not appropriately considered a separate cause of action.

J.A.615

In hopes of avoiding a repeat of past confusion (*see* ECF 112), the Court here notes that Claim I will proceed against the Board of Governors as a judicial review action in conformity with the APA (and this Court's local rules), and the Board of Governors must prepare and file the administrative record. Claim II will proceed against FRBKC as a standard civil action in conformity with the Federal Rules of Civil Procedure (and this Court's local rules), with FRBKC now owing an answer to the amended complaint.

**IT IS THEREFORE ORDERED** that Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss (ECF 124) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss the Amended Complaint (ECF 126) is **GRANTED IN PART AND DENIED IN PART**. The motion is granted solely as to Claim II, which is dismissed only as against the Board of Governors. The remainder of the motion to dismiss is denied.

**DATED**: June ____8____, 2023.

Scott W. Skavdahl
United States District Court Judge

Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson
Laura Harris
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500

*Counsel for Defendant the Federal Reserve Bank of Kansas City*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CUSTODIA BANK, INC., | |
| *Plaintiff,* | |
| v. | No. 1:22-cv-00125-SWS |
| FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, | |
| *Defendants.* | |

**DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S
ANSWER TO CUSTODIA'S FIRST AMENDED COMPLAINT**

Federal Reserve Bank of Kansas City ("FRBKC") answers the Complaint of Plaintiff Custodia Bank, Inc. ("Plaintiff") as follows, answering the allegation of each paragraph of the Complaint and using the same headings, which are not admissions, and paragraph numbers. All allegations are denied except as admitted herein.

## **BACKGROUND**

1.      Answering Paragraph 1, this paragraph consists of Plaintiff's characterization of this action to which no response is required. To the extent a response is required, FRBKC admits that Custodia brings this Complaint against FRBKC and the Federal Reserve Board of Governors ("the Board").

2.      Answering Paragraph 2, FRBKC denies that "Defendants" denied Custodia's request for a master account; FRBKC denied Custodia's request in the exercise of its discretion. FRBKC admits that the holder of a master account may access Federal Reserve services directly, without the need to use an intermediary bank. The remainder of Paragraph 2 sets forth legal conclusions to which no answer is required or makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies them. FRBKC denies the remaining allegations in Paragraph 2.

3.      Answering Paragraph 3, FRBKC admits that Custodia is a financial institution that has received a Special Purpose Depository Institution ("SPDI") charter from Wyoming, and that Custodia requested a Federal Reserve master account. FRBKC admits that it communicated the denial of Custodia's master account request to Custodia on January 27, 2023. FRBKC denies the remainder of Paragraph 3's allegations.

4.      Answering Paragraph 4, FRBKC admits that it maintains that it has discretion to grant or deny Custodia's master account request.  FRBKC denies the remaining allegations in

J.A.618

Paragraph 4.

5.      Answering Paragraph 5, this paragraph contains legal conclusions and citations to correspondence that require no response.  To the extent a response is required, FRBKC respectfully refers the Court to the cited documents for a complete and accurate statements of their contents, and otherwise denies the allegations in Paragraph 5.

6.      Answering Paragraph 6, FRBKC admits that FRBKC informed Custodia that its master account request was denied on January 27, 2023. The remainder of Paragraph 6 makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies them.

7.      Answering Paragraph 7, this paragraph sets forth legal conclusions to which no answer is required or makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies the allegations in Paragraph 7.

8.      Answering Paragraph 8, FRBKC admits that Custodia operates under a Special Purpose Depository Institution charter created by Wyoming, and that no SPDI has received a Federal Reserve master account. The remainder of Paragraph 8 includes Plaintiff's characterization of Wyoming statutes and legal conclusions, neither of which require a response. To the extent a response is required, FRBKC denies the remainder of Paragraph 8.

9.      Answering Paragraph 9, FRBKC admits that it received a business plan from Custodia in May 2020, and that Custodia submitted its request for a master account in October 2020. FRBKC admits that there was a communication between Custodia and Tara Humston, FRBKC's head of Supervision and Risk Management, in 2021, but denies that Custodia's allegation reflects a complete and accurate characterization of that conversation. The remainder of Paragraph 9 sets forth legal conclusions requiring no response. To the extent a response is required,

the remainder of Paragraph 9 is denied.

10.    Answering Paragraph 10, FRBKC denies the allegations in this paragraph.

11.    Answering Paragraph 11, FRBKC denies that Custodia's allegations present an accurate characterization of the risks digital assets may pose to financial systems.  No response is required for the remaining allegations because this allegation is directed to the Board.  To the extent a response is required, FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies the allegations in Paragraph 11.

12.    Answering Paragraph 12, this paragraph contains legal conclusions to which no answer is required. To the extent a response is required, Paragraph 12 is denied.

13.    Answering Paragraph 13, this paragraph contains legal conclusions requiring no response or makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies them.

## **PARTIES**

14.    Answering Paragraph 14, FRBKC admits that Plaintiff was issued an SPDI charter by the Wyoming State Banking Board in October of 2020 and that Plaintiff is located at 2120 Carey Avenue, Suite 300, Cheyenne, WY 82001. FRBKC admits that Caitlin Long was appointed by then-Governor Mead to serve on the Wyoming Blockchain task force. The characterization of Custodia as a bank is a legal conclusion to which no response is required. FRBKC lacks knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 14, and on that basis, FRBKC denies them.

15.    Answering Paragraph 15, FRBKC admits that the Board has various supervisory responsibilities over the Federal Reserve System and the twelve regional Federal Reserve Banks, and that it is a federal agency based in Washington, D.C. that is headed by seven governors

J.A.620

nominated by the President and confirmed by the Senate. FRBKC admits that the Board has its principal place of business at Constitution Ave N.W. & 20th St. N.W., Washington, DC 20551.

16.     Answering Paragraph 16, FRBKC admits that the Board and the twelve regional Federal Reserve Banks, including FRBKC, are parts of the Federal Reserve System. FRBKC admits that it provides certain services within seven states, and that a portion of its activities concern the exercise of authority delegated to it by the Board, including some authority relating to the supervision and regulation of bank holding companies and member banks in its district and related applications or requests. FRBKC denies that it operates for all purposes pursuant to statutory and regulatory authority delegated to it by the Board. FRBKC admits that it has its principal place of business at 1 Memorial Drive, Kansas City, MO 64108. FRBKC denies any remaining allegations in Paragraph 16.

<u>**JURISDICTION AND VENUE**</u>

17.     Answering Paragraph 17, this paragraph consists of legal conclusions requiring no response.

18.     Answering Paragraph 18, this paragraph consists of legal conclusions requiring no response.

19.     Answering Paragraph 19, Custodia's assertions that this controversy is justiciable and that Custodia is suffering an injury set forth legal conclusions to which no answer is required. To the extent a response is required, FRBKC denies the allegations in Paragraph 19.

20.     Answering Paragraph 20, FRBKC admits that Custodia filed its initial complaint on June 7, 2022. FRBKC admits that Custodia's master account request was denied on January 27, 2023. The remainder of Paragraph 20 consists of legal conclusions requiring no response. To the extent a response is required, FRBKC denies the remainder of Paragraph 20.

**J.A.621**

## FACTUAL ALLEGATIONS

21.     Answering Paragraph 21, FRBKC admits that Custodia requested a master account from FRBKC on October 29, 2020, because decisions on individual requests for access to accounts and services are made by the Reserve Bank in whose district the requestor is located. FRBKC denies that "Defendants" denied Custodia's request; FRBKC denied Custodia's request in the exercise of its discretion and communicated this denial to Custodia on January 27, 2023. FRBKC admits that during the relevant time period, a form submitted in connection with a master account request contained the following language: "[p]rocessing may take 5 – 7 business days. Please contact the Federal Reserve Bank to confirm the date that the master account will be established." FRBKC denies that the denial of Custodia's master account request was orchestrated by the Board. FRBKC also denies that it lacks discretion to deny master account requests. FRBKC denies the remaining allegations in Paragraph 21.

### A.  History of Dual-Chartering and State-Level Banking Regulation

22.     Answering Paragraph 22, this paragraph states a legal conclusion to which no response is required. To the extent that a response is required, FRBKC admits that in the United States, banks may be chartered by either the federal or state governments and that at the founding of the United States most banks were state chartered. FRBKC denies the remaining allegations in Paragraph 22.

23.     Answering Paragraph 23, FRBKC admits that Congress passed the National Bank Act, 12 U.S.C. §§ 38 *et seq.*, in 1863 and that nationally chartered banks became more common thereafter.

24.     Answering Paragraph 24, FRBKC admits that Congress passed the Federal Reserve Act, 12 U.S.C. §§ 226 *et seq.*, in 1913, and that the Federal Reserve Act established the Board and the Federal Reserve Banks. FRBKC denies the remaining allegations in Paragraph 24.

25.     Answering Paragraph 25, this paragraph consists of legal conclusions to which no response is required. To the extent that a response is required, FRBKC admits that the chartering and regulation of banks may involve federal and state governments, that the owners of certain financial institutions may choose the type of charter to apply for based on a variety of considerations, and that the existence of different charter types may allow for innovation. However, the dual banking system does not remove Reserve Bank oversight regarding access to the payment system, and FRBKC denies any implication to the contrary and any remaining allegations in Paragraph 25.

26.     Answering Paragraph 26, this paragraph consists of legal conclusions to which no response is required. To the extent a response is required, FRBKC admits that a bank may obtain either a national charter from the Office of the Comptroller of the Currency ("OCC") or a state charter from a state banking authority with certain continuing oversight from the state banking authority. FRBKC denies the remaining allegations in Paragraph 26.

27.     Answering Paragraph 27, this paragraph consists of legal conclusions to which no response is required. To the extent a response is required, FRBKC admits that nationally-chartered banks generally become members of the Federal Reserve System and that state-chartered banks may decide whether to apply to become member banks (and thereby subject themselves to evaluation by the Federal Reserve under statutory criteria set forth by Congress and ongoing supervision and regulation by the Federal Reserve if approved), and further that, as part of its responsibilities, the Board regulates bank holding companies. FRBKC also admits that state-chartered banks that have joined the Federal Reserve System are often referred to as "state member banks" and those that do not are often referred to as nonmember banks. FRBKC admits that when a state-chartered bank becomes a member bank, it is subject to additional legal requirements.

FRBKC admits that state member banks are regulated by both the Federal Reserve and a relevant state banking agency, and state-chartered non-member banks are regulated by a state banking agency and also are usually regulated by the Federal Deposit Insurance Corporation ("FDIC"). Otherwise, Paragraph 27 consists of legal conclusions, not allegations of fact to which a response is required. To the extent a response is deemed required, FRBKC denies the remaining allegations in Paragraph 27.

28.     Answering Paragraph 28, FRBKC admits that deposit-taking national banks are generally required to obtain FDIC insurance and that most states require their state-chartered depository institutions engaged in taking deposits to be FDIC-insured. FRBKC admits it is aware some states or territories have charters that do not require FDIC insurance. The remainder of Paragraph 28 contains legal conclusions to which no response is required. To the extent a response is required, FRBKC lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 28.

**B.  The Monetary Control Act of 1980**

29.     Answering Paragraph 29, this paragraph contains Custodia's characterizations of federal statutes and legal conclusions, neither of which require a response. To the extent a response is required, FRBKC admits that the Depository Institutions Deregulation and Monetary Control Act ("MCA") was passed in 1980. FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the remaining allegations in Paragraph 29.

30.     Answering Paragraph 30, this paragraph contains Custodia's characterizations of federal statutes and legal conclusions, neither of which require a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate

statement of their contents, and otherwise denies the allegations in Paragraph 30.

31.     Answering Paragraph 31, FRBKC admits that the holder of a master account may access Federal Reserve services directly, without the need to use an intermediary bank.  The remainder of this paragraph and footnote 1 contain Custodia's characterizations of federal statutes and legal conclusions, neither of which require a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 31.

32.     Answering Paragraph 32, FRBKC admits that the holder of a master account may access Federal Reserve services directly, without the need to use an intermediary bank.  The remainder of this paragraph and footnote 2 contain Custodia's characterizations of federal statutes and legal conclusions, neither of which require a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 32.

33.     Answering Paragraph 33, this paragraph and footnotes 3, 4, and 5 contain legal conclusions and Custodia's characterizations of federal statutes and the Board's website, neither of which require a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 33.

34.     Answering Paragraph 34, this paragraph and footnote 6 contains legal conclusions and Custodia's characterizations of federal statutes and case law, neither of which require a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 34.

J.A.625

35.     Answering Paragraph 35, FRBKC denies that Defendants' position contravenes statutory mandates or prior interpretations and positions taken by the Board. This paragraph also contains Custodia's characterizations of federal statutes and legal conclusions, neither of which require a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 35.

**C.     The Development of SPDI Banks in Wyoming**

36.     Answering Paragraph 36, FRBKC admits that Wyoming passed Wyo. Stat. §§ 13-12-101, *et seq.*, creating Special Purpose Depository Institutions, in 2019. The remainder of Paragraph 36 includes Plaintiff's characterization of Wyoming statutes and legal conclusions, neither of which require a response, or consists of allegations that FRBKC lacks the knowledge or information to admit or deny, and on that basis FRBKC denies them.

37.     Answering Paragraph 37, FRBKC admits that SPDIs do not lend fiat currency. Paragraph 37 otherwise consists of legal conclusions that require no response as well as allegations that FRBKC lacks the knowledge or information to admit or deny, and on those bases FRBKC denies them.

38.     Answering Paragraph 38, FRBKC admits that a master account provides a means of accessing the Federal Reserve payment system for clearing U.S. dollar transactions. The assertion that SPDIs are banks is a legal conclusion requiring no response. The remainder of Paragraph 38 consists of allegations that FRBKC lacks the knowledge or information to admit or deny, which FRBKC denies on that basis, and otherwise contains allegations that FRBKC denies.

39.     Answering Paragraph 39, this paragraph consists of citations of legal authority and legal conclusions to which no response is required. To the extent a response is required, FRBKC

**J.A.626**

respectfully refers the Court to the cited authority for a complete and accurate statement of their contents. FRBKC admits that no SPDI has received a Federal Reserve master account. The assertion that SPDIs are banks is a legal conclusion requiring no response. The remainder of Paragraph 39 contains Plaintiff's characterization of federal legislation to which no response is required. FRBKC otherwise denies Paragraph 39.

40.     Answering Paragraph 40, this paragraph contains legal conclusions to which no response is required. To the extent a response is required, FRBKC admits that it has communicated that Custodia satisfied the threshold legal definition of an entity eligible for a master account. The remainder of Paragraph 40 is denied.

41.     Answering Paragraph 41, this paragraph and footnote 7 contain Plaintiff's characterizations of Wyoming statutes and a Wall Street Journal Op-Ed or legal conclusions, neither of which requires a response, or makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies them. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of its contents, and otherwise denies Paragraph 41.

42.     Answering Paragraph 42, this paragraph contains Plaintiff's characterizations of Wyoming statutes, to which no response is required, or makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies them. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of its contents, and otherwise denies Paragraph 42.

**D.     Custodia's Application and Board Intervention**

43.     Answering Paragraph 43, FRBKC admits that Custodia submitted its request for a master account on October 29, 2020, and that it was required to file a one-page Master Account

Agreement with its master account request. FRBKC admits that during the relevant time period, a form submitted in connection with a master account request contained the following language: "[p]rocessing may take 5 – 7 business days. Please contact the Federal Reserve Bank to confirm the date that the master account will be established." FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of its contents. FRBKC denies the remainder of Paragraph 43.

44.     Answering Paragraph 44, FRBKC admits that there was a communication between Custodia and Tara Humston, FRBKC's head of Supervision and Risk Management, in 2021, but denies that Custodia's allegation reflects a complete and accurate characterization of that conversation. FRBKC admits that it informed Custodia in January 2022 that it satisfied the threshold legal definition of an entity eligible for a master account. FRBKC denies the remainder of Paragraph 44.

45.     Answering Paragraph 45, FRBKC admits that it communicated with Custodia regarding its master account request while a decision on the request was pending. The remainder of Paragraph 45 is denied.

46.     Answering Paragraph 46, Paragraph 46 is denied.

47.     Answering Paragraph 47, FRBKC admits that, in August 2021, Plaintiff initiated the process to become a member bank of the Federal Reserve System, and that, as a member bank, Plaintiff would be supervised and regulated by the Board and by the Wyoming Division of Banking. The remainder of Paragraph 47 consists of legal conclusions and allegations that FRBKC lacks the knowledge or information to admit or deny, and on that basis, FRBKC denies the remainder of Paragraph 47.

48.     Answering Paragraph 48, FRBKC admits that it held a meeting with Custodia on

March 2, 2022, concerning its master account request. FRBKC denies informing Custodia that it had not started processing Custodia's master account request.

49.     Answering Paragraph 49, FRBKC admits that its President and Chief Executive Officer Esther George received a March 3, 2022, letter from Custodia. FRBKC admits that the letter contained Custodia's characterization of certain of its communications with FRBKC. The remainder of Paragraph 49 is denied.

50.     Answering Paragraph 50, FRBKC admits that Ms. George agreed to meet with Custodia on March 24, 2022. FRBKC admits that Custodia, by letter, offered to hold $1.08 in cash in its master account for every $1.00 of U.S. dollar deposits during its first three years of operation, to provide monthly financial statements, and to agree to other restrictions. The remainder of Paragraph 50 is denied.

51.     Answering Paragraph 51, this paragraph contains Plaintiff's characterization of correspondence with Defendant FRBKC, to which no response is required. To the extent a response is required, Defendant Board respectfully refers the Court to the cited authority for a complete and accurate statement of its contents. FRBKC denies the remaining allegations in Paragraph 51.

**E.     Coordination of Efforts to Deny Custodia's Master Account Application**

52.     Answering Paragraph 52, FRBKC denies all allegations in Paragraph 52.

**1.   The Board's Guidelines for Evaluating Account and Services Requests**

53.     Answering Paragraph 53, FRBKC admits that it stated its intention to consider Board guidelines when evaluating Plaintiff's request for a master account. The remaining allegations of this paragraph otherwise contain Plaintiff's characterization of the Board's Proposed Guidelines for Evaluating Account and Services Requests, published May 11, 2021 ("Proposed

**J.A.629**

Guidelines"), and its Supplemental Proposed Guidelines issued March 8, 2022 ("Supplemental Proposed Guidelines"), to which no response is required. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies Paragraph 53.

54.      Answering Paragraph 54, FRBKC admits that the Board issued Guidelines for Evaluating Account and Services Requests on August 15, 2022 ("Guidelines"). FRBKC denies that the Board had taken control over the consideration of Custodia's master account request, and FRBKC also denies that the Board was "seeding the ground" for the denial of that request. The remaining allegations of this paragraph contain Plaintiff's characterization of those Guidelines, to which no response is required. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies Paragraph 54.

55.      Answering Paragraph 55, this paragraph consists of Plaintiff's characterization of the Board's Guidelines, to which no response is required. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents. Footnote 8 makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies them. FRBKC otherwise denies the allegations in Paragraph 55.

56.      Answering Paragraph 56, this paragraph consists of Plaintiff's characterization of the Board's Guidelines, to which no response is required, or makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies them. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies Paragraph 56.

**2.  Joint Statement on Crypto-Asset Risks to Banking Organizations**

57.     Answering Paragraph 57, this paragraph and footnotes 9 and 10 consist of Plaintiff's characterization of the Joint Statement on Crypto-Asset Risks to Banking Organizations ("Joint Statement on Crypto-Asset Risks"), jointly published by the Board, the FDIC, and the OCC on January 3, 2023, to which no response is required. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents.

58.     Answering Paragraph 58, this paragraph and footnote 11 consist of Plaintiff's characterization of the Joint Statement on Crypto-Asset Risks, to which no response is required. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies Paragraph 58.

59.     Answering Paragraph 59, this paragraph and footnote 12 consist of Plaintiff's characterization of the Joint Statement on Crypto-Asset Risks, to which no response is required. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies Paragraph 59.

60.     Answering Paragraph 60, this paragraph and footnotes 13 and 14 consist of Plaintiff's characterization of a press release issued by BNY Mellon and of the Board's SR Letter 22-06/CA Letter 22-6: Engagement in Crypto-Asset-Related Activities by Federal Reserve-Supervised Banking Organizations (August 16, 2022), to which no response is required. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents. FRBKC denies the remaining allegations in Paragraph 60.

61.     Answering Paragraph 61, this paragraph consists of legal conclusions to which no

J.A.631

response is required. To the extent a response is required, FRBKC denies the allegations in Paragraph 61.

### 3. Denial of Custodia's Master Account Application

62.     Answering Paragraph 62, FRBKC admits that it communicated to Custodia that its request for a master account was denied on January 27, 2023. FRBKC denies the remaining allegations in Paragraph 62.

63.     Answering Paragraph 63, FRBKC admits that on January 23, 2023, at 9:00 a.m. Mountain Time, Board and FRBKC staff held a meeting with Custodia, during which Board staff provided Custodia representatives with an opportunity to withdraw its membership application by January 25. FRBKC admits that Board staff indicated during the meeting that they would recommend that the Board vote to deny Custodia's application for membership in the Federal Reserve. FRBKC admits that Board staff granted an extension but denied Custodia's request for a week-long extension of time to January 30. FRBKC denies the remaining allegations in Paragraph 63.

64.     Answering Paragraph 64, with respect to allegations about Board staff's interactions with individual Governors concerning Plaintiff's membership application, FRBKC lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and on that basis, FRBKC denies them. FRBKC denies the remaining allegations in Paragraph 64, including Plaintiff's characterization that the Board "orchestrated" a denial of Plaintiff's master account request with FRBKC and the White House.

65.     Answering Paragraph 65, FRBKC admits that Board staff granted Custodia an extension until January 26, 2023, to decide whether to withdraw its membership application. FRBKC lacks knowledge or information sufficient to admit or deny the remaining allegations in

J.A.632

this paragraph, and on that basis, FRBKC denies them.

66.     Answering Paragraph 66, FRBKC admits that it was copied on a January 26, 2023, letter from Custodia to Board staff concerning its membership application. FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents. FRBKC otherwise denies the allegations in Paragraph 66 or lacks knowledge or information sufficient to admit or deny the allegations, and on that basis, denies them.

67.     Answering Paragraph 67, FRBKC lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and on that basis, FRBKC denies them.

68.     Answering Paragraph 68, this paragraph and footnotes 15 and 16 contain Custodia's characterizations of a statement released by the White House on January 27, 2023, titled "The Administration's Roadmap to Mitigate Cryptocurrencies' Risks" ("White House Statement"). FRBKC otherwise lacks knowledge of the remaining allegations in Paragraph 68, and on that basis denies them.

69.     Answering Paragraph 69, FRBKC admits that it communicated to Custodia the denial of its master account request. FRBKC denies this was done at the direction of the Board. This paragraph and footnote 17 also consist of legal conclusions and Custodia's characterizations of the White House Statement. To the extent a response is required, FRBKC denies those allegations. FRBKC denies the remaining allegations in Paragraph 69.

70.     Answering Paragraph 70, FRBKC admits it denied Custodia's request for a master account after discovery requests to FRBKC had been served.  FRBKC denies the remaining allegations in Paragraph 70.

### F.     Statutory Basis for Denial of Master Account Applications

71.     Answering Paragraph 71, this paragraph consists of legal conclusions and

Custodia's characterizations of federal statutes and case law, neither of which requires a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 71.

72.     Answering Paragraph 72, FRBKC admits that there was a communication between Custodia and Tara Humston, FRBKC's head of Supervision and Risk Management in 2021, but denies that Custodia's allegation reflects a complete and accurate characterization of that conversation.  FRBKC denies that the Board took control of and decided Custodia's master account request.  The remaining allegations in this paragraph consist of legal conclusions and Custodia's characterizations of federal statutes, neither of which requires a response, or makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on that basis, FRBKC denies them. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 72.

73.     Answering Paragraph 73, this paragraph consists of legal conclusions and Custodia's characterizations of federal statutes, neither of which requires a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of their contents, and otherwise denies the allegations in Paragraph 73.

74.     Answering Paragraph 74, FRBKC denies that the Board coordinated the denial of Custodia's master account request or asserted control over the decision-making process concerning Custodia's master account request.  The remainder of the paragraph consists of legal conclusions and Custodia's characterizations of prior filings or federal case law, neither of which requires a response. To the extent a response is required, FRBKC denies the allegations in Paragraph 74.

75.     Answering Paragraph 75, FRBKC denies the allegations in this paragraph.

76.     Answering Paragraph 76, FRBKC denies that the Board coordinated the denial of Custodia's master account request. This paragraph otherwise consists of legal conclusions and Custodia's characterizations of federal statutes, neither of which requires a response. To the extent a response is required, FRBKC denies the allegations in Paragraph 76.

<div align="center">

**CLAIM FOR RELIEF** I
**Violation of APA, 5 U.S.C. § 706(2)**
**Claim for Unlawful Denial of Master Account Application**
**Against the Board**

</div>

77.     Answering Paragraph 77, no response is required because this claim is not asserted against FRBKC.

78.     Answering Paragraph 78, no response is required because this claim is not asserted against FRBKC.

79.     Answering Paragraph 79, no response is required because this claim is not asserted against FRBKC.

80.     Answering Paragraph 80 and footnote 18, no response is required because this claim is not asserted against FRBKC.

81.     Answering Paragraph 81, no response is required because this claim is not asserted against FRBKC.

82.     Answering Paragraph 82, no response is required because this claim is not asserted against FRBKC.

83.     Answering Paragraph 83, no response is required because this claim is not asserted against FRBKC.

84.     Answering Paragraph 84, no response is required because this claim is not asserted against FRBKC.

85.     Answering Paragraph 85, no response is required because this claim is not asserted against FRBKC.

## CLAIM FOR RELIEF II
### Relief Under the Mandamus Act, 28 U.S.C. § 1361
### Claim for Mandamus Against All Defendants

86.     Answering Paragraph 86, FRBKC incorporates by reference herein its responses to the preceding paragraphs as though set forth fully herein.

87.     Answering Paragraph 87, this paragraph contains Plaintiff's characterization of this action and a quotation from 28 U.S.C. § 1361, to which no response is required. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of its contents, and otherwise denies the allegations contained therein.

88.     Answering Paragraph 88, this paragraph consists of a legal conclusion requiring no response.

89.     Answering Paragraph 89, this paragraph consists of legal conclusions requiring no response.

90.     Answering Paragraph 90, this paragraph and footnote 19 contain legal conclusions requiring no response. To the extent a response is required, FRBKC denies the allegations in Paragraph 90.

91.     Answering Paragraph 91, this paragraph contains legal conclusions requiring no response.

92.     Answering Paragraph 92, FRBKC admits that Custodia's master account request was denied on January 27, 2023. The remainder of this paragraph contains legal conclusions requiring no response. To the extent a response is required, FRBKC denies the remainder of Paragraph 92.

93.     Answering Paragraph 93, FRBKC lacks knowledge or information to admit or deny

the allegations in Paragraph 93, and on that basis denies them.

94.    Answering Paragraph 94, this paragraph consists of a legal conclusion requiring no response. To the extent a response is required, Paragraph 94 is denied.

### CLAIM FOR RELIEF III
### Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201
### Claim for Declaratory Judgment Against All Defendants

95.    Answering Paragraph 95, FRBKC incorporates by reference herein its responses to the preceding paragraphs as though set forth fully herein.

96.    Answering Paragraph 96, this paragraph quotes a federal statute and characterizes Plaintiff's Complaint, neither of which requires a response. To the extent a response is required, FRBKC respectfully refers the Court to the cited authority for a complete and accurate statement of its contents, and otherwise denies the allegations contained therein.

97.    Answering Paragraph 97, this paragraph contains legal conclusions and characterizations of Plaintiff's claims to which no response is required or makes claims that FRBKC lacks knowledge or information sufficient to admit or deny, and on these bases, FRBKC denies them. To the extent a response is required, Paragraph 97 is denied.

98.    Answering Paragraph 98, FRBKC admits that Custodia was chartered in Wyoming. The remainder of Paragraph 98 states legal conclusions to which no response is required. To the extent a response is required, the remaining allegations in Paragraph 98 are denied.

99.    Answering Paragraph 99, FRBKC admits that a master account is necessary to access Federal Reserve services directly, without the need to use an intermediary bank. The remainder of Paragraph 99 and footnote 20 contain legal conclusions requiring no response. To the extent a response is required, the remainder of Paragraph 99 is otherwise denied.

100.    Answering Paragraph 100, this paragraph consists of legal conclusions requiring no response. To the extent a response is required, Paragraph 100 is denied.

101.    Answering Paragraph 101, this paragraph consists of a legal conclusion requiring no response. To the extent a response is required, Paragraph 101 is denied.

## AS TO THE PRAYER FOR RELIEF

FRBKC denies that Custodia is entitled to any of the relief for which it prays in subparagraphs (a)–(f) on page 33 of the Complaint.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof for any claim or element of any claim that properly lies with Plaintiff, FRBKC asserts the following affirmative defenses to Custodia's Complaint.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim against FRBKC for which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff has not alleged an injury in fact that would be redressed by a decision in its favor, and therefore lacks standing and ripeness to bring its complaint.

### THIRD AFFIRMATIVE DEFENSE

This action is barred by the doctrine of unclean hands.

### FOURTH AFFIRMATIVE DEFENSE

This action is barred by estoppel.

### FIFTH AFFIRMATIVE DEFENSE

This action is barred by the doctrine of waiver.

### SIXTH AFFIRMATIVE DEFENSE

This action is barred by the doctrine of illegality.

## RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES

FRBKC reserves the right to raise such additional defenses as may be established during discovery and by the evidence in this case.

J.A.638

DATED 22 June 2023.

Respectfully submitted,

s/Billie LM Addleman
Billie LM Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson
Laura Harris
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
212-556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
202-737-0500
jbucholtz@kslaw.com
jmitchell@kslaw.com
ccarletta@kslaw.com

*Counsel for Defendant*
*the Federal Reserve Bank of Kansas City*

J.A.639

**CERTIFICATE OF SERVICE**

     I certify that on the 22nd day of June, 2023, a copy of the foregoing ***DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S ANSWER TO CUSTODIA'S FIRST AMENDED COMPLAINT*** was served upon all parties to this action via CM/ECF.

                               s/ Shannon M. Ward
                              OF HIRST APPLEGATE, LLP
                              Attorneys for Defendant

**J.A.640**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,                      )
                                          )
            Plaintiff,                    )
                                          )          Case No. 1:22-cv-00125-SWS
       v.                                 )
                                          )
BOARD OF GOVERNORS OF                     )
THE FEDERAL RESERVE SYSTEM &              )
FEDERAL RESERVE BANK                      )
OF KANSAS CITY,                           )
                                          )
            Defendants.                   )

### DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
### NOTICE OF LODGING OF THE ADMINISTRATIVE RECORD

Pursuant to Local Rule 83.6(b)(2), Defendant Board of Governors of the Federal Reserve

System ("Board") hereby provides notification of its lodging of the administrative record

certified by Ann E. Misback, Secretary of the Board. The record has been submitted to the Clerk

by hand delivery and includes both public and sealed versions. The difference between the two

versions is that materials designated as Confidential Information pursuant to the Protective Order

entered by the Court (ECF 174) have been omitted from the public version as required by the

Order. *Id.* § 8.3. Those documents omitted from the public version because they are Confidential

Information are noted in the "Filed Under Seal" column on the index to the record.

In the index, the documents each have an ID. The document with ID of A1 (Bates

numbered FRB-AR-000002) is the final agency action at issue as required by Local Rule

83.6(b)(1)(A), and that final agency action is followed by the three documents to which it

directly refers (A1.1, A1.2, and A1.3, Bates numbered FRB-AR-000003 – FRB-AR-000067).

The documents with a "B" prefix (B1 through B159, Bates numbered FRB-AR-000068 – FRB-

AR-004808) are those documents and materials directly or indirectly considered by the agency

and/or agency decision-makers pursuant to Local Rule 83.6(b)(1)(B). In accordance with Local

Rule 83.6(b)(2), a privilege log is also included.

Dated: August 21, 2023

Respectfully submitted,

 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the Federal Reserve System*

**J.A.642**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 21, 2023, I electronically filed the foregoing using the

Court's CM/ECF system, which will send notification of such filing to all parties of record. In

addition, on this same date, a copy of the record was sent by overnight delivery to the following:

Ryan Thomas Scarborough
Williams & Connolly
680 Maine Avenue SW
Washington, DC 20024
*Counsel for Plaintiff*

Andrew Z. Michaelson
Christine Carletta
King & Spalding LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, DC 20006
*Counsel for Defendant Federal Reserve Bank of Kansas City*

By:     /s/ *Joshua P. Chadwick*
        Joshua P. Chadwick

        *Counsel for Defendant Board of Governors*
        *of the Federal Reserve System*

J.A.643

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING



**FILED**

4:03 pm, 11/13/23

**U.S. Magistrate Judge**

CUSTODIA BANK, INC.,

        Plaintiff,

  vs.

FEDERAL RESERVE BOARD OF
GOVERNORS and FEDERAL RESERVE
BANK OF KANSAS CITY,

      Defendants.

Case No.  22-CV-125-S

---

## SECOND AMENDED SCHEDULING ODER

On November 13, 2023, the Honorable Kelly H. Rankin, United States Magistrate Judge

for the District of Wyoming, held an informal telephonic hearing to address the Defendant Federal

Reserve Bank of Kansas City's Motion for Order to Amend Scheduling Order [ECF No. 198].

Counsel participating were: Scott Ortiz and Ryan Scarborough for Plaintiff; Billie Addleman,

Andrew Michaelson, and Christine Carletta on behalf of Defendant the Federal Reserve Bank of

Kansas City; and Joshua Chadwick on behalf of Defendant the Federal Reserve Board of

Governors.  After hearing from the parties, the Court finds good cause to amend certain portions

of the trial schedule.  However, the final pretrial and trial dates remain as previously imposed.

Therefore, Defendant's Motion to Amend is granted in part and denied in part.  The previously

imposed dates and deadlines are vacated, and the following trial schedule shall control the case

moving forward.

**J.A.644**

JURISDICTION AND VENUE —

The Court has jurisdiction over both the parties and the subject matter of this action, and venue is properly in the United States District Court for the District of Wyoming.  Proper service of process has been accomplished on all parties, and no parties are erroneously joined in or omitted from the action.

CLAIMS AND DEFENSES —

This case is before the Court on Plaintiff's claims under the Administrative Procedures Act.  Plaintiff requested a master account with the Federal Reserve Bank of Kansas City over two years ago.  Plaintiff's request is still pending.  There are four claims remaining after the Court ruled on Defendants' Motions to Dismiss [ECF No. 102].  The four remaining claims are for: 1) unreasonable delay under the Administrative procedure Act 5 U.S.C. § 706(1); 2) Statutory mandamus compelling Defendants to decide Plaintiff's master account request in a timely manner, 28 U.S.C. § 1361; 3) account request in a timely manner, 28 U.S.C. § 1361; 3) declaratory judgment that Defendants have unreasonably delayed resolving Plaintiff's master account request, 28 U.S.C. § 2201; and 4) violation of Constitutional due process by depriving Custodia of its property interest in a master account, U.S. Const. amend. V.

Defendant The Federal Reserve Bank of Kansas City generally denies Plaintiff's allegations and asserts the following affirmative defenses:: 1) Plaintiff has failed to state a claim upon which relief can be granted; 2) Plaintiff's claims are non-justiciable because they are not ripe and because Plaintiff lacks standing; 3) Plaintiff's claims are barred by the doctrine of unclean hands; 4) Plaintiff's claims are barred by estoppel; 5) Plaintiff's claims are barred by the doctrine of waiver; and 6) Plaintiff's claims are barred by the doctrine of illegality.

Defendant the Federal Reserve Board of Governors generally denies Plaintiff's allegations.

On November 11, 2022, the Court issued an Order [ECF No. 102] Granting in Part and Denying in Part Defendants' Motions to Dismiss.  After the Order, Plaintiff's claims will proceed on two tracks.  Track one will conclude with a bench trial.  Track two is the review of an agency action.  However, for purposes of judicial efficiency, and at the request of all parties, the two tracks will follow a parallel briefing schedule for dispositive motions and appellate briefs.

## BENCH TRIAL

### COMPLEXITY OF THE CASE —

The undersigned Judge is of the opinion that this is a non-complex case.

### RULE 26(F) SCHEDULING CONFERENCE —

The parties have complied with the requirements of Rule 26(f) of the Federal Rules of Civil Procedure.

### SELF-EXECUTING ROUTINE DISCOVERY —

The parties have complied with the self-executing routine discovery exchanges as required by U.S.D.C.L.R. 26.1(b).

Pursuant to the January 24, 2014 General Order Regarding Discovery Motions, available at http://www.wyd.ucourts.gov/htmlpages/genorders.html, the parties shall confer regarding any discovery dispute, and in the event the parties cannot settle the discovery dispute on their own, counsel shall jointly contact Judge Rankin's Chambers prior to filing any written discovery motions.

THE PARTIES HAVE A CONTINUING DUTY TO SUPPLEMENT OR CORRECT ALL DISCOVERY DISCLOSURES OR RESPONSES IN ACCORDANCE WITH FED. R. CIV. P. 26(a) AND U.S.D.C.L.R. 26.1(c).

**Proposed Orders —**

All proposed orders regarding dispositive motions filed in this matter should be submitted to Judge Skavdahl's chambers in a word processing format and emailed to wyojudgesws@wyd.uscourts.gov.

All proposed orders regarding non-dispositive motions should be submitted to Judge Rankin's chambers in a word processing format and emailed to wyojudgekhr@wyd.uscourts.gov.

**SELF-EXECUTING ROUTINE DISCOVERY —**

The parties have complied with the self-executing routine discovery exchanges as required by U.S.D.C.L.R. 26.1(b).

Pursuant to the January 24, 2014 General Order Regarding Discovery Motions, available at http://www.wyd.ucourts.gov/htmlpages/genorders.html, the parties shall confer regarding any discovery dispute, and in the event the parties cannot settle the discovery dispute on their own, counsel shall jointly contact Judge Rankin's Chambers prior to filing any written discovery motions.

THE PARTIES HAVE A CONTINUING DUTY TO SUPPLEMENT OR CORRECT ALL DISCOVERY DISCLOSURES OR RESPONSES IN ACCORDANCE WITH FED. R. CIV. P. 26(a) AND U.S.D.C.L.R. 26.1(c).

**EXPERT WITNESS DESIGNATION —**

**Plaintiff Designation Deadline — Completed**

**Defendant Designation Deadline — December 4, 2023**

In accordance with U.S.D.C.L.R. 26.1(e), Plaintiff has already designated expert witnesses and provided Defendant with a complete summary of the testimony of each expert.  In accordance

**J.A.647**

with U.S.D.C.L.R. 26.1(e), Defendants shall designate expert witnesses and provide the Plaintiff

with a complete summary of the testimony of each expert by December 4, 2023.  These summaries

SHALL include a comprehensive statement of the expert's opinions and the basis for the opinions.

*See Smith v. Ford Motor Co.*, 626 F.2d 784 (10th Cir. 1980).  This expert designation does not

satisfy the obligation to provide an expert report under Federal Rule of Civil Procedure

26(a)(2)(B).  Plaintiff may depose Defendant's experts after the discovery cutoff date, but must

complete the depositions **fourteen (14) days** PRIOR to the final pretrial conference.

THE PARTIES SHALL SERVE UPON ONE ANOTHER, AND FILE WITH THE

COURT, THEIR WRITTEN EXPERT AND SUMMARY REPORTS PURSUANT TO FED. R.

CIV. P. 26(a)(2)(B) and (C).

The party designating the expert witness shall set forth all special conditions or

requirements which the designating party or the expert witnesses will insist upon with respect to

the taking of their depositions, including the amount of compensation the expert witness will

require and the rate per unit of time at which said compensation will be payable.  In the event

counsel is unable to obtain such information to include in the designation, the efforts to obtain the

same and the inability to obtain such information shall be set forth in the designation.

U.S.D.C.L.R. 26.1(e).

**LISTING OF OTHER WITNESSES — December 4, 2023.**

The parties shall list all other witnesses that may be called at trial, other than the witnesses

already identified in the initial disclosures and the expert witnesses to be designated as set forth

above, on or before December 4, 2023.  Such listing of witnesses shall include the name, address,

and a summary of the expected testimony of each witness.  Copies of such witness lists shall be

filed with the Court.  Witnesses not listed will be prohibited from testifying, absent consent of the

J.A.648

Court for good cause shown.  Testimony not reasonably set out in the summary may be disallowed on motion of the opposing party.

**DISCOVERY CUTOFF DATE — December 18, 2023**

The discovery cutoff date is December 18, 2023.  All written discovery requests shall be served upon and received by opposing counsel on or before the discovery cutoff date.  All discovery depositions shall be completed by the discovery cutoff date.  Subject to the limitations set forth in Fed. R. Civ. P. 32, trial depositions may be taken up to **seven (7) days** prior to the trial date.

**DISPOSITIVE MOTIONS AND *DAUBERT* CHALLENGES[1] —**

**Filing Deadline – January 19, 2024**

**Response Deadline – February 9, 2024**

**Reply Deadline – February 23, 2024**

The deadline for the parties to file all dispositive motions and *Daubert* challenges together with briefs and materials in support thereof is January 19, 2024.  The parties shall file responsive briefs and materials on or before February 9, 2024, with any reply due by February 23, 2024.  <u>The parties shall strictly comply with all provisions of U.S.D.C.L.R. 7.1.  Provided, however, the Court grants the parties twenty-one days to file any responsive brief and fourteen days for any reply brief.</u>

---

[1] A *"Daubert* Challenge" refers to those challenges made to the validity or admissibility of an expert's opinion testimony based upon the requirements under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**J.A.649**

IF A DISPOSITIVE MOTION AND/OR *DAUBERT* CHALLENGE IS FILED EARLIER THAN THE ABOVE SCHEDULED DATE, THE RESPONDING PARTY MUST RESPOND IN ACCORDANCE WITH U.S.D.C.L.R. 7.1.

**FINAL PRETRIAL CONFERENCE — March 21, 2024, at 1:00 p.m.**

A final pretrial conference in this matter has been scheduled on March 21, 2024, at 1:00 p.m. in the Ewing T. Kerr Courthouse in Casper, Wyoming, before the Honorable Scott W. Skavdahl. Counsel for the parties shall appear in person.

BEFORE THE CONFERENCE, COUNSEL FOR REPRESENTED PARTIES ALL MUST AGREE UPON, PREPARE, AND SIGN A JOINT PROPOSED FINAL PRETRIAL ORDER PREPARED FOR JUDGE SKAVDAHL'S SIGNATURE IN THE FORMAT PROVIDED ON THE DISTRICT COURT WEBSITE UNDER CIVIL FORMS. THIS FORM WILL TAKE THE PLACE OF A FINAL PRETRIAL MEMORANDUM. If you cannot locate the form, please contact Judge Skavdahl's chambers. All represented parties are jointly responsible for the preparation of the proposed Joint Final Pretrial Order. A copy of the proposed order must be delivered directly to Judge Skavdahl's chambers (but not filed) via e-mail to *wyojudgesws@wyd.uscourts.gov* or by U.S. Mail at least **seven (7) days** before the final pretrial conference.

WITNESS AND EXHIBIT LISTS MUST BE EXCHANGED BY THE PARTIES (BUT NOT FILED) AT LEAST TEN (10) DAYS BEFORE THE FINAL PRETRIAL CONFERENCE. Exhibit lists must be attached to, and witness lists must be included as part of, the proposed Final Pretrial Order in accordance with the instructions in the form order. The parties are not required to list rebuttal witnesses or impeachment exhibits.

7

**J.A.650**

COPIES OF ALL EXHIBITS AS TO WHICH THERE MAY BE OBJECTIONS MUST BE BROUGHT TO THE FINAL PRETRIAL CONFERENCE.  If an exhibit is not brought to the final pretrial conference and an objection to the exhibit is asserted, the exhibit may be excluded from evidence for noncompliance with this order.  EXHIBITS MUST BE PREPARED FOR THE FINAL PRETRIAL CONFERENCE AND FOR TRIAL IN ACCORDANCE WITH THE FOLLOWING INSTRUCTIONS:

> **A. Marking of Exhibits**: All exhibits must be marked by the parties before trial. The plaintiff(s) shall list and mark each exhibit with numerals and the number of the case, and counsel for the defendant(s) shall mark each exhibit intended to be offered with letters and the number of the case, e.g., Civil No._____, Plaintiff's Exhibit 1; Civil No. _____, Defendant's Exhibit A.  In the event there are multiple parties, "plaintiff" or "defendant" and the surname or abbreviated names of the parties shall proceed the word "Exhibit," e.g., Defendant Jones Exhibit A, Defendant Smith Exhibit A, etc.

> **B. Elimination of Duplicate**.  The parties should compare the exhibits and eliminate duplicates.  If more than one party wants to offer the same exhibit, then it should be marked with a number and listed as a joint exhibit on the exhibit list of the plaintiff(s).

> **C. Copies for the Court**.  Before trial, each party must supply the Court with one (1) hard copy and one (1) electronic/digital copy of all exhibits to be used at trial.  The hard copies of exhibits should be placed in a ringed binder with a copy of the exhibit list at the front and with each exhibit tabbed.

**EXHIBIT LISTS** — The parties' exhibit lists are to be prepared in the following format:

| EXHIBIT NO. | DESCRIPTION | FILE NAME | OBJECTIONS (CITE FED.R.EVID) | CATEGORY A, B, C | OFFERED | ADMIT/NOT ADMITTED (A)-(NA)* |
|---|---|---|---|---|---|---|
|  |  | (e.g. *****.pdf) |  |  |  |  |

**J.A.651**

| | | (e.g. *****.jpeg) | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

\* This column is for use by the trial judge at trial.

The following categories are to be used for objections to exhibits:

**Category A**. These exhibits are admissible upon motion of any party, and will be available for use by any party at any stage of the proceedings without further proof or objection.

**Category B**. These exhibits are objected to on grounds other than foundation, identification, or authenticity. This category should be used for objections such as hearsay or relevance.

**Category C**. These exhibits are objected to on grounds of foundation, identification, or authenticity. This category should not be used for other grounds, such as hearsay or relevance. Failure to indicate objections to foundation shall be deemed to be a waiver of objections as to foundation for listed exhibits. Any party establishing foundation over objection may move for attorney fees and costs necessary to establish the foundation.

ANY COUNSEL REQUIRING AUTHENTICATION OF AN EXHIBIT MUST SO NOTIFY THE OFFERING COUNSEL IN WRITING WITHIN **FIVE (5) BUSINESS DAYS** AFTER THE EXHIBIT IS MADE AVAILABLE TO OPPOSING COUNSEL FOR EXAMINATION. Failure to do so is an admission of authenticity.

ANY EXHIBIT NOT LISTED ON THE EXHIBIT LISTS IS SUBJECT TO EXCLUSION AT TRIAL. THE COURT MAY DEEM ANY OBJECTION NOT STATED ON THE EXHIBIT LIST AS WAIVED.

Appellate Case: 24-8024   Document: 010111071230   Date Filed: 06/26/2024   Page: 213

**JURY EVIDENCE RECORDING SYSTEM (JERS) —**

The Court is implementing a new system for electronic submission of exhibits to the jury (or to the Court in the case of a bench trial).  The jury evidence recording system (JERS) allows jurors to review evidence (documentary, photo, or video exhibits) on a large plasma screen during deliberations.  Attorneys should provide their trial exhibits in electronic format on a USB drive, DVD, or CD to the office of the Clerk of Court a minimum of **seven (7) days** prior to the start of trial.

All electronic evidence should be provided using the following formats:

- Documents and Photographs:  .pdf, .jpg, .bmp, .tif, .gif

- Video and Audio Recordings:  .avi, .wmv, .mpg, .mp3, .mp4, .wma, .wav

Regarding the file size of electronic evidence, <u>individual files should not exceed 500MB</u>. If possible, exhibits approaching or exceeding this size limit should be separated into multiple files.  Parties may obtain additional information regarding the submission of electronic exhibits by contacting the Clerk's Office.

**WITNESS LISTS —**

The parties shall identify all witnesses they <u>will</u> call or <u>may</u> call and shall further identify whether each witness will testify in person, by deposition or by video tape.

<u>In bench trials</u>, Witness Statements shall be provided for expert witnesses and witnesses whose testimony involves significant technical matters, but no significant issues of credibility. <u>Witness statements shall be prepared and used at trial in accordance with Judge Skavdahl's Procedure for Presentation of Direct Testimony by Witness Statement</u>, which is available on the Court's website under forms or by contacting Judge Skavdahl's chambers.

**BENCH TRIAL — April 8, 2024, at 9:00 a.m.**

A bench trial is set before the Honorable Scott W. Skavdahl for 9:00 a.m. on April 8, 2024, in Casper, Wyoming, and is expected to last 8 days.  This case is stacked # 2 on the Court's docket.  U.S.D.C.L.R. 40.1(a).

<u>ADMINISTRATIVE REVIEW</u>

A federal district court sitting in review of an agency action must sit as a court of appeals including governing itself by referring the to Federal Rules of Appellate Procedure. Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994).

**Administrative Record**

**Deadline August 21, 2023; Objections September 5, 2023**

Defendant, the Federal Reserve Board of Governors shall file the administrative record by August 21, 2023.  Per Local Rule 83.6(b)(3), motions regarding the content of the administrative record will be filed no later than fourteen (14) days after the final administrative record is lodged with this Court, or by September 5, 2023, if filed on August 21, 2023.

The Court notes Plaintiff reserves the right to move to supplement or complete the administrative record after discovery has been obtained.

**APPELLATE BRIEFS —**

**Filing Deadline – December 18, 2023**

**Response Deadline – January 18, 2024**

**Reply Deadline – February 1, 2024**

The Appellant-Petitioner shall file a brief in accordance with Federal Rules of Appellate Procedure 28 and 31(a) and (c), by December 18, 2023.  The Appellee-Respondent

shall file a response brief in accordance with Federal Rules of Appellate Procedure 28 and 31(a) and (c) January 18, 2024.  Any reply briefs are be due by February 1, 2024.

If Appellant-Petitioner files the initial brief before the above imposed deadline, the parties shall comply with the briefing deadlines imposed by Local Rule 83.6(c)

**Oral Argument –**

Any party may request an oral argument after the initial briefing has been filed.

Dated this 13th day of November 2023.

_____
Kelly H. Rankin
U.S. Magistrate Judge

12

**J.A.655**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-00125-SWS |
| v. | ) | |
| | ) | |
| BOARD OF GOVERNORS OF | ) | |
| THE FEDERAL RESERVE SYSTEM & | ) | |
| FEDERAL RESERVE BANK | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER GRANTING JOINT MOTION AND STIPULATION
## TO ALIGN AND CONSOLIDATE APA AND SUMMARY JUDGMENT BRIEFING

Having considered the parties' Motion and Stipulation to Align and Consolidate APA and Summary Judgment Briefing, the Motion is GRANTED.

It is hereby ORDERED that both the civil discovery record (including documents and deposition testimony) between Custodia and Defendant FRBKC and the Board's Administrative Record in this case may be relied upon by all parties including any court hearing in this case throughout the remainder of this litigation, including in any appeal to a federal appellate court—subject to the appellate court's approval. The deadlines for both the dispositive and appellate briefing are set forth below:

Filing Deadline – January 19, 2024

Response Deadline – February 9, 2024

Reply Deadline – February 23, 2024

BY THE COURT:

Kelly H. Rankin
U.S. Magistrate Judge

**J.A.656**

Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:          sortiz@wpdn.net

*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Number: 22-cv-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

### PLAINTIFF CUSTODIA BANK, INC.'S PETITION FOR REVIEW ON ITS APA CLAIM AND ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON ITS STATUTORY MANDAMUS CLAIM

Plaintiff Custodia Bank, Inc. ("Custodia") hereby moves the Court for an order granting its petition for review on its APA claim and ruling that it is entitled to judgment as a matter of law on its Statutory Mandamus Claim, pursuant to Fed. R. App. P. 15 and Fed. R. Civ. P. 56(a). In support of Custodia's Petition for Review on its APA Claim and Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim ("Petition/Motion"), Custodia relies on its *Omnibus Brief in Support of its Petition for Review on its APA Claim and its Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim.*

J.A.657

NOW THEREFORE, Custodia respectfully requests that the Court grant Custodia's Petition/Motion, and award Custodia any and all other relief the Court deems appropriate as a result of its judgment.

DATED this 20th day of December, 2023.

CUSTODIA BANK, INC., Plaintiff

By:  /s/ Scott E. Ortiz
Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:  (307) 265-0700
Facsimile:  (307) 266-2306
Email:  sortiz@wpdn.net

-and-

John K. Villa, *pro hac vice*
Ryan Scarborough, *pro hac vice*
Lauren Weinberger, *pro hac vice*
Ian Swenson, *pro hac vice*
Russell Mendelson, *pro hac vice*
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone:  (202) 434-500
Emails:  jvilla@wc.com
rscarborough@wc.com
lweinberger@wc.com
iswenson@wc.com
rmendelson@wc.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served this day of December 20, 2023, addressed to:

| | |
|---|---|
| Mark Van Der Weide<br>Richard M. Ashton<br>Joshua P. Chadwick<br>Yvonne F. Mizusawa<br>Yonatan Gelblum<br>Katherine Pomeroy<br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM<br>20th Street and Constitutional Avenue, N.W.<br>Washington, DC 20551 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Billie L.M. Addleman<br>John P. Fritz<br>Erin E. Berry<br>HIRST APPLEGATE, LLP<br>P.O. Box 1083<br>Cheyenne, Wyoming 82003 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Andrew Michaelson<br>Laura Harris<br>KING & SPALDING, LLC<br>1185 Avenue of the Americas, 34th Floor<br>New York, New York 10036 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Jeffrey S. Bucholtz<br>Joshua N. Mitchell<br>Christine M. Carletta<br>KING & SPALDING, LLP<br>1700 Pennsylvania Ave., N.W.<br>Washington, D.C. 20006 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Angela Tarasi<br>Jared M. Lax<br>KING & SPALDING, LLP<br>1401 Lawrence Street<br>Suite 1900<br>Denver, Colorado 80202 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |

/s/ Scott E. Ortiz
Scott E. Ortiz

Page **3** of 3

**J.A.659**

Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:          sortiz@wpdn.net

*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Number: 22-cv-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PROPOSED ORDER GRANTING PLAINTIFF CUSTODIA BANK, INC.'S PETITION FOR REVIEW ON ITS APA CLAIM AND ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON ITS STATUTORY MANDAMUS CLAIM**

THIS MATTER came before the Court on *Plaintiff Custodia Bank, Inc.'s Petition for Review on its APA Claim and its Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim ("Petition/Motion")*. Finding good cause,

IT IS HEREBY ORDERED that *Plaintiff Custodia Bank, Inc.'s Petition/Motion* is GRANTED.

DATED:

_____
HONORABLE SCOTT W. SKAVDAHL
UNITED STATES DISTRICT COURT JUDGE

Page **1** of 1

**J.A.660**