Case No. 24-8024

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

## CUSTODIA BANK, INC.,

Appellant,

v.

## FEDERAL RESERVE BOARD OF GOVERNORS et al.,

Appellees.

On Appeal from the U. S. District Court for the District of Wyoming

The Honorable Scott W. Skavdahl, District Judge

District Court No. 1:22-CV-125-SWS

## JOINT APPENDIX

Joshua P. Chadwick
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street & Constitution Ave. NW
Washington, DC 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

Michelle S. Kallen
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com

*Counsel for Appellant*

Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street and Constitution Ave.
NW
Washington, DC 20551
(202) 263-4835
yvonne.f.mizusawa@frb.gov
yonatan.gelblum@frb.gov
katherine.pomeroy@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Andrew Z. Michaelson
KING & SPALDING LLP
1185 Ave. of the Americas, 34th Fl.
New York, NY 10036
(212) 556-2100
amichaelson@kslaw.com

Billie LM Addleman
Erin E. Berry
HIRST APPLEGATE, LLP
PO Box 1083
Cheyenne, WY 82003
(307) 632-0541
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Christine M. Carletta
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
ccarletta@kslaw.com
cfreeman@kslaw.com

Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE,
P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

*Counsel for Appellant*

Jared Lax
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
jlax@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

# TABLE OF CONTENTS

## Volume I of X

District Court Docket Report, *Custodia Bank Inc. v. Federal Reserve Board of Governors et al,* No. 1:22-cv-00125 (D. Wyo.) ...................................................................... J.A.1

Complaint (D. Wyo. June 7, 2022), ECF No. 1 ............................... J.A.41

Exhibit 1 to Complaint (D. Wyo. June 7, 2022), ECF No. 1-2 ......... J.A.86

Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 48 .................................................... J.A.88

Defendant Board of Governors of the Federal Reserve System's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 49 .............................................................. J.A.91

Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 50..... J.A.153

Defendant Federal Reserve Bank of Kansas City's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 51 ...... J.A.157

## Volume II of X

Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's Complaint (D. Wyo. Sept. 13, 2022) ECF No. 58 .......................................................... J.A.216

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss Complaint (D. Wyo. Oct. 4, 2022) ECF No. 96 .................... J.A.269

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss (D. Wyo. Oct. 4, 2022) ECF No. 97 .......................................................... J.A.304

Plaintiff Custodia Bank, Inc.'s Notice of Submission of
    Supplemental Authority (D. Wyo. Oct. 12, 2022) ECF
    No. 98 .................................................................................. J.A.340

Defendant Board of Governors of the Federal Reserve
    System's Response to Plaintiff's Notice and Submission
    of Supplemental Authority (D. Wyo. Oct. 19, 2022) ECF
    No. 99 .................................................................................. J.A.353

Order Granting in Part and Denying in Part Defendants'
    12(b)(6) Motions to Dismiss Complaint (D. Wyo. Nov. 11,
    2022) ECF No. 102 ............................................................. J.A.359

Joint Motion of Defendants Federal Reserve Bank of Kansas
    City and Federal Reserve Board of Governors to Dismiss
    the Complaint as Moot (D. Wyo. Jan. 27, 2023) ECF No.
    116 ....................................................................................... J.A.397

First Amended Complaint (D. Wyo. Feb. 28, 2023) ECF No.
    121 ....................................................................................... J.A.401

Defendant Federal Reserve Bank of Kansas City's Motion to
    Dismiss First Amended Complaint (D. Wyo. Mar. 28,
    2023) ECF No. 124 ............................................................. J.A.438

## Volume III of X

Defendant Board of Governors of the Federal Reserve
    System's Motion to Dismiss the First Amended
    Complaint (D. Wyo. Mar. 28, 2023) ECF No. 126 ............... J.A.459

Defendant Board of Governors of the Federal Reserve
    System's Memorandum of Points and Authorities in
    Support of Its Motion to Dismiss the First Amended
    Complaint (D. Wyo. Mar. 28, 2023) ECF No. 127 .............. J.A.462

Omnibus Memorandum in Opposition to Defendants' Motions
    to Dismiss Plaintiff's First Amended Complaint (D.
    Wyo. Apr. 11, 2023) ECF No. 135 ...................................... J.A.497

Brief of Amicus Curiae Former Senator Patrick J. Toomey in Support of Neither Party (D. Wyo. Apr. 20, 2023) ECF No. 151 ................................................................. J.A.537

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss First Amended Complaint (D. Wyo. May 2, 2023) ECF No. 159 .................. J.A.559

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss the Amended Complaint (D. Wyo. May 2, 2023) ECF No. 160 ................................................................................. J.A.572

Order on Defendants' Motions to Dismiss First Amended Complaint (D. Wyo. June 8, 2023) ECF No. 164 ................. J.A.601

Defendant Federal Reserve Bank of Kansas City's Answer to Custodia's First Amended Complaint (D. Wyo. June 22, 2023) ECF No. 166 ............................................................. J.A.617

Defendant Board of Governors of the Federal Reserve System's Notice of Lodging of the Administrative Record (D. Wyo. Aug. 21, 2023) ECF No. 178 .................................. J.A.641

Second Amended Scheduling Order (D. Wyo. Nov. 13, 2023) ECF No. 211 ........................................................................ J.A.644

Order Granting Joint Motion and Stipulation to Align and Consolidate APA and Summary Judgment Briefing (D. Wyo. Nov. 28, 2023) ECF No. 220 ........................................ J.A.656

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 238 ............................................................. J.A.657

Proposed Order (D. Wyo. Dec. 22, 2023) ECF No. 238-1 .............. J.A.660

**Volume IV of X**

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 239 ........................................................................ J.A.661

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 240 ........................................................................ J.A.725

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 240-1 ..................................... J.A.740

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 240-3 ................................................................. J.A.811

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 240-5 ..................................... J.A.858

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 240-9 ........................................................................ J.A.879

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 240-10 ..................................... J.A.881

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 240-11 ................................... J.A.912

### Volume V of X

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 240-15 ................................................................. J.A.919

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 240-26 ........................................... J.A.921

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 240-31 ................................................... J.A.971

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 240-37 ......... J.A.978

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 240-38 ................................................................................... J.A.983

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 240-40 ........................................................ J.A.986

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 240-45 ................................................................... J.A.988

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 240-47 ...................................................J.A.1043

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 240-53 .....................J.A.1051

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 240-54 ............J.A.1056

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 240-64 .........................................................................J.A.1058

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 240-65 .........................J.A.1061

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 240-67 ..................................................................J.A.1062

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 240-68 ..................................................................J.A.1065

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 240-69 ...........................................................................J.A.1068

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-71 ..................................................................J.A.1071

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 240-75 ..................................................................J.A.1081

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 240-77 ...........................................................................J.A.1087

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-78 ..................................................................J.A.1089

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 240-80 ......................................................J.A.1099

Exhibit CC, Email from Matthew Eichner with the subject line "Custodia response: S-Letter - 2667 with no concerns identified" (Jan. 26, 2023) ECF No. 240-81 .........J.A.1101

vi

Exhibit CD, Letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors (Mar. 8, 2023) ECF No. 240-82 .........................J.A.1103

Exhibit CE, Email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George" (Jan. 27, 2023) ECF No. 240-83 ..................................................................................J.A.1117

Exhibit CF, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Jan. 27, 2022) ECF No. 240-84 ........J.A.1119

Order Granting Unopposed Motion to Amend the Scheduling Order (D. Wyo. Dec. 26, 2023) ECF No. 241 .......................J.A.1127

Amicus Curiae Brief of the State of Wyoming (D. Wy. Jan. 18, 2024) ECF No. 251 ...........................................................J.A.1129

### Volume VI of X

Amici Curiae Brief in Support of Plaintiff filed by Amicus Parties Blockchain Association, Payment System Scholars (D. Wy. Jan. 19, 2024) ECF No. 257 ...................J.A.1137

Amici Curiae Brief in Support of Plaintiff's Motion for Judgment as a Matter of Law filed by Amicus Parties United States House of Representatives Financial Services Committee Members, United States Senate Banking, Housing and Urban Affairs Committee Members (D. Wy. Jan. 19, 2024) ECF No. 259 ...................J.A.1173

Defendant Board of Governors of the Federal Reserve System's Opposition to Plaintiff's Petition for Administrative Procedure Act Review (D. Wyo. Jan. 26, 2024) ECF No. 271 ...........................................................J.A.1200

Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment (D. Wyo. Jan. 26, 2024) ECF No. 272 ..................................................................................J.A.1257

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 282 ...J.A.1260

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 283 ..........J.A.1318

Amicus Brief in Support of Defendants filed by Amicus David Zaring (D. Wy. Feb. 9, 2024) ECF No. 286 .......................J.A.1331

### Volume VII of X

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 299 .......................................................................J.A.1349

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 300 .......................................................................J.A.1402

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 300-7 ...............................J.A.1407

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 300-8 ....................................................J.A.1414

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 300-15 ....................................................J.A.1418

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 27, 2024) ECF No. 313 .......................................J.A.1423

Order on Dispositive Motions (D. Wyo. Mar. 29, 2024) ECF No. 317 ................................................................................J.A.1449

Judgment (D. Wyo. Mar. 29, 2024) ECF No. 318 ........................J.A.1476

Plaintiff Custodia Bank, Inc.'s Notice of Appeal (D. Wyo. Apr. 26, 2024) ECF No. 321 ........................................................J.A.1477

## UNDER SEAL
## Volume VIII of X

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 233 ...........................................................J.A.1480

Proposed Order (D. Wyo. Dec. 20, 2023) ECF No. 233-1 .............J.A.1483

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 234 ........................................................................................J.A.1484

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 236 ........................................................................................J.A.1548

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 236-1 ...................................................................J.A.1563

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 236-3 ........................................................................J.A.1634

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 236-5 ......................................J.A.1681

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 236-9 ........................................................................J.A.1702

## Volume IX of X

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 236-10 ......................................J.A.1704

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 236-11 .................................J.A.1735

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 236-15 ...............................................................J.A.1742

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 236-26 ........................................................J.A.1744

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 236-31 .................................J.A.1794

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 236-37 ........J.A.1801

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 236-38 ...............................................................J.A.1806

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 236-40 ......................................J.A.1809

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 236-45 ..................................................................J.A.1811

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 236-47 .....................................................J.A.1866

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 236-53 .....................J.A.1874

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 236-54 ............J.A.1879

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 236-64 .........................................................................J.A.1881

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 236-65 .........................J.A.1884

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 236-67 ................................................................J.A.1893

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 236-68 .................................................................................J.A.1896

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 236-69 .........................................................................J.A.1899

Exhibit BS, Draft Executive Summary to Esther George with
    the subject line "Custodia Bank, Inc. (fka Avanti Bank
    & Trust) Master Account Recommendation" (Jan. 2023)
    ECF No. 236-71 ..................................................................J.A.1902

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No.
    236-75 ................................................................................J.A.1912

Exhibit BY, Email from Matthew Malloy with the subject line
    "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF
    No. 236-77 ..........................................................................J.A.1918

Exhibit BZ, Draft Executive Summary to Esther George with
    the subject line "Custodia Bank, Inc. (fka Avanti Bank
    & Trust) Master Account Recommendation" (Jan. 2023)
    ECF No. 236-78 ..................................................................J.A.1920

Exhibit CB, Email from Judith Hazen with the subject line
    "Custodia Bank Master Account Request" (Jan. 24,
    2023) ECF No. 236-80 ......................................................J.A.1930

Exhibit CD, Letter from Caitlin Long to the Office of the
    Inspector General of the Federal Reserve Board of
    Governors (Mar. 8, 2023) ECF No. 236-82 ........................J.A.1932

Exhibit CE, Email from Amy LaFave with the subject line
    "Correspondence from Federal Reserve Bank of Kansas
    City President Esther George" (Jan. 27, 2023) ECF No.
    236-83 ................................................................................J.A.1946

Exhibit CF, Letter from The Federal Reserve Bank of Kansas
    City to Caitlin Long (Jan. 27, 2022) ECF No. 236-84 ........J.A.1948

### Volume X of X

Defendant Federal Reserve Bank of Kansas City's Cross-
    Motion for Summary Judgment and Opposition to
    Plaintiff's Petition for Review and Motion for Judgment
    as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 273
    ............................................................................................J.A.1956

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 274 ........J.A.2014

Errata to ECF No. 274 (D. Wyo. Feb. 2, 2024) ECF No. 277 ......J.A.2027

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024) ECF No. 295 .......................................................................J.A.2029

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024) ECF No. 296 .......................................................................J.A.2082

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 296-7 ...............................J.A.2087

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 296-8 ....................................................J.A.2094

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 296-15 ....................................................J.A.2098

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 23, 2024) ECF No. 310 ......................................J.A.2103

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 27, 2024, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Michelle S. Kallen
Michelle S. Kallen

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made and (2) any paper copies of this document submitted to the Court will be identical copies of the version electronically filed.

/s/ Michelle S. Kallen
Michelle S. Kallen

Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE, PC
PO Box 10700
Casper, WY 82602
sortiz@wpdn.net

John K. Villa
Ryan T. Scarborough
Sarah M. Harris (*pro hac vice* admission pending)
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Phone:   202-434-5000
Fax:      202-434-5029
jvilla@wc.com
rscarborough@wc.com
sharris@wc.com
whermadorfer@wc.com
jwolfe@wc.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC.,<br>2120 Carey Avenue, Suite 300<br>Cheyenne, WY 82001<br><br>*Plaintiff,*<br><br>v.<br><br>FEDERAL RESERVE BOARD OF<br>GOVERNORS,<br>Constitution Ave NW & 20th St NW<br>Washington, DC 20551<br><br>FEDERAL RESERVE BANK<br>OF KANSAS CITY,<br>1 Memorial Drive<br>Kansas City, MO 64108,<br><br>*Defendants.* | Civil Case No.: 1:22-CV-00125-SWS |

## OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

    A.    The Federal Reserve System...................................................................................3

    B.    The Federal Reserve's Master Account Application Process.................................4

    C.    Custodia Bank's Wyoming Charter and Master Account Application...................6

STANDARD OF REVIEW ....................................................................................................8

ARGUMENT .........................................................................................................................8

I.     This Case Is Justiciable ...........................................................................................8

II.    Custodia Stated Actionable Claims Based on Defendants' Unlawful Delay in Adjudicating Its Master Account Application (Counts I-IV) .........................................15

    A.    The Board's Failure to Adjudicate Custodia's Master Account within One Year Violates 12 U.S.C. § 4807, and Thus the APA ..............................................15

    B.    Even If the Kansas City Fed Exclusively Makes Master Account Decisions, Custodia Has Adequately Pled That the Lengthy Delay Violates the APA ................................................................................................................23

    C.    Defendants' Delay Is Also Actionable Under the Mandamus Act (Claim II)............................................................................................................................32

    D.    Custodia Adequately Pled a Declaratory Judgment Act Claim (Count IV) ..........33

III.   Vesting Final Decision-Making Authority in the Kansas City Fed Would Violate Numerous Constitutional Commands (Claims III, V, and VI) ........................................33

    A.    Reading Section 342 to Grant Reserve Banks Total Discretion Over Master Accounts Would Flout Nondelegation Principles and Due Process (Claim III) ...........................................................................................................34

    B.    The Appointments Clause Prohibits the Kansas City Fed from Exercising Final, Binding Decision-Making Authority (Claim VI) ........................................37

    C.    Allowing Reserve Bank Directors to Participate in Decision-Making Would Separately Violate Due Process and the Separation of Powers (Claim V) ...........................................................................................................42

IV.   Custodia Adequately Pled Alternative Claims for Relief in the Event Defendants Deny Custodia's Application (Claims VII and VIII)........................................................43

CONCLUSION......................................................................................................................45

J.A.217

## TABLE OF AUTHORITIES

Page

Cases:

*Am. Anti-Vivisection Soc. v. U.S. Dep't of Agric.*, 946 F.3d 615 (D.C. Cir. 2020) ................10

*Armstrong v. Exec. Off. of the President*, 90 F.3d 553 (D.C. Cir.1996)...............................27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...............................................................................8, 19

*Ass'n of Am. R.R.s v Dep't of Transp.*, 821 F.3d 19 (D.C. Cir. 2016)...........................42, 43

*Audubon of Kan., Inc. v. U.S. Dep't of the Interior*,
    568 F. Supp. 3d 1167 (D. Kan. 2021).........................................................................8

*Barrios Garcia v. U.S. Dep't of Homeland Sec.*,
    25 F.4th 430 (6th Cir. 2022) ...........................................................13, 29, 30, 31

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972).......................................36

*Beckles v. United States*, 137 S. Ct. 886 (2017) ...........................................................34

*Bellwether Cmty. Credit Union v. Chipotle Mex. Grill, Inc.*,
    353 F. Supp. 3d 1070 (D. Colo. 2018)........................................................................33

*Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036 (10th Cir. 2014)...............................10

*Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701 (5th Cir. 2017)...........................42

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971 (Fed. Cir. 2020)...............28

*BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532 (2021) ...................................19

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...........................................................................37

*Bustos v. Mayorkas*, 2021 WL 3931173 (D.N.M. Sept. 2, 2021)...........................................30

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936)...............................................................42

*Copelin-Brown v. N.M. State Pers. Off.*, 399 F.3d 1248 (10th Cir. 2005)...........................11

*Cox v. Kijakazi*, 2022 WL 178953 (D.D.C. Jan. 19, 2022) ...............................................31

*Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295 (D.D.C. 2014).......................29

*Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015) ...........................................34, 42

*Dong v. Smithsonian Inst.*, 125 F.3d 877 (D.C. Cir. 1997)...........................................26, 27

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988).........................................................................................21

*Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100 (D.D.C.
    2020) ...........................................................................................................26

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018).................................................21, 45

*Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*,
    262 U.S. 649 (1923).........................................................................................18

*Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*,
    657 F.2d 183 (8th Cir. 1981) .......................................................................28

*Flaherty v. Ross*, 373 F. Supp. 3d 97 (D.D.C. 2019).......................................................28

*Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*,
    583 F. Supp. 674 (N.D. Ga. 1984).............................................................................28

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) .................................16, 29, 30

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*,
    861 F.3d 1052 (10th Cir. 2017) ...............................................................4, 17, 18, 44

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)...............................11

J.A.218

Page

Cases—continued:

*Getty Oil Co. v. Clark*, 614 F. Supp. 904 (D. Wyo. 1985) ............................................9
*Ghadami v. U.S. Dep't of Homeland Sec.*, 2020 WL 1308376 (D.D.C. Mar. 19, 2020).........29
*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38 (2d Cir. 1989)...............44
*Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*,
    482 F.2d 710 (D.C. Cir. 1973)...........................................................................26, 28
*Gundy v. United States*, 139 S. Ct. 2116 (2019) ...........................................................34
*In re Hoag Ranches*, 846 F.2d 1225 (9th Cir. 1988) .....................................................28
*In re Pub. Emps. for Env't Resp.*, 957 F.3d 267 (D.C. Cir. 2020)....................................10
*Indep. Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ..........................................33
*INS v. Chadha*, 462 U.S. 919 (1983) ..........................................................................36
*Intercoll. Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012).........41
*Jarkesy v. SEC*, 34 F. 4th 446 (5th Cir. 2022) ................................................34, 35, 36
*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) .........................................................21, 34, 44
*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983).....28, 44
*Johnson v. Rogers*, 917 F.2d 1283 (10th Cir. 1990).......................................................32
*Kane Cnty. Utah v. Salazar*, 562 F.3d 1077 (10th Cir. 2009) ........................................12
*Katsiavelos v. Fed. Rsrv. Bank of Chi.*, 859 F. Supp. 1183 (N.D. Ill. 1994) ..........................28
*L.D.G. v. Holder*, 744 F.3d 1022 (7th Cir. 2014) ........................................................24
*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)........................................................31
*Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982)...............28
*Lewis v. United States*, 680 F.2d 1239 (9th Cir. 1982).....................................................28
*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) .......................13
*Lombardo v. Handler*, 397 F. Supp. 792 (D.D.C. 1975) ..................................................27
*Lucia v. SEC*, 138 S. Ct. 2044 (2018).........................................................................37
*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .............................................................8
*Mann v. Fifth Third Bank*, 2011 WL 1575537 (S.D. Ohio Apr. 25, 2011) .................16, 25, 26
*Mashpee Wampanoag Tribe Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003).........30
*McKinley v. Bd. of Govs. of Fed. Rsrv. Sys.*, 647 F.3d 331 (D.C. Cir. 2011).........................28
*Mistretta v. United States*, 488 U.S. 361 (1989) ..........................................................34
*Motaghedi v. Pompeo*, 2020 WL 207155 (E.D. Cal. Jan. 14, 2020) ...................................30
*Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017).....................................................21
*New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524 (2d Cir. 2010) ...........26, 27
*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ...................................................16
*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004) ...........................................43
*Prier v. Steed*, 456 F.3d 1209 (10th Cir. 2006)............................................................33
*Rector v. City & Cnty. of Denver*, 348 F.3d 935 (10th Cir. 2003)....................................11
*Rice v. Vill. of Johnstown*, 30 F.4th 584 (6th Cir. 2022).................................................10
*Robertson v. Colvin*, 564 F. App'x 931 (10th Cir. 2014) ..............................................12
*Scott v. Fed. Rsrv. Bank of Kan. City*, 406 F.3d 532 (8th Cir. 2005) .................................28
*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ....................................................11, 35
*Shands v. Tull*, 602 F.2d 1156 (3d Cir. 1979)..............................................................31
*Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587 (1926) ...........................................................31
*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)....................................................26, 28
*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...............................................................11

iv

**J.A.219**

Page

Cases—continued:

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) ............................................................13
*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ......................................................13
*Taft v. Agric. Bank of China Ltd.*, 2016 WL 2766661 (S.D.N.Y. May 12, 2016) .............16, 25
*Telecomms. Res. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ..................................29
*TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*,
     2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) ......................................................... *passim*
*Trump v. New York*, 141 S. Ct. 530 (2020) ............................................................................12
*U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415 (1928) ..........34
*United States v. Arthrex*, 141 S. Ct. 1970 (2021) .....................................................37, 40, 41
*United States v. Cabral*, 926 F.3d 687 (10th Cir. 2019) ........................................................12
*United States v. Wells Fargo & Co.*, 943 F.3d 588 (2d Cir. 2019) ........................................28
*Utah Ass'n of Counties v. Bush*, 455 F.3d 1094 (10th Cir. 2006) ..........................................12
*Wild Watershed v. Hurlocker*, 961 F.3d 1119 (10th Cir. 2020)..............................................21
*Wyoming v. U.S. Dep't of Interior*, 493 F. Supp. 3d 1046 (D. Wyo. 2020) ............................15

Constitution, Statutes, and Rules:

U.S. Const. art. II, § 2, cl. 2 ............................................................................... *passim*

5 U.S.C.
     § 551 .......................................................................................................................26
     § 706 ................................................................................................................25, 29

12 U.S.C.
     § 241 .......................................................................................................................38
     § 248 ....................................................................................................3, 17, 20, 27
     § 248a .........................................................................................................20, 44, 45
     § 289 .........................................................................................................................3
     § 302 ...........................................................................................................3, 38, 43
     § 307 .........................................................................................................................3
     § 341 ...........................................................................................................3, 41, 42, 43
     § 342 ................................................................................................................ *passim*
     § 347 .......................................................................................................................21
     § 347d .....................................................................................................................21
     § 348a .....................................................................................................................21
     § 357 .......................................................................................................................21
     § 358 .......................................................................................................................21
     § 531 .........................................................................................................................3
     § 1813 ..........................................................................................................4, 16, 24
     § 1818 .....................................................................................................................25
     § 1831j ....................................................................................................................25
     § 4801 .....................................................................................................................24
     § 4807 ............................................................................................................. *passim*
     § 5465 .....................................................................................................................18

J.A.220

Page

Constitution, Statutes, and Rules—continued:

28 U.S.C.
§ 451...............................................................................................32
§ 1361.............................................................................................32
§ 2201.............................................................................................33

Wyo. Stat.
§ 13-12-101 *et seq.*.........................................................................6
§ 13-12-103......................................................................................6
§ 13-12-105......................................................................................6
§ 13-12-116....................................................................................10
§ 13-12-119......................................................................................6

12 C.F.R. § 265.20............................................................................27

Fed. R. Civ. P. 12(b)(6).......................................................................8

Other Authorities:

*Appointment and Removal of Federal Reserve Bank Members of the Federal Open
Market Committee*, 43 Op. O.L.C. __ (Oct. 23, 2019) ...............................*passim*
Bd. of Govs. of Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service
Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2enw3reu ...............44
Bd. of Govs. of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services
Requests*, 87 Fed. Reg. 51,099 (Aug. 15, 2022) .......................................*passim*
Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is That
Legal?* Brookings (Nov. 14, 2018) https://tinyurl.com/4pxju8jd .........................4
Walter Dellinger & H. Jefferson Powell, *The Constitutionality of the Bank Bill: The
Attorney General's First Constitutional Law Opinions*, 44 Duke L. J. 110 (1994) .........39
Fed. Rsrv. Banks, Operating Circular 1 (Aug. 16, 2021) .........................................4
Fed. Rsrv. Bank of Phila., *The First Bank of the United States: A Chapter in the
History of Central Banking* (Mar. 2021), https://tinyurl.com/4xb99ys8 ...........................39
H.R. Rep. No. 95-1590 (1978)...............................................................45
Liese Klein, *TNB Seeks to Become State's Newest Bank in Face of Fed Delays*,
NewHavenBiz (Apr. 4, 2022) https://tinyurl.com/3x7ydccu...........................15
Jennifer L. Mascott, *Who Are 'Officers of the United States'?*,
70 Stan. L. Rev. 443 (2018)...............................................................40
*Officers of the United States Within the Meaning of the Appointments Clause*,
31 Op. O.L.C. 73 (2007) ................................................................27, 37, 38
*Providing for Consideration of H.R. 7, Monetary Control Act of 1979*,
125 Cong. 6314 (1979) ...................................................................45

J.A.221

## INTRODUCTION

No one is above the law, especially not the government. And the need for judicial review is at its apex when, as here, the government refuses to make decisions under the deadline Congress set, then claims to be completely unaccountable to anyone. Wyoming-based Custodia Bank applied for a master account with a regional Federal Reserve Bank that would give Custodia access to key Federal Reserve services on the same terms provided to other depository institutions. The federal agency that ultimately decides whether to grant master account applications—the Board of Governors of the Federal Reserve System—has now sat on that application for nearly two years without explanation. Custodia simply asks for a decision, so that it can enjoy the same benefits as other depository institutions or address the agency's concerns should it reject or condition the application. Yet the Board insists there is nothing this Court can do to stop its stonewalling, and refuses to give a timeline for resolution.

This Court should refuse the government's pretzel-twisted logic that the government can act as a law unto itself freed from statutory obligations or judicial review. Congress gave "Federal banking agenc[ies]," including the Board, a one-year deadline to "take final action on any application." 12 U.S.C. § 4807. Even absent a statutory deadline, the Administrative Procedure Act (APA) requires agencies to act within a reasonable time. And the APA, Mandamus Act, and Declaratory Judgment Act all empower this Court to require the Board to finally make a decision.

Defendants try to duck their obligations. They claim that Custodia lacks standing to challenge the delay in adjudicating its application. But Custodia is suffering ongoing harm from the lack of an up-or-down decision. Custodia has had to address that uncertainty by shouldering costlier, short-term arrangements instead of having access to its own master account (with an up decision) or forging a more affordable, long-term relationship with a bank that does have a master account (with a down decision). Courts have routinely found standing in analogous circumstances.

1

Defendants also deem the dispute unripe, claiming that even with a master account, Custodia would need other business licenses (namely, a Certificate of Authority) to start operating. But Custodia just obtained that license, which in all events is inextricably linked with Custodia's ability to access a master account. Defendants further ask the Court to dismiss the case so the Board and its Federal Reserve Banks can firm up policies around digital assets before resolving Custodia's application on an unspecified timeline. But granting Defendants a blank check to delay decision-making would allow Defendants to dodge judicial review indefinitely.

As to the merits, Defendants' primary contention is that Federal Reserve Banks—not the Board—exercise unreviewable, unrestricted control over master account decisions. Because Reserve Banks (in Defendants' telling) are not federal agencies subject to the APA, no deadlines and no fixed criteria purportedly apply to whether parties can obtain master accounts. If adopted, that implausible above-the-law position would unleash thorny constitutional problems that this Court should avoid by adopting the most straightforward reading of the statutory language: under the Federal Reserve Act, the Board retains final decision-making authority over master account applications. Defendants' position also contradicts factual allegations in Custodia's complaint regarding the Board's intervention in Custodia's application process, which must be credited at this stage. As such, the Board is plainly subject to a one-year deadline in resolving applications, and is a federal agency that must operate within the APA's limits.

This Court is all that stands between Defendants and total unaccountability for deciding master account applications however and whenever they wish. The clearest path to a quick, clean, and commonsense result is to deny the motions to dismiss and move toward ordering Defendants to act on Custodia's application. The alternative is to plunge this Court into complex constitutional arguments that call into question the Board's nebulous relationship with Reserve Banks.

## BACKGROUND

### A.    The Federal Reserve System

The Federal Reserve System controls and executes the nation's monetary policy and serves as America's central bank.  The Federal Reserve's Board of Governors, a federal agency, sits atop this system.  *See* Bd. of Govs. Mem. in Support of Mot. to Dismiss (Bd. Br.) 1-2, ECF No. 49.

The Board exercises "general supervision" over twelve regional Reserve Banks, including the Kansas City Fed.  12 U.S.C. § 248(j).  As the Board puts it, "[t]he Board's general supervisory powers are extremely broad."  Bd. Br. 44 n.40.  "The Board oversees the operations of the regional Reserve Banks, including by setting policies for Reserve Banks' lending of money to private banks and provision of other financial services."  *Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. __, at *3 (Oct. 23, 2019) (*Federal Reserve Bank Members*); Bd. Br. 2.  Congress also empowered the Board to "make all rules and regulations necessary to enable [the] board effectively to perform" its statutory duties, including supervising Reserve Banks.  12 U.S.C. § 248(i).  The Board can delegate many functions to Reserve Banks, but retains ultimate authority to review delegated functions.  *Id.* § 248(k).  The Board approves and can terminate Reserve Bank presidents and vice presidents, and appoints a third of Reserve Bank directors.  *Id.* §§ 248(f), 302, 307, 341.  And the Board can "suspend ... operations of any Federal reserve bank" and "liquidate or reorganize such bank."  *Id.* § 248(h).

"The twelve regional Federal Reserve Banks execute the Federal Reserve System's policies."  *Federal Reserve Bank Members,* 43 Op. O.L.C. __, at *3.  As "operating arms" of the Reserve System, Reserve Banks act as "fiscal agents of the United States empowered by delegation from the Board ... to supervise financial institutions and activities."  *Id.* at *8 n.3.  In carrying out these statutory mandates, Reserve Banks serve the United States' interests.  Their profits revert to the U.S. Treasury, *id.* § 289(a)(3)(B), and they are exempt from paying most taxes, *id.* § 531.

3

**B.    The Federal Reserve's Master Account Application Process**

1. Master accounts are accounts that banks hold with a Reserve Bank—in effect, "bank account[s] for banks." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).   Master accounts permit access to a bevy of "indispensable" financial services the Federal Reserve provides. *Id.* at 1064 (Bacharach, J.).   Only by holding a master account may banks directly utilize the Federal Reserve's electronic system for executing debit and credit entries between institutions, clearing checks, transferring securities, and cashing savings bonds. Fed. Rsrv. Banks, Operating Circular 1 at §§ 2.3, 4.1-.3 (Aug. 16, 2021).   Put simply, a bank shut out from the Federal Reserve's payment system "can't really function as a financial institution."   Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities.   But Is that Legal?* Brookings (Nov. 14, 2018) https://tinyurl.com/4pxju8jd.

Banks lacking their own master accounts may access key Federal Reserve services only by partnering with third parties that have a master account.   Operating Circular 1, § 2.7, *supra.*   The additional layer of transactions introduces delays and costs, and creates the prospect that the counterparty might default on the amounts owed or fail to deliver on contractual terms. *See* Compl. ¶ 8.   Intermediary banks also charge fees for their service as intermediaries.   Thus, master account access is by far the more preferable and less-costly course for banks whose primary business is payments, regardless of whether the banks are federally or state chartered.

2. Congress required that "[e]ach Federal banking agency shall take final action on any application to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency." 12 U.S.C. § 4807(a).   The definition of "Federal banking agency" expressly includes the Board. *Id.* § 1813(z).   But the application process for master accounts is opaque.

To apply, banks fill out a one-page application and a Master Account Agreement, which states at the bottom in fine print: "Processing may take 5-7 business days." Compl., Ex. 1, ECF No. 1-2. Ordinarily, master account applications are granted within a few days. Compl. ¶¶ 35, 77, 99. But Defendants have made inconsistent representations about who makes the ultimate decision, and under what criteria. *Id.* ¶¶ 50-60.

In a remarkable coincidence, the Board issued final Guidelines for evaluating master account applications the day before Defendants filed motions to dismiss in this case. Bd. of Govs. of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services Requests*, 87 Fed. Reg. 51,099 (Aug. 15, 2022). Those Guidelines exemplify Defendants' inconsistent positions as to who makes master account decisions, and under what criteria. Compl. ¶¶ 50-60. On the one hand, the Guidelines point to the Board's ultimate control. The Board prescribed a tiered framework for evaluating risks of different institutions accessing master accounts, and stated that state-chartered, non-member institutions without FDIC insurance—namely, banks like Custodia—"will generally receive the strictest level of review." 87 Fed. Reg. at 51,110. The Board promulgated these "guidelines under its general supervision authority over the operations of the Reserve Banks," and identifies "principles to be used by Federal Reserve Banks ... in evaluating requests for master accounts." *Id.* at 51,106. The Board "expect[s] that Reserve Banks [will] engage in consultation with ... the Board" to apply the Guidelines, and will work "in consultation with the Board, to expeditiously develop an implementation plan." *Id.* at 51,102.

On the other hand, the Guidelines claim, as Defendants do here, that "decisions regarding individual access requests remain at the discretion of the individual Reserve Banks." *Id.* at 51,106; Bd. Br. 5; Fed. Rsrv. Bank of Kan. City's Mem. in Support of Mot. to Dismiss (KCF Br.) 12, ECF

No. 51.  The Guidelines do not say if the Board retains veto authority over master account decisions, or whether the Board will reverse determinations that defy these Guidelines.

### C.      Custodia Bank's Wyoming Charter and Master Account Application

1.  In 2019, after extensively consulting with Defendants, Wyoming created a new type of state bank charter, the Special Purpose Depository Institution (SPDI).  Compl. ¶ 28; Wyo. Stat. § 13-12-101 *et seq*.  SPDIs provide a bridge connecting digital asset companies to the U.S. payments system.  Wyoming's Division of Banking heavily regulates SPDIs.  Wyo. Stat. § 13-12-119.  For example, SPDI banks must hold reserves backing 100% of U.S. dollars that clients deposit in bank accounts.  Accordingly, if a client seeks to withdraw funds, the bank will have the assets on hand to cover the withdrawal.  Compl. ¶ 28; Wyo. Stat. §§ 13-12-103, 13-12-105.

In January 2020, Caitlin Long, a 22-year Wall Street veteran, formed Custodia.  That fall, Wyoming's State Banking Board granted Custodia an SPDI charter.  Compl. ¶ 10.  Custodia will not hold customers' digital assets in any of its accounts, so Custodia will not be exposed to digital asset price volatility; its customers will retain all digital asset risks.  *Id*. ¶ 42.  Custodia will simply maintain customers' digital assets in its trust department, like a safety deposit box for digital assets. *Id*.  Custodia will also facilitate exchanges of digital assets for dollars, acting as agent, like banks facilitate exchanges of euros for dollars.  Custodia needs a master account to handle the U.S. dollar portion so that Custodia can use the Federal Reserve payment system's electronic fund transfer services.  At no point would customers' digital assets touch Custodia's master account.  *Id*.

2.  In October 2020, Custodia filed its master account application with the Kansas City Fed.  Compl. ¶ 34.  Custodia submitted some 900 pages of additional information, including Custodia's business plan, bylaws, policies, insurance agreements, and Wyoming Banking Approval Order.  Months passed.  In January 2021, Tara Humston, the Kansas City Fed's head of Supervision and Risk Management, informed Custodia that the application presented "no

6

showstoppers." *Id.* ¶ 36. And in January 2022, the Kansas City Fed confirmed that Custodia meets the legal eligibility requirements for receiving a master account. *Id.*

Nevertheless, nearly two years on, Custodia's application remains pending. *Id.* ¶ 45. Custodia has endeavored to expedite the process, regularly contacting Defendants and setting up numerous meetings. *Id.* ¶ 37. Custodia has repeatedly offered to provide more information, yet Defendants did virtually nothing on the application. *Id.* In August 2021, after nearly a year of Defendants' inaction, Custodia applied to become a member bank of the Federal Reserve System to show its willingness to submit to full federal supervision and accountability. *Id.* ¶ 39.

In March 2022, nearly 17 months after Custodia's master account request, the Kansas City Fed disclosed it had not begun processing the master account application. *Id.* ¶ 40. Custodia then met with Esther George, the Kansas City Fed's President, and offered myriad commitments if granted a master account. *Id.* ¶¶ 41-42. Custodia offered to hold $1.08 in cash in its master account for every $1.00 of customer dollar deposits in its first three years of operation, to provide monthly financial statements, and to follow other restrictions well beyond those of conventional banks. *Id.* ¶ 42. Custodia offered these commitments to further show that Custodia posed minimal risk to customers and the market and no risk to the Federal Reserve System. *Id.* Thereafter, Ms. Humston again confirmed: "Custodia is legally eligible for a master account." *Id.* ¶ 43.

Yet, Defendants still refused to provide any timeline for a decision. *Id.* Nor have Defendants explained their decision-making process. *Id.* ¶ 54. Instead, the Kansas City Fed has taken its direction from the Board, which intervened in Spring 2021 to halt the processing of Custodia's application. *Id.* ¶¶ 58-59; *see TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*, 2020 WL 1445806, at *3 (S.D.N.Y. Mar. 25, 2020) (detailing Board intercession in similar case).

## STANDARD OF REVIEW

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim is plausible if it is accompanied by sufficient factual content to allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" and "the Court accepts as true all well-pleaded allegations." *Audubon of Kan., Inc. v. U.S. Dep't of the Interior*, 568 F. Supp. 3d 1167, 1174 (D. Kan. 2021) (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I.      This Case Is Justiciable

Contrary to Defendants' assertions, this case is justiciable.  As to standing, Custodia is suffering ongoing injuries from delayed adjudication of its application.  And Custodia would suffer yet further injuries if (as Defendants claim) Reserve Banks are the only deciders of master account applications.  The constitutional problems with that argument are, first and foremost, reasons to reject Defendants' interpretation.  But, were Defendants' position correct, Custodia would suffer distinct here-and-now injuries from being subjected to unaccountable and unlawful decision-makers.  This case is also ripe.  Just like countless other cases challenging agency delay, Custodia's injuries from delay are already transpiring and await no further developments.  Defendants' ripeness objections would let the government indefinitely delay judicial review.

1. **Standing**.  Custodia has adequately alleged standing by identifying injuries-in-fact "fairly traceable to" Defendants' unreasonable delay in adjudicating Custodia's master account application, which would "likely ... be redressed" by an up-or-down decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 566 (1992).  To start, Custodia alleges that Defendants' unreasonable delay in processing Custodia's application for a master account inflicts monetary

8

harm, a classic injury in fact. By delaying that decision, Defendants left Custodia with no choice but to temporarily affiliate with a third-party bank that has a master account—a "makeshift," "much costlier" arrangement. Compl. ¶ 8. The third-party bank is charging Custodia to process its transactions in the short term, and Custodia is expending millions of dollars to retool its operating system and processes to be compatible with the third party's system. Using a third party bank introduces counterparty credit and settlement risks and competitive downsides that Custodia would avoid with its own master account. *Id.*

That second-best option harms Custodia regardless of how Defendants resolve Custodia's application. If Defendants grant the application, their delay will have inflicted unnecessary costs on Custodia. And if Defendants deny the application, Custodia will still have incurred unnecessary costs because Custodia cannot negotiate a long-term agreement with a third-party bank unless Custodia knows the fate of its application. Custodia must instead rely on a "makeshift" arrangement which compensates the third-party bank for the risk that its relationship with Custodia could be very short-term because Custodia would stop using it to clear payments as soon as Custodia obtains a master account. *See id.* Either way, Defendants' delay imposes distinct injuries from costly uncertainty that Custodia cannot mitigate until Defendants render a decision, *contra* Bd. Br. 31-32; KCF Br. 38-40. Such "business-related economic uncertainty" creates standing to raise administrative challenges. *Getty Oil Co. v. Clark*, 614 F. Supp. 904, 915 (D. Wyo. 1985).

Courts have found standing based on allegations that delayed agency action forced plaintiffs to expend resources or inflicted other harms. In another challenge to the Board's delayed processing of master account applications, the district court suggested that delay-related injuries would confer standing; the plaintiff there simply failed to plead that theory. *TNB*, 2020 WL 1445806, at *7. And the D.C. Circuit held that an animal rights group had standing to challenge

9

USDA's delay in issuing regulations because the group had to "fill the void by developing the guidance" themselves, draining their resources. *Am. Anti-Vivisection Soc. v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (internal quotation marks omitted). Likewise, the D.C. Circuit held that agencies' failure to issue rules governing commercial flights over national parks inflicted a cognizable injury on the plaintiffs, who alleged that their "enjoyment of the woods" was "marred by the intrusive noise of overflights." *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 272 (D.C. Cir. 2020); *accord Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1059 (10th Cir. 2014) (similar basis for standing). In these cases, agency action still might not avert the harm: USDA's rules might have been insufficiently clear to obviate the need for animal rights groups' guidance, and regulation of commercial flights might not have stopped overflights where plaintiffs hiked. But standing existed because agency inaction *guaranteed* those harms.

Defendants argue that Custodia cannot allege injury because Custodia lacks a Wyoming Certificate of Authority, and could not start operating even if it had a master account. Bd. Br. 31-32; KCF Br. 41 & n.9. The Wyoming Division of Banking approved Custodia's Certificate of Authority on September 12, 2022. Had Defendants acted sooner on Custodia's master account, Custodia could have received this certificate months earlier. Certificates of Authority expire within 6 months for banks that have not yet started operating. *See* Wyo. Stat. § 13-12-116(b). Under Wyoming banking rules, Custodia could not receive that certificate until *after* it received a master account or established a relationship with a third-party bank. Other courts have thus found standing where plaintiffs must navigate distinct application processes for permission to act, but the processes are "intertwined." *Rice v. Vill. of Johnstown*, 30 F.4th 584, 593 (6th Cir. 2022).

Defendants question Custodia's standing to bring due process, nondelegation, and Appointments Clause challenges (Counts III, V-VI). Bd. Br. 27-30; KCF Br. 33, 37-40. To start,

those are constitutional avoidance arguments that impugn Defendants' statutory interpretation that the Kansas City Fed is the sole decision-maker on master accounts. *Infra* p. 21. Even were the Kansas City Fed the lone decision-maker, the ensuing constitutional violations inflict discrete harms on Custodia. Being subjected to unconstitutional procedures and unaccountable decision-makers who exercise improper authority inflicts injury regardless of how the final decision turns out. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020). Standing flows from the prospect of "sustain[ing] injury from an executive act that allegedly exceeds the [agency's] authority." *Id.* (internal quotation marks omitted). Thus, challengers had standing to bring a pre-enforcement challenge to the Public Company Accounting Oversight Board to avoid the injury of being subjected to decisions by unaccountable decision-makers; they did not have to await Board action. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010).

Similarly, for due process challenges, plaintiffs "may suffer injur[ies] in fact from defective procedures," regardless of any additional harm that an adverse decision might inflict. *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 943 (10th Cir. 2003); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016). To assess standing based on due process violations, courts "assum[e] the truth and validity of all of a plaintiff's factual allegations and legal theories," including asserted property interests, and focus on whether more process could benefit the plaintiff. *Copelin-Brown v. N.M. State Pers. Off.*, 399 F.3d 1248, 1253-54 (10th Cir. 2005) (internal quotation marks omitted); *accord Rector*, 348 F.3d at 943 ("Parties may suffer injury in fact from defective procedures even if, at the end of the day, they would not have prevailed on the merits."). Custodia suffers distinct harm from unconstitutional processes apart from any denial of its application. Declaring those

processes unconstitutional would remedy Custodia's harms by reverting decision-making authority to the Board, which must resolve Custodia's application, *contra* Bd. Br. 28 n. 27-28.[1]

Finally, Defendants object that Custodia lacks standing to challenge Defendants' failure to grant Custodia master account access (*i.e.*, standing as to Counts VII and VIII, which seek relief in the alternative).  Bd. Br 30-31; KCF Br. 38-40 & n.8.  Defendants' objections assume away the merits.  If Custodia is correct that the statutory scheme compels Defendants to grant Custodia's application, then Defendants' failure to do so inflicts ongoing harm that this Court can redress by requiring Defendants to grant the application in the event Defendants deny it.

2. **Article III Ripeness.**  For similar reasons, Custodia has alleged a ripe dispute because Custodia's claims are "not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam) (internal quotation marks omitted); *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019).  As noted, Custodia's injuries are not contingent upon an adverse final decision, *contra* Bd. Br. 29-30.  Defendants' delay is currently forcing Custodia to contract with a third-party bank on an expensive, short-term basis, and Custodia's constitutional claims implicate here-and-now injuries.

3. **Prudential Ripeness.**  Finally, Defendants invoke prudential ripeness, claiming that "[t]he complex and far-reaching issues Custodia's Complaint presents are far from fit for a judicial decision" and could be deferred with "little if any hardship" until Defendants resolve both

---

[1] The Board's authorities (at 28) are irrelevant; none involved analogous here-and-now injuries from being subjected to unconstitutional decision-makers or processes.  *Kane County Utah v. Salazar*, 562 F.3d 1077, 1090 (10th Cir. 2009), challenged agency action that had not yet occurred.  *Robertson v. Colvin*, 564 F. App'x 931, 934 (10th Cir. 2014), found no standing because plaintiff's alleged reputational harm from a Social Security adjudicatory finding was too abstract.  And there was no standing in *Utah Association of Counties v. Bush*, 455 F.3d 1094 (10th Cir. 2006), because the plaintiff sued in 1997 but his complained of injury occurred only in 1998.  *Id.* at 1101.

Custodia's master account application and its separate application for Federal Reserve membership. KCF Br. 40-41; *see* Bd. Br. 29-30 (invoking prudential ripeness decisions).

Recent Supreme Court decisions question the validity of the prudential ripeness doctrine. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). And Defendants' plea to punt this case is ironic. Ordinarily, "complex and far-reaching issues," KCF Br. 40, present a classic case for denying motions to dismiss, not reasons to duck federal courts' "virtually unflagging obligation" to decide controversies where jurisdiction exists, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (internal quotation marks omitted). The Board's objection (at 29) that "plaintiff's claims rest on factual speculation about who will make a final decision" is not a ripeness problem; it is a byproduct of Defendants' opaque process, and the remedy is discovery, not dismissal. *See Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 453 (6th Cir. 2022) (rejecting similar argument and deeming discovery "critical to understanding" opaque USCIS processes). Defendants also miss the mark by claiming that the lack of a final decision proves the dispute is unripe. Bd. Br. 29-30; KCF Br. 39-40. Custodia's central objection is that Defendants are refusing to adjudicate Custodia's application on any timeline. Dismissing this case as unripe because Defendants have not rendered a final decision would add insult to injury, and would render the APA's guarantee of judicial review of delayed agency actions a dead letter.

Meanwhile, Defendants' confidence that Custodia will not suffer harm from Defendants' undisclosed timetable is hard to credit given that the clock has been running for nearly two years with no end in sight. The Kansas City Fed (at 44) blithely portrays contracting with a third-party bank as "no mere makeshift solution." But, as the Complaint alleges, that option is costlier and far less desirable than master account access. Compl. ¶ 8. The Kansas City Fed's citationless

13

claim (at 44) that Custodia had "abundant notice" that its application "would take time to review" is absurd.  The application form portrays 5-7 days as the standard timeframe; federal law prescribes a one-year deadline, 12 U.S.C. § 4807; and the Kansas City Fed told Custodia that it was legally eligible for an account and there were "no showstoppers."  Compl. ¶ 36.

Accepting Defendants' prudential ripeness arguments would let the government sidestep judicial review of virtually any decision.  The Kansas City Fed (at 42) asks for dismissal so it can "carefully consider how to exercise its discretion" in light of "ongoing work … by the Federal Reserve System, federal banking agencies, and Congress."  If the standard is that no plaintiffs can sue before federal agencies wrap up considering how to address digital assets, challenges to agency delays would never be ripe.  And kicking this suit until the Board resolves Custodia's Reserve System membership application would let Defendants continue unlawfully delaying Custodia's master account application by dragging their feet on another application.  *Cf.* KCF Br. 43-44.

The Kansas City Fed's pleas for delay in light of the Board's recent Guidelines (at 41-43) are especially eyebrow-raising.  It seems no accident that the Board finalized those Guidelines the day before Defendants' motions to dismiss were due.  The Kansas City Fed claims to enjoy unfettered discretion to decide master account applications and apparently need not follow the guidelines.  Yet the Kansas City Fed (but, tellingly, not the Board) claims that the need to account for those Guidelines justifies an unspecified amount of additional time, even though the final Guidelines substantially resemble the Board's May 2021 proposal, purport to track existing practice, and could not apply retroactively to Custodia if they actually changed substantive criteria for applications in any way.  87 Fed. Reg. at 51,099 & n.3; *supra* p. 5.  Were the Court to accept this argument, agencies could always delay decisions, issue nonbinding guidance on the eve of litigation junctures, and buy more time.

This case differs from instances where courts delay adjudicating challenges to federal rules because the agency issues subsequent rules that modify the challenged rule, alongside plans to completely revise the rule. *See Wyoming v. U.S. Dep't of Interior*, 493 F. Supp. 3d 1046, 1054 (D. Wyo. 2020). There, agencies have actually taken binding, ensuing actions that affect the merits of the challenged rule—unlike the nonbinding guidance here. And those cases prompt stays of the litigation, not dismissal. *See id.* at 1054-57. Allowing an agency to bypass claims of unlawfully delayed agency action just by issuing nonbinding guidance and calling it new grounds for delay would give the government an unprecedented blank check for evading judicial review.

This Court is the only remaining safeguard against Defendants' delay tactics. If the Court takes Defendants at their word, Defendants may do nothing for years. That is what happened after a district court dismissed TNB's complaint alleging a constructive denial of its master account application after 18 months' delay. *TNB*, 2020 WL 1445806, at *10. Nearly five years after TNB applied for a master account, it is still waiting. Liese Klein, *TNB Seeks to Become State's Newest Bank in Face of Fed Delays*, NewHavenBiz (Apr. 4, 2022) https://tinyurl.com/3x7ydccu.

## II.   Custodia Stated Actionable Claims Based on Defendants' Unlawful Delay in Adjudicating Its Master Account Application (Counts I-IV)

As Custodia's complaint alleged, the Board, not Reserve Banks, possesses the ultimate power to decide master account applications. All ordinary indicia of statutory meaning confirm that reading, and Custodia has pled myriad supporting facts. Defendants instead contend that Congress gave the Board control of everything except the kind of master account applications at issue here. That position is untenable, and still would not excuse Defendants' delay.

### A.   The Board's Failure to Adjudicate Custodia's Master Account within One Year Violates 12 U.S.C. § 4807, and Thus the APA

1. Because the Board ultimately controls master account decisions, this case presents a blatant APA violation. Defendants concede that 12 U.S.C. § 4807 prescribes a mandatory, one-

15

year deadline for adjudicating applications: "Each Federal banking agency shall take final action on any application to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency." Bd. Br. 10; KCF Br. 17. The statute identifies the Board as a "Federal banking agency." 12 U.S.C. § 1813(z). And "applications" would plainly include master account applications. Thus, if the Board controls master account adjudications, as Custodia alleges, the Board plainly violated § 4807's one-year deadline.

Defendants respond that, because Custodia submitted its application to the Kansas City Fed, not "to the agency" (the Board), § 4807 does not apply. Bd. Br. 10-11. That is a distinction without a difference: The Board is the head of the Federal Reserve System, of which Reserve Banks are constituent parts. Defendants' position produces absurd results. The point of § 4807 is that, when federal banking agencies are vested with authority to decide applications, they must act swiftly. Congress did not include a glaring loophole whereby the Board could make the one-year deadline magically disappear by routing applications to subsidiary officers or agents. *See Taft v. Agric. Bank of China Ltd.*, 2016 WL 2766661, at *12-13 (S.D.N.Y. May 12, 2016) (rejecting same argument under statute requiring reporting to a "Federal supervisory agency"); *Mann v. Fifth Third Bank*, 2011 WL 1575537, at *3 (S.D. Ohio Apr. 25, 2011) (same).

Nor is there any doubt that if the Board blew § 4807's one-year deadline, the Board violated the APA and should be compelled to resolve Custodia's application. The Board concedes it is a "federal agency" for APA purposes. Bd. Br. 1, 2. Textbook administrative law prescribes that violating a statutorily mandated deadline qualifies as "unlawfully with[holding]" agency action under the APA, 5 U.S.C. § 706(1). Faced with a mandatory deadline for agency action, the Tenth Circuit requires courts to compel agency action. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1189-91 (10th Cir. 1999); *accord Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).

16

2.   Defendants deny that the Board exercises final decision-making authority over master account applications.   Instead, they contend, the Kansas City Fed exercises sole, unreviewable discretion over such applications as a distinct entity that is not subject to § 4807, the APA, or other constraints.  Bd. Br. 2, 12, 17-21; KCF Br. 17-18.  That argument is legally and factually untenable.

a.   Start with the law.  Because the Board sits atop the Federal Reserve System, exercises supervisory authority over Reserve Banks, and controls what powers are delegated to Reserve Banks, the overwhelming inference should be that the Board exercises veto power over everything Reserve Banks do.  *See* 12 U.S.C. § 248(j); *supra* p. 3.  Defendants counter that 12 U.S.C. § 342 gives Reserve Banks exclusive, unilateral authority to decide master account applications free from Board control.  Bd. Br. 17; KCF Br. 21.  That argument is fatally flawed.

*First*, § 342 does not address master account access.  Section 342 states that Reserve Banks "may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items."  Section 342 thus presupposes that various entities *already* have master accounts, which are prerequisites to receive deposits.  Section 342 merely describes "types of monetary instruments that Federal Reserve Banks may receive for deposit or collection" from entities possessing master accounts.  *Fourth Corner*, 861 F.3d at 1074 (Bacharach, J.).  Section 342 does not prescribe conditions for obtaining master accounts.

Other textual clues confirm as much.  Section 342 puts the United States on par with "member banks" and "other depository institutions" as actors equally capable of depositing funds with Reserve Banks.  Reading that language to vest Reserve Banks with plenary control over who gets a master account would lead to the implausible conclusion that Reserve Banks could unilaterally deny master accounts *to the United States*—not just member banks or other depository

17

institutions—for any reason.   The United States needs master accounts to manage the money supply.  But, under Defendants' reading, a single, unaccountable Reserve Bank could unilaterally defeat federal monetary policy and create economic chaos.

Further, Congress elsewhere used different language to grant the Board control over certain master accounts.  In 12 U.S.C. § 5465(a), Congress empowered the Board to "authorize a Federal Reserve Bank to *establish and maintain an account*" and "*provide … services*" for designated financial market utilities.  (Emphasis added).  The Board concedes that language gives the Board control over master accounts involving designated utilities.  Bd. Br. 5 n.5.  Section 5465 shows that when Congress wanted to describe authorization to open master accounts, it used language like "establish an account" or "provide services."  By contrast, § 342 addresses the downstream question of what monetary instruments various actors can deposit once they have master accounts.

Defendants incorrectly rely on *Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923), as evidence that 12 U.S.C. § 342 gives Reserve Banks discretion to deny master accounts.  Bd. Br. 17-19; KCF Br. 21.  *Farmers* reinforces that § 342 confers some discretion over what types of monetary instruments Reserve Banks may accept—not over the antecedent question of whether to grant master accounts in the first place.  *Farmers* held that "neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation *to receive checks for collection*.  The act merely confers authority to do so." 262 U.S. at 655, 662 (emphasis added).  That Reserve Banks need not accept every method of deposit is irrelevant to whether they have discretion to deny master account applications.  *See Fourth Corner*, 861 F.3d at 1074 (Bacharach, J.) (rejecting Defendants' interpretation).

Finally, the Kansas City Fed argues that Wyoming's SPDI charter shows the desirability of giving Reserve Banks "discretion" over master accounts.  KCF Br. 24-27.  The Kansas City Fed

claims that "Custodia's focus on providing cryptocurrency-adjacent services to customers presents increased risk of failure," which risk is "magnified by fraud and manipulation of cryptocurrencies"; asserts "unique compliance challenges"; and warns that letting Custodia "place deposits on the federal Reserve Balance sheet" might impact "monetary policy and preserving U.S. financial stability." *Id.*

But "even the most formidable policy arguments cannot overcome a clear statutory directive." *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1542 (2021) (internal quotation marks omitted). And the Kansas City Fed's policy arguments misstate well-pled facts about Custodia's business model, which this Court must credit. *Iqbal*, 556 U.S. at 678. SPDI banks take U.S. dollar deposits, facilitate payments, and conduct incidental services; they do not lend money. Compl. ¶ 29. SPDI banks cannot make loans with customer deposits in fiat currency (*e.g.*, U.S. dollars) and must back all deposits with 100% cash on hand or similar liquid assets. *Id.* ¶ 28. If Custodia receives a master account, the Federal Reserve System will not be exposed to any digital asset risks. Custodia will hold all customer deposits of U.S. dollars in cash in its Federal Reserve master account, while digital assets will be held in bailment on behalf of customers in its trust department. *Id.* ¶ 42. The Federal Reserve System will remain walled off from the digital assets of Custodia's customers, just like when a bank holds shares of Apple stock for a trust customer. From the Federal Reserve's vantage, assets in Custodia's master account would be the same as those in master accounts of any traditional bank, except Custodia's master account would be far better funded. The Kansas City Fed also ignores Custodia's offer of further precautions, such as holding $1.08 in cash in its master account for every $1.00 of customer U.S. dollar deposits, providing monthly financial statements, and agreeing to certain restrictions. *Id.* ¶ 42.

J.A.240

*Second*, even if § 342 empowered Reserve Banks to adjudicate master account applications, the Board would still retain final decision-making authority. Congress granted the Board the power "[t]o exercise general supervision over" the Reserve Banks, 12 U.S.C. § 248(j), *i.e.*, ultimate veto authority over all decisions Reserve Banks might make. The Board itself portrays that authority as "extremely broad." Bd. Br. 44 n.4.

Congress confirmed the Board's ultimate control of Reserve Bank decisions throughout the Federal Reserve Act. Take § 342 itself. Right after the language Defendants invoke, § 342 authorizes "nonmember bank[s]" to make certain "deposits," but only "[p]rovided, [s]uch nonmember bank[s] … maintain[] with the Federal Reserve bank … balance[s] in such amount[s] as *the Board* determines." (Emphasis added). Section 342 also prescribes that "the Board of Governors" can regulate whatever "reasonable charges" that "member or nonmember bank[s]" make." Translation: the Board, not Reserve Banks, sets key conditions for deposits and charges.

Section 248a(c)(2) offers further support. That provision prescribes that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions." The Board develops the fee schedule for Reserve Bank services. 12 U.S.C. § 248a(a). Those fees cover Reserve Banks' check clearing, collection, and wire transfer services—services that nonmember banks can access only if they have master accounts. *Id.* § 248a(b). Here again, Congress confirmed that the Board ultimately controls a key facet of master account access, *i.e.*, the terms on which account holders can use Reserve Bank services.

Other provisions where Congress delegated duties to Reserve Banks reinforce that Reserve Banks' decisions are subject to Board control. Reserve Banks can set discount rates they will charge account holders, "subject to review and determination of the Board." *Id.* § 357. Reserve Banks can make advances to member banks on their promissory notes, but only at rates "subject

to the review and determination of the Board." *Id.* § 347. And Reserve Banks can receive deposits from and make advances to foreign banks, but only "[s]ubject to such restrictions, limitations, and regulations as may be imposed by the Board." *Id.* § 347d; *see id.* §§ 348a, 358 (similar Board oversight over foreign accounts and bank relationships). Even when Congress specified functions for Reserve Banks to perform, Congress made clear that the Board supervises those functions.

It defies credulity that Congress carved out an exception to the rule that the buck stops with the Board just for determinations about who gets master accounts. It is even less plausible that Congress did so in § 342 without mentioning master accounts, or even applications for or access to accounts. The constitutional problems that would arise if Reserve Banks exercised sole discretion over master account applications are further reason to reject Defendants' interpretation. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (given two possible interpretations, courts should pick the one that avoids constitutional doubts).

The Board's invocation of *Chevron* deference for its Guidelines (at 25-26) does not tilt the scales. The Supreme Court applies *Chevron* as a last resort, only if all other tools—including constitutional avoidance—do not resolve ambiguity. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018); *accord Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 574-75 (1988). Plus, courts do not owe *Chevron* deference to interpretations in non-binding guidance or operating circulars, least of all when those interpretations do not parse § 342 or invoke *Chevron*. *See Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1128 n.9 (10th Cir. 2020); *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017).

b. Custodia's factual allegations—which, at this stage, the Court must accept as true—bear out the Board's ultimate control over master account decisions. Initially, the Kansas City Fed informed Custodia that its application presented "no showstoppers." Compl. ¶ 36. Then the

21

application sat for months after the Board "asserted its control over the decision-making process." *Id*. The Kansas City Fed itself has "pinned its delay on the Board." *Id*. ¶ 49. In practice, "the Board controls the decision because the Kansas City Fed has consulted with and defers to direction from the Board about Custodia's master account application, and in this case the Board has exercised control over the decision-making process." *Id*. ¶ 58.

Litigation over banking institution TNB's master account application underscores the plausibility of Custodia's allegations. *Id*. ¶ 59. There, the Reserve Bank (the New York Fed) conveyed its intent to approve TNB's application. *TNB*, 2020 WL 1445806, at *3. Then, the New York Fed "informed TNB that after hearing from the Board, the [New York Fed] did not think that TNB should expect approval any time in the near future" because "[t]he Board's staff was unwilling to decide on TNB's Master Account." *Id*. (internal quotation marks omitted). Later, the New York Fed indicated that "it was pessimistic *that the Board would allow* the [New York Fed] to issue a Master Account to TNB." *Id*. (emphasis added) (internal quotation marks omitted). And the New York Fed's brief stated that "it would be anomalous for the New York Fed *not* to consider" the "views" of the Board, since the Board "sets policy" and Reserve Banks "implement it." Reply 10, *TNB*, No. 1:18-cv-7978 (S.D.N.Y. Apr. 12, 2019), ECF No. 28.

Defendants' own statements underscore the improbability that the Board lacks control over master account decisions. The Board's brief states that Reserve Banks "carry[] out a variety of functions subject to the general supervisory authority of the Board," that Congress intended for the Board to "retain sufficient power over the reserve banks to enable it to exercise direct authority when necessary," and that "[a]ccess to master accounts is a matter of substantial concern to the Board and entire Federal Reserve System." Bd. Br. 2, 4-5. The Board also concedes that "Operating Circulars," including circulars detailing how to open and close master accounts, are

"issued by Reserve Banks and subject to approval by the Board." Bd. Br. 5. Given these points, the Board's claims that Reserve Banks somehow retain unreviewable discretion are implausible.

Or take the Board's final Guidance on master account access, which the Board issued under its supervisory authority over Reserve Banks and apparently believes Reserve Banks must follow. 87 Fed. Reg. at 51,099. The Guidelines evince the Board's belief that it could have imposed deadlines on master account adjudications. *Id.* at 51,102. The Board "expect[s] that Reserve Banks [will] engage in consultation with the other Reserve Banks and the Board" to consistently apply the Guidelines, and will work "in consultation with the Board, to expeditiously develop an implementation plan." *Id.* And the Board emphasizes the need for uniformity lest individual Reserve Bank decisions "set a precedent that could affect the Federal Reserve's ability to achieve its policy goals now or in the future." *Id.* at 51,106.

Defendants cannot have it both ways. The Board cannot assert authority in Guidelines issued on August 15, 2022 to extensively supervise and participate in master account decisions, yet claim in briefs on August 16 that Reserve Banks have total discretion over master account decisions. Bd. Br. 2, 12, 17-21; KCF Br. 17-18. All signs point to the Board—the head of the Federal Reserve System—retaining ultimate authority over master accounts. At a minimum, the factual allegations support an inference that the Board exercises final decision-making authority— an inference the Court must draw in Custodia's favor at this stage. Custodia has plausibly pled that the Board has defied the one-year statutory deadline and unlawfully withheld agency action under the APA, and dismissal would be inappropriate.

### B. Even If the Kansas City Fed Exclusively Makes Master Account Decisions, Custodia Has Adequately Pled That the Lengthy Delay Violates the APA

Even were Defendants correct that Reserve Banks alone make final decisions as to master accounts, Custodia is still entitled to an order compelling the Kansas City Fed to adjudicate

Custodia's application forthwith.  Like the Board, the Kansas City Fed is a "Federal banking agency" subject to 12 U.S.C. § 4807's mandatory one-year deadline for processing applications. Even were § 4807 somehow inapplicable to the Kansas City Fed, the lengthy delay in adjudicating Custodia's master account application would violate the APA's prohibition on unreasonably delayed agency action.  Defendants cannot indefinitely stonewall Custodia's application by shifting all blame to the Kansas City Fed and portraying that entity as a law unto itself.

1. ***Reserve Banks Are Federal Banking Agencies.***  The Kansas City Fed is a "Federal banking agency" under 12 U.S.C. § 4807, and must follow its one-year deadline.  *Contra* Bd. Br. 10-11; KCF Br. 17-18.  Under the relevant provision, a "Federal banking agency" means "the Comptroller of the Currency," the FDIC, or "the Board of Governors of the Federal Reserve System." 12 U.S.C. § 1813(z); *id.* § 4801(1) (incorporating § 1813(z) definition).  When Congress refers to heads of agencies, that designation presumptively includes subordinate officers and subsidiaries. *See L.D.G. v. Holder*, 744 F.3d 1022, 1026 (7th Cir. 2014) ("Statutory references to the 'Attorney General' include" constituent "component[s] of the Department of Justice").

Defendants are thus incorrect that by imposing a deadline on the "Board," Congress meant to exempt Reserve Banks from any time constraints. Bd. Br. 10; KCF Br. 17.  Under that logic, the FBI or individual U.S. Attorney's Offices could evade statutes directing the "Attorney General" to obtain warrants before conducting electronic surveillance, or the Border Patrol could disclaim any need to follow limits on the "Secretary of Homeland Security's" authority to perform immigration enforcement functions.  No court has endorsed such nonsensical positions.

Related statutes confirm that references to "the Board" include Reserve banks.  Take the Federal Deposit Insurance Act, where Congress used a materially identical definition of an "appropriate Federal banking agency" to refer to the Board.  12 U.S.C. § 4801(1) (adopting

§ 1813(q) definition).  Congress nonetheless specified that "[a] regional office of an appropriate Federal banking agency (including a Federal Reserve bank)" should perform certain functions, *id.* § 1818(t)(5)(A).  In other words, "Federal Reserve bank[s]" are part of "Federal banking agencies."

Courts, too, have held that statutes referring to the Board encompass Reserve Banks. Another district court deemed a Reserve Bank a "Federal banking agency" under the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which includes the Board in its definition of "Federal banking agency."  *See* 12 U.S.C. § 1831j(e); *Mann*, 2011 WL 1575537, at *3.  Reports to "local Federal Reserve bank examiners" thus satisfied FIRREA's statutory command to submit reports to "Federal banking agenc[ies]."  *Mann,* 2011 WL 1575537, at *3. Likewise, a district court held that a Reserve Bank constituted a "federal supervisory agency" for purposes of the Bank Secrecy Act, which does not define that term.  The court refused to conclude that statutes defining a "federal supervisory agency" to include the Board, but not Reserve Banks, would apply only to the "seven Governors of the Federal Reserve Board," not "those acting under their authority and on their behalf."  *Taft*, 2016 WL 2766661, at *12-13.  Defendants cite no contrary authorities.  Thus, even if the Kansas City Fed is the sole decision-maker on Custodia's application, it defied the statutory one-year deadline.

2.  ***Reserve Banks Are APA Agencies That Must Act Within a Reasonable Time.***  Even were § 4807's one-year deadline inapplicable, the Kansas City Fed would qualify as an "agency" that must comply with the APA, including the APA's prohibitions on unlawfully withholding and unreasonably delaying agency action.  5 U.S.C. § 706(1).  And Custodia has adequately alleged that the 22-month delay in processing Custodia's application is manifestly unreasonable.

a.  **Agency Status.**  Defendants deny that the Kansas City Fed is an "agency" for APA purposes.  Bd. Br. 12-13; KCF Br. 13-17.  The consequences of that position would be astonishing.

25

An entity that exercises many binding regulatory powers—including, in Defendants' telling, final authority over decisions affecting the U.S. financial system—would operate free of accountability.

Defendants' interpretation of the APA is incorrect and unprecedented. As relevant here, the APA defines an "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1). Courts look to "the structure, function, and mandate of the entity." *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010) (internal quotation marks omitted). Particularly key is whether the entity exercises "substantial independent authority" to "take final and binding action affecting the rights and obligations of individuals." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881-82 (D.C. Cir. 1997) (cleaned up); *accord Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971); *Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 109-11 (D.D.C. 2020).

Thus, the Office of Science and Technology is an agency under the APA, despite being housed within the Executive Office of the President and performing many advisory functions, because that Office also performs the nonadvisory "function of evaluating federal programs." *Soucie*, 448 F.2d at 1075. Likewise, the D.C. Circuit deemed "Regional Boards" agencies, even though they were housed within the Renegotiation Board, a defunct federal agency tasked with renegotiating federal contracts when contractor profits appeared excessive. *Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 482 F.2d 710, 714-15 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975). Regional Boards were APA agencies because they were "empowered to make final decisions not even reviewable by the [Renegotiation] Board." *Id.* at 715.

By contrast, entities formed by interstate compacts are not APA agencies; they exercise powers delegated by States, not the federal government. *Atl. States Marine*, 609 F.3d at 532-33. Nor are the National Security Council and Smithsonian agencies; they function in an advisory or

grantmaking capacity and exercise no binding regulatory power. *Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 558 (D.C. Cir.1996) (National Security Council); *Dong*, 125 F.3d at 881-83 (Smithsonian). Similarly, the National Academy of Sciences' functions are advisory, and while federal law requires the Environmental Protection Agency to evaluate some Academy findings, "[t]he E.P.A. has clearly felt free to make its own decisions irrespective of the Academy's advice." *Lombardo v. Handler*, 397 F. Supp. 792, 795 (D.D.C. 1975).

Under these cases, Reserve Banks qualify as APA agencies because they wield significant, independent federal regulatory powers. Congress tasked Reserve Banks with implementing federal monetary policy and empowered the Board to "delegate … *subject to the [APA]*, any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to . . . Federal Reserve banks." 12 U.S.C. § 248(k). The Board, in turn, has delegated to Reserve Banks the power to adjudicate Federal Reserve membership applications and other requests and petitions. *See* 12 C.F.R. § 265.20. Unlike the advisory or non-binding powers exercised by the Smithsonian, National Security Council, and other non-agencies, these are all quintessential federal regulatory powers that bind third parties. *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 87 (2007). It is irrelevant that Reserve Banks do not engage in rulemaking or formal adjudication, KCF Br. 14; Reserve Banks conclusively resolve various applications, thereby exercising binding federal power. *See Dong*, 125 F.3d at 882 (looking beyond rulemaking and adjudicatory functions).

Defendants' contention that Reserve Banks possess final authority over master account applications further seals their status as APA agencies. The Board even suggests that *all* functions Congress specifically conferred on Reserve Banks belong to Reserve Banks alone. Bd. Br. 11. That sort of final decision-making power prompted the D.C. Circuit to classify the Office of

J.A.248

Science and Technology and Regional Boards as APA agencies, even though both were part of other organizations (the Executive Office of the President and the Renegotiation Board) and exercised some advisory or non-binding functions. *Soucie*, 448 F.2d at 1075; *Grumman*, 482 F.2d at 714-15; *Flaherty v. Ross*, 373 F. Supp. 97, 104-06 (D.D.C. 2019) (discussing holdings).

Every court to consider the question has deemed Reserve Banks agencies for APA purposes; no case holds otherwise. *See Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*, 583 F. Supp. 674 (N.D. Ga. 1984), *vacated on other grounds*, 597 F. Supp. 462 (N.D. Ga. 1984); *Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982); *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1228 and n.1 (6th Cir. 1983). The Kansas City Fed (at 17) accuses these courts of "faulty reasoning." But these decisions applied the right APA test, deeming Reserve Banks to be agencies because they exercise independent authority over specific functions. *Lee*, 558 F. Supp. at 178; *Flight Int'l*, 583 F. Supp. at 678-79. And these decisions did not even consider Reserve Banks' purported final decision-making authority over master accounts. By contrast, the Kansas City Fed (at 15-16) invokes cases rejecting Reserve Banks' status as "agencies" under definitions that differ from the APA and did not involve assertions of Reserve Banks' putative final decision-making authority.[2]

---

[2] *See Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 976 (Fed. Cir. 2020) (Reserve Banks are "distinct from the government" under America Invents Act, not other statutes); *United States v. Wells Fargo & Co.*, 943 F.3d 588, 597-98 (2d Cir. 2019) (False Claims Act); *Scott v. Fed. Rsrv. Bank of Kan. City*, 406 F.3d 532, 534 (8th Cir. 2005) (28 U.S.C. § 451 definition); *Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*, 657 F.2d 183, 186 (8th Cir. 1981) (not addressing Reserve Banks' agency status), *aff'd*, 455 U.S. 955 (1982); *Katsiavelos v. Fed. Rsrv. Bank of Chi.*, 859 F. Supp. 1183, 1185 (N.D. Ill. 1994) ("Plaintiff does not contend that the FRBC is an executive agency as that term is used in Title VII."); *In re Hoag Ranches*, 846 F.2d 1225, 1227 (9th Cir. 1988) (Fed. R. App. P. 4(a)(1)); *Lewis v. United States*, 680 F.2d 1239, 1240 (9th Cir. 1982) ("critical factor" for Federal Tort Claims Act "is the existence of federal government control over the detailed physical performance and day to day operation of that entity" (internal quotation marks omitted)); *McKinley v. Bd. of Govs. of Fed. Rsrv. Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) (not

b. **Unreasonable Delay**.  Even were § 4807's one-year deadline somehow inapplicable, the APA also instructs courts to compel "unreasonably delayed" agency action.  5 U.S.C. § 706(1); *see Barrios Garcia*, 25 F.4th at 454.  Custodia has plausibly alleged that Defendants' 22 months of inaction fit the bill.  The Tenth Circuit employs a six-factor test from the D.C. Circuit (the so-called *TRAC* factors) to determine the reasonableness of agency delay.  *Forest Guardians*, 174 F.3d at 1189-91 (discussing *Telecomms. Res. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)).  Under those factors, Custodia "alleged facts sufficient to state a plausible claim for unreasonable administrative delay."  *See Ghadami v. DHS*, 2020 WL 1308376, at *7 n.6 (D.D.C. Mar. 19, 2020).

The first two factors are most important, and ask whether there is "any rhyme or reason" for the government's delay and whether "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute."  *Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014) (cleaned up).  Custodia's allegations—which must be taken as true at this stage—show that Defendants have never identified missing information or other specific issues with Custodia's application; the Kansas City Fed instead found "no showstoppers."  The only apparent reason for delay is that the Board expressed broad concerns with institutions subject to "novel" state charters, and wants to freeze their applications regardless of how those specific institutions operate.  Compl. ¶¶ 4, 49, 79.

Meanwhile, Congress has indicated that speed is of the essence for banking-related applications.  Even were 12 U.S.C. § 4807's one-year deadline inapplicable to master account applications, that provision still evidences Congress' expectation that agencies would process banking applications swiftly.  Master account applications likewise represent that decisions usually

---

addressing Reserve Banks' agency status because "[t]he Board concedes that the Federal Reserve Banks ... are not federal agencies" and did not invoke FOIA protections).

take 5-7 days.  *Id.* ¶¶ 6, 35, 77.  As for other factors, expediting review of Custodia's delayed application would hardly derail Defendants' other priorities, especially since Defendants have never identified further information needed.  And harms to Custodia from delay are ongoing and include unnecessary seven-figure costs and injecting uncertainty into Custodia's business model and its ability to retain investors, employees and interest from prospective customers.  *Id.* ¶ 8.

At the very least, the reasonableness of Defendants' delay is a fact-laden inquiry that demands discovery, not dismissal.  "Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances." *Mashpee Wampanoag Tribe Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).  Courts thus consider "[a] claim of unreasonable delay" something that "should not typically be resolved at" the motion to dismiss "stage."  *Barrios Garcia*, 25 F.4th at 451 (internal quotation marks omitted); *accord Bustos v. Mayorkas*, 2021 WL 3931173 *8 (D.N.M. Sept. 2, 2021).

Defendants' rejoinders are meritless.  The Board (at 12-13, 16) remarkably asserts that no timeline applies and that the Board has no duty to expedite decisions.  But agencies do not possess unbridled powers of delay.  "The absence of any standard upon which to frame a timing requirement is not unusual in APA unreasonable delay cases," which is why the *TRAC* factors supply the "framework" for deciding when agencies have dragged their feet too long.  *Motaghedi v. Pompeo*, 2020 WL 207155, at *7 (E.D. Cal. Jan. 14, 2020).  When Congress requires the agency to perform some duty, courts hold the agency to a reasonable timetable even if the agency retains discretion over the outcome.  *See Forest Guardians*, 174 F.3d at 1190.

Defendants assert the reasonableness of their 22-months-and-counting delay, yet tellingly never mention the governing *TRAC* factors.  Bd. Br. 14-15; KCF Br. 17-20.  Given the circumstance-specific nature of those factors, Defendants' examples of courts excusing years-long

J.A.251

agency delays ring hollow.  Just because courts have blessed some lengthier delays is no reason to deem all shorter delays presumptively fine.  Likewise, the Board's just-finalized Guidelines for master account applications do not justify further delay.  Defendants do not say if the Board can reverse Reserve Bank decisions that violate these Guidelines, and portray them as kicking off further guidance to implement them.  Bd. Br. 4-8; KCF Br. 42-43.  Insofar as the Guidelines change substantive criteria, they cannot possibly justify delay, because applying new criteria retroactively would be unlawful.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994); *Cox v. Kijakazi*, 2022 WL 178953, at *8 (D.D.C. Jan. 19, 2022).  At bottom, Defendants refuse to say why they have long delayed resolving Custodia's application.  If nothing else, the Court should allow discovery into what the holdup is—and why Defendants' explanations keep shifting.  Otherwise, "taken to its logical conclusion, the Government's argument would eliminate federal judicial review of any agency action and wipe the APA off the books." *Barrios Garcia*, 25 F.4th at 455.

c.  **Due Process**.  For similar reasons, Defendants' unreasonable delay in adjudicating Custodia's master account application violates bedrock due process principles.  Compl. ¶¶ 92-101 (Count III).  "[A] delay in rendering a decision about property"—here, a master account—"could, at some point, constitute a denial of due process." *Shands v. Tull*, 602 F.2d 1156, 1159 (3d Cir. 1979); *see also Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587, 591 (1926).

The Board contends that Defendants' expressed "intention of going further" with Custodia's application obviates any due process problem.  Bd. Br. 34 (quoting *Smith*, 270 U.S. at 591).  But agencies cannot wave away due process violations with empty words, and the Board's Guidelines and communications with Custodia commit to no timeframe.  87 Fed. Reg. at 51,102. Indeed, the Kansas City Fed invokes the Guidelines to justify indefinite delay.  KCF Br. 42-43.

31

### C.     Defendants' Delay Is Also Actionable Under the Mandamus Act (Claim II)

Even were APA relief unavailable, Custodia would be entitled to compel Defendants to act on its application under the Mandamus Act, 28 U.S.C. § 1361, which authorizes district courts "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." The Mandamus Act clearly covers Defendants. Under that Act, an "agency" includes "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest." 28 U.S.C. § 451. The Board plainly qualifies. *See* Bd. Br. 1. And Reserve Banks would likewise qualify as an "authority" or other entity "of the United States" given that they exercise various delegated sovereign functions. *Cf. Federal Reserve Bank Members*, 43 Op. O.L.C. __, at *8 & n.3 (identifying some of those functions as sovereign).

Regardless, the Mandamus Act also applies to "officer[s] … of the United States." According to Defendants, the Kansas City Fed's President makes final decisions on master account applications, and is undisputedly an inferior officer of the United States. Bd. Br. 35-36; KCF Br. 34-35. So, even were the Kansas City Fed not an "agency," Defendants' purported final decision-maker is subject to the Mandamus Act as an "officer," and this Court should compel her to act.

Custodia satisfies the criteria for mandamus relief based on Defendants' lengthy delay in adjudicating its application. Those criteria are: (1) "a clear right to the relief sought," (2) "a plainly defined and peremptory duty on the part of [the] respondent to do the action in question," and (3) "no other adequate remedy available." *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990).

As for the first two factors, Defendants have violated their statutory obligation to decide master account applications within a year under 12 U.S.C. § 4807, or at minimum violated due process principles through their unreasonable delay. *Supra* p. 32. Defendants' evergreen response, that they have discretion to deny applications, misses the boat. Bd. Br. 17-22; KCF Br. 36.

32

Custodia's primary mandamus claim (Claim II) seeks to compel Defendants to render a decision, not to exercise that discretion in a particular way, and Defendants have no discretion to let Custodia's application languish forever. *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 n.6 (9th Cir. 1997); Compl. ¶ 88. Finally, to the extent the APA is inapplicable, Custodia has no other adequate remedy available to compel Defendants to act. In that case, it is mandamus or nothing, and this Court should not allow Defendants to take years to act with no decision in sight.

## D.  Custodia Adequately Pled a Declaratory Judgment Act Claim (Count IV)

Alternatively, Custodia is entitled to a declaratory judgment "that the Board and/or the Kansas City Fed must decide Custodia's master account application within a reasonable period of time." Compl. ¶ 109. The Declaratory Judgment Act authorizes federal courts, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Here, the actual controversy involves Custodia's entitlement to a timely decision on its master account application, and the harm caused by Defendants' refusal to act. Compl. ¶¶ 102-109.

The Kansas City Fed (at 35) asserts that "[a] declaratory judgment is a remedy, not a cause of action." But requests for declaratory judgments are commonly pled as claims whereby the requested remedy is that "the court . . . declare the rights or other legal relations of any interested party." *Bellwether Cmty. Credit Union v. Chipotle Mex. Grill, Inc.*, 353 F. Supp. 3d 1070, 1088 (D. Colo. 2018). Because there is "some independent basis of jurisdiction," declaratory relief is appropriate. *See Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006).

## III.  Vesting Final Decision-Making Authority in the Kansas City Fed Would Violate Numerous Constitutional Commands (Claims III, V, and VI)

Defendants' interpretation that § 342 of the Federal Reserve Act endows Reserve Banks with exclusive, wholly discretionary authority over master account applications would create

severe constitutional problems.  Defendants concede that the Kansas City Fed is at least a federal instrumentality, *i.e.*, a "corporation[] in which the government has an interest." *U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425-26 (1928);  Bd. Br. 3; KCF Br. 5. Federal instrumentalities must comply with constitutional constraints.  *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 52-55 (2015).  Vesting Reserve Banks with sole discretion over master accounts would blatantly violate nondelegation principles, due process, and the Appointments Clause.  The Court should reject Defendants' position to avoid these substantial constitutional problems. *Jennings*, 138 S. Ct. at 842.  Alternatively, were Defendants' position correct, Custodia is entitled to redress the ensuing constitutional violations with relief reverting decision-making authority to the Board, which must swiftly resolve Custodia's application.

### A.   Reading Section 342 to Grant Reserve Banks Total Discretion Over Master Accounts Would Flout Nondelegation Principles and Due Process (Claim III)

1. In Defendants' telling, § 342 grants Reserve Banks total, unreviewable discretion over master account applications—including the discretion to never decide those applications—just by providing that Reserve Banks "may receive … deposits of current funds" and other types of monetary instruments. Bd. Br. 16-18; KCF Br. 21-24.  That sweeping overreading of § 342 would walk Defendants straight into violations of bedrock nondelegation and due process principles.

Boundless, standardless discretion over regulatory decisions is unconstitutional. "Congress may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the power can exercise it." *Jarkesy v. SEC*, 34 F. 4th 446, 461 (5th Cir. 2022) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)); *see Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).  Relatedly, due process prohibits depriving private parties of property under a law "so standardless that it invites arbitrary enforcement." *Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (internal quotation marks omitted).

34

Yet, under Defendants' view, Congress in § 342 imposed no constraints whatsoever on how Reserve Banks resolve master account applications.  Reserve Banks could grant or deny access to the Federal Reserve System at will (including to the United States itself), with no oversight from anyone else, for any reason or by flipping a coin.  And they could take decades to render decisions, or even sit on applications forever.  *See* Bd. Br. 16-18; KCF Br. 21-24.  Congress' failure to provide any standard cabining Reserve Banks' discretion would amount to a blank check for Reserve Banks to write their own rules, a clear nondelegation violation.  Likewise, that view of § 342 impermissibly invites utterly arbitrary enforcement.  The Fifth Circuit recently held unconstitutional a statutory provision delegating to the Securities and Exchange Commission total discretion over whether to initiate enforcement actions in federal court or before the agency. *Jarkesy*, 34 F.4th at 465-66.  The far broader delegation here is not a close call.

The proof of the problems with Defendants' interpretation is in the pudding.  Defendants have employed an opaque decision-making process and give contradictory accounts of how the application process works.  Compl. ¶ 97.  Defendants' litigation positions conflict with Defendants' representations elsewhere as to *who* decides master accounts.  Defendants simultaneously claim that Reserve Banks have total discretion, yet the Board just issued Guidelines purporting to prescribe a framework for master account application decisions.  *Supra* p. 5.

2.  Defendants contend that a government entity's boundless discretion over a decision insulates it from any due process challenge, because no regulated party could ever expect a sufficient chance of a favorable outcome to confer a property interest.  Bd. Br. 33; KCF Br. 20-21. That argument does not apply to separation of powers or nondelegation violations, where private parties are independently harmed by being subjected to the exercise of powers that a governmental entity does not lawfully possess.  *Seila Law*, 140 S. Ct. at 2196.  As to due process violations,

private parties have standing, and the violation is complete, when the government subjects parties to unconstitutionally arbitrary procedures just for the chance of receiving some property benefit (here, master accounts). *Supra* pp. 11-12. Custodia also has "a legitimate claim of entitlement to" its master account, which is all that is required to establish a property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

The Kansas City Fed (at 30-31) denies that nondelegation principles are implicated, proclaiming that individual adjudications do not involve legislative power because they do not "govern the rights or behaviors of *groups* of entities and individuals," KCF Br. 31. But, under Defendants' view of § 342, nothing stops Reserve Banks from categorically granting or denying all applications. The Kansas City Fed also misapprehends the nondelegation doctrine. Congress impermissibly delegates legislative power by granting some other entity the power to decide what the substance of the law should be—in other words, by granting unfettered discretion over a decision that has "the purpose and effect of altering the legal rights, duties and relations of persons … outside the legislative branch." *Jarkesy*, 34 F.4th at 461 (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)). By contrast, when Congress delegates statutory duties to agencies but cabins their discretion, agencies exercise the *executive* power to enforce the law. *Id*. at 461-62. Similarly, nondelegation challenges do not depend on whether an entity exercises uncabined discretion through rulemaking or adjudication. *Jarkesy* illustrates the point: The Fifth Circuit found an invalid delegation even though the SEC determines case-by-case, not via rulemaking, whether to initiate a given enforcement proceeding before the agency or in federal court. *Id*. at 462-63.

Finally, the Board (at 33) misconceives of Custodia's claim as a vagueness challenge. But the problem here is not that Custodia cannot tell what conduct to engage in or eschew. The problem is that Defendants apparently adjudicate applications for master accounts—applications

that implicate public rights—with no discernible, fixed criteria and no safeguards against arbitrariness. That is a separate species of constitutional violation.

**B.     The Appointments Clause Prohibits the Kansas City Fed from Exercising Final, Binding Decision-Making Authority (Claim VI)**

1.  The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, imposes baseline rules of democratic accountability.   Anyone who performs important sovereign functions—*i.e.*, "exercise[s] significant authority pursuant to the laws of the United States'"—is an "[o]fficer of the United States" whose appointment must comply with the Clause. *United States v. Arthrex*, 141 S. Ct. 1970, 1980 (2021) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)).  Anyone who exercises *final* decision-making authority involving sovereign powers must be appointed as a "principal officer," through presidential appointment and Senate confirmation. *Arthrex*, 141 S. Ct. at 1984.  And anyone making *any* decisions involving important sovereign functions—even initial ones—must be appointed as an "inferior officer," *i.e.*, appointed by the President, the courts, or agency heads. *Lucia v. SEC*, 138 S. Ct. 2044, 2053-54 (2018).  The point of this process is simple: The "legitimacy" of various actors exercising executive power on the President's behalf depends on a "clear and effective chain of command" that alerts the public to *who* wields executive power and creates responsibility for bad decisions. *Arthrex*, 141 S. Ct. at 1979 (internal quotation marks omitted).  So important is this accountability that decisions by improperly appointed officers are void. *Lucia*, 138 S. Ct. at 2055.

Under this framework, only principal officers—people with presidential appointments and Senate confirmation—can render final decisions about master accounts.  Adjudicating master account applications unquestionably involves exercising "significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, because such adjudications "bind[] the government or third parties for the benefit of the public." *Officers of the U.S.*, 31 Op. O.L.C. at 77.  Master

37

account access is not simply a private business decision; the decision implicates federal sanctions policy, implementation of "Board orders," and the stability of the federal payment system. 87 Fed. Reg. at 51,107-09. In the Board's words, controlling master account access is essential to address "risks to the Reserve Banks, to the payment system, to the financial system, and to the effective implementation of monetary policy." *Id.* at 51,100. Analogous functions—like "authority on behalf of the government to receive and oversee the public's funds" and exercising "legal authority over the contracts and supplies … of the nation"—involve significant sovereign authority. *Officers of the U.S.*, 31 Op. O.L.C. at 89-90 (internal quotation marks omitted).

Given the ramifications of master account access, Congress sensibly vested ultimate authority for those decisions in the Board. *Supra* pp. 16-24. And if the Board retains final decision-making power, there is no Appointments Clause problem: all members of the Board are presidentially appointed and Senate-confirmed. 12 U.S.C. § 241. But the Board would have plainly violated its statutory, one-year deadline for deciding applications.

By contrast, the system Defendants posit, where Reserve Banks purportedly possess unreviewable, final discretion over master account access, violates the Appointments Clause and upends accountability. All agree that Reserve Bank presidents, vice presidents, and directors are not appointed as principal officers. Compl. ¶ 121; Bd. Br. 42-45; KCF Br. 34-35; 12 U.S.C. § 302 (appointment process). Indeed, a majority of Reserve Banks' boards of directors are private parties appointed by other private parties. *Infra* p. 43. Under Defendants' view, the President, Treasury Secretary, the Board, and anyone else charged with setting federal monetary policy would be at the mercy of decision-makers within twelve Reserve Banks, any of whom could hold monetary policy, economic sanctions policy, and a host of other federal objectives hostage by granting

master account access to bad actors, denying access across the board to important stabilizing institutions, or simply by refusing to adjudicate any applications at all, much less within a year.

2. Defendants insist that decisions on master accounts involve only routine commercial decisions, not the exercise of sovereign power, and thus do not require *any* governmental actor to make master account decisions. Bd. Br. 39-42; KCF Br. 34-35. Defendants ignore the operative test: whether decisions as to master account access involve "exercise[s] of significant authority pursuant to the laws of the United States." And Defendants' own representations obliterate their litigation position that master account decisions do not involve sovereign power. Take the Board's recent Guidelines. There, the Board casts master account determinations as playing a critical role in executing all sorts of quintessentially sovereign functions, like controlling the money supply, implementing sanctions programs, and integrating the federal payment system. *Supra* pp. 38-39.

The Board (at 39-42) invokes historical practice, noting that the Founding-era First Bank of the United States was viewed as a private entity whose heads were not appointed consistent with the Appointments Clause. Characterizing the First Bank as a private entity is questionable under modern-day Appointments Clause precedents. *See* Walter Dellinger & H. Jefferson Powell, *The Constitutionality of the Bank Bill: The Attorney General's First Constitutional Law Opinions*, 44 Duke L. J. 110, 131-32 (1994). Regardless, the analogy is inapt because today's Federal Reserve System exercises far more governmental power. "Unlike modern central banks, the Bank of the United States did not officially set monetary policy. Nor did it regulate, hold the reserves of, or act as a lender of last resort for other banks." Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* 8 (Mar. 2021), https://tinyurl.com/4xb99ys8. The Federal Reserve System also exercises rulemaking and adjudicatory functions that Defendants elsewhere concede are hallmarks of sovereign authority.

Bd. Br. 2; KCF Br. 14.   Indeed, under the Board's position that Founding-era practice should govern, the Appointments Clause would plainly apply to Reserve Banks' officers and directors, since the Founding-era understanding was that "officers of the United States" included "anyone with ongoing responsibility for a federal statutory duty." Jennifer L. Mascott, *Who Are 'Officers of the United States'?*, 70 Stan. L. Rev. 443, 546 (2018).

3. Defendants alternatively contend that the President of the Kansas City Fed alone makes decisions on master accounts.  Defendants thus see no Appointments Clause problem, reasoning that even inferior officers (like Reserve Bank Presidents) can make "unreviewable final decisions" so long as those officers can be fired at will and face other meaningful forms of supervision and control. Bd. Br. 42-45; KCF Br. 34–35.  Problems abound with Defendants' reasoning.

To start, for Reserve Bank Presidents to validly make *final* decisions on master account applications, they must be appointed as principal officers, *i.e.*, nominated by the President and Senate-confirmed. *Arthrex* held that "unreviewable executive power exercised by [administrative patent judges] is incompatible with their status as inferior officers." 141 S. Ct. at 1983. The Supreme Court found it dispositive that administrative judges could "render a final decision on behalf of the United States without any such review by their nominal superior or any other principal officer in the Executive Branch." *Id.* at 1981 (internal quotation marks omitted). *Arthrex* reiterated that "adequate supervision entails review of decisions issued by inferior officers." *Id.* at 1983.

Significantly, *Arthrex* rejected the sufficiency of many other means for the Director of the Patent and Trademark Office—a principal officer—to supervise and control these administrative judges. The Director's powers to pick which administrative judges hear cases, mandate rehearing before a more favorable panel, deprive decisions of precedential effect, and withdraw all future judicial assignments from judges without cause were no substitute for direct authority to review

administrative judges' decisions. *Id.* at 1981-83.  By definition, then, the lesser control that Defendants portray the Board as exercising over Reserve Banks is plainly inadequate.

Defendants' own authorities illustrate that the Board's power to fire Reserve Bank Presidents is, itself, insufficient. Bd. Br. 44-45 (citing, *inter alia*, *Intercoll. Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1341 (D.C. Cir. 2012)). Other "meaningful control" is necessary. Bd. Br. 44. But by Defendants' own account, no such control exists. Defendants pay lip service to the Board's supervisory authority, yet at the same time suggest the Board is powerless to control Reserve Banks' master account decisions in any way. Bd. Br. 4-8; KCF Br. 42-43.

Further, no authority remotely suggests that Reserve Bank Presidents are the sole decision-makers over master account applications.  Defendants invoke 12 U.S.C. § 341(7), but that provision undermines their position:  Reserve Bank powers can be "exercise[d] by [the] board of directors, or duly authorized officers or agents." In other words, officers *besides* Reserve Bank Presidents make decisions, *contra* Bd. Br. 32, 42; KCF Br. 34-35. Defendants note that Custodia has spoken with the Kansas City Fed's President. Bd. Br. 35; KCF Br. 32. But Custodia has also spoken with other Board and Kansas City Fed officials in a vain attempt to discern who is taking charge. Given the factual uncertainty, Defendants cannot prevail at the motion to dismiss stage.

Finally, the Appointments Clause violation would remain if Reserve Bank boards of directors made final decisions with Reserve Bank presidents. "When federal sovereign authority is delegated to a body, all voting members of that body share in the authority; the officer status of some members does not turn on the presence of others who may outvote them." *Federal Reserve Bank Members*, 43 Op. O.L.C. __, at *8. If Kansas City Fed directors participate in the decision, their appointments must comport with the Appointments Clause—but do not. Compl. ¶ 123.

41

### C. Allowing Reserve Bank Directors to Participate in Decision-Making Would Separately Violate Due Process and the Separation of Powers (Claim V)

The constitutional problems would multiply to the extent Reserve Bank directors—who are private parties—participate in Reserve Banks' purportedly unreviewable, discretionary decisions on master account applications. Custodia has plausibly alleged that such directors would participate in Reserve Bank decisions in the event Defendants' interpretation were correct and Reserve Banks made these decisions themselves. *Id.* ¶¶ 114-116. The Constitution prohibits Congress from vesting private parties with sweeping, discretionary authority. Defendants' contrary argument—that only Reserve Bank Presidents make decisions—is unsupported.

1. "There is not even a fig leaf of constitutional justification" for "handing off regulatory power to a private entity," which is "'legislative delegation in its most obnoxious form.'" *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)); *see also Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 708 (5th Cir. 2017) (private parties violate both due process and separation of powers by adjudicating other private parties' property rights). Handing off regulatory power to "private persons whose interests may be [or] often are adverse to the interests of others in the same business" exacerbates the constitutional offense. *Carter Coal*, 298 U.S. at 311; *see Ass'n of Am. R.R.s v. Dep't of Transp.*, 821 F.3d 19, 27 (D.C. Cir. 2016).

Defendants' interpretation would thus produce a textbook nondelegation violation. Reserve Bank boards of directors include wholly private parties. Compl. ¶ 12. Under 12 U.S.C. § 341(7), Reserve Bank powers are exercised first and foremost by "[the] board of directors"; others must be "duly authorized" to act. Deciding master accounts also plainly involves regulatory power, and also determines other parties' property rights. *Supra* p. 32. "Congress may employ

private entities for ministerial or advisory roles, but it may not give these entities governmental power over others." *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004).

On top of that, some directors "shall be chosen by and be representative of the stockholding banks," 12 U.S.C. § 302, which Custodia has plausibly alleged are often competitors with other banks that request master accounts. The competitive incentives are heightened when a novel banking institution, like Custodia, applies for a master account, thereby threatening the monopoly that traditional banks have on Federal Reserve services. Compl. ¶ 114. These other banks' representatives cannot properly adjudicate Custodia's master account application.

2. Defendants' responses are unpersuasive. As discussed, Defendants' assertion that the Kansas City Fed's President alone makes master account decisions finds no support in 12 U.S.C. § 341(7), would raise constitutional problems, and would at least require discovery. *Supra* pp. 34-42. Defendants also argue that any self-interested parties among Reserve Bank directors would not be a majority and would be subject to Board-ordered recusal for conflicts of interest. Bd. Br. 36-37; KCF Br. 32. But anyone who participates in sovereign decision-making—not just a majority—must properly exercise that power. *See Federal Reserve Bank Members*, 43 Op. O.L.C. __, at *8. Alternative means of control cannot cure an improper delegation of regulatory power. Nor, at this stage, could the Court say whether disinterested Reserve Bank decision-makers (whoever they are) could "overrule" interested directors. *See Ass'n of Am. R.R.s*, 821 F.3d at 35.

## IV.   Custodia Adequately Pled Alternative Claims for Relief in the Event Defendants Deny Custodia's Application (Claims VII and VIII)

If Defendants did deny Custodia's application, Custodia has adequately pled an entitlement to compel Defendants to grant the application. Compl. ¶¶ 128-144.

1. Custodia satisfies requirements for declaratory and mandamus relief because it is statutorily entitled to a master account. Congress has directed that "[a]ll Federal Reserve bank

services covered by the fee schedule" that the Board sets "shall be available to nonmember depository institutions." 12 U.S.C. § 248a(c)(2). "Shall" denotes a mandatory duty. *Jennings*, 138 S. Ct. at 844. "Covered" services include "currency and coin services; checking clearing and collection services; wire transfer services; automated clearinghouse services; settlement services," etc. 12 U.S.C § 248a(b). Putting those clauses together, Congress required that "nonmember depository institutions" like Custodia must be able to access the various "covered services." Critically, no one can access those services absent a master account. As Judge Bacharach concluded in *Fourth Corner*, state-chartered institutions like Custodia are statutorily entitled to master accounts because they "shall" be able to access banking services. 861 F.3d at 1067-73.[3]

Other courts likewise observe that the statute made "check clearing services ... available to all banks." *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989); *see Jet Courier Servs.*, 713 F.2d at 1222-23. And the Board itself has said the relevant statutory language "expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis." Bd. of Govs. of Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (1984), https://tinyurl.com/2enw3reu.

2. Defendants counter that 12 U.S.C. § 342 governs applications for master accounts and confers plenary discretion on Reserve Banks. Bd. Br. 17-22; KCF Br. 21. As discussed, *supra* pp. 17-20, that provision has nothing to do with master account access, and covers what financial instruments Reserve Banks may receive from entities that *already* have master accounts.

---

[3] In *Fourth Corner*, the Tenth Circuit issued a per curiam decision remanding the case to the district court so that Fourth Corner's amended complaint could be dismissed without prejudice and Fourth Corner could "proceed with its claims," then each judge issued a separate opinion. 861 F.3d at 1053. Only Judge Bacharach's opinion engaged with § 248a.

Defendants object that § 248a(c)(2) does not mention master accounts and merely governs "principles for setting prices." Bd. Br. 21-22; *see* KCF Br. 22-23. Those objections equally indict the Board's interpretation of § 342, which also does not mention master accounts. And Defendants misread § 248a(c)(2), which mandates that "*services covered by* the fee schedule" must be "available" to "nonmember depository institutions" on equal footing. Defendants' position—that § 248a requires only parity of fees—reads out this services-to-all-depository-institutions language. Section 248a's mandate can be satisfied only if nonmember depository institutions can access master accounts; no master account, no access to services.

While the Board (at 19-20, 23-25) tries to muddy the waters with legislative history, "legislative history is not the law." *Epic*, 138 S. Ct. at 1631. Regardless, the legislative history supports Custodia. *E.g.*, H.R. Rep. No. 95-1590, at 20 (1978) (explaining that the Monetary Control Act "opens access to Fed services to nonmember banks"); *Providing for Consideration of H.R. 7, Monetary Control Act of 1979*, 125 Cong. 6314 (1979) (statement of Rep. Murphy) (Federal Reserve services "will be provided to all depository institutions").

Finally, the Kansas City Fed objects that if every depository institution is statutorily entitled to a master account, "each individual state" would be "in control of access to the national payment system." KCF Br. 24; *see id.* 28-29. But that is a feature, not a bug, of the dual-tiered banking system the United States has adopted from the beginning. Under that system, States and the federal government enjoy dual responsibilities for chartering banks, ensuring their soundness, and cooperating to police the monetary supply. Compl. ¶ 22.

## CONCLUSION

This Court should deny Defendants' motions to dismiss, ECF Nos. 48 and 50.

Dated: September 13, 2022.

Custodia Bank, Inc., Plaintiff,

45

/s/ Scott E. Ortiz
Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper, WY 82602

John K. Villa
Ryan T. Scarborough
Sarah M. Harris (*pro hac vice* admission pending)
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify, on the 13th day of September, 2022, a true and correct copy of the foregoing was served on counsel, via the Court's electronic system, addressed to:

Joshua Paul Chadwick
Katherine Pomeroy
Yonatan Gelblum
Yvonne Facchina Mizusawa
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, NW
Washington, DC 20551
202-263-4835
joshua.p.chadwick@frb.gov
katherine.pomeroy@frb.gov
yonatan.gelblum@frb.gov
yvonne.f.mizusawa@frb.gov

Angela Tarasi
Christine Carletta
Jeffrey S. Bucholtz
Joshua Nathaniel Mitchell
King & Spaulding LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
720-535-2319
720-535-2400
atarasi@kslaw.com
ccarletta@kslaw.com
jbucholtz@kslaw.com
jmitchell@kslaw.com

Billie L. M. Addleman
Hirst Applegate LLP
1720 Carey Avenue, Suite 400
PO Box 1083
Cheyenne, WY 82003-1083
307-632-0541
307-632-4999
baddleman@hirstapplegate.com

/s/ Scott E. Ortiz

47

J.A.268

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| CUSTODIA BANK, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:22-cv-00125-SWS |
| v. | ) ) | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM & FEDERAL RESERVE BANK OF KANSAS CITY, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
## REPLY IN SUPPORT OF ITS MOTION TO DISMISS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

ARGUMENT ........................................................................................................... 2

I.  Congress Vested Reserve Banks with Deposit-Taking Authority and Imposed No Fixed Deadline on Requests for Deposit Accounts .......................................... 2

    A.  Reserve Banks Are Distinct Entities With Congressionally Defined Authority .... 2

    B.  Congress Conferred Discretion to Accept Deposits, and Therefore Whether to Open Master Accounts, to Reserve Banks in 12 U.S.C. § 342 .......................... 3

    C.  No Required Board Action Has Been Improperly Delayed .................................. 6

II.  Plaintiff Has Failed to Establish Justiciability ................................................. 11

III.  Plaintiff Fails to Allege Any Constitutional Violation ...................................... 17

    A.  Plaintiff Fails to State a Due Process Claim ........................................................ 17

    B.  Plaintiff Fails to State a Claim for Improper Delegation of Legislative Power ................................................................................................................... 20

    C.  Plaintiff Fails to State a Claim for Violation of the Appointments Clause .......... 22

CONCLUSION ...................................................................................................... 25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## Cases

*Aetna Life Insurance Co. v. Haworth*,
    300 U.S. 227 (1937) ............................................................................. 25

*Artis v. D.C.*,
    138 S. Ct. 594 (2018) ......................................................................... 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................. 6, 18, 19, 20

*Association of American Railroads v. DOT*,
    896 F.3d 539 (D.C. Cir. 2018) .......................................................... 20

*Barnhart v. Walton*,
    535 U.S. 212 (2002) ............................................................................. 9

*Beckles v. United States*,
    137 S. Ct. 886 (2017) ......................................................................... 18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................... 20, 25

*Bischoff v. Glickman*,
    54 F. Supp. 2d 1226 (D. Wyo. 1999) ................................................ 7

*Bischoff v. Myers*,
    216 F.3d 1086 (10th Cir. 2000) ......................................................... 8

*Board of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972) ........................................................................... 17

*Brzezinski v. DHS*,
    No. 21-cv-376, 2021 WL 4191958 (D.D.C. Sept. 15, 2021) ............ 10

*Carter v. Genesis Alkali, LLC*,
    No. 20-cv-216, 2021 WL 7209884 (D. Wyo. June 2, 2021) ............ 16

*Collins v. Daniels*,
    916 F.3d 1302 (10th Cir. 2019) ........................................................ 13

*Department of Transportation v. Association of American Railroads*,
    575 U.S. 43 (2015) ........................................................................... 21

ii

J.A.271

*Detroit International Bridge Co. v. Government of Canada*,
  883 F.3d 895 (D.C. Cir. 2018) ........................................................................ 21

*Dong v. Smithsonian Institution*,
  125 F.3d 877 (D.C. Cir. 1997) .......................................................................... 8

*Farmers and Merchants Bank v. Federal Reserve Bank of Richmond*,
  262 U.S. 649 (1923) ........................................................................................... 3

*Farrell-Cooper Mining Co. v. DOI*,
  728 F.3d 1229 (10th Cir. 2013) ...................................................................... 14

*Financial Oversight & Management Board for P.R. v. Aurelius Inv., LLC*,
  140 S. Ct. 1649 (2020) .................................................................................... 23

*Free Enterprise Fund v. PCAOB*,
  561 U.S. 477 (2010) ......................................................................................... 13

*Ghadami v. DHS*,
  No. 19-cv-397, 2020 WL 1308376 (D.D.C. Mar. 19, 2020) ........................... 10

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of N.Y.*,
  866 F.2d 38 (2d Cir. 1989) ............................................................................... 5

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................................................................... 7

*Hillsborough County v. Automated Medical Laboratories., Inc.*,
  471 U.S. 707 (1985) ........................................................................................... 9

*Hyde Park Company v. Santa Fe City Council*,
  226 F.3d 1207 (10th Cir. 2000) ...................................................................... 18

*Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*,
  684 F.3d 1332 (D.C. Cir. 2012) ............................................................. 7, 24, 25

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) ........................................................................... 18

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*,
  713 F.2d 1221 (6th Cir. 1983) .......................................................................... 5

*Kane County, Utah v. United States*,
  950 F.3d 1323 (10th Cir. 2020) ...................................................................... 15

J.A.272

*Kokajko v. FERC*,
    837 F.2d 524 (1st Cir. 1988) ................................................................. 11

*Lambert v. Saul*,
    980 F.3d 1266 (9th Cir. 2020) ................................................................ 9

*Lane v. Lane*,
    646 F. App'x 646 (10th Cir. 2016) ......................................................... 16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................ 16

*Laufer v. Looper*,
    22 F.4th 871 (10th Cir. 2022) ................................................................ 15

*Lewis v. United States*,
    680 F.2d 1239 (9th Cir. 1982) ................................................................ 4

*Mann v. Fifth Third Bank*,
    2011 WL 1575537 (S.D. Ohio Apr. 25, 2011) ....................................... 9

*Martin Marietta Materials, Inc. v. Kansas Department of Transportation*,
    810 F.3d 1161 (10th Cir. 2016) .............................................................. 17

*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................................ 25

*National Federation of Federal Employees v. United States*,
    905 F.2d 400 (D.C. Cir. 1990) ............................................................... 21

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019) ............................................................................. 17

*O'Gilvie v. United States*,
    519 U.S. 79 (1996) .................................................................................. 5

*Rector v. City & County of Denver*,
    348 F.3d 935 (10th Cir. 2003) ................................................................ 12

*Sarlak v. Pompeo*,
    No. 20-cv-35, 2020 WL 3082018 (D.D.C. June 10, 2020) ..................... 10

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ........................................................................... 13

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987) ....................................................................... 9, 10

*Smith v. U.S. Court of Appeals for the Tenth Circuit*,
  484 F.3d 1281 (10th Cir. 2007) .......................................................................... 12

*Taft v. Agricultural Bank of China Ltd.*,
  2016 WL 2766661 (S.D.N.Y. May 12, 2016) ................................................... 8, 9

*TNB USA, Inc. v. Federal Reserve Bank of N.Y.*,
  No. 1:18-cv-7978, 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020)...................... 6, 10, 14

*Telecommunications Research & Action Center v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ....................................................................... 10, 11

*United States v. Arthrex, Inc.*,
  141 S. Ct. 1970 (2021)........................................................................................ 24

*United States v. Hilario*,
  218 F.3d 19 (1st Cir. 2000) ................................................................................ 25

*United States v. Morgan*,
  44 F. App'x 881 (10th Cir. 2002) ....................................................................... 25

*Utah v. Babbitt*,
  137 F.3d 1193 (10th Cir. 1998) .......................................................................... 16

*Utah Association of Counties v. Bush*,
  455 F.3d 1094 (10th Cir. 2006) .......................................................................... 15

*Webster v. Doe*,
  486 U.S. 592 (1988)............................................................................................. 6

*Whitman v. American Trucking Associations*,
  531 U.S. 457 (2001)............................................................................................ 21

*WildEarth Guardians v. National Park Service*,
  703 F.3d 1178 (10th Cir. 2013) ........................................................................... 9

*Wyoming v. Zinke*,
  871 F.3d 1133 (10th Cir. 2017) .......................................................................... 14

*Ysleta Del Sur Pueblo v. Texas*,
  142 S. Ct. 1929 (2022)......................................................................................... 8

v

**Statutes**

5 U.S.C. § 701(a)(2) ........................................................................................ 6

6 U.S.C. § 211 ................................................................................................. 2

12 U.S.C. §§ 241-52 ........................................................................................ 2

12 U.S.C. § 248 .......................................................................................... 2, 10

12 U.S.C. § 248(a)(1) ...................................................................................... 4

12 U.S.C. § 248(f) ....................................................................................... 2, 6

12 U.S.C. § 248(j) ......................................................................................... 25

12 U.S.C. § 248(k) .......................................................................................... 3

12 U.S.C. § 248a ............................................................................................. 5

12 U.S.C. § 248a(d) ...................................................................................... 25

12 U.S.C. § 307 ............................................................................................. 25

12 U.S.C. §§ 341-61 .................................................................................... 2, 4

12 U.S.C. § 341(fifth) ................................................................................... 20

12 U.S.C. § 341(seventh) .............................................................................. 20

12 U.S.C. § 342 ....................................................................................... 3, 4, 5

12 U.S.C. § 343 ............................................................................................... 4

12 U.S.C. § 347 ............................................................................................... 4

12 U.S.C. § 391 ........................................................................................... 4, 5

12 U.S.C. § 1813(q) ........................................................................................ 8

12 U.S.C. § 1813(z) ........................................................................................ 8

12 U.S.C. § 1818(t)(5)(A) .............................................................................. 8

12 U.S.C. § 4801 ............................................................................................. 8

J.A.275

12 U.S.C. § 4807 ................................................................................................... 8

12 U.S.C. § 5465(a) ............................................................................................. 5

28 U.S.C. § 509 ................................................................................................... 2

28 U.S.C. § 531 ................................................................................................... 2

31 U.S.C. § 5328(a) (repealed 2021) ................................................................. 9

Wyo. Stat. § 13-12-116(a) ................................................................................. 16

Act of Feb. 25, 1791, Pub. L. No. 1-10, §§ 10, 12,
    1 Stat. 191, 196 ........................................................................................ 22, 23

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203,
    § 806, 124 Stat. 1376, 1811-14 (2010) ......................................................... 5

Monetary Control Act of 1980, Pub. L. No. 96-221,
    94 Stat. 132 (Mar. 31, 1980) .......................................................................... 5

**Legislative Materials**

H.R. Report No. 69, 63d Cong., 1st Sess. 16 (1913) ....................................... 4

**Regulatory Materials**

Guidelines for Evaluating Account and Service Requests,
    87 Fed. Reg. 51,099 (Aug. 19, 2022) .......................................................... 25

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................... 10, 18, 19, 20

**Other Authorities**

*Appointment & Removal of Federal Reserve Bank Members of the FOMC,*
    2019 WL 11594453 (Op. O.L.C. Oct. 23, 2019) ...................................... 22, 23

**J.A.276**

The Federal Reserve Act ("FRA") makes clear that Congress assigned deposit-taking functions to Reserve Banks rather than to the Board and imposed no fixed deadline for decisions regarding the acceptance or rejection of deposits.  Faced with this inescapable conclusion, Plaintiff argues in its Opposition that the Court must credit its contrary legal conclusions as well-plead allegations that would allow this action to proceed despite its facial legal infirmity.  This is not the law and should be rejected by the Court.

Plaintiff's principal argument, that a one-year statutory deadline applies, is entirely unsupportable and incorrect.  No amount of artful pleading can avoid this conclusion.  And, particularly given the novel complexities of Plaintiff's business model, recent regulatory activity by the Board in this area, and the extensive efforts and ongoing attention being paid by FRBKC to Plaintiff's request (and to its Federal Reserve membership application by the Board), the passage of time in this case is far from unreasonable as a matter of law and provides no basis for the Court to accept Plaintiff's invitation to intervene and direct Plaintiff's preferred outcomes. Rather, FRBKC should be permitted to complete its due diligence, assess the potential systemic financial and other risks presented by Plaintiff's novel business model and plans (including the marketing of a proprietary "programmable U.S. dollar called Avit"), and reach an informed decision under legal authority granted directly to it by Congress subject to Board oversight.

Because the relief Plaintiff seeks is limited to its claim of impermissible delay, *see* Compl. at 42 ("Request for Relief"), dismissal is appropriate without need for the Court to proceed beyond the issue of timing and into Plaintiff's various other statutory and constitutional claims even if those claims could satisfy justiciability requirements (and, as shown below and in the Board's initial brief, they cannot, and would in any event fail on the merits).

## ARGUMENT

**I.    Congress Vested Reserve Banks with Deposit-Taking Authority and Imposed No Fixed Deadline on Requests for Deposit Accounts**

### A.    Reserve Banks Are Distinct Entities With Congressionally Defined Authority

Notwithstanding Plaintiff's repeated assertions that Reserve Banks are indistinguishable from the Board, the FRA makes each Reserve Bank a separate "body corporate" with distinct governance and powers.  12 U.S.C. §§ 341-61.  These unique entities are thus unlike the FBI or Border Patrol (*see* Opp. at 24), which, by statute, are components of the Department of Justice and Department of Homeland Security, respectively.  *See* 28 U.S.C. §§ 509, 531 (FBI); 6 U.S.C. § 211 (Border Patrol).  And Reserve Banks are far different from regional offices of the Federal Deposit Insurance Corporation ("FDIC") or Office of the Comptroller of the Currency ("OCC"), despite one unsupported and conclusory suggestion to the contrary.  *See* Br. of *Amici Curiae* Members of the U.S. Senate Banking Comm. and U.S. House of Reps. Financial Servs. Comm. ("U.S. Members Br."), ECF No. 90-1, at 18.[1]  Instead, Congress quite purposefully drafted the FRA to grant some powers to the Board and some powers directly to the separately incorporated Reserve Banks.  *Compare* FRA subchapter II, 12 U.S.C. §§ 241-52 ("Board of Governors of the Federal Reserve System"), *id.* § 248 ("Enumerated Powers" of the Board) *with* FRA subchapter IX, 12 U.S.C. §§ 341-61 ("Powers and Duties of Federal Reserve Banks").

Plaintiff's conflation of distinct functions notwithstanding, when Reserve Banks exercise powers granted to them by Congress, the Board exercises only supervisory authority.  It cannot make decisions statutorily vested in Reserve Banks, though it may exercise influence through its oversight authority and other means, including its removal powers, *see* 12 U.S.C. § 248(f).  On

---

[1] This brief was submitted by three out of twenty-four members of the Senate Banking Committee and four out of fifty-four members of the House Financial Services Committee.

the other hand, when the Board delegates its own statutory powers to Reserve Banks pursuant to

12 U.S.C. § 248(k), it *can* directly control their activity and outcomes with respect to the

delegated matter.  It is as a result of this delegated authority that Reserve Banks may "process"

many "bank applications on behalf of the Board."  U.S. Members Br. at 18.  The decision at

issue here concerns a distinct Reserve Bank function, not a delegated power.

### B.   Congress Conferred Discretion to Accept Deposits, and Therefore Whether to Open Master Accounts, to Reserve Banks in 12 U.S.C. § 342

As the Board has shown, master accounts are deposit accounts and as such are governed

by 12 U.S.C. § 342, which gives Reserve Banks, including FRBKC, discretion to receive or not

receive deposits, and therefore discretion over whether or not to open a master account for any

particular entity.  Bd. Mem. at 4, 17-20.  As the Board explained, the relevant statutory language

of § 342 includes the permissive "may," which has long been interpreted by courts, including the

U.S. Supreme Court, to denote a discretionary power.  *Id*. at 17-20.[2]

Plaintiff's argument that the Board "sits atop the Federal Reserve System," "exercises

veto power over everything Reserve Banks do," and therefore controls the decision whether to

grant individual master accounts, Opp. at 17; *see also id.* at 2 ("the Board retains final decision-

making authority over master account applications"), ignores Congress's express vesting in

Reserve Banks—not the Board—the discretionary authority to receive deposits, among

---

[2] Plaintiff claims that Defendants incorrectly rely on *Farmers and Merchants Bank v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923), handed down shortly after enactment of the FRA in 1913, in which the Court interpreted § 342's "may receive" language as permissive.  *See, e.g.*, Bd. Mem. at 18-19.  Plaintiff claims that *Farmers* merely "reinforces that § 342 confers some discretion over what types of monetary instruments Reserve Banks may accept," but not the "antecedent question" of whether to open master accounts.  Opp. at 18.  But *Farmers* cannot be read so narrowly, and the language of § 342 is far broader than plaintiff suggests, with the permissive "may" modifying both the verb "receive"—giving Reserve Banks discretion over whether or not to receive deposits, and therefore discretion over whether to open a master account—as well as discretion over the types of deposits to receive, including "current funds in lawful money," "checks," or "other items."  12 U.S.C. § 342.

3

numerous other statutory grants of authority directly to Reserve Banks.  *E.g.*, 12 U.S.C. § 342; *id.* § 343 (Reserve Banks "may discount" certain notes); § 347 (Reserve Banks "may make advances for [limited] periods . . . to its member banks").  Indeed, the entirety of subchapter IX of the FRA, 12 U.S.C. §§ 341-61, is devoted to the "Powers and Duties of Federal Reserve Banks."  While exercising significant supervisory authority over the Reserve Banks (as well as regulating commercial banks[3]), the Board does not direct their day-to-day operations.  *See* 1913 House Report at 18-19; *see also Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) ("It is evident from the legislative history of the Federal Reserve Act that Congress did not intend to give the federal government direction over the daily operation of the Reserve Banks.").[4]

Plaintiff's further argument that § 342 cannot properly be interpreted to give Reserve Banks discretion over whether or not to accept deposits—and therefore discretion whether to open a master account—because this "would lead to the implausible conclusion that Reserve Banks could unilaterally deny master accounts *to the United States*," Opp. at 17, is incorrect.  A different provision of the FRA requires Reserve Banks to accept deposits of public moneys and gives the *Secretary of the Treasury* discretion to determine when to make such deposits. 12 U.S.C. § 391 (public funds "may, upon the direction of the Secretary of the Treasury, be deposited in Federal reserve banks, which banks, when required by the Secretary of the Treasury, shall act as fiscal agents of the United States; and the revenues of the Government or any part thereof may be deposited in such banks").  As a result, "a single, unaccountable Reserve Bank"

---

[3] *See, e.g.*, 12 U.S.C. § 248(a)(1) (granting Board power to "examine at its discretion the accounts, books, and affairs of each Federal reserve bank and of each member bank and to require such statements and reports as it may deem necessary").

[4] That a Reserve Bank might choose to wait to issue a master account decision until the Board issues rules or guidelines relevant to the decision does not convert the decision into one that was made or vested in the Board.  *Contra* Opp. at 14, 23.

4

could not, as Plaintiff implausibly argues, "unilaterally defeat federal monetary policy and create economic chaos." Opp. at 18.  Moreover, if § 342 in fact *required* Reserve Banks to accept deposits, as Plaintiff incorrectly contends, there would have been no reason for Congress to make specific provision in § 391.[5],[6]

Plaintiff's citations to *Greater Buffalo Press, Inc. v. Federal Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989), and *Jet Courier Servs.*, *Inc. v. Federal Reserve Bank of Atlanta*, 713 F.2d 1221, 1222-23 (6th Cir. 1983), for the proposition that the Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (Mar. 31, 1980) ("MCA"), "made 'check clearing services . . . available to all banks,'" Opp. at 44, is also unpersuasive.  Master accounts are deposit accounts, not "services," Bd. Mem. at 20, but even if it were otherwise, these cases simply observed that the MCA added 12 U.S.C. § 248a ("Pricing of services") so that member and nonmember banks alike would pay a uniform fee for Reserve Bank services, not so that each and every bank, regardless of risks to the system and other factors, was guaranteed access to services.  *Greater Buffalo*, 866 F.2d at 46; *Jet Courier*, 713 F.2d at 1227 ("What is clear [from the MCA] is that the covered services offered by Federal Reserve Banks are to be priced explicitly, are to be made

---

[5] Plaintiff's claim that Congress "used different language [in 12 U.S.C. § 5465(a)] to grant the Board control over . . . master accounts" for designated financial market utilities, Opp. at 18, seeks to use inapposite legislation enacted nearly 97 years after the FRA, *see* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 § 806, 124 Stat. 1376, 1811-14 (2010), to impermissibly construe an earlier Congress's enactment.  *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("the view of a later Congress cannot control the interpretation of an earlier enacted statute").  In any event, the section supports the interpretation that § 342 gives Reserve Banks discretion over the master account decision for other depository institutions.

[6] Plaintiff also cites a laundry list of various statutes expressly providing for Board approval of specifically-enumerated Reserve Bank matters, and argues that "[i]t defies credulity that Congress carved out an exception to the rule that the buck stops with the Board just for determinations about who gets master accounts."  Opp. at 20-21.  But this list of *specific matters* requiring Board approval actually indicates the lack of any general "rule" vesting all decisionmaking authority on all matters with the Board.  If the Board had such power, these specific grants of authority would be unnecessary.

5

**J.A.281**

available to nonmember depository institutions at the same fees charged member banks, and that 'over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services.'"); *see also* Bd. Mem. at 21.

### C.    No Required Board Action Has Been Improperly Delayed

Despite Plaintiff's contention that it has alleged facts supporting "an inference that the Board exercises final decision-making authority" over master accounts, Opp. at 23, its self-serving allegations cannot circumvent the language of the statute.[7]  Indeed, Plaintiff cannot bootstrap its way into an interpretation inconsistent with the statutory text by demanding that the legal inferences it wants drawn from its factual allegations be entitled to deference—they are not. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  As discussed above, and in the Board's initial brief (at 1-2, 4-5, 11, 17), the Board does not decide individual master account requests as a matter of law under the FRA.  If unhappy with such a decision, or pattern of decisions, the Board may of course consider use of its broad removal authority over Reserve Bank officials.  *See* 12 U.S.C. § 248(f).  Choosing whether to exercise this authority is a classic example of a matter that is committed to agency discretion, and not a matter subject to APA unreasonable delay jurisprudence.  *See* 5 U.S.C. § 701(a)(2) (APA does not provide for review of matters committed to agency discretion); *cf. Webster v. Doe*, 486 U.S. 592, 600-01 (1988) (judicial review of NSA Director's terminations not permitted under the APA because discharge decisions were "committed to agency discretion by law").

---

[7] Plaintiff's citation to the *TNB* litigation is unavailing, *see* Opp. at 22, as that decision merely cited allegations related to the Board's involvement with TNB's master account request and did not make any findings of fact or law regarding the Board's authority or lack thereof.  *See TNB USA Inc. v. Fed. Reserve Bank of N.Y.*, No. 1:18-cv-7978, 2020 WL 1445806, at *3 (S.D.N.Y. Mar. 25, 2020).

Plaintiff conflates the Board's discretionary supervisory authority that may *influence* how Reserve Banks decide master account requests with responsibility for *directing* the decision.  But supervisory authority is legally distinct from decisionmaking authority, Plaintiff's creative pleading efforts notwithstanding.  *See, e.g.*, *Intercoll. Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1340-41 (D.C. Cir. 2012) (Librarian of Congress could use removal power to "supervise" officials who made "final" decisions not "directly reversible" by the Librarian). Plaintiff takes issue with the Board's approval of Operating Circulars, Opp. at 22-23, but this activity is consistent with the Board's general supervisory role, which can encompass guidance about the process by which Reserve Banks make master account decisions without converting the Board into the decisionmaking authority.  Plaintiff also distorts the Board's role by wrongly claiming that the Board's expectation that Reserve Banks "engage in consultation" with it and each other is tantamount to the Board seizing control of master account decisions.  *See* Opp. at 23.  Once again, this consultative role is consistent with both the Board's general supervisory powers and the fact that it has not been tasked with master account decisions as a matter of law. *Cf. Intercoll. Broad. Sys., Inc.* 684 F.3d at 1339-41 (consultation procedure was aspect of supervision of officials who made "final" decisions not "directly reversible" by superiors).

Because the authority to open master accounts is committed to Reserve Banks by statute, and the Board's powers to influence such decisions are also discretionary, any alleged act taken by the Board that may influence Reserve Bank action (or a decision not to act) as part of its supervisory authority is wholly discretionary and not subject to judicial review under the APA. *Heckler v. Chaney*, 470 U.S. 821, 837 (1985); *see also, e.g.*, *Bischoff v. Glickman*, 54 F. Supp. 2d 1226, 1230 (D. Wyo. 1999) (dismissing APA claims because "issuance or non-issuance" of the requested action was "wholly within the discretion" of the agency), *aff'd on standing grounds*

*sub nom.*, *Bischoff v. Myers*, 216 F.3d 1086 (10th Cir. 2000).

Moreover, master account decisions are not subject to 12 U.S.C. § 4807, which applies a one-year deadline only to applications for decisions assigned to a federal banking agency such as the Board, *not* to decisions that Congress vested in Reserve Banks.  Plaintiff's contrary claim is simply wrong.  Opp. at 16.  Section 4807 is expressly limited to applications made to "federal banking agenc[ies]," as defined in 12 U.S.C. § 1813(z), which is limited to the Board, OCC, and FDIC, and therefore does not encompass master account requests to Reserve Banks.  Bd. Mem. at 10-11.[8]  Plaintiff's § 4807 argument rests largely on its legally erroneous assertion that "the Board controls master account adjudications," Opp. at 16, which is incorrect.  Plaintiff's citation to the definition in another federal banking statute, Opp. at 24-25, does not change this analysis, as § 4807 expressly incorporates the definition of "federal banking agency" in § 1813(z).[9]  *See* 12 U.S.C. § 4801.  Plaintiff's citation to *Taft v. Agricultural Bank of China Ltd.,* 2016 WL

---

[8] Plaintiff's assertion that excluding Reserve Banks from the scope of "Federal banking agency" for purposes of section 4807 would create a "glaring loophole whereby the Board could make the one-year deadline magically disappear by routing applications to subsidiary officers or agents," Opp. at 16, is plainly wrong.  It was *Congress* and not the Board that assigned the power to engage in banking functions such as opening accounts to Reserve Banks in the original FRA, *see supra* at 2-5; the Board is not arguing here that when it delegates its own powers to Reserve Banks—a matter not at issue since this case does not involve a delegated function—section 4807 does not apply.

[9] Plaintiff's reliance on 12 U.S.C. § 1818(t)(5)(A), which concerns submission of investigative requests by a "regional office of an appropriate Federal banking agency (including a Federal Reserve bank)," does not help its position.  The term "appropriate Federal banking agency" is separately defined at 12 U.S.C. § 1813(q) with no cross-reference to the definition of "Federal banking agency" in section 1813(z), so section 1818(t)(5)'s treatment of "appropriate Federal banking agency" is not in any way linked to section 1813(z)'s definition.  In any event, Congress would have had no reason to add the phrase "(including a Federal Reserve bank)" to § 1818(t)(5)(A) if Reserve Banks were already included in the baseline definition of "Federal banking agency."  *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) ("we must normally seek to construe Congress's work so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant" (quotation omitted)); *cf. Dong v. Smithsonian Inst.*, 125 F.3d 877, 878-79 (D.C. Cir. 1997).

8

2766661, at *12-13 (S.D.N.Y. May 12, 2016), in which the court construed the undefined term "federal supervisory agency" in the Bank Secrecy Act, 31 U.S.C. § 5328(a) (repealed 2021), is similarly inapposite because it concerned a different statute and the *delegation* of the Board's examination duties to a Reserve Bank, which is an entirely different circumstance from that presented here.[10]

Although this analysis should conclude the Court's review of Plaintiff's APA claim, Plaintiff's related undue delay arguments also fail.  Plaintiff paints an inaccurate picture of delay by claiming "22 months of inaction," Opp. at 29, but in doing so wholly ignores the Board's efforts to issue its Proposed Guidelines for Evaluating Account and Services Requests, review comments, publish a supplemental notice, and ultimately issue final Guidelines,[11] as well as Plaintiff's intervening action to begin its separate application with the Board to become a member bank some 10 months *after* filing its master account request with FRBKC.  *See* Bd. Mem. at 6-7, 9; Opp. at 6-7; *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987) (crediting the activity engaged in by the agency during the years that passed after initially proposing a rule).  Such activity distinguishes this case from undue delay cases where an agency lay fallow without reason.

---

[10] *Mann v. Fifth Third Bank*, 2011 WL 1575537 (S.D. Ohio Apr. 25, 2011), also involved examination duties.  *Id.* at *3.

[11] Plaintiff argues (Opp. at 21) that the Board is not entitled to deference for the positions articulated in the Guidelines even though the Board is charged with interpreting the FRA, the question of Reserve Bank discretion was squarely addressed in multiple rounds of notice and comment, and the Guidelines were adopted by a unanimous Board vote.  This is not so.  *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1188 (10th Cir. 2013) (in deciding whether to give deference, courts must consider "the agency's expertise, the importance of the question to the agency's administration of the statute, . . . the degree of consideration the agency has given the question," and "the presence or absence of notice-and-comment") (citing *Barnhart v. Walton*, 535 U.S. 212, 222 (2002)); *see also Lambert v. Saul*, 980 F.3d 1266, 1275 (9th Cir. 2020) (granting deference to interpretation in the *preamble* to a rule that followed notice and comment) (citing *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)).

Plaintiff next refers to the factors set forth in *TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (cited in Bd. Mem. at 16), which it first urges the Court to apply, Opp. at 29, before suggesting that the factors should not be considered at the motion to dismiss stage, *id.* at 30. Many courts have rejected the latter argument, finding that "it is appropriate for the Court to apply the factors at this stage." *E.g.*, *Ghadami v. DHS*, No. 19-cv-397, 2020 WL 1308376, at *7 n.6 (D.D.C. Mar. 19, 2020). "In applying these factors, the Court is not determining whether there has been an unreasonable delay; rather, it is determining whether plaintiffs' complaint has alleged facts sufficient to state a plausible claim for unreasonable administrative delay." *Id.* Plaintiff's Complaint—spanning forty-two pages—alleges facts that allow the Court to be able to evaluate the APA claim at this time. Indeed, countless courts have applied the *TRAC* factors and dismissed the case. *E.g.*, *Sierra Club*, 828 F.2d at 799; *Brzezinski v. DHS*, No. 21-cv-376, 2021 WL 4191958, at *6 (D.D.C. Sept. 15, 2021) (dismissing undue delay claim under 12(b)(6) after analyzing the six *TRAC* factors where seventeen months had elapsed since the date of the last government action).

Moreover, the weight of the *TRAC* factors tilts in the Board's favor. With respect to the first two factors regarding a "rule of reason" or timetable for decision, there is no congressionally imposed timeline for a master account decision, and Congress has given the Board wide discretion with respect to the agency's supervision of Reserve Banks. *See* 12 U.S.C. § 248; *cf. Brzezinski*, 2021 WL 4191958, at *5.[12] Furthermore, by issuing the Guidelines, the Board *did*

---

[12] "Absent a congressionally supplied yardstick, courts typically turn to case law as a guide." *Sarlak v. Pompeo*, No. 20-cv-35, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020). The limited case law on this point is in the Board's favor, as the *TNB* court suggested that while an 18-month wait could be "concerning," it was not problematic in the way that a many-year delay would be. *TNB*, 2020 WL 1445806, at *7. Similarly, Plaintiff's master account request here is nowhere approaching the timeline subject to potential judicial action posited by the court in that case.

take action within a reasonable time that will influence Reserve Banks.[13]  Just because the Board did not dictate a specific timeline for Reserve Banks to render a decision, or take some other discretionary act that Plaintiff may desire, does not mean that the Board has not acted in accordance with a "rule of reason."

The third factor regarding the type of harm alleged—which Plaintiff conveniently failed to address—clearly weighs in the Board's favor because a lengthier delay can be reasonable when the issue presented involves economic matters and does not implicate human health and welfare.  *See* Bd. Mem. at 15-16; *Kokajko v. FERC*, 837 F.2d 524, 526 (1st Cir. 1988).  Fourth, "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80.  The Board explained at length why Plaintiff's business model poses novel, precedent-setting risks that require careful consideration by FRBKC.  Bd. Mem. at 9, 14.  A Court-imposed deadline could cause a rushed analysis that jeopardizes the Federal Reserve's ability to achieve its policy goals or result in a premature decision.  While the fifth factor is designed to lean in a petitioner's favor, the nature of the interests prejudiced by delay of a master account decision are purely pecuniary and, as discussed below at 15-17, Plaintiff failed to adequately allege a present injury given its independent inability to operate at the time it filed its Complaint.  Finally, as to the sixth factor, it should be noted that there has been no allegation of impropriety or bad faith by the Board.

## II.    Plaintiff Has Failed to Establish Justiciability

The Board made a facial attack on justiciability and nothing in Plaintiff's Opposition suggests that its allegations satisfy its threshold burden.  With respect to the constitutional claims

---

[13] Plaintiff blithely states, with no analysis, that retroactive application of any change of substantive criteria contained in the Guidelines would be unlawful.  *See* Opp. at 31.  Plaintiff's brief contains no response to the Board's prior argument that applying the Guidelines to Plaintiff's master account request has no impermissible retroactive effect.  Bd. Mem. at 14 n.20.

relating to who might make a final decision (Claims V-VI), and contingent claims seeking relief in the event of an adverse decision (Claim VII-VIII), the Board showed that Plaintiff failed to establish a present injury that supports standing as to such claims, and, alternatively, that the claims were unripe because a decision could be favorable to Plaintiff.  Bd. Mem. at 27-31.  As to Plaintiff's remaining claims relating to timeliness, the Board explained that the Complaint failed to allege that Plaintiff held a Certificate of Authority that allowed it to actually operate as of the time it sued, and therefore had not established the injuries it alleged.  *Id.* at 31-32.

The cases Plaintiff cites do not hold otherwise.  With respect to its due process claim concerning purported bias by officials it speculates might participate in making a final decision on its request (Claim V), *Rector v. City & County of Denver*, 348 F.3d 935 (10th Cir. 2003), in fact supports the Board's position.  *Rector* held that, because a plaintiff "was neither assessed, nor did she pay, the late fee, she has no standing to challenge claims addressing the procedures under which the late fee may be contested" and thus dismissed her due process claim.  *Id.* at 946.  Similarly here, absent an adverse final decision, Plaintiff lacks standing to challenge the purported bias of the potential decisionmakers who allegedly might make such a decision.

Plaintiff's lack of any concrete injury is further reflected in its inability to allege that the final decision—which has not been made—will actually be made by purportedly biased officials, instead resorting to hypotheticals and conjecture.  *See* Compl. ¶ 115 (asserting a violation "*to the extent*" allegedly biased decisionmakers participate in making the final decision).  A plaintiff cannot litigate a hypothetical due process violation that may not materialize based on such speculative assertions about events that may never occur.  *See Smith v. U.S. Ct. of Appeals, for the Tenth Cir.*, 484 F.3d 1281, 1285-86 (10th Cir. 2007) (plaintiff lacked standing to file a federal court challenge on due process grounds to a state court's issuance of unpublished

opinions when no opinion had been issued in his pending state court appeal at the time he sued).

The cases cited by Plaintiff to claim standing as to its Appointments Clause claim (Claim VI) are distinguishable because in those cases the challenged governmental act *had already occurred* and *already impacted* the party invoking the Court's jurisdiction, and thus there was no question as to injury.  In fact, *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), reaffirmed that a plaintiff raising a separation of powers challenge must show that it "sustains injury from an executive act that allegedly exceeds the official's authority" to have standing.  *Id.* at 2196 (cleaned up); *see also Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (cases raising separation of powers issues merit stricter, not laxer standing analysis).

Thus, in *Seila Law*, the petitioner challenged a civil investigative demand that *it had been issued* "to provide documents it would prefer to withhold, a concrete injury."  *Id.* at 2196.  The injury element of standing was thus not at issue; rather, the Court held that the petitioner did not need to show that the demand would not have been issued but for the asserted constitutional violation, *id.*, a matter that appears to concern causation.  Similarly, in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), the respondent had already initiated a formal investigation, *id.* at 487, and its very power to do so was at issue.  *Id.* at 504-05 (noting that "the power to start, stop, or alter individual . . . investigations" was at issue and was one of the ways by which the respondent "interven[ed] in the affairs of regulated firms").  As in *Seila Law*, the Court simply held that the plaintiffs did not need to show that the investigation *that had already been opened* would not have commenced absent the constitutional violation at issue, again addressing causation rather than injury.  *Id.* at 512 n.12.  It did not hold that had no action yet been taken, the plaintiffs would have had standing.  Here, by contrast, Count VI specifically challenges the authority of certain officials to make a *final decision* that has not yet been made; it has not yet

impacted (and may never detrimentally impact) Plaintiff.  Until such a final decision has been made, and unless such a decision is adverse to Plaintiff, it has suffered no concrete injury in connection with these alleged claims, which must therefore be dismissed on standing grounds.

Moreover, the cases cited by Plaintiff do not address the ripeness of its constitutional claims, which relate to the outcome of a process that has not concluded; under controlling precedent, such claims must be dismissed on ripeness grounds when a pending administrative proceeding may result in a decision favorable to the plaintiff.  *Wyoming v. Zinke*, 871 F.3d 1133, 1142 (10th Cir. 2017) (noting "waste of judicial resources" that would result absent dismissal); *Farrell-Cooper Mining Co. v. DOI*, 728 F.3d 1229, 1238 (10th Cir. 2013) (dismissing on ripeness grounds where pending administrative proceedings could result in a favorable decision to the plaintiff).  Here, a final decision may be favorable to Plaintiff, meaning it will have sustained no injury from involvement of any particular officials in making such a decision.[14]

With respect to Plaintiff's assertions about Counts VII and VIII, which are expressly phrased in conditional terms relating to a potential denial of a master account, the fact that a decision has not been made renders them unripe even if, as Plaintiff contends, it has an absolute right to such an account.  *See generally TNB*, 2020 WL 1445806, at *8  (dismissing similar claims on ripeness grounds when a final decision had not been made).  Moreover, as explained below, even if, as Plaintiff contends, the law requires the grant of an account, these claims are

---

[14] The bulk of the briefs from the State of Wyoming and the Wyoming members focus on the substance of the master account decision, *i.e.*, the view that Wyoming SPDIs should quickly be granted a master account because they do not pose a serious risk to the national payment system or the Federal Reserve.  But that issue is unripe and beyond the scope of what should presently be considered by the Court.  Indeed, the Wyoming members acknowledged that they "do not purport to be expert on the questions of federal jurisdiction or the Administrative Procedure Act that underlie much of the defendants' motions to dismiss."  Br. of *Amici Curiae* Wyo. Senator Rothfuss and Rep. Olsen, ECF No. 89, at 2.

not justiciable for the same reason as Plaintiff's timeliness claims (Claims I-IV).

Plaintiff has also failed to establish standing to assert its timeliness claims (or any other claim), as it concedes that it has "just" obtained a Certificate of Authority allowing it to operate, Opp. at 2,[15] *i.e.*, that it was not operating three months earlier when it filed suit.  Its Complaint made no allegations establishing that, as of the time it sued, it had qualified and applied for such a certificate allowing it to operate, or that whatever costs and risks it would incur due to using a partnering arrangement were actual or certainly impending at the time, when it was not actually operating or capable of operating under such an arrangement.[16]  It thus has not established standing, which is assessed as of the time suit is filed.  *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1099, 1101 (10th Cir. 2006) (harm accruing after suit was filed did not establish standing); *see also Kane Cnty., Utah v. United States*, 950 F.3d 1323, 1333 (10th Cir. 2020) (future injury must be "certainly impending" to constitute injury in fact (citation omitted)).  Its citations to cases where delay or uncertainty caused an injury-in-fact, Opp. 9-10, are thus inapposite.

Plaintiff belatedly tries to assert new facts in its brief, claiming that at some unspecified time it incurred costs to retool systems due to a partnering arrangement, Opp. at 8-9, and asserting for the first time that because it had to have either a master account or a relationship with a third-party bank to obtain the certificate, the Defendants' actions delayed issuance of the certificate.  Opp. at 10.  The Board made only a facial attack on justiciability, however, Bd. Mem. at 26 n.25, and assertions not in the Complaint are therefore irrelevant to establishing standing.  *Laufer v. Looper*, 22 F.4th 871, 875-76 (10th Cir. 2022) (disregarding declaration with

---

[15] The State's amicus brief further clarifies that the certificate was issued the day before Plaintiff's Opposition was filed, more than three months after it filed suit.  Br. of *Amicus Curiae* State of Wyo., ECF No. 88 ("Wyo. Br."), at 6.

[16] In fact, Plaintiff has never alleged *when* it expects to start operating.

additional facts in support of standing submitted in opposition to motion to dismiss that raised only a facial attack to standing); *cf. Carter v. Genesis Alkali, LLC*, No. 20-cv-216, 2021 WL 7209884, at *3 (D. Wyo. June 2, 2021) ("Plaintiffs are not permitted to 'effectively amend their Complaint by alleging new facts in their response to a motion to dismiss.'" (citation omitted)).

These assertions are in any event insufficient to establish Plaintiff's standing as of the time it sued. The claim about costs, like the claims of injury in the Complaint, fails to identify when such costs were incurred or became "certainly impending" relative to when the Complaint was filed. The sudden and conclusory assertion that Defendants are responsible for allegedly delaying the grant of a certificate to Plaintiff is not based on any factual allegations supporting an inference that, by the time it brought suit, Plaintiff met all requirements for immediate issuance except for lack of a master account or partnering arrangement,[17] and is in fact inconsistent with Plaintiff's own factual assertions. Plaintiff asserted that it had already negotiated a partnering arrangement as of the time it sued, Compl. ¶ 8, yet only "*just*" received a certificate, Opp. at 2. The State must issue the certificate within 30 days of receiving a complete application, Wyo. Stat. § 13-12-116(a), meaning Plaintiff would have previously received this certificate if the only holdup was lack of a master account or alternative arrangement as it now contends.

These assertions thus fail to demonstrate Plaintiff's standing as of the time it sued. *See Utah v. Babbitt*, 137 F.3d 1193, 1207 n.20 (10th Cir. 1998) ("conclusory allegations" irrelevant to standing analysis (citations omitted)); *cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("'some day' intentions without . . . any specification of when the some day will be" do not establish justiciability); *Lane v. Lane*, 646 F. App'x 646, 649 (10th Cir. 2016) (bare assertion that

---

[17] As indicated in the State's brief, multiple requirements must be met to qualify for a certificate. Wyo. Br. at 5-6.

claim against debtor's bankruptcy estate deprived him of property, without factual allegations showing his entitlement to estate assets, failed to establish standing to contest the claim).

## III.    Plaintiff Fails to Allege Any Constitutional Violation

### A.    Plaintiff Fails to State a Due Process Claim

The Board has explained that Plaintiff failed to state a due process claim because it lacked a concrete property interest that implicated due process protections, and also because its allegations failed to show constitutionally impermissible delay, vagueness, or bias in the master account process.  Bd. Mem. at 33-37.  Plaintiff's Opposition fails to demonstrate otherwise.

First, discretion over master account requests precludes a due process claim because it establishes Plaintiff's lack of a property right implicating due process.  *Martin Marietta Materials, Inc. v. Kansas DOT*, 810 F.3d 1161, 1171, 1178 (10th Cir. 2016).  Plaintiff, quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972), responds in conclusory fashion that it "has 'a legitimate claim of entitlement . . .' which is all that is required to establish a property interest."  Opp. at 36.[18]  But *Roth* explained that, to be "legitimate," such a claim must be legally valid rather than reflect a plaintiff's "unilateral expectation."  408 U.S. 577.  Thus,

---

[18] Plaintiff relies on the canon of constitutional avoidance to argue that the Court should adopt its interpretation of the FRA, Opp. at 2, yet later relies on its favored construction of the statute to assert that it has a "legitimate claim of entitlement" to an account that implicates due process rights, Opp. at 36.  (Elsewhere it raises other statutory arguments in asserting a constitutional violation, *see, e.g., infra* at 20.)  Interpreting the FRA as plaintiff suggests here (or to make the grant of a master account mandatory or the Board responsible for deciding master account requests) is inconsistent with the statutory text, structure, and even section and chapter headings, and thus not a basis for applying the avoidance canon.  *See Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019) (refusing to apply the canon where the statute's text "cuts clearly against" the proponent of avoidance, observing that the "constitutional concerns are offered as just another pillar in an argument for their preferred reading of the [statute]").  Moreover, the canon is only invoked to avoid "serious" constitutional problems.  When judicial precedents "undermine" a plaintiff's constitutional claims, the canon is not implicated.  *Artis v. D.C.*, 138 S. Ct. 594, 606 (2018).  Because Plaintiff's constitutional claims rest on conclusory assertions or inapplicable precedents, the avoidance doctrine provides no reason to adopt Plaintiff's strained construction of the FRA.

where no statute secured a right to the asserted entitlement, no due process rights attached.  *Id.*[19]

Moreover, Plaintiff fails to establish that the master account process violates due process. Citing *Beckles v. United States*, 137 S. Ct. 886, 892 (2017), it argues that "due process prohibits depriving private parties of property under a law 'so standardless that it invites arbitrary enforcement.'"  Opp. at 34.  But it fails to address the Board's point that, under *Beckles*, a purported lack of standards for *FRBKC's* actions does not burden *Plaintiff*'s due process rights. 137 S. Ct. at 895 (rejecting criminal defendant's vagueness challenge to sentencing guidelines for courts because they regulated courts rather than the general public); Bd. Mem. at 34.  Instead, Plaintiff dissembles, claiming to raise a "separate species of constitutional violation" from the vagueness challenge at issue in *Beckles*, but cites no authorities.  Opp. at 35-37.[20]  The only authority it *does* cite, *Beckles*, describes the "arbitrary enforcement" challenge Plaintiff raises as a vagueness challenge and not a distinct cause of action.  137 S. Ct. at 894.  *Beckles* thus controls and precludes Plaintiff's claim.[21]

Plaintiff also fails to state a due process claim for bias in a future final decision that will be made on its request.[22]  As the Board explained, Plaintiff made no factual allegations showing

---

[19] Plaintiff argues that in assessing its *standing* to raise this challenge, its legal conclusions are taken as true.  Opp. at 36.  This argument is irrelevant to the *merits* of its claim, as the Court need not accept Plaintiff's legal conclusions in adjudicating a 12(b)(6) motion.  *Iqbal*, 556 U.S. at 678.

[20] The only other case Plaintiff cites in this discussion, *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), expressly declined to rule on any due process issues.  *Id.* at 466 n.21.

[21] Plaintiff also fails to address the point that, to the extent it asserts a lack of standards, it *lacks* a legally protected property right implicating due process protections.  *See Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1212-13 (10th Cir. 2000) ("[Where ordinances] contain *no standards* governing the . . . exercise of discretion, [appellant] has no protectible property interest on which to base its due process claims." (emphasis added)); Bd. Mem. at 33-34.

[22] Plaintiff does not appear to contest the Board's assertion that if it fails to state an APA claim for undue delay, it necessarily fails to state such a claim on due process grounds, *see* Bd. Mem.

that biased actors will actually participate in making a final decision, and, in any event, adequate safeguards exist to check any potential bias. Bd. Mem. at 35-37. Plaintiff has no response.

With respect to the adequacy of its allegations, Plaintiff makes a conclusory assertion that it "plausibly alleged that such directors would participate in Reserve Bank decisions." Opp. at 42. But the only allegation about director participation was conjectural, conditional, and conclusory, claiming bias "*[t]o the extent that* the Kansas City Fed's Board of Directors finally adjudicates the rights of would-be competitors like Custodia." Compl. ¶ 115 (emphasis added). Plaintiff also alleged no facts showing that, should this conjecture came to pass, the particular directors it accuses of bias (the minority elected to represent the interests of member banks, *see* Compl. ¶ 114), would participate. *Cf.* Bd. Mem. at 35 n.31 (noting recusal requirements in cases of conflict of interest). Plaintiff also made no allegations identifying any FRBKC member bank that competes with it in the cryptocurrency space; in fact, it merely speculated that member banks "are *or may be* competitors." Compl. ¶ 114 (emphasis added).

Plaintiff's conjectural and conclusory assertions—that it will be harmed "to the extent" directors elected by unidentified banks that "may be" competitors would participate in a future decision—are insufficient. Even more direct allegations about actions alleged to have *actually occurred* have been deemed too conclusory to survive a Rule 12(b)(6) motion. *Iqbal*, 556 U.S. at 680-81 ("bare assertions" that Attorney General was the "principal architect" of a policy that knowingly subjected the plaintiff to confinement for discriminatory reasons were "conclusory and not entitled to be assumed true"); *see also id.* at 678 ("'naked assertion[s]' devoid of 'further factual enhancement'" fail to state a claim (citation omitted)). And conjectural allegations about

---

at 34-35 (citing cases). Thus, the reasons stated above (at 9-11) provide an additional basis for finding that plaintiff fails to state a due process claim based on any purported delay.

what *might* happen fail to meet the plausibility requirement necessary to survive a Rule 12(b)(6) motion. *Id.* at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").

In contrast, the only factual content in the Complaint alleging actual involvement by an identified decisionmaker referred to FRBKC's *President*, whom Plaintiff does not accuse of bias, and whom Plaintiff allegedly met and "urged to consider Custodia's application." *Id.* ¶¶ 41-42. Plaintiff contends, without elaboration, that there is "no support in 12 U.S.C. § 341(7)" for FRBKC's President to be the decisionmaker, Opp. at 43, but wholly fails to address the point that 12 U.S.C. § 341(fifth) expressly authorizes her to act as chief executive officer, which was understood at the time of the section's enactment to grant control over all of a bank's operations. *See* Bd. Mem. at 35-36 (citing cases). And Plaintiff's claim that determining the President's role "would at least require discovery," Opp. at 43, is foreclosed by the standard and purpose of Rule 12(b)(6), which requires adequate pleading to subject defendant to *any* discovery. *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557-60 (2007).

Moreover, Plaintiff would still fail to state a claim even if its speculative assertions came to pass; no due process violation would result because the allegedly biased directors would be a minority and would be subject to various means of Board supervision. *See* Bd. Mem. at 35-37 (discussing *Ass'n of Am. R.Rs. v. DOT*, 896 F.3d 539 (D.C. Cir. 2018)). Plaintiff's only response is a conclusory assertion that "not just a Majority . . . must properly exercise . . . power," for which it cites no due process jurisprudence. Opp. at 43.

### B.     Plaintiff Fails to State a Claim for Improper Delegation of Legislative Power

The Opposition fails to show that Plaintiff has a claim for improper delegation of legislative power. It did not address controlling Tenth Circuit cases holding that the history and

provisions of an overall statutory scheme (such as the FRA) can provide sufficient "intelligible principles" to guide agency action. *See* Bd. Mem. at 38-39. Instead, Plaintiff argues that the Board's assertion that master account decisions are discretionary, as is the Board's decision on how to exercise its supervisory powers, *see supra* at 3-8, necessarily proves an improper delegation.[23] Opp. at 35-36. But given the minimal requirements for providing an "intelligible principle," *e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) ("[W]e have found an 'intelligible principle' in various statutes authorizing regulation in the 'public interest.'"), Congress can permissibly delegate sufficient discretion to preclude judicial review and thus commit a matter to agency discretion. *See, e.g., Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 405 (D.C. Cir. 1990) (law contained sufficient intelligible principles to be permissible delegation, but these criteria were too general to allow judicial review of agency action); *see also Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 902-03 (D.C. Cir. 2018) (same).

Plaintiff separately asserts that allowing Federal Reserve Banks to determine requests for master accounts violates limits on delegation of "regulatory power" to private parties. Opp. at 43. Assuming, *arguendo*, that a Reserve Bank's decision on whom it will transact with is a form of "regulatory power," the Board exercises significant influence over Reserve Banks, *e.g.*, Bd. Mem. at 36, 43-44, 44 n.40, and there is no separation of powers violation in allowing a federal instrumentality, *cf.* Compl. ¶ 112 (alleging that FRBKC is a "federal instrumentality"), that is not an "autonomous private enterprise" to exercise such power. *See Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 53, 55 (2015) (holding that extensive government influence over Amtrak

---

[23] Plaintiff also fails to address the point that it cannot obtain relief based on this argument, *see* Bd. Mem. at 38 n.34. Specifically, courts can void, but not rewrite statutes, and it is thus unclear how voiding the statute that allows for master accounts on nondelegation grounds would bring any relief to Plaintiff, which seeks such an account. *Id.* (citing authorities). Plaintiff therefore lacks standing to assert this claim due to lack of redressability.

renders it a non-private actor for separation of powers purposes notwithstanding its statutory classification as a private entity and partial ownership of its common stock by private parties), *cited by Appointment & Removal of Fed. Reserve Bank Members of the FOMC*, 2019 WL 11594453, at *5 n.3 (Op. O.L.C. Oct. 23, 2019) (citing authorities indicating that Reserve Banks are "not an autonomous private enterprise"); *see also* Bd. Mem. at 42-45.  Plaintiff thus fails to show that it has stated a claim for improper delegation of regulatory power.

### C.      Plaintiff Fails to State a Claim for Violation of the Appointments Clause

Plaintiff contends that having FRBKC make final decisions (subject, of course, to its ability to revisit them) on master accounts renders its leadership principal officers who must be nominated by the President and confirmed by the Senate.  As the Board noted, historical precedent indicates that opening a bank account is not the type of sovereign act implicating the Appointments Clause given that the First Congress gave such authority to the First Bank of the United States without making its leaders subject to the Clause.  Bd. Mem. at 39-42.  And to the extent a master account decision implicates the Clause, it can be made by FRBKC's President, who is appointed as an inferior officer under the Clause and does not act as a principal officer regardless of any final decisionmaking power she has.  Bd. Mem. at 42-45.

Plaintiff argues that a decision on a master account request implicates the Clause because it has policy implications.  Opp. at 37-38.  But the First Bank of the United States was charged with advancing various national interests.  Act of Feb. 25, 1791, Pub. L. No. 1-10, 1 Stat. at 191 (Congressional expectation that the Bank would facilitate the "successful conducting of the national finances" and "give facility to the obtaining of loans, for the use of the government, in sudden emergencies").  And its business decisions had clear policy implications given that, for example, it was uniquely allowed to issue notes that the government had to accept as payment,

*id.* §§ 10, 12, 1 Stat. at 196, thus allowing it to create a *de facto* national currency and impact the government's finances.  Yet the First Congress saw no need to have the Bank's management appointed in conformity with the Clause.  Historical practice thus indicates that the Framers did not view banking functions provided for by statute as implicating the Clause regardless of any associated policy implications.  *Cf., e.g.*, *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1659 (2020) (holding, based on legislation from the First Congress, that officials with statutory responsibilities related to U.S. territories are not subject to the Clause).[24]

Plaintiff tries to distinguish the Founders' treatment of the First Bank of the United States by arguing that the Federal Reserve exercises other sovereign powers such as officially setting monetary policy.  Opp. at 39.  But the Court need not decide whether one or more of these *other* responsibilities, such as Reserve Bank presidents' participation on the Federal Open Market Committee ("FOMC") that helps set monetary policy, makes them subject them to the Clause.  *Cf. Appointment & Removal of Fed. Reserve Bank Members of the FOMC*, 2019 WL 11594453, at *1-2 (FOMC service requires that Reserve Bank presidents be appointed as inferior officers).  That is because *Plaintiff* claims that a decision on *a master account* directly implicates the Clause, and that the ability to render a final decision *on this issue* makes the decisionmaker a principal officer under the Clause.  As explained above, historical practice indicates the Framers did not think that this particular type of decision implicated the Clause, and the fact that *other responsibilities* may make Reserve Bank presidents officers under the Clause is thus irrelevant to whether a master account decision implicates the Clause's provisions for principal officers.[25]

---

[24] Plaintiff has also not addressed historical practice spanning most of the Republic's history indicating that the decision at issue need not be made by principal officers.  Bd. Mem. at 45 n.41.

[25] Plaintiff's argument, taken to its logical end, would require that even mundane agency actions, such as deciding how much parking to locate at agency facilities, must be performed by officers appointed under the Clause because *other* agency responsibilities implicate the Clause.

Moreover, even if the Clause were implicated by a master account decision, Plaintiff has not disputed the Board's assertions that FRBKC's President is appointed under the Clause as an inferior Officer and that the Board can remove her at will.  Bd. Mem. at 42-43.  This removal power, combined with the Board's other statutory powers to supervise FRBKC and influence its actions, renders FRBKC's President an inferior officer despite her ability to make a final decision on master accounts.  *Id.* at 42-43.  Plaintiff's arguments to the contrary are unavailing.

As the Board noted, at-will removal power has been consistently found sufficient, in combination with other means of influence, to render an officer "inferior" regardless of any final decisionmaking authority she holds.  Bd. Mem. at 44-45 (citing cases).[26]  Plaintiff tries to distinguish the cited authorities by arguing that the Board lacks sufficient influence over FRBKC, asserting that the Board construes the FRA as leaving it "powerless to control Reserve Bank's master account decisions in any way."  Opp. at 41.  Plaintiff does not explain this conclusory assertion.  To the extent its complaint is that the Board does not act as a type of appellate tribunal, *cf. id.* at 6 (complaining that Guidelines do not indicate if Board will "veto" or "reverse" Reserve Bank decisions), or that Reserve Banks exercise "discretion" in making decisions, *cf.* Opp. at 18, the cited cases make clear that neither circumstance precludes a finding of inferior officer status given other means of exerting influence.  *E.g.*, *Intercoll. Broad. Sys.*, 684 F.3d at 1339-41 (officials who exercised "vast discretion" in making decisions not "directly

---

[26] Plaintiff implies that *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), categorically held that any officer who makes final decisions is a principal officer regardless of removability.  Opp. at 40-41.  But *Arthrex* applied to the *combined effect* of legal provisions "insulating [officers'] decisions from review and their offices from removal."  141 S. Ct. at 1985-86 (citation omitted).  It reaffirmed prior holdings that there is no "exclusive criterion for distinguishing between principal and inferior officers . . . ," *id.* at 1985, thus undercutting Plaintiff's assertion that final decisionmaking authority is such a criterion.  And it expressly declined to reach the question of whether "at-will removal . . . would cure the constitutional problem."  *Id.* at 1987.

reversible" by a superior were inferior officers when subjected to at-will removal and guidance through voluntary consultations); *see also Morrison v. Olson*, 487 U.S. 654, 655 (1988).[27]

Reserve Bank presidents thus are not principal officers, and their appointment as inferior officers comports with the Appointments Clause to the extent it applies.  Plaintiff makes desperate resort to conjecture and speculation, claiming that FRBKC's directors, some of whom are elected by private banks, *might* participate in the decision, and that "[g]iven the factual uncertainty, Defendants cannot prevail at the motion to dismiss stage."  Opp. at 41.  This argument proves too much: any "factual uncertainty" only shows why this claim is nonjusticiable.  *See supra* at 12-13; *see also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (courts must not issue opinions "advising what the law would be upon a hypothetical state of facts"); *United States v. Morgan*, 44 F. App'x 881, 885, *id.* n.2 (10th Cir. 2002) (noting "serious ripeness questions" when litigant sought ruling on "a wholly uncertain set of possible facts and scenarios").  And as explained above, such conjecture also fails to meet *Twombly*'s standards for stating a claim.

## CONCLUSION

For these reasons, and for the reasons stated in its opening brief, the Board respectfully requests that the case be dismissed.

---

[27] Beyond the Board's general supervisory powers and exclusive legal interpretive authority, *see* 12 U.S.C. § 248(j); 87 Fed. Reg. 51,099 at 51,103 n.11, the Board has various other means of exerting control over Reserve Banks.  For example, the Board controls their budgets and salaries. 12 U.S.C. §§ 248a(d), 307.  Such influence is a hallmark of supervision that renders an official an inferior rather than a principal officer.  *See Intercoll. Broad. Sys.*, 684 F.3d at 1339, 1341 (ability to provide guidance through even voluntary consultations together with at-will removal power sufficient to make a final decisionmaker an inferior officer); *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000) (citing Attorney General's authority to set U.S. Attorney salaries and authorize their office expenses as aspects of supervision that render them inferior officers).

J.A.301

Dated: October 4, 2022

Respectfully submitted,

 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the Federal Reserve System*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 4, 2022, I electronically filed the foregoing using the

court's CM/ECF system, which will send notification of such filing to all parties of record.

By:    /s/ *Joshua P. Chadwick*
       Joshua P. Chadwick

       *Counsel for Defendant Board of Governors*
       *of the Federal Reserve System*

Billie L.M. Addleman, #6-3690
John P. Fritz, #7-6318
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
jfritz@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
Laura Harris (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Joshua N. Mitchell (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500

*Counsel for Defendant the Federal Reserve Bank of Kansas City*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| CUSTODIA BANK, INC., <br><br>    *Plaintiff,* <br><br>        v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, <br><br>    *Defendants.* | No. 1:22-cv-00125-SWS |

## DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S
## REPLY IN SUPPORT OF IN SUPPORT OF ITS MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................... iii

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 3

I.   The Court Should Not Decide the Issues Raised by Custodia's
     Complaint at This Premature Juncture. ........................................ 3

     A.   Custodia's claims are not ripe. ............................................ 3

     B.   Custodia does not have standing. ........................................ 8

II.  Counts III and V: Custodia's Due Process Claims Fail Because
     FRBKC Has Discretion to Determine Whether to Open a Master
     Account. .................................................................................. 10

     A.   Section 342 grants discretion to Reserve Banks. ............... 10

     B.   Section 248a does not eliminate Reserve Bank discretion. .............. 12

III. Count I: Custodia's APA Claim Fails Because FRBKC Is Not an
     Agency nor Has Custodia Suffered an Unreasonable Delay. ...................... 14

     A.   FRBKC is not a federal banking agency under 12 U.S.C.
          § 4807. ............................................................................ 14

     B.   FRBKC is not an agency under the APA. ........................... 15

     C.   Custodia has not suffered an unreasonable delay............... 17

IV.  Counts III, V, and VI: FRBKC's Exercise of Discretion Over Master
     Accounts Is Consistent with the Constitution. ............................. 20

     A.   Reserve Bank discretion to grant master accounts does not
          violate nondelegation principles (Count III). ..................... 20

     B.   Custodia is not being regulated by its competitors (Count V). .......... 21

     C.   The Appointments Clause is not implicated in this case
          (Count VI). ...................................................................... 22

V.    Counts II and VII: Custodia's Mandamus Act Claims Fail. ......................... 24

VI.   Counts IV and VIII: Custodia's Declaratory Judgment Act Claims
      Fail Because the Act Provides No Independent Right of Action. ................ 24

CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Haworth*,
   300 U.S. 227 (1937)....................................................................................24

*Awad v. Ziriax*,
   670 F.3d 1111 (10th Cir. 2012) ...................................................................3

*Bd. of Trade v. SEC*,
   883 F.2d 525 (7th Cir. 1989).......................................................................19

*Biden v. Texas*,
   142 S. Ct. 2528 (2022)................................................................................10

*Carter v. Genesis Aklaki, LLC*,
   No. 20-CV-216-SWS,
   2021 WL 7209790 (D. Wyo. Aug. 26, 2021)...............................................9

*Dong v. Smithsonian Inst.*,
   125 F.3d 877 (D.C. Cir. 1997) .............................................................. 15, 16

*Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.*,
   693 F.3d 1195 (10th Cir. 2012)...................................................................24

*Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*,
   262 U.S. 649 (1923)....................................................................................10

*Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*,
   583 F. Supp. 674 (N.D. Ga. 1984) ..............................................................16

*Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*,
   597 F. Supp. 462 (N.D. Ga. 1984) ..............................................................16

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*,
   861 F.3d 1052 (10th Cir. 2017).....................................................................5

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)....................................................................................22

*Ghadami v. DHS*,
   No. CV 19-00397 (ABJ),
   2020 WL 1308376 (D.D.C. Mar. 19, 2020)................................................17

*Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*,
 421 U.S. 168 (1975) .................................................................................16

*Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*,
 482 F.2d 710 (D.C. Cir. 1973) .................................................................16

*Gundy v. United States*,
 139 S. Ct. 2116 (2019) .............................................................................20

*Hayes v. Whitman*,
 264 F.3d 1017 (10th Cir. 2001) .................................................................9

*In re Am. Fed'n of Gov't Emps.*,
 790 F.2d 116 (D.C. Cir. 1986) .................................................................19

*In re Barr Labs., Inc.*,
 930 F.2d 72 (D.C. Cir. 1991) ...................................................................19

*Indep. Min. Co. v. Babbitt*,
 105 F.3d 502 (9th Cir. 1997) ...................................................................19

*Intrepid Potash-N.M., LLC v. U.S. Dep't of Interior*,
 No. 09-cv-1135,
 2010 WL 11595114 (D.N.M. May 10, 2010) ...........................................9

*Jarkesy v. SEC*,
 34 F.4th 446 (5th Cir. 2022) ....................................................................21

*Johnson v. Rogers*,
 917 F.2d 1283 (10th Cir. 1990) ...............................................................24

*Johnson v. Spencer*,
 950 F.3d 680 (10th Cir. 2020) ...................................................................4

*Jojola v. Chavez*,
 55 F.3d 488 (10th Cir. 1995) .....................................................................9

*Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*,
 558 F. Supp. 165 (D. Md. 1982) .............................................................16

*Lewis v. United States*,
 680 F.2d 1239 (9th Cir. 1982) .................................................................16

J.A.308

*Mann v. Fifth Third Bank*,
   No. 1:09-CV-014,
   2011 WL 1575537 (S.D. Ohio Apr. 25, 2011) ....................................................14

*Mistretta v. United States*,
   488 U.S. 361 (1989) ...................................................................................20

*Nat'l Broad. Co. v. United States*,
   319 U.S. 190 (1943) ...................................................................................20

*Salgado-Toribio v. Holder*,
   713 F.3d 1267 (10th Cir. 2013) ...................................................................13

*Taft v. Agric. Bank of China Ltd.*,
   No. 15 CIV 5321 (PAE),
   2016 WL 2766661 (S.D.N.Y. May 12, 2016) ..................................................15

*Telecommc'ns Rsch. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) .................................................................. 18, 19

*Tex. Brine Co., LLC & Occidental Chem. Corp.*,
   879 F.3d 1224 (10th Cir. 2018) ...................................................................3

*Texas v. United States*,
   523 U.S. 296 (1998) ...................................................................................8

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985) ...................................................................................8

*TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*,
   No. 1:18-CV-7978 (ALC),
   2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) ..............................................2, 9

*United States ex rel. Kraus v. Wells Fargo & Co.*,
   943 F.3d 588 (2d Cir. 2019) .......................................................................17

*United States v. Arthrex, Inc.*,
   141 S. Ct. 1970 (2021) ...............................................................................23

*United States v. Bennett*,
   823 F.3d 1316 (10th Cir. 2016) ...................................................................3

J.A.309

*United States v. Cabral*,
  926 F.3d 687 (10th Cir. 2019)...................................................................3

*United States v. Melgar-Diaz*,
  2 F.4th 1263 (9th Cir. 2021)....................................................................20

*United States v. Sup. Ct. of N.M.*,
  839 F.3d 888 (10th Cir. 2016)..................................................................3

*Utah Hous. Corp. v. Country Pines, Ltd.*,
  541 F. Supp. 3d 1288 (D. Utah 2021).....................................................24

*Utah Republican Party v. Cox*,
  892 F.3d 1066 (10th Cir. 2018)................................................................3

*Vaz v. Neal*,
  33 F.4th 1131 (9th Cir. 2022).................................................................19

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)................................................................................20

*Wyoming v. Zinke*,
  871 F.3d 1133 (10th Cir. 2017)................................................................3

*Yakus v. United States*,
  321 U.S. 414 (1944)................................................................................20

**Statutes, Regulations, & Rules**

12 U.S.C. § 221 ........................................................................................14

12 U.S.C. § 248 .............................................................................. 15, 22, 23

12 U.S.C. § 248a ......................................................................................12

12 U.S.C. § 263 ........................................................................................21

12 U.S.C. § 302 ........................................................................................21

12 U.S.C. § 303 ........................................................................................22

12 U.S.C. § 324 ..........................................................................................7

12 U.S.C. § 341 .............................................................................. 14, 22

**J.A.310**

12 U.S.C. § 342 ...................................................................... *passim*

12 U.S.C. § 391 ..................................................................................11

12 U.S.C. § 1813 ........................................................................... 14, 15

12 U.S.C. § 1818 ...............................................................................14

12 U.S.C. § 4801 ...............................................................................14

12 U.S.C. § 5322 ...............................................................................21

12 U.S.C. § 5465 ...............................................................................11

Federal Reserve Act,
    Pub. L. No. 63-43, 38 Stat. 251 (1913) ...................................... *passim*

021.0002.19 Wyo. Code R. ..................................................................6

021.0002.20 Wyo. Code R. ..................................................................6

D. Wyo. Loc. R. 7.1(b)(2)(G) ...............................................................5

**Other Authorities**

*Appointment & Removal of*
    *Fed. Rsrv. Bank Members of Fed. Open Mkt. Comm.*,
    43 Op. O.L.C. __, slip op. (Oct. 23, 2019) ................................. 23, 24

Avanti Fin. Grp., Inc.,
    Comment Letter on Proposed Guidelines for Evaluating Accounts
    (July 12, 2021), https://bit.ly/3CszjgW ...............................................18

*Depository Institutions Deregulation*
    *and Monetary Control Act of 1980*,
    FederalReserveHistory.org (Nov. 22, 2013), https://bit.ly/3US55uP ................13

Fed. Rsrv. Sys.,
    *Guidelines for Evaluating Account and Service Requests*,
    Docket No. OP-1747, https://bit.ly/3C59BiP .......................................7

Fed. Rsrv.,
    Federal Reserve Policy on Payment System Risk
    (Mar. 19, 2021), https://bit.ly/3CsQZJr .............................................5

J.A.311

Press Release,
   Custodia, *Avanti Is Now Custodia, Announces Countdown to
   Launch in Q2*, (Feb. 24, 2022), https://bit.ly/3UOXEo9 .............................. 4, 17

Press Release,
   Custodia, *Avanti Statement on its Application to Become an FDIC-
   Insured Bank* (Nov. 5, 2021), https://bit.ly/3RqGJW9 ........................................7

Press Release,
   Fed. Rsrv. Bank of St. Louis, No. 96-33,
   *New Account Structure Will Support Interstate Branching*
   (May 2, 1996), https://bit.ly/3CqyuFh ...............................................................11

**J.A.312**

## INTRODUCTION

Custodia's Opposition obscures the issue at the heart of this dispute. In Custodia's telling, everything is routine here but for a desire by the Federal Reserve Bank of Kansas City ("FRBKC") to inexplicably sit on a simple request for a master account in perpetuity. Custodia writes as if it were just like any other depository institution except that it is being unfairly deprived of direct access to Federal Reserve services enjoyed by its competitors. In fact, Custodia is at no disadvantage relative to other digital asset businesses, and what it seeks is unprecedented.

This case is really about whether a self-described "first-of-its-kind digital asset bank" can become the first Wyoming Special Purpose Depository Institution (SPDI) to obtain a master account. Custodia, a newly formed entity not yet open for business, will offer digital asset custody, serve as a "bridge" between digital assets and the U.S. dollar, and facilitate payments with a self-issued digital "instrument" called the "Avit." These activities are laden with novel risks, which Custodia's Opposition ignores and its amici misstate. Yet the risks are evident, and they are compounded by the fact that Custodia, at least currently, seeks to operate with *neither* deposit insurance to protect customers nor a federal supervisor to evaluate its compliance with applicable federal banking laws and regulations. Even on a motion to dismiss—accepting the Complaint's allegations as true and taking judicial notice of public reports—it is evident that there is no plausible claim for unreasonable delay. Rather, Custodia's request is taking time for good reason.

FRBKC's motion to dismiss should be granted because Custodia's claims are not ripe and it does not have standing. That was true in *TNB* and it is true here—Custodia has not pleaded any

redressable injury.[1] The lack of ripeness is underscored by three amicus briefs that highlight the complexity of FRBKC's precedent-setting evaluation of Custodia's request.

FRBKC's motion should also be granted if the Court reaches the merits. FRBKC's legal position is straightforward: Congress granted FRBKC discretion to accept deposits in master accounts. Opening a master account is a commercial, risk-based decision that does not implicate sovereign, executive powers. The Appointments Clause therefore presents no issue, but even if it did, it is sufficient that this type of decision is made by a constitutionally-accountable "inferior officer"—FRBKC's President. Meanwhile, the one-year deadline in 12 U.S.C. § 4807 is irrelevant because the defined list of "Federal banking agencies" to which that statute applies does not include Reserve Banks; the APA does not apply because Reserve Banks are not federal agencies; there is no non-delegation problem because Congress provided an "intelligible principle" to guide FRBKC's decision-making; and no due process concern is raised by having a minority of FRBKC's board members representing the banking industry.

FRBKC's position requires no "pretzel-twist[s]." Opp. 1. It flows from straightforward application of the law, and the end result is entirely reasonable: FRBKC can decide on master account requests with input from the Board, and it can apply heightened scrutiny and thoughtful analysis to novel and precedent-setting requests like Custodia's. Congress set no fixed timeline for this consideration, and given the nature of Custodia's proposed business, there is no plausible claim that FRBKC's consideration of Custodia's request has been unreasonable.

---

[1] *TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 1:18-CV-7978 (ALC), 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020), involved a master account request from a so-called "narrow bank" that did not engage in the traditional business of banking but rather sought to profit by passing through to institutional investors the interest paid by Reserve Banks on reserves in master accounts. Scaling of that business model presents risk to the Federal Reserve's implementation of monetary policy, and no Reserve Bank has granted a master account to a narrow bank.

## ARGUMENT

I.  **The Court Should Not Decide the Issues Raised by Custodia's Complaint at This Premature Juncture.**

Custodia's request for a master account is novel and raises serious and complex issues. Custodia's Complaint likewise raises constitutional and administrative law issues with potential implications far beyond this case. The Court need not and should not decide those issues at this juncture. Certain issues may become ripe for decision if FRBKC denies Custodia's account request. But that may not happen, and even if it does, the reasons that FRBKC would give for any denial would make judicial review at that time more concrete and informed. For now, as the amici's wide-ranging submissions highlight, aspects of Custodia's processes and business model remain unclear and under active evaluation, warranting prudence and restraint.

### A.  **Custodia's claims are not ripe.**

"The ripeness doctrine aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (quotation marks omitted). Custodia questions the vitality of the prudential ripeness doctrine, Opp. 13, but the Tenth Circuit has relied on it recently. *See, e.g.*, *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019); *Tex. Brine Co., LLC & Occidental Chem. Corp.*, 879 F.3d 1224, 1231 (10th Cir. 2018); *Utah Republican Party v. Cox*, 892 F.3d 1066, 1092 (10th Cir. 2018); *Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017); *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 903 (10th Cir. 2016). To determine whether a dispute is prudentially ripe, a court "balance[s] the fitness of the issue for judicial review with the hardship to the parties from withholding review." *United States v. Bennett*, 823 F.3d 1316, 1326 (10th Cir. 2016). Custodia's Opposition and the amicus briefs reveal the complexities and evolving factual circumstances that demonstrate the lack of ripeness and the reasonableness of FRBKC's process.

1. *Custodia and its amici make representations that illuminate the complexity of FRBKC's decision. First,* Custodia makes the bold representation that "[i]f Custodia receives a master account, the Federal Reserve System will not be exposed to any digital asset risks." Opp. 19. The reality is not so simple. It is telling that Custodia declines to provide any meaningful detail about its proposed business model in its Complaint or Opposition. For purposes of resolving this motion, however, the Court can take judicial notice of Custodia's own press releases and other public information that refutes Custodia's simplistic risk assessment. *See Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020).

In February, Custodia issued a press release describing itself as a "first-of-its-kind digital asset bank" seeking to provide "ACH and Fedwire services" and to launch a still-in-development "payment instrument" (a so-called "stablecoin") called the "Avit."[2] Custodia claims that when it is operational, it will hold adequate reserves to back the Avit and customer deposits, raising an obvious set of risks concerning plans to manage, track, and control such reserves. Has Custodia adequately assessed operational, cybersecurity, and liquidity risks? Has it established, staffed, and tested a compliance regime sufficient under the Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") regulations? What are the risks posed by issuing the Avit on one or more public blockchains, where individuals who are not customers of Custodia may hold Avits and make worldwide payments using Avits? What will happen if Custodia's customers shift their interests from digital assets to the U.S. dollar *en masse* in the face of a run or other stress on digital assets or financial markets, forcing Custodia to come up with additional reserves on short notice? FRBKC

---

[2] Press Release, Custodia, *Avanti Is Now Custodia, Announces Countdown to Launch in Q2*, (Feb. 24, 2022), https://bit.ly/3UOXEo9.

is exercising prudence and conducting due diligence to ensure it understands all risks—including risks to itself, the payment system, and the implementation of monetary policy.

*Second*, Sen. Rothfuss and Rep. Olsen state that "Custodia has informed the Kansas City Fed (and has stated publicly) that it will have a *zero* net debit cap, meaning it will receive *no* credit from the Kansas City Fed." Rothfuss Br. 12. The U.S. Members' brief makes a similar remark. U.S. Members' Br. 23. That is not accurate: FRBKC will be exposed to credit risk from Custodia. That is because (among other potential sources of risk) Custodia intends to offer automated clearing-house ("ACH") services to customers. Processing of ACH transactions, which occurs in batches several times each day, does not permit a real-time rejection of incoming debits that could cause a master account balance to go negative. In other words, the inability of FRBKC to reject certain transactions in real time would create credit risk to FRBKC even if Custodia's account nominally had a zero net cap. *See* Fed. Rsrv., Federal Reserve Policy on Payment System Risk, Part II (Mar. 19, 2021), https://bit.ly/3CsQZJr (describing ways Reserve Banks mitigate credit risk posed when an institution's master account is negative intra-day).[3]

*Third,* Sen. Rothfuss and Rep. Olsen represent that "any cryptocurrencies held by Custodia will be held in trust and will not appear on Custodia's depository balance sheet at all, thus necessarily insulating the Fed entirely from those risks." Rothfuss Br. 13. Custodia, however, makes no such representation in its Complaint, and the legal and accounting treatment of cryptocurrencies by Custodia is an example of an issue under ongoing evaluation. Moreover,

---

[3] Amici's assertion that Custodia has requested a master account with a zero net debit cap goes outside the pleadings and the public record, as Custodia itself has not made such an allegation. It is nonetheless appropriate for FRBKC to respond to it. *See* Local Rule 7.1(b)(2)(G). And, more generally, these issues help to illuminate why it is taking time for FRBKC to responsibly arrive at an answer to Custodia's request. *See Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1060 (10th Cir. 2017) (Matheson, J.) (concluding that case was premature because plaintiff bank's business model was still in flux).

Wyoming law suggests that digital asset custodians executing blockchain transactions on behalf of customers may be *required* to hold digital assets on their balance sheets to fund the variable network transaction fees paid in cryptocurrency at the time of broadcasting transactions to a blockchain network. *See* 021.0002.19 Wyo. Code R., § 8(a) (requiring digital asset custodians to have on hand "sums required for the execution of transactions" as part of the digital asset custodial services). Custodia may well hold digital assets on its balance sheet.

*Fourth,* Sen. Rothfuss and Rep. Olsen describe the series of BSA/AML compliance regulations that the Wyoming Division of Banking recently promulgated. Rothfuss Br. 20 (citing 021.0002.20 Wyo. Code R. § 7). While meaningful, state requirements do not supplant Reserve Banks' own consideration of compliance with federal law, and even the most robust legal requirements do not guarantee the actual efficacy of a particular SPDI's compliance program. FRBKC has been working diligently with Custodia to determine whether its compliance regime is adequate not only on paper but in practice as well.

These issues highlighted by amici are among those that FRBKC has been actively working with Custodia to better understand and resolve, including during a recent on-site visit as part of its consideration of Custodia's master account request and the Board's consideration of Custodia's application for membership. The prudent course for the Court is to allow FRBKC time to work through these issues and arrive at a decision.

2. *The Board's issuance of the Guidelines demonstrates progress toward a decision.* While a master account decision belongs to an individual Reserve Bank, it may receive input from the Board and other Reserve Banks to promote consistency and a full appreciation of the risks and policy issues a particular request presents. To this end, pursuant to its general oversight authority, the Board recently issued Guidelines to support a structured, transparent, and consistent framework

for Reserve Banks' use in evaluating the implications that account requests may have for Federal Reserve policies and objectives. *See* Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Service Requests*, Docket No. OP-1747, https://bit.ly/3C59BiP.

The Guidelines offer the Board's thinking on the types of risks that the Reserve Banks should focus on and the relative level of due diligence and scrutiny that should be given to various account requests. Custodia currently falls into "Tier 3"—the highest level of scrutiny—based on the absence of either federal insurance or prudential supervision by a federal banking agency. The degree of due diligence and risk-based scrutiny would change if, for example, Custodia receives FDIC insurance. Custodia previously publicly stated an intention to apply for FDIC insurance but to FRBKC's knowledge has not done so. *See* Press Release, Custodia, *Avanti Statement on its Application to Become an FDIC-Insured Bank* (Nov. 5, 2021), https://bit.ly/3RqGJW9. Also, if the Board grants Custodia's membership application, Custodia would become a "Tier 2" organization subject to prudential supervision by a federal banking agency. *See* Compl. ¶ 4; 12 U.S.C. § 324. Custodia worries that the Guidelines will be an excuse for delay, Opp. 31, but neither the notice-and-comment development of the Guidelines nor the pendency of this litigation has halted the work of FRBKC in connection with the ongoing evaluation of Custodia's master account request and its application for membership.

In sum, Custodia's request raises technical, complex, and novel issues that present risk to FRBKC and that potentially have implications for the stability of our nation's payment system. Moreover, the factual landscape in this case is still evolving, as Custodia concedes; for example, it did not receive a Certificate of Authority from Wyoming until the day before its Opposition was due. Opp. 10. FRBKC should be allowed to continue its active and regular engagement with Custodia to ensure it has the facts necessary and can apply recent guidance from the Board before

it renders a decision. FRBKC is gathering more detail on Custodia's anticipated business model, evaluating whether mitigating actions and controls would lessen identified risks, and determining whether granting Custodia an account could result in financial loss to FRBKC or an operational disruption to FRBKC or other participants in the payment system or could affect the implementation of monetary policy and the broader financial system. Even Custodia's amici agree that a master account request requires determining whether the requester is "responsible, safe and sound, and compliant with all material federal and state laws and regulations." Rothfuss Br. 7.

Before the Court weighs in on Custodia's wide-ranging constitutional and administrative law allegations, FRBKC should be afforded reasonable additional time to complete this difficult work, and the Court should await the "contingent future events" that could moot or reshape this case. *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). If instead the Court is inclined to deny Defendants' motions to dismiss, prudence counsels doing so without unnecessarily ruling on complex issues with potential ramifications for the careful balance Congress has created with the Federal Reserve System—including potential consequences far beyond this case—so that the Court may consider those issues, if necessary, with the benefit of a full record.

### B.   Custodia does not have standing.

Custodia's supposed injuries are not pleaded, are not redressable, and are problems of its own making. Having taken on the risk of investing in a business model susceptible to a future, discretionary action by a third party, Custodia now claims it is injured by being forced to do what every other SPDI must do at present: launch with an intermediary bank. Compl ¶ 8. Custodia requests that this Court compel FRBKC to decide—grant or deny—its account request. But as FRBKC pointed out, rendering a decision may not redress Custodia's claimed injury because a denial would leave Custodia precisely where it is today. Mot. 39-40. To make up for this obvious

8

pleading defect, Custodia improperly seeks to use its Opposition to amend its Complaint. *See Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995); *Carter v. Genesis Aklaki, LLC*, No. 20-CV-216-SWS, 2021 WL 7209790, at *1 (D. Wyo. Aug. 26, 2021) (stating that plaintiffs are "not permitted to amend [their] complaint by alleging new facts in a responsive brief" and "declining to consider the new allegations") (citing *Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001)).

For the first time, Custodia claims in its Opposition that it would be better off if FRBKC *denied* its account request because then Custodia could "negotiate a long-term agreement with a third-party bank." Opp. 9. But Custodia does not suggest anywhere in its Complaint that it cannot currently enter into such an agreement. And Custodia certainly does not allege that a denial would "help" it by freeing it to negotiate a long-term agreement with a bank on better terms.

Custodia's newfound theory of injury also runs contrary to the State's understanding that Custodia has a stable relationship with a third-party bank. Wyoming Br. 6 ("while [Custodia] awaits a decision on its master account application, it has moved forward with a third-party banking partner"). In fact, Wyoming issued Custodia a Certificate of Authority based on that representation. *Id.* ("The reason Plaintiff can now receive a COA is that … it has moved forward with a third-party banking partner."). If Custodia wants to amend its Complaint to clarify its status and plans, it can request leave to do so. Otherwise, the Court should refuse to consider these improperly asserted allegations.[4]

---

[4] As explained in FRBKC's motion, to the extent Custodia is claiming that it would be error for FRBKC to deny its account request, that claim is premature given that FRBKC has not denied it. Mot. 36. Recharacterizing FRBKC's ongoing consideration of the request as a "constructive denial" also would not confer standing. *See, e.g., TNB USA Inc.*, 2020 WL 1445806, at *7; *Intrepid Potash-N.M., LLC v. U.S. Dep't of Interior*, No. 09-cv-1135, 2010 WL 11595114, at *11 (D.N.M. May 10, 2010); Mot. 38-39.

II.   **Counts III and V: Custodia's Due Process Claims Fail Because FRBKC Has Discretion to Determine Whether to Open a Master Account.**

The only plausible reading of the Federal Reserve Act ("FRA"), (Pub. L. No. 63-43, 38 Stat. 251 (1913)), is that Reserve Banks have discretion to decide whether to open a master account for depository institutions located in their respective jurisdictions. Because Custodia is not entitled to a master account, it has no property interest in its request and its due process claims fail.

A.   **Section 342 grants discretion to Reserve Banks.**

The FRA unambiguously grants Reserve Banks discretion to decide whether to accept deposits from a depository institution by opening a master account. Custodia contends that this power belongs to the Board and urges the Court to "[s]tart with the law." Opp. 17. But the FRA makes clear that Congress entrusted certain powers to the Board (in Section 11) and certain other powers to the Reserve Banks (in Section 13). In Section 13, dedicated to the "Powers of Federal Reserve Banks," the very first power described is the "Receipt of deposits and collections." 12 U.S.C. § 342. The statute clearly provides that "[a]ny Federal reserve bank *may* receive from any of its member banks, or other depository institutions ... deposits." *Id.* (emphasis added). Contrary to the U.S. Members' brief, "may" is permissive; it does not mean" "shall." *See Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022); *Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 662 (1923). U.S. Members' Br. 13. For its part, Custodia dismisses § 342 because it does not use the words "master accounts," *see* Opp. 18, but master account is simply a term for a deposit

account at a Reserve Bank.[5] Granting master accounts is part and parcel of accepting deposits. Deposits are deposited *into a master account*.[6]

Custodia relies on a provision of the Dodd Frank Act that, it contends, shows that Congress gave the Board, rather than the Reserve Banks, discretion to open master accounts. Opp. 18 (citing 12 U.S.C. § 5465(a)). Custodia's reliance is misplaced, as that provision makes clear that Congress knows how to grant the Board discretion over master accounts when it wants to do so. Section 5465(a) provides: "The Board of Governors may authorize a Federal Reserve Bank to establish and maintain an account for a designated financial market utility...." *Id.* If Custodia were a "designated financial market utility," this statute might be relevant, but it is not. What this statute shows is that Congress *could have* granted the Board comparable authority over master accounts for depository institutions. Instead, Congress gave that power to Reserve Banks.

Reserve Banks naturally confer with each other and the Board to promote consistency and ensure that account decisions align with the purposes of the FRA. And given the Board's general oversight of Reserve Banks, it makes sense for the Board to issue guidelines to assist the Reserve Banks. By statute, however, the decision whether to accept deposits—to open a master account— belongs with Reserve Banks.

---

[5] For context, before interstate bank branching, some banks held different types of accounts and accounts at more than one Reserve Bank. Starting in 1998, the Reserve Banks consolidated all these accounts "into a single, master account" for each account holder to streamline things for both depository institutions and the Reserve Banks. *See* Press Release, Fed. Rsrv. Bank of St. Louis, No. 96-33, *New Account Structure Will Support Interstate Branching* (May 2, 1996), https://bit.ly/3CqyuFh.

[6] Custodia asserts that a "textual clue" supporting its position is that § 342 puts the United States on par with private banks, yielding the absurd result that Reserve Banks could deny an account to the U.S. Government. Opp. 17. This is a red herring, as Section 15 of the FRA authorizes the Secretary of the Treasury to deposit funds in the Reserve Banks and requires the Reserve Banks to act as fiscal agents of the United States. 12 U.S.C. § 391. Congress would not have needed to include § 391 if Reserve Banks did not otherwise have discretion to accept or reject master account requests.

11

**B.      Section 248a does not eliminate Reserve Bank discretion.**

At the end of its brief, Custodia buries an argument that Reserve Banks have no discretion at all, contending that Custodia is "statutorily entitled to a master account" because 12 U.S.C. § 248a provides that services "shall" be available to nonmember depository institutions. Opp. 43-44. Custodia advances a contorted argument that a statutory provision entitled "Pricing of services" and embedded in a section of the FRA focused on powers of the Board (Section 11) somehow eliminates the discretion to accept deposits that Congress granted to Reserve Banks in a section of the FRA dedicated to powers of Reserve Banks (Section 13).

A straightforward reading of § 248a reveals that it is focused on precisely what its title says: pricing. It simply provides that a fee schedule prescribed by the Board for Reserve Bank services "shall be based on the following principles:… Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and shall be priced at the same fee schedule applicable to member banks." The provision does *not* say that Reserve Banks *must* grant master accounts to any and all depository institutions irrespective of the risk presented. It would make no practical sense to eliminate Reserve Banks' discretion to deny accounts to entities that present undue risk, and that is plainly not what Congress did. When it enacted § 248a, Congress did not alter § 342's permissive language.

While amici refer to legislative history, U.S. Members' Br. 7-11, the legislative history does not reflect an intent to deprive Reserve Banks of discretion to deny master accounts to entities presenting undue risk to the Bank, the payment system, or the implementation of monetary policy. None of the cited materials shows anyone in Congress grappling with the implications of shifting to a system in which any depository institution chartered by any state, under any standard, with or without FDIC insurance or federal supervision, would be automatically entitled to a master account—a radical loss of control over monetary policy and the financial system by the federal

government. Not only is it implausible that Congress took such an anomalous step without any member seeming to notice, but, as its name suggests, the Monetary Control Act was intended to *broaden* the Federal Reserve System's control over monetary policy. *See Depository Institutions Deregulation and Monetary Control Act of 1980*, FederalReserveHistory.org (Nov. 22, 2013), https://bit.ly/3US55uP; Mot. 22-24.

For over 100 years, the nation's banking system has been founded on dual state and federal regulation and supervision of banking. Wyoming's SPDI statute, however, allows SPDIs to dispense with the federal half of that equation. In our dual system, states are free to create novel state charters, but the Reserve Banks can decide whether to grant access to Federal Reserve financial services and the payment system based on a risk-based evaluation of the depository institution, including the features of its charter. It makes no sense to think that Congress's expansion of the class of institutions eligible for Federal Reserve services to include non-members was intended to eliminate any ability of the Reserve Banks to control their own balance sheets and address the risks presented by a particular financial institution with a non-traditional charter. Indeed, even Custodia's amici agree that master account requests are not automatic; instead, "the institution seeking access must be legally qualified as well as responsible, safe and sound, and compliant with all material federal and state laws and regulations." Rothfuss Br. 7.

Because Custodia is not entitled to a master account, it has no protected property interest at stake and its due process claims in Counts III and V should be dismissed. *Salgado-Toribio v. Holder*, 713 F.3d 1267, 1271 (10th Cir. 2013).

III.    **Count I: Custodia's APA Claim Fails Because FRBKC Is Not an Agency nor Has Custodia Suffered an Unreasonable Delay.**

A.    **FRBKC is not a federal banking agency under 12 U.S.C. § 4807.**

Custodia's argument that FRBKC is a "Federal banking agency" (Opp. 24-25) under 12 U.S.C. § 4807 is contrary to the plain language of that statute, which defines "Federal banking agenc[ies]" to include only the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, and the FDIC. 12 U.S.C. §§ 1813(z) & 4801(1). That's it—just those three. The fact that Congress did not include Reserve Banks in the statute's list of "Federal banking agenc[ies]" ends the inquiry.

Custodia contends that when Congress refers to "heads of agencies," it "presumptively" includes subordinates and subsidiaries. Opp. 24. But Reserve Banks are not "subsidiaries" of the Board. Each Reserve Bank is its own juridical entity, with its own capacity "[t]o make contracts" and "[t]o sue and be sued." 12 U.S.C. § 341. Indeed, Congress not only made the Board and the Reserve Banks distinct entities, it prescribed different powers to each. *Compare* FRA Section 11, entitled "Powers of Board of Governors of the Federal Reserve System," *with* FRA Section 13, entitled "Powers of Federal Reserve Banks." When Congress defined a "Federal banking agency" in 12 U.S.C. § 1813(z) to include the Board—but not Reserve Banks—it knew what it was doing. Conversely, when Congress does intend to refer to the Board and the Reserve Banks together, it does so expressly. *See* 12 U.S.C. § 1818(t)(5)(A) ("A regional office of an appropriate Federal banking agency (including a Federal Reserve bank) …."); *cf.* 12 U.S.C. § 221 ("The term 'board' shall be held to mean Board of Governors of the Federal Reserve System … the term 'reserve bank' shall be held to mean Federal reserve bank").

Custodia cites two cases that are easily distinguished. Opp. 25. The first, *Mann v. Fifth Third Bank*, No. 1:09-CV-014, 2011 WL 1575537, at *1 (S.D. Ohio Apr. 25, 2011), did not interpret

the meaning of "Federal banking agency" under § 1813(z). Further, *Mann* concerned the exercise of a power—the power to conduct examinations—that Congress entrusted to the Board and the Board, in turn, delegated to Reserve Banks. *See* 12 U.S.C. § 248(a), (k). Here, in contrast, the decision whether to accept deposits from a given institution was entrusted by Congress directly to Reserve Banks; it is not a function delegated by the Board. 12 U.S.C. § 342. The second case, *Taft v. Agric. Bank of China Ltd.*, No. 15 CIV. 5321 (PAE), 2016 WL 2766661, at *12 (S.D.N.Y. May 12, 2016), concerned a statute that, unlike § 4807, left the term "banking agency" undefined.

### B. FRBKC is not an agency under the APA.

Custodia's contention that FRBKC is an "agency" under the APA is based on a false premise that FRBKC exercises "many binding regulatory powers." Opp. 26. Custodia's contention misapprehends the distinction between the two types of acts undertaken by Reserve Banks. The first is the exercise of FRBKC's own powers, granted by Congress and commercial in nature (such as granting or denying master accounts), where the Board has general supervisory authority but cannot directly make decisions statutorily vested in Reserve Banks. The second are the activities FRBKC performs pursuant to the Board's delegation of its own statutory powers to Reserve Banks pursuant to 12 U.S.C. § 248(k), where the Board can directly control FRBKC's actions and outcomes on the delegated function. Critically, with respect to the latter, § 248(k) expressly *prohibits* the Board from delegating functions "relating to rulemaking or pertaining principally to monetary and credit policies." To qualify as an APA "agency," an entity must "exercise substantial independent authority" and "'take final and binding action'" in exercising this authority. *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881-82 (D.C. Cir. 1997) (quotation omitted). Reserve Banks do not do so when acting on the many matters that the Board delegates to them under § 248(k) because, by the nature of authority being delegated, it is not independent. On those matters, Reserve Bank action is not independent, final, or binding in this sense.

What remains are the first type of acts, the limited Reserve Bank powers that are not delegated to them by the Board but were rather granted to them by Congress, such as FRBKC's discretion to accept deposits in a master account, from entities located within its jurisdiction. 12 U.S.C. § 342. This type of decision is insufficient to make FRBKC an APA "agency." The question at hand is whether Custodia can open an account and place deposits directly with FRBKC, or whether it must instead open an account with a different bank. This is a quintessentially commercial and highly localized decision—whether to permit a person or entity to bank with you—and the prospect that Custodia would need to pay the alternative bank a layer of fees, *see* Compl. ¶ 8, does not transform FRBKC's commercial decision into an act of the sovereign. *Cf. Dong*, 125 F.3d at 881-82 (holding that hiring security and giving grants does not make Smithsonian an "agency" because private museums do the same).

The two cases cited by Custodia for the proposition that Reserve Banks are APA "agencies" do not withstand scrutiny. *Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*, 583 F. Supp. 674 (N.D. Ga. 1984), was "vacated" and deemed to "have no precedential effect" by the judge who had issued the opinion. 597 F. Supp. 462 (N.D. Ga. 1984). And *Lee Construction Co. v. Federal Reserve Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982), does not square with the weight of cases holding that Reserve Banks are *not* agencies across a variety of contexts, including under the Federal Tort Claims Act, which defines agency more broadly than the APA. *See, e.g., Lewis v. United States*, 680 F.2d 1239 (9th Cir. 1982) (holding that Reserve Banks are not agencies under the FTCA); Mot. 15-16 & n.4.[7] As the Second Circuit recently explained, "Congress has gone out of its way

---

[7] Custodia's reliance on *Grumman Aircraft Engineering Corp. v. Renegotiation Board*, 482 F.2d 710, 714-15 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975), is misplaced because the Supreme Court expressly avoided the question of whether "Regional Boards" qualified as APA "agencies." *See* 421 U.S. at 188.

to formally separate the [Reserve Banks] from the government. The [Reserve Banks] are not part of any executive department or agency." *United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 597 (2d Cir. 2019). Rather, "Congress intended the [Reserve Banks] to serve the interests of, but stand apart from, the sovereign," and Congress has "carefully retained the formal separation of the [Reserve Banks] from the executive branch" for years. *Id.* at 597-58 (cleaned up). It cannot be that Reserve Banks stand apart from the sovereign yet qualify as "agencies" under the APA.

### C.    Custodia has not suffered an unreasonable delay.

Even if the Court were to conclude (or assume without deciding) that FRBKC is an agency under the APA, Custodia's unreasonable delay claim is without merit and may be dismissed now. *See Ghadami v. DHS*, No. CV 19-00397 (ABJ), 2020 WL 1308376, at *9 (D.D.C. Mar. 19, 2020) (holding that plaintiffs failed to state unreasonable delay claim). In its motion, FRBKC identified a series of questions presented by Custodia's request for a master account. Mot. 18-19. These questions may be considered by the Court because they are founded in Custodia's own allegations, Custodia's own public statements, and other publicly available information. Custodia alleges, for example, that it is "specializing in payment services and digital asset custody." Compl. ¶ 2. And it has issued a press release describing itself as a "first-of-its-kind digital asset bank" that is seeking to provide "ACH and Fedwire services" and to launch a "payment instrument" called the "Avit."[8] Because ACH services inherently involve a potential extension of credit to the counterparty, the Court can see that FRBKC must assess the risk presented to it and customers in the event of a bank failure. *See supra* at 4-5. Because Custodia has publicly announced it is going to launch the "Avit," the Court can see that FRBKC must understand the risk presented by this "instrument." Because Custodia's customers will be transacting in digital assets and "Custodia will also facilitate

---

[8] Press Release, Custodia, *Avanti Is Now Custodia, supra* note 2.

exchanges of digital assets for dollars," Opp. 6, the Court can see that FRBKC must assess the adequacy of Custodia's BSA/AML compliance regime. Indeed, Custodia has acknowledged that its business poses "unique risks and regulatory challenges ... some of which have not yet manifested." Avanti Fin. Grp., Inc., Comment Letter on Proposed Guidelines for Evaluating Accounts 2 (July 12, 2021), https://bit.ly/3CszjgW.

Tellingly, in its Opposition, Custodia declines to engage on any of these questions, dismissing them as "fact-laden." Opp. 30. To be sure, fully addressing these questions as part of reviewing Custodia's request—as FRBKC has been doing for months now—is fact-laden. But the question on a motion to dismiss is whether Custodia has stated a plausible claim that FRBKC's delay has been *unreasonable*, and given the complexities of the issues presented and the moving target presented by Custodia's evolving factual circumstances, the answer is no.

The *TRAC* factors support the conclusion that FRBKC has not unreasonably delayed.[9] *See Telecommc'ns Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 79 (D.C. Cir. 1984). The first two factors, which focus on timing, favor FRBKC. FRBKC has provided a "rule of reason" both to Custodia and to the public—it is evaluating the credit and stability risks Custodia may pose both to FRBKC itself and to the Federal Reserve System as a whole. Congress has promulgated no timetable for FRBKC's decision whether to "receive … deposits" from an institution. *See* 12 U.S.C. § 342.

The third factor also favors FRBKC because this matter falls squarely within the sphere of economic regulation where courts are more tolerant of delays. *TRAC*, 750 F.2d at 80. The fourth factor favors FRBKC because forcing a faster decision could result in harm to FRBKC's duty to

---

[9] While Custodia asserts that FRBKC "never mention[s]" the *TRAC* factors, Opp. 30, FRBKC cited *TRAC* and addressed the factors by describing, *inter alia*, why there is a reasonable explanation for the time it has taken to consider Custodia's request. Mot. 17-20.

safeguard its own balance sheet and protect the payment system by requiring it to render judgment in a shifting landscape (the Board just released its Guidelines) before FRBKC has adequately assessed the associated risks. The Court should decline Custodia's demand that it require FRBKC to short-circuit its analysis. *See In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991) (analyzing the fourth *TRAC* factor and noting that officials had not just been "twiddl[ing] their thumbs" (quoting *Bd. of Trade v. SEC*, 883 F.2d 525, ___ (7th Cir. 1989))). The fifth factor does not favor Custodia; its "interests prejudiced" would be only the cost of using a bank to intermediate. *TRAC*, 750 F.2d at 80. And the sixth factor is inapplicable in that Custodia has not alleged that FRBKC has acted with impropriety or bad faith.

As demonstrated by Custodia's application to the Board for membership in the Federal Reserve, announcement of an intention to apply for FDIC insurance, and post-complaint procurement of a Certificate of Authority permitting it to commence operations, fundamental aspects of Custodia's request have been in flux. Nonetheless, even on the current record, Custodia has not stated a plausible claim for unreasonable delay. *Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022) (using *TRAC* factors to conclude that Executive Office for Immigration Review's four-year delay in completing investigation was not unreasonable); *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 510 (9th Cir. 1997) (Secretary of the Interior's three-and-a-half-year delay in acting on mineral patent applications was not unreasonable under the *TRAC* factors); *In re Am. Fed'n of Gov't Emps.*, 790 F.2d 116, 119 (D.C. Cir. 1986) (Federal Labor Relations Authority's 49-month delay in processing negotiability and unfair labor practice appeals was not unreasonable under the *TRAC* factors).

## IV.   Counts III, V, and VI: FRBKC's Exercise of Discretion Over Master Accounts Is Consistent with the Constitution.

Custodia's assertion that Reserve Bank discretion over master account requests violates the Constitution is wrong.

### A.   Reserve Bank discretion to grant master accounts does not violate nondelegation principles (Count III).

Custodia asserts that the nondelegation doctrine prohibits Congress from granting "boundless, standardless discretion over regulatory decisions" to FRBKC. Opp. 34. This is just a strawman. "[S]tatutory delegation is constitutional as long as Congress 'lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (brackets omitted) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). Courts recognize that the "intelligible-principle" test presents "an exceedingly modest limitation." *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266 (9th Cir. 2021) (quoting *Gundy*, 139 S. Ct. at 2123).

An "intelligible principle" need not be more specific than a broad policy goal. The Supreme Court has upheld the delegation of authority to regulate "in the public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216-17 (1943), to set "fair and equitable" prices, *Yakus v. United States*, 321 U.S. 414, 422, 427 (1944), and to issue air-quality standards that are "requisite to protect the public health," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001) (quotation marks omitted).

Custodia's assertion that § 342 imposes "no constraints whatsoever" on FRBKC's consideration of master account requests—that FRBKC is free to "flip[] a coin"—is bluster. Opp. 35. In fact, Congress supplied the requisite intelligible principle: The very first section of the FRA, for example, sets forth the policy goals for the Federal Reserve System, which alone provide "intelligible principle[s]" to guide FRBKC action. As the Board explained, BOG Mot. 38, the FRA

states that Congress passed the FRA "to furnish an elastic currency … [and] establish a more effective supervision of banking in the United States." *Id.* (quoting FRA, ch. 6, 38 Stat. at 251). Congress later instructed the Federal Reserve System, which includes the Reserve Banks, to pursue a monetary policy of "accommodating commerce and business and with regard to their bearing upon the general credit situation of the country," 12 U.S.C. § 263(c), and to ensure the financial stability of the economy. *E.g.*, 12 U.S.C. § 5322(a)(1). All the Reserve Banks' work, including FRBKC's evaluation of Custodia's request, must be done in furtherance of the goals stated in the FRA. That is sufficient.

Custodia leans heavily on *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), but that case challenged Congress's grant of authority to the SEC to determine on its own which enforcement actions to bring in federal court and which to bring before its own administrative law judges. The court wrote that "[t]he Supreme Court has noted that the power to assign disputes to agency adjudication is 'peculiarly within the authority of the legislative department,'" and it further concluded that Congress gave the SEC "*no guidance*" on the issue. *Id.* at 461-62 (quotation omitted). Here, in contrast, granting a master account is not "peculiarly" legislative, and Congress provided an "intelligible principle" to guide Reserve Banks' decision-making.

## B.   Custodia is not being regulated by its competitors (Count V).

Even setting aside Custodia's failure to show that it has a property interest in a master account, Custodia acknowledges that the constitutional problem it asserts in Count V would arise only "to the extent Reserve Bank directors—who are private parties—participate in" decisions on master account requests. Opp. 42. But FRBKC has already explained that its directors are neither Custodia's competitors nor involved in master account decisions. A supermajority of each Reserve Bank's board of directors—six of nine—are elected to "represent the public." 12 U.S.C. § 302. If a director fails to live up to that mandate, he or she can be removed by the Board of Governors. 12

U.S.C. § 248(f). None of those six directors may be an "officer, director, or employee of any bank," and three of them are further prohibited from owning stock in a bank or affiliate. 12 U.S.C. § 303.

Custodia itself recognized that the decision on its master account will be made by FRBKC's president, not its board of directors. *See* Compl. ¶ 41 (stating that Custodia "sent a letter to Esther George, the President and Chief Executive Officer of the Kansas City Fed," and that it "urged Ms. George to consider Custodia's application"). Because Reserve Banks' presidents are, by statute, selected only by the non-banking directors chosen to represent the public with the approval of the Board of Governors, the presidents do not represent the interests of any depository institution's competitors. 12 U.S.C. § 341 (Fifth). Custodia's professed concern has no application to its master account request.

### C.   The Appointments Clause is not implicated in this case (Count VI).

A fatal flaw in Custodia's Appointments Clause challenge is that a decision on a master account does not implicate the sovereign executive power. Congress may not vest authority to exercise substantial executive power in an individual whom the President cannot remove. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492-93 (2010). By that same token, if the power delegated is not executive power, its wielder is not subject to Appointments Clause concerns. *See id.*

Deciding whether to open a bank account for an entity is not an executive power; it is the type of commercial decision that private banks make every day. When FRBKC takes an action on a master account request, it is exercising business judgment and evaluating the risks posed to its own balance sheet. That it also considers risks posed to the financial system does not convert the decision into an exercise of the executive power of the United States. A commercial decision can have consequences beyond the direct effects of the decision itself, but the existence of such consequences does not change the commercial character of the decision.

Even if deciding whether to open a master account constituted an exercise of executive power, the current structure meets constitutional standards. The decision is made by FRBKC's president, who is an "inferior officer" under the Constitution appointed with the approval of—and subject to at-will removal by—the Board. 12 U.S.C. § 248(f); *see Appointment & Removal of Fed. Rsrv. Bank Members of Fed. Open Mkt. Comm.*, 43 Op. O.L.C. __, slip op. at 2 (Oct. 23, 2019) (explaining that § 248(f) permits the Board to remove Reserve Bank officers at will). Because of the removal power that Congress gave the Board (in addition to the Board's general oversight of the Reserve Banks), Custodia's suggestion that FRBKC's position means that a Reserve Bank could use the master account decision-making process to "hold ... federal objectives hostage" is entirely implausible. Opp. 38.

Citing *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), Custodia contends that anyone who exercises *final* decision-making authority with respect to a sovereign power must be a "principal officer" and not merely an "inferior" one. Opp. 37, 40. That constitutional issue is not present here. In *Arthrex*, administrative patent judges serving on the Patent Trial and Appeal Board ("PTAB") were appointed as inferior officers but made final determinations on patent validity that were unreviewable within the Executive Branch and conclusive on the parties. *Arthrex*, 141 S. Ct. at 1976. The Court held that this violated the Appointments Clause because no constitutionally appointed principal officer could review the APJs' decisions or affect their outcome in a transparent way. *Id.* at 1985. Here, in contrast, a Reserve Bank's decision on a master account request is inherently without prejudice. Unlike a PTAB determination of a patent's validity, a Reserve Bank's decision to accept deposits can be revoked, and a request that has been denied can be renewed. This lack of finality, coupled with the Board's ability to affect the outcome in transparent ways through issuance of guidelines pursuant to its general oversight authority and its authority to

23

J.A.335

remove Reserve Bank presidents, provides accountability that complies with the Appointments Clause. *See Appointment & Removal*, slip op. at 2.

## V. Counts II and VII: Custodia's Mandamus Act Claims Fail.

Counts II and VII just rehash Custodia's other counts, but with the higher mandamus standard requiring "a *clear* right to the relief sought" and "a *plainly defined and peremptory duty*" owed by FRBKC. Opp. 32 (emphasis added) (quoting *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990)). These claims thus fail, *a fortiori*, for the reasons Custodia's other claims fail. In addition, Custodia concedes that Count VII would only apply "[i]f Defendants did deny Custodia's application." Opp. 43. Because that has not happened, Count VII should also be dismissed as unripe.

## VI. Counts IV and VIII: Custodia's Declaratory Judgment Act Claims Fail Because the Act Provides No Independent Right of Action.

Because Custodia's other claims fail, its Declaratory Judgment Act claims must be dismissed as well. Custodia does not dispute that the Declaratory Judgment Act does not provide an independent cause of action. *See Devon Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012); *Utah Hous. Corp. v. Country Pines, Ltd.*, 541 F. Supp. 3d 1288, 1295 n.1 (D. Utah 2021) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). Like Count VII, Count VIII must be dismissed for the additional reason that it is unripe.

\* \* \*

Although the decision on Custodia's account request is FRBKC's to make, that decision must be made with due consideration for the novelty and risks that Custodia's request poses. Should those risks come to pass, the ramifications could be significant for FRBKC, the payment system, and the public. FRBKC is diligently working to resolve Custodia's request, and the Court should afford FRBKC the time needed to complete that important work.

J.A.336

**CONCLUSION**

For the foregoing reasons and those in FRBKC's motion to dismiss, the Complaint should

be dismissed.

Respectfully submitted,

Dated 4 October 2022

  /s/ Billie LM Addleman
Billie LM Addleman, #6-3690
John P. Fritz, #7-6318
HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
jfritz@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
Laura Harris (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Joshua N. Mitchell (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
jmitchell@kslaw.com
ccarletta@kslaw.com

*Counsel for Defendant the*
*Federal Reserve Bank of Kansas City*

J.A.337

**CERTIFICATE OF SERVICE**

I certify the foregoing *Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss* was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure on 4 October 2022, and that copies were served as follows:

John K. Villa
Ryan Thomas Scarborough
Whitney D Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY
680 Maine Avenue SW
Washington, DC 20024
*Attorneys for Plaintiff*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☒ E-FILE

Scott E Ortiz
WILLIAMS PORTER DAY & NEVILLE
159 North Wolcott, Suite 400
P O Box 10700
Casper, WY 82602
*Attorneys for Plaintiff*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☒ E-FILE

Angela Tarasi
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
*Attorneys for Defendant Federal Reserve Bank of Kansas City*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☒ E-FILE

Joshua P. Chadwick, Senior Special Counsel
Yvonne F. Mizusawa, Senior Counsel
Yonatan Gelblum, Senior Counsel
Katherine Pomeroy, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
*Attorneys for Defendant Federal Reserve Board of Governors*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☒ E-FILE

**J.A.338**

Bridget Hill
Karl D. Anderson
Devin Kenney
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
*Attorneys for State of Wyoming*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Lisa Marie Jerde Spillman
Jerde Spillman Law LLC
7527 Jessica Drive
Cheyenne, WY 82009
*Attorneys for Amici Curiae*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

David M. Gossett
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
*Attorneys for Amici Curiae*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Stephen T. Gannon
Lisa Weingarten Richards
Davis Wright Tremaine LLP
4870 Sadler Road, Suite 301
Glen Allen, VA 23060
*Attorneys for Amici Curiae*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Chris Land
Office of Senator Cynthia M. Lummis
United States Senate
124 Russell Senate Office Building
Washington, DC 20510
*Attorneys for Amici Curiae*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

 /s/ Shannon M. Ward
OF HIRST APPLEGATE, LLP

**J.A.339**

Scott E. Ortiz, W.S.B. # 6-4254
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:          sortiz@wpdn.net

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-CV-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF CUSTODIA BANK, INC.'S NOTICE AND SUBMISSION OF SUPPLEMENTAL AUTHORITY

---

Plaintiff Custodia Bank, Inc. respectfully asks the Court to take judicial notice of the attached October 11, 2022 press release from BNY Mellon entitled "*BNY Mellon Launches New Digital Asset Custody Platform*," attached hereto as **Exhibit "A,"** as additional and relevant authority in support of Plaintiff's Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's Complaint (ECF Doc. No. 58). While Custodia has been waiting patiently for Defendants to decide its master account application, BNY Mellon, the oldest bank in the Nation, is "now able to hold and transfer" digital assets on behalf of its banking customers. Ex. A, 1. The Federal Reserve Board of Governors ("Board"), one of two Defendants in this matter,

supervises BNY Mellon as its primary regulator in three distinct areas: (1) as a state-chartered member bank, FDIC, *The Bank of New York Mellon*, https://tinyurl.com/bp5898r3; (2) through BNY's bank holding company, 12 U.S.C. § 1841(a)(1); and (3) through BNY's designation as a Global Systemically Important Bank, Fin. Stability Bd., *2021 List of Global Systemically Important Banks* (Nov. 21, 2021), https://tinyurl.com/2h96y3fm.

This announcement directly refutes the central argument advanced by Defendants— namely, that allowing banks with master accounts to provide custodial services for digital assets poses systemic risks that warrant additional evaluation, thus justifying indefinite delay.  Bd. Br. 8-9; KCF Br. 8-10.  BNY was required to notify its supervisory point of contact at the Federal Reserve prior to engaging in digital asset banking.  *See* Fed. Rsrv. Bd., *Engagement in Crypto-Asset-Related Activities by Fed. Rsrv.-Supervised Banking Orgs.* 3 (Aug. 16, 2022) (attached hereto as **Exhibit "B"**) ("A supervised banking organization should notify its lead supervisory point of contact at the Federal Reserve prior to engaging in any crypto-asset-related activity.").  If holding custody of digital assets poses "novel, precedent-setting risk" to the United States financial system, as Defendants suggest in their motions, then the Board could have—indeed, should have— prevented BNY from engaging in such activities, especially since BNY is a Global Systematically Important Bank.  12 C.F.R. § 225.4(a)(2).  Instead, this recent development aligns precisely with the allegations of favoritism raised by Custodia's Complaint, whereby delay in adjudicating Custodia's master account application "benefits the established financial institutions whose interests are represented on the Board of Directors of the Kansas City Fed" while undermining the competitive advantage of Custodia's SPDI charter.  Compl. ¶ 2; *see also* ¶¶ 8 (delay "benefit[s] existing and entrenched competitors"), 70, 114, 140.  It also crystallizes the lack of respect shown by Defendants for Wyoming and the carefully crafted SPDI charter enacted by the State.

For these reasons, Custodia asks that the Court take notice of the BNY Mellon press release attached hereto as Exhibit A.

DATED this 12th day of October, 2022.

CUSTODIA BANK, INC., Plaintiff

By:    /s/ Scott E. Ortiz
       Scott E. Ortiz, W.S.B. # 6-4254
       WILLIAMS, PORTER, DAY & NEVILLE, P.C.
       159 No. Wolcott, Suite 400
       P.O. Box 10700
       Casper, Wyoming 82602
       Telephone:    (307) 265-0700
       Facsimile:    (307) 266-2306
       Email:        sortiz@wpdn.net

       -and-

       John K. Villa, *pro hac vice*
       Ryan Scarborough, *pro hac vice*
       Sarah M. Harris, *pro hac vice*
       Whitney D. Hermandorfer, *pro hac vice*
       Jamie Wolfe, *pro hac vice*
       WILLIAMS & CONNOLLY, LLP
       680 Maine Avenue SW
       Washington, DC 20024
       Telephone:    (202) 434-500
       Emails:       jvilla@wc.com
                     rscarborough@wc.com
                     sharris@wc.com
                     whermandorfer@wc.com
                     jwolfe@wc.com
                     *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this 12th day of October, 2022:

| | |
|---|---|
| Mark Van Der Weide<br>Richard M. Ashton<br>Joshua P. Chadwick<br>Yvonne F. Mizusawa<br>Yonatan Gelblum<br>Katherine Pomeroy<br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM<br>20th Street and Constitutional Avenue, N.W.<br>Washington, DC 20551 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Billie L.M. Addleman<br>John P. Fritz<br>HIRST APPLEGATE, LLP<br>P.O. Box 1083<br>Cheyenne, Wyoming 82003 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Andrew Michaelson<br>Laura Harris<br>KING & SPALDING, LLC<br>1185 Avenue of the Americas, 34th Floor<br>New York, New York 10036 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Jeffrey S. Bucholtz<br>Joshua N. Mitchell<br>Christine M. Carletta<br>KING & SPALDING, LLP<br>1700 Pennsylvania Ave., N.W.<br>Washington, D.C. 20006 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |

_/s/ Scott E. Ortiz_____
Scott E. Ortiz

-4-

**J.A.343**

# Exhibit A

J.A.344

# BNY Mellon Launches New Digital Asset Custody Platform

---

NEWS PROVIDED BY
**BNY Mellon →**
11 Oct, 2022, 14:00 BST

---

*World's largest custodian bank leads development of financial infrastructure to support digital assets*

NEW YORK, Oct. 11, 2022 /PRNewswire/ -- BNY Mellon today announced that its Digital Asset Custody platform is live in the U.S. With select clients now able to hold and transfer bitcoin and ether, this milestone reinforces BNY Mellon's commitment to support client demand for a trusted provider of both traditional and digital asset servicing.

As America's oldest bank, BNY Mellon has a 238-year legacy of trust, resilience, and innovation. In this spirit, BNY Mellon formed an enterprise Digital Assets Unit in 2021 to develop solutions for digital asset technology, with plans to launch the industry's first multi-asset platform that bridges digital and traditional asset custody.

"Touching more than 20% of the world's investable assets, BNY Mellon has the scale to reimagine financial markets through blockchain technology and digital assets," said Robin Vince, Chief Executive Officer and President at BNY Mellon. "We are excited to help drive the financial industry forward as we begin the next chapter in our innovation journey."

A recent survey sponsored by BNY Mellon highlights already significant institutional demand for a resilient, scalable financial infrastructure built to accommodate both traditional and digital assets. According to the survey, almost all institutional investors (91%) are interested in

**J.A.345**

investing in tokenized products. Additionally, 41% of institutional investors hold cryptocurrency in their portfolio today, with an additional 15% planning to hold digital assets in their portfolios within the next two to five years.

"With Digital Asset Custody, we continue our journey of trust and innovation into the evolving digital assets space, while embracing leading technology and collaborating with fintechs," said Roman Regelman, CEO of Securities Services & Digital at BNY Mellon.

BNY Mellon has been working closely with market-leading fintechs. The firm tapped digital asset technology specialists Fireblocks and Chainalysis to integrate their technology in order to meet the present and future security and compliance needs of clients across the digital asset space.

"As the world's largest custodian, BNY Mellon is the natural provider to create a safe and secure Digital Asset Custody Platform for institutional clients," said Caroline Butler, CEO of Custody Services at BNY Mellon. "We will continue to innovate, embrace new technology and work closely with clients to address their evolving needs."

**About BNY Mellon**

BNY Mellon is a global investments company dedicated to helping its clients manage and service their financial assets throughout the investment lifecycle. Whether providing financial services for institutions, corporations or individual investors, BNY Mellon delivers informed investment and wealth management and investment services in 35 countries. As of June 30, 2022, BNY Mellon had $43.0 trillion in assets under custody and/or administration, and $1.9 trillion in assets under management. BNY Mellon can act as a single point of contact for clients looking to create, trade, hold, manage, service, distribute or restructure investments. BNY Mellon is the corporate brand of The Bank of New York Mellon Corporation (NYSE: BK). Additional information is available on www.bnymellon.com. Follow us on Twitter @BNYMellon or visit our newsroom at www.bnymellon.com/newsroom for the latest company news.

**Media Contact:**

Steve LaMarca

+1 908 581 8292

steve.lamarca@bnymellon.com

**J.A.346**

SOURCE BNY Mellon

# Exhibit B

# Supervision and Regulation Letters

↪ Share   ⬇ PDF   🔊 RSS

## SR 22-6 / CA 22-6: Engagement in Crypto-Asset-Related Activities by Federal Reserve-Supervised Banking Organizations



BOARD OF GOVERNORS
OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C. 20551

DIVISION OF
SUPERVISION AND REGULATION

DIVISION OF CONSUMER
AND COMMUNITY AFFAIRS

**SR 22-6 / CA 22-6**
**August 16, 2022**

**TO THE OFFICER IN CHARGE OF SUPERVISION AND APPROPRIATE SUPERVISORY AND EXAMINATION STAFF AT EACH FEDERAL RESERVE BANK AND BANKING ORGANIZATIONS SUPERVISED BY THE FEDERAL RESERVE**

SUBJECT:
Engagement in Crypto-Asset-Related Activities by Federal Reserve-Supervised Banking Organizations

---

**Applicability:**  This letter applies to all banking organizations supervised by the Federal Reserve, including those with $10 billion or less in consolidated assets.

---

The emerging crypto-asset[1] sector presents potential opportunities to banking organizations, their customers, and the overall financial system; however, crypto-asset-related activities may pose risks related to safety and soundness, consumer protection, and financial stability, including, but not limited to:

- Technology and operations:  The technology underlying crypto-assets is nascent and evolving, and poses novel risks such as those associated with cybersecurity and governance of the underlying network and any related arrangements. These risks are particularly heightened when the underlying technology involves open, permissionless networks.

- Anti-money laundering and countering of financing of terrorism:  Crypto-assets can be used to facilitate money laundering and illicit financing. Some crypto-assets have limited transparency, making it difficult to identify and track ownership.

- Consumer protection and legal compliance:  Crypto-assets pose significant consumer risks such as those related to price volatility, misinformation, fraud, and theft or loss of assets. In addition, banking organizations engaging in crypto-asset-related activities face potential legal and consumer compliance risks stemming from a range of issues, including, for example, uncertainty regarding the legal status of many crypto-assets; potential legal exposure arising from consumer losses, operational failures, and relationships with crypto-asset service providers; and limited legal precedent regarding how crypto-assets would be treated in varying contexts, including, for example, in the event of loss or bankruptcy.

- Financial stability:  Certain types of crypto-assets, such as stablecoins, if adopted at large scale, could also pose risks to financial stability including potentially through destabilizing runs and disruptions in the payment systems.[2]

Given the heightened and novel risks posed by crypto-assets, the Federal Reserve is closely monitoring related developments and banking organizations' participation in crypto-asset-related activities.

This letter provides that a Federal Reserve-supervised banking organization engaging or seeking to engage in crypto-asset-related activities should notify its lead supervisory point of contact at the Federal Reserve.[3] As explained below, prior to engaging in any crypto-asset-related activity, a supervised banking organization must ensure such activity is legally permissible and determine whether any filings are required under applicable federal or state laws. A supervised banking organization should, prior to engaging in these activities, have in place adequate systems, risk management, and controls to conduct such activities in a safe and sound manner and consistent with all applicable laws, including applicable consumer protection statutes and regulations.

**Legal Permissibility**

Prior to engaging in new activities of any kind, a supervised banking organization must ensure that such activities are legally permissible.[4] A supervised banking organization seeking to engage in (or currently engaged in) crypto-asset-related activities must analyze the permissibility of such activities under relevant state and federal laws and determine whether any filings are required under federal banking laws, including the Bank Holding Company Act,[5] Home Owners' Loan Act,[6] Federal

J.A.350

Reserve Act,[7] Federal Deposit Insurance Act,[8] or the regulations promulgated pursuant thereto, as applicable.[9] If any supervised banking organization has questions regarding the permissibility of any crypto-asset-related activities or about the applicability of any filing requirements, it should consult its lead supervisory point of contact at the Federal Reserve.

**Notification of Proposed Activities**

A supervised banking organization should notify its lead supervisory point of contact at the Federal Reserve prior to engaging in any crypto-asset-related activity.  Any supervised banking organization that is already engaged in crypto-asset-related activities should notify its lead supervisory point of contact at the Federal Reserve promptly regarding the engagement in such activities, if it has not already done so. Federal Reserve supervisory staff will provide relevant supervisory feedback, as appropriate, in a timely manner.

In all cases, a supervised banking organization should, prior to engaging in these activities, have in place adequate systems, risk management, and controls to conduct crypto-asset-related activities in a safe and sound manner and consistent with applicable laws, including applicable consumer protection statutes and regulations.  This includes having adequate systems in place to identify, measure, monitor, and control the risks associated with such activities on an ongoing basis. These systems should cover operational risk (for example, the risks of new, evolving technologies; the risk of hacking, fraud, and theft; and the risk of third-party relationships), financial risk, legal risk, compliance risk (including, but not limited to, compliance with the Bank Secrecy Act, anti-money laundering requirements, and sanctions requirements), and any other risk necessary to ensure the activities are conducted in a manner that is consistent with safe and sound banking and in compliance with applicable laws, including applicable consumer protection statutes and regulations. State member banks are also encouraged to notify their state regulator prior to engaging in any crypto-asset-related activity.

Reserve Banks are asked to distribute this letter to the supervised banking organizations in their districts and to appropriate supervisory staff.  In addition, a supervised banking organization may send questions via the Board's public website.[10]

*signed by*
Michael S. Gibson
Director
Division of
Supervision and Regulation

*signed by*
Eric S. Belsky
Director
Division of Consumer
and Community Affairs

## Notes:

1. A crypto-asset generally refers to any digital asset implemented using cryptographic techniques.  Return to text.

2. President's Working Group on Financial Markets, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of Currency, *Report on Stablecoins* (November 2021), https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf.  Return to text.

3. Crypto-asset-related activities may include, but are not limited to, crypto-asset safekeeping and traditional custody services; ancillary custody services; facilitation of customer purchases and sales of crypto-assets; loans collateralized by crypto-assets; and issuance and distribution of stablecoins.  Return to text.

4. This letter does not address the legal permissibility of any specific crypto-asset-related activity.  Return to text.

5. Bank holding companies should consult section 4 of the Bank Holding Company Act (12 U.S.C. § 1843) and Regulation Y (12 CFR part 225).  Return to text.

6. Savings and loan holding companies should consult section 10(c) of the Home Owners' Loan Act (12 U.S.C. § 1467a(c)) and Regulation LL (12 CFR part 238).  Return to text.

7. 12 U.S.C. § 330.  State member banks also should consult state supervisory agencies regarding any required state filings.  Return to text.

8. Under section 24 of the Federal Deposit Insurance Act, an insured state bank may not engage as principal in any type of activity that is not permissible for a national bank, unless (i) the Federal Deposit Insurance Corporation (FDIC) has determined that the activity would pose no significant risk to the Deposit Insurance Fund and (ii) the state member bank is, and continues to be, in compliance with applicable capital standards prescribed by the Board (12 U.S.C. § 1831a(a)(1)). State member banks should consult the regulations and interpretations of the Office of the Comptroller of the Currency and FDIC to determine if activities are permissible under federal law.  Return to text.

9. Among other such requirements, pursuant to section 208.3(d)(2) of the Board's Regulation H, a state member bank may not, without the permission of the Board, cause or permit any change in the general character of its business or in the scope of the corporate powers it exercises at the time of its admission.  12 CFR 208.3(d)(2).  *See also* SR Letter 02-09, "Guidance Regarding Significant Changes in the General Character of a State Member Bank's Business and Compliance with Regulation H," https://www.federalreserve.gov/boarddocs/srletters/2002/sr0209.htm; Frequently Asked Questions about Regulation H, 12 CFR 208.3–Q1, https://www.federalreserve.gov/supervisionreg/legalinterpretations/reg-h-frequently-asked-questions.htm.  Return to text.

10. See https://www.federalreserve.gov/apps/contactus/feedback.aspx.  Return to text.

Last Update: August 16, 2022

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 469-1007
yvonne.f.mizusawa@frb.gov

*Counsel for Defendant Board of Governors of the*
*Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| CUSTODIA BANK, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF GOVERNORS OF<br>THE FEDERAL RESERVE SYSTEM &<br>FEDERAL RESERVE BANK<br>OF KANSAS CITY,<br><br>Defendants. | ) )<br>)<br>)<br>)<br>)  Case No. 1:22-cv-00125-SWS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S RESPONSE TO PLAINTIFF'S NOTICE AND SUBMISSION OF SUPPLEMENTAL AUTHORITY

In its Supplemental Notice (ECF 98-00) ("Supp. Notice"), Custodia seeks to compare its

novel business model to a limited new custody service by one of the most comprehensively

supervised banks in America that has had longstanding access to a Federal Reserve master account. *Id.* at 2, 3. The Bank of New York Mellon ("BNYM"), which is supervised by the Federal Reserve, recently announced that it will launch a limited crypto-asset custody service for select clients. *See* ECF 98-01. Custodia complains that this amounts to "favoritism" by the Board towards established banking institutions, but that complaint ignores the substantial differences between the BNYM announcement and its own business model and plans. Supp. Notice at 2. Accordingly, BNYM's provision of these limited custody services does not show that the Federal Reserve is unreasonably delaying a decision on access to a master account by a unique type of depository institution like Custodia that is proposing a more extensive range of crypto-asset services.

As Custodia acknowledges, the Board recently provided guidance in the crypto-asset area to its supervised entities, such as BNYM, through its August 16, 2022 Supervision and Regulation Letter regarding Crypto Related Activities at Federal Reserve-Supervised Banks ("SR Letter") (ECF 98-02). The SR Letter highlights the "heightened and novel risks posed by crypto-assets," including "risks related to safety and soundness, consumer protection, and financial stability" (anti-money laundering and illicit financing risks among them). *Id.* at 3. As a result of these heightened risks, the SR Letter makes clear that "[a] supervised banking organization should, prior to engaging in [crypto-asset-related] activities, have in place adequate systems, risk management, and controls to conduct such activities in a safe and sound manner and consistent with applicable laws." *Id.* at 4. The Office of the Comptroller of the Currency ("OCC") has also provided guidance in this area indicating that certain crypto custody activities are permissible for national banks, provided that the bank can first demonstrate to supervisors

that it can conduct the activities in a safe and sound manner.[1]  As Custodia correctly observes, BNYM was subject to the SR Letter, which established an expectation that it should "notify its supervisory point of contact at the Federal Reserve" prior to launching its digital asset custody service, *see* Supp. Notice at 2, and public reports state that BNYM obtained approval of its New York state financial regulator this fall, after announcing its planned activity approximately 19 months ago in February 2021.[2]

Contrary to Custodia's suggestions, the Board has presented a consistent message regarding the risks posed by crypto-assets both to Board-supervised financial institutions, and to novel, non-federally regulated, uninsured entities such as Custodia.  As an initial matter, as a federally regulated and insured institution, BNYM falls under "Tier 1" of the Board's recently issued Guidelines for Evaluating Account and Service Requests, 87 Fed. Reg. 51,099, 51,109 (Aug. 19, 2022), and is "already subject to a standard, strict, and comprehensive set of federal banking regulations," and "detailed regulatory and financial information [is] … readily available" regarding BNYM. *Id.*  By contrast, Custodia, as a non-federally regulated, uninsured *de novo* special depository institution, is currently a Tier 3 institution under the Guidelines, and therefore "subject to a regulatory framework that is substantially different from the regulatory framework that applies to federally-insured institutions" and for which "detailed regulatory and financial information … may not exist or may be unavailable." *Id.* at 51,110.

Moreover, as a Federal Reserve-supervised bank, BNYM is subject to continuous

---

[1] *See* OCC Interpretive Letter No. 1179 (Nov. 18, 2021), *available at* https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2021/int1179.pdf
[2] *See America's Oldest Bank, BNY Mellon, Will Hold That Crypto Now*, Wall Street Journal, Oct. 11, 2022, *available at* https://www.wsj.com/articles/americas-oldest-bank-bny-mellon-will-hold-that-crypto-now-11665460354 (BNMY "won the approval of New York's financial regulator earlier this fall to begin receiving select customers' bitcoin and ether starting this week" after "unveil[ing] its plans in February 2021 to hold and transfer digital currencies on behalf of investment firms").

monitoring and supervision by the Board, which includes regular engagement with supervisory staff about any proposed new business lines or activities. The Federal Reserve expects to address any safety and soundness or other issues with BNYM's digital asset custody services through the supervisory process. The same is not true for Custodia, a novel depository institution prohibited under Wyoming law from engaging in the traditional banking activity of lending,[3] exempt from Wyoming's requirement that banks obtain deposit insurance,[4] and not at this time federally regulated (and therefore far more difficult for the Federal Reserve to monitor and assess).

In addition, Custodia proposes to do much more than the limited custody services announced by BNYM. Most notably, Custodia intends to use its balance sheet to conduct certain activities as principal—including issuing the "Avit," a balance sheet liability of Custodia that would be a "tokenized, programmable U.S. dollar."[5] Further, Custodia has made no representation that it will not hold cryptocurrency in a principal capacity, *see* FRBKC Reply (ECF 97) at 5-6—an activity that is outside the scope of conventional custody services, but is arguably required by Wyoming law. *See* Wyo. Digital Asset Custody Rules, Chapter 19, Section 8(a) (requiring digital asset custodians to have on hand "sums required for the execution of transactions" as part of the digital asset custodial services), *available at* https://wyomingbankingdivision.wyo.gov/banks-and-trust-companies/special-purpose-depository-institutions. As explained by Defendants, these and other complex and novel business plans by Custodia present substantial risks and complexities requiring careful and diligent review. *See, e.g.*, Board Br. (ECF 49) at 8-9; FRBKC Br. (ECF 51) at 8-11; FRBKC

---

[3] Wyo. Stat. § 13-12-103(c); Compl. ¶¶ 28, 29.
[4] Wyo. Stat. § 13-2-103(a).
[5] *See* https://custodiabank.com/ (last visited Oct. 19, 2022).

J.A.356

Reply (ECF 97) at 4-8.

Therefore, Custodia's attempt to draw a parallel between BNYM's comprehensively supervised and limited crypto-asset safekeeping service to its novel and far-ranging business model as a non-federally regulated, uninsured depository institution is inapt and has no bearing on the pending motions to dismiss.

Dated: October 19, 2022

Respectfully submitted,

 /s/ *Yvonne F. Mizusawa*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 469-1007
yvonne.f.mizusawa@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2022, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to all parties of record.

By:   _/s/ Yvonne F. Mizusawa_____
Yvonne F. Mizusawa

*Counsel for Defendant Board of Governors*
*of the Federal Reserve System*

J.A.358

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

_____

| | |
|---|---|
| CUSTODIA BANK, INC., | |
| Plaintiff, | |
| v. | Case No. 22-CV-125-SWS |
| FEDERAL RESERVE BOARD OF GOVERNORS, and FEDERAL RESERVE BANK OF KANSAS CITY, | |
| Defendants. | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' 12(b)(6) MOTIONS TO DISMISS

This matter comes before the Court on Defendants' motions to dismiss (ECF 48, 50). Plaintiff filed a consolidated opposition to both motions (ECF 58), and Defendants replied (ECF 96, 97). Plaintiff supplemented its opposition (ECF 98), and Defendant Board of Governors responded to the supplement (ECF 99). The Court has also reviewed and considered the amici briefs from the State of Wyoming (ECF 88), State Senator Rothfuss and State Representative Olsen (ECF 89), and Members of the U.S. Senate Banking Committee and U.S. House of Representatives Financial Services Committee (ECF 92), all of which oppose Defendants' motions to dismiss. The Court heard arguments from counsel on October 28, 2022. (ECF 100.) Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court determines the motions to dismiss must be granted in part and denied in part.

## BACKGROUND

Plaintiff Custodia Bank is a Wyoming depository institution that is unlike a traditional bank because it is "designed to provide custody services for digital assets such as Bitcoin via their trust departments" and "provide a bridge connecting digital asset companies to the U.S. payments system," which would allow, for example, a Custodia customer to use a cryptocurrency like Bitcoin "to make a direct transfer, a purchase, or an investment, rather than having to first convert the" cryptocurrency into U.S. Dollars. (Compl. (ECF 1) ¶ 29.)  Custodia is state-chartered as a Special Purpose Depository Institution (SPDI), a unique-to-Wyoming financial institution intended to facilitate cryptocurrency banking that is prohibited from making loans.  (Compl. ¶ 28.)  It is also chartered to allow the traditional banking service of U.S. Dollar deposit-taking.  (*Id.* ¶ 4.) As a state-chartered institution, it is subject to Wyoming's banking regulatory system and is not required to be insured by the Federal Deposit Insurance Corporation (FDIC).  (*Id.* ¶¶ 2, 18, 23, 26.)  In August 2021, Custodia also applied to Defendant Federal Reserve Board of Governors for membership in the Federal Reserve, which would subject Custodia to oversight and regulation by the Federal Reserve Board (in addition to the state's banking regulatory system).  (*Id.* ¶¶ 4, 24.)

On October 29, 2020, Custodia applied to Defendant Federal Reserve Bank of Kansas City (FRBKC) to obtain a Federal Reserve "master account," which is "put simply, a bank account for banks" that "gives deposit institutions access to the Federal Reserve System's services, including its electronic payments system." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).

J.A.360

"Without such access, a depository institution is nothing more than a vault." *Id.* at 1053 (Moritz, J.) (internal quotation marks omitted).

> The master account is both a record of financial transactions that reflects the financial rights and obligations of an account holder and the Reserve Bank with respect to each other, and the place where opening and closing balances are determined. For each institution, all credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to this single master account at one Reserve Bank.

*Id.* at 1064 n.1 (Bacharach, J.). A master account also enables its holder to access various services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including wire transfer services, automated clearinghouse services, settlement services, securities safekeeping, and Federal Reserve float services. Except for certain unique circumstances, any financial institution can have only one master account with its Federal Reserve Bank.

Custodia asserts, "Direct access to the Federal Reserve is vital to Custodia's ability to operate effectively and efficiently in pursuit of its core mission to offer a secure, compliant bridge between digital assets and the United States dollar payment system." (Compl. ¶ 3.) Custodia currently accesses the Federal Reserve through an intermediary ("correspondent") bank that has a master account, but this arrangement "is much costlier and introduces counterparty credit risk and settlement risk that would" be avoided with its own master account. (*Id.* ¶ 8.) A master account "would allow Custodia to access directly the Federal Reserve, sharply reduce its costs, and bring new products and options to users of financial services." (*Id.* ¶ 3.)

Now two years later, FRBKC has yet to grant or deny Custodia's application for a master account. Custodia alleges, "Upon information and belief, the [FRBKC's]

consideration and impending approval of Custodia's application was derailed when, in spring 2021, the [Defendant Federal Reserve Board of Governors] asserted control over the decision-making process." (Compl. ¶ 6.)  Custodia sues for an order compelling Defendants to "promptly decide" the application. (*Id.* ¶ 81.)  Alternatively, Custodia also says that if FRBKC denies the application, the Court should "issue a writ of mandamus" ordering Defendants to grant the application. (*Id.* ¶ 130.)  Defendants have moved to dismiss Custodia's complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6), asserting Custodia has failed to state any claim on which the Court can grant relief.

## STANDARD FOR 12(b)(6) MOTION TO DISMISS

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, assumed to be true, must "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In the context of a 12(b)(6) motion to dismiss, this plausibility standard requires the plaintiff to plead facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court accepts the nonmoving party's well-pled factual allegations as true and construes them in the light most favorable to the nonmoving party, but it is not bound to accept an asserted legal conclusion as true. *Hall v.*

*Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991); *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

The Court starts with Custodia's primary causes of action before moving to its alternative claims.

## 1. Claim I - Violation of Administrative Procedure Act (APA) for Unreasonable Delay of Agency Action

In its first claim for relief, Custodia contends the Administrative Procedures Act (APA) allows it to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and Defendants have unlawfully withheld or unreasonably delayed the decision on Custodia's application for a master account.  (Compl. ¶¶ 61-81.)  Defendant FRBKC argues it is not an "agency" for purposes of the APA, but even if it was, Custodia has not suffered an "unreasonable delay" under the APA.  (ECF 51 pp. 25-32.[1])  Defendant Federal Reserve Board of Governors argues that while it is an "agency" for APA purposes, it is not the entity that decides Custodia's application and Custodia has not suffered an unreasonable delay under the APA.  (ECF 49 pp. 32-41.)

### 1.1    Whether FRBKC is an Agency Subject to the APA

The APA defines an agency, with certain exceptions not applicable here, as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."  5 U.S.C. § 551(1); 5 U.S.C. 701(b)(1).  Simply put, the law is

---

[1]  Pinpoint citations to documents in the court record are to the page number assigned by the CM/ECF system at the top of each page rather than the page number assigned by counsel at the bottom of the pages.

currently unsettled on whether a Federal Reserve Bank is an "agency" for APA purposes.

Neither the Tenth Circuit nor the U.S. Supreme Court have decided the question, and other

federal district courts are divided on the matter.  For example:

- *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 154 F. Supp. 3d 1185, 1187 (D. Colo. 2016) ("Despite its name, the Bank is not a federal agency. Rather, it is a private corporation created by an Act of Congress and run by its own board of directors."), *reversed and remanded with instructions on other grounds*, 861 F.3d 1052 (10th Cir. 2017).

- *Lee Const. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165, 179 (D. Md. 1982) ("All in all, while the issue is a close one, it would seem that a consideration of each and every one of the relevant factors tips the balance in favor of holding that the Bank is an 'agency' for purposes of judicial review under the APA.  For the most part, that conclusion comports with the decisions of other Courts which have held that Federal Reserve Banks are agencies or instrumentalities of the United States for other purposes.")

- *Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chicago*, 583 F. Supp. 674, 678 (N.D. Ga.) ("There can be no doubt that the Federal Reserve Bank of Chicago is an 'authority' of the government of the United States. As a member bank of the Federal Reserve System, it performs important governmental functions and exercises powers entrusted to it by the United States government.  [Collecting cases.]  Because the Bank is an authority of the United States government and is not listed among the exclusions of section 551, the Court determines that the Bank is an agency subject to review of its action under the Administrative Procedure Act.  How the Bank can contend otherwise in good faith escapes the Court."), *vacated sub nom. Flight Int'l, Inc. v. Fed. Rsrv. Bank of Chicago*, 597 F. Supp. 462 (N.D. Ga. 1984) (expressly stating the prior opinion carries no precedential value).

There is no controlling precedent and precious little persuasive authority on the question

in the Tenth Circuit.  Moreover, the "law on the simple question of what is an agency is

quite complex."  *McKinney v. Caldera*, 141 F. Supp. 2d 25, 31 (D.D.C. 2001).

But in *Lee Const. Co.*, the District of Maryland persuasively concluded that to

determine whether the Federal Reserve Banks were APA agencies, it would be necessary

for a court "to review the organizational structure of Federal Reserve Banks and their

function within the Federal Reserve System in order to determine whether or not such Banks possess sufficient indicia of 'agency' status to be considered agencies for purposes of the APA." *Lee Const. Co.*, 558 F. Supp. at 176; *see New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010) ("courts have emphasized 'the need to examine the structure, function, and mandate' of the entity in question in determining whether it falls within the definition set out in the APA") (quoting *McKinney*, 141 F. Supp. 2d at 33). This Court agrees those factors, and others, weigh on the decision of whether FRBKC is an "agency" for APA purposes. However, that level of information and detail is not part of the record at this stage of the proceedings. At this point, the Court is confident in stating FRBKC exercises, at the least, quasi-agency functions that may render it subject to the APA, but a definitive decision on the matter must wait for further factual development addressing the various factors the Court will have to examine to determine whether FRBKC is a federal agency for APA purposes. For now, the Court has little trouble concluding that, accepting the allegations of the complaint as true and construing them in the light most favorable to the non-moving party, Custodia has stated a plausible claim that FRBKC is subject to the APA.

### 1.2    Whether the Board of Governors is a Proper Defendant

The Board of Governors contends the decision on Custodia's master account application rests with FRBKC. Custodia asserts, "Upon information and belief, [FRBKC's] consideration and impending approval of Custodia's application was derailed when, in spring 2021, the Board [of Governors] asserted control over the decision-making process." (Compl. ¶ 6.) While this allegation is made "upon information and belief," the

plausibility standard of 12(b)(6) "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citations omitted).  Here, several factors combine to make it reasonable to infer the Board of Governors has involved itself in some manner to interfere with or delay Custodia's application:

(1)    More than a year and a half has passed since "Tara Humston, [FRBKC's] head of Supervision and Risk Management, informed Custodia that there were 'no showstoppers' with its master account application."  (Compl. ¶ 36.)

(2)    FRBKC confirmed in a January 2022 letter "that Custodia meets the legal eligibility requirements for receiving a master account."  (*Id.*; *see also* Compl. ¶ 43.)

(3)    In a March 2022 meeting (i.e., after FRBKC asserted there were "no showstoppers" and confirmed Custodia was legally eligible for a master account), FRBKC then "informed Custodia that it had not started processing Custodia's master account application."  (Compl. ¶ 40.)

*See also* 12 U.S.C. § 248 (setting forth the broad authority of the Board of Governors to oversee and supervise the Federal Reserve Banks).

Custodia has plausibly alleged the Board of Governors has participated in or interfered with the consideration and decision of Custodia's master account application.

**1.3    Whether Custodia has Stated a Plausible Claim of Unreasonably Delayed Agency Action**

Knowing that the Board of Governors is an agency subject to the APA and accepting for purposes of this Order that FRBKC is likewise, the next question is whether Custodia has stated a plausible claim of unreasonable delay under the APA against the Defendants. This inquiry breaks down into multiple sub-inquiries.

**1.3.1    A one-year statutory deadline does not apply to deciding Custodia's master account application, but such decision can still be "unreasonably delayed" under the APA.**

Custodia contends a one-year statutory deadline from 12 U.S.C. § 4807(a) applies to its master account application, which the Defendants have exceeded.  (Compl. ¶¶ 6, 46, 74, 87, 107.)  Defendants argue § 4807 does not apply, and therefore Custodia cannot state a claim for unreasonable delay under the APA.

Section 4807 provides:

(a)    In general: Each Federal banking agency shall take final action on any application to the agency before the end of the 1-year period beginning on the date on which a completed application is received by the agency.

(b)    Waiver by applicant authorized: Any person submitting an application to a Federal banking agency may waive the applicability of subsection (a) with respect to such application at any time.

12 U.S.C. § 4807.  Section 4801(1) says the term "Federal banking agencies" has the definition given to it by 12 U.S.C. § 1813.  And § 1813 says "Federal banking agency" means "the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, or the Federal Deposit Insurance Corporation."  12 U.S.C. § 1813(z).  It does not include a Federal Reserve Bank as a "Federal banking agency."

Here, it is undisputed that Custodia submitted its application to FRBKC, not to one of the "Federal banking agencies" identified in 12 U.S.C. § 1813(z).   Accordingly, Custodia's application for a master account submitted to FRBKC is not bound by the one-year limitation of § 4807(a).   Custodia's arguments that Federal Reserve Banks must be inherently included as "Federal banking agencies" is unpersuasive and would require the Court to read words into § 4801 or § 1813(z) that do not exist, which the Court may not do.   Chapter 48 of Title 12 was codified as part of the Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103-325, 108 Stat. 2160 ("Riegle Act"), and when it was passed, Congress certainly knew what Federal Reserve Banks were and could have included them in the definition of "Federal banking agencies" as part of § 4801 if it wanted to.   Indeed, it referenced "Federal reserve bank" several times in other parts of the Riegle Act.   "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."   *Nken v. Holder*, 556 U.S. 418, 430 (2009).   Custodia's assertion that deciding its master account application is subject to the one-year limitation of § 4807(a) is legally unsustainable and fails to state a claim on which relief can be granted.

Nonetheless, again presuming the application of the APA to this issue for now, the decision may be subject to a "reasonable time" deadline; the expiration of a concrete statutory deadline is not necessary for agency action to be unreasonably delayed.   "[I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions—such as the APA's general admonition that

agencies conclude matters presented to them 'within a reasonable time,' *see* 5 U.S.C. § 555(b)—a court must compel only action that is delayed unreasonably." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999).  Section 555(b) provides, "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b); *see also Telecomm. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("section 706(1) coupled with section 555(b) does indicate a congressional view that agencies should act within reasonable time frames").  Under this "within a reasonable time" standard, it rests in the Court's "discretion to decide whether agency delay is unreasonable." *Forest Guardians*, 174 F.3d at 1190.

Custodia has stated a plausible claim of unreasonable delay that survives dismissal. Specifically, the "Master Account Agreement" completed by Custodia and submitted to FRBKC notes that "[p]rocessing may take 5-7 business days.  Please contact the Federal Reserve Bank to confirm the date that the master account will be established."  (ECF 1-2.) This suggests that a standard financial institution can expect a decision on their master account application in a matter of days, whereas Custodia's application has been pending for two years.  Further, Custodia alleges in its complaint, "In early 2021, a representative of [FRBKC] moreover informed Custodia there were 'no showstoppers' with Custodia's application" (Compl. ¶¶ 5, 36), thus suggesting the application had been considered and was on track to be granted.  Custodia also alleges FRBKC confirmed in a January 2021 letter that Custodia was legally eligible for a master account.  (*Id.* ¶¶ 36, 43.)  After all that, FRBKC then informed Custodia in March 2022 that it had not even started processing the

master account application (which may or may not have occurred due to the Board of Governors' involvement).  (*Id.* ¶ 40.)  Considered together, the Court has little difficulty concluding Custodia has asserted a plausible cause of action for unreasonable delay against both Defendants.

### 1.3.2   <u>Only legally-required action can be compelled under the law, and Custodia has stated a plausible claim to compel legally-required action.</u>

"[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).  The Defendants argue that issuing a master account is discretionary and, therefore, cannot be compelled.  This issue, too, is unsettled in the law and, at least at this juncture, the Court concludes Custodia has stated a legally valid claim to relief.

The Defendants contend FRBKC has complete discretion to issue or deny a master account pursuant to 12 U.S.C. § 342, which says in part:

> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, … deposits of current funds in lawful money, national-bank notes, Federal reserve notes, [etc.].

Section 342 is located in Subchapter IX of Chapter 3 of Title 12 of the U.S.C.  Subchapter IX is titled, "Powers and Duties of Federal Reserve Banks."  To effectuate this deposit-taking function, Federal Reserve Banks use the master account to keep a record of each institution's debits and credits.  No provision of the Federal Reserve Act, including § 342, "imposes upon reserve banks any obligation to receive" deposits.  *Farmers' & Merchants'*

*Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923). "The act merely confers authority to do so." *Id.*

The Defendants contend the discretion to receive or reject deposits necessarily carries with the discretion to grant or deny master accounts. (ECF 51 p. 33; ECF 49 pp. 32-35.) This argument presents as logical and may yet carry the day, but at least one judge of the Tenth Circuit has disagreed in a published opinion.

In *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), Judge Bacharach determined 12 U.S.C. § 248a requires Federal Reserve Banks to issue master accounts to eligible depository institutions that apply. That section (part of the Depository Institutions Deregulation and Monetary Control Act of 1980), says in part:

> **(a)      Publication of Pricing Principles and Proposed Schedule of Fees; Effective Date of Schedule of Fees.**
> Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.
> …
> **(c)      Criteria applicable.**
> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>> …
>> (2)      All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. § 248a(a), (c)(2).  Judge Bacharach concluded the only way the "Federal Reserve bank services covered by the fee schedule" can be made available to nonmember depository institutions is by granting them a master account.  *See Fourth Corner*, 861 F.3d at 1071 (Bacharach, J.) ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks.  To purchase these services, a master account is required.  Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts.").  In distinguishing § 342 from § 248a, Judge Bacharach opined:

> Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection….  But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions.  As a result, § 342 does not affect Fourth Corner's entitlement to a master account.

*Fourth Corner*, 861 F.3d at 1074.  That is, he agreed § 342 affords to a Federal Reserve Bank the discretion to take or refuse deposits, but concluded such discretion was separate and apart from the issuance of master accounts.  *See id.* at 1073-74 ("But this discretion does not encompass the issuance of master accounts."); *see also* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with Federal Reserve Banks and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

The Defendants spill much ink explaining why Judge Bacharach's opinion in *Fourth Corner* cannot win the day in this case.  (ECF 49 pp. 37-41; ECF 51 pp. 33-36.)  They

point out *Fourth Corner* was a three-way split decision between the three-judge panel, and Judge Bacharach was effectively the odd man out as he voted to reverse the dismissal of the complaint while the other two judges voted to uphold the dismissal. *See Fourth Corner*, 861 F.3d at 1053. All true. Nonetheless, it's worth noting that the other two judges did not reach the merits of the § 248a versus § 342 statutory interpretation question (because they found dismissal warranted), so we don't currently know if they would have seen it the same as Judge Bacharach or not.

The Defendants also note that Section 248a is found in Subchapter II of Chapter 3 of Title 12, and Subchapter II is titled "Board of Governors of the Federal Reserve System." Indeed, § 248 begins, "The Board of Governors of the Federal Reserve System shall be authorized and empowered: [list of duties]." 12 U.S.C. § 248. Thus, Judge Bacharach appears convinced that Congress effectively mandated Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions that apply in a Subchapter that sets forth the duties of a completely different entity (the Board of Governors). The Court agrees it appears a strange place for Congress to stick such a requirement that would seemingly govern the Federal Reserve Banks. Of course, the title of a statute, along with the title of the subchapter the statute resides in, might matter only if the Court first determines the statute is ambiguous, and even then it might matter only very little. "[U]nder the general rules of statutory interpretation, the title to a statutory provision is not part of the law itself, although it can be used to interpret an ambiguous statute." *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 n.4 (10th Cir. 1998) (quoting *Johnston v. Commissioner of Internal Revenue*, 114 F.3d 145, 150 (10th Cir. 1997), and giving "little

weight" to the title of the Americans With Disabilities Act); *see Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 529 (1947) ("For interpretative purposes, [statutory headings and titles] are of use only when they shed light on some ambiguous word or phrase.  They are but tools available for the resolution of a doubt.  But they cannot undo or limit that which the text makes plain.").  Thus, the title of Subchapter II and the location of § 248a within the statutory code likely offer relatively little toward refuting Judge Bacharach's opinion.

To cut short what could become an unnecessarily long recap of the Defendants' objections to Judge Bacharach's opinion in *Fourth Corner*, the Court concludes Custodia has stated a plausible claim to compel legally-required action for two reasons.  First, Judge Bacharach's opinion may plausibly be the law on this matter in this case.  *See* Mot. Dismiss Hr'g Tr. 31:1-17 (ECF 101 p. 31) (counsel for the Board of Governors affirming the deposits of funds with a Federal Reserve Bank and the services of § 248a are distinct), 57:7-58:9 (ECF 101 pp. 57-58) (counsel for FRBKC agreeing that § 342 allows FRBKC discretion over deposit-taking even after a master account is opened).

Second, and more immediately significant, a full statutory interpretation of the matter is better left for another day.  In this particular case, the facts alleged by Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a) in granting Custodia's master account application.  For example, if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little because it may be that FRBKC

failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes, as Custodia has plausibly suggested).  Thus, because the development of facts underlying or refuting certain allegations may prove particularly relevant to any statutory interpretation of § 342 versus § 248, the Court will not undertake a complete analysis at this stage of the proceedings without further development of those facts.

The Defendants' requests to dismiss Custodia's "Claim for Relief I - Violation of APA, 5 U.S.C. § 706(a) Claim for Unreasonable Delay of Agency Action Against All Defendants" will be denied.

## 2.    <u>Claim II - Compel Action under the Mandamus Act</u>

Custodia's second cause of action seeks a writ of mandamus compelling action from the Defendants under 28 U.S.C. § 1361, which provides:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

"Mandamus is the traditional writ designed to compel government officers to perform nondiscretionary duties."  *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005).  In a mandamus action, the Court should

> measure the allegations in the complaint against the statutory and constitutional framework to determine whether the particular official actions complained of fall within the scope of the discretion which Congress accorded the administrators....  In other words, even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised.  In these situations, mandamus will lie when the standards have been ignored or violated.

*Carpet, Linoleum & Resilient Tile Layers, Loc. Union No. 419, Bhd. of Painters & Allied Trades, AFL-CIO v. Brown*, 656 F.2d 564, 566 (10th Cir. 1981) (quoting *Davis Associates, Inc. v. Sec., Dep't of Housing and Urban Development*, 498 F.2d 385, 389 & n.5 (1st Cir. 1974)).

Under Judge Bacharach's view in *Fourth Corner*, Custodia has stated a claim of both unreasonable delay of a decision on its master account application and legal entitlement to a master account. Therefore, the Court finds Custodia's request for mandamus relief should not be dismissed. In short, "there may well exist statutory or regulatory standards delimiting the scope or manner in which" the Defendants may exercise their discretion (if any) over Custodia's master account application, and assuming the truth of Custodia's allegations, those standards may have been ignored or violated in this case. That is, applying Judge Bacharach's reasoning, Custodia has plausibly alleged the Defendants have "failed to discharge a duty owed to plaintiffs which Congress has directed them to perform." *Carpet, Linoleum & Resilient Tile Layers, etc. v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981).

Custodia's claim for mandamus relief plausibly functions in a complementary fashion to § 706(1) of the APA, which allows the Court to compel agency action that is unlawfully withheld or unreasonably delayed. Additionally, Custodia's claim for mandamus relief plausibly functions as an alternative claim to its APA claim as it relates to FRBKC, if the Court ultimately determines FRBKC is not an agency for APA purposes (as FRBKC currently asserts).

After having found Custodia stated a plausible claim for relief under the APA against both Defendants, it finds Custodia's claim for mandamus relief is also plausible and should not be dismissed.

**3.      Claim III (in part) - Violation of Due Process Based on Entitlement to Master Account and Unreasonable Delay**

As part of its third claim, Custodia contends it has been denied due process because it has a legal entitlement to and property interest in a master account.  The Defendants disagree and argue Custodia cannot prevail on a due process claim as a matter of law because it lacks a property interest in a master account.  (ECF 51 pp. 41-42; ECF 49 p. 48.)

"[T]o prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest." *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007) (quoting *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000)).  "An individual has a property interest in a benefit for purposes of due process protection only if he has a 'legitimate claim of entitlement' to the benefit, as opposed to a mere 'abstract need or desire' or 'unilateral expectation.'" *Id.* at 1078-79 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  The Court determined above that if Judge Bacharach's opinion in *Fourth Corner* is a correct interpretation of the law, then Custodia appears entitled to a master account under 12 U.S.C. § 248a.

Therefore, at this early stage of the proceedings, Custodia has plausibly alleged a legitimate claim of entitlement to a master account sufficient to support a due process claim.  Similarly, because Custodia has plausibly alleged an unreasonable-delay claim

under the APA, it has stated a sufficient due process claim.  (*See* Compl. ¶ 100; ECF 49 pp. 4-50.)

4.     <u>**Claim III (in part) - Violation of Separation of Powers (Nondelegable Doctrine)**</u>

Also within its third cause of action, Custodia contends that if Defendants' claim is true that the Federal Reserve Banks have unbounded and unreviewable discretion under 12 U.S.C. § 342 to issue or deny master accounts, then Congress violated the nondelegation doctrine (separation of powers) by delegating its legislative power to the Federal Reserve Banks with no guidance ("intelligent principles").  Article I of the U.S. Constitution begins, "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art I, § 1.  "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).  That is, the people's representatives in Congress must make the law rather than delegate that power to the executive or judicial branches.  The U.S. Supreme Court has long "recognized, however, that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  In particular, Congress "may confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy*, 139 S. Ct. at 2123 (citing *Mistretta*, 488 U.S. at 372).  "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.* (quoting *Mistretta*, 488 U.S. at 372).

Because the nondelegation doctrine bars Congress from delegating "powers which are strictly and exclusively legislative," *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825), to the other Branches, it's not uncommon for a court facing a delegation challenge to first ask "whether the statute has delegated legislative power to the agency." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001). "Whether the statute delegates legislative power is a question for the courts[.]" *Id.* at 473. The Defendants argue a decision on a master account application is not the exercise of legislative authority. (ECF 51 pp. 42-43; ECF 49 pp. 52-54.)

Black's Law Dictionary defines "legislative power" as "[t]he power to make laws and to alter them." *Legislative Power*, <u>Black's Law Dictionary</u> (11th ed. 2019); *see Gundy*, 139 S. Ct. 2116, 2133 (Gorsuch, J., dissenting) ("When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'") (footnotes omitted). Similarly, "legislation" is "[t]he process of making or enacting a positive law in written form." *Legislation*, <u>Black's Law Dictionary</u> (11th ed. 2019); *see Loving v. United States*, 517 U.S. 748, 758 (1996) ("the lawmaking function belongs to Congress").

The Court starts where Custodia's Claim III starts—presuming the Defendants' interpretation of § 342 is correct for purposes of this discussion. Even with such a presumption, the boundless discretion to grant or deny a master account application is not "legislative power." Decisions on master account applications do not involve lawmaking

or rulemaking or enacting generally applicable regulations.  Under Defendants' interpretation of § 342, Congress has passed a law instructing Federal Reserve Banks they may grant or deny master applications as they see fit, and granting or denying master applications, even with unbridled discretion, is not legislative action.  It simply does not result in the passage of a generally applicable pronouncement governing future actions. *See United States v. Hutchinson*, 573 F.3d 1011, 1032 n.4 (10th Cir. 2009) ("Additionally, he claims that 21 U.S.C. § 851(a), the statute that allows the prosecutor to establish a prior conviction by information, violates the constitutional doctrine prohibiting the delegation of legislative power because it does not prescribe an 'intelligible principle' for the executive to follow in deciding whether to seek a sentencing enhancement on this basis. But allowing prosecutors discretion to seek (or not seek) sentencing enhancements involves no delegation of *legislative* power: such a decision is an exercise of the prerogative power committed to the *executive* department, and is no different than the discretion possessed by prosecutors to bring (or not bring) criminal charges in the first instance.") (internal citations omitted).  Therefore, Congress cannot be said to have trespassed upon the nondelegation doctrine by enacting § 342 because the decision on a master account application is not a legislative function.

Custodia has not set forth a plausible separation-of-powers claim based on violation of the nondelegation doctrine, and this claim must be dismissed under Rule 12(b)(6).

## 5.   Claim IV - Declaratory Judgment Based on Unreasonable Delay

In its fourth claim for relief, Custodia seeks a judgment declaring the Board of Governors "and/or" FRBKC "must decide Custodia's master account application within a

reasonable period of time." (Compl. ¶ 109.) FRBKC accurately argues the Declaratory

Judgment Act provides a remedy for valid federal causes of action and does not offer a

separate cause of action. (ECF 51 p. 47); *see Nero v. Oklahoma*, No. 22-6121, 2022 WL

14423872, at *2 (10th Cir. Oct. 25, 2022) (unpublished) ("the Declaratory Judgment Act

does not provide an independent federal cause of action") (citing *Skelly Oil Co. v. Phillips

Petrol. Co.*, 339 U.S. 667, 671–74 (1950)). "To maintain an action for a declaratory

judgment, then, [Custodia] must assert a valid federal cause of action—one that exists

independent of any request for declaratory relief." *Nero*, 2002 WL 14423872, at *2. As

the Court determined above Custodia has asserted plausible claims of unreasonable delay

under the APA and the Mandamus Act, its action for a declaration that a master account

application must be decided within a reasonable period of time is valid.

Therefore, while Custodia's claim for declaratory judgment is not properly

understood as a stand-alone cause of action (and cannot truly be an "alternative" to Claims

I and II, despite Custodia's pleading), it is a viable request for relief that will not be

dismissed at this time.

**6.    Claim V - Violation of Due Process Based on Decision-Making by Interested
Parties (Bias)**

Next, Custodia asserts that FRBKC's Board of Directors is comprised of officials

from other banks who "are or may be competitors with all other banks requesting master

accounts." (Compl. ¶ 114.) Custodia says:

> To the extent that [FRBKC's] Board of directors finally adjudicates the rights
> of would-be competitors like Custodia, the current master application review
> regime works "an intolerable and unconstitutional interference with personal

liberty and private property" by vesting "self-interested" actors with "regulatory authority over [their] rivals."

(Compl. ¶ 115 (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), and *Assoc. of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 27 (D.C. Cir. 2016)).

The Defendants assert the decision on a master account application is made by the president of FRBKC, not its Board of Directors.  (ECF 49 p. 50; ECF 51 p. 44.)  Custodia's factual allegations agree.  Custodia alleges that after learning in March 2022 that FRBKC had allegedly not started processing Custodia's master account application (despite it being almost a year-and-a-half old at that point), Custodia sent a letter to FRBKC's president, Esther George, in which it "urged Ms. George to consider Custodia's application." (Compl. ¶¶ 40-41.)  Custodia has not alleged Ms. George is biased against it or is an official from a competing bank.  Statutory law precludes six of the nine FRBKC directors from being officers, directors, or employees of any bank.  *See* 12 U.S.C. § 303.  These six directors are the Class B and Class C directors.  *See id.*  More importantly, these six Class B and Class C directors select FRBKC's president (having selected Ms. George as relevant here), with the approval of the Board of Governors.  12 U.S.C. § 341.  Thus, six non-officers, non-directors, and non-employees of any bank chose Ms. George to be FRBKC's president, and it is Ms. George (who is not alleged to be biased or Custodia's competitor) who the complaint's well-pled allegations plausibly suggest is to make the decision on Custodia's master account application.

Moreover, even if FRBKC's Board of Directors was making the decision on Custodia's master account application, two-thirds of the directors (the Class B directors

and the Class C directors) are not potential competitors of Custodia (because they are not officers, directors, or employees of a bank).

Custodia has not stated a plausible claim of violation of due process based on bias or regulation by a competitor.  This cause of action is not tethered to the relevant factual allegations or the statutory law.  Accordingly, it will be dismissed under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

### 7.   <u>Claim VI - Violation of the Appointments Clause</u>

In its sixth cause of action, which it identifies as an alternative claim to Claims I and II, Custodia asserts "the Federal Reserve System's process for deciding master account applications violates the United States Constitution's Appointments Clause."  (Compl. ¶ 118.)

> Under the Constitution, "[t]he executive Power" is vested in the President, who has the responsibility to "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; § 3.  The Appointments Clause provides that he may be assisted in carrying out that responsibility by officers nominated by him and confirmed by the Senate ["principal officers"], as well as by other officers not appointed in that manner but whose work, we have held, must be directed and supervised by an officer who has been ["inferior officers"].  § 2, cl. 2.

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1976 (2021) (first alteration in original).

The Appointments Clause states:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2 cl. 2.  The Appointments Clause thus "lays out the permissible methods of appointing 'Officers of the United States,' a class of government officials distinct from mere employees." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2049 (2018).

Essentially, Custodia alleges that a decision on its master account application constitutes the exercise of executive power, which must be done by the U.S. President, or a principal officer appointed by the President upon the advice and confirmation of the Senate.

> Under this framework, only principal officers—people with presidential appointments and Senate confirmation—can render final decisions about master accounts.  Adjudicating master account applications unquestionably involves exercising "significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, because such adjudications "bind[] the government or third parties for the benefit of the public."  *Officers of the U.S.*, 31 Op. O.L.C. at 77.

(ECF 58 p. 43.)  As neither the president of FRBKC nor its board of directors are appointed by the U.S. President with Senate confirmation, Custodia asserts the Appointments Clause precludes them from deciding master account applications.  As noted above, the factual allegations in Custodia's complaint support that the master account application is decided by the president of FRBKC as opposed to FRBKC's board of directors.

Similar to the nondelegation doctrine discussed earlier, the first question to address for this claim is whether a decision on a master account application constitutes the exercise of "executive power."  FRBKC contends it is not, arguing the decision is "an essentially commercial decision," and "Custodia can point to no court that has held that a Reserve Bank's grant or denial of a master account—a bank account—somehow implicates [] 'executive Power.'" (ECF 51 p. 46.)  The Supreme Court has described executive power

as the authority to administer and enforce laws "or appoint the agents charged with the duty of such enforcement." *Buckely v. Valeo*, 424 U.S. 1, 139 (1976) (quoting *Springer v. Philippine Islands*, 277 U.S. 189, 202 (1928)), *superseded by statute on other grounds as recognized in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Relatedly, the Supreme Court has said the executive power of the government is "the general administrative control of those executing the laws, including the power of appointment and removal of executive officers." *Myers v. United States*, 272 U.S. 52, 164 (1926); *see also* U.S. Const. art. II, § 3 (assigning the U.S. President the responsibility to "take Care that the Laws be faithfully executed").

   As applied here, the Court finds Custodia has plausibly alleged that FRBKC's president is exercising executive power when deciding a master account application. Whether deciding the application under § 342 (as the Defendants claim) or under § 248a (as Custodia claims), the complaint sufficiently asserts the decision constitutes the execution and enforcement of the Federal Reserve Act (and other laws and federal regulations with the force of law) when granting or denying a master account. *See Arthrex*, 141 S. Ct. at 1979 ("Today, thousands of officers wield executive power on behalf of the President in the name of the United States."); *but see United States v. Wells Fargo & Co.*, 943 F.3d 588, 597–98 (2d Cir. 2019) ("Although, in the intervening decades, Congress has transferred functional ownership and control of the [Federal Reserve Banks] to the Treasury and to the Board … Congress has carefully retained the formal separation of the [Federal Reserve Banks] from the executive branch.") (internal citations and footnotes omitted). The Court does not here decide as a matter of law whether decisions on master

account applications are executive functions, but it finds Custodia has plausibly alleged such.

Next, the Court considers whether a plausible violation of the Appointments Clause has been alleged concerning the master account decision by the FRBKC president.  That largely depends on whether the FRBKC president is a principal officer (requiring appointment by the U.S. President with confirmation by the Senate), an inferior officer (who, by appropriate law, may be appointed directly by the President, courts, or department heads), or a nonofficer (a government employee not subject to the Appointments Clause). "The exercise of 'significant authority pursuant to the laws of the United States' marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley,* the line between officer and nonofficer." *Edmond v. United States*, 520 U.S. 651, 662 (1997); *see Buckley*, 424 U.S. at 126 ("any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article").  Under the circumstances of this case, Custodia has plausibly alleged FRBKC's president (who also serves as its CEO) exercises significant authority pursuant to the laws of the United States. *See, e.g.*, 12 U.S.C. § 341 (Federal Reserve Bank president shall also be the chief executive officer of the Federal Reserve Bank); *Job Description: President and CEO*, Fed. Rsrv. Bank of Kansas City (May 2022) ("The President and CEO of the Federal Reserve Bank of Kansas City is responsible for the overall performance of the Bank and represents the Tenth District economy in national policy discussions…. The

President's responsibilities fall into three broad areas: a policymaker and policy advisor; the CEO of the organization; and a contributor to Federal Reserve System leadership.")[2]. Indeed, that FRBKC's president holds final decision-making authority over the master account application demonstrates her exercise of significant authority. *See Bandimere v. Sec. & Exch. Comm'n*, 844 F.3d 1168, 1183-84 (10th Cir. 2016) ("final decision-making power is relevant in determining whether a public servant exercises significant authority"); (ECF 51 p. 46 (FRBKC noting the decision on a master account application is "one with significant implications")). It's fair to say Federal Reserve Bank presidents "perform more than ministerial tasks." *Freytag v. Comm'r*, 501 U.S. 868, 881 (1991). Accordingly, the FRBKC president is plausibly a principal officer or an inferior officer subject to the Appointments Clause.

The Board of Governors says that to the extent the master account application decision is an executive function, FRBKC's president is an inferior officer appointed in conformity with the Appointments Clause. (ECF 49 pp. 57-59; ECF 96 p. 30.) "Our cases have not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond*, 520 U.S. at 661. Custodia's argument that only a principal officer may exercise final decision-making authority (and, correspondingly, that the exercise of final decision-making authority establishes someone as a principal officer) is misplaced. *See Bandimere*, 844 F.3d at 1183-84 (stating final

---

[2]   Available at: https://www.kansascityfed.org/about-us/presidential-search/.   The Court takes judicial notice of this document prepared by Defendant FRBKC. *See S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1192 (D.N.M. 2013) (court has discretion to take judicial notice of adjudicative facts, which are simply the facts of a particular case, at any stage of the proceeding, including a motion to dismiss without conversion to summary judgment).

decision-making authority weighs on whether a public servant is an officer versus a nonofficer and describing how inferior officers can have final decision-making power). Therefore, that FRBKC's president has final say over Custodia's master account application does not singularly determine whether she is or must be a principal officer as opposed to an inferior officer for purposes of the Appointments Clause.

> We held in *Edmond v. United States*, 520 U.S. 651, 662–663, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997), that "[w]hether one is an 'inferior' officer depends on whether he has a superior," and that "'inferior officers' are officers whose work is directed and supervised at some level" by other officers appointed by the President with the Senate's consent.

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010).

The Board of Governors, which is appointed by the U.S. President and confirmed by the Senate, argues that it supervises FRBKC's president and was required to approve her appointment, thus making her an inferior officer. The law accords with this contention. Federal Reserve Bank presidents are appointed by the Federal Reserve Bank's board of directors, and their appointment requires the approval of the Board of Governors. 12 U.S.C. § 341 (*Fifth*) ("The president shall be the chief executive officer of the bank and shall be appointed by the Class B and Class C directors of the bank, with the approval of the Board of Governors of the Federal Reserve System, for a term of 5 years[.]"). The Board of Governors supervises the Federal Reserve Banks, including their presidents, and has the authority to suspend or remove a Federal Reserve Bank president. *See, e.g.*, 12 U.S.C. § 248(a), (f), (j); 12 U.S.C. § 248b; *but see Scott v. Fed. Rsrv. Bank of Kansas City*, 406 F.3d 532, 535 (8th Cir. 2005) (FRBKC "is a private, independent entity independently run by its own board of directors. It is not run by the Federal Reserve Board of Governors

or any other part of the executive branch.").  Thus, FRBKC's president's "work is directed and supervised at some level" by other officers appointed by the President and confirmed by the Senate.  Accordingly, assuming for purposes of this Order that she is an "officer" of the Executive Branch, she is an inferior officer.

Finally, assuming the FRBKC president is an inferior officer, her appointment by the FRBKC's board of directors with approval by the Board of Governors accords with the Appointments Clause.  Giving Custodia's cause of action every reasonable inference, the Court assumes for purposes of this Order that the Federal Reserve System is a "department" because it is a "free-standing, self-contained entity in the Executive Branch."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511 (2010).  The Court further assumes that the Board of Governors is the "head" of the Federal Reserve System.[3]  *See Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 16 (D.D.C. 2001) ("The Board administers the Federal Reserve System"), *aff'd sub nom. Trans Union LLC v. F.T.C.*, 295 F.3d 42 (D.C. Cir. 2002)); *Free Enter. Fund*, 561 U.S. at 512-13 (a multimember body may be the head of a department for purposes of the Appointments Clause).  With that foundation of inferences in Custodia's favor, appointment of FRBKC's president by the board of directors with approval of the Board of Governors satisfies the Appointments Clause.  *See Free Enter. Fund*, 561 U.S. at 512 n.13 ("We have previously found that the department head's approval [as opposed to direct appointment by the department head] satisfies the Appointments Clause[.]") (collecting cases).  Therefore, Custodia has failed

---

[3]  Determining the Federal Reserve System is not a "department" and the Board of Governors is not its "head" would arguably render the Appointments Clause inapplicable, thus eliminating this cause of action.

to state a plausible claim for relief based on the Appointments Clause, and Claim VI will be dismissed.

**8.     Claims I through VI are justiciable but Claims VII and VIII are not.**

The Court will next discuss the Defendants' arguments that Custodia's lawsuit is not justiciable, at least not currently.  (*See* ECF 49 pp. 41-47; ECF 51 pp. 49-57.)  This analysis will build off the prior examinations of Claims I through VI (which are justiciable) and then address Claims VII and VII (which are not justiciable).

In this case, justiciability refers to Custodia's legal standing to bring its lawsuit and whether its causes of action are ripe for adjudication.  *See Flast v. Cohen*, 392 U.S. 83, 95 (1968) (explaining justiciability is "a concept of uncertain meaning and scope" and concerns a variety of subjects).  "[J]usticiability implicates the court's jurisdiction." *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004).

> A motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) may take one of two forms.  A facial attack looks only to the factual allegations of the complaint in challenging the court's jurisdiction.  A factual attack goes beyond the factual allegations of the complaint and presents evidence in the form of affidavits or otherwise to challenge the court's jurisdiction.

*Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010) (citing *Stuart v. Colorado Interstate Gas Co.,* 271 F.3d 1221, 1225 (10th Cir. 2001)). The Defendants here present a facial challenge to justiciability based on the allegations of the complaint.  Therefore, the Court applies "the same standards under Rule 12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action." *Id.*

### 8.1    Custodia has standing to assert Claims I through VI.

The Court's authority to adjudicate live cases and controversies "includes the requirement that litigants have standing." *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021) (quoting *California v. Texas*, ⸻ U.S. ⸻, 141 S. Ct. 2104, 2113 (2021)).

> To have standing, a plaintiff must establish three things: (1) he suffered an "injury in fact"—"an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is likely the injury will be "redressed by a favorable decision."

*Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61(1992) (internal quotation marks and citations omitted)). "The party invoking federal jurisdiction has the burden of establishing the elements of standing." *Southwest Envtl. Ctr. v. Sessions*, 355 F. Supp. 3d 1121, 1128 (D.N.M. 2018).

Custodia's complaint satisfies the elements for standing to sue as to Claims I through VI (all considered above). First, it alleges Custodia's continued need to use the master account of an intermediary ("correspondent") bank to access the Federal Reserve System while waiting for the last two years for a decision on its own master account application "is much costlier and introduces counterparty credit risk and settlement risk that would" be avoided with its own master account. (Compl. ¶ 8.) The complaint asserts that Custodia's own master account "would allow Custodia to access directly the Federal Reserve, sharply reduce its costs, and bring new products and options to users of financial services." (*Id.* ¶ 3.) These allegations of increased costs due to the delay of its own master account adequately assert a concrete, particularized, actual, and currently ongoing injury-

in-fact to Custodia.  "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"  *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S. Ct. 973, 983 (2017) (citing *McGowan v. Maryland,* 366 U.S. 420, 430–431 (1961)).

Second, the complaint sufficiently alleges Custodia's injury is fairly traceable to the challenged delay.  Specifically, as the Court already determined Custodia has stated a plausible claim for unreasonable delay under the APA and if Judge Bacharach's statutory interpretation in *Fourth Corner* applies here and entitles Custodia to a master account, Custodia's increased costs from having to use an intermediary bank during the unreasonable delay would be fairly traceable to one or both Defendants' actions causing the unreasonable delay.

Third, Custodia has adequately asserted its injury of increased costs would be redressed by a court decision in its favor.  That is, if the Court ruled in Custodia's favor on Claim I (APA), Claim II (Mandamus) or Claim III (Due Process entitlement) and compelled FRBKC to issue a master account as the remedy, Custodia would then be saved the additional costs it is currently incurring.  Accordingly, Custodia has carried its burden of establishing the elements of standing at this stage of the proceedings.

FRBKC relies on the unpublished case of *TNB USA Inc. v. Fed. Rsrv. Bank of New York*, No. 1:18-CV-7978 (ALC), 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020), in support of its argument against Custodia's legal standing.  (ECF 51 pp. 50-57.)  Similar to this case, the plaintiff's master account application in *TNB* was still pending at the time suit was filed.  *TNB*, 2020 WL 1445806, at *6.  Dissimilar to this case, the plaintiff there argued the

Federal Reserve Bank had constructively denied the application by reason of the delay.  *Id.*

Significantly, the district court in *TNB* said:

> As discussed above, I do not think that the FRBNY has constructively or formally decided on TNB's application.  Accepting this premise, the current injuries TNB is enduring are those emanating from the FRBNY's *delay* in deciding on the application.  But the FRBNY's delay is not TNB's cause of action.  TNB is suing the FRBNY specifically over its *refusal* to provide TNB an account….
>
> Because the alleged injury is the FRBNY's denial, not delay, the current delay-induced injuries TNB cites are not the relevant injuries for the standing analysis.  Further, because the denial has not occurred, TNB has no qualifying imminent injury and thus this case must be dismissed on standing grounds.

*Id.* at *7.  *TNB* is materially different from this case.  Here, Custodia has specifically alleged a claim for the delay in deciding its application.  Further, as set forth above, Custodia has asserted delay-induced injuries sufficient for constitutional standing.  The Court finds the decision in *TNB* carries little applicability to this case.

Custodia has carried its burden of establishing the elements of Article III standing concerning Claims I through VI, and dismissal of those causes of action on standing grounds is not warranted.

### 8.2   Claims I through VI are constitutionally and prudentially ripe for adjudication.

The Defendants' arguments that this lawsuit is constitutionally unripe largely echo their arguments as to standing.  (*See* ECF 49 pp. 44-45; ECF 51 pp. 49-52.)  FRBKC further argues Custodia's claims are prudentially unripe.  (ECF 51 pp. 52-57.)

The ripeness doctrine originates "both from Article III limitations on judicial power and prudential reasons for refusing to exercise jurisdiction."  *N. Mill St., LLC v. City of*

*Aspen*, 6 F.4th 1216, 1224 (10th Cir. 2021) (quoting *Utah Republican Party v. Cox*, 892 F.3d 1066, 1092 (10th Cir. 2018)).  "The purpose of the ripeness doctrine is to prevent the premature adjudication of abstract claims."  *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019) (quoting *Tex. Brine Co. v. Occidental Chem. Corp.*, 879 F.3d 1224, 1229 (10th Cir. 2018)).  "Article III and prudential ripeness are both "concerned with whether a case has been brought prematurely, but they protect against prematureness in different ways and for different reasons."  *N. Mill St.*, 6 F.4th at 1224-25 (quoting *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003)).  "A claim is not constitutionally ripe for adjudication pursuant to Article III "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1065 (10th Cir. 2012) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Even where a claim is ripe under Article III's requirement of a live case or controversy, the Court may decline to consider the issue under the prudential ripeness doctrine.  This doctrine requires the Court to balance "the fitness of the issue for judicial review" against "the hardship to the parties from withholding review."  *Texas Brine Co., LLC & Occidental Chem. Corp.*, 879 F.3d 1224, 1229 (10th Cir. 2018)

Claims I through VI are ripe for consideration.  Based on Custodia's plausible claim of injury due to unreasonable delay, combined with the over two-year period since Custodia applied for a master account, Custodia's first six causes of action are grounded in events that have already transpired along with injuries that have occurred and continue to occur.  Claims I through VI do not concern contingent future events.  Moreover, their

current fitness for judicial review is weighty (see discussions above) and the hardship to Custodia from withholding review would be severe.  Consequently, the Court concludes Claims I through VI are both constitutionally and prudentially ripe for adjudication at the current time.

### 8.3   Custodia lacks standing to pursue Claims VII and VIII, and these causes of action are not ripe for adjudication.

The result is different concerning Claims VII and VIII.  In these causes of action, Custodia seeks mandamus relief (Claim VII) and declaratory judgment (Claim VIII) "only in the event that Defendants deny Custodia's application for a master account."  (Compl. ¶¶ 130, 139.)  Custodia does not allege such a denial has occurred, even constructively.  Thus, Custodia has not suffered an injury of having its master account application denied, and these claims expressly rest upon a future event that may never come to pass.  Consequently, Custodia lacks standing to sue the Defendants on Claims VII and VIII, and these claims are not constitutionally ripe for adjudication.  Claims VII and VIII must be dismissed as non-justiciable.

### CONCLUSION AND ORDER

In Claim I, Custodia alleges a plausible claim of unreasonable delay under the APA.  In part of Claim III, Custodia alleges a plausible violation of due process based on an alleged property interest in and legal entitlement to a master account.  Claims II and IV complement these causes of action in seeking mandamus and declaratory judgment.  Consequently, these claims survive dismissal.

In the remainder of Claim III, Custodia does not allege a plausible separation-of-powers violation based on the nondelegable doctrine, which will be dismissed.  Likewise, Claim V fails to state a plausible violation of due process based on bias and Claim VI fails to state a plausible violation of the Appointments Clause, both of which will be dismissed. Finally, Claims VII and VIII will be dismissed because Custodia does not have standing to pursue them and they are not ripe for adjudication.

**IT IS THEREFORE ORDERED** that Defendants' motions to dismiss (ECF 48, 50) are **GRANTED IN PART AND DENIED IN PART** for the reasons discussed herein. Claims I, II, IV, and part of Claim III (alleging a due process violation) state plausible causes of action for relief.  Claims V, VI, VII, VIII, and the remainder of Claim III (alleging a nondelegable doctrine violation) do not state plausible claims on which relief can be granted and are hereby dismissed.

**DATED**: November 11th, 2022.

Scott W. Skavdahl
United States District Court Judge

**J.A.396**

Billie L.M. Addleman, #6-3690
John P. Fritz, #7-6318
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
jfritz@hirstapplegate.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, <br><br> *Defendants.* | No. 1:22-cv-00125-SWS |

## JOINT MOTION OF DEFENDANTS FEDERAL RESERVE BANK
## OF KANSAS CITY AND FEDERAL RESERVE BOARD OF GOVERNORS TO
## DISMISS THE COMPLAINT AS MOOT

The Court's Order on Defendants' motions to dismiss left standing Claims I, II, IV, and the

due process portion of Claim III from Custodia's Complaint. *See Order Granting in Part and*

*Denying in Part Defendants' 12(b)(6) Motions to Dismiss*, ECF No. 102 at 38. Each of these

remaining claims seeks the same relief: an order compelling the Federal Reserve Bank of Kansas

City ("FBRKC") to promptly decide Custodia's request for a master account. *See* Compl. ¶¶ 81,

91, 101, 109. On January 27, 2023, FRBKC provided Custodia a letter stating that FRBKC had

denied Custodia's request for a master account and providing the basis for that decision.

Given that Custodia has obtained the relief requested in its remaining claims, the Court should dismiss this case as moot under Article III of the Constitution, which permits federal courts to adjudicate only live controversies. *See Alvarez v. Smith*, 558 U.S. 87, 92 (2009). Because mootness deprives the court of subject matter jurisdiction, a moot case must be dismissed. *See, e.g.*, *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996) ("Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction."). Furthermore, an "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Alvarez*, 558 U.S. at 92 (internal quotation marks omitted).  A case can become moot where, as here, an event occurs during the pendency of the action that makes it impossible for the court to grant the relief requested. *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *see also Kan. Judicial Review v. Stout*, 562 F.3d 1240, 1245 (10th Cir. 2009) ("If, during the pendency of the case, circumstances change such that the plaintiff's legally cognizable interest in a case is extinguished, the case is moot, and dismissal may be required."). "It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology*, 506 U.S. at 12 (internal quotation marks omitted). Actions alleging unreasonable delay are thus mooted once the allegedly delayed action has been taken.  *See, e.g.*, *Landrith v. Schmidt*, 732 F.3d 1171, 1172–73 (10th Cir. 2013) (mandamus petition claiming district court had unreasonably delayed ruling was moot once district court ruled); *cf. St. Pierre v. Norton*, 498 F. Supp. 2d 214, 223 (D.D.C. 2007) ("a claim for unlawful delay of agency action becomes moot once the agency takes the requested action").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

Dated 27 January 2023

/s/ Billie LM Addleman
Billie LM Addleman, #6-3690
John P. Fritz, #7-6318
HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
jfritz@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
Laura Harris (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Joshua N. Mitchell (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
jmitchell@kslaw.com
ccarletta@kslaw.com

*Counsel for Defendant the*
*Federal Reserve Bank of Kansas City*

Joshua P. Chadwick, Senior Special Counsel
Yvonne F. Mizusawa, Senior Counsel
Yonatan Gelblum, Senior Counsel
Katherine Pomeroy, Senior Counsel
BOARD   OF   GOVERNORS   OF   THE   FEDERAL
RESERVE SYSTEM
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
Phone: (202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Federal Reserve Board of*
*Governors*

**J.A.399**

## CERTIFICATE OF SERVICE

I certify the foregoing *Federal Reserve Bank of Kansas City and Federal Reserve Board of Governor's Motion to Dismiss* was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure on 27 January 2023, and that copies were served as follows:

John K. Villa
Ryan Thomas Scarborough
Whitney D Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY
680 Maine Avenue SW
Washington, DC 20024
*Attorneys for Plaintiff*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Scott E Ortiz
WILLIAMS PORTER DAY & NEVILLE
159 North Wolcott, Suite 400
P O Box 10700
Casper, WY 82602
*Attorneys for Plaintiff*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Angela Tarasi
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
*Attorneys for Defendant Federal Reserve Bank of Kansas City*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

 /s/ Shannon M. Ward
OF HIRST APPLEGATE, LLP
Attorneys for Defendant

**J.A.400**

Scott E. Ortiz, W.S.B. # 6-4254
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 N. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
Email:        sortiz@wpdn.net

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-CV-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

### FIRST AMENDED COMPLAINT

1.      Plaintiff Custodia Bank, Inc. ("Custodia") (f/k/a Avanti) brings this First Amended Complaint against Defendants the Federal Reserve Board of Governors ("Board") and the Federal Reserve Bank of Kansas City ("Kansas City Fed") and alleges as follows.

### <u>INTRODUCTION</u>

2.      This case involves Defendants' patently unlawful denial of an application critical to Custodia's business—a master account—to which it is unequivocally entitled as an eligible depository institution.  Without such an account Custodia cannot directly access the Federal Reserve and cannot offer the same custodial services for crypto-assets that incumbent banks like

BNY Mellon presently provide.  Without a master account, if Custodia is able to operate at all, it is as a second-class citizen, relegated to dependency on and fealty to an intermediary bank.

3.     Custodia is a Wyoming-headquartered and chartered bank led by experienced and respected members of the financial-services industry, specializing in payment services and crypto-asset custody.  For 27 months, Defendants refused to act upon Custodia's application for a master account with the Federal Reserve.  Confronted with discovery requests to the Kansas City Fed and a looming deadline for the Board to produce an administrative record that would have revealed the Board's control over the Kansas City's Fed's decision-making process, Defendants tried to moot the litigation.  On January 27, 2023, in a coordinated maneuver orchestrated by the Board in consultation with the White House and leaked to reporters by Board officials the day before it occurred, the Kansas City Fed reported the denial of Custodia's master account application immediately after the Board denied Custodia's membership application.

4.     Throughout the initial stages of this litigation, the Kansas City Fed and the Board have maintained that the Kansas City Fed had complete discretion to grant or deny Custodia's master account application.  However, Defendants' actions throughout the application process, culminating in the denial of Custodia's master account application, have made clear what Custodia has long known to be true—it is the Board that is pulling the strings.  The Kansas City Fed can exercise no discretion over Custodia's master account application without the approval or, at the very least, the nonobjection of the Board.

5.     Defendants, however, had no discretion to deny Custodia's master account application.  Pursuant to 12 U.S.C. § 248a(c)(2), "[a]ll Federal Reserve bank services ... *shall* be available to nonmember depository institutions" (emphasis added).  As a state-chartered bank whose charter expressly permits U.S. dollar deposit-taking and whose business plan includes U.S.

2

dollar deposit-taking in the ordinary course of business, Custodia is plainly eligible for a master account under the express terms of the governing federal law. *See* 12 U.S.C. § 226 et seq. Indeed, it is undisputed that Custodia is an eligible "nonmember depository institution[]," a fact that the Kansas City Fed has acknowledged in its correspondence with Custodia. It is further undisputed that Custodia must have a master account to access "Federal Reserve bank services." Because 12 U.S.C. § 248a requires that Custodia be able to access all "Federal Reserve bank services," Defendants had a non-discretionary duty to grant Custodia's master account application and not to discriminate against Custodia in its ability to access all bank services using that account. Any other outcome eviscerates the dual-banking system that has served our nation since its founding.

6. Despite this clear statutory mandate, on January 27, 2023, the Kansas City Fed communicated to Custodia that its master account application was denied. As such, Custodia, an eligible nonmember depository institution, cannot access Federal Reserve Bank Services. Rather than operating as an independent institution as contemplated in its business plans, Custodia must partner with a correspondent bank if it is to provide any banking services. This arrangement not only dramatically increases Custodia's costs but it also hinders Custodia's ability to provide the same custodial services for crypto-assets that incumbent banks like BNY Mellon presently offer. Custodia has devoted years of effort by a number of skilled professionals and substantial resources to preparing its business, including by undergoing intense review and satisfying stringent regulatory requirements imposed by its chartering state of Wyoming. Such efforts are for naught if Custodia is unable to access and use the master account to which it is statutorily entitled.

7. The denial of Custodia's master account application results in substantial, ongoing injury to Custodia. The immediate injury is that Custodia is forced to defer its solo entry into the financial services market in favor of a decidedly second-best and far more expensive alternative:

3

J.A.403

launching with a correspondent bank that has a master account.  This makeshift solution is much costlier, makes Custodia dependent on the whims of a third-party bank, and introduces counterparty credit risk and settlement risk that would have been avoided if Defendants had granted Custodia's master account application.  It also eliminates much of the competitive benefit that Custodia would enjoy from using the charter that Wyoming granted it, thus benefiting existing and entrenched competitors and ignoring Wyoming's sovereignty as a state that has clear statutory authority to charter depository institutions.

8.      Wyoming is a nationwide leader in developing charters tailored for banking in the crypto-asset industry.  In developing the Special Purpose Depository Institution ("SPDI") charter under which Custodia operates, Wyoming worked hand-in-glove with the Kansas City Fed in order to ensure that all SPDI-chartered banks would be eligible to access the Federal Reserve through master accounts.  Despite these efforts, Defendants' treatment of Custodia's application throughout the process, including the rationale for the ultimate denial, makes clear that Defendants have no intention of allowing any SPDI-chartered bank to access the Federal Reserve system.  Ultimately Defendants' refusal to recognize the SPDI charter works not only to the detriment of Custodia but also to the detriment of Wyoming and its autonomy under a centuries-old, dual-banking system to make the decision about which financial institutions to charter.  Defendants' refusal also contravenes federal statutory requirements prohibiting the Board from discriminating against such nonmember, state-chartered institutions.  12 U.S.C. § 248a.

9.      Defendants have a nondiscretionary duty to grant Custodia's application for a master account.  The Kansas City Fed, for its part, received Custodia's business plan in May 2020, months before Custodia submitted its master account application in October 2020.  In early 2021,

J.A.404

a representative of the Kansas City Fed moreover informed Custodia there were "no showstoppers" with Custodia's application.

10.     Upon information and belief, the Kansas City Fed's consideration and impending approval of Custodia's application was derailed when, in spring 2021, the Board asserted control over the decision-making process.  The Board then began a concentrated and coordinated effort to prevent Custodia and other de novo banks with any ties to crypto-assets from accessing the Federal Reserve through master accounts.

11.     Notably, the Board's alleged concerns about the threat that crypto-assets pose to financial systems does not stretch to banks that already possess master accounts.  Incumbent banks, such as BNY Mellon, are already providing custodial services for crypto-assets with the consent of the Federal Reserve.  The Board's permission for established institutions, such as BNY Mellon, a Global Systematically Important Bank (12 C.F.R. § 217.402), to engage with crypto-assets belies Defendants' assertion that it is too risky for Custodia, a state-chartered Special Purpose Depository Institution, to do the same thing.  The Board's anti-competitive and hypocritical position benefits entrenched interests at the expense of Custodia, Wyoming, and Special Purpose Depository Institutions more generally.

12.     While the facts of this case may appear complex, the core issue is simple: Defendants are statutorily required to grant Custodia's master account application and failed to do so.  The governing statutes require the Court to enforce Defendants' non-discretionary duty to grant Custodia's master account application.

13.     Custodia has exhausted all options short of litigation to obtain the master account to which it is legally entitled.  Rather than submitting to full federal regulation and supervision as it intended to do, Custodia is now having to litigate against its would-be regulators to enforce the

J.A.405

governing statutes which entitle Custodia to the access and use of a master account. Such a result benefits no one, least of all Custodia which would far rather use its knowledge and experience to provide safe and secure custodial services for crypto-assets.

<u>PARTIES</u>

14.    Plaintiff Custodia is a Wyoming bank. It was granted a Special Purpose Depository Institution bank charter by the Wyoming State Banking Board on October 28, 2020. It has its primary place of business at 2120 Carey Avenue, Suite 300, Cheyenne, WY 82001. Custodia is currently regulated by the Wyoming Division of Banking. Custodia's founders include experienced executives, such as Caitlin Long (CEO), a 22-year Wall Street veteran who was a managing director and head of Morgan Stanley's pension solutions business until 2016 and was appointed by then-Governor Mead to serve on the Wyoming Blockchain Task Force in 2018-2019.

15.    Defendant Federal Reserve Board of Governors is the main governing body of the Federal Reserve System. The Board is charged with overseeing the 12 regional Federal Reserve Banks. It has its principal place of business at Constitution Ave N.W. & 20th St. N.W., Washington, DC 20551. The Board is an agency of the United States, and comprises seven members, or "governors," who are nominated by the President and confirmed by the Senate.

16.    Defendant Federal Reserve Bank of Kansas City is one of 12 regional Federal Reserve Banks that, along with the Board, make up the United States Federal Reserve System. The Kansas City Fed serves at least portions of seven states, including the entirety of Wyoming. In this role, it operates pursuant to statutory and regulatory authority delegated to it by the Board. The Kansas City Fed has its principal place of business at 1 Memorial Drive, Kansas City, MO 64108. The Kansas City Fed supervises and regulates bank holding companies and Federal Reserve System member banks in its district, acts on applications within its authority, and enforces compliance with federal banking laws against relevant banking institutions in its district.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 12 U.S.C. § 632, which provides that "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits." Additionally, 28 U.S.C. § 1331 gives this Court jurisdiction over all civil actions "arising under the Constitution, laws or treaties of the United States."

18.     Venue is proper in this District under 28 U.S.C. §1391(b)(1) because both the Board and the Kansas City Fed reside in this District for purposes of 28 U.S.C. §1391(c)(2). The Board and the Kansas City Fed are entities with the capacity to be sued. They are subject to this Court's personal jurisdiction because they have purposefully availed themselves of the privileges of conducting business in this District, the claims herein arose in this District, many material witnesses are located in this District, and Defendants are subject to this Court's jurisdiction under Wyo. Stat. Ann. § 5-1-17, Wyoming's Long-Arm Statute. Venue is also proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this matter occurred in this District. In addition, venue is proper under 28 U.S.C. § 1391(e) because Custodia resides in this district and a substantial part of the events or omissions giving rise to its claims occurred here.

19.     An actual controversy exists between the parties concerning the legality of Defendants' denial of Custodia's master account application. That controversy is justiciable: Custodia already is suffering injury on account of Defendants' denial of Custodia's master account application.

20.     Custodia requests expedited discovery and a speedy hearing on its claims in this matter as continued delay will only further the injuries of which Custodia complains. Custodia waited 27 months for a decision on its master account application. On June 7, 2022, Custodia

brought claims against Defendants for unreasonable delay in adjudicating its master account. After over 6 months of litigation, and on the eve of having to produce discovery that would have revealed the extent of the Board's control over the Kansas City Fed's decision-making process, Defendants denied Custodia's membership and master account applications, thereby crystalizing the ultimate question: whether Defendants have discretion to deny a master account for an eligible depository institution. Allowing the Defendants to draw this case out longer simply extends the injury that the Defendants are knowingly and unlawfully inflicting on Custodia—depriving Custodia of the use of a master account.

## **FACTUAL ALLEGATIONS**

21.     On October 29, 2020, Custodia, an eligible state-chartered bank, submitted an application for a Federal Reserve master account. As required by Federal Reserve System regulations, Custodia submitted its application to the Federal Reserve Bank responsible for its district, the Kansas City Fed. Processing a master account application ordinarily takes "5 – 7 days," as stated on the application form at the time. Over two years later, on January 27, 2023, Defendants denied Custodia's application in a decision orchestrated by the Board. The denial of Custodia's master account application is contrary to law as Defendants had no discretion to deny the application.

### **A.     History of Dual-Chartering and State-Level Banking Regulation**

22.     The United States operates a dual-banking system, which allows banks to be chartered by either the state or federal government. At the founding of the United States, almost all banks were state chartered.

23.     It was not until the 1863 passage of the National Bank Act that nationally chartered banks started to proliferate. 12 U.S.C. § 38 *et seq.*

8

24.    In 1913, Congress established the federal banking system as we know it today with the passage of the Federal Reserve Act.  12 U.S.C. § 226 *et seq.*

25.    The dual-chartering system's division of regulatory responsibility among state and federal authorities is a hallmark of federalism.  It allows financial institutions to choose among various options to reflect their intended business plans, factoring in geographic concerns and operational concerns such as business models, accessibility of regulators, regulatory philosophies, and costs.  The availability of state charters allows for innovation in the financial services marketplace, permitting states to develop new ideas and competitors subject, of course, to applicable review by federal authorities.  The continued existence of state bank charters allows states to be responsive to the financial needs of their citizens and to innovate and support financial institutions that meet the needs of their citizens as well as the needs of the state as a whole.

26.    Under the current dual-chartering system, banks can apply for a national charter from the Office of the Comptroller of the Currency ("OCC") or for a state charter from the relevant state's banking authority.  National banks are chartered and primarily regulated by the OCC, while state banks are chartered and principally overseen by the state's banking regulatory agency.

27.    Once an institution is chartered, the next question is whether it will be a member of the Federal Reserve System.  Nationally chartered banks must become members of the Federal Reserve System. 12 U.S.C. § 222.  Within the Federal Reserve System, the Federal Reserve Board regulates, *inter alia*, bank holding companies.   State-chartered banks may choose to become members of the Federal Reserve System, but, unlike nationally chartered banks, do not have to do so.  Those state banks that join the Federal Reserve System are known as "state member banks." Those that do not are known as "nonmember banks."  As a member of the Federal Reserve System, state member banks are regulated by both the Federal Reserve and the relevant state banking

agency, whereas state-chartered nonmember banks are regulated by the state banking agency and may also be regulated by the Federal Deposit Insurance Corporation ("FDIC").

28.     National banks are generally required to submit an application for and obtain FDIC insurance.  Most states require their state-chartered banking institutions engaged in taking deposits to be FDIC-insured.  Not every state-chartered bank, though, is required to be insured by the FDIC. Uninsured state bank charters exist in several states and U.S. territories, such as Wyoming, Connecticut, and Puerto Rico.  Likewise, some states, such as Massachusetts, Illinois, and Colorado, permit depository trust charters, which are eligible for Federal Reserve master accounts and are also uninsured.

**B.     The Monetary Control Act of 1980**

29.     In 1980, Congress enacted the Depository Institutions Deregulation and Monetary Control Act ("MCA") which mandates that nonmember state-chartered deposit-taking institutions, like Custodia, be allowed to access Federal Reserve System bank services through master accounts—regardless of whether such institutions elect to become Federal Reserve member banks, and regardless of whether they are FDIC-insured.  Under the statute, the Federal Reserve cannot discriminate against state-chartered depository banks in the provision of Federal Reserve bank services.  *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a).

30.     In keeping with the long history of dual-chartering, the MCA leveled the playing field as between member banks and state non-member banks.  In furtherance of that mission, the MCA mandated that "[a]ll Federal Reserve bank services covered by the fee schedule ***shall be available to nonmember depository institutions*** and such services shall be priced at the same fee schedule applicable to member banks."  12 U.S.C. § 248a(c)(2) (emphasis added).  The services subject to the fee schedule which must be available to nonmember depository institutions include

"check clearing and collection services," "currency and coin services," "wire transfer services," and many other services which all require a master account.

31.     Legislative history makes clear that, at the time the MCA was passed, Congress intended that the MCA require the Federal Reserve to grant master accounts to all eligible nonmember institutions.  The final conference committee report acknowledges that the MCA "includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and open access to these services to all depository institutions* on the same terms and conditions as member banks."[1]  Such services can be accessed only with a master account.

32.     Debate on the House floor over the bill similarly recognized that the MCA required the Board "to publish a proposed schedule of fees for services which are now provided at no cost to members but which, under the new plan, *will be provided to all depository institutions* for a fee, regardless of membership."[2]  Again, such services are available to nonmember depository institutions only through a master account.

33.     At the time the MCA passed, the Federal Reserve likewise recognized the historic import of the statute with the Chairman of the Board noting that Titles I and II of the MCA "will undoubtably take their place among the *most important pieces of financial legislation enacted in this century.*"[3]  The Board subsequently acknowledged that the relevant statutory language "expanded the Federal Reserve's role by *requiring the Federal Reserve to provide its services to*

---

[1] H. Rept. 96-842, Depository Institutions Deregulation and Monetary Control Act of 1980 Conference Committee Report, 96th Cong., 2d Sess., at *71 (March 21, 1980) (emphasis added).

[2] 125 Cong. Rec. 6314 (July 20, 1979) (emphasis added).

[3] *See Depository Institutions and Monetary Control Act of 1980*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreservehistory.org/essays/monetary-control-act-of-1980 (emphasis added).

J.A.411

*all depository institutions on an equitable basis*."[4]  And, the Board's own website continues to advise that "Federal Reserve payment services *are available to all depository institutions*."[5] Indeed, Custodia is not aware of any eligible depository institution for which Defendants have denied a master account application.

34.     The only Judge to have directly addressed the issue of whether the MCA mandates that all eligible depository institutions be granted master accounts concluded that it did.  In *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017), Tenth Circuit Judge Robert Bacharach explained that state-chartered depository institutions like Custodia are statutorily entitled to master accounts because they "*shall*" be able to access banking services. 861 F.3d at 1067-74.  Other courts have likewise observed that the MCA made "check clearing services ... available to all banks."[6]

35.     Congress, the Federal Reserve itself, and the courts have all recognized that the MCA expanded Federal Reserve bank services to all depository institutions, and those services can be accessed only through a master account.  Any contrary position now taken by Defendants

---

[4] *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks*, Bd. of Governors of the Fed. Reserve Sys. (1984), https://tinyurl.com/2enw3reu (emphasis added).

[5] *Policies: The Federal Reserve in the Payments System*, Bd. of Governors of the Fed. Rsrv. Sys., available at http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (emphasis added); Fed. Rsrv. Bd., *Policies: Principles for the Pricing of the Federal Reserve Bank Services* (1980), https://tinyurl.com/mr4cbtjb ("Services covered by the fee schedule *are available to all depository institutions*." (emphasis added)); Fed. Rsrv. Bd., *Federal Reserve's Key Policies for the Provision of Financial Services*, https://tinyurl.com/2t8cthms (last updated Oct. 28, 2016) (noting that the Monetary Control Act gives *"all depository institutions access to the Federal Reserve's payment services"* (emphasis added)).

[6] *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989); *See also Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1222-23 (6th Cir. 1983) (explaining that under the MCA, "check clearing formerly provided to member banks only *will be made available to all banks*, regardless of whether or not they are members" (emphasis added)).

contravenes statutory mandates and decades of prior interpretations and positions taken by the Board.

**C.     The Development of SPDI Banks in Wyoming**

36.     In 2019, Wyoming legislated a new type of state bank charter, the Special Purpose Depository Institution ("SPDI"). Wyo. Stat. § 13-12-101, *et seq*. This legislation passed the Wyoming legislature with a veto-proof, bi-partisan majority. SPDI banks are regulated by the Wyoming Division of Banking. Unlike traditional banks, SPDIs are generally prohibited from making loans with customer deposits of fiat currency, and further must continually back all customer deposits with 100% cash on hand or high-quality liquid assets. Like traditional banks, SPDIs must hold capital on top of the assets that back customer deposits.

37.     SPDI banks do not lend money; instead, they specialize in taking deposits, facilitating payments for customers, and other incidental services. SPDI banks were designed to provide a bridge connecting crypto-asset companies to the U.S. payments system (for example, to pay their staff in U.S. dollars). SPDI banks were also designed to provide custody services for crypto-assets via their trust departments, analogous to the custody services provided by the trust departments of custody banks for the trillions in securities held by retirement plans and mutual funds. SPDI banks allow, for example, a customer to use his or her Bitcoin held in the trust department of an SPDI bank to make a direct transfer, a purchase, or an investment, rather than having to first convert that Bitcoin into U.S. dollars.

38.     Having a master account means that SPDI banks do not have to use an intermediary bank in order to access the Federal Reserve banking system for clearing U.S. dollar transactions. Eliminating the "middleman" cuts costs, lowers risk (including counterparty credit risk), and provides SPDI bank customers with more efficient and customizable payment services that can be programmed using software. It does not mean that SPDI banks hold crypto-assets within their

13

master accounts. Custodia would hold no crypto-assets on its balance sheet or within its master account.

39.     The sponsors of Wyoming's SPDI regime recognized that access to Federal Reserve banking services through master accounts would be crucial for the functioning of SPDI banks. The SPDI charter accordingly was developed to satisfy all requirements of the Federal Reserve Act for depository institutions. Under the Federal Reserve Act, Federal Reserve banking services must be accessible to "nonmember deposit institutions . . . [and] be priced at the same fee schedule applicable to member banks." So, to be eligible for a master account, an applicant must be either a member bank or a depository institution, defined as either: (1) a bank insured by the FDIC, or (2) a bank eligible to be insured by the FDIC. 12 U.S.C. §461(b)(1)(A)(i).

40.     SPDI-chartered banks meet the latter category because, as a state-chartered bank authorized and expected to take deposits, they are eligible to be insured by the FDIC. The Kansas City Fed recognizes the eligibility of SPDI banks for master accounts and has specifically confirmed that Custodia is an eligible depository institution. And, because all eligible depository institutions "shall" be permitted to access the Federal Reserve bank services, SPDI-chartered banks are entitled to master accounts. 12 U.S.C. § 248a(c)(2).

41.     The SPDI charter's compliance with Federal Reserve regulations was no accident. In developing the SPDI charter, Wyoming legislators coordinated with the federal government, holding more than 100 meetings with the Board and the Kansas City Fed and taking their views into account in crafting and revising proposed legislation.[7] The resulting SPDI charter offers the

---

[7] In a *Wall Street Journal* Op-Ed, U.S. Senator Cynthia Lummis provided background information on the steps that Wyoming took in passing its SPDI bank charter legislation. Despite mutual efforts in passing this legislation, the Federal Reserve has to this point refused to grant SPDI banks access to the Federal Reserve System. Cynthia Lummis, "The Fed Battles Wyoming on Cryptocurrency," *The Wall Street Journal* (Nov. 30, 2021), https://tinyurl.com/5xkcjpj5.

prospect of safe, efficient, and protected access to the Federal Reserve banking system for the crypto-asset industry. As such, Wyoming, and by extension Custodia, reasonably believed that their charter would be honored by the Federal Reserve.

42.    Nevertheless, in an abundance of caution, Wyoming initially included in the SPDI charter legislation a provision which would have expressly allowed the Wyoming Attorney General to sue the Federal Reserve if SPDI-chartered banks were denied master accounts. This provision was removed from the legislation after representatives of the Kansas City Fed assured Wyoming that the SPDI charter complied with Federal Reserve regulations making such a provision unnecessary.

**D.    Custodia's Application and Board Intervention**

43.    On October 29, 2020, Custodia filed its application to open and maintain a master account with the Kansas City Fed. Along with its application, Custodia was required by the Federal Reserve to submit a one-page Master Account Agreement. The standard form agreement, available from the Federal Reserve, stated that "[p]rocessing may take 5 – 7 business days. Please contact the Federal Reserve Bank to confirm the date that the master account will be established." Compl. Ex. 1.

44.    At the time the application was filed, Custodia's application was complete. Neither the Kansas City Fed nor the Board has informed Custodia of the need for additional information necessary to complete the application. In January 2021, Tara Humston, the Kansas City Fed's head of Supervision and Risk Management, informed Custodia that there were "no showstoppers" with its master account application. Yet, upon information and belief, the Kansas City Fed's impending approval of Custodia's application was stalled when, a few months later in spring 2021, the Board asserted its control over the decision-making process. This is so even though the Kansas

City Fed confirmed, including via a January 2022 letter, that Custodia met the legal eligibility requirements for receiving a master account.

45.    While waiting to have its application considered, Custodia was in regular contact with both the Kansas City Fed and the Board through letters, calls, emails, and remote and in-person meetings.  Custodia repeatedly offered to provide additional information about its business plan specifically, and SPDI-chartered banks more generally, to spur consideration of its application.

46.    The Board exercises ultimate control over the decision to grant or deny a master account, and exercised that power to assert control over the decision-making process for Custodia's application in particular.

47.    In a further attempt to demonstrate its commitment to safety and soundness, Custodia submitted an application to become a member bank of the Federal Reserve system on August 5, 2021.  As a member bank, Custodia would be regulated and examined directly by the Federal Reserve Board in addition to the Wyoming Division of Banking.  It is not necessary to be a member bank in order to receive a master account, and the Federal Reserve cannot discriminate against nonmember banks in granting access to Federal Reserve Bank services.   12 U.S.C. § 248a(c)(2).  Custodia, however, took this additional step to demonstrate to the Kansas City Fed and the Board its willingness to submit to full federal supervision and accountability.

48.    In a March 2, 2022 meeting, nearly 17 months after the submission of Custodia's master account application, the Kansas City Fed informed Custodia that it had not started processing Custodia's master account application.

49.    After learning that the Kansas City Fed had not started processing its master account application, Custodia sent a letter to Esther George, the President and Chief Executive

16

Officer of the Kansas City Fed. In that March 3, 2022 letter, Custodia described the steps that it had taken to obtain approval and urged Ms. George to consider Custodia's application.

50.    Ms. George agreed to meet in person with Custodia on March 24, 2022. Prior to that meeting, Custodia again wrote Ms. George a letter offering specific commitments Custodia would implement if granted a master account, including holding $1.08 in cash in its master account for every $1.00 of customer U.S. dollar deposits in its first three years of operation, providing monthly financial statements, and agreeing to certain restrictions. These commitments are not necessary for the grant of a master account, but Custodia offered them in an effort to encourage the Defendants to adjudicate Custodia's master account application. This is because Custodia's business model is safe and sound. Custodia plans to hold all customer deposits of U.S. dollars in cash in a Federal Reserve master account and it plans to hold no crypto-assets for its own account. This means that Custodia will not be exposed to the volatility of crypto-asset prices because it will hold all crypto-assets in bailment on behalf of a customer in its trust department. In other words, granting Custodia a master account would not expose the Federal Reserve System to any crypto-asset risk, as Custodia would only handle U.S. dollars in its master account and Custodia's trust customers would retain all crypto-asset risks.

51.    After the meeting, Tara Humston, the head of Supervision and Risk Management at the Kansas City Fed, sent a letter re-confirming that "Custodia is legally eligible for a master account." Unfortunately, the Kansas City Fed refused to provide any sort of timeline for a decision on Custodia's master account application. The Kansas City Fed's refusal or inability to provide any sort of timeline reflected the fact that the Board had already asserted control over the decision-making process governing Custodia's master account application.

J.A.417

### E.   Coordination of Efforts to Deny Custodia's Master Account Application

52.     By trying to moot Custodia's original Complaint on the eve of discovery, Defendants are trying to hide the actual process for reviewing master account applications in a black box.   In various meetings and communications, the Kansas City Fed and the Board alternately cited each other as the reason that the adjudication of Custodia's application was delayed.   However, throughout the lengthy evaluation of Custodia's master account application and eventual denial, it has become increasingly clear that the Board masterminded the entire process.

#### 1.   The Board's Guidelines for Evaluating Account and Services Requests

53.     The Kansas City Fed expressly cited the Board's development of guidelines for evaluating master account applications as a reason for not being able to decide Custodia's master account application in a timely manner.   Beginning in May 11, 2021, almost 7 months after Custodia filed its application for a master account, the Board issued proposed guidelines for evaluating master account applications to establish a "tiered-review framework to provide additional clarity on the level of due diligence and scrutiny to be applied to requests for Reserve Bank accounts and services."   *See* Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021).   More recently, in early March 2022, the Board issued supplemental proposed guidelines for notice and comment.   *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 12,957 (Mar. 8, 2022).

54.     However, it was not until August 15, 2022, one day before Defendants were ordered to file motions to dismiss in this litigation, that the Board issued its final Guidelines.   Bd. of Govs. of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services Requests*, 87 Fed. Reg. 51,099 (Aug. 15, 2022).   The eyebrow-raising timing of the Board's finalization of its Guidelines is

18

evidence that the Board had taken control over the consideration of Custodia's master account application and was seeding the ground for its eventual, unlawful denial.

55.     The Guidelines themselves further point to the Board's ultimate control over the master account process more generally.  The Board prescribed a tiered framework for evaluating risks of different institutions accessing master accounts, and stated that state-chartered, non-member institutions without FDIC insurance[8]—namely, banks like Custodia—"will generally receive the strictest level of review."  87 Fed. Reg. at 51,110.  The Board promulgated these "guidelines under its general supervision authority over the operations of the Reserve Banks," and identified "principles to be used by Federal Reserve Banks … in evaluating requests for master accounts."  *Id*. at 51,106.  The Board "expect[s] that Reserve Banks [will] engage in consultation with … the Board" to apply the Guidelines, and will work "in consultation with the Board, to expeditiously develop an implementation plan."  *Id*. at 51,102.

56.     While purporting to leave the ultimate decision on master accounts with the Federal Reserve Banks, the Guidelines make clear that the Board both manages and supervises the master account application adjudication process.  Custodia is not aware of a Federal Reserve bank ever issuing a decision on a master account application contrary to the Board's "consultation."

### 2.     Joint Statement on Crypto-Asset Risks to Banking Organizations

57.     On January 3, 2023, the Board in conjunction with the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency published a joint statement on the

---

[8] Custodia submitted an application for FDIC insurance in November 2021 in a good-faith attempt to break the logjam, but learned it was not available for de novo banks that engage in crypto-asset activities.  *See* Custodia, *Avanti Statement on its Application to Become an FDIC-Insured Bank* (Nov. 5, 2021), https://custodiabank.com/press/avanti-statement-on-its-application-to-become-an-fdic-insured-bank/.

risks of crypto-assets in the United States banking system.[9]  The statement acknowledged that the banking agencies are "carefully reviewing *any proposals* from banking organizations to engage in activities that involve crypto-assets."[10]

58.    As with the Guidelines, this statement was released by the Board and not the Federal Reserve Banks.  The statement shows that the Board has taken an active role in "reviewing any proposals" from banks intending to engage with crypto-assets.  Such applications undoubtably included Custodia's application for a master account.  The statement goes on to say that "the agencies continue to take a careful and cautious approach related to current or proposed crypto-asset-related activities."[11]  The Board thus emphasized its own care and caution in evaluating any proposals relating to crypto-assets.  Notably absent from the statement is mention of the Federal Reserve banks, let alone an acknowledgment that the Board's review would supposedly play second fiddle to the Federal Reserve banks' independent evaluation of those proposals—the fiction that Defendants have authored throughout this litigation.

59.    In the statement, the Board resorts to fear-mongering, claiming that "issuing or holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound

---

[9] Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, *Joint Statement on Crypto-Asset Risks to Banking Organizations* (Jan. 3, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230103a1.pdf.

[10] *Id*. (emphasis added)

[11] *Id*.

banking practices."[12]  Such statements reek of hypocrisy given that the Board and other Federal Reserve banks already permit federally-regulated banks like BNY Mellon to transfer crypto-assets.

60.     For example, on October 11, 2022, while Custodia's membership and master account applications were still pending, BNY Mellon—the oldest bank in the nation—announced that it was providing its customers with custodial services for crypto-assets.[13]  All that was required for BNY Mellon to initiate such activities was for the bank simply to "notify its lead supervisory point of contact at the Federal Reserve."[14]  On information and belief, neither the Board nor the Reserve Banks have prohibited or restricted BNY Mellon's crypto-asset services.  If such services are truly harmful to the United States banking systems, the participation of an institution as important and entrenched as BNY Mellon—a Global Systematically Important Bank—would presumably pose a larger threat than a Wyoming-based de novo banking institution like Custodia.

61.     Instead of truly viewing crypto-assets as an existential threat to the Federal Reserve, it appears that Defendants are attempting to restrict activities involving crypto-assets to federally-regulated banks at the expense of state-chartered institutions, like Custodia.  Such discrimination against state-chartered institutions demeans the state banking regulators, like Wyoming's Division of Banking, which are fully prepared to regulate such institutions and ensure compliance with all banking laws.  Such discrimination against state-chartered institutions is prohibited by statute.  *See* 12 U.S.C. § 248a.

---

[12] *Id.*

[13] BNY Mellon, *BNY Mellon Launches New Digital Asset Custody Platform* (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html.

[14] Federal Reserve Board of Governors, *Engagement in Crypto-Asset-Related Activities by Fed. Rsrv.-Supervised Banking Orgs* (Aug. 16, 2022), https://www.federalreserve.gov/supervisionreg/srletters/SR2206.htm.

J.A.421

### 3.    Denial of Custodia's Master Account Application

62.    The Kanas City Fed communicated to Custodia that its master account application was denied on January 27, 2023.  The timing and circumstances of the denial reinforce that the denial was part of a larger effort coordinated by the Board (in conjunction with the White House) in response to its decision that de novo banks should not be permitted to engage with crypto-assets.

63.    On January 23, 2023, the Board staff held an impromptu meeting with Custodia. Custodia was not informed of the purpose of the meeting.  During the meeting, the Board staff told Custodia that they would recommend that the Board vote to deny Custodia's application for membership in the Federal Reserve.  The Board staff gave Custodia 48 hours to decide whether it would withdraw its application or face the likely denial, and denied a request for a one-week extension.

64.    Banks are ordinarily given at least one opportunity to address perceived shortcomings in an application; moreover, banks typically get a week or longer to consider whether to withdraw an application once the staff conveys their intention to recommend denial.  Custodia received neither.  Staff refused to consider additional, material information that previously had been invited by Board representatives, and offered only an additional 24 hours because, unbeknownst to Custodia at the time, the Board was orchestrating denial of Custodia's membership and master account applications behind the scenes and, prior to January 23, 2023, had already arranged to have individual Governors of the Federal Reserve Board vote to deny Custodia's applications.  Anything more than 72 hours for Custodia to decide whether to rescind its membership application would have jeopardized the plan that the Board had orchestrated with the Kansas City Fed and the White House.

65.    Custodia's Board of Directors was jammed into making a decision on January 26, 2023 whether to withdraw its membership application by the short 72-hour turnaround time and

by the Board's press leaks about Custodia, which caused rampant rumors that the outcome of Custodia's applications was already a foregone conclusion.

66.    On January 26, 2023, Custodia responded to the Board staff by letter and made clear that it would not withdraw its membership application but offered to submit an amended application if necessary for the Board to finally review the updated application information it had already submitted to the Board, some of which had been pending for more than six months. Custodia's letter detailed several unreasonable aspects concerning the Federal Reserve's consideration of its membership application.   Such irregularities included conducting a full examination before Custodia was even operational (in violation of the Federal Reserve's own guidance), refusing to review Custodia's updated documentation and information, expanding the scope of Custodia's examination midway through to include activities and products that would not be operational at launch, providing only one opportunity for Custodia to pass its examination while other applicants are afforded at least two, subjecting Custodia to a higher standard of review applicable to large banks without notifying Custodia in advance, and refusing to review the remediation plan submitted by Custodia that the Board itself had requested from Custodia.

67.    Less than 24 hours after Custodia sent its letter refusing to withdraw its membership application but offering to resubmit an amended version, the Board voted to deny Custodia's membership application.  The Board's decision was accompanied by an unusually lengthy order— making clear that the Board had finalized its decision long before Custodia's letter refusing to withdraw its application.

J.A.423

68.     At approximately the same time as the Board made public its decision on Custodia's membership application, the White House released a statement on the risks of crypto-assets.[15] The White House statement noted that "agencies are using their authorities to ramp up enforcement where appropriate and issue new guidance when needed."[16] It is no coincidence that the Board made public its denial of Custodia's membership application at approximately the same time that the White House released a statement on crypto-assets. The Board had already decided that de novo banks would not be permitted to engage with crypto assets within the Federal Reserve System, and other offices and agencies were doing their part to support the Board's decision.

69.     The *coup de grace* came just a few hours later, when the Kansas City Fed communicated to Custodia that its master account application was denied. The denial of Custodia's master account application was done at the direction of the Board. The language in the Kansas City Fed's denial echoed the Board's denial of Custodia's membership application and the White House's statement on crypto-assets.[17]

70.     The decision on Custodia's master account application occurred just two weeks before this Court had ordered the Board to produce the administrative record on its consideration of Custodia's master account application, and while Custodia's discovery requests to the Kansas City Fed were outstanding. The timing of the denial in relation to these deadlines suggests it was

---

[15] The White House, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* (Jan. 27, 2023), https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/.

[16] *Id.*

[17] The Kansas City Fed acted within hours of the Board's denial, ignoring the fact that Custodia has the right to request reconsideration of the Board's action within 15 days, in accordance with 12 CFR § 262.3(k), and exercised that right on February 13, 2023, submitting a revised business plan that addresses issues raised in the denial. Again, the decisions were foregone conclusions.

J.A.424

designed to defer any visibility into, or judicial review of, the Board's outsized role in adjudicating Custodia's master account application.

**F.      Statutory Basis for Denial of Master Account Applications**

71.     Defendants have relied on 12 U.S.C. § 342 to argue that Reserve Banks have the statutory authority to make discretionary decisions on whether to open master accounts. This provision, however, does not mention master accounts. Rather, it specifies, as relevant here, that Reserve Banks "may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items." 12 U.S.C. § 342. That Reserve Banks have discretion regarding the form of deposit is irrelevant to whether Defendants have discretion to deny master account applications. *See Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649, 662 (1923) (noting that the statute does not "impose[] upon reserve banks any obligation to *receive checks for collection*" (emphasis added)). The statute, moreover, presupposes that various entities already have master accounts, which are prerequisites to receive deposits.

72.     In addition to 12 U.S.C. § 342 being inapplicable on its face, the circumstances surrounding Custodia's master account application and denial make clear that the Kansas City Fed did not have discretion to deny Custodia's master account application because, in practice, the decision was not the Kansas City Fed's to make. Nearly three months after Custodia filed its master account application, Kansas City Fed's head of Supervision and Risk Management informed Custodia that its application had "no showstoppers." Custodia's master account application was soon thereafter derailed when the Board took control over the application. The Board has taken the position that de novo banks should not be permitted to engage with crypto-assets—discrediting Wyoming's efforts in creating the SPDI charter. After the Board decided that

25

Custodia and banks like it should be excluded from the Federal Reserve system, the fate of Custodia's master account application was sealed regardless of which entity was ultimately charged with communicating the decision.

73.    Defendants' representations that 12 U.S.C. § 342 gives Reserve Banks discretionary authority over master accounts stands in conflict not only with the factual reality but also with the MCA.   Congress empowered the Board with authority over master account applications for nonmember depository institutions, like Custodia, by directing the Board to ensure that "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions*." 12 U.S.C. § 248a(c)(2) (emphasis added).  In order for these bank services to be available to nonmember depository institutions, as they must be, those institutions must have a master account.

74.    The Board used its statutory authority over master accounts unlawfully to coordinate the denial of Custodia's master account application.  And, this is not the first time the Board has asserted its control over Reserve Banks to commandeer a master account application. By way of example, the New York Federal Reserve Bank consulted with the Board on a master account application for another applicant, ultimately delaying action so that the Board could weigh its "concerns" over that applicant's business model. *See* Mot. to Dismiss 7, 14, *TNB USA, Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 1:18-cv-7978 (ALC) (S.D.N.Y. Mar. 8, 2019), ECF No. 21.  Thus, to the extent the Board disclaims authority to dictate master account decisions here, that position would break with past practice and is inconsistent with its actions over Custodia's master account application—namely, its assertion of control over the decision-making process related to Custodia's master account application in spring 2021.

75.     In short, the Board coordinated the denial of Custodia's master account application. Such coordination makes clear that the decision on Custodia's master account never truly rested with the Kansas City Fed and there was never any meaningful discretion to be exercised.

76.     The Board's coordination of the denial of Custodia's master account application was unlawful because the MCA provides that "[a]ll Federal reserve bank services ... *shall* be available to nonmember depository institutions." 12 U.S.C. § 248a(c)(2) (emphasis added). Without a master account, Custodia, a nonmember depository institution, cannot access Federal Reserve Services.  Such deprivation prevents Custodia from operating as designed and prevents Wyoming from realizing the promise of the SPDI charter.

**CLAIM FOR RELIEF I**
**Violation of APA, 5 U.S.C. § 706(2)**
**Claim for Unlawful Denial of Master Account Application Against the Board**

77.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

78.     Under Section 706 of the APA, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

79.     The Board is an agency for purposes of the APA, which defines an agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."  5 U.S.C. § 551(1).  This APA definition of agency has been interpreted to

include "any administrative unit with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971).

80.     There is no dispute that the Board is an agency of the United States government for purposes of the APA.  On its public website, the Board states that "[t]he Administrative Procedure Act sets out the requirements for federal agencies, ***including the Federal Reserve Board***, to follow when issuing proposed and final regulations."[18]  The Board has substantial independent authority in the fulfillment of its specific duties, which include supervising and regulating financial institutions, fostering payment systems, and engaging in the rulemaking necessary to carry out its responsibility to set the monetary policy of the United States.  In fulfilling its duties, the Board acts with the imprimatur of the United States government.

81.     As a United States government agency, the Board has a non-discretionary duty, under the MCA, to make available to nonmember depository institutions Federal Reserve bank services through master accounts.  12 U.S.C. § 248a(c)(2).  While the Kansas City Fed may be responsible for communicating the decision on Custodia's master account, both agencies work in concert to consider and process applications and decisions are subject to the Board's supervision. At a minimum, it is incumbent upon the Board to exercise its supervisory authority so as to ensure that all master account applications are fairly adjudicated and that eligible nonmember depository institutions can access Federal Reserve services.

82.     Custodia completed its master account application on October 29, 2020. Defendants acknowledged that Custodia is eligible to maintain a master account and that there were "no showstoppers" with its master account application.  Despite recognizing that Custodia

---

[18] Fed. Rsrv. Bd., *What Specific Steps Does the Board Take to Issue a Regulation?* (June 29, 2018), https://tinyurl.com/3ffs8xuk (emphasis added).

J.A.428

properly filed its master account and that it is an eligible nonmember depository institution, the Board orchestrated the denial of Custodia's master account application.

83.     The Board's action orchestrating the denial of Custodia's master account application is patently unlawful.  Under 12 U.S.C. § 248a(c)(2), "all Federal Reserve bank services ... *shall* be available to nonmember depository institutions" (emphasis added).  Such services are available to nonmember depository institutions like Custodia only through a master account.  As such, the Board acted unlawfully by orchestrating the denial of Custodia's master account application and depriving Custodia of access to Federal Reserve bank services.

84.     In light of these facts, and the other facts alleged herein, the Board's "agency action" in denying Custodia's master account application is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

85.     Custodia is therefore entitled under the APA to an order compelling the Board to rescind the denial of Custodia's master account application and to grant Custodia's master account application.

**CLAIM FOR RELIEF II**
**Relief Under the Mandamus Act, 28 U.S.C. § 1361**
**Claim for Mandamus Against All Defendants**

86.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

87.     Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  In this action, Custodia is requesting that the Court issue a writ of mandamus to the Board and the Kansas City Fed directing that they

29

promptly rescind the denial of Custodia's master account application and instead grant the application so that Custodia can access Federal Reserve bank services.

88.     This Court has jurisdiction over Custodia's action under the Mandamus Act.

89.     Based on facts already alleged, *supra* ¶¶ 79-80, the Board is a United States agency subject to the mandamus power of this Court.  And, regardless of the Kansas City Fed's agency status, the Kansas City Fed's President is an "officer[] ... of the United States" and is thus also subject to the Court's mandamus power.

90.     Mandamus is appropriate here because Custodia has a clear and certain claim to have its master account application granted.  Pursuant to statute, Federal Reserve banking services "*shall* be available" on an equal and non-discriminatory basis to eligible depository institutions. 12 U.S.C. § 248a(c)(2) (emphasis added).[19]   Defendants acknowledge that accessing Federal Reserve services requires an institution like Custodia to maintain a master account.  The Kansas City Fed has confirmed that Custodia is eligible for a master account.  Yet despite its valid Wyoming charter and conceded eligibility, Custodia's master account application was denied.  The Board and the Kansas City Fed were statutorily required to grant Custodia's master account application.

91.     Custodia asks the Court to enforce Custodia's statutory right to have its master account application granted and for an order directing Defendants not to discriminate against Custodia's ability to use that account.

---

[19] *See also Fourth Corner Credit Union*, 861 F.3d at 1067-74 (Bacharach, J.) (opining that the term "shall" "indicates a congressional command," as (1) the language was unambiguous, (2) prior agency interpretations were consistent with this understanding, and (3) legislative history supported this conclusion).

J.A.430

92.     Mandamus is necessary in this case because there are no other adequate remedies available.  Custodia's master account was denied on January 27, 2023, and Custodia has no other method by which it can access Federal Reserve services.

93.     Without a master account, Custodia will incur unnecessary costs, encounter otherwise avoidable risks (such as settlement risk and counterparty risk), and will lose ground to competitors that already have a master account.  Ultimately, without a master account, Custodia will be unable to operate as designed and may have to cease all banking operations.

94.     Custodia is therefore entitled under the Mandamus Act to an order compelling the Board and/or the Kansas City Fed to rescind the denial of Custodia's master account application and instead to grant the application.

### CLAIM FOR RELIEF III
**Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201**
**Claim for Declaratory Judgment Against All Defendants**

95.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

96.     Custodia seeks a declaratory judgment under 28 U.S.C. § 2201(a).  This statute provides that, "[i]n the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

97.      This case presents an actual controversy.  Custodia maintains that, as a state-chartered, deposit-taking bank, it is entitled to access Federal Reserve bank services through a master account.  Without a master account, Custodia will incur unnecessary costs, encounter otherwise avoidable risks (such as settlement risk and counterparty risk), and will lose ground to

**J.A.431**

competitors that already have a master account.  Ultimately, without a master account, Custodia will be unable to operate as designed and may have to cease all banking operations.

98.    The controversy arises in this Court's jurisdiction.  Custodia resides in Wyoming. And the Kansas City Fed and the Board both reside in Wyoming for purposes of this action because they have availed themselves of the opportunity to conduct business in Wyoming.  Additionally, many of the events giving rise to this claim have occurred in Wyoming, including the issuance of Custodia's charter and the preparation of the master account application.

99.    The Board and the Kansas City Fed have a statutory obligation to provide Custodia with access to Federal Reserve bank services through a master account.  Pursuant to statute, Federal Reserve banking services "*shall* be available" on an equal and non-discriminatory basis to all eligible depository institutions.  12 U.S.C. § 248a(c)(2) (emphasis added).[20]  Such services are available only through a master account.  Custodia is an eligible depository institution.  Yet despite its valid Wyoming charter and conceded eligibility, Custodia has been denied access to Federal Reserve banking services through a master account.  Defendants must rescind the denial of Custodia's master account application, grant Custodia's master account application, and permit Custodia to use its master account to access Federal Reserve bank services in a non-discriminatory manner.

100.    Through this Amended Complaint, Custodia has filed an appropriate pleading to have its rights declared.  The Court can resolve this controversy by declaring that Custodia has a right, as an eligible, deposit-taking bank, to have a master account and to use that master account to access Reserve Bank services in a non-discriminatory manner.

---

[20] *See supra* fn. 19.

101.    Custodia is therefore entitled under the Declaratory Judgment Act to a declaration

from this Court that the Board and/or the Kansas City Fed has a statutory obligation to provide

Custodia with a master account and to permit Custodia to use that master account to access Reserve

Bank services in a non-discriminatory manner.

## REQUEST FOR RELIEF

WHEREFORE, Custodia respectfully requests the Court to:

a.    Order a speedy hearing on this action, thereby advancing this action on the Court's
calendar;

b.    Order the Kansas City Fed and/or the Board promptly to rescind the denial of
Custodia's master account application and instead to grant Custodia's master
account application;

c.    Declare unlawful the Defendants' denial of Custodia's master account and any
discriminatory treatment in Custodia's access to Federal Reserve bank services;

d.    Grant Plaintiff all monetary damages permissible under law;

e.    Grant Plaintiff costs, fees, and other expenses under the Equal Access to Justice
Act, 28 U.S.C. § 2412; and

f.    Grant any other and further relief that the Court deems just and proper.

DATED: 28 February 2023                    Respectfully submitted,

/s/ Scott E. Ortiz
Scott E. Ortiz, WSB #5-2550
WILLIAMS PORTER DAY NEVILLE PC
PO Box 10700
Casper, WY 82602

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Whitney D. Hermandorfer
Jamie Wolfe

33

J.A.433

Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing document was delivered to the Court via the CM/ECF System and served upon counsel via CM/ECF electronic transmission this 28th day of February, 2023:

Mark Van Der Weide
Richard M. Ashton
Joshua P. Chadwick
Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitutional Avenue, N.W.
Washington, DC 20551

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Billie L.M. Addleman
John P. Fritz
HIRST APPLEGATE, LLP
P.O. Box 1083
Cheyenne, Wyoming 82003

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Andrew Michaelson
Laura Harris
KING & SPALDING, LLC
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

  /s/ Scott E. Ortiz
Scott E. Ortiz

J.A.435

# **Exhibit 1**

Avanti Financial Group, Inc -

**FEDERAL RESERVE ®**
**FINANCIAL SERVICES**
FRBservices.org

**Federal Reserve Bank**
**Operating Circular 1, Appendix 1**
**Master Account Agreement**
Servicing FRB Office: _____
Effective Date: _____

## Section 1 – Master Account Agreement

The Institution named below agrees to the provisions of Operating Circular 1, Account Relationships, of the Federal Reserve Bank named above, and to the provisions of all operating circulars of each Federal Reserve Bank from which the Institution obtains services, as the circulars may be amended from time to time. The transactions and fees for services obtained will be settled in the Master Account unless the Institution requests otherwise by submitting a Transaction and Service Fee Settlement Authorization (Operating Circular 1, Appendix 2) and/or a Letter of Agreement for Obtaining Advances Through a Correspondent (Operating Circular 10).

**All Fields Are Required**

| | |
|---|---|
| Routing (ABA) Number | TBD |
| Financial Institution Name | Avanti Financial Group, Inc |
| Street Address | 2120 Carey Street, 3rd Floor |
| City | Cheyenne |
| State & Zip Code | *State* Wyoming / *Zip Code* 82001 |
| Official Signature* | *Britney Reddy* |
| Name | *First* Britney / *Middle Initial* D / *Last* Reddy |
| Title | Chief Financial Officer and Chief Banking Officer |
| Date | 10/29/2020 |
| Anticipated Account Opening Date | January 2021 |

## Section 2 – Questions Regarding the Account Should be Directed to:

| | |
|---|---|
| Name | *First* Britney / *Middle Initial* D / *Last* Reddy |
| Title | Chief Financial Officer and Chief Banking Officer |
| Telephone Number | *Phone* ██ ████ / *Extension* |
| E-mail | ███████████ |

## Section 3 – Questions Regarding the Account Should be Directed to Alternate:

| | |
|---|---|
| Name | *First* Charles / *Middle Initial* D / *Last* Thompson |
| Title | Chief Legal Officer and Chief Compliance Officer |
| Telephone Number | *Phone* ██ ████ / *Extension* |
| E-mail | ███████████ |

* Official signature must be a signer designated on your institution's Official Authorization List.
Processing may take 5-7 business days. Please contact the Federal Reserve Bank to confirm the date that the master account will be established.

J.A.437

Billie L.M. Addleman, #6-3690
John P. Fritz, #7-6318
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
jfritz@hirstapplegate.com

Andrew Michaelson
Laura Harris
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500

*Counsel for Defendant the Federal Reserve Bank of Kansas City*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, <br><br> *Defendants.* | No. 1:22-cv-00125-SWS |

## DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S
## MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.     Custodia's Master Account Request Has Been Denied. .......................................... 3

II.    Congress Recently Amended the Federal Reserve Act to Require the Board of Governors to Publish a Database of Reserve Bank Master Accounts. ................................ 4

III.   Custodia's Amended Complaint Asserts an APA Claim Solely Against the Board of Governors. ......................................................................................................... 5

ARGUMENT ....................................................................................................................... 6

I.     Count II Should Be Dismissed as to FRBKC. ....................................................... 6

      a.   Count II Fails Because 12 U.S.C. § 248a Does Not Entitle Custodia to a Master Account. .............................................................................................. 8

      b.   Count II Should Be Dismissed Against FRBKC in Any Event. ................................ 11

II.    Count III Fails Because the Declaratory Judgment Act Does Not Provide an Independent Cause of Action. ............................................................................ 14

CONCLUSION .................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Haworth,*
   300 U.S. 227 (1937) ................................................................................ 14

*Bartlett Mem'l Med. Ctr., Inc. v. Thompson,*
   347 F.3d 828 (10th Cir. 2003) ................................................................ 7

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.,*
   669 F.3d 1203 (11th Cir. 2012) .............................................................. 13

*Citizens' Comm. to Save Our Canyons v. Krueger,*
   513 F.3d 1169 (10th Cir. 2008) .............................................................. 11

*DeHerrera v. Kozak,*
   No. 19-CV-111-SWS, 2019 WL 13259867 (D. Wyo. Oct. 3, 2019) ......... 3

*Devon Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.,*
   693 F.3d 1195 (10th Cir. 2012) .............................................................. 14

*Ecology Ctr. v. U.S. Forest Serv.,*
   451 F.3d 1183 (10th Cir. 2006) .............................................................. 11

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ................................................................................ 10

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City,*
   861 F.3d 1052 (10th Cir. 2017) ........................................................ 10, 11

*Gregg v. Georgia,*
   428 U.S. 153 (1976) ................................................................................ 11

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.,*
   58 F. Supp. 3d 1191 (D.N.M. 2014) ...................................................... 14

*Johnson v. Rogers,*
   917 F.2d 1283 (10th Cir. 1990) .............................................................. 7

*Ketcham v. U.S. Nat'l Park Serv.,*
   No. 16-cv-17, 2016 WL 4268346 (D. Wyo. Mar. 29, 2016) .................. 14

*Marks v. United States,*
   430 U.S. 188 (1977) ................................................................................ 11

*Mt. Emmons Min. Co. v. Babbitt,*
   117 F.3d 1167 (10th Cir. 1997) .............................................................. 12

J.A.440

*Nero v. Oklahoma*,
No. 22-6121, 2022 WL 14423872 (10th Cir. Oct. 25, 2022) ........................................ 14, 15

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) ................................................................................... 11

*Rios v. Ziglar*,
398 F.3d 1201 (10th Cir. 2005) ................................................................................... 7

*Sierra Club v. Hodel*,
848 F.2d 1068 (10th Cir. 1988) ................................................................................. 14

*Skelly Oil Co. v. Phillips Petroleum Co.*,
339 U.S. 667 (1950) ................................................................................................... 14

*Utah Hous. Corp. v. Country Pines, Ltd.*,
541 F. Supp. 3d 1288 (D. Utah 2021) ........................................................................ 14

*Vill. of Los Ranchos De Albuquerque v. Marsh*,
956 F.2d 970 (10th Cir. 1992) ................................................................................... 14

*W. Shoshone Bus. Council*
*ex rel. W. Shoshone Tribe of Duck Valley Rsrv. v. Babbitt*,
1 F.3d 1052 (10th Cir. 1993) ....................................................................................... 7

**Statutes & Rules**

5 U.S.C. § 706 .................................................................................................................. 7

12 U.S.C. § 248c ....................................................................................................... 4, 5, 9

12 U.S.C. § 342 ................................................................................................. 6, 9, 10, 13

28 U.S.C. § 1361 ......................................................................................................... 1, 6

28 U.S.C. § 2201 ........................................................................................................... 14

Fed. R. Civ. P. 65 .......................................................................................................... 13

**Other Authorities**

Fed. Res. Sys.,
FRB Order No. 2023-02 (Jan. 27, 2023),
*available at* https://www.federalreserve.gov/
newsevents/pressreleases/orders20230324a.htm ........................................................ 4

Press Release, White House,
Statement by the President on H.R. 7776, the James M. Inhofe National Defense
Authorization Act for Fiscal Year 2023 (Dec. 23, 2022), https://bit.ly/3Jm7DN5 .................. 4

**J.A.441**

## INTRODUCTION

Much has changed since this Court considered the motions to dismiss Custodia's original complaint. The Board of Governors of the Federal Reserve System ("Board of Governors" or the "Board") denied Custodia's membership application, the Federal Reserve Bank of Kansas City ("FRBKC") denied Custodia's master account request, and Congress amended the Federal Reserve Act. The denial of the account request mooted all of Custodia's claims that had survived the Court's order on the motions to dismiss, and Custodia filed its Amended Complaint.

While Custodia's original complaint asserted a multiplicity of legal theories, the Amended Complaint asserts only one. According to Custodia, 12 U.S.C. § 248a (Section 11A of the Federal Reserve Act, entitled "Pricing of Services") requires the Board of Governors to provide Custodia a master account because all entities holding a state banking charter are automatically entitled to a master account, regardless of the viability of an entity's business plan; the risks it presents to customers, counterparties, and the Federal Reserve System; the adequacy of its compliance programs to combat money-laundering and the financing of terrorism; or any other facts or circumstances. And while the original complaint hedged on whether the Board of Governors or FRBKC was responsible for deciding Custodia's master account request, the Amended Complaint asserts one central factual allegation: the Board of Governors made the decision to deny Custodia's account request. In keeping with its sole legal theory and factual allegations, the Amended Complaint's only substantive claim—Count I, contending that the denial of Custodia's account request was contrary to § 248a—is asserted under the Administrative Procedure Act and only against the Board of Governors.

In addition to Count I against the Board of Governors, the Amended Complaint pleads two other counts against both the Board and FRBKC, but those claims are both derivative of Count I.

Count II seeks relief under 28 U.S.C. § 1361, the mandamus statute. Custodia's only theory

for why it is entitled to mandamus, however, is that it "has a clear and certain claim to have its master account application granted" pursuant to § 248a. Am. Compl. ¶ 90. That is the same legal theory asserted in Count I. And as Custodia recognizes, § 248a is directed to the Board of Governors, not the Reserve Banks. *See, e.g.*, Am. Compl. ¶¶ 8, 73, 76. As the Board explains in its motion to dismiss, Custodia's interpretation of § 248a is incorrect as a matter of law. But even if it were correct, any relief that Custodia would obtain under § 248a would likewise be directed to the Board of Governors.

Count III seeks relief under the Declaratory Judgment Act. But this Court has already recognized that the Declaratory Judgment Act merely provides a remedy; it does not provide a cause of action. Count III thus adds nothing to Count I. If Custodia were to prevail on Count I, one potential form of relief could be a declaratory judgment. But as with Count II, any relief on Custodia's theory that § 248a requires the Board of Governors to grant it an account would be directed to the Board.

As explained in the Board of Governors' motion to dismiss, Custodia's legal theory is wrong. Section 248a does not require the Board of Governors to grant a master account to anyone—it does not even govern master account requests. But even apart from that, § 248a does not automatically entitle any and every entity holding any state charter to obtain a master account regardless of significant concerns raised by allowing the entity direct access to the Federal Reserve's payment system. And while Custodia alleges that it is being subjected to disparate treatment and that established banks are being permitted to offer the services it wants to offer, Am. Compl. ¶ 60, that is both legally irrelevant and untrue. FRBKC provided Custodia a letter outlining well-founded reasons for the denial of its master account request. Custodia, tellingly, has chosen not to challenge those reasons in the Amended Complaint. Instead, Custodia's position is that the

2

reasons for the denial are irrelevant because § 248a absolutely required the Board to grant its request even if there were good reasons to deny it. The Amended Complaint squarely presents that legal theory, and the Court should reject it and dismiss this action with prejudice for the reasons set forth more fully by the Board of Governors in its motion to dismiss.

In all events, however, the Court should dismiss FRBKC from this action. If Custodia prevails on its sole legal theory, it will obtain relief against the Board of Governors and its claims against FRBKC will be superfluous. If Custodia fails on Count I, Counts II and III will fail with it. Either way, the Amended Complaint does not state a claim upon which relief may be granted against FRBKC.

## BACKGROUND

### I.    Custodia's Master Account Request Has Been Denied.

When Custodia filed its first complaint with this Court, its only request for relief was for the Board of Governors or FRBKC to make a decision on Custodia's master account request. *See, e.g.*, ECF No. 1 ¶ 2. Custodia has now received that relief: on January 27, 2023, FRBKC sent Custodia a letter denying its account request and setting forth the basis of its decision. *See* Am. Compl. ¶ 6. FRBKC is filing a copy of that decision under seal. *See* Declaration of Billie L.M. Addleman, March 28, 2023, ¶ 4, Ex. A [hereinafter "Denial Ltr."] at 2.[1]

When the Court ruled on the initial motions to dismiss, Custodia's application to the Board of Governors for membership in the Federal Reserve System was pending. On January 27, 2023,

---

[1] The denial letter is referred to in Custodia's complaint and is central to its claims: it is the decision Custodia is asking the Court to set aside. The Court therefore may consider the denial letter. *See, e.g.*, *DeHerrera v. Kozak*, No. 19-CV-111-SWS, 2019 WL 13259867, at *1 (D. Wyo. Oct. 3, 2019) (Skavdahl, J.) (relying on documents referred to in the complaint while considering a motion to dismiss and noting that "a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss" (internal quotation marks omitted)).

the Board denied that application in an 86-page order that described the many concerns the Board

had with Custodia's application and proposed business model.[2]

## II.    Congress Recently Amended the Federal Reserve Act to Require the Board of Governors to Publish a Database of Reserve Bank Master Accounts.

Following this Court's order on the motions to dismiss Custodia's initial complaint,

Congress amended the Federal Reserve Act to add a new provision concerning master accounts.

On December 23, 2022, the President signed into law the National Defense Authorization Act

("NDAA").  Press Release, White House, Statement by the President on H.R. 7776, the James M.

Inhofe National Defense Authorization Act for Fiscal Year 2023 (Dec. 23, 2022),

https://bit.ly/3Jm7DN5. Section 5708 of Title LVII of the FY 2023 NDAA amends the Federal

Reserve Act by inserting § 11C, entitled "Master Account and Services Database." 12 U.S.C.

§ 248c.

Section 248c requires the Board of Governors to create and maintain a public, online,

searchable database of institutions that have access to a Reserve Bank master account and services,

as well as entities that have requested the same. *Id.* § 248c(b)(1). The database must be updated

quarterly and include the status of any request for access, including whether a request was rejected.

*Id.* § 248c(b)(1)(B)(ii).  Notably, this amendment to the Federal Reserve Act limits the Board of

---

[2] The Board released the final version of the Order on March 24, 2023. The Board summarized its conclusions: "In summary, the Board believes that approving Custodia's application as submitted would be inconsistent with the factors that the Board is required to consider. There are significant deficiencies in Custodia's risk management and controls framework in relation to Custodia's limited basic banking activities. Even if Custodia were able to successfully remediate all issues identified with respect to its ability to safely and soundly conduct its limited day-one activities, conducting only this limited set of activities would not enable it to constitute a viable bank in the medium or long term. Moreover, the future earnings prospects of the business model that Custodia has proposed—that is, an uninsured, undiversified, crypto-asset-focused business model featuring a number of novel and untested activities posing heightened risks—is inconsistent with approval." Fed. Res. Sys., FRB Order No. 2023-02, at 9–10 (Jan. 27, 2023), *available at* https://www.federal reserve.gov/newsevents/pressreleases/orders20230324a.htm (confidential information redacted).

Governors' role to publication of a database containing certain master account information from each Reserve Bank, and otherwise makes clear that Congress views a master account as something a Reserve Bank—not the Board of Governors—can provide.

Before this amendment, the Federal Reserve Act did not make specific reference to "master accounts." Now, § 248c refers to "access requests," which it defines as "a request to a Federal reserve bank for access to a reserve bank master account and services." *Id.* § 248c(a)(1). That same section defines "Reserve bank master account and services" as "an account in which a Federal reserve bank—(A) receives deposits for an entity other than an official accountholder; or (B) provides any service under section 248a(b) . . . to an entity other than an official accountholder." *Id.* § 248c(a)(3). ("Official accountholder" is defined to mean certain governmental entities. *Id*. § 248c(a)(2).)

## III. Custodia's Amended Complaint Asserts an APA Claim Solely Against the Board of Governors.

Custodia's Amended Complaint paints a very different picture from its initial complaint. In the Amended Complaint, Custodia's factual allegations and legal theory are directed at the Board of Governors. In Count I, Custodia asserts an APA claim against only the Board of Governors, not FRBKC. The substance of Count I is directed entirely at the Board, in terms of both Custodia's legal theory and its factual allegations. Custodia alleges that the Board of Governors (not FRBKC) made the decision to deny its master account request and contends that § 248a required the Board to grant it. *See, e.g.*, Am. Compl. ¶¶ 4, 8, 10, 62, 64, 73, 75.

Custodia alleges, for example, that "[t]he Board exercises ultimate control over the decision to grant or deny a master account, and exercised that power to assert control over the decision-making process for Custodia's application in particular." Am. Compl. ¶ 46. Under Custodia's theory of the case, FRBKC was merely "charged with communicating the decision"

made by the Board of Governors. Am. Compl. ¶ 72. According to Custodia, while the letter denying its account request was sent by FRBKC, the decision was made by the Board of Governors: "[t]he denial of Custodia's master account application was done at the direction of the Board." Am. Compl. ¶ 69.[3]

Given that Custodia alleges that the Board of Governors denied its request in violation of § 248a—a provision that on its face is addressed to the Board of Governors—it is not surprising that Custodia named the Board as the only defendant on its APA claim. And Count I is the only substantive claim asserted in the Amended Complaint; Counts II and III are derivative of Count I.

Count II seeks relief under 28 U.S.C. § 1361, the mandamus statute. While Count II names FRBKC as a defendant as well as the Board of Governors, it asserts the same legal theory as Count I, namely, that "Custodia has a clear and certain claim to have its master account application granted" pursuant to § 248a. Am. Compl. ¶ 90. Count III seeks relief under the Declaratory Judgment Act, which this Court has already held does not create an independent cause of action. *See* ECF No. 102 at 23 ("Custodia's claim for declaratory judgment is not properly understood as a stand-alone cause of action . . . .").

## ARGUMENT

## I.   Count II Should Be Dismissed as to FRBKC.

The mandamus statute, 28 U.S.C. § 1361, grants district courts the authority to issue a writ of mandamus compelling "an officer or employee of the United States" to "perform a duty owed to the plaintiff." By its nature, mandamus is a last resort, available only where a plaintiff has no

---

[3] While FRBKC decided Custodia's master account request pursuant to the discretion Congress afforded it in Section 13 of the Federal Reserve Act (12 U.S.C. § 342), FRBKC recognizes that Custodia's allegations are taken as true for the limited purpose of this motion.

other avenue for relief. *Bartlett Mem'l Med. Ctr., Inc. v. Thompson*, 347 F.3d 828, 835 (10th Cir. 2003) ("Mandamus relief is available to a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." (cleaned up)). In particular, where a remedy is available under the APA, mandamus is not appropriate. *W. Shoshone Bus. Council ex rel. W. Shoshone Tribe of Duck Valley Rsrv. v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993) (mandamus was not available because review was possible under the APA). Moreover, the mandamus statute requires a plaintiff to surmount a higher bar than the APA. To prevail under the APA, Custodia would have to show that the Board of Governors' alleged action was "not in accordance with law." 5 U.S.C. § 706(2)(A). But to prevail under the mandamus statute, Custodia would have to show "a clear right to the relief sought" and "a plainly defined and peremptory duty" owed to it. *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990); *see Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005).

Yet Custodia's mandamus claim asserts the same legal theory and factual allegations as its APA claim. Like Count I, Count II alleges that that the Board of Governors had a nondiscretionary duty under § 248a to direct the issuance of a master account to Custodia and that the Board violated that duty by denying Custodia's account request. *See* Am. Compl. ¶¶ 83, 90. As explained in section A below and at more length in the Board of Governors' motion to dismiss, Custodia's legal theory is wrong. The Court should hold that § 248a does not require the Board of Governors to grant Custodia a master account and should dismiss Count II for the same reasons it should dismiss Count I.

Because Count II is derivative of Count I, however, the Court should dismiss Count II as against FRBKC for the reasons set forth in section B below regardless of its disposition of Count I. If Custodia were to prevail on its APA claim in Count I, the availability of APA relief would mean

that mandamus relief was unavailable. Conversely, if Custodia's APA claim fails because the Court rejects Custodia's interpretation of § 248a, Custodia's mandamus claim would fail, *a fortiori*, because it is based on the same legal theory and subject to, if anything, a higher standard.

> **a.** **Count II Fails Because 12 U.S.C. § 248a Does Not Entitle Custodia to a Master Account.**

Custodia's legal theory is that, as a holder of a state charter that makes it eligible to apply for deposit insurance, it is automatically and "unequivocally entitled" to a master account—full stop. Am. Compl. ¶ 2. If Custodia's anti-money-laundering and Bank Secrecy Act compliance procedures are inadequate and could lead to illegal activity, too bad. If its business model raises questions of long-term sustainability and providing a master account would endanger depositors (because it has not obtained deposit insurance), too bad. If giving it direct access to the nation's payments system would threaten the Federal Reserve's control over its own balance sheet, too bad. According to Custodia, none of that matters because Congress, in enacting § 248a, required the Board of Governors to give a master account to all entities that hold a state charter—regardless of the permissible activities or other terms of the charter, regardless of the lack of deposit insurance, regardless of the lack of federal supervision, regardless of the nature of the state supervision and resolution framework, and regardless of any other circumstances. Am. Compl. ¶ 12 ("While the facts of this case may appear complex, the core issue is simple: Defendants are statutorily required to grant Custodia's master account application."). That legal theory is utterly untenable.

Section 248a does not speak to whether the Board of Governors should grant a master account to anyone, let alone require the Board to grant an account to all comers notwithstanding concerns. Section 248a instructs the Board of Governors to "put into effect a schedule of fees," *id*. § 248a(a), for certain payment services and requires those services to be made available on a nondiscriminatory pricing basis to nonmember banks, so long as the nonmembers meet criteria

that the Board of Governors has set for members, including maintaining minimum "balances sufficient for clearing purposes," *see id.* § 248a(c). This provision mandates non-discriminatory *pricing* for Federal Reserve services to ensure that depository institutions are not charged different prices for the same product or service based on their membership status with the Federal Reserve, and no one disputes that the Board of Governors has published a schedule of fees for Federal Reserve services that does not differentiate in price between members and non-members. Nowhere in § 248a is there any reference to master accounts, much less a mandate that the Board open deposit accounts, accept funds and provide services to all depository institutions irrespective of risk, insurance or supervision.

Rather than being governed by § 248a, which is addressed to the Board of Governors, master accounts are governed by § 342, which addresses powers Congress granted to the Reserve Banks. Section 248a is contained in the subchapter titled "Board of Governors of the Federal Reserve System." *See id.* §§ 241–253. Section 342, in contrast, is contained in the subchapter titled "Powers and Duties of Federal Reserve Banks." *See id.* §§ 341–364. Congress's recent amendment of the Federal Reserve Act—just three months ago, after the Court's ruling on the initial motions to dismiss—makes clear that Congress views a master account as something a Reserve Bank—not the Board of Governors—can provide. In new § 248c, Congress defined a "*reserve bank* master account." *Id.* § 248c(a)(3) (emphasis added). Access to a "reserve bank master account" must logically be governed by the provisions of the Federal Reserve Act directed to Reserve Banks. That means § 342, which gives Reserve Banks discretion over whether to grant them. *Id.* § 342 ("*may* receive . . . deposits") (emphasis added).

It would be highly anomalous to conclude that Congress imposed a non-discretionary duty on the Board of Governors to give master accounts to any and all state-chartered depository

institutions, regardless of the Board of Governors' concerns about a given requestor. Custodia contends that respect for our "dual-banking system" requires holding that any entity chartered by any state has an absolute right to a master account, Am. Compl. ¶ 5, but that gets things backwards. Accepting deposits into a master account and providing Federal Reserve services affords the account holder direct access to the nation's payments system and to the Federal Reserve's own balance sheet. The federal half of our "dual" banking system would be meaningless if the Board of Governors, a federal agency, were required as an automatic, ministerial matter to give direct access to the Federal Reserve's balance sheet to any entity that obtained any charter that any state saw fit to issue under whatever standards and procedures the state might choose to prescribe or follow (even if the charter contains unique features that remove or weaken protections that exist for traditional bank customers).

For a court to draw such an anomalous and consequential conclusion, Congress would need to have spoken quite clearly. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). In § 248a, Congress did not speak to "reserve bank master accounts" at all, let alone "unequivocally entitle[]" any and all eligible entities to a master account no matter what concerns an entity's request may raise. Am. Compl. ¶ 2.

These considerations help explain why Custodia's reliance on Judge Bacharach's separate opinion in *Fourth Corner* is misguided. *See Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1068 (10th Cir. 2017). Judge Bacharach erred by concluding that § 248a(c)(2)'s provisions directed to the Board of Governors regarding nondiscriminatory pricing of Federal Reserve services negated § 342's direct grant of discretion to Reserve Banks to decide whether to accept deposits. Judge Bacharach's opinion, which was issued before Congress's recent

amendments to the FRA, also fails to account for the monumental shift in regulation of the nation's financial system that his reading could create.[4]

The Court should reject Custodia's theory that § 248a absolutely entitles it to a master account. And because that is Custodia's *only* legal theory in Count I and Count II alike, the Court should dismiss both of those counts.[5]

### b.    Count II Should Be Dismissed Against FRBKC in Any Event.

If the Court allows Count I to proceed against the Board, FRBKC should still be dismissed from Count II because Count II does not state an independent claim for relief that could be viable against FRBKC.

Mandamus, by its nature, can be available only if no other relief is available. But if Custodia is correct about what § 248a means (which it is not), it has a remedy under the APA in Count I. Because Counts I and II are based on the same legal theory—the sole legal theory asserted

---

[4] Judge Bacharach's opinion is not binding on this Court. The Tenth Circuit's disposition in *Fourth Corner* was to direct the dismissal of the amended complaint without prejudice. 861 F.3d at 1053 (per curiam). Judge Bacharach would have allowed that complaint to proceed, but both Judge Moritz and Judge Matheson disagreed. *Id*. A separate opinion of a single judge advocating a disposition that the other judges rejected has no binding force. *Cf. Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[ ] on the narrowest grounds." (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976))).

[5] Notably, Custodia chose not to allege that the denial of its master account request was arbitrary and capricious. Such a claim would have put at issue the reasons why Custodia's account request was denied—and thus would have shone a light on the multiple significant concerns raised by Custodia's request. *See Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (noting that review of agency action is "highly deferential" and "the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment" (quoting *Ecology Ctr. v. U.S. Forest Serv.*, 451 F.3d 1183, 1188 (10th Cir. 2006) and *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994)). Instead, Custodia's claim is that it doesn't matter what reasons underlay the denial of its account request because the law absolutely entitles it to a master account.

in the Amended Complaint—there is no scenario under which Custodia would be entitled to relief under Count II. If Custodia prevails on Count I, it will neither need nor be entitled to mandamus relief; Count II will be moot. *See Mt. Emmons Min. Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997) ("The availability of a remedy under the APA technically precludes Mt. Emmons' alternative request for a writ of mandamus."). And if Custodia does not prevail on Count I, the Court's ruling against it on Count I will equally doom Count II.[6]

To be sure, Count II names FRBKC as a defendant along with the Board of Governors, while Count I names only the Board. But that does not change the derivative nature of Count II, because it remains true that the two counts are based on the same legal theory and the same factual allegations. And those allegations are that *the Board of Governors* made the decision to deny Custodia's master account request, and that legal theory is that § 248a required *the Board of Governors* to grant that request. There are no independent allegations against FRBKC in Count II. Instead, Custodia's claim is that the Board of Governors, not FRBKC, made the decision and FRBKC merely was "charged with communicating the decision" the Board had made. Am. Compl. ¶ 72; *see also id*. (alleging that "in practice, the decision was not the Kansas City Fed's to make"). Without allegations that FRBKC did more than communicate the Board of Governors' decision on Custodia's master account request or a legal theory directed at FRBKC, Custodia's mandamus claim is nothing more than a duplicative claim against the Board of Governors that § 248a entitles Custodia to a master account.

The Amended Complaint stands in contrast to the initial Complaint, in which Custodia alleged in the alternative both that FRBKC was (or should have been) the decisionmaker on its

---

[6] Because the Board is undisputedly an APA agency, there is no threshold obstacle to Count I and a ruling against Custodia on Count I would mean the Court has rejected Custodia's interpretation of § 248a.

master account request *and* that the Board of Governors was (or should have been) the decisionmaker. *Compare, e.g.*, ECF No. 1 ¶ 38 (alleging that the Board of Governors was required to decide the master account request) *with, e.g., id.* ¶ 116 (alleging that FRBKC was required to decide it). Now, however, Custodia has chosen to allege that the Board of Governors was the decisionmaker and to advance only the legal theory that § 248a required the Board to make a different decision. As a result, while the Court viewed Custodia's mandamus claims in its initial complaint as "complementary" to its other, substantive claims against FRBKC, ECF No. 102 at 18, now there are no substantive claims against FRBKC.

In essence, Custodia has named FRBKC as nothing more than a relief defendant. Custodia's concern appears to be that the Board of Governors does not itself provide master accounts and thus might need to work with FRBKC to effectuate a court order requiring the Board to provide Custodia with an account. *See* Am. Compl. ¶ 72. The relief Custodia seeks in Count I, therefore, might run through FRBKC as a practical matter.

But FRBKC need not remain a defendant in this action for the Court to afford Custodia relief. If the Court holds that § 248a requires the Board of Governors to provide Custodia with a master account and enters judgment against the Board on Count I, FRBKC would be obligated to work with the Board if doing so were necessary to effectuate the Court's order. *See* Fed. R. Civ. P. 65(d)(2)(A) & (C) (an injunction binds the parties and "other persons who are in active concert or participation" with the parties and who have actual notice); *see also Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 n.1 (11th Cir. 2012) (questioning whether it was necessary for relief defendant to remain a party in the case since an injunction would be binding on it under Rule 65). To be clear, FRBKC's position is that § 342 grants Reserve Banks discretion to decide master account requests. But if the Court enters judgment for Custodia on Count I, it will

13

necessarily have concluded, to the contrary, that § 248a compels the Board of Governors to provide

a master account to Custodia. On that (incorrect) premise, § 248a would also presumably empower

the Board of Governors to work with FRBKC as necessary to ensure that happens.[7]

## II.   Count III Fails Because the Declaratory Judgment Act Does Not Provide an Independent Cause of Action.

Count III fails to state a claim upon which relief may be granted because the Declaratory

Judgment Act, 28 U.S.C. § 2201, does not create a right of action. *Devon Energy Prod. Co. v.*

*Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012). Instead, the Act merely

provides that a declaratory judgment is a remedy that may be available on a proper underlying

cause of action. The Court already recognized as much in its order on the initial motions to dismiss.

*See* ECF No. 102 at 22–23; *see also Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2

(10th Cir. Oct. 25, 2022) ("the Declaratory Judgment Act does not provide an independent federal

cause of action" (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–74 (1950)));

*Utah Hous. Corp. v. Country Pines, Ltd.*, 541 F. Supp. 3d 1288, 1295 n.1 (D. Utah 2021) (citing

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). "To maintain an action for a declaratory

judgment, then, [Custodia] must assert a valid federal cause of action—one that exists independent

---

[7] In all events, if FRBKC remains in this action as a relief defendant, the action should proceed on an administrative record under the APA. The only substantive claim in the Amended Complaint is Custodia's APA claim against the Board of Governors. Where a party includes additional claims in what fundamentally is an APA case, the case as a whole proceeds under the APA and is decided based on the administrative record. *See, e.g., Ketcham v. U.S. Nat'l Park Serv.*, No. 16-cv-17, 2016 WL 4268346, at *2 (D. Wyo. Mar. 29, 2016) (Skavdahl, J.) (holding that plaintiff could not circumvent APA record review by pleading a claim under a source of law other than the APA); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1238 (D.N.M. 2014) (same). The presence of a relief defendant does not change that rule. *See Sierra Club v. Hodel*, 848 F.2d 1068, 1077 (10th Cir. 1988) (per curiam) (finding that Garfield County, which was not an APA agency, was an indispensable party as a relief defendant, but proceeding on an administrative record under the APA), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

of any request for declaratory relief." *Nero*, 2022 WL 14423872, at *2.

In ruling on the initial motions to dismiss, the Court held that Custodia's counts seeking declaratory relief did not state viable standalone causes of action. ECF No. 102 at 22. The Court nonetheless declined to dismiss the Declaratory Judgment Act counts because substantive causes of action against FRBKC survived dismissal, and the Declaratory Judgment Act might have provided appropriate relief if Custodia had prevailed. *Id*. at 23. The Amended Complaint, however, does not assert any substantive claims against FRBKC. If Custodia prevails on Count I against the Board of Governors, it might be able to obtain declaratory relief against the Board, the only defendant on that independent cause of action. But Custodia has not pleaded an underlying cause of action against FRBKC "that exists independent of [Count III's] request for declaratory relief." *Nero*, 2022 WL 14423872, at *2. The Court should therefore dismiss Count III against FRBKC.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint.

Date: March 28, 2023.

Respectfully submitted,

  /s Billie LM Addleman
Billie LM Addleman, #6-3690
John P. Fritz, #7-6318
HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
jfritz@hirstapplegate.com

Andrew Michaelson
Laura Harris
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
lharris@kslaw.com

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
jmitchell@kslaw.com
ccarletta@kslaw.com

*Counsel for Defendant the*
*Federal Reserve Bank of Kansas City*

J.A.457

**CERTIFICATE OF SERVICE**

       I certify the foregoing *Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss* was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure on 28 March 2023, and that copies were served as follows:

John K. Villa
Ryan Thomas Scarborough
Whitney D Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY
680 Maine Avenue SW
Washington, DC 20024
*Attorneys for Plaintiff*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Scott E Ortiz
WILLIAMS PORTER DAY & NEVILLE
159 North Wolcott, Suite 400
P O Box 10700
Casper, WY 82602
*Attorneys for Plaintiff*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Angela Tarasi
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
*Attorneys for Defendant Federal Reserve Bank of Kansas City*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

Joshua P. Chadwick, Senior Special Counsel
Yvonne F. Mizusawa, Senior Counsel
Yonatan Gelblum, Senior Counsel
Katherine Pomeroy, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C.  20551
*Attorneys for Defendant Federal Reserve Board of Governors*

☐ U.S. MAIL
☐ FED EX
☐ FAX
☐ HAND DELIVERED
☐ EMAIL
☑ E-FILE

       /s Shannon M. Ward
       OF HIRST APPLEGATE, LLP
       Attorneys for Defendant

**J.A.458**