Case No. 24-8024

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

### CUSTODIA BANK, INC.,

Appellant,

v.

### FEDERAL RESERVE BOARD OF GOVERNORS et al.,

Appellees.

On Appeal from the U. S. District Court for the District of Wyoming

The Honorable Scott W. Skavdahl, District Judge

District Court No. 1:22-CV-125-SWS

### JOINT APPENDIX

Joshua P. Chadwick
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street & Constitution Ave. NW
Washington, DC 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

Michelle S. Kallen
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com

*Counsel for Appellant*

Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street and Constitution Ave.
NW
Washington, DC 20551
(202) 263-4835
yvonne.f.mizusawa@frb.gov
yonatan.gelblum@frb.gov
katherine.pomeroy@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Andrew Z. Michaelson
KING & SPALDING LLP
1185 Ave. of the Americas, 34th Fl.
New York, NY 10036
(212) 556-2100
amichaelson@kslaw.com

Billie LM Addleman
Erin E. Berry
HIRST APPLEGATE, LLP
PO Box 1083
Cheyenne, WY 82003
(307) 632-0541
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Christine M. Carletta
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
ccarletta@kslaw.com
cfreeman@kslaw.com

Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE,
P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

*Counsel for Appellant*

Jared Lax
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
jlax@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

# TABLE OF CONTENTS

## Volume I of X

District Court Docket Report, *Custodia Bank Inc. v. Federal Reserve Board of Governors et al,* No. 1:22-cv-00125 (D. Wyo.) ...................................................................... J.A.1

Complaint (D. Wyo. June 7, 2022), ECF No. 1 ............................... J.A.41

Exhibit 1 to Complaint (D. Wyo. June 7, 2022), ECF No. 1-2 ......... J.A.86

Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 48 ................................................... J.A.88

Defendant Board of Governors of the Federal Reserve System's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 49 ............................................................... J.A.91

Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 50 ..... J.A.153

Defendant Federal Reserve Bank of Kansas City's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 51 ...... J.A.157

## Volume II of X

Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's Complaint (D. Wyo. Sept. 13, 2022) ECF No. 58 ............................................................ J.A.216

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss Complaint (D. Wyo. Oct. 4, 2022) ECF No. 96 ..................... J.A.269

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss (D. Wyo. Oct. 4, 2022) ECF No. 97 ........................................................... J.A.304

Plaintiff Custodia Bank, Inc.'s Notice of Submission of Supplemental Authority (D. Wyo. Oct. 12, 2022) ECF No. 98 ................................................................... J.A.340

Defendant Board of Governors of the Federal Reserve System's Response to Plaintiff's Notice and Submission of Supplemental Authority (D. Wyo. Oct. 19, 2022) ECF No. 99 ................................................................... J.A.353

Order Granting in Part and Denying in Part Defendants' 12(b)(6) Motions to Dismiss Complaint (D. Wyo. Nov. 11, 2022) ECF No. 102 ............................................. J.A.359

Joint Motion of Defendants Federal Reserve Bank of Kansas City and Federal Reserve Board of Governors to Dismiss the Complaint as Moot (D. Wyo. Jan. 27, 2023) ECF No. 116 ................................................................. J.A.397

First Amended Complaint (D. Wyo. Feb. 28, 2023) ECF No. 121 ................................................................. J.A.401

Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss First Amended Complaint (D. Wyo. Mar. 28, 2023) ECF No. 124 ............................................. J.A.438

## Volume III of X

Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss the First Amended Complaint (D. Wyo. Mar. 28, 2023) ECF No. 126 ............... J.A.459

Defendant Board of Governors of the Federal Reserve System's Memorandum of Points and Authorities in Support of Its Motion to Dismiss the First Amended Complaint (D. Wyo. Mar. 28, 2023) ECF No. 127 .............. J.A.462

Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint (D. Wyo. Apr. 11, 2023) ECF No. 135 ........................................ J.A.497

Brief of Amicus Curiae Former Senator Patrick J. Toomey in Support of Neither Party (D. Wyo. Apr. 20, 2023) ECF No. 151 .................................................................. J.A.537

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss First Amended Complaint (D. Wyo. May 2, 2023) ECF No. 159 .................. J.A.559

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss the Amended Complaint (D. Wyo. May 2, 2023) ECF No. 160 ............................................................... J.A.572

Order on Defendants' Motions to Dismiss First Amended Complaint (D. Wyo. June 8, 2023) ECF No. 164 ................. J.A.601

Defendant Federal Reserve Bank of Kansas City's Answer to Custodia's First Amended Complaint (D. Wyo. June 22, 2023) ECF No. 166 ............................................. J.A.617

Defendant Board of Governors of the Federal Reserve System's Notice of Lodging of the Administrative Record (D. Wyo. Aug. 21, 2023) ECF No. 178 ................................. J.A.641

Second Amended Scheduling Order (D. Wyo. Nov. 13, 2023) ECF No. 211 ....................................................... J.A.644

Order Granting Joint Motion and Stipulation to Align and Consolidate APA and Summary Judgment Briefing (D. Wyo. Nov. 28, 2023) ECF No. 220 ........................................ J.A.656

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 238 ............................................. J.A.657

Proposed Order (D. Wyo. Dec. 22, 2023) ECF No. 238-1 ............. J.A.660

**Volume IV of X**

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 239 ..................................................................... J.A.661

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 240 ..................................................................... J.A.725

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 240-1 ....................................... J.A.740

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 240-3 ............................................................... J.A.811

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 240-5 ..................................... J.A.858

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 240-9 ..................................................................... J.A.879

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 240-10 ....................................... J.A.881

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 240-11 ................................... J.A.912

## Volume V of X

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 240-15 ............................................................... J.A.919

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 240-26 ........................................... J.A.921

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 240-31 ................................................... J.A.971

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 240-37 ......... J.A.978

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 240-38 ................................................................... J.A.983

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 240-40 ......................................................... J.A.986

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 240-45 ................................................................... J.A.988

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 240-47 ...................................................J.A.1043

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 240-53 ....................J.A.1051

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 240-54 ...........J.A.1056

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 240-64 .........................................................................J.A.1058

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 240-65 ........................J.A.1061

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 240-67 ..................................................................J.A.1062

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 240-68 ..................................................................J.A.1065

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 240-69 ..........................................................................J.A.1068

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-71 ................................................................J.A.1071

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 240-75 ..................................................................J.A.1081

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 240-77 ..........................................................................J.A.1087

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-78 ................................................................J.A.1089

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 240-80 ......................................................J.A.1099

Exhibit CC, Email from Matthew Eichner with the subject line "Custodia response: S-Letter - 2667 with no concerns identified" (Jan. 26, 2023) ECF No. 240-81 .........J.A.1101

Exhibit CD, Letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors (Mar. 8, 2023) ECF No. 240-82 .........................J.A.1103

Exhibit CE, Email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George" (Jan. 27, 2023) ECF No. 240-83 ..................................................................................J.A.1117

Exhibit CF, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Jan. 27, 2022) ECF No. 240-84 ........J.A.1119

Order Granting Unopposed Motion to Amend the Scheduling Order (D. Wyo. Dec. 26, 2023) ECF No. 241 .......................J.A.1127

Amicus Curiae Brief of the State of Wyoming (D. Wy. Jan. 18, 2024) ECF No. 251 ...........................................................J.A.1129

## Volume VI of X

Amici Curiae Brief in Support of Plaintiff filed by Amicus Parties Blockchain Association, Payment System Scholars (D. Wy. Jan. 19, 2024) ECF No. 257 ...................J.A.1137

Amici Curiae Brief in Support of Plaintiff's Motion for Judgment as a Matter of Law filed by Amicus Parties United States House of Representatives Financial Services Committee Members, United States Senate Banking, Housing and Urban Affairs Committee Members (D. Wy. Jan. 19, 2024) ECF No. 259 ...................J.A.1173

Defendant Board of Governors of the Federal Reserve System's Opposition to Plaintiff's Petition for Administrative Procedure Act Review (D. Wyo. Jan. 26, 2024) ECF No. 271 ...........................................................J.A.1200

Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment (D. Wyo. Jan. 26, 2024) ECF No. 272 ..................................................................................J.A.1257

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 282 ...J.A.1260

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 283 ..........J.A.1318

Amicus Brief in Support of Defendants filed by Amicus David Zaring (D. Wy. Feb. 9, 2024) ECF No. 286 .......................J.A.1331

## Volume VII of X

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 299 .....................................................................J.A.1349

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 300 .....................................................................J.A.1402

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 300-7 ...............................J.A.1407

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 300-8 ....................................................J.A.1414

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 300-15 ..................................................J.A.1418

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 27, 2024) ECF No. 313 .....................................J.A.1423

Order on Dispositive Motions (D. Wyo. Mar. 29, 2024) ECF No. 317 ...............................................................................J.A.1449

Judgment (D. Wyo. Mar. 29, 2024) ECF No. 318 .......................J.A.1476

Plaintiff Custodia Bank, Inc.'s Notice of Appeal (D. Wyo. Apr. 26, 2024) ECF No. 321 ......................................................J.A.1477

## UNDER SEAL
## Volume VIII of X

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 233 ..........................................................J.A.1480

Proposed Order (D. Wyo. Dec. 20, 2023) ECF No. 233-1 .............J.A.1483

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 234 ..........................................................................................J.A.1484

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 236 ..........................................................................................J.A.1548

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 236-1 ..................................................................J.A.1563

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 236-3 .......................................................................J.A.1634

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 236-5 ......................................J.A.1681

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 236-9 .......................................................................J.A.1702

### Volume IX of X

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 236-10 ......................................J.A.1704

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 236-11 .................................J.A.1735

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 236-15 ...............................................................J.A.1742

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 236-26 ..........................................................J.A.1744

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 236-31 .................................J.A.1794

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 236-37 ........J.A.1801

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 236-38 ...............................................................J.A.1806

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 236-40 ......................................J.A.1809

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 236-45 ...................................................J.A.1811

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 236-47 ...................................................J.A.1866

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 236-53 .....................J.A.1874

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 236-54 ............J.A.1879

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 236-64 ........................................................................J.A.1881

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 236-65 .........................J.A.1884

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 236-67 ................................................................J.A.1893

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 236-68 ................................................................................J.A.1896

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 236-69 ........................................................................J.A.1899

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 236-71 ...................................................................J.A.1902

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 236-75 ...................................................................J.A.1912

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 236-77 ...........................................................................J.A.1918

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 236-78 ...................................................................J.A.1920

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 236-80 ......................................................J.A.1930

Exhibit CD, Letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors (Mar. 8, 2023) ECF No. 236-82 ........................J.A.1932

Exhibit CE, Email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George" (Jan. 27, 2023) ECF No. 236-83 ...................................................................J.A.1946

Exhibit CF, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Jan. 27, 2022) ECF No. 236-84 ........J.A.1948

## Volume X of X

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 273 ...........................................................................J.A.1956

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 274 .........J.A.2014

Errata to ECF No. 274 (D. Wyo. Feb. 2, 2024) ECF No. 277 ......J.A.2027

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024) ECF No. 295 ......................................................................J.A.2029

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024) ECF No. 296 ......................................................................J.A.2082

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 296-7 ...............................J.A.2087

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 296-8 ....................................................J.A.2094

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 296-15 ..................................................J.A.2098

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 23, 2024) ECF No. 310 .......................................J.A.2103

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Michelle S. Kallen
Michelle S. Kallen

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made and (2) any paper copies of this document submitted to the Court will be identical copies of the version electronically filed.

/s/ Michelle S. Kallen
Michelle S. Kallen

Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:          sortiz@wpdn net

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Number: 22-cv-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF CUSTODIA BANK, INC.'S OMNIBUS BRIEF IN SUPPORT OF ITS PETITION FOR
REVIEW ON ITS APA CLAIM AND ITS MOTION
FOR JUDGMENT AS A MATTER OF LAW ON ITS STATUTORY MANDAMUS CLAIM**

---

**J.A.661**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT ....................................................................4

PROCEDURAL POSTURE ................................................................................4

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW AND DECISION ....................6

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE.........................................6

    I.      Wyoming Developed a Novel SPDI Charter and Supervisory Framework in Close Conjunction with the Kansas City Fed. ....................................................6

    II.     As the OCC Approved the Authority of National Banks To Provide Cryptocurrency Custody Services, Incumbent Banks Announced Crypto-Related Banking Services. .....................................................................8

    III.    Custodia Was One of the First SPDIs To Apply for a Master Account. .................9

    IV.    The Kansas City Fed Tried To "Buy . . . Some Time" for the Board To Answer the Important Policy Questions Raised by Custodia's Master Account Application. ........................................................10

    V.     The Board Set Up the Nontraditional Account Access Workstream Structure To Assess Master Account Applications from Novel Banks. ...............12

    VI.    Following Custodia's Application, the Board Issued New Guidelines for the Assessment of Master Accounts. ........................................................13

    VII.   Custodia Applied for Membership to the Federal Reserve....................................15

    VIII.  The Board and Kansas City Fed Reviewed Custodia's Master Account and Membership Applications in Tandem and Determined That All Gaps Identified Were "Addressable." ............................................................16

    IX.    The Board Issued the S-2677 Letter ("S-Letter") To Instruct Reserve Banks on How To Implement the Account Access Guidelines. ...........................19

    X.     Pursuant to the S-Letter, the Reserve Banks and Board Staff Developed a Handbook To Implement the Account Access Guidelines ("Handbook"), Which Further Increased Board Control.............................................................20

**J.A.662**

XI.    Numerous Board Employees Participated in the Review of Custodia's Master Account Request. ...................................................................21

XII.    Unbeknownst to President George, Board Staff Edited the Kansas City Fed's Memorandum Recommending Denial of Custodia's Master Account Application. ...........................................................................23

XIII.   The January 27, 2023 Denial Decisions Were Coordinated. ...............................27

STANDARD OF REVIEW ........................................................................................30

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................31

ARGUMENT ...............................................................................................................33

I.     The Federal Reserve Lacked Discretion To Deny Custodia a Master Account. ...............................................................................................33

    A.    The Unambiguous Language of the Monetary Control Act of 1980 Controls. .................................................................................33

    B.    Defendants' Reliance on 12 U.S.C. § 342 Is Misplaced...........................36

    C.    Past Interpretations by the Board of Governors Support Custodia's Reading of the Monetary Control Act. .........................................38

    D.    Interpretations by Officials with the Regional Federal Reserve Banks also Support the Plain Meaning of the Monetary Control Act. ..........................................................................................39

    E.    The Legislative History of the Monetary Control Act Supports the Statute's Plain Meaning. .............................................................41

    F.    Two Courts of Appeals Have Viewed § 248a(c)(2) as Requiring Open Access.....................................................................................45

    G.    Academics Examining the Issue Support Custodia's Reading of the Statute. ......................................................................................46

II.    The Board Took Final Agency Action Against Custodia. ....................................49

III.   Discovery Has Revealed That the Board Inserted Itself into the Master Account Decision-Making Process.......................................................49

CONCLUSION............................................................................................................54

J.A.663

# TABLE OF AUTHORITIES

## CASES

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*, ---- F. Supp. 3d ---- 2023 WL 7111182 (S.D.N.Y. Oct. 27, 2023)................................................................45, 46

*Bank Stationers Ass'n, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 704 F.2d 1233 (11th Cir. 1983) .................................................................................................................................39

*Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250 (10th Cir. 2016)...............................................................................................................33–34, 34

*Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310 (10th Cir. 2007).........................................49

*Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223 (10th Cir. 2016) .....................................49

*Est. of Smith v. Heckler (In re Smith)*, 747 F.2d 583 (10th Cir. 1984) ..........................................31

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ......................................................34

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 154 F. Supp. 3d 1185 (D. Colo. 2016), *vacated*, 861 F.3d 1052 ......................................................................................33

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017) .................................................................................................................................... passim

*Gares v. Willingboro Township*, 90 F.3d 720 (3d Cir. 1996) .......................................................36

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38 (2d Cir. 1989)....................45

*Hernandez-Avalos v. INS*, 50 F.3d 842 (10th Cir. 1995).............................................................32

*In re Nat'l Nurses United*, 47 F.4th 746 (D.C. Cir. 2022) ............................................................31

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983)...........37, 45

*Karim v. Allen*, No. 21-cv-2861-WJM-KLM, 2023 WL 4624896 (D. Colo. July 19, 2023)..30, 31

*Lopez v. Davis*, 531 U.S. 230 (2001) ...........................................................................................34

*Marathon Oil Co. v. Lujan*, 937 F.2d 498 (10th Cir. 1991)..........................................................54

*McGraw v. Barnhart*, 450 F.3d 493 (10th Cir. 2006)...................................................................33

*Nat. Res. Def. Council v. Regan*, 67 F.4th 397 (D.C. Cir. 2023).............................................34–35

*Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520 (S.D.N.Y. 1983) .............................45

J.A.664

*Tista v. Jaddou*, 577 F. Supp. 3d 1219 (D.N.M. 2021)...................................................31

*Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087 (E.D.N.Y. 1986) ..............45

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ...........................................32, 49

*United States v. Wells Fargo & Co.*, 943 F.3d 588 (2d Cir. 2019)..................................................37

*Western Minnesota Municipal Power Agency v. Federal Energy Regulatory Commission*, 806 F.3d 588 (D.C. Cir. 2015).............................................................36

*WildEarth Guardians v. National Park Service*, 703 F.3d 1178, 1189 (10th Cir. 2013) ..36–37, 38

## STATUTES AND REGULATIONS

12 C.F.R. § 265.20 (2022) ...............................................................................10, 50

86 Fed. Reg. 25,865 (May 11, 2021) .........................................................................13

86 Fed. Reg. 25,865, 25,867–69 (May 11, 2021) .......................................................13

87 Fed. Reg. 51,099 (Aug. 19, 2022).....................................................................13, 14

101 Pa. Code § 15.142(c)............................................................................................36

5 U.S.C. § 704...............................................................................................................49

5 U.S.C. § 706(2)(C)......................................................................................................31

12 U.S.C. § 248(k).................................................................................................10, 50

12 U.S.C. § 248a.......................................................................................................6, 35

12 U.S.C. § 248a(b)(1)–(7)..........................................................................................34

12 U.S.C. § 248a(b)(8).................................................................................................34

12 U.S.C. § 248a(c)(2).............................................................................................34, 45

12 U.S.C. § 342.............................................................................................................44

12 U.S.C. § 461(b)(2)(A)..............................................................................................44

12 U.S.C. § 461(c)(1)(A)...............................................................................................37

12 U.S.C. § 632................................................................................................................4

12 U.S.C. § 5321(b)..................................................................................................10–11

12 U.S.C. § 5322(a)(1)...............................................................................................10–11

iv

**J.A.665**

28 U.S.C. § 1331 ...................................................................................................4

021-19 Wyo. Code R. § 19-4 ................................................................................7

Wyo. Stat. Ann. §§ 13-12-101–13-12-126 .....................................................6, 7

Wyo. Stat. Ann. § 13-12-103 ................................................................................8

Wyo. Stat. Ann. § 13-12-105 ................................................................................8

Wyo. Stat. Ann. § 13-12-119 ................................................................................8

Wyo. Stat. Ann. § 34-29-104 ................................................................................8

## OTHER AUTHORITIES

126 Cong. Rec. 6250 (1980) ...............................................................................44

126 Cong. Rec. 6897 (1980) ...............................................................................44

Anatoli Kuprianov, *The Monetary Control Act & the Role of the Fed. Rsrv. in the Interbank Clearing Market* (1985) .............................................................42

Bd. of Governors of the Fed. Rsrv. Sys., 2023–2025 FOMC Trading and External Communications Blackout Calendar, https://www.federalreserve.gov/monetarypolicy/files/fomc-blackout-period-calendar.pdf..........28

Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision of Financial Services: About*, https://www.federalreserve.gov/paymentsystems/pfs_about.htm ................................................39

Bd. of Governors of the Fed. Rsrv. Sys., FOMC Policy on External Communications of Federal Reserve System Staff (adopted June 22, 2011), https://www.federalreserve.gov/monetarypolicy/files/FOMC_ExtCommunicationStaff.pdf ......................................................................................................28–29

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the Federal Reserve Bank Services*, http://www.federalreserve.gov/paymentsystems/pfs_principles.htm ...........................................38

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (emphasis added) http://www.federalreserve.gov/paymentsystems/pfs_standards.htm.............................................39

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments System*, http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm ...............................39

v

**J.A.666**

Brian Deese, Arati Prabhakar, Cecilia Rouse, & Jake Sullivan, *The Administration's Roadmap To Mitigate Cryptocurrencies' Risks*, White House (Jan. 27, 2023), https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/ ................................................................27

Fed. Rsrv. Fin. Servs., Fed. Rsrv. Banks Operating Circular No. 1:  Account Relationships (2023), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf. ..............................................................9

*Federal Reserve Requirements:  Hearing on S. 353, and Proposed Amendments on S. 85, and H.R. 7 Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 96th Cong. 11 (1980) ........43

*Federal Reserve Requirements: Hearings on S. 353 and Proposed Amendments, S. 85, and H.R. 7 Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 96th Cong. Rec. 5 (1980) ............................................................................................................................41

Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 Bus. Law. 1333 (1984) ................46

Gordon H. Sellon, Jr., *The Instruments of Monetary Policy*, Economic Review 6 (1984), https://www.kansascityfed.org/documents/1281/1984-The%20Instruments%20of%20Monetary%20Policy.pdf ............................................................40

H.R. Rep. No. 95-1590 (1978) ...........................................................................................44

Julie A. Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, 109 Iowa L. Rev. 117 (2023) ..........................................................................................42, 47

Lawrence E. Filson & Sandra L. Strokoff, *The Legislative Drafter's Desk Reference* § 22.10 (2d ed. 2008) .......................................................................................................36

Lydia Beyoud, Allyson Versprille, & Katanga Johnson, *Federal Reserve Says It Won't Approve US Crypto Firm's Membership*, Bloomberg (Jan. 27, 2023, 11:01 AM), https://www.bloomberg.com/news/articles/2023-01-27/federal-reserve-signals-it-won-t-approve-crypto-firm-s-membership-application ............................................................27

Monetary Control Act of 1980, Pub. L. No. 96-221, § 103, 94 Stat. 132 (1980) .........................37

Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Its Order Denying the Application by Custodia Bank, Inc., To Be Supervised by the Federal Reserve (Mar. 24, 2023), https://www.federalreserve.gov/newsevents/pressreleases/orders20230324a.htm ................16, 29

Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Announces Denial of Application by Custodia Bank, Inc. To Become a Member of the Federal Reserve System (Jan. 27, 2023, 11:30 AM), https://www.federalreserve.gov/newsevents/pressreleases/orders20230127a.htm ................27–28

SR 20-16 Letter from Board of Governors of the Federal Reserve System, to the Officer in Charge of Supervision at Each Federal Reserve Bank (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm ........................................17

Staff of H. Subcomm. on Domestic Monetary Policy, H. Rep. No. 98-17 (Comm. Print 1984) ..................................................................................................................................47–48

Statement To Promote a Level Playing Field for All Banks with a Federal Supervisor, Regardless of Deposit Insurance Status (Jan. 27, 2023, 11:30 AM), https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230127a.htm.......................27

Statement, Board of Governors of the Federal Reserve System, Policy Statement on Section 9(13) of the Federal Reserve Act (Jan. 27, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230127a1.pdf ..............23

Thomas C. Baxter, Jr. & James H. Freis, Jr., *Fostering Competition in Financial Services: From Domestic Supervision to Global Standards*, 34 New Eng. L. Rev. 57 (1999)...............................................................................................................................46

Timothy K. Armstrong, *Chevron Deference and Agency Self-Interest*, 13 Cornell J.L. & Pub. Pol'y 203 (2004)..........................................................................................................46

William P. Statsky, Legislative Analysis and Drafting (2d ed. 1984)..........................................36

Wyo. Div. of Banking, Special Purpose Depository Institution Examination Manuals (2021), https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view.....................8

J.A.668

Plaintiff Custodia Bank, Inc. ("Custodia") respectfully submits this omnibus brief in support of its petition for review on its Administrative Procedure Act ("APA") claim and its motion for judgment as a matter of law on its Mandamus claim challenging Defendants' denial of its master account request. Custodia respectfully submits that Defendants' unlawful actions warrant relief under the APA as to Defendant Federal Reserve Board of Governors ("Board"), and warrant statutory mandamus with respect to Defendant Federal Reserve Bank of Kansas City ("Kansas City Fed") requiring the issuance of a master account to Custodia.

## INTRODUCTION

This case presents a David and Goliath story. The Federal Reserve is the nation's central bank and the most powerful financial institution in the world. Custodia is a small Wyoming-chartered Special Purpose Depository Institution ("SPDI"), deemed a "novel bank" by the Federal Reserve because its business plans involve both traditional and digital asset services. Custodia follows in a long line of state-chartered financial institutions that have brought innovation to America's dual banking system.

A master account is a straight-forward affair. It is the key to banking services that the Monetary Control Act of 1980 guaranteed to all eligible depository institutions such as Custodia, not just to banks that are members of the Federal Reserve System. When Custodia applied for a master account with the Kansas City Fed in October 2020, it hardly expected that the one-page application for the master account, which advised that action on the application might take 5–7 business days, would be purposefully deferred by the Reserve Bank, at the request of the Board, to buy some time for the Board to consider how to deal with the application. Wyoming officials had literally spent years revising the SPDI charter legislation, rules, and supervisory program based on input from Kansas City Fed officials. After nearly two years of fruitless waiting, Custodia brought a lawsuit to compel a decision.

1

The Board, however, contrived a plan to ensure that Reserve Banks reach Board-desired outcomes on all master account decisions.  After Custodia filed its lawsuit, the Board issued three documents—the Guidelines, the S-Letter, and the Handbook[1]—largely aimed at Custodia and other "novel" banks; they set the bar so high for so-called Tier 3 depository institutions like Custodia that, realistically, a master account was almost certain to be denied to this category of state-chartered banks.  The Board euphemistically mandated "consultation" by the Reserve Banks with the Board, moving ultimate control of the master account decision-making process to the Board and requiring Reserve Banks to give the Board a last look at the end of the process.

Contrary to the Monetary Control Act's promise of access to Federal Reserve services for members and non-members alike, the Guidelines discriminated against state-chartered banks like Custodia that did not have a federal regulator (*e.g.*, FDIC or Federal Reserve), shunting them into a dead-end, Tier 3 status that disadvantaged state-chartered banks relative to their federally chartered peers.  The Board inserted itself into the review of Custodia's master account request every step of the way.  More than one dozen Board staff participated in the review and denial of Custodia's master account request.  At least another ten were involved in broader account access policies pertaining to SPDIs like Custodia, including Board-controlled working groups that drafted the Handbook governing Reserve Bank consideration of master accounts.

The Board's General Counsel encouraged Custodia to apply for membership to escape Tier 3 status, and Custodia followed his lead.  This, too, proved to be a ploy to derail Custodia's master account application.  The Board then maneuvered so that Custodia's Federal Reserve membership application and master account application would be linked and considered in

---

[1] These terms are defined in the Statement of Material Facts Not in Dispute below.  *See infra* paragraphs 19, 34 (and accompanying header), 38 (same).

J.A.670

tandem; denial of one (membership) would mean denial of the other (master account).  The Board indisputably decided membership.  It misled Custodia about the membership examination, promising that it would be a targeted exam based on Custodia's Day 1 activities, as is typical for a *de novo* bank still being constructed, only to judge Custodia against the standard of a fully operating "complex bank."  It then invited Custodia to remediate gaps and promised, in writing, to consider that evidence in a follow-up examination, only to refuse to consider Custodia's remedial measures as a prelude to denial.  When Custodia exercised its statutory right to request reconsideration and submitted a revised business plan that addressed issues newly raised by the Board and Reserve Bank in the denial letters, its proposal was never considered.

If any question remained, the choreographed events on January 27, 2023—press leaks, membership denial, White House and Board anti-crypto statements, master account denial, and motions to dismiss—answer it definitively.  This was no coincidence.  The behind-the-scenes plotting does not reflect well on the Board, especially since in this (and other) litigation, the Board has claimed that it has nothing to do with master account decision-making, and that this authority rests exclusively with Reserve Banks.

The Board also, throughout the administrative process, ignored the relevant law.  Under the Monetary Control Act, the Federal Reserve had no discretion to deny a master account to Custodia.  This legal conclusion is not only supported by the plain language of the statute, but by repeated interpretations by the Board and Reserve Banks, the legislative history of the Monetary Control Act, the longstanding interpretation of this statute by other courts and academics, and the Board's admission in this case that it took ***final agency action*** that affected Custodia's rights. Finally, the fruits of discovery in this case demonstrate that, as Judge Bacharach concluded in

3

*Fourth Corner*,[2] the discretion argument put forward by Defendants is a litigation position only—wholly unsubstantiated by the facts, relevant law, or Federal Reserve history and precedent.

## JURISDICTIONAL STATEMENT

This Court has subject matter jurisdiction pursuant to 12 U.S.C. § 632, and 28 U.S.C. § 1331.  Under Section 632, "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits."  Under Section 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

## PROCEDURAL POSTURE

After waiting nearly 20 months for a decision on a master account request that typically takes 5–7 days, Custodia filed this lawsuit on June 7, 2022.  (ECF No. 1, Compl.)  Custodia alleged that agency action had been unlawfully withheld and unreasonably delayed in violation of the APA and in contravention of its statutory rights.  (*Id.*)  On August 16, 2022, Defendants filed motions to dismiss.  (ECF Nos. 48, 50.)  One of their primary defenses was that the Board could not be sued because, while the Board was an agency for APA purposes, the authority for deciding master account applications rested solely with the Reserve Bank.  (ECF No. 49, at 17.)  The Kansas City Fed, in turn, asserted that while it has responsibility for deciding master account applications, it could not be sued because it was a federal instrumentality, not an agency of the United States.  (ECF No. 51, at 13–15.)  Both Defendants argued that, in any event, Section 342

---

[2] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1064–80 (10th Cir. 2017) (Op. of Bacharach, J.).

of the Federal Reserve Act gave them complete discretion to grant or deny master accounts. (ECF No. 49, at 17–26; ECF No. 51, at 20–29.)  The Court granted in part and denied in part Defendants' motions, allowing the case to proceed to discovery on a subset of APA, mandamus, and Due Process claims.  (ECF No. 102.)

On January 27, 2023, less than two weeks before the deadline for the Board to produce the Administrative Record, the Board denied Custodia's membership application and the Kansas City Fed communicated a denial of Custodia's master account application.  These actions were part of an orchestrated series of events discussed in greater detail below.  Custodia promptly amended its complaint to bring an APA claim against the Board, and statutory mandamus claims against both Defendants.  (ECF No. 121, Am. Compl. ¶¶ 77–94.)  Both Defendants again moved to dismiss, making many of the same arguments as in their first motions to dismiss, (ECF Nos. 124, 126.), and the Court again granted in part and denied in part the motions, allowing the APA claim to proceed against the Board and the statutory mandamus claim to proceed against the Kansas City Fed.  (ECF No. 164.)

The Board filed its Administrative Record on August 21, 2023 (ECF No. 178.), and the Kansas City Fed and Custodia engaged in discovery.  Custodia informed the Board that it intended to contest the contents of the Administrative Record given the evidence that had come to light in the Kansas City Fed's production and the testimony of its witnesses.  To resolve that dispute, the parties stipulated and the Court approved that all evidence between Custodia, the Kansas City Fed, and the Board's Administrative Record "may be relied upon by all parties and any court hearing this case, including in any appeal involving agency record review."  (ECF No. 219, ¶ 3.)  The parties further agreed that Custodia would file a single, omnibus brief addressing its claims against both Defendants.  Although the scheduling order does not require dispositive

J.A.673

motions to be filed until January 19, 2024, discovery has closed[3] and the uncontested record firmly establishes Custodia's right to relief, without need for trial.

### STATEMENT OF THE ISSUES PRESENTED FOR REVIEW AND DECISION

In this case, Defendants argue that individual Federal Reserve Banks, and not the Board, exercise unreviewable discretion over applications for master accounts. The Board claims, accordingly, that it cannot be sued for actions it did not take; and the Kansas City Fed argues that it cannot be sued under the APA. The Court ordered discovery to determine the role each Defendant played in the denial of Custodia's master account application. The Court left resolution of the statutory issues presented by the case for the period after discovery closed.

The issues presented for the Court's review are the following:

1.  Does the record demonstrate that the Board inserted itself into the process for deciding Custodia's application for a master account?

2.  Does 12 U.S.C. § 248a, as amended by the Monetary Control Act of 1980, deprive Defendants of discretion to deny Custodia's master account application?

### STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**I.    Wyoming Developed a Novel SPDI Charter and Supervisory Framework in Close Conjunction with the Kansas City Fed.**

1.    The dual-banking system permits depository institutions to be chartered by either federal or state banking authorities. Ex. A (Conti-Brown Expert Report) ¶ 11.

2.    In 2019, the State of Wyoming enacted a banking charter for SPDIs to facilitate banking with digital assets. *See* Wyo. Stat. Ann. §§ 13-12-101–13-12-126. The SPDI statute requires a conservative business plan, as unlike traditional banks, SPDIs are prohibited from making loans with customer deposits and must back all customer deposits with 100% cash on

---

[3] The parties agreed to allow the deposition of Custodia's hybrid fact/expert witness, Katie Cox, to occur on December 19–20 to accommodate scheduling issues.

hand or high-quality liquid assets.  Wyo. Stat. Ann. §§ 13-12-103, 13-12-105.  SPDIs hold

customer deposits in U.S. dollars (or similar "highly liquid" non-volatile "[i]nvestments," such

as "obligations of the United States treasury or other federal agency obligations")—not digital

assets—as SPDIs hold digital assets separately in trust.  *Id.* §§ 13-12-105, 34-29-104; 021-19

Wyo. Code R. § 19-4.  Additionally, because SPDIs must hold reserves covering 100% of U.S.

dollars that clients have deposited in bank accounts, if all customers seek to withdraw funds from

their accounts simultaneously, the bank has the cash on hand to cover all withdrawals.  *See* Wyo.

Stat. Ann. §§ 13-12-101–13-12-126.

      3.     The innovative SPDI statute was the result of two years of thoughtful planning.

Wyoming worked hand-in-hand with the Kansas City Fed to develop the SPDI legislation,

conducting approximately 100 meetings with staff from the Kansas City Fed and the Board

between 2017 and 2019.  *See* Ex. B, at FRBKC-00015090 (Wall Street Journal piece); Ex. C

(KC Fed 30(b)(6) Tr.), at 20:9–19; Ex. D (the Kansas City Fed "has been meeting with [the

Division of Banking] on a weekly basis to discuss a variety of topics related to the SPDI

charters."); Ex. E (Humston Tr.), at 24:17–25:7.  The Kansas City Fed asked Wyoming

legislators to remove a provision from its draft legislation that authorized the Wyoming Attorney

General to sue if a SPDI were denied a master account with the Federal Reserve.  *See* Ex. F, at

23 (Draft SPDI legislation with Attorney General provision); Ex. G (Kansas City Fed talking

points requesting removal of this provision).  Wyoming agreed to that request after Reserve

Bank officials assured state representatives that such a provision was unnecessary.  *See* Ex. C

(KC Fed 30(b)(6) Tr.), at 59:5–15, 61:14–62:9; *see also* Ex. H (Kansas City Fed email regarding

removal of this provision).

4.      Wyoming also agreed to the Reserve Bank's request to remove references to Section 248a of the Monetary Control Act, the provision under review here.  Ex. C (KC Fed 30(b)(6) Tr.), at 57:21–58:12; Ex. G.  Contrary to its current litigation posture, the Kansas City Fed displayed concern about Section 248a from the beginning.  The removal of both the Attorney General and Section 248a references in Wyoming's draft statute had no substantive impact on the eligibility of SPDIs to access Federal Reserve services.  *See, e.g.*, Ex. I (letter confirming eligibility).  Esther George, President of the Kansas City Fed, understood that a "big goal of a SPDI-chartered depository institution [was] to be able to get a master account and access Fed services."  Ex. J (George Tr.), at 24:16–20.

5.      Wyoming SPDIs are regulated by the Wyoming Division of Banking, Wyo. Stat. Ann. § 13-12-119, which developed a robust, 772-page supervisory examination manual, Wyo. Div. of Banking, Special Purpose Depository Institution Examination Manuals (2021), https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view.  President George has deep respect for the Wyoming Division of Banking, and her staff expressed favorable views toward the SPDI framework.  *See, e.g.*, Ex. J (George Tr.), at 28:14–20, 282:6–11 ("I believe [the Division of Banking] would have been willing to share information."); Ex. K (Nugent Tr.), at 36:18–38:6, 62:20–63:4 (Wyoming "took a thoughtful approach to developing the [SPDI] framework."); Ex. E (Humston Tr.), at 25:16–28:5.

## II.     As the OCC Approved the Authority of National Banks To Provide Cryptocurrency Custody Services, Incumbent Banks Announced Crypto-Related Banking Services.

6.      On July 22, 2020, the Office of the Comptroller of the Currency ("OCC") advised that "a national bank may provide . . . cryptocurrency custody services on behalf of customers."  Ex. L, at 1 (Interpretive Letter No. 1170).  This OCC guidance, as well as the testimony of witnesses in this case, confirm there is nothing illegal about state-chartered depository

institutions providing banking services related to digital assets.  *See, e.g.*, Ex. J (George Tr.), at 43:16–44:2 (acknowledging that the OCC has determined that it is legally permissible for its banks to hold digital assets in a custodial relationship), 46:4–12 (same); Ex. E (Humston Tr.), at 18:1–15.

7.     In light of this guidance, large incumbent banks have started providing digital asset-related banking services to their customers.  *See, e.g.*, Ex. E (Humston Tr.), at 16:5–8; Ex. J (George Tr.), at 44:13–23; *see also id.* at 171:7–13 (acknowledging that "if you were a member bank you could start engaging in crypto-related asset activity and all you had to do was give notice to your supervisor").  State-chartered banks are permitted to engage in the same activities as national banks.  Ex. E (Humston Tr.), at 12:13–19.  Discovery revealed that, when drafting the Custodia master account denial, Kansas City Fed staff used materials sent to it by the lobbying group for the largest incumbent banks in the U.S., which mischaracterized Wyoming's digital asset laws.  *See, e.g.*, Ex. M, at 2 (Kansas City Fed officials sharing a piece by the Bank Policy Institute called "Beware the Kraken").

III.     **Custodia Was One of the First SPDIs To Apply for a Master Account.**

8.     On October 29, 2020, Plaintiff Custodia Bank, Inc. ("Custodia," formerly known as "Avanti") was one of the first SPDIs to apply for a master account with the Federal Reserve. (ECF No. 1, Ex. 1 to Compl.)  (Custodia's application); Ex. E (Humston Tr.), at 39:5–8.  A master account is required for a bank to directly access the Federal Reserve's services for executing debit and credit entries between institutions, clearing checks, transferring securities, and cashing savings bonds.  *See* Fed. Rsrv. Fin. Servs., Fed. Rsrv. Banks Operating Circular No. 1:  Account Relationships §§ 2.3, 2.9, 4.1–3, 5.3 (2023), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf.

9.      Without a master account, the only way to access the Federal Reserve's payment system is indirectly, through a "middleman" correspondent bank or a correspondent-like relationship.  Ex. N (Hazen Tr.), at 53:15–25; Ex. C (KC Fed 30(b)(6) Tr.), at 53:11–54:16.  Doing so imposes additional costs and counterparty credit risk, injects settlement risk given the inability to ensure simultaneous settlements, and exposes institutions to existential risks if the correspondent bank terminates the relationship.  Ex. C (KC Fed 30(b)(6) Tr.), at 54:17–55:22.

10.     When Custodia applied for a master account, the one-page application stated that processing time may take 5–7 business days.  (ECF No. 1, Ex. 1 to Compl.)  Master account decisions tend to occur quickly, usually within a week or two, but no more than a couple of months.  Ex. E (Humston Tr.), at 191:2–7; Ex. J (George Tr.), at 101:8–14.

11.     Upon its initial review of Custodia's application, a senior official at the Kansas City Fed told Custodia in January 2021 that there were "no showstoppers."  Ex. J (George Tr.), at 60:21–62:7; Ex. O.

**IV.    The Kansas City Fed Tried To "Buy . . . Some Time" for the Board To Answer the Important Policy Questions Raised by Custodia's Master Account Application.**

12.     Contrary to the "no showstoppers" communication to Custodia, Kansas City Fed officials realized the Reserve Bank had no discretion to answer the "unprecedented" policy questions raised by Custodia's application.  *See infra* paragraph 14.  While Congress has authorized the Board to delegate certain responsibilities to Reserve Banks, the Board may not delegate functions that raise "significant legal, supervisory, or policy issues."  12 C.F.R. § 265.20 (2022) (excepting from powers that could be delegated to Reserve Banks).  Nor may the Board delegate functions "pertaining principally to monetary and credit policies" or financial stability, which are two of the six principles enumerated in the Guidelines.  *See* 12 U.S.C. § 248(k); *infra* paragraph 18; *see also* 12 U.S.C. §§ 5321(b), 5322(a)(1) (the purpose of the

10

Financial Stability Oversight Council—on which the Board, and not the Reserve Banks, holds a seat—is to, in part, "identify risks to the financial stability of the United States" and "respond to emerging threats to the stability of the United States financial system").

13. At his nomination hearing in January 2022, Fed Chairman Jerome Powell publicly acknowledged the policy issues raised by Custodia's application and their consideration by the Board, testifying that SPDIs were "novel charters" that are "hugely precedential," and thus "we" (as in, the Board) "are looking carefully at it.  I do think we will make some progress on this . . . ."  Ex. P, at 39.

14. Numerous statements made and actions taken by Kansas City Fed officials demonstrate that the Reserve Bank looked to the Board to answer these policy questions, confirming Chairman Powell's testimony and the Board's role here.  *See, e.g.*, Ex. Q, at FRBKC-00017834 (President George's March 2021 notes reflecting that "[Board Vice-Chair] Lael [Brainard] feels we don't have authority to say no to request.  I pushed back and argued we need broader policy issue addressed."); Ex. R, at FRBKC-00009848 (March 24, 2022, meeting where President George told Custodia that SPDIs "require us to engage broadly with the Board" and that "[w]e want any decision we make to align with public policy pronouncements."); Ex. S (November 5, 2020, email stating, "Due to the unique nature of SPDIs and the broader impacts this decision may have, we are working with our colleagues across the System and at the Board to understand their viewpoints on the matter."); Ex. T, at FRB-AR-003858 (August 2, 2021, letter from Kansas City Fed General Counsel Craig Zahnd stating that "[w]e are working closely with the [Board] as we continue to evaluate the novel risks and opportunities presented by digital assets and the SPDI charter."); Ex. E (Humston Tr.), at 331:12–332:11 (Senior Kansas City Fed

official testifying that "[f]rom very early . . . since the formation of the SPDI charters, we had

felt" that SPDIs were "precedent setting" and "first of its kind.").

       15.    Indeed, as early as December 2020, the Kansas City Fed began orchestrating

delays in evaluating Custodia's master account application to "***buy . . . some time***" while internal

conversations with the Board were "getting geared up." Ex. U (emphasis added). Internal

communications among Reserve Bank staff at this time provide some explanation: they were

"uncomfortable" about "mak[ing] it up as we go with crypto," "hard pressed to find anyone

that's comfortable in this murky water," did not "feel confident in this area," and wished that

Custodia would "go away." Ex. V, at FRBKC-00002560; Ex. W, at FRBKC-00014058. This

approach is consistent with President George's testimony: that the Kansas City Fed would not

make a "risk assessment" until sufficient feedback had been provided by the Board. *See* Ex. J

(George Tr.), at 50:14–51:16.

## V.    The Board Set Up the Nontraditional Account Access Workstream Structure To Assess Master Account Applications from Novel Banks.

      16.    While Custodia's master account application languished at the Kansas City Fed,

the Board set up a "Nontraditional Account Access Workstream Structure" (the "NTAA

Workstream") to assess master account applications from banks it deemed novel. *See* Ex. X; Ex.

Y. Created in November 2020, this group was led by a Board-dominated Steering Committee

and contained two sub-groups, a Policy Workstream and a Practical Workstream, which were

staffed largely by Board employees. Ex. Y; Ex. C (KC Fed 30(b)(6)), at Tr. 144:5–18, 157:3–10,

159:10–161:1.

      17.    The Board created the NTAA Workstream in direct response to the increasing

number of requests for master account access from novel depository institutions like Custodia

and the Board's need to provide "policy guidance and practical coordination to support Reserve

Bank account decisions that are prudent, consistent, and timely"; the Workstream proved heavily influential in Reserve Bank decision-making concerning non-traditional banks like SPDIs.  Ex. Y, at FRBKC-00004902; *see* Ex. X; Ex. C (KC Fed 30(b)(6)), at Tr. 277:2–16, 356:12–357:3.

## VI.    Following Custodia's Application, the Board Issued New Guidelines for the Assessment of Master Accounts.

18.    At the time that Custodia applied for a master account, the Board had never issued any public guidelines for the assessment of master accounts, *see* Ex. Z (Katie S. Cox Expert Report) ¶ 61, and the Kansas City Fed had denied a master account on only one occasion (Fourth Corner Credit Union, largely on the grounds that it would engage in illegal activity), *see* Ex. J (George Tr.), at 41:9–42:16.  But suddenly, months after Custodia's application, the Board published for public comment its Proposed Guidelines for Evaluating Account and Services Requests.  *See* 86 Fed. Reg. 25,865 (May 11, 2021).  These proposed guidelines set out six principles for evaluating master account applicants,[4] most of which were non-delegable policy matters that statutes require the Board, and not Reserve Banks, to decide (*e.g.*, legal eligibility, financial stability, monetary policy).  *Id.*; *see supra* paragraph 12.

19.    The Board finalized the proposed guidelines on August 15, 2022 ("Guidelines" or "Account Access Guidelines").  *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 19, 2022).  The Board justified its issuance of the Guidelines due to

---

[4] These six principles include:  (1) Legal eligibility; (2) Risk to Reserve Banks (granting a master account should not present  undue credit, operational, settlement, cyber or other risks to the Reserve Bank); (3) Risk to the overall payment system; (4) Risk to the U.S. financial system; (5) Risk of facilitating illicit activity such as money laundering, terrorism financing, fraud, cybercrimes, or other illicit activity; and (6) Risk of adverse effects on monetary policy. Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865, 25,867–69 (May 11, 2021).

"a recent uptick in novel charter types being authorized or considered by federal and state banking authorities across the country." *Id.*

20.     The Guidelines introduced a three-tiered approach for classifying banks. Tier 1 institutions are eligible institutions that are federally insured through the Federal Deposit Insurance Corporation (FDIC). *Id.* at 51,109. Tier 2 institutions are not federally insured but are subject to prudential supervision by a federal banking agency, such as via membership in the Federal Reserve. *Id.* at 51,109–10. Tier 3 institutions are those like Custodia that are not federally insured and are not supervised by a federal agency. *Id.* at 51,110. Reserve Banks can grant Tier 1 institutions master accounts via a streamlined process without much scrutiny. *Id.* at 51,109. By contrast, "institutions in a higher tier will on average face greater due diligence and scrutiny than institutions in a lower tier," *i.e.*, "Tier 3 institutions will generally receive the strictest level of review," including mandatory consultations with the Board. *Id.* at 51,109–10.

21.     In internal discussions, Kansas City Fed staff acknowledged that Tier 3 was a dead end. *See, e.g.*, Ex. AA, at FRBKC-00004944 (March 14, 2022, Teams Chat acknowledging that "[e]ntities falling into Tier 3 will have a high bar to cross to get an account" and that the wording suggested "that approval isn't anticipated if Tier 3 route is taken."); Ex. AB, at FRBKC-00013860 (Kansas City Fed staffer's September 2022 notes reading, "Frame up as 'No' for Tier 3."), FRBKC-00013879 (same staffer's notes from March 2022 referring to a meeting with Custodia that says "Not finding path for you under Tier 3"); *see also* Ex. AC, at FRBKC-00013973 (Notes from Kansas City Fed official Tara Humston indicating, "Matt [Eichner from the Board] thought guidelines gives us all we need to say no.").

22.     Custodia's application was part of the impetus for the Guidelines. *See* Ex. Q, at FRBKC-00017835 (President George's notes: "3-9-21 Jeff Walker [Payments Policy Board

staff]—***Board of Gov work on SPDI targeting late April to release FRN [Federal Register Notice]***. Is this an issue for Congress?  Ultimately yes.  Our grant of access will be global signal of support for crypto."  (emphasis added)); Ex. AD (November 4, 2021, observation by President George's deputy that "[t]he timeline is probably technically accurate" in response to remarks by Custodia's CEO, Caitlin Long, that the "Fed then decided to hit them 'out of left field' with the proposed account access guidelines.").

23.    The Board's issuance of the Guidelines served as another mechanism to delay a decision on Custodia's master account.  On August 2, 2021, the Kansas City Fed's General Counsel, Craig Zahnd, wrote to Custodia's CEO that the Federal Reserve "anticipate[s] that a final decision on your application will be made ***pursuant to the guidelines and legal interpretation the Board may provide*** and it would be inappropriate for us to issue a decision before this work has progressed further."  Ex. T, at FRB-AR-003858 (emphasis added).

## VII.    Custodia Applied for Membership to the Federal Reserve.

24.    In May 2021, the Board's General Counsel, Mark Van Der Weide, urged Custodia to apply for membership in the Federal Reserve system as a way to become federally regulated and ease its path to a master account.  Ex. AE (Long Tr.), at 222:21–223:22.  Although Custodia was still building the bank and not yet operating, he noted that Federal Reserve guidance permits it to admit pre-operating banks to membership.  *Id.* at 287:13–288:8.

25.    Custodia filed an application for membership in August 2021.  Ex. AF.  If granted, membership would have subjected Custodia to Federal Reserve supervision on top of its existing supervision from Wyoming.  Upon hearing that Custodia had applied for membership, Mr. Van Der Weide reacted positively.  *Id.*

26.    On October 21, 2022, the Kansas City Fed told Custodia that if Custodia were granted membership, Custodia would qualify for Tier 2 status; without membership, Custodia

would remain Tier 3.  Ex. AG, at FRBKC-00000297.  Because of the importance of the Board's

membership decision to the assessment of Custodia's master account application under the

Guidelines, the Kansas City Fed could not conclude its analysis of Custodia's master account

application until the Board decided Custodia's membership application.  Ex. N (Hazen Tr.), at

245:20–246:12.

**VIII.      The Board and Kansas City Fed Reviewed Custodia's Master Account and Membership Applications in Tandem and Determined That All Gaps Identified Were "Addressable."**

27.      Kansas City Fed staff were charged, together with Board staff, with evaluating

Custodia's membership application and its master account application in tandem.  Ex. AH (May-

Oder (Vol. I) Tr.), at 269:14–271:14; Ex. AI (Mullins Tr.), at 125:13–127:4, 204:1–8; *see id.* at

50:6–52:15.  Work that was done on the membership application was leveraged for the master

account review, and vice versa.  Ex. AH (May-Oder (Vol. I) Tr.), at 277:14–22; Ex. AJ (Crouch

Tr.), at 116:3–15; Ex. AI (Mullins Tr.), at 60:20–61:7, 103:19–104:6, 125:13–126:4; Ex. AK

(August 19, 2022, letter from the Kansas City Fed explaining that "Information obtained" would

be used to inform both the membership and master account applications.).

28.      The Board was the decisionmaker for Custodia's membership application.  *See,*

*e.g.*, Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Its

Order Denying the Application by Custodia Bank, Inc., To Be Supervised by the Federal

Reserve (Mar. 24, 2023),

https://www.federalreserve.gov/newsevents/pressreleases/orders20230324a.htm.  But the Board

used Kansas City Fed staff to conduct the examination.  Ex. AJ (Crouch Tr.), at 18:10–20, 19:2–

5.  In assessing Custodia's master account request, Kansas City Fed staff were careful not to

contradict the Board's analysis on membership.  As one Kansas City Fed staffer put it, "I've

been asked to . . . make sure that we are ***not getting out of sync*** with the membership side.  We

do not want to contradict one another." Ex. AL, at FRBKC-2133 (emphasis added); *see also* Ex. AH (May-Oder Tr. (Vol. I)), at 300:13–301:20 ("[W]e wanted to make sure that our analysis of those reviews [for the membership and master account] were consistent.").

29.     Because each review leveraged information from the other, there was substantial "overlap" in the master account and membership reviews. Ex. AM, at FRBKC-00002200–01 (May 10, 2022, email stating that "there is a lot of overlap" between the membership and master account reviews.); Ex. AH (May-Oder Tr. (Vol. I)), at 277:14–22 ("there was a lot of overlap"); *see also* Ex. AN (review "[f]eed[s] into membership and Master Account applications").

30.     The Board then used Custodia's decision to apply for membership at the Board's behest against it, subjecting Custodia to unparalleled scrutiny for a *de novo* institution in contravention of the Board's public, written guidance. *See, e.g.*, SR 20-16 Letter from Board of Governors of the Federal Reserve System, to the Officer in Charge of Supervision at Each Federal Reserve Bank (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm (describing initial examinations of *de novo* institutions as "targeted in scope"). Before the pre-membership examination began, Custodia was told that it would only be examined on its Day 1 activities, and future products would be assessed in subsequent examinations. Ex. AK, at FRBKC-00009860 (August 19, 2022, letter from the Kansas City Fed). But the Kansas City Fed moved the goalposts during the examination, instead assessing Custodia's potential "future products and services," in addition to the products Custodia proposed for its initial phase of operations. Ex. AJ (Crouch Tr.), at 208:25–209:22. Moreover, mid-exam the Kansas City Fed determined that Custodia would be held to the standard of a "complex bank" (a bank of at least $10–50 billion in assets), even though Custodia had not yet opened. *See* Ex. AO.

17

31.     In an October 21, 2022, letter to Custodia summarizing the results of the examination, the Kansas City Fed found "numerous exceptions to, or departures from, safe and sound banking practices."  Ex. AP, at FRBKC-00014758.  Most of these gaps were attributable to the fact that the Kansas City Fed (under the Board's direction) converted the examination, midstream, to one that would be applied to a complex bank while also examining its three-year product roadmap—not the Day 1 activities that the Kansas City Fed told Custodia it would be reviewing.  Ex. AK.

32.     Despite this onerous and unprecedented scrutiny, staff from the Kansas City Fed told Custodia during the follow-up exit meeting that "***everything can be addressed over time***."  Ex. AQ, at 5 (emphasis added); Ex. AJ (Crouch Tr.), at 162:3–9, 164:12–18 (lead examiner testifying that all of the gaps identified in this exam "could be addressed" by Custodia).  The Kansas City Fed invited Custodia to "provide a comprehensive written response to the Reserve Bank describing all corrective actions taken or planned," committed in writing to provide feedback, and promised there would be a follow-up exam (as is customary).  Ex. AP, at FRBKC-00014763; *see also* Ex. Z (Katie S. Cox Expert Report) ¶ 43 ("it is customary for the Federal Reserve to conduct at least one follow-up examination").

33.     In December 2022, Custodia had already remediated the vast majority of the gaps identified during the examination and promptly submitted evidence documenting its efforts, as well as a plan to remediate the rest.  *See* Ex. AR, at Custodia-00007002.  But the Kansas City Fed reneged on its written promise to review this evidence as part of a follow-up examination; neither the Board nor the Reserve Bank considered the updated materials in their assessment of Custodia's application for a master account or membership.  Ex. C (KC Fed 30(b)(6) Tr.), at 215:19–219:10.

18

J.A.686

**IX.    The Board Issued the S-2677 Letter ("S-Letter") To Instruct Reserve Banks on How To Implement the Account Access Guidelines.**

34.    The Board took additional, behind-the-scenes actions to ensure that it controlled the decision on Custodia's master account application.  The Board drafted an "S-Letter," non-public guidance for Reserve Banks on implementing the Account Access Guidelines, which further cemented the Board's control over the master account review process.  *See generally* Ex. AS.

35.    S-Letters are exceedingly rare.  Prior to the S-Letter referenced here, neither Esther George nor her deputy Tara Humston had ever seen one during their long careers at the Kansas City Fed.  Ex. J (George Tr.), at 240:25–241:4 (could not recall another S-letter in the last 20 years); Ex. E (Humston Tr.), at 9:10–15, 221:15–22 (could not recall another S-letter in her 25-year career).

36.    The S-Letter, which was finalized on January 17, 2023, but circulated in draft form a year earlier, drew objection from President George.  *See, e.g.*, Ex. J (George Tr.), at 85:9–19 ("I had concerns of whether the S letter was necessary."); Ex. AT, at FRBKC-00011221 (February 9, 2022, Teams Chat noting that George "had concerns about that piece [the S-Letter] specifically").  Understanding her objection had been overruled by the Board, President George recognized that the S-Letter could not be ignored, *see* Ex. J (George Tr.), at 86:3–10, and that, as Board guidance, it supplanted Reserve Bank procedures and policies, requiring for the first time that Reserve Banks provide "predecisional" drafts to the Board for its review, *id.* at 88:10–24.

37.    The S-Letter requires Reserve Banks to notify the Board when a Tier 2 or Tier 3 institution applies for a master account and to consult directly with the Board's Director of Reserve Bank Operations and Payment Services ("RBOPS") prior to communicating a decision on a Tier 2 or 3 institution's master account.  Ex. AS, at FRB-AR-000016.

19

X.      **Pursuant to the S-Letter, the Reserve Banks and Board Staff Developed a Handbook To Implement the Account Access Guidelines ("Handbook"), Which Further Increased Board Control.**

38.      The S-Letter also required the development of a Board-approved handbook ("Handbook") instructing Reserve Banks how to implement the Account Access Guidelines.  Ex. AS, at FRB-AR-000015.  The S-Letter dictated that the Handbook and any amendments to it be provided to the director of RBOPS and would "not take effect if the director of RBOPS (or director's designee), in consultation with the Board's general counsel (or the general counsel's designee), raises an objection within 10 business days of receipt."  *Id.*



40.      The Handbook was developed by the NTAA Workstream, which is a Board-controlled working group.  Ex. C (KC Fed 30(b)(6) Tr.), at 276:6–277:15; *see supra* paragraph 16.  Drafts of the Handbook were used as a "reference point" in assessing Custodia's master account request.  Ex. C (KC Fed 30(b)(6) Tr.), at 278:8–19.

20



## XI.   Numerous Board Employees Participated in the Review of Custodia's Master Account Request.

44.     The Kansas City Fed has admitted that more than a dozen individuals at the Board

were involved in reviewing Custodia's master account request, producing a list of names at its

Rule 30(b)(6) deposition.  *See* Ex. BA, at Tab 10 (listing 13 Board staff, including Board Vice

Chair Lael Brainard).  In response to questioning, the Kansas City Fed agreed that at least 10

more Board employees were involved in Custodia's master account application or addressed

policy questions concerning Wyoming SPDI banks' access to Federal Reserve services.  *See* Ex.

J.A.689

BB (listing 10 additional Board personnel); *see also* Ex. C (KC Fed 30(b)(6) Tr.), at 144:19–

145:10, 150:9–151:17, 153:8–170:20, 175:6–25.

45.     The Board's involvement extended to its upper echelons.  Within days of

Chairman Powell's January 2022 testimony that "there are good arguments for viewing SPDIs as

depository institutions . . . .  I do think we will make some progress on this . . . ," Ex. P, at 39;

*see also supra* paragraph 13, the Board's General Counsel notified Custodia that the Board had

determined Custodia was a depository institution legally eligible for a master account.  Ex. BC,

at FRBKC-00000446–47 (January 26, 2022, email describing communication between the

Board's General Counsel, Mark Van Der Weide, and Custodia's lawyer, Derek Bush, confirming

eligibility.); Ex. I (January 27, 2022, letter to Custodia from the Kansas City Fed reconfirming

the Board's determination.).

46.     President George had numerous conversations with Lael Brainard, then-Vice

Chair of the Board, regarding Custodia and SPDIs more generally.  Ex. J (George Tr.), at 38:24–

39:6; Ex. C (KC Fed 30(b)(6) Tr.), at 176:12–177:8; *see e.g.*, Ex. BD, at FRBKC-00015475

(discussing President George's call with Vice-Chair Brainard regarding "Master account

requests" and indicating that Brainard "has asked her staff to focus attention on this issue . . . ,

but knows this will be a slow process and we will frustrate these SPDIs in the interim"); Ex. BE

(January 6, 2021, email from President George stating that she "plan[ned] to visit with Lael in

the next few weeks" regarding the issue of "Wyoming special charters (Avanti) gaining access to

a master account.").

47.     In late November 2022, just days before Kansas City Fed staff began drafting a

memo recommending denial of Custodia's master account application, Michael Barr, Vice Chair

of Supervision at the Board, met with staff to discuss Custodia's master account and membership

applications.  Ex. BF, at FRBKC-00002169–70 (November 22, 2022, email discussing the meeting with Vice Chair Barr.).

48.     The Kansas City Fed kept the Board apprised of everything that was happening on Custodia's master account.  *See, e.g.*, Ex. BG (September 27, 2022, email to Board staff regarding Custodia's master account.); Ex. BH, at FRBKC-00005022 (July 25, 2022, message discussing what information to include regarding Custodia's master account for a meeting with the Board.).

## XII.     Unbeknownst to President George, Board Staff Edited the Kansas City Fed's Memorandum Recommending Denial of Custodia's Master Account Application.

49.     After the cryptocurrency exchange FTX collapsed in November 2022, the White House and the Board turned against anything associated with crypto.  *See, e.g.*, Ex. BI (January 27, 2023, White House statement on cryptocurrencies' risks.); Statement, Board of Governors of the Federal Reserve System, Policy Statement on Section 9(13) of the Federal Reserve Act (Jan. 27, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230127a1.pdf (describing a proposed Board policy statement that "would presumptively prohibit [state member banks] from holding most crypto-assets as principal").  They did so indiscriminately despite the fact that the collapse of FTX was caused by fraud, not by issues unique or inherent to digital assets.  *See, e.g.*, Ex. M, at FRBKC-00004964 (Kansas City Fed examiner explaining that Custodia is "not comparable to FTX" as, among many differences, the "SPDI rules require SPDI stablecoins to be backed dollar for dollar by cash."); Ex. BJ, at FRBKC-00015275 (email regarding the Kansas City Fed's determination that "Custodia wouldn't be in the same situation" as other banks that struggled after FTX's collapse); *see also* Ex. BK, at FRBKC-00014994 (email regarding Custodia's differences from FTX, and the Custodia CEO's provision of evidence of probable criminal activity at FTX to the FBI months before FTX collapsed).

50.      As late as mid-November 2022, Kansas City Fed staff internally were discussing

conditions to accompany approval of Custodia's master account request.  Ex. BL, at FRBKC-

0010129 (November 14, 2022, cover email); Ex. BM, at FRBKC-00010133–35 (attachment

describing potential master account conditions).  Reserve Banks have imposed use-based

conditions on master accounts, but cannot impose membership-like requirements to access

Federal Reserve services.  Ex. BN (Conti-Brown Rough Tr.), at 180:3–16, 271:13–272:1.

51.      But soon after FTX collapsed, progress on Custodia's master account application

stopped, and in early December the Kansas City Fed began drafting a memo to President George

recommending denial of Custodia's master account application ("George Recommendation

Memo").  *See, e.g.*, Ex. J (George Tr.), at 193:8–19.  This timing coincided with Board staff's

communication to the Kansas City Fed its expectation that Custodia's application (likely

membership, but never explicitly specified as such) would be denied.  On November 27, 2022,

Board staffer Pat Grant indicated that "the current path is leaning towards denial," Ex. BO, and

then three days later, a Kansas City Fed staffer discussed a "call from the Board yesterday"—*i.e.*,

on November 29—that prompted "next steps" of "delivering the message" regarding "the denial"

to Custodia.  Ex. BP (November 30, 2022, discussion).

52.      Unbeknownst to both President George and Ms. Humston, Board staff heavily

revised the draft denial memo regarding Custodia's master account.  Ex. J (George Tr.), at

198:2–16; Ex. E (Humston Tr.), at 360:1–361:5.  On January 6, 2023—more than a week before

the S-Letter was finalized and before President George had seen the George Recommendation

Memo—Judith Hazen, a Reserve Bank Vice President, shared a draft of the George

Recommendation Memo with Board staff.  *See* Ex. BQ, at FRB-AR-000324.  Hazen was

responding to a request from a deputy in the Board's RBOPS division, Jason Hinkle, to see drafts

of the recommendation memo before it was shared with President George.  Ex. BR, at FRBKC-00011699–70.

53.     Board staff from a wide range of divisions—including Supervision & Regulation (SR), Monetary Affairs (MA), Financial Stability (FS), and RBOPS—extensively revised the George Recommendation Memo, providing more than two dozen comments in a draft the Board returned to the Kansas City Fed's Hazen on January 9, 2023.  Ex. BQ, at FRB-AR-000324 (January 9 email); *see generally* Ex. BS (attached draft with comments).  The Board's edits included a request that the memo be revised to "explicitly discuss the application of the Board's Account Access Guidelines to Custodia's request."  Ex. BS, at FRB-AR-000326.  The Board's Deputy Director of RBOPS also did not want the dead-end nature of Tier 3 status to be stated transparently in the memo.  *Id.* at FRB-AR-000333 (commenting that a Reserve Bank draft sentence implied that "providing an account and/or services to any tier 3 institutions (without a federal regulator) would be contrary to Board policies" and advising that the Kansas City Fed edit this language to avoid saying the quiet part out loud).  In line with the Board's anti-crypto stance following FTX's collapse, he also encouraged adding discussion of "the high volatility of the crypto industry," *id.* at FRB-AR-000326, even though customers' digital assets would be held in bailment and not on Custodia's balance sheet.

54.     The negative statements in this memo, made increasingly critical by edits from the Board, contravened prior positive written assessments from Reserve Bank staff regarding Custodia.  Kansas City Fed staff initially deemed Custodia's capital "adequate," but with Board staff influence the assessment became that there was a "lack of a robust capital requirement framework"; "strong" risk management turned into "significant risk management gaps"; "liquidity risk is relatively low" became insufficient "liquidity risk management processes"; and

an assessment that Custodia's management experience was "impressive" and "extensive" was converted into a "lack of collective depth of relevant banking experience." *Compare* 

*with* Ex. BS, at FRB-AR-000332 (Board suggested edits indicating that because Custodia would "lack . . . a robust capital requirement framework," there could be "implications for the assessment of monetary policy implementation and financial stability risks under the Guidelines."); *compare*

and

*with* Ex. BS, at FRB-AR-000329 (asserting "significant risk management gaps"); *compare* Ex. BW, at FRBKC-0004979 (January 26, 2022, Kansas City Fed chat discussing that "liquidity risk is relatively low."), *with* Ex. BS, at FRB-AR-000331 (Board comment regarding "adding mention of analysis of the maturity of Custodia's liquidity risk management processes."); *compare*

*with* Ex. BS, at FRB-AR-000331 (asserting "lack of collective depth of relevant banking experience and bank-specific risk management expertise").

55.     On January 10, 2023, Matthew Malloy from the Board's Division of Monetary Affairs provided additional edits that attempted to obscure the Board's role in the master account decision-making process. *See* Ex. BY (Malloy's cover email).  He suggested removing a statement that Custodia's master account raised "broad policy matters that extend beyond the Reserve Bank."  Ex. BZ, at FRB-AR-000323 (attached draft reflecting Malloy's line edits).

With the Board's edits implemented, the draft George Recommendation Memo was finally shared with President George on January 19, 2023.  Ex. CA.

56.     On January 24, 2023, Judith Hazen formally sent the George Recommendation Memo to the director of the Board's RBOPS division, Matt Eichner, as required by the S-Letter. Ex. CB; *see also* Ex. AS, at FRB-AR-000016–17 (S-Letter).  Eichner responded on January 26 at 10:39 p.m., authorizing "the Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision to deny the request for a master account and access to services."  Ex. CC.  The Board has admitted that Eichner's approval email constitutes its "final agency action" on Custodia's master account.  (ECF No. 178.)

## XIII.     The January 27, 2023 Denial Decisions Were Coordinated.

57.     On January 27, 2023, a number of carefully choreographed events transpired in quick succession.  Here is the timeline:

- **10:57 a.m. ET**:  The Board notified Custodia that the Board voted to deny its membership application.  Ex. CD, at Custodia-00010270.

- **11:01 a.m**. **ET**:  Bloomberg published a story about Custodia's membership denial.  Lydia Beyoud, Allyson Versprille, & Katanga Johnson, *Federal Reserve Says It Won't Approve US Crypto Firm's Membership*, Bloomberg (Jan. 27, 2023, 11:01 AM), https://www.bloomberg.com/news/articles/2023-01-27/federal-reserve-signals-it-won-t-approve-crypto-firm-s-membership-application.

- **11:30 a.m. ET**:  The White House released a new anti-cryptocurrency policy statement.  Brian Deese, Arati Prabhakar, Cecilia Rouse, & Jake Sullivan, *The Administration's Roadmap To Mitigate Cryptocurrencies' Risks*, White House (Jan. 27, 2023), https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/; Ex. CD, at Custodia-00010271.

- **11:30 a.m. ET**:  The Board released a new cryptocurrency policy statement. Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Issues Policy Statement To Promote a Level Playing Field for All Banks with a Federal Supervisor, Regardless of Deposit Insurance Status (Jan. 27, 2023, 11:30 AM), https://www.federalreserve.gov/newsevents/pressreleases/bcreg20230127a.htm.

- **11:30 a.m. ET**:  The Board announced the denial of Custodia's membership application.  Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal

27

Reserve Board Announces Denial of Application by Custodia Bank, Inc. To Become a Member of the Federal Reserve System (Jan. 27, 2023, 11:30 AM), https://www.federalreserve.gov/newsevents/pressreleases/orders20230127a.htm.

- **2:00 p.m. ET**:  The Kansas City Fed notified Custodia that it denied Custodia's master account application.  Ex. CE (timestamped email relayed correspondence to Custodia, showing 1 pm CT); Ex. CF (attached correspondence).

- **4:35 p.m. ET**:  The Board and Kansas City Fed jointly moved to dismiss Custodia's lawsuit.  (ECF No. 116.)

58.   Nothing about this process was coincidence.  Kansas City Fed Assistant Vice President Christi May-Oder had written to Board staff in December 2022, "[W]e are planning to issue a decision on the master account very quickly following the decision on the membership." Ex. CG.  Moreover, Bloomberg had been able to release a story by 11:01 am because information had leaked to Bloomberg *before* January 27 about these forthcoming decisions.  *See* Ex. CH (January 26, 2023, email from Bloomberg reporter.).  On January 26, within hours of Custodia informing the Board's General Counsel by letter that it would not be withdrawing its membership application, a reporter relayed the contents of that confidential letter back to Custodia.  Ex. CD, at Custodia-00010270; *see also* Ex. CQ (email correspondence with Board regarding Custodia's decision not to withdraw its membership); Ex. CH (Bloomberg reporter describing on January 26 that she was "told that the several financial institutions that have de novo banking licenses related to crypto in process with the Fed or OCC have received calls within the last 48 hours saying they have to pull their applications.").  These press leaks violated Federal Reserve policy, which prohibited any communications with the media during a Federal Reserve "black-out" period (January 21–February 2, 2023).  *See* Bd. of Governors of the Fed. Rsrv. Sys., 2023–2025 FOMC Trading and External Communications Blackout Calendar, https://www.federalreserve.gov/monetarypolicy/files/fomc-blackout-period-calendar.pdf; *see also* Bd. of Governors of the Fed. Rsrv. Sys., FOMC Policy on External Communications of

J.A.696

Federal Reserve System Staff (adopted June 22, 2011),

https://www.federalreserve.gov/monetarypolicy/files/FOMC_ExtCommunicationStaff.pdf.

59.     President George testified that the denial of Custodia's master account came from the fact that she did not see a "pathway" for a "novel start-up wanting to deal with digital assets and you're a State-chartered entity, like Custodia" to get a master account.  Ex. J (George Tr.), at 302:10–22.  In other words, while established Federal Reserve member banks could (and do) deal with digital assets, a state-chartered start-up was not afforded that same opportunity.  *See, e.g.*, Ex. E (Humston Tr.), at 16:5–8; Ex. L (OCC Interpretive Letter).

60.     Had Custodia been granted a master account, it would have been the 443rd uninsured master account holder.  Ex. AE (Long Tr.), at 137:18–25 (describing 442 uninsured master account holders as of August 2023).  In the past, the Federal Reserve used to grant master accounts to applicants with the characteristics of the newly developed "Tier 3," as it did not claim discretion to control access to Federal Reserve services between the passage of the Monetary Control Act in 1980 and 2015.  Ex. BN (Conti-Brown Rough Tr.), at 88:18–21.  But since the implementation of the Guidelines, no Tier 3 institution has been granted a master account.  Ex. Z (Cox Expert Report) ¶ 66.

61.     The Board's membership denial order was an unprecedented 86-pages long, full of factual errors and misleading statements.  *See* Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Its Order Denying the Application by Custodia Bank, Inc., To Be Supervised by the Federal Reserve (Mar. 24, 2023), https://www.federalreserve.gov/newsevents/pressreleases/orders20230324a.htm.  Custodia subsequently sent a letter to the Office of the Inspector General for the Board documenting 23

J.A.697

violations and "a litany of irregular Board actions" that occurred over the course of the Board's consideration of Custodia's membership application.  Ex. CD, at Custodia-00010268–69.

62.     The characterizations of Custodia in the Board's membership denial order were also starkly at odds with more positive assessments that Kansas City staff had expressed about Custodia during their review process.  *See supra* paragraph 54.  And they contradicted a parallel onsite examination by Wyoming's Division of Banking in August and September 2022, which granted Custodia a certificate of authority to operate on September 12, 2022.  Ex. CI.

63.     Because the membership and master account evaluations were running in parallel, the Board's denial of Custodia's membership application effectively dictated the Kansas City Reserve Bank's decision on Custodia's master account application.  Ex. AH (May-Oder (Vol. I) Tr.), at 72:23–73:14, 203:13–25; Ex. N (Hazen Tr.), at 248:2–14; Ex. E (Humston Tr.), at 403:16–404:12.  The Board's action on Custodia's membership application sealed the fate of Custodia's master account.

## STANDARD OF REVIEW

When a party seeks review of agency action under the APA, the district court judge sits as an appellate tribunal and the entire case is a question of law.[5]  As the District of Colorado recently held:  "Federal Rule of Civil Procedure 56, which governs summary judgment, operates differently in an APA case.  Instead of considering whether there are genuine disputes of material fact, the district court sits as an appellate tribunal."  *Karim v. Allen*, No. 21-cv-2861-WJM-KLM, 2023 WL 4624896, at *1 (D. Colo. July 19, 2023) (internal quotation marks

---

[5] Accordingly, the Court's Second Amended Scheduling Order provides: "A federal district court sitting in review of an agency action must sit as a court of appeals including governing itself by referring [to the] Federal Rules of Appellate Procedure."  (ECF No. 211 at 11.)

omitted).  "The entire case on review is a question of law, and a court should only consider arguments about the legal conclusion to be drawn about the agency action." *Id.* (internal quotation marks omitted).  Generally, in APA cases, the court's review is based on the administrative record. *Id.*  Here, the parties stipulated and the Court approved that all evidence between Custodia, the Kansas City Fed, and the Board's Administrative Record "may be relied upon by all parties including any court hearing . . . this case throughout the remainder of this litigation."  (ECF No. 220.)

The APA instructs courts to "hold unlawful and set aside agency action" that is "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(C).  The mandamus statute requires court action where there is a clear duty to act.  *See In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022); *see also Est. of Smith v. Heckler* (*In re Smith*), 747 F.2d 583, 591 (10th Cir. 1984) ("If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose.").  The analyses and the remedies under the Mandamus Act and the APA are identical when the relief sought is to compel agency action unlawfully withheld.  *Tista v. Jaddou*, 577 F. Supp. 3d 1219, 1231 (D.N.M. 2021) ("In this manner, § 706(1) incorporates the mandamus remedy into the APA.").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The two causes of action in this case, which are lodged against the Board and the Reserve Bank, arise under the APA and the Mandamus Act.  The remedies are identical where, as here,

the relief sought is to compel agency action unlawfully withheld.[6]  The Court has ruled that the case is one that is to be adjudicated under the APA.

The denial of a master account to Custodia is final agency action under the APA, reflecting the culmination of the decision-making process.  Legal consequences of great magnitude flow from that decision.  *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597–602 (2016) (setting forth requirements for judicial review in the APA context).  In its filing of the administrative record, the Board conceded that:  "The document with ID of A1 (Bates numbered FRB-AR-000002) is the ***final agency action*** at issue as required by Local Rule 83.6(b)(1)(A)."  (ECF No. 178 (emphasis added).)  The document referred to is the January 26, 2023, email from Matthew Eichner of the Board to Esther George of the Reserve Bank.  Ex. CC.  In that email, the Board, referring to both the S-Letter and the Kansas City Fed's pre-decisional analysis of Custodia's request for a master account pursuant to the S-Letter (as well as the earlier-issued Guidelines) gave the Kansas City Fed the green light to deny Custodia's master account application.  *Id.*  The Board's insistence that it had nothing to do with the decision is belied by its admission that it took final agency action on January 26, 2023.  Accordingly, all the requirements for Court review in this case under the APA have been met.

In Section I below, Custodia addresses the principal legal issue in the case, *i.e.* whether the Federal Reserve (Board or Reserve Bank) has discretion to deny an eligible applicant a master account.  The argument tracks the thoughtful and in-depth opinion of Judge Bacharach in the *Fourth Corner* case.[7]  Judge Bacharach rejected the identical position advanced here by the

---

[6] "The two statutes [APA and Mandamus] are, after all, merely different means of compelling an agency to take action which by law it is required to take."  *Hernandez-Avalos v. INS*, 50 F.3d 842, 844 (10th Cir. 1995) (internal quotation marks omitted).

[7] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017).

Defendants.  In so doing, he looked to the Monetary Control Act's unambiguous language; to

past interpretations by the Board of Governors; interpretations by officials with the regional

Federal Reserve Banks; the statute's legislative history; and interpretations of the relevant

statutory provision by other courts and academics.  *Fourth Corner Credit Union v. Fed. Rsrv.*

*Bank of Kan. City*, 861 F.3d 1052, 1067–74 (10th Cir. 2017) (Op. of Bacharach, J.).  Although

Judge Bacharach wrote for himself, no other judge on the panel disagreed with his reasoning.

Judge Moritz in fact agreed with Judge Bacharach's conclusion that a master account is

necessary to access all Federal Reserve Bank services.  *See id.* at 1053 (Op. of Moritz, J.).  The

district court, moreover, reached the same legal conclusion as Judge Bacharach, holding that the

language of § 248a(c)(2) "is not limited to pricing."  *Fourth Corner Credit Union v. Fed. Rsrv.*

*Bank of Kan. City*, 154 F. Supp. 3d 1185, 1188 (D. Colo. 2016), *vacated*, 861 F.3d 1052.

     In Section II, Custodia answers the question the Court asked in ordering discovery:  what

roles did the Defendants play in the denial of Custodia's master account application.  The

undisputed answer is that the Board controlled the process and ultimate disposition of Custodia's

master account application—which the Court, having read the Statement of Undisputed Facts,

already knows.

## ARGUMENT

**I.    The Federal Reserve Lacked Discretion To Deny Custodia a Master Account.**

    **A.    The Unambiguous Language of the Monetary Control Act of 1980 Controls.**

    When interpreting a statute, a court's "primary task" is to "determine congressional

intent, using traditional tools of statutory interpretation."  *McGraw v. Barnhart*, 450 F.3d 493,

498 (10th Cir. 2006) (citation omitted).  The "first step in interpreting a statute is to determine

whether the language at issue has a plain and unambiguous meaning with regard to the particular

dispute in the case."  *Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr.,*

33

821 F.3d 1250, 1258 (10th Cir. 2016) (citation omitted).  "If the language is plain and

unambiguous," the inquiry ends there, "and the plain meaning of the statute controls."  *Id.*

(citation omitted).

The principal statutory provision is plain on its face.  Section 248a of the Monetary

Control Act does two things:  "It ensures universal access to certain bank services and provides

uniform pricing for them."  *Fourth Corner*, 861 F.3d at 1068 (Op. of Bacharach, J.).  The key

statutory section states:

> The schedule of fees prescribed pursuant to this section shall be
> based on the following principles:
>
> . . . (2) All ***Federal Reserve bank services*** covered by the fee
> schedule ***shall be available*** to nonmember depository institutions
> ***and*** such services ***shall be priced*** at the same fee schedule applicable
> to member banks . . . .

12 U.S.C. § 248a(c)(2) (emphases added).  The enumerated bank services include "(1) currency

and coin services: (2) check clearing and collection services; (3) wire transfer services; (4)

automated clearinghouse services; (5) settlement services; (6) securities safekeeping services;

[and] (7) Federal Reserve float . . . ."  *Id.* § 248a(b)(1)–(7).  In addition, access must be given to

(8) "any new services which the Federal Reserve System offers, including but not limited to

payment services to effectuate the electronic transfer of funds."  *Id.* § 248a(b)(8).

The word "shall" in a congressional enactment is mandatory.  *See Forest Guardians v.

Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) (citation omitted) ("The Supreme Court and this

circuit have made clear that when a statute uses the word 'shall,' Congress has imposed a

mandatory duty upon the subject of the command."  (citation omitted)); *Lopez v. Davis*, 531 U.S.

230, 241 (2001) ("Congress used 'shall' to impose discretionless obligations."); *Nat. Res. Def.*

*Council v. Regan*, 67 F.4th 397, 402 (D.C. Cir. 2023) ("It is well established that 'the word

"'shall'" generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.'" (citation omitted)). Accordingly, in this case, the statute unambiguously commands Defendants to grant access to all services covered by "the fee schedule" to "nonmember depository institutions." As a nonmember depository institution deemed eligible by both the Board and the Kansas City Fed, Custodia must be granted a master account.

While Defendants have argued Section 248a does not pertain to master accounts because master accounts are not referenced on this statutory list of services, a bank cannot access the promised services without a master account. As Judge Bacharach observed, "Without a master account, none of the fee schedule's services would be available." *Fourth Corner*, 861 F.3d at 1069 (Op. of Bacharach, J.). Judge Bacharach correctly saw this argument as an "effort to subvert congressional intent." *Id.* (Op. of Bacharach, J.). Judge Moritz agreed with Judge Bacharach's conclusion that a master account is necessary to access all Federal Reserve Bank services. *Id.* at 1053 (Op. of Moritz, J.). Put in every day terms, an individual may be entitled to the contents of a safe deposit box, but without the key to the box that entitlement is worthless. A master account is the key to bank access for the services enumerated in 12 U.S.C. § 248a.[8]

Defendants have also argued that because the statute did not employ the word "all," they did not need to grant the mandatory banking services to every legally eligible nonmember bank that applied. However, the statute retains its mandatory nature with or without the indefinite adjective "all." Judge Bacharach, in *Fourth Corner*, engaged in a learned exploration of the

---

[8] In any event, if a master account is viewed as a "service" that does not appear on the list, the statute remedies this. It plainly states that in addition to the enumerated services, equal access must be given to "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds."

indefinite article "all," examining how case law, statutes, and drafting treatises read the absence of that term in a statute. *Fourth Corner*, 861 F.3d at 1069–70 (Op. of Bacharach, J.) (citations omitted). He correctly concluded that it was not necessary to put "all" before a plural noun such as "nonmember depository institutions." *Id.* at 1070 (Op. of Bacharach, J.) (citation omitted). As he noted, in *Gares v. Willingboro Township*, 90 F.3d 720, 726 (3d Cir. 1996) (citation omitted), the court interpreted the phrase "prevailing plaintiffs" to include all prevailing plaintiffs; in *Western Minnesota Municipal Power Agency v. Federal Energy Regulatory Commission*, 806 F.3d 588, 592 (D.C. Cir. 2015), the court held that the terms "states" and "municipalities" included all states and municipalities. *Fourth Corner*, 861 F.3d at 1070 (Op. of Bacharach, J.). Drafters of statutes are often cautioned not to freely use "all." *See, e.g.*, 101 Pa. Code § 15.142(c). "Use adjectives such as 'each,' 'every,' 'any,' 'all,' 'no,' and 'some' . . . only when necessary. . . . If the subject of the sentence is plural, it is almost never necessary to use this kind of adjective." William P. Statsky, Legislative Analysis and Drafting 184 (2d ed. 1984). Grammarians agree. *See, e.g.*, Lawrence E. Filson & Sandra L. Strokoff, *The Legislative Drafter's Desk Reference* § 22.10, at 297–98 (2d ed. 2008).

## B.   Defendants' Reliance on 12 U.S.C. § 342 Is Misplaced.

Defendants contend that 12 U.S.C. § 342 grants discretion to Reserve Banks to deny access to Federal Reserve services because it specifies that Reserve Banks "may" receive deposits from any of its member banks or other depository institutions. There are several problems with this argument. The Monetary Control Act of 1980 amended three pertinent statutory provisions—12 U.S.C. §§ 248a, 342, and 461—to effectuate three goals: uniform access, pricing, and reserve requirements that did not depend on Federal Reserve membership status. Each one of these provisions can and should be read in harmony with the others, which is consistent with statutory interpretation canons. *WildEarth Guardians v. National Park Service*,

703 F.3d 1178, 1189 (10th Cir. 2013) ("When two related statutes appear to conflict, courts have a duty to construe them harmoniously and give each effect.").

At the same time Congress added Section 248a to mandate uniform access and equal pricing, without regard to membership status, it also imposed reserve requirements on all depository institutions.  *See Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1222–23 (6th Cir. 1983).  The Monetary Control Act expanded Federal Reserve control over the money supply by requiring all depository institutions to maintain reserves at a rate set by the Federal Reserve under Section 461.  *See* Monetary Control Act of 1980, Pub. L. No. 96-221, § 103, 94 Stat. 132 (1980).  Section 461 requires reserves be held in a Reserve Bank account, by a correspondent, or as "vault cash."  12 U.S.C. § 461(c)(1)(A).  But prior to 1980, Section 342 only permitted Reserve Banks to accept deposits from Federal Reserve members.  Thus, Congress amended Section 342 to authorize Reserve Banks to accept deposits not just from Federal Reserve members, but also from "other depository institutions."  Monetary Control Act of 1980, Pub. L. No. 96-221, § 105(a)(1), 94 Stat. 132.  The amendment to Section 342 enabled non-member depository institutions to comply with Section 461's newly imposed reserve requirements by depositing funds with Reserve Banks.  That enabling amendment did not undermine Section 248a's simultaneous grant of access to Federal Reserve services or the requirement that those services be priced consistently.

Section 342 speaks to which entities may make deposits with a Reserve Bank, *see United States v. Wells Fargo & Co.*, 943 F.3d 588, 602 n.13 (2d Cir. 2019), and the types of deposits that may be received in an account (*e.g.*, lawful money, national bank notes, Federal Reserve notes, checks, drafts, etc.), *see Fourth Corner*, 861 F.3d at 1073–74 (Op. of Bacharach, J.).  It is easily harmonized with both Section 248a, which enumerates separate and distinct services that

37

eligible depository institutions are entitled to access, and Section 461 given Congress' desire to stop differentiating between members and non-members when it came to equality of access, equality of pricing, and equality of reserve requirements.

Even if there were a conflict, and there is none, the more specific statute, Section 248a would control access to Federal Reserve services over the more general Section 342. *WildEarth*, 703 F.3d at 1189 ("Normally when two statutes conflict, we interpret the more specific statute as an exception to the more general statute.").

### C. Past Interpretations by the Board of Governors Support Custodia's Reading of the Monetary Control Act.

For decades, the Board asserted that the Monetary Control Act gave all depository institutions access to the Federal Reserve payments system. That practice started immediately after Congress passed the Monetary Control Act, increasing the number of institutions that could directly access Fed services from "5,400 member banks to over 40,000 depository institutions." Ex. CJ, at 11 (The Role and Activities of the Federal Reserve System In the Nation's Check Clearing and Payment System). Those Board statements are critical evidence that the original public meaning of the Monetary Control Act provided all depository institutions access to Federal Reserve services.

- 1980: "*Services covered by the fee schedule are available to all depository institutions*." Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the Federal Reserve Bank Services*, http://www.federalreserve.gov/paymentsystems/pfs_principles.htm (emphasis added) (last updated Nov. 8, 2008).

- 1981: The Board's Division of Data Processing issued a Notice discontinuing the list of "State Member Banks of the Federal Reserve System/Nonmember Banks that Maintain Clearing Accounts with Federal Reserve Banks/Corporations Doing Foreign Banking and Financing" because "*[d]ata on nonmember banks with clearing accounts with the Federal Reserve Banks . . . has little relevance due to changes in monetary policy as a result of the Monetary Control Act (MCA) of 1980*." Ex. CK (Bd. of Governors, Notice (Aug. 20, 1981)) (emphasis added).

- 1983:  "***The Board contends that the language and legislative history of § [248a] evince an intent to provide nonmember financial institutions access to Federal Reserve services . . . .***"  *Bank Stationers Ass'n, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 704 F.2d 1233, 1236 (11th Cir. 1983) (emphasis added).

- 1984:  "The Monetary Control Act of 1980 (MCA) has expanded the Federal Reserve's role by ***requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis . . . .***"  Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (emphasis added) http://www.federalreserve.gov/paymentsystems/pfs_standards.htm.

- 1984 / 1990 / 2001:  "***Federal Reserve payment services are available to all depository institutions . . . .***"  Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments System*, http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (emphasis added) (last updated Aug. 11, 2020).

- Today:  "Congress expanded the Federal Reserve's role in the payment system with the enactment of the Monetary Control Act of 1980 (MCA).  The MCA subjected all depository institutions, not just member banks, to reserve requirements and ***also gave all depository institutions access to the Federal Reserve's payment services.***"  Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision of Financial Services: About*, https://www.federalreserve.gov/paymentsystems/pfs_about.htm (last updated Oct. 28, 2016) (emphasis added).

Relying on a similar (but not identical) recitation of Board statements, Judge Bacharach determined that "the Board's current interpretation is '"entitled to considerably less deference" than a consistently held agency view.'"  *Fourth Corner*, 861 F.3d at 1070–71 (Op. of Bacharach, J.) (citation omitted).  The same conclusion should be reached here.

### D.   Interpretations by Officials with the Regional Federal Reserve Banks also Support the Plain Meaning of the Monetary Control Act.

Over the decades, the Board has not been alone in its interpretation that the Monetary Control Act extends access to the payments system to all depository institutions.  Reciting similar statements from other Reserve Banks and officers in Cleveland, Chicago, Richmond, Boston, and San Francisco, such as the Cleveland Fed's statement that "***[o]ur services will now***

*be available to all depository institutions*," Judge Bacharach described a "chorus of officials recognizing that the [Monetary Control Act] extends Federal Reserve services to all nonmember depository institutions." *Fourth Corner*, 861 F.3d at 1072 (Op. of Bacharach, J.) (alteration in original) (emphasis added) (citation omitted).

To that chorus we can now add the Kansas City Fed's voice.  Although the Kansas City Fed refused to produce its annual reports in discovery, Custodia obtained them from a university library.  In January 1981, the President of the Kansas City Fed described a "rapidly changing financial environment," noting that the passage of the Monetary Control Act was "sure to make the '80s a dynamic time for all financial institutions."  Ex. CL, at 1 (Kansas City Fed Annual Report (1980–1982)).  Confirming that the Monetary Control Act was not just a pricing statute, the president wrote that "[t]he services provided by the Federal Reserve Bank . . . will become directly available to many more financial institutions.  The Monetary Control Act also requires that these services be priced explicitly."  *Id.*

A few years later, a senior economist at the Kansas City Fed published an article openly acknowledging the reality that Defendants assiduously deny in this litigation:  "[A]ll institutions subject to reserve requirements were granted access to Federal Reserve services including the discount window."  Gordon H. Sellon, Jr., *The Instruments of Monetary Policy*, Economic Review 6, 7 (1984), https://www.kansascityfed.org/documents/1281/1984-The%20Instruments%20of%20Monetary%20Policy.pdf.  Since Section 461 imposed reserve requirements on all depository institutions, this amounts to an admission by the Kansas City Fed that Federal Reserve services are available to all.

Finally, Esther George, President of the Kansas City Fed during the pendency of Custodia's Master Account application, confirmed that the Monetary Control Act "level[ed] the

playing field." Ex. J (George Tr.), at 12:16–25.  George started at the Kansas City Fed in 1982, and she testified that "[her] understanding of the Monetary Control Act is it no longer made a distinction between those that were members of the Federal Reserve and those that were not, in terms of access to services and their pricing." *Id.* at 15:11–16:19 (The Monetary Control Act "eliminated the distinction between member banks and non-member banks"), 47:10–19 ("The Monetary Control Act allowed for equal access to [Federal Reserve Services] as a legal eligibility requirement.").  The chorus is now deafening.

    **E.**    **The Legislative History of the Monetary Control Act Supports the Statute's Plain Meaning.[9]**

    Prior to the Monetary Control Act of 1980, the Board and its Reserve Banks provided services only to member banks and did so free of charge.  In the 1970s, however, many banks withdrew from the Federal Reserve System as they faced high inflation, spiking interest rates, and onerous Board requirements to maintain ever-increasing non-interest bearing reserve balances.  Many banks started to make the calculation that they were better off abandoning their membership in the Federal Reserve System, even though that would mean they would have to pay for banking services.  The Board worried that, with fewer banks, would come lessened Board influence.  *See Federal Reserve Requirements: Hearings on S. 353 and Proposed Amendments, S. 85, and H.R. 7 Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 96th Cong. Rec. 5 (1980) (Statement of Paul A. Volcker, Chairman, Bd. Of Governors of the Fed. Rsrv. Sys.) (speaking of an "avalanche in loss of members.").

---

[9] When, as here, the meaning of a statute is clear, it is generally unnecessary to resort to legislative history.  Nonetheless, in this instance, the legislative history, which was also examined by Judge Bacharach in *Fourth Corner*, is particularly illuminating on the issue of Congress's intent and hence included here.

The Board was also having money problems.  One way to rectify that problem was to charge members for banking services.  Yet, if the Board were to do so, it feared that more banks would leave the System, and thereby lessen the Board's ability to influence monetary policy. Julie A. Hill, *From Cannabis to Crypto:  Federal Reserve Discretion in Payments*, 109 Iowa L. Rev. 117, 168 (2023) (citing Monetary Control and the Membership Problem:  Hearings on H.R. 13476, H.R. 13477, H.R. 12706 and H.R. 14072 Before the H. Comm. on Banking, Fin. & Urb. Affs., 95th Cong. 80, 87 (1978) (statement of G. William Miller, Chairman, Bd. of Governors of Fed. Rsrv. Sys.)).

Adding to these problems, in the 1970s, the thrift industry was deregulated, and thrifts sought access to the Federal Reserve's automated clearing network, as well as other services.  At the time, thrifts and savings banks were considered "novel" charters like SPDIs are today.  *Id.* at 182–83.  In January 1976, the Board modified its access guidelines to accommodate thrifts that might become members of the automated clearing house associations that it serviced.  *See* Anatoli Kuprianov, *The Monetary Control Act & the Role of the Fed. Rsrv. in the Interbank Clearing Market* at 29 n.18 (1985) (citing Board of Governors of the Federal Reserve System, "Access to Federal Reserve Clearing and Settlement Facilities:  Proposed Policy," 40 Fed. Reg. 641 (June 17, 1975)).  The Justice Department's position, conveyed to the Board, was that the antitrust laws "***required equal access***."  *See id.* at 29 (citing *Comments of the United States Department of Justice; Proposed Amendment of Regulation J and Related Issues* (May 14, 1974)) (emphasis added).  The Department also argued that it favored the adoption of a system of competitively set prices for electronic funds transfer services.  The Department emphasized that a "discriminatory pricing system can be as substantial a bar to competition as exclusionary rules."  *Id.* (quoting Comments of the United States Department of Justice at 27).

42

Congress legislated against this backdrop.  In the run-up to passage of the Monetary Control Act, congressional hearings focused on access to Federal Reserve services, bank reserves, and pricing.  During the hearings, Federal Reserve Chairman Paul Volcker testified on the need to enact equal access legislation.  He warned that a failure to do so would leave the Federal Reserve "with the increasingly awkward problem of discriminating between members and nonmembers in the provision of certain services, such as automated clearinghouse payments, which for practical reasons cannot operate efficiently unless open to all depository institutions." *Federal Reserve Requirements:  Hearing on S. 353, and Proposed Amendments on S. 85, and H.R. 7 Before the S. Comm. on Banking, Hous., and Urb. Affs.*, 96th Cong. 11 (1980).

The compromise reached by Congress was that all depository institutions would have to meet federal reserve requirements; services provided would be priced equally for members and nonmembers alike; and in return, all depository institutions (state non-member banks, federally chartered banks, thrifts, credit unions) would have open access to the Federal Reserve's services without having to become members of the Federal Reserve System or obtain FDIC insurance. Congress was well-aware of the Federal Reserve's dwindling membership problem and its equally worrisome revenue problem.  Extending reserve requirements to nonmember depository institutions, and providing access to Federal Reserve services for nonmember banks, addressed both problems, while creating an even playing field for financial institutions rather than the Federal Reserve's "private club."

Judge Bacharach understood that "[t]his objective was ultimately implemented through [Section] 248a(c)(2)." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d at 1072 (Op. of Bacharach, J.).  As Senator Proxmire, one of the bill's sponsors, explained, "since nonmember institutions will be required to hold reserves under the act it is reasonable that they

43

should be provided access to Fed services."  *See* 126 Cong. Rec. 6897 (1980) (Statement of S. William Proxmire).  Indeed, the Monetary Control Act codified this requirement in 12 U.S.C. § 461(b)(2)(A) ("Each depository institution shall maintain reserves against its transaction accounts . . . .") and made a conforming amendment to 12 U.S.C. § 342 to add "or other depository institutions."  12 U.S.C. § 342 ("Any Federal reserve bank may receive from any of its member banks, ***or other depository institutions.***"  (emphasis added)); *see also* 126 Cong. Rec. at 7063 ("[T]his bill mandates banks to place reserves in the national bank.").  In other words, the Monetary Control Act in 1980 leveled the playing field by requiring equal access, equal pricing, and equal reserve requirements for all depository institutions and amended the text of Sections 248a, 342, and 461 to accomplish this outcome.

The legislative history, accordingly, fully supports the plain terms of the statute.  *See, e.g.*, 126 Cong. Rec. 6250 (1980) (Conf. Rep.) ("The House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks and open access to [Federal Reserve] services to ***all depository institutions*** on the same terms and conditions as member banks." (emphasis added)); *see also* H.R. Rep. No. 95-1590, at 20 (1978) ("The [House Committee on Banking Finance and Urban Affairs] believes that the wide access to Federal Reserve services for nonmember banks authorized by this bill will insure [sic] that a basic level of services is available to all banks throughout [this] country on a nondiscriminatory basis."); 126 Cong. Rec. 6250 (1980) (Conf. Rep.) ("House amendment includes a provision for the Federal Reserve to . . . open access to [Federal Reserve] services to all depository institutions on the same terms and conditions as member banks.").

Four years after passage of the Monetary Control Act, the House Subcommittee on Domestic Monetary Policy assessed the Board's compliance with the statute. It prepared a lengthy report, but the headline for this case comes from the "Executive Summary."

> **Before the MCA, the payments system was segmented into two distinct and separate areas.** The Federal Reserve provided payments services without charge to banks that were members of the Federal Reserve System . . . . Supplementing Federal Reserve's payment services were the private payments services provided by correspondent banks to non-member financial institutions for a fee or by local clearinghouses . . . .
>
> **The Monetary Control Act changed this system in three ways.** First, it directed the Federal Reserve to impose explicit charges for payment services traditionally provided without charge to member banks. **It further specified that these services should be made available to all depository institutions and not just to member banks.** Finally, the Federal Reserve was directed to recover over the long run through these charges both the direct costs of providing the services and the imputed tax and capital costs a private company would have to bear.

Ex. CJ, at vii–viii (emphases added).

### F.   Two Courts of Appeals Have Viewed § 248a(c)(2) as Requiring Open Access.

In two appellate rulings, more or less contemporaneous with enactment of the Monetary Control Act, the courts concluded that Section 248a establishes open access to Federal Reserve services. *See Jet Courier*, 713 F.2d at 1223; *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989). District courts have also observed that Section 248a creates a non-discretionary duty to provide the Federal Reserve services to all depository institutions. *See Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087, 1090 (E.D.N.Y. 1986); *Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520, 522–23 (S.D.N.Y. 1983).

Only one court has held otherwise. In *Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*, ---- F. Supp. 3d ---- 2023 WL 7111182 (S.D.N.Y. Oct. 27, 2023), (currently on appeal to the Second Circuit) the plaintiff bank sought a preliminary injunction

45

**J.A.713**

requiring the Federal Reserve Bank of New York to maintain its master account, which it had

opened in 2012.  The account was closed because the Reserve Bank found that Banco San Juan

allegedly committed substantial BSA violations during its decade of operation.

The district court (Koeltl, J.), recognized that

> [W]hatever rights BSJI may have had to open a Master Account is
> not at issue because BSJI had a Master Account and specifically
> agreed that the FRBNY had the right to terminate that account.
> There is no statute that provides that a Federal reserve bank lacks
> the power to terminate a Master Account.  Rather, there is an
> agreement governing the Master Account that allowed the FRBNY
> to close the account.

*Id.* at *8–9 (citations omitted).  Accordingly, the court's ruling relied on an analysis—based on

contract principles, musings as to how the banking statutes should be read, and its rejection of

Judge Bacharach's analysis in *Fourth Corner*—that is largely inapplicable here.  Furthermore, it

is pure *dicta*, and of no precedential value in the Tenth Circuit.

## G.    Academics Examining the Issue Support Custodia's Reading of the Statute.

Judge Bacharach also looked to the work of academics, who "have agreed" that

Section 248a "entitle[s] all depository institutions to Federal Reserve services."  *See Fourth*

*Corner*, 861 F.3d at 1073 (Op. of Bacharach, J.).[10]

Since *Fourth Corner*, the issue of access to Federal Reserve services has received further

attention from legal scholars.  In the leading article on access to Federal Reserve services,

Professor Julie Hill carefully analyzed "the statutory text, the legislative purpose underpinning

---

[10] These include:  Timothy K. Armstrong, *Chevron Deference and Agency Self-Interest*, 13
Cornell J.L. & Pub. Pol'y 203, 231 n.148 (2004); Thomas C. Baxter, Jr. & James H. Freis, Jr.,
*Fostering Competition in Financial Services:  From Domestic Supervision to Global Standards*,
34 New Eng. L. Rev. 57, 70 (1999); Fred H. Miller, Robert G. Ballen, & Hal S. Scott,
*Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*,
39 Bus. Law. 1333, 1365 (1984).

the statute[], and past Federal Reserve Practices," and "conclude[d] that the law requires that the Federal Reserve provide accounts and payment services to all member banks and depository institutions."  Hill, *supra* p. 42, at 122–23.

Additionally, Custodia retained Dr. Peter Conti-Brown as an expert legal historian in this case.  Ex. A (Conti-Brown Expert Report) ¶¶ 1–4.  Dr. Conti-Brown's report examines "the nearly fifty-year history of the Monetary Control Act" and "conclude[s] that the Board's claim of discretion over Master Account access does not conform to history, practice, legal context, or the public policies of the US government and the Federal Reserve itself."  *Id.* ¶¶ 9, 16, 25–96.

Dr. Conti-Brown also explains how Defendants' claimed discretion over Master Account access "fundamentally remakes the nature of the US financial and banking system, a delicate balance that has evolved over 160 years, in a way that Congress never authorized and never intended."  *Id.* ¶ 9.  Federal Reserve services are required to do the business of modern banking, and a Master Account is required to access those services.  *See Fourth Corner*, 861 F.3d at 1053 (Op., of Moritz, J.); Ex. A (Conti-Brown Expert Report) ¶ 12.  Because of that, access to a Master Account is a choke point through which the Federal Reserve System has sought to control "every depository institution in the country."  *Id.* ¶ 13.  The power to second-guess chartering decisions made by the OCC, FDIC, and state banking agencies, "is an astonishing claim of authority, unprecedented in banking history."  *Id.* ¶ 96.  In the past, Congress has recognized that possibility that the Federal Reserve might be conflicted in its role as provider of payment services and its other function as a bank regulator.  We see this clearly demonstrated in this case because the Board is second-guessing reasoned, chartering and risk management decisions made by a state banking authority under the guise of its role in providing payment services.  These functions are distinct and should be maintained so.  *See* Staff of H. Subcomm.

on Domestic Monetary Policy, H. Rep. No. 98-17, at 27 (Comm. Print 1984) ("The Federal Reserve has recognized the potential conflicts between its role as regulator and its role as competitive provider of payment services . . . ."). Congress has clearly said that the determination for what is a depository institution under federal law, and it is not the Board's role to second-guess that decision.

Professor Ricks, the Reserve Bank's "rebuttal" expert, has no response to Dr. Conti-Brown, Professor Hill, or the academics cited by Judge Bacharach. Professor Ricks' report says nothing about the Monetary Control Act's legislative history or how the Board and the Reserve Banks implemented the Monetary Control Act. His only substantive defense of Defendants' claimed discretion over master account access is to point to discretion in bank supervision, a completely different governmental function only exercised by a depository institution's supervisory authority. Ex. CM (Ricks Expert Report) ¶¶ 7–11; Ex. AY (Conti-Brown Suppl. Expert Report) ¶¶ 14–26. Otherwise, Ricks spends pages explaining why he thinks Section 248a's non-discretionary duty to provide Federal Reserve services is bad policy. Ex. CM (Ricks Expert Report) ¶¶ 21–35. These policy arguments turn a blind eye to how power is shared in the American banking system between the federal government and the States as well as between agencies at the federal and state levels. Ex. A (Conti-Brown Expert Report) ¶¶ 36–40. Ricks thus discounts the multitude of checks on his slippery slope. But in any event, these sorts of policy questions should be resolved by Congress and have no bearing on the proper interpretation of Section 248a.

The overwhelming evidence, from the statutory language and its legislative history to the Federal Reserve's contemporaneous understandings of the Monetary Control Act, plus court decisions and academic works, fully support Custodia's entitlement by law to a master account.

II.      **The Board Took Final Agency Action Against Custodia.**

"Final agency action[s]" are subject to judicial review under the Administrative

Procedure Act.  5 U.S.C. § 704.  Agency actions are final when they meet two conditions:  (1)

"the action must mark the consummation of the agency's decisionmaking process—it must not

be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights

or obligations have been determined, or from which legal consequences will flow."  *Ctr. for*

*Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) (citations omitted).  Courts

take a "pragmatic" approach to finality and do not elevate form over function.  *U.S. Army Corps*

*of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted).

Here, the Board identified Ex. CC (FRB-AR-000002) as the final agency action in this

case.  (ECF No. 178.)  In that letter, the Board informed the Kansas City Fed that it had

completed its review of Custodia's master account application and that it "ha[d] no concerns

with the Reserve Bank moving forward with its plan to communicate to Custodia Bank its

decision to deny the request for a master account and access to services."  Ex. CC.  By

acknowledging it took "final agency action," the Board concedes that the Board "determin[ed]

the rights and obligations" of Custodia with respect to its master account application.  *Cure*

*Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1232 (10th Cir. 2016) (citation omitted).

III.     **Discovery Has Revealed That the Board Inserted Itself into the Master Account**
         **Decision-Making Process.**

This Court, deciding that a full statutory interpretation in this case was "better left for

another day," ordered discovery to ascertain the Board's involvement in the decision-making

process.  (ECF No. 164, at 10.)  It reasoned that "the facts . . . could weigh heavily on the Court's

analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no

discretion (under § 248a) in granting Custodia's master account application."  (ECF No. 164, at

49

J.A.717

10.)  Discovery in this case weaves a rich tapestry of facts—all undisputed, and heretofore hidden from public view—revealing the Board's deep involvement in Custodia's master account request from the very beginning.  If there were any doubt—and there should be none given the five bases identified by Judge Bacharach and augmented by Custodia's own research and the Board's concession that it took final agency action that determined Custodia's rights—discovery in this case provides a final nail in the coffin.

As one of the first SPDIs to request a master account, *supra* paragraph 8, Custodia's application raised unprecedented policy questions that only the Board could answer.  *See* 12 U.S.C. § 248(k); 12 C.F.R. § 265.20 (excepting from powers that can be delegated to Federal Reserve Banks matters that raise "significant legal, supervisory, or policy issues").  President George had to defer to the Board's decision on Custodia's "legal eligibility," as well as "broader policy issues" raised by applications from novel SPDI charters.  Ex. J (George Tr.), at 50:7–51:24.  Indeed, the Chairman of the Board of Governors, Jerome Powell, testified during his confirmation hearing in response to a question from Senator Lummis that SPDIs like Custodia raised significant legal, supervisory, and policy issues that warranted Board involvement.  *See* Ex. P, at 39 ("[W]e want to be really careful because they are hugely precedential.  They are very important from a precedential standpoint.  And so we have been looking carefully at this . . . .").  The pronoun "we" obviously means the Board.[11]

---

[11] This is consistent with the Board's past practice concerning "novel" entities.  In 2018, only two years prior to Custodia submitting its master account application, the Federal Reserve Bank of New York informed TNB USA Inc. ("TNB") that, after "consultation with the Board," the Reserve Bank was "not currently in a position to . . . represent[]" that it was "prepared to open a master account for TNB," noting that "senior policy officials at the [Board] have expressed the strong view that the New York Fed should not approve TNB's request for a master account." Ex. CN.  In its brief correspondence, the Reserve Bank also highlighted that TNB was already "well aware from its communications with staff at the [Board]" that there were "substantial public policy concerns regarding TNB's business model."  *Id.*

Discovery from the Kansas City Fed unequivocally reveals the Board's involvement at every critical juncture. Immediately upon receiving Custodia's master account request, officials at the Kansas City Fed sought to "buy some time" for the Board and its Payment Systems Policy Advisory Committee to establish a Non-Traditional Accounts Access ("NTAA") group, led by a Board-dominated Steering Committee and served by two sub-groups—a Policy Workstream and a Practical Workstream—staffed largely by Board employees. The Board then proposed public "Guidelines for Evaluating Account and Services Requested," which contravened the Monetary Control Act by taking the position that Reserve Banks had discretion to deny master accounts. Not coincidentally, those Guidelines were finalized the day before Defendants' deadline to file motions to dismiss Custodia's claims in this case. The Guidelines established a never-before-seen tiering system that relegates novel institutions like Custodia (which are state-chartered but lack a federal regulator) into a dead-end, Tier 3 status. Kansas City Fed staff understood at the time that Tier 3 status was a dead-end, commenting in a private chat about a Custodia "Review Playbook":

| Crouch: | First sentence of the document, Master Account: At this time, we do not anticipate Custodia obtaining a master account unless Custodia is granted FDIC insurance or becomes a Federal Reserve member. |
|---|---|
| Crouch: | Is that true? Does the [Federal Register Notice] tier 3 review come into play at all here? |
| May-Oder: | Yes, that's correct. Entities falling into Tier 3 will have a high bar to cross to get an account. |
| Crouch: | Understand the high bar, just the wording through [*sic*] me off, that approval isn't anticipated if Tier 3 route is taken. |

Ex. AA (Mar. 14, 2022, Teams Chat).

The Board was active behind the scenes. Roughly a year before it was issued, the Board drafted a rare S-Letter, *see* Ex. AS, that drew objections from the Kansas City Fed:

51

J.A.719

Hinkle (Bd):    Hello, just sent an email to the [Payments System Policy Advisory Committee] that we are willing to hold back the S-letter is [*sic*] that is their recommendation.  Hope that alleviates any concerns that Esther and you have.

Hazen (KCF):  Thanks for the heads up.  I believe she is planning to send her response shortly and will likely support further conversation on the S Letter.  We were not able to brief her but she sent a message earlier today noting that she had concerns about that piece specifically.

Ex. AT (Feb. 9, 2022, Teams Chat).  The S-Letter mandated consultation with the Board on master account decisions, establishment of the ARISG to ensure immediate Board notification of master account requests by novel charters, and adherence to an Implementation Handbook that spelled out the Board's ability to veto any master account decision with which it disagreed.  *See* Ex. AS.  Like the Guidelines, although drafts had circulated for more than a year, the S-Letter was not officially issued until shortly before the denial of Custodia's membership and master account applications.  *See id.*

But the Board's involvement did not stop there.  Roughly two dozen Board employees played a role in determining the outcome of Custodia's master account request or the ability of SPDIs to access the payments system.  *See supra* paragraph 44.  For instance, Vice Chair Lael Brainard had numerous conversations with Esther George about Custodia's master account request.  *See supra* paragraph 46.  President George's contemporaneous notes reflected that "[Federal reserve Vice-Chair] Lael [Brainard] feels we don't have authority to say no to [Custodia's] request.  I pushed back and argued we need broader policy issue addressed."  Ex. Q, at FRBKC-0017834.  In January 2022, shortly after Chairman Powell's confirmation hearing and 15 months after Custodia first applied for a master account, the Board—not the Reserve Bank— decided that Custodia was eligible for a master account.  Vice-Chair Brainard communicated the

news to Senator Lummis, while Board General Counsel Mark Van Der Weide informed

Custodia.  Ex. CO; *see supra* paragraph 45.

Behind the scenes, the Board took steps that virtually guaranteed denial of Custodia's

master account request.  The Board's General Counsel invited Custodia to apply for Federal

Reserve membership, supposedly as a way to facilitate consideration of its master account

request.  *See supra* paragraph 24.  When Custodia obliged, the Board then used that decision

against Custodia, subjecting it to a punishing pre-membership exam whose process was so

lacking that it led Custodia to ask the Board's Inspector General to investigate 23 violations of

federal law, rules, policies and procedures.  *See supra* paragraph 58.  As but one example,

Reserve Bank staff told Custodia to prepare for a targeted examination that would focus on

Custodia's Day 1 business plan and shortly thereafter; but the membership denial treated

Custodia as a complex bank and judged it on its three-year product roadmap that was not yet

fully constructed.  Ex. CD.  Similarly, during the post-exam exit meeting, Kansas City Fed staff

working at the behest of the Board informed Custodia that everything "could be addressed" and

invited Custodia to submit proof of remediation.  Ex. AJ (Crouch Tr.), at 162:3–9, 164:12–18;

Ex. AP, at FRBKC-00014763.  Custodia did so, but the Kansas City Fed refused to consider this

evidence.  Ex. C (KC Fed 30(b)(6) Tr.), at 215:19–219:10.  These deviations condemned

Custodia—which was willing to have a federal regulator—to Tier 3 status and an orchestrated

master account denial that came immediately on the heels of the membership denial.

Staff at the Kansas City Fed understood that their recommendation on Custodia's master

account request should not contradict the Board's membership decision.  *See* Ex. CP, at FRBKC-

00002133 (Reserve Bank email stating "we do not want to contradict one another."); *see also* Ex.

N (Hazen Tr.), at 246:3–246:12 ("[T]he final piece that we needed to understand before we could

53

conclude our analysis [of the master account] was what the decision was going to be by the Board of Governors on the membership request.").  Thus, the denial of Custodia's membership application rendered the master account decision a *fait accompli*.  In effect, it dictated the outcome of Custodia's master account request.  The decisions were so intertwined that the Kansas City Fed did not start drafting a denial recommendation memo until after Board staffers communicated that they were leaning towards denial, and did not issue its master account denial until the Board voted to deny membership.

But perhaps the most stunning fact that would never have seen the light of day but for discovery is this:  in the wake of FTX's collapse and a mysterious briefing to Vice-Chair Barr concerning Custodia's membership and master account applications, ***Board staff edited and rewrote key parts of an internal Kansas City Fed memo recommending denial to the Kansas City Fed President without her knowledge before she saw or signed the denial letter***.  The Kansas City Fed later shared that memo with the Board's Director of RBOPS for non-objection, which was provided late at night, less than 12 hours before the Board voted to deny membership to Custodia.

By focusing only on President George's self-serving testimony that she made the master account decision, Defendants invite the Court to blinker itself from reality.  Discovery reveals that the Board was deeply intertwined in the outcome of Custodia's master account request.  That level of involvement is not consistent with the notion of unfettered Reserve Bank discretion that the Defendants advanced at the motion-to-dismiss stage.

## CONCLUSION

"Administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform."  *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991).  In this case, both the Board and the Kansas City Fed lack discretion to deny a master

54

J.A.722

account to an eligible depository institution.  Custodia respectfully submits that, whether pursuant to the APA count against the Board, or pursuant to the statutory mandamus count against the Kansas City Fed, or both, the Monetary Control Act requires the Court to vacate the denial of Custodia's master account request and enjoin Defendants from refusing to grant Custodia direct access to the Federal Reserve payments system.

DATED this 20th day of December, 2023.

CUSTODIA BANK, INC., Plaintiff

By:    /s/ Scott E. Ortiz
Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:    (307) 265-0700
Facsimile:    (307) 266-2306
Email:        sortiz@wpdn.net

-and-

John K. Villa, *pro hac vice*
Ryan Scarborough, *pro hac vice*
Lauren Weinberger, *pro hac vice*
Ian Swenson, *pro hac vice*
Russell Mendelson, *pro hac vice*
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone:    (202) 434-500
Emails:       jvilla@wc.com
              rscarborough@wc.com
              lweinberger@wc.com
              iswenson@wc.com
              rmendelson@wc.com

*Attorneys for Plaintiff*

55

J.A.723

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served this day of December 20, 2023, addressed to:

Mark Van Der Weide
Richard M. Ashton
Joshua P. Chadwick
Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitutional Avenue, N.W.
Washington, DC 20551

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Billie L.M. Addleman
John P. Fritz
Erin E. Berry
HIRST APPLEGATE, LLP
P.O. Box 1083
Cheyenne, Wyoming 82003

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Andrew Michaelson
Laura Harris
KING & SPALDING, LLC
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Angela Tarasi
Jared M. Lax
KING & SPALDING, LLP
1401 Lawrence Street
Suite 1900
Denver, Colorado 80202

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

/s/ Scott E. Ortiz
Scott E. Ortiz

**J.A.724**

Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:         sortiz@wpdn.net

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Number: 22-cv-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

**DECLARATION OF RYAN SCARBOROUGH IN SUPPORT OF PLAINTIFF CUSTODIA BANK, INC.'S OMNIBUS BRIEF IN SUPPORT OF ITS PETITION FOR REVIEW ON ITS APA CLAIM AND MOTION FOR JUDGMENT AS A MATTER OF LAW ON ITS STATUTORY MANDAMUS CLAIM**

---

I, Ryan Scarborough, declare as follows:

1.      I am an attorney at Williams & Connolly LLP, counsel for the Plaintiff in the above-captioned action.

2.      I respectfully submit this declaration in support of Plaintiff Custodia Bank, Inc's Omnibus Brief in Support of its Petition for Review on its APA Claim and its Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim.

3.      Attached hereto as Exhibit A is a true and accurate copy of Peter Conti-Brown's Expert Report, dated October 20, 2023.

J.A.725

4.      Attached hereto as Exhibit B is a true and accurate copy of an email from Seth Ruhter with the subject line "Re:  WSJ Op-Ed- updated," dated December 2, 2021, bearing a bates number that begins at FRBKC-00015088.

5.      Attached hereto as Exhibit C is a true and accurate copy of excerpts from the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, dated November 16, 2023.

6.      Attached hereto as Exhibit D is a true and accurate copy of an email from Esther George with the subject line "RE:  Wyoming SPDI Conversations," dated August 6, 2020, bearing a bates number that begins at FRBKC-00000276.

7.      Attached hereto as Exhibit E is a true and accurate copy of excerpts from the deposition of Tara Humston, dated November 3, 2023.

8.      Attached hereto as Exhibit F is a true and accurate copy of the State of Wyoming House Bill Working Draft regarding Special Purpose Depository Institutions legislation, dated 2019.

9.      Attached hereto as Exhibit G is a true and accurate copy of a document entitled "Wyoming Cryptocurrency Bill Talking Points," dated December 3, 2018, bearing a bates number that begins at FRBKC-00018341.

10.     Attached hereto as Exhibit H is a true and accurate copy of an email from Nick Billman with the subject line "RE:  Wyoming Talking Points," dated December 12, 2018, bearing a bates number that begins at FRBKC-00018339.

11.     Attached hereto as Exhibit I is a true and accurate copy of a letter from The Federal Reserve Bank of Kansas City to Chuck Thompson, dated January 27, 2022, bearing a bates number that begins at FRBKC-00000234.

12.    Attached hereto as Exhibit J is a true and accurate copy of excerpts from the deposition of Esther George, dated November 9, 2023.

13.    Attached hereto as Exhibit K is a true and accurate copy of excerpts from the deposition of Jackie Nugent, dated November 15, 2023.

14.    Attached hereto as Exhibit L is a true and accurate copy of a letter from the Office of the Comptroller of the Currency with the subject line "Re:  Authority of a National Bank to Provide Cryptocurrency Custody Services for Customers," dated July 22, 2020.

15.    Attached hereto as Exhibit M is a true and accurate copy of a Short Message Report, dated December 9, 2022, bearing a bates number that begins at FRBKC-00004962.

16.    Attached hereto as Exhibit N is a true and accurate copy of excerpts from the deposition of Judith Hazen, dated October 17, 2023.

17.    Attached hereto as Exhibit O is a true and accurate copy of an email from Caitlin Long with the subject line "Re:  Interesting data points for you," dated January 29, 2021, bearing a bates number that begins at Custodia-00002096.

18.    Attached hereto as Exhibit P is a true and accurate copy of excerpts from the transcript of the nomination hearing of Chair of the Federal Reserve Board of Governors Jerome Powell, dated January 11, 2022.

19.    Attached hereto as Exhibit Q is a true and accurate copy of an internal document from Esther George with the subject line "Phone call with President George/Gov. Brainard to discuss a new proposal from TCH," dated March 12, 2021, bearing a bates number that begins at FRBKC-00017834.

20.    Attached hereto as Exhibit R is a true and accurate copy of a document entitled "Custodia (f/k/a Avanti) Meeting," dated March 24, 2022, bearing a bates number that begins at FRBKC-00009848.

21.    Attached hereto as Exhibit S is a true and accurate copy of an email from Porcia Block with the subject line "FW: Draft Agenda for Introductory Calls," dated November 5, 2020, bearing a bates number that begins at FRBKC-00003426.

22.    Attached hereto as Exhibit T is a true and accurate copy of a letter from The Federal Reserve Bank of Kansas City to Caitlin Long, dated August 2, 2021, bearing a bates number that begins at FRB-AR-003858.

23.    Attached hereto as Exhibit U is a true and accurate copy of an email from Esther George with the subject line "Re: Meeting request from Avanti," dated December 2, 2020, bearing a bates number that begins at FRBKC-00010562.

24.    Attached hereto as Exhibit V is a true and accurate copy of an email from Lacey Peters with the subject line "RE: SPDI Custodia and Fiduciary Manual," dated December 3, 2020, bearing a bates number that begins at FRBKC-00002560.

25.    Attached hereto as Exhibit W is a true and accurate copy of privileged and redacted handwritten notes entitled "Tara's Book," dated June 17, 2021, through August 5, 2021, bearing a bates number that begins at FRBKC-00014054.

26.    Attached hereto as Exhibit X is a true and accurate copy of an email from Kathy Wilson with the subject line "RE: Resources to contribute from Kansas City," dated November 16, 2020, bearing a bates number that begins at FRBKC-00004899.

27.     Attached hereto as Exhibit Y is a true and accurate copy of a document entitled "Board/FRS:  Nontraditional Account Access Workstream Structure," bearing a bates number that begins at FRBKC-00004902.

28.     Attached hereto as Exhibit Z is a true and accurate copy of Katie S. Cox's Expert Report, submitted October 20, 2023.

29.     Attached hereto as Exhibit AA is a true and accurate copy of a Short Message Report, dated March 14, 2022, bearing a bates number that begins at FRBKC-00004943.

30.     Attached hereto as Exhibit AB is a true and accurate copy of redacted handwritten notes, dated October 2, 2020, bearing a bates number that begins at FRBKC-00013890.

31.     Attached hereto as Exhibit AC is a true and accurate copy of redacted handwritten notes entitled "Tara's Book," dated November 8, 2021, through December 12, 2021, bearing a bates number that begins at FRBKC-00013969.

32.     Attached hereto as Exhibit AD is a true and accurate copy of an email from Tara Humston with the subject line "RE:  Avanti @ Money 2020," dated November 4, 2021, bearing a bates number that begins at FRBKC-00000394.

33.     Attached hereto as Exhibit AE is a true and accurate copy of excerpts from the deposition of Caitlin Long, dated November 29, 2023.

34.     Attached hereto as Exhibit AF is a true and accurate copy of an email from Caitlin Long with the subject line "update," dated, August 6, 2021, bearing a bates number that begins at Custodia-00004366.

35.     Attached hereto as Exhibit AG is a true and accurate copy of a letter from The Federal Reserve Bank of Kansas City to Caitlin Long, dated October 21, 2022, bearing a bates number that begins at FRBKC-00000297.

36.     Attached hereto as Exhibit AH is a true and accurate copy of excerpts from the deposition of Christi May-Oder, dated October 19, 2023.

37.     Attached hereto as Exhibit AI is a true and accurate copy of excerpts from the deposition of Andrea Mullins, dated December 7, 2023.

38.     Attached hereto as Exhibit AJ is a true and accurate copy of excerpts from the deposition of Ross Crouch, dated October 25, 2023.

39.     Attached hereto as Exhibit AK is a true and accurate copy of a letter from The Federal Reserve Bank of Kansas City to Caitlin Long, dated August 19, 2022, bearing a bates number that begins at Custodia-00009860.

40.     Attached hereto as Exhibit AL is a true and accurate copy of an email from Judith Hazen with the subject line "RE:  Custodia Memo to Esther," dated December 6, 2022, bearing a bates number that begins at FRBKC-00002132.

41.     Attached hereto as Exhibit AM is a true and accurate copy of an email from Jeff Imgarten with the subject line "RE:  Custodia Review Documents," dated June 25, 2022, bearing a bates number that begins at FRBKC-00002200.

42.     Attached hereto as Exhibit AN is a true and accurate copy of a redacted email from Jeff Imgarten with the subject line "RE:  Notes from 1/26 Meeting with the Board," dated February 28, 2022, bearing a bates number that begins at FRBKC-00003428.

43.     Attached hereto as Exhibit AO is a true and accurate copy of an email from Katie Cox with the subject line "Re:  definition of 'complex bank,'" dated October 22, 2022, bearing a bates number that begins at Custodia-00003104.

44.     Attached hereto as Exhibit AP is a true and accurate copy of a letter from The Federal Reserve Bank of Kansas City to Caitlin Long, dated October 21, 2022, bearing a bates number that begins at FRBKC-00014758.

45.     Attached hereto as Exhibit AQ is a true and accurate copy of a document titled, "Custodia Feedback Meeting Comments" summarizing feedback to be delivered to Custodia regarding its September 6, 2022, pre-membership examination.

46.     Attached hereto as Exhibit AR is a true and accurate copy of an email from Caitlin Long with the subject line "Custodia," dated December 21, 2022, bearing a bates number that begins at Custodia-00007002.

47.     Attached hereto as Exhibit AS is a true and accurate copy of an S-2677 letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank, dated January 17, 2023, bearing a bates number that begins at FRB-AR-000014.

48.     Attached hereto as Exhibit AT is a true and accurate copy of a Short Message Report, dated February 9, 2022, bearing a bates number that begins at FRBKC-00011220.

49.     Attached hereto as Exhibit AU is a true and accurate copy of Katie S. Cox's Supplemental Expert Report, dated December 4, 2023.

50.     Attached hereto as Exhibit AV is a true and accurate copy of a document entitled "DRAFT4 V3 Account Access Guidelines - FRS Internal Implementation Handbook," dated September 22, 2022, bearing a bates number that begins at FRBKC-00017974.

51.     Attached hereto as Exhibit AW is a true and accurate copy of a document entitled "DRAFT4 V4 Account Access Guidelines - FRS Internal Implementation Handbook," dated October 21, 2022, bearing a bates number that begins at FRBKC-00018073.

52.     Attached hereto as Exhibit AX is a true and accurate copy of a document entitled "Account Access Guidelines - FRS Internal Implementation Handbook," dated August 16, 2023, bearing a bates number that begins at FRBKC-00017290.

53.     Attached hereto as Exhibit AY is a true and accurate copy of Peter Conti-Brown's Supplemental Expert Report, dated December 11, 2023.

54.     Attached hereto as Exhibit AZ is a true and accurate copy of a document entitled "Novel Account Access Review," bearing a bates number that begins at FRBKC-00017570.

55.     Attached hereto as Exhibit BA is a true and accurate copy of Tab 10, which contains a list of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness.

56.     Attached hereto as Exhibit BB is a true and accurate copy of a list of individuals who were involved in working with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition.

57.     Attached hereto as Exhibit BC is a true and accurate copy of an email from Chris Gaul-Pearson with the subject line "RE:  ABA Routing Number," dated January 27, 2022, bearing a bates number that begins at FRBKC-00000446.

58.     Attached hereto as Exhibit BD is a true and accurate copy of an email from Jackie Nugent with the subject line "RE:  Master account requests - next steps for us to work on," dated November 24, 2020, bearing a bates number that begins at FRBKC-00015474.

59.     Attached hereto as Exhibit BE is a true and accurate copy of an email from Esther George with the subject line "RE:  SPDI charter/master account," dated January 6, 2021, bearing a bates number that begins at FRBKC-00004808.

60.     Attached hereto as Exhibit BF is a true and accurate copy of an email from Judith Hazen with the subject line "RE:  Copy of Custodia Briefing Memo," dated November 22, 2022, bearing a bates number that begins at FRBKC-00002169.

61.     Attached hereto as Exhibit BG is a true and accurate copy of an email from Christi May-Oder with the subject line "Monetary Policy/Financial Stability Discussion," dated September 27, 2022, bearing a bates number that begins at FRBKC-00000460.

62.     Attached hereto as Exhibit BH is a true and accurate copy of a Short Message Report, dated July 25, 2022, bearing a bates number that begins at FRBKC-00005021.

63.     Attached hereto as Exhibit BI is a true and accurate copy of an article by Brian Deese, et al entitled "The Administration's Roadmap to Mitigate Cryptocurrencies' Risks," dated January 27, 2023.

64.     Attached hereto as Exhibit BJ is a true and accurate copy of an email from Jackie Nugent with the subject line "FW:  #Aware - FW:  WSJ News Alert:  [Redacted] Race to Cover $8.1 Billion in Withdrawals During Crypto Meltdown," dated January 5, 2023, bearing a bates number that begins at FRBKC-00015275.

65.     Attached hereto as Exhibit BK is a true and accurate copy of an email from Tara Humston with the subject line "FW:  Correspondence from Custodia Regarding FTX Exchange and Related Policy Implications," dated November 23, 2022, bearing a bates number that begins at FRBKC-00014994.

66.     Attached hereto as Exhibit BL is a true and accurate copy of an email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information," dated November 14, 2022, bearing a bates number that begins at FRBKC-00010129.

67.     Attached hereto as Exhibit BM is a true and accurate copy of a document entitled "Potential Membership Application Commitments Summary," bearing a bates number that begins at FRBKC-00010131.

68.     Attached hereto as Exhibit BN is a true and accurate copy of excerpts from the rough transcript of the deposition of Peter Conti-Brown, dated December 14, 2023.

69.     Attached hereto as Exhibit BO is a true and accurate copy of an email from Jeff Imgarten with the subject line "RE:  Copy of Custodia Briefing Memo?," dated November 27, 2022, bearing a bates number that begins at FRBKC-00016494.

70.     Attached hereto as Exhibit BP is a true and accurate copy of a Short Message Report, dated November 30, 2022, bearing a bates number that begins at FRBKC-00015783.

71.     Attached hereto as Exhibit BQ is a true and accurate copy of an email from Jason Hinkle with the subject line "RE:  Draft Recommendation Memo," dated January 9, 2023, bearing a bates number that begins at FRB-AR-000324.

72.     Attached hereto as Exhibit BR is a true and accurate copy of an email from Nick Billman with the subject line "Re: #Aware - Feedback on FRBKC Custodia analysis on Monetary policy & FS risk," dated January 3, 2023, bearing a bates number that begins at FRBKC-00011698.

73.     Attached hereto as Exhibit BS is a true and accurate copy of a draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust)

Master Accounts Recommendation," dated January XX, 2023, bearing a bates number that begins at FRB-AR-000326.

74.     Attached hereto as Exhibit BT is a true and accurate copy of an internal memo from the Federal Reserve Bank of Kansas City with the subject line "Update on Avanti Bank & Trust, Cheyenne, WY (Avanti) - Information may support internal staff with ongoing master account access request and Federal Reserve membership application analyses," dated January 13, 2022, bearing a bates number that begins at FRBKC-00010204.

75.     Attached hereto as Exhibit BU is a true and accurate copy of a document entitled "SPDI Conclusion Memo," dated July 15, 2020, bearing a bates number that begins at FRBKC-00009384.

76.     Attached hereto as Exhibit BV is a true and accurate copy of a communication from Rob Triano with the subject line "RE:  Initial/Pre-scope Review of Internal Audit," dated October 22, 2021, bearing a bates number that begins at FRBKC-00000054.

77.     Attached hereto as Exhibit BW is a true and accurate copy of a Short Message Report, dated January 26, 2022, bearing a bates number that begins at FRBKC-00004977.

78.     Attached hereto as Exhibit BX is a true and accurate copy of a document entitled "Application Review - Avanti," dated July 15, 2020, bearing a bates number that begins at FRBKC-00009571.

79.     Attached hereto as Exhibit BY is a true and accurate copy of an email from Matthew Malloy with the subject line "RE:  Draft Recommendation Memo," dated January 10, 2023, bearing a bates number that begins at FRB-AR-000313.

80.     Attached hereto as Exhibit BZ is a true and accurate copy of a draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust)

Master Accounts Recommendation," dated January XX, 2023, bearing a bates number that begins at FRB-AR-000315.

81.     Attached hereto as Exhibit CA is a true and accurate copy of an email from Judith Hazen with the subject line "Custodia Recommendation," dated January 19, 2023, bearing a bates number that begins at FRBKC-00010951.

82.     Attached hereto as Exhibit CB is a true and accurate copy of an email from Judith Hazen with the subject line "Custodia Bank Master Account Request," dated January 24, 2023, bearing a bates number that begins at FRB-AR-000003.

83.     Attached hereto as Exhibit CC is a true and accurate copy of an email from Matthew Eichner with the subject line "Custodia response:  S-Letter - 2667 with no concerns identified," dated January 26, 2023, bearing a bates number that begins at FRB-AR-000002.

84.     Attached hereto as Exhibit CD is a true and accurate copy of a letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors, dated March 8, 2023, bearing a bates number that begins at Custodia-00010268.

85.     Attached hereto as Exhibit CE is a true and accurate copy of an email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George," dated January 27, 2023, bearing a bates number that begins at FRBKC-00002171.

86.     Attached hereto as Exhibit CF is a true and accurate copy of a letter from The Federal Reserve Bank of Kansas City to Caitlin Long, dated January 27, 2022, bearing a bates number that begins at FRBKC-00002172.

87.     Attached hereto as Exhibit CG is a true and accurate copy of an email from Christi May-Oder with the subject line "Re:  #Aware - Feedback on FRBKC Custodia analysis on

Monetary policy & FS risk," dated December 23, 2022, bearing a bates number that begins at FRBKC-00013622.

88.     Attached hereto as Exhibit CH is a true and accurate copy of an email from Press@Custodia with the subject line "Re:  Bloomberg News Inquiry," dated January 26, 2023, bearing a bates number that begins at Custodia-00010032.

89.     Attached hereto as Exhibit CI is a true and accurate copy of a letter from the State of Wyoming Department of Audit to Caitlin Long, dated September 12, 2022, bearing a bates number that begins at Custodia-00004962.

90.     Attached hereto as Exhibit CJ is a true and accurate copy of a report of the House Subcommittee on Domestic Monetary Policy of the Committee on Banking, Finance and Urban Affairs entitled, "The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System, Report of the Subcommittee on Domestic Monetary Policy (98th Cong., Second Session)," dated November 1984.

91.     Attached hereto as Exhibit CK is a true and accurate copy of a Notice from the Board of Governors of the Federal Reserve System, dated August 20, 1981.

92.     Attached hereto as Exhibit CL is a true and accurate copy of the Federal Reserve Bank of Kansas City 1981 Annual Report, dated January 1981.

93.     Attached hereto as Exhibit CM is a true and accurate copy of Morgan Ricks' Expert Report, dated December 4, 2023.

94.     Attached hereto as Exhibit CN is a true and accurate copy of a letter from The Federal Reserve Bank of New York to Thomas Dewey, dated May 16, 2018, bearing a bates number that begins at TNB-0000002.

95.    Attached hereto as Exhibit CO is a true and accurate copy of an email from Caitlin Long with the subject line "baby steps," dated January 27, 2022, bearing a bates number that begins at Custodia-00008131.

96.    Attached hereto as Exhibit CP is a true and accurate copy of an email from Judith Hazen with the subject line "Re:  Custodia Memo to Esther," dated December 6, 2022, bearing a bates number that begins at FRBKC-00002132.

97.    Attached hereto as Exhibit CQ is a true and accurate copy of an email from Caitlin Long with the subject line "Re:  Custodia does not withdraw its membership application; willing to resubmit it if that is necessary for Fed to finally review updated record," dated January 27, 2023, bearing a bates number that begins at Custodia-00009974.

DATED this 20th day of December, 2023.

/s/ Ryan Scarborough_____
Ryan Scarborough, *pro hac vice*
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
rscarborough@wc.com
*Attorney for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document was served this day of December 20, 2023, addressed to:

| | |
|---|---|
| Mark Van Der Weide<br>Richard M. Ashton<br>Joshua P. Chadwick<br>Yvonne F. Mizusawa<br>Yonatan Gelblum<br>Katherine Pomeroy<br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM<br>20th Street and Constitutional Avenue, N.W.<br>Washington, DC 20551 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Billie L.M. Addleman<br>John P. Fritz<br>Erin E. Berry<br>HIRST APPLEGATE, LLP<br>P.O. Box 1083<br>Cheyenne, Wyoming 82003 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Andrew Michaelson<br>Laura Harris<br>KING & SPALDING, LLC<br>1185 Avenue of the Americas, 34th Floor<br>New York, New York 10036 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Jeffrey S. Bucholtz<br>Joshua N. Mitchell<br>Christine M. Carletta<br>KING & SPALDING, LLP<br>1700 Pennsylvania Ave., N.W.<br>Washington, D.C. 20006 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Angela Tarasi<br>Jared M. Lax<br>KING & SPALDING, LLP<br>1401 Lawrence Street<br>Suite 1900<br>Denver, Colorado 80202 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |

/s/ Ryan Scarborough
Ryan Scarborough

J.A.739

# EXHIBIT A

# [PUBLIC VERSION]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,
2120 Carey Avenue, Suite 300
Cheyenne, WY 82001

     *Plaintiff*,

       v.

FEDERAL RESERVE BOARD OF
GOVERNORS,
Constitution Ave NW & 20th St NW
Washington, DC 20551

FEDERAL RESERVE BANK
OF KANSAS CITY,
1 Memorial Drive
Kansas City, MO 64108,

     *Defendants*.

Civil Case No.: 1:22-CV-00125-SWS

---

**EXPERT REPORT OF PETER CONTI-BROWN, PH.D.**

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1
       A.    Qualifications .................................................................................1
       B.    Compensation Disclosure .............................................................2
       C.    Documents Considered ..................................................................3
II.    Summary of Opinions ................................................................................4
III.   THE FED WAITED MORE THAN THIRTY YEARS AFTER PASSAGE OF
       THE MONETARY CONTROL ACT TO ASSERT DISCRETION OVER
       WHETHER TO GRANT MASTER ACCOUNT REQUESTS .......................................10
       A.    The Dual Banking System ..........................................................10
       B.    The Federal Reserve System ......................................................12
       C.    The Fragmented Regulatory Landscape for Banking .............14
       D.    The Monetary Control Act of 1980 ............................................16
       E.    The 1998 Introduction of Master Accounts ..............................20
       F.    In 2015, the Federal Reserve Changes Course .........................25
             1.    Fourth Corner Credit Union..............................................26
             2.    The Narrow Bank ...............................................................30
             3.    The Territorial Bank of American Samoa ("TBAS") ...............31
       G.    The Federal Reserve Doubles Down on Its Claim of Discretion with Its
             2022 Guidelines for Evaluating Account and Services Requests .........................33
IV.    THE BOARD CONTROLS DECISIONS OVER MASTER ACCOUNT
       REQUESTS LIKE CUSTODIA'S THAT RAISE PUBLIC POLICY
       QUESTIONS ...........................................................................................39
       A.    Previous Cases of Board Intervention in Master Account Requests ...................40
             1.    The Narrow Bank ...............................................................40
             2.    The Territorial Bank of American Samoa ("TBAS") ...............42
       B.    The Board's Intervention in Custodia's Master Account Request .......................43
             1.    The Board Determined Whether Custodia Was Eligible for a
                   Master Account ...............................................................43
             2.    The Board's public and private guidance asserts Board Dominance
                   Over Master Account Access........................................................44
             3.    The Board Implemented Its Public and Internal Guidance when
                   Denying Custodia's Master Account Request...........................................50
V.     CONCLUSION........................................................................................52

i

I, Peter Conti-Brown, Ph.D., declare and state as follows:

## I.        INTRODUCTION

### A.        <u>Qualifications</u>

1.        I am the Class of 1965 Associate Professor of Financial Regulation at The Wharton School of the University of Pennsylvania.  I received an AB from Harvard College, a law degree from Stanford Law School, and a PhD in financial history from Princeton University, where my graduate coursework was in both history and economics.

2.        I teach courses on financial regulation, financial history, and business ethics, among other topics, to undergraduates, graduate students pursuing their Masters Degrees in Business Administration, and PhD students in the History Department of the University of Pennsylvania and in the Department of Legal Studies and Business Ethics at The Wharton School.  I also teach executives at The Wharton School's campus in Philadelphia and in San Francisco and around the world.  Prior to becoming a professor at Wharton in 2015, I was an academic fellow at Stanford Law School and Stanford's Graduate School of Business for four years.  I have also held positions in federal government as a law clerk for two federal appellate judges on the U.S. Courts of Appeals for the Second and District of Columbia Circuits.

1

3.     I have published numerous articles and books on the subjects of
banking, central banking, and the Federal Reserve, including a forthcoming history
of the Federal Reserve System and another on the history of bank supervision in
the United States.  I am also the co-author of one of the leading textbooks on
financial regulation in wide use in law schools in the United States.

4.     I have consulted widely in the financial services industry, and have
been retained as an expert witness in *Holbrook vs. The Brink's Company*, US
District Court for the Southern District of Ohio Eastern Division, Case No. 2:13-
cv-873, which was resolved by the court on a motion for summary judgment prior
to my deposition; *Home Federal Bank of Tennessee v. Home Federal Bank
Corporation*, US District Court for the Eastern District of Tennessee, Case No.
3:18-cv-00379, which was settled by the parties prior to my deposition; and *Ocwen
vs. Weiner,* US District Court for the Eastern District of California, Case No. 2:14-
cv-02597, for which I was deposed in March 2019 and which was settled by the
parties in 2023.[1]

**B.     Compensation Disclosure**

5.     Plaintiff Custodia Bank, Inc, ("Plaintiff") is paying an hourly fee of
$950 per hour for the time I spend working on this Report and otherwise assisting

---

[1] More on my educational and research background is included in the attached Curriculum Vitae.  Exhibit 1.

counsel on this case.  My compensation is not contingent on any outcome in this case.  The views expressed herein are my own.

### C.   **Documents Considered**

6.      In conducting my analysis, I have considered the scholarly literature on the history and practices of Federal Reserve System services.  I also extensively consulted the legislative histories of the Federal Reserve Act (and its amendments, including the Banking Act of 1935), the Depository Institutions and Monetary Control Act of 1980 ("Monetary Control Act"), and the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, among others mentioned below.  I consulted the historical record regarding the challenges of providing Federal Reserve services throughout its 110-year history.  I consulted news coverage of the Federal Reserve's master account procedures from 1997 to the present.  I consulted the annual reports of the Board of Governors of the Federal Reserve System and the twelve Federal Reserve Banks.  And I reviewed the administrative record produced by the Federal Reserve Board of Governors as well as documents produced by the Federal Reserve Bank of Kansas City.  Specific citations follow below, with a list of citations included as Exhibit 2.  I refer to all materials, including any legal materials, only for factual and historical purposes; nothing in this report purport to be a legal conclusion on the questions pending before the court.

3

## II.    Summary of Opinions

7.      This report contains my findings and opinions as of October 20, 2023. My analysis of these issues is ongoing and my opinions may change if additional information relevant to these questions comes to my attention, for example, through reports or documents generated through further discovery by the parties.[2]

8.      I have been retained by Plaintiff to provide expert opinions on two related questions: (1) whether the Fed's claim of discretion over Master Account access conforms to history, practice, legal context, and the public policies of the US government and the Federal Reserve itself; and (2) whether the Board of Governors of the Federal Reserve exercises ultimate authority over Master Account access.

9.      *First*, I conclude that the Board's claim of discretion over Master Account access does not conform to history, practice, legal context, or the public policies of the US government and the Federal Reserve itself.  The Fed only began to assert such discretion over Master Account access around 2015.  This assertion also fundamentally remakes the nature of the US financial and banking system, a delicate balance that has evolved over 160 years, in a way that Congress never authorized and never intended.

---

[2] Throughout this report, I have referred to the decision-making entity in determining access to Master Accounts as "the Federal Reserve" or "the Fed." This refers to the Federal Reserve System, which includes the Fed's Board of Governors, a governmental agency in Washington, DC, and the twelve quasi-private Federal Reserve Banks.

4

10.    The Fed's assertion of discretion over Master Account access for legally eligible, duly chartered depository institutions upsets what is known as the "dual banking system," a system that permits state and federal chartering authorities and state and federal supervisory and regulatory authorities to participate in the management of the US financial system.[3] Key to the success of the dual banking system is the recognition that state and federal authorities each play a role in granting access to the banking system that is supervised and regulated jointly by both state and federal actors.

11.    The federalism at the heart of the dual banking system is important not only because of the historical evolution that produced it.  State and federal participation in bank chartering, supervision, and regulation also permits depository institutions to survey various options and business models – traditional banks, credit unions, thrifts, for example.  In turn, this system permits states and federal chartering and supervisory authorities to experiment in competition with each other to drive innovation, financial inclusion, and the availability of novel financial services to a dynamic economy.

12.    The Fed's assertion of discretion in granting access to a Master Account upsets this delicate balance.  As I wrote in 2018, a depository institution that is

---

[3] See, e.g., The National Banks and the Duel Banking System (Comptroller of the Currency, September 2003).

denied access to a Master Account at a Federal Reserve Bank "can't really function as a financial institution.  It becomes instead a kind of storage locker."[4] A depository institution so denied can no longer function by that name, despite the authorization from state chartering authorities and the legal eligibility to bank at the Federal Reserve.

13.    Before 2015, the Federal Reserve viewed access to a Master Account as, in legal scholar Julie Hill's description, a "quick" process that deferred risk assessments to "a federal or state bank supervisor." [5]  After 2015, the Fed changed that delicate process entirely.  By claiming a second look at every depository institution that seeks to do business with the Federal Reserve (as every depository institution must do), the Fed has become the *de facto* re-chartering authority for every depository institution in the country, whatever its business model, whatever its geographic footprint, whatever its local governmental support.

14.    Under the Fed's newly discovered discretion in providing access to the Master Account, it has displaced state chartering and supervisory authorities.  Under the Fed's theory of the scope of its authority, there is no limit to this displacement. It can, by its assertion, second guess any determination made by any state

---

[4]  Peter Conti-Brown, The Fed Wants To Veto State Banking Authorities.  But Is That Legal?  Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd.

[5] Julie A. Hill, *Opening a Federal Reserve Account*, 40 YALE J. REGUL. 453, 456, 463 (2023)

government at any time with respect to what constitutes the appropriate provision of banking and financial services anywhere within the reach of the global banking system.

15.     These sweeping assertions of authority are not limited to the question of Master Account access.  The Fed has also used ongoing access to its priced services as a cudgel for depository institutions to which it has already granted access.  As explained in more detail below, such was the case of the Territorial Bank of American Samoa ("TBAS").[6]This level of centralized federal control over every aspect of banking is new in the 160-year history of the formal federal banking supervision in the United States.

16.     It is also new in the nearly fifty-year history of the Monetary Control Act ("MCA").  As explained in more detail below, from the passage of the MCA in 1980 through the creation of the Master Account in 1998 until the Fed announced its discretion to deny access in 2015, the Fed treated such access as routine and deferential.  The legislative history surrounding the MCA illustrates what was intended by the passage of the relevant provisions: "open access to Federal Reserve System services" for all depository institutions while maintaining "the

---

[6] *See infra* §§ III.F.3, IV.A.2

continuation of the freedom for banks to choose a State or Federal charter and membership in the Federal Reserve System" as they preferred.[7]

17.     The Federal Reserve's newly asserted authority to grant or deny access as it sees fit to these services is thus inconsistent with the MCA and the choices Congress made when enacting that legislation.  It is also inconsistent with the history, practice, and public policy of the US government and the Federal Reserve itself.

18.     *Second*, the historical record shows that, since the Fed announced its authority to act as a re-chartering agency for all depository institutions, the Board of Governors has exercised control over specific access or lack of access to Master Account and other Fed services.

19.     The Board of Governors, not the twelve quasi-private Federal Reserve Banks, is responsible for controlling regulatory, supervisory, and financial policy for the Federal Reserve System.

20.     As I explain below, in at least three previous cases, the Board has intervened in decisions on Master Account access that, in the Fed's view, implicate its own policy choices.[8]

---

[7] Hrg. Before the Sen. Committee on Banking, Housing, and Urban Affair, 96th Cong. at 54 (Feb. 4-5 1980).

[8] *See infra* § IV.A.

J.A.750

21.     The administrative record in this case supports the conclusion that the Board reached the same determination in the present case, as well.  Staff at the Kansas City Fed and the Board of Governors viewed Custodia's request for access to a Master Account as setting "precedent."[9]

22.     The Fed thus attached policy importance to accepting Custodia's request to be accepted into the financial and banking system.  It also apparently disagreed with Wyoming state banking authorities and the Wyoming state legislature in this regard.  Based on my review of the administrative record in this case, I conclude that the Board of Governors expressed these views specifically in denying Custodia's access to the Master Account in two ways: (1) by consulting regularly with the Kansas City Fed throughout the pendency of Custodia's master account request, and (2) by redlining the recommendation that the Kansas City Fed staff made to the Kansas City Fed President regarding Custodia's request.

23.     More generally, the Board of Governors asserted its control over these evaluative processes in two additional ways: (1) by promulgating the Guidelines for Evaluating Account and Service Requests, which provides a detailed roadmap for denial of access and essentially invites Reserve Banks to consult with the Board on marginal cases; and (2) by issuing the non-public internal guidance letter S-

---

[9] FRB-AR-000336 at FRB-AR-000343; FRBKC-00014860 at FRBKC-000014862.

9

2677, which explicitly requires Reserve Banks that are "considering approval of an access request from a higher risk entity, *including all Tier 2 or Tier 3 institution*s," to "consult with the director of [Reserve Bank Operations and Payment Systems]" on the results of its pre-decisional analysis under the Guidelines prior to communicating any decision to the institution."[10]

24.    The Fed has gone to some length to make Custodia's denial of access to a Master Account appear to be an independent determination of the Federal Reserve Bank of Kansas City.  The record shows otherwise.  The Board must not be permitted to hide behind the quasi-private Federal Reserve Banks in making regulatory and supervisory decisions.

III.    **THE FED WAITED MORE THAN THIRTY YEARS AFTER PASSAGE OF THE MONETARY CONTROL ACT TO ASSERT DISCRETION OVER WHETHER TO GRANT MASTER ACCOUNT REQUESTS**

A.    <u>**The Dual Banking System**</u>

25.    The United States operates a dual banking system that allows banks to be chartered by either the state or federal government.  This system began with the passage of the National Banking Acts of 1863 and 1864, which initiated the era of nationally chartered banks.

---

[10] FRB-AR_000014 at FRB- AR-000016.

26.     Banks with national charters are primarily supervised and regulated by the Office of the Comptroller of the Currency (OCC), an independent regulator within the US Treasury.  Banks with state charters are primarily supervised by state regulators.  The existence of charter and supervisory optionality has raised debates about the wisdom of this system.[11]  Nevertheless, the dual banking system has been sustained by Congress for 160 years.

27.     While the dual-banking system divides the chartering and regulatory responsibilities between the Federal and state governments, it does not create two separate systems for bank services.  The Federal Reserve must provide access to the U.S. dollar payment system to eligible depository institutions on a nondiscriminatory basis.[12] This is because there is only one provider of essential central banking financial services: the US central bank, or the Federal Reserve System.  There is no state analogue of these services.  The Fed, in this respect, is the only game in town.

---

[11] *Compare* Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 STANFORD L. REV. 1 (1977) *with* Henry N. Butler and Jonathan R. Macey, *Myth of Competition in the Dual Banking System*, 73 CORNELL L. REV. 677 (1988).

[12] 12 U.S.C. §§ 248a(c)(2), 1831d(a).

11

### B.      The Federal Reserve System

28.      The Federal Reserve System was created by Congress and signed into law on December 23, 1913.[13]  The three words in its title, curious for central banks then and now, spoke to the balance that its framers had to strike in creating a new central bank in the United States, given Americans' longstanding skepticism of central banks and centralized bank power.

29.      The "Reserve" part of the new System was natural enough:  To combat the string of devastating Gilded Age financial panics and crises, Congress sought to create a reserve of "elastic" currency that could circulate more quickly through an economy in distress than the alternatives that had been tried before.[14]

30.      The "Federal" part was an acknowledgement that the power for this system would be shared between a central authority, then called the Federal Reserve Board, and the twelve quasi-private "Reserve Banks" organized according to a process set forth in the Federal Reserve Act.

31.   The Reserve Banks, the Federal Reserve Board, and the banks that opted to become members of the Federal Reserve to gain access to its financial services formed the "System."

---

[13] Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (1913).

[14] Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (1913); Roger Lowenstein, AMERICA'S BANK: THE EPIC STRUGGLE TO CREATE THE FEDERAL RESERVE (2015); Elmus Wicker, BANKING PANICS OF THE GILDED AGE (2000).

32.     Almost immediately there were conflicts and uncertainties about who would have supervisory authority over which depository entities.[15]

33.     National banks – those chartered by the OCC – were required by law to become members of the Federal Reserve System.  This created a conflict between the OCC and the Fed regarding which entity would have primacy with respect to regulating and supervising those national banks.

34.     Similarly, once state-chartered banks joined the Federal Reserve System, those banks were supervised by both state and federal regulators.  There again arose the question of supervisory primacy: would the states control these institutions, or would the Federal Reserve?  That answer varied state by state and reserve bank by reserve bank.  What was consistent across the System was that membership in the Fed did not replace state supervision.  Rather, state supervisors and state-chartered banks ensured that state supervision remained firmly in place, whatever requirements the Fed might impose on those state banks that joined its System.

35.     Originally, the Fed was charged with providing its financial services only to "its member banks" and "the United States."[16] In 1917, however, Congress

---

[15] 1 Allan Meltzer, A HISTORY OF THE FEDERAL RESERVE at 75 (2003) ("Tensions between the Board and the reserve banks began before the System opened for business.")

[16] Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251, § 13 (1913).

13

began expanding this list of covered entities.  Today, subject to some restrictions, covered entities include "member banks, or other depository institutions, . . . the United States" and "nonmember bank or trust company or other depository institution."[17]

### C.  The Fragmented Regulatory Landscape for Banking

36.     The problem of regulatory and supervisory confusion with the addition of the Federal Reserve—and thus the need to adjudicate those tensions—was recognized from the beginning.  Even before the Federal Reserve System was created, there were prominent individuals who advocated for the displacement of the national banking charter.

37.     For example, Lyman Gage, writing as a former Secretary of the Treasury in 1907, wrote that the Comptroller of the Currency had essentially failed in its efforts to supervise the financial system and "should be repealed" in favor of a "central bank or Government bank of adequate capital.[18]

38.     Such was a common refrain throughout the last 110 years, most recently in a call for reform issued by former Fed Chairman Paul Volcker in

---

[17] 12 USC § 342.

[18] Gage et al, "The Financial Situation," *North American Review,* Feb 1908, vol 187, page 161-192.

14

2015.[19]  Volcker and his colleagues looked at all the fractures in federal and state

bank regulation and reached the conclusion that so disjointed a system was not able

to effectuate the financial and monetary policy goals that Congress had put before

them.

39.     Despite the long enthusiasm for simplifying or centralizing this

system, each of these efforts failed.  As a result, a clear set of responsibilities

developed, echoing through many different statutory allocations of responsibility,

as follows:

> a.     The Comptroller of the Currency has exclusive chartering
>
>        authority and primary supervisory authority over banks that
>
>        sought or received a national charter.
>
> b.     The state chartering authorities have exclusive chartering
>
>        authority and primary supervisory authority for state-law
>
>        matters over those banks that sought or received a state charter.
>
> c.     Since 1933, the Federal Deposit Insurance Corporation has
>
>        worked with the OCC in supervising national banks and the
>
>        state chartering authorities in working with state banks.

---

[19] See Volcker Alliance, *Reshaping the Financial Regulatory System*, April 2015.  For more on the history of these failed efforts, see Elizabeth F. Brown, *Prior Proposals to Consolidate Federal Financial Regulators,* THE VOLCKER ALLIANCE (2015).

     d.     The Federal Reserve shared supervisory authority over national banks (which were members of the Federal Reserve System by statute) and the state banks that opted into membership.

40.     Prior to 1980, the Fed was also permitted to discriminate in the provision of services in favor of those entities that became members of the Federal Reserve System.  Such discrimination, the Fed believed, was necessary in part to attract state banks to join the Federal Reserve System, given that membership also included regulatory requirements that were sometimes more burdensome than state banking authorities required of the same entities.

### D.     **The Monetary Control Act of 1980**

41.     Federal Reserve Bank services were at one time limited to Federal Reserve discretion, which gave preference to Federal Reserve member banks.  That changed in 1980, when Congress passed the Monetary Control Act and removed such discretion from the Federal Reserve.

42.     Then-Fed Chairman Paul Volcker testified that Congress needed to change the law because failure to do so left the Fed "with the increasingly awkward problem of discriminating between members and nonmembers in the provision of certain services, such as automated clearinghouse payments, which for

16

practical reasons cannot operate efficiently unless open to all depository institutions."[20]

43.     William Proxmire, one of the sponsors of the legislation that would amend the Federal Reserve Act, stated his aim more clearly: he wanted "open access to Federal Reserve System services" and "the continuation of the freedom for banks to choose a State or Federal charter and membership in the Federal Reserve System."[21]

44.     Consistent with those statements, the conference report announces an intention to "open access to [Federal Reserve] services to all depository institutions on the same terms and conditions as member banks."[22]

45.     The Monetary Control Act as signed into law implemented that intention.  The Monetary Control Act requires the Federal Reserve to offer the services enumerated in 12 U.S.C. § 248a not just to its member banks but to all depository institutions regardless of their membership status.[23]  The Act also requires the Federal Reserve to price its services at cost, charge the same price to all

---

[20] Hrg. Before the Sen. Committee on Banking, Housing, and Urban Affair, 96th Cong. at 11 (Feb. 4-5 1980).

[21] *Id.* at 54.

[22] 126 Cong. Rec. 6250 (1980) (Conf. Rep.)

[23] See Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 Bus. Law. 1333, 1365 (1984) ("The [Monetary Control Act] required the Federal Reserve, for the first time, to provide access to virtually all of its services to all depository institutions on the same terms and conditions, and to charge for such services.").

17

depository institutions, and publish its prices publicly.[24]   No provision of the

Monetary Control Act exempts a particular Federal Reserve payment service or

indicates that providing payment services would be a discretionary matter with the

Federal Reserve.  By mandating access to the priced services of the Federal Reserve

to all depository institutions rather than merely to member banks, Congress

intentionally "increased the potential universe served by the Federal Reserve from

5,400 member banks to over 40,000 depository institutions."[25]   After the Act's

passage, the Fed invited nonmember banks and thrifts to take advantage of these

services.[26]

46.     In 1980, the Fed issued its first regulatory implementation of the

Monetary Control Act and stated in the Federal Register that the statute "requires

the Board of Governors of the Federal Reserve System to begin putting into effect a

schedule of fees for services . . . and to make such services covered by the fee

schedule available to all depository institutions."[27]   A few months later, it

---

[24] 12 U.S.C. § 248a(c)(2).

[25] House Committee on Banking, Finance, and Urban Affairs:  Subcommittee on Domestic Monetary Policy, *The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System*, 98th Cong. (1984).

[26] See Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 462.

[27] Federal Reserve Bank Services; Proposed Fee Schedules and Pricing Principles, 45 Fed. Reg. 58,689, 58,689 (Sept. 4, 1980)

reaffirmed that such "[s]ervices covered" by the statute must be made "available to all depository institutions."[28]

47.     In July 1981, the Federal Reserve Bank of Dallas, which managed the Fed's automated clearing house service, similarly announced that beginning in August of that year, such services would be "available to all depository institutions in the District."[29]

48.     Indeed from 1980 until approximately2015, the Fed – both the Board of Governors and the Federal Reserve Banks – urged all depository institutions to take advantage of its services on equal terms.[30]

49.     Contemporary experts agreed with the Fed's interpretation of the Monetary Control Act:  Since the 1980s, it has been well-understood among

---

[28] Adoption of Fee Schedules and Pricing Principles for Federal Reserve Bank Service, 46 Fed. Reg. 1338, 1338 (Jan. 6, 1981)

[29] Federal Reserve Bank of Dallas, Circular No. 81-155 (July 30, 1981).  *See also* Julie Hill, From Cannabis to Crypto: Federal Reserve Discretion in Payments, Iowa Law Review, vol 109, draft July 17, 2023, pp 61-63 for more such citations.

[30] Hill, *Discretion in Payments*, *supra* n. 28 at 61.  *See also* J.L. Jackson & Willis J. Winn, *Foreword to Federal Reserve Bank of Cleveland 1980 Annual Report* at 2 (1981) (stating that in light of the 1980 Deregulation and Monetary Control Act, "[o]ur services will now be available to all depository institutions"); Elijah Brewer III, *The Depository Institutions Deregulation and Monetary Control Act of 1980*, Econ. Perspectives, Sept.-Oct. 1980, at 3, 4 (stating that the 1980 Deregulation and Monetary Control Act requires the Federal Reserve to "grant all depository institutions access to [Federal Reserve] services"); Lynn Elaine Browne, *The Evolution of Monetary Policy and the Federal Reserve System Over the Past Thirty Years: An Overview*, New Eng. Econ. Rev., Jan.-Feb. 2001, at 3, 8 (stating that the 1980 Deregulation and Monetary Control Act required the Federal Reserve to make Federal Reserve services "available to all depository institutions"); Anatoli Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Econ. Rev., July-Aug. 1985, at 23 (stating that the 1980 Deregulation and Monetary Control Act required Federal Reserve services to be "made available to all depository institutions on equal terms"); Gary C. Zimmerman, *The Pricing of Federal Reserve Services Under the MCA*, Econ. Rev., Winter 1981, at 22 (1981) (stating that the 1980 Deregulation and Monetary Control Act "provides for access by all depository institutions to major [Federal Reserve] services").

banking experts that "[t]he [Monetary Control Act] . . . required the Federal Reserve, for the first time, to provide access to virtually all of its services to all depositary institutions on the same terms and conditions, and to charge for such services."[31]

50.     For roughly two decades, from 1980 until 1998, the priced services identified in the Monetary Control Act were spread throughout the Federal Reserve System.  Nonbank depository institutions, such as thrifts and credit unions, made liberal use of the Fed's discount window and other priced services, including payment services.

51.     The timing of the Monetary Control Act's passage was fortuitous. Shortly after its passage, the US financial system was hit by a slow-boiling financial crisis that lasted from the early 1980s through at least 1995.  During a period of unprecedented tumult in this sector, the Fed provided financial services for these firms that it did not charter, whose business practices it did not sanction.

### E.      The 1998 Introduction of Master Accounts

52.     In the mid-1990s, Congress enacted the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994.[32] The Act made a sweeping

---

[31] Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 Bus. Law. 1333, 1365 (1984).

[32] Riegle-Neal Interstate Banking and Branching Efficiency Act, Pub. L. No. 103-328, 108 Stat. 2338 (1994).

change to the way that depository institutions could do business across state lines, ending a longstanding, uniquely American experiment in banking known as "unit banking," or the practice of limiting a bank to a single branch.  After this liberalization, the Fed consolidated all its priced services into a single account, which it called the "Master Account."[33] Following this consolidation, the only way to access Federal Reserve services such as check clearing and wire transfer services is through this new account.

53.     When introducing the master account, the Fed, through the Federal Reserve Bank of Dallas, announced via an Operating Circular several benefits of the new system that would be "uniform across Federal Reserve Districts."[34] The Circular outlined what the Fed called the "contract" between it and the depository institutions that were legally eligible.  While the circular did state that "all master accounts are subject to Reserve Bank approval," the Circular also stated that all that was needed to open a Master Account was to "execute a Master Account Agreement." This agreement was a single page long.  The boilerplate language indicated the institution's accession to the terms of the Opening Circular.  It then

---

[33] Hill, *Opening a Federal Reserve Account, supra* n. 5 at 462.

[34] Federal Reserve Bank of Dallas, *Notice 97-104:  Federal Reserve Standardized Operating Circulars* (Nov. 12, 1997),

J.A.763

contained space to input only basic identifying information related to the institution.

54.     There was no space in this Master Account Agreement for the institution to provide any information regarding risk assessments, capital structure, business model, shareholders, relationship with federal supervisors, Fed membership status, deposit or share insurance status, or any other such information on which the Fed later relied in finding its discretion.  The Dallas Fed later reported that the processing of these agreements could take "5-7 business days," suggesting a perfunctory processing function, not a risk evaluation or quasi-chartering determination.[35]

55.     The assertion in the Circular that the Reserve Bank could subject the Master Account Agreement to "approval" suggests some kind of discretionary determination.  The practices of the previous and subsequent decades suggest otherwise.  The Federal Reserve Banks and Board of Governors could indeed reject entities that lacked legal eligibility for such an account.  This legal determination was not necessarily a cut-and-dried exercise and could arguably mean that the Fed could conclude for marginal cases that a proposed Agreement

---

[35] Fed. Rsrv. Bank of Dallas, Operating Circular No. 1: Account Relationships, Apx. 1 (effective Sept. 1, 2002)

could not be executed because the Fed deemed the entity to lack legal eligibility for it.

56.     The reason for creating the Master Account as an agreement to strike between client and service provider rather than an application to be approved by a chartering authority to a supplicant goes back to the delicate balances of federalism in the dual banking system and pre-specified regulatory lanes in the federal government.  In our dual banking system, the chartering authority for banks is divided between the states and the federal government.  Each bank must choose its chartering authority.  At the federal level, the OCC, FDIC, and Fed also each play distinct roles.

57.     It is important to understand why these different lanes of operation are so important and so important to preserve.  Chartering authority is the ability of a government entity – state or federal – to give a depository institution permission to engage in the business of banking.  Chartering also commits the governmental entity to an ongoing relationship with the depository institution.  That relationship involves both regulation and bank supervision.  Regulation is the passage of rules for the entire system under that jurisdiction; supervision is a set of relationships

23

that puts banks and their chartering authorities in constant dialogue about, among other things, the risk management of new and existing services.[36]

58.    I have searched through public records, every publicly available annual statement of every Federal Reserve Bank and the Fed's Board of Governors from 1980 to the present, news accounts, and the scholarly literature.  I have found no instance of the Fed publicly asserting that it had discretion to deny a master account to a duly-chartered depository institution between 1998 and 2015.  Instead, it repeatedly stated or suggested that such accounts would be approved after a cursory agreement was signed and submitted to the relevant Federal Reserve Bank.[37]

59.    So far as I have been able to discern, none of the above was controversial for the first 35 years after Congress enacted the Monetary Control

---

[36] See Peter Conti-Brown & Sean Vanatta, *Risk, Discretion, & Bank Supervision* (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4405074

[37] 2010, Board of Governors Annual Report, p153 (referring to a changes to interest-bearing deposits, with no reference to discretion in approving those accounts) https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/2010-2468; Federal Reserve Bank of Philadelphia. Annual Report. 2010. P7. https://fraser.stlouisfed.org/title/annual-report-federal-reserve-bank-philadelphia-469/navigating-change-579775; Marlin, Steven. "KeyCorp Moves to Single Fed Account." July 1998. BankTech.com. Available: https://drive.google.com/file/d/18EYlbXZ6nNNurycQa4e7eN9a1UPGf-oy/view?usp=share_link; 1997, Federal Reserve Bank of San Francisco, pdf6, https://www.frbsf.org/wp-content/uploads/1997_annual_report.pdf (discussing the emergence of depository institutions with nationwide networks as a reason to grant them master accounts); 1997, Board of Governors Annual Report, p248 (discussing that the new master account would be available to "each chartered institution), https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/1997-2457; Board of Governors, p257 (discussing the need for consolidated priced services in the form of a "relationship between the Federal Reserve and any depository institution.") , https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/1996-2460; Federal Reserve Bank of Dallas. New Bulletin 11, Circular No. 81-155. July 30, 1981. https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/new-bulletin-11-541337; Federal Reserve Bank of San Francisco "Federal Reserve Notes." July 1981. https://fraser.stlouisfed.org/title/federal-reserve-notes-5186/july-1981-527563. *See also*, Hill, *supra* n. 28 at 60-62.

24

Act.  I have found no evidence that during the period from 1980 to approximately 2015 was the Federal Reserve asserting the power to decide whether to grant priced services to legally eligible depository institutions.

F.    **In 2015, the Federal Reserve Changes Course**

60.    The Federal Reserve's veered away from the routine and deferential nature of Master Account access in 2015, when it refused to grant access to Fourth Corner Credit Union, a duly-chartered Colorado state credit union.  The Fourth Corner Credit Union litigation was the first time that the Fed publicly asserted that it had discretion to choose which legally eligible, duly chartered depository institutions could or could not receive access to its priced services.

61.    Remarkably, in litigation regarding this denial, counsel for the Fed acknowledged that the Fed could not identify any time in the previous ten years when the Fed had exercised discretion to deny an eligible credit union access to a Master Account.[38]  The Court noticed the change.  In his separate opinion, Judge Bacharach observed that the departure from precedent appeared to be a "litigation position."[39]

---

[38] See Reporter's Transcript Oral Argument 37-39, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, 154 F. Supp. 3d 1185 (D. Colo. 2016) (No. 15-CV-01633). See also Hill, *Discretion in Payments*, *supra* n. 28 at 62-63.[39] *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052, 1071 (10th Cir. 2017) (Op of Bacharach, J.).

[39] *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052, 1071 (10th Cir. 2017) (Op of Bacharach, J.).

25

62.     In the years that followed, the Fed would follow the course it charted in *Fourth Corner* on at least three other occasions.  I summarize *Fourth Corner* and these other cases below.[40]

### 1.     *Fourth Corner Credit Union*

63.     The first instance of the Fed publicly claiming that it had the discretion to deny access to its priced services came, as noted, in the case of Fourth Corner Credit Union.

64.     The Fed's justification for this denial was that the credit union, as "a de novo depository institution, there is no historical record for the [Federal Reserve Bank of Kansas City] to review."[41] It also cited the National Credit Union Administration's determination that Fourth Corner did not submit sufficient information to "assess [its] ability to safely and soundly operate and comply with applicable laws and regulations, including Bank Secrecy Act and Anti-Money Laundering responsibilities."[42]

---

[40] The facts that follow are based on press reports, court filings, and the interviews conducted by legal scholar Julie Hill, as described in her two recent articles on the Fed's Master Accounts.  See Hill, *Discretion in Payments*, *supra* n. 28 and Hill, *Opening a Federal Reserve Account*, *supra* n. 5.

[41] Hill, *Discretion in Payments*, *supra* n. 28 at 15

[42] *Id.*  Julie Hill evaluates Fourth Corner's request for a Master Account and the subsequent litigation thoroughly in Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 471-76.

J.A.768

65.     This denial appears to be focused on Fourth Corner's plan for providing financial services to marijuana-related businesses that were unquestionably legal under Colorado state law and more questionably illegal under federal law.[43]

66.     The split between state drug laws and federal drug laws introduced a complex question of federalism, federal preemption, and prosecutorial discretion, a set of issues that scholars and policymakers continue to debate.[44]

67.     With Fourth Corner Credit Union, the Fed entered that debate with an emphatic view: an exception to the previously routine access to Master Accounts for legally eligible depository institutions.  That exception seems to be that depository institutions that might provide financial services to entities that violate federal law will be denied access to the Fed's priced services if it suspects that entities engaged in those services are violating federal drug law.

68.     After the Fed denied Fourth Corner's account, the bank sued, requesting that the Court enter an injunction ordering the Fed to comply with 12 U.S.C. § 248a and provide the bank with a master account.

---

[43] Some of the businesses that Fourth Corner sought to serve were advocacy groups whose activities were permissible under both state and federal law.

[44] Johnathan Adler, MARIJUANA FEDERALISM:  UNCLE SAM AND MARY JANE (2020).

27

69.     The district court dismissed Fourth Corner's complaint.  The Court concluded that the bank was "asking the Court to exercise its equitable authority to issue a mandatory injunction.  But courts cannot use equitable powers to issue an order that would facilitate criminal activity."[45]  The district court also concluded that "it is at least implicit that [12 U.S.C.§ 248a] does not mandate the opening of a master account that will facilitate activities that violate federal law."[46]

70.     The bank appealed that decision to the Tenth Circuit, which remanded the case to the district court for dismissal without prejudice with each judge writing separately, without resolving the question of the scope of 12 U.S.C. § 248a or the Fed's controversial interpretation of it.[47]

71.     Following the lawsuit, Fourth Corner requested a Master Account again, this time with the explicit commitment that it would "not serve marijuana-related businesses until there is a change in federal law that authorizes financial institutions to serve marijuana-related businesses."[48]  The Kansas City Fed responded to Fourth Corner's access request by calling Fourth Corner's request a

---

[45] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 154 F. Supp. 3d 1185, 1188 (D. Colo. 2016), *vacated,* 861 F.3d 1052 (10th Cir. 2017).

[46] *Id.* at 1189.

[47] *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017).

[48] Complaint at ¶ 41, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-CV-02361 (D. Colo. Sept. 29, 2017).  See also Hill, *Discretion in Payments*, *supra* n.28 at 17-18;.

28

"unique" one that raised "legal and policy questions" that the Fed would have to resolve before it could grant that access.[49]

72.    Rather than continue to engage in the Fed's efforts to turn Master Account access into a rechartering exercise, the credit union filed another lawsuit. The Kansas City Fed then granted Fourth Corner's master account request conditional on Fourth Corner's acquisition of share insurance.[50]

73.    There is no statutory basis for requiring share insurance for credit unions:  Credit unions without share insurance are eligible for a Master Account. But the Fed used its claimed discretion to impose these additional requirements on Fourth Corner.  Fourth Corner could not get share insurance and thus never received Master Account access.[51]

---

[49] Complaint at ¶¶ 33,50 Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-CV-02361 (D. Colo. Sept. 29, 2017).  Answer at ¶¶ 33,50, Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City, No. 17-CV-02361 (D. Colo. Nov. 8, 2017).  See also Hill, *Discretion in Payments*, *supra* n.28 at 18.

[50] *See* Hill, *Discretion in Payments*, *supra* n.28 at 18.

[51] *Id.*

## 2. *The Narrow Bank*

74.     In 2017, James McAndrews, the former director of research for the

Federal Reserve Bank of New York, saw a business opportunity in changes to the

Fed's monetary policy framework.  He wanted to create a new bank that did not

engage in lending and thus maintained a full, 100% reserve bank (as opposed to the

fractional reserve model that most banks maintain in the deposit-taking and lending

activities that they pursue).

75.     His bank, The Narrow Bank (TNB), received a Connecticut state

charter and sought a Master Account.  The Fed refused to either grant or deny that

request, but did subject TNB to extensive vetting in connection with its Master

Account request (and after it had already received its Master Account request).

TNB filed suit, but the court dismissed its Complaint at the Fed's urging because,

the Fed argued, the case was not ripe given the Fed's own lack of decision on that

request.[52]  Six years later, TNB's request is still pending.[53]

76.     With TNB, the Fed appears to claim an exception to its previous

assertions that all depository institutions would receive access to its priced services

on equal terms.  That exception seems to be that depository institutions cannot

---

[52] Hill, *Discretion in Payments*, *supra* at n.28 at 21.

[53] *Id.*

30

have novel business practices that the Fed's monetary policymakers, in their sole wisdom and determination, do not favor.

### 3. *The Territorial Bank of American Samoa ("TBAS")*[54]

77.     In 2012, the Bank of Hawaii, a private bank and the only provider of financial services in American Samoa, announced that it was ceasing operations in this remote and deeply impoverished US territory.  Officials from American Samoa tried but failed to persuade other banks from the U.S. and elsewhere to open services.  They opted instead to open their own bank, with the government as shareholders.

78.     The Federal Reserve Bank of San Francisco referred the case to the Board of Governors in Washington DC. Board staff demanded that the bank (owned by the government) explain how it would insulate itself from governmental pressures from the American Samoan government.  It challenged the territory's new supervisory agency, the Office of Financial Services, and queried whether the American Samoan government could effectively supervise banking at all.

79.     TBAS's request stalled until the Trump Administration nominated and the Senate confirmed the candidacy of Randal Quarles of Utah to become a

---

[54] The travails of the TBAS have been extensively documented in *American Banker*.  See Rob Blackwell, How Far Does American Samoa Have to Go to Get a Bank?, *American Banker*, July 31, 2017 and Rob Blackwell, American Samoa Finally Gets a Public Bank, *American Banker* (April 30, 2018).

member of the Board of Governors.  Quarles, who personally knew some of the

consultants retained by TBAS, helped push the request through.  TBAS was now a

bank with an executed Master Account Agreement.

80.     The execution of this Agreement was no mere formality, though.

TBAS had to agree to a higher capital buffer than other banks that received a lower

capital requirement.  It had to hold more reserves than regulations required.  It had

to send the Fed monthly financial statements.  And it had to agree that it could not

borrow from the discount window.[55]  In other words, before the Federal Reserve

would permit TBAS to execute a Master Account Agreement – an agreement that

had for many years been pro forma for legally eligible, duly chartered depository

institutions – the bank had to agree to ongoing, extensive Federal Reserve

supervision, despite there being no legal or historical basis for such supervision.

81.     With TBAS, the Fed appears to claim a third exception to its previous

assertions that all depository institutions would receive access to its priced services

on equal terms.  That exception seems to be that depository institutions that are

chartered by American Samoa (and perhaps other government entities?) must

subject themselves to Fed supervision, whether they want to join the Federal

Reserve System or not.

---

[55] The legal scholar Julie Hill learned these limitations from interviews with TBAS officials.  See  Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 487-92.

32

G.   **The Federal Reserve Doubles Down on Its Claim of Discretion with Its 2022 Guidelines for Evaluating Account and Services Requests**

82.   No statute addresses the provision of Master Accounts.  While the Board recognized as early as 2004 that the Reserve Banks should adopt policy statements governing standards and processes for Master Accounts, only one Reserve Bank, the Federal Reserve Bank of New York, did so.[56]   The Board itself issued no guidance for Master Accounts until after the Plaintiff in this case sued.

83.   In August 2022, the Federal Reserve's Board of Governors adopted Guidelines for Evaluating Account and Service Requests.  The draft version of this guidance was published on May 5, 2021.  This "final guidance" was meant to clarify the process the Board of Governors has instructed the Reserve Banks to follow when the Banks (and Board) make decisions about access to priced services.[57]

84.   In this Guidance document, adopted well after the Fed was subject to multiple lawsuits regarding its authority in this space, the public learned for the first time of the Fed's newly adopted posture as a quasi-chartering authority.

---

[56] Hill, *Opening a Federal Reserve Account*, *supra* n. 5 at 467.

[57] Bd. of Govs. of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg. 51,099 (Aug. 15, 2022).

33

85.    In conjunction with lengthy assertions of the Fed's own discretion in approving what it regards as Master Account "applications," the Board also announced the factors it would weigh against legally eligible, duly chartered depository institutions that sought to execute a Master Account Agreement. Among other principles, the Board announced three that render it a quasi-chartering authority over the entire financial system.

86.    *First*, the Fed asserts that a legally eligible, duly chartered depository institution will face a searching evaluation in its attempt to execute a Master Account Agreement based on the Fed's own assessments of the "credit, operational, settlement, cyber, or other risks" to the Federal Reserve Banks, to the overall payment system, to the "stability of the US financial system" and to "the Federal Reserve's ability to implement monetary policy."[58]  The number of factors that could affect "other risks" to the "overall payment system" or undermine the "stability of the US financial system" or otherwise become adverse to the Fed's "ability to implement monetary policy" is so vast that there are few banking practices today that would not be subject to that analysis. In other words, by asserting this authority over master accounts (which are required for modern

---

[58] *Id.* at 51,099 – 51,100.

banking), the Fed has asserted that it is the primary (re)chartering authority for the entire US financial system.

87.     Relatedly, the Fed asserts that a legally eligible, duly-chartered depository institution will face a more challenging task in executing its Master Account Agreement if it engages "in novel activities for which authorities are still developing appropriate supervisory and regulatory frameworks."[59]

88.     There is no question that assessing the business practices of a proposed depository institution is an important determination for the appropriate governmental entity to make.  The problem with the Fed's assertion of this sweeping authority is that it is not that entity for the overwhelming number of legally eligible depository institutions in the United States.  It can only assess its supervisory and regulatory abilities for those entities for which it is the primary supervisor, namely, state-chartered members of the Federal Reserve System as well as bank and financial holding companies.  The determinations of harmful or helpful novelty has always been, historically, something for the chartering entity to determine.  In the dual banking system, this provides space for states to experiment as the so-called laboratories of democracy.  The Fed's contrary assertion

---

[59] *Id.* at 51,101.

J.A.777

eviscerates that historical model and places it in the position of evaluating every risk and every novelty everywhere in the financial system.

89.    It is also important to note some implications of the Fed's skepticism of novelty of new entrants into the banking system.  That posture puts a heavy thumb on the scale in favor of incumbent banks.  The Guidelines are specifically biased against innovators and novel financial institutions, decreasing the incentives for innovations for incumbents and new entrants alike.  The result if the Fed is permitted to persist in this practice is the stunted development of the US banking system.

90.    *Second*, the Board announced a "tiered" approach to evaluating these and other risks.  The most favored depository institutions to receive the least quasi-chartering scrutiny will be those "eligible institutions that are federally insured." Second are eligible depository institutions "that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency." By making this distinction, the Fed is actively discriminating against those legally eligible institutions that receive their charter from a state chartering authority and either do not seek deposit insurance at all or seek it from a state or private entity. The Fed labels the latter institutions third tier and will treat the chartering processes to which the states of the union (and its territories) as suspect, with risks to be reevaluated by the Fed in the way it chooses, with minimal disclosure.

91.     This tiered approach whereby the Fed explicitly favors depository institutions with *federal* deposit insurance or a *federal* prudential supervisory authority is as stunning a departure from the traditions of American banking as I can recall reading from an official document.  Nowhere in the statutes governing the Federal Reserve System or in the rich political history regarding the reach of the central bank's powers over the American financial system have I ever seen an assertion of power by the Fed to supplant completely the activities of state banking authorities.  There will be countless examples of depository institutions that do not have a primary federal supervisor, all of which chartered at the state level, many serving unique financial needs to their communities.  The Guidelines are a signal to, for example, state-chartered, state-insured credit unions that their entire business model is now under heavy federal scrutiny, despite the fact that these entities structured their affairs to stay closer to their own communities.

92.     All of the depository institutions considered in each of these tiers are legally eligible and duly chartered.  These are the depository institutions that the framers of the Monetary Control Act meant for the Fed to service on equitable terms to Fed member banks.  Now, suddenly, the Fed has determined that some of them will be more equal than others.

93.     *Third*, "[p]rovision of an account and services to an institution should not adversely affect the Federal Reserve's ability to implement monetary policy."

37

J.A.779

Again, this wide-open prerogative of the Fed is the Board of Governor's alone to determine.[60]  Banking practices that expose the weaknesses of adopted monetary policy procedures – procedures not adopted by statute, but by practice – can subject those depository institutions to existential crisis if the Fed does not like that exposure.  If, for example, a banking practice creates incentives for institutions to take advantage of services through facilities that the Fed has designed poorly, rather than face the criticism for such poor design, the Fed can threaten to use its substantial authority over the payment system to protect itself in the pursuit of flawed monetary policy.  The Fed, in these circumstances, becomes judge and jury of itself.

94.     By placing itself in the position of evaluating all of these issues, the Fed has made access to its priced services – access that the framers of the Monetary Control Act intended to be open and to all depository institutions – a second chartering event.  The Fed will determine whether a depository institution can access the entire payment and financial services system.  In this way the Fed can determine whether any depository institution, anywhere, will live or die, succeed or fail, before having the chance to do so on its own merits.

---

[60] 12 U.S.C. § 248(k)

95.     With the adoption of these Guidelines in 2022, in direct departure from decades of practice, the Fed has decided that it has finally achieved a status that Congress considered and rejected for most of the Fed's 110 years: the Federal Reserve is now the supervising authority of the entire US banking system.

96.     The Fed's 2022 Guidance is the clearest signal I can name in the 160-year history of the dual banking system that an entity of the federal government has decided that state banking authorities do not have rights that require respect and deference.  It is an astonishing claim of authority, unprecedented in banking history.

## IV.   THE BOARD CONTROLS DECISIONS OVER MASTER ACCOUNT REQUESTS LIKE CUSTODIA'S THAT RAISE PUBLIC POLICY QUESTIONS

97.     The Federal Reserve Board of Governors makes key legal determinations for the Federal Reserve System, particularly when it comes to regulatory, supervisory, and financial policy matters (as opposed to monetary policy matters under statutory control of the Federal Open Market Committee). The Board is responsible for supervising the Federal Reserve System's twelve regional banks and for supervising and regulating Fed member banks, various holding companies, and other entities defined by law.   The Board has authority to

J.A.781

delegate some of its responsibilities.  But even then, the delegation is not complete: the Board is responsible for the ultimate outcomes of its policymaking authority.[61]

98.     Such policymaking authority includes the management of its priced services.  Although I have seen no evidence that the Board intervenes in run-of-the-mill requests for master accounts, the Board has intervened in two of the cases noted above.  As described more fully below, it is clear from the record, including most recently in the case of TBAS, that the chief decision-maker in these cases is the Board of Governors, not the individual Federal Reserve Banks.  The Board dictated the outcome of TNB's and TBAS's master account requests because each of those cases raised public policy questions.

99.     It is also clear from the administrative record in this case that the Board dictated the outcome of Custodia's request.

**A.     <u>Previous Cases of Board Intervention in Master Account Requests</u>**

*1.     The Narrow Bank*

100.   Discovery in this case has revealed that the Board has intimately involved in the denial of TNB's master account request.

---

[61] See 12 U.S.C. 248(k) (giving the Board the power "[t]o delegate, by published order or rule and subject to subchapter II of chapter 5, and chapter 7, of title 5, any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to one or more administrative law judges, members or employees of the Board, or Federal Reserve banks.")

101.   In a 2018 letter to Counsel for TNB, the General Counsel of the New York Fed informed TNB "that senior policy officials at the Board of Governors have expressed the *strong view* that the New York Fed should not approve TNB's request for a master account."[62]

102.   The New York Fed's letter further explained that "there are substantial policy concerns regarding TNB's business model, whose sole purpose is to arbitrage the Federal Reserve's Interest on Excess Reserves ("IOER") rate."[63] The letter noted that TNB was "well aware" of such concerns "from its communications *with staff at the Board of Governors*."[64]

103.   Litigation documents from the TNB lawsuit further confirm the Board's involvement in TNB's master account request.  When the New York Fed filed its motion to dismiss, the Board of Governors filed an amicus brief in support of that motion.[65]  In that brief, the Board told the Court that it was "weighing the policy considerations implicated by TNB's business model."[66]

---

[62] TNB-0000002 (emphasis added).

[63] *Id.*

[64] *Id.* (emphasis added)

[65] Memorandum of Law of Amicus Curiae the Bd. of Governors of the Fed. Rsrv. in Support of Defendant the Fed. Rsrv. Bank of N.Y.'s Motion to Dismiss, TNB USA v. Fed. Rsrv. Bank of N.Y., No. 1:18-CV-07978, 2020 WL 1445806 (2020)

[66] *Id.* at 15.

104.   As noted, TNB's request is still pending, six years later.

## 2.   *The Territorial Bank of American Samoa ("TBAS")*[67]

105.   When TBAS applied for a master account with the Federal Reserve Bank of San Francisco, the San Francisco Fed referred the case, apparently very quickly, to the Board of Governors in Washington DC.

106.   The request then stalled at the Board with plenty of questions about whether TBAS was suited to its chartering authority but no action on its request to become a full-fledged participant in the financial system.

107.   This changed in 2017 when Randal Quarles, a newly confirmed member of the Federal Reserve Board of Governors, helped push the request to completion.

108.   TBAS gained access to a Master Account, but the Board decided that it did not trust the government of American Samoa to adequately supervise TBAS. TBAS had to agree to a higher capital buffer than other banks that received a lower capital requirement.  It had to hold more reserves than regulations required.  It had to send the Fed monthly financial statements.  And it had to agree that it could not borrow from the discount window.  These ongoing conditions on TBAS mean that the Fed has an ongoing supervisory relationship with the bank.

---

[67] See Rob Blackwell, How Far Does American Samoa Have to Go to Get a Bank?, *American Banker*, July 31, 2017 and Rob Blackwell, American Samoa Finally Gets a Public Bank, *American Banker* (April 30, 2018).

109.  There is no statutory basis for these requirements.  The Board reached them on its own.

**B.**  **The Board's Intervention in Custodia's Master Account Request**

110.    It is uncontroversial that Custodia, as the first bank to combine traditional banking with crypto-assets, implicated matters of policy that the Board felt essential to assess before deciding on Custodia's Master Account access. Based on my review of the administrative record and documents produced by the Kansas City Fed, I conclude that the Board did so on its own initiative and assessment of its risks.

### 1.   *The Board Determined Whether Custodia Was Eligible for a Master Account*

111.   Throughout 2021, Custodia and its outside counsel had a series of calls with Board staff regarding Custodia's eligibility for a master account.[68] Notably, Custodia primarily conducted those calls with Board staff rather than with Reserve Bank staff.[69]

112.   On August 2, 2021, the Kansas City Fed sent Custodia a letter stating that "it would be inappropriate for [the Bank] to issue a decision" on Custodia's master account request before the Board clarified its interpretation of Custodia's

---

[68] Cox Rpt. ¶ 38.

[69] *Id.*

"legal eligibility for a master account under the Federal Reserve Act."[70]  The

reference to Custodia's legal eligibility appears to be in reference to the same

statement that the Board's General Counsel had previously made to the same

effect.[71]

### 2.   The Board's public and private guidance asserts Board Dominance Over Master Account Access

113.   The Board's primacy in reaching conclusions about TNB, TBAS, and

Custodia is consistent with its own public and private guidance about Master

Account access.  This bears out in the present litigation.  On May 5, 2021, the

Board proposed Guidelines for Evaluating Account and Services Requested (the

"Guidelines").  While those guidelines were pending, the Kansas City Fed

informed Custodia that "it would be inappropriate to issue a decision" on

Custodia's master account request until those guidelines were finalized.[72]  The

Guidelines became final on August 15, 2022.

114.   In addition to the principles discussed about the Guidelines above,

they also show the Board's assertion over the process for granting Master Account

access.  The Guidelines were designed so "that the Reserve Banks [would] apply a

---

[70] FRB-AR-003858.

[71] FRBKC-00000234 ("As was recently conveyed to your counsel ... it has been determined that Avanti satisfies the threshold definition of an entity eligible to maintain a master account.").

[72] FRBKC-00003858

consistent set of guidelines when reviewing [] access requests to promote

consistency across Reserve Banks and to facilitate equitable treatment across

institutions."[73] The Board stated that the Guidelines were needed due to "a recent

uptick in novel charter types being authorized or considered by federal and state

banking authorities across the country.  As a result, the Reserve Banks are

receiving an increasing number of inquiries and access requests from institutions

that have obtained, or are considering obtaining, such novel charter types."[74]

115.   As explained above, the Board's articulation of these new principles

and risk assessments, as well as its categorization of state-supervised depository

institutions as second and third tier, is an extraordinary usurpation of chartering

authority that is not the Fed's to exercise.  What these Guidelines also demonstrate

is that the Board is in full command of that usurpation.

116.   Similarly and more concretely, on January 17, 2023, the Board

finalized and issued internal guidance letter, S-2677.[75]

117.   In S-2667, the Board sets forth a series of "Expectations":  "the Board

expects the Reserve Banks to (1) establish and maintain Federal Reserve System

---

[73]   Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099, 51,106.

[74] *Id.* at 51,099.

[75] FRB-AR-000014.

(System) implementation procedures for the Guidelines, (2) participate in an access request information sharing forum, and (3) consult, as appropriate, with Board staff."[76]

118.   Expectations is a euphemism, however.  Consistent with its role as policymaker for the entire Federal Reserve System, the Board uses S-2667 to instruct the Reserve Banks on how they must perform in evaluating requests to access Master Accounts from beginning to end.  Under S-2667, Reserve Banks' implementation of the Guidelines mentioned above "should reflect the guidance provided by the Board in the Guidelines" and "must" be provided "to the director of the Division of Reserve Bank Operations and Payment Systems (RBOPS)" before they take effect.[77]  Such procedures "shall not take effect if the director of RBOPS (or director's designee), in consultation with the Board's general counsel (or the general counsel's designee), raises an objection within 10 business days of receipt."[78]

119.   The Board goes further.  Under S-2667, the "Reserve banks should consult with the other Reserve Banks and Board staff, as appropriate, via an

---

[76] FRB-AR-000014 at FRB-AR-000015.

[77] *Id.*

[78] *Id.*

information sharing forum to discuss administration of access requests, implementation of the Guidelines, and other related issues."[79]  The Board directed that the information sharing forum "should include members form all Reserve Banks and be open to Board staff liaisons."[80]

120.   Although the Board also included the proviso that it "recognizes the discretion granted to the Reserve Banks under section 13 of the Federal Reserve Act to grant or deny access requests or to take action on existing access relationships," the Board in fact made no room for that discretion: Master Account decisions required Board input.  The Board "expects the Reserve Banks to consult, as appropriate, with Board staff to provide insight into application of the Guidelines to requests and to further support consistency in decision-making across Reserve Banks."[81]

121.   In advocating for Reserve Bank discretion, the Board may have meant that the access to Master Accounts is usually an automatic exercise.  The Board instructs the Reserve Banks that "[m]ost requests for master accounts by U.S. branches and agencies of foreign banks (FBOs) are expected generally to be

---

[79] Id.

[80] Id.

[81] Id.

47

routine, and accordingly Reserve Banks need not consult with the Board regarding

such requests in most cases."[82]  When "account requests . . . present novel risks,"

however, the Board insists that "Reserve Banks should consult RBOPS."[83]  S-2667

also makes clear that eligibility for access should be determined "in consultation

with Board Legal."[84]

122.   The Board goes further still on its instruction to Reserve Banks on

how decisions on Master Account access must be made.  In brief, the decision is

not the Reserve Banks to make.  S-2667 makes clear that "any Reserve Bank that

is considering approval of  an access request from a higher risk entity, *including all

Tier 2 or Tier 3 institution*s, should consult with the director of RBOPS on the

results of its pre-decisional analysis under the Guidelines prior to communicating

any decision to the institution."[85]  Relatedly "[a]ny Reserve Bank that is

considering denying any access request, including an access request from an

institution in Tier 1, should consult the director of RBOPS prior to communicating

any decision to the requesting institution."[86]  The Board thus not only reinforces

---

[82] FRB-AR-000014 at FRB-AR-000016.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

the favoritism for federal institutions with federal insurance already found in the Guidelines. It also emphasizes that such favoritism is ultimately the responsibility of the Board of Governors.

123.   After the Reserve Banks contacts the Board, "the director of RBOPS will review, in coordination with other Board divisions (such as Legal, Monetary Affairs, Supervision and Regulation, and Financial Stability), as appropriate, the Reserve Bank's record documenting application of the Guidelines in evaluating the access request, including the risk level after implementation of the Reserve Bank's plans to mitigate any risks identified."[87]

124.   Remarkably, given S-2667's assertion that Reserve Banks retain the discretion to grant or deny access to Fed services, S-2667 directs the Reserve Banks to "confirm in writing to the director of RBOPS how [they have] addressed any concerns the RBOPS director has raised regarding" requests for services "[p]rior to granting an access request."[88]

125.   Finally "[a]ny Reserve Bank that is considering an involuntary termination of access should consult the director of RBOPS prior to communicating any decision to an institution."[89]

---

[87] *Id.*

[88] *Id.*

[89] FRB-AR-000014 at FRB-AR-000017.

49

126.  S-2667 is an unremarkable document in many respects.  It merely restates the uncontroversial view that the Board of Governors controls policymaking within the Federal Reserve System.  To the extent that Reserve Banks participate in that decision, they do so as subordinates.

127.  What is remarkable is that the Board somehow insists otherwise, that it is merely a consultative body available to Reserve Banks should they need extra resources.  S-2667 lays bare the conceit that this description of power dynamics within the Federal Reserve System is an argument meant to shield the Board from scrutiny and subvert careful systems of public accountability over a government agency.  Despite its careful wording, S-2667 leaves the reader with no doubt that the Board "expects" that it will dictate the results of access requests of interest.

### 3.  The Board Implemented Its Public and Internal Guidance when Denying Custodia's Master Account Request

128.  In this case, the Board not only insisted on "consulting" on Custodia's access request, the Board dictated the outcome of that request and the reasoning for the denial.  The Board also did so while attempting to obscure the fact of its involvement.

129.  The Board and the Kansas City Fed implemented S-2667's new review procedures when evaluating Custodia's master account.  "Pursuant to" the draft of S-2677, the Kansas City Fed "provid[ed] [its] pre-decisional draft

memorandum regarding potential actions on Custodia's request for a master account" to Board staff on January 10, 2023.[90]

130.   Board staff reviewed the draft memo written by Reserve Bank staff outlining the reasons for denying Custodia's request to gain access to a Master Account for the Kansas City Fed.  This memo was meant for an internal audience. The Board provided extensive feedback, including deleting and adding language to the memo in tracked changes.[91]  One particularly notable edit is Board staff's removal of a reference to "broad policy matters" and "risk mitigation strategies" that were "being considered by the Federal Reserve Board" during the pendency of Custodia's access request.[92]

131.   The Reserve Bank staff's final memo substantially incorporated the Board's edits and comments.  More pointedly, the Reserve Bank only relayed the Fed's decision on Custodia's Master Account access after Board staff blessed the final recommendation by stating that they "have no concerns with the Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision

---

[90] FRB-AR-000335.

[91] FRB-AR-000315;000326.

[92] FRB-AR-000315 at FRB-AR-000323.  *See also* FRB-AR-000344.

to deny the request for a master account and access to services" that the Kansas City Fed proceeded to deny Custodia's master account request.[93]

132.    Through the Guidelines and S-2667, the Board formalized what had been an informal process previously – namely, the Board intervening in master account requests that raised public policy questions.  Custodia's request appears to fit the parameters of what the Board wanted to accomplish.  The task was not delegation to the Reserve Banks, but Board control of Master Account access.  The record in this case is replete with evidence of such intervention, and such intervention is consistent with recent Board practice.  Ultimately, it was the Board's decision to deny Custodia's master account request.

## V.    CONCLUSION

133.    For the reasons explained above, it is my opinion that the Fed's claim of discretion over master account requests is inconsistent with history, practice, legal context, and the public policies of the US government and of the Federal Reserve itself prior to 2015.

134.    It is also my opinion that the Board of Governor's exercises control over Master Account access when the Board deems such access relevant to its own assessment of public policy.

---

[93] FRB-AR-000002.

52

J.A.794

135.   I further conclude that the Board, consistent with past recent practice, exercised control over Custodia's efforts to gain access to a Master Account at the Federal Reserve Bank of Kansas City.

136.   Because discovery is ongoing and the Kansas City Reserve Bank has not completed its production of documents, I reserve the right to modify or supplement the opinions set forth in my report and the bases for those opinions.

DATE: October 20, 2023                 By: _____
                                           Dr. Peter Conti-Brown

53

J.A.795

# EXHIBIT 1

# Peter Conti-Brown

The Wharton School of the University of Pennsylvania • 3730 Walnut Street, Suite 600
Philadelphia, PA 19104 • petercb@wharton.upenn.edu • (215) 898-6516 (office) • U.S. Citizen

---

## ACADEMIC APPOINTMENTS

**The Wharton School of the University of Pennsylvania**, Department of Legal Studies and Business Ethics

*Class of 1965 Associate Professor of Financial Regulation* (with tenure)            2021 – present

*Assistant Professor*            2015 – 2021

Courses taught: Legal Studies 101; Securities Regulation; Other People's Money: The Law, Politics, and History of Financial Institutions; Responsibility in Business; The Regulation of Financial Institutions (University of Pennsylvania Law School

**Goethe University – Frankfurt**, House of Finance            2021-2022

*Metzler Visiting Professorship*

Courses taught: Other People's Money: The Law, Politics, and History of Financial Institutions; Global Central Banking: The Institutional Context

**Columbia Law School**            Fall 2020

*Pritzker-Pucker Family Visiting Assistant Professor of Law*

Course taught: Secured Transactions

## OTHER AFFILIATIONS

**Advisory Board Member**, *Federal Reserve Archival System for Economic Research (FRASER)*            2021 – present

**Nonresident Fellow in Global Policy**, Visa Economic Empowerment Institute            2021 – present

**Advisory Board Member**, *Twenty Acre Capital LP*            2019 – present

**Member,** The Committee on Monetary and Financial Law            2019 – present
of the International Law Association (MOCOMILA)

**Nonresident Fellow**, Economic Studies, The Brookings Institution            2019 – present

Affiliated with the Hutchins Center on Fiscal and Monetary Policy and the Center on Regulation and Markets

**Visiting Researcher**, International Monetary Fund, Research Department            2019

September 2023

## E D U C A T I O N

**Princeton University**, Department of History, PhD                                                       2017
**Stanford Law School**, J.D.                                                                                          2010
**The City College of New York**, Department of Education, M.S.                                      2007
**Harvard College**, A.B., *magna cum laude*, Phi Beta Kappa                                         2005

## O T H E R   E X P E R I E N C E

**Academic Fellow**, Rock Center for Corporate Governance, Stanford Law School        2010 – 2015
    In residence 2010-2011; nonresident, 2011-2015.
**Of Counsel**, Gupta Wessler PLLC, Washington, D.C.                                                  2013 – 2016
**Law Clerk**, Judge Stephen F. Williams, U.S. Court of Appeals for the D.C. Circuit      2012 – 2013
**Law Clerk**, Judge Gerard E. Lynch, U.S. Court of Appeals for the Second Circuit       2011 – 2012
**English and ESL Teacher**, High School for Media & Communications, New York City Department
    of Education                                                                                                           2005 – 2007

## P U B L I C A T I O N S

### Books

*The Federal Reserve: An American History,* under contract WW Norton

*The Banker's Thumb: A History of Bank Supervision in America* (with Sean Vanatta), under contract Princeton
    University Press

*The Law of Financial Institutions*, Aspen, 7th edition (2021) (with Richard Carnell, Jonathan Macey, Geoffrey Miller)

*Research Handbook on Central Banking,* Edward Elgar Publishing, 2018 (with Rosa M. Lastra)

*The Power and Independence of the Federal Reserve,* Princeton University Press (2016)

*When States Go Broke: Origins, Context, and Solutions for the American States in Fiscal Crisis*, Cambridge University
    Press, 2012 (with David Skeel)

### Published and Forthcoming Articles and Essays

"Bankruptcy and the Macroeconomy: A New Approach for Governmental Reaction to Economic Crisis" (with
    David Skeel) (forthcoming *Yale Journal on Regulation*, March 2023)

"Banking on a Curve: How to Restore the Community Reinvestment Act," *Harvard Business Law Review*,
    forthcoming (with Brian Feinstein)

"Financial Crises and Legislation" *Journal of Financial Crises*, vol 4, issue 3, 2021 (with Michael Ohlrogge)

"The Federal Reserve System: Diversity and Governance, 1913-2019," *Journal on Financial Crises*, vol 4, issue 4,
    2021 (with Kaleb Nygaard as first author)

"The Contingent Origins of Financial Legislation," *Washington University Law Review*, forthcoming 2021 (with
    Brian Feinstein)

"The Principled Leadership of Middle Management: Stephen F. Williams's Liberal Critique of *Marks*," 38 *Yale
    Journal on Regulation* 736 (2021).

"The Logic and Legitimacy of Supervision: Revisiting the Bank Holiday of 1933," 95 *Business History Review* 87
    (2021) (with Sean Vanatta)

"Technocratic Pragmatism, Bureaucratic Expertise, and the Federal Reserve" 130 *Yale Law Journal* (2021) (with
    David Wishnick)

**J.A.798**

"Towards an Administrative Law of Central Banking," 38 *Yale Journal on Regulation* (2021) (with Yair Listokin and Nicholas Parrillo)

"Independence in Institutional Design: Gilson & Kraakman's Revolution, Postponed," 45 *Journal of Corporation Law* 865 (2020).

"Institutions: A Research Program for Law, Macroeconomics, and History," 83 *Law and Contemporary Problems* 157 (2020)

"Private Markets, Public Options, and the Payment System," 37 *Yale Journal on Regulation* 380 (2020) (with David Wishnick)

"The Foreign Affairs of the Federal Reserve," 44 *Journal on Corporation Law* 665 (2019) (with David Zaring)

"Ulysses and the Punch Bowl: The Governance, Accountability, and Independence of the Federal Reserve," 24 *George Mason Law Review* 617 (2017)

"The Institutions of Federal Reserve Independence," 32 *Yale Journal on Regulation* 257 (2015)

"Elective Shareholder Liability," 64 *Stanford Law Review* 409 (2012)

"Liability Holding Companies," 59 *UCLA Law Review* 852 (2012) (with Anat Admati and Paul Pfleiderer)

"Direct Democracy and State Fiscal Crises: The Problem of Too Much Law," 7 Duke Journal on Constitutional Law & Public Policy 43 (2012)

"Scarcity Amidst Wealth: The Law, Finance, and Culture of Elite University Endowments in Financial Crisis," 63 *Stanford Law Review* 669 (2011)

"A Proposed Fat-Tail Risk Metric: Disclosures, Derivatives, and the Measurement of Financial Risk," 87 Washington University Law Review 1461 (2010)

## Articles under Submission

"Risk, Discretion, and Bank Supervision," (with Sean Vanatta)

"Board Diversity Matters: An Empirical Assessment of Community Reinvestment at Federal Reserve-Regulated Banks" (with Brian Feinstein and Kaleb Nygaard)

## Book Chapters

"The Central Banking Century: An Introduction to Institutional Central Banking," in Conti-Brown and Lastra, eds., *Research Handbook on Central Banking*, Edward Elgar Publishing, 2018.

"Central Banking and Institutional Change in the United States: Punctuated Equilibrium in the Development of Money, Finance, and Banking," in Conti-Brown & Lastra, eds. *Research Handbook on Central Banking*, Edward Elgar Publishing, 2018

"Politics, Independence, and Retirees: Long-term Low Interest Rates at the U.S. Federal Reserve,"*How Persistent Low Returns Will Shape Saving and Retirement*, edited by Robert Clark, Raimond Maurer, and Olivia Mitchell, Oxford University Press, 2018.

"Introduction: The Perennial Crisis Among the American States," in *When States Go Broke: Origins, Context, and Solutions for the American States in Fiscal Crisis* (Peter Conti-Brown and David Skeel eds., Cambridge University Press) (2012)

## Reports, Reviews, Op-eds and Other Materials

"This Bank Proposal Will Damage Our Economy and Make Voters Even More Resentful," *New York Times,* April 2023

"The Federal Reserve Cannot Investigate Itself," *The American Prospect*, April 2023

"It was the worst of times," *American Banker,* November 2021

"Focus on bank supervision, not just bank regulation," Brookings Institution, Series on Financial Markets and Regulation, November 2, 2021 (with Sean Vanatta)

"Where is the Fed's Vice Chair for Supervision?" Brookings Institution, Series on Financial Markets and Regulation, October 26, 2021

"What can an investment bank teach us about American power?" *American Banker*, September 6, 2021

"Where are the Biden financial regulations?" Brookings Institution, Series on Financial Markets and Regulation, August 17, 2021

"Rethinking the Power of Market Influencers," *American Banker*, July 29, 2021

"Diversity Within the Federal Reserve System," Brookings Institution, Series on Financial Markets and Regulation, April 13, 2021 (with Kaleb Nygaard)

"What's Next for the Treasury-Fed Covid-19 Lending Facilities?" Brookings Institution, Hutchins Center for Fiscal and Monetary Policy, November 24, 2020

"Twitter and the Federal Reserve: How the U.S. Central Bank Is (and Is Not) Surviving Social Media, Brookings Institution, Series on Financial Markets and Regulation, October 29, 2020

"Using the Federal Reserve's Discount Window for Debtor-in-Possession Financing During the Covid-19 Bankruptcy Crisis," Brookings Institution, Hutchins Center for Fiscal and Monetary Policy, July 29, 2020 (with David Skeel)

"Restoring the Promise of Federal Reserve Governance," *Mercatus Working Paper*, January 2020

"Review: Sven Beckert & Christine Desan, eds., *American Capitalism: New Histories*" 72 Economic History Review 1099 (2019).

"Review: William L. Silber, *The Story of Silver: How the White Metal Shaped America and the Modern World*," Business History Review (2019)

"Explaining the New Fed-Treasury Emergency Fund," *Brookings Institution, Center on Regulation and Markets,* April 3, 2020.

"The curse of confidential supervisory information," *Brookings Institution, Center on Regulation and Markets*, December 20, 2019

"How do you solve a problem like Fannie and Freddie? Not by creating more of them," *Brookings Institution, Center on Regulation and Markets*, October 7, 2019

"What happens if Trump tries to fire Fed chair Jerome Powell?" *Brookings Institution, Hutchins Center on Fiscal and Monetary Policy*, September 9, 2019

"Can fintech increase lending? How courts are undermining financial inclusion," *Brookings Institution, Center on Regulation and Markets*, April 16, 2019

"The Fed Wants To Veto State Banking Authorities. But Is That Legal?" *Brookings Institution Center on Regulation and Markets*, November 14, 2018

"Can Trump Fire Jerome Powell? It's a Political Question," *Wall Street Journal*, December 10, 2018

"John Williams may be one of the best central bankers—but that doesn't mean he should run the New York Fed," *Brookings Institution Center on Regulation and Markets*, July 24, 2018

"The Fed's Job Isn't To Make Trump Happy," *Wall Street Journal*, July 22, 2018

"Why the next big bank shouldn't be the USPS," *Brookings Institution Center on Regulation and Markets*, May 31, 2018

"The Quarles Quarrel Hurts the Fed," *Wall Street Journal*, April 23, 2018

"Too Many Empty Chairs at the Federal Reserve," *Wall Street Journal*, October 4, 2017

"The Economy's Visible Hands," *Wall Street Journal*, March 2, 2017

"The Most Powerful Man in Washington You've Never Heard Of," *Wall Street Journal*, February 15, 2017

"To Fix the Fed, Simplify It," *New York Times*, July 29, 2015

"The Twelve Federal Reserve Banks: Governance and Accountability in the 21st Century," *Hutchins Center on Fiscal and Monetary Policy at the Brookings Institution*, Working Paper (2015)

"Governing the Federal Reserve System after the Dodd-Frank Act," *Peterson Institute for International Economics Policy Paper* 13-25 (2013)

"Misreading Walter Bagehot: What *Lombard Street* Really Means for Central Banking," Essay on Walter Bagehot's *Lombard Street*, *The New Rambler*, December 14, 2015

"The Accidental History of the Federal Banking and Securities Laws: A Review of Michael Perino's *Hellhound of Wall Street: How Ferdinand Pecora's Investigation of the Great Crash Forever Changed American Finance*," 39 Securities Regulation Law Journal 45 (2011)

## HONORS, GRANTS, AND AWARDS

| | |
|---|---|
| **Wharton MBA Excellence in Teaching Award** | 2018-2023 |
| **Tanoto Fund Award** | 2020-2021 |
| **Cynthia and Bennett Golub Endowed Faculty Scholar Award** | 2018-2019 |
| **Wharton Undergraduate Excellence in Teaching Award** | 2017, 2018, 2019 |
| **Penn Undergraduate Research Mentoring Award** | 2016, 2017, 2019, 2020, 2022 |
| **Wharton Dean's Fund Research Award** | 2016, 2017, 2019 |
| **Institute for Political History**, Hugh Davis Graham Award | 2016 |
| **Council on Foreign Relations**, Stephen M. Kellen Term Member | 2015-2020 |

## SELECT PRESENTATIONS

Available on request

## OTHER AFFILIATIONS

*Law & Macroeconomics*, conference co-convenor and SSRN e-journal co-editor, with Adam Feibelman (Tulane), Anna Gelpern (Georgetown), Rosa Lastra (Queen Mary, University of London), and Yair Listokin (Yale)

*Professional Memberships*, Business History Conference

*Bar Memberships*, District of Columbia Bar (2014-present); New York State Bar (2011-2015)

## OTHER

**Languages**:   Fluent in Portuguese, proficient in Spanish and Capeverdean Creole, beginner French and German

**Personal**:   Married to Nikki Conti-Brown, with four children

**J.A.801**

# EXHIBIT 2

## MATERIALS RELIED UPON LIST

- Motion to Dismiss Memorandum, ECF No. 49
- Motion to Dismiss Memorandum, ECF No. 51
- Amici Brief in Opposition to Motion to Dismiss, ECF. No. 92
- Reply in Support of Motion to Dismiss, ECF No. 96
- Reply in Support of Motion to Dismiss, ECF No. 97
- Transcript of Motion Hearing Proceedings
- Amended Complaint, ECF. No. 121
- Motion Dismiss, ECF. No. 124
- Motion Dismiss, ECF. No. 127
- Memorandum in Opposition to Motion to Dismiss Amended Complaint, ECF. No. 135
- Brief of Amicus Curiae, ECF. No. 151
- Reply to Motion to Dismiss, ECF. No. 159
- Reply to Motion to Dismiss, ECF. No. 160
- Amended Amicus Curiae Brief, ECF. No. 163
- Answer to Amended Complaint with Affirmative Defenses, ECF No. 166
- Amended Scheduling Order, ECF. No. 169
- Federal Reserve Bank of Cleveland, 1980 Annual Report (1981) (Federal Reserve Bank Cleveland Research Department)
- Gary C. Zimmerman , *Economic Review: Money and the Monetary Control Act*, Fed. Rsrv. (Winter 1981)
- Gary C. Zimmerman, The Pricing of Federal Reserve Services Under the MCA, Econ. Rev., Winter 1981, at 22 (1981)
- Fed. Rsrv. Bd., Federal Reserve's Key Policies for the Provision of Financial Services, https://www.federalreserve.gov/paymentsystems/pfs_about.htm (Aug. 11, 2020)

- Fed. Rsrv. Bd., Federal Reserve's Key Policies for the Provision of Financial Services (Nov. 20, 2008) ("Policies: Principles for the Pricing of Federal Reserve Bank Services")
- Fed. Rsrv. Bd., Federal Reserve's Key Policies for the Provision of Financial Services (Nov. 20, 2008) ("Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks")
- Fed. Rsrv. Bd., Federal Reserve's Key Policies for the Provision of Financial Services –, (last updated Aug., 11, 2020) ("Policies: The Federal Reserve in the Payments System, Issued 1984; revised 1990 and January 2001)
- Fed. Rsrv. Bank of Chi., The Depository Institutions Deregulation and Monetary Control Act of 1980: Landmark financial legislation for the 80s, (n.d.)
- Lynn Elaine Browne, *The Evolution of Monetary Policy and the Federal Reserve System Over the Past 30 Years: An Overview*, New Eng. Rev. (2001)
- Anatoli Kuprianov, *Economic Review: The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Fed. Rsrv. Bank of Richmond (1985)
- Steve Marlin, *KeyCorp Moves to Single Fed Account*, BankTech.com (July 1998)
- Kaitlin Ugolik, *Cannabis Economy Lags Behind Legalization*, Institutional Inv. (Aug. 28, 2015)
- David Kelly, *Legal Pot Shops Are a High-risk Business to Banks*, L.A. Times (n.d.)
- Nathaniel Popper, *Fed Denies Credit Union For Cannabis*, N.Y. Times (July 31, 2015)
- Matt Richtel, *First Bank of Bud*, N.Y. Times (Feb. 8, 2015)
- Ellen Brown, *A Public Bank for Los Angeles*, LA Mag. (2018) (Issue 69)
- Michael S. Derby, *Lawsuit Against New York Fed Seen as a Policy Threat*, Wall St. J. (Sept. 27, 2018)
- Ellen Brown, *The Public Banking Revolution Is upon Us*, Dissident Voice: Pol. Sci. Blog (Apr. 19, 2019)
- *Can the Cowboy State Sell Crypto to the Fed?*, Euromoney (Feb. 25, 2022)
- Desi Volker, *The Paycheck  Protection Program Liquidity Facility*, 28 Econ. Pol'y Rev. (2022)
- Andrew Akerman, *Kansas City Rescinds Master Account for Payment Firm, GOP Senator Says*, Wall St. J. (June 9, 2022)

- Dennis M. Gingold, *Fed Nominee Sarah Bloom Rasking Did Nothing Wrong; Former Chairman of Reserve Trust Company Writes to Clear the Air*, Wall St. J: Letter to the Editor (Feb. 15, 2022)
- Peter Rudegeair, Plaid *Co-Founder Takes Aim at Technology for Banking*, Wall St. J. (Apr. 22, 2022)
- Paul Kiernan, *Federal Reserve Finalizes Guidelines for Access to Its Payment Systems; Institutions Engaged in Novel Activities Would Undergo More extensive Review*, Wall St. J. (Aug. 15, 2022)
- *Monetary Control and the Membership Problem: Hearing on H.R. 13476, H.R. 13477, H.R. 12706 and H.R. 14072 Before the H. Comm. on Banking, Finance and Urban Affairs*, 95th Cong. (1978).
- H.R. Rep. No. 95-1590 (1978).
- S. 3485, 95th Cong. (1978) (Cong Senate Bill Priced Services).
- H.R. Rep. No. 96-263 (1979).
- H.R. Rep. No. 96-842 (1978) (Conf. Rep.).
- *Federal Reserve Requirements: Hearings on S. 353, S. 85 and H.R. 7 Before the H. Comm. on Banking, Housing, and Urban Affairs*, 96th Cong. (1980).
- Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980).
- H.R. 7, 96th Cong. (1979).
- 125 Cong. Rec. 16,619 (1979).
- 126 Cong. Rec. H2273 (daily ed. Mar. 27, 1980).
- 126 Cong. Rec. S3235 (daily ed. Mar. 28, 1980).
- *Monetary Policy Improvement Act of 1979: Hearings on S. 85 and S. 353 Before the S Comm. on Banking, Housing, and Urban Affairs*, 96th Cong. (1979).
- 125 Cong. Rec. H10260 (daily ed. Nov. 7, 1979).
- 125 Cong. Rec. S467 (daily ed. Jan. 18, 1979) (statement of Sen. Proxmire).
- 125 Cong. Rec. S14785 (daily ed. Sept. 7, 1978) (Statement of Sen. Proxmire).
- 126 Cong. Rec. S1178 (daily ed. Jan. 30, 1980) (Statement of Sen. Tower).
- Federal Reserve Bank of Dallas, Circular No. 97-104 (Nov. 12, 1997) (Standardized Operating Circulars 1-10, Federal Reserve Bank of Dallas, January 2, 1988).
- Allan Meltzer, A History of the Federal Reserve, volume 1 (2003)
- Bd. of Govs. of Fed. Rsrv. Sys., Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 15, 2022)

- Dan Awrey, *Unbundling Banking, Money, and Payments* (January 31, 2021). European Corporate Governance Institute - Law Working Paper No. 565/2021, Cornell Legal Studies Research Paper No. 21-11, Georgetown Law Journal, Forthcoming, Available at SSRN: https://ssrn.com/abstract=3776739 or http://dx.doi.org/10.2139/ssrn.3776739
- Elijah Brewer III, The Depository Institutions Deregulation and Monetary Control Act of 1980, Econ. Perspectives, Sept.-Oct. 1980
- Fred H. Miller, Robert G. Ballen, & Hal S. Scott, Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers, 39 Bus. Law. 1333, 1365 (1984)
- Gage et al, "The Financial Situation," North American Review, Feb 1908.
- Henry N. Butler and Jonathan R. Macey, Myth of Competition in the Dual Banking System, 73 CORNELL L. REV. 677 (1988)
- Johnathan Adler, MARIJUANA FEDERALISM: UNCLE SAM AND MARY JANE (2020)
- Julie Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments* Iowa Law Review, vol 109, draft July 17, 2023
- Julie Hill, *Opening a Federal Reserve Account*, Yale Journal on Regulation, vol 40, 2023
- Kenneth E. Scott, The Dual Banking System: A Model of Competition in Regulation, 30 STANFORD L. REV. 1 (1977)
- Lynn Elaine Browne, The Evolution of Monetary Policy and the Federal Reserve System Over the Past Thirty Years: An Overview, New Eng. Econ. Rev., Jan.-Feb. 2001
- Paul Warburg, *The Federal Reserve System - Its Origin and Growth, Reflections and Recollections*, Vol. 2, New York, The MacMillan Company, 1930, digitized for Fraser http://fraser.stlouisfed.org
- Peter Conti-Brown, The Fed Wants To Veto State Banking Authorities. But Is That Legal? Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd
- Peter Conti-Brown & Sean Vanatta, *Risk, Discretion, & Bank Supervision* (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4405074
- Riegle-Neal Interstate Banking and Branching Efficiency Act, Pub. L. No. 103-328, 108 Stat. 2338 (1994)
- Rob Blackwell, How Far Does American Samoa Have to Go to Get a Bank?, American Banker, July 31, 2017
- Rob Blackwell, American Samoa Finally Gets a Public Bank, American Banker (April 30, 2018)
- Roger Lowenstein, America's Bank: The Epic Struggle To Create the Federal Reserve (2015)

- Volcker Alliance, Reshaping the Financial Regulatory System, April 2015.
- Elizabeth F. Brown, Prior Proposals to Consolidate Federal Financial Regulators, The Volcker Alliance (2015)
- 12 U.S.C. § 248
- 12 U.S.C. § 342
- 46 Fed. Reg. 1338, 1338 (Jan 6, 1981)
- 87 Fed. Reg. at 51,099 – 51,100
- Federal Reserve Act, Pub. L. No. 63-43, 38 Stat. 251 (1913)
- Hrg.Before the Committee on Banking, Housing, and Urban Affairs, United States Senate 96th Cong. (1980)
- Reporter's Transcript of Oral Argument in *The Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City,* Civil Action No. 15-cv-01633, ECF No. 45, dated January 4, 2016
- Complaint in *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, Civil Action No. 17-CV-02361, dated September 29, 2017
- Answer in *Fourth Corner Credit Union v. Fed. Reserve Bank of Kansas City*, Civil Action No. 17-CV-02361, dated November 8, 2017
- Memorandum of Law of *Amicus Curiae* The Board of Governors of the Federal Reserve in Support of Defendant The Federal Reserve Bank of New York's Motion to Dismiss in *TNB USA Inc. v Federal Reserve Bank of New York,* Civil Action No. 1:18-cv-7978-ACL, ECF No. 45, dated February 6, 2020
- Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City, 154 F. Supp. 3d 1185, 1188 (D. Colo. 2016), vacated, 861 F.3d 1052 (10th Cir. 2017)
- Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City, 861 F.3d 1052 (10th Cir. 2017)
- The National Banks and the Duel Banking System (Comptroller of the Currency, September 2003)
- Federal Reserve Requirements, Hearings
- Letter from Esther L. George, President, Federal Reserve Bank of Kansas City, to Deirdra A. O'Gorman, CEO
- 1997, Federal Reserve Bank of San Francisco, pdf6, https://www.frbsf.org/wp-content/uploads/1997_annual_report.pdf
- 1997, Board of Governors Annual Report, p248, https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/1997-2457
- Board of Governors, p257, https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/1996-2460

- Federal Reserve Bank of Dallas. New Bulletin 11, Circular No. 81-155. July 30, 1981. https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/new-bulletin-11-541337
- Federal Reserve Bank of San Francisco "Federal Reserve Notes." July 1981, https://fraser.stlouisfed.org/title/federal-reserve-notes-5186/july-1981-527563
- 2010, Board of Governors Annual Report, p153, https://fraser.stlouisfed.org/title/annual-report-board-governors-federal-reserve-system-117/2010-2468
- Federal Reserve Bank of Philadelphia. Annual Report. 2010. P7, https://fraser.stlouisfed.org/title/annual-report-federal-reserve-bank-philadelphia-469/navigating-change-579775

- Documents Produced by the Federal Reserve Bank of Kansas City, including: FRBKC-00000054; FRBKC-00000234; FRBKC-00000254; FRBKC-00000266; FRBKC-00000276; FRBKC-00000297; FRBKC-00000313; FRBKC-00000314; FRBKC-00000319; FRBKC-00000328; FRBKC-00000387; FRBKC-00000390; FRBKC-00000394; FRBKC-00000397; FRBKC-00000437; FRBKC-00000446; FRBKC-00000460; FRBKC-00000465; FRBKC-00000480; FRBKC-00000488; FRBKC-00000513; FRBKC-00000565; FRBKC-00000626; FRBKC-00000667; FRBKC-00001586; FRBKC-00001601; FRBKC-00001668; FRBKC-00001715; FRBKC-00001908; FRBKC-00001961; FRBKC-00002132; FRBKC-00002133; FRBKC-00002169; FRBKC-00002172; FRBKC-00002183; FRBKC-00002200; FRBKC-00002366; FRBKC-00002407; FRBKC-00002424; FRBKC-00002514; FRBKC-00002560; FRBKC-00002573; FRBKC-00002695; FRBKC-00002728; FRBKC-0000297; FRBKC-00003309; FRBKC-00003331; FRBKC-00003348; FRBKC-00003379; FRBKC-00003421; FRBKC-00003424; FRBKC-00003426; FRBKC-00003428; FRBKC-00003432; FRBKC-00003561; FRBKC-00003592; FRBKC-00003607; FRBKC-00003671; FRBKC-00003695; FRBKC-00003950; FRBKC-00004229; FRBKC-00004256; FRBKC-00004282; FRBKC-00004620; FRBKC-00004638; FRBKC-00004647; FRBKC-00004677; FRBKC-00004710; FRBKC-00004768; FRBKC-00004808; FRBKC-00004836; FRBKC-00004899; FRBKC-00004902; FRBKC-00004904; FRBKC-00004916; FRBKC-00004943; FRBKC-00004977; FRBKC-00004983; FRBKC-00005021; FRBKC-00005060; FRBKC-00005156; FRBKC-00005172; FRBKC-00005232; FRBKC-00005243; FRBKC-00005245; FRBKC-00005326; FRBKC-00005333;

FRBKC-00009364; FRBKC-00009369; FRBKC-00009384; FRBKC-00009385; FRBKC-00009848; FRBKC-00009854; FRBKC-00013627; FRBKC-0009385; FRBKC-00014860

- Documents Produced by the Board of Governors of the Federal Reserve System, including: FRB-AR-000001; FRB-AR-000002; FRB-AR-000003; FRB-AR-000004; FRB-AR-000014; FRB-AR-000068; FRB-AR-000153; FRB-AR-000154; FRB-AR-000162; FRB-AR-000163; FRB-AR-000191; FRB-AR-000201; FRB-AR-000204; FRB-AR-000216; FRB-AR-000222; FRB-AR-000227; FRB-AR-000233; FRB-AR-000245; FRB-AR-000247; FRB-AR-000250; FRB-AR-000298; FRB-AR-000306; FRB-AR-000308; FRB-AR-000313; FRB-AR-000315; FRB-AR-000323; FRB-AR-000324; FRB-AR-000326; FRB-AR-000333; FRB-AR-000334; FRB-AR-000335; FRB-AR-000336; FRB-AR-000345; FRB-AR-000356; FRB-AR-000359; FRB-AR-000362; FRB-AR-000461; FRB-AR-000549; FRB-AR-000561; FRB-AR-000589; FRB-AR-000629; FRB-AR-000634; FRB-AR-000638; FRB-AR-000679; FRB-AR-000740; FRB-AR-000920; FRB-AR-000950; FRB-AR-000956; FRB-AR-000964; FRB-AR-000986; FRB-AR-000991; FRB-AR-001145; FRB-AR-001191; FRB-AR-001202; FRB-AR-001204; FRB-AR-001210; FRB-AR-001211; FRB-AR-001318; FRB-AR-001323; FRB-AR-001400; FRB-AR-001409; FRB-AR-001533; FRB-AR-001593; FRB-AR-001599; FRB-AR-001607; FRB-AR-001673; FRB-AR-001690; FRB-AR-001696; FRB-AR-001754; FRB-AR-001806; FRB-AR-001810; FRB-AR-001835; FRB-AR-001853; FRB-AR-001857; FRB-AR-001859; FRB-AR-001862; FRB-AR-001865; FRB-AR-001872; FRB-AR-001874; FRB-AR-001898; FRB-AR-001983; FRB-AR-002188; FRB-AR-002238; FRB-AR-002240; FRB-AR-002248; FRB-AR-002264; FRB-AR-002273; FRB-AR-002414; FRB-AR-002415; FRB-AR-002433; FRB-AR-002446; FRB-AR-002448; FRB-AR-002471; FRB-AR-00250; FRB-AR-002508; FRB-AR-002671; FRB-AR-002689l FRB-AR-002695; FRB-AR-002709; FRB-AR-002729; FRB-AR-002758; FRB-AR-002767; FRB-AR-002909; FRB-AR-002947; FRB-AR-002972; FRB-AR-002974; FRB-AR-002976; FRB-AR-002979; FRB-AR-002989; FRB-AR-002991; FRB-AR-002993; FRB-AR-003072; FRB-AR-003079; FRB-AR-003083; FRB-AR-003088; FRB-AR-003233; FRB-AR-003259; FRB-AR-003269; FRB-AR-003276; FRB-AR-003282; FRB-AR-003337; FRB-AR-003772; FRB-AR-003793; FRB-AR-003858; FRB-AR-003860; FRB-AR-003863; FRB-AR-003917; FRB-AR-003939; FRB-AR-003981; FRB-AR-003994; FRB-AR-003997; FRB-AR-004014; FRB-AR-004026; FRB-AR-004110; FRB-AR-004113; FRB-AR-004116; FRB-AR-004126; FRB-AR-004129; FRB-AR-004134; FRB-AR-004138; FRB-AR-004142; FRB-AR-004144; FRB-AR-004178;

FRB-AR-004195; FRB-AR-004199; FRB-AR-004214; FRB-AR-004225; FRB-AR-004353; FRB-AR-004369; FRB-AR-004381; FRB-AR-004383; FRB-AR-004385; FRB-AR-004412; FRB-AR-004452; FRB-AR-004549; FRB-AR-004558; FRB-AR-004585; FRB-AR-004588; FRB-AR-004593; FRB-AR-004594; FRB-AR-004605; FRB-AR-004617; FRB-AR-004619; FRB-AR-004783; FRB-AR-004786; FRB-AR-004796; FRB-AR-004805; FRB-AR-004807; FRB-AR-004808

- Documents Produced by The Narrow Bank: TNB-0000001-9

# EXHIBIT C

# [PUBLIC VERSION]

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3

4       CUSTODIA BANK, INC.,

5                        Plaintiff

6       vs.                              No.

7       FEDERAL RESERVE BOARD OF         22-cv-00125-SWS

8       GOVERNORS and FEDERAL RESERVE

9       BANK OF KANSAS CITY,

10                       Defendant.

11

12

13

14

15            CONFIDENTIAL DEPOSITION OF JUDITH HAZEN,

16      FRBKC Representative, a Defendant, taken on behalf of

17      the Plaintiff before Kelsey Robbins Schmalz, CSR No.

18      1571, CCR No. 1148, RPR, pursuant to Notice on the

19      16th of November, 2023, at the offices of the Federal

20      Reserve Bank of Kansas City, 1 Memorial Drive, Kansas

21      City, Missouri.

22

23

24

25

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 20

1    generally about his involvement in conversations with

2    the State of Wyoming about the SPDI draft litigation?

3              A.    So he provided me information on

4    conversations that were happening predating my

5    involvement with the legislation and with the

6    entities, and that included an overview of our -- of

7    conversations between the Federal Reserve Bank staff

8    and the State of Wyoming during that time.

9              Q.    And what is the time period that he

10   was referencing with you?  Or let me ask it a

11   different way.

12             What is the time period that the

13   Kansas City Fed was engaged in conversations with

14   representatives of the State of Wyoming in connection

15   with the draft SPDI legislation?

16             A.    So conversations with the Kansas City

17   Fed would go back to 2017 or 2018.  Conversations

18   that I covered with Nick I believe were occurring in

19   the 2019 time frame.

20             Q.    Okay.  And did Nick have perspective

21   or knowledge about conversations that would have

22   occurred with the State of Wyoming representatives in

23   2017 or 2018?

24             MS. CARLETTA:  Objection.  Form.

25             A.    So Nick Billman would have been

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 53

1    BY MR. SCARBOROUGH:

2            Q.      Were representations made by Kansas

3    City Fed officers that if Wyoming SPDI charters

4    entities applied they would be given access to the

5    Federal Reserve payment system?

6                    MS. CARLETTA:  Objection.  Form.

7            A.      I'm not aware of a conversation that

8    SPDI entities would have master accounts made

9    available to them.

10   BY MR. SCARBOROUGH:

11           Q.      When you mentioned a moment ago that

12   there are ways to access the Federal Reserve payment

13   system other than through a master account, the

14   testimony that we've heard from various

15   representatives or various employees of the Kansas

16   City Fed is that the only other way to access it is

17   through a correspondent banking relationship?

18                   Is that correct, first of all?  Is

19   that the Kansas City Fed's understanding that the

20   only two ways to access the Federal Reserve payment

21   system are through a master account or through a

22   correspondent banking relationship?

23                   MS. CARLETTA:  Objection.  Form.

24   Misstates testimony.

25           A.      So the only two are not that, but yes,

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 54

1    often you will see an institution that as accessing

2    services and maintains an account with the Reserve

3    Bank and settles directly within that account.  You

4    also have institutions that have direct access to

5    services and choose to settle in another

6    institutions's master account.  That is what I would

7    think of as a correspondent/respondent relationship.

8                 There are also other ways you can

9    access the banking system, though, and that would be

10   as a commercial customer of another bank that

11   maintains access to services, either through their

12   own master account or a correspondent relationship,

13   and so to have direct access, the two most common

14   ways would be through your own master account or by

15   settling in a correspondent account, but they're not

16   the only ways to access.

17          Q.    If you don't have your own master

18   account and you have to go through a correspondent

19   relationship or a commercial banking relationship to

20   get access, does that, first of all, interject

21   additional time into the process before transactions

22   can settle?

23                 MS. CARLETTA:  Objection.  Form.

24          A.    I can't answer the specifics on how

25   all of the mechanics could work for all of the

J.A.815

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 55

1    iterations of those, but it could.

2    BY MR. SCARBOROUGH:

3         Q.    And could it also inject additional

4    cost to the entity seeking to access the Federal

5    Reserve payment system?

6              MS. CARLETTA:  Same objection.

7         A.    I would expect that any entity

8    providing services is going to charge for that.

9    BY MR. SCARBOROUGH:

10        Q.    Okay.  And if an entity had its own

11   master account, it would not face those same timing

12   issues and it would not face those same cost issues;

13   is that fair?

14             MS. CARLETTA:  Objection.  Form.

15        A.    If the question is if an entity

16   maintains its own master account does it not need to

17   pay a fee to another entity for using its services or

18   whatever fees that a commercial bank may choose to

19   charge its customers, that would be accurate, but

20   there are other expenses that might be incurred, so

21   there is still an expense relative to maintaining a

22   master account.

23             MR. SCARBOROUGH:  Okay.  We've been

24   going a while.  I haven't finished this document yet,

25   but why don't we take a break and then we can pick

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 57

1    George or meetings that we would have attended, but I

2    can't cite like where they were at in the deposition.

3         Q.    That's fine.  Based on what you

4    reviewed -- and, again, I'm speaking to you in your

5    capacity as the Kansas City Fed representative.

6         A.    Yes.

7         Q.    Was there any testimony that Tara

8    Humston gave that the Kansas City Fed would disavow?

9         A.    No.

10        Q.    And was there any testimony that she

11   gave that the Kansas City Fed would disagree with?

12        A.    No.

13        Q.    Okay.  Thank you for those

14   clarifications.

15             I just wanted to return to Exhibit 226

16   so that we could finish up with that.  That's the

17   talking points that were prepared by some combination

18   of Veronica Sellers, Kevin Moore and Ryan Harwell,

19   correct?

20        A.    I believe also Nick Billman.

21        Q.    Correct.  Thank you for pointing that

22   out.  So we talked before about section 248a and the

23   desire of the Kansas City Fed officers to have that

24   reference -- or those references removed from the

25   draft legislation.  Do you know whether references to

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 58

1   248a were removed from the final legislation?

2               MS. CARLETTA:  Objection.  Form.

3          A.    Chris Land agreed to remove the

4   specific references to that section.

5   BY MR. SCARBOROUGH:

6          Q.    And that's reflected in the email

7   Exhibit 227 --

8          A.    Correct.

9          Q.    -- that Nick Billman sent summarizing

10  his call with Chris Land on December 12th, 2018?

11         A.    The email is dated December 12th,

12  2018.  The conversation may not have been that day.

13         Q.    Yeah, you're right.  It looks like if

14  you read the first line of the email it's a little

15  faint, but it says that he wanted to follow up on his

16  call with Chris Land last Friday afternoon, and this

17  email was sent on December 12th, Wednesday, so if I'm

18  doing my math correctly, that would put this back at

19  December 7th, Friday; is that right?

20         A.    I believe that's accurate.

21         Q.    The other concern that was reflected

22  in the key issues at the top was that the Kansas City

23  Fed wanted Wyoming to remove the requirement for the

24  attorney general of the State of Wyoming to sue the

25  Federal Reserve Bank on behalf of a private entity if

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 59

1    it was denied a master account?

2              MS. CARLETTA:  Objection.  Form.

3    Sorry.

4    BY MR. SCARBOROUGH:

5         Q.    Did Wyoming make changes to its

6    legislation to address that concern?

7              MS. CARLETTA:  Objection.  Form.

8         A.    So I see the reference that the Kansas

9    City Fed suggested removing that, and it was reported

10   to Kevin Moore and Ryan Harwell by Albert that the

11   State had struck the language that required the state

12   attorney general to sue the Fed for reasons that had

13   been cited in the talking points when the State

14   realized it could not take legal actions against the

15   Fed on behalf of private citizens.

16   BY MR. SCARBOROUGH:

17        Q.    And are you reading from Exhibit 227,

18   the December 5th, 2018, email summary from Kevin

19   Moore?

20        A.    I am.

21        Q.    That same email, the following

22   paragraph references that fact that Albert -- and

23   this is a reference to Albert Forkner, correct?

24        A.    Yes, Albert Forkner.

25        Q.    Also knows there's sensitivity to

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 61

1              A.      That is what this says.

2              Q.      Was the issue around member status

3     raised because the Reserve Bank did not control

4     whether a special purpose depository institution

5     would be granted membership?

6                      MS. CARLETTA:  Objection.  Form and

7     outside the scope.

8              A.      Concerns about membership status and

9     Federal Reserve services are raised because they're

10    not within the purview of the state to determine, and

11    so there's concern in the legislature implying or

12    conveying that.

13    BY MR. SCARBOROUGH:

14             Q.      I see.  And did Chris Land confirm in

15    his conversation with anybody that occurred I believe

16    on December 17th, 2018, that, in fact, the language

17    that had been discussed about a mandatory lawsuit

18    provision was ultimately removed from the SPDI

19    legislation?

20                     MS. CARLETTA:  Objection.  Form.

21             A.      I'll need just a moment to read it to

22    see if that's in here.

23    BY MR. SCARBOROUGH:

24             Q.      I believe it's reflected in the second

25    sentence at the top of the email?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 62

1          A.     Yes.  The one that I can't read with

2     the highlighting.

3          Q.     Yeah.  I believe it says -- I have a

4     clearer version on my screen that says, Chris

5     confirmed what Kevin and Ryan heard from Jeff and

6     Albert below about the mandatory lawsuit provision

7     being removed.

8                 Did I read that accurately?

9          A.     You did read that accurately.

10    BY MR. SCARBOROUGH:

11         Q.     Now, in looking through the talking

12    points, and those talking points are I think four

13    pages long; is that right?

14         A.     Yes.

15         Q.     There are -- in addition to the two

16    key issues that were identified and we've already

17    discussed, it appears that there were other

18    observations that the Kansas City Fed officers shared

19    with the Wyoming representatives about the draft

20    legislation; is that fair?

21         A.     So referencing the talking points

22    document, I think this is information that was

23    developed internally.  What was conveyed in

24    conversations may not have included all of these, but

25    I would rely on the communications that are outlined

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 144

1    the forefront and ultimately resulted in creating the

2    novel account -- or the account access steering

3    committee is what's defined on this page.

4    BY MR. SCARBOROUGH:

5            Q.    Gotcha.  And on the nontraditional

6    account access group -- work group, am I

7    understanding it correctly that there was both a

8    steering committee as well as two different

9    workstreams, a practical workstream and a policy

10   workstream?

11           MS. CARLETTA:  Objection.  Form.

12           A.    So as outlined here, yes.  There was a

13   group put together that constituted what became the

14   nontraditional account access steering committee, and

15   under that there were groups that were focusing on

16   looking at broader policy -- that was dubbed the

17   policy workstream and one that was dubbed the

18   practical workstream.

19           MR. SCARBOROUGH:  Can you mark that as

20   Exhibit 233.

21           (FRB Exhibit No. 233 was marked for

22   identification by the reporter.)

23   BY MR. SCARBOROUGH:

24           Q.    I'm going to hand you a document

25   that's been marked as Exhibit 233, which is simply a

J.A.822

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 145

1    form because I want to create a list, and I don't

2    know if you have a pen, but I have a fancy one from

3    the Federal Reserve Bank of Kansas City if you would

4    like to use it.

5              A.    I hear they're in high demand.

6              Q.    Yes.  What I would like to do as we go

7    through is to sort of keep a running list of

8    individuals who were involved in dealing with

9    nontraditional accounts like SPDIs or Custodia

10   specifically, okay?

11             MS. CARLETTA:  And I'll just note for

12   the record I think we're talking about Topic No. 2;

13   is that right?

14             MR. SCARBOROUGH:  I don't have it in

15   front of me, but let me look real quick.

16             MS. CARLETTA:  Assuming we're talking

17   about Topic No. 2, we said that would produce a

18   witness to discuss generally the positions and

19   identities of individuals at the Board who had

20   substantive discussions with FRBKC employees about

21   Custodia's master account request.

22             MR. SCARBOROUGH:  Yeah.  This is not

23   just limited to Topic 2.  It also encompasses

24   Topic 6, for instance, which deals with the various

25   working groups and PSPAC and et cetera that was

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 150

1    I'm writing it correctly.

2              MS. CARLETTA:  You can write it down

3    as you go.  I don't know what she's going to be able

4    to verify.  It's not clear from the face of that

5    document what we're doing here.  You can ask the

6    question and she can answer it.

7         A.    Can you repeat the question?

8    BY MR. SCARBOROUGH:

9         Q.    Sure.  Am I correct that you

10   previously have testified today that the Payment

11   Systems Policy Advisory Committee was involved in

12   addressing issues that were raised by novel chartered

13   entities, first of all?

14             MS. CARLETTA:  Objection.  Form.

15        A.    So the PSPAC was one of the groups

16   that was aware of and interested in the issues that

17   were being raised by new charter types, by novel

18   business plans, by novel uses of existing charters.

19   BY MR. SCARBOROUGH:

20        Q.    And the PSPAC did not include every

21   member of -- every Governor on the Board, correct?

22        A.    A subset of Governors sitting on the

23   PSPAC.

24        Q.    So I'm going to write PSPAC, subset of

25   Governors on No. 1, okay?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 151

1          A.     Okay.

2                 MS. CARLETTA:  Okay.  You're writing

3     it down.

4          A.     I see you writing it down.

5     BY MR. SCARBOROUGH:

6          Q.     Does that capture the participants

7     from the Board at the PSPAC level who had anything to

8     do with nontraditional account access issues raised

9     by novel chartered entities?

10                MS. CARLETTA:  She is standing on her

11    deposition testimony.  She is not verifying this

12    document.

13         A.     So yes.  The representation on PSPAC

14    from the Board of Governors includes a subset of

15    Governors, but the PSPAC is broader than the

16    substance set of Governors, it also inside a subset

17    of Reserve Bank presidents.

18    BY MR. SCARBOROUGH:

19         Q.     Right, and I'm only looking to catch

20    the folks from the Board who were involved, so that's

21    why I've written subset of Governors and didn't say

22    anything more about Reserve Bank personnel, okay?

23                MS. CARLETTA:  It doesn't matter what

24    you've written.  It's attorney work product.  We're

25    standing on her -- she is not verifying that document

Page 153

1   the PSPAC level in connection with considerations

2   raised by nontraditional accounts like SPDIs or

3   others?

4               MS. CARLETTA:  Same objections.

5          A.     It represents the membership on PSPAC

6   at the Board of Governors.

7   BY MR. SCARBOROUGH:

8          Q.     Okay.  So let me direct your

9   attention, then, to Exhibit 202, which you have you

10  in front of you.  You mentioned that there was a

11  steering committee, correct?

12         A.     Yes.

13         Q.     And this is a steering committee for

14  the nontraditional account access groups, correct?

15         A.     Yes.  That's what the group was

16  titled.

17         Q.     Okay.  So who served on the steering

18  committee at the board level?

19         A.     On this document, it notes David

20  Mills.

21         Q.     Okay.  I'm going to write these down

22  as you go.  So David Mills, and what was his role?

23         A.     He is a co-chair.

24         Q.     And what position did he have at the

25  Board?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 154

1           A.      I would have to look up his specific

2    title for you.

3           Q.      Does it indicate on Exhibit 202 that

4    he was with RBOPS?

5           A.      He worked in the RBOPS division.

6           Q.      And does that stand for Reserve Bank

7    Operations and Payment Services?

8           A.      I believe so.  I'm not sure if the S

9    is services or system.

10          Q.      Let me see if I can find the answer

11   for you quickly.  I have it down as Reserve Bank

12   Operations and Payment Systems.  Do you have any

13   reason to disagree with that?

14          A.      No.  I can confirm it during the break

15   if you want me to, but that seems reasonable.

16          Q.      And so do you see here that I've

17   written down on No. 2 David Mills, RBOPS?

18          A.      I see that.

19          Q.      Okay.  And that's written on

20   Exhibit 233.  So who's the next member from the Board

21   who served on the steering committee?

22          A.      This notes Jeff Walker.

23          Q.      Jeff Walker.  And was Jeff Walker also

24   with RBOPS?

25          A.      That's what noted on the paper.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 155

1          Q.     And I've written that down as No. 3,

2     correct?

3          A.     Yes.

4          Q.     The next person that's listed on the

5     steering committee from the Board is Stephanie

6     Martin; is that right?

7          A.     Yes.  That's the next name from the

8     Board on the list.

9          Q.     And she's with Board legal; is that

10     fair?

11          A.     That's what it says.

12          Q.     So I've written Stephanie Martin,

13     legal, as No. 4, correct?

14          A.     Okay.

15          Q.     And then the next person that's listed

16     is Kavita Jain.  Is she also with the Board?

17          A.     She is.

18          Q.     And she served on the nontraditional

19     account access steering committee?

20          A.     That's what's noted here.

21          Q.     And she is with the board S&R.  What

22     does S&R stand for?

23          A.     Supervision and regulation.

24          Q.     So I've written as No. 5 Kavita's name

25     and her role as Board S&R, right?

Page 156

```
 1              A.     Yes.  Or just S&R, but yes.
 2              Q.     Then we have Marnie DeBoer.  Does
 3      she -- have you also seen her name as Margaret
 4      DeBoer?
 5              A.     Yes.
 6              Q.     And is she also a staff member for the
 7      Board of Governors?
 8              A.     She is.
 9              Q.     So I'm going to write down Marnie
10      DeBoer, and it indicates that she was in the Board
11      M&A; is that right?
12              A.     Board MA, yes.
13              Q.     Pardon me.  MA.
14                     And so I've written her name, Marnie
15      DeBoer, MA there, correct?
16              A.     Correct.
17              Q.     And then if I look down, the next
18      Board person that I see is Jennifer Lucier.  Am I
19      getting that right; do you know?
20              A.     I see the name.  I don't know the
21      pronunciation.
22              Q.     And Jennifer Louis, it indicates here,
23      was also with RBOPS at the Board?
24              A.     That's on the paper, yes.
25              Q.     So I've marked that as No. 7 for her
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 157

1    name, correct?

2            A.      I see that on that page.

3            Q.      Okay.  Now, in addition to the

4    steering committee, if you look further down on this

5    document on the practical workstream, there are other

6    members of the Board who are also participating,

7    correct?

8                    MS. CARLETTA:  Objection.  Form.

9            A.      I see on the list under practical

10   workstream a list of Board staff.

11   BY MR. SCARBOROUGH:

12           Q.      Okay.  One of the co-chairs for the

13   practical workstream was a Board member, correct?

14           A.      This indicates Kathy Wilson.

15           Q.      And Kathy Wilson, it indicates she is

16   also with RBOPS?

17           A.      Yes.  That's in parentheses.

18           Q.      And I've written her name at No. 8,

19   correct?

20           A.      I see that.

21           Q.      And then there's representatives from

22   Board legal, Gavin Smith; is that right?

23           A.      I see that.

24           Q.      And I've written his name as No. 9 on

25   this, correct?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 158

1          A.      I see that.

2          Q.      There's a reference to MPOA David

3    Lowe, do you know what MPOA is?

4          A.      I don't.

5          Q.      Do you know who David Lowe is?

6          A.      The name is familiar, but I'm -- I

7    don't know the division.  I'm sorry.

8          Q.      Do you know if he worked for the

9    bank -- for the Board or a Reserve Bank?

10              MS. CARLETTA:  Objection.  Form.

11         A.      I don't.  I see that he's listed under

12   Board staff in this document, but I don't know him

13   specifically.

14   BY MR. SCARBOROUGH:

15         Q.      All right.  So I'm going to put David

16   Lowe down and I'll write MPOA since he's listed under

17   Board staff, okay?  Do you see that as No. 10?

18         A.      Yeah.  I see you wrote the same thing

19   over here that's on this document.

20         Q.      Okay.  And then the next person listed

21   as Board staff is Dan McGonegal; is that right?

22         A.      Yes.

23         Q.      And is Mr. McGonegal part of the Board

24   S&R department?

25         A.      He is now, yes.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 159

1          Q.    And do you see for No. 11 I've written

2     his name with S&R next to it?

3          A.    I see that.

4          Q.    Then the next person down it indicates

5     is Ben Hobbs, also with RBOPS; is that right?

6          A.    I see that.

7          Q.    And I've written his name and

8     indicated that he is with RBOPS, correct?

9          A.    I see that.

10         Q.    And then if you flip the page to

11    workstream No. 1, the policy workstream, one of the

12    co-chairs of that group is also a Board staffer,

13    correct?

14         A.    Yes.  On here I see Jason Hinkle.

15         Q.    And he is also with RBOPS?

16         A.    That's in parentheses, yes.

17         Q.    You see him as listed as No. 13?

18         A.    Yes.

19         Q.    And then under Board staff for this

20    policy workstream, there's a representative from

21    legal.  That's Sophia Allison, correct?

22         A.    On Board legal it says Sophia Allison.

23         Q.    And I'll write legal next to her name.

24    Do you see that?

25         A.    I see that.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 160

1          Q.      Okay.  And then we have Mary Francis,

2     and I'll never be able to say her last name, but it

3     looks like Styczynski?

4          A.      Yes.

5          Q.      Is she also with the Board?

6          A.      Yes.

7          Q.      And her specific role is listed there

8     as also being MPOA, correct?

9          A.      Yes.  That's the designation on the

10    page.

11         Q.      And I've written her in as No. 15,

12    correct?

13         A.      Yes.

14         Q.      Now, I'm not going to include Dan

15    McGonegle a second time, although he is also on this

16    policy workstream, right?

17         A.      Yes, I see his name on here.

18         Q.      So the next person we have come to

19    appears to be Kirstin Wells; is that right?

20         A.      Yes.

21         Q.      Is she also a Board member?

22         A.      She is designated here as RBOPS.

23         Q.      I've written her name in as No. 16

24    with RBOPS next to it.

25                 Do you see that?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 161

1          A.    Okay.

2                MS. CARLETTA:  I'll just note that

3     this document also -- next to Kirstin Wells also says

4     parentheses, FOCS.  I don't know what that means.

5     BY MR. SCARBOROUGH:

6          Q.    Ms. Hazen, are there other

7     Board-related members, so staffers, Governors,

8     anybody from the Board who, to your knowledge are or

9     the Kansas City Fed's knowledge, participated on

10    either the nontraditional account access steering

11    committee, practical workstream 1 or policy

12    workstream 2 other than the folks that we've listed

13    here?

14               MS. CARLETTA:  Objection.  Form.

15         A.    I believe this document is showing

16    those that were engaged at the creation of this, and

17    I don't see any notable names missing.

18    BY MR. SCARBOROUGH:

19         Q.    So -- I didn't mean to interrupt you.

20         A.    I was just going to say I don't -- I

21    know that there have been changes in membership from

22    the Reserve Bank participation side, and so

23    potentially there's been changes from the Board side

24    but there's no names that I'm surprised not to see on

25    the list.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 162

1          Q.     Now I'm going to hand you a document

2    that was marked previously as Exhibit 218, and this

3    is a document that references crypto asset policy and

4    then it's got a redaction applications.

5                 Do you see that?

6          A.     I see that.

7          Q.     And it also reflects that there is

8    involvement in answering some crypto policy questions

9    that the Kansas City Fed was facing; is that correct?

10         A.     The invitation says, This is to

11   discuss some of the crypto policy questions KC is

12   facing as it works through the redacted applications.

13         Q.     Are you familiar with Jeff Ernst?

14         A.     I am.

15         Q.     Is he -- in what ways are you familiar

16   with Mr. Ernst?

17         A.     So I've worked with Jeff Ernst through

18   my role in the supervision function and engagement

19   with what we call the system risk council.

20         Q.     And does the system risk council, does

21   that address questions that arise in connection with

22   novel chartered entities?

23         A.     They do not.

24         Q.     Okay.  Why is -- go ahead.

25         A.     I'm sorry.  I just realized when I

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 163

1    said -- I'm sharing with you how I personally know

2    Jeff Ernst.  I didn't prepare to be able to speak to

3    all that is -- what it encompasses, so I'm sorry.

4              Q.    I understand.  Is it fair to say that

5    Mr. Ernst was involved in answering crypto policy

6    questions that the Kansas City Fed was trying to

7    address?

8              MS. CARLETTA:  Objection.  Form and

9    outside the scope.

10             A.    I don't know about Jeff's engagement

11   other than what's noted on this calendar invitation.

12   BY MR. SCARBOROUGH:

13             Q.    Okay.  And is it -- and he is a Board

14   staff member?

15             A.    Yes.

16             Q.    And did the SPDI-chartered entities

17   present crypto policy questions that needed to be

18   addressed?

19             A.    Broadly, there were crypto policy

20   questions that were being contemplated by the Board

21   and Reserve Bank staff.  I can't speak to if this

22   document is referencing specific questions that would

23   have been raised by SPDIs or a specific entity.

24             Q.    And I'm less concerned about that

25   particular document than trying to identify

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 164

1    individuals at the Board who would have been involved

2    in addressing policy issues or other questions that

3    would arise in connection with SPDI charters or the

4    like.

5         A.    I think what's challenging for me in

6    responding is that there is an evolution that is

7    happening at this time in that industry and then also

8    within the financial industry, and so to be able to

9    pinpoint what questions are being raised because of

10   the SPDI charters and what questions are being raised

11   just as we more broadly monitor what's happening in

12   the financial industry, I'm not prepared to make that

13   delineation.

14        Q.    Okay.  Let me ask you, did Asad Kudiya

15   have interaction with the Kansas City Fed in

16   connection with SPDI charters or issues around crypto

17   policy novel chartered entity account access?

18             MS. CARLETTA:  Objection.  Form and

19   outside the scope.

20        A.    Asad Kudiya would have been involved

21   in the application for membership by Custodia.

22   BY MR. SCARBOROUGH:

23        Q.    Would Asad have had any role in

24   connection with broader crypto policy questions?

25             MS. CARLETTA:  Same objections.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 165

1          A.     I'm not certain what all is

2    encompassed in Asad's role.

3    BY MR. SCARBOROUGH:

4          Q.     What about Gavin Smith?  Strike that.

5    We've already established Gavin Smith's

6    participation.

7                 What about Molly Mahar?

8                 MS. CARLETTA:  Same objection.

9          A.     Kavita Jain reports to Molly Mahar.

10   I'm not aware of Molly Mahar's scope of

11   responsibilities or her specific engagement.

12   BY MR. SCARBOROUGH:

13         Q.     Okay.

14         A.     On activities related to Custodia or

15   requests related to Custodia.

16         Q.     In preparing to testify today, did you

17   identify individuals from the Board who participated

18   in providing comments or feedback on the

19   recommendation letter that was prepared for Esther

20   George?

21         A.     Yes.  I looked at comments that had

22   been provided on our analysis.

23         Q.     Okay.  Who provided comments from the

24   Board in connection with the recommendation memo to

25   Esther George?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 166

1           MS. CARLETTA:  Objection.  Form.

2           A.     I'm not certain that I could delineate

3      who specifically provided the comments on the memo

4      itself versus others that provided substantive

5      comments in other forms.

6      BY MR. SCARBOROUGH:

7           Q.     Let's just do it broadly.  Who

8      provided comments in any way, shape or form from the

9      Board to the Kansas City Fed in connection with the

10     recommendation memo?

11          A.     So individuals that --

12          MS. CARLETTA:  Objection.  Form --

13          A.     -- we would have had conversations

14     with at the Board included Sophia Allison.

15     BY MR. SCARBOROUGH:

16          Q.     Okay.  Let me see here.  We've already

17     got her on the list as No. 14 I'll show you.  Is that

18     right, No. 14?

19          A.     Yes.  Your list says Sophia Allison,

20     legal.

21          Q.     Who else?

22          A.     Lael Brainard.

23          Q.     So I'm going to write -- I'll write

24     Lael down although I put an asterisks -- do you know

25     if Lael was on the PSPAC?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 167

1              A.      I believe she was.

2              Q.      All right.  I'll write Lael's name but

3       I'll put an asterisk beside it on No. 17.

4                   MS. CARLETTA:  And, I'm sorry, what

5       are we creating -- can you restate the question for

6       this list?

7       BY MR. SCARBOROUGH:

8              Q.      So what was Lael Brainard's -- she

9       gave feedback on the recommendation memo?

10                  THE WITNESS:  Can I answer now?

11                  MS. CARLETTA:  I just didn't hear the

12      question.  That's all.

13             A.      Lael Brainard had conversations with

14      Esther George.

15      BY MR. SCARBOROUGH:

16             Q.      Okay.  And we'll come back to the

17      substance of it, but who else would have given

18      feedback on the recommendation -- the denial

19      recommendation?

20             A.      So others that I have include Margaret

21      DeBoer.

22             Q.      And we have Marnie DeBoer listed as

23      No. 6?

24             A.      I see that.

25             Q.      So I'm not going to write her down.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 168

1       Who else do you have?

2               A.      I have Matt Eichner.

3               Q.      And was he the head of RBOPS?

4               A.      Yes.

5               Q.      I'm going to write RBOPS there.  Who

6       else besides Matt?

7               A.      Jason Hinkle.

8               Q.      I've already got Jason written down as

9       No. 13 so I'm not going to rewrite him, okay?

10              A.      Okay.

11              Q.      Who else?

12              A.      Laura Lipscomb.

13              Q.      I don't have her, so what was her

14      position or role at the Board?

15              A.      I believe that she is in monetary

16      affairs.

17              Q.      So MA?

18              A.      Yes.

19              Q.      I've written her down at No. 19.  All

20      right, who else?

21              A.      Matt Malloy.

22              Q.      And what was his role?

23              A.      He is also in monetary affairs.

24              Q.      And do you see I've written him down

25      as No. 20?

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

                                                    Page 169

1              A.     I see that.

2              Q.     Okay.  Who else?

3              A.     Stephanie Martin.

4              Q.     I've got her already as No. 4,

5       correct?

6              A.     Yes.  I see that.

7              Q.     And then who else do you have?

8              A.     Dave Mills.

9              Q.     No. 2 on my list?

10             A.     Yes.

11             Q.     And who else?

12             A.     Gavin Smith.

13             Q.     He's No. 9 on my list.  Who else do

14      you have?

15             A.     Mark Van Der Weide.

16             Q.     Write him down, mark Van Der Weide,

17      and he is legal, correct?

18             A.     He's general counsel.

19             Q.     So I'll write GC as No. 21.

20             A.     Okay.

21                    MS. CARLETTA:  Just for the record,

22      she is reading from Tab 10 of Exhibit 225.

23      BY MR. SCARBOROUGH:

24             Q.     Who else do you have?

25             A.     Jeff Walker.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 170

1              Q.      He's No. 3, correct?

2              A.      Yes.

3              Q.      Who else?

4              A.      Evan Winerman.

5              Q.      I'll write his name down.  What was

6       Evan's role?

7              A.      I believe Evan is in legal.

8              Q.      At the Board?

9              A.      Yes.

10             Q.      So do you see I've written him down as

11      No. 22?

12             A.      Yes.

13             Q.      Is that the complete list that you've

14      been able to compile of individuals who had

15      involvement in giving feedback in one way or another

16      to the denial recommendation?

17             A.      I would say that these are the

18      individuals that were involved in substantive

19      conversations around Custodia's master account

20      request from the Board of Governors.

21             Q.      Okay.  Does the Kansas City Fed have

22      any knowledge or awareness of briefings that were

23      provided to Vice Chair Barr in connection with

24      Custodia -- both its membership application and its

25      master account request?

Page 175

```
 1     issues raised by novel chartered entities like SPDIs
 2     and the like?
 3                     MS. CARLETTA:  Objection.  Form and
 4     outside the scope.
 5     BY MR. SCARBOROUGH:
 6          Q.     And I'll hand you Exhibit 233 so you
 7     have that in front of you, but is there anybody
 8     that's not reflected on that list so far?
 9                     MS. CARLETTA:  Same objections.
10          A.     So to the latter part of your
11     question, there were conversations broadly that
12     were happening around evolution in the financial
13     industry, so this would not be an inclusive list of
14     all conversation that is have happened across the
15     Federal Reserve System in regard to individuals
16     that you've identified that are on emails, yes, I
17     see that we've pulled out the names that are relevant
18     from the Board, and then it's also inclusive of the
19     list that I had identified of individuals that the
20     Reserve Bank had substantive discussions regarding
21     Custodia.
22                     I don't have a full list of everyone
23     that's been engaged in watching the evolution of the
24     financial system for the last four years for this
25     discussion today.
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 176

1    BY MR. SCARBOROUGH:

2          Q.      And if we were to include that, that

3    would include people like Jeff Ernst, for instance?

4                  MS. CARLETTA:  Objection.  Form.

5    Outside the scope.

6          A.      Among others, yes.

7                  MR. SCARBOROUGH:  Why don't we go

8    ahead and take our lunch break, and then we can pick

9    up afterwards.

10                 (Off the record from 12:37 to 1:20.)

11   BY MR. SCARBOROUGH:

12         Q.      All right.  We are back after lunch.

13   When we were talking earlier about the interactions

14   that occurred between Board staff or Board Governors

15   and representatives of the Kansas City Fed in

16   connection with the recommendation to deny Custodia a

17   master account, you mentioned that there were

18   substantive discussions with Lael Brainard.

19                 Do you remember that?

20         A.      Yes.

21         Q.      Can you on behalf of the Kansas City

22   Fed describe what those discussions were with

23   Vice Chair Brainard?

24                 MS. CARLETTA:  Objection.  Form.

25         A.      So discussions regarding Custodia's

Page 177

1    master account request would have occurred between

2    Vice Chair Brainard and President Esther George.

3    BY MR. SCARBOROUGH:

4         Q.    Can you tell me about the substance of

5    those discussions?

6         A.    I believe according to President

7    George's testimony that there were discussions around

8    legal eligibility.

9         Q.    Is the sum and substance of your

10   knowledge to testify about discussions that occurred

11   with Vice Chair Brainard what Esther George testified

12   to in her deposition?

13        A.    Yes.

14        Q.    Are you aware of any other sources of

15   information or knowledge beyond Esther George's

16   testimony that would address the substance of any

17   communications involving Vice Chair Brainard?

18        A.    No.

19        Q.    Are you aware of any documents that

20   have been prepared to summarize communications from

21   Vice Chair Brainard concerning Custodia's master

22   account request?

23             MS. CARLETTA:  Objection.  Form.

24        A.    So I think the direct or the firsthand

25   account of the conversations between Esther George

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 207

1          A.    I can't speak to the activities of

2     other institutions.

3     BY MR. SCARBOROUGH:

4          Q.    The Kansas City Fed has

5     information-sharing agreements with other Reserve

6     Banks as well as the Board of Governors, correct?

7               MS. CARLETTA:  Objection.  Form and

8     outside the scope.

9          A.    I believe that we do, but I didn't

10    prepare by reviewing to confirm.

11    BY MR. SCARBOROUGH:

12         Q.    Well, there's an -- are you also

13    familiar with the fact that there is an ARISG,

14    Account Request Information Sharing Group, that

15    exists between the Board and the Reserve Banks in

16    connection with master account requests?

17              MS. CARLETTA:  Same objections.

18         A.    So I'm aware of a group that consists

19    of representatives from across the Reserve Banks and

20    also includes liaisons to the Board of Governors.

21    BY MR. SCARBOROUGH:

22         Q.    Okay.  And through any of the

23    information-sharing vehicles that are available to

24    the Kansas City Fed, is the Kansas City Fed aware of

25    other institutions within the Reserve system that

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 215

1           THE REPORTER:  I need you to slow

2      down, please, when you're reading.

3           THE WITNESS:  I'm sorry.

4           A.     To clarify, Currently policies,

5      procedures and risk limits are not as developed as

6      what would be expected for an operating traditional

7      bank, most notably, in the areas of the BSA/AML and

8      OFAC compliance and IT.

9      BY MR. SCARBOROUGH:

10          Q.     And did the Kansas City Fed reach

11     those conclusions in connection with the

12     pre-membership exam that was performed in the fall of

13     2022?

14          MS. CARLETTA:  Objection.  Form.

15          A.     So looking at this draft document, I

16     assume it would have been informed by the membership,

17     the review that was conducted that fall.

18     BY MR. SCARBOROUGH:

19          Q.     Did the Kansas City Fed after the

20     exclusion of that pre-membership exam in the fall of

21     2022 invite Custodia to remediate and submit

22     documentation of the remedial measures that it was

23     taking to address the gaps that were identified

24     related to BSA/AML OFAC compliance and IT issues?

25          MS. CARLETTA:  Objection.  Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 216

1          A.     So my understanding is that after the

2    conveying the findings from that membership review,

3    Custodia asked if they could submit additional

4    information.  That information was received, but it

5    was made clear that it would require additional

6    review to determine the effectiveness of the

7    remediation steps.

8    BY MR. SCARBOROUGH:

9          Q.     So is it the Kansas City Fed's

10   position that it was Custodia that asked whether it

11   could resubmit versus the Kansas City Fed

12   representatives asking Custodia to address and

13   resubmit?

14         A.     So there was clarification on what the

15   expectations were coming out of that review, and it's

16   my understanding that Custodia was planning to be

17   responsive to those findings but it was clarifying

18   that there was not a timeline that needed to be acted

19   on, and then as information was received that it

20   would not be able to be responded to on a flow basis

21   but instead that we would need to see substantive

22   movement and then go in and conduct follow-up review

23   to determine the effectiveness of the remediation

24   actions.

25         Q.     And Custodia provided to the Kansas

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 217

1     City Fed evidence of the remedial actions that it had

2     taken to fill the gaps that had been identified in

3     the pre-membership exam, correct?

4                    MS. CARLETTA:  Objection.  Form.

5          A.     So Custodia provided updated

6     information following that examination, but there was

7     not opportunity to review for sufficiency with

8     follow-up activity to confirm that it had

9     addressed -- in fact, addressed all of the issues

10    identified.

11    BY MR. SCARBOROUGH:

12         Q.     Did the remedial information provided

13    by Custodia relating to the gaps, was that

14    information conveyed to the Board of Governors?

15                    MS. CARLETTA:  Objection.  Form and

16    outside the scope.

17         A.     I would need to -- I didn't prepare

18    with what information was conveyed to the Board in

19    the context of the membership request, so I'm...

20    BY MR. SCARBOROUGH:

21         Q.     Did the Kansas City Fed take any steps

22    to review the adequacy of the information -- remedial

23    measures that Custodia took and submitted in late

24    2022?

25                    MS. CARLETTA:  Same objections.

Page 218

1            A.      So the information that Custodia

2      submitted was reviewed, but the -- to determine the

3      adequacy or sufficiency of the response would have

4      required more than reviewing the documentation.

5      BY MR. SCARBOROUGH:

6            Q.      It would have required a second

7      examination to go back in and validate what had been

8      put in place, correct?

9                   MS. CARLETTA:  Objection.  Form.

10            A.      It likely would have required

11      follow-up and time for Custodia to have implemented

12      what it proposed.

13      BY MR. SCARBOROUGH:

14            Q.      Why didn't the Kansas City Fed go in

15      and do that follow-up review?

16                   MS. CARLETTA:  Objection.  Form and

17      outside the scope.

18            A.      My understanding is that Custodia was

19      frustrated with the timeline, and so once we had

20      information sufficient to make a determination on the

21      master account, we communicated that.

22      BY MR. SCARBOROUGH:

23            Q.      Ma'am, Custodia was invited to submit

24      remedial evidence, did so, and is it the Kansas City

25      Fed's position that after being -- after Custodia was

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 219

1    invited to provide that information and did so that

2    it didn't want the Kansas City Fed to come back in

3    and review the measures and the adequacy of the

4    measures that it had put in place?

5              MS. CARLETTA:   Same objections.

6         A.      So Custodia provided that in response

7    to the exam that was conducted for membership, and so

8    when the Board of Governors determined that they had

9    sufficient information to deny membership, that was

10   informative to our master account request.

11   BY MR. SCARBOROUGH:

12        Q.      Did anybody at the Kansas City Fed

13   say, Wait, Board, you shouldn't be denying membership

14   and citing shortcoming in BSA/AML OFAC compliance or

15   IT because Custodia was invited to remediate, did so,

16   and we should go in and see if they did it?

17             MS. CARLETTA:  Objection.  Form and

18   outside the scope.  This is about membership.

19        A.      Yeah.  So for the membership process,

20   I can't speak to how the Board of Governors handled

21   the processing of their review.  The feedback that

22   was provided by -- or to Custodia, Custodia indicated

23   they were going to respond to, which is in Custodia's

24   purview, but the Board's determination to move

25   forward on the membership is a separate matter.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 276

1    individuals from multiple Reserve Banks and, again,

2    with input from staff at the Board of Governors with

3    specific subject matter expertise relative to the

4    handbook.

5    BY MR. SCARBOROUGH:

6         Q.    Who at the Kansas City Fed worked on

7    or contributed to drafts of the handbook?

8              MS. CARLETTA:  Objection.  Form and

9    outside the scope.

10        A.    So drafts of the handbook would have

11   been shared with several individuals through the

12   nontraditional account access practical workstream as

13   well as the policy workstream, and then within the

14   Reserve Bank we would have shared it with relevant

15   staff for the opportunity to provide input.  I

16   believe that Nick Billman is the one that provided

17   input on behalf of the Kansas City Fed to the

18   handbook.

19   BY MR. SCARBOROUGH:

20        Q.    And who at the Board provided input on

21   the handbook to the Kansas City Fed's knowledge?

22             MS. CARLETTA:  Objection.  Form and

23   outside the scope.

24        A.    I don't know the specific individuals

25   that provided input into the handbook.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 277

1    BY MR. SCARBOROUGH:

2              Q.      You mentioned that the nontraditional

3    account access working group as well as the practical

4    and policy workstream -- did they have input into --

5    did those groups have input into the implementation

6    handbook?

7              MS. CARLETTA:   Objection.   Form and

8    misstates testimony.

9              A.      So the practical workstream would have

10   been engaged in helping to develop the handbook and

11   then the information would have been shared with the

12   policy workstream and the steering committee and

13   probably others beyond that.   I don't know who

14   specifically took advantage of the opportunity to

15   provide feedback on the drafts.

16   BY MR. SCARBOROUGH:

17             Q.      When was the final version of the

18   handbook created?

19             A.      The final version of the handbook was

20   approved by the Conference of Presidents I believe at

21   the August or September meeting 2023.

22             Q.      A version has been produced that's

23   dated in August of 2023.   Would that coincide with

24   when it was finalized and approved?

25             MS. CARLETTA:   Objection.   Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 278

1              A.      I assume -- so the Conference of

2      Presidents did not approve the handbook until after

3      Custodia's master account request had been

4      determined.  If you have a version dated August 2023,

5      I assume that's the final version that was approved

6      by COP.

7      BY MR. SCARBOROUGH:

8              Q.      Did the Kansas City Fed rely on drafts

9      of the handbook when assessing Custodia's master

10     account request?

11             MS. CARLETTA:  Objection.  Form.

12             A.      So the Federal Reserve Bank of Kansas

13     City began the analysis of Custodia's master account

14     prior to the drafting of the handbook, but as the

15     handbook was drafted and the guidelines were

16     contemplated, we were mindful of how those were

17     evolving and used those as a reference point to

18     ensure that we were conducting a fulsome analysis of

19     the request.

20     BY MR. SCARBOROUGH:

21             Q.      Now, did the handbook supplant the

22     Kansas City Fed's policies, procedure, et cetera,

23     when it came to considering and determining master

24     account requests?

25             MS. CARLETTA:  Objection.  Form and

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 356

1          A.     I would say that we were using the

2     handbook to ensure that our own analysis wasn't

3     omitting any material risk that had been identified

4     through that document.

5     BY MR. SCARBOROUGH:

6          Q.     Was another output from the NTAA the

7     account access guidelines?

8               MS. CARLETTA:  Objection.  Form.

9          A.     So the account access guidelines would

10    have been issued by the Board of Governors.

11    BY MR. SCARBOROUGH:

12         Q.     And they were developed through the

13    NTAA process and finalized and issued by the Board of

14    Governors, correct?

15              MS. CARLETTA:  Objection.  Form.

16         A.     So the policy workstream under the

17    nontraditional account access steering committee had

18    engagement in thinking about the principles and the

19    guidelines.

20    BY MR. SCARBOROUGH:

21         Q.     I want to make sure I heard you

22    correctly.  The NTAA did participate in the

23    development of the guidelines that were ultimately

24    issued by the Board, correct?

25              MS. CARLETTA:  Objection.  Form.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 357

1          A.     The policy workstream under the

2     nontraditional account access steering committee had

3     engagement.

4     BY MR. SCARBOROUGH:

5          Q.     Okay.  Did the Kansas City Fed

6     determine that before it would decide Custodia's

7     master account request, it would wait for the Board's

8     account access guidelines to be finalized?

9               MS. CARLETTA:  Objection.  Form.

10         A.     So the Kansas City Reserve Bank had

11     been conducting a review of Custodia's master account

12     request, and as we were aware the guidelines were

13     forthcoming, we would have incorporated that into our

14     analysis as well.

15     BY MR. SCARBOROUGH:

16         Q.     And the Kansas City Fed didn't want to

17     make a decision before those guidelines were

18     finalized on the master account request, right?

19               MS. CARLETTA:  Objection.  Form.

20         A.     We would want to make an informed

21     decision on the master account request, and so if

22     the Board is considering clarifying for the public

23     the risks that are considered in master account

24     requests, we would take that into account in our

25     analysis.

# EXHIBIT E

# [PUBLIC VERSION]

Page 1

1          UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF WYOMING

3

4      _____

5   CUSTODIA BANK INC.,          )Civil Number
                                 )22-cv-00125-SWS
6       Plaintiff,               )
                                 )
7   v.                           )
                                 )
8   FEDERAL RESERVE BOARD        )
    OF GOVERNORS and FEDERAL     )
9   RESERVE BANK OF              )
    KANSAS CITY,                 )
10                               )
        Defendants.              )
11  _____

12

13

              - C O N F I D E N T I A L -
14

15              Deposition of

16             TARA HUMSTON

17           November 3, 2023

18             8:04 a.m.

19

20

21   Reported by:  Bonnie L. Russo

22   Job No. 6153223

CONFIDENTIAL

Page 9

1                  P R O C E E D I N G S

2                     (8:04 a.m.)

3

4                    TARA HUMSTON,

5     being first duly sworn, to tell the truth, the

6         whole truth and nothing but the truth,

7                  testified as follows:

8     EXAMINATION BY COUNSEL FOR PLAINTIFF

9              BY MR. SCARBOROUGH:

10         Q.    Ms. Humston, good morning.  My name

11    is Ryan Scarborough.  I represent Custodia

12    Bank.

13              How long have you worked at the

14    Kansas City Fed?

15         A.    25 years.

16         Q.    And have you ever worked at the

17    board of governors?

18         A.    No.

19         Q.    If I refer to the board, do you

20    understand that to refer to the board of

21    governors?

22         A.    Yes.

Page 12

1          A.     That is correct.

2          Q.     And custodial services is just a

3    fancy term for like a safe deposit box, right?

4          A.     I wouldn't necessarily use that

5    definition.  I'm not sure if that's how it's

6    defined.

7          Q.     Is a safe deposit box one form of a

8    custodial service?

9          A.     Yes.

10         Q.     And there are other forms as well,

11   correct?

12         A.     That is correct.

13         Q.     State-chartered banks are permitted

14   to do anything that national banks can do,

15   right?

16              MR. MICHAELSON:  Objection.  Form.

17              THE WITNESS:  Yes.  I believe most

18   -- yes, banks are permitted to do anything a

19   national bank is permitted to do.

20              BY MR. SCARBOROUGH:

21         Q.     And their abilities to provide

22   banking services are coextensive of what

Page 16

1          A.    I would say it's been a novel

2     activity that's come into banking.

3          Q.    And there are banks in the Federal

4     -- excuse me.

5               There are banks in the Federal

6     Reserve system that provide custodial services

7     for digital assets, right?

8          A.    Yes, I believe that's correct.

9          Q.    And examples of banks are -- include

10     -- strike that.

11               Examples of banks that provide

12     custodial services for digital assets include

13     Bank of New York Mellon, right?

14               MR. MICHAELSON:  I just instruct you

15     not to answer that question to the extent it

16     would reveal confidential supervisory

17     information confidential to the Fed.  If you

18     know, you can answer this question based on

19     publicly available information.  You can

20     answer.

21               THE WITNESS:  I'm not sure if what I

22     know is public or not in talking to my New York

Page 18

1          Q.    Now, there is nothing illegal about

2     a bank providing custodial services for

3     cryptocurrency assets, right?

4          A.    At this time I'm not aware of it

5     being illegal.

6          Q.    Would you agree it's a legally

7     permissible activity?

8                MR. MICHAELSON:  Objection.  Form.

9                THE WITNESS:  Legally permissible to

10    custody those assets.

11               BY MR. SCARBOROUGH:

12         Q.    Are you aware that the OCC permits

13    national banks to provide custodial services

14    for crypto assets?

15         A.    I believe that's their regulation.

16         Q.    Do you know that the OCC issued an

17    interpretive letter in July 2020 opining that

18    providing custodial services for crypto assets

19    is a legally permissible activity?

20         A.    Yes, I know the OCC issued that

21    letter.

22         Q.    And that's around the same time that

Page 24

1           MR. MICHAELSON:  Objection.  Form.

2           THE WITNESS:  No, I was not working

3     with them directly.

4           BY MR. SCARBOROUGH:

5      Q.    Were there people at the Kansas City

6     Fed who worked directly with representatives of

7     Wyoming in connection with the SPDI

8     legislation?

9      A.    I wouldn't consider it working with

10    them, but I do know some from my team had

11    reviewed drafts and had discussions.

12     Q.    Would it be fair to characterize it

13    as consultation?

14     A.    I can't speak -- I wasn't part of

15    those conversations, but they sent us drafts to

16    review.

17     Q.    Who from your staff had -- had

18    discussions with representatives from Wyoming?

19     A.    To my knowledge, it was primarily

20    Jackie Nugent.

21     Q.    Did Esther George?

22     A.    Esther did have a conversation or --

CONFIDENTIAL

Page 25

1    I can't speak to how many.  I know she had some

2    contact at some point.

3        Q.    And did her contacts include

4    speaking with the commissioner of the Wyoming

5    Division of Banking, Albert Forkner?

6        A.    I do recall her saying she had

7    talked with Albert Forkner.

8        Q.    And did you have any conversations

9    with Wyoming representatives?

10        A.    At the time Albert would have been

11    the commissioner of Wyoming, and so in

12    supervising institutions in Wyoming, I would

13    have had periodic contact with Albert.  I don't

14    recall a specific meeting just to discuss the

15    SPDI charter.

16        Q.    You mentioned that you had regular

17    conversations with Wyoming more generally in

18    connection with their supervision -- was that

19    in connection with their supervision of

20    entities in Wyoming?

21        A.    Yes.  We work with the state

22    commissioners on the institutions that we

CONFIDENTIAL

Page 26

```
 1        jointly supervised through the dual banking

 2        system.

 3            Q.    Okay.  Do you have any criticism of

 4        the Wyoming Division of Banking?

 5            A.    No specific -- it's not a criticism,

 6        but we often help some of our state

 7        counterparts because they lack the resources to

 8        be able to supervise some of the entities in

 9        their state.

10            Q.    Did Wyoming have experience

11        personnel performing supervisory roles?

12            A.    For traditional banking charters,

13        they had staff that were -- had the skill set

14        needed to supervise traditional bank charters.

15            Q.    They were qualified?

16                  MR. MICHAELSON:  Objection.  Form.

17                  THE WITNESS:  Qualified for what?

18                  BY MR. SCARBOROUGH:

19            Q.    For supervising traditional bank

20        charters, as you said?

21            A.    They had individuals I think our

22        team would say were qualified.
```

Page 27

1      Q.    And they had individuals who were

2   also competent, correct?

3      A.    Competent in...?

4      Q.    Supervising traditional bank

5   charters.

6      A.    I think if we say they were skilled,

7   they would be competent in supervising a

8   traditional bank charter.

9      Q.    And they had individuals who were

10   well trained in supervising traditional bank

11   charters, right?

12      A.    Wyoming Department of Banking had

13   training available to their examiners.  Some of

14   the states rely on the Federal Reserve's

15   training, so I don't know to what extent their

16   state relied on ours, but many of our states

17   are not able to fully utilize their own

18   training programs.

19      Q.    But your experience with Wyoming was

20   that they -- the individuals you dealt with

21   were well trained, correct?

22      A.    I don't deal with many of their

CONFIDENTIAL

Page 28

1      examiners directly, so I don't have personal

2      representation on the training level of their

3      staff.  But more generally I think my team

4      found they have examiners that would be skilled

5      in their job.

6          Q.    Now, in spending -- in developing

7      the SPDI legislation, Wyoming had several years

8      of experience and focus on learning and

9      developing a cryptocurrency supervisory regime;

10      is that fair?

11          A.    I -- I don't know that they trained

12      their exam staff on that supervisory regime.

13      My understanding is they worked with an

14      external party to develop a supervisory regime,

15      and I heard from Commissioner Forkner at the

16      time that they were working with them to

17      develop the supervisory program.  But to the

18      extent their team was ever trained on that

19      program, I don't know how successful that was.

20          Q.    Would it be fair to say that at the

21      time you -- the Kansas City Fed received the

22      first request for a master account from a SPDI

CONFIDENTIAL

Page 38

1          terminology here.  You say legal to apply for a

2          master account.

3                    Do you understand that to mean the

4          same thing as being legally eligible for a

5          master account?

6               A.    To be legally eligible to apply for

7          a master account.

8               Q.    Okay.  And so that determination as

9          to whether Custodia was legally eligible to

10         apply for a master account was made by the

11         board of governors, wasn't it?

12              A.    I don't recall.

13              Q.    Okay.  Do you have any reason -- any

14         basis to dispute that that determination was

15         made by the board of governors?

16              A.    I can't say either way.

17              Q.    Would you agree that Custodia's

18         request for a master account was one of several

19         applications that presented the policy question

20         about whether a novel chartered institution

21         should get access to the payment system?

22                    MR. MICHAELSON:  Objection.  Form.

CONFIDENTIAL

Page 39

1           THE WITNESS:  Custodia was one of

2     other entities that were bringing this question

3     to light.

4           BY MR. SCARBOROUGH:

5     Q.    Was Custodia the first

6     SPDI-chartered institution to request a master

7     account?

8     A.    Yes, I believe they were the first.

9     Q.    Let me hand you a document which

10    we'll mark as Exhibit 147.

11          MR. SCARBOROUGH:  Oh, let's not mark

12    this one as 147.

13          THE COURT REPORTER:  Let's not?

14          MR. SCARBOROUGH:  Yeah.  I

15    apologize.  Can we take the sticker off?

16          (Discussion off the stenographic

17    record.)

18          BY MR. SCARBOROUGH:

19    Q.    So I'm going to hand you a

20    document -- sorry.  Yeah.  I'm going to hand

21    you a document that has been marked as Exhibit

22    10.  I will try to catch that next time.

Page 191

1          A.      True.

2          Q.      Okay.  How long does it typically

3    take for a master account to be --

4          A.      For a traditional --

5          Q.      -- decided?

6          A.      -- commercial bank, it can be done

7    in a week's time or less.

8          Q.      Okay.  In terms of the time line

9    that you referenced here about the time line is

10   probably, technically accurate about -- is that

11   referencing the fact that the request just sat

12   at the Fed before Custodia was hit out of left

13   field with the proposed account access

14   guidelines?

15              MR. MICHAELSON:  Objection.  Form.

16              THE WITNESS:  No.  I mean, in the

17   e-mail, we are not seeing an attached picture.

18   I may have been referring to that.  I don't --

19   I don't recall what that looked like.

20              But, I mean, I would be speculating

21   to say if I am referring to what was in the

22   picture attached --

CONFIDENTIAL

Page 221

1      for what?  Supervisory --

2             A.    Supervision and regulation.

3             Q.    Oh, supervision and regulation.

4             Okay.  And an SR letter is different

5      than an S letter, correct?

6             A.    Yes.

7             Q.    Do you know what the S for S letter

8      stands for?

9             A.    I do not.

10            Q.    Okay.  And so with SR letters, you

11     see those frequently in your role at the Kansas

12     City Fed, correct?

13            A.    Yes, I would say I see those on a

14     regular cadence.

15            Q.    Okay.  With regard to an S letter,

16     the only time in your experience that you have

17     seen one is the S letter that was issued in

18     connection with implementing or

19     operationalizing the account access guidelines;

20     is that fair?

21            A.    To my recollection, that's the only

22     one.

CONFIDENTIAL

Page 331

1      to identify which public officials were being

2      referenced in your letter concerning the

3      responsible development of digital assets and

4      their integration into the financial system?

5           A.    Yeah.  As I said in the deposition I

6      think three times here just now, I do not know

7      who that is referring to in these public

8      officials.

9           Q.    Okay.  And turning to the second

10     page of the letter, in the --

11          A.    In the draft or the letter?

12          Q.    Oh, I'm sorry.  Exhibit 158, the

13     final letter.

14               In the penultimate paragraph, you

15     start out:  "We understand the urgency with

16     which you will need to make business decisions

17     for Custodia," and then you say:  "I hope that

18     you understand the precedent-setting decision

19     involving nontraditional charters and new

20     activities is one that the Federal Reserve Bank

21     of Kansas City must weigh carefully."

22               Was that your view at the time, that

CONFIDENTIAL

Page 332

1    the decision on whether to grant Custodia a

2    master account was a precedent-setting decision

3    for nontraditional charters?

4         A.    Yes.  From very early on I think

5    since the formation of the SPDI charters, we

6    had felt that -- that nontraditional nature and

7    the word of being "nontraditional" or "novel,"

8    that would be precedent setting, because in my

9    mind nontraditional and novel means it's one of

10   the first times you're seen in an early stage.

11   So it would be the first of its kind.

12            And so any other federal district

13   getting a request or having a state form, a

14   state charter, this would be influential to

15   another reserve bank's decision.

16        Q.    Okay.  And this letter would have

17   gone out to the Custodia on April 15, 2022,

18   right?

19        A.    That would be my understanding the

20   way it's stated.

21            MR. SCARBOROUGH:  Okay.  I'm going

22   to hand you what we'll mark as Exhibit 160.

CONFIDENTIAL

Page 360

1      Q.    What's your understanding of who
2      would have had input on the recommendation memo
3      to Esther George?
4      A.    That we were writing to Esther, it
5      would have -- if -- I don't know what Chris,
6      his involvement was in the memo itself, but
7      Christi May-Oder and Judith Hazen, myself, and
8      we would have asked for our legal colleagues to
9      ensure that we -- since we are under this
10     lawsuit, they would be reviewing it as well
11     from a legal basis.
12     Q.    Okay.  So Christi May-Oder, Judith
13     Hazen, your legal colleagues, and yourself
14     would have had input on it.  You're not aware
15     of whether Chris Gaul-Pearson did.
16           Anybody else that you're aware of
17     having input on the recommendation memo to
18     Esther George?
19     A.    I mean, I don't know if Chris
20     Gaul-Pearson -- I mean, he reports to Christi,
21     so she may have assigned it to him or someone
22     on her team to begin the beginnings of a memo.

Page 361

1      But, no, I'm not aware of others.

2          Q.    Do you know whether anybody from the

3      board of governors edited the memo before it

4      was provided to Esther George?

5          A.    I would not be aware of that.

6          Q.    Okay.  Would it be appropriate for

7      anybody at the board of governors to edit the

8      memo to Esther George?

9          A.    If there was a component where we

10     were speaking on behalf of something

11     represented by the board, our team might

12     consult with the board on a particular part, if

13     we are representing something that falls with

14     the board of governors's realm.

15              But in this case, I don't recall if

16     that was necessary.

17         Q.    What parts of the recommendation

18     memo relating to Custodia master account

19     request would have been appropriate for the

20     board of governors to comment or edit on or

21     edit?

22         A.    I would only think of the legal

Page 403

1          before that could be communicated to Custodia?

2               A.     Could you say that once again --

3               Q.     Sure.

4               A.     -- is that my understanding or are

5          you saying --

6               Q.     Yes, I am asking about your

7          understanding.

8               A.     It was my understanding we needed to

9          wait for Matt Eichner to respond to what we had

10         sent him.

11              Q.     Was it also your understanding that

12         this response from Matt Eichner needed to occur

13         before the board voted on the membership

14         application?

15              A.     No, that was not my understanding.

16              Q.     Okay.  Was it your understanding

17         that the Kansas City Fed was going to wait to

18         issue its denial of Custodia's master account

19         request until the board of governors informed

20         Custodia that its membership application was

21         denied?

22              A.     That was a decision we were weighing

CONFIDENTIAL

Page 404

1    locally in that did it make sense for us to

2    hold our denial letter in case the board went a

3    direction we were not expecting because we had

4    recommended denial.  We did not -- I did not

5    know with certainty if any of the governors had

6    different views, and it was -- their vote would

7    come out differently.

8            And so of the vote came out

9    differently, it might cause us to rethink our

10   analysis because some of the factors that we

11   had included -- maybe the fact pattern would

12   change if they were a member institution.

13       Q.    So the next morning the board of

14   governors voted 7-0 to deny membership to

15   Custodia; is that correct?

16       A.    Yes.

17       Q.    And they issued a denial letter that

18   morning, right?

19       A.    I don't know when it was in the day.

20   I believe it was morning.

21       Q.    Okay.  Is it your understanding that

22   the rollout of the denial of the membership and

# EXHIBIT I

# [PUBLIC VERSION]

 

FEDERAL RESERVE BANK *of* KANSAS CITY

January 27, 2022

Chuck Thompson
Chief Legal Officer | Chief Compliance Officer
Avanti Financial Group, Inc.
*(sent via email to chuck@avantibank.com)*

Re: ***Legal Eligibility / Avanti Financial Group, Inc.***

Chuck,

Rob Triano forwarded your email from yesterday relating to legal eligibility. I am responding on behalf of the Bank.

As was recently conveyed to your counsel, Derek Bush of Cleary, Gottlieb, Steen & Hamilton LLP, it has been determined Avanti satisfies the threshold definition of an entity eligible to maintain a master account. This determination is based on analysis of Avanti and its business model and should not be viewed as a precedent for any other institutions.

As you know, efforts related to potential access to Federal Reserve accounts and services by novel, non-traditional charters and the permissibility of crypto-asset related activities remain under active evaluation. As a result, a decision regarding whether to grant Avanti a master account at FRBKC has not been reached.

Per your request, we intend to convey this decision to Accuity later today. Accuity may choose to grant Avanti a routing transit number as part of its process. Consistent with your previously communicated intent, this routing number may only be used for testing purposes at this time. As no final determination has been made with regard to master account access, Avanti assumes the risk of developing a processing system or incurring other costs.

Please feel free to contact me at craig.zahnd@kc.frb.org or (816) 881-2533 with any questions.

Sincerely,

Craig Zahnd
General Counsel

1 Memorial Drive · Kansas City, Missouri 64198 · 800.333.1010 · www.kansascityfed.org

CONFIDENTIAL

FRBKC-00000234

**J.A.880**

# EXHIBIT J

# [PUBLIC VERSION]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF WYOMING

2

3

       CUSTODIA BANK, INC.,        )
4                                  )
                    Plaintiff,     )
5                                  )
       v.                          )
6                                  ) 1:22-cv-00125-SWS
       FEDERAL RESERVE BOARD       )
7      OF GOVERNORS AND            )
       FEDERAL RESERVE BANK OF     )
8      KANSAS CITY,                )
                                   )
9                   Defendants.    )
10
11
12              * DESIGNATED CONFIDENTIAL *
13            * SUBJECT TO A PROTECTIVE ORDER *
14
15
16              ZOOM/IN-PERSON DEPOSITION OF ESTHER
17     GEORGE, a Witness, taken remotely on behalf of
18     the Plaintiff before Peggy E. Corbett, CSR, CCR,
19     RDR, pursuant to Notice on the 9th day of
20     November, 2023, at the offices of the Federal
21     Reserve Bank of Kansas City, 1 Memorial Drive,
22     Kansas City, Missouri 64198.
23
24
25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 12

1     A.    He was a good working associate here and

2     served well as a director of our bank.

3     Q.    All right.  I take it given your 40-year

4     involvement you have pretty good general

5     understanding of the operations of the Kansas

6     City Federal Reserve Bank, would that be a fair

7     statement?

8     A.    I do think I have a broad understanding

9     of this bank's operation.

10    Q.    So tell me, you started here at the

11    Kansas City Fed approximately two years after the

12    Monetary Control Act of 1980 was passed by

13    Congress; is that your understanding?

14    A.    I joined in 1982, and the Monetary

15    Control Act was in 1980, yes.

16    Q.    Tell me what your general understanding

17    is as to what the Monetary Control Act did in

18    regard to changes with the Federal Reserve Bank

19    system.

20    A.    My understanding of the changes had to

21    do with levelling the playing field and really

22    setting in motion pricing standards for the

23    Reserve Banks, in terms of how they deliver

24    services, making them not exclusive to member

25    banks, but opening them up for non-member banks,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 15

1      Q.   Do you know, is there a similar Annual
2  Report for the Kansas City Federal Reserve that
3  references what the changes in the Monetary
4  Control Act really mean?
5              MR. MICHAELSON:  Objection, form.
6      A.   I would not know here what the 1980
7  report of the Kansas City Fed would have said.
8  There was not a standard form.  Each bank would
9  have developed their presentation based on their
10  own judgments.
11      Q.   (BY MR. ORTIZ)  Earlier when you told me
12  that your understanding of the Monetary Control
13  Act was that it leveled the playing field that
14  really meant that State-chartered banks were
15  entitled to access Federal services, basically
16  access to the Federal Reserve system, correct?
17              MR. MICHAELSON:  Objection, form.
18      A.   My understanding of the Monetary Control
19  Act is it no longer made a distinction between
20  those that were members of the Federal Reserve
21  and those that were not, in terms of access to
22  services and their pricing.
23      Q.   (BY MR. ORTIZ)  So when you are not a
24  member of a member bank, you're typically a
25  State-chartered bank; is that correct?  That's a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 16

1    non-member bank?

2          A.    A State-chartered bank can be a member

3    bank, yeah.

4          Q.    Sure, but most non-member banks are

5    State-chartered banks, true?

6          A.    That would be true.

7          Q.    And you're saying what the Monetary

8    Control Act said, you can be a State-chartered

9    non-member bank and you have to be given access

10   to Federal services; is that correct?

11                MR. MICHAELSON:   Objection, form,

12   misstates prior testimony.

13         Q.    (BY MR. ORTIZ)   Is that your

14   understanding?

15         A.    It eliminated the distinction between

16   member banks and non-member banks.

17         Q.    And that's what you meant when you said

18   it levels the playing field?

19         A.    That's what I meant.

20         Q.    So back when you started in '82, and

21   maybe for the first 15 years or more there was no

22   such thing or no term that you called the master

23   account, was there?

24         A.    I'm not sure.

25         Q.    Can we agree, say at least starting at

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 24

1     they were interfacing with your team, correct?

2          A.   I did understand they wanted access to

3     an account at the Federal Reserve Bank of Kansas

4     City.

5          Q.   That was the whole point; draft

6     something that would qualify as a depository

7     institution, in order to get a master account,

8     correct?

9               MR. MICHAELSON:  Objection, form.

10         A.   Actually it was one of the early

11    questions we raised about whether that made the

12    institution viable --

13         Q.   (BY MR. ORTIZ)  Sure.

14         A.   -- or whether there were other options

15    to them.

16         Q.   And you knew early on that that was a

17    big goal of a SPDI-chartered depository

18    institution, to be able to get a master account

19    and access Fed services?

20         A.   I did understand that.

21         Q.   All right.  So did you ever direct any

22    representatives from the Kansas City Fed to

23    advise someone at the State of Wyoming that you

24    didn't have policies in place that would allow

25    you to evaluate a SPDI charter like Custodia?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 28

1          MR. MICHAELSON:  Objection, form.

2     A.   I don't recall any meetings that were

3     specifically intended for this.  Our interactions

4     with the State Banking Department covered a

5     broader set of responsibilities that we had.

6          So I would meet a couple of times a year

7     with the State Banking Department about

8     supervisory issues that we shared over

9     State-chartered banks.

10    Q.   (BY MR. ORTIZ)  Do you have a good

11    relationship with the Wyoming State Banking

12    Commission?

13    A.   I believe we do.

14    Q.   Do you have a good relationship with

15    Albert Forkner?

16    A.   I believe we did.

17    Q.   You did at that time, as well?

18    A.   I did, yes.

19    Q.   Did you have respect for him?

20    A.   I did have respect for Albert Forkner.

21    Q.   Respect for the way Wyoming Banking

22    Commission went about supervising their charter

23    banks?

24    A.   Yes.  We worked closely together in the

25    supervision of our State-chartered banks.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 38

1        Q.   (BY MR. ORTIZ)  Who is Lael Brainard?

2        A.   Lael Brainard was a member of the Board

3    of Governors of the Federal Reserve.

4        Q.   Was there a time that she was a Chairman

5    of the Board of Governors?

6        A.   No, Lael Brainard at one point was the

7    Vice Chair of the Board.

8        Q.   Vice Chair.  Did you have a sense as to

9    her background and experience within the Federal

10   Reserve system?

11       A.   Lael Brainard is a highly regarded

12   economist and policymaker.

13       Q.   You had conversations with Lael Brainard

14   where she specifically told you under the

15   Monetary Control Act you didn't have the

16   authority to deny Custodia a master account,

17   didn't she?

18       A.   Lael Brainard did not at any point tell

19   me I did not have authority.

20       Q.   Never anything in that context at all?

21            MR. MICHAELSON:  Objection, form.

22       A.   I'm not sure what you mean about

23   context.

24       Q.   (BY MR. ORTIZ)  The context of you

25   somehow just saying, "I have discretion, I can

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 39

1    deny this master account at any time."  Didn't

2    you have specific conversations with Lael

3    Brainard about that?

4         A.   I had conversations with Lael Brainard

5    about the threshold issue of eligibility for this

6    particular charter.

7         Q.   But you don't think she told you if they

8    were eligible, they had to have a master -- you

9    had to give them a master account?

10        A.   Lael Brainard did not at any point tell

11   me to grant nor deny a master account.

12        Q.   Did you have conversations with Senator

13   Cynthia Lummis about the issue of whether you

14   were obligated under the Monetary Control Act to

15   give Custodia a master account?

16        A.   I had at least one, and maybe two

17   conversations with Senator Lummis at her

18   requests.

19        Q.   Did Senator Lummis advise you that her

20   office's interpretation of the law was the

21   Monetary Control Act required you to give

22   Custodia a master account if they were an

23   eligible depository institution?

24        A.   I believe the Senator did have that

25   view.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 41

1    without naming names or based on public

2    information, that you're not divulging

3    confidential information of the bank.

4              MR. ORTIZ:  I think given the

5    change in the law, Counsel, I don't think that's

6    confidential at all, but you --

7         A.   Would you please ask your question

8    again.

9         Q.   (BY MR. ORTIZ)  Sure.  You just told me

10   that it's long been your practice that regardless

11   of legal eligibility for a master account, you

12   could still evaluate them and deny a master

13   account; is that right?  Is that what you're

14   telling me?

15        A.   That is correct.

16        Q.   So I want to know, give me an example in

17   the last 25 years where an eligible depository

18   institution was denied a master account, other

19   than Custodia.

20             MR. MICHAELSON:  Same objections,

21   but go ahead.

22        A.   I can think of one case.

23        Q.   (BY MR. ORTIZ)  Okay, who was that?

24        A.   Four Corners.

25        Q.   All right, and Four Corners Bank was

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 42

1      dealing with the question of legal

2      permissibility, since they were going to be

3      dealing with marijuana sales and growers, and

4      that was in contradiction of Federal law, right?

5          A.   That was among the issues that we were

6      addressing.

7          Q.   Sure, right.  Other than Four Corners

8      Bank that had a conflict between the Federal Drug

9      Control Act which said you can't buy and sell

10     marijuana, in conflict with Colorado law that

11     said you could, can you give me any other example

12     of a depository institution that is conducting

13     legally permissible activities and is also

14     legally eligible for a master account, where it's

15     been denied by the Kansas City Fed?

16         A.   I do not have any examples right now.

17         Q.   There is not -- there isn't one, is

18     there?  Custodia is the only one, isn't it,

19     ma'am?

20         A.   I am not aware if they are the only one,

21     but I don't recall that.

22         Q.   And you would probably be the person,

23     given your tenure at the Fed, 40 years being

24     involved in this, you would be the one person

25     that would probably have that historical

J.A.891

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 43

```
1    knowledge, agreed?
2         A.   I have a long-standing experience with
3    these institutions, yes.
4         Q.   And I'm not implying anything with age.
5    I'm just implying you're kind of the keeper of
6    the historical knowledge over the last 30 or 40
7    years, aren't you --
8                   MR. MICHAELSON:  Objection, form.
9         Q.   (BY MR. ORTIZ)  -- for the Kansas City
10   Fed?
11                  MR. MICHAELSON:  Lack of
12   foundation.
13        A.   I am not a keeper of the information.
14   This is an institution that has deep
15   institutional knowledge.
16        Q.   (BY MR. ORTIZ)  But one thing that was
17   determined early on in this case was that holding
18   crypto-assets in a custodial relationship, that
19   was not legally -- that was determined to be a
20   legally permissible activity early on by the OCC,
21   wasn't it?
22                  MR. MICHAELSON:  Objection, form.
23        A.   I believe the OCC had made judgments
24   around its special charter.
25        Q.   (BY MR. ORTIZ)  Sure, and said it was
```

J.A.892

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 44

1    legally permissible to do so, right?

2          A.    I believe they did.

3          Q.    And you also knew that there were member

4    banks within the system doing the same thing that

5    Custodia wanted to do, correct?

6                MR. MICHAELSON:  Objection, form.

7          A.    I did not have access to the

8    confidential supervisory information of other

9    institutions, and really had only available to me

10   the public pronouncements, news articles, press

11   releases that those institutions would have

12   offered.

13         Q.    (BY MR. ORTIZ)  So from just a public

14   knowledge standpoint, you knew that BNY Mellon,

15   State Street, other institutions were engaged in

16   the same activities that Custodia was trying to

17   become involved in, correct?

18               MR. MICHAELSON:  Objection, form.

19         A.    I was aware these activities were being

20   described, but in the context of a very different

21   legal and regulatory framework for insured

22   depository institutions than the one we were

23   looking at with the SPDI charter.

24         Q.    (BY MR. ORTIZ)  Just because they were

25   state -- or excuse me, because they were Federal

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 46

1    issued their letter, correct?

2        A.   I was not aware that this activity was

3    legally permissible.

4        Q.   Really?  You did not have information

5    from other sources that the OCC had issued an

6    advisory letter that this type of activity,

7    custodial activity with crypto-assets was, in

8    fact, legally permissible?

9                 MR. MICHAELSON:  Objection, form.

10       A.   I would have understood that the OCC

11   believed that it was permissible for a national

12   bank.

13       Q.   (BY MR. ORTIZ)  Well, was that not good

14   enough for you?

15       A.   We were dealing with State-chartered

16   institutions, and again, the Wyoming legislation

17   had created a bespoke regulatory structure that

18   did not include Federal supervision under the

19   existing framework.

20       Q.   Well, you agree that the whole concept

21   of the Monetary Control Act is that you can't

22   allow member banks to do something, but then tell

23   State-chartered banks it's illegal them for them

24   to do it, right?

25                 MR. MICHAELSON:  Objection, form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 47

1          A.    The Monetary Control Act was focused on

2     the financial services provided by the regional

3     Reserve Banks, and not the broader regulatory

4     framework of the banking agencies.

5          Q.    (BY MR. ORTIZ)   How do you know that?

6          A.    Because we would apply the Monetary

7     Control Act provisions to our provision of

8     financial services and the access to a Federal

9     Reserve banking account.

10         Q.    Because the Federal, the Monetary

11    Control Act says all State-chartered banks are

12    entitled to all Federal services.   That's what

13    Monetary Control Act says, right?

14              MR. MICHAELSON:   Objection, form,

15    misstates the statute.

16         Q.    (BY MR. ORTIZ)   True?

17         A.    The Monetary Control Act allowed for

18    equal access to those services as a legal

19    eligibility requirement.

20              (Exhibit 176 was marked by the

21    reporter for identification.)

22         Q.    (BY MR. ORTIZ)   So I'm handing you what

23    we've marked as Deposition Exhibit 176 which is

24    the Interpretive Letter Number 1170, July, 2020

25    from the Office of the Comptroller of the

J.A.895

Page 50

1    of Governors to answer those questions for you?

2         A.   Our staff would have had long-standing

3    relationships with the Board staff, who would

4    have dealt with these issues both at a policy

5    level, at a risk level, and that's where the

6    initial conversations took place.

7         Q.   So let's kind of break down when you're

8    analyzing whether Custodia could get a master

9    account in your view, tell me the specific issues

10   that you needed the Board Of Governors to make a

11   decision on versus something you think you can do

12   at the Kansas City Fed level.

13             MR. MICHAELSON:   Objection, form.

14        Q.   (BY MR. ORTIZ)  So I think you talked

15   about legal permissibility; is that right?

16        A.   Right.  So as we approached this issue

17   there were really in my mind three parts to this.

18   One was the threshold issue of legal eligibility.

19   The entity that normally issues routing transit

20   numbers had flagged this for the Reserve Bank

21   without issuing.  They had asked the question

22   about whether the institution was legally

23   eligible.  So that was a threshold question for

24   us.

25             The second question was the nature of

Page 51

1    the activity itself, the framework with which

2    that activity would occur; in other words a

3    State-chartered entity that did not have Federal

4    supervision, and we were seeking the Board's

5    input as part of our decision-making to

6    understand was that raising broader policy issues

7    that we would need to take into account.

8        Q.   So the Board has to make --

9             MR. MICHAELSON:  Hold on.  Let the

10   witness finish.

11       Q.   (BY MR. ORTIZ)  Go ahead, I'm sorry.

12       A.   And the third question which was one

13   that we always involve is assuming those things

14   were affirmed, then we would make our independent

15   risk assessment around whether the institution

16   should be granted access.

17       Q.   Were there other considerations that the

18   Board had to weigh in on that you could not do on

19   your own, other than what you have just described

20   for me?

21       A.   Those were the general issues,

22   interpretation of law as it related to legal

23   eligibility, and consistency with a broader

24   policy framework, regulatory framework.

25       Q.   How about the whole issue of monetary

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 60

1    by nominee Powell, whether he was going to be

2    Chairman of the Federal Reserve Board,

3    representations he made to Cynthia Lummis about

4    maybe moving this forward on the process, agreed?

5    That's how that timing worked out?

6              MR. MICHAELSON:  Objection, form.

7         A.   I would not have been privy to the

8    conversations between Chairman Powell and Senator

9    Lummis.

10        Q.   (BY MR. ORTIZ)  Did you attend any of

11   the hearings or watch any of the hearings and

12   statements he made, questions raised by Senator

13   Lummis when he was going through the confirmation

14   process?

15        A.   I did not watch those confirmation

16   hearings.

17             MR. ORTIZ:  Do you want to take

18   about a 7-minute break.

19             MR. MICHAELSON:  Sure.

20                  (Brief recess taken.)

21        Q.   (BY MR. ORTIZ)  I want to talk about a

22   couple of other -- you know, I was asking about

23   people that may have made comments to you.  Do

24   you remember after Custodia had submitted its

25   application and put in all the materials, having

J.A.898

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 61

1    a conversation with Tara Humston where she said,

2    "Listen, I don't think there's any show-stoppers

3    here.  It looks good to go"?

4                MR. MICHAELSON:  Objection, form.

5         A.   I do remember I had multiple

6    conversations with Tara.  The term "show-stopper"

7    I recall was in the context of, "Do you have any

8    more information that you need?"

9         Q.   (BY MR. ORTIZ)  Okay.  Explain that to

10   me.

11        A.   So in our consideration of factors that

12   will influence our decision, our understanding of

13   risk, we will go back to the requesting party, to

14   the applicant to fill any gaps in information

15   that we think we don't have.

16             Those might be policies.  They might be

17   a business plan.  They may be artifacts that we

18   think are relevant to our decision-making.

19        Q.   (BY MR. ORTIZ)  So did Tara tell you

20   that she told Caitlin Long, "There's no

21   show-stoppers with your application," did she

22   report that to you?

23        A.   I was aware of that frame, and in the

24   context of my conversation with Tara, my

25   understanding was, "Do we have all the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 62

1      information from Custodia that is relevant to our

2      analysis?"

3          Q.    And the report to you was, "Yes, and I

4      don't see any show-stoppers?"

5          A.    I am aware of that, yes.

6          Q.    That was her comment back to you?

7          A.    That was her comment.

8          Q.    And Tara, and I don't, just

9      colloquially, was she kind of like your

10     right-hand person on a lot of these issues?

11         A.    Tara reported to me as the head of our

12     Division of Bank Supervision.

13         Q.    Would it be fair to say you interfaced

14     with her with direct contact as much as anyone on

15     your team?

16         A.    I did have regular status meetings with

17     Tara.

18         Q.    Is that something where when you're in

19     town, you probably see and talk to her daily?

20         A.    It may not be every day, but we worked

21     on the same floor and I could contact her.

22         Q.    Is she one of those people, did you have

23     like a select few that had your cell number and

24     had the green light to call you any time they

25     wanted to?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 85

1    interject, same objection regarding the Board's

2    assertion to the deliberative process.  I think

3    it's okay to answer the question with yes or no,

4    whether you had concerns, but I instruct you not

5    to get into the substance of what the draft S

6    letter looked like, or the nature of any

7    questions or concerns or comments that FRBKC had

8    with respect to a draft S letter.

9         Q.   (BY MR. ORTIZ)  Is that correct, you had

10   concerns about the S letter?

11        A.   I had concerns of whether the S letter

12   was necessary, given our long-standing practice

13   of consulting with the Board whenever we were

14   raised with unique or novel questions.

15        Q.   That was the only concern you had?

16        A.   That was my fundamental concern.

17        Q.   Were there other concerns?

18        A.   I did not see the S letter as changing

19   our authorities in any way, so I'm not sure I

20   understand your question.

21        Q.   What is, had you ever seen an S letter

22   before directing you to do something at the

23   Kansas City Fed?

24        A.   The Board of Governors uses S letters as

25   a guidance form across The Reserve Banks for the

J.A.901

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 86

1    Federal Reserve system, to ensure consistent

2    understanding of various expectations.

3         Q.    When you -- I'm sorry for interrupting

4    you.  When you get an S letter from the Board of

5    Governors, do you follow it?  Do you follow the

6    directives of the S letter?

7         A.    That would be the expectation.

8         Q.    You can't just ignore it, correct?

9         A.    You should not ignore it.  It would be

10   our practice to follow the expectations.

11        Q.    You get slapped by the mother ship if

12   you ignore the S letters, right?

13              MR. MICHAELSON:  Objection, form.

14        A.    Our expectation is that we want to

15   follow consistent practices.

16        Q.    (BY MR. ORTIZ)  Sure.  So this is -- and

17   in the context of this S letter and these account

18   access guidelines really are applying directly to

19   novel institutions like Custodia, agreed?

20              MR. MICHAELSON:  Objection, form.

21        A.    No actually the guidelines are clear

22   that they apply to all institutions that have

23   access to Fed accounts.

24        Q.    (BY MR. ORTIZ)  Were the S letter and

25   the account access guidelines being circulated in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 88

1    being able to communicate to potential requestors

2    for these accounts, with the expectations that we

3    had.

4        Q.   So if we look at, when you said that the

5    guidelines, or this was published for public

6    comment, the S letter is not public.  That is a

7    private document, is it not?

8        A.   That would be internal to the Federal

9    Reserve.

10       Q.   Sure, so if we look at the first couple

11   of pages of Exhibit 34 and we see things like

12   Board expectations, Board consultation process,

13   that type of stuff, that was never disseminated

14   to the public, was it?

15       A.   Unless it was part of the guidelines,

16   that's what the public would have seen in terms

17   of any of those characterizations.

18       Q.   And in fact, it was never in writing at

19   any time before that you had to give

20   predecisional drafts and memos to the Board of

21   Governors to weigh in on when you were making

22   decisions on master accounts.  That was never in

23   writing anywhere before this S letter, was it?

24       A.   I'm not aware that that was in writing.

25       Q.   And, in fact, that wasn't the practice

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 101

1        A.    October of 2020.

2        Q.    (BY MR. ORTIZ)  I apologize.

3              MR. SCARBOROUGH:  Good objection.

4        Q.    (BY MR. ORTIZ)  I apologize -- has been

5    pending with you for basically 5 or 6 months,

6    correct?

7        A.    That is correct.

8        Q.    Just as an aside how long was it -- did

9    it normally take to assess risk on an institution

10   and give them an answer yea or nay on a master

11   account?  That can be done in a couple of months

12   typically, can't it?

13       A.    Yes, under routine circumstances it

14   typically moves quicker.

15       Q.    So we're maybe six months in the

16   process, you're having, and this looks like to be

17   a phone call with President George and Governor

18   Brainard to discuss a new proposal from TCH.

19   What does that mean?  What's TCH?

20       A.    TCH is the acronym for the

21   clearinghouse.  It's an association of the

22   largest banks.

23       Q.    So I want to go down and look at your

24   notes there.  It says, "Call with Bill," is it

25   "Demchak"?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 171

1      Q.   So have you ever seen Exhibit 185 which
2  are basically the questions and answers
3  associated with this letter from the Board of
4  Governors?
5      A.   I don't remember these frequently asked
6  questions but --
7      Q.   Did you have a general understanding
8  from any of your staff at the time that basically
9  if you were a member bank you could start
10  engaging in crypto-related asset activity and all
11  you had to do was give notice to your supervisor?
12     A.   Yes, I would have been aware of this
13  guidance.
14     Q.   So what this means is if you are a
15  member bank, you can do exactly what Custodia was
16  doing.  You don't even have to ask permission.
17  You simply give notice that you're doing it,
18  right?
19          MR. MICHAELSON:  Objection, form.
20     A.   This was a requirement to give notice.
21  It wasn't an assessment of the risk associated
22  with these activities.
23     Q.   (BY MR. ORTIZ)  So Custodia has been
24  waiting now almost two years.  We're at August of
25  '22.  They have been waiting two years.  You get

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 193

1      A.   It is a first level supervisory

2   position.

3      Q.   And the CRRM Department is -- kind of

4   basically has got the lead on the whole risk

5   assessment with Custodia, right?

6      A.   That would be their area of

7   responsibility, yes.

8      Q.   So I want to look at this.  It says,

9   "Good afternoon.  CRRM is working on a memo to

10  Esther regarding a potential decision on

11  Custodia's master account."

12         So this is December 6th, 2022.  Did you

13  have an idea in early December they were working

14  on a memo for you on a potential decision?

15     A.   So I wouldn't put the dates exactly

16  here, but in this timeframe, I would have asked

17  this team to begin to pull together a memo that

18  would state our position in potentially denying

19  this request.

20     Q.   So this also says, "This is moving

21  pretty quick and there are some gaps that Judith,

22  Christi and I would like your help filling in,

23  given you are the experts.  Do you have any idea

24  what that means, what gaps needed to be filled in

25  now that this was moving quick?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 198

1    it.

2         Q.   What I would like to know from you is

3    did you have an understanding as to who actually

4    had drafted the memo that was sent to you in this

5    timeframe in Exhibit 51?

6         A.   My understanding is that our staff did

7    the drafting of this memo.

8         Q.   Just the Kansas City Fed staff?

9         A.   The Kansas City staff, yes.

10        Q.   Do you know if the Board weighed in on

11   multiple occasions and made edits and additions

12   and corrections as to what they wanted that memo

13   to say?

14             MR. MICHAELSON:  Object to form.

15        A.   I am not aware that they would have been

16   involved in that.

17        Q.   (BY MR. ORTIZ)  That would surprise you

18   if that happened, wouldn't it?

19        A.   It would not surprise me that the staff

20   would be sharing their analysis.

21        Q.   But it would surprise you if someone

22   from the Board started doing rewrites and

23   additions and edits?

24             MR. MICHAELSON:  Object to form.

25        A.   I don't know if it would surprise me.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 240

1    seen in the last 20 years?

2              MR. MICHAELSON:  Object to form.

3         A.   I wouldn't know.  I wouldn't know.

4         Q.   (BY MR. ORTIZ)  It's pretty rare, isn't

5    it?

6         A.   I would think there would be not many,

7    compared to what we see coming out of the

8    Division of Bank Supervision.

9         Q.   And that would be the SR-type letters?

10        A.    The SR-type letters.

11        Q.   So an S letter that comes and is dealing

12   with these account access issues, can you think

13   of another one that you received other than S

14   letter 2667?

15              MR. MICHAELSON:  Object to form.

16              MR. ORTIZ:  2677.

17        Q.   (BY MR. ORTIZ)  Whatever the number is.

18              MR. MICHAELSON:  Object to form.

19        Q.   (BY MR. ORTIZ)  Have you seen another

20   one other than the S letter in the guidelines

21   we've talked about in this case?

22        A.    No.  Given the nature of the guidelines

23   I saw this S letter as accompanying those as a

24   compliment.

25        Q.   (BY MR. ORTIZ)  And my question is, is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 241

1    that the only one you've seen say in the last 20

2    years, the S letter?

3                 MR. MICHAELSON:  Object to form.

4         A.    I cannot remember any other S letters.

5         Q.    (BY MR. ORTIZ)  You can't remember any

6    others?

7         A.    It doesn't mean they are not there.  I

8    just don't -- I couldn't name one for you.

9         Q.    Let me hand you what's already in

10   evidence as Exhibit 37.  Is this a copy of the

11   actual denial letter that went out to Caitlin

12   Long at Custodia?

13        A.    Yes, I think this is the SR letter.

14        Q.    And I apologize, you're right.  This was

15   broken down into a short one-page letter that you

16   signed then with an attachment of the summary

17   analysis.

18        A.    Yes.

19        Q.    Okay, so your team did follow your

20   requests there in the last day or two?

21        A.    Yes.

22        Q.    Now did you know that this decision had

23   been leaked out to media sources and was being

24   recorded the day before the letter was issued?

25                 MR. MICHAELSON:  Object to form.

J.A.909

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 282

1    on Custodia, and they made it clear to you they

2    would do that, didn't they?

3         A.   That was under a different legal and

4    regulatory framework than our tradition and

5    decades of information sharing.

6         Q.   As to specifically SPDI institutions,

7    Albert Forkner made it clear they were going to

8    share all the information you wanted as to those

9    charters, didn't he?

10        A.   I believe Albert would have been willing

11   to share information.

12        Q.   So this whole issue of you not having

13   data or access to information, that's not true

14   either, is it?

15             MR. MICHAELSON:   Object to form.

16        Q.   (BY MR. ORTIZ)   Because you had

17   everything the Banking Commission in Wyoming had,

18   you could have gotten access to, true?

19             MR. MICHAELSON:   Objection to form.

20        A.   I was not aware that we had any

21   authority to compel that information to be shared

22   with us.

23        Q.   (BY MR. ORTIZ)   Well, if you had

24   information sharing agreements in place with the

25   State of Wyoming for banks that they chartered,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 302

1    they were being managed, in compliance with

2    relevant laws and regulations.

3        Q.   (BY MR. ORTIZ)  Did you know that

4    Custodia was actually invited by your staff to

5    remediate the risks and resubmit their risk

6    management plan?

7        A.   It would not be unusual for an

8    institution that we've raised questions with to

9    come back at another time and resubmit a request.

10       Q.   Would you agree, given the parameters

11   you've talked about, a broad question, if you're

12   a novel start-up wanting to deal with digital

13   assets and you're a State-chartered entity, like

14   Custodia, you can never get a master account.

15   You can't.

16             MR. MICHAELSON:  Object to form,

17   calls for speculation.

18       A.   I can't answer that question.

19       Q.   (BY MR. ORTIZ)  You don't see a pathway

20   for that as you sit here right now, though, do

21   you?

22       A.   I did not see it as of January 27th.

23       Q.   You have been really patient.  That's

24   all the questions I have.

25             MR. MICHAELSON:  No further

# EXHIBIT K

# [PUBLIC VERSION]

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3

4      CUSTODIA BANK, INC.,

5                      Plaintiff,

6      vs.                          No.

7      FEDERAL RESERVE BOARD OF        22-cv-00125-SWS

8      GOVERNORS and FEDERAL RESERVE

9      BANK OF KANSAS CITY,

10                     Defendants.

11

12

13

14

15

16

17          CONFIDENTIAL DEPOSITION OF JACKIE NUGENT, a

18     witness, taken on behalf of the Plaintiff before

19     Kelsey Robbins Schmalz, CSR No. 1571, CCR No. 1148,

20     RPR, pursuant to Notice on the 15th of November,

21     2023, at the offices of the Federal Reserve Bank of

22     Kansas City, 1 Memorial Drive, Kansas City, Missouri.

23

24

25

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 36

1    frame, had Custodia -- it was Avanti then, but

2    Custodia or Kraken, had they already been chartered,

3    to your knowledge, by the State of Wyoming?

4                    MS. CARLETTA:  Objection.  Form.

5            A.    I can't recall when they were

6    chartered.

7    BY MR. ORTIZ:

8            Q.    So I guess I'm a little confused when

9    you said you were doing this just out of your own

10   curiosity.  Did people up the chain of command know

11   that you were participating with the Wyoming Banking

12   Commission on a scheduled call every two weeks to go

13   over their supervisory framework for SPDIs?

14           A.    Yes, they were aware.

15           Q.    And were they encouraging you to do

16   that?

17           A.    They did not discourage me.

18           Q.    I take it you were being open and

19   honest in your communications with representatives

20   from the State of Wyoming?

21           A.    Yes, given an informal feedback

22   relationship.

23           Q.    Were the representatives from the

24   State of Wyoming entitled to rely on what you

25   were telling them that were being stated in good

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 37

1    faith?

2         A.    Albert understood that our thoughts

3    were informal.

4         Q.    Are you telling me that you could say

5    things that weren't true on behalf of the Kansas City

6    Fed?

7              MS. CARLETTA:  Objection.  Form.

8    Misstates testimony.

9    BY MR. ORTIZ:

10        Q.    And informal thought, you still want

11   that to be accurate and honest, agree?

12             MS. CARLETTA:  Objection.  Form.

13        A.    I have a great deal of respect for our

14   colleagues at any federal or state agency, so I have

15   an interest in being professional.

16   BY MR. ORTIZ:

17        Q.    Did you find that you were impressed

18   with the statutory supervisory framework that the

19   Wyoming Banking Commission had put in place for the

20   SPDIs?

21             MS. CARLETTA:  Objection.  Form.

22        A.    Can you ask again?

23   BY MR. ORTIZ:

24        Q.    Sure.  Were you impressed with the

25   supervisory framework that Wyoming created for these

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 38

```
 1    SPDI charters?
 2              MS. CARLETTA:  Same objection.
 3         A.    I had appreciation for how they went
 4    about developing the supervisory framework.  That did
 5    not mean I didn't have questions or think that there
 6    may be gaps.
 7    BY MR. ORTIZ:
 8         Q.    Did you give them advice on changes
 9    that needed to be made or gaps that needed to be
10    filled as we're going through these months and months
11    of phone calls and interactions?
12              MS. CARLETTA:  Objection.  Form.
13         A.    I shared my perspectives from my role
14    in examinations.
15    BY MR. ORTIZ:
16         Q.    And after you shared your perspective,
17    were there times that the Wyoming supervisory rules
18    or framework changed to incorporate your thoughts
19    from your perspective?
20         A.    I don't know.
21         Q.    Were there times, for instance, you
22    saw things that they had added based on comments you
23    had given them?
24              MS. CARLETTA:  Objection.  Form.
25         A.    I don't know.
```

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 62

1        A.     Yes.

2        Q.     And you accepted that offer?

3        A.     Yes.

4        Q.     And you shared your thoughts with them

5    about that -- what Promontory was doing?

6               MS. CARLETTA:  Objection.  Form.

7        A.     We did not share our thoughts with

8    them.

9    BY MR. ORTIZ:

10       Q.     One way or another?

11              MS. CARLETTA:  Objection.  Form.

12       A.     Correct.  We did not share our

13   thoughts with them.

14   BY MR. ORTIZ:

15       Q.     Did you have any follow-up meetings

16   with Promontory after this meeting?

17       A.     I can't recall.  We had an

18   introductory call.  I can't recall if we had a second

19   follow-up.

20       Q.     Did you form an impression one way or

21   another about their competency or sophistication

22   level after that meeting?

23       A.     Personal opinions.  The consultants

24   working on the manuals seemed to have relevant

25   backgrounds.

CONFIDENTIAL * * * CONFIDENTIAL * * * CONFIDENTIAL

Page 63

1        Q.      Any other impressions you formed?

2        A.      As I mentioned earlier, I personally

3    thought they took a thoughtful approach to developing

4    the framework.

5        Q.      Anything else?

6        A.      No.

7        Q.      All right.  Let me move to Page 18322,

8    and there is a date of July 8th, '20, and it says,

9    Christi.

10               Would that be Christi May-Oder?

11       A.      I believe so.

12       Q.      And this says, Regarding NTMA meeting.

13               Is that nontraditional master account?

14       A.      Yes.

15       Q.      Were you part of a committee, that

16   committee?

17       A.      No.

18       Q.      Did you go to those NTMA meetings?

19       A.      I went to internal Kansas City

20   meetings that were titled NTMA as well.

21       Q.      So how do I interpret this?  Is this

22   information -- where you put like Christi's name and

23   a date, is this information Christi is sharing with

24   you?

25       A.      This appears to me to be information

J.A.918