Case No. 24-8024

## UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

### CUSTODIA BANK, INC.,

Appellant,

v.

### FEDERAL RESERVE BOARD OF GOVERNORS et al.,

Appellees.

On Appeal from the U. S. District Court for the District of Wyoming

The Honorable Scott W. Skavdahl, District Judge

District Court No. 1:22-CV-125-SWS

## JOINT APPENDIX

Joshua P. Chadwick
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street & Constitution Ave. NW
Washington, DC 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

Michelle S. Kallen
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com

*Counsel for Appellant*

Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street and Constitution Ave.
NW
Washington, DC 20551
(202) 263-4835
yvonne.f.mizusawa@frb.gov
yonatan.gelblum@frb.gov
katherine.pomeroy@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Andrew Z. Michaelson
KING & SPALDING LLP
1185 Ave. of the Americas, 34th Fl.
New York, NY 10036
(212) 556-2100
amichaelson@kslaw.com

Billie LM Addleman
Erin E. Berry
HIRST APPLEGATE, LLP
PO Box 1083
Cheyenne, WY 82003
(307) 632-0541
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Christine M. Carletta
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
ccarletta@kslaw.com
cfreeman@kslaw.com

Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE,
P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

*Counsel for Appellant*

Jared Lax
Kɪɴɢ & Sᴘᴀʟᴅɪɴɢ LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
jlax@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

# TABLE OF CONTENTS

## Volume I of X

District Court Docket Report, *Custodia Bank Inc. v. Federal Reserve Board of Governors et al,* No. 1:22-cv-00125 (D. Wyo.) ...................................................................... J.A.1

Complaint (D. Wyo. June 7, 2022), ECF No. 1 ............................... J.A.41

Exhibit 1 to Complaint (D. Wyo. June 7, 2022), ECF No. 1-2 ......... J.A.86

Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 48 ................................................... J.A.88

Defendant Board of Governors of the Federal Reserve System's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 49 .............................................................. J.A.91

Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 50..... J.A.153

Defendant Federal Reserve Bank of Kansas City's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 51 ...... J.A.157

## Volume II of X

Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's Complaint (D. Wyo. Sept. 13, 2022) ECF No. 58 .......................................................... J.A.216

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss Complaint (D. Wyo. Oct. 4, 2022) ECF No. 96 .................... J.A.269

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss (D. Wyo. Oct. 4, 2022) ECF No. 97 .......................................................... J.A.304

Plaintiff Custodia Bank, Inc.'s Notice of Submission of
Supplemental Authority (D. Wyo. Oct. 12, 2022) ECF
No. 98 ................................................................................ J.A.340

Defendant Board of Governors of the Federal Reserve
System's Response to Plaintiff's Notice and Submission
of Supplemental Authority (D. Wyo. Oct. 19, 2022) ECF
No. 99 ................................................................................ J.A.353

Order Granting in Part and Denying in Part Defendants'
12(b)(6) Motions to Dismiss Complaint (D. Wyo. Nov. 11,
2022) ECF No. 102 ............................................................ J.A.359

Joint Motion of Defendants Federal Reserve Bank of Kansas
City and Federal Reserve Board of Governors to Dismiss
the Complaint as Moot (D. Wyo. Jan. 27, 2023) ECF No.
116 .................................................................................... J.A.397

First Amended Complaint (D. Wyo. Feb. 28, 2023) ECF No.
121 .................................................................................... J.A.401

Defendant Federal Reserve Bank of Kansas City's Motion to
Dismiss First Amended Complaint (D. Wyo. Mar. 28,
2023) ECF No. 124 ............................................................ J.A.438

### Volume III of X

Defendant Board of Governors of the Federal Reserve
System's Motion to Dismiss the First Amended
Complaint (D. Wyo. Mar. 28, 2023) ECF No. 126 ............... J.A.459

Defendant Board of Governors of the Federal Reserve
System's Memorandum of Points and Authorities in
Support of Its Motion to Dismiss the First Amended
Complaint (D. Wyo. Mar. 28, 2023) ECF No. 127 .............. J.A.462

Omnibus Memorandum in Opposition to Defendants' Motions
to Dismiss Plaintiff's First Amended Complaint (D.
Wyo. Apr. 11, 2023) ECF No. 135 ....................................... J.A.497

Brief of Amicus Curiae Former Senator Patrick J. Toomey in
    Support of Neither Party (D. Wyo. Apr. 20, 2023) ECF
    No. 151 ................................................................. J.A.537

Defendant Federal Reserve Bank of Kansas City's Reply in
    Support of Its Motion to Dismiss First Amended
    Complaint (D. Wyo. May 2, 2023) ECF No. 159 .................. J.A.559

Defendant Board of Governors of the Federal Reserve
    System's Reply in Support of Its Motion to Dismiss the
    Amended Complaint (D. Wyo. May 2, 2023) ECF No. 160
    ............................................................................. J.A.572

Order on Defendants' Motions to Dismiss First Amended
    Complaint (D. Wyo. June 8, 2023) ECF No. 164 ................. J.A.601

Defendant Federal Reserve Bank of Kansas City's Answer to
    Custodia's First Amended Complaint (D. Wyo. June 22,
    2023) ECF No. 166 .............................................. J.A.617

Defendant Board of Governors of the Federal Reserve
    System's Notice of Lodging of the Administrative Record
    (D. Wyo. Aug. 21, 2023) ECF No. 178 ................................. J.A.641

Second Amended Scheduling Order (D. Wyo. Nov. 13, 2023)
    ECF No. 211 ....................................................... J.A.644

Order Granting Joint Motion and Stipulation to Align and
    Consolidate APA and Summary Judgment Briefing (D.
    Wyo. Nov. 28, 2023) ECF No. 220 ....................................... J.A.656

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA
    Claim and Its Motion for Judgment as a Matter of Law
    on Its Statutory Mandamus Claim (D. Wyo. Dec. 22,
    2023) ECF No. 238 ............................................................ J.A.657

Proposed Order (D. Wyo. Dec. 22, 2023) ECF No. 238-1 .............. J.A.660

**Volume IV of X**

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 239 .................................................................. J.A.661

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 240 .................................................................. J.A.725

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 240-1 ....................................... J.A.740

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 240-3 .................................................................. J.A.811

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 240-5 ....................................... J.A.858

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 240-9 .................................................................. J.A.879

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 240-10 ....................................... J.A.881

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 240-11 .................................... J.A.912

### Volume V of X

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 240-15 .................................................................. J.A.919

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 240-26 .......................................................... J.A.921

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 240-31 .................................................... J.A.971

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 240-37 ......... J.A.978

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 240-38 .................................................................... J.A.983

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 240-40 ......................................................... J.A.986

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 240-45 .................................................................. J.A.988

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 240-47 ....................................................J.A.1043

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 240-53 ....................J.A.1051

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 240-54 ............J.A.1056

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 240-64 ........................................................................J.A.1058

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 240-65 .........................J.A.1061

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 240-67 ..................................................................J.A.1062

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 240-68 ..................................................................J.A.1065

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 240-69 ..........................................................................J.A.1068

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-71 ..................................................................J.A.1071

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 240-75 ..................................................................J.A.1081

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 240-77 ..........................................................................J.A.1087

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-78 ..................................................................J.A.1089

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 240-80 ......................................................J.A.1099

Exhibit CC, Email from Matthew Eichner with the subject line "Custodia response: S-Letter - 2667 with no concerns identified" (Jan. 26, 2023) ECF No. 240-81 .........J.A.1101

Exhibit CD, Letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors (Mar. 8, 2023) ECF No. 240-82 .........................J.A.1103

Exhibit CE, Email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George" (Jan. 27, 2023) ECF No. 240-83 ..................................................................................J.A.1117

Exhibit CF, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Jan. 27, 2022) ECF No. 240-84 ........J.A.1119

Order Granting Unopposed Motion to Amend the Scheduling Order (D. Wyo. Dec. 26, 2023) ECF No. 241 .......................J.A.1127

Amicus Curiae Brief of the State of Wyoming (D. Wy. Jan. 18, 2024) ECF No. 251 ...........................................................J.A.1129

## Volume VI of X

Amici Curiae Brief in Support of Plaintiff filed by Amicus Parties Blockchain Association, Payment System Scholars (D. Wy. Jan. 19, 2024) ECF No. 257 ....................J.A.1137

Amici Curiae Brief in Support of Plaintiff's Motion for Judgment as a Matter of Law filed by Amicus Parties United States House of Representatives Financial Services Committee Members, United States Senate Banking, Housing and Urban Affairs Committee Members (D. Wy. Jan. 19, 2024) ECF No. 259 ...................J.A.1173

Defendant Board of Governors of the Federal Reserve System's Opposition to Plaintiff's Petition for Administrative Procedure Act Review (D. Wyo. Jan. 26, 2024) ECF No. 271 ...........................................................J.A.1200

Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment (D. Wyo. Jan. 26, 2024) ECF No. 272 ....................................................................................J.A.1257

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 282 ...J.A.1260

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 283 ..........J.A.1318

Amicus Brief in Support of Defendants filed by Amicus David Zaring (D. Wy. Feb. 9, 2024) ECF No. 286 .......................J.A.1331

## Volume VII of X

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 299 ....................................................................J.A.1349

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 300 ....................................................................J.A.1402

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 300-7 ...............................J.A.1407

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 300-8 ....................................................J.A.1414

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 300-15 ...................................................J.A.1418

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 27, 2024) ECF No. 313 ......................................J.A.1423

Order on Dispositive Motions (D. Wyo. Mar. 29, 2024) ECF No. 317 ...............................................................................J.A.1449

Judgment (D. Wyo. Mar. 29, 2024) ECF No. 318 .......................J.A.1476

Plaintiff Custodia Bank, Inc.'s Notice of Appeal (D. Wyo. Apr. 26, 2024) ECF No. 321 ........................................................J.A.1477

<div align="center">

**UNDER SEAL**
**Volume VIII of X**

</div>

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 233 ...........................................................J.A.1480

Proposed Order (D. Wyo. Dec. 20, 2023) ECF No. 233-1 .............J.A.1483

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 234 ........................................................................................J.A.1484

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 236 ........................................................................................J.A.1548

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 236-1 ..................................................................J.A.1563

Exhibit C, Excerpts from Federal Reserve Bank of Kansas
     City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 236-
     3 ......................................................................................J.A.1634

Exhibit E, Excerpts from Deposition of Tara Humston (Nov.
     3, 2023) ECF No. 236-5 ....................................................J.A.1681

Exhibit I, Letter from The Federal Reserve Bank of Kansas
     City to Chuck Thompson (Jan. 27, 2022) ECF No. 236-9
     ...........................................................................................J.A.1702

## Volume IX of X

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9,
     2023) ECF No. 236-10 ......................................................J.A.1704

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov.
     15, 2023) ECF No. 236-11 ................................................J.A.1735

Exhibit O, Email from Caitlin Long with the subject line "Re:
     Interest data points for you" (Jan. 29, 2021) ECF No.
     236-15 ................................................................................J.A.1742

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF
     No. 236-26 ..........................................................................J.A.1744

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov.
     29, 2023) ECF No. 236-31 ................................................J.A.1794

Exhibit AK, Letter from The Federal Reserve Bank of Kansas
     City to Caitlin Long (Aug. 19, 2022) ECF No. 236-37 ........J.A.1801

Exhibit AL, Email from Judith Hazen with the subject line
     "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No.
     236-38 ................................................................................J.A.1806

Exhibit AN, Email from Jeff Imgarten with the subject line
     "RE: Notes from 1/26 Meeting with the Board" (Feb. 28,
     2022) ECF No. 236-40 ......................................................J.A.1809

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 236-45 ...................................................................J.A.1811

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 236-47 ....................................................J.A.1866

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 236-53 .....................J.A.1874

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 236-54 ............J.A.1879

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 236-64 ........................................................................J.A.1881

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 236-65 .........................J.A.1884

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 236-67 ...............................................................J.A.1893

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 236-68 ...............................................................................J.A.1896

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 236-69 ..........................................................................J.A.1899

Exhibit BS, Draft Executive Summary to Esther George with
the subject line "Custodia Bank, Inc. (fka Avanti Bank
& Trust) Master Account Recommendation" (Jan. 2023)
ECF No. 236-71 ..................................................................J.A.1902

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No.
236-75 ..................................................................................J.A.1912

Exhibit BY, Email from Matthew Malloy with the subject line
"RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF
No. 236-77 ...........................................................................J.A.1918

Exhibit BZ, Draft Executive Summary to Esther George with
the subject line "Custodia Bank, Inc. (fka Avanti Bank
& Trust) Master Account Recommendation" (Jan. 2023)
ECF No. 236-78 ..................................................................J.A.1920

Exhibit CB, Email from Judith Hazen with the subject line
"Custodia Bank Master Account Request" (Jan. 24,
2023) ECF No. 236-80 ......................................................J.A.1930

Exhibit CD, Letter from Caitlin Long to the Office of the
Inspector General of the Federal Reserve Board of
Governors (Mar. 8, 2023) ECF No. 236-82 ........................J.A.1932

Exhibit CE, Email from Amy LaFave with the subject line
"Correspondence from Federal Reserve Bank of Kansas
City President Esther George" (Jan. 27, 2023) ECF No.
236-83 ..................................................................................J.A.1946

Exhibit CF, Letter from The Federal Reserve Bank of Kansas
City to Caitlin Long (Jan. 27, 2022) ECF No. 236-84 ........J.A.1948

### Volume X of X

Defendant Federal Reserve Bank of Kansas City's Cross-
Motion for Summary Judgment and Opposition to
Plaintiff's Petition for Review and Motion for Judgment
as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 273
..........................................................................................J.A.1956

Declaration of Andrew Michaelson in Support of Defendant
Federal Reserve Bank of Kansas City's Cross-Motion for
Summary Judgment and Opposition to Plaintiff's
Petition for Review and Motion for Judgment as a
Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 274 .........J.A.2014

Errata to ECF No. 274 (D. Wyo. Feb. 2, 2024) ECF No. 277 ......J.A.2027

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the
Federal Reserve Bank of Kansas City's Cross-Motion for
Summary Judgment and Reply Brief in Support of
Custodia's Petition for Review on Its APA Claim and Its
Motion for Judgment as a Matter of Law on Its
Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024)
ECF No. 295 .......................................................................J.A.2029

Declaration of Ryan Scarborough in Support of Plaintiff
Custodia Bank, Inc.'s Omnibus Opposition to the
Federal Reserve Bank of Kansas City's Cross-Motion for
Summary Judgment and Reply Brief in Support of
Custodia's Petition for Review on Its APA Claim and Its
Motion for Judgment as a Matter of Law on Its
Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024)
ECF No. 296 .......................................................................J.A.2082

Exhibit CX, Excerpts from the deposition of Peter Conti-
Brown (Dec. 14, 2023) ECF No. 296-7 ...............................J.A.2087

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov.
30, 2023) ECF No. 296-8 ....................................................J.A.2094

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec.
19, 2023) ECF No. 296-15 ...................................................J.A.2098

Defendant Federal Reserve Bank of Kansas City's Reply in
Support of Its Cross-Motion for Summary Judgment (D.
Wyo. Feb. 23, 2024) ECF No. 310 ......................................J.A.2103

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Michelle S. Kallen
Michelle S. Kallen

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made and (2) any paper copies of this document submitted to the Court will be identical copies of the version electronically filed.

/s/ Michelle S. Kallen
Michelle S. Kallen

# EXHIBIT O

# [PUBLIC VERSION]

J.A.919

Message

| | |
|---|---|
| **From**: | Caitlin Long [caitlin@avantibank.com] |
| on behalf of | Caitlin Long <caitlin@avantibank.com> [caitlin@avantibank.com] |
| **Sent**: | 1/29/2021 5:10:04 AM |
| **To**: | Clive Mitchell [clive@railsbank.com] |
| **Subject**: | Re: Interesting data points for you |

Thanks -- hadn't seen this yet!!

Update from us -- the Fed told us there are "no showstoppers" but we won't have an answer regarding the master account until early March, at the earliest. Separately, a lead investor group is coming together for us -- if it happens, we'll look to close end of Feb. No need to rush a chat before our scheduled time, but please think about what (if anything) that might mean for Railsbank.

Have a great weekend!

On Thu, Jan 28, 2021 at 10:03 PM Clive Mitchell <clive@railsbank.com> wrote:

**Shaul** 12:43 AM

NAB just acquired 86400 (or the 80% it didnt own) for $220m. Incumbents have one less challenger to worry about down under. https://www.afr.com/companies/financial-services/nab-scoops-up-neobank-86-400-20210129-p56xpy

**Australian Financial Review**

**NAB scoops up neobank 86 400**

National Australia Bank will take over Australian neobank 86 400 in a $220 million deal that is planned to flesh out the major bank's digital subsidiary, UBank.
Yesterday at 10:53 PM (55 kB)

https://static.ffx.io/images/$zoom_0.299%2C$multiply_0.7554%2C$ratio_1.777778%2C$width_1059%2C$x_0%2C$y_0/t_crop_custom/e_sharpen:25%2Cq_85%2Cf_jpg/t_afr_no_label_no_age_social_wm/7e3ede084adf2f8ac2c7d2766fceb19b62fe0be7

12:44

85k users, 375m AUD deposits and 270m mortgage book

--
All the best

Clive Mitchell / Co-Founder and Growth / +44 7841567417
Office location / We're hiring!

# EXHIBIT Z

# [PUBLIC VERSION]

**CONFIDENTIAL**

IN  ACCORDANCE  WITH  A   PROTECTIVE  ORDER,  THE  ENCLOSURE(S)

SHALL  BE  TREATED  AS  CONFIDENTIAL  AND  SHALL  NOT  BE   SHOWN  TO

ANY   PERSON   OTHER   THAN   THOSE   PERSONS   DESIGNATED   IN

PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.

**J.A.921**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,
2120 Carey Avenue, Suite 300
Cheyenne, WY 82001

    *Plaintiff*,

        v.

FEDERAL RESERVE BOARD OF
GOVERNORS,
Constitution Ave NW & 20th St NW
Washington, DC 20551

FEDERAL RESERVE BANK
OF KANSAS CITY,
1 Memorial Drive
Kansas City, MO 64108,

    *Defendants*.

Civil Case No.: 1:22-CV-00125-SWS

---

**EXPERT REPORT OF KATIE S. COX**

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................1

II.  SUMMARY OF OPINIONS ...........................................2

III. QUALIFICATIONS ...................................................3

IV.  GENERAL BACKGROUND .........................................6

V.   CHRONOLOGY .....................................................8

VI.  OPINIONS ...........................................................12

A.   The Board, Not the Reserve Bank, Determined Whether
     Custodia Bank Was Eligible for a Master Account. ...........14

B.   Board Intervention Halted the Kansas City Reserve Bank's
     Examination of Custodia and Thwarted Custodia's Entitlement
     to a Master Account. .............................................17

C.   The Board's Denial of Custodia's Membership Application
     Effectively Prevented the Reserve Bank from Approving the
     Master Account Application. ....................................22

D.   The Board Issued Guidelines That Gave It Control over Master
     Accounts for Novel Banks Such as Custodia. ..................25

E.   Through the Non-Public S-Letter Process, the Board Revised
     Parts of the Denial of Custodia's Master Account Application..........29

VII. CONCLUSION ......................................................36

i

I, Katie S. Cox, declare and state as follows:

## I.   INTRODUCTION

1.   My name is Katie S. Cox and I have been asked to prepare an expert report on behalf of Custodia Bank, Inc. ("Custodia") in this case pending before the United States District Court for the District of Wyoming.

2.   I have been an advisor to Custodia since May 2020, and I also serve as an observer on Custodia's audit committee.   In my role as an advisor, I have participated in telephone calls and meetings with officials from the Federal Reserve Bank of Kansas City and the Board of Governors of the Federal Reserve System ("the Board") concerning both Custodia's master account application and its Federal Reserve membership application.

3.   As an advisor to Custodia, I am compensated in two ways.   First, I am paid a monthly retainer of $2,500.   Second, I have received stock options, none of which I have exercised.

4.   My compensation for providing an independent written analysis in this Report is $500 per hour.   My compensation and my role as an advisor to Custodia are in no way contingent on the opinions expressed in this report.

5.   Neither my connection to Custodia, nor my compensation, has affected my opinions in this matter.   They are the same opinions I would express if I were not an advisor to Custodia.

1

6.      In formulating the opinions contained in this report, I have considered my training, knowledge, and experience working in the Federal Reserve System for over three decades, my current work as a regulatory consultant, and the materials cited in Exhibit 1 to this Report.   In addition, I have considered my first-hand experience as an advisor to Custodia, including my interactions with personnel from the Board and from the Federal Reserve Bank of Kansas City.

## II.    SUMMARY OF OPINIONS

7.      Based on my experience working in the Federal Reserve System for over three decades, my review of the relevant materials, and my communications with the Federal Reserve Bank and Board as a Custodia advisor, it is my opinion that the Board intervened in Custodia's request for a master account and exercised control over the denial of Custodia's master account.   This overarching opinion is supported by the following which will be explained in more detail below:

> a.  The Board, not the Reserve Bank, determined whether Custodia was eligible for a master account;
>
> b.  Board intervention halted the Kansas City Reserve Bank's examination of Custodia and thwarted Custodia's entitlement to a master account;

2

    c. The Board's denial of Custodia's membership application effectively prevented the Reserve Bank from approving the master account application;

    d. The Board issued Guidelines that gave it control over master accounts for novel banks such as Custodia;

    e. Through a non-public S-Letter process, the Board revised parts of the denial of Custodia's master account application.

8. The above events support my opinion that the Board ultimately controlled the decision on Custodia's master account application because whether to allow Custodia, a novel institution holding custody of crypto assets, into the Federal Reserve System was a policy decision which only the Board could make.

## III. QUALIFICATIONS

9. I hold a Bachelor of Science degree in Commerce with a concentration in finance from the University of Virginia.

10. From 1985 until 1988, I was a financial analyst in the Mergers & Acquisitions Section at the Federal Reserve Bank of Dallas. In this role, I analyzed proposals submitted for bank holding company formations, acquisitions, and mergers involving financial institutions with assets between $20 million and $600 million.

3

11.     From 1988 until 1995, I was a Bank Examiner in the Federal Reserve System at four different Reserve Banks.   In June 1993, I became a commissioned Federal Bank Examiner, which allowed me to directly supervise examination teams and be designated the "examiner-in-charge."   As a Bank Examiner, I conducted examinations of commercial banks, foreign branches, Edge Act Corporations, and bank holding companies.   The scope of work encompassed evaluating internal control systems and corporate governance, performing loan review, and evaluating the condition of the entities as related to capital, asset quality, management, earnings, and liquidity.   I reported findings to management of the banking entities and the individual Reserve Banks in written and oral form.

12.     I served as an instructor for the Federal Reserve System's core bank examiner school from 1992-1995.   In this role, I provided instruction to assistant bank examiners as to how the Federal Reserve analyzes the financial condition of banks and bank holding companies.

13.     Between 1995 and mid-1999, I accompanied my husband on two active duty U.S. Air Force tours.  During 1995 through 1997, I provided independent audit services for various entities operating on U.S. Air Base, Ramstein, Germany. During the latter part of 1997 until mid-1999, I was an auditor for the U.S. Air Force Audit Agency.   I performed audits of numerous U.S. Air Force units, including hazardous material handling operations and accounting functions.

J.A.927

14.     From 1999, until my retirement in 2020, I worked in the Mergers and Acquisitions Section at the Board.  In 2010, I became a manager in the section.  As a manager, I oversaw the review of the most complex domestic and international merger and acquisition proposals filed with the Federal Reserve System.  I collaborated with applicants to address regulatory concerns involving areas such as the long-term viability of a business plan, direct and indirect proposed owners, product risk management, concentrations related to revenues or assets, and Bank Secrecy Act compliance.  I reviewed organizational documents, capital instrument documents, and proposed management and remediation for corporate governance weaknesses.  I presented oral and written briefings to the Governors of the Board to obtain guidance for proposals that presented novel banking policy questions (including banking products or services) or involved very large banking institutions.  I served as one of the Federal Reserve's key drivers in the development of bank mergers and acquisitions policies.  I provided leadership in developing and implementing bank regulatory burden reduction initiatives, particularly for U.S. community banks.  While in this role, I saw first-hand how the Board creates policies and procedures with the goal of ensuring that Reserve Banks are consistent in their supervision and regulation of banking entities.

15.     Since May 2020, I have provided bank regulatory consulting services to a variety of firms, including Custodia.  My services have included advising banks

5

on their proposals before the Federal Reserve, as well as serving as a subject matter expert for investment firms to assess the probability of success for large, proposed mergers such as the TD Bank and First Horizon merger.

16.    Since May 2022, I have been a consultant to PricewaterhouseCoopers ("PwC").  I have helped PwC advise traditional and nontraditional financial firms on a range of regulatory matters, including charter conversions, applications before bank regulators, regulatory strategy, and risk management.

17.    All told, I have over 35 years of experience in the Federal Reserve System, working for both Reserve Banks and the Board, as well as providing bank regulatory advice to a variety of clients.

## IV.    GENERAL BACKGROUND

18.    The Board is the supervisory authority for the Federal Reserve System, which is the Central Bank for the United States.  Matters of policy are decided exclusively by the Board, which oversees the Reserve Banks.  *See* 12 U.S.C. § 248(k) (noting that the Board cannot delegate functions pertaining to "monetary and credit policies" to Reserve Banks).  The Board has many methods by which it ensures that Reserve Banks comply with its policies.  Overall, the Board can "exercise general supervision over said Federal Reserve Banks."  12 U.S.C. § 248(j).  Additionally, the Board has specific powers that it can use to ensure that Reserve Banks are following Board policy, including the review of accounts and records of Reserve

Banks, 12 U.S.C. § 248(a); removing Reserve Bank officers, 12 U.S.C. § 248(f); suspending operations of the Reserve Bank, 12 U.S.C. § 248(h); and approving or rejecting compensation for directors of the Reserve Bank, 12 U.S.C. § 307.

19.     While the Board is the head of the Federal Reserve, the United States and its territories are divided into twelve districts, each with a separately incorporated Reserve Bank.   The Board has delegated numerous functions and responsibilities to those Reserve Banks to carry out governmental monetary and regulatory policies.   Some of the key delegated responsibilities include: (1) the supervising and examining of certain banking entities in their districts; (2) lending to depository institutions; (3) providing key financial services that support the nation's payment system; and (4) examining certain financial institutions regarding consumer protection and fair lending laws. *See* United States Federal Reserve System, *The Fed Explained:   What the Central Bank Does* 10-11 (Aug. 2021), available at https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf.   In my experience, while the Reserve Banks are separately incorporated and have their own presidents and boards of directors, they must defer to the Board regarding policy matters.   *See* 12 U.S.C. § 248(k).

20.     In carrying out certain responsibilities, the Reserve Banks provide accounts and payment services for financial institutions holding accounts at that Reserve Bank.   One type of Federal Reserve application which is evaluated and

J.A.930

processed by Reserve Banks is the master account application, which allows an institution to have access to the Federal Reserve's financial services. Reserve Banks typically quickly and summarily approve master account applications for traditional banks. Indeed, Custodia was initially advised that action on its application would take only five to seven business days. Ex. 1 to Am. Compl, ECF No. 121. However, as I describe below, Custodia's master account application did not proceed in the typical fashion. The ultimate decision denying Custodia a master account, taken after the application had been pending for years and litigation had ensued, was in my opinion engineered by the Board. The Board took control of Custodia's master account application because the application was linked to the Board's policy decision on whether non-traditional financial institutions holding custody of crypto-assets should be allowed access to Federal Reserve services.

## V.   CHRONOLOGY

21.   Custodia is a Wyoming depository institution founded in 2020. The bank has a special purpose depository institution charter ("SPDI") from the State of Wyoming. It is chartered to provide both traditional U.S. banking services and certain crypto asset banking services. Custodia offers institutional customers custody and settlement services for crypto assets, while also offering some traditional banking services.

8

22.    A master account would provide Custodia direct access to the Federal Reserve's payment system.  Banks primarily use master accounts to make payments to each other using Fedwire, a service that allows banks to clear and settle accounts in real time by instructing the Federal Reserve to adjust the balances in their respective accounts.  Without a master account, Custodia is unable to operate as designed in its business plan and relies on a correspondent banking relationship.  Using a correspondent banking relationship (as Custodia presently must do to operate) is more expensive and introduces additional risks, particularly counterparty settlement risk.

23.    In early 2020, Custodia began communicating with the Kansas City Reserve Bank concerning its plans to apply for a master account.  On October 29, 2020, Custodia formally applied to the Reserve Bank to obtain a master account.

24.    Rather than simply process the request for a master account (as is typically the case for eligible depository institutions), the Reserve Bank subjected Custodia to a safety and soundness examination.  The Reserve Bank's process in examining Custodia was initially cordial and cooperative.  Many of the Reserve Bank's examination staff took courses and obtained certifications in order to better understand the crypto asset industry and how Custodia's business model would fit into that industry.  Custodia worked directly with Reserve Bank staff to help them understand not only the crypto industry, but also how Custodia's business plan

would operate.   The Reserve Bank examiners seemed genuinely excited and interested to be assigned to the Custodia review and appeared to look forward to having such a banking entity in their district.   Their communications with Custodia, both in writing and orally, signaled that there were no insurmountable issues.   *See, e.g.*, FRBKC-00003695 (describing Custodia management as "impressive" and "seasoned"); ███████████ ████████ ████ █████████ ██ ████████ FRBKC-00003607 at 20 (noting that Custodia would not "impact financial stability").   In January 2021, an officer of the Reserve Bank stated that she "did not see any showstoppers" regarding the bank's application, indicating that the Reserve Bank was open-minded about Custodia's master account application and believed that the application was ultimately approvable.

25.   In August 2021, Custodia also applied to the Board for membership in the Federal Reserve, which would subject Custodia to regulation by the Federal Reserve System in addition to regulation by the State of Wyoming.

26.   On January 27, 2022, the Reserve Bank notified Custodia that it met "the threshold legal definition of an entity that is eligible for a master account." FRBKC-00000488.

27.   In mid-December 2022, however, all Reserve Bank examination work for Custodia Bank halted, as did communications between the Reserve Bank and Custodia Bank.

28.     On January 27, 2023, three actions occurred in quick succession that prevented Custodia from obtaining a master account.   First, the Board denied Custodia's application to become a member of the Federal Reserve, citing among other things, the bank's "novel business model and proposed focus on cryptoassets." Second, the White House issued a statement on the risks of crypto assets.   The statement made clear that the administration viewed with skepticism financial institutions engaging with crypto assets and that the administration was working with banking regulators to develop safeguards and to "continue these efforts, including those designed to address and limit financial institutions' exposure to the risks of digital assets."   White House, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* (Jan. 27, 2023).   And finally, the Federal Reserve Bank of Kansas City communicated the denial of Custodia's application for a master account.

29.     For the reasons explained below, based on my experience working in the Federal Reserve System, it is my opinion that the Board's concern over novel banks engaging with crypto assets as a policy matter dictated the denial of Custodia's master account application.   The Board not only set policy; in this case it intervened in the decision-making process for Custodia's master account application in order to ensure its desired outcome.

11

J.A.934

**VI.   OPINIONS**

30.    The story of the Federal Reserve Board's involvement in Custodia's efforts to seek a master account (and the ultimate denial of the bank's application) is clear from the record in the case.  I ground my opinions on the combination of these documents, as well as my experience and my first-hand involvement in dealings with the Board and the Kansas City Reserve Bank.  Beginning at his confirmation hearing on January 11, 2022, Board Chair Jerome Powell expressed concern to the Senate Committee on Banking, Housing, and Urban Affairs about granting master accounts to SPDIs and other "novel banks"

31.    During the confirmation hearing, Senator Cynthia Lummis of Wyoming asked Chair Powell about the Board's treatment of Wyoming SPDIs:

> The Federal Reserve Act says that a depository institution is any institution eligible for deposit insurance.  The FDIC says, in General Counsel Opinion 8867, that an entity is a depository institution if it is creating deposit liabilities out of customer assets and is characterized by state law as a bank. As you know, Chairman Powell, I am terribly concerned about the manner in which Wyoming's special purpose depository institutions are being treated by the Federal Reserve.  We have discussed this.  What is your reaction to this?

32.    Chair Powell responded:

> So as we discussed, *there are novel charters, and the ["special purpose depository institutions"] are one of them, and we want to be really careful because they are hugely precedential.*  They are very important from a precedential standpoint.  *And so we have been looking carefully at this*, and I would say there are good arguments for viewing SPDIs as depository institutions for this purpose, and *we are looking carefully at it.  I do think we will make some progress on this*, and we can talk about it more offline.  But I

12

think you do understand that we--you know, if we start granting these there will be a couple hundred of them pretty quickly, and we have to think about the broader safety and soundness implications. And, you know, ***it is just hugely precedential. That is really why we have taken our time with it.*** And we appreciate you bringing it my attention, and so we can continue to talk about it. (emphasis added).

33.     This excerpt demonstrates that, as early as his confirmation hearing, Chair Powell saw the issue of SPDIs as one for the Board since historically the Board has been in charge of making "precedential" policy decisions for the Federal Reserve System as a whole.   Deciding whether to allow novel institutions holding crypto assets access to the Federal Reserve System was such a precedential decision, within the Board's authority, not the authority of the Reserve Banks.   *See* 12 C.F.R. 265.20(a)(17) (2023) (excepting from powers granted to Federal Reserve Banks matters that raise "significant legal, supervisory, or policy issues").

34.     By stating that the Board was "looking carefully at this," Chair Powell made clear that the Board was, and would continue to be, involved in the decision-making process for whether SPDI banks should be permitted to access the Federal Reserve.   He also signaled that master accounts for nontraditional institutions such as Custodia should not be granted without Board approval.   Reserve Banks are not deaf to such statements; in my experience, staff are attuned to Board pronouncements and act accordingly.

**A.**     **The Board, Not the Reserve Bank, Determined Whether Custodia Bank Was Eligible for a Master Account.**

35.     Despite the Reserve Bank's position (in this litigation and generally) that it controls the master account process, it has been my uniform experience that the Federal Reserve Board makes key legal determinations for the Federal Reserve System, particularly when it comes to policy matters.  The Board would not involve itself in run-of-the-mill requests for master accounts.   But a novel-chartered depository institution is expected to be singled out for Board scrutiny.  That was the case with The Narrow Bank ("TNB") and now Custodia as well as other novel institutions.

36.     Custodia is not an outlier when it comes to Board influence on applications for master accounts.   Interference by the Board derailed TNB's application for a master account.  TNB's business model was similar to Custodia's in that it intended to accept deposits but not make loans.  On April 27, 2018, TNB submitted an application to the Federal Reserve Bank of New York requesting a master account.  Soon thereafter, the New York Reserve Bank's General Counsel wrote that the Reserve Bank was not prepared to issue the account because "senior policy officials at the Board of Governors have expressed the strong view that the New York Fed should not approve TNB's request for a master account."  TNB-0000002.  To date, the New York Reserve Bank has not decided TNB's master account application.

14

37.     In November 2020, shortly after Custodia applied for a master account, the Board created a "Nontraditional Account Access Workstream Structure" which used resources and personnel from the Board as well as various Reserve Banks, including Kansas City.    *See* FRBKC-00004899; FRBKC-00004902.    This workstream was formed in direct response to the increasing number of requests for master account access from novel institutions and the Board's perceived need to provide "policy guidance and practical coordination to support Reserve Bank account decisions that are prudent, consistent, and timely." FRBKC-00004902.  The first novel institution to be considered by the Board's newly created workstream was Custodia, confirming that the Board viewed the master account decision as a policy matter. *Id*.  Chair Powell himself, in his above-cited Congressional testimony, called the Custodia decision "just hugely precedential."  I believe that the Workstream was one of the vehicles that the Board used to communicate its views that Custodia's master account application should be denied.

38.     Throughout 2021, Custodia, its outside counsel and I, had a series of calls with Board staff regarding Custodia's eligibility for a master account.  Notably, we primarily conducted those calls *with Board staff* rather than with Reserve Bank staff and it was very clear that the Board's General Counsel would make the eligibility decision.

J.A.938

39.   In my experience, the specific decision on whether a novel institution such as Custodia was eligible for a master account is the type of decision that the Board would traditionally make.  And in fact, on August 2, 2021, the Kansas City Reserve Bank sent Custodia a letter stating that "it would be inappropriate for us to issue a decision" on Custodia's master account application before the Board clarified its interpretation of Custodia's "legal eligibility for a master account under the Federal Reserve Act."  FRB-AR-003858; *see also* FRBKC-00009854 (draft letter stating that the "Reserve Bank does not have authority to interpret legal eligibility").

40.   Making it incontestably clear that a decision on Custodia's eligibility rested squarely with the Board, on January 27, 2022, Mark Van Der Weide, the General Counsel for the Board, told Custodia's outside legal counsel in a conference call that Custodia satisfied the threshold definition of an entity eligible to maintain a master account.  *See* FRBKC-00000446 at 2.  While Craig Zahnd, the General Counsel, of the Kansas City Reserve Bank, formally conveyed the decision on eligibility to Custodia by letter, he did so by referencing Mr. Van Der Weide's call to Custodia's outside counsel.  See FRBKC-00000234 ("As was recently conveyed to your counsel ... it has been determined that Avanti satisfies the threshold definition of an entity eligible to maintain a master account.").  It could not be clearer, therefore, that as to a master account for Custodia, the Board was pulling the strings.

16

41.   The Board's role in Custodia's master account application is not surprising.  I would expect the Board to take the primary role in deciding any new policy questions, such as whether depository institutions holding custody of crypto-assets are eligible to access the Federal Reserve System.

**B.**   **Board Intervention Halted the Kansas City Reserve Bank's Examination of Custodia and Thwarted Custodia's Entitlement to a Master Account.**

42.   The Reserve Bank staff began its examination of Custodia Bank on September 6, 2022.  Because Custodia had applied both for a master account with the Kansas City Reserve Bank and later for membership in the Federal Reserve, the information from the examination was used to evaluate both the master account and membership applications.  *See* FRBKC-0000297 ("Our ongoing review of Custodia's master account request also leverages information and material from the September 6, 2022, examination of Custodia as part of the evaluation of Custodia's application for membership in the Federal Reserve System.").

43.   On October 21, 2022, the Reserve Bank provided Custodia written results of the initial examination.  The Bank identified "numerous exceptions to, or departures from, safe and sound banking practices in Custodia's prospective risk management program compared to the risk management practices that would typically be expected or required of an operating state member bank under Reserve Bank supervision."  *See* FRB-AR-001204 at 1-2.  It is typical, however, in my

17

experience, for a *de novo* institution such as Custodia to have numerous risk management functions not fully operational at the time of the first examination, and it is customary for the Federal Reserve to conduct at least one follow-up examination and sometimes more than one.  *See* FRBKC-00013627 (noting there "will likely need to be multiple exams [of Custodia] given this is a de novo").

44.   The October 21, 2022 examination summary from the Reserve Bank further advised Custodia that its "remediation efforts will subsequently be assessed by Reserve Bank staff at a future date, which may include onsite reviews/examinations and/or additional request for information deemed necessary…the Reserve Bank will continue to engage in periodic discussions with Custodia's senior management regarding the status of its operations and other matters pertinent to the membership application." FRB-AR-001204 at 6.  In the following months, and despite regular communication, Reserve Bank staff provided no indication that any of the issues were unexpected for a de novo institution, much less insurmountable.

45.   Custodia staff and I had bi-weekly calls with the Reserve Bank, and sometimes Board staff, to discuss Custodia's progress in addressing the examination findings as well as to inquire about the status of the membership and master account applications.  The last of these calls occurred December 15, 2022, and it included Board staff.  During this call, Caitlin Long, the CEO of Custodia Bank, informed

18

System staff that 12 of the 14 priority one examination items and 96% of the Bank Secrecy Act/Anti-Money Laundering issues had been remediated.

46.     Following this call, it appeared that Custodia was well on its way to securing a master account.  Custodia had been found eligible for such an account, had a supervisory examination, and had addressed nearly all of the priority one problems identified by the bank examiners prior to any subsequent examination.

47.     On December 20, 2022, Custodia provided a very comprehensive response to the Reserve Bank examiners, as well as a remediation plan for all priority two examination findings.  *See* Letter from Custodia to the Ross Crouch (Dec. 20, 2022).

48.     On December 16, 2022, the Kansas City Reserve Bank unexpectedly canceled the bi-weekly calls, not just for that week, but going forward.  This was highly unusual.  In my experience, following an initial examination, Reserve Bank staff will work with the financial institution to remediate identified risks.  In fact, as noted above, the Reserve Bank stated its intentions to do so in its examination findings letter to Custodia.  FRB-AR-001204 at 6.  That did not happen here.

49.     Custodia was unable to substantively communicate with Federal Reserve staff until January 23, 2023.  On that day, Board staff unexpectedly informed Custodia that the staff was recommending denial of the bank's application to become a member of the Federal Reserve System.

19

50.     Board staff did not provide any advance notice or an opportunity to correct any perceived problems.  The Board staff gave Custodia only 48 hours to decide whether to withdraw its application.  Ordinarily, banks in this position are afforded at least one week to decide whether to accept a denial or withdraw an application.  During my 21 years with the Board, in the mergers and acquisition section, I made at least 50 such calls indicating that a denial would be recommended; I cannot recall a single time when the Board gave an applicant only 48 hours to respond.  Rather than having a week or more to consider the Board's likely denial, Custodia was forced to convene a meeting of its board of directors on short notice to decide its course of action.  Custodia decided not to withdraw its membership application.  Custodia communicated this decision to the Board's General Counsel on January 26, 2023.

51.     Also on January 26, 2023, Custodia received an email from a reporter who notified Custodia that all banks with business plans involving crypto assets that had pending applications at both the Federal Reserve and the Office of the Comptroller of Currency (the federal regulator for national banks) were being asked to withdraw their applications.

52.     On January 27, 2023, the Board of Governors voted to deny Custodia's membership in the Federal Reserve.  *See* FRBKC-00005326.  The Board issued a press release making public its denial of Custodia's membership application on that

20

same day.  *See* Bd. of Govs. of the Fed. Reserve, *Federal Reserve announces denial of application by Custodia Bank, Inc., to become a member of the Federal Reserve System* (Jan. 27, 2023), available at https://www.federalreserve.gov/newsevents/pressreleases/orders20230127a.htm.

53.   Simultaneously, the White House released a statement highly critical of cryptocurrency.  The White House statement observed that "some cryptocurrency entities ignore applicable financial regulations and basic risk control—practices that protect the country's households, businesses, and economy.   In addition, cryptocurrency platforms and promoters often mislead consumers, have conflicts of interest, fail to make adequate disclosures, or commit outright fraud."  White House, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* (Jan. 27, 2023), available at https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/.

54.   Based on my experience working with the Federal Reserve System, I do not believe that the simultaneous timing of the White House statement and the Board's denial of Custodia's Federal Reserve membership application was coincidental.  During my career with the Federal Reserve, I do not recall the White House issuing a policy statement or an Executive Order related to a Board matter coincident with the Board's action on a proposal.  I am aware of the White House intervening on at least two proposals for which I was the principal Board analyst.

21

However, on both occasions, the White House directly contacted a Governor of the Board to orally convey the White House's preferred action on a proposal.

55.     It is my opinion that the Board's denial of Custodia's membership application, in close coordination with the White House's anti-crypto policy statement, dictated the outcome of Custodia's master account application.   Further, as will be explained below, under the Board's Payment Systems Access Guidelines, the Board's membership decision laid the foundation for denying Custodia's application for a master account, and more generally, the foundation to keep all banks with novel business models (e.g., Tier 3 banks) from obtaining master accounts.

### C.     The Board's Denial of Custodia's Membership Application Effectively Prevented the Reserve Bank from Approving the Master Account Application.

56.      Given the Board's denial of Custodia's membership application, and the White House's near-simultaneous statement on the risks of crypto assets, the decision to deny Custodia's master account application—which was communicated by the Kansas City Reserve Bank staff a few hours later—was preordained.

57.     Kansas City staff were charged with evaluating both Custodia's membership application and its master account application.  Throughout this parallel review process, the master account evaluation and the membership evaluation proceeded in tandem.

22

58.     For example, a May 10, 2022 email from Ben McGhee of the Reserve Bank stated that "there is a lot of overlap" between the membership and master account reviews.  FRBKC-00002200; *see also* FRBKC-00003428 (explaining that the supervisory review would feed into the membership and master account applications).  Similarly, Christi May-Oder sent an email indicating that "[i]t would be helpful to hear more about how their [sic] looking at it from a membership perspective" when deciding if the master account evaluation should cover Day 1 operations or longer-term plans.  FRBKC-00000480; FRBKC-00004282 at 2 ("We will look to examiners to identify any commitments related to potential Reserve Bank membership and any conditions to a potential master account access request decision.").  And, most notably, on December 6, 2022, Chris Gaul-Pearson emailed "I've been asked to see if you could help us make sure that we are not getting out of sync with the membership side.  ***We do not want to contradict one another***."  FRBKC-00002132 at 2.  Based on the Kansas City Reserve Bank's fear of contradicting the Board's decision on membership, the Kansas City Reserve Bank determined that its master account decision would "follow up very quickly after the membership decision."  FRBKC-00001668.

59.     Because the two evaluations were running in parallel, the Board's denial of Custodia's membership application effectively dictated the Kansas City Reserve Bank's decision on Custodia's master account application.  The Board's

23

membership denial order was an unprecedented 86 pages long, and presented an extremely negative (but often erroneous) depiction of Custodia and its business plan. It also was starkly at odds with more positive assessments that Kansas City staff had expressed about Custodia during their review process. ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Further, I note that none of the written correspondence from the Reserve Bank had introductory paragraphs that described insurmountable concerns. *See, e.g.,* FRB-AR-001204. In my experience, if Federal Reserve System staff believed Custodia's proposals were not approvable, they would have included such language.

60. Following the Board's publication of the membership denial, there was no possibility that Custodia's master account application would get approved. In fact, the Reserve Bank's denial of Custodia's master account application came just hours after the Board's denial action on the membership proposal. This clearly was a coordinated action. In my experience, the System works very hard to publicly present a united and consistent approach to regulating its banking entities throughout all twelve Reserve Banks. In light of the Board's Guidelines governing master accounts and the newly announced tiering classifications (discussed below), the

24

Reserve Bank functionally did not have any discretion in acting on Custodia's master account proposal independently of the Board's adverse action on the membership application.

**D.    The Board Issued Guidelines That Gave It Control over Master Accounts for Novel Banks Such as Custodia.**

61.    On May 11, 2021, the Board proposed Guidelines for Evaluating Account and Services Requests (the "Guidelines"), which became final on August 15, 2022.   The Guidelines did not exist before Custodia filed its application for a master account.

62.    The Guidelines were designed so "that the Reserve Banks [would] apply a consistent set of guidelines when reviewing [] access requests to promote consistency across Reserve Banks and to facilitate equitable treatment across institutions."   87 Fed. Reg. 51,099 at 51,106 (Aug. 19, 2022).   As the Board explained, there was a particular need for the Guidelines due to "a recent uptick in novel charter types being authorized or considered by federal and state banking authorities across the country.   As a result, the Reserve Banks are receiving an increasing number of inquiries and access requests from institutions that have obtained, or are considering obtaining, such novel charter types."   87 Fed. Reg. 51,099 at 51,099 (Aug. 19, 2022).

63.    The Guidelines created a System-wide policy for how Reserve Banks would adjudicate master account applications.   Section 1 of the Guidelines

establishes six principles focused on risk management and mitigation.  Section 2 describes how those principles will be applied within a three-tier review structure with different levels of scrutiny corresponding to the level of risk that the Board assigned to different entity categories.  Tier 1 institutions are eligible institutions that are federally insured.  Tier 2 institutions are not federally insured but are subject to prudential supervision by a federal banking agency.  Tier 3 institutions include eligible institutions like Custodia that are not federally insured, do not have a holding company subject to Federal Reserve oversight, are chartered under state law and are not subject to prudential supervision by a federal banking agency, or have a holding company that is not subject to Federal Reserve oversight.

64.    Under the Guidelines, Reserve Banks can grant Tier 1 institutions master accounts in a streamlined review process without much scrutiny.  Traditional financial institutions typically have federal insurance and are thus granted an easier path to Federal Reserve access due to their Tier 1 status.

65.    The presumption is reversed for Tier 2 and 3 institutions, which lack federal deposit insurance and/or a federal regulator.  Reserve Banks must exercise increased scrutiny over applications from these institutions, including consultation with the Board.  This "coordination" between the Reserve Banks and the Board effectively gives the Board veto power over which, if any, Tier 2 and 3 institutions

receive a master account.  In reality, though, the Board exercises its power long before any "recommendation" gets made by the Reserve Bank.

66.    Notably, since the Board started publicly keeping track of master account requests on December 23, 2022, only Tier 1 institutions have been granted master accounts.  Conversely, the only master account applications that have been rejected have come from Tier 3 institutions.  *See generally* Bd. of Govs. of the Fed. Reserve, *Master Account and Services Database*, available at https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm.

67.    It is my opinion that the Board developed the Guidelines to exert control over Custodia's master account application and similar future applications by novel banks.  The Board issued the proposed Guidelines in May 2021, almost seven months after Custodia had applied for a master account.  The Kansas City Reserve Bank made it clear that it would not decide Custodia's master account application until the Guidelines were finalized because such a decision would be "informe[d]" by the Guidelines, FRBKC-00000387 at 3, and that it would be "inappropriate" for the Kansas City Reserve Bank to reach a decision ahead of the finalized Guidelines.  FRB-AR-003858.

68.    On August 15, 2022, just one day before Defendants' motions to dismiss were due in this litigation, the Board issued its final Guidelines.  A month

later, the Kansas City Reserve Bank commenced evaluating Custodia as a Tier 3 institution.  FRBKC-00001601.  And one month after that, the Kansas City Reserve Bank informed Custodia that "[i]n applying the Account Access Guidelines, FRBKC has determined that under its current structure, Custodia qualifies as a Tier 3 institution, posing the highest level of risk and subject to the strictest level of review."  FRBKC-00000297.  But the Kansas City Reserve Bank also noted that "Custodia may become a Tier 2 institution under the Account Access Guidelines if it obtains membership in the Federal Reserve System." *Id*.

69.    Based on my experience working for the Board, the development and publication of the draft Guidelines shortly after Custodia applied for a master account, and the Kansas City Reserve Bank's swift reliance on the Guidelines in assessing Custodia's master account application, was not a coincidence.  Instead, given Custodia's novel proposal to provide custody services for crypto assets as well as Custodia's novel state banking charter, it is my opinion that the Board was particularly concerned with Custodia gaining access to the Federal Reserve System and therefore used the Guidelines to set up a process to ensure that the Board would be able to exert control over the ultimate decision through Custodia's status as a Tier 3 institution.  *See* FRBKC-00000394 (acknowledging that the connection between Custodia's master account application and the initial proposal of the Guidelines is "technically accurate").

70.    The Board's desire to use the Guidelines to exert control over Custodia's master account application was ultimately successful.  In March 2022, Kansas City Reserve Bank staff acknowledged "we do not anticipate Custodia obtaining a master account unless Custodia is granted FDIC insurance or becomes a Reserve member" because without FDIC insurance or Federal Reserve membership, Custodia would be a tier 3 institution.  FRBKC-00004943.  When asked about the practical effect of a tier 3 status, Christi May-Oder, an Assistant Vice President with the Kansas City Reserve Bank, admitted that "[e]ntities falling into Tier 3 will have a high bar to cross to get an account."  *Id*.  Ross Crouch who was responsible for conducting Custodia's examination agreed that "approval isn't anticipated if Tier 3 route is taken."  *Id*.  Using the tiering system that it had developed in direct response to Custodia's master account application, the Board effectively denied Custodia's master account application by denying its membership application.

71.    Issuance of the Guidelines gave the Board a way to control the master account application process, ensuring that even novel banks deemed eligible for master accounts such as Custodia, would find it almost impossible to secure them.

**E.    Through the Non-Public S-Letter Process, the Board Revised Parts of the Denial of Custodia's Master Account Application.**

72.    The Board's creation of System-wide policies to deal with applications from novel institutions did not end with the creation of the "Nontraditional Account Access Workstream Structure" or the publishing of the Guidelines.  Rather, the

29

Board took a further step when, on January 17, 2023, just days before the Reserve Bank denied Custodia Bank's master account application, the Board finalized and issued internal guidance letter, S-2677. FRB-AR-000014. This guidance is internal to the Federal Reserve System and hidden from public view. The S-2677 letter set out a mandatory review process that requires Reserve Banks to "consult" with the Board on Tier 2 and 3 institutions. One or more drafts of this internal guidance letter were circulated to the Kansas City Reserve Bank in 2022 and possibly much earlier, but to date neither the Board nor the Reserve Bank have produced those drafts or the communications surrounding them. It is my opinion that the letter itself, including the development of the draft versions, was another mechanism by which the Board exercised control over the outcome of Custodia's master account application.

73.     According to the S-2677 letter, Reserve Banks are required to provide the Board with early notification when Tier 2 or 3 institutions apply for a master account. FRB-AR-000014 at 3. This early notice allows the Board to influence the evaluation of Tier 2 and 3 institutions from the outset of the master account process. In addition, the Letter requires Reserve Banks to consult directly with a Division Director at the Board prior to communicating a decision on a master account to a Tier 2 or 3 institution. FRB-AR-000014 at 3. Under the terms of the S-2677 Letter, the Kansas City Fed could not approve Custodia's application without first "consult[ing]" with the Board. *Id*. Notably, this presumption against granting access

to Tier 2 and 3 institutions is reversed for Tier 1 institutions for which a Reserve Bank must notify the Board only if it is considering denying a master account application. *Id*.

74.    In my experience, the requirement that a Reserve Bank consult directly with a Division Director is highly unusual.  Typically, consultation with a Board staff member is sufficient, and the Board staff member decides whether to elevate the matter within the Board.  Requiring a Division Director to be consulted effectively removes decision-making authority from Reserve Banks.  While Reserve Banks may work collaboratively with Board staff, Reserve Banks would be extremely reluctant to countermand the opinion of a Board Division Director, who reports directly to the Governors of the Board.  By requiring consultation with a Division Director prior to the communication on a master account decision, the Board effectively established veto power over Reserve Bank decisions on master account applications for Tier 2 and 3 institutions.

75.    The Board's mandatory review process was deployed for the first time when evaluating Custodia's master account application. FRBKC-00000314 (describing "muddl[ing] through this process for more or less the first time").  On January 6, 2023, at a time when the Kansas City Reserve Bank still had the Custodia master account application under consideration, Judith Hazen, a Reserve Bank Vice President, sent an email and draft recommendation memorandum to members of the

31

Board.  *See* FRBKC-00012350 at 2 ("Pursuant to the proposed S Letter, we are providing our pre-decisional draft memorandum regarding potential actions on Custodia's request for a master account").  While the Kansas City Reserve Bank memo recommended denial of Custodia's master account application due to the earlier Board intervention described above, the Board's comments on and edits to the memo recommending master account denial served as the final nail in the coffin.

76.     The Kansas City Reserve Bank's recommendation memo regarding Custodia's master account application received heavy editing from Board staff.  As an initial matter, the Board requested that the Kansas City Reserve Bank revise the memo to "explicitly discuss the application of the Board's Account Access Guidelines to Custodia's request."  FRB-AR-000326.  The Board was expressly linking the recommendation memo to the Guidelines under which Custodia was a Tier 3 institution, virtually certain to be denied.

77.     The Board also tried to obfuscate the effect of being a Tier 3 institution under the Guidelines.  In a comment to one sentence, the Board asked, "[a]re you asserting that providing an account and/or services to any tier 3 institutions (without a federal regulator) would be contrary to Board policies?"  The Board then directed the Kansas City staff to "rework" this sentence.  FRB-AR-000326 at 8.  The resulting edit removed the implication that no Tier 3 institution could ever qualify for a master account (to preserve the fallacy that Tier 3 status was not a *de facto* denial), and

32

obscured the fact that Custodia was inevitably going to be denied a master account due to its Tier 3 status.

78.   The remaining Board-provided editing was nearly all negative towards Custodia's master account application.  Board staff requested that there be particular emphasis and elaboration on matters related to a high risk, highly volatile, so-called "monoline business," the alleged fostering of illicit activities just by engaging in crypto activities, and significant Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") risks.  *See, e.g.*, FRB-AR-000326 (Board comment on the "lack of visibility" for Custodia given the "monoline business model and the high volatility of the crypto industry"); *id.* at 2 (suggesting discussion of "BSA/AML risks"); *id.* at 3 (suggesting discussion of risks of "unregulated exchanges and cryptocurrencies").

79.   If the goal is for decision makers in the System to deny a proposal, using any combination of words such as high risk, high volatility, monoline business model, illicit activities, and BSA/AML risk, will achieve that result.  Decision makers in the System very rarely will approve a proposal that involves one of these characteristics.  Board staff doomed any chances of approval of Custodia's master account proposal by editing the Reserve Bank's recommendation memo to overly emphasize such risks.  The Board's comments on and edits to the memorandum effectively ensured that the application would be denied.

80. Moreover, these edits from the Board staff contravened written assessments from Reserve Bank staff about Custodia reflected in earlier documents. *See, e.g.*, FRBKC-00002183 (expressing doubt that issues with "monetary base size or collateral silos is likely to be a concern for the next several years"); ████████

████████████████████████████████████████

████████████████████ FRBKC-00000465 (noting that in the event of a bank failure "there wouldn't be much to unwind aside from the cash in the master account"); ████████████████████████████████████

████████████████ ████████████████ ████████ █

████████

81. On January 10, 2023, a section chief in the Board's Division of Monetary Affairs, via an email sent to several Kansas City Reserve Bank staff, also provided material edits to the Kansas City Reserve Bank's recommendation memo regarding Custodia Bank's master account application. FRB-AR-000313. These edits included adding that Custodia could "create more significant monetary policy implementation ... concerns." FRB-AR-000315 at 9. This was another edit that dictated the denial of a master account application. A Reserve Bank would never want to cause serious disruption to the System's ability to conduct monetary policy. Nor would a Reserve Bank question Board staff's determination that a financial

34

institution would seriously disrupt the System's ability to implement monetary policy.

82.     In another edit, the Board removed a sentence stating: "These are broad policy matters that extend beyond the Reserve Bank and while risk mitigation strategies are being contemplated by the Federal Reserve Board, practically, it is not clear how these controls would be implemented."  FRB-AR-000315 at 9.   The removal of this sentence had a twofold effect: first, it further obscured the Board's role in the denial of Custodia's master account application given that only the Board decides policy questions; second, it withdrew the possibility that Custodia could, at later date, be granted a master account once certain risk mitigation controls were in place at the Board level.

83.     The Reserve Bank staff's final memo substantially incorporated the Board's edits and comments.  There appears to have been no effort by Board staff to help the Reserve Bank make a balanced presentation that included discussion of the significant risk management framework that Custodia had developed to mitigate identified risks.  Board staff similarly made no effort to include a discussion of the benefits of bringing a special purpose bank such as Custodia into the federal bank regulatory system.  Relatedly, Board staff did not discuss the risks of not approving the application and having non-regulated entities provide crypto asset custody services in the United States.  In my experience, if the Board were attempting to

present an unbiased opinion rather than attempting to ensure a denial, it would have discussed these balancing factors.  Instead, I hold the opinion that the Board-edits made pursuant to the S-2677 letter were a one-sided presentation intended to justify the Board's intended outcome.

84.    The Guidelines and its implementing S-2677 letter ultimately gave the Board control not only over the ultimate decision on Custodia's master account application, but also the reasoning used for that decision.  The nature of the Board's edits and comments on the memo similarly ensured the desired outcome for Custodia's master account application—denial.

## VII.  CONCLUSION

85.    For the reasons explained above, it is my opinion that although the final Custodia master account decision was issued under the imprimatur of the Reserve Bank, the Board was pulling the strings.

86.    This is not surprising.  It is the Board which by law must decide policy questions, and this was a policy question that the Board Chair himself described as "just hugely precedential."  The years 2020 to 2023 were characterized by vigorous debate over crypto-assets which always seemed to be in the news – the rise and fall of the price of Bitcoin, the increasing percentage of the population holding those assets, regulatory rumblings, comments from Congress and the White House, and legal actions by agencies such as the SEC asserting that the crypto-assets were

36

securities under the Securities & Exchange Act and could be regulated.  Against this backdrop, with Custodia being the first financial institution seeking a master account with a novel plan to offer both ordinary banking services and crypto-asset services, the Board necessarily was the ultimate decision-maker.  The Board used direct and indirect methods to insert itself into the adjudication of Custodia's master account application including making the eligibility determination; halting the Kansas City Reserve Bank's examination of Custodia; denying Custodia's membership application; publishing the Guidelines; heavily editing the denial memo; and issuing the S-2677 Letter.  Given the degree of Board interference throughout Custodia's master account application process, it is my belief that the Kansas City Reserve Bank would have been unable to exercise any authority it might arguably have had in deciding Custodia's application.

87.    Because discovery is ongoing and the Kansas City Reserve Bank has not completed its production of documents, I reserve the right to modify or supplement the opinions set forth in my report and the bases for those opinions.

DATE: _10/25/23_

By: _Katie S. Cox_

Katie S. Cox

37

# EXHIBIT 1

## MATERIALS RELIED UPON LIST

- Amended Complaint and Exhibit 1, ECF No. 121
- Bd. of Govs. of the Fed. Reserve, *Federal Reserve announces denial of application by Custodia Bank, Inc., to become a member of the Federal Reserve System* (Jan. 27, 2023), available at https://www.federalreserve.gov/newsevents/pressreleases/orders20230127a.htm.
- Bd. of Govs. of the Fed. Reserve, *Master Account and Services Database*, available at https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm.
- Chair Jerome Powell, *Senate Committee on Banking, Housing, and Urban Affairs Confirmation Hearing* (Jan. 11, 2022)
- Letter from Custodia to Ross Crouch (Dec. 20, 2022)
- Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021)
- Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 15, 2022)
- U.S. Fed. Reserve Sys., *The Fed Explained: What the Central Bank Does*, available at federalreserve.gov/aboutthefed/the-fed explained.pdf
- White House, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* (Jan. 27, 2023)
- 12 C.F.R. 265.20
- 12 U.S.C. § 248
- 12 U.S.C. § 307
- Documents Produced by the Federal Reserve Bank of Kansas City, including: FRBKC-00000054; FRBKC-00000234; FRBKC-00000254; FRBKC-00000266; FRBKC-00000276; FRBKC-00000297; FRBKC-00000313; FRBKC-00000314; FRBKC-00000319; FRBKC-00000328; FRBKC-00000387; FRBKC-00000390; FRBKC-00000394; FRBKC-00000397; FRBKC-00000437; FRBKC-00000446; FRBKC-00000460; FRBKC-00000465; FRBKC-00000480; FRBKC-00000488; FRBKC-00000513; FRBKC-00000565; FRBKC-00000626; FRBKC-00000667; FRBKC-00001586; FRBKC-00001601; FRBKC-00001668; FRBKC-00001715; FRBKC-00001908; FRBKC-00001961; FRBKC-00002132; FRBKC-00002133; FRBKC-00002169; FRBKC-00002172; FRBKC-00002183; FRBKC-00002200; FRBKC-00002366; FRBKC-00002407; FRBKC-00002424; FRBKC-00002514; FRBKC-00002560; FRBKC-00002573; FRBKC-00002695; FRBKC-00002728; FRBKC-0000297;

FRBKC-00003309; FRBKC-00003331; FRBKC-00003348; FRBKC-00003379; FRBKC-00003421; FRBKC-00003424; FRBKC-00003426; FRBKC-00003428; FRBKC-00003432; FRBKC-00003561; FRBKC-00003592; FRBKC-00003607; FRBKC-00003671; FRBKC-00003695; FRBKC-00003950; FRBKC-00004229; FRBKC-00004256; FRBKC-00004282; FRBKC-00004620; FRBKC-00004638; FRBKC-00004647; FRBKC-00004677; FRBKC-00004710; FRBKC-00004768; FRBKC-00004808; FRBKC-00004836; FRBKC-00004899; FRBKC-00004902; FRBKC-00004904; FRBKC-00004916; FRBKC-00004943; FRBKC-00004977; FRBKC-00004983; FRBKC-00005021; FRBKC-00005060; FRBKC-00005156; FRBKC-00005172; FRBKC-00005232; FRBKC-00005243; FRBKC-00005245; FRBKC-00005326; FRBKC-00005333; FRBKC-00009364; FRBKC-00009369; FRBKC-00009384; FRBKC-00009385; FRBKC-00009848; FRBKC-00009854; FRBKC-00013627; FRBKC-0009385

- Documents Produced by the Board of Governors of the Federal Reserve System, including: FRB-AR-000001; FRB-AR-000002; FRB-AR-000003; FRB-AR-000004; FRB-AR-000014; FRB-AR-000068; FRB-AR-000153; FRB-AR-000154; FRB-AR-000162; FRB-AR-000163; FRB-AR-000191; FRB-AR-000201; FRB-AR-000204; FRB-AR-000216; FRB-AR-000222; FRB-AR-000227; FRB-AR-000233; FRB-AR-000245; FRB-AR-000247; FRB-AR-000250; FRB-AR-000298; FRB-AR-000306; FRB-AR-000308; FRB-AR-000313; FRB-AR-000315; FRB-AR-000323; FRB-AR-000324; FRB-AR-000326; FRB-AR-000333; FRB-AR-000334; FRB-AR-000335; FRB-AR-000336; FRB-AR-000345; FRB-AR-000356; FRB-AR-000359; FRB-AR-000362; FRB-AR-000461; FRB-AR-000549; FRB-AR-000561; FRB-AR-000589; FRB-AR-000629; FRB-AR-000634; FRB-AR-000638; FRB-AR-000679; FRB-AR-000740; FRB-AR-000920; FRB-AR-000950; FRB-AR-000956; FRB-AR-000964; FRB-AR-000986; FRB-AR-000991; FRB-AR-001145; FRB-AR-001191; FRB-AR-001202; FRB-AR-001204; FRB-AR-001210; FRB-AR-001211; FRB-AR-001318; FRB-AR-001323; FRB-AR-001400; FRB-AR-001409; FRB-AR-001533; FRB-AR-001593; FRB-AR-001599; FRB-AR-001607; FRB-AR-001673; FRB-AR-001690; FRB-AR-001696; FRB-AR-001754; FRB-AR-001806; FRB-AR-001810; FRB-AR-001835; FRB-AR-001853; FRB-AR-001857; FRB-AR-001859; FRB-AR-001862; FRB-AR-001865; FRB-AR-001872; FRB-AR-001874; FRB-AR-001898; FRB-AR-001983; FRB-AR-002188; FRB-AR-002238; FRB-AR-002240; FRB-AR-002248; FRB-AR-002264; FRB-AR-002273; FRB-AR-002414; FRB-AR-002415; FRB-AR-002433; FRB-AR-002446; FRB-AR-002448; FRB-AR-002471; FRB-AR-00250; FRB-AR-002508;

FRB-AR-002671; FRB-AR-002689l FRB-AR-002695; FRB-AR-002709;
FRB-AR-002729; FRB-AR-002758; FRB-AR-002767; FRB-AR-002909;
FRB-AR-002947; FRB-AR-002972; FRB-AR-002974; FRB-AR-002976;
FRB-AR-002979; FRB-AR-002989; FRB-AR-002991; FRB-AR-002993;
FRB-AR-003072; FRB-AR-003079; FRB-AR-003083; FRB-AR-003088;
FRB-AR-003233; FRB-AR-003259; FRB-AR-003269; FRB-AR-003276;
FRB-AR-003282; FRB-AR-003337; FRB-AR-003772; FRB-AR-003793;
FRB-AR-003858; FRB-AR-003860; FRB-AR-003863; FRB-AR-003917;
FRB-AR-003939; FRB-AR-003981; FRB-AR-003994; FRB-AR-003997;
FRB-AR-004014; FRB-AR-004026; FRB-AR-004110; FRB-AR-004113;
FRB-AR-004116; FRB-AR-004126; FRB-AR-004129; FRB-AR-004134;
FRB-AR-004138; FRB-AR-004142; FRB-AR-004144; FRB-AR-004178;
FRB-AR-004195; FRB-AR-004199; FRB-AR-004214; FRB-AR-004225;
FRB-AR-004353; FRB-AR-004369; FRB-AR-004381; FRB-AR-004383;
FRB-AR-004385; FRB-AR-004412; FRB-AR-004452; FRB-AR-004549;
FRB-AR-004558; FRB-AR-004585; FRB-AR-004588; FRB-AR-004593;
FRB-AR-004594; FRB-AR-004605; FRB-AR-004617; FRB-AR-004619;
FRB-AR-004783; FRB-AR-004786; FRB-AR-004796; FRB-AR-004805;
FRB-AR-004807; FRB-AR-004808

- Documents Produced by The Narrow Bank: TNB-0000002

# EXHIBIT 2

J.A.965



# Katie S. Cox

P.O. Box 171, Elkton, Virginia 22827| 703-640-8666| katie@coxfedlaw.com| LinkedIn KatieSCox

Former federal bank regulator with over 30 years of bank examination and mergers and acquisition experience.  Proven record of identifying and addressing corporate governance issues.  Material audit experience.  Significant experience in reviewing mergers and acquisition proposals for permissibility, strategic viability, and integration success.  In-depth expertise regarding U.S. federal and state regulation of digital assets.  Demonstrated ability to provide a regulator's point of view to make an organization regulatory compliant as well as financially successful.

## Corporate Governance Skills

- Board member of the Virginia State Golf Association.  Serve on the Strategic Planning, Governance and Finance Committees.
- Audit committee member of Custodia Bank, a digital asset products and service provider.
- Key presenter for the Federal Reserve's Large Banking Institution Director Orientation Program, which provides regulatory training for new directors of U.S. banking institutions with assets between $10 billion and $50 billion.
- Contributor to Federal Reserve Guidance SR 15-15 *Supervisory Concerns Related to Shareholder Protection Arrangements*, which describes unsafe and unsound issues related to certain provisions in shareholders' capital raising instruments.
- Federal bank examiner experience in assessing corporate governance adequacy, which included reviewing sufficiency of board packages and evaluating board member composition and effectiveness of oversight.

## Digital Transformation Regulatory Affairs Skills

- Regulatory affairs advisor for a de novo depository institution which will solely focus on digital asset products and services.  This institution applied with the Federal Reserve System for a master account and is working towards being the first U.S. digital asset-focused bank to receive such an account.
- Stay apprised of actions of U.S. regulators and legislators regarding a U.S. central bank digital currency as well as other digital assets and blockchain technology.

## Mergers & Acquisitions Skills

- Key official responsible for mergers and acquisitions in the Federal Reserve System.  Ensured that proposals met all statutory factors, including strategic future prospects; managed the review of proposals in a timely fashion; and developed recommendations for action on proposals.
- Presented policy setting or significantly large proposals to numerous chairs of the Federal Reserve, including Greenspan, Bernanke, Yellen and Powell, to seek a decision of approval or denial.
- Developed key regulatory M&A guidance, including SR 13-7 *State Member Bank Branching Considerations* and SR 14-*2 Enhancing Transparency in the Applications Process*.  This innovative guidance was designed to convey to the public mergers and acquisitions regulatory concerns that can hinder proposals.

# Work Experience

**PwC**

*May 2022- Present*
Consultant, Financial Services Risk & Regulatory Practice
Advise clients on a range of regulatory matters, including charter conversions, applications, regulatory strategy, and risk management.  Assist a range of traditional and nontraditional financial services firms with respect to regulatory communications and engagement strategies.

**Fitco Consulting Pte, Limited**

*July 2021 – January 2023*
Financial Services Regulatory Consultant
Fitco is an international company that connects subject matter experts with private and public entities. Currently advise several Asian clients regarding U.S. banking regulators' economic and digital assets policies as well as U.S. legislators' actions.  Areas of focus include the Federal Reserve's Federal Open Market Committee actions, the Federal Reserve's on-going consideration of developing a central bank digital dollar, and U.S. regulatory and legislative efforts concerning stablecoins and other digital assets.

**Custodia Bank, Inc. (formerly known as Avanti Financial Group)**

*May 2020 – Present*
Advisor
Custodia Bank is a *de novo* special purpose depository institution which will engage in a range of digital assets payments, custody, securities, and commodities activities for institutional customers. Responsibilities include providing business, industry, regulatory affairs, and product advice, as well as guidance related to the company's business strategies.  Provide government relations services.  Also serve on the company's audit committee.

**Board of Governors of the Federal Reserve System (Board)**

*Mergers & Acquisitions Section*

*November 2010 – March 2020*
Manager
Oversaw the review of the most complex domestic and international merger and acquisition proposals filed with the Federal Reserve System.  These proposals involved the offering of fintech products and services such as artificial intelligence, cryptocurrency, blockchain technology, and innovative money transmissions.  These proposals also included community bank acquisitions.  Collaborated with applicants to address regulatory concerns involving areas such as the long-term viability of a business plan, direct and indirect proposed owners, product risk management, concentrations related to revenues or assets, and Bank Secrecy Act compliance.  Reviewed organizational documents, capital instrument documents, and proposed management in order to identify corporate governance weaknesses.  Presented oral and written briefings to the Governors of the Board to obtain guidance for proposals that posed novel banking policy matters (including banking products or services) or involve very large banking institutions.  Served as one of the Federal Reserve's key drivers in the development of bank mergers and acquisitions policies.  Provided leadership in developing and implementing bank regulatory burden reduction initiatives, particularly for U.S. community banks.  Served as the Federal Reserve System's subject matter expert on Regulation W, which governs transactions between banks and their affiliates.

*March 2006 – October 2010*
<u>Senior Supervisory Financial Analyst</u>
Position required leadership skills to coordinate the review by Board and Reserve Bank staff and other banking regulators of complex mergers and acquisition proposals.  Served as analyst for several high profile, market disruption-related proposals filed during the height of the financial crisis.  These included the proposals to convert to bank holding companies by Ally (formerly GMAC) and Goldman Sachs, the acquisition of Merrill Lynch by Bank of America, and the acquisition of Countrywide by Bank of America.  Developed and presented briefings for policy setting proposals to the Governors of the Board, including several Chairs of the Board.

*March 2001 – February 2006*
<u>Supervisory Financial Analyst</u>
Performed financial and managerial reviews of proposals by domestic banks, foreign banks, and nonbanks that raised material supervisory, financial, and/or policy issues.  Coordinated these reviews with staff of the Board, the Reserve Banks, and other regulatory agencies.  Identified issues presented by such proposals and recommended appropriate solutions consistent with Federal Reserve System policies, procedures, and guidelines.  Developed written and/or oral presentations to the Governors of the Board to articulate Board staff's recommendations regarding the appropriate action on such banking proposals.  Served as the Board's primary analyst to review applications involving asset quality, securitization, and Regulation W issues.

*June 1999 – February 2001*
<u>Senior Financial Analyst</u>
Performed financial and managerial analysis of domestic and foreign bank proposals that raised supervisory, financial, or policy issues.  Developed written analysis and recommendations for immediate management.

**U.S. Air Force Audit Agency[1]**

*August 1997 – May 1999*
<u>Auditor</u>
Performed audits of U.S. Air Force entities.  Scope of work included researching prior audits, reviewing pertinent regulations and directives, and determining audit objectives.  Developed audit programs with specific audit steps to achieve the audit objectives.  Conducted audits that incorporated sampling techniques – both random and judgmental, reviewed internal controls, and determined compliance with applicable regulations and U.S. Air Force directives.  Developed recommendations for addressing identified weaknesses.  Presented findings and recommendations to military commanders in oral and written form.

**Federal Reserve System**

*April 1993 – June 1995*
<u>Commissioned Federal Bank Examiner</u>
Conducted examinations of commercial banks, foreign branches, Edge Act Corporations, and bank holding companies.  Directly supervised examination teams.  Scope of work encompassed evaluating internal audit systems and corporate governance, performing loan review, and evaluating the condition of the entities as related to capital, asset quality, management, earnings, and liquidity.  Reported findings to

---

[1] I temporarily left the Federal Reserve System in 1995 in order to accompany my husband on his active duty U.S. Air Force tours in Ramstein, Germany and San Antonio, Texas.  I was not employed for the first two years of his tour in Germany.

management of the banking entities and the Federal Reserve System in written and oral form.  Served as an instructor for the Federal Reserve System's core bank examiner school.

*August 1990 – March 1993*
<u>Associate Bank Examiner</u>
Performed loan review and served as examiner-in-charge of community banks and bank holding companies.  Served as assistant-in-charge of large and/or problematic institutions; primary function was to assess adequacy of internal control procedures.  Provided on the job training to less experienced examiners.

*January 1988 – July 1990*
<u>Assistant Bank Examiner</u>
Evaluated the audit functions and assessed the overall system of internal controls of commercial banks, foreign branches, and Edge Act Corporations.  Verified financial reports submitted to the Federal Reserve and determined compliance with various federal and state banking laws.

*November 1985 – December 1987*
<u>Financial Analyst</u>
Analyzed proposals submitted for bank holding company formations, acquisitions, and mergers involving financial institutions with assets between $20 million and $600 million.  Prepared written summary of findings, including detailed financial and managerial analysis of bank holding companies and banks for senior Reserve Bank management.

## Education & Certifications

**Central High School,** Woodstock, Virginia, High School Diploma, June 1981

**University of Virginia**, Charlottesville, Virginia, Bachelor of Science in Commerce, May 1985
Concentration in Finance with additional course working in accounting (21 hours)

**Kansas State University**, Manhattan, Kansas, Agricultural Lending School

**Commissioned Federal Bank Examiner**, Federal Reserve System, April 1993

## KATIE S. COX

## Board Experience

Board member, Virginia State Golf Association, Richmond, VA January 2022 - Present
Finance Committee, Mount Vernon Country Club, Alexandria, VA January 2008 - December 2018
Board member and Treasurer, Girl Scouts Overseas, Ramstein, Germany July 1995 - July 1997

## Other Interests

**Golf:**
2011 USGA Women's Mid-Amateur Competitor
2013 USGA Women's Senior Amateur Competitor
4-time Club Champion - Mount Vernon Country Club, Alexandria, VA
1-time Club Champion - Fort Belvoir Golf Club, Alexandria, VA
3-time Club Champion - Spotswood Country Club, Harrisonburg, VA
8-time member of winning team - Virginia Women's State Team Matches, Mount Vernon Country Club
2022 Ranked #5 VSGA Senior Women's Golfer
2022 Women's District of Columbia Golf Association's Senior Champion

# EXHIBIT AE

# [PUBLIC VERSION]

J.A.971

**C O N F I D E N T I A L**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

No. 1:22-cv-00125-SW

────────────────────────────────────────

DEPOSITION OF CAITLIN LONG

November 29, 2023

────────────────────────────────────────

CUSTODIA BANK, INC.,

Plaintiff,

vs.

FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL
RESERVE BANK OF KANSAS CITY,

Defendants.

────────────────────────────────────────

APPEARANCES:

      WILLIAMS, PORTER, DAY & NEVILLE, P.C.
         By Scott E. Ortiz, Esq.
         159 North Wolcott Street
         Suite 400
         Casper, WY  82601
         sortiz@wpdn.net
            Appearing on behalf of Plaintiff.

      KING & SPALDING LLP
         By Andrew Michaelson, Esq.
         1185 Avenue of the Americas
         34th Floor
         New York, NY  10036
         amichaelson@klaw.com.
            and
      HIRST APPLEGATE, LLP
         By Billie L.M. Addleman, Esq.
         1720 Carey Avenue
         4th Floor
         Cheyenne, WY  82003-1083
          baddleman@hirstapplegate.com
            Appearing on behalf of Defendant.

1     A    It depends what you mean by, "speedy like."

2   Again, Commissioner Forkner knew that there were

3   multiple states that had uninsured bank charters, and

4   I recall him telling me they were in the northeast.

5           Subsequently, as in much more recently, I

6   did go look at who had those charters and figure out

7   which states had them.  They are special purpose

8   uninsured charters that have, in the case of the ones

9   in the northeast, that have been around since the

10  late 1980s or early 1990s.

11    Q    Those charters don't involve digital assets,

12  though, right?

13    A    Correct.

14    Q    So here you're submitting a request for a

15  master account as an uninsured entity, folks on

16  digital assets --

17    A    Yes.

18    Q    -- right?  As of October of -- November

19  2020, were you aware of any uninsured entity with a

20  business model focused on digital assets that had a

21  master account?

22    A    I was not aware of any.  I do know now there

23  are 442 uninsured fed master account holders.  That's

24  publicly disclosed in the feds August database

25  update.

*Meadors Court Reporting*

1      A     No.  It was by Zoom.

2      Q     And how long did it last?

3      A     An hour.

4      Q     And who was the principal speaker on behalf

5   of Custodia?

6      A     I was.

7      Q     Did anyone else speak on behalf of

8   Custodia?

9      A     Derek Bush, and I'm not sure who else, but

10   the management team would have been on.

11      Q     Who were the primary speakers on behalf of

12   the board?

13      A     Mark.  It was Mark's meeting.

14      Q     So Mark Van Der Weide was the primary

15   speaker?

16      A     Yes.

17      Q     AND did you walk through this -- at that

18   time, where did Custodia's application for membership

19   stand?

20      A     We had not applied yet.

21      Q     Was that a subject of discussion at the

22   meeting, membership?

23      A     No.  Actually, what happened is I made the

24   comment that it was on our road map to apply for fed

25   membership, but my understanding based on advice we'd

1    received is that the fed does not want de novos to

2    become member banks until the banks had been

3    operating for a while and the kinks were worked out.

4          That prompted a call from Mark Van Der Weide

5    to Derek Bush right after the meeting to correct what

6    I had said, that the fed would welcome that, and

7    Derek and Mark spoke, and Derek's interpretation was,

8    "Mark is recommending that you apply for fed

9    membership, so let's do it."

10    Q    Do you recall whether the subject of

11    membership came up in this meeting that you had, the

12    Zoom meeting that you had with the board?

13    A    It definitely did because Mark made the

14    phone call on the basis of something I said, and I'm

15    just looking here to see if it's mentioned in the

16    slides or what the context was that would have

17    prompted Mark to make that phone call to Derek right

18    afterwards.  Nothing's jumping out at me, but

19    obviously, I did say something because he called to

20    correct, and Derek's interpretation of that was Mark

21    wants us to apply to become a member bank now instead

22    of waiting, and we did.

23    Q    Did you ask at that meeting -- did Custodia

24    ask at that meeting whether a decision on Custodia's

25    master account in the hands of the Board of

1     Q     Were those digital assets products and

2     services, though, were essential to Custodia's

3     profitability as a business, right?

4     A     Ultimately, yes.  And here's the disconnect.

5     Wyoming Division of Banking looked at us as a true de

6     novo that was staging over a three-year period

7     product launches.  The Kansas City Fed, contrary to

8     what Mark Van Der Weide told us, did not want a de

9     novo bank to be applying for membership because the

10    hurdle against which we were measured in the exam was

11    a bank that was fully operating with no ramp-up

12    period.

13    Q     Is it your testimony that it was improper

14    for Ross Crouch to include in this exam risk

15    management associated with digital asset products and

16    services that were not going to be rolled out on day

17    one?

18    A     It was inconsistent with the feds own SR, I

19    believe it was 2016, that makes reference to de novo

20    banks, and that's what Mark Van Der Weide had pointed

21    Derek Bush back to when he corrected my statement

22    about the fed not wanting de novo banks to apply for

23    membership until they've been operating for a while,

24    and he pointed to the fact that the fed had this

25    statement for de novo banks, but it was obvious that

1   the Kansas City Fed did not want a de novo bank to

2   apply for membership because the hurdle that it set

3   for us was so high.

4         And to give you an example, the entire

5   banking industry in the State of Wyoming has roughly

6   seven billion dollars in assets, and we as a de novo

7   bank were measured against a $50 billion complex bank

8   standard.

9   Q    You're, at this time, telling the fed that

10  you're going to launch with a narrow group of

11  products and services which will have Custodia

12  running at a loss, right?

13  A    Yes.

14  Q    Custodia would not be profitable?

15  A    That's normal for de novo banks.

16  Q    What's your basis for saying it's normal for

17  de novo banks?

18  A    Every bank before it launches has to spend

19  the money on the banking core, has to put the risk

20  management systems in place, has to put the financial

21  management systems in place.

22        It's the nature of a de novo that you have

23  to spend money before you generate your first dollar

24  of revenue.

25  Q    And for Custodia, profitability would be

# EXHIBIT AK

# [PUBLIC VERSION]

J.A.978

FEDERAL RESERVE BANK *of* KANSAS CITY

August 19, 2022

SENT VIA SECURED EMAIL

Caitlin Long, Chair/CEO
Custodia Bank, Inc.
Cheyenne, Wyoming 82001

Dear CEO Long:

As you are aware, the Federal Reserve Bank of Kansas City (Reserve Bank) plans to conduct a pre-membership examination of Custodia Bank, Inc. (Custodia) beginning September 6, 2022. The examination will use a Financial Date of June 30, 2022. The majority of examination work will be conducted offsite, with some onsite presence planned during the week of September 19, 2022.

The commercial examination will begin the week of September 6, 2022, and continue through the week of September 26, 2022. A review of Custodia's Bank Secrecy Act (BSA) and Anti-Money Laundering (AML) compliance program will take place concurrently with the commercial examination. The examination will also include a review of Custodia's information technology (IT) environment. The focus of this examination will be on overall risk management practices and products and services that will be in place when operations commence, or soon thereafter. If it is determined that additional review is necessary to evaluate the membership application, a future review (or reviews) may be conducted targeting planned digital asset-related products and services that are key to Custodia's longer term business plan. As indicated in prior communications, the information obtained during the pre-membership examination will also inform the ongoing master account request evaluation process.

To help facilitate our offsite analysis and review, please send the requested information directly to our office by the dates listed below.

- Attachment I:  Items requested for review for the various business areas and functions should be submitted to the Reserve Bank by **September 6, 2022,** with BSA requested documentation submitted to the Reserve Bank by **August 29, 2022**.
- Attachment II: Information Technology Request List – items should be returned to the Reserve Bank by **September 6, 2022.**
- Attachment III:  Risk Management Questionnaire should be completed and returned by **September 6, 2022.**
- Attachment IV:  Directors and Executive Officers Information should be completed and submitted by **September 12, 2022.**

CONFIDENTIAL

**J.A.979**
Custodia-00009860

RESTRICTED FR // EXTERNAL



The Federal Reserve System requires that electronic information be provided in a secure manner. You may email materials to me at ross.crouch@kc.frb.org using the secure TLS connection.

I hope this advanced listing will help your staff more conveniently prepare for our upcoming examination. If you have any questions or are unsure of how to respond to any item, please contact me at (816) 881-2686 or via e-mail.

Sincerely,

Ross Crouch
Examiner in Charge

Attachments

CONFIDENTIAL

J.A.980
Custodia-00009861

## Attachment IV
## Directors and Executive Officers Information

Directors First, Then Executive Officers)

| Name Bank Title City, State Committee Assignments | Date of Birth Year Elected Meetings Missed | Present Salary Last Year's Bonus | Years in Present Position Years with Bank Number of Shares Owned | (A) Primary Bank Responsibilities (B) Occupation, if other than banking (C) Position in other financial institutions (D) Other Professional Expertise (E) Civic and Community positions held |
|---|---|---|---|---|
| Name: | Date of Birth: | Present Salary: | Years in Present Position: | A) |
| Bank Title: | | | | B) |
| | | | | C) |
| City, State: | Year Elected: | Bonus Last Year: | Years with Bank: | D) |
| | | | | E) |
| Committee Assignments: | Meetings Missed: | | Number of Shares Owned: | |
| Name: | Date of Birth: | Present Salary: | Years in Present Position: | A) |
| Bank Title: | | | | B) |
| | | | | C) |
| City, State: | Year Elected: | Bonus Last Year: | Years with Bank: | D) |
| | | | | E) |
| Committee Assignments: | Meetings Missed: | | Number of Shares Owned: | |
| Name: | Date of Birth: | Present Salary: | Years in Present Position: | A) |
| Bank Title: | | | | B) |
| | | | | C) |
| City, State: | Year Elected: | Bonus Last Year: | Years with Bank: | D) |
| | | | | E) |

CONFIDENTIAL

**J.A.981**
Custodia-00009862

**Attachment IV**
**Directors and Executive Officers Information**

| Committee Assignments: | Meetings Missed: | Number of Shares Owned: |
|---|---|---|
| | | |

# EXHIBIT AL

# [PUBLIC VERSION]

J.A.983

Hazen

EXHIBIT NO. 24
DI 723
METROPOLITAN
COURT REPORTING & LEGAL VIDEO

Message

| | |
|---|---|
| **From:** | Hazen, Judith [/o=ExchangeLabs/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=7350443e31634d16b20426c96a89699c-J1JHH02] |
| **Sent:** | 12/06/2022 7:14:31 PM |
| **To:** | Fitzgerald, Nancy [nancy.fitzgerald@kc.frb.org] |
| **CC:** | Baxter, Ashle [ashle.baxter@kc.frb.org] |
| **Subject:** | Re: Custodia Memo to Esther |

Perfect, thank you!

Get Outlook for iOS

**From:** Fitzgerald, Nancy <nancy.fitzgerald@kc.frb.org>
**Sent:** Tuesday, December 6, 2022 5:32:45 PM
**To:** Hazen, Judith <judith.hazen@kc.frb.org>
**Cc:** Baxter, Ashle <Ashle.Baxter@kc.frb.org>
**Subject:** RE: Custodia Memo to Esther

RESTRICTED FR // FRSONLY

## RESTRICTED FR // FRSONLY

Judith – Just wanted to let you know that I asked Chris GP to set up a meeting with you, Christi, himself, Ashle, Ben and me to discuss his request below.

Nancy



**Nancy Fitzgerald, CFA**
*Lead Risk Specialist*
P: 816.206.9877  E: nancy.fitzgerald@kc.frb.org
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive  ·  Kansas City, Missouri 64198  ·  www.kansascityfed.org

**From:** Baxter, Ashle <Ashle.Baxter@kc.frb.org>
**Sent:** Tuesday, December 06, 2022 3:17 PM
**To:** Hazen, Judith <judith.hazen@kc.frb.org>
**Cc:** Fitzgerald, Nancy <nancy.fitzgerald@kc.frb.org>
**Subject:** FW: Custodia Memo to Esther

RESTRICTED FR // FRSONLY

## RESTRICTED FR // FRSONLY

Hi Judith, would you have a couple of minutes to chat with Nancy and me on this request and give us a little better idea of what Chris is looking for?  Neither of us have thought about things from the master account perspective for a while and want to make sure we understand so we can get Ester the most relevant information.

Thanks,

CONFIDENTIAL

FRBKC-00002132

**J.A.984**

Ashle

**From:** Gaul-Pearson, Chris <chris.gaul-pearson@kc.frb.org>
**Sent:** Tuesday, December 6, 2022 12:34 PM
**To:** Baxter, Ashle <Ashle.Baxter@kc.frb.org>; McGhee, Ben <Ben.McGhee@kc.frb.org>; Fitzgerald, Nancy <nancy.fitzgerald@kc.frb.org>
**Subject:** Custodia Memo to Esther

RESTRICTED FR // FRSONLY

**RESTRICTED FR // FRSONLY**

Good afternoon,

CRRM is working on a memo to Esther regarding a potential decision on Custodia's master account.  This is moving pretty quick and there are some gaps that Judith, Christi and I would like your help filling in given you are the experts.  Content and structure of this memo is still being discussed, but we are hoping to add some specific detail, some of which you've probably documented elsewhere.  Is this something you all are available to help support this week?  I will say this memo and situation remains fluid and I will communicate any changes as I become aware.

Nancy – Could you add context to the capital section?  Specifically highlighting capital issues with SPDIs and Custodia in particular.  If possible, could you also indicate which issues are curable versus those that are not or may not be curable?
Ben – At this time, I've been asked to see if you could help us make sure that we are not getting out of sync with the membership side.  We do not want to contradict one another.  There may be additional asks by Judith for assistance with the memo, but nothing specific at this moment.
Ashle – From the digital asset perspective, permissibility aside, are there any issues that are not fixable/curable that we should be considering from a master account perspective?

President George Custodia Recommendation Memo .docx

You should be able to edit the document using the link, but please let me know if you have any issues.  Also, if you have any questions, please let me know.

Thanks,

**Chris Gaul-Pearson**
*Manager, Credit, Reserves, and Risk Management Department*
P: *816.881.2553*  Dept: *800.333.2987*  E: *chris.gaul-pearson@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive  ›  Kansas City, Missouri 64198  ·  www.kansascityfed.org

# EXHIBIT AN

# [PUBLIC VERSION]

Message

**Sent:** 2/28/2022 11:58:58 AM
**Subject:** Notes from 1/26 Meeting with the Board

- # Redacted

- Avanti Supervisory Review
  - Feed into membership and Master Account applications
  - In the absence of a master account being granted in the near future, the organization plans to establish an account/partnership with Cross River (New Jersey) and become operational at the beginning of April. However, the Avit and cryptocurrency activities will not be pursued right away.
  - Wyoming's list of requirements for the Avit.

- Master Account
  - Letter to, and conversation with, Wyoming Attorney General to hear them out and provide additional context on why our review of the request/
    - No further action required at this time.
    - However, more questions will come.
  - Senator Lumis' concerns address both Avanti and existing banking/regulatory firms.
  - Legal eligibility would allow Accuity to issue an account to Avanti for testing purposes only.

- Membership
  - ○



**Jeff Imgarten**
*Assistant Vice President | Applications & Enforcement*
P: 816.881.2073   E: jeffrey.imgarten@kc.frb.org
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive    Kansas City, Missouri 64198    www.kansascityfed.org 

*Please use E-Apps - a secure web-based system that allows organizations to submit applications to the Federal Reserve online. No Postage, No Cost. Click here for details*



EXHIBIT 115
WIT Imgarten
DATE: 10-24-23
Peggy Corbett RDR, CSR, CRR, CCR

CONFIDENTIAL

FRBKC-00003488
J.A.987

# EXHIBIT AS

# [PUBLIC VERSION]

J.A.988

INTERNAL FR/OFFICIAL USE // FRSONLY



BOARD OF GOVERNORS
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D.C. 20551



ADDRESS OFFICIAL CORRESPONDENCE
TO THE BOARD

S-2677

January 17, 2023

## TO THE PRESIDENT AND FIRST VICE PRESIDENT OF EACH FEDERAL RESERVE BANK

On August 15, 2022, the Board announced Guidelines for Evaluating Account and Services Requests (Guidelines) to be applied by Federal Reserve Banks (Reserve Banks) in their evaluation of requests for Reserve Bank accounts and services [Attachment 1]. In addition, the Board has approved a policy establishing an internal review process for such requests [Attachment 2]. Under this policy, the Board expects the Reserve Banks to (1) establish and maintain Federal Reserve System (System) implementation procedures for the Guidelines, (2) participate in an access request information sharing forum, and (3) consult, as appropriate, with Board staff.

Copies of the Guidelines and the policy are attached.[1]  The Guidelines were effective August 19, 2022, upon publication in the *Federal Register*.  If you have questions about the foregoing, please contact Jason Hinkle at (202) 912-7805.

Very truly yours,

*(Signed) Ann E. Misback*

Ann E. Misback
Secretary

Attachments

---

[1] The guidelines are also available on the Board's public website:
https://www.federalreserve.gov/newsevents/pressreleases/files/other20220815a1.pdf

FRB-AR-000014

INTERNAL FR/OFFICIAL USE // FRSONLY

*Attachment 1 to S-2677*

**Procedures for the Provision of Accounts and Services to Institutions**

### I. Overview

Under its general supervisory authority over Federal Reserve Banks (Reserve Banks) in section 11(j) of the Federal Reserve Act, the Board of Governors of the Federal Reserve System (Board) has issued *Guidelines for Evaluating Account and Services Requests* (Guidelines). The Guidelines are intended to be used by Reserve Banks in evaluating requests for master accounts and access to Reserve Bank financial services (access requests) as well as in cases in which a Reserve Bank determines to reevaluate the risks associated with existing accounts or existing access to Reserve Bank financial services (existing access relationships).[1] The Guidelines reflect the Federal Reserve's policy goals of (1) ensuring the safety and soundness of the banking system, (2) effectively implementing monetary policy, (3) promoting financial stability, (4) protecting consumers, and (5) promoting a safe, efficient, inclusive, and innovative payment system. The Guidelines are designed to support consistency in approach and decision-making across Reserve Banks, while recognizing the discretion granted to the Reserve Banks under section 13 of the Federal Reserve Act to grant or deny access requests or to take action on existing access relationships.

### II. Board Expectations

Accordingly, the Board expects the Reserve Banks to (1) establish and maintain Federal Reserve System (System) implementation procedures for the Guidelines, (2) participate in an access request information sharing forum, and (3) consult, as appropriate, with Board staff, each as outlined below.

(1) *System Implementation Procedures.* The System implementation procedures for the Guidelines should be approved and maintained by the Conference of Presidents (COP) or its delegate. These procedures should provide a general process flow, describe the information to be gathered, and provide guidance on analyzing the types of risk identified in the Guidelines. The procedures should reflect the guidance provided by the Board in the Guidelines, including that the Reserve Banks should consider, to the extent possible, the assessments of an institution by its existing state and/or federal supervisors when the Reserve Banks conduct their independent analysis of an institution's risk profile. The procedures should also provide guidance on the implementation of the three-tier review framework outlined in Section 2 of the Guidelines.

Following COP approval of the System implementation procedures (or any amendments to the procedures), the Reserve Banks must provide the procedures or amendments to the director of the Division of Reserve Bank Operations and Payment Systems (RBOPS). The procedures or amendments shall not take effect if the director of RBOPS (or director's designee), in consultation with the Board's general counsel (or the general counsel's designee), raises an objection within 10 business days of receipt.

(2) *Information Sharing Forum.* On an ongoing basis, Reserve Banks should consult with the other Reserve Banks and Board staff, as appropriate, via an information sharing forum to discuss

---

[1] The Guidelines do not apply to certain requests, including requests for joint accounts. See the Guidelines for additional detail.

administration of access requests, implementation of the Guidelines, and other related issues. To further the goal of consistency in evaluations across the System, Reserve Banks should consider as part of the information sharing forum how other Reserve Banks have evaluated similar access requests. The information sharing forum is the responsibility of the COP or its delegate and should include members from all Reserve Banks and be open to Board staff liaisons.

(3) *Preliminary Notification to Board Staff.* Reserve Banks should notify Board staff when new access requests and reevaluations of existing access relationships under the Guidelines involve higher-risk institutions or raise unusual, novel, or complicated issues. This includes, but is not limited to, all reviews related to institutions that are included in Tiers 2 and 3. The standard System implementation procedures for the Guidelines should identify potential situations in which preliminary notification to appropriate Board staff is recommended during the analysis stage and provide an opportunity for appropriate Board staff to advise on the analysis. In addition, as discussed below, Reserve Banks should consult with the director of RBOPS prior to communicating decisions on certain higher risk actions, as described below.

### III. Board Consultation Process

The Board expects the Reserve Banks to consult, as appropriate, with Board staff to provide insight into application of the Guidelines to requests and to further support consistency in decision-making across Reserve Banks. At the same time, as noted above, the Board recognizes the discretion granted to the Reserve Banks under section 13 of the Federal Reserve Act to grant or deny access requests or to take action on existing access relationships.

(1) *Access Approvals for Higher Risk Entities.* Any Reserve Bank that is considering approval of an access request from a higher risk entity, including all Tier 2 or Tier 3 institutions, should consult with the director of RBOPS on the results of its pre-decisional analysis under the Guidelines prior to communicating any decision to the institution.[2] The director of RBOPS will review, in coordination with other Board divisions (such as Legal, Monetary Affairs, Supervision and Regulation, and Financial Stability), as appropriate, the Reserve Bank's record documenting application of the Guidelines in evaluating the access request, including the risk level after implementation of the Reserve Bank's plans to mitigate any risks identified. As part of this consultation, the Reserve Bank should provide the director of RBOPS sufficient time for appropriate review and coordination with other Board divisions. Prior to granting an access request, the Reserve Bank should confirm in writing to the director of RBOPS how it has addressed any concerns the RBOPS director has raised regarding such request.

(2) *Denial of Access Requests.* Any Reserve Bank that is considering denying any access request, including an access request from an institution in Tier 1, should consult the director of RBOPS prior to communicating any decision to the requesting institution.[3] The director of RBOPS will

---

[2] Most requests for master accounts by U.S. branches and agencies of foreign banks (FBOs) are expected generally to be routine, and accordingly Reserve Banks need not consult with the Board regarding such requests in most cases. However, Reserve Banks should consult RBOPS regarding account requests from U.S. branches and agencies of FBOs that may present novel risks (e.g., if an FBO functions primarily as a financial market infrastructure).

[3] If Reserve Bank legal in consultation with Board Legal decides an institution is not eligible under the Federal Reserve Act or other federal statute to maintain an account at a Reserve Bank, then the decision is not subject to further Board staff consultation.

FRB-AR-000016

**J.A.991**

INTERNAL FR/OFFICIAL USE // FRSONLY

review the record created by the Reserve Bank in support of the decision, as discussed in III(1) above.

(3) *Involuntary Access Termination.* Any Reserve Bank that is considering an involuntary termination of access should consult the director of RBOPS prior to communicating any decision to an institution. The director of RBOPS will review the record created by the Reserve Bank in support of the decision, as discussed in III(1) above.

FRB-AR-000017

**J.A.992**

INTERNAL FR/OFFICIAL USE // FRSONLY

*Attachment 2 to S-2677*

**FEDERAL RESERVE SYSTEM**

**Docket No. OP-1747**

**Guidelines for Evaluating Account and Services Requests**

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Final Guidance

**SUMMARY:** The Board of Governors of the Federal Reserve System (Board) has approved final guidelines (Account Access Guidelines) for Federal Reserve Banks (Reserve Banks) to utilize in evaluating requests for access to Reserve Bank master accounts and services (accounts and services).

**DATE:** **Implementation Date is August 19, 2022.**

**FOR FURTHER INFORMATION CONTACT:**

Jason Hinkle, Assistant Director (202-912-7805), Division of Reserve Bank Operations and Payment Systems, or Gavin Smith, Senior Counsel (202-452-3474), Legal Division, Board of Governors of the Federal Reserve System.  For users of Telecommunications Device for the Deaf (TDD) only, please contact 202-263-4869.

**SUPPLEMENTARY INFORMATION:**

**I.  Background**

The payments landscape is evolving rapidly as technological progress and other factors are leading both to the introduction of new financial products and services and to different ways of providing traditional banking services.  Relatedly, there has been a recent

FRB-AR-000018

**J.A.993**

uptick in novel charter types being authorized or considered by federal and state banking authorities across the country.  As a result, the Reserve Banks are receiving an increasing number of inquiries and access requests from institutions that have obtained, or are considering obtaining, such novel charter types.

A.    *Summary of May 2021 Proposed Account Access Guidelines*

On May 5, 2021, the Board requested comment on proposed guidelines to be used by Reserve Banks in evaluating requests for accounts and services (Original Proposal or Proposed Guidelines).[1,2]  The Original Proposal reflected the Board's policy goals of (1) ensuring the safety and soundness of the banking system, (2) effectively implementing monetary policy, (3) promoting financial stability, (4) protecting consumers, and (5) promoting a safe, efficient, inclusive, and innovative payment system.  The Original Proposal was also intended to ensure that Reserve Banks apply a transparent and consistent set of factors when reviewing requests for access to accounts and services (access requests).[3]

The Original Proposal consisted of the following six principles:

1.  Each institution requesting an account or services must be eligible under the Federal Reserve Act or other federal statute to maintain an account at a Reserve Bank and receive Federal Reserve services and should have a well-founded, clear, transparent, and enforceable legal basis for its operations.

---

[1] 86 FR 25865 (May 11, 2021).

[2] The Proposed Guidelines are designed to be applied to both new and pending access requests as well as cases where the Reserve Bank determines to reevaluate the risk of existing accounts.  This broad application is intended to ensure that risks are identified and mitigated and that institutions are treated in a fair and equitable manner.

[3] In developing the Account Access Guidelines, the Board sought to incorporate as much as possible existing Reserve Bank risk management practices.

INTERNAL FR/OFFICIAL USE // FR5ONLY

2. Provision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber or other risks to the Reserve Bank.

3. Provision of an account and services to an institution should not present or create undue credit, liquidity, operational, settlement, cyber or other risks to the overall payment system.

4. Provision of an account and services to an institution should not create undue risk to the stability of the U.S. financial system.

5. Provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, or other illicit activity.

6. Provision of an account and services to an institution should not adversely affect the Federal Reserve's ability to implement monetary policy.

The first principle specified that only institutions that are legally eligible for access to Reserve Bank accounts and services would be considered for access. The remaining five principles addressed specific risks, ranging from narrow risks (such as risk to an individual Reserve Bank) to broader risks (such as risk to the U.S. financial system).[4] For each of these five principles, the Original Proposal set forth factors that Reserve Banks should consider when evaluating an institution's access request against the specific risk targeted by the principle (several factors are pertinent to more than one principle). The identified factors are commonly used in the regulation and supervision of federally-insured institutions and many

---

[4] The six principles were designed primarily as a risk management framework and, as such, focused on risks an institution's access could pose. The Board notes, however, that granting an access request could also have net benefits to the financial system.

INTERNAL FR/OFFICIAL USE // FRSONLY

of the factors are utilized in existing Reserve Bank risk management practices. The Original Proposal noted that requests from non-federally-insured institutions would generally be subject to a greater level of review. In addition, the Board noted that, when applying the Account Access Guidelines, the Reserve Bank reviewing the access request should integrate to the extent possible the assessments of the requesting institution by its state and/or federal supervisors into the Reserve Bank's own independent assessment of the institution's risk profile.

The Board intended for the Original Proposal to support consistency in evaluating account access requests across Reserve Banks, while maintaining the discretion granted to the Reserve Banks under the Federal Reserve Act to grant or deny access requests. The Board noted in the Original Proposal that a consistent framework across Reserve Banks would reduce the potential that one Reserve Bank might be considered to be more likely to grant access requests than another Reserve Bank and would mitigate the risk that an individual access request decision by one Reserve Bank could create de facto Federal Reserve System policy regarding access requests for a particular business model or risk profile.

The Original Proposal was based on a foundation of risk management and mitigation. In developing the Original Proposal, the Board considered the risks that may arise when an institution gains access to accounts and services. These risks include, among others, risks to the Reserve Banks, to the payment system, to the financial system, and to the effective implementation of monetary policy. The Original Proposal would prompt the Reserve Bank to evaluate an eligible institution's risk profile and identify risk-mitigation

FRB-AR-000021

**J.A.996**

INTERNAL FR/OFFICIAL USE // FRSONLY

strategies adopted by the eligible institution (including capital, risk management frameworks, compliance with regulations, and supervision) as well as potential risk mitigants that could be implemented by the Reserve Bank (including account agreement provisions, restrictions on financial services accessed, and account risk controls).

In the Original Proposal, the Board expressed the Federal Reserve's broad policy goals in providing accounts and services. In addition, the Board stated that, while the Proposed Guidelines would be intended primarily to apply to new access requests, Reserve Banks would also apply them to existing account and services relationships where appropriate, such as when a Reserve Bank becomes aware of a significant increase in the risks that an account holder presents due to changes in the nature of, for example, its principal business activities or condition.

The Board requested comment on all aspects of the Original Proposal, including whether the scope and application of the Proposed Guidelines was sufficiently clear and appropriate to achieve their intended purpose. The Board also requested comment on whether other criteria or information might be relevant when Reserve Banks evaluate access requests. The Board further sought comment specifically on the following aspects of the Original Proposal:

1. Do the Proposed Guidelines address all the risks that would be relevant to the Federal Reserve's policy goals?

2. Does the level of specificity in each principle provide sufficient clarity and transparency about how the Reserve Banks will evaluate requests?

3. Do the Proposed Guidelines support responsible financial innovation?

FRB-AR-000022

INTERNAL FR/OFFICIAL USE // FRSONLY

Finally, the Board sought comment on whether the Board or the Reserve Banks should consider other steps or actions to facilitate the review of access requests in a consistent and equitable manner.

### B.    *Summary of March 2022 Supplemental Notice*

On March 1, 2022, the Board published a second notice (the Supplemental Notice),[5] which proposed to incorporate into the Account Access Guidelines a tiered review framework to provide additional clarity on the level of due diligence and scrutiny that Reserve Banks would apply to different types of institutions when applying the six risk-based principles.

In the Original Proposal, the introductory text to the Account Access Guidelines noted that the application of the Guidelines to requests by federally-insured institutions should be fairly straightforward, while requests from non-federally-insured institutions may necessitate more extensive due diligence. The Supplemental Notice proposed a three-tiered review framework—which would become Section 2 of the Account Access Guidelines—to provide additional clarity regarding the minimum level of review for different types of institutions.

Under the Supplemental Notice, proposed Tier 1 would consist of eligible institutions that are federally-insured. These institutions are already subject to a homogeneous and comprehensive set of federal banking regulations, and, in most cases, detailed regulatory and financial information about these firms would be readily available to Reserve Banks.

---

[5] 87 FR 12957 (March 8, 2022).

Accordingly, the Supplemental Notice stated that access requests by Tier 1 institutions would generally be subject to a less intensive and more streamlined review.[6]

In the Supplemental Notice, proposed Tier 2 would consist of eligible institutions that are not federally-insured but that are subject to federal prudential supervision at the institution and, if applicable, at the holding company level.[7] The Supplemental Notice explained that Tier 2 institutions are subject to similar but not identical regulations as federally-insured institutions, and as a result, may present greater risks than Tier 1 institutions. Additionally, detailed regulatory and financial information regarding Tier 2 institutions is less likely to be available and may not be available in public form. Accordingly, the Supplemental Notice stated that access requests by Tier 2 institutions would generally receive an intermediate level of review.

In the Supplemental Notice, proposed Tier 3 would consist of eligible institutions that are not federally insured and not subject to prudential supervision by a federal banking agency at the institution or holding company level. The Supplemental Notice stated that Tier 3 institutions may be subject to a supervisory or regulatory framework that is substantially different from, and possibly weaker than, the supervisory and regulatory framework that applies to federally-insured institutions, and as a result may pose the highest level of risk. Detailed regulatory and financial information regarding Tier 3 institutions may not exist or

---

[6] The Supplemental Notice stated that, in cases where the application of the Guidelines to a Tier 1 institution identifies a potentially higher risk profile, the institution would receive additional attention.

[7] The Supplemental Notice noted the Board would expect holding companies of Tier 2 institutions to comply with similar requirements as holding companies subject to the Bank Holding Company Act.

INTERNAL FR/OFFICIAL USE // FRSONLY

may be unavailable. Accordingly, the Supplemental Notice stated that access requests by Tier 3 institutions would generally receive the strictest level of review.

The Board sought comment on all aspects of the proposed three-tiered review framework.

## II.    Discussion

The Board is adopting final Account Access Guidelines. Section 1 of the final Account Access Guidelines is substantially the same as the Original Proposal with minor changes to improve clarity in response to comments received. As described further below, the Board has made certain changes in Section 2 of the final Account Access Guidelines to provide more comparable treatment between non-federally-insured institutions chartered under state and federal law. Specifically, the Board has revised Tier 2 to include a narrower set of non-federally-insured national banks than the definition proposed in the Supplemental Notice.[8] Under the revised Tier 2, non-federally-insured institutions that are chartered under federal law will only be considered in Tier 2 if the institution has a holding company that is subject to Federal Reserve oversight. In addition, the Board is updating the Section 2 tiering framework to emphasize that the review of institutions' requests will be completed on a case-by-case, risk-focused basis within each of the three tiers.[9] For example, Reserve Banks may take comparatively longer to review access requests by institutions that engage in novel

---

[8] These revisions to Tier 2 apply only to non-federally-insured institutions chartered under federal law. Under the final Account Access Guidelines, a non-federally-insured institution chartered under state law will (consistent with the Supplemental Notice) be considered in Tier 2 if (i) the institution is subject to prudential supervision by a federal banking agency, and (ii) to the extent the institution has a holding company, that holding company is subject to Federal Reserve oversight.

[9] As described further below, the Board is making some other minor updates to Section 2 of the Account Access Guidelines, including clarifying that Edge and Agreement Corporations and U.S. branches and agencies of foreign banks would fall under a Tier 2 level of review due to Federal Reserve oversight over these institutions.

activities for which authorities are still developing appropriate supervisory and regulatory frameworks.

By adopting the final Account Access Guidelines, the Board would establish a transparent and equitable framework for Reserve Banks to apply to all access requests. To promote consistency, the Reserve Banks are working together, in consultation with the Board, to expeditiously develop an implementation plan for the final Guidelines.

### A. *Comments on the Original Proposal*

The Board received 46 individual comment letters and 281 duplicate form letters in response to the Original Proposal. Nearly all of the comment letters expressed general support for the Proposed Guidelines, and most letters also made recommendations for improvements. Commenters represented several types of institutions, including (1) institutions with traditional charters, such as banks and credit unions, and their trade associations; (2) institutions with novel charters, such as cryptocurrency custody banks, and their trade associations; and (3) think tanks and non-profit advocacy groups. The views expressed by the first category of commenters often conflicted with the views expressed by the second category of commenters. The duplicate form letters included recommendations that mirrored those submitted by trade associations for institutions with traditional charters, which opposed greater account access for institutions with novel charters.

Many commenters provided general comments on the Original Proposal that addressed one or more of three high-level themes: (1) policy requirements to gain access to accounts and services; (2) implementation of the Proposed Guidelines; and (3) legal eligibility for Reserve Bank accounts. Some commenters made recommendations related to

FRB-AR-000026

**J.A.1001**

INTERNAL FR/OFFICIAL USE // FRSONLY

the Proposed Guidelines that did not fit into these themes and are also described below. Lastly, some commenters provided responses to the specific questions posed in the Original Proposal as well as comments on specific principles in the Proposed Guidelines.

### 1. Policy Requirements to Gain Access to Accounts and Services

Most commenters, while supporting the Proposed Guidelines, provided recommendations for improvements to the Guidelines that, in their view, would assist the Board in achieving its stated policy goals. These recommendations to amend the Proposed Guidelines were often conflicting.

Many commenters made recommendations that would, in their view, provide an easier path for institutions, particularly those with novel charters, to successfully gain access to accounts and services. Some of these commenters recommended that the Board provide more specific requirements for access requests, so that requesting institutions, chartering authorities, and other banking regulators would have more clarity on what is required for obtaining access to accounts and services. Other commenters stated that the Proposed Guidelines may be ineffective if they are implemented in a way that subjects institutions with novel charters to restrictions that resemble regulatory requirements that do not fit their business models. While some commenters generally stated that requirements for access to accounts and services should accommodate institutions that have different levels of regulatory oversight, others suggested that the Board establish charter-specific requirements for account access. Some commenters expressed concern about the statement in the Original Proposal that "access requests from non-federally-insured institutions may require more

INTERNAL FR/OFFICIAL USE // FRSONLY

extensive due diligence," suggesting that this position would stifle innovation to the extent that it would impose stricter requirements on state-chartered institutions without federal deposit insurance. Finally, some commenters recommended that the Board could mitigate the risks posed by institutions with certain novel banking charters by allowing such institutions to maintain limited-access accounts that would provide a subset of services offered by Reserve Banks.

Many commenters, on the other hand, recommended that the Proposed Guidelines should provide a more challenging path for institutions with novel charters to gain access to accounts and services. Many of these commenters argued that the Proposed Guidelines should subject non-federally-insured institutions to the same types of requirements as apply to federally-insured depository institutions, regardless of the institution's business model. These commenters generally argued that institutions with novel charters are not subject to the same strict and costly regulations or to the same rigorous reviews as apply to traditional institutions, providing such institutions with unfair advantages over institutions with traditional charters. Some commenters recommended that the Proposed Guidelines include more granular and strict standards, such as explicit capital and liquidity requirements. Others recommended additional requirements for account access, such as compliance with the Community Reinvestment Act and consumer protection laws, or that Reserve Banks consider the risks from an institution's affiliate relationships and subject an institution's holding company to the Bank Holding Company Act. Still other commenters suggested that the Proposed Guidelines should require all accountholders that do not file call reports to publicly

INTERNAL FR/OFFICIAL USE // FRSONLY

provide periodic audited financial reports so that payment system participants are better able to assess counterparty risk.

### Board Response

The Board believes that the final Account Access Guidelines provide a framework that will effectively support responsible innovation and prudent risk management. The Account Access Guidelines establish a consistent, comprehensive, and transparent framework for Reserve Banks to analyze access requests on a case-by-case, risk-focused basis reflecting the institution's full risk profile (including its business model, size, complexity, and regulatory framework) and to mitigate, to the extent possible, the risks identified. Furthermore, as noted in the Original Proposal, each requesting institution's risk management and governance infrastructure is expected both to meet existing regulatory and supervisory requirements and to be sufficiently tailored to the institution's business, in the Reserve Bank's assessment, to mitigate the risks identified by the Account Access Guidelines.

As noted in the final Account Access Guidelines, a Reserve Bank may implement risk mitigants including imposing conditions or restrictions on an institution's access to accounts and services if necessary to mitigate risks set forth in the Account Access Guidelines. Reserve Banks also retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated.

### 2. Implementation of the Account Access Guidelines

Many commenters provided recommendations related to how the Proposed Guidelines will be implemented and how to promote consistency in their application by Reserve Banks.

INTERNAL FR/OFFICIAL USE // FRSONLY

Some of these commenters asked the Board to specify the mechanism(s) by which such consistency would be achieved. Other commenters went further, suggesting that the Board should give consent and non-objection to Reserve Bank access-request determinations, or that the Board should form a centralized (i.e., Board-led) evaluation committee to consider access requests. Further, several commenters suggested various avenues for increased communication from Reserve Banks about their decisions to grant or deny account requests, including publishing decisions on access requests (including any supporting analysis), maintaining an up-to-date list of all institutions that have been granted access, and formally communicating with state regulators about how the Federal Reserve views particular state charters. In addition, many commenters recommended that the Board establish timelines within which Reserve Banks must grant or deny access requests, arguing that such timeliness would provide greater transparency and give requesting institutions more clarity on the resources and time needed for the evaluation process. One commenter further argued that expectations of a lengthy review process could discourage institutions with novel charters from requesting accounts and thus discourage innovation.

Commenters expressed differing opinions on whether a Reserve Bank should conduct an independent assessment of a requestor's risk profile. Some commenters suggested that a Reserve Bank's assessment of a requestor's risk profile should defer to the primary regulator's assessment of the risks posed by the institution, while others said the Board should ensure that a Reserve Bank conduct an independent risk assessment separate from that of the institution's primary regulator. Additionally, a few commenters suggested that the Board remove language from the Proposed Guidelines that recognizes the authority granted

FRB-AR-000030

**J.A.1005**

INTERNAL FR/OFFICIAL USE // FRSONLY

to Reserve Banks under the Federal Reserve Act to exercise discretion in granting or denying requests for accounts and services.

Many commenters argued that the Proposed Guidelines should require ongoing review of non-federally-insured institutions, so as to appropriately monitor the risks that such institutions, and especially those with novel charters, could pose after obtaining access to accounts and services. Some commenters singled out cyber risk as a specific area for ongoing review.

### *Board Response*

In the final Account Access Guidelines, the Board's primary goal is to establish a transparent and consistent framework for all access requests across Reserve Banks from both risk and policy perspectives. To emphasize this goal, the Board has incorporated in the introduction to the final Account Access Guidelines the expectation that Reserve Banks engage in consultation with the other Reserve Banks and the Board, as appropriate, to support consistent implementation of the Account Access Guidelines. In further support of this goal and as explained further below, the Board has adopted a new Section 2 of the Account Access Guidelines establishing a tiered review framework that provides additional guidance on the level of due diligence and scrutiny to be applied to access requests. Additionally, as noted previously, the Reserve Banks are working together, in consultation with the Board, to expeditiously develop an implementation plan for the final Guidelines.

Regarding comments to disclose information on particular requests, the Board notes that when evaluating access requests, Reserve Banks communicate directly with the requestor and, in some cases, with the institution's primary regulator, including by requesting

FRB-AR-000031

**J.A.1006**

additional information, clarifying the status of the request, and communicating any controls
or limitations that might be placed on the account and services. However, the identity of
institutions that maintain accounts at Reserve Banks, or that request access to accounts and
services, is considered confidential business information and, as such, public disclosure of
account status by the Reserve Banks would not be appropriate.[10]

The Board has also considered whether the final Account Access Guidelines should
include a timeline for completing reviews of access requests by Reserve Banks. The Board
believes that the nature of relevant variables in access requests—including the variety of
charter types, business models, regulatory regimes, and risk profiles—precludes specification
of a single timeline. The Reserve Banks face challenges in balancing the desire by requestors
for a specific timeline with Reserve Banks' need to perform thorough reviews of requestors
with novel, complex, or high-risk business plans, along with requestors that are subject to
novel regulatory regimes. Setting a specific timeline could result in an increased number of
premature or unnecessary denials of access requests in cases where the specified timeline
does not allow the Reserve Banks sufficient time to understand the intricacies of the
requesting institutions' risk profiles. Accordingly, the Board has not adopted a timeline
expectation in the final Account Access Guidelines, but the Board has added language to
emphasize the Board's expectations for Reserve Banks to coordinate in focusing on both
timeliness and consistency in evaluating access requests.

The Board believes it is important that Reserve Banks evaluate both the potential risks
posed by an eligible institution's access request and the potential actions to mitigate such

---

[10] The Board notes that institutions may choose to self-publicize their account and service requests and status.

INTERNAL FR/OFFICIAL USE // FRSONLY

risks. The final Account Access Guidelines emphasize that a Reserve Bank should integrate, to the extent possible, the assessments of an institution by state and/or federal supervisors into the Reserve Bank's independent assessment of the institution's risk profile. This integration will ensure that Reserve Banks use all relevant data in pursuing the goal of prudent risk management. The Board has also added language in the final Account Access Guidelines that clarifies the respective roles of the Board (Reserve Bank oversight) and the Reserve Banks (discretion in decision making) with respect to evaluating access requests.

With regard to the recommendation for ongoing review of the risks posed by non-federally-insured institutions' access to accounts and services once an access request has been granted, the Board notes that the introduction to the Account Access Guidelines includes language discussing existing condition monitoring practices. The Board believes that the Reserve Banks' existing risk-management practices sufficiently address the risks identified by these comments without the need for an explicit expectation in the Account Access Guidelines for ongoing review of non-federally-insured institutions.

### 3. Legal Eligibility

Some commenters requested that the Guidelines more specifically address legal eligibility for access to accounts and services. Others presented arguments about what entities are, or should be, legally eligible for access to accounts and services. Other commenters suggested that the Board should issue a moratorium on granting access requests made by institutions with novel charters until the Board clarifies legal eligibility, that the Board should publish a list of charter types already deemed to be legally eligible, or that the Board should study account access decisions by other central banks. One commenter argued

that the Board should interpret the definition of a "depository institution" eligible for access to accounts and services as broadly as possible to support expanded access to accounts and services, which the commenter argued would support financial innovation.

Several commenters recommended that the Board should ensure that its interpretation of legal eligibility supports responsible financial innovation as stated as a policy goal of the Board. Some of these commenters recommended that the Board review legal eligibility broadly to support innovation and expand eligibility. One commenter recommended that the Board decouple legal eligibility for a Reserve Bank account from eligibility for direct access to Federal Reserve financial services. The commenter argued that decoupling direct access to services from eligibility for accounts would have benefits for consumers and pointed to other countries which have taken such action.

### *Board Response*

As the Board noted in the Original Proposal, it has been considering whether it may be useful to clarify the interpretation of legal eligibility under the Federal Reserve Act for access to accounts and services. After a careful analysis of this issue, the Board has determined it is not necessary to do so at this time. The Account Access Guidelines do not establish a legal eligibility standard, but the first principle clearly states that institutions must be eligible under the Federal Reserve Act or other federal statute to maintain an account at a Reserve Bank. The Board believes this provides sufficient clarity on what entities may legally request access to account and services, and the Reserve Banks will continue to assess an institution's legal

INTERNAL FR/OFFICIAL USE // FRSONLY

eligibility under Principle 1 on a case-by-case basis to ensure that only entities that are legally eligible may request to obtain such access.[11]

The Board notes that the purpose of the Account Access Guidelines is to ensure that Reserve Banks evaluate a transparent and consistent set of risk-focused factors when reviewing account requests. The Board is not expanding (or limiting) the types of institutions that legally may request access to Reserve Bank accounts and services.

### 4. Additional Comments

#### A. *Comments Supporting a Ban on Novel Charter Account Access*

Some commenters suggested that novel charters mix commercial and financial activities and provide a "back door entry" into banking for commercial entities. These commenters recommended that the Federal Reserve not grant access requests from institutions with novel charters.

#### *Board Response*

The Board does not believe that it is appropriate to categorically exclude all novel charters from access to accounts and services. The Account Access Guidelines as adopted are intended to be applied by Reserve Banks to access requests from eligible institutions with both novel and more traditional charters. The Board believes that the final Account Access Guidelines will provide a robust framework for analyzing and mitigating risks.

#### B. *Comments Opposing the Proposed Guidelines*

---

[11] While Reserve Banks exercise decision-making authority with respect to access requests, the Board has interpretive authority with respect to the Federal Reserve Act and thus is responsible for interpreting the provisions of the Act concerning legal eligibility.

While most commenters supported the Original Proposal, three commenters opposed the Proposed Guidelines entirely. One of these commenters argued the Guidelines created opacity in the master account process, not clarity. Two other commenters opposed the Proposal because, in their view, the Proposed Guidelines would expand access to accounts and services to institutions with novel business models that pose high levels of risk to the payments and banking system.[12]

### *Board Response*

The Board believes that the final Account Access Guidelines provide greater transparency and clarity than currently exist on the factors that Reserve Banks should consider in evaluating access requests. The Board also believes that the final Account Access Guidelines strike an appropriate balance between providing transparency and allowing for implementation of the Guidelines across a variety of potential institutions that may request accounts (e.g., institutions with differing charter types, business models, or regulatory regimes). The Board believes that the final Account Access Guidelines create a structured and sufficiently transparent framework that will help to foster a consistent evaluation of access requests across all twelve Reserve Banks and will benefit the financial system broadly.

In response to the comments related to expansion of eligibility, the Board emphasizes that, as noted previously, the Account Access Guidelines do not establish legal eligibility

---

[12] Many of these commenters pointed to "fintech" related business models and other novel special purpose charters as posing heightened risk to the payment system and financial markets.

standards but instead establish a risk-focused framework for evaluating access requests from legally eligible institutions under federal law.

### C. *Comments on Individual Principles*

The Board received some comments on individual principles in the Original Proposal. Several commenters, while on net supportive of Principle 4 (Financial Stability) and Principle 6 (Monetary Policy Implementation), suggested some refinements, including a specification that most "traditional" institutions, due to their business model and size, would not create risks to financial stability and/or monetary policy implementation. Other commenters interpreted Principle 6 to suggest that Reserve Banks, rather than the Board, have the authority to establish the rate of interest on reserve balances (IORB). A few commenters expressed concern that these principles would be challenging to assess. Within this group, one commenter opined that the Board should adapt its monetary policy practices to the economic reality created by a competitive market rather than embed a monetary policy principle in the Guidelines. Finally, many commenters commended the Board for addressing these topics in the Guidelines; some of these commenters asked the Board to expand its discussion of the potential negative effects that granting account access to institutions with novel charters could have on financial stability and monetary policy implementation.

### *Board Response*

The Board recognizes the concerns raised by commenters that the principles focused on financial stability and monetary policy implementation deal with complex topics requiring levels of analysis and precision that may be challenging to address. For instance, it will be difficult to forecast how granting account access to a requesting institution would affect the

FRB-AR-000037

**J.A.1012**

INTERNAL FR/OFFICIAL USE // FRSONLY

level and variability of the demand for and supply of reserves balances—which is important to monetary policy implementation. However, the Federal Reserve is able to estimate the potential risk posed by a requestor (such as the risk that an institution might have large, unpredictable swings in its account balance) and whether existing tools can adequately mitigate those risks. The Board also recognizes that some smaller institutions with traditional charters would likely not create risks to financial stability or monetary policy implementation. Nevertheless, the Board has determined that both the financial stability principle and the monetary policy principle should remain in the final Account Access Guidelines, because they provide full transparency to the public on the types of factors Reserve Banks should consider in evaluating access requests. In addition, the Board has amended a footnote in the Account Access Guidelines to delete the language that a few commenters interpreted to suggest that Reserve Banks have the authority to establish the IORB rate.

### D. *Comments on Specific Questions*

As noted previously, the Original Proposal posed three specific questions and an additional open-ended question to the public.

a. Question 1

The Board asked whether the principles in the Proposed Guidelines address all the risks that would be relevant to the Federal Reserve's policy goals. Commenters generally agreed that the risks identified in the Proposed Guidelines are relevant for the Reserve Banks to consider when evaluating access requests. Many commenters raised concerns, however, regarding the ability of Reserve Banks to mitigate these risks in the case of institutions with

novel charters that are not subject to regulatory and supervisory oversight that is similar to that applied to federally-insured institutions. Some commenters suggested that the Proposed Guidelines should put greater emphasis on consumer protection, particularly consumer privacy, and on cybersecurity risks.

### *Board Response*

The Board notes that cybersecurity risk is included in Principle 2 (Risk to the Reserve Bank) and Principle 3 (Risk to the Payment System) of the final Account Access Guidelines as a factor that Reserve Banks should consider in their review of account requests. The Board also notes that, while the Account Access Guidelines do not specify consumer protection as an account-related risk, Principle 1 (Legal Eligibility) provides that Reserve Banks should assess the extent to which an institution's activities and services comply with applicable laws and regulations, including those that address consumer protection. Lastly, Section 2 of the final Account Access Guidelines (discussed further below) provides additional guidance on the level of due diligence expected by Reserve Banks for requests from institutions that are not subject to regulatory and supervisory oversight similar to that applied to federally-insured institutions.

b. Question 2

The Board asked whether the level of specificity in each principle provides sufficient clarity and transparency about how the Reserve Banks will evaluate requests. Many commenters addressing Question 2 recommended that the Board add more detail to the Proposed Guidelines to increase the level of clarity and transparency.

### *Board Response*

The Board's response to these comments is described in Section II.A.

c.  Question 3

The Board asked whether the principles support responsible financial innovation. Several commenters stated that the Proposed Guidelines achieve a balance between supporting responsible financial innovation and managing the identified risks by allowing for flexibility to accommodate different business models. Other commenters expressed concern, however, that the implementation of the Proposed Guidelines could stifle innovation if institutions were forced to comply with rules and regulations that do not make sense for their business model, size, or complexity.

**Board Response**

The Board believes the final Account Access Guidelines support risk-focused, case-by-case review by Reserve Banks of access requests. As such, the Board believes the Account Access Guidelines support responsible innovation by balancing the provision of accounts and services to a wide range of institutions on the one hand and managing risks related to such access on the other. This is discussed in more detail in Section II.A.

d.  Question 4

The Board also requested comment on whether the Board or the Reserve Banks should consider other steps or actions to facilitate the review of access requests in a consistent and equitable manner. As noted previously, commenters provided a wide range of comments that recommended potential improvements to the Account Access Guidelines to enhance their effectiveness.

**Board Response**

FRB-AR-000040

**J.A.1015**

INTERNAL FR/OFFICIAL USE // FRSONLY

The Board addressed these comments in Section II.A-C.

**E. Technical Changes**

Principle 5 in the Account Access Guidelines addresses the risks to the overall economy. While the Board did not receive specific comments on Principle 5, it has made minor technical changes to the language to ensure the clarity and accuracy of the discussions of institutions' Bank Secrecy Act/Anti-Money Laundering (BSA/AML) and Office of Foreign Assets Control (OFAC) requirements and compliance programs. The Board has also made other minor technical edits to enhance the clarity of the Guidelines (e.g., replacing the term "factors" with "principles" for consistency and clarifying the risk-free nature of Reserve Bank balances).

### B. Comments on the Supplemental Notice

The Board received 24 comment letters on the Supplemental Notice. While most commenters generally expressed support for the proposed tiering framework, four commenters objected to the manner in which the proposed tiering framework would treat certain state-chartered institutions. A different group of commenters supported the tiering framework and called for heightened scrutiny of non-federally-insured depository institutions that request Reserve Bank accounts. Many commenters reiterated the comments that they previously submitted on the Original Proposal.[13] In particular, a number of commenters recommended that non-federally-insured institutions, particularly those in Tier 3, not be

---

[13] For example, many commenters restated comments relating to legal eligibility for accounts and services, while other commenters restated their comment suggesting that non-federally-insured institutions should receive accounts and services only if they are subject to the same regulatory framework as federally-insured institutions. The Board addressed these comments in Section II.A, *supra*.

FRB-AR-000041

granted access to Reserve Bank accounts and services. Additionally, one commenter, who supported the tiering framework generally, objected to Reserve Banks subjecting institutions with existing accounts to what the commenter termed "new standards" once the Board's Proposed Guidelines are made final.

### 1. Treatment of State-Chartered Institutions

Four commenters objected to the manner in which the proposed tiering framework would treat certain state-chartered institutions. These commenters principally argued that the proposed tiering framework would (1) result in disparate treatment of non-federally-insured institutions with state charters as compared to those with federal charters; (2) undermine the dual banking system; and (3) ignore the strong prudential regulation that some states have in place for non-federally-insured institutions.

Broadly, this group of commenters focused their concerns on the placement of depository institutions in proposed Tier 2 and Tier 3 while noting that they viewed Tier 1 as proposed as equitable and non-problematic. In particular, these commenters expressed concerns that non-federally-insured national trust banks (NTBs) chartered by the Office of the Comptroller of the Currency (OCC) would receive preferential treatment under the proposed guidelines and asserted that many state-chartered trusts are subject to robust prudential regulations. They further argued that the tiering framework erroneously implies that NTBs are subject to a similar set of regulations as federally-insured institutions. Two of the commenters further stated that their respective state-chartered trust banks are subject to robust regulation and supervision and suggested that these institutions should be subject to a less strict level of review than the Board proposed.

FRB-AR-000042

**J.A.1017**

INTERNAL FR/OFFICIAL USE // FRSONLY

Relatedly, these commenters argued that the proposed tiering framework would introduce a bias in favor of federally-chartered institutions compared to state-chartered institutions. They argued that the tiering framework as proposed would result in an uneven playing field that would undermine the dual banking system. One of the commenters recommended that the Board revise the Proposed Guidelines to ensure that access to Reserve Bank accounts and services be afforded to eligible institutions on an equitable and impartial basis, regardless of whether they are state-chartered or federally-chartered.

Lastly, these commenters objected to language in proposed Tier 3 that might imply that state banking authorities' supervision is weaker than that of federal banking authorities. These commenters point to the robust regulatory standards and close supervision that states have had in place for many years for non-federally-insured institutions. One of the commenters also noted that state regulators work closely with their Reserve Bank on the supervision of state member banks.

One of the commenters recommended that the Account Access Guidelines should not have a tiering framework but, alternatively, that Reserve Banks should review access requests by applying an activity and risk lens to access requests. A different commenter recommended that the tiering framework should focus on an institution's past performance as a key criterion for determining whether it is included in Tier 2 or Tier 3.

Other commenters on the Supplemental Notice supported the tiering framework as proposed, noting that it provides additional transparency and clarity on the level of review an access request would receive based on key characteristics. One commenter noted that the tiering framework would help an institution requesting access understand Reserve Bank

expectations and take steps to demonstrate that appropriate risk management policies and safeguards are in place.

### *Board Response*

The Board has reviewed the comments provided and revised its approach to Tiers 2 and 3 in the final Account Access Guidelines. Specifically, the Board has made certain changes in Section 2 of the final Account Access Guidelines to provide more comparable treatment between non-federally-insured institutions chartered under state and federal law. As discussed above, the Board has modified Tier 2 to include a narrower set of non-federally-insured national banks than proposed in the Supplemental Notice. Under the revised Tier 2, a non-federally-insured institution chartered under federal law will be considered in Tier 2 only if the institution has a holding company that is subject to Federal Reserve oversight. In addition, a non-federally-insured institution chartered under state law will (as proposed in the Supplemental Notice) be considered in Tier 2 if (i) the institution is subject (by statute) to prudential supervision by a federal banking agency, and (ii) to the extent the institution has a holding company, that holding company is subject to Federal Reserve oversight (by statute or commitments).[14]

The Board believes it is appropriate to subject non-federally-insured institutions that the Federal Reserve supervises to an intermediate level of review under Tier 2, as the Reserve Banks already have supervisory information about, as well as regulatory authority

---

[14] In practice, non-federally-insured institutions that are chartered under state law are subject to prudential supervision by the Board if they become members of the Federal Reserve System.

INTERNAL FR/OFFICIAL USE // FRSONLY

over, such institutions and understands their risk profiles. Tier 3 will contain all other non-federally-insured institutions.

In addition, the Board has made minor updates to the proposed tiering framework to emphasize that the review of institutions' requests would be completed on a case-by-case, risk-focused basis within the three tiers, meaning that, within each tier, institutions with high-risk business models should be subject to more intensive review than those with lower-risk business models.

Lastly, in response to concerns raised by some comments that the language in the description of Tier 3 implies that supervision conducted by state banking authorities is broadly weaker than federal supervision, the Board has removed references to "supervisory" differences in the description of Tier 3.

### 2. Non-federally-insured institutions

Several commenters expressed views that non-federally-insured institutions as a class pose an unacceptable level of risk to the payment system and financial markets. While some of these commenters directed their comments towards institutions in both Tiers 2 and 3, some focused solely on institutions in Tier 3. These commenters expressed a view that these institutions are not subject to sufficient regulation and as a result the Reserve Banks should not provide access to Tier 3 institutions or to non-federally-insured institutions more broadly.

#### *Board Response*

The Board does not believe that it is appropriate to categorically exclude all Tier 3 or non-federally-insured institutions from access to accounts and services. The Board believes that Tier 2 and 3 institutions represent a wide range of risk profiles (based on business model,

size, complexity, regulatory framework, and other factors), and therefore a single response to account requests from this heterogenous group would not be appropriate. The Account Access Guidelines as adopted are intended to be applied by Reserve Banks to access requests from eligible institutions and the Board believes that the final Account Access Guidelines will provide a robust framework for analyzing and mitigating risks.

### 3. New standards

One commenter objected to Reserve Banks subjecting institutions with existing accounts to what the commenter termed "new standards" once the Board's Proposed Guidelines are made final.

#### *Board Response*

The Board has developed the Proposed Guidelines, in part, to increase the level of transparency and consistency of the process used by Reserve Banks to evaluate institutions' access to Reserve Bank accounts and services. As noted above, the Proposed Guidelines are informed by and incorporate, where possible, existing Reserve Bank risk-management practices. As a result, the Board views the final Account Access Guidelines as an evolution of existing practices rather than the creation of "new standards." Additionally, the Board believes that in order for the Proposed Guidelines to be an effective risk-mitigation tool they should be applied broadly including to existing accounts. This view is supported by public comments on the Original Proposal discussed above. The Board expects that any Reserve Bank reevaluation of the risk of an institution's existing account will include discussions with the institution and its regulators.

### III. Conclusion

FRB-AR-000046

**J.A.1021**

INTERNAL FR/OFFICIAL USE // FRSONLY

For the reasons set forth above, the Board is adopting final Account Access Guidelines.

FRB-AR-000047

J.A.1022

INTERNAL FR/OFFICIAL USE // FRSONLY

## IV.    Account Access Guidelines

*Guidelines Covering Access to Accounts and Services at Federal Reserve Banks (Account Access Guidelines)*

### Section 1: Principles

The Board of Governors of the Federal Reserve System (Board) has adopted account access guidelines comprised of six principles to be used by Federal Reserve Banks (Reserve Banks) in evaluating requests for master accounts and access to Reserve Bank financial services (access requests).[1,2]   The Board has issued these account access guidelines under its general supervision authority over the operations of the Reserve Banks, 12 U.S.C. 248(j). Decisions on individual requests for access to accounts and services are made by the Reserve Bank in whose District the requestor is located. The Account Access Guidelines apply to requests from all institutions that are legally eligible to receive an account or services, as discussed in more detail in the first principle.[3] The Board expects the Reserve Banks to engage in consultation with each other and the Board, as appropriate, on reviews of account and service requests, as well as ongoing monitoring of accountholders, to ensure that the guidelines are implemented in a consistent and timely manner.

---

[1] As discussed in the Federal Reserve's Operating Circular No. 1, an institution has the option to settle its Federal Reserve financial services transactions in its master account with a Reserve Bank or in the master account of another institution that has agreed to act as its correspondent. These principles apply to requests for either arrangement.

[2] Reserve Bank financial services mean all services subject to Federal Reserve Act section 11A ("priced services") and Reserve Bank cash services. Financial services do not include transactions conducted as part of the Federal Reserve's open market operations or administration of the Reserve Banks' Discount Window.

[3] These principles would not apply to accounts provided under fiscal agency authority or to accounts authorized pursuant to the Board's Regulation N (12 CFR 214), joint account requests, or account requests from designated financial market utilities, since existing rules or policies already set out the considerations involved in granting these types of accounts.

FRB-AR-000048

INTERNAL FR/OFFICIAL USE // FRSONLY

The Board believes it is important to make clear that legal eligibility does not bestow a right to obtain an account and services. While decisions regarding individual access requests remain at the discretion of the individual Reserve Banks, the Board believes it is important that the Reserve Banks apply a consistent set of guidelines when reviewing such access requests to promote consistency across Reserve Banks and to facilitate equitable treatment across institutions.

These Account Access Guidelines also serve to inform requestors of the factors that a Reserve Bank will review in any access request and thereby allow a requestor to make any enhancements to its risk management, documentation, or other practices to attempt to demonstrate how it meets each of the principles.

These guidelines broadly outline considerations for evaluating access requests but are not intended to provide assurance that any specific institution will be granted an account and services. The individual Reserve Bank will evaluate each access request on a case-by-case basis. When applying these account access guidelines, the Reserve Bank should factor, to the extent possible, the assessments of an institution by state and/or federal supervisors into its independent analysis of the institution's risk profile. The evaluation of an institution's access request should also consider whether the request has the potential to set a precedent that could affect the Federal Reserve's ability to achieve its policy goals now or in the future.

---

If the Reserve Bank decides to grant an access request, it may impose (at the time of account opening, granting access to service, or any time thereafter) obligations relating to, or conditions or limitations on, use of the account or services as necessary to limit operational, credit, legal, or other risks posed to the Reserve Banks, the payment system, financial stability or the implementation of monetary policy or to address other considerations.[5] The account-holding Reserve Bank may, at its discretion, decide to place additional risk management controls on the account and services, such as real-time monitoring of account balances, as it may deem necessary to mitigate risks. If the obligations, limitations, or controls are ineffective in mitigating the risks identified or if the obligations, limitations, or controls are breached, the account-holding Reserve Bank may further restrict the institution's use of accounts and services or may close the account. Establishment of an account and provision of services by a Reserve Bank under these guidelines is not an endorsement or approval by the Federal Reserve of the institution. Nothing in the Board's guidelines relieves any institution from compliance with obligations imposed by the institution's supervisors and regulators.

---

[5] The conditions imposed could include, for example, establishing a cap on the amount of balances held in the account. In addition, the Board may authorize a Reserve Bank to pay a different rate of interest on balances held in the account or may limit the amount of balances in the account that receive interest.

INTERNAL FR/OFFICIAL USE // FRSONLY

Accordingly, Reserve Banks should evaluate how each institution requesting access to an account and services will meet the following principles.[6] Each principle identifies factors that Reserve Banks should consider when evaluating an institution against the specific risk targeted by the principle (several factors are pertinent to more than one principle). The identified factors are commonly used in the regulation and supervision of federally-insured institutions. As a result, the Board anticipates the application of the account access guidelines to access requests by federally-insured institutions will be fairly straightforward in most cases which is consistent with Section 2 of these Guidelines. However, Reserve Bank assessments of access requests from non-federally-insured institutions may require more extensive due diligence. Reserve Banks monitor and analyze the condition of institutions with access to accounts and services on an ongoing basis. Reserve Banks should use the guidelines to re-evaluate the risks posed by an institution in cases where its condition monitoring and analysis indicate potential changes in the risk profile of an institution, including a significant change to the institution's business model.

[6] The principles are designed to address risks posed by an institution having access to an account and services, ranging from narrow risks (e.g., to an individual Reserve Bank) to broader risks (e.g., to the overall economy). Review activities performed by the Reserve Bank may address several principles at once.

-34-

FRB-AR-000051

**J.A.1026**

1. Each institution requesting an account or services must be eligible under the Federal Reserve Act or other federal statute to maintain an account at a Federal Reserve Bank (Reserve Bank) and receive Federal Reserve services and should have a well-founded, clear, transparent, and enforceable legal basis for its operations.[7]

    a. Unless otherwise specified by federal statute, only those entities that are member banks or meet the definition of a depository institution under section 19(b) of the Federal Reserve Act are legally eligible to obtain Federal Reserve accounts and financial services.[8]

    b. The Reserve Bank should assess the consistency of the institution's activities and services with applicable laws and regulations, such as Article 4A of the Uniform Commercial Code and the Electronic Fund Transfer Act (15 U.S.C. 1693 et seq). The Reserve Bank should also consider whether the design of the institution's services would impede compliance by the institution's customers with U.S. sanctions programs,

---

[7] These principles do not apply to accounts and services provided by a Reserve Bank (i) as depository and fiscal agent, such as those provided for the Treasury and for certain government-sponsored entities (12 U.S.C. 391, 393-95, 1823, 1435), (ii) to certain international organizations (22 U.S.C. sections 285d, 286d, 290o-3, 290i-5, 290l-3), (iii) to designated financial market utilities (12 U.S.C. 5465), (iv) pursuant to the Board's Regulation N (12 CFR 214), or (v) pursuant to the Board's Guidelines for Evaluating Joint Account Requests.

[8] Unless otherwise expressly excluded under the previous footnote, these principles apply to account requests from all institutions, including member banks or other entities that meet the definition of a depository institution under section 19(b) (12 U.S.C. 461(b)(1)(A)), as well as Edge and Agreement Corporations (12 U.S.C. 601-604a, 611-631), and U.S. branches and agencies of foreign banks (12 U.S.C. 347d).

-35-

FRB-AR-000052

Bank Secrecy Act (BSA) and anti-money laundering (AML) requirements or regulations, or consumer protection laws and regulations.

2. Provision of an account and services to an institution should not present or create undue credit, operational, settlement, cyber or other risks to the Reserve Bank.

a. The Reserve Bank should incorporate, to the extent possible, the assessments of an institution by state and/or federal supervisors into its independent assessment of the institution's risk profile.

b. The Reserve Bank should confirm that the institution has an effective risk management framework and governance arrangements to ensure that the institution operates in a safe and sound manner, during both normal conditions and periods of idiosyncratic and market stress.

i. For these purposes, effective risk management includes having a robust framework, including policies, procedures, systems, and qualified staff, to manage applicable risks. The framework should at a minimum identify, measure, and control the particular risks posed by the institution's business lines, products and services. The effectiveness of the framework should be further supported by internal testing and internal audit reviews.

ii. The framework should be subject to oversight by a board of directors (or similar body) as well as oversight by state and/or federal banking supervisor(s).

-36-

FRB-AR-000053

J.A.1028

iii.  The framework should clearly identify all risks that may arise related to the institution's business (e.g., legal, credit, liquidity, operational, custody, investment) as well as objectives regarding the risk tolerances for the management of such risks.

c.  The Reserve Bank should confirm that the institution is in substantial compliance with its supervisory agency's regulatory and supervisory requirements.

d.  The institution must, in the Reserve Bank's judgment:

i.  Demonstrate an ability to comply, were it to obtain a master account, with Board orders and policies, Reserve Bank agreements and operating circulars, and other applicable Federal Reserve requirements.

ii.  Be in sound financial condition, including maintaining adequate capital to continue as a going concern and to meet its current and projected operating expenses under a range of scenarios.

iii.  Demonstrate the ability, on an ongoing basis (including during periods of idiosyncratic or market stress), to meet all of its obligations in order to remain a going concern and comply with its agreement for a Reserve Bank account and services, including by maintaining:

A.  Sufficient liquid resources to meet its obligations to the Reserve Bank under applicable agreements, operating circulars, and Board policies;

-37-

B.  The operational capacity to ensure that such liquid resources are available to satisfy all such obligations to the Reserve Bank on a timely basis; and

C.  Settlement processes designed to appropriately monitor balances in its Reserve Bank account on an intraday basis, to process transactions through its account in an orderly manner and maintain/achieve a positive account balance before the end of the business day.

iv.  Have in place an operational risk framework designed to ensure operational resiliency against events associated with processes, people, and systems that may impair the institution's use and settlement of Reserve Bank services. This framework should consider internal and external factors, including operational risks inherent in the institution's business model, risks that might arise in connection with its use of any Reserve Bank account and services, and cyber-related risks. At a minimum, the operational risk framework should:

A.  Identify the range of operational risks presented by the institution's business model (e.g., cyber vulnerability, operational failure, resiliency of service providers), and establish sound operational risk management objectives to address such risks;

B.  Establish sound governance arrangements, rules, and procedures to oversee and implement the operational risk management framework;

-38-

C. Establish clear and appropriate rules and procedures to carry out the risk management objectives;

D. Employ the resources necessary to achieve its risk management objectives and implement effectively its rules and procedures, including, but not limited to, sound processes for physical and information security, internal controls, compliance, program management, incident management, business continuity, audit, and well-qualified personnel; and

E. Support compliance with the electronic access requirements, including security measures, outlined in the Reserve Banks' Operating Circular 5 and its supporting documentation.

3. Provision of an account and services to an institution should not present or create undue credit, liquidity, operational, settlement, cyber or other risks to the overall payment system.

a. The Reserve Bank should incorporate, to the extent possible, the assessments of an institution by state and/or federal supervisors into its independent assessment of the institution's risk profile.

b. The Reserve Bank should confirm that the institution has an effective risk management framework and governance arrangements to limit the impact that idiosyncratic stress, disruptions, outages, cyber incidents, or other incidents at the institution might have on other institutions and the payment system broadly. The framework should include:

-39-

INTERNAL FR/OFFICIAL USE // FRSONLY

    i. Clearly defined operational reliability objectives and policies and procedures in place to achieve those objectives.

    ii. A business continuity plan that addresses events that have the potential to disrupt operations and a resiliency objective to ensure the institution can resume services in a reasonable timeframe.

    iii. Policies and procedures for identifying risks that external parties may pose to sound operations, including interdependencies with affiliates, service providers, and others.

c. The Reserve Bank should identify actual and potential interactions between the institution's use of a Reserve Bank account and services and (other parts of) the payment system.

    i. The extent to which the institution's use of a Reserve Bank account and services might restrict funds from being available to support the liquidity needs of other institutions should also be considered.

d. The institution must, in the Reserve Bank's judgment:

    i. Be in sound financial condition, including maintaining adequate capital to continue as a going concern and to meet its current and projected operating expenses under a range of scenarios.

    ii. Demonstrate the ability, on an ongoing basis (including during periods of idiosyncratic or market stress), to meet all of its obligations in order to

<div align="center">-40-</div>

<div align="right">**J.A.1032**</div>

remain a going concern and comply with its agreement for a Reserve Bank account and services, including by maintaining:

A. Sufficient liquid resources to meet its obligations to the Reserve Bank under applicable agreements, Operating Circulars, and Board policies;

B. The operational capacity to ensure that such liquid resources are available to satisfy all such obligations to the Reserve Bank on a timely basis; and

C. Settlement processes designed to appropriately monitor balances in its Reserve Bank account on an intraday basis, to process transactions through its account in an orderly manner and maintain/achieve a positive account balance before the end of the business day.

iii. Have in place an operational risk framework designed to ensure operational resiliency against events associated with processes, people, and systems that may impair the institution's payment system activities. This framework should consider internal and external factors, including operational risk inherent in the institution's business model, risk that might arise in connection with its use of the payment system, and cyber-related risks. At a minimum, the framework should:

-41-

A.  Identify the range of operational risks presented by the institution's business model (e.g., cyber vulnerability, operational failure, resiliency of service providers), and establish sound operational risk management objectives;

B.  Establish sound governance arrangements, rules, and procedures to oversee the operational risk management framework;

C.  Establish clear and appropriate rules and procedures to carry out the risk management objectives;

D.  Employ the resources necessary to achieve its risk management objectives and implement effectively its rules and procedures, including, but not limited to, sound processes for physical and information security, internal controls, compliance, program management, incident management, business continuity, audit, and well-qualified personnel.

4.  Provision of an account and services to an institution should not create undue risk to the stability of the U.S. financial system.

a.  The Reserve Bank should incorporate, to the extent possible, the assessments of an institution by state and/or federal supervisors into its independent assessment of the institution's risk profile.

b.  The Reserve Bank should determine, in consultation with the other Reserve Banks and Board as appropriate, whether the access to an account and services by an institutionitself or a group of like institutions could introduce financial

-42-

FRB-AR-000059

**J.A.1034**

stability risk to the U.S. financial system.

c. The Reserve Bank should confirm that the institution has an effective risk management framework and governance arrangements for managing liquidity, credit, and other risks that may arise in times of financial or economic stress.

d. The Reserve Bank should consider the extent to which, especially in times of financial or economic stress, liquidity or other strains at the institution may be transmitted to other segments of the financial system.

e. The Reserve Bank should consider the extent to which, especially during times of financial or economic stress, access to an account and services by an institution itself (or a group of like institutions) could affect deposit balances across U.S. financial institutions more broadly and whether any resulting movements in deposit balances could have a deleterious effect on U.S. financial stability.

i) Balances held in Reserve Bank accounts present no credit or liquidity risk, making them very attractive in times of financial or economic stress. As a result, in times of stress, investors that would otherwise provide short- term funding to nonfinancial firms, financial firms, and state and local governments could rapidly withdraw that funding and instead deposit their funds with an institution holding mostly central bank balances. If the institution is not subject to capital requirements similar to a federally-insured institution, it can more easily expand its balance sheet during times

-43-

INTERNAL FR/OFFICIAL USE // FRSONLY

of stress; as a result, the potential for sudden and significant deposit inflows into that institution is particularly large, which could disintermediate other parts of the financial system, greatly amplifying stress.

5. Provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity.

    a. The Reserve Bank should incorporate, to the extent possible, the assessments of an institution by state and/or federal supervisors into its independent assessment of the institution's risk profile.

    b. The Reserve Bank should confirm that the institution has a BSA/AML compliance program consisting of the components set out below and in relevant regulations.[9]

        i. For these purposes, the Reserve Bank should confirm that the institution's BSA/AML compliance program contains the following elements[10]:

---

[9] Refer to 12 CFR 208.62 and 63, 12 CFR 211.5(k), 5(m), 24(f), and 24(j), and 12 CFR 225.4(f) (Federal Reserve); 12 CFR 326.8 and 12 CFR part 353 (FDIC); 12 CFR 748.1-2 (NCUA); 12 CFR 21.11, and 21, and 12 CFR 163.180 (OCC); and 31 CFR 1020.210(a) and (b), and 31 CFR 1020.320 (FinCEN), which are controlling.

[10] Reserve Banks may reference the FFIEC BSA/AML Manual. These guidelines may be updated to reflect any changes to relevant regulations.

-44-

INTERNAL FR/OFFICIAL USE // FRSONLY

A. A system of internal controls, including policies and procedures, to ensure ongoing BSA/AML compliance;

B. Independent audit and testing of BSA/AML compliance to be conducted by bank personnel or by an outside party;

C. Designation of an individual or individuals responsible for coordinating and monitoring day-to-day compliance (BSA compliance officer);

D. Ongoing training for appropriate personnel, tailored to each individual's specific responsibilities, as appropriate;

E. Appropriate risk-based procedures for conducting ongoing customer due diligence to include, but not limited to, understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile and conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information;

c. The Reserve Bank should confirm that the institution has a compliance program designed to support its compliance with the Office of Foreign Assets Control (OFAC) regulations at 31 CFR Chapter V.[11]

---

[11] Reserve Banks may reference the OFAC section of the FFIEC BSA/AML Manual. These guidelines may be updated to reflect any changes to relevant regulations.

FRB-AR-000062

**J.A.1037**

        i. For these purposes, the Reserve Bank may review the institution's written OFAC compliance program, provided one has been created, and confirm that it is commensurate with the institution's OFAC risk profile. An OFAC compliance program should identify higher-risk areas, provide for appropriate internal controls for screening and reporting, establish independent testing for compliance, designate a bank employee or employees as responsible for OFAC compliance, and create a training program for appropriate personnel in all relevant areas of the institution.

6. Provision of an account and services to an institution should not adversely affect the Federal Reserve's ability to implement monetary policy.

    a. The Reserve Bank should incorporate, to the extent possible, the assessments of an institution by state and/or federal supervisors into its independent assessment of the institution's risk profile.

    b. The Reserve Bank should determine, in consultation with the other Reserve Banks and the Board as appropriate, whether access to an account and services by an institution itself or a group of like institutions could have an effect on the implementation of monetary policy.

    c. The Reserve Bank should consider, among other things, whether access to a Reserve Bank account and services by the institution or group of like institutions could affect the level and variability of the demand for and supply

-46-

of reserves, the level and volatility of key policy interest rates, the structure of key short-term funding markets, and on the overall size of the consolidated balance sheet of the Reserve Banks. The Reserve Bank should consider the implications of providing an account to the institution in normal times as well as in times of stress. This consideration should occur regardless of the current monetary policy implementation framework in place.

**Section 2:  Tiered Review Framework**

The tiered review framework in this section is meant to serve as a guide to the level of due diligence and scrutiny to be applied by Reserve Banks to different types of institutions. Although institutions in a higher tier will on average face greater due diligence and scrutiny than institutions in a lower tier, a Reserve Bank has the authority to grant or deny an access request by an institution in any of the three proposed tiers, based on the Reserve Bank's application of the Account Access Guidelines in Section 1 to that particular institution. As discussed above, an institution's access request will be reviewed on a case-by-case, risk-focused basis and the tiers are designed to provide additional transparency into the expected review process based on key characteristics.

1.  Tier 1: Eligible institutions that are federally insured.[15]

    a.  As federally-insured depository institutions, Tier 1 institutions are

---

[15] See 12 USC 1813(c)(2) (defining "insured depository institution" for purposes of the Federal Deposit Insurance Act) and 12 USC 1752(7) (defining "insured credit union" for purposes of the Federal Credit Union Act).

FRB-AR-000064

already subject to a standard, strict, and comprehensive set of federal banking regulations.

b. In addition, for most Tier 1 institutions, detailed regulatory and financial information would in most cases be readily available, often in public form.

c. Accordingly, access requests by Tier 1 institutions will generally be subject to a less intensive and more streamlined review.

d. In cases where the application of the Guidelines to Tier 1 institutions identifies potentially higher risk profiles, the institutions will receive additional attention.

2. Tier 2: Eligible institutions that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency.[16] In addition, (i) if such an institution is chartered under federal law, it has a holding company that is subject to Federal Reserve oversight (by statute or commitments); and (ii) if such an institution is chartered under state law and has a holding company, that holding company is subject to Federal Reserve oversight (by statute or commitments).[17]

---

[16] The federal banking agencies include the Board, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation, and the National Credit Union Administration. Non-federally-insured institutions that are chartered under federal law are subject to prudential supervision by the OCC. Non-federally-insured institutions that are chartered under state law are subject to prudential supervision by the Board if they become members of the Federal Reserve System.

[17] Edge and Agreement Corporations and U.S. branches and agencies of foreign banks would fall under a Tier 2 level of review because of Federal Reserve oversight over these institutions.

    a. Tier 2 institutions are subject to a similar, but not identical, set of regulations as federally-insured institutions. As a result, Tier 2 institutions may still present greater risks than Tier 1 institutions.

    b. Reserve Banks will have significant supervisory information about, as well as some level of regulatory authority over, Tier 2 institutions.

    c. Accordingly, account access requests by Tier 2 institutions will generally receive an intermediate level of review.

3. Tier 3: Eligible institutions that are not federally insured and are not considered in Tier 2.

    a. Non-federally-insured institutions that are chartered under federal law but do not have a holding company subject to Federal Reserve oversight would be considered in Tier 3.

    b. Non-federally-insured institutions that are chartered under state law and are not subject (by statute) to prudential supervision by a federal banking agency, or have a holding company that is not subject to Federal Reserve oversight, would be considered in Tier 3.

    c. Tier 3 institutions may be subject to a regulatory framework that is substantially different from the regulatory framework that applies to federally-insured institutions.

-49-

**J.A.1041**

INTERNAL FR/OFFICIAL USE // FRSONLY

    d.  In addition, detailed regulatory and financial information regarding

        Tier 3 institutions may not exist or may be unavailable.

    e.  Accordingly, Tier 3 institutions will generally receive the strictest

        level of review.

By order of the Board of Governors of the Federal Reserve System.

**Ann Misback,**
*Secretary of the Board*

FRB-AR-000067

**J.A.1042**

# EXHIBIT AU

# [PUBLIC VERSION]

**CONFIDENTIAL**

IN ACCORDANCE WITH A  PROTECTIVE ORDER, THE ENCLOSURE(S) SHALL BE TREATED AS CONFIDENTIAL AND SHALL NOT BE  SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,
2120 Carey Avenue, Suite 300
Cheyenne, WY 82001

    *Plaintiff*,

        v.

FEDERAL RESERVE BOARD OF
GOVERNORS,
Constitution Ave NW & 20th St NW
Washington, DC 20551

FEDERAL RESERVE BANK
OF KANSAS CITY,
1 Memorial Drive
Kansas City, MO 64108,

    *Defendants*.

Civil Case No.: 1:22-CV-00125-SWS

---

**SUPPLEMENTAL EXPERT REPORT OF KATIE S. COX**

I, Katie S. Cox, declare and state as follows:

## I.  INTRODUCTION

1.  On October 20, 2023, I submitted a report in this matter ("Cox Report").

2.  Counsel for Plaintiff Custodia subsequently provided me with documents and deposition transcripts that were produced after I submitted my report. This Supplemental Report presents additional opinions based on these additional materials. All opinions and conclusions expressed in my original Cox Report remain unchanged.

## II.  ADDITIONAL OPINIONS

### A.  The Federal Reserve Banks Must Adhere to a Board-Approved Handbook That Gives the Board Control Over the Review of Master Accounts Applications

3.  By its terms, the S-2677 letter issued by the Board of Governors of the Federal Reserve System ("Board") on January 17, 2023 requires Reserve Banks to develop Board-approved procedures for implementing the Guidelines for Evaluating Account and Service Requests ("Account Access Guidelines"). FRB-AR-000014 at § II.



2



7.     I understand from reviewing the deposition transcript of the Federal Reserve Bank of Kansas City's designee that Board staff participated in drafting the Handbook.  30(b)(6) Dep. Tr. at 275:19–276:4.  I further understand that the Federal Reserve Bank of Kansas City consulted the Guidelines Handbook and used it "as a

3

reference point" in assessing Custodia's master account request, even though it was still in draft form at the time. *Id.* at 278:8–19.





5



13.   Overall, it is my opinion that the draft and final Guidelines Handbook provides the Board significant control over how master account applications by banks such as Custodia are to be reviewed and acted upon by the Reserve Banks.

14.   Because discovery is ongoing, I reserve the right to modify or supplement the opinions set forth in my report and the bases for those opinions.

DATE: _12/4/23_                     By: _Katie S Cox_

                                              Katie S. Cox

J.A.1049

## COX SUPPLEMENTAL MATERIALS RELIED UPON LIST

- Documents Produced by the Federal Reserve Bank of Kansas City, including: FRBKC-00011189; FRBKC-00018216; FRBKC-00017834; FRBKC-00010562; FRBKC-00011481; FRBKC-00010129; FRBKC-00010131; FRBKC-00015474; FRBKC-00016741; FRBKC-00016743; FRBKC-00017570; FRBKC-00017974; FRBKC-00018073; FRBKC-00017290; FRBKC-00017820; FRBKC-00017823
- Deposition Transcripts, including: Federal Reserve Bank of Kansas City's Rule 30(b)(6) Designee; Christi May-Oder (Volumes I and II); Esther George; Jackie Nugent; Jeffrey Imgarten; Jenifer Haake; Judith Hazen; Ross Crouch; Tara Humston
- Documents that Have Been Designated as Deposition Exhibits in this Litigation, including: Exhibit 1; Exhibit 3; Exhibit 225, Exhibit 228; Exhibit 229; Exhibit 230; Exhibit 231

# EXHIBIT BA

# [PUBLIC VERSION]

J.A.1051

J.A.1052

FRBKC

EXHIBIT NO. 225

11.03.23



**FRBKC – 30(b)(6) Table of Contents**

1. Custodia Master Account Timeline

2. SPDI Legislation Email

3. Reasons for Denial

4. Master Account Policies and Procedures

5. Operating Circular 1 – February 1, 2013 and August 16, 2021

6. Standard Operating Procedure 10 Eligibility Processing Guidelines – Ex. 54

7. Reserve Bank Condition Monitoring Standards and Practices – Ex. 171

8. FRBKC Individuals Involved in Drafting Recommendation Memo

9. FRBKC Individuals Solicited for Comments on Draft S-Letter

10. Board Individuals Who Had Contact with FRBKC Individuals Regarding Master Account

11. Guidelines for Evaluating Account and Services Requests

12. S-Letter 2677 – Ex. 34

13. FRBKC Master Account Data as of November 2023

J.A.1054

**Board Individuals Who Had Contact with FRBKC Individuals About Custodia's MA**

- Allison, Sophia
- Brainard, Lael
- DeBoer, Margaret
- Eichner, Matt
- Hinkle, Jason
- Lipscomb, Laura
- Malloy, Matt
- Martin, Stephanie
- Mills, Dave
- Smith, Gavin
- Van Der Weide, Mark
- Walker, Jeff
- Winerman, Evan

# EXHIBIT BB

# [PUBLIC VERSION]

J.A.1056

## FEDERAL RESERVE BOARD STAFF / GOVERNORS

1. PSPAC - subset of Governors
2. David Mills - RBOPS
3. Jeff Walker - RBOPS
4. Stephanie Martin - Legal
5. Kavita Jain - S+R
6. Marnie DeBoer - MYA
7. Jennifer Lucier - RBOPS
8. Kathy Wilson - RBOPS
9. Gavin Smith - Legal
10. David Lowe - MFOA
11. Dan McGonegle - S+R
12. Ben Hobbs - RBOPS
13. Jason Hinkle - RBOPS
14. Sophia Allison - Legal
15. Mary-Frances Styczynski -
16. Kirstin Wells - RBOPS MPOD
17. Lael Brainard *
18. Matt Eichner - RBOPS
19. Laura Lipscomb - MA
20. Matt Malloy - MA
21. Mark van Der Weide - GC
22. Evan Winerman - Legal
23. Courtney Demartini -

24. Joshua Chadwick - Legal
25. _____
26. _____
27. _____
28. _____
29. _____
30. _____
31. _____
32. _____
33. _____
34. _____
35. _____
36. _____
37. _____
38. _____
39. _____
40. _____
41. _____
42. _____
43. _____
44. _____


FRBKC
EXHIBIT NO. 233
11623   CRS
MCR METROPOLITAN
COURT REPORTING ● LEGAL VIDEO

J.A.1057

# EXHIBIT BL

# [PUBLIC VERSION]

J.A.1058

EXHIBIT NO. 20

Message

| From: | Imgarten, Jeffrey [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CB7EE225C63D41DEA12294D68E5BEDB1-J1JBI01] |
|---|---|
| Sent: | 11/14/2022 7:01:56 PM |
| To: | Humston, Tara L [tara.l.humston@kc.frb.org]; Hazen, Judith [judith.hazen@kc.frb.org]; Harwell, Ryan [ryan.harwell@kc.frb.org]; Conley, Amber [amber.conley@kc.frb.org]; Steckline, Michael [michael.r.steckline@kc.frb.org] |
| CC: | May-Oder, Christi [christi.may-oder@kc.frb.org]; Gaul-Pearson, Chris [chris.gaul-pearson@kc.frb.org]; Peters, Lacey [lacey.peters@kc.frb.org]; Crouch, Ross [ross.crouch@kc.frb.org]; Haake, Jenifer [jenifer.haake@kc.frb.org]; McGhee, Ben [ben.mcghee@kc.frb.org]; Crouse, Tyler [tyler.crouse@kc.frb.org]; Parton, Malea [malea.parton@kc.frb.org]; Billman, Nick [nick.billman@kc.frb.org]; Vandivort, Bill [bill.vandivort@kc.frb.org]; Weaver, Myles [myles.weaver@kc.frb.org]; Nugent, Jackie [jackie.nugent@kc.frb.org] |
| Subject: | Initial Draft of Commitments/Conditions for Custodia Bank—Supplemental Information |
| Attachments: | Custodia Proposed Membership Commitments Summary Memo - EI and Applications-11-10-22.docx; Copy of Examiner Regulation Assessment - Final.xlsx |

RESTRICTED FR // FRSONLY

**RESTRICTED FR // FRSONLY**

Colleagues,

As a supplement to the draft version of the commitments/conditions for Custodia Bank that were distributed to the group last week, attached is the examination team's assessment of various regulations that may not apply to Custodia because of the absence of deposit insurance from the FDIC and corresponding recommendations regarding to the extent to which mitigating measures (in the form of commitments or conditions) should be taken to address these regulation gaps. For ease of reference, both the commitments/conditions memo and regulation assessment are attached to this email and will be added to the calendar invite as well.

Thank you,



**Jeff Imgarten**
*Assistant Vice President | Applications & Enforcement*
P: *816.881.2073* E: *jeffrey.imgarten@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive · Kansas City, Missouri 64198 · www.kansascityfed.org > > > 🔗 📄 📹 ◉ 📷

---

**From:** Imgarten, Jeffrey
**Sent:** Thursday, November 10, 2022 4:10 PM
**To:** Humston, Tara L <tara.l.humston@kc.frb.org>; Hazen, Judith <judith.hazen@kc.frb.org>; Harwell, Ryan <ryan.harwell@kc.frb.org>; Conley, Amber <amber.conley@kc.frb.org>; Steckline, Michael <michael.r.steckline@kc.frb.org>
**Cc:** May-Oder, Christi <christi.may-oder@kc.frb.org>; Gaul-Pearson, Chris <chris.gaul-pearson@kc.frb.org>; Peters, Lacey <lacey.peters@kc.frb.org>; Crouch, Ross <ross.crouch@kc.frb.org>; Haake, Jenifer <jenifer.haake@kc.frb.org>; McGhee, Ben <Ben.McGhee@kc.frb.org>; Crouse, Tyler <tyler.crouse@kc.frb.org>; Parton, Malea <Malea.Parton@KC.FRB.ORG>; Billman, Nick <Nick.Billman@kc.frb.org>; Vandivort, Bill <Bill.Vandivort@kc.frb.org>; Weaver, Myles <Myles.Weaver@kc.frb.org>; Nugent, Jackie <jackie.nugent@kc.frb.org>
**Subject:** Initial Draft of Commitments/Conditions for Custodia Bank

RESTRICTED FR // FRSONLY

**RESTRICTED FR // FRSONLY**

Tara, Judith, Ryan, Amber, and Mike,

Pursuant to prior conversations with the Board, Ben McGhee, Ross Crouch, Jenifer Haake, and other examiners involved in the pre-membership examination of Custodia Bank identified various commitments and conditions that may merit consideration in conjunction with our evaluation of the membership application and master account request, respectively.  Since these commitments/conditions are unprecedented in several respects and have broad implications, we are sharing a draft version with you for review/discussion prior to providing them to the Board (no definitive timeline, but we would like to send them to the Board soon).

Recognizing there is likely much to discuss, debate, and explain regarding these commitments and conditions, we will set up a meeting next week to see if we can reach some type of consensus regarding our assessments and recommendations.  Given the number of stakeholders and the time of year, finding a date/time that will accommodate everyone's schedule is challenging.  We will do our best to minimize scheduling conflicts, but if you aren't able to attend, you are welcome to pass along any comments/feedback to the group or let me know directly and we can make sure your input is incorporated.  Along those lines, there is undoubtedly someone that I've (inadvertently) failed to include on this message and/or will accidentally omit on the forthcoming calendar invite---recipients can forward either or both as they deem appropriate.

If there are any immediate questions or concerns regarding next steps, please let me know.

Thank you,



**Jeff Imgarten**
*Assistant Vice President* | *Applications & Enforcement*
P: *816.881.2073*  E: *jeffrey.imgarten@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive  ·  Kansas City, Missouri 64198  ·  www.kansascityfed.org  > > >

# EXHIBIT BM

# [PUBLIC VERSION]

# KEPT UNDER SEAL PURSUANT TO PROTECTIVE ORDER

CONFIDENTIAL

IN ACCORDANCE WITH A PROTECTIVE ORDER, THE ENCLOSURE(S) SHALL BE TREATED AS CONFIDENTIAL AND SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.

# EXHIBIT BO

# [PUBLIC VERSION]

J.A.1062

Message

**Sent:**      11/27/2022 6:33:25 PM
**To:**        Patrick Grant [patrick.m.grant@frb.gov]
**Subject:**   RE: Copy of Custodia Briefing Memo?

Thank you very much for the update , Pat.



**Jeff Imgarten**
*Assistant Vice President | Applications & Enforcement*
P: *816.881.2073*  E: *jeffrey.imgarten@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive  ·  Kansas City, Missouri 64198  ·  www.kansascityfed.org  » » »

---

**From:** Patrick Grant <patrick.m.grant@frb.gov>
**Sent:** Sunday, November 27, 2022 4:59 PM
**To:** Imgarten, Jeffrey <jeffrey.imgarten@kc.frb.org>; Tkacz, Scott (Board) <scott.r.tkacz@frb.gov>; Kudiya, Asad (Board) <asad.i.kudiya@frb.gov>; Hickman, Daniel (Board) <daniel.j.hickman@frb.gov>; Sack, Vaishali (Board) <vaishali.d.sack@frb.gov>; Smith, Dwight (Board) <dwight.l.smith@frb.gov>; McCullers, Madeline (Board) <madeline.r.mccullers@frb.gov>
**Subject:** RE: Copy of Custodia Briefing Memo?

INTERNAL FR/OFFICIAL USE // FRSONLY

Hi Jeff,
Sorry for the delayed response.  Staff is still working on the briefing note, and the current path is leaning towards denial, although that could change.  We'll should be in a better place with the note around mid-week and would suggest having a conversation around then to discuss further.

Thanks,
Pat

---

**From:** Imgarten, Jeffrey <jeffrey.imgarten@kc.frb.org>
**Sent:** Tuesday, November 22, 2022 3:37 PM
**To:** Patrick Grant <patrick.m.grant@frb.gov>; Scott Tkacz <scott.r.tkacz@frb.gov>
**Subject:** Copy of Custodia Briefing Memo?

INTERNAL FR/OFFICIAL USE // FRSONLY

**INTERNAL FR/OFFICIAL USE // FRSONLY**

Pat and Scott,

Last week, Dwight had a few follow-up questions/clarifications for us regarding Custodia and indicated that he was working on a briefing note. In a related development, Jason Hinkle, Deputy Associate Director within RBOPS, touched base with Judith Hazen earlier this week regarding the status of Custodia's master account request for the purposes of briefing Vice Chair Barr.

CONFIDENTIAL                                                                      FRBKC-00016494

In light of the preceding, would it be possible for us to get a copy of the final memo provided to Vice Chair Barr in connection with any briefings regarding Custodia?  As we coordinate with our supervision staff in evaluating Custodia's pending response to the risk management gaps identified in our October letter, any context we can get on how our collective evaluation of the membership application is being framed for Vice Chair Barr and discussed among other stakeholders at the Board would be tremendously helpful.

Thank you in advance for your consideration.



**Jeff Imgarten**
*Assistant Vice President* | *Applications & Enforcement*
P: *816.881.2073*  E: *jeffrey.imgarten@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive  ·  Kansas City, Missouri 64198  ·  www.kansascityfed.org  >>>  🏢 🐦 📷 📷 📷

CONFIDENTIAL

# EXHIBIT BP

# [PUBLIC VERSION]

J.A.1065

## Short Message Report

| Conversations: 1 | Participants: 2 |
|---|---|
| Total Messages: 5 | Date Range: 11/30/2022 |

## Outline of Conversations

💬     **Crouch, Ross, McGhee, Ben - 11/30/2022** · 5 messages on 11/30/2022



EXHIBIT 99
WIT _Longster_
DATE: 10-24-23
Peggy Corbett RDR, CSR, CRR, CCR

CONFIDENTIAL

**Messages in chronological order** (times are shown in GMT -06:00)

---

💬    **Crouch, Ross, McGhee, Ben - 11/30/2022**

BM    **McGhee, Ben**                                                                     11/30/2022, 9:45 AM
Can you talk for a minute - I got a call from the Board yesterday and wanted to share unless Jeff has already done so

RC    **Crouch, Ross**                                                                       11/30/2022, 9:45 AM
yeah. I'm free

RC    **Crouch, Ross**                                                                    11/30/2022, 1:31 PM
If you guys have any debrief discussions for next steps, could you loop me in?

BM    **McGhee, Ben**                                                               11/30/2022, 1:43 PM
Will probably need to think a bit about how/when we talk to Wyoming about the denial. Probably, immediately prior to delivering the message to Custodia.

BM    **McGhee, Ben**                                                               11/30/2022, 1:55 PM
If it gets final to a final vote.

CONFIDENTIAL

# EXHIBIT BQ

# [PUBLIC VERSION]

**J.A.1068**

Hazen

EXHIBIT NO. 26

10.17.23

METROPOLITAN
COURT REPORTING & LEGAL VIDEO

| From: | "Jason Hinkle" <jason.a.hinkle@frb.gov> |
|---|---|
| Sent: | Mon 1/9/2023 5:38:35 PM (UTC-05:00) |
| To: | "Judith Hazen \(FRS\)" <judith.hazen@kc.frb.org>, "Margaret DeBoer" <margaret.deboer@frb.gov>, "Matthew Malloy" <Matthew.S.Malloy@frb.gov>, "Courtney Demartini" <courtney.e.demartini@frb.gov> |
| Cc: | "Christi May-Oder \(FRS\)" <christi.may-oder@kc.frb.org>, "Nick Billman \(FRS\)" <nick.billman@kc.frb.org>, "Bill Vandivort \(FRS\)" <bill.vandivort@kc.frb.org>, "Joshua Chadwick" <joshua.p.chadwick@frb.gov>, "Kavita Jain" <kavita.jain@frb.gov>, "Evan Winerman" <evan.h.winerman@frb.gov>, "Gavin Smith" <gavin.l.smith@frb.gov> |
| Subject: | RE: Draft Recommendation Memo |
| Attachment: | President George Custodia Master Account Recommendation Memo-Draft 01.06.2023 KJ_JH.docx |

RESTRICTED FR // FRSONLY

Judith,

Attached is feedback from Board S&R, Financial Stability and me. Happy to have a call to talk through the feedback. In summary, there is no concern with the proposed recommendation and the feedback points to places where the framing could be augmented. Thanks!

Jason

**From:** Hazen, Judith <judith.hazen@kc.frb.org>
**Sent:** Friday, January 6, 2023 2:53 PM
**To:** Jason Hinkle <jason.a.hinkle@frb.gov>; Margaret DeBoer <margaret.deboer@frb.gov>; Matthew Malloy <Matthew.S.Malloy@frb.gov>; Courtney Demartini <courtney.e.demartini@frb.gov>
**Cc:** Christi May-Oder {FRS} <christi.may-oder@kc.frb.org>; Nick Billman (FRS) <nick.billman@kc.frb.org>; Bill Vandivort (FRS) <bill.vandivort@kc.frb.org>; Joshua Chadwick <joshua.p.chadwick@frb.gov>
**Subject:** Draft Recommendation Memo

RESTRICTED FR // FRSONLY

## RESTRICTED FR // FRSONLY

All,

Pursuant to the proposed S letter, we are providing our pre-decisional draft memorandum regarding potential actions on Custodia's request for a master account. For ease of reference, public policy considerations are discussed on pages 2 and 8. Please let us know if you have any questions or comments as soon as possible.

Judith

FRB-AR-000324



**Judith Hazen**
*Vice President*
816.881.2789   *Judith.Hazen@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive   Kansas City, Missouri 64198   www.kansascityfed.org

FRB-AR-000325

# EXHIBIT BS

# [PUBLIC VERSION]

J.A.1071



RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Date:    January XX, 2023

To:    Esther George

From:    Judith Hazen and Christi May-Oder

Subject:    Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation

---

EXECUTIVE SUMMARY

Custodia Bank, Inc., (Custodia) Cheyenne, Wyoming, a *de novo*, *uninsured* state-chartered special purpose depository institution (SPDI), requested a master account with the Federal Reserve Bank of Kansas City (FRBKC) on October 29, 2020. Custodia proposes to serve the digital asset industry by acting as a bridge to the traditional payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption, and other crypto-asset escrow and brokerage services. FRBKC's review of Custodia's business plan and supporting documents noted the following key concerns:

> **Commented [JH1]:** The memo doesn't explicitly discuss the application of the Board's Account Access Guidelines to Custodia's request. While many of the risks discussed in the Guidelines are mentioned in the discussions, it isn't easy to connect the dots. Consider adding an appendix that lists the 6 principles with bullets of the key findings and implications for the recommended action.

- Custodia's planned business model relies heavily upon a nascent and volatile crypto industry and presents illicit finance risks through novel activities.
- As noted in the federal bank regulatory agencies' January 3, 2023 Joint Statement,[1] these novel activities do not yet have legal clarity at the federal level and have not yet been deemed permissible for insured depository institutions. Further, it has yet to be determined whether or how the activities may be conducted in a manner that adequately addresses safety and soundness concerns. This uncertainty, inherent risk, and the narrowly-focused monoline business plan concentrated in the crypto sector call into question the financial viability of the firm and its ability to generate sufficient earnings to support operations and augment capital.
- FRBKC credit risk and supervisory staff's review of existing operations and policies (related to the core banking services Custodia intends to offer at launch and in the near term) revealed exceptions to safe and sound banking standards and best practices in the areas of BSA/AML and OFAC compliance, information technology, internal audit, financial projections, and liquidity risk management. While these matters could be remediated for the limited set of core banking services in the near- and medium-term, the viability of the business model is fundamentally dependent upon Custodia engaging in digital asset activities that have significantly more risk and operational complexity (and would require correspondingly more robust risk management and compliance systems).
- Absent a federal regulator, the Reserve Bank will have limited visibility into Custodia's financial condition and operations (and therefore, limited visibility into the risks borne by the Reserve Bank and other participants in the Federal Reserve payment system), which are expected to change significantly through evolution of the business model following commencement of operations. Relatedly, regulation of Custodia is entirely dependent on an unproven state supervisory program specifically designed for athis novel charter/institution type that does not inherently include the safety and soundness standards, requirements, and safeguards embedded within the regulatory regime established for insured depository institutions. FRBKC also has serious concerns with safely and effectively resolving a deposit-taking entity outside of the Federal Deposit Insurance

> **Commented [JH2]:** There are currently institutions without a federal regulator with master accounts and access to services and FRBKC has, if not currently, provided such institutions access. Consider linking the lack of visibility (or less visibility than an IDI) into the condition, operations, etc. with the institution's planned higher risk, monoline business model and the high volatility of the crypto industry.

---

[1] *See* Joint Statement on Crypto-Asset Risks to Banking Organizations, https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230103a1.pdf, January 3, 2023.

1

FRB-AR-000326

**J.A.1072**

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Corporation (FDIC) resolution process through the new and untested Wyoming state law resolution process for SPDIs.

- The approval of an uninsured, state-chartered entity with a narrowly-focused business model reliant on serving the crypto industry and issuing a proprietary crypto token to be backed by cash held as reserves at the FRBKC, and issued and circulated on an open, public, decentralized network, would pose material public policy concerns that could create undue risk to the financial system and adversely affect the Federal Reserve's ability to implement monetary policy.

In light of these concerns, staff recommends denial of Custodia's master account request.

While the decision to deny a master account request rests with the Reserve Bank, Federal Reserve System guidance is being developed that requires a preliminary recommendation for denial of a master account request to be shared with the Director of the Board's Division of Reserve Bank Operations and Payment Systems (RBOPS) prior to communicating any denial to the entity seeking the account. The consultation process provides an opportunity for RBOPS and other Board Divisions to provide feedback to the Reserve Bank regarding the Reserve Bank's analysis of the entity. The Reserve Bank may incorporate or address any feedback or concerns, but still retains decision making authority. The Reserve Bank plans to provide a summary recommendation to Matt Eichner, Director of RBOPS, following your support for the denial decision.

BACKGROUND AND TIMELINE

Custodia is a *de novo* SPDI with a charter issued under the Wyoming SPDI Act. The Wyoming legislature enacted the SPDI Act (and other digital-asset-related legislation) in 2019, to facilitate the establishment of a new type of uninsured depository~~financial~~ institution that could serve blockchain innovators and encourage crypto-asset-based businesses to form and operate in Wyoming. Under the SPDI Act, Custodia may engage in nonlending banking business, provide payment services for depositors, and, with the approval of the State Banking Commissioner, engage in any other activity that is usual or incidental to the business of banking. Wyoming law prohibits SPDIs from making loans and requires SPDIs to maintain unencumbered liquid assets with a value of at least 100 percent of its deposit liabilities.

Custodia was granted an SPDI bank charter by the Wyoming Division of Banking (DOB) on October 28, 2020. Custodia submitted Operating Circular 1 Master Account Agreements to FRBKC on October 29, 2020, and later submitted application materials to become a member of the Federal Reserve System on August 5, 2021. Since that time, FRBKC has engaged extensively with Custodia regarding its master account request and devoted significant resources to understanding Custodia's business plan, the SPDI charter, the DOB's supervision program for SPDIs, and the risks and opportunities presented by Custodia's request.

Concurrent with the FRBKC's review, numerous reports and events surfaced that shed light on the nascent, volatile crypto-asset industry, vulnerabilities of open, public, decentralized networks, and the impact of insufficient oversight of firms engaged in related activities. In 2020 and 2021, the Office of the Comptroller of the Currency Interpretive Letter 1170 series provided and clarified interpretations of permissibility for national banks, reaffirming the primacy of safety and soundness in conducting certain cryptocurrency, distributed ledger, and stablecoin activities, and requiring supervisory nonobjection before national banks may engage in such activities. In November 2021, the President's Working Group (PWG),[2] joined by the FDIC and the Office of the Comptroller of the Currency (OCC), released a report highlighting the benefits

---

[2] *See* President's Working Group on Financial Markets Report on Stablecoins, https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf, November 1, 2021.

2

**Commented [KJ3]:** Consider including a bullet in this exec summary on the significant BSA/AML risks posed by the proposed business model

**Commented [KJ4]:** Refer to risks noted in the interagency statement

**Commented [KJ5R4]:** Consider also adding a sentence noting that, as proposed, Avit would be an openly circulating liability of Custodia on an open, public network. Accordingly, Custodia would not be able to track the holders of its liability at any given time, neither would it be able to track/monitor intermediaries trading, leveraging, or fractionalizing that liability. This poses risks not just to custodia, but potentially to financial stability if the payment system were to scale

**Commented [JH6]:** "Material public policy concerns" is not defined and open to interpretation. Consider replacing with a reference to the principles in the Board's Account Access Guidelines.

CONFIDENTIAL - Subject to Protective Order

FRB-AR-000327

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

and risks of stablecoins, including inconsistent and fragmented oversight of token issuers. The report provided several recommendations for mitigating risks to stablecoin users and guarding against stablecoin runs (including a requirement for stablecoin issuers to be insured depository institutions), the latter of which sought to address concerns related to payment system risk and concentration of economic power. In both December 2021 and October 2022, the Financial Stability Oversight Council (FSOC) published reports[3] highlighting regulatory concerns with stablecoins and the wider cryptocurrency market, including the risks that crypto-asset activities could pose to the stability of the U.S. financial system if their interconnections with the traditional financial system or their overall scale were to grow without adherence to or being paired with appropriate regulation.

<div style="border:1px solid;">Commented [KJ7]: Could also refer to the risks highlighted in the Executive Order on DA https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/</div>

The volatility of the market was evident during this time as well. In May 2022, the TerraUSD stablecoin and Luna token, which together formed an algorithmic stablecoin, collapsed, causing investors to lose millions. In November 2022, the cryptocurrency exchange FTX collapsed and filed for bankruptcy, which had a direct and significant impact on Silvergate Bank, La Jolla, California, an insured state member bank, and reportedly led to instability in a number of crypto-related companies.[4] Amidst these reports and collapses, the crypto industry continues to experience a so-called "crypto winter" in which two-thirds of the market capitalization or total market value of cryptocurrency has been lost and many crypto and blockchain companies continue to experience losses as prices fall, illustrating the risks and volatility within the nascent industry. Most recently, the Federal Reserve along with the FDIC and OCC issued a joint statement highlighting crypto-asset risks that banking organizations should be aware of as confirmed by these events over the past year. In addition to these industry developments, the Board issued Guidelines for Evaluating Account and Services Requests (Account Guidelines) to the Reserve Banks, inclusive of a tiered framework, in August 2022.

<div style="border:1px solid;">Commented [KJ8]: This section focuses on risks associated with unregulated exchanges and cryptocurrencies. Custodia could argue that it is looking to bring the activity within the perimeter. As such it is important to also highlight the following additional risks that have been illustrated in the recent crypto market meltdown:
- (1) open, public decentralized networks, specifically those related to hacks/thefts, illicit finance, lack of governance mechanisms, and absence of standards (refer to interagency statement), given that Custodia is proposing issuing a stablecoin on such a network
- (2) monoline, crypto-focused business models</div>

Custodia proposes to serve the digital asset industry by acting as a bridge to the traditional payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption, and other crypto-asset escrow and brokerage services. Custodia represents it is seeking direct access to the Federal Reserve payment system and a master account to execute its business plan in a revenue efficient manner and to mitigate apparent liquidity and settlement risks within the broader digital asset ecosystem.

Upon receipt of the account request, Reserve Bank staff began an immediate assessment of Custodia's business plan and supporting documents. During this evaluation, the timelines for the various planned crypto products and services have changed and the proposed use cases of the Avit have evolved over time, as have staff employed by Custodia in various key areas. Custodia was notified of its legal eligibility for a master account and legal eligibility for membership in the Federal Reserve System in early 2022, understanding that legal eligibility merely means an entity has met the initial threshold of eligibility and can proceed to an assessment of business model and risks posed. Shortly after the issuance of the PWG report, Custodia submitted a draft deposit insurance application to the FDIC. The FDIC provided feedback and based on those interactions, Custodia subsequently abandoned plans to seek deposit insurance. Custodia continued work throughout 2021 and 2022 to build products and operational infrastructure and regularly engaged with Reserve Bank supervisory staff regarding risk management and operational infrastructures.

---

[3] *See* Financial Stability Oversight Council 2021 Annual Report, https://home.treasury.gov/system/files/261/FSOC2021AnnualReport.pdf ; see also the FSOC's Report on Digital Asset Financial Stability Risks and Regulation (October 3, 2022), https://home.treasury.gov/system/files/261/FSOC-Digital-Assets-Report-2022.pdf.

[4] *See* "Silvergate Raced to Cover $8.1 Billion in Withdrawals During Crypto Meltdown," Wall Street Journal (January 5, 2023), https://www.wsj.com/articles/silvergate-raced-to-cover-8-1-billion-in-withdrawals-during-crypto-meltdown-11672895207?st=rit0i89dnb6qnrb&reflink=desktopwebshare_permalink

3

CONFIDENTIAL - Subject to Protective Order

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Beginning September 6, 2022, a pre-membership examination occurred. Custodia was informed that information obtained during the pre-membership examination would be used both in the evaluation of Custodia's master account request and membership application (as had been the case through these processes) to reduce repetitive questions and burden on Custodia. The membership examination was aimed at evaluating only Custodia's risk management program related to core banking products that would be offered upon opening, namely deposit accounts and traditional payment services.

Custodia reported throughout 2021 and 2022 that crypto-asset-related products would be offered after they opened for business, although the permissibility of these activities for an insured depository institution or state member bank remained in question and prior DOB notification is required. At the time of the pre-membership examination, Custodia's plans for crypto-asset-related products and services, including the technology and risk management infrastructures to support, facilitate, and execute the planned activities, remained in the early stages of development and were not formally assessed as part of the review. Nonetheless, the September 6, 2022 pre-membership examination identified significant risk management gaps in Custodia's day-one activities, which will consist of only limited banking services. These gaps were most notable in the areas of BSA/AML and OFAC compliance, internal audit, and information technology relative to what would be expected of an operating state member bank with only traditional banking activities.

A review of activities was conducted by the DOB in September 2022. While the state examiners identified some of the issues raised by FRBKC supervisory staff, the scope of the review and details regarding findings appear more limited. Subsequent to the DOB review, Custodia was granted a Certificate of Authority (COA) on September 12, 2022, approving the firm to commence business within six months. The approval was limited to imminent traditional banking products, relying on a phased formal approval process to be followed by the organization prior to commencing proposed digital asset activities.

On December 20, 2022, Custodia provided the Reserve Bank an update of their efforts to remediate the risk management gaps that were identified during the pre-membership examination. However, given the significance and breadth of the detailed issues identified during the examination, a targeted review conducted by the Reserve Bank would be necessary to fully assess the adequacy of Custodia's response.

EVALUATION OF MASTER ACCOUNT REQUEST

Structure

By legislative design, an SPDI is not a traditional bank; SPDIs have unique features that distinguish them from traditional commercial banks and weaken or remove protections that exist for customers of insured depository institutions. For example, SPDIs are exempt from Wyoming's requirement that its banks obtain FDIC insurance.[5] *See* Wyo. Stat. § 13-2-103(a). FDIC insurance "protects depositors if a bank fails ... and helps prevent bank runs by providing consumers with the confidence that their money will be available during periods of economic or financial stress."[6] .

As noted above, SPDIs are required to maintain unencumbered liquid assets equal to at least 100 percent of deposit liabilities, which is intended to mitigate the absence of FDIC insurance protection. However,

---

[5] As noted above, Custodia filed a draft deposit insurance application with the FDIC following the release of the PWG report on Financial Markets Report on Stablecoins on November 1, 2021, which recommended that stablecoin issuance be limited to FDIC-insured depository institutions. The FDIC reviewed the draft application and provided feedback to Custodia in early 2022. Custodia subsequently abandoned plans to seek deposit insurance.
[6] See Congressional Research Service, *An Analysis of Bank Charters and Selected Policy Issues* (January 21, 2022), https://crsreports.congress.gov/product/pdf/R/R47014.

4

CONFIDENTIAL - Subject to Protective Order

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

existing statutory and regulatory frameworks, including those related to resolution, certain capital requirements, enforcement actions, changes in control, activities restrictions, and consumer protection are directly linked to (and only applicable based on) status as an insured depository institution. Thus, Custodia is seeking to benefit from Federal Reserve System (FRS) financial services without being subject to the same regulatory limitations as insured depository institutions designed to protect depositors and bank counterparties, has no federal banking regulator,[2] and is not obligated to comply with traditional banking regulations.

Proposed Business Plan

Custodia's proposed business plan is narrowly focused on serving the crypto-asset sector, offering novel, high-risk business activities for which a fully mature legal/regulatory environment and industry-standard, business-cycle-tested set of risk management and operational practices and tools have not yet been established.  Custodia intends to engage in a broad range of digital-asset-related activities that, while allowed for an SPDI as a matter of Wyoming state law, are not clearly permissible for insured depository institutions or state member banks because they extend beyond existing interpretations and guidance from the federal banking agencies on digital asset/blockchain technology and raise safety and soundness and illicit finance concerns. Custodia has identified four key business lines that it intends to initiate over a three-year time frame:

(1) core banking – traditional banking services, including demand deposits, ACH and wire services, offered through internally developed online and mobile platforms;

(2) custody – custody of digital assets, including holding crypto-assets on balance sheet to facilitate the execution of transactions;

(3) prime services – on/off ramp transactions between fiat currency and crypto-currency, agency services including asset brokerage, escrow, foreign exchange, and finder activities related to digital asset lending; and

(4) Avit – a bank-issued crypto token utilized for instantaneous payments that would freely circulate on a public blockchain.

BSA/AML and OFAC Compliance

In addition to concerns with Custodia's business plan being focused on a narrow sector of the economy and financial services industry, to date, there is lack of clarity at the federal level regarding the permissibility of several activities proposed by Custodia. These concerns are further heightened given that Custodia is an uninsured depository institution focused almost entirely on serving the crypto-asset market, which presents elevated illicit finance and other safety and soundness risks.

Crypto-assets pose significant BSA/AML and OFAC compliance risks due to the lack of transparency; ease and speed of transfer; and general irrevocability of transactions.  The ability to conduct instantaneous transactions electronically and pseudonymously enables numerous small transactions to move large sums of money undetected by monitoring systems. While the pre-membership examination did not include a review of the proposed crypto-asset activities, examiners identified significant gaps in Custodia's BSA/AML and OFAC compliance programs even for its core banking activities. Although Custodia has communicated they are actively working to remediate the gaps identified during the pre-membership examination, the gaps identified with respect to its core banking activities raise significant concerns regarding Custodia's ability to effectively scale the program to comply with BSA/AML and OFAC requirements for its proposed, higher-risk crypto-asset activities.  Such concerns are highlighted in the

---

[2] [Place holder for final recommendation/action on membership application.]

5

> **Commented [KJ9]:** Consider adding a section on operational risks of proposed business model, highlighting:
> - Crypto-asset trading, and crypto-collateralized lending involve significant operational risks, which pose significant safety and soundness concerns
> - Custodia would have no control over the governance of the network on which Avit will be circulated. The open decentralized network could have outages, cyber-attacks, hostile takeovers, etc. all of which would de out of Custodia's control.

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

January 3, 2023 Joint Statement, which notes that, "agencies are continuing to assess whether and how current and proposed crypto-asset-related activities by banking organizations can be conducted in a manner that adequately addresses safety and soundness, [...] legal permissibility, and compliance with applicable laws and regulations, including anti-money laundering and illicit finance statutes and rules."

Although not reviewed in detail during the pre-membership examination, Custodia's planned issuance of the Avit on two public permissionless blockchains adds to concerns related to BSA/AML and OFAC compliance. In the Joint Statement, the federal banking agencies also note that "[b]ased on the agencies' current understanding and experience to date, the agencies believe that issuing or holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound banking practices." Custodia acknowledges that users would have the ability to conduct Avit transactions in perpetuity using wallets not hosted or controlled by Custodia, which would not have undergone an onboarding process with Custodia. Similarly, non-customers of Custodia would be able to hold and redeem Avits without undergoing the full due diligence required for customer on-boarding. In addition, by the nature of the digital assets Custodia intends to hold in custody and the blockchains upon which transactions in those assets are recorded, Custodia will pay processing fees to transaction validators who are unknown at the time the payment is made and who may remain anonymous even after the wallet associated with the validator is known. This places Custodia and its customers in the position of making payments to unknown parties who could be illicit actors or sanctioned entities. While the cryptocurrency industry remains in its infancy, and there are several questions related to application of the existing BSA/AML/OFAC legal regime to digital assets that neither FinCEN nor OFAC has addressed, such issues highlight the inherent risks associated with crypto-assets that need to be mitigated to ensure this activity can be conducted in a safe and sound manner consistent with applicable law.

> **Commented [KJ10]:** Suggest using the term "crypto-assets" or "digital-assets" for consistency.

Furthermore, Custodia has experienced turnover within key leadership roles, most notably the BSA/AML compliance officer, a role that four individuals have held since 2021, as well as the chief technology officer and chief compliance officer. The lack of stability in these key roles and lack of collective depth of relevant banking experience and bank-specific risk management expertise raise concerns regarding the management team's ability to conduct the proposed activities in a safe and sound manner. A lack of depth and breadth of expertise in risk, banking regulation, and compliance at the board of directors and management levels may have contributed to the number and degree of shortcomings identified in the pre-membership examination. Custodia added management and staff resources in BSA and risk after the pre-membership examination to address these concerns. However, the effectiveness of these additions is not readily apparent.

Financial Considerations

It is uncertain whether a narrowly-focused business of offering banking services to a novel, high-risk, and not fully mature industry is viable. The Wyoming SPDI charter has not yet shown itself to support a successful business model. At the Reserve Bank's pre-membership review, which covered only core banking operations, examiners identified numerous exceptions to safe and sound banking standards, requirements, and best practices. While it may be possible for Custodia to remedy some of these matters for the initial core banking services planned to be offered by the institution in the near term, there was insufficient information available at the time of the examination to fully evaluate the adequacy of Custodia's risk management systems for much riskier and complex planned digital asset activities, which are fundamental to the institution's ongoing viability. Additionally, the narrowly-focused nature of the novel SPDI business model means an SPDI's customer base is not diversified and likely to respond in a similar manner to industry stresses and events. For example, the potential rapid loss of customers could result in a

> **Commented [JH11]:** Consider adding the point that it is unclear (as articulated in the recent Joint statement) that all of the future planned crypto activities (e.g., holding crypto on book)are legally permissible for an IDI and that Custodia's business model may not be viable if it were not able to conduct those activities.

> **Commented [JH12]:** Consider removing. It is not clear how this is related to the case-by-case analysis of Custodia's request.

> **Commented [KJ13]:** Also emphasize interconnectedness of crypto market participants and contagion risk, as evidenced by Terra/Luna and FTX collapses and resulting cascading effect on other crypto focused companies

> **Commented [JH14]:** Also consider adding mention of analysis of the maturity of Custodia's liquidity risk management processes. The Silvergate example illustrates the need for a highly developed liquidity risk management framework for institutions in the crypto space, particularly for uninsured institutions which have higher run risk.

6

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

rapid decline in revenue and threaten the viability of an SPDI, which is exacerbated by the absence of deposit insurance and an untested resolution program administered by the DOB.

<u>Capital Requirements</u>

The statutory capital requirements (W.S. 13-12-110) prescribe initial capital for the first three years of operations. They provide little guidance to the Commissioner on how to develop capital regulations. The SPDI rules (Chapter 20, section 2) say that an SPDI shall have initial capital commensurate with its risk profile and proposed activities; however, the rules do not specify how to assess the risk of the activities unique to SPDIs or relate them to capital requirements. The rules give the Commissioner a high degree of discretion in setting capital requirements, which have been set as these years of projected operating expenses for Custodia. It is not clear how this capital requirement was determined or will change over time. It is unknown if the Wyoming capital regulations for SPDIs adequately capture an SPDI's risks. Insufficient capital to support its operations and timely fulfillment of obligations, including during periods of stress, creates undue risk to the Reserve Bank.

> **Commented [JH15]:** Are there aspect of Custodia's planned core banking activities that would require a more robust capital regime if they were an IDI? If so, consider adding discussion of that.

Custodia is not subject to the federal regulatory capital framework for traditional insured banks and the state regulations do not contain minimum leverage and risk-based capital requirements. Even if the state regulations did contain such requirements, the federal framework for all but the largest banks is based on capital necessary for the primary risk of a traditional banking model, credit risk. It is not adequate to measure capital adequacy for a nontraditional institution like an SPDI, which is not permitted to engage in lending by statute, but has significant operational, cybersecurity, BSA/AML, strategic, and other risks.

In the absence of deposit insurance and absence of interagency capital standards that account for the types of risks posed by Custodia's business model and considering the institution's reliance on revenue generated from narrowly focused, volatile crypto-asset-based activities as its primary source of capital augmentation, it remains unclear if Custodia's current and projected capital base will be sufficient to support its risk profile.

> **Commented [JH16]:** Consider adding discussion that the lack of a robust capital requirement framework for Custodia could result in unrestrained asset growth with implications for the assessment of monetary policy implementation and financial stability risks under the Guidelines. The discussion later in the document hints at this issue, but it might be better to be more explicit here.

<u>Resolution Process</u>

The difference between the resolution framework for a federally insured depository institution and an SPDI is a key difference between Tier 1 and Tier 3 institutions as described in the Account Access Guidelines and a major source of risk to the FRBKC. Custodia is required by state regulation to develop a resolution plan within six months of commencing operations. Wyo. Rules & Regs. 021.0002.20 § 4(a). Since Custodia is not FDIC insured, nor federally regulated, the resolution process in the event of a failure is not sufficiently defined without a resolution plan. Under Wyoming's SPDI statute, each SPDI must secure a surety bond or irrevocably pledge specified assets to the State to cover costs likely to be incurred by the Commissioner in a liquidation or conservatorship of the SPDI. Wyo. Stat. § 13-12-118. The DOB has required Custodia to pledge $15MM of capital. This capital is not presumed to support the risk born by the Federal Reserve Bank, and instead is excluded from consideration of unencumbered assets that could protect the Reserve Bank in the event of a Custodia failure with a negative balance in the master account. At this time, Custodia has not developed a resolution plan, but has indicated preliminarily that it would rely upon a sale of its assets and liabilities to another Wyoming SPDI, none of which are federally regulated or currently operating. In the event no Wyoming SPDI is available to acquire its business, Custodia would sell its custody business to crypto-asset exchanges or trust companies, and its deposit business to banks that provide traditional banking services to the crypto-asset industry. However, as evident by recent events in the crypto industry, such proposed acquirers are likely to be experiencing stress at the same time as Custodia.

7

CONFIDENTIAL - Subject to Protective Order

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

If a resolution plan is put in place by Custodia, the process outlined by the DOB contains no guarantees the Reserve Bank would be made whole in the event Custodia fails to meet its obligations. In the event of an SPDI's failure and subsequent resolution under a receivership administered by the State Banking Commissioner, this Reserve Bank would have the same priority treatment as all other Custodia customers, with its claims paid at the same time and with the same priority as any customer "claims relating to deposits, custodial, fiduciary and trust assets." Wyo. Rules & Regs. 021.0002.20 § 6(j). This contrasts with insured, federally regulated entities where customer deposits are insured and indemnity agreements between the Reserve Banks and both the FDIC and National Credit Union Administration would provide indemnification to the Reserve Bank in the event of a failure up to the value of the collateral pledged to the Reserve Bank. With the DOB and Custodia, there is no indemnity agreement or other arrangement in place to provide assurance that the Reserve Bank would be protected in the event it continues providing financial services to an SPDI experiencing financial distress. The Reserve Bank's practice to assist and ensure orderly closures of depository institutions would be severely hindered by a lack of clarity around protecting the Reserve Bank from loss. In addition, the process for resolution, in the absence of a plan defined by the institution and approved by the DOB, is unclear. The DOB would be faced with the receivership of a depository institution with novel activities for which it does not have any prior experience.

Public Policy Implications

> **Commented [JH17]:** Consider renaming this section. As me

The statutory and regulatory safety and soundness framework for SPDIs is substantially different from the framework that applies to federally insured institutions. While state and federal banking agencies are responsible for ensuring safety and soundness of an entity's activities, *only* the Federal Reserve has a mission to ensure a safe and efficient payments system.

The lack of a federal prudential framework for SPDIs (like other Tier 3 institutions under the Guidelines) leaves the Reserve Bank with limited risk-monitoring tools and virtually no remediation or enforcement authority, other than what would be available under the Board's Policy on Payment System Risk and Operating Circular 1.[8] The potential for contractual commitments by Custodia to provide information and other limited monitoring or visitation rights by the Reserve Bank as a condition for the provision of an account and services would not mitigate risks to nearly the same extent or with the same legal certainty that would come from federal prudential supervision over Custodia pursuant to a well-established legal and regulatory framework. This effectively creates an inability by the Reserve Bank to assist the Board in its policy goals of ensuring the safety and soundness of the banking system, effectively implementing monetary policy, promoting financial stability, protecting consumers, and promoting a safe, efficient, inclusive, and innovative payment system.

> **Commented [JH18]:** I find this sentence overly broad and confusing. Are you asserting that providing an account and/or services to any tier 3 institutions (without a federal regulator) would be contrary to Board policies? This sentence could be read to imply that. I suggest that you rework this sentence to be focused on your specific risk analysis of Custodia.

These concerns are presented through the structure of an SPDI as well as Custodia's planned business model and *de novo* status. For example, the design of the Avit, which is intended to be backed by deposits held in a master account, could have implications for the Federal Reserve's balance sheet. Growth in the Avit would generate demand for Federal Reserve liabilities and given the volatility of the crypto business, could create significant fluctuations and complicate the Federal Reserve's ability to manage the size of its balance sheet.

> **Commented [RJ19]:** The operational risks of Avit issued and circulated on an open public decentralized network also poses significant risks, if Avit scales and becomes a key component of the US payment system.
> There are significant risks to payment system that operates on an infrastructure with "lack of governance mechanisms establishing oversight of the system; the absence of contracts or standards to clearly establish roles, responsibilities, and liabilities; and vulnerabilities related to cyber-attacks, outages, lost or trapped assets, and illicit finance." – as noted on the interagency system.

In addition, the backing of Avits by deposits held at the Reserve Bank could be viewed as implicit backing by the Federal Reserve, which could also enable such products to scale quickly. While Custodia alone may not impact the Federal Reserve's balance sheet, granting Custodia a master account would set a favorable

> **Commented [JH20]:** This characterization seems to me overly broad and overstating the risk without support. The issuance of Avits would need to be massive before it created implications for the balance sheet. Are there specific aspect of Custodia's business model (such as the lack of a dynamic, asset-sized based capital requirements) that increase the monetary policy and/or financial stability risks of the Avit?

---

[8] *See* The Federal Reserve's Payment System Risk Policy,
https://www.federalreserve.org/paymentsystems/psr_relpolicies.htm; Operating Circular 1, Section 2.11,
https://www.frbservices.org/binaries/content/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf

8

FRB-AR-000333

J.A.1079

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

precedent for other existing SPDIs and other non-traditional charters. It would make uninsured charters more attractive for the crypto-asset industry, and issuance of instruments like the Avit by master account holders may be precedent-setting in allowing similar products at other banks. Collectively, these trends could accelerate the growth of the crypto-asset market, creating financial stability concerns. These are broad policy matters that extend beyond the Reserve Bank and while risk mitigation strategies are being contemplated by the Federal Reserve Board, practically, it is not clear how these controls would be implemented.

CONCLUSION

The identified issues create undue risk to the Reserve Bank, risk to the overall economy due to potential illicit activities, and potential risk to the payment system. In light of these risks and public policy implications, staff recommends denial of Custodia's master account request.

**Commented [JH21]:** Seems overly broad and potentially overstating the risk. I believe that there are several IDIs that have played around with stablecoins, such as BNYM. Consider focusing on the analysis of Custodia's proposed stablecoin/Avit that potentially raises higher risk than other examples.

**Commented [JH22]:** Aren't there already a list of crypto-related institutions with a range of novel charters that are uninsured? So, how would a master account for Custodia be some watershed in interest of uninsured charters?

You have strong arguments above (some of which could be further strengthened) that the specific risks of Custodia support denying an account. Consider framing the monetary policy and financial stability risks as contributing factors that augment that more critical risks above.

**Commented [JH23]:** From Financial Stability colleagues: the link between accelerating the growth of the cryptoasset market and creating financial stability concerns isn't totally clear

**Commented [JH24]:** This mention of potential risk mitigation strategies (i.e. account balance limits, correct) being explored by the System seems to added without context.

9

# EXHIBIT BW

# [PUBLIC VERSION]

J.A.1081



## Short Message Report

| Conversations: 1 | Participants: 2 |
|---|---|
| Total Messages: 45 | Date Range: 1/26/2022 |

### Outline of Conversations

💬    **Triano, Rob, Crouch, Ross - 1/26/2022** · 45 messages on 1/26/2022

CONFIDENTIAL

**Messages in chronological order** (times are shown in GMT -06:00)

---

💬   **Triano, Rob, Crouch, Ross - 1/26/2022**

RC   **Crouch, Ross**                                                                 1/26/2022, 7:48 AM
Avanti Executive Summary 1.25.2022 DRAFT.CMO - RC addressed comment.docx{Avanti Executive Summary 1.25.2022 DRAFT.CMO - RC addressed comment.docx}

I addressed Christi's first comment here

*Attachment: Avanti Executive Summary 1.25.2022 DRAFT.CMO - RC addressed comment.docx (10 KB)*

RT   **Triano, Rob**                                                                 1/26/2022, 7:56 AM
Thanks for covering that...if you want to reply to the email, feel free.  I was going to wait for Chris and then address all comments in one.  I'm in the SP doc and will finish that sentence on ACH debitors...it was missing a few words

RC   **Crouch, Ross**                                                                 1/26/2022, 7:57 AM
I think it is okay to address all the comments in one

RT   **Triano, Rob**                                                                 1/26/2022, 8:04 AM
I was thinking about this a bit last night on the ACH originators...went back through my FFIEC teaching materials.  If an ACH originator initiates 300 debit transactions for the day. The receiving banks have until settlement (think 2pm daily) to reject or accept the transactions.  On top of that the receiving bank has a couple days to then return the transaction based on any number of error codes.  I want to say this is a specific example of settlement risk, but then the  ACH collateral accounts are the mitigant in that case.

RT   **Triano, Rob**                                                                 1/26/2022, 8:05 AM
300 is just an arbitrary number in this example.  If 15 of them are returned, the collateral account would need to be amply funding at a certain dollar level

RC   **Crouch, Ross**                                                                 1/26/2022, 8:05 AM
I see.  Maybe we can reword that piece to state Settlement risk to Avanti in prime services is expected to be low as Avanti intends to only act as an agent...

RT   **Triano, Rob**                                                                 1/26/2022, 8:07 AM
I'll tweak just a bit there.  I don't think we need to be any more explicit in core banking - it should be inferred that ACH collateral is covering the risk that the bank is on the hook for returned transactions.  It's a combo of settlement, compliance, and operational risks

RT   **Triano, Rob**                                                                 1/26/2022, 8:07 AM
Working on that one-pager to guide tomorrow's meeting.  may share that with you shortly...I scrapped what I had last night

RC   **Crouch, Ross**                                                                 1/26/2022, 8:07 AM
Yeah.  I'm just not confident enough on what settlement risk is to make any definitive statements

RC   **Crouch, Ross**                                                                 1/26/2022, 8:08 AM
bummer that you had to scrap what you had.

RC   **Crouch, Ross**                                                                 1/26/2022, 8:08 AM
I'm happy to help

RT   **Triano, Rob**                                                                 1/26/2022, 8:08 AM
I'm a bit more confident now after reading that stuff last night, at least on the payments front...the custody/escrow stuff, I think, confused me bc Avanti is setting that up to the point where they shift settlement risk 100% to operational risk

RT   **Triano, Rob**                                                                 1/26/2022, 8:09 AM
I kept getting thrown off by the comments/questions around custody on that topic

RT    **Triano, Rob**      1/26/2022, 9:06 AM

Just making adjustments on Chris' comments.  If you have a couple minutes, might get your take on the Liquidity section. I suspect he's wanting some form of bullets 2-4 on Denton's analysis.  I can take a stab at editing that now

RT    **Triano, Rob**      1/26/2022, 9:06 AM

\* As a provider of limited traditional banking services, liquidity risk is relatively low, since lending is not allowed and all SPDI liabilities will be 100 percent backed by liquid assets. Further, the company will require a funded escrow account for customers originating ACH transfers.

\* As a digital asset custodian, Avanti's role is generally limited to holding digital assets on behalf of the clients, which presents limited liquidity risk.

\* As a prime brokerage services provider, Avanti will act as an agent to facilitate the purchase and sale of digital assets, but will not act as a counterparty to the transactions. It is possible that Avanti's deposit and withdrawal activity (and thus its Reserve Bank master account balance) will fluctuate significantly in tandem with fluctuations in digital asset prices. For example, Avanti's customers may deposit or withdrawal USD funds into Avanti that would then be used to purchase or redeem digital assets. According to Avanti's December 1, 2021 correspondence, To mitigate risks to the Reserve Bank from rapid outflows, Avanti states that (1) its customers will only be allowed to settle deposits/withdrawals during the Federal Reserve's operating hours, and (2) Avanti would opt for a zero cap on its Reserve Bank master account, thus mitigating the risk to the Reserve Bank from potential daylight overdrafts.

\* As an issuer of Avits – which would be a liability of the firm that the company describes as "digital cashiers' checks" – the requirement to fully back liabilities with liquid assets would mitigate most related liquidity risk.

RC    **Crouch, Ross**      1/26/2022, 9:13 AM

The third bullet is tricky because it discusses liquidity risk to Avanti but merges it with potential risk to the Reserve Bank.

RT    **Triano, Rob**      1/26/2022, 9:13 AM

Yeah - I was able to easily fit in 2 and 4, but struggling with that one right now

RT    **Triano, Rob**      1/26/2022, 9:13 AM

Liquidity and market risks as planned are low. Management plans to maintain cash at least equal to 100 percent of core deposits in the master account, if approved. Only noninterest-bearing deposits are planned to be offered at this time. The company's short-term plan is to proceed with operations through Cross River prior to gaining access to a master account. If granted master account access, the firm does not anticipate being granted the ability to incur daylight overdrafts. Additionally, Avanti's role as a digital asset custodian presents limited liquidity risk as their role is generally holding digital assets on behalf of its clients. The Avit product would also present limited liquidity risk as they'd be fully backed by liquid assets.

RT    **Triano, Rob**      1/26/2022, 9:14 AM

I'll clean up the language a bit but trying to squeeze prime services between the last two sentences

RT    **Triano, Rob**      1/26/2022, 9:14 AM

we have some of this earlier in the doc too

RC    **Crouch, Ross**      1/26/2022, 9:15 AM

Well - prime services aren't really a liquidity risk

RC    **Crouch, Ross**      1/26/2022, 9:15 AM

I'm not sure that If they weren't offered the deposits would just leave the bank based on digital asset price volatility

RC    **Crouch, Ross**      1/26/2022, 9:16 AM

I think the salient point is that deposit level volatility may be impacted by digital asset price volatility

RC    **Crouch, Ross**      1/26/2022, 9:16 AM

which should be mitigated by having 100 percent cash on hand.

RT    **Triano, Rob**      1/26/2022, 9:18 AM

That's helpful...thanks!  Here's a rough attempt.  Close?

RT    **Triano, Rob**                                                                1/26/2022, 9:18 AM

Liquidity and market risks as planned are low. Management plans to maintain cash at least equal to 100 percent of core deposits in the master account, if approved. Only noninterest-bearing deposits are planned to be offered at this time. The company's short-term plan is to proceed with operations through Cross River prior to gaining access to a master account. If granted master account access, the firm does not anticipate being granted the ability to incur daylight overdrafts. Additionally, Avanti's digital asset custody activity presents limited liquidity risk as their role is generally holding digital assets on behalf of its clients. The Avit product would also present limited liquidity risk as they'd be fully backed by liquid assets. Lastly, potential deposit level fluctuations based on the volatility of the digital asset market (bitcoin only at product launch) are mitigated by holding assets in cash.

RC    **Crouch, Ross**                                                               1/26/2022, 9:20 AM

by holding the aforementioned cash levels.

RC    **Crouch, Ross**                                                               1/26/2022, 9:21 AM

I think that will work well.  A lot of this stuff is also discussed in the products/services summary.

RT    **Triano, Rob**                                                               1/26/2022, 9:21 AM

Agreed on the also being discussed above comment...should tie nicely now.  Thanks for the help on that

RC    **Crouch, Ross**                                                               1/26/2022, 9:21 AM

no problem

RT    **Triano, Rob**                                                               1/26/2022, 9:21 AM

I'll reply that we made adjustments to address their edits/comments

RC    **Crouch, Ross**                                                               1/26/2022, 9:22 AM

I'm going to go stealth mode for the next hour (do not disturb) - ping me if you need me.

RT    **Triano, Rob**                                                               1/26/2022, 9:23 AM

Sounds good

RC    **Crouch, Ross**                                                               1/26/2022, 1:39 PM

There is that "pre-examination" language again in the email chain that Jeff sent us

RT    **Triano, Rob**                                                               1/26/2022, 1:47 PM

gamesmanship going on there....no matter how clear we've been, I think she's trying to influence a bit {Smile}😊}

RC    **Crouch, Ross**                                                               1/26/2022, 1:47 PM

yep.  we can always start adding a disclaimer to our meeting invites

RC    **Crouch, Ross**                                                               1/26/2022, 1:48 PM

two can play this documentation game

RT    **Triano, Rob**                                                               1/26/2022, 1:48 PM

Might not be a bad idea to have something in writing...will add that to the list to ask Bill/Nick tomorrow

RC    **Crouch, Ross**                                                               1/26/2022, 1:48 PM

It is exciting to see some movement here

RT    **Triano, Rob**                                                               1/26/2022, 1:48 PM

I have a call at 2, but do you want to connect for 5?  I was just in on a board call with Bill/Nick

RT    **Triano, Rob**                                                               1/26/2022, 1:49 PM

We could connect later or tomorrow too - I can guide the discussion tomorrow afternoon, but I figured that we may want to connect on that for a bit beforehand too

RC    **Crouch, Ross**                                                      1/26/2022, 1:49 PM
      sure

RT    **Triano, Rob**                                                       1/26/2022, 3:39 PM
      I'm open until 4 and then after 4:45.  Wide open tomorrow morning until 11 too if better

RT    **Triano, Rob**                                                       1/26/2022, 3:41 PM
      Added you as an optional attendee to my BSA system working session with Avanti tomorrow if you'd like.  Disclaimers
      via email are already in place on that one and I'll do so after the meeting too.

RC    **Crouch, Ross**                                                      1/26/2022, 3:42 PM
      Ok.  I'm free now

CONFIDENTIAL

# EXHIBIT BY

# [PUBLIC VERSION]

J.A.1087

EXHIBIT NO. 30

| **From:** | "Matthew Malloy" <Matthew.S.Malloy@frb.gov> |
| **Sent:** | Tue 1/10/2023 6:03:32 PM (UTC-05:00) |
| **To:** | "Judith Hazen \(FRS\)" <judith.hazen@kc.frb.org>, "Jason Hinkle" <jason.a.hinkle@frb.gov>, "Margaret DeBoer" <margaret.deboer@frb.gov>, "Courtney Demartini" <courtney.e.demartini@frb.gov> |
| **Cc:** | "Christi May-Oder \(FRS\)" <christi.may-oder@kc.frb.org>, "Nick Billman \(FRS\)" <nick.billman@kc.frb.org>, "Bill Vandivort \(FRS\)" <bill.vandivort@kc.frb.org>, "Joshua Chadwick" <joshua.p.chadwick@frb.gov>, "Gavin Smith" <gavin.l.smith@frb.gov> |
| **Subject:** | RE: Draft Recommendation Memo |
| **Attachment:** | President George Custodia Master Account Recommendation Memo-Draft 01.06.2023 ma3.docx |

RESTRICTED FR // FRSONLY

Hi Judith: please see some suggestions in the attached draft from Board MA for your consideration.
Best, Matt

**From:** Hazen, Judith <judith.hazen@kc.frb.org>
**Sent:** Friday, January 6, 2023 2:53 PM
**To:** Jason Hinkle <jason.a.hinkle@frb.gov>; Margaret DeBoer <margaret.deboer@frb.gov>; Matthew Malloy <Matthew.S.Malloy@frb.gov>; Courtney Demartini <courtney.e.demartini@frb.gov>
**Cc:** Christi May-Oder (FRS) <christi.may-oder@kc.frb.org>; Nick Billman (FRS) <nick.billman@kc.frb.org>; Bill Vandivort (FRS) <bill.vandivort@kc.frb.org>; Joshua Chadwick <joshua.p.chadwick@frb.gov>
**Subject:** Draft Recommendation Memo

RESTRICTED FR // FRSONLY

**RESTRICTED FR // FRSONLY**

All,

Pursuant to the proposed S letter, we are providing our pre-decisional draft memorandum regarding potential actions on Custodia's request for a master account. For ease of reference, public policy considerations are discussed on pages 2 and 8. Please let us know if you have any questions or comments as soon as possible.

Judith



**Judith Hazen**
*Vice President*
P: 816.881.2789  E: *Judith.Hazen@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive    Kansas City, Missouri 64198    www.kansascityfed.org    

FRB-AR-000313

**J.A.1088**

# EXHIBIT BZ

# [PUBLIC VERSION]

J.A.1089



RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Date: January XX, 2023

To: Esther George

From: Judith Hazen and Christi May-Oder

Subject: Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation

## EXECUTIVE SUMMARY

Custodia Bank, Inc., (Custodia) Cheyenne, Wyoming, a *de novo* state-chartered special purpose depository institution (SPDI), requested a master account with the Federal Reserve Bank of Kansas City (FRBKC) on October 29, 2020. Custodia proposes to serve the digital asset industry by acting as a bridge to the traditional payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption, and other crypto-asset escrow and brokerage services. FRBKC's review of Custodia's business plan and supporting documents noted the following key concerns:

- Custodia's planned business model relies heavily upon a nascent and volatile crypto industry and presents illicit finance risks through novel activities.
- As noted in the federal bank regulatory agencies' January 3, 2023 Joint Statement,[1] these novel activities do not yet have legal clarity at the federal level and have not yet been deemed permissible for insured depository institutions. Further, it has yet to be determined whether or how the activities may be conducted in a manner that adequately addresses safety and soundness concerns. This uncertainty, inherent risk, and the narrowly-focused business plan call into question the financial viability of the firm and its ability to generate sufficient earnings to support operations and augment capital.
- FRBKC credit risk and supervisory staff's review of existing operations and policies (related to the core banking services Custodia intends to offer at launch and in the near term) revealed exceptions to safe and sound banking standards and best practices in the areas of BSA/AML and OFAC compliance, information technology, internal audit, financial projections, and liquidity risk management. While these matters could be remediated for the limited set of core banking services in the near- and medium-term, the viability of the business model is fundamentally dependent upon Custodia engaging in digital asset activities that have significantly more risk and operational complexity (and would require correspondingly more robust risk management and compliance systems).
- Absent a federal regulator, the Reserve Bank will have limited visibility into Custodia's financial condition and operations (and therefore, limited visibility into the risks borne by the Reserve Bank and other participants in the Federal Reserve payment system), which are expected to change significantly through evolution of the business model following commencement of operations. Relatedly, regulation of Custodia is entirely dependent on an unproven supervisory program for a novel charter/institution type that does not inherently include the safety and soundness standards, requirements, and safeguards embedded within the regulatory regime established for insured depository institutions. FRBKC also has serious concerns with safely and effectively resolving a deposit-taking entity outside of the Federal Deposit Insurance Corporation (FDIC) resolution process through the new and untested Wyoming state law resolution process for SPDIs.

---

[1] *See* Joint Statement on Crypto-Asset Risks to Banking Organizations, https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230103a1.pdf, January 3, 2023.

1

**J.A.1090**

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

- The approval of an uninsured, state-chartered entity with a narrowly-focused business model reliant on serving the crypto industry and issuing a proprietary crypto token or other liabilities to be backed by ~~cash held as reserve~~ balances at the FRBKC ~~would pose material public policy concerns that could create~~ lead to undue risk to the financial system ~~and or adversely affect~~ complicate the Federal Reserve's ability to implement monetary policy.

In light of these concerns, staff recommends denial of Custodia's master account request.

While the decision to deny a master account request rests with the Reserve Bank, Federal Reserve System guidance is being developed that requires a preliminary recommendation for denial of a master account request to be shared with the Director of the Board's Division of Reserve Bank Operations and Payment Systems (RBOPS) prior to communicating any denial to the entity seeking the account. The consultation process provides an opportunity for RBOPS and other Board Divisions to provide feedback to the Reserve Bank regarding the Reserve Bank's analysis of the entity. The Reserve Bank may incorporate or address any feedback or concerns, but still retains decision making authority. The Reserve Bank plans to provide a summary recommendation to Matt Eichner, Director of RBOPS, following your support for the denial decision.

BACKGROUND AND TIMELINE

Custodia is a *de novo* SPDI with a charter issued under the Wyoming SPDI Act. The Wyoming legislature enacted the SPDI Act (and other digital-asset-related legislation) in 2019, to facilitate the establishment of a new type of financial institution that could serve blockchain innovators and encourage crypto-asset-based businesses to form and operate in Wyoming. Under the SPDI Act, Custodia may engage in nonlending banking business, provide payment services for depositors, and, with the approval of the State Banking Commissioner, engage in any other activity that is usual or incidental to the business of banking. Wyoming law prohibits SPDIs from making loans and requires SPDIs to maintain unencumbered liquid assets with a value of at least 100 percent of its deposit liabilities.

Custodia was granted an SPDI bank charter by the Wyoming Division of Banking (DOB) on October 28, 2020. Custodia submitted Operating Circular 1 Master Account Agreements to FRBKC on October 29, 2020, and later submitted application materials to become a member of the Federal Reserve System on August 5, 2021. Since that time, FRBKC has engaged extensively with Custodia regarding its master account request and devoted significant resources to understanding Custodia's business plan, the SPDI charter, the DOB's supervision program for SPDIs, and the risks and opportunities presented by Custodia's request.

Concurrent with the FRBKC's review, numerous reports and events surfaced that shed light on the nascent, volatile crypto-asset industry and the impact of insufficient oversight of firms engaged in related activities. In 2020 and 2021, the Office of the Comptroller of the Currency Interpretive Letter 1170 series provided and clarified interpretations of permissibility for national banks, reaffirming the primacy of safety and soundness in conducting cryptocurrency, distributed ledger, and stablecoin activities, and requiring supervisory nonobjection before national banks may engage in such activities. In November 2021, the President's Working Group (PWG),[2] joined by the FDIC and the Office of the Comptroller of the Currency (OCC), released a report highlighting the benefits and risks of stablecoins, including inconsistent and fragmented oversight of token issuers. The report provided several recommendations for mitigating risks to stablecoin users and guarding against stablecoin runs (including a requirement for stablecoin issuers to

---

[2] *See* President's Working Group on Financial Markets Report on Stablecoins, https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf, November 1, 2021.

2

CONFIDENTIAL - Subject to Protective Order

FRB-AR-000316

J.A.1091

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

be insured depository institutions), the latter of which sought to address concerns related to payment system risk and concentration of economic power. In both December 2021 and October 2022, the Financial Stability Oversight Council (FSOC) published reports[3] highlighting regulatory concerns with stablecoins and the wider cryptocurrency market, including the risks that crypto-asset activities could pose to the stability of the U.S. financial system if their interconnections with the traditional financial system or their overall scale were to grow without adherence to or being paired with appropriate regulation.

The volatility of the market was evident during this time as well. In May 2022, the TerraUSD stablecoins and Luna token, which together formed an algorithmic stablecoin, collapsed, causing investors to lose millions. In November 2022, the cryptocurrency exchange FTX collapsed and filed for bankruptcy, which had a direct and significant impact on Silvergate Bank, La Jolla, California, an insured state member bank, and reportedly led to instability in a number of crypto-related companies.[4] Amidst these reports and collapses, the crypto industry continues to experience a so-called "crypto winter" in which two-thirds of the market capitalization or total market value of cryptocurrency has been lost and many crypto and blockchain companies continue to experience losses as prices fall, illustrating the risks and volatility within the nascent industry. Most recently, the Federal Reserve along with the FDIC and OCC issued a joint statement highlighting crypto-asset risks that banking organizations should be aware of as confirmed by these events over the past year. In addition to these industry developments, the Board issued Guidelines for Evaluating Account and Services Requests (Account Guidelines) to the Reserve Banks, inclusive of a tiered framework, in August 2022.

Custodia proposes to serve the digital asset industry by acting as a bridge to the traditional payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption, and other crypto-asset escrow and brokerage services. Custodia represents it is seeking direct access to the Federal Reserve payment system and a master account to execute its business plan in a revenue efficient manner and to mitigate apparent liquidity and settlement risks within the broader digital asset ecosystem.

Upon receipt of the account request, Reserve Bank staff began an immediate assessment of Custodia's business plan and supporting documents. During this evaluation, the timelines for the various planned crypto products and services have changed and the proposed use cases of the Avit have evolved over time, as have staff employed by Custodia in various key areas. Custodia was notified of its legal eligibility for a master account and legal eligibility for membership in the Federal Reserve System in early 2022, understanding that legal eligibility merely means an entity has met the initial threshold of eligibility and can proceed to an assessment of business model and risks posed. Shortly after the issuance of the PWG report, Custodia submitted a draft deposit insurance application to the FDIC. The FDIC provided feedback and based on those interactions, Custodia subsequently abandoned plans to seek deposit insurance. Custodia continued work throughout 2021 and 2022 to build products and operational infrastructure and regularly engaged with Reserve Bank supervisory staff regarding risk management and operational infrastructures. Beginning September 6, 2022, a pre-membership examination occurred. Custodia was informed that information obtained during the pre-membership examination would be used both in the evaluation of Custodia's master account request and membership application (as had been the case through these

---

[3] *See* Financial Stability Oversight Council 2021 Annual Report,
https://home.treasury.gov/system/files/261/FSOC2021AnnualReport.pdf ; see also the FSOC's Report on Digital Asset Financial Stability Risks and Regulation (October 3, 2022), https://home.treasury.gov/system/files/261/FSOC-Digital-Assets-Report-2022.pdf.
[4] *See* "Silvergate Raced to Cover $8.1 Billion in Withdrawals During Crypto Meltdown," Wall Street Journal (January 5, 2023), https://www.wsj.com/articles/silvergate-raced-to-cover-8-1-billion-in-withdrawals-during-crypto-meltdown-11672895207?st=ct0i89dnb6gnrb&reflink=desktopwebshare_permalink

3

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

processes) to reduce repetitive questions and burden on Custodia. The membership examination was aimed at evaluating only Custodia's risk management program related to core banking products that would be offered upon opening, namely deposit accounts and traditional payment services.

Custodia reported throughout 2021 and 2022 that crypto-asset-related products would be offered after they opened for business, although the permissibility of these activities for an insured depository institution or state member bank remained in question and prior DOB notification is required. At the time of the pre-membership examination, Custodia's plans for crypto-asset-related products and services, including the technology and risk management infrastructures to support, facilitate, and execute the planned activities, remained in the early stages of development and were not formally assessed as part of the review. Nonetheless, the September 6, 2022 pre-membership examination identified significant risk management gaps in Custodia's day-one activities, which will consist of only limited banking services. These gaps were most notable in the areas of BSA/AML and OFAC compliance, internal audit, and information technology relative to what would be expected of an operating state member bank with only traditional banking activities.

A review of activities was conducted by the DOB in September 2022. While the state examiners identified some of the issues raised by FRBKC supervisory staff, the scope of the review and details regarding findings appear more limited. Subsequent to the DOB review, Custodia was granted a Certificate of Authority (COA) on September 12, 2022, approving the firm to commence business within six months. The approval was limited to imminent traditional banking products, relying on a phased formal approval process to be followed by the organization prior to commencing proposed digital asset activities.

On December 20, 2022, Custodia provided the Reserve Bank an update of their efforts to remediate the risk management gaps that were identified during the pre-membership examination. However, given the significance and breadth of the detailed issues identified during the examination, a targeted review conducted by the Reserve Bank would be necessary to fully assess the adequacy of Custodia's response.

EVALUATION OF MASTER ACCOUNT REQUEST

Structure

By legislative design, an SPDI is not a traditional bank; SPDIs have unique features that distinguish them from traditional commercial banks and weaken or remove protections that exist for customers of insured depository institutions. For example, SPDIs are exempt from Wyoming's requirement that banks obtain FDIC insurance.[5] *See* Wyo. Stat. § 13- 2-103(a). FDIC insurance "protects depositors if a bank fails ... and helps prevent bank runs by providing consumers with the confidence that their money will be available during periods of economic or financial stress."[6]

As noted above, SPDIs are required to maintain unencumbered liquid assets equal to at least 100 percent of deposit liabilities, which is intended to mitigate the absence of FDIC insurance protection. However, existing statutory and regulatory frameworks, including those related to resolution, certain capital requirements, enforcement actions, changes in control, activities restrictions, and consumer protection are directly linked to (and only applicable based on) status as an insured depository institution. Thus, Custodia

---

[5] As noted above, Custodia filed a draft deposit insurance application with the FDIC following the release of the PWG report on Financial Markets Report on Stablecoins on November 1, 2021, which recommended that stablecoin issuance be limited to FDIC-insured depository institutions. The FDIC reviewed the draft application and provided feedback to Custodia in early 2022. Custodia subsequently abandoned plans to seek deposit insurance.
[6] See Congressional Research Service, *An Analysis of Bank Charters and Selected Policy Issues* (January 21, 2022), https://crsreports.congress.gov/product/pdf/R/R47014.

4

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

is seeking to benefit from Federal Reserve System (FRS) financial services without being subject to the same regulatory limitations as insured depository institutions designed to protect depositors and bank counterparties, has no federal banking regulator,[7] and is not obligated to comply with traditional banking regulations.

Proposed Business Plan

Custodia's proposed business plan is narrowly focused on serving the crypto-asset sector, offering novel, high-risk business activities for which a fully mature legal/regulatory environment and industry-standard, business-cycle-tested set of risk management and operational practices and tools have not yet been established. Custodia intends to engage in a broad range of digital-asset-related activities that, while allowed for an SPDI as a matter of Wyoming state law, are not clearly permissible for insured depository institutions or state member banks because they extend beyond existing interpretations and guidance from the federal banking agencies on digital asset/blockchain technology and raise safety and soundness and illicit finance concerns. Custodia has identified four key business lines that it intends to initiate over a three-year time frame:

(1) core banking – traditional banking services, including demand deposits, ACH and wire services, offered through internally developed online and mobile platforms;
(2) custody – custody of digital assets, including holding crypto-assets on balance sheet to facilitate the execution of transactions;
(3) prime services – on/off ramp transactions between fiat currency and crypto-currency, agency services including asset brokerage, escrow, foreign exchange, and finder activities related to digital asset lending; and
(4) Avit – a bank-issued crypto token utilized for instantaneous payments that would freely circulate on a public blockchain.

BSA/AML and OFAC Compliance

In addition to concerns with Custodia's business plan being focused on a narrow sector of the economy and financial services industry, to date, there is lack of clarity at the federal level regarding the permissibility of several activities proposed by Custodia. These concerns are further heightened given that Custodia is an uninsured depository institution focused almost entirely on serving the crypto-asset market, which presents elevated illicit finance and other safety and soundness risks.

Crypto-assets pose significant BSA/AML and OFAC compliance risks due to the lack of transparency; ease and speed of transfer; and general irrevocability of transactions. The ability to conduct instantaneous transactions electronically enables numerous small transactions to move large sums of money undetected by monitoring systems. While the pre-membership examination did not include a review of the proposed crypto-asset activities, examiners identified significant gaps in Custodia's BSA/AML and OFAC compliance programs even for its core banking activities. Although Custodia has communicated they are actively working to remediate the gaps identified during the pre-membership examination, the gaps identified with respect to its core banking activities raise significant concerns regarding Custodia's ability to effectively scale the program to comply with BSA/AML and OFAC requirements for its proposed, higher-risk crypto-asset activities. Such concerns are highlighted in the January 3, 2023 Joint Statement, which notes that, "agencies are continuing to assess whether and how current and proposed crypto-asset-related activities by banking organizations can be conducted in a manner that adequately addresses safety

[7] [Place holder for final recommendation/action on membership application.]

5

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

and soundness, […] legal permissibility, and compliance with applicable laws and regulations, including anti-money laundering and illicit finance statutes and rules."

Although not reviewed in detail during the pre-membership examination, Custodia's planned issuance of the Avit on two public permissionless blockchains adds to concerns related to BSA/AML and OFAC compliance. In the Joint Statement, the federal banking agencies also note that "[b]ased on the agencies' current understanding and experience to date, the agencies believe that issuing or holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network, or similar system is highly likely to be inconsistent with safe and sound banking practices." Custodia acknowledges that users would have the ability to conduct Avit transactions in perpetuity using wallets not hosted or controlled by Custodia, which would not have undergone an onboarding process with Custodia. Similarly, non-customers of Custodia would be able to hold and redeem Avits without undergoing the full due diligence required for customer on-boarding. In addition, by the nature of the digital assets Custodia intends to hold in custody and the blockchains upon which transactions in those assets are recorded, Custodia will pay processing fees to transaction validators who are unknown at the time the payment is made and who may remain anonymous even after the wallet associated with the validator is known. This places Custodia and its customers in the position of making payments to unknown parties who could be illicit actors or sanctioned entities. While the cryptocurrency industry remains in its infancy, and there are several questions related to application of the existing BSA/AML/OFAC legal regime to digital assets that neither FinCEN nor OFAC has addressed, such issues highlight the inherent risks associated with crypto-assets that need to be mitigated to ensure this activity can be conducted in a safe and sound manner consistent with applicable law.

Furthermore, Custodia has experienced turnover within key leadership roles, most notably the BSA/AML compliance officer, a role that four individuals have held since 2021, as well as the chief technology officer and chief compliance officer. The lack of stability in these key roles and lack of collective depth of relevant banking experience and bank-specific risk management expertise raise concerns regarding the management team's ability to conduct the proposed activities in a safe and sound manner. A lack of depth and breadth of expertise in risk, banking regulation, and compliance at the board of directors and management levels may have contributed to the number and degree of shortcomings identified in the pre-membership examination. Custodia added management and staff resources in BSA and risk after the pre-membership examination to address these concerns. However, the effectiveness of these additions is not readily apparent.

<u>Financial Considerations</u>

It is uncertain whether a narrowly-focused business of offering banking services to a novel, high-risk, and not fully mature industry is viable. The Wyoming SPDI charter has not yet shown itself to support a successful business model. At the Reserve Bank's pre-membership review, which covered only core banking operations, examiners identified numerous exceptions to safe and sound banking standards, requirements, and best practices. While it may be possible for Custodia to remedy some of these matters for the initial core banking services planned to be offered by the institution in the near term, there was insufficient information available at the time of the examination to fully evaluate the adequacy of Custodia's risk management systems for much riskier and complex planned digital asset activities, which are fundamental to the institution's ongoing viability. Additionally, the narrowly-focused nature of the novel SPDI business model means an SPDI's customer base is not diversified and likely to respond in a similar manner to industry stresses and events. For example, the potential rapid loss of customers could result in a rapid decline in revenue and threaten the viability of an SPDI, which is exacerbated by the absence of deposit insurance and an untested resolution program administered by the DOB.

6

CONFIDENTIAL - Subject to Protective Order

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Capital Requirements

The statutory capital requirements (W.S. 13-12-110) prescribe initial capital for the first three years of operations. They provide little guidance to the Commissioner on how to develop capital regulations. The SPDI rules (Chapter 20, section 2) say that an SPDI shall have initial capital commensurate with its risk profile and proposed activities; however, the rules do not specify how to assess the risk of the activities unique to SPDIs or relate them to capital requirements. The rules give the Commissioner a high degree of discretion in setting capital requirements, which have been set as three years of projected operating expenses for Custodia. It is not clear how this capital requirement was determined or will change over time. It is unknown if the Wyoming capital regulations for SPDIs adequately capture an SPDI's risks. Insufficient capital to support its operations and timely fulfillment of obligations, including during periods of stress, creates undue risk to the Reserve Bank.

Custodia is not subject to the federal regulatory capital framework for traditional insured banks and the state regulations do not contain minimum leverage and risk-based capital requirements. Even if the state regulations did contain such requirements, the federal framework for all but the largest banks is based on capital necessary for the primary risk of a traditional banking model, credit risk. It is not adequate to measure capital adequacy for a nontraditional institution like an SPDI, which is not permitted to engage in lending by statute, but has significant operational, cybersecurity, BSA/AML, strategic, and other risks.

In the absence of deposit insurance and absence of interagency capital standards that account for the types of risks posed by Custodia's business model and considering the institution's reliance on revenue generated from narrowly focused, volatile crypto-asset-based activities as its primary source of capital augmentation, it remains unclear if Custodia's current and projected capital base will be sufficient to support its risk profile.

Resolution Process

The difference between the resolution framework for a federally insured depository institution and an SPDI is a key difference between the resolution framework for a federally insured depository institution and an SPDI is a key difference between Tier 1 and Tier 3 institutions as described in the Account Access Guidelines and a major source of risk to the FRBKC. Custodia is required by state regulation to develop a resolution plan within six months of commencing operations. Wyo. Rules & Regs. 021.0092.20 § 4(a). Since Custodia is not FDIC insured, nor federally regulated, the resolution process in the event of a failure is not sufficiently defined without a resolution plan. Under Wyoming's SPDI statute, each SPDI must secure a surety bond or irrevocably pledge specified assets to the State to cover costs likely to be incurred by the Commissioner in a liquidation or conservatorship of the SPDI. Wyo. Stat. § 13-12-118. The DOB has required Custodia to pledge $15MM of capital. This capital is not presumed to support the risk born by the Federal Reserve Bank, and instead is excluded from consideration of unencumbered assets that could protect the Reserve Bank in the event of a Custodia failure with a negative balance in the master account. At this time, Custodia has not developed a resolution plan, but has indicated preliminarily that it would rely upon a sale of its assets and liabilities to another Wyoming SPDI, none of which are federally regulated or currently operating. In the event no Wyoming SPDI is available to acquire its business, Custodia would sell its custody business to crypto-asset exchanges or trust companies, and its deposit business to banks that provide traditional banking services to the crypto-asset industry. However, as evident by recent events in the crypto industry, such proposed acquirers are likely to be experiencing stress at the same time as Custodia.

If a resolution plan is put in place by Custodia, the process outlined by the DOB contains no guarantees the Reserve Bank would be made whole in the event Custodia fails to meet its obligations. In the event of an SPDI's failure and subsequent resolution under a receivership administered by the State Banking

7

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

Commissioner, this Reserve Bank would have the same priority treatment as all other Custodia customers, with its claims paid at the same time and with the same priority as any customer "claims relating to deposits, custodial, fiduciary and trust assets." Wyo. Rules & Regs. 021.0002.20 § 6(j). This contrasts with insured, federally regulated entities where customer deposits are insured and indemnity agreements between the Reserve Banks and both the FDIC and National Credit Union Administration would provide indemnification to the Reserve Bank in the event of a failure up to the value of the collateral pledged to the Reserve Bank. With the DOB and Custodia, there is no indemnity agreement or other arrangement in place to provide assurance that the Reserve Bank would be protected in the event it continues providing financial services to an SPDI experiencing financial distress. The Reserve Bank's practice to assist and ensure orderly closures of depository institutions would be severely hindered by a lack of clarity around protecting the Reserve Bank from loss. In addition, the process for resolution, in the absence of a plan defined by the institution and approved by the DOB, is unclear. The DOB would be faced with the receivership of a depository institution with novel activities for which it does not have any prior experience.

<u>Public Policy Implications</u>

The statutory and regulatory safety and soundness framework for SPDIs is substantially different from the framework that applies to federally insured institutions. While state and federal banking agencies are responsible for ensuring safety and soundness of an entity's activities, *only* the Federal Reserve has a mission to ensure a safe and efficient payments system.

The lack of a federal prudential framework for SPDIs (like other Tier 3 institutions under the Guidelines) leaves the Reserve Bank with limited risk-monitoring tools and virtually no remediation or enforcement authority, other than what would be available under the Board's Policy on Payment System Risk and Operating Circular 1.[8] The potential for contractual commitments by Custodia to provide information and other limited monitoring or visitation rights by the Reserve Bank as a condition for the provision of an account and services would not mitigate risks to nearly the same extent or with the same legal certainty that would come from federal prudential supervision over Custodia pursuant to a well-established legal and regulatory framework. This effectively creates an inability by the Reserve Bank to assist the Board in its policy goals of ensuring the safety and soundness of the banking system, effectively implementing monetary policy, promoting financial stability, protecting consumers, and promoting a safe, efficient, inclusive, and innovative payment system.

These concerns are presented through the structure of an SPDI as well as Custodia's planned business model and *de novo* status. Although not currently considered determinative in this instance, staff also reviewed the potential monetary policy implementation and financial stability considerations around this account request. For example, tThe design of the Avit, which is intended to be backed by reserve deposits balances held in a master account, could have implications for the Federal Reserve's balance sheet. In particular, the backing of Avits by reserve balances could be viewed as implicit endorsement by the Federal Reserve, which could enable it to scale quickly. Growth in the Avit cwould generate significant demand for Federal Reserve liabilities and given the volatility of the crypto business, could create significant fluctuations in demand for Federal Reserve liabilities and could complicate the Federal Reserve's ability to ability to manage the size of its balance sheet implement monetary policy, particularly absent regulatory clarity currently on much of the crypto industry. In addition, the backing of Avits by deposits held at the Reserve

---

[8] *See* The Federal Reserve's Payment System Risk Policy, https://www.federalreserve.org/paymentsystems/psr_relpolicies.htm; Operating Circular 1, Section 2.11, https://www.frbservices.org/binaries/content/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf

8

CONFIDENTIAL - Subject to Protective Order

RESTRICTED FR // FRSONLY

Attorney-Client Privileged and Confidential

~~Bank could be viewed as implicit backing by the Federal Reserve, which could also enable such products to scale quickly.~~

~~In addition, the backing of Avits by deposits held at the Reserve Bank could be viewed as implicit backing by the Federal Reserve, which could also enable such products to scale quickly.~~ While Even if Custodia alone ~~may~~ does not materially impact the Federal Reserve's balance sheet, granting Custodia a master account would set a ~~favorable~~ precedent for other existing SPDIs and other similar non-traditional charters. It ~~c~~would make uninsured charters more attractive for the crypto-asset industry, and issuance of instruments like the Avit by master account holders may be precedent-setting in allowing similar products at other banks. Collectively, these potential trends could ~~accelerate the growth of the crypto-asset market,~~ ~~creating~~create more significant monetary policy implementation and financial stability concerns. ~~These are broad policy matters that extend beyond the Reserve Bank and while risk mitigation strategies are being contemplated by the Federal Reserve Board, practically, it is not clear how these controls would be implemented.~~

Formatted: Strikethrough

CONCLUSION

The identified issues create undue risk to the Reserve Bank, risk to the overall economy due to potential illicit activities, and potential risk to the payment system. In light of these risks and public policy implications, staff recommends denial of Custodia's master account request.

CONFIDENTIAL - Subject to Protective Order

FRB-AR-000323

**J.A.1098**

# EXHIBIT CB

# [PUBLIC VERSION]

J.A.1099

| From: | "Hazen, Judith" <judith.hazen@kc.frb.org> |
|---|---|
| Sent: | Tue 1/24/2023 1:28:18 PM (UTC-05:00) |
| To: | "Eichner, Matthew \(Board\)" <matthew.j.eichner@frb.gov> |
| Cc: | "George, Esther L" <esther.l.george@kc.frb.org>, "Humston, Tara L" <tara.l.humston@kc.frb.org>, "May-Oder, Christi" <christi.may-oder@kc.frb.org>, "Hinkle, Jason \(Board\)" <jason.a.hinkle@frb.gov>, "Zahnd, Craig C" <Craig.Zahnd@kc.frb.org>, "Billman, Nick" <Nick.Billman@kc.frb.org> |
| Subject: | Custodia Bank Master Account Request |
| Attachment: | Custodia Master Account Recommendation Memo.pdf |

RESTRICTED FR // FRSONLY

**RESTRICTED FR // FRSONLY**

Matt,

Pursuant to the recently issued S letter, we are sharing our analysis of the master account request by Custodia Bank, Inc. conducted by our Reserve Bank. We have consulted with Board staff from various divisions as the Reserve Bank has developed our analysis. We anticipate sharing our decision to deny the request in the near future, potentially as soon as this week.

Please let me know what questions I can answer.

Thanks!
Judith



**Judith Hazen**
*Group Vice President*
  *816.881.2789*  *Judith.Hazen@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive  ·  Kansas City, Missouri 64198  ·  www.kansascityfed.org  » » 



FRB-AR-000003

**J.A.1100**

# EXHIBIT CC

# [PUBLIC VERSION]

**J.A.1101**

| From: | Matthew Eichner |
|---|---|
| To: | Esther George (FRS) |
| Cc: | Kelly Dubbert (FRS); Tara Humston (FRS); Christi May-Oder (FRS); Craig Zahnd (FRS); Nick Billman (FRS); Mark Van Der Weide; Susan Foley; Jennifer Lucier; David Mills; Jeff Walker; Emily Caron; Kathy Wilson; Evan Wineman; Gavin Smith; Michael Gibson; Molly Mahar; Kavita Jain; Andreas Lehnert; Michelle Olivier; Namirembe Mukasa; Trevor Reeve; James Clouse; Margaret DeBoer; Matthew Malloy; Benjamin Hobbs; Larkin Turman |
| Subject: | Custodia response: S-letter – 2667 with no concerns identified |
| Date: | Thursday, January 26, 2023 10:39:38 PM |

INTERNAL FR/OFFICIAL USE // FRSONLY

Dear Esther,

As you are well aware, on August 15, 2022, the Board announced *Guidelines for Evaluating Account and Services Requests* (Guidelines) to be applied by Federal Reserve Banks (Reserve Banks).  The Guidelines are designed to support consistency in approach and decision-making across Reserve Banks, while recognizing the discretion granted to the Reserve Banks under section 13 of the Federal Reserve Act to grant or deny access requests or to take action on existing access relationships.

In addition, the Board has approved a policy establishing implementation procedures for the Guidelines (S-letter 2667).  Under S-letter 2667 the Board expects the Reserve Banks to consult, as appropriate, with Board staff to provide insight into application of the Guidelines to certain requests and to further support consistency in decision-making across Reserve Banks.

Consistent with S-letter 2667, the Federal Reserve Bank of Kansas City has provided to Board staff its pre-decisional analysis of Custodia Bank's request for a master account and access to services. Board staff have reviewed the Reserve Bank's record documenting application of the Guidelines in evaluating the access request.  We have no concerns with the Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision to deny the request for a master account and access to services.

Let us know if Board staff can be of additional assistance in this matter.

My regards,

-matt

**Matthew J. Eichner**
Director
Division of Bank Operations and Payment Systems
Federal Reserve Board

matthew.j.eichner@frb.gov
(202) 452-2019



FRB-AR-000002

**J.A.1102**

# EXHIBIT CD

# [PUBLIC VERSION]

**J.A.1103**

**CONFIDENTIAL TREATMENT REQUESTED**



March 8, 2023

Office of Inspector General
Federal Reserve Board of Governors
20th Street and Constitution Avenue N.W.
Washington, D.C. 20551

Dear Staff of the Office of Inspector General:

We submit the following 23 complaints for your review, pertaining to the application of Custodia Bank, Inc. ("Custodia") to become a state member bank, pursuant to the Office of Inspector General's mission to investigate violations of laws, rules or regulations, mismanagement, and abuse of authority by the Board of Governors (the "Board") of the Federal Reserve System ("System"). We believe the complaints listed herein involve violations of due process, law, regulation, and abuse of authority.

This letter is co-signed by Caitlin Long, CEO of Custodia, and Katie Cox, an independent advisor to Custodia. Ms. Cox is a retired Federal Reserve examiner who worked for the Federal Reserve System for 32 years, most recently as a manager in the Mergers and Acquisitions section at the Board of Governors in Washington, D.C., a section she was in for over 20 years before her retirement in 2020.

Ms. Cox notes that something went very wrong with the Federal Reserve System's handling of Custodia's proposal and that the decision-making process did not comport with the Federal Reserve's normal processes. It was not the Federal Reserve she knows, which was always balanced, methodical and respectful of applicants' due process.

We request that the Office of Inspector General intervene to delay the publication of the Board's pending 86-page order pertaining to the denial of the membership application of Custodia, which is scheduled for release on or about March 17, 2023, until your office has investigated the complaints herein and becomes satisfied that both the private and publication versions of the order (with redactions) meet the Federal Reserve's policies, procedures and due process requirements. The 86-page Custodia order is without precedent in the history of the Federal

1

CONFIDENTIAL

CONFIDENTIAL TREATMENT REQUESTED

Reserve System for numerous reasons, as we explain in this letter – for example, it is 41% longer than the longest order of the Board dating back to at least 2014 (which includes 200 Board orders), it contains four times the normal quantity of confidential information contained in a standard Board order, it is 14 times longer than any precedent denial order (dating to December 1996), and there have been zero instances of an order released after the press release date since 2014 (as is the case with Custodia). We believe much of the 86-page order's content is arbitrary, capricious and potentially even retaliatory and discriminatory, and its publication in the absence of due process will harm Custodia's business prospects of operating as a state-chartered bank via a correspondent bank, will harm its employee retention and will harm its reputation with its prospective customers and investors.

Custodia's membership application presented novel issues for the Federal Reserve System because its business plan involves bridging digital asset technology with traditional banking, and doing so in a safe and sound way while avoiding the very liquidity risk problems faced by banks that serve the digital asset sector today.[1] However, the novel nature of Custodia's proposal does not alleviate the Board's obligation to provide Custodia with due process. Just to have its membership application processed in the first place, Custodia had to sue – specifically, the Board did not begin processing Custodia's membership application until after Custodia filed a lawsuit for undue delay in its master account application in June 2022 (which was ten months after Custodia initially filed its application to become a state member bank in August 2021 and 19 months after it filed its master account application). This lag time does not comport with the normal process for either application. In the meantime, the Board has permitted incumbent banks like BNY Mellon to provide custody services for digital assets.

This letter details a litany of irregular Board actions pertaining to Custodia – for example, a record-fast denial after an applicant declined to withdraw an application, a Board order crammed with a record amount of confidential business plan and prejudicial confidential supervisory information, a refusal to consider a revised business plan, a hastily-drafted policy statement cited as a reason to deny an application despite the policy not being enacted yet, press leaks designed to pressure an applicant to withdraw, a preordained Board vote orchestrated in coordination with the White House and completed within hours during FOMC blackout week, and numerous other breaks from standard procedure. The process was never fair because the result was preordained, and certain procedures that are customarily extended to *de novo* applicants were not extended to Custodia. All of these indicate that Custodia was thrown under the proverbial bus for reasons unrelated to Custodia's application.

---

[1] Custodia holds a Wyoming special-purpose depository institution ("SPDI") charter. The State of Wyoming and FRBKC held more than 100 meetings about the design of the SPDI charter, and FRBKC provided input into Wyoming's comprehensive regulatory framework, as did Promontory Financial Group. *See* https://www.wsj.com/articles/the-fed-battles-wyoming-cryptocurrency-powell-brainard-bitcoin-digital-ass ets-spdi-fintech-11638308314.

2

CONFIDENTIAL

**CONFIDENTIAL TREATMENT REQUESTED**

BACKGROUND

Custodia is a Cheyenne, Wyoming-based *de novo* bank that is not yet accepting external customer deposits. Custodia received its bank charter pursuant to a 7-0 vote of the Wyoming State Banking Board in October 2020. It immediately applied for a master account at the Federal Reserve Bank of Kansas City ("FRBKC") and subsequently applied to become a state member bank in August 2021. In June 2022, Custodia filed suit against the Board of Governors and FRBKC for improper delay pertaining to its master account application. Custodia underwent a pre-membership examination by the FRBKC in September 2022 and received an exam findings letter dated October 21, 2022. Regarding the exam findings, the examiners-in-charge notified Custodia that "everything is addressable." The Board, FRBKC and Custodia were working toward a follow-up examination until something abruptly changed in January 2023. On January 23, 2023, System staff notified Custodia that, if it did not withdraw its membership application, staff would recommend denial.

On January 25-27, 2023, the following events occurred:
- The White House and Board staff leaked to multiple reporters on or about January 25 that Custodia's pending membership application would imminently be denied by the Board of Governors, and reporters began calling Custodia for comment.
- During the afternoon of January 25, amid the press telling Custodia that the Board denial vote was preordained, Custodia's board of directors met to consider whether to withdraw its membership application.
- At 1:11pmET on January 26, a reporter said the following to Custodia in an email:
  *"I was told that the several financial institutions that have de novo banking licenses related to crypto in process with the Fed or OCC have received calls within the last 48 hours saying they have to pull their applications for various reasons."*
- At 4:54pmET on January 26, Custodia emailed its decision in a letter to Mark Van Der Weide, General Counsel of the Board of Governors, declining to withdraw.
- Within hours of Custodia sending that letter to Mr. Van Der Weide on January 26 at 4:54pmET, a reporter knew the contents of the letter and relayed them back to Custodia during a conversation with Custodia's press representative.
- On the morning of January 27, reporters continued to aggressively pursue a comment from Custodia.
- At 10:57amET on January 27, Custodia's outside counsel received an email from Board Legal (Asad Kudiya, Assistant General Counsel) notifying that the Board voted to deny Custodia's application.
- At 11:01amET on January 27, Bloomberg published its story exactly 4 minutes after Mr. Kudiya notified Custodia of the Board's denial vote. The Bloomberg reporter told Custodia that, by then, Bloomberg had received multiple confirmations that the Board had actually voted to deny Custodia's application minutes before, so Bloomberg had finally received the requisite confirmations of the leak and therefore was finally cleared to publish the story.

3

CONFIDENTIAL TREATMENT REQUESTED

(Custodia subsequently provided a comment, which Bloomberg added to the updated version of its story published at 1:35pmET.)

- Mr. Kudiya attached the 86-page order to his email notifying Custodia of the Board's denial.
- With precision timing, the following 5 events then occurred on January 27:
    1. 11:30amET:  The White House released a new crypto policy statement
    2. 11:30amET:  The Board of Governors released a new crypto policy statement
    3. 11:30amET:  The Board of Governors announced the denial of Custodia's membership application
    4. 2:00pmET:   FRBKC notified Custodia that it denied Custodia's master account application
    5. 4:35pmET:   The Board of Governors and FRBKC jointly moved to dismiss Custodia's lawsuit

COMPLAINTS

Incorporating by reference the above facts, Custodia submits the following 23 complaints for your consideration. The complaints are presented in chronological order. Please note that some of the most important complaints are recent and are therefore toward the end of the list:

1. Custodia's membership application was filed in August 2021; however, the Kansas City Reserve Bank did not acknowledge receipt of Custodia's membership application until March 2022, did not begin processing its application until June 2022, and did not begin its pre-membership examination until September 2022. This lag time does not comport with the normal process for a membership application.

2. Notice of Custodia's initial membership application was not published in the Federal Reserve's H.2 report, which lists all applications and notices that have been filed with the Federal Reserve System. Despite Ms. Cox's repeated verbal inquiries over months to System staff about the lack of publication of Custodia's membership application in the H.2 report, System staff continued to indicate that they would look into the matter. In the end, no H.2 publication was made until after the Board vote occurred, which means the public was never afforded proper notice. This is a substantial break from Federal Reserve procedure.

3. The Federal Reserve violated its own guidance, *SR 20-16 Supervision of De Novo State Member Banks*, which instructs Federal Reserve Banks to conduct a targeted examination of a *de novo* bank seeking to become a state member bank within the first six months following the *de novo's* formation, which we interpreted to mean when the *de novo* is

4

operational (the language in the guidance is not precise).[2] Under the SR 20-16 guidance, the Federal Reserve System relies on the state bank chartering authority's examination of a *de novo* bank, so that Federal Reserve examiners do not 'reinvent the wheel.' The Federal Reserve's first examination may be a targeted examination – not a full-scope examination – and should focus on the bank's risk management process. The guidance also states: *"Examiners should also review the de novo's operating results for consistency with its projections and any business and operating plans submitted in connection with its membership application"* (emphasis added). The Federal Reserve did not follow this guidance in multiple respects regarding Custodia:

- The Federal Reserve's examination of Custodia was not targeted. It was instead full-scope.
- The Federal Reserve's full-scope examination of Custodia was not required until one year after the bank commenced operations, but the Federal Reserve conducted a full-scope examination of Custodia before it commenced operations.
- Consequently, the Federal Reserve was unable to compare Custodia's operating results for consistency with its projections, as the guidance explicitly requires.
- The Federal Reserve's examination did not rely on the Wyoming Division of Banking's charter examination findings.
- Evidence of 'scope creep' exists in multiple instances of the Federal Reserve's October 21, 2022 exam findings letter, whose actual scope went well beyond the initial scope of the exam. Here is one example: *"In general, overall policies and procedures are limited in detail and are not sufficiently tailored to Custodia's unique business model and planned activities"* (emphasis added). Planned activities were expressly excluded from the exam scope as defined in the Day 1 letter, which was limited to *"products and services that will be in place when operations commence, or soon thereafter."* The same is true for the reference to "unique business model" – there is nothing unique about Custodia's initial launch products (Fedwire and ACH).

Indeed, Federal Reserve System staff themselves were uncertain before the exam whether they had the regulatory authority to conduct the exam they conducted on Custodia, the results of which Board staff cited in the 86-page order denying Custodia's membership application. Initially, in July/August 2022, there was confusion among System staff about whether the pre-membership exam for Custodia would be a full-fledged exam or merely a "visitation" – because membership applicants are not yet Federal Reserve-supervised institutions, so there was an open question whether the Federal Reserve even had the regulatory authority to conduct an actual exam on a non-operating bank. Then, System staff decided the exam would be an "exam-lite" (the examiner's words) – staff informed Custodia that it would not be issuing a written exam letter or assigning a management

---

[2]  FR 2083, *Application to the Board of Governors of the Federal Reserve System for Membership in the Federal Reserve System*, applies to a "newly organizing bank that seeks to become a state member bank."
https://www.federalreserve.gov/apps/reportingforms/Download/DownloadAttachment?guid=a7feb68a-d1 98-4f32-b3 4e-d96506da3cf7. A link to SR 20-16, *Supervision of De Novo State Member Banks* (which contains the imprecise language) is here:
https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm.

5

CONFIDENTIAL TREATMENT REQUESTED

rating, and that the exam would be limited to launch products only (Fedwire and ACH, as noted in the Day 1 letter sent to Custodia on August 19, 2022). Then, ultimately, the exam evolved into a full-scope exam (later expanded during the exam to cover Custodia's entire 3-year product roadmap), and System staff changed course – deciding last-minute to issue exam feedback in writing, which FRBKC delivered to Custodia on October 21, 2022.

Nonetheless, Custodia cooperated fully and in good faith with the exam. Custodia relied upon System staff's representation that it would be afforded a follow-up exam, as noted below, so it had no reason to object before the exam occurred or to appeal the exam findings via the ombudsman process, as separately noted below.

4. By broadening the exam scope as noted above, the Federal Reserve subjected Custodia to a higher standard than it uses to review other *de novo* bank applicants: By judging Custodia against the expanded exam scope of a fully-operational bank, the Federal Reserve did not allow for a ramp-up period typically accorded to *de novo* banks. The statutory factors for membership, which are provided in the Federal Reserve's Regulation H, do not require that banks be fully operational before attaining membership. Yet, by expanding the exam scope for Custodia to include its full three-year product development roadmap upfront, the Fed functionally imposed a standard that strayed outside the Federal Reserve Act – in essence, requiring that Custodia be fully operational with all products and services on its roadmap before becoming a member bank.

5. Following Custodia's September 2022 exam, the FRBKC examiner-in-charge told Custodia multiple times that "everything is addressable" in relation to its exam findings (reading from a script). Additionally, before giving feedback, the lead BSA/AML examiner said "all the things we will mention are achievable." At the time, FRBKC staff confirmed to Ms. Long and Board staff separately confirmed to Ms. Cox that there was no inclination among System staff to deny Custodia's application after the examination. The examiner-in-charge agreed with Ms. Long's interpretation that the examination result in October 2022 was "a not yet, but not a no."

Then, on January 27, 2023 the answer changed to a "no" and the Board's 86-page order portrayed the September 2022 examination findings as insurmountable – painting Custodia's examination as a failure on every front. System staff admitted that they did not consider any new information in the meantime, so it is not clear why the result changed from a "not yet" after the examination to a "no" months later. The change to "no" begs credulity, in part because the Wyoming Division of Banking (Custodia's regulator) also conducted an on-site examination of Custodia in August/September. Both the Wyoming Division of Banking and an independent consultant determined Custodia was ready to start taking external deposits last Fall (and the Wyoming Division of Banking granted Custodia a certificate of authority to operate on September 12, 2022).

6

**CONFIDENTIAL TREATMENT REQUESTED**

Something changed at the Federal Reserve that was unrelated to Custodia or its September 2022 examination – because, until January 2023, Custodia was on good terms and making progress. Custodia was given no indication that anything was amiss until January 23, 2023.

If the Federal Reserve's answer is "no" for policy reasons, then the Federal Reserve should say that instead of publishing an order that inaccurately impugns Custodia as unsafe and unsound and that will prejudice Custodia's business prospects operating as a state-chartered bank independent of its status with the Federal Reserve.

6. The "Day 1 letter" for Custodia's exam was dated August 19, 2022, and the examination was based on information as of that date. System staff admitted in the 86-page order that it did not consider the updated information Custodia submitted after that date (which was voluminous). This means the 86-page order was based on outdated information that was six months old in many cases – and six months is an epoch for a *de novo* bank finalizing its policies, procedures and risk management for the first time. At the time, Custodia did not object to the decision made by the examiner-in-charge not to review Custodia's updated information piecemeal as Custodia was regularly submitting it because, as noted in the next paragraph, all parties involved with Custodia's application expected there to be a follow-up examination that would incorporate all the updated information – but that second exam never happened. Instead, the 86-page order was drafted to paint Custodia in the worst possible light and without acknowledging the conclusions were based on outdated information. It is irregular for the Federal Reserve to base a Board decision on information that was so outdated, particularly for a *de novo* bank whose documentation rapidly improves.

7. System staff indicated in October 2022 that Custodia would be given a customary follow-up examination. *De novo* membership applicants often do not achieve approval for membership on their first examination, and they customarily receive at least a second examination. Custodia was afforded only one examination and that examination was conducted before Custodia was operational (in violation of Federal Reserve guidance, as noted above). Again, all this is a break with standard Federal Reserve practice.

8. Had Custodia been forewarned in October 2022 that it would not be afforded a second examination as discussed above, Custodia would have appealed the examination findings at the time (since appeals must be filed within 30 days from the receipt of examination results). But the 30-day window had long closed by the time System staff notified Custodia in January 2023 it would not receive a follow-up examination. Again, this does not comport with standard Federal Reserve practice and with an applicant's due process rights.

9. In good faith, Custodia used significant resources to provide complete responses and a remediation plan for all examination findings in December 2022. System staff had

7

CONFIDENTIAL

CONFIDENTIAL TREATMENT REQUESTED

committed in writing to Custodia on October 21, 2022 that "...*these remediation efforts will subsequently be assessed by Reserve Bank staff at a future date...*," but that never happened. Custodia's remediation efforts were never assessed by Reserve Bank staff, as promised in writing to Custodia.

10. System staff scheduled a call for January 23, 2023 but did not inform Custodia what would be discussed during the call – so Custodia, as normal, invited its key personnel to join. Unexpectedly and without any warning, Custodia was informed that Board staff would be recommending denial of Custodia's membership application and asked Custodia to respond within 48 hours as to whether it would withdraw its membership application. Ms. Cox, who was in the Mergers and Acquisitions Section of the Board for over 20 years and has made countless calls of this nature, notes that such calls are typically conducted with only the applicant's counsel and top management, and that bank employees are not involved in such detrimental discussions. This was a significant break with standard Federal Reserve practice and created an employee retention challenge for Custodia.

11. Further, Ms. Cox notes that the Federal Reserve typically gives applicants a full calendar week to make the important decision whether to withdraw a proposal. Mr. Kudiya, on January 23, initially gave Custodia only 48 hours. Custodia needed to convene an emergency board meeting and requested an additional week. However, Mr. Kudiya provided Custodia with only an additional 24 hours. It is now clear why Board staff was rushing – as discussed in the facts above, a precision-orchestrated series of announcements with the White House was on tap for January 27, 2023.

12. The Federal Reserve violated its policies pertaining to confidential business information and confidential supervisory information, which do not permit leaks to reporters (particularly involving confidential supervisory matters), but someone at the Federal Reserve did use press leaks to pressure Custodia. In addition to the facts disclosed above, reporters revealed several leaked things to Custodia in multiple conversations between January 25-27, including that the Board's forthcoming vote to deny Custodia's application would be a foregone conclusion and they implied that the White House was involved. The facts surrounding these press leaks support the conclusion that the outcome of Custodia's application was preordained.

13. On January 26, 2023, as noted above, Custodia received an email from a reporter who notified Custodia that all pending applicants at both the Fed and OCC with digital asset components to their business plans were simultaneously being asked to withdraw their applications. This is *prima facie* evidence that Custodia's application was not considered on its own merits, and was instead thrown into a much broader, coordinated effort (into which the Board's 86-page order may be viewed as "back-papering the file" by revising history to make it appear that Custodia's exam resulted in a "no" answer, which it did not).

8

CONFIDENTIAL

CONFIDENTIAL TREATMENT REQUESTED

14. White House involvement in a Federal Reserve Board vote on an application, which the leaks to reporters portrayed as preordained, is highly irregular. In addition to reporters implying that the White House was involved, Custodia was subsequently contacted by a Biden Administration insider who independently confirmed that the White House was involved. The insider provided the name of a person at the White House who allegedly was involved: Bharat Ramamurti, Deputy Director for the National Economic Council. Please note, however, that Custodia has no way to confirm the veracity of Mr. Ramamurti's alleged involvement and is providing you with his name in good faith to potentially assist your investigation. No one at Custodia has ever met Mr. Ramamurti.

Ms. Cox notes that, during her 32-year Federal Reserve System career, the Federal Reserve System has operated as an independent agency and has resisted any White House influence. Staff would do its best to make fair and balanced presentations to the Governors in order for decisions to be made in a thoughtful and informed manner. Ms. Cox observes that something has gone terribly wrong in the review of Custodia's application, whereby Custodia has not been given due process and it appears that, based upon the events described above, political pressure pushed the Board to make a hasty and poorly informed decision.

15. On January 27, 2023, in an unprecedentedly quick fashion – 17 hours after Custodia notified Mr. Van Der Weide that it declined to withdraw the application – the Board voted to deny Custodia's membership. From Ms. Cox's experience, that is record time and it condensed a process that normally takes weeks into one that took 17 hours (i.e., from 4:54pmET on January 26 to 10:57amET on January 27, based on email records). Normally, for a proposal that staff intends to take to the Board for denial, Board staff, at minimum, meet with the Committee on Supervision and Regulation to get its consent to move the proposal forward for denial. If the Committee supports a denial recommendation, Board staff then complete a "Board package" that includes recommendation memos from certain divisions of the Board and the Legal Division's draft order and send that package to the Secretary of the Board. The Secretary's office then releases the package via email to the Governors to vote on via email. The Governors are typically given at least three business days to review the documents, request changes to the draft order, and cast their votes. The votes are tabulated by the Secretary's office usually by noon and the Legal Division finalizes and publishes the order on the same day of the finalized vote. This process can take several weeks to complete. In Custodia's case, the process spanned only hours.

16. The Board's Custodia vote occurred during the "blackout week," the week before the Federal Open Market Committee ("FOMC") meeting held on January 31 and February 1. During blackout weeks, Board staff is instructed not to communicate with Board members regarding matters not related to FOMC matters. That the Board would break with its long-standing "blackout" procedure in order to coordinate the January 27 announcements with the White House's announcement is irregular.

9

**CONFIDENTIAL TREATMENT REQUESTED**

17. In their haste to complete the orchestrated series of announcements, the Board and FRBKC neglected to provide Custodia its statutory right to request Board reconsideration of its membership denial within 15 days of the Board's decision, pursuant to 12 CFR part 262.3(k). Instead, FRBKC denied Custodia's master account application within hours of the Board's denial of its membership application, and before Custodia had the opportunity to exercise its statutory right to request reconsideration. The hasty FRBKC action was a violation of Custodia's due process and the statutory protection it was due.

18. On January 27, 2023, Mr. Kudiya provided Custodia a copy of the Board's 86-page order denying its membership application (an order that has not yet been published). In reviewing the last 200 Board actions on proposals on the Board's website, dating back to 2014, Custodia was unable to find a single instance where the final order was not released simultaneously with the Board action. Moreover, the average length of a Board order is 19.6 pages. Custodia's 86-page order would be 41% longer than the longest published by the Board based upon our review of the last 200 Board actions, since the longest order published to date was 61 pages (excluding 19 pages of appendices). Our review also found zero instances of an attached order released after the press release date. Custodia's order is far out of the norm of standard Federal Reserve practice.

19. Custodia could find no other example of a Board order containing remotely the same quantity of disclosures of Custodia's confidential business plan and confidential supervisory information – Custodia estimates that the 86-page order contains four times greater confidential information than the next longest order it could find, based on public information. Custodia objected to the extensive publication of its confidential business information and noted that some of the confidential supervisory information contained in the 86-page order was not factually correct. Mr. Kudiya later confirmed that the Board has no plans to correct the factual inaccuracies, one of which – that Custodia had already spent half of the capital it raised on formation expenses – was not only wrong because it was based on outdated information that neglected to reflect Custodia's October 2022 capital raise, but it was also prejudicial to Custodia by casting aspersions on its expense management practices. The order is also filled with misleading statements and omissions, such as: "Custodia is not seeking deposit insurance from the Federal Deposit Insurance Corporation ("FDIC")." Custodia did seek FDIC insurance but it was not available to Custodia. Had it been available, Custodia would have obtained it – and System staff knew this. Such a material omission from the order, and the inclusion of a misleading statement instead, paints Custodia as trying to avoid federal regulation, when the opposite is true.

Custodia requested that significant amounts of confidential information be redacted from the order – again, Custodia plans to operate as a state-chartered bank – however, Board Legal rejected the vast majority of Custodia's requests for confidential treatment. Mr. Kudiya further indicated to Custodia's outside counsel that the Board will make no

10

CONFIDENTIAL TREATMENT REQUESTED

redactions of its own. So, the Board plans to publish virtually the entire 86-page order, which Custodia views as disparate treatment, prejudicial, potentially retaliatory, and intended to harm its business prospects. We have attached to this email the three most recent proposals denied by the Board of Governors of which we are aware, dating back to December 1996 – they are two, six and two pages long, respectively. Custodia's is 86-page denial order is non-standard.

20. The 86-page Board order contained certain language that surprised Custodia in light of the Federal Reserve System's stated commitment to diversity, equity and inclusion. Custodia qualifies as a female-owned bank (because more than 51% of its voting stock is female-owned). The 86-page order repeatedly asserted that Custodia's management has limited "relevant banking experience," which struck Custodia as arbitrary and odd since 100% of its senior management has relevant banking experience. System staff did not raise this issue with Custodia until the issue was highlighted in the 86-page order. Regardless of the outcome of Custodia's situation, we urge the Office of Inspector General to consider whether this approach by the Federal Reserve System to require "relevant banking experience" might actually be a form of systemic discrimination that perpetuates the woeful underrepresentation of protected classes among owners of banks in the United States and subtly discourages protected classes from attempting to form *de novo* banks. According to the OCC, there are only 13 women-owned banks in the U.S. (out of 4,236 total), or 0.3%. For the Federal Reserve to engage in disparate treatment of a woman-owned bank at all – much less to the magnitude of the numerous breaks with policy, procedure, normal practice and due process that Custodia has described in this letter – is disturbing.

21. In the 86-page Board order dated January 27, the Board cited a new Board policy that had not yet been enacted, was not published in the Federal Register until February 7 and applied only to existing member banks (i.e., not to Custodia). Citing a not-yet-enacted policy is a significant break from the normal methodical approach used by the Federal Reserve, and it is questionable whether a yet-to-be-enacted policy that did not technically apply to the applicant could be cited in a Board order as a reason for denial of a pending application.

22. The Board released the above-referenced January 27 policy statement simultaneously with the Board's announcement that it denied Custodia's membership application. The policy statement was hastily-drafted, defining a major shift on digital assets and severely restricting the banking industry's activities involving digital assets. The policy statement does not appear to conform with the requirements of the Administrative Procedure Act, which requires public comment on such substantive proposed rules or guidance.

23. On February 13, 2023, Custodia submitted a significantly revised business plan to the Board which addressed the Board's concerns defined in the 86-page order, and requested

11

CONFIDENTIAL                                                          Custodia-00010278

CONFIDENTIAL TREATMENT REQUESTED

reconsideration of the denial based on the revised business plan. The new plan broadened Custodia's target customer base well beyond the digital asset industry, and removed two activities for which Custodia had repeatedly requested permission in the preceding months (but for which the Board denied permission on January 27, 2023). On February 23, 2023, the Board denied Custodia's request for reconsideration. Custodia's revised business plan remains in limbo.

This is all particularly troubling because Custodia has been a good-faith actor throughout the process, endeavoring to help the Federal Reserve understand how digital assets will impact the banking system and then, once FTX imploded and bank runs began, how to respond to the numerous problems. An investigation of the email record will indicate numerous examples of Custodia helping Federal Reserve staff at various levels of the System during its 27-month application processes – including, at Ms. Cox's urging, emails aimed at helping examiners understand what to look for among the banks as the FTX mess was unfolding. Moreover, Custodia disclosed two things to System staff: (1) that Ms. Long began providing law enforcement, beginning last summer, with evidence of probable crimes committed by FTX, and (2) Custodia warned System staff of impending bank runs at the banks serving the digital asset industry. Yet, the Federal Reserve proverbially shot the messenger who tried to warn it of problems.

We will close by sharing with you Custodia's email to Mr. Van Der Weide on the morning of January 27, 2023, just minutes before the Board released its denial, which will hopefully help you understand how Custodia has been a good actor and has continually sought a constructive outcome:

> *It seems you believe crypto is a threat to banking system stability. Much of it is, but some of it is not – and that's where Custodia intends to do business. I believe regulators could truly benefit from the knowledge of responsible players who understand how to distinguish the wheat from the chaff, and who want the chaff to burn on a raging pyre before it hurts the banking system and consumers again. Very few people truly saw what was coming well before it happened — from the bank runs to the imploding lenders and even to the biggest fraud. Custodia did, and informed law enforcement months before FTX imploded. Aren't you curious how? That was no accident. And, among those few people, even fewer would be at the table with you – but we are, and we've been trying hard to work with you.*

Something went very wrong with Custodia's proposals, and we request that your office investigate and take appropriate action if you agree that Custodia did not receive due process. Specifically, we request that you intervene to delay the already-delayed publication of the 86-page order, which is scheduled for release on or about March 17, until you determine that both its private and redacted versions comport with due process.

12

CONFIDENTIAL TREATMENT REQUESTED

Please let us know if you need additional information from us. Custodia's counsel has authorized us to tell you that you may communicate directly with us regarding the matters raised herein.

Sincerely,                                    Sincerely,

*Katie S. Cox*

Caitlin Long                                  Katie S. Cox
CEO, Custodia Bank                            Adviser to Custodia Bank, retired 32-year examiner and manager of the Mergers and Acquisitions section at the Board of Governors in Washington, D.C.

cc:  Jeremiah Bishop, Commissioner
     Wyoming Division of Banking

13

# EXHIBIT CE

# [PUBLIC VERSION]

**J.A.1117**

Message
_____

| | |
|---|---|
| **From**: | LaFave, Amy [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=31B78A7416814E15B5AAFB4719E3EA19-J1ALK01] |
| **Sent**: | 1/27/2023 12:59:53 PM |
| **To**: | caitlin@custodiabank.com |
| **CC**: | George, Esther L [esther.l.george@kc.frb.org]; Humston, Tara L [tara.l.humston@kc.frb.org]; jeremiah.bishop@wyo.gov |
| **Subject**: | Correspondence from Federal Reserve Bank of Kansas City President Esther George |
| **Attachments**: | Custodia Master Account Request Response 01.27.2023.pdf |

NONCONFIDENTIAL // EXTERNAL

**NONCONFIDENTIAL // EXTERNAL**

Good afternoon.

Please see the attached correspondence on behalf of Federal Reserve Bank of Kansas City President Esther George.

Thank you.

**Amy LaFave** *(she/her/hers)*
*Executive Assistant II to President Esther George*
P: **816.585.0555**   E: *amy.lafave@kc.frb.org*
FEDERAL RESERVE BANK OF KANSAS CITY
1 Memorial Drive  ·  Kansas City, Missouri 64198  ›  www.kansascityfed.org

**J.A.1118**

FRBKC-00002171

# EXHIBIT CF

# [PUBLIC VERSION]

J.A.1119





**FEDERAL RESERVE BANK** *of* **KANSAS CITY**

January 27, 2023

Caitlin Long
Chief Executive Officer
Custodia Bank, Inc.
2120 Carey Avenue, Suite 300
Cheyenne, Wyoming 82001

Via Electronic Mail: caitlin@custodiabank.com

Dear Ms. Long:

We have completed our review of the request by Custodia Bank, Inc. ("Custodia") to open a master account with the Federal Reserve Bank of Kansas City ("Reserve Bank"). Our analysis is based on the information Custodia has provided to the Reserve Bank, including information provided through the pre-membership examination that commenced September 6, 2022. As addressed in our correspondence on October 21, 2022, in its current structure as an uninsured, state-chartered depository institution that is not subject to prudential supervision by a federal banking agency, Custodia is considered a Tier 3 institution under the Board of Governors' Guidelines for Evaluating Account and Services Requests ("Account Access Guidelines"). Institutions in Tier 3 are subject to the strictest level of review. Our review considered activities proposed to be conducted in Custodia's business plan in both the near- and longer-term, and the potential risks they introduce relative to the Account Access Guidelines.

Custodia intends to engage in a number of crypto-asset-related activities, including offering core banking services to crypto-asset companies; providing custody of digital assets, including holding crypto-assets as principal to facilitate the execution of transactions; offering "prime services" to facilitate transactions between fiat currency and crypto-assets, including agency services such as crypto-asset escrow, foreign exchange, and other activities related to digital asset lending by customers; and issuing "Avit," a bank-issued crypto token utilized for instantaneous payments that is intended to freely circulate on at least two public permissionless networks.

Custodia proposes to focus almost exclusively on offering products and services related to novel crypto-asset activities and to accept entirely uninsured deposits, an unprecedented business model that presents heightened risks involving activities that do not currently have clarity at the federal level. As noted in the January 3, 2023 Joint Policy Statement on Crypto-Asset Risks to Banking Organizations issued by the Board of Governors, Federal Deposit Insurance Corporation ("FDIC"), and Office of the Comptroller of the Currency ("OCC"), it is highly likely that key activities proposed by Custodia are inconsistent with safe and sound banking practices, including issuing and holding as principal crypto-assets that are issued, stored, or transferred on an open, public, and/or decentralized network. The federal agencies also have significant safety and soundness concerns with business models that are concentrated in crypto-asset-related activities or have concentrated exposures to the crypto-asset sector.

1 Memorial Drive  ·  Kansas City, Missouri 64198  ·  800.333.1010  ·  www.kansascityfed.org

CONFIDENTIAL

FRBKC-00002172

**J.A.1120**



As a *de novo* Special Purpose Depository Institution ("SPDI"), that is not federally insured or subject to prudential supervision by a federal banking agency, with a business plan narrowly focused on crypto-asset activities and serving the crypto-asset sector by offering novel and higher-risk business activities, and not subject to an established, interagency capital framework that fully addresses the relevant risks or a defined resolution process, we have determined accepting deposits from Custodia into a master account would introduce undue risk as described in the attached summary analysis. Therefore, based on the current facts and circumstances, the Reserve Bank denies Custodia's request for a master account.

Sincerely,

Esther George
President and CEO

Attachment

Cc:   Jeremiah Bishop, Wyoming Banking Commissioner
      Tara Humston, Senior Vice President, Federal Reserve Bank of Kansas City

2

CONFIDENTIAL

FRBKC-00002173

J.A.1121



**FEDERAL RESERVE BANK** *of* **KANSAS CITY**

CUSTODIA MASTER ACCOUNT SUMMARY ANALYSIS
Attachment

BACKGROUND AND TIMELINE

Custodia was granted an SPDI bank charter by the Wyoming Division of Banking ("DOB") on October 28, 2020, and submitted Operating Circular 1 ("OC1") Master Account Agreements to the Reserve Bank on October 29, 2020. At that time, Custodia had not yet been granted a Certificate of Authority ("COA") from the DOB approving the firm to commence business.[1]   From the time Custodia submitted the OC1 Master Account Agreements, the Reserve Bank has engaged extensively with Custodia regarding its master account request and devoted significant resources to understanding Custodia's business plan, the SPDI charter, the DOB's supervision program for SPDIs, and the risks and benefits presented by Custodia's request. On January 27, 2022, the Reserve Bank conveyed to Custodia that it "satisfies the threshold definition of an entity eligible to maintain a master account." The Reserve Bank also conveyed that "efforts related to potential access to Federal Reserve accounts and services by novel, nontraditional charters and the permissibility of crypto-asset related activities remain under active evaluation" and that a decision on granting a master account had not been reached. On September 12, 2022, Custodia was granted a COA by the DOB, approving the firm to commence business within six months.

Throughout the Reserve Bank's review, the timelines for Custodia's various planned crypto-related products and services have changed, as have staff employed by Custodia in key areas. Additionally, the proposed use cases of Custodia's bank-issued crypto token, the "Avit," have evolved over time. Custodia submitted application materials to become a member of the Federal Reserve System on August 5, 2021, and throughout 2021 and 2022, Custodia continued to build products and operational infrastructure that were necessary to commence operations and regularly engaged with Reserve Bank supervisory staff regarding risk management and operational infrastructures. Beginning September 6, 2022, a pre-membership examination was conducted by Reserve Bank staff. Custodia was advised that information obtained during the pre-membership examination would be used both in the evaluation of Custodia's master account request and membership application to reduce duplicative questions and burden on Custodia. At the time of the pre-membership examination, Custodia's plans for crypto-asset-related products and services, including the technology and risk management infrastructures to support, facilitate, and execute the planned activities, remained in the early stages of development and therefore could not be formally assessed as part of the review. The membership examination evaluated Custodia's risk management program related to core banking products that would be offered upon opening, namely deposit accounts and core payment services. Nonetheless, the pre-membership examination identified significant risk management gaps concerning the limited banking services Custodia would offer upon opening, which Custodia is currently addressing. These gaps were most notable in the areas of Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") and Office of Foreign Asset Control ("OFAC") compliance, internal audit, and information technology relative to what would be expected of an operating state member bank with only traditional banking activities. The information obtained from the pre-membership examination helped to inform the evaluation of the master account; however, the review of the master account considers the entirety of Custodia's proposed business plan and structure based on all activities in which it intends to engage.

---

[1] When a charter application is approved by the State Banking Board, the institution may not commence operations before receiving a certificate of authority to operate from the Commissioner pursuant to Wyo. Stat. § 13-12-116 and Wyo. Stat. 13-2-213.

1



Concurrent with the Reserve Bank's review, numerous reports and events have illuminated the volatile nature of the crypto-asset market, the vulnerabilities of open, public, decentralized networks, and the impact of insufficient oversight of firms engaged in crypto-related activities. In 2020 and 2021, the OCC issued Interpretive Letters 1170, 1172, 1174, and 1179, reaffirming the primacy of safety and soundness in conducting certain cryptocurrency, distributed ledger, and stablecoin activities, and requiring supervisory nonobjection before national banks may engage in such activities. In November 2021, the President's Working Group on Financial Markets ("PWG"),[2] joined by the FDIC and the OCC, released a report highlighting the benefits and risks of stablecoins, including inconsistent and fragmented oversight of token issuers. The report provided several recommendations for mitigating risks to stablecoin users and guarding against stablecoin runs (including a requirement for stablecoin issuers to be insured depository institutions), the latter of which sought to address concerns related to payment system risk and concentration of economic power.[3] In both December 2021 and October 2022, the Financial Stability Oversight Council ("FSOC") published reports[4] highlighting regulatory concerns with stablecoins and the wider cryptocurrency market, including the risks that crypto-asset activities could pose to the stability of the U.S. financial system if their interconnections with the traditional financial system or their overall scale were to grow without adherence to or being paired with appropriate regulation.

Most recently, the Federal Reserve Board of Governors, along with the FDIC and OCC, issued the Joint Statement[5] highlighting crypto-asset risks to banking organizations. The Joint Statement specifically referenced the events of the past year marked by significant volatility and exposure of vulnerabilities in the crypto-asset sector, resulting in significant losses in the total market value of cryptocurrency and failure of several prominent crypto and blockchain companies. These episodes have illustrated the risks, interconnectedness, and volatility within the nascent industry.

The market volatility described above is important because Custodia proposes to serve the crypto-asset industry by acting as a bridge to the established banking and payments system through the provision of deposit services, crypto-asset custody services, proprietary crypto token issuance/redemption on open, public, decentralized networks, and other crypto-asset escrow and prime services. In addition to the individual risks posed by these activities, Custodia's business model is narrowly focused and concentrated in a high-risk and volatile industry.

---

[2] *See* President's Working Group on Financial Markets Report on Stablecoins, https:/:home.treasury .gov/system/files/136/StableCoinReport_NovI_508.pdf, November 1, 2021.
[3] As communicated in the materials provided for the pre-membership examination, Custodia applied for FDIC insurance in November 2021 and at the FDIC's request, entered into the FDIC's draft proposal review program. The FDIC provided oral feedback in both December 2021 and January 2022, and written feedback in March 2022. Based on these interactions, Custodia concluded that FDIC insurance would not be approved and, as a consequence, Custodia did not proceed further.
[4] *See* Financial Stability Oversight Council 2021 Annual Report, https://home.treasury.gov/system/files/261/FSOC2021AnnualRepmt.pdf; see also the FSOC's Report on Digital Asset Financial Stability Risks and Regulation (October 3, 2022), https://home.treasury.gov/system/files/261/FSOC-Digital-Assets-Report-2022.pdf.
[5] *See* Joint Statement on Crypto-Asset Risks to Banking Organizations, https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg2o230101at.pdf, January 3, 2021.

2

CONFIDENTIAL                                                                                     FRBKC-00002175

J.A.1123



## EVALUATION OF MASTER ACCOUNT REQUEST

The Reserve Bank has evaluated Custodia's business plan and proposed structure based on all activities in which it intends to engage, and not only those proposed to be offered initially. An assessment of the overall business model is important to determine both the viability of the business model and the associated risks presented by future activities. In completing its review of Custodia's request, the Reserve Bank considered the principles outlined in the Account Access Guidelines,[6] as the Account Access Guidelines formalized the pre-existing process (areas of risk and modes of analysis) encompassed in the evaluation of master account requests (i.e., heightened scrutiny applied to non-traditional entities or those with business activities presenting various types of heightened risks).

### BSA/AML and OFAC Compliance Risk

As outlined in the Account Access Guidelines, receiving deposits through the provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity. Crypto-assets pose significant BSA/AML and OFAC compliance risks due to the significant anonymity afforded to holders; ease and speed of transfer; and general irrevocability of transactions. The ability to conduct instantaneous transactions electronically and pseudonymously enables numerous small transactions to move large sums of money undetected by monitoring systems. Custodia's planned issuance of the Avit on two public permissionless networks [7] highlights the need for strong BSA/AML and OFAC compliance. Custodia acknowledges that users would have the ability to conduct Avit transactions indefinitely using wallets not hosted or controlled by Custodia, which would not have undergone an onboarding process with Custodia. Similarly, unknown persons who are not customers of Custodia would be able to hold and redeem Avits without undergoing the full due diligence required for customer onboarding. In addition, by the nature of the crypto-assets Custodia intends to hold in custody and the networks upon which transactions in those assets are recorded, both Custodia and holders of Avits will pay transaction processing fees to unknown transaction validators. This places Custodia and its customers in the position of making payments to unknown parties who could be illicit actors or sanctioned entities. A sound BSA/AML and OFAC compliance program is critical in deterring and preventing these types of activities at, or through, banks and other financial institutions. Custodia has not yet built or demonstrated the ability to scale an effective BSA/AML and OFAC compliance program to control for these risks.

### Financial Considerations

A narrowly focused business model offering banking services to a novel, higher-risk, and not fully mature industry raises questions about the firm's viability. This uncertainty highlights the need for capital to mitigate risks in the business model and offset fluctuations in earnings. The narrow nature of Custodia's anticipated use of the novel SPDI charter, focused on fee-based income from planned crypto-asset-related activities, exposes Custodia's revenue to significant fluctuations in response to industry stresses and events. For example, a potential

---

[6] *See* Guidelines for Evaluating Account and Services Requests,
https://wwwv.federalreserve.gov/newsevents/pressreleases/files/other20220815a1.pdf, August 15, 2022.
[7] Custodia plans to use Ethereum and Liquid networks. Ethereum operates on distributed ledger technology and Liquid operates on a blockchain.

3

J.A.1124



rapid loss of customers (or decrease in volume of transactions from which Custodia generates fees) could result in a rapid decline in revenue and threaten Custodia's earnings.

Unlike ordinary commercial banks providing traditional banking services, Custodia is an uninsured, *de nova* depository institution not subject to federal supervision and regulation, seeking to engage in multiple high-risk endeavors concentrated in a high-risk industry. Its revenue will be generated primarily from crypto-adjacent activity with no history of safe and sound operations, diversified sources of revenue, and effective risk-management practices, meaning comparisons between Custodia and insured depository institutions are misplaced.

<u>Capital Requirements</u>

Custodia is not subject to the federal regulatory capital framework for insured banks. Neither the federal capital framework nor the Wyoming state rules have incorporated requirements related specifically to crypto-assets. The recent market events discussed above demonstrate the interconnectedness of crypto-market participants, contagion risk, and the need for a robust capital framework. In the absence of deposit insurance and interagency capital standards that account for the types of risks posed by Custodia's business model, which includes significant operational, cybersecurity, BSA/AML and OFAC compliance, strategic, and other risks, and considering the institution's reliance on revenue generated from narrowly focused, volatile crypto-asset-based activities as its primary source of capital augmentation, it remains unclear if Custodia's current and projected capital base will be sufficient to support its risk profile.

<u>Counterparty Risk and Resolution Process</u>

Custodia is required to maintain unencumbered liquid assets equal to at least one hundred percent of deposit liabilities.[8] Nonetheless, Custodia could be subject to run risks, as its business is focused on novel, risky activities and the firm will be subject to a legal regime and resolution process that has not been subject to a court-validated claims process (even where assets purportedly are in excess of deposit liabilities). Moreover, Custodia is not subject to any federal prudential regulation or supervision - either at the institution level or on a consolidated basis - and would not offer the protection of federal deposit insurance and FDIC receivership in the event of a failure. Existing federal statutory and regulatory frameworks to protect both depositors and the safety and soundness of the banking system, including those related to resolution, certain capital requirements, enforcement actions, changes in control, activities restrictions, and consumer protection are directly linked to (and only applicable based on) status as an insured depository institution.

The absence of a proven resolution process exacerbates the risk to the Reserve Bank presented by the receipt of deposits from Custodia. In addition, the Reserve Bank has serious concerns with safely and effectively resolving a deposit-taking entity without significant customer impacts outside of a proven resolution process, particularly without a formal resolution plan in place or tested. While the DOB, as the chartering authority, does not require a resolution plan to be developed until the institution has been in operation for six months, the sufficiency of the plan is a critical component of the Reserve Bank's evaluation of the risks presented by Custodia in the event of a liquidation or conservatorship by the DOB. Custodia's suggestion that a straightforward

---

[8] Custodia has indicated a willingness to hold these assets as reserves for the first three years of operation, however the Wyoming rules allow Custodia to hold other high-quality liquid assets, which may introduce credit or market risk to the institution.

4



resolution could be accomplished via a sale of its custody business and deposits to another de-novo Wyoming SPDI or another financial institution with a focus on the crypto-asset industry is questionable, as such proposed acquirers are likely to be experiencing stress at the same time and for the same reasons as Custodia. Under the Wyoming Division of Banking's SPDI Rules and Regulations, the resolution plan is required to include how Custodia would "protect the interests of the customers of the institution and to protect the financial system from material risks." Wyo. Rules & Regs. 021.0002.20 § 4(c). As part of the provision of accounts and payment services to depository institutions, it is the role of the Reserve Bank to ensure the risks presented from accepting deposits and providing services to an account holder do not result in loss to the Reserve Bank or negatively impact the payment system. However, in the absence of a resolution plan, these risks cannot be effectively and comprehensively assessed.

<u>Lack of Federal Regulatory Oversight</u>

The statutory and regulatory safety and soundness framework for SPDis is substantially different from the framework that applies to federally insured institutions. While state and federal banking agencies are responsible for ensuring safety and soundness of an entity's activities, only the Federal Reserve has a mission to ensure a safe and efficient payments system. The Reserve Bank has a long-standing and productive relationship with the DOB in our respective supervisory roles for state-chartered member banks. However, the lack of a federal prudential framework for SPDis leaves the Reserve Bank with limited risk-monitoring tools and virtually no remediation or enforcement authority, other than what would be available under the Board's Policy on Payment System Risk and Operating Circular 1.[9] These limited monitoring and mitigation tools are insufficient given the risks posed by Custodia's proposed business model.

Federal regulation and supervision take on heightened importance in this case. Access to a master account for an uninsured, state-chartered entity, with a narrowly focused business model reliant on serving the crypto-asset industry and issuing a proprietary crypto token to be backed by cash held as reserves at the Reserve Bank, poses important public policy questions that have not been fully addressed. Even absent the concerns detailed above, a proposal of this nature has the potential to create undue risk to the financial system and adversely affect the Federal Reserve's ability to implement monetary policy. In short, Custodia currently has no federal banking regulator and is not obligated to comply with the comprehensive set of federal banking regulations applicable to federally-insured banks. Thus, Custodia is seeking to utilize a novel high risk business model to benefit from access to Federal Reserve System financial services without being subject to the same regulatory limitations as insured depository institutions designed to protect depositors and bank counterparties.

CONCLUSION

Based on the facts and circumstances described above, we have determined accepting deposits from Custodia into a master account would introduce undue risk to the Reserve Bank, risk to the overall economy due to potential illicit activities, and potential risk to the payments system that cannot be effectively mitigated at this time.

---

[9] Under Operating Circular 1, depositmy institutions with accounts at Reserve Banks agree as a matter of contract law to particular arrangements with the Reserve Banks. Under the Payment System Risk Policy, firms with access to Fed payment services may be required to post collateral to protect Reserve Banks from the credit risk associated with operating the payment system and providing services to a particular institution.

5

CONFIDENTIAL                                                                    FRBKC-00002178

J.A.1126



FILED

U.S. DISTRICT COURT
DISTRICT OF WYOMING

8:06 am, 12/26/23

**U.S. Magistrate Judge**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| CUSTODIA BANK, INC. | } |
| Plaintiff, | } |
| vs. | } |
| FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, | } |
| Defendants. | } |

Civil No. 1:22-cv-00125-SWS

## *ORDER GRANTING UNOPPOSED MOTION TO AMEND THE SCHEDULING ORDER*

**THIS MATTER** comes before the Court upon *Defendants' Unopposed Motion to Amend the Scheduling Order* ("Motion") and the Court having reviewed and considered the same hereby **ORDERS** that the Motion is hereby **GRANTED**.

**IT IS HEREBY ORDERED,** the current schedule is amended as follows:

| Briefing Schedule | New Date |
|---|---|
| **Custodia Dispositive Motion** | Dec. 20, 2023 |
| **Amicus Briefs in Support of Custodia** | Jan. 19, 2024 |
| **FRBKC Cross-Motion for Summary Judgment/Opposition** <br><br> **Board Response** <br><br> **Daubert Motions** | Jan. 26, 2024 |
| **Amicus Briefs in Support of Defendants** | Feb. 9, 2024 |
| **Custodia Cross-Opposition to Defendants Motions/Reply** <br><br> **Daubert Responses** | Feb. 16, 2024 |
| **FRBKC Replies in Support of Summary Judgment and Daubert Motions** | Feb. 23, 2024 |
| **Pre-Trial Conference** | Mar. 21, 2024 |
| **Bench Trial** | Apr. 8, 2024 |

**J.A.1127**

*IT IS FURTHER ORDERED* that all deadlines in the *Second Amended Scheduling Order* dated February 23, 2023, not modified herein, shall remain in effect.

*IT IS FURTHER ORDERED* the Pre-trial conference and bench trial dates shall remain the same.

Dated:   December 26, 2023.

BY THE COURT:

_____
KELLY H. RANKIN
United States Magistrate Judge

**J.A.1128**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF WYOMING**

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 1:22-cv-00125-SWS |
| BOARD OF GOVERNORS OF | ) | |
| THE FEDERAL RESERVE SYSTEM & | ) | |
| FEDERAL RESERVE BANK | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

***AMICUS CURIAE* BRIEF OF THE STATE OF WYOMING IN SUPPORT OF
PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

---

Pursuant to this Court's Order setting the deadline for amicus briefs in support of
Plaintiff Custodia for January 19, 2024 and the Court's Order Granting the State of
Wyoming Leave to File dated January 18, 2024, the State of Wyoming files this *amicus
curiae* brief. The Wyoming Attorney General is further authorized to file this *amicus* by
Wyo. Stat. Ann. § 9-1-603(a)(iv) which authorizes her to "[r]epresent the state in suits,
actions or claims in which the state is interested in . . . any United States court[.]" Wyo.
Stat. Ann. § 9-1-603(a)(iv). This brief is intended to provide further context and support to
the Plaintiff's Petition for Review on its APA Claim and its Motion for Judgment as a
Matter of Law on its Statutory Mandamus Claim filed on December 22, 2023. [ECF 238]
While the State does not seek to vindicate Custodia's individual interests, it instead speaks

in favor of its regulatory banking regime and the United States' dual banking system to provide the Court with additional insight in analyzing Plaintiff's arguments.

## ARGUMENT

Defendants' internal correspondence, uncovered during discovery, makes clear that they saw Plaintiff's request for a master account as being precedential for all Special Purpose Depository Institutions (SPDI). *See* ECF 240-19 (writing in regard to Plaintiff's master account application, "[d]ue to the unique nature of SPDIs and the broader impacts this decision may have, we are working with our colleagues across the system and at the Board to understand their viewpoints on the matter"). This revelation confirms the State's existing concern that the Defendants' overwhelming bias against State-chartered banks, and those chartered by Wyoming particularly, makes any Wyoming issued SPDI charter irrelevant. Even though it is carefully crafted, the State's regulatory banking regime for all SPDIs is essentially nullified by the Defendants' posture and actions taken in this appeal.

The State's primary concern is that Defendants' reasoning, as it relates to the Plaintiff, applies equally to all SPDI banks chartered under Wyoming law. [ECF 129 at 7-8]. Statements made by Defendants, demonstrate that Defendants' denial was due in large part to the fact that Plaintiff would operate under a SPDI charter from the State of Wyoming. For example, to briefly name just a few of these, the Kansas City Fed has prominently noted that:

- "Neither the federal capital framework nor the Wyoming state rules have incorporated requirements related specifically to crypto-assets." [ECF 129 at 7].

- "[T]he Wyoming rules allow Custodia to hold other high-quality liquid assets, which may introduce credit or market risk to the institution." [ECF 129 at 7, n.8].

- "[T]he firm will be subject to a legal regime and resolution process that has not been subject to a court validated claims process (even where assets purportedly are in excess of deposit liabilities)." [ECF 129 at 7].

- "The absence of a proven resolution process exacerbates the risk to the Reserve Bank presented by the receipt of deposits from Custodia." [*Id.*]

- "The statutory and regulatory safety and soundness framework for SPDIs is substantially different from the framework that applies to federally insured institutions." [ECF 129 at 8].

While directed toward Plaintiff's individual application, each of the foregoing statements are equally true about every potential Wyoming SPDI which may come into existence. Each of those statements demonstrate the Kansas City Fed's disdain for and disparagement of Wyoming's statutory and regulatory banking regime.

Given the apparent internal position of Defendants, it is reasonable to infer that they will consistently apply their apparent animus towards all Wyoming SPDI banks on future applications. Moreover, the decision letter makes clear that the Kansas City Fed's decision is not based solely "on the facts and circumstances" of the Plaintiff but is rather tied to the Fed's distrust of Wyoming's SPDI model itself. [ECF 129 at 7-8]. The Defendants' actions in this case essentially nullifies, without adequate justification, Wyoming's SPDI regulatory structure. Defendants' conduct thus injures the State's regulatory banking interest.

The State of Wyoming has an interest in its regulation of banking activities that occur within its borders and in upholding its bank chartering role under the United States'

dual banking system. The State also has a direct pecuniary interest in the creation and regulation of SPDI banks, given that it collects fees from regulated and operating SPDIs. Wyo. Stat. Ann. § 13-12-119(d). Defendants' equivocations and its questioning of Wyoming law, illuminates the impingement on Wyoming's regulatory authority.

Equality between federally-chartered and state-chartered banks is "firmly embedded in the statutes governing the national banking system." *First Nat. Bank in Plant City v. Dickinson*, 396 U.S. 122, 133 (1969). Multiple precedential decisions confirm this stance. *See, e.g.*, *State of Colo. ex rel. Colorado State Banking Bd. v. Resolution Trust Corp.*, 926 F.2d 931, 946 (10th Cir. 1991) (outlining how regulation that "applie[d] equally to both state and national banks" "protect[ed] competitive equality" between them); *State of Colo. ex rel. State Banking Bd. v. First Nat. Bank of Fort Collins*, 540 F.2d 497, 500 (10th Cir. 1976) ("[T]he congressional intent behind the provisions of [federal branch banking statute] was to place national and state banks on a basis of 'competitive equality[.]'"). Indeed, the principle of regulatory equality is further enhanced by the requirement of 12 U.S.C. § 248a(c)(2) that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions"—of which class Plaintiff is. 12 U.S.C. § 248a(c)(2); 12 U.S.C. § 461(b)(1)(A)(i).

However, instead of considering that precedent, the Defendants appear to have tied everything together related to cryptocurrency, bias against new financial devices, and apparent fraud within these spheres (including FTX, as discussed in Plaintiff's omnibus brief), in a reflexive posture that amounts to "*virtual currency is risky, thus Wyoming SPDIs are risky, thus a Wyoming SPDI (such as the Plaintiff) should be denied the ability*

*to operate through a master account.*" This approach is both improper and offensive to the proper division of finance regulation in the United States. Indeed, Defendant Board's Policy Statement declared that

> the Board would presumptively prohibit SMBs [state member banks] from holding most crypto-assets as principal, and also would provide that any SMB seeking to issue a dollar token would need to demonstrate, to the satisfaction of Federal Reserve supervisors, that the bank has controls in place to conduct the activity in a safe and sound manner, and to receive a Federal Reserve supervisory nonobjection before commencing such activity

Statement, Board of Governors of the Federal Reserve System, Policy Statement on Section 9(13) of the Federal Reserve Act (Jan. 27, 2023).[1] This disrespect for the dual banking system and Wyoming's chartered banks should not stand.

## CONCLUSION

Plaintiff's use of the SPDI charter should not impact whether it receives a master account; instead, it should be judged according to its own merits and the legal constraints on Defendants during the master account application review process. Rather than apply a logical method based on Plaintiff's actual plan of operation, or even a true assessment of the risks and features of SPDIs, the Defendants appear to have applied an automatic and tenuous heuristic in settling on their decision to deny the Plaintiff's application. In sum, Wyoming chartered SPDIs, utilizing innovative financial and banking markets, should not be penalized reflexively for doing so. Rather, those entities should instead be subject to an appropriate level of scrutiny free from bias against the structure of the dual banking system.

---

[1] https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230127a1.pdf

The State of Wyoming has, thus far in vain, tried to comply with all the requirements that the Defendants have put out in creating SPDI charters, and yet the Defendants still have not granted master accounts for any SPDIs.

The State of Wyoming respectfully requests that the Court consider the State's regulatory position in analyzing Plaintiff's motion for judgment as a matter of law.

Dated this 18th day of January, 2024.

/s/ Devin Kenney
Bridget Hill, Wyo. Bar No. #6-3616
Attorney General
Karl Anderson, Wyo. Bar No. #6-2807
Supervising Attorney General
Devin Kenney, Wyo. Bar No. #7-5964
Senior Assistant Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-7886
bridget.hill@wyo.gov
karl.anderson@wyo.gov
devin.kenney1@wyo.gov

ATTORNEYS FOR STATE OF WYOMING

# CERTIFICATE OF SERVICE

I certify that on this 18th day of January 2024, a copy of the foregoing *AMICUS CURIAE* BRIEF OF THE STATE OF WYOMING IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW was served in the following manner as addressed to:

John K. Vila                                         VIA CM/ECF
Ryan Thomas Scarborough
Whitney D. Hermandorfer
Jamie Wolfe
WILLIAMS & CONNOLLY
680 Maine Avenue SW
Washington, DC 20024
*Attorneys for Plaintiff*

Scott E. Ortiz                                       VIA CM/ECF
WILLIAMS PORTER DAY & NEVILLE
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
*Attorneys for Plaintiff*

Angela Tarasi                                        VIA CM/ECF
KING &SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
*Attorneys for Defendant Federal Reserve Bank
of Kansas City*

Billie LM Addleman                                   VIA CM/ECF
John P. Fritz
HIRST APPLEGATE
P.O. Box 1083
Cheyenne, WY 82003
*Attorneys for Defendant Federal Reserve Bank
of Kansas City*

Joshua P. Chadwick                              VIA CM/ECF
Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
Board of Governors of the Federal Reserve
System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
*Attorneys for Defendant Federal Reserve Board*
*of Governors*

    /s/ Jessica Curless
    Paralegal
    Wyoming Attorney General's Office