## VOLUME VI of X (Pages J.A.1137 – J.A.1348)

Case No. 24-8024

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

### CUSTODIA BANK, INC.,

Appellant,

v.

### FEDERAL RESERVE BOARD OF GOVERNORS et al.,

Appellees.

On Appeal from the U. S. District Court for the District of Wyoming

The Honorable Scott W. Skavdahl, District Judge

District Court No. 1:22-CV-125-SWS

## JOINT APPENDIX

Joshua P. Chadwick
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street & Constitution Ave. NW
Washington, DC 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

Michelle S. Kallen
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com

*Counsel for Appellant*

Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street and Constitution Ave.
NW
Washington, DC 20551
(202) 263-4835
yvonne.f.mizusawa@frb.gov
yonatan.gelblum@frb.gov
katherine.pomeroy@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Andrew Z. Michaelson
KING & SPALDING LLP
1185 Ave. of the Americas, 34th Fl.
New York, NY 10036
(212) 556-2100
amichaelson@kslaw.com

Billie LM Addleman
Erin E. Berry
HIRST APPLEGATE, LLP
PO Box 1083
Cheyenne, WY 82003
(307) 632-0541
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Christine M. Carletta
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
ccarletta@kslaw.com
cfreeman@kslaw.com

Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE,
P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

*Counsel for Appellant*

Jared Lax
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
jlax@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

# TABLE OF CONTENTS

## Volume I of X

District Court Docket Report, *Custodia Bank Inc. v. Federal Reserve Board of Governors et al,* No. 1:22-cv-00125 (D. Wyo.) ...................................................................... J.A.1

Complaint (D. Wyo. June 7, 2022), ECF No. 1 ............................... J.A.41

Exhibit 1 to Complaint (D. Wyo. June 7, 2022), ECF No. 1-2 ......... J.A.86

Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 48 ................................................... J.A.88

Defendant Board of Governors of the Federal Reserve System's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 49 ............................................................... J.A.91

Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 50..... J.A.153

Defendant Federal Reserve Bank of Kansas City's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 51 ...... J.A.157

## Volume II of X

Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's Complaint (D. Wyo. Sept. 13, 2022) ECF No. 58 ........................................................... J.A.216

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss Complaint (D. Wyo. Oct. 4, 2022) ECF No. 96 ..................... J.A.269

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss (D. Wyo. Oct. 4, 2022) ECF No. 97 ........................................................... J.A.304

Plaintiff Custodia Bank, Inc.'s Notice of Submission of
    Supplemental Authority (D. Wyo. Oct. 12, 2022) ECF
    No. 98 .................................................................................. J.A.340

Defendant Board of Governors of the Federal Reserve
    System's Response to Plaintiff's Notice and Submission
    of Supplemental Authority (D. Wyo. Oct. 19, 2022) ECF
    No. 99 .................................................................................. J.A.353

Order Granting in Part and Denying in Part Defendants'
    12(b)(6) Motions to Dismiss Complaint (D. Wyo. Nov. 11,
    2022) ECF No. 102 ............................................................. J.A.359

Joint Motion of Defendants Federal Reserve Bank of Kansas
    City and Federal Reserve Board of Governors to Dismiss
    the Complaint as Moot (D. Wyo. Jan. 27, 2023) ECF No.
    116 ....................................................................................... J.A.397

First Amended Complaint (D. Wyo. Feb. 28, 2023) ECF No.
    121 ....................................................................................... J.A.401

Defendant Federal Reserve Bank of Kansas City's Motion to
    Dismiss First Amended Complaint (D. Wyo. Mar. 28,
    2023) ECF No. 124 ............................................................. J.A.438

## Volume III of X

Defendant Board of Governors of the Federal Reserve
    System's Motion to Dismiss the First Amended
    Complaint (D. Wyo. Mar. 28, 2023) ECF No. 126 ............... J.A.459

Defendant Board of Governors of the Federal Reserve
    System's Memorandum of Points and Authorities in
    Support of Its Motion to Dismiss the First Amended
    Complaint (D. Wyo. Mar. 28, 2023) ECF No. 127 .............. J.A.462

Omnibus Memorandum in Opposition to Defendants' Motions
    to Dismiss Plaintiff's First Amended Complaint (D.
    Wyo. Apr. 11, 2023) ECF No. 135 ........................................ J.A.497

Brief of Amicus Curiae Former Senator Patrick J. Toomey in Support of Neither Party (D. Wyo. Apr. 20, 2023) ECF No. 151 ................................................................ J.A.537

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss First Amended Complaint (D. Wyo. May 2, 2023) ECF No. 159 ................. J.A.559

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss the Amended Complaint (D. Wyo. May 2, 2023) ECF No. 160 ............................................................................ J.A.572

Order on Defendants' Motions to Dismiss First Amended Complaint (D. Wyo. June 8, 2023) ECF No. 164 ................. J.A.601

Defendant Federal Reserve Bank of Kansas City's Answer to Custodia's First Amended Complaint (D. Wyo. June 22, 2023) ECF No. 166 ............................................................. J.A.617

Defendant Board of Governors of the Federal Reserve System's Notice of Lodging of the Administrative Record (D. Wyo. Aug. 21, 2023) ECF No. 178 ................................. J.A.641

Second Amended Scheduling Order (D. Wyo. Nov. 13, 2023) ECF No. 211 ....................................................................... J.A.644

Order Granting Joint Motion and Stipulation to Align and Consolidate APA and Summary Judgment Briefing (D. Wyo. Nov. 28, 2023) ECF No. 220 ........................................ J.A.656

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 238 ............................................................. J.A.657

Proposed Order (D. Wyo. Dec. 22, 2023) ECF No. 238-1 .............. J.A.660

**Volume IV of X**

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 239 ................................................................. J.A.661

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 240 ................................................................. J.A.725

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 240-1 ................................. J.A.740

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 240-3 ..................................................... J.A.811

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 240-5 ................................. J.A.858

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 240-9 ................................................................. J.A.879

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 240-10 ................................ J.A.881

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 240-11 .............................. J.A.912

## Volume V of X

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 240-15 ................................................... J.A.919

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 240-26 .............................................. J.A.921

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 240-31 .................................................... J.A.971

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 240-37 ......... J.A.978

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 240-38 .................................................................... J.A.983

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 240-40 ......................................... J.A.986

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 240-45 .................................................... J.A.988

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 240-47 .................................................... J.A.1043

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 240-53 ....................J.A.1051

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 240-54 ...........J.A.1056

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 240-64 .........................................................................J.A.1058

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 240-65 .........................J.A.1061

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 240-67 ...................................................................J.A.1062

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 240-68 ..................................................................J.A.1065

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 240-69 ...........................................................................J.A.1068

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-71 .................................................................J.A.1071

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 240-75 ..................................................................J.A.1081

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 240-77 ..........................................................................J.A.1087

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-78 .................................................................J.A.1089

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 240-80 ........................................................J.A.1099

Exhibit CC, Email from Matthew Eichner with the subject line "Custodia response: S-Letter - 2667 with no concerns identified" (Jan. 26, 2023) ECF No. 240-81 .........J.A.1101

Exhibit CD, Letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors (Mar. 8, 2023) ECF No. 240-82 .........................J.A.1103

Exhibit CE, Email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George" (Jan. 27, 2023) ECF No. 240-83 ..................................................................................J.A.1117

Exhibit CF, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Jan. 27, 2022) ECF No. 240-84 ........J.A.1119

Order Granting Unopposed Motion to Amend the Scheduling Order (D. Wyo. Dec. 26, 2023) ECF No. 241 .......................J.A.1127

Amicus Curiae Brief of the State of Wyoming (D. Wy. Jan. 18, 2024) ECF No. 251 ............................................................J.A.1129

## Volume VI of X

Amici Curiae Brief in Support of Plaintiff filed by Amicus Parties Blockchain Association, Payment System Scholars (D. Wy. Jan. 19, 2024) ECF No. 257 ....................J.A.1137

Amici Curiae Brief in Support of Plaintiff's Motion for Judgment as a Matter of Law filed by Amicus Parties United States House of Representatives Financial Services Committee Members, United States Senate Banking, Housing and Urban Affairs Committee Members (D. Wy. Jan. 19, 2024) ECF No. 259 ...................J.A.1173

Defendant Board of Governors of the Federal Reserve System's Opposition to Plaintiff's Petition for Administrative Procedure Act Review (D. Wyo. Jan. 26, 2024) ECF No. 271 ............................................................J.A.1200

Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment (D. Wyo. Jan. 26, 2024) ECF No. 272 ..................................................................................J.A.1257

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 282 ...J.A.1260

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 283 ..........J.A.1318

Amicus Brief in Support of Defendants filed by Amicus David Zaring (D. Wy. Feb. 9, 2024) ECF No. 286 ......................J.A.1331

## Volume VII of X

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 299 .....................................................................J.A.1349

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 300 .....................................................................J.A.1402

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 300-7 ...............................J.A.1407

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 300-8 .....................................................J.A.1414

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 300-15 ....................................................J.A.1418

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 27, 2024) ECF No. 313 ......................................J.A.1423

Order on Dispositive Motions (D. Wyo. Mar. 29, 2024) ECF No. 317 ................................................................................J.A.1449

Judgment (D. Wyo. Mar. 29, 2024) ECF No. 318 .......................J.A.1476

Plaintiff Custodia Bank, Inc.'s Notice of Appeal (D. Wyo. Apr. 26, 2024) ECF No. 321 .......................................................J.A.1477

## UNDER SEAL
## Volume VIII of X

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 233 ..........................................................J.A.1480

Proposed Order (D. Wyo. Dec. 20, 2023) ECF No. 233-1 ............J.A.1483

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 234 ........................................................................................J.A.1484

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 236 ........................................................................................J.A.1548

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 236-1 ................................................................J.A.1563

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 236-3 ........................................................................J.A.1634

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 236-5 ......................................J.A.1681

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 236-9 ........................................................................J.A.1702

## Volume IX of X

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 236-10 ......................................J.A.1704

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 236-11 .................................J.A.1735

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 236-15 ................................................................J.A.1742

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 236-26 .........................................................J.A.1744

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 236-31 .................................J.A.1794

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 236-37 ........J.A.1801

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 236-38 ................................................................J.A.1806

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 236-40 ......................................J.A.1809

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 236-45 ...................................................................J.A.1811

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 236-47 ......................................................J.A.1866

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 236-53 .....................J.A.1874

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 236-54 ............J.A.1879

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 236-64 .........................................................................J.A.1881

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 236-65 .........................J.A.1884

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 236-67 ................................................................J.A.1893

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 236-68 ................................................................................J.A.1896

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 236-69 .........................................................................J.A.1899

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 236-71 ..................................................................J.A.1902

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 236-75 ................................................................................J.A.1912

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 236-77 ..........................................................................J.A.1918

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 236-78 ..................................................................J.A.1920

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 236-80 ......................................................J.A.1930

Exhibit CD, Letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors (Mar. 8, 2023) ECF No. 236-82 ........................J.A.1932

Exhibit CE, Email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George" (Jan. 27, 2023) ECF No. 236-83 ................................................................................J.A.1946

Exhibit CF, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Jan. 27, 2022) ECF No. 236-84 ........J.A.1948

## Volume X of X

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 273 ..............................................................................J.A.1956

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 274 ........J.A.2014

Errata to ECF No. 274 (D. Wyo. Feb. 2, 2024) ECF No. 277 ......J.A.2027

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024) ECF No. 295 .......................................................................J.A.2029

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024) ECF No. 296 .......................................................................J.A.2082

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 296-7 ...............................J.A.2087

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 296-8 ....................................................J.A.2094

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 296-15 ..................................................J.A.2098

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 23, 2024) ECF No. 310 ......................................J.A.2103

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 27, 2024, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Michelle S. Kallen
Michelle S. Kallen

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made and (2) any paper copies of this document submitted to the Court will be identical copies of the version electronically filed.

/s/ Michelle S. Kallen
Michelle S. Kallen

Tyler J. Garrett, #6-4400
HATHAWAY & KUNZ, LLP
2515 Warren Avenue, Suite 500
Cheyenne, WY 82001
(307) 634-7723
tgarrett@hkwyolaw.com

Michelle S. Kallen*
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
mkallen@jenner.com

Matthew I. Summers*
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
msummers@jenner.com
*Admitted pro hac vice

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., | Civil Case No.: 1:22-CV-00125-SWS |
| *Plaintiff,* | |
| v. | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, and | |
| FEDERAL RESERVE BANK OF KANSAS CITY, | |
| *Defendants.* | |

## BLOCKCHAIN ASSOCIATION AND PAYMENT SYSTEMS SCHOLARS' AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFF

## CORPORATE DISCLOSURE STATEMENT

Counsel for amicus Blockchain Association (BA) certifies that BA has no parent

corporation and no publicly held corporation owns 10% or more of any stock in BA.[1]

---

[1] Amici curiae Gerald P. Dwyer, Frank Emmert, Tonya M. Evans, Julie Andersen Hill, and George Selgin are individuals, not corporations.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................... i

TABLE OF AUTHORITIES ........................................................................iii

IDENTITY AND INTEREST OF AMICI CURIAE .................................... 1

PRELIMINARY STATEMENT ..................................................................... 2

ARGUMENT .................................................................................................... 3

I.     Defendants' assertion of complete discretion to deny master accounts
       undermines the important role states play in the dual banking system ......... 3

       A.     The dual banking system respects the distinct chartering
              authority of both state and federal entities ............................. 4

       B.     The Monetary Control Act maintains the state-federal balance
              in the dual banking system.................................................... 7

       C.     The Federal Reserve Board's self-assigned risk-vetting
              responsibility undermines financial innovation ................................... 11

II.    Defendants' newfound risk-assessment role fundamentally undermines
       Wyoming's chartering decision......................................................... 15

CONCLUSION.................................................................................... 25

CERTIFICATE OF SERVICE................................................................. 26

APPENDIX ..................................................................................App. 1

J.A.1139

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*,
  No. 23-cv-6414, 2023 WL 7111182 (S.D.N.Y. Oct. 27, 2023) ................................ 21

*FERC v. Mississippi*,
  456 U.S. 742 (1982) ................................................................................................ 13

*First Nat'l Bank v. Kentucky*,
  76 U.S. 353 (1869) .................................................................................................... 5

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*,
  861 F.3d 1052 (10th Cir. 2017) ........................................................................ 6, 8, 21

*Lacewell v. Off. of Comptroller of Currency*,
  999 F.3d 130 (2d Cir. 2021) ..................................................................................... 4

*Lusnak v. Bank of Am., N.A.*,
  883 F.3d 1185 (9th Cir. 2018) ................................................................................ 12

*Nat'l State Bank, Elizabeth, N.J. v. Long*,
  630 F.2d 981 (3d Cir. 1980) .................................................................................... 11

*New State Ice Co. v. Liebmann*,
  285 U.S. 262 (1932) ................................................................................................ 13

*In re S. Indus. Banking Corp.*,
  872 F.2d 1257 (6th Cir. 1989) ................................................................................ 11

*United States v. Lopez*,
  514 U.S. 549 (1995) ................................................................................................ 13

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) .................................................................................................. 5

*Utility Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014) ................................................................................................ 21

**Statutes and Rules**

12 U.S.C. § 1(a) (2010) ................................................................................................ 4

iii

12 U.S.C. § 25b(b)(1)(B) (Dood-Frank) (2018) ............................................................ 11

12 U.S.C. § 248a(c)(2) (1980) ...................................................................................... 8

Federal Reserve Act, ch. 6, 38 Stat. 251 (1913) ........................................................ 5

Fed. R. App. P. 29(4)(E) ............................................................................................. 1

021-20 Wyo. Code R. § 20-2(d)(i)–(vi) ................................................................... 18–19

Wyo. Rules & Regs. 021.0002.20 § 6(j)(ii) ............................................................... 7

Wyo. Rules & Regs. 021.0002.20 § 9(d)(i)–(iii) ....................................................... 16

Wyo. Stat. Ann. § 13-12-101, *et seq.* ...................................................................... 16

Wyo. Stat. Ann. § 13-12-105(a) ................................................................................ 16

Wyo. Stat. Ann. § 13-12-105(b)(iii) .......................................................................... 17

Wyo. Stat. Ann. § 13-12-119 ..................................................................................... 19

D. Wyo. Local Rule 83.6(d) ....................................................................................... 1

D. Wyo. Local Rule 7.1(b)(1)(A) ............................................................................... 1

## Other Authorities

126 Cong. Rec. 6197 (1980) ...................................................................................... 8

Baher Azmy, *Squaring the Predatory Lending Circle: A Case for States
as Laboratories of Experimentation*, 57 Fla. L. Rev. 295 (2005) .................... 14, 15

Bank for Int'l Settlements, *Principles for Financial Market
Infrastructures* 73 (Apr. 2012) ..................................................................... 6

Bank of England, *Regulatory Regime for Systemic Payment Systems
Using Stablecoins and Related Service Providers* (Nov. 2023) ...................... 24

Bd. of Governors of Fed. Rsrv. Sys., *Guide to the Federal Reserve's
Payment System Risk Policy on Intraday Credit* § II. C. (eff. July
12, 2012) ...................................................................................................... 6

*Bitcoin Banking: European Banks Are Beating U.S. Banks In The
Crypto Custody Race*, Forbes (July 12, 2023) .......................................... 24

Jonathan Buck, *Bitcoin Banking: European Banks Are Beating U.S.
Banks In The Crypto Custody Race*, Forbes (July 12, 2023) ...................... 24

J.A.1141

Gaven Cheong et al., *Government Attitude and Definition in Blockchain & Cryptocurrency Laws and Regulations 2024 | Hong Kong*, Global Legal Insights (last visited Jan. 18, 2024) ..................................... 24

Congressional Rsch. Serv., *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress* (May 17, 2019) ............................................................................................................. 3, 4

Peter Conti-Brown, *The Twelve Federal Reserve Banks: Governance and Accountability in the 21st Century*, Brookings Working Paper No. 10 (Mar. 2, 2015) .................................................................................. 5

Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But is That Legal?* Brookings (Nov. 14, 2018) .......................................... 8

Jon Durfee et al., *Examining CBDC and Wholesale Payments*, FEDS Notes (Sept. 8, 2023) ....................................................................... 6

FDIC, *FDIC State Tables* (last visited Jan. 18, 2024) ................................ 4

FRB Order No. 2023-02, Order Denying Application for Membership (Jan. 27, 2023) ............................................................................ 20, 21

Fed. Rsrv. Bd., *A Summary of the Roundtable Discussion on the Risk and Security Involving Retail Payments Over the Internet* (last visited Jan. 18, 2024) ............................................................ 10

Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular No. 1*, Account Relationships (eff. Sept. 1, 2023) ........................................... 7

Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* (11th ed. 2021) ............................................................................. 5

Bob Fernandez, *Wyoming Effort to Support Crypto-Focused Banks Set Back by Fed Concerns About Industry*, Wall St. J., Sept. 5, 2023 ...................... 19

Fin. Stability Bd., *High-Level Recommendations for the Regulation, Supervision and Oversight of Global Stablecoin Arrangements* (July 17, 2023) ................................................................................ 18

Tamar Frankel, *The Dual State-Federal Regulation of Financial Institutions–A Policy Proposal*, 53 Brook. L. Rev. 53 (1987) ............................... 14

Stephen J. Friedman, *A New Paradigm for Financial Regulation: Getting From Here to There*, 43 Md. L. Rev. 413 (1984) ..................................... 20

Frontline, *Secret History of the Credit Card*, PBS (2004) ................................ 14

J.A.1142

*Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg. 51,099 (Aug. 19, 2022) ............................................................ 10

H.B. 74, 65th Leg., Reg. Sess. (Wyo. 2019) ................................................. 16

H.R. Rep. No. 95-1590 (1978) ........................................................................ 8

Julie Andersen Hill, *Opening a Federal Reserve Account*, 40 Yale J. on Reg. 459 (2023) ....................................................... 5, 6, 7, 9, 10

Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. Chi. L. Rev. 357 (2016) .......................................................................... 17

Libr. of Congress, *Switzerland: New Amending Law Adapts Several Acts to Developments in Distributed Ledger Technology* (Mar. 3, 2021)......................................................................................... 23–24

Libr. of Congress, *Yellowstone, the First National Park* (last visited Jan. 18, 2024) ........................................................................... 13

Patricia A. McCoy, *The Moral Hazard Implications of Deposit Insurance: Theory and Evidence* (Feb. 18, 2007) .................................. 17

Office of the Comptroller of the Currency, *Payment Systems* (Oct. 2021).......................................................................................... 7

Martin Leo Rivers, *The World's First Regulated Crypto Bank Braces For Flood Of Institutional Money*, Forbes (Apr. 21, 2022) .................... 24

Julie L. Stackhouse, *Why America's Dual Banking System Matters*, Fed. Rsrv. Bank of St. Louis (Sept. 18, 2017) .......................................... 3

State of Wyo., Dep't of Audit, Division of Banking, *Special Purpose Depository Institutions: Updated Capital Requirement Guidance* (July 7, 2021) ....................................................... 16, 18, 19

*The EPC and the SEPA Process*, European Payments Council, (last visited Jan. 18, 2024) .......................................................... 23

J.W. Verret, *Federalism and Fintech Firms: A Review of Pro-Fintech Innovations and A Suggested Federalism Based Reform to Facilitate Fintech Innovation*, 41 Rev. Banking & Fin. L. 313 (2021)................ 12

Arthur E. Wilmarth Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133 (1990).........................3, 5, 11, 12, 13, 14, 15, 22

Wyo. Div. of Banking, *Special Purpose Depository Institution Examination Manuals* (Jan. 2021) .............................................................. 9, 16, 19

Wyo. Sec'y of State, *The Choice is Yours* (2022) ........................................................... 13

Yesha Yadav et al., *Payments and the Evolution of Stablecoins and CBDCs in the Global Economy* Vand. L. Rsch. Paper No. 23-19 (revised Apr. 25, 2023) ............................................................................ 3, 6, 11, 23

J.A.1144

## IDENTITY AND INTEREST OF AMICI CURIAE[2]

Amici curiae Gerald P. Dwyer, Frank Emmert, Tonya M. Evans, Julie Andersen Hill, and George Selgin are professors and scholars who specialize in financial markets, banking regulation, and digital asset markets. Their backgrounds are detailed in the attached appendix.

Amicus curiae Blockchain Association (BA) is the leading nonprofit membership organization dedicated to promoting a pro-innovation policy environment for digital assets. BA endeavors to achieve regulatory clarity and to educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace. BA represents over 100 member companies that reflect the diversity of the dynamic blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem. Blockchain technology, which underlies digital assets, has demonstrated the potential to foster a more equitable financial system and return control over user data back to individuals instead of large corporations. Unlike traditional payment methods, digital assets are accessible to anyone with an internet connection, enabling those who may lack financial services—or those who wish for more efficiency, transparency, and fewer fees—to join the global economy. Although the industry is still in its nascency, growth

---

[2] In accordance with Local Rule 7.1(b)(1)(A), Amici have conferred with the parties and they consent to the filing of this amicus brief. In accordance with Local Rule 83.6(d) and Federal Rule of Appellate Procedure 29(4)(E), Amici affirm that no party or counsel for a party authored this brief in whole or in part and that no person other than amici, their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

J.A.1145

is rapid and protecting the ability of developers and entrepreneurs to innovate through sensible regulation is key.

Amici have an interest in ensuring an effective regulatory banking regime.

## PRELIMINARY STATEMENT

The outcome of this case may gravely impact decades-long precedent and established Congressional directives to maintain the strength of America's dual banking system. The dual banking system established by Congress empowers both the state and federal governments to play equal roles in chartering and regulating banks. It reflects sovereign values dating back more than a century, and has allowed state banking systems to lead innovation in how Americans move, use, and manage their money. The arguments advanced by the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of Kansas City (Defendants) in this case threaten to upend this system. Defendants arrogate power to the federal banking agencies that Congress did not intend.

Defendants' actions in this case transform the long-established master account process from a simple application (akin to opening a bank account) into an opportunity for a federal agency to second-guess a state's risk-based supervisory framework. Not only is this inconsistent with the Federal Reserve Board's long-held practice for master accounts, but sanctioning this newly proclaimed power is inconsistent with the balance between state and federal responsibility in the dual banking system. Amici therefore urge this Court to grant Custodia's Petition for Review and Motion for Judgment as a Matter of Law. Pl's Omnibus Br., ECF 239.

J.A.1146

## ARGUMENT

The impact of Defendants' arguments upends the balance between state and federal financial regulators.  This case raises the fundamental question of whether federal financial regulators can empower themselves to second-guess a state's risk analysis—like Wyoming's Special Purpose Depository Institution (SPDI) framework—and upset the balance between state and federal financial regulation within the dual banking system.

### I.    Defendants' assertion of complete discretion to deny master accounts undermines the important role states play in the dual banking system

"Since the early days of our Republic, the federal government and the states have shared responsibility for the regulation of banking."  Arthur E. Wilmarth Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1152 (1990).[3]  This shared responsibility has traditionally resulted in state regulation dominating payments, and federal regulation focused on money laundering and illicit finance concerns.  *See* Yesha Yadav et al., *Payments and the Evolution of Stablecoins and CBDCs in the Global Economy*, Vand. L. Rsch. Paper No. 23-19 at 6 (revised Apr. 25, 2023), http://tinyurl.com/msbc6b82; *see also* Julie L. Stackhouse, *Why America's Dual Banking System Matters*, Fed. Rsrv. Bank of St. Louis (Sept. 18, 2017), http://tinyurl.com/mu7p78jw ("In our country's early years, those seeking to issue and

---

[3] The parallel state and federal banking systems that co-exist in the United States today is called the "dual banking system."  *See* Congressional Rsch. Serv., *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress*, 4–5 (May 17, 2019), https://sgp.fas.org/crs/misc/R45726.pdf.

circulate bank notes required a bank charter, and most of those charters were issued at a state level.").

### A. The dual banking system respects the distinct chartering authority of both state and federal entities

Under today's dual-banking system, banks have the option of applying "for a national charter from the Office of the Comptroller of the Currency (OCC) or a state charter from a state's banking authority." *Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress*, *supra*, at 4–5. A bank's choice of chartering authority is also a choice of its primary regulator; the OCC is the primary regulator of national banks and state agencies serve as primary regulators of state-chartered banks. *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 135 (2d Cir. 2021) ("Within [the dual banking] system, both federal and state governments are empowered to charter banks and to regulate the banks holding their respective charters."); 12 U.S.C. § 1(a) (2010). As of September 2023, there are 3,551 state-charted banks and 729 commercial banks with national charters. FDIC, *FDIC State Tables*, https://state-tables.fdic.gov/ (last visited Jan. 18, 2024). State banks are an important part of the United States banking system.

National banks are typically subject to generally applicable state laws, and state banks may be subject to generally applicable federal laws and federal regulations. *Federal Preemption in the Dual Banking System*, *supra*, at 6–7.[4]

---

[4] By design, state law provides the legal backdrop against which national banks function, and "[t]he fact that the banking agencies maintain a close surveillance of the industry with a view toward preventing unsound practices that might impair liquidity or lead to insolvency does not make federal banking regulation all-pervasive." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 352 (1963); *First*

"Because federal and state banking laws allow banks to convert between national and state charters without the approval of their current regulator, the dual banking system contains a 'safety valve' allowing banks to escape from arbitrary, inflexible or outdated regulation." Wilmarth Jr., *supra*, at 1155.[5]

Although common parlance refers to "the Fed" as a single, uniform entity, the system is more complex.[6] The Federal Reserve System includes a central governing Board with seven members and twelve Federal Reserve Banks supervised by the Board. *See* Federal Reserve Act, ch. 6, 38 Stat. 251 (1913); Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* 2 (11th ed. 2021), http://tinyurl.com/n8fkxy3m; Julie Andersen Hill, *Opening a Federal Reserve Account*, 40 Yale J. on Reg. 459 (2023). "[M]aster accounts" are Federal Reserve Bank accounts that provide financial institutions the safest place "to deposit money" and the potential to "earn interest." Andersen Hill, *supra*, at 459. A master account also confers access to "payment systems operated by the Federal Reserve" System, including "check clearing,

---

*Nat'l Bank v. Kentucky*, 76 U.S. 353, 362 (1869) (national banks "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation").

[5] This case highlights why the dual banking system is important: in the face of a vacuum of federal regulation for crypto banking services, states like Wyoming have stepped up to fill the void. *See* Section II, *infra*.

[6] *See* Peter Conti-Brown, *The Twelve Federal Reserve Banks: Governance and Accountability in the 21st Century*, Brookings Working Paper No. 10 at 3 (Mar. 2, 2015), http://tinyurl.com/444d8j74 ("The term 'Federal Reserve' is not a noun, but a compound adjective. There are Federal Reserve Banks, Federal Reserve Notes, a Federal Reserve Board, and, taken together, a Federal Reserve System, all created by the Federal Reserve Act of 1913. But there is no 'Federal Reserve' by itself. This vocabulary failure belies a harder problem for thinking about the Federal Reserve System—even though we rarely refer to it as such, to paraphrase Kenneth Shepsle, the Fed is a 'they,' not an 'it[.]'").

wire transfer, and automated clearinghouse payment systems." *Id.* at 459–60. *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Op. of Mortiz, J.) ("A master account is, put simply, a bank account for banks."). Payments made through the system are generally safer and cheaper than payments by other means. Federal Reserve notes and master account balances are "central bank money," which has no settlement or credit risk. Because paper notes can be stolen, master account balances are considered the safest money. Jon Durfee et al., *Examining CBDC and Wholesale Payments*, FEDS Notes (Sept. 8, 2023), http://tinyurl.com/53vfhjvh; Yadav et al., *supra*, at 11–12 (Banks with master account balances "enjoy the assurance that their funds are held in the safest [metaphorical] vaults anywhere.").

Access to master accounts reduces latent settlement and concentration risk, as depository institutions do not rely on other institutions to settle customer accounts with the Federal Reserve System. Bank for Int'l Settlements, *Principles for Financial Market Infrastructures* 73 (Apr. 2012), http://tinyurl.com/4uwxw294 (A financial market infrastructure (FMI) "should conduct its money settlements in central bank money where practical and available. If central bank money is not used, an FMI should minimi[z]e and strictly control the credit and liquidity risk arising from the use of commercial bank money.").[7]

---

[7] Risk is further reduced because Defendants can offer a SPDI a "zero net debit cap" master account, which, like a debit card, does not permit the institution to overdraw its account. Bd. of Governors of Fed. Rsrv. Sys., *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* § II. C. (eff. July 12, 2012), http://tinyurl.com/mry9be82. Additionally, the Federal Reserve is given a senior lien

Using a master account is also cheaper because payments are, in practice, ultimately settled through transfers to and from depository institutions' Federal Reserve master accounts.  Transfers at the Fed have legal finality.  Office of the Comptroller of the Currency, *Payment Systems* 11 (Oct. 2021), http://tinyurl.com/3sfefu64 ("[e]ach transfer is final and irrevocable when made").  A depository institution without a master account must work through a "correspondent bank" that has a Federal Reserve account and is willing to hold the other institution's "deposits and process its payments" through the Federal Reserve System (often at great expense to its correspondent institution).  This arrangement typically involves more time, a settlement risk if the correspondent bank fails, and the possibility that the correspondent closes the account.  Andersen Hill, *supra*, at 460.  Within the dual banking system, a depository institution that obtains a state charter is legally eligible for a master account.  *Id.*[8]

### B.   The Monetary Control Act maintains the state-federal balance in the dual banking system

Congress has taken steps to ensure that Federal Reserve payment services are equally available to state and nationally chartered depository institutions.  In 1980, Congress passed the Monetary Control Act, which sought to provide broad access to

---

on an SPDI's assets in the event of receivership, which effectively reduces the risk to the Federal Reserve System to near zero.  Wyo. Rules & Regs. 021.0002.20 § 6(j)(ii).

[8] To obtain a correspondent relationship with another bank, the Federal Reserve must approve the correspondent relationship based on the same standards as a master account application.  So far, the Federal Reserve has refused permission to Custodia for even a correspondent relationship.  Fed. Rsrv. Fin. Servs., *Federal Reserve Banks Operating Circular No. 1*, Account Relationships (eff. Sept. 1, 2023), http://tinyurl.com/ecftjvuu.

J.A.1151

Federal Reserve's services.  The bill's key aim was to facilitate "wide access to Federal Reserve services for nonmember banks" and to ensure "that a basic level of services is available to all banks throughout the country on a nondiscriminatory basis."  H.R. Rep. No. 95-1590, at 20 (1978).[9]  In the provision at the heart of this case, Section 248a(c)(2), Congress required that Federal Reserve Banks provide the same account and payment services to all depository institutions (even though some posed more risk than others and that states weighed risk as part of their chartering process).[10]

The plain text of Section 248a(c)(2) reflects that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks.  As a practical matter, the Federal Reserve bank services discussed in Section 248a(c)(2) can only be provided to institutions with master accounts.[11]  It follows that the decision to deny a master account to any eligible depository institution is tantamount

---

[9] *See also* 126 Cong. Rec. 6197, 6250 (1980) (Conf. Rep.) ("House amendment includes a provision for the Federal Reserve to . . . open access to [Federal Reserve] services to all depository institutions on the same terms and conditions as member banks.").

[10] 12 U.S.C. § 248a(c)(2) (1980) ("All Federal Reserve bank services covered by the fee schedule [that the Monetary Control Act required the Board of Governors of the Federal Reserve System to propose] shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.").

[11] "[A]ll services offered by the Federal Reserve System are conditioned on the issuance of master accounts. . . . Without a master account, none of the fee schedule's services would be available." *Fourth Corner Credit Union*, 861 F.3d at 1068–69 (Op. of Bacharach, J.); Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities.  But is That Legal?* Brookings (Nov. 14, 2018), http://tinyurl.com/569enyb5 ("The master account allows a financial institution to participate in the payment system.  Without it, a financial institution can't really function as a financial institution.  It becomes instead a kind of storage locker.").

to charging it a prohibitive price for the services in question.  Although Defendants suggest that certain depository institutions pose risks that make them unsuitable to receive master accounts, neither the Monetary Control Act nor any other part of the Federal Reserve Act grants the Federal Reserve the right to act as supervisor for state-chartered banks, by vetting them for risk or otherwise, absent a bank becoming a member bank of the Federal Reserve System.  Wyoming in particular has an extensive risk-vetting framework composed of two separate chapters of administrative rules and a 772-page examination manual, which are primarily based on Federal rules for banks.  Wyo. Div. of Banking, *Special Purpose Depository Institution Examination Manuals* (Jan. 2021), http://tinyurl.com/4medjt5v.

In fact, for almost four decades, the Federal Reserve Board did not view itself as responsible for second-guessing the risk evaluations in the state-chartering process. Opening a master account was straightforward and similar to opening a bank account: an institution would fill out "a one-page form" that identified the applicant, "list[ed] the people to whom the Federal Reserve Bank should direct questions," and committed to be "bound by the Federal Reserve's account policies."  Andersen Hill, *supra*, at 455. The process typically took five to seven business days.  *Id.* at 456.  In the last decade, however, the Federal Reserve Board began using the master account process to deny state-chartered depository institutions access to its payment services, while justifying such denials—whether outright or by refusal to make a decision—by appeal to

9

potential riskiness.  *Id.*  For more novel entities, securing a master account became "a lengthy process more like applying for a bank charter."  *Id.*[12]

The Federal Reserve Board recently formalized its self-declared risk-assessment responsibility by adopting *Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg. 51,099, 51,099 (Aug. 19, 2022).  The Guidelines set forth an extensive risk-vetting framework for accounts and services, laying out three tiers for classifying banks.  *Id.* at 51,109.  Tier 1 for institutions insured by the Federal Deposit Insurance Corporation (FDIC).  Institutions not federally insured, but subject to federal banking agency supervision, are classified as Tier 2.  *Id.* at 51,109–110.  And Tier 3 institutions are neither federally insured nor subject to federal agency supervision.  *Id.* at 51,110.  Applications from Tier 3 institutions are presumptively denied.  *Id.* at 51,106–110; *see also* ECF 239 at 14 (citing discovery from Kansas City Federal Reserve staff stating that "approval isn't anticipated if Tier 3 route is taken").

The Guidelines formalized the chartering-like process novel banks recently encountered from the Federal Reserve Board (without appropriate Congressional authority).  *Id.* at 51,099 n.3 (acknowledging that "[i]n developing the Account Access Guidelines, the Board sought to incorporate as much as possible existing Reserve Bank risk management practices"); *accord* Decl. in Support of Pl's Omnibus Br., ECF

---

[12] Novel banking technologies are the vanguard of innovation, yet, as with digital banking in the early 2000s, the Federal Reserve System has often approached them with concern over potential risk.  *See* Fed. Rsrv. Bd., *A Summary of the Roundtable Discussion on the Risk and Security Involving Retail Payments Over the Internet*, http://tinyurl.com/5fprsstd (last visited Jan. 18, 2024).

240-17, Ex. Q at FRBKC-00017835 (notes from Kansas Federal Reserve President Esther George concluding that, notwithstanding the Board's work on the Guidelines, "this [is] an issue for Congress"). Notwithstanding the Guidelines, it remains difficult for innovative banks to obtain access to master accounts. And, while the Guidelines suggest that certain applicants will be subject to greater scrutiny, they give little clarity for precisely how a novel institution can obtain an account. Nor do they impose a clear limit on the time the Federal Reserve Board may take to reach a decision. In short, the Board has not imposed any constraint on its ability to arbitrarily deny legally eligible depository institutions access to master accounts. Yadav et al., *supra*, at 12–13.

The Federal Reserve Board essentially claims near-absolute authority over master accounts. This result is inconsistent with the dual-banking system enacted by Congress and the principles of good government.

### C.   The Federal Reserve Board's self-assigned risk-vetting responsibility undermines financial innovation

The Monetary Control Act does not empower the Federal Reserve Board to second-guess a state's chartering decisions. And, despite multiple efforts to remove state authority over bank regulation, Congress has repeatedly upheld the dual banking system. Wilmarth Jr., *supra*, at 1153–54; *In re S. Indus. Banking Corp.*, 872 F.2d 1257, 1260 (6th Cir. 1989) (describing "Congress' longstanding concern for maintaining a dual banking system in the United States"); *Nat'l State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 985 (3d Cir. 1980) ("congressional support remains for dual regulation"); *see also* 12 U.S.C. § 25b(b)(1)(B) (Dodd-Frank) (2018)

**J.A.1155**

(explaining that federal law will not preempt state consumer financial law unless "State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers").

In 1933, for example, Congress rejected proposals that would have undermined the state banking system by "allowing national banks to branch across state lines and by providing federal deposit insurance only to national banks and state member banks." Congress, instead, preserved the rule "allow[ing] national banks to establish branches only within their home state[s]," and only where state-chartered banks enjoyed the same privilege. Wilmarth Jr., *supra*, at 1154. In 1956, "Congress prohibited interstate acquisitions of banks by bank holding companies without state authorization," thus preserv[ing] state control over the expansion of banking organizations." *Id.* More recently, Dodd-Frank codified a high standard for federal preemption of state consumer financial law. *See Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1193 (9th Cir. 2018) ("state consumer financial law is preempted *only if* it 'prevents or significantly interferes with the exercise by the national bank of its powers'") (quoting 12 U.S.C. § 25b(b)(1)(B)).[13]

The dual banking system has a long record of state innovation inspiring Congress's legislation. "Courts and commentators frequently have recognized that the 50 States serve as laboratories for the development of new social, economic, and

---

[13] *Accord* J.W. Verret, *Federalism and Fintech Firms: A Review of Pro-Fintech Innovations and A Suggested Federalism Based Reform to Facilitate Fintech Innovation*, 41 Rev. Banking & Fin. L. 313, 340 (2021) ("the Dodd-Frank Act explicitly ensures that the CFPB cannot stand in the way of a 'race to regulate' or otherwise alleviate anticompetitive regulations adopted by states under the guise of consumer protection").

political ideas." *FERC v. Mississippi*, 456 U.S. 742, 788 (1982) (O'Connor, J., concurring in part and dissenting in part);[14] *see also United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring) (discussing states' role "as laboratories for experimentation to devise various solutions where the best solution is far from clear"); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). The state banking system has helped innovate "real estate lending, trust services, reserve requirements, and deposit insurance"—all innovations that Congress eventually incorporated into the laws governing national banks. *See* Wilmarth Jr., *supra*, at 1156–57. State innovation also spurred "interstate electronic funds transfer ('EFT') systems" by establishing "networks of automated teller machines ('ATMs')."[15] *Id.* at 1156. States initiated use of "negotiable order of withdrawal ('NOW') accounts."[16] *Id.* Congress

---

[14] "This state innovation is no judicial myth. When Wyoming became a State in 1890, it was the only State permitting women to vote." *Mississippi*, 456 U.S. at 788. Wyoming is also home to America's first national park, first national monument, and it created the limited liability company form of business entity. Wyo. Sec'y of State, *The Choice is Yours* (2022), https://sos.wyo.gov/Forms/Publications/ChoiceIsYours.pdf; Libr. of Congress, *Yellowstone, the First National Park*, http://tinyurl.com/yyd9y3hb (last visited Jan. 18, 2024).

[15] "Interstate shared EFT systems enable customers of a participating bank to obtain access to their accounts by using ATMs located at other participating institutions in the same state or in different states." Wilmarth Jr., *supra*, at 1156 n.98.

[16] "NOW accounts are savings accounts" that allow a "customer to withdraw funds by means of a negotiable instrument" like "a check." *Id.* at 1156 n.99.

13

authorized NOW accounts only after several states demonstrated that this convenient service was "highly desirable to both consumers and banks." *Id.* at 1157.[17]

Another example of state banking innovation is South Dakota's decision in the early 1980s permitting banks to charge credit card holders higher rates—most state usury laws at the time capped the maximum rate well below the Federal Reserve's Federal Funds Rate. South Dakota's innovation attracted banks (including Citibank and Wells Fargo) and allowed them to strengthen credit card offerings. Frontline, *Secret History of the Credit Card*, PBS (2004), http://tinyurl.com/y28u8cm9. "[B]y allowing the states to adopt new approaches to bank regulation, the dual banking system permits individual states to act as 'laboratories for change' and to have their experiments adopted by Congress if they prove to be successful." Wilmarth Jr., *supra*, at 1155–56.[18]

States' banking authorities also facilitate change in the face of Congressional paralysis. In the context of the interstate banking movement, for example, "Congress

---

[17] State regulators in the financial industry are generally more responsive to needs of local communities and locally-based banks. State regulators are, therefore, the driving force for innovation. Baher Azmy, *Squaring the Predatory Lending Circle: A Case for States as Laboratories of Experimentation*, 57 Fla. L. Rev. 295, 392 (2005) (federalism "promotes the democratic ideal because state governments are more closely in tune with their citizens and therefore more accountable and responsive to local constituent needs"); *id.* at 394 ("[S]tates will often react to social and economic problems more immediately and responsively than the federal government.").

[18] Unsuccessful state innovation within the dual banking system limits the risk of widespread harm because the experiment was limited to a single state. Tamar Frankel, *The Dual State-Federal Regulation of Financial Institutions–A Policy Proposal*, 53 Brook. L. Rev. 53, 56 (1987) ("in times of change, when experiments and innovations are particularly valuable, the dual banking system reduces the risk of adverse effects to the national system by limiting experiments to one state"). Such "decentralized decision-making promoted by federalism allows for more and better opportunities for innovation and experimentation with social and economic policy than does one centralized bureaucracy." Azmy, *supra*, at 392; Wilmarth Jr., *supra*, at 1157 ("It seems likely that these state experiments will provide useful practical

was unable to enact legislation and the states took the lead in liberalizing geographic restraints on interstate acquisitions of banks." *Id.* at 1177.  As another example, "[f]ederal law currently prohibits national banks and bank holding companies from engaging in most types of securities underwriting, insurance underwriting and sales, and real estate investment and development activities.  In recent years Congress has been stymied by contests among competing interest groups and has not acted on legislative proposals to authorize new bank powers." *Id.* at 1152.  "In contrast, many state legislatures have enacted laws permitting banking organizations to engage to some degree in securities, insurance or real estate activities." *Id.*  And, some "states responding to the predatory lending phenomenon have supplemented [federal law] by including a greater proportion of loans to be subject to regulation." Azmy, *supra*, at 365.

*     *     *

Defendants' argument that the routine master account process empowers them to second-guess the risk assessment underlying a state-issued charter threatens the dual banking system, which has facilitated responsive and innovative banking.

## II.   Defendants' newfound risk-assessment role fundamentally undermines Wyoming's chartering decision

Any suggestion in this case that Wyoming's SPDI process requires additional federal risk micromanagement undermines Wyoming's role in the dual-banking

---

experience that will assist in fashioning a new federal policy on bank powers."); Azmy, *supra*, at 362 ("The percolation of state and local regulations is thus generating a sophisticated invaluable regulatory dialogue between the federal and state governments–a real value to our federal system[.]").

system.  Custodia was already evaluated—and passed—a thorough government risk assessment when it was chartered by the State of Wyoming as a Special Purpose Depository Institution.  First Am. Compl., ECF 121, ¶¶ 3, 14.

1.      Wyoming enacted a banking charter for Special Purpose Depository Institutions in 2019 to facilitate banking with digital assets.  *See* H.B. 74, 65th Leg., Reg. Sess. (Wyo. 2019); Wyo. Stat. Ann. § 13-12-101, *et seq.*  It thereby became the first state to offer a bank charter that outlines how regulatory authorities will supervise digital assets.

Just because Wyoming's SPDI charter is innovative, there is no reason to suppose that depository institutions established under it pose added risks that warrant extra scrutiny by federal officials, let alone refusal to grant master accounts. On the contrary: to qualify as a Wyoming SPDI a depository institution must be considerably *safer* than most banks, including national banks.  Wyoming's regulation requires that a SPDI's assets be "managed prudently, consistent with safe and sound banking practices, in a manner that [a]ddresses interest rate risk, including repricing, basis, yield curve and option risk; [p]revents mismatching; and [a]ccounts for potential stress scenarios."  Wyo. Rules & Regs. 021.0002.20 § 9(d)(i)–(iii); *Special Purpose Depository Institution Examination Manuals*, *supra*.  The regulation's specific requirements are strict: a SPDI must invest 100% of its U.S. dollar demand deposits in either cash on hand or high-quality liquid assets, altogether prohibiting it from making any loans.  State of Wyo., Dep't of Audit, Division of Banking, *Special Purpose Depository Institutions: Updated Capital Requirement Guidance* (July 7, 2021), http://tinyurl.com/yp5f5ncn; Wyo. Stat. Ann. § 13-12-105(a) ("At all times, a

16

special purpose depository institution shall maintain unencumbered liquid assets valued at not less than one hundred percent (100%) of its depository liabilities."). SPDIs hold customer deposits in U.S. dollars (or similar "highly liquid" non-volatile "[i]nvestments," such as "obligations of the United States treasury or other federal agency obligations"). Wyo. Stat. Ann. § 13-12-105(b)(iii).

Custodia's proposed model is stricter still. Custodia proposes to 100% back its customers' U.S. dollar deposits with Federal Reserve master account balances (the safest of all U.S. dollar assets). In short, Custodia seeks to operate what economists call a "full reserve" bank. *See* Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. Chi. L. Rev. 357, 413–16 (2016) (citing Milton Friedman, *A Program for Monetary Stability* 65–76 (Fordham 1960)). And while it is true that Custodia's plan does not include FDIC insurance, economists have long understood full-reserve banking as a safe alternative to deposit insurance because it dispenses with the risks responsible for most bank failures (severe decline in the value of bank assets or unsustainable depositor runs). *Id.* at 361. Because it also avoids the "moral hazard" problem—banks' tendency to take excessive risks with insured deposits—many economists consider full-reserve banking a safer alternative to deposit insurance. *Id.*; *see also* Patricia A. McCoy, *The Moral Hazard Implications of Deposit Insurance: Theory and Evidence* (Feb. 18, 2007), http://tinyurl.com/2buuudsp.[19]

Because of its 100% reserve requirement, Custodia's SPDI could not fail because of bad loans, falling bond prices, depositors' fears, or any common causes of

---

[19] Full-reserve banking is uniquely situated to crypto asset regulation. Nearly every proposal for regulation of stablecoins requires that each stablecoin be 100%

bank failures. It could, however, wind up for other reasons, including operational risks, and sufficiently high liquidation costs could in theory leave its creditors, including depositors, on the hook. But any reasonable capital cushion should rule out this possibility, and Wyoming's SPDI regulations provide for ample capital.

The capital requirement in Wyoming's 2021 SPDI Guidance has three parts:

1. **Capital Stock.** The capital stock consists of a "[s]tatutory requirement of not less than $5,000,000." The Wyoming Division of Banking Commissioner is vested with authority to "set the capital requirement on a case-by-case basis," "*in a manner commensurate with the risk profile* and proposed activities of the institution."

2. **Surplus/Operating Expenses.** The capital requirement includes three years "of projected operating expenses" "specified in the [SPDI's] business plan."

3. **Contingency Account.** The capital requirement also includes "2%" of non-custodial demand "deposits of fiat currency" starting in the SPDI's third year of operation.

*Special Purpose Depository Institutions: Updated Capital Requirement Guidance*, *supra* (emphasis added). Wyoming law requires the Banking Commissioner to consider the following factors with a holistic review: (i) "[p]eer institutions" of the SPDI, "which may include custodial banks and national trust banks"; (ii) *the* "*activities and risks posed by the business plan and financial projections*" *of the SPDI*; (iii) the federal "prompt corrective action tier 1 leverage ratio"; (iv) the "non-leveraged nature of deposits related to custodial, fiduciary and trust accounts administered by the institution"; (v) "[c]urrent market conditions, including capital requirements of recently-chartered de novo banks"; and (vi) "[p]otential costs of a receivership." 021-

---

backed by high-quality liquid assets held at a central bank or in government bonds. *See* Fin. Stability Bd., *High-Level Recommendations for the Regulation, Supervision and Oversight of Global Stablecoin Arrangements* 11 (July 17, 2023), http://tinyurl.com/4tkx3ypf.

20 Wyo. Code R. § 20-2(d)(i)–(vi) (emphasis added); *see also Special Purpose Depository Institutions: Updated Capital Requirement Guidance*, *supra*.

"Generally, the Division [of Banking] focuses significantly on the activities and risks posed by the business plan of a SPDI and its financial projections." *Special Purpose Depository Institutions: Updated Capital Requirement Guidance*, *supra* [20] The Guidance makes clear that "[a] prospective SPDI should anticipate an initial capital requirement similar to a federally-insured institution and other recently chartered de novo banks." *Id.* at 2. And it notes that the Wyoming Division of Banking expects that each SPDI "meet the capital ratios set by the Federal Reserve and FDIC." *Id.* Wyoming SPDIs are regulated by the Wyoming Division of Banking, Wyo. Stat. Ann. § 13-12-119, which developed a detailed, 772-page supervisory examination manual, *Special Purpose Depository Institution Examination Manuals*, *supra*.

Even though the SPDI framework has existed for more than three years, the Federal Reserve Board has not approved any SPDIs for "master accounts." Bob Fernandez, *Wyoming Effort to Support Crypto-Focused Banks Set Back by Fed Concerns About Industry*, Wall St. J., Sept. 5, 2023.

2. Defendants contend it would be "highly anomalous" to conclude that the Board of Governors is required to give master accounts to "any and all state-chartered depository institutions, regardless of the Board of Governors' concerns about a given

---

[20] As they created the SPDI framework, Wyoming lawmakers consulted with the Kansas City Fed and implemented changes based on the Kansas City Fed's suggestions. Bob Fernandez, *Wyoming Effort to Support Crypto-Focused Banks Set Back by Fed Concerns About Industry*, Wall St. J., Sept. 5, 2023, at 4.

requestor." Fed. Rsrv. Bank of Kan. City Mot. to Dismiss, ECF 124 at 9–10. More "anomalous," however, is a federal agency second-guessing a state's bank-chartering decision. Stephen J. Friedman, *A New Paradigm for Financial Regulation: Getting From Here to There*, 43 Md. L. Rev. 413, 421 (1984) ("State banks were permitted to join the Federal Reserve System while still retaining their state charters as long as they met minimum capital and reserve requirements."). Defendants highlight two "concerns" with Custodia. Neither concern justifies expanding the scope of the Federal Reserve Board's power when granting master accounts. And both concerns disparage the state chartering process and undermine the dual banking system.

*First*, Defendants insist that they must be able to review a state-chartered bank's risk profile. *See* ECF 124 at 8–9; *see also* FRB Order No. 2023-02, Order Denying Application for Membership at 4 (Jan. 27, 2023), http://tinyurl.com/bdda8zwt (asserting that Custodia's "risk management and controls" are "insufficient"). The Federal Reserve Board does not seek to evaluate a state-chartered bank's risk profile in the first instance. Instead, it claims power to re-review the entity's risk profile with the assumption that the state's process is insufficient. *Accord* ECF 124 at 10 (suggesting that states issue charters "under whatever standards and procedures the state might choose to prescribe or follow (even if the charter contains unique features that remove or weaken protections that exist for traditional bank customers)"). Such a pejorative approach to state-issued charters tarnishes the dual banking system.[21] And this presumption is itself

---

[21] Of course, the Federal Reserve Board is not required to give a master account to entities violating or that propose violating federal money laundering law or

undermined by discovery in this case, which revealed that the Federal Reserve Bank of Kansas City generally agreed with Wyoming's risk analysis, before they were reversed by the Board.  *See* ECF 239 at 25–26.

*Second*, Defendants suggest they must be able to review the sustainability of a state-chartered bank's business model.  ECF 124 at 8–10.  In this way, the Federal Reserve Board exceeds mere skepticism of Wyoming's risk analysis.  It also includes a power to weigh in on the strength of a bank's business model.[22]  An assertion of power to deny a master account because the Board doubts the likelihood that the business will thrive is unprecedented.  Adopting the Board's newfound power to deny master accounts based on its judgment of whether a business model will likely succeed is sure to squelch innovation, which is often pioneered by states.

In any event, Defendants' distrust of state regulatory bodies is misplaced, and the Supreme Court requires that courts greet it with skepticism.  *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover

---

providing banking services to industries engaged in activities that are illegal.  *Fourth Corner Credit Union*, 861 F.3d at 1053; *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 23-cv-6414, 2023 WL 7111182, at *8 (S.D.N.Y. Oct. 27, 2023).  If an entity that passed a state risk assessment is not otherwise violating federal law, the Board cannot leverage the master account process to oversee states.

[22] *See* FRB Order No. 2023-02, Order Denying Application for Membership, *supra*, at 9–10 ("Even if Custodia were able to successfully remediate all issues identified with respect to its ability to safely and soundly conduct its limited day-one activities, conducting only this limited set of activities would not enable it to constitute a viable bank in the medium or long term.  Moreover, the future earnings prospects of the business model that Custodia has proposed—that is, an uninsured, undiversified, crypto-asset-focused business model featuring a number of novel and untested activities posing heightened risks—is inconsistent with approval.").  Discovery, however, has cast significant doubt on the validity of the Board's conclusions here.  ECF 239 at 23–24 (discussing the Board's anti-crypto shift after the collapse of FTX).

J.A.1165

in a long-extant statute an unheralded power to regulate a significant portion of the American economy, . . . [we] typically greet its announcement with a measure of skepticism.") (internal quotation marks and citation omitted).[23]   Inventing a new oversight role for the Board as part of the master account process would be improper and undermined by the Board's long-held representation that it is not tasked with weighing risk for a state chartered bank.   To the extent that the Board based its decision to deny Custodia a master account on perceived inadequacies in Wyoming's regulatory scheme, the denial was improper; and in any event, Wyoming has a strong regulatory framework for digital assets that is respected, even by former Kansas City Federal Reserve President Esther George.   *See* ECF 239 at 8 (discussing President George's "deep respect for the Wyoming Division of Banking").

3.     *Finally*, even in the case of financial innovation that presents some risk, avoiding risk is not without tradeoffs.   Notwithstanding a shift to digital payments, "the underlying infrastructure for processing payments remains slow, unwieldy, and expensive.   Sending money from one person's bank account to another . . . routinely takes at least one, if not often multiple business days to finalize.   During these

---

[23] "[T]he empirical evidence does not support the existence of a 'competition in laxity' between federal and state banking regulators.   In recent years, state banks have consistently outperformed national banks in terms of average capital ratios and average returns on assets and equity.   In addition, the recent bank failure rate has been lower for state banks than for national banks."   Wilmarth Jr., *supra*, at 1240; *id.* at 1242 ("The empirical evidence on state bank performance supports the view that the states have generally maintained good regulatory standards with regard to banks.   Over the past six years, the capital ratios, financial results, and failure rates have been significantly more favorable for state banks than for national banks.").

lengthy processing periods, those entitled to money cannot use it-resulting in loss of economic value." Yadav et al., *supra*, at 3.

Bulky federal regulation is not well-equipped to account for such innovation. The proposed Access Guidelines, for example, would likely prohibit banks from implementing online banking services.[24]  Commonplace payments that used to be "unimaginable" (online shopping or taking a cab without cash) are now seamless.  *Id.* at 15.  But these innovations "ultimately rest on core payment processing systems founded on long-established, bank-centric infrastructure[,]" inviting exploration into how the system can be made more efficient and effective.  *Id.*

As federal legal support for innovation stagnates, other countries are actively courting the next wave of technology by providing regulatory frameworks that facilitate innovation while protecting market participants.[25]  The European Union created a cross-border payment zone to facilitate seamless payments across member countries.  *See The EPC and the SEPA Process*, European Payments Council, http://tinyurl.com/y27hduk7 (last visited Jan. 18, 2024).  Swiss civil law recognizes cryptocurrencies as intangible assets and permits the transfer of crypto tokens as a representation of value (while also regulating transfer of rights through digital registers).  Libr. of Congress, *Switzerland: New Amending Law Adapts Several Acts to*

---

[24] This was obviously not the Federal Reserve's intent but is a consequence of the Guidelines' text.

[25] "Many countries and regions have sought to create new payment rails capable of enabling user-friendly, digital, cheap, instant or very quick, and person-to-person/account-to-account payments as a critical part of their domestic financial infrastructure."  Yadav et al., *supra*, at 28 (discussing innovations in "real-time payment" technology in India, China, Thailand, Brazil, and South Korea).

*Developments in Distributed Ledger Technology* (Mar. 3, 2021), http://tinyurl.com/4zxc2aft. Hong Kong regulators expanded jurisdiction to offer "investor protection" while building a "regulatory framework across the entire ecosystem such that Hong Kong" has become "a hub for cryptocurrency activity" in Asia. *See* Gaven Cheong et al., *Government Attitude and Definition in Blockchain & Cryptocurrency Laws and Regulations 2024 | Hong Kong*, Global Legal Insights, http://tinyurl.com/25n32h2d (last visited Jan. 18, 2024).[26] And the Bank of England now requires that issuers back all outstanding stablecoins with deposits in a master account at the Bank of England. *See* Bank of England, *Regulatory Regime for Systemic Payment Systems Using Stablecoins and Related Service Providers* (Nov. 2023), http://tinyurl.com/2ze5nzux. If the American banking system cannot adapt, it will fall behind.

The Federal Reserve Board's newfound risk-assessment responsibility as part of the master account process not only undermines the important role Wyoming's innovative SPDI system plays, it also stymies state innovation outside the crypto industry. And because states have been laboratories of innovation, impeding states' progress will, in turn, impede federal innovation, and ultimately restrict America's future competitiveness in the global financial services industry.

---

[26] Digital asset banks in Switzerland, France, and Germany have raised money and offered services without major failures. *See, e.g.*, Martin Leo Rivers, *The World's First Regulated Crypto Bank Braces For Flood Of Institutional Money*, Forbes (Apr. 21, 2022), http://tinyurl.com/2s4mbd8s. These firms and traditional banks facilitating digital asset banking have been successful and stable global pioneers. Jonathan Buck, *Bitcoin Banking: European Banks Are Beating U.S. Banks In The Crypto Custody Race*, Forbes (July 12, 2023), http://tinyurl.com/ythh6ef2.

J.A.1168

\*      \*      \*

Creating a new layer of federal administrative oversight to second-guess and effectively override state charter risk assessment is inconsistent with the dual banking system and undermines states' roles as laboratories of financial innovation. It also conflicts with Congress's intent to maintain the integrity and strength of the dual banking system.

## CONCLUSION

Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law should be granted.

Respectfully submitted,

Dated: January 19, 2024

/s/ *Michelle S. Kallen*
Michelle S. Kallen
*Counsel for Amici Curiae*

Tyler J. Garrett, #6-4400
HATHAWAY & KUNZ, LLP
2515 Warren Avenue
Suite 500
Cheyenne, WY 82001
(307) 634-7723
tgarrett@hkwyolaw.com

Michelle S. Kallen*
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000
mkallen@jenner.com

Matthew I. Summers*
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
msummers@jenner.com
*Admitted *pro hac vice*

25

**J.A.1169**

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of January 2024, I caused the foregoing document to be electronically transmitted to the Clerk of Court of the U.S. District Court, District of Wyoming, using the CM/ECF system for filing.  Based on the records currently on file the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

Dated: January 19, 2024                    By:    /s/ *Michelle S. Kallen*

JENNER & BLOCK LLP

J.A.1170

APPENDIX
DESCRIPTION OF AMICI CURIAE SCHOLARS

**Gerald P. Dwyer** is an Emeritus Professor and BB&T Scholar at Clemson University.  Previously, he was Director of the Center for Financial Innovation and Stability and Vice President at the Federal Reserve Bank of Atlanta for more than a decade.  Professor Dwyer's scholarship has appeared in *The Oxford Handbook of the Economics of Central Banking*, the *Journal of International Money and Finance*, *Applied Economics*, and other top publications.

**Frank Emmert** is a Professor of Law at the Indiana University Robert H. McKinney School of Law.  He has published more than a hundred books, articles, and conference papers, with a focus on business law and financial markets in the United States and abroad.  Professor Emmert is a thought leader on digital asset creation, regulation, and stabilization around the globe.

**Tonya M. Evans** is a Professor of Law at Penn State Dickinson Law with a co-appointment at the Penn State Institute for Computational and Data Sciences.  Professor Evans speaks and consults regularly in the United States and abroad about the legal implications of new technologies and innovation.  She sits on the Digital Currency Group Board of Directors and is the author of Digital Money Demystified.

**Julie Andersen Hill** is the Vice Dean and Alton C. and Cecile Cunningham Craig Professor of Law at the University of Alabama School of Law.  Professor Hill is a recognized expert on financial institution regulation.  Her scholarship has appeared

in the Yale Journal on Regulation, Washington University Law Review, Indiana Law Journal, the Wisconsin Law Review, and other respected publications.

**George Selgin** is a senior fellow and director emeritus of the Center for Monetary and Financial Alternatives at the Cato Institute and professor emeritus of economics at the University of Georgia.  His research covers a broad range of topics within the field of monetary economics, including monetary history, macroeconomic theory, and the history of monetary thought.  He is the author of numerous articles and books and is a founder of the Modern Free Banking School.

**J.A.1172**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,
2120 Carey Avenue, Suite 300
Cheyenne, WY 82001

     *Plaintiff*,

       v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,
Constitution Avenue NW & 20th St NW
Washington, DC 20551

FEDERAL RESERVE BANK
OF KANSAS CITY,
1 Memorial Drive
Kansas City, MO 64108

     *Defendants*.

Civil Case 1:22-CV-00125-SWS

---

**BRIEF OF**

**MEMBERS OF THE UNITED STATES SENATE BANKING COMMITTEE AND**

**UNITED STATES HOUSE OF REPRESENTATIVES FINANCIAL SERVICES COMMITTEE**

**AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR**

**JUDGMENT AS A MATTER OF LAW**

---

**TABLE OF CONTENTS**

STATEMENT OF INTEREST………..………………………………………………....…..3

RULE 29(A)(4)(E) STATEMENT....………………………………………………..4

SUMMARY OF ARGUMENT…………………………………………………………...5

ARGUMENT

    1. Introduction…………………………...……………………….……6

    2. The Plain Text of the Monetary Control Act and Canons of Interpretation…………………..……………………………………6

    3. The Meaning of Section 342 is Not "Unambiguous"………..….……....12

    4. The Legislative History of Section 248a………………………………..16

    5. Only Congress is Empowered to Determine What is A "Depository Institution"………………………………………....………20

    6. Conclusion……………………………………………………………23

CERTIFICATE OF SERVICE....………………..……………………………………26

## STATEMENT OF INTEREST

*Amici*, Senator Cynthia M. Lummis of Wyoming and Representative Warren E. Davidson of Ohio, are members of the United States Senate Banking Committee and the United States House of Representatives Financial Services Committee, respectively.

The Members have a distinct constitutional interest in the faithful execution of the laws enacted by Congress and the exercise of Congressional oversight prerogatives. Additionally, the Members have a strong legislative interest in promoting responsible financial innovation, including through robust crypto asset regulation and an effective, efficient and safe payments system.

*Amici* understand this case to be of vital importance to the future of the United States' financial system, because it will judicially affirm decades of existing precedent under which Defendants respected States' chartering and risk-management decisions within our dual banking system. Defendants have only recently reinterpreted the law to arrogate to themselves power that Congress never has granted.

*Amici* previously filed a brief in opposition to Defendants' Motions to Dismiss (ECF 92) in September 2022, and have continued to conduct a detailed analysis of the statutory scheme governing master accounts. In the past months, *amici* have crawled through the bowels of Congressional legislative history and U.S. Supreme Court briefing over the last century to uncover new primary source documents which will illumine the key issues before this Court.

## RULE 29(A)(4)(E) STATEMENT

The author of this brief certifies that no outside counsel, neither in whole nor in part, authored this brief. Further, the author of this brief did not receive funding from any party for preparation of the brief.

## SUMMARY OF ARGUMENT

The plain text of 12 U.S.C. § 248a, when read *in pari materia* with §§ 342 and 461, evidences a clear Congressional priority to embed the dual banking system into our payments system and to grant the same access to both State and Federally-supervised banks. Additionally, the Federal Reserve's focus on the "unambiguous" nature of 12 U.S.C. 342 is colorful at best, and subject to doubt. Finally, only Congress, not the Fed, is empowered to determine what is—and is not—a "depository institution."

For those reasons, and others set forth more fully *infra*, this Court should grant Plaintiff's Motion for Judgment as a Matter of Law (ECF 238).

# ARGUMENT

## 1. Introduction

> The dual banking system has provided and continues to offer significant benefits to our financial system and the economy. *One of the primary benefits of dual banking is that the multiple options for state and federal charters have led to considerable innovation and improvement in banking services*. We have seen these benefits from the beginning.[1]

Ten years prior to the start of this matter, then-Federal Reserve Bank of Kansas City President Esther George's remarks underscored how our banking system should function and the importance of responsible innovation in our financial framework. The case pending before this Court is yet another milestone in the "considerable innovation and improvement in banking services" which emerges from the system of state regulation lauded by President George.

The position advanced by the Board of Governors of the Federal Reserve System ("Board") and the Federal Reserve Bank of Kansas City ("Reserve Bank") would establish an unaccountable, nonreviewable process for state-chartered depository institutions to gain access to our Nation's payment system through Reserve Bank accounts and services ("master accounts"), one of the essential features of a depository institution. This exceeds the statutory authority of the Federal Reserve, and threatens to transmogrify our dual banking system into one Congress did not create—one where states do not operate on a level playing field and are mere appendages.

## 2. The Plain Text of the Monetary Control Act and Canons of Interpretation

Congress enacted the Depository Institutions Deregulation and Monetary Control Act of 1980 ("Monetary Control Act")[2] to create a level playing field among depository institutions that are members of the Federal Reserve System (including all national banks and state member banks),

---

[1] President Esther L. George, *Perspectives on 150 Years of Dual Banking*, Conf. of State Bank Supervisors State-Federal Supervisory Forum, May 22, 2012 (emphasis added), *available at* https://www.kansascityfed.org/documents/2644/speeches-2012-george-ga-csbs-05-22.pdf.

[2] Depository Institutions Deregulation and Monetary Control Act, Pub. L. 96-221, 94 Stat. 132 (1980), § 105.

with state non-member banks and federal/state credit unions to enhance the Federal Reserve's ability to control the money supply during a period of heightened inflation.[3] Paul Volcker, Chairman of the Board of Governors at the time, noted that the legislation would "undoubtedly take [its] place among the most important pieces of financial legislation enacted in this century."[4]

As the Monetary Control Act evidences and as the forthcoming discussion analyzes in detail, Congress was clear in requiring master accounts be provided to all depository institutions.[5] The impetus of this was to enable depository institutions to comply with the new requirement of the Monetary Control Act to maintain a portion of the institution's capital at that institution's Administrative Reserve Bank[6] and to later[7] receive interest on excess reserves, both of which, as the Board acknowledges, are "essential"[8] to the appropriate conduct of monetary policy, which is the primary mission tasked to the Board and the Reserve Bank by Congress.[9]

Section 248a is clear. Defendants spill much ink discussing how that statute only governs pricing of Federal Reserve services, but a close textual analysis of the word "and" below demonstrates the scope of the statute is clearly not limited to pricing. The key phrase in § 248a says:

---

[3] *See Depository Institutions and Monetary Control Act of 1980*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreservehistory.org/essays/monetary-control-act-of-1980 (last visited Sept. 6, 2022). *See also* 126 Cong. Rec. 7070 (Mar. 28, 1980) (statement of Sen. Proxmire).

[4] *Id.* Twelve U.S.C. § 248a, the provision mandating that Federal Reserve Banks provide accounts and services to all depository institutions on a level playing field was enacted as part of this legislation.

[5] 12 U.S.C. § 248a(c)(2) ("*All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions* and such services shall be priced at the same fee schedule applicable to member banks…") (emphasis added).

[6] The term "Administrative Reserve Bank" refers to the Federal Reserve Bank designated by Congress to cover a particular geographic area. *See* FED. RSRV. BANKS, OPERATING CIRCULAR 1, at *1, *available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf.

[7] Interest on excess reserves were authorized by Congress in the Financial Services Regulatory Relief Act of 2006, Pub. L. 109-256, 120 Stat. 1966, § 201.

[8] Def. Bd. of Governors of the Fed. Rsrv. System's Mem. of Points and Authorities in Support of its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *5-6 (Aug. 16, 2022).

[9] 12 U.S.C. § 225a.

> All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions *and* such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.[10]

This statutory paragraph has three distinct components: (1) a requirement that all "Federal Reserve bank services" listed in the fee schedule in subsection (b) be made available to "nonmember depository institutions" (which unambiguously covers Plaintiff); (2) that the services listed in subsection (b) be priced utilizing the same fee schedule as member banks; and (3) that nonmember depository institutions be subject to the same terms of access as member banks. Adoption of Defendants' preferred reading would render the "shall be available" clause to be surplusage.

The Supreme Court has recognized that in cases where multiple statutes relate to the same issue (e.g., 12 U.S.C. §§ 248a, 342, 461), the canon against surplusage "is strongest."[11] Also, the *in pari materia* canon of statutory interpretation holds that courts should construe statutes governing the same issue as a single, whole body of law that fits together as functionally as possible.[12] This Court should interpret the provisions of §§ 342 and 461 in a manner that gives effect to the words of each. The Federal Reserve's proffered interpretation would not give effect to the plain text of § 248a.

---

[10] 12 U.S.C. § 248a(c)(2) (emphasis added).

[11] *Yates v. United States,* 574 U.S. 528, 543 (2015)( "[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.") (citing *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013)).

[12] *See Wachovia Bank, N.A.*, *v. Schmidt*, 546 U.S. 303, 315-16 (2006) ("…under the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read 'as if they were one law.'") (citations omitted); *Stender v. Smith-Archstone Operating Trust*, 958 F.3d 938, 942 (10th Cir. 2020) (citation omitted) (stating the Tenth Circuit's "longstanding practice of construing statutes *in pari materia*."); *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1253 fn. 1 (10th Cir. 2012) ("Statutes that are *in pari materia* — dealing with the same subject matter — should be construed consistently with each other.").

Section 461 has three primary focus areas for the purpose of this case: (1) it defines "depository institution";[13] (2) specifies that "each depository institution shall maintain reserves against its transaction accounts" for the purposes of "implementing monetary policy,"[14] and mandates that required reserves be held in a master account, at a correspondent depository institution, or as cash in the vault of the institution.[15] The reserve requirement is unambiguous—it applies to "*each* depository institution," and like the purpose of the Monetary Control Act, was designed to give the Federal Reserve greater control over economic policy. Both §§ 248a and 461 likewise use the mandatory "shall."

Section 342 states that "[a]ny Federal reserve bank may receive from any of its member banks or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts…."[16] This authorizing language is further qualified by requirements that a depository institution maintain a sufficient clearing balance and for depository institutions to charge fees related to the clearing of checks and similar items.[17] This language uses the term "may," which could grant some discretion as to the types of monetary instruments that may be collected.[18] However, this term can yield to an alternate reading when contrary indicators of legislative intent are present, especially in an

---

[13] 12 U.S.C. § 461(b)(1)(A). Plaintiff is unambiguously a depository institution under this statute, as Defendant concedes. *See* Ex. I, ECF 236.

[14] *Id.* at (b)(2).

[15] 12 U.S.C. § 461(c)(1)(A). Importantly, under Federal Reserve Operating Circular 1, a Reserve Bank is required to approve any correspondent relationship a depository institution may maintain. *See* FED. RSRV. BANKS, OPERATING CIRCULAR 1, at *8 *available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf ("Each executed Pass-Through Agreement is subject to approval by the ARB [Administrative Reserve Bank] of the Correspondent."). This requirement, in effect, operates to give the Federal Reserve an absolute veto over a depository institution's ability to comply with 12 U.S.C. § 461—other than holding large amounts of vault cash, which implicates security concerns and is impractical in this age of digital banking.

[16] 12 U.S.C. § 342.

[17] *Id.*

[18] *Cortez Byrd Chips v. Bill Harbert Constr. Co.*, 529 U.S. 193, 198-99 (2000).

authorizing sense.[19] *Farmers and Merchants Bank* itself acknowledges the fact that "may" is not always permissive and that the context of the provision is key.[20] While the actual meaning of § 342 is subject to doubt (see section 3 *infra*), § 342 can be harmonized with §§ 248a and 461.

Sections 248a and 342 govern different services. Section 342 deals with the form of deposits and collection of certain monetary instruments (deposits of lawful money, checks, notes, etc.). Section 248a lists a broader range of services, including "currency and coin services," "wire transfer services," "automatic clearinghouse services," "settlement services," "securities safekeeping services" and all other new payment mechanisms the Federal Reserve implements (e.g., FedNow, a forthcoming stablecoin settlement system currently under consideration by Congress, etc.). The Federal Reserve may have some measure of discretion with respect to the form of deposits listed only in § 342, but this statute can *also* be read as granting the Federal Reserve legal authorization to receive these instruments, which is a necessary predicate.

Nevertheless, the distinct and separate services listed by § 248a are governed by the mandatory "shall." To the extent to which the same services are covered by both §§ 248a and 342, 248a would control because it was enacted later in time,[21] and a more specific statute generally governs a less specific statute.[22] The *Brown & Williamson* Court noted this, observing:

> Over time, however, subsequent acts can shape or focus those meanings. The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." United States v. Fausto, 484 U.S. at 453. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.[23]

---

[19] *See id*. at 199 (citing *United States v. Rogers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion[, but] this common-sense principle of statutory construction . . . can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute.").

[20] 262 U,S, 649, 662-63 (1923) ("It is true that in statutes the word 'may' is sometimes construed as 'shall.' But that is where the context, or the subject-matter, compels such construction.").

[21] *See FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 143 (2000).

[22] *WildEarth Guardians v. National Park Service*, 703 F.3d 1178, 1189 (10th Cir. 2013).

[23] *Id*.

Consequently, services like wires, settlement, securities safekeeping and new Federal Reserve payment innovations *shall* be provided to all depository institutions, but deposits of lawful money and check clearing could entail some measure of Fed discretion. Nevertheless, any level of discretion contained in § 342 would have to yield to the command in § 461(b) that each depository institution maintain reserves at the Fed or at a correspondent (both subject to the Reserve Bank approval under Operating Circular 1). For these reasons, §§ 248a, 342 and 461 can be read harmoniously, with §§ 248a and 461 imposing a duty on the Fed to provide a number of services to a depository institution that require a master account.

This is the reason why Congress amended § 342 as part of the Monetary Control Act.[24] In imposing the new reserve requirement for "each depository institution" under § 461, Congress technically had to amend 342 to add the term "other depository institutions" to permit nonmember state institutions to place deposits at the Fed, because, prior to 1980, only Federal Reserve members could place deposits with the central bank.

If Congress hadn't made these conforming amendments to § 342 in 1980, Defendants would *not* be able to point to this language today and claim discretion. Additionally, Congress failing to make these amendments and enacting § 461 would have created some disharmony between §§ 248a, 342 and 461, vis-à-vis the ability of nonmember depository institutions to place their required statutory reserves at the Federal Reserve. Consequently, these amendments should not be read as ratifying the Federal Reserve's *new* interpretation of this provision ('new' in the sense that the Federal Reserve previously argued it was required to accept deposits and checks under this statute in 1917, as set forth in section 3 *infra*), but as granting the threshold legal authority to the Fed to receive deposits from state nonmember depository institutions and

---

[24] Monetary Control Act, § 105.

effectuating the core intent of the Monetary Control Act—giving the Fed *more* control over economic policy.

### 3.   The Meaning of Section 342 is Not "Unambiguous"

The history of § 342 is colorful and not "unambiguous" as Defendants portray in their Memoranda on the Motions to Dismiss.[25] Section 342 was originally enacted as § 13 of the Federal Reserve Act in 1913, and was amended and recodified several times in 1916, 1917 and 1980. In 1917, when Congress enacted amendments, the House Committee Report stated that the meaning of this provision was to:

> *[P]ermit* nonmember State banks and trust companies, even though too small to be eligible for membership in the Federal reserve banks, *to avail themselves* of the clearing and collection facilities of the Federal Reserve System, *provided they* cover at par checks on themselves sent for collection by the Federal reserve bank, and *provided further* that they keep a compensating balance with the Federal reserve banks in an amount to be determined under the rules proscribed by the Federal Reserve Board.[26]

This House Committee Report states § 13/342 was enacted to "permit" nonmember state banks to avail themselves of Federal Reserve clearing and collection system, provided they meet two (and only two) conditions: (1) that they cover certain checks at par; and (2) that a clearing balance be maintained at their Reserve Bank.[27] Through authorizing nonmember institutions to participate in the Federal Reserve clearing system, the intent of this provision was to bring the clearing of *all* checks into the Federal Reserve System, and give a legal entitlement to *all* banks to clear checks.[28]

---

[25] Def. Bd. of Governors of the Fed. Rsrv. System's Mem. of Points and Authorities in Support of its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *17, 19 (Aug. 16, 2022) ("Here, the use of "may" in section 342 makes clear Congress's intent that Reserve Banks have authority to accept deposits or open deposit accounts but are not required to do so."); ("The unambiguous text of Section 13…"); Def. Fed. Rsrv. Bank of Kansas City's Mem. of Points and Authorities in Support of Its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *21 (Aug. 16, 2022) ("This plain statutory text makes clear that while Federal Reserve Banks have the authority to accept deposits…").
[26] H. Rept. 65-35, *Amendments to the Federal Reserve Act*, *H.R. 3673,* H. Comm. on Banking and Currency, 65th Cong., 1st Sess., at *2 (Apr. 27, 1917) (emphasis added) (on file with counsel).
[27] *Id*.
[28] *Id*. ("Any clearing and collection plan to be effective must be so comprehensive as to include all checks.") (emphasis added).

The House Committee Report also underscores the fact that a Federal Reserve clearing system needed all banks to participate in order to be effective:

> a necessary factor in any successful clearing plan is the offset whereby balances only require settlement instead of the total volume of transactions. As long as the clearing system does not embrace *all of the banks*, this offset is lost in a corresponding degree and the value of the system diminished in proportion.[29]

Moreover, a letter from Secretary of the Treasury McAdoo to Rep. Glass that was reprinted in the House Committee Report states that these amendments were "unanimously recommended" by the Federal Reserve Board to Congress in 1917.[30] Finally, newspaper reports surrounding the passage of the 1917 amendments evidence a broad public understanding that any state depository institution that wanted to access the Federal Reserve's payments and clearing system could do so, as long as it deposited a portion of its reserves at a Reserve Bank.[31]

The Board cites one piece of legislative history in support of its claim of discretion,[32] but this excerpt is conclusory and only restates the statutory text without further analysis. In its Memorandum on the Motion to Dismiss, the Board stated that "[t]he legislative history [of § 342] nowhere suggests the receipt of deposits is in any way mandatory."[33] This assertion is clearly false, given the 1917 committee report language *supra*.

---

[29] *Id.*

[30] *Id.* at *4.

[31] *See, e.g., To Fortify Reserve Act*, L.A. TIMES, Jun. 19, 1917 (noting the purpose of the amendments was "[t]o Open Doors of the System to State Institutions" and that "[a]ccession of trust companies and state banks will be brought about in two ways. The institutions may join the system outright [membership] … or they may, by depositing a portion of their reserves with a Federal reserve bank, become members of the Federal reserve clearance system, the most effective in the country." The article also noted that "[o]fficials anticipate a landslide of State banks and trust companies to the system…"); *Bill to Widen Reserve System Sent to Wilson*, CHICAGO DAILY TRIBUNE, Jun. 19, 1917; *Will Strengthen Reserve Banks*, THE HARTFORD COURANT, Jun. 19, 1917; *Congress Again Has Reserve Act Amendments*, WALL ST. J., Apr. 18, 1917 (all on file with counsel).

[32] Def. Bd. of Governors of the Fed. Rsrv. System's Mem. of Points and Authorities in Support of its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *20 (August 16, 2022) ("The House Report on the FRA made clear that the permissive "may receive" language in § 13 "authorized" Federal Reserve Banks 'to receive current deposits from their [member banks].'").

[33] *Id.* at *35.

In interpreting the text of § 342 in *Farmers and Merchants Bank* as part of its response to the petition for certiorari before the U.S. Supreme Court in 1923, the Federal Reserve Bank of Richmond asserted that this statute created a legal right for nonmember depository institutions to place deposits and clear checks at a Reserve Bank.[34] In its merits brief in the 1923 case, the Richmond Reserve Bank stated the following:

> In addition to the banks having full membership in said System, as aforesaid, non-member State banks and trust companies of each district and *entitled to avail themselves* of the collection and clearance facilities of the Federal Reserve System, by establishing and maintaining clearing accounts and carrying appropriate balances with the Reserve Bank of the District in which they are located.[35]

The Richmond Reserve Bank also stated that "it was the obvious purpose of Congress to establish under [§ 13, codified as § 342]" a "*universal* par clearance system."[36] The Reserve Bank continued, commenting on the 1917 amendments to § 13 that "by this section as thus developed and amended, complete and adequate provision was made for the *universal* par-clearance and collection of checks in the United States through the Federal Reserve Bank."[37] It was further noted by the Reserve Bank:

> That the authority now existed in the Federal Reserve Banks to establish a *universal system* for par-clearance and collection of checks, would seem to be too clear for serious controversy. But it is submitted that this Act not only gave the banks the authority to establish such a system, *but required that they do so*, in the interest of the public at large.[38]

The word 'universal' hardly implies the presence of discretion on the part of the Fed among depository institutions. The Federal Reserve's position in *Farmers and Merchants* was that nonmember State banks had a legal entitlement to avail themselves of the "collection and clearance facilities" of the Fed—the exact opposite position that Defendants take today, based on nearly the

---

[34] Brief for Resp't, Petition for Cert., *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823, at *4 (Feb. 16, 1923) ("it is obvious that the express authority to perform a service for a member bank is equivalent to a mandatory provision that the service shall be performed if it is practical to do so.") (on file with counsel).

[35] Merits Brief for Resp't, *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823, at *5 (Apr. 19, 1923) (on file with counsel).

[36] *Id.* at *32. (emphasis added).

[37] *Id.* at *34. (emphasis added).

[38] *Id.* (emphasis added).

same statutory language.[39] The Fed's incentives in 1917 were to attract the maximum number of banks to participate in the new Federal Reserve payments system, whereas today—despite nearly the same statutory language—the Federal Reserve payment system is more akin to an exclusive club.

Of course, the reason the Federal Reserve feels empowered to take such a position is *Farmers and Merchants*, which held that "… in each amendment, as in § 13, the words used were 'may receive' -- words of authorization merely."[40] However, the Court's decision was not absolute, acknowledging that context has a key role to play in the interpretation of this statute.[41] The Court squarely found that "'may' is sometimes construed as 'shall' based on 'the context, or the subject-matter.'"[42]

The Supreme Court evidenced that the "statute appears to have been drawn with great care."[43] It was. Congress' clear intent, as evidenced by the 1917 committee report and the Fed's contemporaneous interpretation of this provision, was that *all* State nonmember banks should be permitted access to Federal Reserve clearing facilities. In *Farmers and Merchants,* neither the Petitioner nor the Respondent was seemingly aware of the existence of the 1917 House Committee Report in briefing that Supreme Court case—it was never mentioned or cited by any party in that case and it was not cited by the Supreme Court in its decision.[44] Consequently, it is an open question whether the Supreme Court's interpretation of § 13/342 in *Farmers and Merchants* over

---

[39] *Farmers and Merchants Bank v. Federal Rsrv. Bank of Richmond*, 262 U.S. 649, 662 (1923).

[40] *Id.*

[41] *Id.* at 662-63 ("It is true that in statutes the word 'may' is sometimes construed as 'shall.' But that is where the context, or the subject-matter, compels such construction.").

[42] *Id.*

[43] *Id.*

[44] *See generally id.*; Brief for Petitioner, Petition for Cert., *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823 (Jan. 31, 1923); Brief for Resp't, Petition for Cert., *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823 (Feb. 16, 1923); Merits Brief for Petitioner, *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823 (Mar. 31, 1923); Merits Brief for Resp't, *Farmers and Merchants Bank v. Fed. Rsrv. Bank of Richmond*, No. 22-823 (Apr. 19, 1923) (all on file with counsel).

100 years ago should be accorded the full measure of precedential weight, having missed such an unambiguous indicator of Congressional intent.

Whether or not *Farmers and Merchants* remains good law, these sources demonstrate that the meaning of § 342 cannot bear the weighty interpretation that the Federal Reserve proffers to this Court. Given these indications of Congressional intent and the Fed's historical (and opposite) interpretation of this provision, § 342 should not be given controlling weight in this Court's statutory interpretation, and should be read *in pari materia* with §§ 248a and 461.

### 4.  The Legislative History of Section 248a

Conversely, evidence supporting Plaintiff's argument can be found in numerous instances within the Monetary Control Act's legislative history. "Depository institution" is defined in the Monetary Control Act as "(i) any insured bank as defined in section 3 of the Federal Deposit Insurance Act or any bank which is eligible to make application to become an insured bank under section 5 of such Act."[45] A bank "is eligible to make application to become an insured bank" if it is duly chartered under federal or state law and is engaged in the business of receiving deposits, other than trust funds…"[46]

In the final conference committee report on the Monetary Control Act, the conferees made the following explanatory statements on the scope, context and meaning of the legislation:

- "The conference reported bill provides certain Federal Reserve requirements for *all depository institutions*. It does not, however, require any institution to be a member of the Federal Reserve."[47]

---

[45] Monetary Control Act, § 103 (codified at 12 U.S.C. § 461(b)(1)(A)).
[46] *See* 12 U.S.C. § 1813 (Federal Deposit Insurance Act); Fed. Deposit Ins. Corp. Gen'l Counsel Op. 88-67 (Oct. 27, 1988).
[47] H. Rept. 96-842, *Depository Institutions Deregulation and Monetary Control Act of 1980 Conference Committee Report,* 96th Cong., 2d Sess., at *69 (March 21, 1980) (emphasis added). This is clear evidence of Congressional intent that banks should not be required to have a Federal regulator in order to access the payment system.

- "These reserve requirements would apply to *all depository institutions*. Depository institutions are authorized to use balances maintained in Federal Reserve banks to satisfy liquidity requirements under the Federal Home Loan Bank Act and the Nation[al] Credit Union Act."[48]

- "*Any depository institution* holding transaction accounts would have access under the same terms and conditions as member banks to the Federal Reserve discount window upon enactment of the bill."[49]

- "The House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and open access to these services to all depository institutions* on the same terms and conditions as member banks."[50]

Additionally, in debate on the Senate floor on the conference committee report, Congress' intent for the act to apply to all depository institutions was evidenced clearly, as follows:

- "The *mandatory aspects of this bill* are directly opposite to the voluntary solution of Federal Reserve membership which were voted and agreed to by the Senate Banking Committee…"[51]

- "*This bill mandates banks to place reserves in the national bank.*"[52]

- "One way to resolve this problem [allowing better control of monetary policy by the Federal Reserve] is to provide *mandatory reserves for all depository institutions*, including

---

[48] *Id.* at 70.
[49] *Id.* at 71.
[50] *Id.* (emphasis added).
[51] 126 Cong. Rec. 7063 (Mar. 28, 1980) (emphasis added)
[52] *Id.* Sen. Armstrong's remark that the bill requires banks to hold reserves at the national bank refers to the requirement contained in 12 U.S.C. § 461(b)(2).

credit unions, savings and loan associations, commercial banks and mutual savings banks."[53]

- "Consequently, we will now have a system whereby *every depository institution in the country will be subject to keeping reserves at the Fed.*"[54]

Despite Defendants' claims to the contrary,[55] it is clear that Members of Congress, in both the House and Senate, understood the Monetary Control Act to apply to "every depository institution in the country," without exception, which is inconsistent with the Defendants' position that the Reserve Banks retain discretion.[56]

The Board, in its Memorandum on the Motion to Dismiss, attempts to advance the argument that the Federal Reserve Act (as amended by the Monetary Control Act) merely authorizes, but does not require, the Reserve Bank to provide a master account.[57] Moreover, the Board states the following about 12 U.S.C. § 248a, the provision that requires the Reserve Banks to provide master accounts to all depository institutions: "Nothing in that section requires that any particular institution receive a master account, or that each and every institution is entitled to access Federal Reserve services. Rather, it requires only that nonmember institutions that do obtain Federal Reserve services pay the same amount for those services as member banks."[58]

---

[53] *Id.* at 7071 (statement of Sen. Tower) (emphasis added). It is notable that the 96th Congress and Sen. Proxmire included a variety of charter types in his statement and in the definition of "depository institution," emphasizing that the bill should have broad application to all bank-like entities.

[54] *Id.* at 7072.

[55] Def. Bd. of Governors of the Fed. Rsrv. Sys. Mem. in Support of Mot. to Dismiss, at *25, ECF 49. ("[T]here is no indication that Congress intended the MCA as a *mandatory* right of access to Reserve Bank services to all nonmember banks…").

[56] *See supra* note 19.

[57] *See, e.g.,* Def. Bd. of Governors of the Fed. Rsrv. System's Mem. of Points and Authorities in Support of its Motion to Dismiss, *Custodia Bank, Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *20 (Aug. 16, 2022).

[58] *Id.*

The conference committee report on 12 U.S.C. § 248a states that "[t]he House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks *and open access to these services to all depository institutions* on the same terms and conditions as member banks."[59] There are two components to this statement: (1) "a provision for the Federal Reserve to price services"; *and* (2) "open access to these services to all depository institutions." Conference committee reports—generally bicameral and bipartisan—can be "authoritative" in statutory interpretation.[60]

Why would Congress have included this provision in the conference committee report if it had not intended the statutory language in §248a to have an effect, especially when that section clearly states "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions *and* such services shall be priced at the same fee schedule applicable to member banks…"? This statutory phrase has two parts as well, and its argument that § 248a only sets out a "pricing principle[]," misses the point that the word "*and*" separates the disjunctive phrases "All Federal Reserve bank services covered by the fee schedule *shall* be available to nonmember depository institutions…" and the phrase "such services shall be priced at the same fee schedule…" They are separate statutory functions, both of which should be given effect. Reading out half of this sentence, in favor of only effectuating the pricing principle, would likewise violate the rule against surplusage.[61]

---

[59] H. Rept. 96-842, *Depository Institutions Deregulation and Monetary Control Act of 1980 Conference Committee Report,* 96th Cong., 2d Sess., at *71 (March 21, 1980) (emphasis added).

[60] *Diallo v. Gonzales*, 447 F.3d 1274, 1282 (10th Cir. 2006); George A. Costello, *Average Voting Members and Other "Benign" Fictions: The Relative Reliability of Committee Reports, Floor Debates and Other Sources of Legislative History*, 1990 DUKE L.J. 39, 47 ("Frequently the action of the conference committee is the critical stage in shaping legislation. It is here that bills subject to a conference take on their final form, and differences in House and Senate versions of the bills are reconciled. If the conference committee explains its action clearly, then courts will not hesitate to rely on that explanation.") (emphasis added).

[61] *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

Four years after passage of the Monetary Control Act, the House Committee on Banking, Finance and Urban Affairs conducted a review of the implementation of this legislation.[62] The House Committee concluded that the Monetary Control Act changed the status quo in two ways: (1) by directing the Federal Reserve to impose explicit charges for payment services to both member and nonmember banks; and (2) specifying that the Federal Reserve should provide these services "to *all* depository institutions and not just member banks," foreclosing the notion that 248a is merely about pricing.[63] The Committee also found that these "legislative changes and the actions taken by the Federal Reserve to implement them broke down the division within the payments system…"[64]

The legislative history cited above makes it clear that the provisions of the Monetary Control Act were intended by Congress to apply to "every depository institution in the country," without exception. This was meant to enable the Federal Reserve to have increased control over monetary policy by requiring *all* depository institutions to hold a specified amount of capital at their Reserve Bank based on their deposits.[65]

**5.      Only Congress is Empowered to Determine What is a "Depository Institution"**

Moreover, the Board and the Reserve Bank are not empowered to determine what is—and what is not—a "depository institution" under the existing statutory scheme. The Reserve Bank— shockingly—does not attempt to hide an attempt to arrogate this power to itself,[66] diminishing the

---

[62] H. Rept. 98-17, *The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System*, H. Comm. on Banking, Finance and Urban Aff., 98th Cong., 2d Sess., at *VII (Nov. 1984).
[63] *Id.* (emphasis added).
[64] *Id.*
[65] *See Depository Institutions and Monetary Control Act of 1980*, Bd. of Governors of the Fed. Rsrv. Sys., https://www.federalreservehistory.org/essays/monetary-control-act-of-1980 (last visited Sept. 6, 2022).
[66] *See* Def. Fed. Rsrv. Bank of Kansas City's Mem. of Points and Authorities in Support of Its Motion to Dismiss, *Custodia Bank , Inc. v. Federal Reserve Bd. of Governors, Fed. Rsrv. Bank of Kansas City*, No. 22-CV-125, at *24 (Aug. 16, 2022).

fact that Congress, through a number of laws,[67] has set out clearly what is a depository institution/bank[68] and what is not. A master account, and corresponding access to the payment system, is one of the hallmark features of a depository institution/bank that are not accessible to other financial institutions, including investment companies, broker/dealers and lenders. Moreover, in light of § 461(b)'s requirement that "each depository institution" place reserves at the Fed, if the Fed has an absolute veto over both state chartered depository institutions obtaining a master account *and* being able to obtain a correspondent relationship under Operating Circular 1, is that entity *de facto* still a depository institution?

A depository institution that does not have a master account "can't really function as a financial institution,"[69] and if the Federal Reserve has the ability to determine which depository institutions can and cannot receive a master account, the Fed would essentially become the ultimate decision-maker for what is a bank in this country, upsetting our dual banking system.[70]

It is not conceivable that the Board or the Reserve Bank should have unaccountable authority to essentially determine what depository institutions are 'real' depository institutions and which are not, when Congress has set down in explicit detail the requirements for a federal or state-chartered entity to qualify as a "depository institution," consistent with the spirit of our dual banking system. Congress intended for states to be permitted to charter depository institutions

---

[67] *See, e.g.,* 12 U.S.C. § 461(b)(1)(A) (definition of "depository institution"); 12 U.S.C. § 1813(a) (definition of "bank" and "state bank"); 12 U.S.C. § 1841(c) (definition of "bank" for bank holding company supervision); 15 U.S.C. § 80b-2(a)(2) (definition of "bank" for Investment Company Act purposes); 15 U.S.C. § 80a-2(a)(5) (definition of "bank" for Investment Advisers Act purposes); 26 U.S.C. § 581 (definition of "bank" for tax purposes).

[68] A "depository institution" is a chartered financial institution that receives demand deposits, e.g., receiving customer currency for safekeeping/lending purposes and recording those customer funds as a liability on its balance sheet. A "depository institution" can be a bank, special purpose depository institution, credit union, federal thrift association or similar entities." This is in comparison to a credit union, which is a not-for-profit depository institution.

[69] *See* Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is that Legal? Brookings Institution* (Nov. 14, 2018), https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/.

[70] Julie L. Stackhouse, *Why America's Dual Banking System Matters,* Fed. Rsrv. Bank of St. Louis, Sept. 18, 2017, https://www.stlouisfed.org/on-the-economy/2017/september/americas-dual-banking-system-matters.

under that state's laws, and as long as the institution comported with the definition of depository institution/bank under Federal law, Congress did not intend for the Board or Reserve Bank to overrule the prudent judgment of a state for its own. This is a dangerous precedent.

During debate on the Monetary Control Act in 1980, Congress dismissed the possibility that the Board, the Reserve Banks or the Federal Government might assume the power of determining which state-chartered banks are in fact banks under Federal law. Senator Proxmire, Chairman of the Senate Banking Committee, noted the following:

> Nevertheless, the fact is that the Federal Government does not replace the State chartering of banks. The Federal Government does not replace the Federal insurance for State banks. The Federal Government does not replace examination and supervision of State banks by the State examiners and the State instructors under State control. The States retain authority to define the power of State-chartered banks.[71]

Today, ironically, debate around the Monetary Control Act has come full circle as the Board and the Reserve Banks, through this litigation, the related Account Access Guidelines, S-Letter 2667 and the Implementation Handbook[72] are essentially arguing that they have the legal authority to determine what is a depository institution and what is not. In construing §§ 248a, 342 and 461 *in pari materia*, the Court should carefully consider whether the Account Access Guidelines, S-Letter 2667 and the Implementation Handbook are legally viable under currently law, and find that the Board is not permitted to override the risk assessment decisions of a state banking supervisor.

Congress understood the importance of protecting and preserving the dual banking system when it passed the Monetary Control Act,[73] and as described, has set down very clear definitions of what is a "depository institution," and what is a "bank" in statute. Despite some original

---

[71] 126 Cong. Rec. 7070 (Mar. 28, 1980).

[72] Guidelines for Evaluating Account and Service Requests, 87 Fed. Reg. 51099, 51100 (Aug. 19, 2022). *See* Ex. AS, AX, ECF 236.

[73] 126 Cong. Rec. 7070. (Mar. 28, 1980) (statement of Sen. Proxmire) ("Mr. President, this is not a destruction of the dual banking system. If it were, you would not get the tremendous over-whelming approval of the bill by the institutions themselves. The dual banking system is retained.").

concerns by some that the Monetary Control Act would destroy our dual banking system,[74] the four decades since the bill's passage have proven that these fears were unfounded because the dual banking system remains alive and well even today, as was Congress' intention. Should the Defendants' argument be accepted, however, it would serve as a paradigm shift that would subvert the states' role within our financial system.

### 6.    Conclusion

The Federal Reserve has historically stated that master accounts were available to all depository institutions. Today, the Federal Reserve's website states that "[i]n summary, the role of the Federal Reserve in providing payment services is to promote the integrity and efficiency of the payments mechanism and to ensure the provision of payment services to all depository institutions on an equitable basis, and to do so in an atmosphere of competitive fairness."[75] The Board's website also evidences that it understood the Monetary Control Act to require that Reserve Banks provide master accounts to all depository institutions.[76] Additionally, the Federal Reserve's Account Structure Guide states that "[a] Financial Institution may maintain a Master Account with its ARB [Administrative Reserve Bank] if it is eligible as defined in OC 1 [Operating Circular 1] and applicable law."[77] The current *litigating position* of the Board and Reserve Bank is not

---

[74] *Id.* at 7072. (Sen. Tower, "In my opinion, this will further erode the dual banking system and increase the possibility of creating a single bank regulatory agency, at the Federal level, for all financial institutions."

[75] *Policies: The Federal Reserve in the Payments System,* Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (last visited Sept. 8, 2022) ("Federal Reserve payment services are available to all depository institutions . . . .").

[76] *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks*, Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_standards.htm ("The Monetary Control Act of 1980 . . . has expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis . . . .").

[77] FED. RSRV. SYS., FEDERAL RESERVE ACCOUNT STRUCTURE, TRANSACTION SETTLEMENT AND REPORTING GUIDE 12 (2017), *available at* https://app.frbservices.org/assets/resources/rules-regulations/operating-circular-1-accnt-structure.pdf.

consistent with past statements and practice, and undercuts their stated commitment to provide payment services "in an atmosphere of competitive fairness."[78]

This matter is not about crypto assets, but fidelity to Congress' enactments and the dual banking system. At three other states, including Connecticut, Idaho and Vermont,[79] currently have depository institution charters similar to the Wyoming special purpose depository institution with pending master account applications at the Federal Reserve. In total, the Board recently disclosed 26 uninsured, non-federally regulated master account applicants in its most recent quarterly update of master account requests, a substantial majority of which have no plans to handle crypto assets.[80] One such institution which seeks to address inefficiencies in foreign exchange lists former Federal Reserve Board Vice Chair for Supervision Randy Quarles as an investor and organizer.[81]

Six months after the beginning of this matter, then-Kansas City Fed President Esther George delivered remarks prior to her January 2023 retirement. In commenting on her work on payments and the development of the new FedNow system, she noted "that the Federal Reserve's role *will ensure equitable access to banks of all sizes nationwide*" and that "*every bank* deserves the same opportunity to offer that service [FedNow] to its community."[82] While the Federal Reserve may have a laudable public position on equality of access to the payments system, this matter shows that the Federal Reserve System has miles to go in following the law.

---

[78] *Policies: The Federal Reserve in the Payments System,* Bd. of Governors of the Fed. Rsrv. Sys., *available at* http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (last visited Sept. 8, 2022) ("Federal Reserve payment services are available to all depository institutions . . . .").

[79] *See* Fed. Rsrv. Bd., *Master Account and Services Database: Requests for Access*, https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm (last visited Jan. 17, 2024).

[80] *Id.*

[81] *See* Ben Margulies, *Ex-Fed Vice Chair Quarles Linked to Bank Seeking Master Account*, CENTRAL BANKING MAGAZINE, Jun. 28, 2023, https://www.centralbanking.com/regulation/banking/7959134/ex-fed-vice-chair-quarles-linked-to-bank-seeking-master-account.

[82] *Reflections on 40 Years at the Central Bank, Remarks by Esther George at the Exchequer Club of Washington, D.C.,* Jan. 18, 2023, https://www.kansascityfed.org/Speeches/documents/9332/2023-George-Exchequer-01-18.pdf.

For the reasons discussed above, this Court should grant Plaintiff's Motion for Judgment as a Matter of Law (ECF 238).

Submitted respectfully this 19th day of January, 2024,

/s/ Chris Land

Chris Land, General Counsel (Wyo. Bar #7-6006)
Office of Senator Cynthia M. Lummis
United States Senate
127A Russell Senate Office Building
Washington, DC 20510

Phone: (202) 224-3424
E-Mail: chris_land@lummis.senate.gov

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify, on the 19th day of January 2024, a true and correct copy of this motion

was served on counsel, via the Court's electronic system, addressed to:

Joshua Paul Chadwick
Katherine Pomeroy
Yonatan Gelblum
Yvonne Facchina Mizusawa
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitution Avenue, NW
Washington, DC 20551
202-263-4835
joshua.p.chadwick@frb.gov
katherine.pomeroy@frb.gov
yonatan.gelblum@frb.gov
yvonne.f.mizusawa@frb.gov

Andrew Michaelson
Angela Tarasi
Christine Carletta
Jared Lax
Laura Harris
Jeffrey S. Bucholtz
Joshua Nathaniel Mitchell
KING & SPAULDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
720-535-2319
720-535-2400
amichaelson@kslaw.com
atarasi@kslaw.com
ccarletta@kslaw.com
jlax@kslaw.com
lharris@kslaw.com
jbucholtz@kslaw.com
jmitchell@kslaw.com

Billie L.M. Addleman
Erin Berry
Hirst Applegate LLP
1720 Carey Avenue, Suite 400
PO Box 1083
Cheyenne, WY 82003-1083
307-632-0541
307-632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Scott E. Ortiz
Williams Porter Day Neville PC
PO Box 10700
Casper, WY 82602
(307) 265-0700
sortiz@wpdn.net

John K. Villa
Ryan T. Scarborough
Sarah M. Harris
Jamie Wolfe
Ian M. Swenson
Lauren Weinberger
Russell Mendelson
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5173
jvilla@wc.com
rscarborough@wc.com
sharris@wc.com
jwolfe@wc.com
iswenson@wc.com
lweinberger@wc.com
rmendelson@wc.com

/s/ Chris Land

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-00125-SWS |
| v. | ) | |
| | ) | |
| BOARD OF GOVERNORS OF | ) | |
| THE FEDERAL RESERVE SYSTEM & | ) | |
| FEDERAL RESERVE BANK | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
## OPPOSITION TO PLAINTIFF'S PETITION FOR ADMINISTRATIVE PROCEDURE
## ACT REVIEW

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION .................................................................................................... 1

STATEMENT OF THE ISSUE ................................................................................ 2

BACKGROUND ..................................................................................................... 2

STANDARD OF REVIEW ...................................................................................... 5

ARGUMENT ......................................................................................................... 6

I.   Federal Reserve Banks Retain the Necessary Discretion to Deny or Restrict Access
     to Master Accounts and Services ................................................................... 6

     A.   Reserve Banks Have Always Assessed Risks When Providing Accounts and
          Services to Depository Institutions ......................................................... 6

          1.   Reserve Banks consistently exercised discretion over access to
               accounts and services between 1913 and 1980 .............................. 7

          2.   Reserve Banks have continued to exercise discretion over accounts
               and services for all institutions between the enactment of the
               Monetary Control Act in 1980 and the present ........................... 10

     B.   The Monetary Control Act of 1980 Did Not Eliminate Reserve Bank
          Discretion ............................................................................................ 13

          1.   Section 248a's plain text does not grant Custodia a right to a
               master account .......................................................................... 14

          2.   The MCA did not limit discretion granted under section 342 ........ 18

          3.   Custodia cannot bootstrap its favored reading onto the MCA's
               plain text by resorting to generalized statements and other extra-
               statutory sources ....................................................................... 21

          4.   *Banco San Juan* is both illustrative and persuasive ..................... 26

     C.   There Is No Indication That Congress Intended to Abdicate Federal Monetary
          Policy and Payment Systems to Control by Individual States or Territories ........ 29

II.     The Board Did Not Direct the Denial of Custodia's Master Account Request or Exceed
        Its Statutory Authority .................................................................................................... 34

        A.      The Board Followed the Consultation Process Set Forth in the Guidelines
                and Implementing S-Letter, But the Decision Was Made by FRBKC ................. 34

        B.      The Board Did Not Take Actionable "Final Agency Action" on Custodia's
                Account Request ................................................................................................... 39

        C.      Even if the Board Had "Inserted Itself into the Master Account Decision-
                Making Process" as Custodia Claims, That Is Neither Unlawful Nor a
                Violation of the APA ............................................................................................ 42

CONCLUSION ...................................................................................................................... 44

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

**Cases**

*7-Eleven, Inc. v. National Union Insurance Co. of Pittsburgh, Pa.*,
    33 F. App'x 703 (5th Cir. 2002) ........................................................ 16

*American Petroleum Institute v. DOI*,
    81 F.4th 1048 (10th Cir. 2023) ........................................................... 6

*Anderson v. Suiters*,
    499 F.3d 1228 (10th Cir. 2007) ......................................................... 24

*Andresen v. Maryland*,
    427 U.S. 463 (1976) .......................................................................... 15

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*,
    No. 23-cv-6414 (JGK), 2023 WL 7111182
    (S.D.N.Y. Oct. 27, 2023) ..................................... 2, 3, 14, 17, 21, 26, 27, 28, 29, 30, 32, 33

*Barnett Bank of Marion County, N.A. v. Nelson*,
    517 U.S. 25 (1996) ............................................................................ 30

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................... 41

*Bischoff v. Glickman*,
    54 F. Supp. 2d 1226 (D. Wyo. 1999), *aff'd on standing grounds sub nom.*,
    *Bischoff v. Myers*, 2000 WL 743686 (10th Cir. June 9, 2000) ......................... 43

*Board of Governors of the Federal Reserve System v. First Lincolnwood, Corp.*,
    439 U.S. 234 (1978) ..................................................................... 22, 38

*Carroll v. Logan*,
    735 F.3d 147 (4th Cir. 2013) ............................................................. 21

*Cherokee Nation v. Bernhardt*,
    936 F.3d 1142 (10th Cir. 2019) ......................................................... 19

*Cherry v. U.S. Dep't of Agriculture*,
    13 F. App'x 886 (10th Cir. 2001) ....................................................... 40

*Colorado Farm Bureau Federation v. U.S. Forest Service*,
    220 F.3d 1171 (10th Cir. 2000) ............................................... 40, 41, 42

*Custis v. United States,*
    511 U.S. 485 (1994) ............................................................................................ 20

*DHS v. MacLean,*
    574 U.S. 383 (2015) ............................................................................................ 17

*Edwards v. Valdez,*
    789 F.2d 1477 (10th Cir. 1986) ......................................................................... 23

*Farmers & Merchants Bank v. Federal Reserve Bank of Richmond,*
    262 U.S. 649 (1923) ............................................................................... 8, 19, 20

*Fasano v. Federal Reserve Bank of New York,*
    457 F.3d 274 (3d Cir. 2006) ......................................................................... 2, 35

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City,*
    861 F.3d 1052 (10th Cir. 2017) .................................................................. 17, 27

*Gares v. Willingboro Township,*
    90 F.3d 720 (3d Cir. 1996) ................................................................................ 17

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York,*
    866 F.2d 38 (2d Cir. 1989) ................................................................................ 27

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................................................ 43

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983) ............................................................................................ 20

*Hohn v. United States,*
    524 U.S. 236 (1998) ............................................................................................ 20

*In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litigation,*
    1 F. Supp. 3d 34 (E.D.N.Y. 2014) ...................................................................... 3

*In re McDaniel,*
    973 F.3d 1083 (10th Cir. 2020) ......................................................................... 16

*In re TD Bank, N.A.,*
    150 F. Supp. 3d 593 (D.S.C. 2015) .................................................................... 3

*Jet Courier Services., Inc. v. Federal Reserve Bank of Atlanta,*
    713 F.2d 1221 (6th Cir. 1983) ..................................................................... 10, 27

*Kay Electric Cooperative v. City of Newkirk, Oklahoma,*
  647 F.3d 1039 (10th Cir. 2011) ................................................... 21

*Kobach v. U.S. Election Assistance Commission,*
  772 F.3d 1183 (10th Cir. 2014) ................................................... 40

*Loughrin v. United States,*
  573 U.S. 351 (2014) ........................................................... 16, 17

*Marathon Oil Co. v. Lujan,*
  937 F.2d 498 (10th Cir. 1991) .................................................. 43, 44

*Marshall County Health Care Authority v. Shalala,*
  988 F.2d 1221 (D.C. Cir. 1993) .................................................... 5

*Maryland v. Wilson,*
  519 U.S. 408 (1997) ............................................................. 17

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ............................................................. 24

*McNary v. Haitian Refugee Center, Inc.,*
  498 U.S. 479 (1991) ............................................................. 16

*Merit Management Group, LP v. FTI Consulting, Inc.,*
  138 S. Ct. 883 (2018) ........................................................... 15

*Miami Tribe of Oklahoma v. United States,*
  198 F. App'x 686 (10th Cir. 2006) ............................................... 42

*Milner v. Dep't of Navy,*
  562 U.S. 562 (2011) ............................................................. 24

*Nelson v. United States,*
  40 F.4th 1105 (10th Cir. 2022) ........................................... 17, 21, 26

*NLRB v. SW General, Inc.,*
  580 U.S. 288 (2017) ............................................................. 23

*Oceana, Inc. v. Pritzker,*
  24 F. Supp. 3d 49 (D.D.C. 2014) ................................................. 22

*Salt Lake Tribune Publishing Co. v. Management Planning, Inc.,*
  390 F.3d 684 (10th Cir. 2004) ................................................... 30

*Sinclair Wyoming Refining Co., LLC v. U.S. EPA*,
 72 F.4th 1137 (10th Cir. 2023) ........................................................................ 40

*State of Utah v. Babbitt*,
 137 F.3d 1193 (10th Cir. 1998) ........................................................................ 5

*United States v. Allen*,
 983 F.3d 463 (10th Cir. 2020) .......................................................................... 20

*United States v. Rohde*,
 159 F.3d 1298 (10th Cir. 1998) ........................................................................ 28

*United States v. Sturm*,
 673 F.3d 1274 (10th Cir. 2012) ........................................................................ 21

*Western Energy Alliance v. Biden*,
 Nos. 21-cv-13 and 56-SWS, 2022 WL 18587039 (D. Wyo. Sept. 2, 2022) ..................... 40

*Western Minnesota Municipal Power Agency v. FERC*,
 806 F.3d 588 (D.C. Cir. 2015) .................................................................. 17, 19

*Wyoming v. U.S. Dep't of Agriculture*,
 661 F.3d 1209 (10th Cir. 2011) ........................................................................ 43

**Statutes**

5 U.S.C. § 551(13) ........................................................................................... 41

5 U.S.C. §§ 701–706 ....................................................................................... 43

5 U.S.C. § 701(a) ............................................................................................ 43

5 U.S.C. § 701(a)(2) ........................................................................................ 43

5 U.S.C. § 706 ................................................................................................. 5

5 U.S.C. § 706(2) .................................................................................... 6, 42, 44

5 U.S.C. § 706(2)(A) ........................................................................................ 6

5 U.S.C. § 706(2)(C) ........................................................................................ 6

12 U.S.C. § 24(first)-(seventh cl. 1) ................................................................... 3

12 U.S.C. § 225a ............................................................................................. 35

12 U.S.C. § 248(j) ................................................................................................ 3

12 U.S.C. § 248(k) .............................................................................................. 35

12 U.S.C. § 248a ............................ 2, 11, 13, 14, 15, 19, 20, 21, 23, 24, 26, 27, 29, 30, 33, 34, 43

12 U.S.C. § 248a(a) ................................................................................ 2, 15, 43

12 U.S.C. § 248a(c) ......................................................................... 15, 16, 18, 26

12 U.S.C. § 248a(c)(1) ........................................................................................ 16

12 U.S.C. § 248a(c)(2) ......................................................................... 16, 18, 27

12 U.S.C. § 248a(c)(3)–(4) ................................................................................. 16

12 U.S.C. § 248c ................................................................................................. 34

12 U.S.C. § 248c(a)(3) ........................................................................................ 43

12 U.S.C. § 248c(b)(1) ........................................................................................ 33

12 U.S.C. § 248c(3) .............................................................................................. 2

12 U.S.C. § 301 ..................................................................................................... 3

12 U.S.C. § 321 ..................................................................................................... 7

12 U.S.C. § 321 *et seq* ........................................................................................ 4

12 U.S.C. § 341(first-seventh) ............................................................................. 3

12 U.S.C. § 341(sixth) .......................................................................................... 3

12 U.S.C. § 341(seventh) ..................................................................................... 3

12 U.S.C. §§ 341–361 .......................................................................................... 3

12 U.S.C. § 342 ........................................ 2, 7, 12, 15, 16, 17, 18, 19, 20, 26, 27, 34, 39

12 U.S.C. § 343 ..................................................................................................... 2

12 U.S.C. § 347 ..................................................................................................... 2

12 U.S.C. § 347c ................................................................................................... 2

12 U.S.C. § 347d ............................................................................................... 2

12 U.S.C. § 355(1) ............................................................................................. 2

12 U.S.C. § 461 ............................................................................................... 19

12 U.S.C. § 461(b)(2) ...................................................................................... 18

12 U.S.C. § 461(c)(1)(A)(i) ............................................................................ 19

12 U.S.C. § 461(c)(1)(B) ................................................................................ 19

28 U.S.C. § 2412(b) ........................................................................................ 17

101 Pa. Code § 15.142(c) ............................................................................... 18

U.C.C. § 3-102(c) ........................................................................................... 12

U.C.C. § 4-103(b) ........................................................................................... 12

U.C.C. § 4A-107 ............................................................................................. 12

Wyo. Stat. § 34.1-3-102(c) ............................................................................. 12

Wyo. Stat. § 34.1-4-103(c) ............................................................................. 12

Wyo. Stat. § 34.1-4.A-107 ............................................................................. 12

Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq*,
     Pub. L. No. 63-43, ch. 6 §§ 9, 13, 19, 38 Stat. 251, 259, 263, 270 ................. 7, 19
     Pub. L. No. 65-25, § 4, 40 Stat. 232, 234–35 ................................................. 7

International Banking Center Regulatory Act,
     Puerto Rico Act No. 52-1989 (Aug. 11, 1989) https://bvirtualogp.pr.gov/ogp/Bvirtual/
     leyesreferencia/PDF/Y%20-%20Ingl%C3%A9s/52-1989.pdf ........................ 32

Monetary Control Act of 1980, Pub. L. No. 96-221,
     § 105(a)(1), 94 Stat. 132 .............................................................................. 16
     § 107, 94 Stat. 132, 141 ............................................................................... 15

**Regulations**

12 C.F.R. § 204.5(a)(1) ................................................................................... 19

12 C.F.R. § 204.5(a)(2) ................................................................................... 19

**Rules**

Local Rule 83.6(b)(1)..................................................................... 39, 40

**Regulatory Materials**

Guidelines for Evaluating Account and Services Requests,
    86 Fed. Reg. 25,865 (May 11, 2021) (Proposal)............................... 3
    87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice)............... 3
    87 Fed. Reg. 51,099 (Aug. 19, 2022) (Final)............................. 3, 12, 13, 35, 38

Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems,
    50 Fed. Reg. 21,120 (1985) .................................................... 11, 22, 23

**Other Authorities**

126 Cong. Rec. 6250 (1980)......................................................... 24

126 Cong. Rec. 6897 (1980)......................................................... 23

Board of Governors of the Federal Reserve System, Minutes of Board Meeting (July 26, 1945)
    https://fraser.stlouisfed.org/files/docs/historical/nara/bog_minutes/
    19450726_Minutes.pdf ............................................................ 9

Board of Governors of the Federal Reserve System, Federal Reserve Bulletin (February 1964)
    https://fraser.stlouisfed.org/title/federal-reserve-bulletin-62/february-1964-21350 ......... 10

Chester Morrill, Secretary, Board of Governors of the Federal Reserve System, *Nonmember Bank Clearing Accounts*, Letter X-9187 (April 26, 1935), https://fraser.stlouisfed.org/
    archival-collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill
    -re-nonmember-bank-clearing-accounts-505912........................................ 8, 9

Dan Awrey, *Unbundling Banking, Money, and Payments*,
    110 Geo. L.J. 715 (2022) ....................................................... 24

Department of the Treasury, National Money Laundering Risk Assessment (Feb. 2022),
    https://home.treasury.gov/system/files/136/2022-National-Money-Laundering-
    Risk-Assessment.pdf............................................................. 32

Federal Deposit Insurance Corporation, *The Banking Crises of the 1980s and Early 1990s: Summary and Implications*, https://www.fdic.gov/bank/historical/history/3_85.pdf ....... 32

Federal Reserve Bank Operating Circular 1, Account Relationships
    (Sept. 1, 2023) https://www.frbservices.org/binaries/content/assets/crsocms/resources/
    rules-regulations/090123-operating-circular-1.pdf......................................... 12

Federal Reserve Bank Operating Circular 1, Account Relationships
(Jan. 2, 1998) web.archive.org/web/20000116011948/http://www.frbservices.org/
Industry/pdf/Oc1.pdf............................................................................................ 11, 12, 23

Federal Reserve Board, *Interstate Branching: New Account Structure*,
https://www.federalreserve.gov/generalinfo/isb/qanda.htm ............................................... 7

Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems*
(2022 draft) (ECF No. 160-1) ............................................................................................ 26

Lawrence E. Filson & Sandra L. Strokoff,
The Legislative Drafters Desk Reference § 22.10 ...................................................... 17, 18

Morgan Ricks, Professor, Expert Report (Dec. 4, 2023) ......................................................... 31, 32

Office of the Comptroller of the Currency, OCC Interpretive Letter No. 1082,
2007 WL 5393636 (May 17, 2007)...................................................................................... 3

Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that Legal?*
(Nov. 14, 2018) https://www.brookings.edu/research/the-fed-wants-to-veto-state-
banking-authorities-but-is-that-legal/ ............................................................................... 25

William P. Statsky, Legislative Analysis and Drafting 177 (2d Cir. 1984)................................... 17

## INTRODUCTION

Custodia's extraordinary contention in this case is that Federal Reserve Banks are statutorily prohibited from assessing their counterparties for risks of any kind. This position is entirely untenable and there is no evidence that Congress intended such an anomalous result through the Monetary Control Act ("MCA") or otherwise. Neither the plain text of the statute nor its purpose—to improve the Federal Reserve's control of the money supply—requires Reserve Banks to ignore risks to themselves, the public, the financial system, or the economy in deference to any individual institution. Reserve Banks necessarily assess risk in their provision of accounts and services to both member and non-member institutions and Custodia's contrary contention defies law, reason, and longstanding historical precedent.

Among the mandates assigned by Congress to the Federal Reserve System are the preservation of financial stability and the implementation of national monetary policy. The Federal Reserve is of course also responsible for ensuring the safety and soundness of Reserve Banks, which serve as the operating arms of the nation's central bank and jointly operate a federal payments system. By Congressional design, these responsibilities rest within the Federal Reserve System and not with any individual state, territory, or financial institution. Nothing about the ability of states or territories to charter depository institutions, or Congress's broadening of access to Reserve Bank accounts and services as a general matter, alters this result. The recent expansion of novel charters and institutions—some that have inadequate money laundering controls or threaten the implementation of national monetary policy contrary to any conceivable understanding of Congressional intent in the MCA—renders the Federal Reserve's risk-assessment responsibilities more important, not less, and the recent formalization

of policies and procedures to address these issues within the central bank should not be surprising.

Because Custodia has staked its Administrative Procedure Act ("APA") claim on a phantom proscription against counterparty risk assessment by Federal Reserve Banks that would have grave consequences and was unintended by Congress—and in so doing has conspicuously and tellingly forsaken any challenge to the well-considered, risk-based *reasons* for its account denial—its claim fails as a matter of law.

## STATEMENT OF THE ISSUE

The central question presented for review is whether 12 U.S.C. § 248a imposes a discretionless mandate requiring that a Reserve Bank master account be provided to, and maintained for, each and every depository institution regardless of risk.

## BACKGROUND

As the Court knows, the Federal Reserve System is comprised of the Board, the Federal Open Market Committee ("FOMC"), and twelve Federal Reserve Banks that serve financial institutions within their respective districts. *Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 277 (3d Cir. 2006). As a federal agency and not a bank, the Board has neither the ability nor the statutory authority to receive deposits or carry out activities such as check clearing, wire transfers, automated clearing house ("ACH") services, currency and coin services, or other services appurtenant to the business of banking that Congress has vested in the Reserve Banks. *See, e.g.*, 12 U.S.C. §§ 342, 343, 347, 347c, 347d, 355(1). Thus, the Reserve Banks are responsible for opening, maintaining, and, when appropriate, terminating accounts (and corresponding services) held by depository institutions. *See* 12 U.S.C. § 342; Operating Circular ("OC") 1; 12 U.S.C. § 248a(a) ("Federal Reserve bank services"); *id.* § 248c(3) ("reserve bank master account and services"); *see also Banco San Juan Internacional, Inc. v. Fed. Reserve Bank*

*of N.Y.*, No. 23-cv-6414 (JGK), 2023 WL 7111182, at *1 (S.D.N.Y. Oct. 27, 2023) ("Congress

authorized Federal reserve banks to carry out certain banking functions . . . including the

authority to accept or reject deposits from depository institutions") (citing 12 U.S.C. §§ 341–

361).[1]

The Board routinely issues guidance as part of its general oversight of Reserve Banks,

*see* 12 U.S.C. § 248(j), and did so with respect to Reserve Bank master accounts and services in

August 2022 following two public notice and comment periods spanning fifteen months. *See*

87 Fed. Reg. 51,099, Guidelines for Evaluating Account and Services Requests ("Guidelines")

(Aug. 19, 2022); 87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice); 86 Fed. Reg.

25,865 (May 11, 2021) (Proposal). The Guidelines set forth six principles for use in access

decisions and create a three-tiered review framework that "is meant to serve as a guide to the

level of due diligence and scrutiny to be applied by Reserve Banks to different types of

institutions." 87 Fed. Reg. at 51,109. The Board subsequently issued S-Letter 2677 on January

---

[1] Consistent with the relevant statutory authorities, Reserve Banks necessarily exercise their banking functions with due consideration of attendant risks. *See, e.g.*, 12 U.S.C. § 341 (sixth) (Reserve Bank board of directors responsible for bylaws "regulating the manner in which its general business may be conducted"); § 341 (seventh) (granting Reserve Banks "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter"); § 301 (Reserve Bank board "shall perform the duties usually appertaining to the office of directors of banking associations" and "*may*, subject to the provisions of law and the orders of the Board of Governors of the Federal Reserve System, extend to each member bank such discounts, advancements, and accommodations as *may be safely and reasonably made*" (emphases added)). Notably, the powers of Federal Reserve Banks under the FRA were closely modeled on the powers granted to national banks (which previously served some of the functions of Reserve Banks) under the National Bank Act, *compare, e.g.*, 12 U.S.C. § 24(first)–(seventh cl. 1) *with id.* § 341(first)–(seventh), and the power granted under the latter act "to receive deposits" has likewise been construed as "discretionary." *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 611 (D.S.C. 2015) (quoting OCC Interp. Ltr. No. 1082, 2007 WL 5393636, at *2 (May 17, 2007)); *In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 45 (E.D.N.Y. 2014) (same). Risk assessment and mitigation is a necessary feature of operations at both types of banks.

17, 2023, which implemented the expectation set forth in the Guidelines that "Reserve Banks engage in consultation with" the Board, "as appropriate, to support consistent implementation of the Account Access Guidelines." Pl. Br., Exhibit AS at FRB-AR–14–17, 31.[2]

Custodia submitted its request for a master account to the Federal Reserve Bank of Kansas City ("FRBKC") in October 2020, and later initiated a separate application process to become a member bank of the Federal Reserve System in August 2021. Am. Compl. ¶¶ 21, 47. FRBKC performed a pre-membership examination of Custodia in September 2022 under Board-delegated authority (unlike accounts and services, membership is a Board function, *see* 12 U.S.C. § 321 *et seq.*), and sought additional information from Custodia in October 2022. FRB-AR-1400, 1806. On October 21, 2022, FRBKC bank examiners provided feedback to Custodia from the pre-membership examination. FRB-AR-1204. This feedback also informed the Reserve Bank's master account decision in an effort to reduce burden and avoid duplicative inquiries. FRB-AR-1806. Among other findings, the Reserve Bank examiners "identified numerous exceptions to, or departures from, safe and sound banking practices in Custodia's prospective risk management program compared to the risk management practices that would typically be expected or required." FRB-AR-1204–05.

On January 6, 2023, in an effort to meet the forthcoming S-Letter's expectation to consult with the Board when assessing higher risk entities such as Custodia, *see* Pl. Br., Exhibit AS at FRB-AR-16, FRBKC staff sought the perspective of various subject-matter experts at the Board

---

[2] S-Letters are sequentially numbered letters—*i.e.*, more than 2,600 such letters preceded S-2677—issued by the Board that provide operational guidance to Reserve Banks and have historically covered a range of topics, such as administration, personnel, and financial services. FRBKC Br., Exhibit 16 at 261:13–15, 263:10–14, 292:20–293:14. These letters are commonly incorporated into and consulted internally through the Federal Reserve Administrative Manual. *See, e.g.*, https://www.governmentattic.org/33docs/FRS-FRAM_2001-2010.pdf (excerpts).

on a memo it had drafted recommending denial of Custodia's master account request. *See* Pl. Br., Exhibit BQ. Board staff provided suggestions for consideration on January 9 and 10. Pl. Br., Exhibits BQ, BS, BY, BZ. After considering this feedback, and consistent with the process set forth in the S-Letter, FRBKC sent the Board Reserve Bank Operations and Payment Systems ("RBOPS") Division Director an email sharing its final analysis of Custodia's master account request. FRB-AR-3–13. In response, on January 26, 2023, the RBOPS Division Director wrote to the FRBKC President that: (1) the Reserve Bank's consultative approach was consistent with S-Letter 2677; (2) "Board staff have reviewed the Reserve Bank's record documenting application of the Guidelines in evaluating the access request;" and (3) the Board had "no concerns with the Reserve Bank moving forward with its plan to communicate to Custodia Bank its decision to deny the request for a master account and access to services." Pl. Br., Exhibit CC at FRB-AR-2. On January 27, 2023, the Board issued a detailed decision denying Custodia's application for Federal Reserve membership due to various failures to satisfy established membership criteria. *See* FRB-AR-153. Soon after, FRBKC informed Custodia of its decision to deny the master account request along with a written explanation of the reasons for its decision. Pl. Br., Exhibit CF. These reasons for FRBKC's account denial, s*ee id.* & FRBKC Br., stand unchallenged.

## STANDARD OF REVIEW

When agency action is challenged under the APA, "[t]he entire case on review is a question of law, and only a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *State of Utah v. Babbitt*, 137 F.3d 1193, 1207 n.20 (10th Cir. 1998). "[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

Custodia's APA claim asks only whether the Board has acted "in excess of statutory . . . authority" under 5 U.S.C. § 706(2)(C), *see* Pl. Br. at 31, and Custodia has elected not to pursue an "arbitrary and capricious" challenge to the reasons for its account denial under § 706(2)(A). *See generally id.* (declining to raise arbitrary and capricious standard or lodge any arguments challenging the reasons for its account denial); *Am. Petroleum Inst. v. DOI*, 81 F.4th 1048, 1058 n.5 (10th Cir. 2023) (noting that arguments under a specific subsection of § 706(2) had been waived "by inadequately developing an argument grounded in that provision in its opening brief"); Order Denying State of Wyo.'s Mot. For Permission to Intervene, ECF 162 at 5 (May 17, 2023) (denying intervention because it would "unnecessarily expand this case *from statutory construction* to one that involves what the Defendants are allowed to consider," and that "the Court need only address the potential of a *mandatory duty*" (emphases added)).

## ARGUMENT

## I.   Federal Reserve Banks Retain the Necessary Discretion to Deny or Restrict Access to Master Accounts and Services

### A.   Reserve Banks Have Always Assessed Risks When Providing Accounts and Services to Depository Institutions

Since the passage of the Federal Reserve Act ("FRA") in 1913, and continuing after the enactment of the MCA in 1980, the Federal Reserve Banks have considered risk in providing their banking services. While Custodia premises its argument on the concept of "access" or "availability" (Pl. Br. at 33–49), Custodia does not—and cannot—establish that such "access" to or "availability" of banking services has ever equated to an absolute, non-discretionary requirement that Reserve Banks provide accounts and services to all requesting institutions, regardless of risk. This extraordinary position defies common sense, the historical record, the text of the statute, and the expectations of Congress.

1.    **Reserve Banks consistently exercised discretion over access to accounts and services between 1913 and 1980**

Since the enactment of the FRA, the Federal Reserve Banks have exercised discretion in granting access to Reserve Bank accounts and services. This longstanding exercise of discretion is rooted in Congress's general grant of banking authority to Reserve Banks, *see supra* at 2-3 & n.1, as well as Section 13 of the FRA, which stated from its enactment in 1913 that Federal Reserve Banks "*may* receive" deposits from "member banks." Pub. L. No. 63-43, 38 Stat. 251, 263 (currently codified at 12 U.S.C. § 342) (emphasis added). State-chartered banks became "members" of the Federal Reserve System by "mak[ing] application to the reserve bank organization committee, and thereafter to the Federal Reserve Board for the right to subscribe to the stock of the Federal reserve bank organized or to be organized within the Federal reserve district where the applicant is located," and the Federal Reserve could decide membership based upon "such rules and regulations as it may prescribe." Pub. L. No. 63-43, § 9, 38 Stat. at 259 (currently codified at 12 U.S.C. § 321). In 1917, Congress amended Section 13 to allow limited deposit-taking accounts "solely for the purposes of exchange or collection" from "any nonmember bank or trust company." Pub. L. No. 65-25, § 4, 40 Stat. 232, 234-35.[3]

In 1923, the Supreme Court had occasion to opine on the language in Section 13 regarding check collection, and held that the language granted Reserve Banks discretion.

---

[3] These limited "exchange or collection" accounts established at Reserve Banks pursuant to Section 13 were referred to as "clearing accounts." Beginning in 1998, the Federal Reserve no longer used the term "clearing account" and incorporated these accounts into its revised "master account" structure. *See* Federal Reserve Board, *Interstate Branching: New Account Structure*, *available at* https://www.federalreserve.gov/generalinfo/isb/qanda.htm ("All credits and debits resulting from the use of Federal Reserve services will be booked to this one account."). This unified account structure was made possible by the MCA's revision of FRA Section 13 to permit general deposit accounts for non-member depository institutions.

Specifically, in interpreting Section 13's language that a Reserve Bank "may receive from any nonmember bank . . . deposits of checks . . . payable upon presentation," the Court rejected an argument that "the Federal Reserve Bank of Richmond is obliged to receive for collection any check upon any North Carolina state bank." *Farmers & Merchs. Bank v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 662 (1923). The Court noted that Congress had from time to time enlarged "[t]he class of cases" to which the Reserve Banks' authority to receive checks applied, "[b]ut in each amendment, as in section 13, the words used were 'may receive'—words of authorization merely." *Id*. The Court further observed that the FRA "appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the [B]oard and the Reserve Banks 'shall' do and what they 'may' do." *Id.* at 663. The Court listed twenty-one provisions of the original FRA where both "may" and "shall" were used, and another seven where only "shall" was used, to illustrate the precision Congress took in distinguishing actions the Board or Reserve Banks were allowed to take from those they were required to take. *Id.* at 663 n.6.

In 1935, a Reserve Bank raised with the Board "a question of policy with respect to the circumstances and conditions under which clearing accounts of nonmember banks should be accepted under the authority of Section 13 of the Federal Reserve Act." Chester Morrill, Secretary, Bd. of Governors of the Fed. Reserve Sys., Letter X-9187 (Apr. 26, 1935), at 365.[4] The Board surveyed Reserve Banks, and many reported that they declined to open such accounts in various circumstances. For example, the Federal Reserve Bank of Dallas reported that "in considering an application from a nonmember bank to become a clearing member we simply

---

[4] *Available at* https://fraser.stlouisfed.org/archival-collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-nonmember-bank-clearing-accounts-505912.

weigh all the facts." *Id.* at 371. The Federal Reserve Bank of Minneapolis similarly indicated that it did not automatically open clearing accounts for all nonmember banks: "We have received a number of requests recently to open accounts for non-member banks for the purpose of depositing idle funds with us. . . . We have not accepted these accounts and have endeavored to restrict the accounts to active non-member clearing accounts." *Id.* at 369. And the Federal Reserve Bank of Philadelphia stated that, while it had opened accounts for nonmembers in the past, it had stopped doing so. The Board in no way required that Reserve Banks open these accounts and acknowledged that such decisions were left to the discretion of the Reserve Banks, stating "it is the Board's view that requests for the establishment of clearing accounts by non-member banks should be passed upon by your directors *in the light of all the circumstances surrounding each application*." *Id.* at 366 (emphasis added).

In 1945, the Board was asked by The Peoples Savings Bank in Iowa for a definition of a "nonmember clearing account." Minutes of Board Meeting of July 26, 1945, at 2.[5] The Board unanimously approved a response stating that Section 13 of the FRA "reasonably define[s]" the term, and "the Board has never found it necessary to further define it." *Id.* The Board further indicated that it "has not prescribed specific conditions or requirements which should or should not be made by a Federal Reserve Bank in connection with the opening and maintenance of nonmember clearing accounts," but that a Federal Reserve Bank can "*in its discretion* accept[] such an account." *Id.* at 3 (emphasis added). In a similar vein, in 1964 the Federal Reserve Board received an inquiry about whether branches of foreign banks and private banks were "nonmember banks" eligible to open clearing accounts at Reserve Banks pursuant to Section 13.

---

[5] *Available at* https://fraser.stlouisfed.org/files/docs/historical/nara/bog_minutes/19450726_ Minutes.pdf.

*Federal Reserve Bulletin* (Feb. 1964), at 168–69.[6] In response, the Board noted that these entities

engaged in banking activities like those typically performed by commercial banks and were

subject to supervision of state banking regulators. *Id.* Accordingly, the Board concluded that a

foreign bank branch or a private bank was a "nonmember bank" eligible for a clearing account*,*

but cautioned that *the opening of such accounts was subject to the "discretion" of the Federal*

*Reserve Bank* whose district encompassed the institution. *Id.*

Thus, from the earliest days of the Federal Reserve, the provision of accounts and

services was an exercise vested to the Federal Reserve's discretion. And the Supreme Court

validated early on that, in the various places where Congress used permissive language in the

FRA, including in Section 13, this language merely provided an *authorization* rather than a

requirement.

  2. **Reserve Banks have continued to exercise discretion over accounts**
    **and services for all institutions between the enactment of the**
    **Monetary Control Act in 1980 and the present**

The Federal Reserve's exercise of discretion to protect the financial system did not

change following the enactment of the MCA in 1980. To facilitate its goal of restoring Federal

Reserve control over the money supply, the MCA amended Section 13 to authorize Reserve

Banks to open deposit accounts for nonmember depository institutions and provided for a pricing

schedule in Section 11A under which corresponding Reserve Bank services would "be made

available to non-member depository institutions *at the same fees charged member banks*." *Jet*

*Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983)

(emphasis added). The MCA in no way altered the discretion granted Reserve Banks in Section

---

[6] *Available at* https://fraser.stlouisfed.org/title/federal-reserve-bulletin-62/february-1964-21350.

13, and in the wake of its passage Reserve Banks continued to consider risk in making decisions about access to accounts and services.

For example, in 1985, the Federal Reserve adopted policies on overdrafts that limited some depository institutions' ability to send payments via Fedwire. *See Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems*, 50 Fed. Reg. 21,120 (1985). In the ordinary course of their businesses, banks may incur negative balances in their master accounts when processing funds transfers on behalf of their customers. The Federal Reserve was concerned "that a participant could be unwilling or unable to settle a large net debit position," and noted that "[a] failure of one participant to settle could seriously jeopardize the financial positions of its net creditors on that network, with serious repercussions spreading from those participants to their creditors." *Id.* at 21,121. To limit the risk of overdrafts, the Federal Reserve validated that each Reserve Bank had the power "to reject funds transferred" when those transfers "expose[d] the Reserve Bank to excessive risk." *Id.* at 21,124. And in certain cases, a Reserve Bank could "prohibit [an institution] from using Fedwire." *Id.* Thus, an institution's "access" to this Federal Reserve service, which is among those listed in section 248a, was explicitly conditioned on risk in accordance with the authority provided by Congress in the FRA.

In 1998, the Federal Reserve Banks began issuing circulars governing the relationship between a Reserve Bank and a master account holder. These circulars make clear that a master account involves a contract between a depository institution and the Reserve Bank and that the Reserve Bank can terminate the relationship at any time. For example, the 1998 OC-1 "establish[es] the terms for opening, maintaining, and terminating master accounts with the

Federal Reserve Bank." Operating Circular 1, Account Relationships (Jan. 2, 1998) ¶ 1.1.[7] In addition, the Circular states that "*[a]ll master accounts* are subject to Reserve Bank approval," *without distinguishing between member or non-member banks*, and notes that the Reserve Bank "may close your master account . . . at any time but will endeavor to give at least five business days' prior notice." *Id.* ¶¶ 2.3, 2.8. Both of these provisions are substantively similar to the comparable provisions in the most recent operating circular, reflecting the longstanding practice in which decisions about all master accounts are made by Reserve Banks based on their exercise of discretion. *See* Operating Circular 1, Account Relationships (Sept. 1, 2023) ¶¶ 1.0, 2.6, 2.10.[8]

More recently, the growth of novel charters and rise of uninsured depository institutions led the Federal Reserve Board to establish more formalized processes to manage risk through its Guidelines and implementing S-Letter. *See supra* at 3. Consistent with 12 U.S.C. § 342, the Board's Guidelines continued to "make clear that legal eligibility does not bestow a right to obtain an account and services." 87 Fed. Reg. at 51,106. Rather, the Board emphasized that "Reserve Banks . . . retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." *Id.* at 51,102. The Board emphasized that, even when access is

---

[7] *Available at* web.archive.org/web/20000116011948/http://www.frbservices.org/Industry/pdf/Oc1.pdf.

[8] *Available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf. Notably, Federal Reserve Operating Circulars have been expressly incorporated into the Uniform Commercial Code and Wyoming law. *See, e.g.*, U.C.C. § 3-102(c) & Wyo. Stat. § 34.1-3-102(c) (noting, with respect to negotiable instruments, that "[r]egulations of the Board of Governors of the Federal Reserve System and operating circulars of the Federal Reserve Banks supersede any inconsistent provision of this Article to the extent of the inconsistency"); U.C.C. § 4A-107 & Wyo. Stat. § 34.1-4.A-107 (same with respect to funds transfers); U.C.C. § 4-103(b) & Wyo. Stat. § 34.1-4-103(c) (noting, with respect to bank deposits and collections, that "[a]ction or non-action approved by this Article or pursuant to Federal Reserve regulations or operating circulars" constitutes "the exercise of ordinary care").

granted, the Reserve Bank "may impose (at the time of account opening, granting access to service, or any time thereafter) obligations relating to, or conditions or limitations on, use of the account or services as necessary to limit operational, credit, legal, or other risks posed to the Reserve Banks, the payment system, financial stability or the implementation of monetary policy or to address other considerations." 87 Fed. Reg. at 51,106–07. However, "[i]f the obligations, limitations, or controls are ineffective in mitigating the risks identified or if the obligations, limitations, or controls are breached, the account-holding Reserve Bank may further restrict the institution's use of accounts and services or may close the account." *Id.* at 51,107.

In sum, as the historical record makes clear, Reserve Banks have always exercised discretion to make risk-based account and services decisions in furtherance of the stability of the U.S. financial and payment systems. It could hardly be otherwise. And as the iterations of OC-1 have long made clear with respect to master accounts in particular, Reserve Banks must first approve, and retain the authority to close, these accounts *for all member and non-member banks alike*. Custodia's contention that *it* has a non-discretionary right to a master account and corresponding services, *when member banks have no such right*, lays bare the utter implausibility of the statutory construction it urges upon the Court.

### B.  The Monetary Control Act of 1980 Did Not Eliminate Reserve Bank Discretion

Although Custodia relies exclusively on the MCA to support its claim, the Federal Reserve Banks' long-standing and common-sense consideration of risk in connection with their account decisions is entirely consistent with the MCA, which does not impose a duty, much less "a clear duty," *cf.* Pl. Br. at 31, that they grant master accounts to all depository institutions. The plain text of 12 U.S.C. § 248a merely obliges the Board to establish *a fee schedule* for Reserve Bank services. Neither the text of section 248a nor any other part of the MCA mandates the grant

of a master account or limits Reserve Banks' discretion over such accounts. The extra-statutory authorities that Custodia cites do not compel a different result. And the recent decision in *Banco San Juan* persuasively demonstrates why the statutory text does not mandate granting an account.

>   **1.      Section 248a's plain text does not grant Custodia a right to a master account**

Custodia rests its case on 12 U.S.C. § 248a, which states:

*Pricing of services*

*(a)      Publication of pricing principles and proposed schedule of fees; effective date of schedule of fees*

>   [T]he Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and . . . the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.
>
>                                             . . .

*(c)      Criteria applicable*

>   The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>
>   (1)      All Federal Reserve bank services covered by the fee schedule shall be priced explicitly.
>
>   (2)      All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.
>
>   (3)      Over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred . . . .
>
>   (4)      Interest on items credited prior to collection shall be charged at the current rate applicable in the market for Federal funds.

12 U.S.C. § 248a(a), (c). Section 248a thus states that the Board must publish pricing principles for services and must publish a fee schedule based on these principles, and that this schedule must be based on enumerated principles. Specifically, in setting the fee schedule the Board must take into consideration, *inter alia*, that Reserve Banks would be accepting deposits from, and offering corresponding services to, a larger universe of institutions that included nonmember depository institutions in accordance with the authorization in the MCA's modification of section 342.[9] The provision does not, as Custodia claims, "unambiguously command[]" Defendants to grant access to services covered by 'the fee schedule' to every 'nonmember depository institution[],'" Pl. Br. at 35, as underscored by the fact that no such requirement exists as to member banks.

Moreover, the statute's text provides other indicia that the actions it mandates solely concern pricing. As an initial matter, section 248a's title, which was enacted by Congress, MCA, Pub. L. No. 96-221, § 107, 94 Stat. 132, 141, indicates that its purpose is to control "*[p]ricing of services.*" *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (section headings "supply cues as to what Congress intended" (citation omitted)). Additionally, the section's sole reference to availability of services is in subparagraph (c)(2), which is part of a list of what the statute indicates are pricing principles. The list is preceded by "[t]he schedule of fees . . . shall be based on the following principles," followed by a colon. 12 U.S.C. § 248a(c). When a list is preceded by such prefatory language and a colon, this language limits the scope of what follows. *See e.g.*, *Andresen v. Maryland*, 427 U.S. 463, 481 (1976) ("[An item in] a series that

---

[9] Such a reading requiring the fee schedule to account for the use of services by nonmember institutions clearly leaves the reference to Reserve Bank services being "available to nonmember depository institutions" as more than mere surplusage, contrary to legislative amici's contention. *Cf.* Legislator Amicus Br. at 8.

follows [a colon] is limited by what precedes that colon"); *7-Eleven, Inc. v. Nat'l Union Ins. Co. of Pittsburgh, Pa.*, 33 F. App'x 703, at * 5 (5th Cir. 2002) ("[A colon preceding a list] tells [readers] that everything following the colon will deal exclusively with [what precedes it]."). And the other items in the list relate solely to pricing, 12 U.S.C. § 248a(c)(1), (3)–(4), further indicating that section 248a(c)(2) concerns pricing rather than access. *In re McDaniel*, 973 F.3d 1083, 1098 (10th Cir. 2020) (applying the canon of *noscitur a sociis* to construe a phrase in a list based on its "common quality" with other list items).

The MCA also amended section 342 by adding "or other depository institution" after "member banks" to those entities from which Reserve Banks "may" accept deposits, MCA § 105(a)(l), 94 Stat. 132, and notably did not change the "may" to "shall." Its failure to use this obvious language to mandate access further indicates that the MCA-enacting Congress did not intend to require Reserve Banks to accept deposits from all banks in all circumstances. *Cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 494 (1991) (construing a statute narrowly where Congress "could easily have used broader statutory language" but did not do so).

Moreover, even if subsection 248a(c)(2) were somehow construed to be a mandate concerning access to services, it would not guarantee Custodia a master account because it does not make a reference to granting access to *all* depository institutions. Instead, subsection 248a(c) uses, in the same sentence, the word "[a]ll" in relation to the services it covers, but not to the institutions that might access these services. 12 U.S.C. § 248a(c) ("All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions"). "When Congress includes particular language in one section of a statute but omits it in another— let alone in the adjoining provision—courts presume that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (cleaned up). This presumption

"applies with particular force" if the inclusion and omission occur "in close proximity—indeed [as here], in the same sentence." *DHS v. MacLean*, 574 U.S. 383, 392 (2015). The statute's text thus indicates that it at most concerns provision of "*all* Reserve bank services" to nonmember banks *as a class*, not to all banks in that class.[10] Indeed, the Tenth Circuit made this point in a recent controlling decision. *See Nelson v. United States*, 40 F.4th 1105, 1115 (10th Cir. 2022) ("The rule against surplusage . . . counsel[s] us to construe 'any statute,' in [28 U.S.C.] § 2412(b), in a different and broader manner than the provision's initial, unadorned reference to 'statute' in order to give meaning to the term 'any.'"). Custodia's reliance on Judge Bacharach's prior *Fourth Corner* opinion to argue otherwise, Pl. Br. at 35–36, is misplaced given the Tenth Circuit's subsequent ruling in *Nelson* that expressly addressed the use and omission of a qualifier comparable to "all" in the same statutory provision.[11] Moreover, the MCA's failure to include

_____

[10] The fact that the MCA only amended section 342 to *allow* Reserve Banks to accept deposits from nonmember banks, rather than to order that they "shall" do so, is also consistent with reading it as authorizing the provision of services to nonmembers as a class, without mandating that such services be provided to any individual institution.

[11] Unlike *Nelson*, Judge Bacharach's concurring opinion—which discussed this issue but failed to account for the initial "all"—is not binding precedent in the Tenth Circuit. *Banco San Juan*, 2023 WL 7111182, at *8 ("Judge Bacharach's opinion is neither controlling (even in the Tenth Circuit), nor persuasive."); *accord Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) (a statement in a concurrence does not "constitute[] binding precedent"). And the extra-circuit cases Custodia cites are readily distinguishable. In *Gares v. Willingboro Township*, 90 F.3d 720 (3d Cir. 1996), the court construed a statute awarding punitive damages to "prevailing plaintiffs" as applying to all plaintiffs, but relied on another provision in the same statute expressly making "punitive damages . . . available to *all* persons." *Id.* at 726 (emphasis in original) (citations omitted). Moreover, the statute at issue in both *Gares* and *Western Minnesota Municipal Power Agency v. FERC*, 806 F.3d 588 (D.C. Cir. 2015), did not use "all" in the same sentence as the term at issue. One treatise has not been published since 1984 and has been cited in only one federal case available on Westlaw, and that was in Judge Bacharach's opinion in *Fourth Corner*. Even still, that treatise cautions that drafters of statutes must "[b]e consistent and uniform in the use of language" and "[v]ariation for the sake of variation has no place in drafting." William P. Statsky, *Legislative Analysis and Drafting* 177 (2d Cir. 1984). The other treatise does not discuss the word "all" in the section cited by Custodia. Lawrence E. Filson & Sandra L. Strokoff, *The Legislative Drafters Desk Reference* § 22.10

"all" before "depository institutions" in § 248a(c) contrasts with use of express language elsewhere in the MCA where Congress *did* intend to make a universal mandate applicable to all depository institutions. Specifically, as legislative amici acknowledge, the MCA's universally-applicable "reserve requirement is unambiguous—it applies to 'each depository institution.'" Legislator Amicus Br. at 9 (quoting 12 U.S.C. § 461(b)(2)).

Lastly, by expressly providing that "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks," section 248a(c)(2) itself importantly recognizes that there is no categorical right to access Reserve Bank services. Rather, as shown above, Reserve Banks appropriately exercise discretion with respect to their provision of accounts and services to member banks as well as to non-member banks, consistent with the authority granted to them by Congress in the FRA.

### 2. The MCA did not limit discretion granted under section 342

Custodia no longer presses its prior argument, based on Judge Bacharach's plainly erroneous reading, that section 342 only provides for Reserve Bank discretion as to which *monetary instruments* to accept, rather than discretion as to which *institutions* to take such deposits from.[12] Instead, it now admits as it must that "Section 342 speaks to which entities may

(discussing terms "a," "an," "any," "each," and "every"). And while Custodia cites a provision of Pennsylvania law for the proposition that "[d]rafters of statutes are often cautioned not to freely use 'all'" (Pl. Br. at 36 (citing 101 Pa. Code § 15.142(c)), that proposition supports the Board because the drafters of the MCA acted consistent with that guidance—choosing not to "freely" use the word "all" and instead only using it in one part of section 248a(c)(2) and not the other.

[12] *See* ECF 135 at 18 ("[section] 342 has consistently been interpreted as relating to Reserve Bank's discretion over the types of monetary instruments to accept"). Undeterred by Custodia's abandonment, legislative amici continue to press this argument, *see* Legislator Amicus Br. at 10, which ignores the use of the permissive "may" in section 342 with respect to both whom the Reserve Banks "may" accept deposits from and what deposits they may accept. *See* 12 U.S.C.

make deposits with a Reserve Bank"—a precondition to corresponding services—but contends that reading section 342 "in harmony" with section 248a and section 461, as amended by the MCA, requires narrowing the discretion that section 342 gives Reserve Banks. Pl. Br. at 36–37. This yet again disregards statutory text.

First, section 461 does not conflict with a reading allowing Federal Reserve Banks to determine whether to allow depository institutions to open master accounts. The section's mandate to keep reserves can be satisfied by the common practice of maintaining reserves in another depository institution's account. 12 U.S.C. § 461(c)(1)(B); 12 C.F.R. § 204.5(a)(2).[13] Section 248a similarly does not conflict with reading section 342 as granting discretion. As explained in part B.1, *supra*, section 248a's plain text indicates in multiple ways that its only mandates concern pricing. Since its text does not support, much less compel, a broader reading modifying section 342, such a reading is disfavored. *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1156 (10th Cir. 2019) (a later statute modifies an earlier act "only to the extent necessary to avoid the irreconcilable conflict or inconsistency" (citations omitted)).

Moreover, Custodia's claim that the MCA imposes a requirement that Reserve Banks "shall" grant it a master account is an argument for implied repeal of section 342's permissive language, since "[t]he ordinary meaning of 'shall' is the opposite of 'may,'" *W. Minn. Mun. Power Agency*, 806 F.3d at 592, and *Farmers & Merchants* held that such was the meaning of

---

§ 342 ("Any Federal reserve bank *may* receive *from* [specified classes of depositors] deposits *of* [specified monetary instruments]." (emphases added)).

[13] Reserves may also be kept in vault cash, 12 U.S.C. § 461(c)(1)(A)(i); 12 C.F.R. § 204.5(a)(1), an option first available at the time the FRA was passed in 1913. Federal Reserve Act of 1913, Pub. L. No. 63-43, ch. 6, § 19, 38 Stat. 251, 270.

"may" as used in section 342.[14] While legislative amici make the extraordinary claim that "it is

an open question whether the Supreme Court's interpretation of § 13/342 . . . should be accorded

the full measure of precedential weight" because they contend the Court reached the wrong

result, Legislator Amicus Br. at 15–16, the Court has made clear that "*[o]ur* decisions remain

binding precedent until *we* see fit to reconsider them . . . ." *Hohn v. United States*, 524 U.S. 236,

252–53 (1998) (emphases added).

"Clear legislative intent" is required to repeal this grant of discretion in the earlier statute,

so even language "not entirely harmonious with an earlier [statute]" would be insufficient to

meet the "high bar" required to demonstrate an implied repeal. *United States v. Allen*, 983 F.3d

463, 471 & n.3 (10th Cir. 2020) (citations omitted). Also, as previously noted, the MCA

amended section 342 without changing "may" in that section to "shall." Congress' decision to

amend section 342 without modifying language that *Farmers & Merchants* construed as

permissive is a strong indication of its intent to retain this construction rather than overrule it.

*Custis v. United States*, 511 U.S. 485, 500 (1994) (citing *Herman & MacLean v. Huddleston*,

459 U.S. 375, 385–86 (1983)).

Finally, even if section 248a were susceptible to a reading mandating that Reserve Banks

must grant all requests for master accounts, that reading would be disfavored because the more

specific statute is section 342. This section governs Reserve Bank deposits (and by extension

Reserve Bank deposit accounts and corresponding services) and is in the FRA subchapter on the

---

[14] 262 U.S. at 662–63. Legislative amici argue that *Farmers & Merchants* acknowledged that "may" need not imply discretion in certain contexts, Legislator Amicus Br. at 10, but the Supreme Court rejected the argument in *this* context, holding that both *section 342 and the FRA as a whole* did not present "[a] context [that] compels such a construction [because t]hroughout the Act, the distinction is clearly made between what the Board and the reserve banks 'shall' do and what they 'may' do." 262 U.S. at 662–63.

"Powers and Duties of Reserve Banks," as opposed to section 248a, which does not mention

deposits and is in the FRA subchapter concerning *the Board*, which indisputably does not open

or provide Reserve Bank accounts or services. *Cf. Kay Elec. Co-op. v. City of Newkirk, Okla.*,

647 F.3d 1039, 1044 (10th Cir. 2011) ("a specific statute controls over a general one"); *see also*

*Carroll v. Logan*, 735 F.3d 147, 152 (4th Cir. 2013) (a provision in Chapter 13 of the Bankruptcy

Code was the more specific provision in the context of a proceeding governed by that chapter);

*Banco San Juan*, 2023 WL 7111182, at *8 ("If Congress intended to require Federal reserve

banks to provide specific services, the direction would reasonably have been found in the section

dealing with the duties and powers of Federal reserve banks and not in the section dealing with

fee schedules set by the Board.").

### 3.    Custodia cannot bootstrap its favored reading onto the MCA's plain text by resorting to generalized statements and other extra-statutory sources

Custodia also attempts resort to extra-statutory authorities such as statements by Federal

Reserve personnel, individual legislators, and academics. Pl. Br. at 38–45, 46–48. But such

sources cannot be used to overcome the plain text of the statute as construed based on traditional

tools of statutory interpretation. *See*, *e.g.*, *Nelson*, 40 F.4th at 1116–17; *United States v. Sturm*,

673 F.3d 1274, 1279 (10th Cir. 2012). And the authorities Custodia cites do not support a

different result.

First, Custodia cites statements from the Board's webpage, individual Board staffers, and

elsewhere to argue that the Board's "interpretation [of the MCA] is 'entitled to considerably less

deference," Pl. Br. at 38–39, as well as statements by various Reserve Bank constituents that it

contends support its position. *Id.* at 38–41. As a threshold matter, these statements are ambiguous

at best or consistent with Reserve Banks' undisputed post-MCA *ability* to provide accounts and

services to nonmember banks *as a class*, subject to equitable pricing conditions, rather than a *mandate* to provide accounts and services to each and every such bank regardless of individual bank risk. *See, e.g.*, *id.* at 39 (MCA requires the "Federal Reserve to provide its services to all depository institutions *on an equitable basis*" (emphasis added)); *id.* at 40 ("[T]he services provided by the Federal Reserve Bank . . . will become directly available to *many more* financial institutions.  The Monetary Control Act also *requires that these services be priced explicitly*." (emphasis added) (quoting FRBKC Annual Report (1980–82)).[15] Notably, not one of these statements speaks of eliminating the Reserve Banks' longstanding discretion over access to their accounts and services by those authorized by law to obtain them.

Moreover, as explained above, the Board bases its interpretation on the plain text of the MCA. As a result, the ambiguous statements on which Custodia relies do not call into question the deference that the Board's reasonable interpretation in the Guidelines invites. *See Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood, Corp.*, 439 U.S. 234, 251 (1978); *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 70 (D.D.C. 2014) (guidance "deserve[s] considerable deference" when, as here, the agency uses a "highly formal process,' including "notice[s] in the Federal Register," "accept[ing] public comments," engaging in lengthy "deliberation," and then "publish[ing] a proposed [set of guidelines] for further comment"). And other more formal guidance, including that issued near in time to the enactment of the MCA, as well as all versions of Operating Circular 1, which expressly sets out the guidelines for provision of Reserve Bank services, has long contained statements making clear that no bank or depository institution has an absolute right to a master account or services. *See, e.g.*, *Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems*, 50 Fed. Reg. 21,120, 21,122, 21,124 (1985) (providing for

---

[15] As Custodia concedes, this is something that the Fed itself requested. *See* Pl. Br. at 43.

Reserve Bank "elimination of access to daylight overdrafts" and rejection of fund transfers by institutions that "expose the Reserve Bank to excessive risk"); 1998 OC-1 at ¶¶ 2.3, 2.6 ("*[A]ll master accounts* are subject to Reserve Bank approval . . . . [W]e may close your master account . . . at any time but will endeavor to give you at least five business days' prior notice." (emphasis added)). The various administrative statements Custodia cites could not entitle it to an account that the *statute* itself does not guarantee.

Second, Custodia cites to floor statements, testimony, and other portions of the MCA's legislative history (and even legislative history from a subsequent Congress). Pl. Br. at 41–45. But its divergent collection of excerpts of unenacted text hardly shows that the MCA imposes a universal access mandate that its own text does not impose. *Cf. NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("floor statements by individual legislators rank among the least illuminating forms of legislative history"); *Edwards v. Valdez*, 789 F.2d 1477, 1481 n.6 (10th Cir. 1986) ("The proper function of legislative history is to solve, and not create, ambiguity." (citation omitted)). In fact, the floor statement Custodia cites regarding "access to Fed services," *see* Pl. Br. at 43–44 (citing 126 Cong. Rec. 6897 (1980) (Statement of Sen. William Proxmire)), demonstrates the dangers of relying on such unenacted text to alter the meaning of the enacted statute; elsewhere, the same statement discusses in some detail an eight-year period to implement section 248a that is also unanchored in the statute's text. *See* 126 Cong. Rec. 6897 (1980) (Statement of Sen. William Proxmire) ("After the 8-year period there will be no differences . . . in access to Fed services, but until then it is likely that there will be differences. The final judgment on just what those differences will be is left to the Federal Reserve."). Moreover, the full excerpt of the conference report cited by Custodia says nothing about eliminating existing discretion (as with all of the public statements on which Custodia relies) and also treats section

248a as a provision governing "*Pricing* of Federal Reserve Services." And while it mentions opening services to all institutions, it does so in the same breath with *"on the same terms and conditions" as member banks*, rather than including a standalone requirement of (discretionless) access. 126 Cong. Rec. 6250 (1980) (emphases added). Thus, the legislative history cited by Custodia is consistent with the Board's reading and is hardly compelling support for its position. *Cf. Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("We will not [allow] ambiguous legislative history to muddy clear statutory language.").

Third, Custodia invites the Court to abdicate its judicial role and defer to the opinions of its paid expert, Professor Conti-Brown, and to Professor Julie Hill. As an initial matter, there is no academic consensus favoring Custodia. *See, e.g.*, Dan Awrey, *Unbundling Banking, Money, and Payments*, 110 Geo. L.J. 715, 746 (2022) ("[E]ven within th[e] relatively narrow universe of eligible institutions, the Fed has considerable discretion to impose further access restrictions."). And apart from the impropriety of relying on purported expert opinion to construe a statute, *cf. Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) (expert "testimony on ultimate questions of law, i.e., legal opinions or conclusions," inappropriate), these sources are hardly persuasive.

The cited portions of Professor Conti-Brown's analysis do not engage with the MCA's *actual text*, *see generally* Pl. Br. at 47–48 (citations omitted), and rely on sources, such as unenacted statements by members of a subsequent Congress, which are an especially dubious basis for construing the act. *E.g.*, *Mass. v. EPA*, 549 U.S. 497, 530 n.27 (2007) ("post-enactment

legislative history is . . . inherently entitled to little weight" (citation omitted)).[16] Moreover, the persuasiveness of his assertions is further undermined by his prior suggestion that Reserve Banks must open accounts *even for entities intending to violate federal law*, a view that was rejected by the Colorado district court and each of the three members of the Tenth Circuit to consider the question. *See* Peter Conti-Brown, *The Fed wants to veto state banking authorities. But is that Legal?* (Nov. 14, 2018)[17] (the statute "isn't at all clear that they have the authority to reject Fourth Corner's application," despite the illegality of its business model).

Professor Hill is an equally unpersuasive source, given her readiness to disregard her own prior research. A draft article posted by Professor Hill in 2022 reached radically different conclusions from those Custodia now cites, stating, *inter alia*, that:

- "the text of the Monetary Control Act *is far from a conclusive mandate to provide service to every depository institution*";

- "since the passage of the Monetary Control Act, . . . [w]hen individual banks present abnormally high risk, the Federal Reserve Banks have repeatedly stated that they have the authority to withhold services [to] those banks. Indeed, *operating major nation-wide payment systems without imposing risk-related terms and conditions would be foolhardy. Having risk-related terms and conditions without ability to enforce the terms by limiting services would be useless*";

- "the Federal Reserve *has discretion to deny some institutions accounts and services*";

- "[i]f the Federal Reserve has the authority to set nondiscretionary terms, then *surely it also has authority to deny access to banks that did not meet those terms*";

- "[t]he legislative history supports the idea that the Monetary Control Act was designed to level the playing field between types of institutions, *rather than treat each individual bank exactly the same regardless of risk*"; and

---

[16] *See also* FRBKC's *Daubert* Motions (the Board concurs with and adopts these motions, which demonstrate the impropriety and unreliability of this testimony and that of Custodia's other expert-designee).

[17] *Available at* https://www.brookings.edu/research/the-fed-wants-to-veto-state-banking-authorities-but-is-that-legal/.

- "[d]enying [the Federal Reserve] the authority to set terms and conditions that would, for example, limit risk and improve function, could *frustrate the purpose of the Monetary Control Act*."

*See* Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (2022 draft), ECF 160-1, at 34–38, 41 (emphases added). She further noted that "both the Board and the Reserve Banks have emphasized their discretion to limit access" across many years, concluding that "*[a] complete catalog of these instances would be too voluminous for this [86-page] article*." *Id.* at 39 (emphasis added). The Court should therefore rely on the statute's plain text, which does not grant a right to a master account, rather than the dubious advocacy of these sources.

### 4.   *Banco San Juan* is both illustrative and persuasive

Custodia places heavy emphasis on Judge Bacharach's opinion and on two appellate decisions that did not engage in any analysis of the text of section 248a, but these authorities do not offer persuasive support for its position. In contrast, Custodia's attempt to disparage *Banco San Juan*'s holding as "dicta," Pl. Br. at 46, is a bald mischaracterization of the opinion, which thoroughly analyzed the relevant statutory provisions and held that their plain text does not grant depository institutions a right to a master account.

In addition to ignoring its pricing context, a significant part of Judge Bacharach's reasoning concerning construction of the plain text of section 248a(c) is inconsistent with the Tenth Circuit's subsequent ruling in *Nelson v. United States*, as noted above, casting further doubt on his opinion. Judge Bacharach's opinion also preceded the Board's Guidelines, adopted after public notice and comment, which constitute the most formal administrative pronouncement to date on the issue. And it relied for part of its analysis on a plainly erroneous reading of section 342 as only addressing discretion concerning the monetary instruments that

Reserve Banks may accept but not "which institutions can access Federal Reserve services," *Fourth Corner*, 861 F.3d at 1074 (Opinion of Bacharach, J.). Even Custodia has now wisely abandoned this interpretation. *See supra* at 18, Pl. Br. at 37.

Moreover, the two appellate cases that Custodia cites did not engage in any analysis of whether section 248a eliminated Reserve Bank discretion to grant or deny accounts to individual institutions, because the issue was not before the courts. The plaintiff in *Jet Courier Services*, 713 F.2d at 1224, simply argued that the Board's fee schedule violated section 248a's rules for *pricing*. *Id.* Consequently, the court, while making the vague and unremarkable observation that Reserve Bank services were being "made available" to non-members, conducted no analysis of the issue. Similarly, *Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York*, 866 F.2d 38 (2d Cir. 1989), was a suit by a company that was a depositor rather than a depository institution over an alleged delay in clearing checks, *id.* at 41, and in its own dicta simply cited to *Jet Courier's* unremarkable statement in the introduction without any additional analysis. *Id.* at 40. These cases are entirely consistent with the opening of accounts and provision of corresponding services to non-members as a class through the revision of section 342.

In contrast, Judge Koeltl in *Banco San Juan* engaged in a detailed analysis of the relevant statutory text—in the face of compelling real-world facts—and held that "Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so." 2023 WL 7111182, at *7. The court noted that section 248a's plain text indicates that its only mandate concerns pricing rather than a requirement to grant accounts to any requesting bank. *Id.* ("Section 248a(c)(2) . . . is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System. . . . [T]he section does not even state that the services covered by the fee schedule shall be available to 'all nonmember depository institutions.'"). The

court further explained that it did not find Judge Bacharach's opinion persuasive because, "[i]f Congress intended to require Federal reserve banks to provide specific services, the direction would reasonably have been found in the section dealing with the duties and powers of Federal reserve banks and not in the section dealing with fee schedules set by the Board." *Id.* at *8.

While Custodia attempts to dismiss this holding as dicta because the court *also* held that the bank had contractually waived any right it might otherwise have had to a master account, Pl. Br. at 46, that was plainly an alternate holding. *See Banco San Juan*, 2023 WL 7111182, at *7 ("BSJI's statutory claim fails because . . . Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so. *Moreover*, the FRBNY . . . [had] the contractual right to close BSJI's Master Account." (emphasis added)); *cf. United States v. Rohde*, 159 F.3d 1298, 1302 & n.5 (10th Cir.1998) (The "alternate holding [was] not dicta . . . . Were this panel inclined to engage in the business of labeling as dicta one of the two alternative grounds . . . , it would then confront defendant's failure to demonstrate why that label ought not adhere to the alternative which is innocuous to her theory, rather than to the alternative which undermines it."). Tellingly, the Blockchain amici, including Professor Hill, agree that *Banco San Juan* is good law, concluding that "*[o]f course*" the Federal Reserve "is not required to give a master account to entities violating or that propose violating federal money laundering law or providing banking services to industries engaged in activities that are illegal." Blockchain Amicus Br. at 20–21 n.21. But, given that both BSJI and Custodia were denied master accounts in part based on gaps in their money laundering controls, this is an inherently inconsistent position that raises more questions than it answers. Indeed, amici are notably silent as to a coherent *statutory* basis to distinguish between these two circumstances, or others along the spectrum of risk, and they necessarily resort to advocacy for their preferred outcome untethered to the statute. In contrast,

*Banco San Juan* is persuasive and compelling authority indicating that the plain text of the statute does not require that all nonmember banks be granted accounts and services in all circumstances.

### C. There Is No Indication That Congress Intended to Abdicate Federal Monetary Policy and Payment Systems to Control by Individual States or Territories

Beyond the failure of its statutory interpretation arguments, Custodia's opening brief fails to show how Reserve Banks are supposed to control risk with respect to their provision of accounts and services. This omission is notable—although Custodia cannot credibly contend that Reserve Banks are forbidden from making risk-based decisions, there is no way to square those risk-based decisions with Custodia's preferred reading of section 248a.

Notwithstanding Custodia's present desire to dodge the issue of a standard for access to accounts and services that incorporates risk assessment, recall that Custodia previously tried to furnish such a standard for the Court:

> There are at least three ways that a financial institution can be ineligible for a master account, giving Defendants justification to reject that institution's master account application. First, the institution could engage or intend to engage in activities illegal under Federal law. Second, the institution could fail to submit a completed application. Third, the institution could have a charter that does not comply with the Federal Reserve Act's requirements.

ECF 135 at 22. Custodia also claimed that master account requests are subject to "adjudication" to screen for these factors. *Id.* at 23. But lost in this complex attempt is any effort to reconcile Custodia's bespoke eligibility concept with its arguments about section 248a: Where in the "plain and unambiguous" language of section 248a (Pl. Br. at 34) is this conception of eligibility? Where in the "plain and unambiguous" language of section 248a is this "adjudication" process for access to accounts and services? And at what point is the prospect for illegal activity so great that access to accounts and services may be restricted? Upon risk of co-

opting a Federal Reserve Bank into illegal activity? Upon criminal investigation? Upon

indictment? Upon conviction? After all appeals have been exhausted? Although these are real-

world problems faced by Reserve Banks on a routine basis, as *Banco San Juan* persuasively

shows, no answers are forthcoming and they cannot be found in section 248a. Custodia's

eligibility rubric was created from whole cloth because even it understands that its "open access"

argument is highly problematic and at odds with Congressional intent.

Nor is it the case that an institution chartered under state law is automatically entitled to a

Federal Reserve Bank master account despite Custodia's appeal to generalized conceptions of

dual banking. States have never been able to dictate which institutions have access to the Federal

Reserve's balance sheet, and indeed, when state and federal interests conflict with respect to

banking, federal law governs. *See, e.g.*, *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S.

25, 28 (1996) (holding that a federal law granting national banks the authority to sell insurance

impliedly preempted a state law that prohibited banks from engaging in this activity); *cf. Salt

Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to

states that could frustrate purposes of a federal statute absent evidence Congress "plainly

intended" it). And while amici write at length about purported harms to the dual banking system

and Wyoming's chartering decisions, *e.g.*, Blockchain Amicus Br. at 3–24, their alarmist claims

are divorced from the reality that state-chartered banks can and do operate with or without a

master account.[18] There is simply no inviolate right pursuant to which a state or territory can

---

[18] As a practical matter, the Federal Reserve's exercise of master account discretion in no way
infringes on Wyoming's or other states' ability to charter or regulate banks. Indeed, the many
other banks operating in the state of Wyoming, regardless of whether they are state or federally
chartered, or have a master account or not, appear to be getting along just fine. And Custodia,
like other banks that do not have master accounts, has access to Federal Reserve services through
partnership with an existing accountholder, Am. Compl. ¶ 6; Custodia in fact publicly announced

charter any type of entity it wishes and then have those institutions automatically granted a

Federal Reserve master account without any consideration whatsoever by the Federal Reserve.[19]

Moreover, considering risks in providing access to Reserve Bank accounts and services is

not merely an academic exercise; the failure to do so could lead to significant negative

consequences to the financial system. As detailed in the expert report of Professor Morgan Ricks,

if a judicial ruling required a Federal Reserve Bank to grant access to each and every chartered

entity, regardless of risk, the adverse consequences could be dramatic:

- A state or territory might seek to win market share in digital asset or other financial businesses by enacting a "free banking" statute with no regulatory apparatus or supervision whatsoever. In such a situation, totally unregulated institutions would gain access to Federal Reserve accounts and services, with potentially devastating consequences to financial stability, monetary policy implementation, money laundering, and terrorism financing. Pl. Br., Exhibit CM at 18.

- A state or territory might enact a "self-depository" statute that allowed any individual or entity, from the United States or from abroad, to establish, for a small fee, an unregulated and unsupervised "bank" subsidiary to hold its own cash. In such a situation, the Federal Reserve would be bombarded with master account requests from individuals or entities, both domestic and foreign, including anyone who wanted to use the account for illicit purposes. Pl. Br., Exhibit CM at 18.

- Credit risks would be significantly heightened if the Federal Reserve was put in the position of extending credit to unsound institutions. Pl. Br., Exhibit CM at 12–14. For example, risky institutions might incur negative balances in their master accounts when processing funds transfers on behalf of their customers, and there also may be mismatches in check clearing operations. Such conduct could lead to large losses borne by the Federal Reserve, ultimately resulting in lower earnings being remitted to the Treasury. *Id.* at 13.

in August 2023 that it is presently serving external customers. The claims of an assault on the dual banking system—which are in any event policy and not legal arguments—ring hollow.

[19] The State of Wyoming suggests some appreciation for this in its amicus brief, offering that Custodia's account request should be "subject to an appropriate level of scrutiny" and "judged according to its own merits" using a "logical method based on Plaintiff's actual plan of operation," Wyo. Amicus Br. at 5, none of which would be permitted under Custodia's extreme view of the law.

Professor Ricks also addresses the important adverse monetary policy implications presented by potential new business models. *Id.* at 15. Thus, as Professor Ricks correctly concludes, "if the Fed lacked any discretionary authority over access to master accounts and related services, federal law enforcement and counterterrorism efforts could be hindered," and there would likely be substantial "negative consequences for the Fed, the financial system, and the American public." Pl. Br., Exhibit CM at 12–13, 17. Such consequences would go far beyond any conceivable intention of the Congress that passed the MCA.[20]

A compelling example of the need to allow Reserve Banks to make risk-based determinations was recently considered in the *Banco San Juan* case described above. After the Federal Reserve Bank of New York ("FRBNY") made the decision to terminate the master account of BSJI, a Puerto Rican bank, the institution sued.[21] The court refused to halt the master account closure, noting that "BSJI's specific and numerous risk factors justif[ied] the FRBNY's decision to close BSJI's Master Account." *Banco San Juan*, 2023 WL 7111182, at *11 (citations omitted). In particular, the court observed that "FRBNY's Compliance Office found a significant

---

[20] It bears noting that the MCA was passed during a time of traditional, insured depository institutions operating within the bounds of a single state. Interstate banking was not enabled until the enactment in 1994 of the Riegle-Neal Interstate Banking and Branch Efficiency Act. *See* FDIC, *The Banking Crises of the 1980s and Early 1990s: Summary and Implications*, at 11, *available at* https://www.fdic.gov/bank/historical/history/3_85.pdf.

[21] BSJI is an international banking entity ("IBE"), a type of banking entity chartered by Puerto Rico that first became allowed in 1989. *See* International Banking Center Regulatory Act, Puerto Rico Act No. 52-1989 (Aug. 11, 1989), *available at* https://bvirtualogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/Y%20-%20Ingl%C3%A9s/52-1989.pdf. By law, IBEs generally cannot provide services to Puerto Rican residents; they may take deposits and offer loans only to nonresident customers and foreign business entities. The Treasury Department has warned that IBEs operating under this charter are "attractive money laundering vehicles, potentially allowing nefarious actors to misuse them to facilitate illicit financial activity." National Money Laundering Risk Assessment (Feb. 2022), at 69, *available at* https://home.treasury.gov/system/files/136/2022-National-Money-Laundering-Risk-Assessment.pdf.

number of red flags identified in BSJI's transaction activity." *Id.* (citations omitted). The court

determined that the FRBNY was justified in seeking to close a risky master account:

> Accepting deposits from and providing financial services to a financial institution
> with BSJI's record of noncompliance exposes the FRBNY and the financial
> system to risk. This harm is not just to the FRBNY, but to the fiscal system,
> because "federal reserve banks are not operated for the profit of shareholders;
> rather, they were created and are operated in furtherance of the national fiscal
> policy." Moreover, maintaining a Master Account with an entity that the FRBNY
> concluded posed an undue risk of "activities such as money laundering, economic
> or trade sanctions violations, or other illicit activity," implicates the Federal
> Reserve in BSJI's questionable transactions.

*Id.* at *12 (citations omitted). Thus, as the court concluded, "granting BSJI's motion for

emergency relief [to stop the account closure] would place the public in harm's way." *Id.*

Custodia elides over these concerns by dismissing them as "policy questions" that

"should be resolved by Congress." Pl. Br. at 48. But Congress *has* resolved these questions by

enacting Section 13 of the FRA in 1913. And even as Congress modified some of the language of

Section 13 in 1980, it left unchanged the operative permissive language regarding deposit-taking.

Accordingly, Federal Reserve Banks have exercised continuous discretion throughout their 110-

year history, consistent with the policy choices made by Congress in Section 13 of the FRA.

Custodia's attempt to disrupt longstanding practice and introduce unprecedented risk into the

financial system must be rejected.[22]

---

[22] Not surprisingly given this historical backdrop, Congress recently recognized, in a law enacted
in 2022, that requests for master accounts and services (including those services set forth in
section 248a) from "a depository institution that is not an insured depository institution"—a
category that includes Custodia—may be "rejected." 12 U.S.C. § 248c(b)(1). If it were the case
that the granting of a master account to depository institutions is purely ministerial under the
FRA, then Congress could have readily clarified that expectation during its recent legislation on
the issue of master accounts given its clear awareness of the Board's Guidelines and the dispute
at hand. *See Banco San Juan*, 2023 WL 7111182, at *7 (holding that the recent FRA amendment
"confirms that Federal reserve banks may 'reject' [master account] applications" by requiring the
Board to create a searchable database that includes, *inter alia*, "rejected" applications (quoting

At bottom, Reserve Banks do not have a discretionless, ministerial mandate to open a master account for each and every depository institution under section 248a. Allowing any institution to receive and maintain a master account, regardless of the risks its presents, is an extraordinary proposition unsupported by the statute as enacted and its subsequent history, and the only way to avoid this extreme and unsupportable result is to acknowledge that the Federal Reserve Banks can exercise discretion in providing access to accounts and corresponding services pursuant to their statutory authorities including section 342.

## II.    The Board Did Not Direct the Denial of Custodia's Master Account Request or Exceed Its Statutory Authority

### A.    The Board Followed the Consultation Process Set Forth in the Guidelines and Implementing S-Letter, But the Decision Was Made by FRBKC

The Court should reject Custodia's unfounded claim that the Board's January 26, 2023 email informing FRBKC that Board staff had completed a review of FRBKC's "analysis of Custodia Bank's request for a master account"—and had "no concerns" with the Reserve Bank's "communicat[ing] to Custodia Bank its decision to deny the request"—somehow dictates the outcome of this case. Pl. Br., Exhibit CC at 1; *see* Pl. Br. at 3, 27, 32, 49–54; *see also* FRBKC Br. (cataloging FRBKC's extensive and detailed decision-making process leading up to its denial of Custodia's master account). As described below, Board and FRBKC staff appropriately followed the procedures set forth in the Board's recently issued S-Letter 2677, which is the Board's official policy implementing its Guidelines and provides that Reserve Banks should "consult, as appropriate, with Board staff" in evaluating requests for access to master accounts

statute)). Regardless of the purpose of the provision, it would be odd for Congress to contemplate that master account requests by depository institutions may be "rejected" in the newly enacted section 248c, while ignoring just two sections away (in section 248a) a purported Congressional mandate that they be granted in every instance.

and Reserve Bank services to promote consistency under the Guidelines. Pl. Br., Exhibit AS at FRB-AR-14.

    As stated in the S-Letter, the Board issued the Guidelines under its "general supervisory authority over Federal Reserve Banks" under section 11(j) of the FRA. *Id.* at FRB-AR-15. The Guidelines "are intended to be used by Reserve Banks in evaluating requests for master accounts" and they "reflect the Federal Reserve System's policy goals of (1) ensuring the safety and soundness of the banking system, (2) effectively implementing monetary policy, (3) promoting financial stability, (4) protecting consumers, and (5) promoting a safe, efficient, inclusive, and innovative payment system." *Id.*[23] As provided by Section 13 of the FRA, and as has been the Federal Reserve's longstanding practice through and including Custodia's master account request, the S-Letter states that while consultation with the Board and other Reserve

---

[23] Custodia incorrectly argues that the Guidelines impermissibly delegate to Reserve Banks "non-delegable" monetary and credit policy, financial stability, and eligibility matters that statutes require the Board to decide. Pl. Br. at 10, 13. However, section 11k of the FRA, 12 U.S.C. § 248(k), upon which Custodia relies, provides in pertinent part that the Board has the power "[t]o delegate, by published order or rule . . . any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies," and contains no prohibition on delegation of financial stability responsibilities. 12 U.S.C. § 248(k). Moreover, the Guidelines plainly do not "delegate" to Reserve Banks the Board's authorities with regard to monetary and credit policy, *see* 12 U.S.C. § 225a (the Board and FOMC "shall maintain long run growth of the monetary and credit aggregates commensurate with the economy's long run potential to increase production, so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates"), but rather simply require Reserve Banks to "evaluate" how institutions seeking a master account "will meet" the six principles, including the sixth principle that an access request not adversely affect implementation of monetary policy. Guidelines, 87 Fed. Reg. at 51,107, 109. Indeed, the Board's use in the Guidelines of the term "implement," *id*. at 51,109, makes plain that the monetary policy *decision* has already been made by the Board and FOMC pursuant to section 225a, and that the Reserve Banks' evaluation in connection with a master account request is consistent with the Reserve Banks' role in carrying out monetary policy directives. *See Fasano*, 457 F.3d at 277 ("[t]he individual Federal Reserve Banks carry out . . . monetary policy so formulated" by the Board and FOMC pursuant to section 225a). Rather than delegating the *Board's* authority, the Guidelines simply provide guidance on criteria that Reserve Banks consider when exercising authority that Congress has directly vested in the Reserve Banks.

Banks for novel requests or those that raise potential risks supports the goal of consistency, the *decision* to grant or deny a master account request and access to services rests with the administrative Reserve Bank. *See id.* at FRB-AR-15–16.

In furtherance of these goals, the S-Letter states that "Reserve Banks should notify Board staff when new access requests . . . involve higher-risk institutions or raise unusual, novel, or complicated issues . . . includ[ing] . . . Tiers 2 and 3" institutions, *id.* at FRB-AR-16, as was the case with Custodia. In addition, in order to "provide an opportunity for appropriate Board staff to advise on the analysis," the S-Letter provides that Reserve Banks "should consult with the director of RBOPS prior to communicating decisions on certain higher-risk actions," using the procedure outlined in the S-Letter. *Id.* And "[a]ny Reserve Bank that is considering *denying* any access request, including an access request from an institution in Tier 1, should consult the director of RBOPS prior to communicating any decision to the requesting institution." *Id.* (emphasis added).

This consultative process in support of consistency—while leaving the decision to the Reserve Bank—is precisely the procedure FRBKC followed when it denied Custodia's master account request.[24] In particular, pursuant to the procedures set forth in the proposed S-Letter, in early January 2023 FRBKC staff emailed Board staff a draft of its recommendation memo to President Esther George to seek any input Board staff with relevant expertise might have on FRBKC staff's analysis. Where appropriate, Board staff made minor suggestions on FRBKC

---

[24] Contrary to Custodia's claim that the S-Letter procedure was a "contrived . . . plan to ensure that Reserve Banks reach Board-desired outcomes on all master account decisions," Pl. Br. at 2, FRBKC President George testified that, even in the absence of the S-Letter, FRBKC had "a long-standing practice of consulting with the Board whenever [a master account request] . . . raised unique or novel questions" and "did not see the S-letter as changing [her] authorities in any way." Pl. Br., Exhibit J at 85.

staff's presentation of their analysis. *See* Pl. Br., Exhibits BQ, BS, BY, BZ (extracts from Board

Administrative Record at FRB-AR-313–34). Far from showing that "Board staff edited and

rewrote key parts of an internal Kansas City Fed memo recommending denial to the Kansas City

Fed President," as Custodia disingenuously claims, Pl. Br. at 54 (emphasis omitted), staff from

the Board's Division of Monetary Affairs with relevant expertise made "some *suggestions*" on

FRBKC's analysis "*for your consideration*," Pl. Br., Exhibit BY (emphases added), and the staff

suggestions from other Board divisions concluded, "[i]n summary, there is no concern with

[FRBKC staff's] proposed recommendation and the feedback points to places where the framing

could be augmented." Pl. Br., Exhibit BQ at FRB-AR-324. These two sets of staff comments

provided largely minor, technical, or organizational suggestions (some rejected) designed to

promote clarity, but in no way altered FRBKC's bottom-line conclusions. *See, e.g.*, Pl. Br.,

Exhibit BS at FRB-AR-326 ("[c]onsider adding an appendix that lists the 6 principles with

bullets of the key findings"); *id.* at FRB-AR-331 ("[s]uggest using the term 'crypto-assets' or

'digital-assets' for consistency").[25]

Indeed, contrary to Custodia's claim that "the Board controlled the process and ultimate

disposition of Custodia's master account application," Pl. Br. at 33, FRBKC staff's early January

2023 draft recommendation memo *already recommended denial of Custodia's master account*

*request* before Board staff added light comments that had no effect on the core substance of the

recommendation or its outcome. *See* Pl. Br., Exhibit BS at FRB-AR-316 ("[i]n light of these

---

[25] Despite this handful of innocuous comments (around "two dozen" by Custodia's count, *see* Pl.
Br. at 25), Custodia attempts a sleight-of-hand to suggest that Board staff inserted adverse
language—regarding, for example, Custodia's "lack of collective depth of relevant banking
experience . . . and bank-specific risk management expertise"—in place of more favorable
language. *Id.* at 25–26. Not so. As the cited documents make clear, this and other cited language
was in FRBKC's original draft and not suggested by Board staff.

concerns, [FRBKC] staff recommends denial of Custodia's master account request"); *id.* at FRB-AR-323 (concluding with recommendation of denial). Similarly, contrary to Custodia's claim that RBOPS Director Matthew Eichner's January 26, 2023 email to Ms. George (Pl. Br., Exhibit CC) somehow overrode FRBKC's decision-making process, the email did little more than confirm to FRBKC, consistent with the procedures in the S-Letter for any Reserve Bank considering "denying an access request," Pl. Br., Exhibit AS at FRB-AR-16–17, that FRBKC "ha[d] provided to Board staff *its* pre-decisional analysis of Custodia Bank's request for a master account," that "Board staff have reviewed *the Reserve Bank's* record documenting application of the Guidelines," and that Board staff "ha[s] no concerns with [FRBKC's] moving forward with *its* plan to communicate to Custodia Bank *its* decision to deny the request for a master account." Pl. Br., Exhibit CC at FRB-AR-2 (emphases added).[26]

Two days prior to Mr. Eichner's email, consistent with the S-Letter, FRBKC staff emailed Mr. Eichner FRBKC's detailed, ten-page final memorandum to Ms. George, dated January 19, 2023, setting forth FRBKC staff's thorough and well-supported analysis underlying Reserve Bank staff's recommendation that she deny Custodia's master account request. FRB-AR-3–13. FRBKC staff's January 19, 2023 memo reiterated, consistent with the S-Letter, Section 13 of the FRA, and longstanding Federal Reserve practice, that "[w]hile the final

---

[26] While Custodia places weight on the assertion that "the Board—not the Reserve Bank—decided that Custodia was eligible for a master account," Pl. Br. at 52, there is no dispute that the Board exercises interpretive authority as to the FRA. *See* Guidelines, 87 Fed. Reg. at 51,103 n.11; *First Lincolnwood*, 439 U.S. at 251. In any event, legal eligibility was not a determinative factor in the account denial and the fact that FRBKC consulted with Board staff on the threshold eligibility determination *a year prior* to FRBKC's ultimate decision to deny the account, Pl. Br., Exhibit I, is of no moment as to FRBKC's ultimate authority, which it exercised, to make the final account decision. Indeed, Ms. George testified to her (correct) understanding that, "regardless of legal eligibility for a master account, [she] could still evaluate and deny a master account." Pl. Br., Exhibit J at 41:10–15.

decision to deny a master account rests with the appropriate administrative Reserve Bank, . . . [t]he Reserve Bank *may incorporate or address* any feedback or concerns, but still retains decision making authority under the Federal Reserve Act (12 U.S.C. § 342)." FRB-AR-5 (emphasis added).

And, consistent with FRBKC's decision-making authority, FRBKC, not the Board, conveyed its decision to deny the master account to Custodia. Pl. Br., Exhibits CE, CF. In her January 27, 2023 letter denying Custodia's request, Ms. George informed Custodia that FRBKC had "completed [its] review of the request by Custodia . . . to open a master account." Pl. Br., Exhibit CF at FRBKC-2172. Ms. George's letter, and FRBKC's attached summary analysis, described the factors FRBKC took into consideration in reaching its decision and concluded that, "based on the current facts and circumstances, *the Reserve Bank denies* Custodia's request for a master account." *Id*. at FRBKC-2173 (emphasis added).

### B. The Board Did Not Take Actionable "Final Agency Action" on Custodia's Account Request

Local Rule 83.6(b)(1) provides in pertinent part that "the [administrative] record in proceedings to review agency action is comprised of: (A) the final agency action being challenged;" and "(B) all documents and materials directly or indirectly considered by the agency and/or agency decision-makers." Custodia's APA claim against the Board challenges "action orchestrating the denial of Custodia's master account application," Am. Compl. ¶ 83, and the Local Rules required the Board to file its administrative record responsive to that claim. *See* ECF 112, December 12, 2022 Order Denying Plaintiff's Motion to Strike, at 4 ("[t]he plaintiff is the master of the complaint," and it is appropriate for the Board "to rely on and respond to Custodia's pleadings" by filing an administrative record); *see also id.* at 3 (finding Custodia's contrary claim "borderline nonsensical"). Because the Guidelines and implementing S-Letter are

J.A.1249

the official policy of the Board regarding the role of its staff on master account requests—and define the parameters of the Board's official role in this case consistent with its statutory authority under the FRA—the Board appropriately complied with the Local Rule's requirements by designating the last-in-time (*i.e.*, final) step (action) that the Board took (the Eichner email and supporting documentation) as the culmination of its role. Although Custodia now contends that the Board's lodging of the administrative record and its orientation of the Court to its structure and contents in compliance with the Local Rule[27] has substantive legal relevance, *see* Pl. Br. at 3, 27, 32, 49, this gimmicky argument does nothing to advance its claim and instead signals its desperation and inability to prove the existence of an actionable claim against the Board. *Cf. Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189–90 (10th Cir. 2014) (APA analysis focuses on substance, not labels).

Custodia's angst stems from its understanding that "[p]laintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action'" as to the decision at issue. *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000); *see also Cherry v. U.S. Dep't of Ag.*, 13 F. App'x 886, 890 (10th Cir. 2001). In the absence of such action, the Court lacks jurisdiction. *Sinclair Wyo. Ref. Co., LLC v. U.S. EPA*, 72 F.4th 1137, 1143 (10th Cir. 2023) ("a petitioner challenging agency action must show the action is final" in order to invoke the Court's jurisdiction under the APA); *see also Western Energy Alliance v. Biden*, Nos. 21-cv-13 and 56-SWS, 2022 WL 18587039, at *6 (D. Wyo. Sept. 2, 2022) ("a petitioner must challenge a 'final agency action' in order to have statutory (prudential) standing to seek judicial review under the APA").

---

[27] *See* ECF 178 (identifying documents "as required by Local Rule 83.6(b)(1)").

Here, the Eichner email, the only "final agency action" identified by Custodia, does not meet the tests for "agency action" or "finality" *as to Custodia's master account request to FRBKC*, causing Custodia's APA claim to fail. The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Eichner email, a statement that he had "no concerns" with the analysis underlying FRBKC's decision to deny the master account, is simply a response to *FRBKC's* determination to deny Custodia's master account in accordance with the Guidelines and does not give rise to a cause of action by Custodia against the Board. *See Colo. Farm Bureau*, 220 F.3d at 1174 (that Colorado had "federal government consent" for its plan to reintroduce the Canadian lynx on federal land; that the plan was "agreed to, supported, and facilitated by" the Forest Service; and that "Colorado allegedly worked with the Forest Service in formulating the Plan," did not constitute actionable agency action of the Forest Service (quoting complaint)).

In addition to not meeting the test for "agency action," the Eichner email, which simply reflects the Board's general supervision of FRBKC, does not meet the test for "final" agency action as to the denial of Custodia's account request. Any such action requires that two conditions be satisfied: (1) the action "must not be of a merely tentative or interlocutory nature;" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quotations omitted). Custodia points to no decision-making process by which the Board rendered the "last word" on Custodia's account request as it must. Rather, the emails and comments Custodia points to show the Board's consultations with and suggestions to FRBKC staff as to *the Reserve Bank*'s decision. Nor did "legal consequences" to Custodia flow from Mr. Eichner's email stating that he had "no concerns." Rather, those consequences flowed from

FRBKC's January 27, 2023 decision communicated to Custodia to deny the master account. *See Colo. Farm Bureau*, 220 F.3d at 1173 ("[n]either the Complaint nor the plaintiffs' brief tells us how rights and obligations are determined by, or how legal consequences flow from, the federal involvement"); *Miami Tribe of Oklahoma v. United States*, 198 F. App'x 686, 690 (10th Cir. 2006) (Department of Interior (DOI) opinion letter regarding tribal sovereignty over a tract of land did not constitute actionable final agency action because "Congress has vested the authority to decide gaming contracts under the [Indian Gaming Regulatory Act] with the NIGC [National Indian Gaming Commission]," and the "DOI Opinion Letter is only a *part of the process* that will eventually result in the final NIGC action" (emphasis added)).[28]

Because Congress vested final decision-making authority over master accounts in the Reserve Banks, and Board staff consultations culminating in the Eichner email expressing "no concern" were just "part of the process," they do not constitute the final agency action necessary for Custodia to maintain an APA claim against the Board.

### C.     Even if the Board Had "Inserted Itself into the Master Account Decision-Making Process" as Custodia Claims, That Is Neither Unlawful Nor a Violation of the APA

Finally, even if the Board had "inserted itself" into FRBKC's review of the master account application, as Custodia claims, Pl. Br. at 2, 6, 49, Custodia still has not shown that the Board violated the APA because it has failed to show any action by the Board that is "in excess of its statutory . . . authority" under 5 U.S.C. § 706(2). *See* Pl. Br. at 31.[29] Custodia suggests that

---

[28] Of course, relevant final agency action is only a necessary, not a sufficient, basis for an APA claim. Only "[a] person suffering legal wrong *because of* [such] agency action . . . is entitled to judicial review thereof," 5 U.S.C. § 702, and the "no concerns" email likewise fails this test.

[29] Indeed, Custodia's current claim that the Board "inserted itself" into FRBKC's review of the master account request is a significant retreat from the allegations of the Amended Complaint that the Board "orchestrat[ed] the denial of Custodia's master account application," *id.* ¶ 83, and

the Board should have intervened to block FRBKC's denial of its master account request, but it identifies no provision of law that requires the Board to take such action or that prevents the Board from expressing lack of concern with the decision of FRBKC. Section 248a is not such a provision, as it only requires the Board to "publish . . . a set of pricing principles . . . and a proposed schedule of fees . . . for Federal Reserve services to depository institutions," 12 U.S.C. § 248a(a), taking into consideration certain factors, and it has done so. Notwithstanding Custodia's argument that "[a]dministrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform," Pl. Br. at 54 (quoting *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991)), the Board has no ability to provide "Reserve Bank master account and services," 12 U.S.C. § 248c(a)(3), and Custodia identifies no statutory language requiring the Board to order FRBKC to grant Custodia's account request.[30]

---

*itself* "den[ied] Custodia's master account application." *Id.* ¶ 84. Custodia's shifting rationale reflects the absence of support for its claim.

[30] Even beyond Custodia's failure to show any unlawful Board action, its APA claim fails under the well-established exception to judicial review set forth in section 701(a) of the APA. 5 U.S.C. § 701(a). Section 701(a) provides that the APA's comprehensive judicial review provisions, *id.* §§ 701–706, apply "according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Under section 701(a)(2), judicial "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, because the Board's actions are not themselves unlawful, and the Board is not a bank and cannot itself provide a master account or services to Custodia, Custodia's claim would in effect require the Board to exercise its "general supervis[ory]" discretion under section 11(j) of the FRA to *order* FRBKC to provide an account and services to Custodia. Such action on the Board's part fails the *Heckler v. Chaney* test because section 11(j) is written in general terms and the action requested by Custodia is "committed to agency discretion by law" and exempt under section 701(a)(2) from the APA's judicial review provisions as a result. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1242 (10th Cir. 2011) (citing *Heckler*, 470 U.S. at 830); *Bischoff v. Glickman*, 54 F. Supp. 2d 1226, 1230 (D. Wyo. 1999) (dismissing APA claims because "issuance or non-issuance" of the requested action was "wholly within the discretion" of the

Indeed, *Marathon Oil*, cited by Custodia, does not support, but rather undermines, its claims. While the Tenth Circuit in that case held that the district court's mandamus order requiring an agency to "expeditiously complete administrative action" on an application for oil shale mining patents, which had been pending for four years, was appropriate, 937 F.2d at 500, the court *also* held that the district court had "exceeded its authority when it ordered the defendants *to approve the application*" because the agency had "not yet determined officially that all conditions to issuance of the patents have occurred." *Id*. at 501 (emphasis added). As the Tenth Circuit explained, while the court can compel that a discretionary decision be made in appropriate circumstances, "it cannot dictate how that discretion is to be exercised." *Id*. (citing cases). Likewise here. Because Custodia has no absolute right to a master account, its APA claim against the Board fails regardless of who exercised discretion over the decision.[31]

## CONCLUSION

For all of the foregoing reasons, Custodia has failed to show that the Board acted "in excess of statutory . . . authority" in violation of 5 U.S.C. § 706(2) and its APA claim against the Board fails as a matter of law.

---

agency), *aff'd on standing grounds sub nom. Bischoff v. Myers*, 2000 WL 743686, at *2 (10th Cir. June 9, 2000) ("a court may not order the agency to perform what is purely a discretionary act").

[31] Custodia's Declaratory Judgement Act claim (Count III) fails alongside its APA claim (Count I). As the Court noted in its decision dismissing the Count II mandamus claim against the Board, "Custodia's claim for declaratory judgment is not properly understood as a standalone cause of action," but rather a "request for relief" accompanying its other claims. ECF 164 at 15.

Dated: January 26, 2024

Respectfully submitted,

 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel (*pro hac vice*)
Yvonne F. Mizusawa, Senior Counsel (*pro hac vice*)
Yonatan Gelblum, Senior Counsel (*pro hac vice*)
Katherine Pomeroy, Senior Counsel (*pro hac vice*)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2024, I electronically filed the foregoing using the

Court's CM/ECF system, which will send notification of such filing to all parties of record.

By:    /s/ *Joshua P. Chadwick*
               Joshua P. Chadwick

*Counsel for Defendant Board of Governors*
*of the Federal Reserve System*

**J.A.1256**

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com
*Counsel for Defendant Federal Reserve Bank of Kansas City*

Billie L.M. Addleman, #6-3690
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 532-4999
baddleman@hirstapplegate.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC.,<br><br>    *Plaintiff,*<br><br>       v.<br><br>FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY,<br><br>    *Defendants.* | No. 1:22-cv-00125-SWS |

## FEDERAL RESERVE BANK OF KANSAS CITY'S
## CROSS-MOTION FOR SUMMARY JUDGMENT

**J.A.1257**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Federal Reserve Bank of Kansas City ("FRBKC") hereby moves this Court for summary judgment on all of the claims asserted against it by Plaintiff.  Because there are no genuine issues of material fact with respect to Plaintiff's claims, FRBKC is entitled to summary judgment as a matter of law.

In support of this motion, FRBKC relies upon the *Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law* filed contemporaneously herewith, as well as the accompanying deposition transcripts and exhibits, and all other pleadings and papers on file in this matter.

Dated:  26 January 2024.

/s Billie LM Addleman

**BILLIE LM ADDLEMAN, #6-3690**
**ERIN E. BERRY, #7-6063**
OF HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com
*Counsel for Defendant*
*Federal Reserve Bank of Kansas City*

## CERTIFICATE OF SERVICE

I certify the foregoing ***FEDERAL RESERVE BANK OF KANSAS CITY'S CROSS-MOTION FOR SUMMARY JUDGMENT*** was served upon all parties to this action via CM/ECF pursuant to the Federal Rules of Civil Procedure on 26 January 2024.


 /s Shannon M. Ward
OF HIRST APPLEGATE, LLP
Attorneys for Defendant

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 532-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

*Counsel for Defendant Federal Reserve Bank of Kansas City*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CUSTODIA BANK, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY, <br><br> *Defendants.* | No. 1:22-cv-00125-SWS |

**DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S PETITION FOR REVIEW AND MOTION FOR JUDGMENT AS A MATTER OF LAW**

J.A.1260

# TABLE OF CONTENTS

Table of Authorities..................................................................................................iii

Preliminary Statement.............................................................................................. 1

Counterstatement of Undisputed Facts ................................................................... 4

I.    Reserve Banks Mitigate Risk By Exercising Discretion Over Access to Services. ........................................................................................................ 5

    A.    The Federal Reserve's Mission Is to Promote Financial Stability and Implement Monetary Policy.......................................................... 5

    B.    Congress Empowered Reserve Banks to Provide Payment Services While Mitigating the Risks Arising Therefrom. ...................................... 5

    C.    For Nearly a Century, Reserve Banks Have Mitigated Risk by Exercising Discretion Over Access to Services. ....................................... 7

    D.    FRBKC's "Credit Risk Management" Department Is Responsible for Access to Services in the System's Tenth District. ................................. 9

II.    Custodia Presents Novel Risks and Considerations........................................ 11

    A.    Custodia Is Not a Traditional Bank......................................................11

    B.    FRBKC Cautioned Wyoming That SPDIs Would Not Receive Automatic Access to Reserve Bank Accounts and Services............................... 12

III.    Custodia Requested a Master Account Before Building Its Business. ........................... 13

    A.    Custodia Planned to Hold Uninsured Customer Deposits and Profit from Digital Asset Services that It Had Not Yet Designed. .................................. 13

    B.    Custodia's Executive Team Lacked Relevant Banking Experience. .................... 16

    C.    Custodia's Risk Management and Compliance Infrastructure Was Unbuilt. ................................................................................... 17

IV.    FRBKC Denied Custodia's Master Account Request....................................... 18

    A.    Custodia's Request Was "Non-Routine," Non-Traditional, and Premature. ................................................................................... 18

    B.    Custodia's Request Raised Questions Concerning Legal Eligibility, Policy, and Risk. .......................................................................... 19

C.      FRBKC Leadership Was Never Comfortable with the Risks Posed by Custodia's Request. ............................................................................. 24

D.      FRBKC Decided to Deny Custodia's Request After an In-Depth, On-Site Examination Confirmed Policy and Risk Issues. ........................... 26

E.      FRBKC Controlled the Outcome. ........................................................ 29

F.      The Board's Account Access Guidelines Did Not Dictate the Outcome of FRBKC's Decision. .......................................................................... 30

G.      The Board's "S-Letter" Process Did Not Dictate the Outcome of FRBKC's Decision. .............................................................................. 32

H.      Custodia's Membership Application Did Not Dictate the Outcome of FRBKC's Decision. .............................................................................. 34

ARGUMENT ............................................................................................................ 35

I.     FRBKC Is Entitled to Judgment as a Matter of Law Because Section 248a Does Not Provide an Absolute, Non-Discretionary Entitlement to a Master Account. ............. 35

A.      Mandamus Is a Remedy Only for Non-Discretionary, Ministerial Rights. .................................................................................................... 35

B.      Section 248a Does Not Provide an Absolute Entitlement to a Master Account. .................................................................................................. 36

C.      FRBKC Made the Decision to Deny Custodia's Master Account Request, but Mandamus Relief Is Unwarranted Regardless. ................................ 42

1.       *FRBKC decided Custodia's master account request.* ............................. 42

2.       *FRBKC is entitled to judgment as a matter of law regardless of its and the Board's respective roles in denying Custodia's master account request.* .......................................................................... 48

CONCLUSION ........................................................................................................ 49

# TABLE OF AUTHORITIES

**Cases**

*Am. Bankers Ass'n v. United States*,
    932 F.3d 1375 (Fed. Cir. 2019) ........................................................... 5

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.* (*BSJI*),
    2023 WL 7111182 (S.D.N.Y. Oct. 24, 2023) ................................... 3, 38

*Bartlett Mem'l Med. Ctr., Inc. v. Thompson*,
    347 F.3d 828 (10th Cir. 2003) ............................................................ 35

*Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.*,
    766 F.2d 538 (D.C. Cir. 1985) .............................................................. 5

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*,
    713 F.2d 1221 (6th Cir. 1983) .............................................................. 5

*Johnson v. Rogers*,
    917 F.2d 1283 (10th Cir. 1990) .......................................................... 36

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ............................................................. 36

*Marquez-Ramos v. Reno*,
    69 F.3d 477 (10th Cir. 1995) .............................................................. 36

*Nero v. Oklahoma*,
    2022 WL 14423872 (10th Cir. Oct. 25, 2022) ..................................... 36

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*,
    906 F. Supp. 2d 202 (S.D.N.Y. 2012) ................................................... 5

*TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*,
    2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) ................................... 6, 21

*United States ex rel. Dunlap v. Black*,
    128 U.S. 40 (1888) ............................................................................. 36

**Statutes**

12 U.S.C. § 222 ........................................................................................ 5

12 U.S.C. § 248a ................................................................. 2, 12, 48, 49

12 U.S.C. §§ 341-361 ............................................................................. 5

12 U.S.C. § 342 ....................................................................................... 5

12 U.S.C. § 1841(c) .................................................................................. 12, 19

28 U.S.C. § 1361 ............................................................................................. 35

Wyo. Stat. Ann. § 13-2-103 .......................................................................11, 12

Wyo. Stat. Ann. § 13-2-201 ............................................................................11

Wyo. Stat. Ann. §§ 13-12-101–13-12-126 .....................................................11

Wyo. Stat. Ann. § 13-12-103 .......................................................................... 12

Wyo. Stat. Ann. § 13-12-105 .......................................................................... 12

**Regulations**

12 C.F.R. § 201.1, *et seq.* ................................................................................ 6

12 C.F.R. § 265.20(e)(1) ................................................................................. 34

Guidelines for Evaluating Account and Services Requests,
    87 Fed. Reg. 12,957 (Mar. 8, 2022)........................................................... 31

Policy Statement on Section 9(13) of the Federal Reserve Act,
    88 Fed. Reg. 7848 (Feb. 7, 2023) .............................................................. 15

**Other Authorities**

Bd. of Governors,
    FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset Risks to
    Banking Organizations (Jan. 3, 2023), http://tinyurl.com/nhdkv56d ...................................... 15

Bd. of Governors,
    Federal Reserve Policy on Payment System Risk
    (*as amended* July 20, 2023), https://bit.ly/3zVvBd1 ............................................. 6, 7

BNY Mellon,
    Annual Report 2022, http://tinyurl.com/yed5j4na .................................................... 23

BNY Mellon,
    Comment Letter on Proposed Rule on Safeguarding Advisory Client Assets (May 8,
    2023), http://tinyurl.com/yrykzkxd.............................................................. 23

Brus, Brian
    *Old-fashioned financing: S&L still thriving without FDIC insurance,*
    J. Record (Nov. 15, 2018), http://tinyurl.com/ya5f6wcx ...............................................11

Diamond, Douglas W., et al.
Fed. Rsrv. Bank of Minneapolis, *Bank Runs, Deposit Insurance, and Liquidity*,
24 Quarterly Rev. 14 (2000), http://tinyurl.com/ycyt7byd .......................................................11

*Failed Bank List: Failed Bank Information for Signature Bank, New York, NY*, FDIC.gov
(Mar. 20, 2023), http://tinyurl.com/4vvuz5r9 ........................................................................ 14

Fed. Rsrv. Bank of Kansas City,
*Esther L. George* (2023), http://tinyurl.com/3bbzk9vm ........................................................... 9

Fed. Rsrv. Bank of Kansas City,
*What We Do* (Jan. 8, 2021), https://www.kansascityfed.org/careers/what_we_do/................... 9

Ihrig. Jane, Zeynep Senyuz, & Gretchen Weinbach,
The Fed's "Ample Reserves" Approach to Implementing Monetary Policy
(Fed. Rsrv. Bd., Working Paper No. 2020-022, Feb. 19, 2020),
http://tinyurl.com/29xuwpw8 ................................................................................................. 7

*Master Account and Services Database*,
FederalReserve.gov (*current as of* Nov. 30, 2023),
http://tinyurl.com/4c95xdt9 ...................................................................................................11

Moen, Jon R., & Ellis W. Tallman,
*The Panic of 1907*, Fed. Rsrv. History (Dec. 4, 2015),
https://www.federalreservehistory.org/essays/panic-of-1907 ................................................. 41

*Monetary Policy: Credit and Liquidity Programs and the Balance Sheet*,
FederalReserve.gov (Nov. 15, 2021), https://bit.ly/3dnokva .................................................... 7

Morrow, Allison
*Crypto-friendly lender Silvergate collapses*,
CNN (Mar. 8, 2023), http://tinyurl.com/4nkezrze .................................................................. 14

Nat'l Cmty. Reinvestment Coal. et al.,
Comment Letter on Proposed Guidelines for Evaluating Account and Services
Requests (Jan. 17, 2023), http://tinyurl.com/nzpc24us............................................................ 42

Nebraska Financial Innovation Act,
LB 649, 107th Leg., 1st Sess. (announced in January 2021),
https://nebraskalegislature.gov/FloorDocs/107/PDF/Intro/LB649.pdf ................................... 21

Off. of Comptroller of Currency, Interpretive Letter No. 1179 on Bank Authority
(Nov. 18, 2021), http://tinyurl.com/38c4e99b ......................................................................... 22

Proposed Guidelines for Evaluating Account and Services Requests,
86 Fed. Reg. 25,865 (May 11, 2021) ................................................................................ 30, 31

Report on Stablecoins
   (President's Working Grp. on Fin. Mkts., Working Paper, Nov. 2021),
   http://tinyurl.com/5225srnv) ................................................................................................ *passim*

Reserve Maintenance Manual,
   FederalReserve.gov (Nov. 19, 2018), https://bit.ly/3QnjMUl ..................................................... 6

Sablik, Tim
   Fed. Rsrv. Bank of Richmond, *The Fed Is Shrinking Its Balance Sheet.*
   *What Does That Mean?*, Econ Focus 4, 7 (Q3 2022), http://tinyurl.com/5x66nes8 ................ 6

SEC Staff Accounting Bulletin No. 121 (Apr. 11, 2022)............................................................. 23

U.S. Fed. Rsrv. Sys.,
   No. 0821, The Fed Explained:
   What the Central Bank Does (11th ed. 2021), http://tinyurl.com/a7y83ejh ....................... 5, 34

Wilmarth, Arthur E., Jr.
   *The Expansion of State Bank Powers, the Federal Response, and the Case for*
   *Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133 (1990) ................................ 42

Wilmarth, Arthur E., Jr.
   *We Must Protect Investors and Our Banking System from the Crypto Industry*,
   101 Wash. U. L. Rev. 235 (2023)............................................................................................ 42

Wyo. Div. of Banking (2021),
   http://tinyurl.com/bdfsryhw ................................................................................................ 12

Wyo. Div. of Banking,
   *Special Purpose Depository Institutions* (2021),
   http://tinyurl.com/2p8uwc8p................................................................................................ 12

**PRELIMINARY STATEMENT**

Congress created the Federal Reserve Bank of Kansas City ("FRBKC") to act, along with the other eleven Reserve Banks and the Board of Governors (the "Board"), as part of the Federal Reserve System (the "Federal Reserve"). Congress charged Reserve Banks with operating a safe, stable, and reliable national payment system. For over one hundred years, Reserve Banks have exercised discretion over direct access to this payment system.

Custodia is a start-up seeking to straddle the worlds of banking and digital asset commerce. Unlike traditional banks, Custodia operates without deposit insurance and seeks to profit from transaction fees on a range of digital asset services commonly provided by non-banks. A member of its Board of Directors considers it a "transaction processer"—like Visa and other companies that do not have master accounts. Custodia intends to serve as a "bridge" between banking and digital asset services, and to profit from regulatory arbitrage, enjoying bank-like access to Federal Reserve services, but without bank-like deposit insurance, oversight, or risk management.

In October 2020, Custodia requested a master account from FRBKC to obtain direct access to Federal Reserve payment services. At the time, it had not yet developed concrete plans for *any* of the three digital asset services—prime services (facilitating crypto transactions), stablecoin issuance, and digital asset custody—that it hoped would someday make it profitable. Nor had it completed building its risk management or compliance infrastructure for its day-one activities. It wanted a master account first and would figure the rest out later.

In keeping with its longstanding procedures, FRBKC led in-depth risk assessments into all aspects of Custodia's business and found that it did not have adequate policies, procedures, personnel, or infrastructure to provide banking services in a safe and sound manner. Meanwhile, FRBKC engaged with other Reserve Banks and the Board of Governors on the novel and complex policy issues raised by requests for Federal Reserve services from a range of other non-traditional

entities located across the country.  Some of these policy issues included treatment of digital assets (*e.g.*, is it permissible for banks to issue stablecoins or hold crypto-assets on balance sheet), while others were more structural in nature (*e.g.*, what risks arise from granting access to institutions that are uninsured, not federally supervised, and not engaged in the traditional business of banking).

In June 2022, Custodia initiated this lawsuit to demand an answer on its master account request.  By this time, it had *still* not developed concrete plans for its three digital asset services and had *still* not completed building its risk management and compliance infrastructure for its day-one activities.  FRBKC continued its analysis and led an in-depth, on-site risk assessment in September 2022.  FRBKC proceeded to deny the request, for a host of reasons, in January 2023.

Custodia now asks this Court to compel the Board of Governors and FRBKC to give it a master account and access to services.  The absolutist nature of Custodia's legal theory is striking. Custodia does not challenge the reasons given by FRBKC for denying its request.  Custodia does not, for example, allege that FRBKC erred in assessing the risks that would be posed by granting it a master account or misjudged the adequacy of its compliance infrastructure, or that the denial was arbitrary and capricious for any other reason.  Instead, Custodia's position is that it doesn't matter what risk it poses.  According to Custodia, the Federal Reserve has no discretion over depository institutions' use of its services, irrespective of risk.[1]  Custodia's interpretation of the Federal Reserve Act ("FRA") would confer an entitlement to automatic access to Reserve Bank accounts and services upon any and all state- or territory-chartered depository institutions, even

---

[1] Custodia claims a statutory right not only to a "master account" but also to direct access to all Federal Reserve services accessible via master accounts and identified in 12 U.S.C. § 248a(b). *See* Custodia Br. at 35 (ECF 234) ("Put in every day terms, an individual may be entitled to the contents of a safe deposit box, but without the key to the box that entitlement is worthless."); *id.* (asking the Court to "command[] Defendants to grant access to all services covered by 'the fee schedule'" in § 248a(b)).

over a Reserve Bank's well-founded risk concerns.  Reserve Banks would be forced into a counterparty relationship with every entity to which any state gave a novel charter, effectively handing over control of the nation's payment system, and implementation of the nation's monetary policy through the Federal Reserve's balance sheet, to state legislatures.

FRBKC moves for summary judgment on both of Custodia's claims against it (Claims II and III) because they are without merit.  Both stand on the radical, erroneous premise that the FRA provides Custodia an absolute, non-discretionary statutory right to directly access and use Reserve Bank master accounts and services.  Custodia's theory fails first and foremost because the FRA does not say that.  *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.* (*BSJI*), 2023 WL 7111182, at \*6-9, \*11 (S.D.N.Y. Oct. 24, 2023) (rejecting argument that § 248a provides a right to a master account and services).  Construing the FRA as Custodia urges also would violate multiple canons of statutory construction: it would render provisions of the FRA meaningless and dramatically reshape the relationship between the federal government and the states in a way that Congress did not and could not have intended.  What the FRA requires is simple: equal pricing subject to baseline terms, not automatic access.  Or put differently, the Federal Reserve must treat nonmembers and members equally when pricing its services, but it can exercise discretion over access to services for both members and nonmembers alike to protect the integrity of the nation's payment system.[2]

---

[2] Custodia repeatedly hints at "discriminat[ion]" and casts itself as a "David" seeking to engage in digital asset activities enjoyed by large banks.  Custodia Br. at 1-2.  Yet Custodia, the master of its own complaint, elected *not* to contend that the denial of its request was discriminatory or "arbitrary and capricious," instead relying solely on its absolute-entitlement theory.  *See* ECF 197 ("The soundness and correctness of that decision [the denial of Custodia's request] is not at issue.").  As a result, there is no claim in this case that the Federal Reserve is treating Custodia unfairly.

The Court denied dismissal at the pleading stage and ordered discovery on Custodia's claim that the Board, rather than FRBKC, denied its master account request. ECF 164 at 10-11. Discovery has made clear that FRBKC—not the Board—denied Custodia's master account request in the exercise of its own discretion. Even Custodia seemingly recognizes that the evidence contradicts its earlier allegations that FRBKC was poised to grant a master account until the Board took over, ECF 121 ¶¶ 10, 44, as Custodia now contends merely that the Board "inserted itself" into FRBKC's decision-making process. Whether the Board played some role, however, is beside the point. While the Court used the words "inserted itself," what the Court wanted to know was whether the Board dictated the outcome: "if discovery reveals the Board of Governors in fact inserted itself into FRBKC's consideration of Custodia's application, the level of discretion held by FRBKC under the law may matter little, because it may be that FRBKC failed to exercise any such discretion (if, that is, the Board of Governors was pulling the puppet strings behind the scenes ...")." ECF 164 at 10 (quotation marks omitted). And on this question, there is no genuine issue of fact. No reasonable factfinder could find that FRBKC was a mere puppet and the Board dictated the outcome. But even if the Board had done so, Custodia's claims would still fail as a matter of law because they are premised entirely on its absolute-entitlement theory, which is wrong. Custodia is therefore not entitled to any relief regardless of the respective roles of the Board and FRBKC in the denial. Accordingly, FRBKC is entitled to summary judgment on Claims II and III, and Custodia's motion for summary judgment must be denied.

## COUNTERSTATEMENT OF UNDISPUTED FACTS

FRBKC provides a counterstatement of facts not in dispute below and provides specific objections to each paragraph of Custodia's statement of facts in Exhibit 1.

I.    **Reserve Banks Mitigate Risk By Exercising Discretion Over Access to Services.**

A.    **The Federal Reserve's Mission Is to Promote Financial Stability and Implement Monetary Policy.**

1. The Federal Reserve is composed of the Board, twelve regional Reserve Banks, and the Federal Open Market Committee ("FOMC").  12 U.S.C. § 222.  Congress created the Federal Reserve "to oversee banking operations and promote [] greater economic stability."  *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019); *see also Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1228 (6th Cir. 1983) ("The Federal Reserve System ... functions as the nation's chief money manager.  It is this nation's central bank, performing a vital governmental role.").  It serves the public interest by promoting a stable financial system and implementing monetary policy.  *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F. Supp. 2d 202, 232 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014); *Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.*, 766 F.2d 538, 539 (D.C. Cir. 1985).

2. The Federal Reserve ensures "the stability of the financial system" by "minimiz[ing] and contain[ing] systemic risks."  U.S. Fed. Rsrv. Sys., No. 0821, The Fed Explained: What the Central Bank Does ("The Fed Explained") at 1 (11th ed. 2021), http://tinyurl.com/a7y83ejh.

B.    **Congress Empowered Reserve Banks to Provide Payment Services While Mitigating the Risks Arising Therefrom.**

3. In furtherance of the Federal Reserve's mission, Reserve Banks "take the lead in providing accounts and payment services to depository institutions."  *See id.* at 86-87.  Payment services include check clearing, wire transfers, Automated Clearinghouse ("ACH") payments, and FedNow, a real-time settlement system.  *See id.* at 4, 11, 38, 93-95.

4. Congress authorized Reserve Banks to carry out this function, 12 U.S.C. §§ 341-361, and granted them discretion to do so, 12 U.S.C. § 342 ("Any Federal reserve bank *may* receive from any of its member banks, or other depository institutions ... deposits ... ." (emphasis added)).

5.  To directly access Federal Reserve services, a depository institution must open a "master account" with its administrative Reserve Bank and place deposits therein.[3]  Reserve Maintenance Manual, FederalReserve.gov (Nov. 19, 2018), https://bit.ly/3QnjMUl.

6.  As set forth below, a depository institution's access to services presents at least three different categories of risk: risk to the Reserve Bank, risk to implementation of monetary policy through the Federal Reserve's balance sheet, and risk to the overall payment system.

7.  Risk to the Reserve Bank includes counterparty credit risk.  Reserve Banks extend credit to banks that use the payment system, and a Reserve Bank is therefore at risk of losing money that a depository institution may owe to it.  *See* Bd. of Governors, Federal Reserve Policy on Payment System Risk, at 3-4, 15, 33 (*as amended* July 20, 2023), https://bit.ly/3zVvBd1.  Losses incurred by a Reserve Bank are ultimately borne by U.S. taxpayers.  *See* Tim Sablik, Fed. Rsrv. Bank of Richmond, *The Fed Is Shrinking Its Balance Sheet. What Does That Mean?*, Econ Focus 4, 7 (Q3 2022), http://tinyurl.com/5x66nes8 (noting that Federal Reserve losses could require fiscal support from the Treasury).

8.  Master accounts are "bank account[s] for banks," *see TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*, 2020 WL 1445806, at *1 (S.D.N.Y. Mar. 25, 2020), and just as commercial banks protect themselves against counterparty credit risk by doing business only with those customers deemed creditworthy, Reserve Banks do the same.  *See, e.g.*, 12 C.F.R. § 201.1, *et seq.* (establishing rules under which a Reserve Bank may extend credit to depository institutions and others); Federal Reserve Policy on Payment System Risk at 15-35 (outlining the methods used to provide intraday credit while controlling credit risk to the Reserve Banks).

---

[3] A master account is not required "to engage in banking or bank-like activities."  Ex. 2 ("Ricks Rep.") at 11.  Rather, financial institutions can "'plug in' to the Federal Reserve's payment services" through intermediaries.  *Id*. at 9.

9.  The second risk concerns the Federal Reserve's ability to implement monetary policy. When a bank deposits money in a master account, the deposits ("reserve balances") sit directly on the Federal Reserve's balance sheet.  *See Monetary Policy: Credit and Liquidity Programs and the Balance Sheet*, FederalReserve.gov (Nov. 15, 2021), https://bit.ly/3dnokva.  The more deposits, the bigger the liabilities on the balance sheet.  *See id.*

10.  When the Federal Reserve seeks to implement monetary policy by increasing (or decreasing) monetary supply, its ability to do so may be affected by the magnitude and nature of the liabilities on the balance sheet.  *See* Jane Ihrig, Zeynep Senyuz, & Gretchen Weinbach, The Fed's "Ample Reserves" Approach to Implementing Monetary Policy (Fed. Rsrv. Bd., Working Paper No. 2020-022, Feb. 19, 2020), http://tinyurl.com/29xuwpw8.

11.  A third risk is systemic.  If a bank with a master account fails, its inability to make good on payments could result in harm to others and undermine faith in the system.  *See, e.g.*, Federal Reserve Policy on Payment System Risk at 4-5.

**C.   For Nearly a Century, Reserve Banks Have Mitigated Risk by Exercising Discretion Over Access to Services.**

12.  To mitigate risks presented by access to master accounts and services, the Federal Reserve has long exercised discretion to grant, deny, or limit banks' ability to deposit funds and access services.  Numerous examples in the public record are described in the Board's brief being filed today, which is incorporated by reference herein (the "Board's brief").  These examples show Reserve Banks' exercise of discretion over access to clearing accounts dating back to the 1930s. *See, e.g.*, Ex. 3 (Letter No. X-9187 from Chester Morrill, Sec'y, Fed. Rsrv. Bd., to E.M. Stevens, Chairman, Fed. Rsrv. Bank of Chi., 364, 372 (Apr. 26, 1935), https://perma.cc/UGY2-EAP7 ("It is the Board's view that requests for the establishment of clearing accounts by nonmember banks should be passed upon by [Reserve Bank] directors *in the light of all the circumstances*

*surrounding each application*." (emphasis added)).  They also include, in more recent years, numerous policies in the public record.  *See, e.g.*, Ex. 4 (Fed Rsrv. Bank of Dallas, Circular No. 85-75 on Large Wire Transfers (June 4, 1985)); Ex. 5 (Operating Circular 1 ("OC1") (1998)); Ex. 6 (Policy on Payments System Risk, 69 Fed. Reg. 69,926 (Dec. 1, 2004)).

13.  Internal policies and procedures likewise reflect Reserve Bank discretion over access to master accounts and services. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

14. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

15.  Reserve Banks adopt and implement their own policies and procedures concerning access to services.  *See, e.g.*, Ex. 9 (Fed. Rsrv. Bank of N.Y., Guidance for Federal Reserve Financial Services Applicants That Are Deemed High Risk by the Federal Reserve Bank of New

York (Aug. 18, 2014)); Ex. 10 (Fed. Rsrv. Bank of N.Y., Accounts and Financial Services Handbook (Feb. 25, 2020)).

### D.   FRBKC's "Credit Risk Management" Department Is Responsible for Access to Services in the System's Tenth District.

16.   FRBKC is the administrative Reserve Bank for the Federal Reserve's Tenth District. *See* Fed. Rsrv. Bank of Kansas City, *What We Do* (Jan. 8, 2021), https://www.kansascityfed.org/careers/what_we_do/.   As such, FRBKC is responsible for providing services to banks located in several states, including Wyoming, and for monitoring and mitigating the risks arising therefrom.  *See id.*  FRBKC has a department dedicated to this—the aptly named Credit Risk Management ("CRM") Department.  *See* Ex. 11 at FRBKC-00010263 (noting that a Reserve Bank's CRM department manages payment system access).

17.   During the relevant period, Christi May-Oder served as the head of CRM.  *See* Ex. 12 ("May-Oder Tr.") at 19:15-18, 20:19-21.  At the time of the denial of Custodia's request, Ms. May-Oder reported to Judith Hazen, a Vice President of Supervision and Risk Management, who in turn reported to Tara Humston, the Senior Vice President of Supervision and Risk Management.  *See* Ex. 13 ("Imgarten Tr.") at 113:2-20.  Ms. Humston reported to then-President Esther George, *see* Ex. 14 ("Humston Tr.") at 10:12-16, who served as FRBKC's President and Chief Executive Officer from 2011 to 2023, s*ee* Fed. Rsrv. Bank of Kansas City, *Esther L. George* (2023), http://tinyurl.com/3bbzk9vm.

18. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19.

20.

"Routine" requests can be processed "in a week's time or less." Humston Tr. 191:2-7.

21.

Non-routine requests are rare, and master accounts are rarely provided to entities that lack federal insurance and a federal regulator. *See* Ex. 16 ("30(b)(6) Tr.") at 298:19-299:2 (recalling only two such master accounts over the past twenty years).[4]

---

[4] Custodia's assertion that there are 442 uninsured master account holders, Custodia Br. at 29, is incorrect. It offers as proof only Ms. Long's testimony that this was "publicly disclosed in the

22.   Historically, non-routine requests have "received the highest level of scrutiny and review." May-Oder Tr. 313:9-14; *see also* 30(b)(6) Tr. 359:15-20.

23.   At present, 540 institutions have master accounts with FRBKC.  All but one are *both* federally insured and federally supervised.[5]  The majority (394) are state-chartered.  *See* Ex. 17 at Tab 13.

## II.   Custodia Presents Novel Risks and Considerations.

### A.   Custodia Is Not a Traditional Bank.

24.   The traditional business of banking involves taking deposits and making loans, and Wyoming provides a charter for institutions engaged in these activities.  *See* Wyo. Stat. Ann. § 13-2-201.  Wyoming's traditional charter obligates banks to obtain insurance provided by the Federal Deposit Insurance Company ("FDIC").  Wyo. Stat. Ann. § 13-2-103.  Deposit insurance is widely seen as having successfully protected against systemic bank runs for nearly a century.  *See* Douglas W. Diamond et al., Fed. Rsrv. Bank of Minneapolis, *Bank Runs, Deposit Insurance, and Liquidity*, 24 Quarterly Rev. 14 (2000), http://tinyurl.com/ycyt7byd.

25.  In 2019, Wyoming created a novel charter for "special purpose depository institutions" ("SPDIs").  Wyo. Stat. Ann. §§ 13-12-101–13-12-126.  Unlike traditional banks, SPDIs are *prohibited* from engaging in lending and are not required to obtain insurance.  SPDIs are expected to operate on a fully reserved basis and to generate revenue from fees on digital asset-related

Fed's August database," Ex. 18 ("Long Tr.") at 139, but that database includes entities that access Federal Reserve services through an intermediary.  *See Master Account and Services Database*, FederalReserve.gov (*current as of* Nov. 30, 2023), http://tinyurl.com/4c95xdt9 ("Financial institutions accessing Reserve Bank financial services can settle transactions either by having their own master account or by using another depository institution's master account.").

[5] The one institution lacking federal insurance and a federal supervisor is a century-old, traditional savings and loan association in Oklahoma.  Brian Brus, *Old-fashioned financing: S&L still thriving without FDIC insurance*, J. Record (Nov. 15, 2018), http://tinyurl.com/ya5f6wcx.

services.  *See* Wyo. Stat. Ann. §§ 13-2-103, 13-12-103, 13-12-105; Wyo. Div. of Banking, *Special Purpose Depository Institutions* (2021), http://tinyurl.com/2p8uwc8p.

26.   SPDIs are not subject to numerous federal statutes and regulations that apply to traditional banks and that have provided a time-tested process for ensuring the safety and soundness of the banking system.  *See* Ex. 19 at FRBKC-00010139 (assessing applicability of various statutes and regulations to SPDIs).  Notably, the parent companies of SPDIs are not subject to the restrictions and limitations in the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1841(c), because SPDIs do not fit that statute's definition of what constitutes a "bank."

27.   SPDIs are supervised by the Wyoming Division of Banking (the "WY DOB").  *See* Wyo. Div. of Banking, *Special Purpose Depository Institutions* (2021), http://tinyurl.com/2p8uwc8p.  The WY DOB's mission, in part, is to "maintain a financial regulatory system for Wyoming that promotes a progressive banking environment" and that "allows for economic development within this State."  Wyo. Div. of Banking (2021), http://tinyurl.com/bdfsryhw.  Understandably, the WY DOB is not charged with protecting the nation's financial stability or implementing federal monetary policy.

**B.     FRBKC Cautioned Wyoming That SPDIs Would Not Receive Automatic Access to Reserve Bank Accounts and Services.**

28.   On December 5, 2018, FRBKC personnel spoke with Albert Forkner, the then-Wyoming Banking Commissioner, regarding the draft SPDI legislation.  *See* Ex. 20 at FRBKC-00018340.  Talking points developed in preparation for the call stated that Reserve Banks are not required by 12 U.S.C. § 248a to provide access to services.  *See* Ex. 21 at FRBKC-00018341.  Immediately following the call, an FRBKC participant reported to internal stakeholders that "[f]or the reasons ... cited in the talking points," Wyoming realized it could not sue FRBKC to force it to provide master accounts to SPDIs and that FRBKC "relayed" to Mr. Forkner that decisions about

"Fed services" are "the p[u]rview of the Fed." *See* Ex. 20 at FRBKC-00018339-40.[6] Separately, Mr. Forkner told President George that master accounts would be "desirable" but "not required" for SPDIs. *See* George Tr. 65:6-66:1.

### III.   Custodia Requested a Master Account Before Building Its Business.

#### A.   Custodia Planned to Hold Uninsured Customer Deposits and Profit from Digital Asset Services that It Had Not Yet Designed.

29.   Custodia, formerly known as Avanti, sought to act as a "bridge" connecting "the U.S. dollar payments system" to "digital assets." *See* Ex. 22 at Custodia-00008801. It envisioned four business lines, one of which involved an aspect of traditional banking (deposit accounts with payment services), but three of which involved digital asset services frequently provided in today's market by non-banks such as crypto exchanges:

- "**Core Banking**": offering deposit accounts and payment services (*e.g.*, ACH and wire transactions), but only on a remote basis.[7] Ex. 22 at Custodia-00008807-08.

- "**Prime Services**": facilitating crypto transactions, including a "fiat on/off ramp (i.e., brokerage of digital assets)." Ex. 22 at Custodia-00008810-11.

- "**Custody Services**": providing custody of digital assets. Ex. 22 at Custodia-00008809-10.

- "**The Avit**": issuing, selling, and redeeming a digital asset "akin to a stablecoin," "utilizing the same technology" as a stablecoin, offering the "functionality" of a stablecoin, and "replac[ing] some of the demand for stablecoins," but which Custodia was "careful not to call [] a stablecoin" because it was "very different." *See* Ex. 24 at

---

[6] Custodia contends (at 7) that Wyoming worked "hand-in-hand" and had "approximately 100 meetings" with FRBKC from 2017 to 2019. The vast majority of these meetings, however, related to subjects other than the legislation, such as FRBKC's joint supervision of Wyoming's traditional Federal Reserve member banks. *See* Ex. 23 ("George Tr.") at 27:22-28:9; *see also* 30(b)(6) Tr. 38:16-39:18. FRBKC has "help[ed]" to supervise Wyoming's traditional banks at times because the WY DOB has "lack[ed] the resources to be able to supervise some of the entities in their state." *See* Humston Tr. 26:3-9.

[7]

30.

31.

32.

33. Transaction processors, money transmitters, and many other businesses provide Custodia's planned digital asset services—prime services, custody, and stablecoins—without master accounts. *See* Ricks Rep. at 10-12.

34.

35. **Prime Services** ("matching buyers and sellers" of crypto) would require Custodia to partner with a third-party crypto exchange, but as of June 2022 (when it launched this lawsuit), it had no "leading candidate" and no agreements in place. *See* Long Tr. 107-109. Custodia "hadn't figured out the details." *See* Long Tr. 80-81; 109.

36. **Custody Services** were also undeveloped. As of June 2022, Custodia "had not built the technology platform" for its "core" custody product offering. *See* Long Tr. 74-75, 78. It had not built systems to prevent a rogue employee from stealing uninsured, custodied digital assets. *Id.* And it was unclear how Custodia could operate its custody business in a manner consistent with both state and federal guidance. Custodia says that Wyoming would have *required* Custodia to hold crypto on its balance sheet to facilitate its custody business, but the Federal Reserve's position was that holding crypto on balance sheet was "highly likely to be inconsistent with safe and sound banking practices." *Compare* Long Tr. 87-88, 90, *with* Bd. of Governors, FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset Risks to Banking Organizations (Jan. 3, 2023), http://tinyurl.com/nhdkv56d, *and* Policy Statement on Section 9(13) of the Federal Reserve Act, 88 Fed. Reg. 7848, 7850 (Feb. 7, 2023).

37. **The Avit's** technology, policies, procedures, and controls had, as of June 2022, also not been developed. *See* Ex. 27 at FRBKC-00017437. Moreover, the federal banking agencies' collective view was that stablecoins should be issued only by *insured* depository institutions and only if they had appropriate controls in place. *See* Report on Stablecoins at 17 (President's Working Grp. on Fin. Mkts., Working Paper, Nov. 2021) ("PWG Report"), http://tinyurl.com/5225srnv); Long Tr. 66.

38. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**B.    Custodia's Executive Team Lacked Relevant Banking Experience.**

39. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

40.    Ms. Long previously worked at Credit Suisse and Morgan Stanley.  *See* Long Tr. 20:6-10.  At Credit Suisse, Ms. Long was involved in lending against life insurance but "didn't interact with the master account."  *See* Long Tr. 21:21-22:6.  At Morgan Stanley, Ms. Long worked in the "Pension Solutions Group" and "Corporate Strategies Group," but not "with Morgan Stanley's banks."  *See* Long Tr. 22:12-23:25.  She has never managed a bank supervised by a federal banking regulator.  *See* Ex. 22 at Custodia-00008803; Ex. 24 at Custodia-00001095.

41.    Custodia's second-in-command is Zev Shimko, President and COO.  *See* Ex. 28 ("Shimko Tr.") at 24:12-15.  Mr. Shimko graduated from college in 2014 and, prior to joining Custodia, had most recently worked for a blockchain technology company involved in underwriting, issuing, and trading different financial assets.  *See* Shimko Tr. 13:20-23, 18:4-21; *see also* Ex. 24 at Custodia-00001095.  Like Ms. Long, Mr. Shimko had never managed a bank supervised by a federal banking regulator.  *See* Shimko Tr. 19:2-11.

42. Custodia's remaining leadership lacked significant banking experience. *See* Ex. 29 at Custodia-00003347 (noting feedback from FRBKC that "the number one thing that has caused problems for the Fed with de novo banks is that they don't have enough people experienced in bank regulations" and acknowledging that Custodia's executive team and board lacked such experience to date); Ex. 30 at Custodia-00002854, 2856 (from November 2022: "[C]onsider adding a director with bank regulatory and especially BSA/AML experience... .").

**C.      Custodia's Risk Management and Compliance Infrastructure Was Unbuilt.**

43. In early 2022, roughly 18 months after requesting a master account, Custodia had only a "first draft" of its BSA/AML policies that had not been reviewed by consultants or the WY DOB.[8] *See* Long Tr. 16:21-17:8.

44. On February 16, 2022, Custodia's Chief Legal and Compliance Officer (CLO/CCO) advised that "no one in the compliance function was comfortable" with the company's financial crime mitigation software and that, as a result, Custodia would be starting from square one with a new vendor. *See* Ex. 25 at FRBKC-00000145. Custodia also informed its Board of Directors that it needed to "build out its compliance group." *Id*. at FRBKC-00000146. Custodia's CLO/CCO then stepped down. Long Tr. 261:14-19.

45. Custodia thereafter engaged a third party, Crowe, to advise on BSA/AML compliance and risk management gaps, and Custodia started work with a new financial crime mitigation vendor. *See* Ex. 31 at FRBKC-00016118 (providing May 18, 2022 update that Custodia had "engaged Crowe to perform a comprehensive review of the BSA program, including a system

---

[8] Ms. Long testified that stablecoins present no higher risk of use in money laundering than paper currency. Long Tr. 100:103:19, 104:15-105:16. This contrasts with federal guidance reporting on the challenges presented by the use of cryptocurrency for illicit purposes. *See, e.g.*, PWG Report at 19-21 (outlining "Illicit Finance Risk" presented by stablecoins).

validation prior to launch"); Long Tr. 230:9-14; Ex. 32 at FRBKC-00005784-85 (stating that Custodia changed financial crime mitigation providers because it did not believe the initial provider "could be certified as providing to the Company the capabilities that it needs to accurately perform sanctions screening and transaction monitoring").

46.  Before completing the remediation identified by Crowe, Custodia filed this lawsuit.[9]

## IV.   FRBKC Denied Custodia's Master Account Request.

### A.   Custodia's Request Was "Non-Routine," Non-Traditional, and Premature.

47.  Custodia requested a master account with FRBKC in October 2020.  *See* Ex. 33 at FRBKC-00012687. ████████████████████████████████████████████

████████████████████████████████████████████████ Custodia checked both boxes.

48.  In addition, Custodia proposed to operate as a non-traditional bank—without deriving profit from lending or investment.  There are presently no uninsured, non-traditional depository institutions with a master account in the Tenth District.  *See* Ex. 17 at Tab 13 and *supra* note 5.

49.  And, Custodia's non-routine, non-traditional request was premature.  CRM grants master accounts to de novo institutions like Custodia only once "everything is in place."  Ex. 34 at FRBKC-00004231-32.  The master account is "the last thing."  Ex. 35 ("Crouch Tr.") at 131:22-132:4; *see also id.* at 278:16-279:3 (master accounts are opened when the de novo bank has the "controls in place" and is "ripe ... mature and ready to go.").  Custodia, however, filed its request

_____

[9] As of May 2022, Crowe had told Custodia that its BSA/AML policy required "more granularity" and "lack[ed] specificity."  *See* Ex. 36 at FRBKC-00003008; *see also* Long Tr. 266:20-267:3.  Crowe's review concluded around August 2022 and resulted in recommendations for program enhancements across areas such as model development, validation, calibration, and risk management; due diligence and customer risk identification; corporate governance; policies and procedures; risk assessment; self-testing; transaction monitoring, investigations, and case management; and record retention.  *See* Ex. 27 at FRBKC-00017428.

"well in advance of when they were ready to open." *Id.* at 131:22-132:4.  Custodia was still in its "construction period."  *See* Long Tr. 144:3-9.

50.    When it submitted its request prematurely, Custodia lacked familiarity with the process.  Ms. Long had no experience using or requesting a master account.  Long Tr. 21:21-24:25. She relied on Katie Cox for advice on the Federal Reserve, but master accounts were "not something [Ms. Cox] had recent experience with."  Long Tr. 133:20-22.  Ms. Cox had never seen CRM's account opening policies and procedures and did not know that CRM conducted a risk assessment.  *See* Ex. 37 ("Cox Tr. (Day 1)") at 35:3-7, 148:8-20, 149:11-16 and Ex. 38 ("Cox Tr. (Day 2)") at 60:10-13.

51.  In November 2020, FRBKC's senior staff met with Custodia virtually.  *See* Ex. 39 at FRBKC-00014922.  President George conveyed that the decision "was not going to be quick," and that it could "go either way."  *id.* at FRBKC-00014923.  She was "very noncommittal."  *See* Long Tr. 47:22-48:2.  President George "focused" on how Custodia was doing "novel things."  *See* Long Tr. 142:8-13; Ex. 40 at Custodia-00005521.

   **B.    Custodia's Request Raised Questions Concerning Legal Eligibility, Policy, and Risk.**

52.  **Legal Eligibility.**  ███████████████████████████████

███████████████████████████████   ███████████████████████

Eligibility is a "threshold issue."  *See* George Tr. 50:16-24; May-Oder Tr. 30:22-25.

53.  President George "questioned whether they were eligible ... [and] whether the way this [SPDI] charter had been constructed was consistent with laws that governed eligibility ... ." George Tr. 264:19-22.  As noted *supra* at paragraph 26, Custodia did not, for example, meet the definition of a "bank" under the BHCA.  *See* 12 U.S.C. § 1841(c).

54. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

55. FRBKC Legal consulted with Board Legal. *See* 30(b)(6) Tr. 194:14-22. In January 2022, it was determined that based on information then known, Custodia met the FRA's definition of a "depository institution" and was therefore "eligible" to request a Reserve Bank account and services. *See* Ex. 41 at FRBKC-00000234.

56. **Policy Issues.** Custodia's request also implicated a range of policy questions. One set of policy questions concerned the "novel [SPDI] charter" and "an uninsured institution having access to the Federal Reserve payment system." George Tr. 106:13-21. A second set of policy questions concerned the permissibility of Custodia's planned digital asset services—prime services, digital asset custody, and stablecoin issuance—and whether such activities constituted "appropriate banking activity." George Tr. 106:13-21; *see* Ex. 42 at FRBKC-00014934 (noting that Custodia "introduce[d] a complex set of considerations for risks and opportunities to banking organizations, their customers and the Reserve Banks, as well as to the nation's overall financial system and the implementation of monetary policy"); Ex. 43 at FRBKC-00013806 (Christi May-Oder talking points from September 2021 raising outstanding policy and risk questions posed by Custodia).

57. President George recognized that her decision on Custodia's request could set precedent for FRBKC's evaluation of account requests from other SPDIs and serve as a relevant example for the other Reserve Banks. George Tr. 57:4-11 ("I think it's fair to say that I was aware this was potentially precedent-setting, and that this was an evolving landscape in terms of the considerations that were being given both legislatively by Congress and the banking agencies, and

I thought it was a relevant factor for me to take in before making a decision about this master account."). Her decision would affect "how others would understand their eligibility and access expectations." George Tr. 93: 1-3.

58. President George decided not to resolve these policy questions in a silo, and instead sought input from a variety of sources to inform her decision. George Tr. 50:25-52:7 ("[W]e were seeking the Board's input as part of our decision-making to understand ... [the] broader policy issues that we would need to take into account."); Humston Tr. 441:10-12 ("we would find it imprudent not to take in views from others"); *id.* 45:10-46:6.

59. President George had, in fact, initiated a discussion on issues presented by SPDIs even before Custodia submitted its request for a master account. In August 2020, President George raised the subject with other Reserve Bank Presidents in the Conference of Reserve Bank Presidents (the "COP"), as these other presidents could potentially see similar requests in their districts. Ex. 44 at FRBKC-00010932. There was "broad recognition of the policy issues." *Id*. And the policy questions "raise[d] bigger issues than just in WY." *Id*.

60. Around that time, states other than Wyoming were considering SPDI-like charters. *See, e.g.*, Nebraska Financial Innovation Act, LB 649, 107th Leg., 1st Sess. (announced in January 2021), https://nebraskalegislature.gov/FloorDocs/107/PDF/Intro/LB649.pdf.

61. There was also, at the time, an uptick in requests for master accounts from non-traditional entities that were *not* involved in digital assets. *See* Humston Tr. 175:15-22. An example was The Narrow Bank ("TNB"), which had obtained a Connecticut banking charter in hopes of arbitraging the Federal Reserve's payment of interest on reserves of cash held in master accounts. *See TNB USA Inc.*, 2020 WL 1445806, at *2.

62.   Partly as a result of President George's efforts, an existing System-wide group called the Payments System Policy Advisory Committee ("PSPAC") (which coordinates some System work and policy/strategy development for domestic and international payment and settlement issues) created a nontraditional account access group (the "NTAA") composed of staff from Reserve Banks and the Board that "was looking at issues that were relevant and of interest to the [S]ystem as a whole."  30(b)(6) Tr. 142:11-20.

63.   As of the date when Custodia's request was denied, many policy questions presented by Custodia's request were still unresolved.  George Tr. 244:10-11 ("[T]he broad policy issues had not been codified and resolved in my view.").  The following announcements demonstrate the unsettled nature of these policy decisions when Custodia's master account request was pending:

- **Stablecoins.**  On November 1, 2021, the President's Working Group on Financial Markets (along with the FDIC and OCC) issued a report on stablecoins.  The Working Group called on Congress to pass legislation to "require stablecoin issuers to be insured depository institutions."  PWG Report at 2.

- **Incomplete "Policy Sprints."**  On November 23, 2021, the Board, the FDIC, and the OCC issued a "Joint Statement on Crypto-Asset Policy Sprint Initiative and Next Steps."  *See* Ex. 45.  The agencies announced that they had recently completed "sprints" on several "crypto-asset activities," including custody, stablecoins, holding crypto on balance sheet, and "facilitation of customer purchases and sales of crypto-assets."  *Id.*  The joint statement did not announce policy decisions but rather provided a "roadmap" for a plan to provide greater clarity in 2022. [10]  *See id.*

- **Crypto on Balance Sheet.**  On January 3, 2023, the Board, FDIC, and OCC issued a Joint Statement on Crypto-Asset Risks to Banking Organizations, which explained that holding crypto assets on balance sheet was "highly likely to be

---

[10] While the OCC had previously stated that "a national bank may provide ... cryptocurrency custody services on behalf of customers," Custodia Br., Ex. L at 1 (Interpretive Letter No. 1170), on November 18, 2021, the OCC clarified that the cryptocurrency and stablecoin activities addressed in its prior interpretive letters are only legally permissible for a bank to engage in as part of the "business of banking" if the bank can demonstrate, to the satisfaction of its banking supervisor, that it has controls in place to conduct the activity in a safe and sound manner.  *See* Off. of Comptroller of Currency, Interpretive Letter No. 1179 on Bank Authority (Nov. 18, 2021), http://tinyurl.com/38c4e99b.

inconsistent with safe and sound banking practices."  Joint Statement on Crypto-Asset Risks to Banking Organizations at 2.

- **Custody.**  Digital asset custody was permissible if done in a safe and sound manner, but in March 2022, the SEC issued a "bulletin" requiring that SEC-registered institutions account for crypto-custodied assets on balance sheet.  *See* SEC Staff Accounting Bulletin No. 121 (Apr. 11, 2022) ("SAB 121").  SAB 121 had the practical effect of putting SEC-registered institutions (including BNY Mellon) out of the digital asset custody business. [11]

64.  **Layered Risk.**  In addition to the eligibility and policy questions, FRBKC "would make our independent risk assessment around whether the institution should be granted access." George Tr. 51:12-16; Ex. 15 at FRBKC-00015583-84.  CRM must "evaluate the risk parameters of the institution requesting the account."  *See* George Tr. 33:12-14.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  *see also supra* ¶¶ 18-19.

65.  FRBKC led multiple risk assessments of Custodia's business.  *See, e.g.*, Ex. 46 at FRBKC-00002695 (summer 2020); Ex. 47 at FRBKC-00015695 (October 2020); Ex. 48 at FRBKC-00003638 (January 2021); Ex. 49 at FRBKC-00016716 (March 2021); Ex. 50 at FRBKC-00016665 (August 2021); Ex. 51 at FRBKC-00003331 (October 2021 through January 2022); Ex. 52 at FRBKC-00016159 (October 2021 through January 2022); Ex. 27 at FRBKC-00017421 (May 2022 through October 2022).

66.  A multi-month review commenced in October 2021.  *See* Ex. 52 at FRBKC-00016159. The review was conducted exclusively by FRBKC personnel and was led in part by Ross Crouch,

---

[11] *See* BNY Mellon, Comment Letter on Proposed Rule on Safeguarding Advisory Client Assets (May 8, 2023), http://tinyurl.com/yrykzkxd; BNY Mellon, Annual Report 2022 at 135, http://tinyurl.com/yed5j4na (noting that BNY Mellon's digital asset custody represents a *de minimis* amount).

who has more than 18 years of professional experience conducting safety and soundness examinations of supervised banks and bank holding companies. *See id.*; *see also* Ex. 51 at FRBKC-00003331; Crouch Tr. 7-8.

67. Custodia's existence was little more than "a business plan with some draft policies." Crouch Tr. 43:25-44:8 ("there weren't a lot of issues to identify because there just wasn't a lot to review").

    **C.**    **FRBKC Leadership Was Never Comfortable with the Risks Posed by Custodia's Request.**

68. Throughout the process, FRBKC had serious concerns about the risks posed by Custodia's request. *See* Humston Tr. 439:1-5 ("there was quite a bit of skepticism from Day 1"); Ex. 53 ("Hazen Tr.") at 156:16-19 ("From the beginning of this process, I have concerns about

what this entity type and this specific business model present to this Reserve Bank and to the System more broadly."), 344:17-20 ("Consistently through the analysis, I believe that [President George] was highly skeptical of granting an account, and so I would say that her views were skewed towards denying the account."); May-Oder Tr. 307 ("from very, very early in the process it was leaning towards no given their risk profile and the concerns that were raised regarding the business model ... I can't think of a time where I felt like there was a lean towards approval.").

69.   In its initial meeting, in November 2020, President George was "very noncommittal" and indicated that it "could still go either way."  Ex. 39 at FRBKC-00014923; Long Tr. 47:22-48:2.  On January 20, 2021, Ms. Humston informed Custodia that the "work still continues" and there were "complexit[ies]."  *See* Ex. 54 at FRBKC-00014277.  FRBKC raised a number of questions to Custodia concerning policy questions, the definition of stablecoins (and whether they are "securities" under federal securities laws), and whether there was any "movement" on Custodia obtaining FDIC insurance (answer: "no") that made clear FRBKC had concerns and that a grant of the request was not imminent.  *See id.* at FRBKC-00014277-80. [12]

70.   In February 2021, President George's view was "no access b/c don't know what we're dealing with yet."  Ex. 54 at FRBKC-00014288; Hazen Tr. 252:3-8 (discussing drafting a denial memo before Custodia applied for membership in 2021); *see also* Ex. 54 at FRBKC-00014295.  FRBKC thereafter conducted a series of risk assessments that consistently found substantial risk management gaps. *See supra* ¶¶ 65–66.

---

[12] During this meeting, Ms. Long asked FRBKC, "Are there show stoppers?"  *See* Ex. 54 at FRBKC-00014277.  Ms. May-Oder's contemporaneous notes reflect no direct response to the question, and as the meeting continued, FRBKC raised a number of complex policy questions.  *See id.*

71.   There is no evidence that any member of FRBKC's senior leadership ever favored granting Custodia's request.

**D.    FRBKC Decided to Deny Custodia's Request After an In-Depth, On-Site Examination Confirmed Policy and Risk Issues.**

72.   In May 2022, FRBKC geared up for another risk assessment (the "pre-membership exam").  Ex. 56 at FRBKC-00016141-42; Ex. 55 at FRBKC-00017394.  This examination was also led by FRBKC personnel, including Mr. Crouch.  *Id.*  At a May 2022 meeting, Mr. Crouch provided Custodia feedback on a prior risk assessment and described FRBKC's plans to conduct an additional exam.  Mr. Crouch specifically informed Custodia that the exam would look beyond "day one" activities.  Ex. 56 at FRBKC-00016141 ("[W]ill focus on specific operational risks related to planned products and services ... core banking, custody and prime services").

73.   By this time, Custodia had applied to become a Federal Reserve member bank.  In order to minimize duplicative requests and reduce burden on Custodia, the pre-membership exam was intended to inform both FRBKC's decision on Custodia's master account request and resolution of Custodia's membership application.  *See* Ex. 56 at FRBKC-00016141-42; Ex. 55 at FRBKC-00017394.  In May 2022, an examiner in FRBKC's CRM department assigned to the master account piece of the exam began compiling questions for the examination relevant to the master account request.  Ex. 57 at FRBKC-00002203.

74.   FRBKC had a meeting scheduled with Custodia to discuss the pre-membership exam on June 9, 2022.  *See* Ex. 58 at FRBKC-00011132.

75.   On June 7, 2022, Custodia initiated this lawsuit.  ECF 1.  The meeting that had been scheduled for June 9, 2022, was postponed, but FRBKC's work on the pre-membership exam continued.  *See* Ex. 58 at FRBKC-00011132.

76. 

77. 

78. In addition, policy questions persisted concerning Custodia's plan to derive profit from fees on digital asset services while providing "core banking" services on an uninsured basis. Custodia's prime services and Avit product lacked sufficient detail to evaluate, and its proposal to facilitate its digital asset custody business by holding crypto on balance sheet contravened Federal Reserve supervisory guidance.  *See, e.g.*, Ex. 59 at FRBKC-00002175 (discussing issues with

prime services); Joint Statement on Crypto-Asset Risks to Banking Organizations at 2 (discussing concerns with crypto held on the balance sheet as principal instead of in a purely custodial arrangement).  Custodia's plan to issue the Avit product continued to run counter to the November 2021 federal banking agencies' recommendation that stablecoins should be issued only by insured depository institutions.  *See* PWG Report at 2.

79.  Following the conclusion of the pre-membership exam, President George directed FRBKC staff to draft an internal memo recommending denial and draft a denial letter to Custodia. *See* George Tr. 193:15-19; May-Oder Tr. 307.  FRBKC staff began to draft a denial memo by early December 2022.    Hazen Tr. 252:3-8; Ex. 60 at FRBKC-00002133.    The FRBKC memo recommended denial on multiple bases.  *See* Ex. 61 at FRBKC-00009928.  FRBKC solicited input on the memo from Board staff on January 6, 2023.  *See* Ex. 62 at FRBKC-00016409.  Board staff provided comments that had no significant impact on the memo's substance and none on its conclusion.  *See* Ex. 63 at FRB-AR-000313; Ex. 64 at FRB-AR-000315; Ex. 65 at FRB-AR-000324; Ex. 66 at FRB-AR-000326.

80.  On January 27, 2023, President George issued the denial to Custodia.  *See* Ex. 59 at FRBKC-00002172.  She explained the timing as follows:

> So we discussed the timing of this letter, because I was within a few days of leaving the Federal Reserve. By that point we had gotten what I thought we were going to get. … [T]he account access guidance had been issued, the issue of legal eligibility had been decided, and there was no sense that some of the broader policy issues that I was hoping to see resolved were going to be resolved in a timely manner.
>
> * * *
>
> So given that timing and given the fact that Custodia had filed a lawsuit challenging the timing, I felt we should make a decision here that we would be able to take the information that we had, and that before I transitioned out of the organization, it would be responsible for us to give them that decision.

George Tr. 242:21-243:16.  President George retired a few days later, on January 31, 2023.  *Id.* at 244:25-245:2.

      **E.**      **FRBKC Controlled the Outcome.**

    81.   President George testified that she made the decision to deny Custodia's master account request.  *See* George Tr. 254:4-10; 260:24-261:21.  Her decision was based on a range of risk and policy considerations set forth in her letter and summary analysis to Custodia communicating the denial.  *See* George Tr. 254:19-260:23.; Ex. 59 at FRBKC-00002172. President George further testified that FRBKC "had seen inadequacies in the policies and procedures, the operational components, had raised questions about the management's ability to establish a risk management program for this institution, and also had raised questions about ultimately in the event of a failure, how the resolution of this institution would be handled, which is a very relevant factor in considering stability and implications of a failure."  George Tr. 255:16-24; *see also id.* at 176:22-177:8 ("I knew from my experience that one of the highest indicators of failure can be a highly concentrated institution around a particular asset class, and that had been borne out over history… .  And … [FRBKC] had gone on in to look at the risk profile of Custodia, and saw inadequate compliance and risk management practices in place around this very concentrated activity.").

    82.   Every FRBKC employee who worked on the request and was deposed testified that President George made the decision to deny Custodia's master account request.  *See* 30(b)(6) Tr. 330:11-15; Humston Tr. 429:7-14; Hazen Tr. 190:15-25; May-Oder Tr. 308:16-18; Imgarten Tr. 294:6-9; Crouch Tr. 311:11-16; Ex. 67 ("Haake Tr.") at 218:21-25; Ex. 68 ("Mullins Tr.") at 233:23-235:12; Ex. 69 ("Nugent Tr.") at 202:13-16.

    83.  FRBKC and the Board repeatedly informed Custodia that FRBKC owned the decision:

- In November 2020, FRBKC informed Custodia that FRBKC was responsible for making the decision. *See, e.g.*, Ex. 39 at FRBKC-00014924 ("it is a RB decision.").

- On March 5, 2021, FRBKC informed Custodia that "[President George] has the final decision on granting the master account and the Board is being looped in for consultation and consensus building. So there really isn't anyone in particular at the Board driving any decision making...." Ex. 70 at Custodia-00008664.

- On April 27, 2021, the Board confirmed to Custodia that "individual account requests are handled at the Reserve Bank level." Ex. 71 at Custodia-00004601.

- On March 24, 2022, President George stated that "these are Reserve Bank decisions." Ex. 72 at FRBKC-00009849. During the same meeting, Custodia informed FRBKC that Governor Lael Brainard of the Federal Reserve Board had told Senator Cynthia Lummis that master account requests are "purely reserve bank decision[s]." *Id.*

84. The Board of Governors did not vote on Custodia's master account request. George Tr. 259:9-19, 260:17-23. The Board did not dictate the denial, and no individual Governor expressed a view to President George as to whether to grant Custodia's request. *See* George Tr. 292:19-21 ("Actually at no time did I hear a Governor express a view of whether they would grant or not grant a master account."); *see also id.* at 259:9-261:13; 30(b)(6) Tr. 330:6-10; Crouch Tr. 302:18-303:7; Haake Tr. 147:6-10; Hazen Tr. 184:25-185:11; Humston Tr. 435:1-436:22; Imgarten Tr. 296:12-14; May-Oder Tr. 308:25-309:17; Nugent Tr. 248:22-249:1; Mullins Tr. 167:21-168:7.

85. The System-wide working groups addressing policy issues concerning non-traditional master accounts and/or digital assets never expressed a view of Custodia's request. Hazen Tr. 75-83; 30(b)(6) Tr. 329-330.

### F. The Board's Account Access Guidelines Did Not Dictate the Outcome of FRBKC's Decision.

86. In May 2021, the Board proposed guidelines for Reserve Banks to apply when deciding individual master account requests. Proposed Guidelines for Evaluating Account and Services Requests, 86 Fed. Reg. 25,865 (May 11, 2021) ("Proposed Guidelines"). The Board issued the

proposal because there had been "a recent uptick in novel charter types being authorized or considered across the country and, as a result, the Reserve Banks are receiving an increasing number of inquiries and requests for access to accounts and services from novel institutions." *Id.* at 25,866.

87.   The Proposed Guidelines did not address the specific policy issues raised by Custodia's request.  Ex. 73 at FRB-AR-000049.  Instead, to "support consistency in approach and decision-making across Reserve Banks," the Proposed Guidelines announced six general "principles"[13] for Reserve Banks to consider in deciding requests "while maintaining Reserve Bank discretionary authority to grant or deny requests."  *See* Proposed Guidelines, 86 Fed. Reg. at 25,866.

88.   FRBKC was already considering the same six principles described in the Proposed Guidelines.  May-Oder Tr. 53:19-54:3 (the Guidelines were "just a way to make … our internal procedures that we had been following for many years … more transparent to the public.").

89.   In March 2022, the Board announced revised proposed guidelines. *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 12,957 (Mar. 8, 2022) ("Revised Proposed Guidelines").  The Revised Proposed Guidelines added a "tiering structure" pursuant to which entities lacking federal insurance and a federal supervisor—"Tier 3"—would receive the "strictest" level of scrutiny.  *See id.* at 12,958.

90.   FRBKC was already applying the highest level of scrutiny to Custodia's request.  May-Oder Tr. 313 ("Given that it was considered a nonroutine account opening ... they received the highest level of scrutiny and review."); *id.* 189:13-17 ("Tier 3 is something that was applied to how

---

[13] The six "principles" were 1) legal eligibility, 2) risks to the Reserve Bank, 3) risks to the overall payment system, 4) risks to the stability of the U.S. financial system, 5) risks to the economy, and 6) whether the requestor could have an adverse effect on the Federal Reserve's ability to implement monetary policy.  Proposed Guidelines, 86 Fed. Reg. at 25,867-69.

we had already been assessing institutions such as Custodia that were in that higher risk category."); George Tr. 82:15-18 ("I think early on we understood that any of these novel or unusual cases required a different level of scrutiny, and that was longstanding, it was well before these guidelines were promulgated...."); *see* 30(b)(6) Tr. 359:7-20; Mullins Tr. 210:4-17; Shimko Tr. 140:16-141:8 (Custodia's President agreeing that "Custodia was, over a long period of time, asked many questions about its business models, many questions about digital assets" from "early on," even "from before the application itself").

91.   Even before the Revised Proposed Guidelines were issued, FRBKC had subjected Custodia to an examination that revealed substantial gaps in Custodia's business plans and compliance infrastructure.  Ex. 52 at FRBKC-00016159.  FRBKC management had always been skeptical, and policy questions remained unresolved. *See supra* ¶¶ 68-71.  Thus, when the Revised Proposed Guidelines were issued, it was already FRBKC's view that, unless something significant were to change, a master account was "unlikely" and "not anticipate[d]."  *See* Ex. 74 at FRBKC-00004944 ("At this time we do not anticipate Custodia obtaining a master account unless Custodia is granted FDIC insurance or becomes a Federal Reserve member."); Ex. 75 at FRBKC-0013964.

92.   In March 2022, FRBKC informed Custodia that while FRBKC "can decide this on [its] own," it did not intend to render its decision until the Guidelines were "finalized."  Ex. 72 at FRBKC-00009849.  The Revised Proposed Guidelines were finalized in August 2022.

**G.    The Board's "S-Letter" Process Did Not Dictate the Outcome of FRBKC's Decision.**

93.   The Board issued an "S-Letter" to provide Reserve Banks with guidance in connection with implementation of the final Guidelines.  Ex. 73 at FRB-AR-000014.  System Letters (more commonly known as S-Letters) are not rare—they are numbered sequentially, and this one was numbered S-2677 (the "S-Letter"), Ex. 73 at FRB-AR-000014.  *Id.*; 30(b)(6) Tr. 261-63.  S-Letters

are internal policy statements from the Board to the Reserve Banks on topics such as the administration of Reserve Bank operations (*e.g.*, budget and audit matters), personnel matters (*e.g.*, salary limits for Reserve Bank officers), and issues related to the Reserve Banks' provision of financial services (*e.g.*, S-Letter 2677).  30(b)(6) Tr. 292-293.

94.  The S-Letter provides that the Board expects Reserve Banks to "notify Board staff when new access requests ... involve higher-risk institutions or raise unusual, novel, or complicated issues."  Ex. 76 at FRB-AR-0000016.  This was consistent with FRBKC's existing practice: President George had started System-wide discussions concerning novel issues cropping up around the System more than a year before the Board issued even the Proposed Guidelines.  *See* Ex. 44 at FRBKC-00010932; May-Oder Tr. 290:11-25 ("Our practice prior to the S Letter being enacted, we would have typically engaged the Board on these types of requests or activities that would be considered unusual, novel ... .").

95.  The S-Letter also states that Reserve Banks should "consult" with the Board before denying or approving a request from a higher-risk entity.  Ex. 76 at FRB-AR-0000016.  FRBKC shared its draft denial recommendation memo with Board staff on January 6, 2023.  Ex. 77 at FRB-AR-000335; *see* Hazen Depo. Tr. 227:12-20 (explaining that the draft memo was provided to Board staff because the issuance of the S-Letter was imminent and the Custodia denial would likely be the first one, so there was interest in gathering staff-level feedback on the format and content).  The Board's feedback was in line with FRBKC's thinking and did not change the outcome.  *See* Ex. 64 at FRB-AR-000315; Ex. 66 at FRB-AR-000326; May-Oder Tr. 309 (S-Letter feedback was "very much aligned with what we had provided to the Board").

96. On January 24, 2023, FRBKC shared the final version of its analysis. Ex. 78 at FRB-AR-0000003. The Board responded that it had "no concerns" with FRBKC's denial. Ex. 79 at FRB-AR-000002.

97. The Guidelines, the S-Letter, and an accompanying "Handbook" developed to facilitate implementation of the Guidelines all confirm that Reserve Banks have discretion to decide individual master account requests. Ex. 73 at FRB-AR-000015, 49; Ex. 80 at FRBKC-00017294.

**H.      Custodia's Membership Application Did Not Dictate the Outcome of FRBKC's Decision.**

98. In 2021, while its master account request was pending, Custodia applied for membership with the Federal Reserve. *See* Ex. 81 at FRBKC-00017547. The Board has authority to decide on applications for membership, though it has delegated authority to approve—but not to deny—membership applications to Reserve Banks. *See* 12 C.F.R. § 265.20(e)(1).

99. State-chartered nonmember banks typically are insured and thus have the FDIC as their primary federal regulator and supervisor (while national banks are supervised by the OCC). *See* The Fed Explained at 62-82. But Custodia did not have FDIC insurance and thus did not have a federal regulator or supervisor. *See* Long Tr. 61:2-4; Ex. 72 at FRBKC-00009848. If it were to become a member of the Federal Reserve, however, that would change, as it would come under the regulatory and supervisory authority of the Federal Reserve. George Tr. 210:17-20. Thus, if membership were granted to Custodia, FRBKC would have considered Custodia's master account request differently in light of the fact that Custodia would be operating with a federal prudential supervisor. *See* George Tr. 211:12-17 ("That would have been new information that would have caused us to extend our analysis here....").

100. President George was prepared to deny Custodia's request, but she felt it would make little sense to deny the request only to have the Board subsequently grant membership. *Id.*

at 210:17-20.  If the Board were to grant membership, FRBKC would have had to "rethink the risks that we had identified and what potential mitigants might be in place."  30(b)(6) Tr. 314:16-315:17.  Accordingly, President George held Custodia's master account request due to the chance the Board would grant its membership application.[14]  George Tr. 196:4-8; *see also id.* 210:17-20 ("If the Board granted membership, it would have changed the analysis we would have put in here....").

101.  The Board voted to deny membership to Custodia on January 27, 2023, and President George thereafter informed Custodia of FRBKC's denial of its master account request.[15]

**ARGUMENT**

I.     **FRBKC Is Entitled to Judgment as a Matter of Law Because Section 248a Does Not Provide an Absolute, Non-Discretionary Entitlement to a Master Account.**

A.     **Mandamus Is a Remedy Only for Non-Discretionary, Ministerial Rights.**

The Mandamus Act, 28 U.S.C. § 1361, grants district courts the authority to issue a writ of mandamus compelling "an officer or employee of the United States" to perform a non-discretionary, ministerial duty owed to the plaintiff.  *Bartlett Mem'l Med. Ctr., Inc. v. Thompson*, 347 F.3d 828, 835 (10th Cir. 2003) ("Mandamus relief is available to a plaintiff ... only if the

---

[14] FRBKC staff were simultaneously working on two separate analyses—one to inform FRBKC's decision on the master account and one to support the Board's decision on membership.  FRBKC staff took care to ensure that their respective analyses did not contradict each other, Hazen Tr. 212:4-217:12;  May-Order Tr. 299:18-303:3;  George Tr. 181:14-185:14, but there is no evidence that President George deferred to any Board decision on whether to grant the master account request.  Indeed, she arrived at her decision to deny that request before the Board voted on membership.  *See* George Tr. 244:12-246:12.

[15] Custodia has suggested that the White House played a role in "coordinating" the denial of Custodia's membership application and master account request.  *See* ECF 121 ¶ 7.  Custodia brings no evidence of this.  Ms. Long testified that she believes it to be true based on conversations she had with a Bloomberg reporter in which the Bloomberg reporter *declined* to confirm that the White House was a source of a leak.  *See* Long Tr. 319:6-323:6.  President George had "no heads up" about the White House announcement, and it "wasn't a factor" in her decision.  George Tr. 253:2-9.

defendant owes him a clear nondiscretionary duty." (cleaned up)).

Custodia's choice to bring only a mandamus claim against FRBKC is consistent with the absolutist nature of its legal theory, namely, that § 248a gives Custodia an automatic, non-discretionary, ministerial-type right to a master account. *See, e.g.*, ECF 121 ¶¶ 2, 6, 13, 40, 97, 101; Custodia Br. at 35, 38, 46, 48. Anything less than such an absolute, "clear and indisputable" right would not be cognizable as a mandamus claim. *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990); *see Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995) (mandamus claim cannot succeed if "statute vests discretion in a public official" (quotation marks omitted)); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170-71 (1803); *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 44 (1888).[16]

### B.    Section 248a Does Not Provide an Absolute Entitlement to a Master Account.

As explained in the Board's brief, Custodia's contention—that § 248a gives every eligible depository institution an automatic, non-discretionary right to a Reserve Bank master account irrespective of risk—is wrong. No court has ever forced a Reserve Bank to provide an account and services to *any* entity. To avoid duplication, FRBKC incorporates the Board's brief, which explains why Custodia's position cannot be reconciled with the text, structure, context, or history of the FRA. But FRBKC's thorough evaluation of Custodia's risk management and compliance

---

[16] While Custodia also asserts Claim III against FRBKC under the Declaratory Judgment Act, this Court has already held that "the Declaratory Judgment Act provides a remedy for valid federal causes of action and does not offer a separate cause of action." ECF 164 at 15. As a result, while Claim III may be a viable request for a declaratory form of relief if Custodia were to prevail on its mandamus claim (Claim II), the mandamus claim is the only cause of action at issue. *See id.* And if Claim II against FRBKC fails, then Custodia is not entitled to any relief against FRBKC and Count III fails along with Count II. *See Nero v. Oklahoma*, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022) (declaratory judgment claim requires "a valid federal cause of action—one that exists independent of any request for declaratory relief").

infrastructure makes FRBKC uniquely situated to expand on the Board's brief in one important respect: Custodia itself is a case study in why its reading of § 248a cannot be right.

As explained in the Counterstatement of Facts, FRBKC conducted eensive analyses of Custodia in evaluating its request for a master account. And what FRBKC found raised serious concerns. When Custodia's master account request was pending, Custodia was not ready for business and had inadequate risk management and compliance controls. Shortly before denying Custodia's request, FRBKC led an on-site examination that found "significant risk management gaps" relating to Custodia's "overall risk management, the BSA/AML and OFAC compliance program, the information technology program, the internal audit program, and various financial areas"—in other words, Custodia's risk management and compliance programs were inadequate *across the board*. *See* Ex. 27 at FRBKC-00017423.

Moreover, Custodia sought a master account and access to services while planning to launch digital asset services contrary to federal guidance and emerging crypto policy. It planned to issue the "Avit" notwithstanding the collective recommendation of the federal banking agencies that stablecoins should be issued only by insured depository institutions. PWG Report at 16. It contemplated holding crypto as principal on its balance sheet to facilitate digital asset custody notwithstanding that this is "highly likely to be inconsistent with safe and sound banking practices." Joint Statement on Crypto-Asset Risks to Banking Organizations at 2. And its "Prime Services," facilitating crypto/fiat transactions, could have potentially run afoul of various federal policies and guidance, though Custodia's plans for those services were too undeveloped to know for sure. Long Tr. 109 ("we hadn't figured out the details"). Despite all of these issues, Custodia's construction of § 248a would still mandate that it receive and maintain access to services.

To be sure, Custodia may disagree with FRBKC's conclusions about the risks Custodia would pose if given a master account. But Custodia chose not to challenge the denial of its request on the merits. That choice is telling. If Custodia had argued, for example, that the denial was arbitrary and capricious, that would have put FRBKC's *reasons* for the denial directly at issue (setting aside for the moment FRBKC's belief that it is not a federal agency subject to the APA). Likewise, if Custodia had argued that the denial was discriminatory, that would have put at issue whether Custodia in fact was similarly situated to (as opposed to riskier than) banks that have master accounts. Custodia evidently did not want this case to be about those factual issues, so it limited its claims to a theory of absolute, non-discretionary entitlement.

On that extreme theory, Custodia is entitled to a master account even if everything FRBKC cited as reason for concern is true—FRBKC's reasons don't matter. Indeed, because FRBKC supposedly had a ministerial duty to give Custodia a master account, FRBKC had no business even asking Custodia questions about its compliance infrastructure, risk management practices, or business plans. That is why Ms. Long views this case as posing the question whether a SPDI is entitled to a master account even if it does not have a chief compliance officer. Long Tr. 265:7-12 (stating "we're about to find out" the answer to that question).

If Custodia's extreme theory were correct, Custodia would not be the only entity to take advantage of it. FRBNY found that continuing to provide an account and services to Banco San Juan Internacional, for example, "pose[d] undue risk to the overall economy by facilit[ating] activities such as money laundering, economic or trade sanctions violations, or other illicit activities." *BSJI*, 2023 WL 7111182, at *4 (quotation marks omitted). Custodia tries to run away from BSJI, *see* Custodia Br. at 45-46, but it cannot escape the absoluteness of its interpretation of § 248a. The very kind of risk assessment that led FRBNY to revoke BSJI's master account would

be ultra vires on Custodia's interpretation.  Any statutory interpretation that would require the Federal Reserve to give master accounts and access to services to banks as risky as BSJI was assessed to be should raise a massive red flag. [17]

It is especially notable that even certain of Custodia's amici recognize that a theory of absolute entitlement to a master account for every eligible institution is untenable.  Wyoming's amicus brief thus argues that Custodia "should be judged according to its own merits."  Wyo. Amicus Br. at 5 (ECF 251).  *It was*—and it conspicuously opted not to challenge that merits judgment.  And if Custodia's absolute-entitlement theory were correct, there would be no "merits" to "judge[]"—every eligible institution would automatically get a master account and access to services as a ministerial matter.  Indeed, Custodia's construction threatens to eviscerate many of the Federal Reserve's longstanding risk management policies and procedures, including OC1, the Policy on Payments System Risk, Standard Operating Procedure 10, the Guidelines, and the risk assessment procedures and controls used to monitor and mitigate risks associated with account holders' use of services.  All of these would be thrown out the window if § 248a were to provide a statutory right to unfettered access to services. [18]

Custodia acknowledges that its legal position would result in what could charitably be called anomalies, but it fails to dispel these concerns.  In an effort to blunt the most dangerous and absurd implications of its position, Custodia implies that Reserve Banks might retain authority to impose "use-based conditions" on master accounts, Custodia Br. at 24, but this raises more

---

[17] FRBKC describes the facts relating to BSJI as laid out by the court.  The point, again, is that Custodia's absolute-entitlement theory requires assuming those very concerning facts to be true, just as it requires assuming that FRBKC's reasons for denying Custodia's request were well taken.

[18] Other amici of Custodia's recognize—and advocate—that result.  *See* Legislators' Amicus Br. at 22 (ECF 259) (arguing that Board's Account Access Guidelines, S-Letter, and Handbook are not "legally viable").

questions than it answers. Custodia fails to explain what these "use-based conditions" may be, what limits apply to them, and how they square with Custodia's proffered construction of § 248a. Custodia cautions, for example, that even if Reserve Banks retain authority to impose "use-based conditions," they cannot impose "membership-like requirements," but Custodia fails to explain where in the statute this rule comes from, what "membership-like requirements" are, why that position does not run contrary to § 248a(c)(2)'s provision that "nonmembers shall be subject to any other terms ... that the Board may determine are applicable to member banks," and why this would not result in FRBKC preventing Custodia's use of the very services to which it claims statutory entitlement.[19] Custodia's acknowledgment of the issue helpfully demonstrates why its proposed interpretation of law cannot be accepted.

Nor can invoking the dual banking system—as Custodia and its amici do countless times—make these problems with Custodia's interpretation go away. Eliminating Reserve Bank discretion over access to master accounts and services would mean putting *state* legislatures and banking authorities in control of *federal* priorities. Under Custodia's interpretation, the WY DOB would control Custodia's access to the federal payment system, while the Federal Reserve would need to defer to Wyoming's judgments. State authorities would even be responsible for monitoring and mitigating risk that state-chartered institutions present *to Reserve Banks*. Ex. 82 ("Conti-Brown Tr.") at 188:18-189:2. Suggesting that states control access to the Federal Reserve balance sheet, with the provision of master accounts to all comers mandatory and ministerial, does not respect the dual banking system—it writes the federal part out of the equation.

---

[19] If Custodia's legal position is that § 248a mandates only the provision of an empty and unusable master account, then it should say so. As FRBKC understands it, Custodia's position is rather that § 248a affords it a statutory, nondiscretionary right to *use* enumerated services—in Custodia's words, "the contents of [the] safe deposit box." Custodia Br. at 35.

Custodia's interpretation would also encourage a race to the bottom among state chartering authorities.  States would be free to attract business by crafting simplified banking charters, reducing regulatory requirements, and/or easing supervision, all while promising that access to the Federal Reserve's services would be guaranteed by § 248a.  Custodia itself intends to use "geographically dispersed" staff to serve remote customers.  *See* Ex. 22 at Custodia-00008804. Nothing would prevent another state (or in Conti-Brown's view, American Samoa) from luring Custodia away from Wyoming with fewer regulatory requirements or softer supervision.  *See* Conti-Brown Tr. 313-18.  It would make no sense to interpret the FRA this way given that preventing such a race to the bottom is precisely what led Congress to create the Federal Reserve in the first place.  *See, e.g.*, Jon R. Moen & Ellis W. Tallman, *The Panic of 1907*, Fed. Rsrv. History (Dec. 4, 2015), https://www.federalreservehistory.org/essays/panic-of-1907 (noting that the lack of an institution designed to bring stability to banking and financial markets spurred the establishment of the Federal Reserve).  Adopting that radical position is what would "fundamentally remake" the system, Custodia Br. at 47 (quotation marks omitted), and it is not what the dual chartering system has ever meant or required.

As Custodia's amici note, President George consistently supported the dual banking system in the decades following the enactment of the Monetary Control Act of 1980.  Legislators' Amicus Br. at 6.  Despite Custodia's desire to wrap itself in a states' rights theme, this case is not about whether states can charter banks as they see fit.  It is about whether states' chartering decisions deprive the Federal Reserve of any ability to protect its own balance sheet and the integrity of the nation's payment system.  Historically, state-chartered institutions have been subject federal oversight from the Federal Reserve and the FDIC.  Arthur E. Wilmarth Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58

Fordham L. Rev. 1133, 1159-60 (1990).  Indeed, until 2019, "every state required state-chartered banks that accepted deposits from the public to obtain federal deposit insurance."  Arthur E. Wilmarth Jr., *We Must Protect Investors and Our Banking System from the Crypto Industry*, 101 Wash. U. L. Rev. 235, 322 (2023).[20]  Federal oversight from the Federal Reserve and FDIC of state-chartered nonmember banks is a core feature of the dual banking regime.  *See* Wilmarth, *Dual Banking*, 58 Fordham L. Rev. at 1137 n.8, 1159-60, 1191, 1250; George Tr. 31:12-21 ("Our dual banking system is based on a national charter issued by the [OCC], or the 50 states issue their own charter, in which case they apply to the Federal Reserve or the FDIC for their federal supervision.... So all state-chartered institutions come with federal supervision in the current legal and regulatory framework.").

### C. FRBKC Made the Decision to Deny Custodia's Master Account Request, but Mandamus Relief Is Unwarranted Regardless.

#### 1. *FRBKC decided Custodia's master account request.*

FRBKC made the decision to deny Custodia's master account request.  *See supra* Section IV. E.  President George testified that she made the decision in consultation with FRBKC's senior staff.  George Tr. 254.  Her testimony is corroborated by the testimony of every other FRBKC employee or representative who testified, who all said it was President George's decision. 30(b)(6)

---

[20] Custodia's Blockchain Association amici cite Wilmarth no less than nine times in support of their view that the Federal Reserve has no discretion regarding access to master accounts and services.  Blockchain Amicus Br. at 3, 5, 11, 12, 13 & n.15, 14, 22 n.23 (ECF 257).  Amici may not be aware that Wilmarth has made his views on this subject clear—and they run directly contrary to amici's portrayal: "The Federal Reserve Act (FRA) rightfully confers the right to determine access to Fed services to the Federal Reserve and only to the Federal Reserve."  Nat'l Cmty. Reinvestment Coal. et al., Comment Letter on Proposed Guidelines for Evaluating Account and Services Requests (Jan. 17, 2023), http://tinyurl.com/nzpc24us.  Finding otherwise "would encourage states to use regulatory arbitrage for their gain" and "would create very substantial risks and costs for the Fed.  Such decisions cannot depend solely on the whim and discretion of state legislators and regulators."  *Id.*

Tr. 330:14-15; Humston Tr. 429:7-14; Hazen Tr. 190:15-25; May-Oder Tr. 308:16-18; Imgarten Tr. 294:6-9; Crouch Tr. 73:1-4; Haake Tr. 218:21-25; Mullins Tr. 233:23-235:12; Nugent Tr. 202:13-16. It is corroborated by contemporaneous documents reflecting that FRBKC employees led risk assessments of Custodia, that President George met routinely with them to discuss progress, and that FRBKC repeatedly told Custodia that FRBKC (not the Board) would make the call. *See, e.g.*, George Tr. 62:8-63:6; Ex. 75 at FRBKC-00013942-46, FRBKC-00013950; Ex. 46 at FRBKC-00002695; Ex. 47 at FRBKC-00015695; Ex. 48 at FRBKC-00003638; Ex. 49 at FRBKC-00016716; Ex. 50 at FRBKC-00016665; and Ex. 52 at FRBKC-00016159. And it is corroborated by the fact that FRBKC has an entire department—the CRM department—established to handle master account requests, and that the head of CRM testified that she applied CRM's longstanding policies and procedures to Custodia's request. May-Oder Tr. 35-36; 53-56.

There is no genuine issue of fact as to whether FRBKC denied Custodia's request in the exercise of its own discretion. Custodia had set out to prove that the Board dictated the result, *see, e.g.*, ECF 121 ¶¶ 3, 10, 44, 46, 51, 55, 72, 74, but failed. It therefore now contends that the "issue[] presented" is whether the Board "inserted itself into the process" for deciding Custodia's master account request, Custodia Br. at 6, such that FRBKC's exercise of discretion was not "unfettered." *Id.* at 49-54. But the question the Court wanted answered is whether FRBKC denied the request and exercised its own discretion in so doing, ECF 164 at 10-12, and the unrefuted facts described above establish that it did and was not a mere "puppet" with the Board pulling the strings.

Custodia is unable to reasonably contend that the Board dictated the outcome because there is no evidence at all suggesting that it did. The Board did not vote on the request, *see* George Tr. 259:14-19, and there is no evidence that any of the Governors or their staff expressed the view

to President George that Custodia's request should be denied.   George Tr. 259-61; 30(b)(6) Tr. 330:6-10;  Crouch  Tr. 302:18-303:7;  Haake  Tr. 147:6-10;  Hazen  Tr. 185:6-11;  Humston Tr. 435:1-436:22; Imgarten Tr. 296:12-14; May-Oder Tr. 308:25-309:17; Nugent Tr. 200:4-201:5, 248:22-249:1; Mullins Tr. 167:21-168:7.  In March 2021, President George made a handwritten note indicating that one Governor "feels we don't have authority to say no to request."  Ex. 83 at FRBKC-00017834.  President George testified that this concerned whether Custodia was "legally eligible" for an account (not whether its request should be granted), *see* George Tr. 104:1-15, but either way, that individual Governor's view certainly did not dictate denial.[21]

Custodia principally argues that the Board "inserted itself" into the process by taking part in policy discussions.  To be clear, the Board did not need to "insert itself" into such processes. *President George solicited the Board's views as part of her evaluation of the request*.  President George tried to initiate System-wide policy discussions on issues presented by SPDIs and other non-traditional entities in August 2020, even before Custodia's request came in, and in March 2021 she "argued" to the Board that "we need the broader policy issue addressed."  Exs. 44, 83. Custodia's request presented a range of policy issues.  George Tr. 106:17-21 (the "broader policy issues which involved a novel charter, an uninsured institution having access to the Federal Reserve payment system, and the nature and risks associated with these activities as an appropriate banking activity").  It would, in President George's view, set expectations in the industry for when

---

[21]

access would be granted and when it would not.  It therefore made sense for President George to discuss the policy issues presented with other Reserve Banks and the Board.

That said, the notion that System-wide policy discussions eviscerated FRBKC's discretion to decide Custodia's request is entirely without basis in the record.  Custodia argues that the Board was involved at "every critical juncture" and refers generally to the existence of System-wide policy workstreams, but it brings no proof that any of these working groups expressed a view on Custodia's request, let alone dictated its outcome.  The record reflects that they did not.  30(b)(6) Tr. 329-330.[22]

Custodia asserts that the Board-issued Guidelines relegated Custodia to "dead-end, Tier 3 status."  Custodia Br. at 51.  To be sure, the Board's Revised Proposed Guidelines, issued on March 8, 2022, provide that requesting institutions that lack federal insurance and a federal supervisor are to be considered "Tier 3" and are subjected to the highest level of scrutiny.  That, however, states the obvious.  To Custodia's great frustration, FRBKC had by that point already been applying heightened scrutiny to Custodia's request *for more than a year*.  May-Oder Tr. 53-56; Shimko Tr. 140:16-141:8. President George had been "very noncommittal" from the outset and was never comfortable with the idea of granting Custodia's request.[23]  *See, e.g.*, George Tr. 183, 254, 260; Hazen 351:17-20; May-Oder Tr. 307:7-25.  Custodia brings no proof that FRBKC would have

---

[22]  The multi-dimensional bases for FRBKC's denial of Custodia's request, as reflected in its letter to Custodia, belie the notion that any System-wide working group rendered a policy decision that dictated the outcome of Custodia's request.

[23]  In its Amended Complaint, Custodia alleged that FRBKC was on track to grant its master account request until the Board "derailed" it.  ECF 121 ¶ 72.  Discovery revealed that, to the contrary, FRBKC at no time leaned in favor of granting it.  *See supra* ¶¶ 68-71.

granted Custodia's request had the guidelines not been issued.[24]  It has therefore failed to establish that the Revised Proposed Guidelines had any impact on FRBKC's decision.

Custodia breathlessly contends that the most "stunning fact that would have never seen the light of day but for discovery is" that FRBKC shared its draft recommendation to deny Custodia's request with the Board and Board staff commented on it.  Custodia Br. at 54.  So what?  Yes, the Board issued an S-Letter asking Reserve Banks to "consult" with the Board before denying master account requests from Tier 3 institutions.  Ex. 73 at FRB-AR-000016.  Yes, FRBKC shared its draft recommendation with Board staff in a manner consistent with the S-Letter.  And yes, Board staff provided comments on the draft recommendation.  But these documents speak for themselves, and FRBKC welcomes the Court's review of the Board's limited comments.  Ex. 65 at FRB-AR-000324; Ex. 66 at FRB-AR-000326-34; Ex. 63 at FRB-AR-000313; Ex. 64 at FRB-AR-000315-23; Ex. 79 at FRB-AR-000002.  President George requested that her staff draft the recommendation memo before the Board ever saw it, the draft reflected her thinking, and the Board staff's comments and suggested edits changed neither its substance nor its direction.  May-Oder Tr. 307.  The notion that FRBKC's sharing of a draft with Board staff, and Board staff's provision of minor comments, mean that FRBKC was not exercising its discretion does not withstand scrutiny.

Rather, the record makes clear that President George decided to deny Custodia's request unless there was a major change in circumstance, such as obtaining insurance (from the FDIC) or membership (from the Board).  Membership would have resulted in Custodia having a federal

---

[24] Both the Guidelines and an internal Handbook implementing them provide that a Reserve Bank has the authority to grant or deny an access request by an institution in "any of the three proposed tiers."  Ex. 73 at FRB-AR-00064;

prudential regulator, so rather than denying Custodia's request *before* the Board voted on membership, President George chose to hold her decision in abeyance pending the Board vote on membership.[25]  *See* George Tr. 210:17-20, 211:12-17; Humston Tr. 251:19-252:4.  But that was President George's choice.

It is helpful to step back from the trees to survey the forest.  Custodia asks this Court to believe that the Board denied Custodia's request without a vote and without any internal Board analysis regarding that request.  It would have this Court believe that the Board issued Guidelines—public guidelines, subject to two notice-and-comment-periods—that say one thing (Reserve Banks retain discretion and should apply generic principles to any request) but mean another (FRBKC must deny Custodia's request).[26]  Its theory is that the Board pulled the strings through an elaborate "ploy," Custodia Br. at 2, tricking Custodia into applying for membership, only to use the results of the membership exam to deny the master account request. That theory does not make sense.

---

[25] The Board's decision whether to grant membership is based on different standards and a different set of considerations than a Reserve Bank's decision whether to grant a master account. *See* Custodia Opp. to MTD 30 (ECF 135) (conceding that the membership decision and master account decision are "completely separate applications with different standards governed by different bodies of law").

[26] Custodia claims that several of the Guidelines' principles are "non-delegable policy matters that statutes require the Board, and not Reserve Banks, to decide."  Custodia Br. at 13.  As a threshold matter, that is an inaccurate, over-simplified characterization of how the Board and the Reserve Banks interact.  The entire System—the Board, the Reserve Banks, and the FOMC (which includes Reserve Bank Presidents)—works together to set and effectuate the goals of the FRA. *See, e.g.*, George Tr. 53:5-17; 296-302; May-Oder Tr. 138-39.  Legal eligibility, monetary policy, and financial stability are all considerations that FRBKC has historically considered when evaluating master account requests.  *See generally* Ex. 15.  Regardless, the primary issues leading to Custodia's denial were traditional risk-based considerations, including the facts that Custodia was uninsured, had no federal oversight, lacked sufficient BSA/AML compliance measures, and posed risks to FRBKC and to the payment system because of its business model, lack of capital requirements, and unproven resolution process.  *See* Ex. 59 at FRBKC-00002172-78.

Why would the Board go through so much effort "instead of simply imposing its will?" ECF 225 at 11. The Board had no qualms about denying Custodia's membership application and issuing an 86-page order explaining all the reasons why. Why would it simultaneously hide a desire to deny Custodia's master account request? Discovery in this case shows that it did no such thing. Instead, FRBKC conducted due diligence into Custodia's request, had serious concerns at all times about granting it, communicated with other parties including the Board and Reserve Banks (as one would expect given the federated nature of the System and the importance of communication on these sorts of novel issues), and made a decision based on all available inputs.

2. *FRBKC is entitled to judgment as a matter of law regardless of its and the Board's respective roles in denying Custodia's master account request.*

Even if (contrary to fact) the Board controlled the decision regarding Custodia's master account request, that would not entitle Custodia to any relief. As explained in the preceding section and in the Board's brief, § 248a does not afford an automatic, non-discretionary right to a master account and Federal Reserve services to all depository institutions irrespective of risk.[27] Because all of Custodia's claims are based on that erroneous legal theory, Custodia's claims fail as a matter of law regardless of FRBKC's and the Board's respective roles in the denial. To be sure, as the Court observed in its motion to dismiss order, if the Board did not control the denial, then Count I—"Claim for Unlawful Denial of Master Account Application Against the Board"—is asserted against the wrong defendant and fails for that separate reason. *See* ECF 164 at 11; ECF 121 at 27. The Court thus believed that discovery concerning the Board's role was relevant, *see*

---

[27] The Federal Reserve would retain discretion over access to services and, at minimum, would retain the power to make services available to nonmembers only on the "terms ... that the Board may determine are applicable to member banks." § 248a(c)(2). If the Federal Reserve would not permit a member bank similarly situated to Custodia to access services as Custodia intends to do, then Custodia could be denied access on a non-discriminatory basis.

*also* ECF 164 at 12, and stated that "a full statutory interpretation of the matter is more appropriate after further development of important facts," ECF 164 at 10-11.  Now that the facts have been developed, the Court should hold that § 248a does not give Custodia an absolute, non-discretionary right to a master account and that FRBKC is thus entitled to judgment as a matter of law on Custodia's mandamus claim, regardless of how the Court may view the evidence concerning FRBKC's and the Board's respective roles in the denial.

## CONCLUSION

For the foregoing reasons, this Court should grant FRBKC's motion for summary judgment, deny Custodia's request for summary judgment, and dismiss Custodia's Amended Complaint with prejudice.

Respectfully submitted,

Dated: January 26, 2024

/s/ Billie LM Addleman
Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

*Counsel for Defendant*
*Federal Reserve Bank of Kansas City*

J.A.1316

**CERTIFICATE OF SERVICE**

I certify that on the 26 January 2024, a copy of the foregoing was served upon all parties to this action via CM/ECF.

 s/ Shannon M. Ward
OF HIRST APPLEGATE, LLP
Attorneys for Defendant

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com
*Counsel for Defendant the Federal Reserve Bank of Kansas City*

Billie L.M. Addleman, #6-3690
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 532-4999
baddleman@hirstapplegate.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| CUSTODIA BANK, INC.,<br><br>    *Plaintiff,*<br><br>      v.<br><br>FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY,<br><br>    *Defendants.* | No. 1:22-cv-00125-SWS |

## DECLARATION OF ANDREW MICHAELSON IN SUPPORT OF DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S PETITION FOR REVIEW AND MOTION FOR JUDGMENT AS A MATTER OF LAW

I, Andrew Michaelson, declare as follows:

1.      Attached hereto as Exhibit 1 is a true and accurate copy of the Federal Reserve Bank of Kansas City's Objections to Custodia's Statement of Material Facts Not in Dispute.

2.      Attached hereto as Exhibit 2 is a true and accurate copy of the Expert Report of Professor Morgan Ricks.

3.      Attached hereto as Exhibit 3 is a true and accurate copy of Letter No. X-9187 from Chester Morrill of the Federal Reserve Bank of Chicago, dated April 26, 1935.

4.      Attached hereto as Exhibit 4 is a true and accurate copy of Circular No. 85-75 from the Federal Reserve Bank of Dallas, dated June 4, 1985.

5.      Attached hereto as Exhibit 5 is a true and accurate copy of Operating Circular No. 1 from the Federal Reserve Bank of Dallas, dated January 2, 1998.

6.      Attached hereto as Exhibit 6 is a true and accurate copy of the Federal Register entry, dated December 1, 2004, containing the notice "Policy on Payments System Risk."

7.      Attached hereto as Exhibit 7 is a true and accurate copy of a document titled "Reserve Bank Condition Monitoring Standards and Practices," last revised September 15, 2023.

8.      Attached hereto as Exhibit 8 is a true and accurate copy of a document titled "SOP 10 Eligibility Processing Guidelines Credit and Risk Management," dated May 20, 2019.

9.      Attached hereto as Exhibit 9 is a true and accurate copy of a document, dated August 18, 2014, titled "Guidance for Federal Reserve Financial Services Applicants That Are Deemed High Risk by the Federal Reserve Bank of New York."

10.     Attached hereto as Exhibit 10 is a true and accurate copy of a document titled "Account and Financial Services Handbook" from the Federal Reserve Bank of New York, dated February 25, 2020.

11.     Attached hereto as Exhibit 11 is a true and accurate copy of an email from Tara Humston with the subject line "Call with Katherine Carroll – Avanti," dated November 11, 2020, bearing the beginning Bates number FRBKC-00010263.

12.     Attached hereto as Exhibit 12 is a true and accurate copy of excerpts from the transcript of the deposition of Christi May-Oder, dated October 19, 2023 and November 8, 2023.

13.     Attached hereto as Exhibit 13 is a true and accurate copy of excerpts from the transcript of the deposition of Jeffrey Imgarten, dated October 24, 2023.

14.     Attached hereto as Exhibit 14 is a true and accurate copy of excerpts from the transcript of the deposition of Tara Humston, dated November 3, 2023.

15.     Attached hereto as Exhibit 15 is a true and accurate copy of a document with the title "Credit & Risk Management PSR Unit Procedures Manual," dated June 2019.

16.     Attached hereto as Exhibit 16 is a true and accurate copy of excerpts from the transcript of the deposition of Judith Hazen as Rule 30(b)(6) witness, dated November 16, 2023.

17.     Attached hereto as Exhibit 17 is a true and accurate copy of excerpts from the materials entered as Exhibit 225 in the November 16, 2023 deposition of the Federal Reserve Bank of Kansas City's Rule 30(b)(6) witness.

18.     Attached hereto as Exhibit 18 is a true and accurate copy of excerpts from the transcript of the deposition of Caitlin Long, dated November 29, 2023.

19.     Attached hereto as Exhibit 19 is a true and accurate copy of a spreadsheet assessing the applicability of various statutes and regulations to SPDIs, produced in native form under the slip sheet bearing the Bates number FRBKC-00010139.

20.     Attached hereto as Exhibit 20 is a true and accurate copy of an email from Nick Billman with the subject line "RE: Wyoming Talking Points," dated December 12, 2018, bearing the beginning Bates number FRBKC-00018339.

21.     Attached hereto as Exhibit 21 is a true and accurate copy of a document with the title "Wyoming Cryptocurrency Bill Talking Points," dated December 3, 2018, bearing the beginning Bates number FRBKC-00018341.

22.     Attached hereto as Exhibit 22 is a true and accurate copy of an Avanti Financial Group, Inc. business plan, dated August 4, 2021, bearing the beginning Bates number Custodia-00008796.

23.     Attached hereto as Exhibit 23 is a true and accurate copy of excerpts from the transcript of the deposition of Esther George, dated November 9, 2023.

24.     Attached hereto as Exhibit 24 is a true and accurate copy of an Avanti Financial Group presentation, dated May 2021, bearing the beginning Bates number Custodia-00001094.

25.     Attached hereto as Exhibit 25 is a true and accurate copy of minutes and materials from a Custodia Board of Directors meeting, dated February 16, 2022, bearing the beginning Bates number FRBKC-00000143.

26.     Attached hereto as Exhibit 26 is a true and accurate copy of Caitlin Long's redacted handwritten notes produced in this litigation, bearing the beginning Bates number Custodia-00008686.

27.     Attached hereto as Exhibit 27 is a true and accurate copy of a document titled "Pre-Membership Examination Summary Conclusions," dated November 2, 2022, bearing the beginning Bates number FRBKC-00017421.

28.     Attached hereto as Exhibit 28 is a true and accurate copy of excerpts from the transcript of the deposition of Zev Shimko, dated November 30, 2023.

29.     Attached hereto as Exhibit 29 is a true and accurate copy of a Custodia chat log, dated May 18, 2022, bearing the beginning Bates number Custodia-00003346.

30.     Attached hereto as Exhibit 30 is a true and accurate copy of a document titled "Board of Directors and Audit Committee Self-Evaluation Worksheet," bearing the beginning Bates number Custodia-00002851.

31.     Attached hereto as Exhibit 31 is a true and accurate copy of an email from Ross Crouch with the subject line "FW: Summary of 5/17 Custodia meeting and recent updates," dated May 31, 2022, bearing the beginning Bates number FRBKC-00016116.

32.     Attached hereto as Exhibit 32 is a true and accurate copy of minutes and materials from a Custodia Board of Directors meeting, dated April 27, 2022, bearing the beginning Bates number FRBKC-00005784.

33.     Attached hereto as Exhibit 33 is a true and accurate copy of Avanti Financial Group's Application to Open and Maintain a Master Account, dated October 29, 2020, bearing the beginning Bates number FRBKC-00012687.

34.     Attached hereto as Exhibit 34 is a true and accurate copy of a document titled "Custodia Touchpoint Meeting (02-28-22)," dated February 28, 2022, bearing the beginning Bates number FRBKC-00004229.

35.     Attached hereto as Exhibit 35 is a true and accurate copy of excerpts from the transcript of the deposition of Ross Crouch, dated October 25, 2023.

36.     Attached hereto as Exhibit 36 is a true and accurate copy of minutes and materials for a Custodia Board of Directors meeting, dated May 11, 2022, bearing the beginning Bates number FRBKC-00003007.

37.     Attached hereto as Exhibit 37 is a true and accurate copy of excerpts from the transcript of the deposition of Katie Cox, dated December 19, 2023.

38.     Attached hereto as Exhibit 38 is a true and accurate copy of excerpts from the transcript of the deposition of Katie Cox, dated December 20, 2023.

39.     Attached hereto as Exhibit 39 is a true and accurate copy of an email from Tara Humston with the subject line "RE: Call with Katherine Carroll – Avanti," dated November 12, 2020, bearing the beginning Bates number FRBKC-00014922.

40.     Attached hereto as Exhibit 40 is a true and accurate copy of an email from Caitlin Long with the subject line "Fed meeting update," dated November 12, 2020, bearing the beginning Bates number Custodia-00005521.

41.     Attached hereto as Exhibit 41 is a true and accurate copy of a letter from the Federal Reserve Bank of Kansas City, dated January 27, 2022, bearing the beginning Bates number FRBKC-00000234.

42.     Attached hereto as Exhibit 42 is a true and accurate copy of a letter from the Federal Reserve Bank of Kansas City, dated January 7, 2022, bearing the beginning Bates number FRBKC-00014934.

43.    Attached hereto as Exhibit 43 is a true and accurate copy of "SPDI In-Person" meeting notes, dated September 1, 2021, bearing the beginning Bates number FRBKC-00013806.

44.    Attached hereto as Exhibit 44 is a true and accurate copy of an email from Tara Humston with the subject line "RE: Update on COP discussion re: NTMA," dated August 7, 2021, bearing the beginning Bates number FRBKC-00010932.

45.    Attached hereto as Exhibit 45 is a true and accurate copy of a document titled "Joint Statement on Crypto-Asset Policy Sprint Initiative and Next Steps," dated November 23, 2021.

46.    Attached hereto as Exhibit 46 is a true and accurate copy of a document to "facilitate internal conversation and discussion with the Wyoming Division of Banking (DoB) related to consideration of the special purpose depository institution (SPDI) application of Avanti, a commercial blockchain company, to form Avanti Bank & Trust," bearing the beginning Bates number FRBKC-00002695.

47.    Attached hereto as Exhibit 47 is a true and accurate copy of a document titled "Application Review - Avanti," dated October 14, 2020, bearing the beginning Bates number FRBKC-00015695.

48.    Attached hereto as Exhibit 48 is a true and accurate copy of an email from Suzee Webber with the subject line "Risk Assessment #2," dated February 1, 2021, bearing the beginning Bates number FRBKC-00003638.

49.    Attached hereto as Exhibit 49 is a true and accurate copy of a draft document titled "Principles Covering Access to Accounts and/or Services at Federal Reserve Banks," bearing the beginning Bates number FRBKC-00016716.

50.     Attached hereto as Exhibit 50 is a true and accurate copy of a draft document titled "Principles Covering Access to Accounts and/or Services at Federal Reserve Banks," bearing the beginning Bates number FRBKC-00016665.

51.     Attached hereto as Exhibit 51 is a true and accurate copy of an email from Rob Triano with the subject line "RE: SPDI Work," dated October 14, 2021, bearing the beginning Bates number FRBKC-00003331.

52.     Attached hereto as Exhibit 52 is a true and accurate copy of an internal memorandum with the subject line "Update on Avanti Bank & Trust, Cheyenne, WY (Avanti)," dated January 13, 2022, bearing the beginning Bates number FRBKC-00016159.

53.     Attached hereto as Exhibit 53 is a true and accurate copy of excerpts of the transcript from the deposition of Judith Hazen, dated October 16, 2023.

54.     Attached hereto as Exhibit 54 is a true and accurate copy of handwritten notes of Christi May-Oder, dated October 2020 through August 2021, bearing the beginning Bates number FRBKC-00014246.

55.     Attached hereto as Exhibit 55 is a true and accurate copy of a document with the title "2022 Pre-Membership Examination Scope Memorandum," bearing the beginning Bates number FRBKC-00017394.

56.     Attached hereto as Exhibit 56 is a true and accurate copy of a document with the title "Meeting with Custodia Management to Provide Feedback on the FRBKC's 2021 Review," bearing the beginning Bates number FRBKC-00016135.

57.     Attached hereto as Exhibit 57 is a true and accurate copy of an email from Jeff Imgarten with the subject line "RE: Custodia Review Documents" dated June 25, 2022, bearing the beginning Bates number FRBKC-00002200.

58.     Attached hereto as Exhibit 58 is a true and accurate copy of an email from Judith Hazen with the subject line "FW: Meeting to Discuss Membership Application" dated June 8, 2022, bearing the beginning Bates number FRBKC-00011132.

59.     Attached hereto as Exhibit 59 is a true and accurate copy of a letter from FRBKC to Custodia dated January 27, 2023, bearing the beginning Bates number FRBKC-00002172.

60.     Attached hereto as Exhibit 60 is a true and accurate copy of an email from Judith Hazen with the subject line "Re: Custodia Memo to Esther" dated December 6, 2022, bearing the beginning Bates number FRBKC-00002132.

61.     Attached hereto as Exhibit 61 is a true and accurate copy of a document with the title "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" dated January 19, 2023, bearing the beginning Bates number FRBKC-00009928.

62.     Attached hereto as Exhibit 62 is a true and accurate copy of an email from Judith Hazen with the subject line "Draft Recommendation Memo" dated January 6, 2023, bearing the beginning Bates number FRBKC-00016409.

63.     Attached hereto as Exhibit 63 is a true and accurate copy of an email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" dated January 10, 2023, bearing the beginning Bates number FRB-AR-000313.

64.     Attached hereto as Exhibit 64 is a true and accurate copy of a draft document with the title "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" bearing the beginning Bates number FRB-AR-000315.

65.     Attached hereto as Exhibit 65 is a true and accurate copy of an email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" dated January 9, 2023, bearing the beginning Bates number FRB-AR-000324.

66.     Attached hereto as Exhibit 66 is a true and accurate copy of a draft document with the title "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" bearing the beginning Bates number FRB-AR-000326.

67.     Attached hereto as Exhibit 67 is a true and accurate copy of excerpts from the transcript of the deposition of Jenifer Haake, dated October 26, 2023

68.     Attached hereto as Exhibit 68 is a true and accurate copy of excerpts from the transcript of the deposition of Andrea Mullins, dated December 7, 2023.

69.     Attached hereto as Exhibit 69 is a true and accurate copy of excerpts from the transcript of the deposition of Jackie Nugent, dated November 15, 2023.

70.     Attached hereto as Exhibit 70 is a true and accurate copy of an email from Caitlin Long with the subject line "Fwd: Just spoke with Jackie Nugent" dated March 6, 2021, bearing the beginning Bates number Custodia-00008663.

71.     Attached hereto as Exhibit 71 is a true and accurate copy of an email from Derek Bush with the subject line "Re: Avanti – Special Purpose Depository Institution – Wishes to Schedule a Meeting with Board Staff" dated April 27, 2021, bearing the beginning Bates number Custodia-00004600.

72.     Attached hereto as Exhibit 72 is a true and accurate copy of notes from a March 24, 2022 meeting between FRBKC and Custodia, bearing the beginning Bates number FRBKC-00009848.

73.     Attached hereto as Exhibit 73 is a true and accurate copy of S-Letter 2677 dated January 17, 2023, bearing the beginning Bates number FRB-AR-000014.

74.     Attached hereto as Exhibit 74 is a true and accurate copy of a Teams chat between Christi May-Oder and Ross Crouch dated March 14, 2022, bearing the beginning Bates number FRBKC-00004943.

75.     Attached hereto as Exhibit 75 is a true and accurate copy of handwritten notes of Tara Humston, dated January 12, 2022, through March 20, 2022, bearing the beginning Bates number FRBKC-00013942.

76.     Attached hereto as Exhibit 76 is a true and accurate copy of S-Letter 2677 dated January 17, 2023, bearing the beginning Bates number FRB-AR-000014.

77.     Attached hereto as Exhibit 77 is a true and accurate copy of an email from Judith Hazen with the subject line "Draft Recommendation Memo," dated January 6, 2023, bearing the beginning Bates number FRB-AR-000335.

78.     Attached hereto as Exhibit 78 is a true and accurate copy of an email from Judith Hazen with the subject line "Custodia Bank Master Account Request," dated January 24, 2023, bearing the beginning Bates number FRB-AR-000003.

79.     Attached hereto as Exhibit 79 is a true and accurate copy of an email from Matt Eichner with the subject line "Custodia response: S-letter – 2667 with no concerns identified," dated January 26, 2023, bearing the beginning Bates number FRB-AR-000002.

80.     Attached hereto as Exhibit 80 is a true and accurate copy of a document titled "Account Access Guidelines – FRS Internal Implementation Handbook," dated August 16, 2023, bearing the beginning Bates number FRBKC-00017290.

81.     Attached hereto as Exhibit 81 is a true and accurate copy of a letter from Custodia titled "Application by Avanti Financial Group, Inc. (d/b/a Avanti Bank & Trust) for Federal Reserve Membership," dated August 5, 2021, bearing the beginning Bates number FRBKC-00017547.

82.     Attached hereto as Exhibit 82 is a true and accurate copy of excerpts from the transcript of the deposition of Peter Conti-Brown, dated December 14, 2023.

83.     Attached hereto as Exhibit 83 is a true and accurate copy of handwritten notes of Esther George, bearing the beginning Bates number FRBKC-00017834.

84.     Attached hereto as Exhibit 84 is a true and accurate copy of a draft document titled "Novel Account Access Review" bearing the beginning Bates number FRBKC-00017570.

DATED this 26th day of January 2024.

/s/ *Andrew Michaelson*
Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com
*Counsel for Defendant the*
*Federal Reserve Bank of Kansas City*

## CERTIFICATE OF SERVICE

I certify the foregoing **Declaration in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law** upon all parties to this action pursuant to the Federal Rules of Civil Procedure via CM/ECF on January 26, 2024.

_Shannon M. Ward_
OF HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC



**FILED**

11:32 am, 2/9/24

**Margaret Botkins
Clerk of Court**

David Zaring  (pro se)
The Wharton School
The University of Pennsylvania
600 Jon M. Huntsman Hall
3730 Walnut Street, #600
Philadelphia, PA 19104-6340
(215) 573-7154
zaring@wharton.upenn.edu

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,

     *Plaintiff,*

     v.

FEDERAL RESERVE BOARD OF
GOVERNORS and FEDERAL
RESERVE BANK OF KANSAS CITY,

     *Defendants.*

No. 1:22-cv-00125-SWS

## DAVID ZARING'S  AMICUS BRIEF IN SUPPORT OF DEFENDANTS

### Introduction and Overview

I, amicus David Zaring,[1] am a professor at the Wharton School of the

University of Pennsylvania. I am a scholar of financial regulatory institutions, have

authored over fifty articles on administrative law and financial regulation, and am

currently writing an article on novel charters and new entrants in the banking

market, *Rebuilding the Regulatory Perimeter*. I have studied the Office of the

Comptroller of the Currency (OCC)'s chartering practices, including the special

---

[1] This brief is filed pursuant to consents obtained from all parties. No person other than amicus
authored this brief in whole or in part or made a monetary contribution toward its preparation or
submission. Amicus thanks Rachel Shoemaker of the University of Pennsylvania School of Law for
research assistance.

purpose charter program for financial technology (fintech) companies that is a federal version of the state charter that Custodia received from the State of Wyoming.[2] I am one of the twenty most cited active scholars of administrative law in general, and one of the ten most cited in financial regulation. Before entering the academy and winning tenure at Wharton, I served as a litigator in the Federal Programs Branch of the Department of Justice. My background provides a unique perspective on the financial system and the risks presented if Custodia's requested relief is granted. I have no financial interest in the outcome of this case.

This case is about statutory interpretation — Custodia contends that the Monetary Control Act gives the Federal Reserve Banks and Board no discretion in deciding whether to allow Custodia access to the payment rails run by the Fed (I will not distinguish between the Board and the Reserve Bank for the purposes of this brief, although I know the Reserve Bank and the Board have different roles with regard to master accounts). Because such an argument is inconsistent with the way that financial regulation works and could lead to adverse outcomes if adopted as a generalized rule, I write in support of the position of the Federal Reserve Bank of Kansas City and the Board of Governors. The statute cannot leave the Fed with no choice in the matter.

The limited nature of the question before the Court makes a difference in the legal analysis. This case is not about whether Custodia has devised a business model that is worthy of master account access, and so I offer no argument on that

---

[2] *See* David Zaring, *Modernizing the Bank Charter*, 61 WM. & MARY L. REV. 1397 (2020).

question. Nor is this case only about whether Custodia is entitled to a master account as of right. Under Custodia's view of the case, *any* state-chartered bank, trust, special purpose depositary institution, or other kind of business, is entitled to a master account, no matter the viability of the business, or the nature of the state charter.

I would place the question of master account access in the context of how financial regulation works more generally. It is a system that relies on the ability of regulators and supervisors to exercise discretion – mandatory obligations that regulators have towards regulated industry are few and far between, and with good reason. Regulators must exercise discretion because banks, while providing an extraordinarily valuable service, are risky enterprises, capable of failing in hours, if not days, with effects that can be felt by other banks, and even by the broader economy.[3]

Regulators must be able to identify and respond to these sorts of risks. It would be surprising and inconsistent with the regulatory scheme if regulators, who have almost total discretion over whether to charter a bank, whether to provide it with deposit insurance, how to oversee the bank once it opens for business, and how to test banks for riskiness once they are open, had no choice but to let a bank make payments through the Fed's master account system, no matter the purpose of the bank or its solvency.

---

[3] We saw just how quickly a bank could fail only last year. Ken Sweet & Stan Choe, *'A Bank Sprint, Not a Bank Run': These Days, Depositors' Mass Fear Can Go Viral Faster Than Regulators are Able to Respond,* CHI. TRIB. March 17, 2023 ("What made the failure of Silicon Valley Bank unique compared to past failures of large banks was how quickly it collapsed.").

J.A.1333

### Argument

Banks are financial intermediators: they take deposits, use those deposits to make loans, and facilitate payments between clients.[4]  In each of these functions, supervisors have — and, indeed, require if they are to do their job properly — the discretion to grant and then supervise these banking practices. Banks that want to hold deposits, other than trust funds, must establish to the satisfaction of the Federal Deposit Insurance Corporation that they are safe enough to warrant deposit insurance, and then must undergo regular examinations to ensure that the deposits they do hold are safe and sound.[5]  Banks that want to issue loans must establish that they are prudently managed to get a bank charter, and then must comply with balance sheet analyses designed to ensure that they are holding sufficient capital against those loans, which in turn are "risk weighted" by regulators.[6]  It would be terribly surprising if supervisors had no discretion to

---

[4] 12 C.F.R. § 5.20(e)(i); *see* OFF. OF THE COMPTROLLER OF THE CURRENCY, CONSIDERING CHARTER APPLICATIONS FROM FINANCIAL TECHNOLOGY COMPANIES (2018), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/pub-considering-charter-apps-from-fin-tech-co.pdf (stating that special purpose national banks must engage in at least one of the "core banking functions of taking deposits, paying checks, or lending money").

[5] *See* 12 U.S.C. § 1815(a) (titled "Application to Corporation Required," and providing, in subsection 1, that "any depository institution which is engaged in the business of receiving deposits other than trust funds…,upon application to and examination by the Corporation and approval by the Board of Directors, may become an insured depository institution"). *See also Exploring Special Purpose National Bank Charters for Fintech Companies*, OFFICE OF THE COMPTROLLER OF THE CURRENCY (Dec. 2016) ("[A] fintech company with a special purpose national charter that does not take deposits, and therefore is not insured by the Federal Deposit Insurance Corporation (FDIC), would not be subject to laws that apply only to insured depository institutions.").

[6] *See* Andrew P. Scott and Marc Labonte, *Bank Capital Requirements: A Primer and Policy Issues*, CONG. RSCH. SERV. (March 9, 2023), https://crsreports.congress.gov/product/pdf/R/R47447 (reviewing the measures financial regulators take to ensure that banks have adequate capital to issue loans).

decide whether new entrants into the business of banking were ready to take on the third core activity in banking – processing payments.

The basis for this discretion lies in the dangerous nature of banking, which, although an invaluable service, has, throughout the nation's history, led to financial crisis after financial crisis.[7] In financial regulation, regulators cannot be expected to open the full suite of banking services to new entrants as of right.

## I.   Banks May Not Open as a Matter of Right.

Consider the review of the question whether to charter a bank. While corporate charters can be obtained from states within minutes, the bank chartering process is much more elaborate. Bank submit lengthy applications to regulators who have, in the past, enjoyed almost total discretion over whether to grant or not grant the applicant's license to open a bank. Courts, recognizing the need for discretion and expertise provide "extraordinary deference" to the OCC when reviewing its chartering decisions.[8] As Margaret Tahyar has observed, "a generation has grown to accept that the granting of bank charters is so up to the discretion of the bank regulators that the regulator need not even give reasons for a denial."[9]

For example, the OCC, after the last financial crisis, decided to radically limit the issuance of bank charters, presumably because it wanted to be sure that the

---

[7] *See generally* CHARLES KINDLEBERGER, MANIAS, PANICS, AND CRASHES: A HISTORY OF FINANCIAL CRISES (8TH ED. 2023). *See also* David Zaring, *The Corporatist Foundations of Financial Regulation*, 108 IOWA L. REV. 1304 (2023) ("[B]anking is weirdly dangerous and is accordingly regulated weirdly.").
[8] MICHAEL S. BARR, ET. AL., FINANCIAL REGULATION: LAW & POLICY 168 (2d ed. 2018).
[9] Margaret E. Tahyar, *Are Bank Regulators Special?* THE CLEARING HOUSE (Jan. 1, 2018), https://www.theclearinghouse.org/banking-perspectives/2018/ 2018-q1-banking-perspectives/articles/ are-bank-regulators-special.

banking sector had stabilized before it opened the doors to new institutions. The

FDIC took a similar approach to applications for deposit insurance.  During the

decade between 2007 and 2017, the OCC only issued six bank charters, and the

FDIC accepted even fewer deposit insurance applications – and during that period,

at least 800 banks disappeared.[10]  Regulators never took the perspective that they

were obligated to issue charters to new entrants into the banking system, or that

they had an obligation to replace old banks with new ones.

When federal regulators felt comfortable enough to reopen the application

process, charter applicants were met with searching and lengthy reviews. Novel

kinds of banks, like the online-only bank Varo, spent years and millions of dollars

seeking a national bank charter.[11]  After receiving a conditional approval from the

OCC, the FDIC took three years and multiple rounds of applications before issuing

its own order conditionally approving Varo's application for deposit insurance.[12]

---

[10] David Zaring, *Modernizing the Bank Charter*, 61 WM. & MARY L. REV. 1397, 1399 n.4 (2020) (citing MICHAEL S. BARR, ET. AL., FINANCIAL REGULATION: LAW & POLICY 168 (2d ed. 2018)).
[11] *See* OCC, Preliminary Conditional Approval 1205 of the De Novo Charter Application for the Proposed Varo Bank, National Association, Salt Lake City, UT (Charter Number 25147), https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/2018/ca1205.pdf (Sep. 2018); Penny Crosman, *Mission-Driven Varo Money Secures $45 Million from Investors*, AM. BANKER (Jan. 18, 2018, 9:00 AM), https://www.americanbanker.com/news/mission-driven-varo-money-secures-45-million-from-investors (Varo's CEO observed that "The OCC is not going to relax their standards, so it's been a rigorous process.").
[12] Kate Rooney, *Fintech Varo Gets One Step Closer to Becoming an Actual Bank: 'We See It as a Pretty Big Moat'*, CNBC (Feb. 11, 2020) https://www.cnbc.com/2020/02/11/start-up-bank-varo-gets-approval-to-become-a-full-scale-bank.html. ("After three years and multiple rounds of applications, the FDIC approved the fintech company's national bank charter application"). *See also* FDIC, *Re: Varo Bank, NA*, www.fdic.gov/regulations/laws/bankdecisions/depins/varo-bank-na-draper-utah.pdf (Feb. 7, 2020).

J.A.1336

Moreover, this protracted initial application process does not get the bank all the way toward opening.[13] The OCC ordinarily extracts a Capital Assurance and Liquidity Maintenance Agreement and a Capital Liquidity and Support Agreement from conditionally improved applicants.[14]  It also imposes capital raising requirements on the bank before it will let the bank open for business, even after issuing the conditional approval.[15] The FDIC has its own set of requirements that must be met before a conditional approval becomes a final one permitting the bank to open for business.[16]  No bank is entitled to a conditional approval as of right, nor are banks that receive conditional approvals entitled to final approvals permitting them to open.  In fact, the cryptocurrency trust Protego – a business not unlike Custodia – has still not received a final approval from the OCC, although it did obtain a conditional approval on February 5, 2021.[17]

## II.    Banks, Once Open, Are Subject to Highly Discretionary Supervision.

Once open for business, banks are subject to an  even more discretionary and searching regular review of their business practices.

---

[13] *See* OFFICE OF THE COMPTROLLER OF THE CURRENCY, COMPTROLLER'S LICENSING MANUAL: CHARTERS 4 at 3 (2021), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/licensing-booklet-charters.html.
[14] *Id.* at 30, 59.
[15] *See id.*
[16] *See Applying For Deposit Insurance A Handbook for Organizers of De Novo Institutions*, FED. DEP. INS. CORP. (April 2017), https://www.fdic.gov/regulations/applications/handbook.pdf.
[17] Derek Andersen, *Protego's Conditional National Bank Status Expired Without Approval: Report*, COINTELEGRAPH, Mar. 17, 2023, https://cointelegraph.com/news/protego-s-conditional-national-bank-status-expired-without-approval-report.

**J.A.1337**

Consider lending. All banks, whether chartered by a state or federal regulator, must justify their lending decisions in ways that comply with capital rules that require the bank to calculate how much capital it must hold against each loan it makes.[18] The idea is that banks take on a great deal of credit risk – the risk that a borrower from the bank will not pay the bank back and will default on its loan. To prepare for that risk, banks must hold capital against those loans, and regulators will complain if the mix of lending decisions made by the bank could expose it to a risk that too many of its loans could go bad at once, as happened to many financial institutions in wake of the housing crisis that led to the last great financial crisis.[19]

For example, in their "Underwriting and Loan Approval Process" guide, the FDIC's Division of Supervision and Consumer Protection provides a list of a dozen factors that might signal elevated risk worthy of follow up for loan underwriters and approvers, but notes that "[t]hese lists are not exhaustive, and examiners must exercise discretion in determining the expanse and depth of examination procedures to apply. If examiners identify significant concerns, they should expand procedures

---

[18] Scott and Labonte, *supra* note 4.
[19] Steven L. Schwarcz, Essay, *Markets, Systemic Risk, and the Subprime Mortgage Crisis*, 61 SMU L. REV. 209, 210 (2008) (pointing to the mortgage crisis as a trigger in the 2008 financial crisis). Naturally, this regulatory discretion is matched by bank lending discretion – no one is entitled to a bank loan as of right. *See generally* Gene Ambrocio and Iftekhar Hasan, *What Drives Discretion in Bank Lending? Some Evidence and a Link in Private Information*, 106 J. OF BANKING & FINANCE 323 (July 11, 2019) (discussing how the level of discretion used by banks has varied across time and type of lending institution).

J.A.1338

accordingly."[20]  Banks cannot make loans as of right and must expect that regulators will scrutinize their loan books regularly.

If lending – the asset side of a bank balance sheet – is supervised in a way replete with discretion, one can think about the liability side of the bank balance sheet in a similar way. The FDIC exists to protect depositors from the risk that their bank will fail. If it does, the agency will make depositors whole if the failing bank cannot do so. This form of insurance has had many salutary consequences. But because the government is on the hook for losses sustained by a failing bank, the FDIC's examiners will very carefully ensure that the bank has an adequate cushion of money from shareholders or other lenders to the bank to make it unlikely that resort to the agency's insurance fund will be needed. Here too, the regulatory watchword's discretion. FDIC examiners embed themselves inside the bank and go through the balance sheet.[21]  They also look to see if there are other signs of trouble and how the bank is operated as well.[22]

More generally, banking regulators assesses banks pursuant to its CAMELS rating system. CAMELS – which stands for capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk – is a rating system

---

[20] *Fed. Deposit Ins. Corp.*, Credit Card Activities Manual, Ch. VII – Underwriting and Loan Approval Process (2007) available at https://www.fdic.gov/regulations/examinations/credit_card/ch7.html.
[21] *Basic Examination Concepts and Guidelines*, FED. DEP. INS. CORP. (March 2023), https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/section1-1.pdf ("Given the fundamental reasons for conducting examinations, regulatory personnel must have access to all records and employees of a bank during an examination.").
[22] *Id.* ("[B]ank examinations play a key role in the supervisory process by helping the FDIC identify the cause and severity of problems at individual banks and emerging risks in the financial-services industry. The accurate identification of existing and emerging risks helps the FDIC develop effective corrective measures for individual institutions and broader supervisory strategies for the industry..")

that allows banking regulators to monitor the health of banks and compare bank health over time with peers.[23] Banks are rated on each element from 1 ("strong") to 5 ("critically deficient"), and a composite rating for each bank is determined based on all six components.[24] However, this overall composite score is not based on the average of the ratings for each individual component. Instead "some components are weighed more heavily than others based on examiner judgment of risk."[25] For example, due to the size of the loan portfolio at community banks, the "asset quality" rating is the most important.[26] When it comes to assessing capital, "examiners also compare a bank's capital ratios with those of similar banks" – regulators may come to different views about similar amounts of capital if one bank looks like its peer group, while another one does not.[27] This rating, though confidential, is hugely important to the supervision of the bank by regulators, as if a bank's CAMELS composite rating is a 3, 4 or 5, bank supervisors will require the bank's board of directors to enter into an agreement to correct the issues identified by supervisors.[28]

---

[23] Julie Stackhouse, *The ABCs of CAMELS,* FEDERAL RESERVE BANK OF ST. LOUIS (July 24, 2018), https://www.stlouisfed.org/on-the-economy/2018/july/abcs-camels.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] Julie Stackhouse, *CAMELS Ratings: Capital Adequacy,* FEDERAL RESERVE BANK OF ST. LOUIS (Aug. 22, 2018), https://www.stlouisfed.org/on-the-economy/2018/august/camels-ratings-capital-adequacy.
[28] Julie Stackhouse, *The ABCs of CAMELS,* FEDERAL RESERVE BANK OF ST. LOUIS (July 24, 2018), https://www.stlouisfed.org/on-the-economy/2018/july/abcs-camels.

J.A.1340

Moreover, many banks are, if large enough, subjected to an additional discretionary review under the federal government's stress testing regime.[29] Stress tests force banks to consider not only whether they would survive under the conditions that exist in in the real world, but also what actions the bank could take to survive in a hypothetical situation, such as a rapid rise in interest rates, or a sudden recession.[30] Traditionally, supervisors devise different kinds of stress tests each time they impose the requirement on banks, and they have in the past not let the banks know what kind of a test they will impose in any particular year.[31] The watchword is discretion, once again, and no bank is entitled to pass a stress test as of right.

Perhaps unsurprisingly, courts have understood the need for this sort of discretionary oversight of deposit taking, lending, and overall resiliency, and have accordingly reviewed appeals of supervisory decisions by banking regulators deferentially.[32]

---

[29] The larger the bank, the more frequent the test. For explanation of testing, *see Stress Tests and Capital Planning*, THE FEDERAL RESERVE, Aug. 10, 2020, available at https://www.federalreserve.gov/supervisionreg/stress-tests-capital-planning.htm.

[30] For examples of hypothetical scenarios used by the Federal Reserve, *see Federal Reserve Board Releases Hypothetical Scenarios for Second Round of Bank Stress Tests*, THE FEDERAL RESERVE, Sept. 17, 2020, available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20200917a.htm.

[31] "Stress tests usually vary in design and complexity." FDIC, *Proposed Guidance on Stress Testing for Banking Organizations With More Than $10 Billion in Total Consolidated Assets*, 76 Fed. Reg. 35,072, 35,074 (June 15, 2011).

[32] Julie Andersen Hill's 2015 study found in examining over a decade of appeals that against the OCC, the "appealing bank was the clear winner in only 20% of appeals," and through the Fed's appeals process, in only 8% of the appeals was the examiner determination reversed. Julie Andersen Hill, *When Bank Examiners Get It Wrong: Financial Institution Appeals of Material Supervisory Determinations*, 92 WASH. U.L. REV. 1101, 1127, 1137 (2015).

J.A.1341

### III.    Payment Processing Must Be Supervised in the Same Way that Deposit-Taking and Lending is Supervised

In addition to taking deposits and making loans, a third critical role that banks play is facilitating payments. The Fed has long played a role in helping them through that process. Here too, the watchword has been discretion. The Fed's traditional payment system, Fedwire, is only open to a limited set of financial institutions, and certainly not to commercial firms.[33] Its new service, FedNow, is an optional way to settle payments more quickly.[34] Banks have the discretion to decide whether they wish to adopt the new service, and the Fed has indicated that not everyone who wishes to sign up for FedNow will be entitled to do so as a matter of right.[35]

Nor does this change, as a matter of regulation, for nonbanks. They must obtain money transmitter licenses from the states in which they operate, and they are certainly not entitled to those as a matter of right.  Meeting the requirements for these consumer protection "safety and soundness" laws can be a lengthy and expensive process.[36] In describing this process, Faisal Khan observed that "[o]btaining money transmitter licenses is no easy feat. It involves a large amount of paperwork, money and time. It can take up to two years to amass all 50 state

---

[33] FRB, Fedwire Funds Services, https://www.federalreserve.gov/paymentsystems/fedfunds_about.htm (describing the institutions eligible to participate in Fedwire).
[34] See *Common Questions About the FedNow Service*, FEDNOW.ORG (2023), https://explore.fednow.org/common-questions.
[35] *See id.* ("As with current Federal Reserve Bank services, the FedNow Service is available to depository institutions eligible to hold accounts at the Federal Reserve Banks under applicable federal statutes and Federal Reserve rules, policies and procedures.").
[36] Kevin V. Tu, *Regulating the New Cashless World*, 65 ALA. L. REV. 77, 82 (2013)

J.A.1342

licenses."[37] Wyoming does not require SPDI holders to acquire MTL licenses, however, meaning that neither the federal government nor the states would have any discretion to supervise these MTL licenses – an outcome that, when it comes to payments, would make SPDIs unregulated by either the federal government or the states in which the SPDIs do business.[38]

### IV.   Requiring the Fed to Give Master Accounts to Novel Financial Institutions as a Matter of Right Would Mean That the Fed Could Be Forced to Do Business with Bad Actor or Insolvent Banks.

In short, the financial regulatory system does not entitle banks to anything as a matter of right but relies on the informed choices by regulators to ensure that only safe and sound institutions offer banking services to the public.

It would be curious if, given the almost total discretion afforded to regulators when it comes to assessing the credit risk that banks take when they lend, protecting the depositors who trust their money to banks, and assessing the safety and soundness of banks as they continue to operate, that regulators would lack any discretion when it comes to allowing banks to access the Fed's payment rails.

Such a rule would have extremely risky consequences, as Morgan Ricks observed in his expert report.[39] If a state chartered a bank, or developed a novel kind of bank charter and awarded it to a firm that risked violating federal law, it

---

[37] Faisal Khan, *How to Get Money Transmitter License Coverage for Your Startup*?, BLOG FAISAL KHAN (Sept. 9, 2016), https://blog.faisalkhan.com/money-transmitter-licenseapplication-d9dd32286871 [https://perma.cc/MJ2U-XRB6].

[38] *See* WYO. STAT. ANN. § 40-22-104(vi) (West 2021) (stating the "[b]uying, selling, issuing, or taking custody of payment instruments or stored value in the form of virtual currency or receiving virtual currency for transmission to a location within or outside the United States by any means" is exempted from the state's Money Transmitter Law).

[39] *See* Expert Report of Morgan Ricks, Doc. 240-91, filed Dec. 22, 2023, at 12-19.

J.A.1343

cannot be the case that federal regulators would be obligated to allow that bank to access the payment rails.

One could imagine institutions using special-purpose charters to evade anti-money laundering rules with which they would otherwise have to comply. Nor does it seem in any way logical to permit a financial institution about which federal regulators had real doubts about insolvency, to send as much money as it liked to whatever destination it chose, with the support of the Fed. It is similarly inconceivable that the Fed would be required to continue access to the payment rails for banks engaged with international financial institutions in opposition to the United States' interests. Custodia's position, if generalized, would mean that states could play politics with their charters, and force the famously apolitical Fed to go along. Some states might devise special purpose charters designed to cater to or any kind of interest group across the political spectrum at the exclusion of others, and the Fed would be obligated to support them.

None of this is meant to reflect at all on the merits of plaintiff's application — it is only to note that, as a statutory matter, the way banking regulation works cannot possibly entitle Custodia to payment services as a matter of right.

In fact, I am on record supporting the OCC's efforts to develop a financial technology charter of which special-purpose banks like Custodia could avail themselves.[40] Federal regulators should be open to innovative new entrants — and

---

[40] Peer-to-peer lenders could obtain a lending-only charter from the federal government and evade the need for deposit insurance. Or perhaps payments processors should be allowed to have a federal charter that would obviate the need for them to obtain money transmitter licenses in every state in which they do business.

perhaps should afford those institutions' aspects to so-called "skinny charters" such as the charter that Custodia received from Wyoming. These sorts of novel charters might be good for the financial industry, but it has to be the case that federal regulators would not have to provide them with payment services as of right, but rather after the sort of careful review that characterizes banking regulation in every other context.

Moreover, I was sufficiently intrigued by Custodia's project to invite the firm's Chief Executive Officer to speak to a group of financial regulation academics about it in June, 2021. I came away from the speech with a sense that the firm was managed by a thoughtful leader.

But this dispute is not about the quality of Custodia's business plan, it is a question of statutory interpretation. The Monetary Control Act, and the financial regulatory scheme more generally, does not entitle Custodia or any other applicant to a master account as of right.

### V.    The Plain Language of the Monetary Control Act Does Not Require the Fed to Award Custodia a Master Account.

I will leave most of the statutory interpretation arguments in the case to the litigants. But as the Board's and the Reserve Bank's briefs explain in greater detail, the Monetary Control Act's plain language hardly requires the defendants to award master accounts to any and all applicants who seek them. In its attempt to level the playing field between financial institutions, the Monetary Control Act states that "[a]ll Federal Reserve bank services covered by the fee schedule *shall* be

15

available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks…".[41]

The purpose of the statute and fee schedule is to prevent price discrimination for services with an associated cost between member and non-member institutions. But providing access with no assessment of risk cannot be what the statute requires. Having access to a Master Account is not a service on the fee schedule for which non-member and member institutions have been charged different and discriminatory prices for, it is a status granted in accordance with the Federal Reserve's discretion. Furthermore, regardless of what services § 248a(c)(2) covers, the statute does not guarantee such services to any depository institution without discretion, as the statute does not require that "[a]ll…services" be provided to *all* depository institutions. The inclusion of "all" with respect to the Federal Reserve services and exclusion of "all" regarding which depository institutions suggests that there be no discretion over which services must be priced according to the fee schedule, but that discretion remains in providing depository institutions access to such services, such as retaining discretion in granting master accounts.

As the Board and the Reserve Bank explain, the Fed's discretion here is also consistent with the text of 12 U.S.C. § 342. That statute provides that "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon

---

[41] 12 U.S.C. § 248a(c)(2) (emphasis added).

J.A.1346

presentation or other items, and also, for collection, maturing notes and bills....”[42] By using "may" it appears that Congress intended to provide discretion to the Federal reserve banks in their ability to receive funds from depository institutions. As Judge Koeltl of the Southern District of New York concluded, "12 U.S.C. § 342 makes clear that Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so.”[43]

It is reasonable to conclude that the Federal Reserve has discretion under § 342 to receive deposits by granting access to Fed master accounts, and that if granted such access, under § 248a(c)(2) these nonmember institutions must have access to the fees covered by the fee schedule at the same prices as available to member banks. As Judge Koeltl observed, § 248a(c)(2) "is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System.”[44]

---

[42] 12 U.S.C. § 342.
[43] Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *7 (S.D.N.Y. Oct. 27, 2023).
[44] Id.

17

## Conclusion

For the foregoing reasons, the Court should rule in favor of the defendants.

Dated:  9 February 2024.

David Zaring  (pro se)
The Wharton School
The University of Pennsylvania
600 Jon M. Huntsman Hall
3730 Walnut Street
Philadelphia, PA 19104-6340
(215) 573-7154
zaring@wharton.upenn.edu

## CERTIFICATE OF SERVICE

I certify the foregoing *David Zaring's Amicus Brief in Support of Defendants* was served upon all parties to this action via CM/ECF pursuant to the Federal Rules of Civil Procedure on 9 February 2024.

DAVID ZARING (pro se)

J.A.1348