Case No. 24-8024

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

### CUSTODIA BANK, INC.,

*Appellant,*

v.

### FEDERAL RESERVE BOARD OF GOVERNORS et al.,

*Appellees.*

On Appeal from the U. S. District Court for the District of Wyoming

The Honorable Scott W. Skavdahl, District Judge

District Court No. 1:22-CV-125-SWS

## JOINT APPENDIX

Joshua P. Chadwick
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street & Constitution Ave. NW
Washington, DC 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

Michelle S. Kallen
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
MKallen@jenner.com

*Counsel for Appellant*

Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
20th Street and Constitution Ave.
NW
Washington, DC 20551
(202) 263-4835
yvonne.f.mizusawa@frb.gov
yonatan.gelblum@frb.gov
katherine.pomeroy@frb.gov

*Counsel for Appellee Federal
Reserve Board*

Andrew Z. Michaelson
KING & SPALDING LLP
1185 Ave. of the Americas, 34th Fl.
New York, NY 10036
(212) 556-2100
amichaelson@kslaw.com

Billie LM Addleman
Erin E. Berry
HIRST APPLEGATE, LLP
PO Box 1083
Cheyenne, WY 82003
(307) 632-0541
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Christine M. Carletta
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
ccarletta@kslaw.com
cfreeman@kslaw.com

Ian Heath Gershengorn
Laurel L. Rimon
Emanuel Powell III
Maria LaBella
JENNER & BLOCK LLP
1099 New York Ave. NW,
Suite 900
Washington, DC, 20001-4412
Telephone: 202-639-6000
IGershengorn@jenner.com
LRimon@jenner.com
EPowell@jenner.com
MLaBella@jenner.com

Scott E. Ortiz
WILLIAMS, PORTER, DAY & NEVILLE,
P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602
Telephone: 307-265-0700
sortiz@wpdn.net

Ryan Scarborough
Jamie Wolfe
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW,
Washington, DC 20024
Telephone: 202-434-5173
rscarborough@wc.com
jwolfe@wc.com

*Counsel for Appellant*

Jared Lax
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
jlax@kslaw.com

*Counsel for Appellee Federal
Reserve Bank of Kansas City*

# TABLE OF CONTENTS

## Volume I of X

District Court Docket Report, *Custodia Bank Inc. v. Federal Reserve Board of Governors et al,* No. 1:22-cv-00125 (D. Wyo.) ...................................................................... J.A.1

Complaint (D. Wyo. June 7, 2022), ECF No. 1 ............................... J.A.41

Exhibit 1 to Complaint (D. Wyo. June 7, 2022), ECF No. 1-2......... J.A.86

Defendant Board of Governors of the Federal Reserve System's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 48 ................................................. J.A.88

Defendant Board of Governors of the Federal Reserve System's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 49 .............................................................. J.A.91

Defendant Federal Reserve Bank of Kansas City's Motion to Dismiss Complaint (D. Wyo. Aug. 16, 2022) ECF No. 50..... J.A.153

Defendant Federal Reserve Bank of Kansas City's Memorandum of Points and Authorities in Support of Its Motion to Dismiss (D. Wyo. Aug. 16, 2022) ECF No. 51 ...... J.A.157

## Volume II of X

Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss Plaintiff's Complaint (D. Wyo. Sept. 13, 2022) ECF No. 58 .......................................................... J.A.216

Defendant Board of Governors of the Federal Reserve System's Reply in Support of Its Motion to Dismiss Complaint (D. Wyo. Oct. 4, 2022) ECF No. 96 ..................... J.A.269

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Motion to Dismiss (D. Wyo. Oct. 4, 2022) ECF No. 97 .......................................................... J.A.304

Plaintiff Custodia Bank, Inc.'s Notice of Submission of
    Supplemental Authority (D. Wyo. Oct. 12, 2022) ECF
    No. 98 ................................................................................ J.A.340

Defendant Board of Governors of the Federal Reserve
    System's Response to Plaintiff's Notice and Submission
    of Supplemental Authority (D. Wyo. Oct. 19, 2022) ECF
    No. 99 ................................................................................ J.A.353

Order Granting in Part and Denying in Part Defendants'
    12(b)(6) Motions to Dismiss Complaint (D. Wyo. Nov. 11,
    2022) ECF No. 102 ............................................................ J.A.359

Joint Motion of Defendants Federal Reserve Bank of Kansas
    City and Federal Reserve Board of Governors to Dismiss
    the Complaint as Moot (D. Wyo. Jan. 27, 2023) ECF No.
    116 ...................................................................................... J.A.397

First Amended Complaint (D. Wyo. Feb. 28, 2023) ECF No.
    121 ...................................................................................... J.A.401

Defendant Federal Reserve Bank of Kansas City's Motion to
    Dismiss First Amended Complaint (D. Wyo. Mar. 28,
    2023) ECF No. 124 ............................................................ J.A.438

## Volume III of X

Defendant Board of Governors of the Federal Reserve
    System's Motion to Dismiss the First Amended
    Complaint (D. Wyo. Mar. 28, 2023) ECF No. 126 ............... J.A.459

Defendant Board of Governors of the Federal Reserve
    System's Memorandum of Points and Authorities in
    Support of Its Motion to Dismiss the First Amended
    Complaint (D. Wyo. Mar. 28, 2023) ECF No. 127 .............. J.A.462

Omnibus Memorandum in Opposition to Defendants' Motions
    to Dismiss Plaintiff's First Amended Complaint (D.
    Wyo. Apr. 11, 2023) ECF No. 135 ...................................... J.A.497

Brief of Amicus Curiae Former Senator Patrick J. Toomey in
    Support of Neither Party (D. Wyo. Apr. 20, 2023) ECF
    No. 151 .................................................................................... J.A.537

Defendant Federal Reserve Bank of Kansas City's Reply in
    Support of Its Motion to Dismiss First Amended
    Complaint (D. Wyo. May 2, 2023) ECF No. 159 .................. J.A.559

Defendant Board of Governors of the Federal Reserve
    System's Reply in Support of Its Motion to Dismiss the
    Amended Complaint (D. Wyo. May 2, 2023) ECF No. 160
    ............................................................................................ J.A.572

Order on Defendants' Motions to Dismiss First Amended
    Complaint (D. Wyo. June 8, 2023) ECF No. 164 ................. J.A.601

Defendant Federal Reserve Bank of Kansas City's Answer to
    Custodia's First Amended Complaint (D. Wyo. June 22,
    2023) ECF No. 166 .............................................................. J.A.617

Defendant Board of Governors of the Federal Reserve
    System's Notice of Lodging of the Administrative Record
    (D. Wyo. Aug. 21, 2023) ECF No. 178 ................................ J.A.641

Second Amended Scheduling Order (D. Wyo. Nov. 13, 2023)
    ECF No. 211 ....................................................................... J.A.644

Order Granting Joint Motion and Stipulation to Align and
    Consolidate APA and Summary Judgment Briefing (D.
    Wyo. Nov. 28, 2023) ECF No. 220 ....................................... J.A.656

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA
    Claim and Its Motion for Judgment as a Matter of Law
    on Its Statutory Mandamus Claim (D. Wyo. Dec. 22,
    2023) ECF No. 238 ............................................................. J.A.657

Proposed Order (D. Wyo. Dec. 22, 2023) ECF No. 238-1 .............. J.A.660

**Volume IV of X**

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 239 ...................................................................... J.A.661

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 22, 2023) ECF No. 240 ...................................................................... J.A.725

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 240-1 ....................................................... J.A.740

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 240-3 ................................................................................ J.A.811

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 240-5 ....................................... J.A.858

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 240-9 ...................................................................... J.A.879

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 240-10 ....................................... J.A.881

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 240-11 ................................... J.A.912

### Volume V of X

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 240-15 ................................................................. J.A.919

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 240-26 .......................................................... J.A.921

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 240-31 .................................................... J.A.971

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 240-37 ......... J.A.978

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 240-38 .................................................................................. J.A.983

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 240-40 ......................................................... J.A.986

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 240-45 .................................................................. J.A.988

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 240-47 ....................................................J.A.1043

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 240-53 .....................J.A.1051

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 240-54 ............J.A.1056

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 240-64 ..........................................................................J.A.1058

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 240-65 .........................J.A.1061

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 240-67 ..................................................................J.A.1062

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 240-68 ..................................................................J.A.1065

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 240-69 ...........................................................................J.A.1068

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-71 .................................................................J.A.1071

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 240-75 ..................................................................J.A.1081

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 240-77 ...........................................................................J.A.1087

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 240-78 .................................................................J.A.1089

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 240-80 ......................................................J.A.1099

Exhibit CC, Email from Matthew Eichner with the subject line "Custodia response: S-Letter - 2667 with no concerns identified" (Jan. 26, 2023) ECF No. 240-81 .........J.A.1101

Exhibit CD, Letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors (Mar. 8, 2023) ECF No. 240-82 ........................J.A.1103

Exhibit CE, Email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George" (Jan. 27, 2023) ECF No. 240-83 ..................................................................................J.A.1117

Exhibit CF, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Jan. 27, 2022) ECF No. 240-84 ........J.A.1119

Order Granting Unopposed Motion to Amend the Scheduling Order (D. Wyo. Dec. 26, 2023) ECF No. 241 ......................J.A.1127

Amicus Curiae Brief of the State of Wyoming (D. Wy. Jan. 18, 2024) ECF No. 251 ...........................................................J.A.1129

## Volume VI of X

Amici Curiae Brief in Support of Plaintiff filed by Amicus Parties Blockchain Association, Payment System Scholars (D. Wy. Jan. 19, 2024) ECF No. 257 ...................J.A.1137

Amici Curiae Brief in Support of Plaintiff's Motion for Judgment as a Matter of Law filed by Amicus Parties United States House of Representatives Financial Services Committee Members, United States Senate Banking, Housing and Urban Affairs Committee Members (D. Wy. Jan. 19, 2024) ECF No. 259 ...................J.A.1173

Defendant Board of Governors of the Federal Reserve System's Opposition to Plaintiff's Petition for Administrative Procedure Act Review (D. Wyo. Jan. 26, 2024) ECF No. 271 ...........................................................J.A.1200

Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment (D. Wyo. Jan. 26, 2024) ECF No. 272 ..................................................................................J.A.1257

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 282 ...J.A.1260

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Feb. 2, 2024) ECF No. 283 ..........J.A.1318

Amicus Brief in Support of Defendants filed by Amicus David Zaring  (D. Wy. Feb. 9, 2024) ECF No. 286 .......................J.A.1331

## Volume VII of X

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 299 .....................................................................J.A.1349

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 21, 2024) ECF No. 300 .....................................................................J.A.1402

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 300-7 ...............................J.A.1407

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 300-8 ....................................................J.A.1414

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 300-15 ...................................................J.A.1418

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 27, 2024) ECF No. 313 ......................................J.A.1423

Order on Dispositive Motions (D. Wyo. Mar. 29, 2024) ECF No. 317 ...............................................................................J.A.1449

Judgment (D. Wyo. Mar. 29, 2024) ECF No. 318 ........................J.A.1476

Plaintiff Custodia Bank, Inc.'s Notice of Appeal (D. Wyo. Apr. 26, 2024) ECF No. 321 ........................................................J.A.1477

## UNDER SEAL
## Volume VIII of X

Plaintiff Custodia Bank, Inc.'s Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 233 ..........................................................J.A.1480

Proposed Order (D. Wyo. Dec. 20, 2023) ECF No. 233-1 .............J.A.1483

Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 234 .......................................................................................J.A.1484

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Brief in Support of Its Petition for Review on Its APA Claim and Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Dec. 20, 2023) ECF No. 236 .......................................................................................J.A.1548

Exhibit A, Peter Conti-Brown's Expert Report (Oct. 20, 2023) ECF No. 236-1 ...................................................................J.A.1563

Exhibit C, Excerpts from Federal Reserve Bank of Kansas City's 30(b)(6) Deposition (Nov. 16, 2023) ECF No. 236-3 .......................................................................J.A.1634

Exhibit E, Excerpts from Deposition of Tara Humston (Nov. 3, 2023) ECF No. 236-5 ......................................J.A.1681

Exhibit I, Letter from The Federal Reserve Bank of Kansas City to Chuck Thompson (Jan. 27, 2022) ECF No. 236-9 .......................................................................J.A.1702

## Volume IX of X

Exhibit J, Excerpts from Deposition of Esther George (Nov. 9, 2023) ECF No. 236-10 ......................................J.A.1704

Exhibit K, Excerpts from Deposition of Jackie Nugent (Nov. 15, 2023) ECF No. 236-11 ................................J.A.1735

Exhibit O, Email from Caitlin Long with the subject line "Re: Interest data points for you" (Jan. 29, 2021) ECF No. 236-15 ................................................................J.A.1742

Exhibit Z, Katie S. Cox's Expert Report (Oct. 25, 2023) ECF No. 236-26 ........................................................J.A.1744

Exhibit AE, Excerpts from Deposition of Caitlin Long (Nov. 29, 2023) ECF No. 236-31 ................................J.A.1794

Exhibit AK, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Aug. 19, 2022) ECF No. 236-37 ........J.A.1801

Exhibit AL, Email from Judith Hazen with the subject line "RE: Custodia Memo to Esther" (Dec. 6, 2022) ECF No. 236-38 ................................................................J.A.1806

Exhibit AN, Email from Jeff Imgarten with the subject line "RE: Notes from 1/26 Meeting with the Board" (Feb. 28, 2022) ECF No. 236-40 ......................................J.A.1809

Exhibit AS, S-2677 Letter from the Board of Governors of the Federal Reserve System to the President and First Vice President of each Federal Reserve Bank (Jan. 17, 2023) ECF No. 236-45 ...................................................................J.A.1811

Exhibit AU, Katie S. Cox's Supplemental Expert Report (Dec. 4, 2023) ECF No. 236-47 .....................................................J.A.1866

Exhibit BA, List of individuals from the Board who had contact with individuals from the Federal Reserve Bank of Kansas City about Custodia's master account, excerpted from the binder used by Judith Hazen to prepare as the Federal Reserve Bank of Kansas City's 30(b)(6) deposition witness, ECF No. 236-53 .....................J.A.1874

Exhibit BB, List of individuals involved with non-traditional accounts, like Special Purpose Depository Institutions, while working at the Federal Reserve Board of Governors, created during the Federal Reserve Bank of Kansas City's 30(b)(6) deposition, ECF No. 236-54 ............J.A.1879

Exhibit BL, Email from Jeff Imgarten with the subject line "Initial Draft of Commitments/Conditions for Custodia Bank-Supplemental Information" (Nov. 14, 2022 ) ECF No. 236-64 .........................................................................J.A.1881

Exhibit BM, Potential Membership Application Commitments Summary, ECF No. 236-65 .........................J.A.1884

Exhibit BO, Email from Jeff Imgarten with the subject line "RE: Copy of Custodia Briefing Memo?" (Nov. 27, 2022) ECF No. 236-67 ...............................................................J.A.1893

Exhibit BP, Short Message Report (Nov. 30, 2022) ECF No. 236-68 ................................................................................J.A.1896

Exhibit BQ, Email from Jason Hinkle with the subject line "RE: Draft Recommendation Memo" (Jan. 9, 2023) ECF No. 236-69 .........................................................................J.A.1899

Exhibit BS, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 236-71 ...................................................................J.A.1902

Exhibit BW, Short Message Report (Jan. 26, 2022) ECF No. 236-75 ...................................................................J.A.1912

Exhibit BY, Email from Matthew Malloy with the subject line "RE: Draft Recommendation Memo" (Jan. 10, 2023) ECF No. 236-77 ...........................................................J.A.1918

Exhibit BZ, Draft Executive Summary to Esther George with the subject line "Custodia Bank, Inc. (fka Avanti Bank & Trust) Master Account Recommendation" (Jan. 2023) ECF No. 236-78 ...................................................................J.A.1920

Exhibit CB, Email from Judith Hazen with the subject line "Custodia Bank Master Account Request" (Jan. 24, 2023) ECF No. 236-80 .......................................................J.A.1930

Exhibit CD, Letter from Caitlin Long to the Office of the Inspector General of the Federal Reserve Board of Governors (Mar. 8, 2023) ECF No. 236-82 ........................J.A.1932

Exhibit CE, Email from Amy LaFave with the subject line "Correspondence from Federal Reserve Bank of Kansas City President Esther George" (Jan. 27, 2023) ECF No. 236-83 ...................................................................J.A.1946

Exhibit CF, Letter from The Federal Reserve Bank of Kansas City to Caitlin Long (Jan. 27, 2022) ECF No. 236-84 ........J.A.1948

### Volume X of X

Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 273 ...................................................................J.A.1956

Declaration of Andrew Michaelson in Support of Defendant Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Petition for Review and Motion for Judgment as a Matter of Law (D. Wyo. Jan. 26, 2024) ECF No. 274 .........J.A.2014

Errata to ECF No. 274 (D. Wyo. Feb. 2, 2024) ECF No. 277 ......J.A.2027

Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024) ECF No. 295 ........................................................................J.A.2029

Declaration of Ryan Scarborough in Support of Plaintiff Custodia Bank, Inc.'s Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on Its APA Claim and Its Motion for Judgment as a Matter of Law on Its Statutory Mandamus Claim (D. Wyo. Feb. 16, 2024) ECF No. 296 ........................................................................J.A.2082

Exhibit CX, Excerpts from the deposition of Peter Conti-Brown (Dec. 14, 2023) ECF No. 296-7 ...............................J.A.2087

Exhibit CY, Excerpts from the deposition of Zev Shimko (Nov. 30, 2023) ECF No. 296-8 ....................................................J.A.2094

Exhibit DF, Excerpts from the deposition of Katie Cox (Dec. 19, 2023) ECF No. 296-15 ..................................................J.A.2098

Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 23, 2024) ECF No. 310 ......................................J.A.2103

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Michelle S. Kallen
Michelle S. Kallen

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made and (2) any paper copies of this document submitted to the Court will be identical copies of the version electronically filed.

/s/ Michelle S. Kallen
Michelle S. Kallen

Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:     (307) 265-0700
Facsimile:     (307) 266-2306
Email:         sortiz@wpdn.net

*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC.,                  )
                                      )
      Plaintiff,                  )
                                      )
v.                                    )    Civil Number: 22-cv-00125-SWS
                                      )
FEDERAL RESERVE BOARD OF              )
GOVERNORS and FEDERAL RESERVE         )
BANK OF KANSAS CITY,                  )
                                      )
      Defendants.                 )

---

**PLAINTIFF CUSTODIA BANK, INC.'S OMNIBUS OPPOSITION TO THE FEDERAL RESERVE BANK OF KANSAS CITY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY BRIEF IN SUPPORT OF CUSTODIA'S PETITION FOR REVIEW ON ITS APA CLAIM AND ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON ITS STATUTORY MANDAMUS CLAIM**

---

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    DEFENDANTS LACK DISCRETION TO DENY CUSTODIA A MASTER
       ACCOUNT. ...........................................................................................................4

       A.     The Plain Language of the Monetary Control Act of 1980 Is Dispositive. ............4

       B.     Section 342, Relied on By Defendants, is Not Controlling. ..................................16

       C.     The Decision of the SDNY in *Banco San Juan* Was Wrongly Decided and
              is Not Precedential. ...............................................................................................18

       D.     Defendants' Pre-1980 History is Irrelevant and Their Post-1980 History
              Misleading...............................................................................................................20

       E.     Defendants Demonize Custodia and Its Business Plan..........................................22

       F.     The Denial of a Master Account to Custodia Constitutes Final Agency
              Action Under the APA............................................................................................24

       G.     The Board Lacks Authority to Regulate State Banks That Are Not
              Members of the Federal Reserve System..............................................................28

       H.     Defendants' Prematurity Argument is Meritless. .................................................29

III.   DEFENDANTS' ARGUMENTS ARE AN AFFRONT TO THE DUAL-
       BANKING SYSTEM. .........................................................................................30

IV.    THE BOARD CONTROLLED THE DECISION ON CUSTODIA'S MASTER
       ACCOUNT APPLICATION. ..............................................................................34

       A.     The Board Controlled the Master Account Decision Via the Guidelines..............37

       B.     The Board Controlled the Master Account Decision Via its Membership
              Decision. .................................................................................................................38

       C.     The Board Controlled the Master Account Decision Via the S-Letter and
              Revisions to the Recommendation Memo. ............................................................39

V.     EVEN IF THE KANSAS CITY FED DECIDED CUSTODIA'S MASTER
       ACCOUNT APPLICATION, SECTION 248A ENTITLES CUSTODIA TO
       RELIEF...................................................................................................................41

VI.    CONCLUSION.....................................................................................................42

APPENDIX A: CORE FACTS THAT FRBKC HAS NOT DISPUTED ................................. A-1

**J.A.1351**

## **TABLE OF AUTHORITIES**

### **CASES**

*Abbott Labs v. Gardner,* 387 U.S. 136 (1967) ............................................................27

*Banco San Juan v. Federal Reserve Board of New York*, 2023 WL 7111182 (S.D.N.Y. Oct. 24, 2023) ...........................................................................................11, 18, 19, 20

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................27

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169 (D. Wyo. 2022) ........................................................................................................7, 42

*Del. Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90 (D.C. Cir. 2018) ............6

*Duncan v. Walker*, 533 U.S. 167 (2001) ...................................................................9

*First Nat. Bank in Plant City v. Dickinson,* 396 U.S. 122 (1969) ................................33

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008) ......................7

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017) ................................................................................................. *passim*

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38 (2d Cir. 1989) ....................11

*Heard v. Dulayev*, 29 F.4th 1195 (10th Cir. 2022) ................................................37, 41

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ...................................................................................41

*Janny v. Gamez*, 8 F.4th 883 (10th Cir. 2021) ......................................................34, 36

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983) ...............11

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ................................................4, 8

*King v. Burwell*, 576 U.S. 473 (2015) .....................................................................6

*Lincoln v. Vigil*, 508 U.S. 182 ...............................................................................27

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018) ...........................7

*Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507 (D.C. Cir. 2000) ....................8

*Nelson v. United States*, 40 F. 4th 1105 (10th Cir. 2022) ........................................13, 14

*Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520 (S.D.N.Y. 1983) ............11

*Robbins v. Chronister*, 435 F.3d 1238 (10th Cir. 2006) ................................................................11

*Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087 (E.D.N.Y. 1986) .............11

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) .................................................27

*United States v. Wells Fargo & Co.*, 943 F.3d 588 (2d Cir. 2019)................................................18

*Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ............................................................28

*W. Minn. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 806 F.3d 588 (D.C. Cir. 2015) ...................................................................................................................................13

*W. Virginia v. EPA*, 597 U.S. 697 (2022) ....................................................................................15

*Weyerhaeuser Co. v. U.S. Fish and Wldlife Serv.*, 139 S. Ct. 361 (2018)....................................27

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) ..................................................25, 27

## STATUTES AND REGULATIONS

87 Fed. Reg. 51,099 (Aug. 19, 2022)..............................................................................................25

Fed. R. Civ. P. 56(a) ..................................................................................................................34, 41

5 U.S.C. § 701(a)(2).......................................................................................................................27

12 U.S.C. § 248a ..................................................................................................................... *passim*

12 U.S.C. § 342 ....................................................................................................................... *passim*

12 U.S.C. § 461................................................................................................................................4

12 U.S.C. § 1831d(a) .....................................................................................................................31

021-20 Wyo. Code R. § 20-9(d) ....................................................................................................31

## OTHER AUTHORITIES

126 Cong. Rec. 6897 (1980)...........................................................................................................5

*Avanti Statement on its Application to Become an FDIC-Insured Bank*, Custodia (Nov. 5, 2021), https://custodiabank.com/press/avanti-statement-on-its-application-to-become-an-fdic-insured-bank/ ......................................................................................................................23

*BNY Mellon Launches New Digital Asset Custody Platform*, BNY Mellon (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html ......................................................22

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118 (2016)................15

SR 20-16 Letter from Bd. of Governors of the Fed. Rsrv. System (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm ........................................30

H. Conf. Rpt. 96-842, Depository Institutions Deregulation and Monetary Control Act of 1980, 96th Cong., 2d Sess. (Mar. 21, 1980) ..............................................................................1, 7

John F. Manning, *What Divides Textualists from Purposovists*, 106 Colum. L. Rev. 70 (2006)...........................................................................................................................................15

Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980)............................ *passim*

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ....................................8

William P. Statsky, *Legislative Analysis and Drafting* 184 (2d ed. 1984) ..................................13

## I.    INTRODUCTION

Defendants invite the Court to second-guess Congress and the choices it made in 1980 when enacting the Monetary Control Act ("MCA").  Defendants now reject the dramatic alterations the MCA made to the legal landscape in 1980, although they readily acknowledged these changes for decades.  Their discussion of the Federal Reserve Act of 1913, and the Federal Reserve as it existed in the decades prior to the MCA, may be an interesting historical digression, but it is not relevant to a post-1980 world where Congress decided that all depository institutions should be subject to reserve requirements that are integral to the Federal Reserve Board of Governors' ("Board") ability to control monetary policy and, as a trade-off, granted access to Federal Reserve payment services to all eligible depository institutions.

Defendants' misreading of Section 342 and syntactic deconstruction of Section 248a are rebutted by the statute's plain text and Congress's repeated statements that the MCA's legislative purpose was both to "price services provided by the Federal Reserve Banks **and** open access to these services to all depository institutions on the same terms and conditions as member banks." H. Conf. Rpt. 96-842, Depository Institutions Deregulation and Monetary Control Act of 1980, 96th Cong., 2d Sess. at 71 (Mar. 21, 1980) (emphasis added).  Open access means that eligible institutions, not in violation of applicable law, must be given equal access to Federal Reserve services; and the only way to do that is through a master account.  This does not throw open the doors to risky institutions, because the state chartering process ensures front-end risk assessments, the Board's eligibility decision weeds out impermissible banking activities, and Section 248a expressly provides that the Board can manage risk by requiring banks to maintain sufficient clearing balances in their master accounts.

Defendants also ignore the facts that have come to light through discovery.  In the Court's motion to dismiss opinion, it observed that "[i]n this particular case, the facts alleged by

Custodia could weigh heavily on the Court's analysis of whether Congress afforded FRBKC complete discretion (under § 342) or no discretion (under § 248a) in granting Custodia's master account application."  Order on Defendants' Motion to Dismiss Am. Compl. ("MTD Order"), ECF No. 164, at 10.  The Court also opined that

> if discovery reveals the Board of Governors in fact inserted itself
> into FRBKC's consideration of Custodia's application, the level of
> discretion held by FRBKC under the law may matter little because
> it may be that FRBKC failed to exercise any such discretion (if, that
> is, the Board of Governors was pulling the puppet strings behind the
> scenes, as Custodia has plausibly suggested).

*Id.*

Discovery has been revealing.  It is quite clear now that the initially positive assessments of Custodia and its management team changed dramatically after the Board took over.  The Board baited Custodia into applying for membership, promising that it would hasten the master account approval process and would focus its membership analysis on Day One operations, only to move the goalposts by focusing on Custodia's long-range business plan and dictate an outcome on membership with which Federal Reserve Bank of Kansas City ("Kansas City Fed" or "Reserve Bank") officials understood they needed to stay in "sync" for the master account. *See e.g.*, Ex. AL, ECF No. 236-38, at FRBKC-00002133.

Defendants chiefly argue that the final decision denying a master account was the decision of Esther George, the President of the Kansas City Reserve Bank.  Although the denial went out under her name, discovery demonstrates that the Board's influence, like gravity, was inescapable.  The Board's constant presence in the decision-making process, and shaping of the final decision, exerted an inexorable pull on the Reserve Bank, starting from the very moment that Custodia submitted its application and senior executives at the Kansas City Fed began trying to "buy some time" for the Board to get involved and up to speed.  The Kansas City Fed's self-

serving assertion that Esther George simply consulted with the Board is like saying the sun orbits the earth.  Copernicus knew better.

No matter what spin Defendants put on the facts, the obvious and inescapable conclusion is that the Board was not going to let the Reserve Bank reach a decision on Custodia's application for a master account with which the Board disagreed.  Without conceding the following are relevant under the MCA, there is no dispute that (1) Defendants thought Custodia was going to set a precedent, and the Board wanted to get it right; (2) Defendants thought Custodia's application presented overarching policy questions for the Board to decide; (3) the Kansas City Fed looked to the Board to decide policy and eligibility questions; and (4) the Board established a process that gave it visibility and control over Reserve Bank handling of master account applications through the Guidelines, the Handbook, and the S-Letter.  While Ms. George may have signed the final denial letter, it came on the heels of the Board's denial of Custodia's membership application (which then served as the basis for the master account denial) and was subject to the Board's review, scrutiny, editing, and ultimate veto authority.

Many of Defendants' arguments, particularly those going to the question of risk, are at bottom a rejection of the dual-banking system and an affront to Wyoming's Division of Banking. Custodia is legally entitled to a master account, and Defendants' refusal to provide that account violates Section 248a.  If Defendants are dissatisfied with the state of the law, they can ask Congress to revise the Federal Reserve Act.  Congress was concerned enough with the lack of transparency surrounding the Board's master account process that it recently enacted legislation requiring the Board to disclose a public database of institutions that hold, or have requested, access to master accounts.  But Congress did not change the MCA, whose guiding principle is equal access.  Until that happens, it is this Court's duty to apply the law, not amend it in response

to agency policy arguments.  Pursuant to Section 248a, the Court should deny Defendants'

motions, sustain Custodia's APA challenge to the Board's final agency action, grant Custodia

summary judgment on its mandamus claim against the Kansas City Fed, and order that Custodia

receive its long overdue master account.

## II.      DEFENDANTS LACK DISCRETION TO DENY CUSTODIA A MASTER ACCOUNT.

### A.      The Plain Language of the Monetary Control Act of 1980 Is Dispositive.

The heart of the case is a legal issue, concerning whether the Board and the Kansas City

Fed have discretion to deny Custodia a master account once Custodia was found to be eligible

for one.  As Custodia explained in its opening brief, three statutory sections are in play, i.e., 12

U.S.C. §§ 248a, 342 and 461.  All three provisions were amended by the Monetary Control Act

of 1980 and function together as a whole.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291

(1988) (to determine the plain meaning of a statute, the court must look not only to "the

particular statutory language at issue," but also to "the language and design of the statute as a

whole").

Custodia relies for its no-discretion argument on Section 248a(c), which was enacted

through the Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980):  "The

schedule of fees prescribed pursuant to this section shall be based on the following principles:

. . . (2) All ***Federal Reserve bank services*** covered by the fee schedule ***shall be available*** to

nonmember depository institutions ***and*** such services ***shall be priced*** at the same fee schedule

applicable to member banks."  12 U.S.C. § 248a(c)(2) (emphasis added).  The enumerated bank

services include (1) currency and coin services; (2) check clearing and collection services; (3)

wire transfer services; (4) automated clearinghouse services; (5) settlement services; (6)

securities safekeeping services; and (7) Federal Reserve float.  *Id.* § 248a(b).  In addition, access

must be given to (8) "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds." *Id*.

Congress enacted Section 248a in 1980 when Federal Reserve member banks were withdrawing from the Federal Reserve System in the wake of high inflation, rising interest rates, and onerous Board requirements to maintain ever-increasing non-interest-bearing reserves within the System. Pl. Custodia Bank, Inc.'s Omnibus Br. in Support of its Petition for Review on its APA Claim and its Mot. for Judgment as a Matter of Law on its Statutory Mandamus Claim ("Custodia Br."), ECF No. 234, at 41. At the same time, thrifts and certain other financial institutions wanted to become members of the Federal Reserve System because membership offered access to the payments system at no charge. *Id.* at 42. The new legislation was a compromise. It invited into the Federal Reserve System non-member depository institutions, including state non-member banks, thrifts and credit unions, whether or not they had FDIC or NCUA insurance. These entities were given full access to the Federal Reserve's enumerated services, but in return they had to meet federal monetary reserve requirements. Further, the enumerated services, formerly free to members, were now to be made available and priced equally for all, regardless of membership status. *Id.* at 43. As Senator Proxmire, one of the bill's sponsors, explained the statute's twin purposes: "since nonmember institutions will be required to hold reserves under the act it is reasonable that they should be provided access to Fed services." *See* 126 Cong. Rec. 6897 (1980).

Defendants argue that because Section 248a does not reference master accounts, they are not obligated to provide master accounts to eligible depository institutions. Def. Bd. of Governors of the Fed. Rsrv. System's Opposition to Pl.'s Petition for Administrative Procedure Act Review ("Bd. Br."), ECF No. 271, at 15; *see also* Def. Fed. Rsrv. Bank of Kan. City's

Cross-Mot. for Summ. Judgment and Opposition to Pl.'s Petition for Review and Mot. for

Judgment as a Matter of Law ("FRBKC Br."), ECF No. 273, at 36 (incorporating the Board's

arguments).  Judge Bacharach was not persuaded by this argument, because "[w]ithout a master

account, none of the fee schedule's services would be available." *Fourth Corner Credit Union v.

Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1069 (10th Cir. 2017) (Op. of Bacharach, J.).

Defendants' argument proves too much.  If accepted, Defendants' position would amend the

statute, allowing Defendants to avoid their statutory obligations to provide services by imposing

a non-statutory prerequisite on banks seeking services.  It cannot be so easy to defy "Congress's

unambiguous command to make services in the fee schedule available to nonmember depository

institutions."[1] *Id*. (Opinion of Bacharach, J.).

 The Board launches several other attacks on a plain reading of the statute that are equally

unpersuasive and ignore that when "expounding a statute, we must not be guided by a single

sentence or member of a sentence, but look to the provisions of the whole law." *Del. Dep't of

Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 97 (D.C. Cir. 2018) (quoting *U.S. Nat'l Bank of

Or. v. Indep. Ins. Agents of Am., Inc*., 508 U.S. 439, 455 (1993)); *see also King v. Burwell*, 576

U.S. 473, 486 (2015) ("Our duty, after all, is 'to construe statutes, not isolated provisions.'"

(quoting *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S.

280, 290 (2010))).

---

[1] Section 248a's list of services includes a catchall provision that covers "any new services
which the Federal Reserve System offers, including but not limited to payment services to
effectuate the electronic transfer of funds."  12 U.S.C. § 248a(b)(8).  Because master accounts
did not exist in 1980 and are required "to effectuate the electronic transfer of funds," they can
either be interpreted as a "new service[]" the Federal Reserve must provide to nonmember banks,
or the functional reality that the enumerated services, by definition, cannot be provided except
through an account (which is a bookkeeping tool for keeping track of the services).  *Id.*

Reprising an argument from its motion to dismiss (soundly rejected by Judge Bacharach), the Board argues that Section 248a is a mere pricing statute. It points to the title of the section, which refers to pricing. This Court, in its opinion at the motion to dismiss stage, recognized that "the title of a statute, along with the title of the subchapter the statute resides in, might matter only if the Court first determines the statute is ambiguous, and even then it might matter only very little." *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169, 1184 (D. Wyo. 2022). Here, there is no ambiguity. Section 248a's plain language addresses both access and pricing, stating unequivocally that: "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions ***and*** such services shall be priced at the same fee schedule applicable to member banks."

The House Conference Report reinforces this conclusion, explaining that the purpose of the legislation was both to "price services provided by the Federal Reserve Banks ***and*** open access to these services to all depository institutions on the same terms and conditions as member banks." H. Conf. Rpt. 96-842, Depository Institutions Deregulation and Monetary Control Act of 1980, 96th Cong., 2d Sess. at 71 (Mar. 21, 1980) (emphasis added). The Reserve Banks themselves understood this at the time, as a number of them—including the Kansas City Fed—published official statements that acknowledged the monumental changes wrought by the 1980 MCA. *See* Custodia Br. at 39–41. Given the plain statutory language and the clear legislative history, the title of the section is irrelevant. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,583 U.S. 366, 380 (2018) ("[S]ection headings cannot limit the plain meaning of a statutory text . . . ."); *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[A] subchapter heading cannot substitute for the operative text of the statute."); *Nat'l Ctr. for Mfg. Scis. v. Dep't of Def.*, 199 F.3d 507, 511 (D.C. Cir. 2000) ("The plain meaning of a

statute cannot be limited by its title . . . and provisions in a statute do not always align with its title.").

The Board also contends that the introductory clause of subsection (c) limits the operation of the subsequent statutory language to pricing.  Board Br. at 15–16.  Here the Board commits a cardinal sin of statutory interpretation:  failing to consider "the language and design of the statue as a whole."  *K Mart Corp.*, 486 U.S. at 291; Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 153 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").  Start with the text.  Section 248a(c)(2) provides:

> (c) The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>
>        ***
>
> (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

At a minimum, the text of Section 248a(c)(2) acknowledges that the availability of Federal Reserve services has been expanded to "nonmember depository institutions" and that the pricing of such services should factor in their use by nonmember depository institutions.  *Id.* § 248a(c)(2).  As explained in Custodia's opening brief, prior to the MCA, Federal Reserve services were provided only to member banks and were provided for free.  Custodia Br. at 41.  When Congress extended access to Federal Reserve services to nonmember banks, Congress empowered the Fed to charge for its services in order to account for the increased costs

associated with the increased use of such services.  *Id.* at 43.  Even if Section 248a(c)(2) is read as a pricing principle, the principle is that the Fed must base its prices on the fact that non-member depository institutions have access to Federal Reserve services and the requirement that the Fed provide these services to members and non-members at the same price.  The MCA imposed an enormous increase in the Fed's operating footprint, and thus its operating costs, by expanding access from "5,400 member banks to over 40,000 depository institutions," Ex. CJ, ECF No. 236-88, at 11, and the MCA incorporated into the pricing principle the twin mandate of exponential growth in access.

When one takes a step back and looks at the entirety of the MCA, it becomes even clearer that Section 248a(c)(2) operates not only as a pricing principle but also as a guarantee of access to Federal Reserve services.  Section 248a was added by Section 107 of the Monetary Control Act.  *See* Monetary Control Act of 1980, Pub. L. No. 96-221, § 107, 94 Stat. 132 (1980).  No other section of the MCA speaks to the availability of Federal Reserve services.  *See generally id.*  Since prior to the MCA only members had access to Federal Reserve services, Section 248a(c)(2) must guarantee access to nonmembers to give content to the principles of nondiscrimination in pricing and of the use of Federal Reserve services by nonmembers.  To read Section 248a(c)(2) as merely addressing pricing and not nonmember access would render the provision superfluous and nonsensical, even as a pricing principle—another cardinal sin of statutory interpretation.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute. . . .  We are thus reluctan[t] to treat statutory terms as surplusage in any setting." (internal quotation marks omitted) (alteration in original)).  Rather the clear implication of the statute's text and structure is that

Section 248a(c)(2) provides that pricing should be based on the fact that nonmembers will have access to Federal Reserve services and it extends access to those nonmembers.

Section 248a(c)(2) does one more thing:  It empowers the Board to "subject" nonmember banks' access to Federal Reserve services to the same terms the Board "determine[s] are applicable to member banks," including "a requirement of balances sufficient for clearing purposes" so long as those requirements are also applicable to member banks.  This second half of Section 248a(c)(2) has nothing to do with how 248a(c)(2) operates as a pricing principle; it only pertains to the terms governing access to services.  For this dependent clause to have meaning, the preceding independent clause must extend access to nonmembers.  This reading is also consistent with the MCA's legislative history.  Member banks are supervised by the Federal Reserve, and the framers of the MCA stated repeatedly that the goal was to provide Federal Reserve services to "all depository institutions [including nonmember banks] on the same terms and conditions as member banks."  Custodia Br. at 44 (quoting 126 Cong. Rec. 6250 (1980) (Conf. Rep.)).  Conditionality and access are thus inextricably linked.  If Congress had not included the conditional language in Section 248a(c)(2), then nonmember banks would have been granted access to Federal Reserve services on *more favorable terms* than member banks.

To the extent there is any doubt about what Congress accomplished with Section 248a, the legislative history of the MCA removes it.  The legislative history is replete with references to the need to open access to Federal Reserve services to nonmember banks.  Custodia Br. at 43–44.  The original public meaning of Section 248a is further corroborated by the Board's and the Reserve Banks' post-enactment statements, which uniformly show that they originally understood the MCA extended access to nonmember institutions.  *Id.* at 38–41.  Because Section 107 of the MCA (codified as Section 248a) is the only provision of the Act that discusses

the availability of Federal Reserve services, it is the only statutory provision that could support those understandings.  It is therefore no surprise that every court, save one (which arose in the context of a bank that lost its master account allegedly for failing to comply with the law), to address Section 248a since 1980 construed that provision as guaranteeing access to Federal Reserve services.  *See Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1222–23 (6th Cir. 1983); *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989); *Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087, 1090 (E.D.N.Y. 1986); *Northpark Nat'l Bank v. Bankers Tr. Co.*, 572 F. Supp. 520, 522–23 (S.D.N.Y. 1983).  *But see Banco San Juan v. Federal Reserve Board of New York*, 2023 WL 7111182, at *7–8 (S.D.N.Y. Oct. 24, 2023).

At bottom, Defendants ask this Court to adopt an absurd reading of Section 248a. *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) ("This court has said that an interpretation of a statute is absurd if it leads to "results 'so gross as to shock the general moral or common sense." (internal quotation marks omitted)).  Why would Congress pass a statute directing the Federal Reserve to price its services based on the principle that such services are "available to nonmember depository institutions" and are available "at the same fee schedule applicable to member banks" without granting access to services to nonmember institutions? Congress would not do so.  The only reading of Section 248a that gives meaning to the entire section is one that respects Congress's understanding of the MCA—as reflected in the Act's text, structure, and context—and acknowledges that Section 248a guarantees that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions."

Notably, the Board agrees that Section 248a directs the Board to "take into consideration, *inter alia*, that Reserve Banks would be accepting deposits from, and offering corresponding services to, a larger universe of institutions that included nonmember depository institutions" when setting prices for Federal Reserve Services.  Bd. Br. at 15.  But the Board asserts that "the MCA's modification of section 342" is what granted nonmember banks access to such services. *Id.*  The MCA, however, only modified Section 342 to include "other depository institutions" among the entities that could make deposits at Reserve Banks.  *See* Monetary Control Act of 1980, Pub. L. No. 96-221, § 105, 94 Stat. 132 (1980) (amending Section 342).  And Section 342 only mentions "services" as a "factor[]" the Board should consider when determining the minimum balance a nonmember bank must hold with a Reserve Bank to maintain an account.  12 U.S.C. § 342.  There is no textual basis for the position that the MCA's amendments to Section 342 expanded access to Federal Reserve services.

In various parts of its brief, the Board proclaims that member banks do not have a right to access Federal Reserve services.  Bd. Br. at 13, 15, 18.  But the Board cites no evidence of member banks being denied access to Federal Reserve services.  The Board's pre-MCA history documents denials to ***nonmember*** institutions, which, all agree, did not have any right to access such services at that time.  Bd. Br. at 7–10.  The Board's post-MCA history reflects conditions placed on the use of Federal Reserve services, not the wholesale denial of access to such services.  Bd. Br. at 10–13.  Other than the Board's incorrect assertion that Section 342 controls access to Federal Reserve services, the Board provides no support for the idea that member banks do not have a right to access Federal Reserve Services.

The Board touts the absence of the modifier "all" before the statute's language about access as yet another reason to reject Custodia's position.  This, too, was an argument that

Defendants raised at the motion to dismiss stage without success, as they did several years earlier when Judge Bacharach issued his opinion in *Fourth Corner*.  Defendants contend that even if Section 248a(c) "were somehow construed to be a mandate concerning access to services, it would not guarantee Custodia a master account because it does not make a reference to granting access to *all* depository institutions."  Bd. Br. at 16.  Rather, the adjective "all" is only used, in the same sentence, to modify "services."

As Custodia observed in its opening omnibus brief, *see* Custodia Br. at 36, the statute retains its mandatory and inclusive nature without the adjective "all."  Judge Bacharach in *Fourth Corner* rejected the very same argument made by Defendants, after an in-depth analysis. As Judge Bacharach concluded:  "Omitting 'all' resulted in the absence of a restrictive modifier for the phrase 'nonmember depository institutions.'  Without a restrictive modifier, the phrase 'nonmember depository institutions' is an inclusive term that includes all nonmember depository institutions."  861 F.3d at 1069–70 (Opinion of Bacharach, J.) (footnote omitted); *see also W. Minn. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 806 F.3d 588, 592 (D.C. Cir. 2015) (terms "states" and "municipalities" included all states and municipalities).  Judge Bacharach further observed that, in similar circumstances, "drafters of statutes are often cautioned against unnecessarily inserting the adjective 'all' before a plural noun (like 'nonmember depository institutions')."  861 F.3d at 1070 (Opinion of Bacharach, J.) (citing, *inter alia*, William P. Statsky, *Legislative Analysis and Drafting* 184 (2d ed. 1984) (observing that when the subject of the sentence is plural, adjectives such as 'any' and 'all' should "almost never" be used)).

The Board cites *Nelson v. United States*, 40 F. 4th 1105 (10th Cir. 2022) for its argument that there is some significance to omitting "all" before "nonmember depository institutions."  Bd.

Br. at 17.  But the Board reads *Nelson* too broadly.  There the Court addressed whether the terms "statute" and "any statute" had the same meaning when used in the same statute.  40 F.4th at 1114–15.  The Court, citing the rule against surplusage, "conclude[d] that it would be wrong to interpret the first use of 'statute' . . . and the later use of 'any statute' as identical in meaning" because to do so would vitiate Congress's use of "any." *Id.* at 1115.  The Court held that "the word 'any' has an expansive meaning" and that "the rule against surplusage" directed the Court to give the phrase "any statute" "a different and broader" meaning than the word "statute" "in order to give meaning to the term 'any.'" *Id.*  But here the Board points to two totally different phrases—"All Federal Reserve bank services" and "nonmember depository institutions"—so there is not the same need to draw a distinction between otherwise identical terms.  And construing the phrase "nonmember depository institutions" as encompassing all nonmember depository institutions does not render any part of the statute surplusage in the same way that construing "any statute" as meaning merely "federal statutes" nullifies the word "any" with an unduly narrow construction.  *Nelson* does not help the Board in this case.

In passing, the Board swipes at Custodia's expert, Dr. Peter Conti-Brown, and an independent scholar, Professor Julie Hill, whose law review article Custodia referenced.  Bd. Br. at 24–26.  But it does not engage with the substance of either scholar's analysis.  The Board tries to dismiss Dr. Conti-Brown's opinions because his "analysis do[es] not engage with the MCA's *actual text*." Bd. Br. at 24.  As Custodia's expert witness, Dr. Conti-Brown was not asked to interpret the MCA; instead, he opined on the "history, practice, legal context, and the public policies of the US government and the Federal Reserve."  Ex. A (Conti-Brown Expert Report), ECF No. 236-1, ¶ 8.  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory

scheme." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022).  *See also* Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2121 (2016) ("[C]ourts should seek the best reading of the statute by interpreting the words of the statute, ***taking account of the context of the whole statute***, and applying the agreed upon semantic canons." (emphasis added)).  John F. Manning, *What Divides Textualists from Purposovists*, 106 Colum. L. Rev. 70, 75 (2006) ("[T]extualists understand that the meaning of statutory language (like all language) ***depends wholly on context***." (emphasis added)).  Although Dr. Conti-Brown does not opine on the ultimate legal question of how the MCA should be interpreted, the historical analysis he offers supplies the ***context*** necessary for a proper statutory interpretation.  The Board's only response to Professor Hill's analysis is that she changed her mind.  But that strengthens rather than undermines her ultimate conclusion.  As an independent third party, Professor Hill did what careful scholars do—she put out a draft paper about a topic whose opacity Defendants guarded so closely that Congress had to force the disclosure of master account holders and requestors by requiring them to make their database public.  Following critical responses, and new information, she refined her analysis.  The Board may disagree with her ultimate conclusions, but her process was sound and her conclusions are well-supported.

Finally, the Board suggests that Section 248a does not grant Custodia an entitlement to a master account because the statute provides that "nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks."  Bd. Br. at 18 (quoting 12 U.S.C. § 248a(c)(2)).  As discussed above, this provision imbues the Board with the ability to impose lawful conditions (such as maintaining an adequate clearing balance) on the usage of a master account (provided those conditions also apply to members), but does not permit the Board to deny access outright.

**B.     Section 342, Relied on By Defendants, is Not Controlling.**

Defendants rely solely on 12 U.S.C. § 342, another statutory section amended by the MCA, without accounting for the interplay between two other statutory sections that were also amended at the same time.  The statutory section, as enacted in 1913, provided that:  "Any Federal reserve bank may receive from any of its member banks, and from the United States, deposits of current funds in lawful money, national bank notes, Federal Reserve notes, or checks and drafts upon solvent member banks, payable upon presentation . . . ."  In 1980, through the MCA, Congress inserted "or other depository institutions" after "member banks," and inserted that same phrase after "non-member bank or trust company" wherever it appeared in the statute.  Today, the relevant portion of Section 342 provides:

> Any Federal reserve bank may receive from any of its member banks, ***or other depository institutions***, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items, and also, for collection, maturing notes and bills; or, solely for purposes of exchange or of collection may receive from other Federal reserve banks deposits of current funds in lawful money, national-bank notes, or checks upon other Federal reserve banks, and checks and drafts, payable upon presentation within its district  or other items, and maturing notes and bills payable within its district[.]  (emphasis added)

This statutory provision must be read in harmony with the others.  At the same time Congress added Section 248a to mandate the twin principles of uniform access and equal pricing, without regard to membership status, Congress expanded Federal Reserve control over the money supply by requiring all depository institutions to maintain reserves at a rate set by Reserve Banks.  Custodia Br. at 37.  Prior to 1980, Section 342 only permitted Reserve Banks to accept deposits from Federal Reserve members.  *Id.*  Thus, Congress amended Section 342 to authorize Reserve Banks to accept deposits from not only Federal Reserve members, but also from "other depository institutions," which was a necessary step, given the significant expansion

of access to a far larger group of depository institutions.  *Id.*  The amendment allowed

nonmember depository institutions to comply with Section 461's newly imposed reserve

requirements, but it did not undermine Section 248a's grant of access to Federal Reserve

services.

Defendants argue that under Section 342 a Reserve Bank has discretion to deny access to

Federal Reserve services because it states that Reserve Banks "may" receive deposits from any

of its member banks or other depository institutions.  Bd. Br. at 7–8, 16, 19–21; FRBKC Br. ¶ 4.

Thus, according to Defendants, Congress did not intend to require Reserve Banks to accept

deposits in all situations, and, by extension, this discretion necessarily extends to the provision of

Federal Reserve services.  FRBKC Br. ¶ 4; Bd. Br. at 6–13.  Judge Bacharach took this argument

head on and explained that "Section 342 addresses the types of monetary instruments that

Federal Reserve Banks may receive for deposit or collection. . . . But § 342 does not address

which institutions can access Federal Reserve services; that subject is governed instead by

§ 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember

depository institutions."  *Fourth Corner*, 861 F.3d at 1074 (Op. of Bacharach, J.).  Judge

Bacharach's analysis—that Section 342 affords a Reserve Bank discretion regarding deposits,

something separate and apart from the issuance of master accounts—is correct.  *See id.* at 1074

(Op. of Bacharach, J.) ("But this discretion does not encompass the issuance of master

accounts.").

Defendants point out that *Fourth Corner* was a three-way panel split and Judge

Bacharach was the only member of the panel to address the statutory issues.  But as this Court

observed at the motion to dismiss stage, "Judge Bacharach's opinion may plausibly be the law on

this matter in this case."  MTD Order at 10.  Counsel for Defendants, at the motion to dismiss

argument, conceded as much.  *See* Mot. Dismiss Hr'g Tr., ECF No. 101, at 31:1–17 (counsel for

the Board of Governors affirming the deposits of funds with a Federal Reserve Bank and the

services of Section 248a are distinct); *id.* at 57:7–58:9 (counsel for FRBKC agreeing that

Section 342 allows FRBKC discretion over deposit-taking even after a master account is

opened).   As for the *Fourth Corner* ruling, it is worth noting that the other two judges on the

Tenth Circuit panel did not disagree with Judge Bacharach; they just did not reach the merits of

the statutory interpretation question.  Judge Matheson found that the case raised prudential

ripeness concerns.  Judge Moritz was concerned with the illegality defense.  Only Judge

Bacharach spoke to the broad legal issues.  His opinion stands alone as the only appellate

opinion to thoroughly address the legal issues presented in this case.

What is clear, in any event, is that Section 342 does not give the Board or the Kansas City

Fed discretion to deny an eligible depository institution access to the payments system.  The

statute does not mention master accounts; rather, it speaks to which entities may make deposits

with a Reserve Bank, *see United States v. Wells Fargo & Co.*, 943 F.3d 588, 603 n.13 (2d Cir.

2019), and the types of deposits that may be received in an account (e.g., lawful money, national

bank notes, Federal Reserve notes, checks, drafts, etc.).  In contrast, not only is Section 248a

targeted, clear, and precise, it is the capstone that explains the simultaneous changes Congress

made to Section 342 and Section 461.  Thus, there can be no doubt that Section 248a is the

relevant—indeed paramount—statutory section as it harmonizes all three statutory provisions.

### C.      The Decision of the SDNY in *Banco San Juan* Was Wrongly Decided and is Not Precedential.

Defendants cite *Banco San Juan v. Federal Reserve Board of New York*, 2023 WL

7111182, (S.D.N.Y. Oct. 24, 2023) (appeal withdrawn Feb. 12, 2024), for the proposition that

Section 342 is dispositive.  Custodia addressed that case in its opening brief, but does so now at greater length given Defendants' reliance on that out-of-circuit district court opinion.

*Banco San Juan* is easily distinguishable.  That case did not address front-end access. Banco San Juan already had a master account.  Instead, it arose on a motion for a TRO and preliminary injunction seeking to require the Board and the Reserve Bank to refrain from closing Banco San Juan's master account for allegedly failing to comply with federal law, specifically the Bank Secrecy Act and related Anti-Money Laundering requirements.  The district court (Koeltl, J.) recognized that "***whatever rights BSJI may have had to open a Master Account is not at issue***."  *Banco San Juan*, 2023 WL 7111182, at *8 (emphasis added).  Yet that is precisely the issue at the heart of Custodia's lawsuit.  The court went on to rule that the decision to close the master account was not arbitrary and capricious.  It held that the bank's statutory claim failed because, inter alia, "the FRBNY executed a Master Account Agreement and Supplemental Terms agreement with BSJI both of which give the FRBNY the contractual right to close BSJI's Master Account."  *Id.* at *7 (internal citation omitted).

Nonetheless, when evaluating the likelihood of success on the merits for purposes of the preliminary injunction, the court ruled that Section 248(a) was a pricing statute, and Section 342 controlled master accounts and gave the Reserve Bank discretion.  This was *dictum*, since the court earlier recognized that "whatever rights BSJI may have had to open a Master Account [wa]s not at issue."  *Id.* at *8.  In any event, to the extent the district court ruled on the statutory issues presented here, its analysis pales in comparison to the in-depth exegesis of Section 248a provided by Judge Bacharach in *Fourth Corner*.  *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7–8, *with Fourth Corner*, 861 F.3d at 1067–74 (Op. of Bacharach, J.).

The district court did not focus on the fact that Section 248a(c)(2) refers to both the availability of Federal Reserve services *and* the pricing of Federal Reserve services. *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7 *with*, *Fourth Corner*, 861 F.3d at 1068–70 (Op. of Bacharach, J.). Furthermore, the district court did not engage with the long record of the Board and the Reserve Banks interpreting the MCA as entitling eligible depository institutions to access to Federal Reserve services. *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7–8 *with*, *Fourth Corner*, 861 F.3d at 1070–72 (Op. of Bacharach, J.). Nor did the court consider the MCA's legislative history. *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7–8, *with Fourth Corner*, 861 F.3d at 1072–73 (Op. of Bacharach, J.). While the court acknowledged Second Circuit precedent holding that "the Federal Reserve must make [§ 248a] services available without regard to a bank's member status," the court failed to recognize that the only way to access those services is via a master account. *Banco San Juan Internacional*, 2023 WL 7111182, at *7 n. 8 (citing *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of New York*, 866 F.2d 38, 40 (2d Cir. 1989)). Finally, the district court disregarded the academic literature on the MCA. *Compare Banco San Juan Internacional*, 2023 WL 7111182, at *7–8, *with Fourth Corner*, 861 F.3d at 1073 (Op. of Bacharach, J.). Given its deficiencies, *Banco San Juan*'s *dictum* is unpersuasive and should not be followed.

### D. Defendants' Pre-1980 History is Irrelevant and Their Post-1980 History Misleading.

This case turns on the Court's construction of the statutory sections relied on by the parties and does not necessitate a trial. The Board's brief contains a section (pages 7–10) styled "Reserve Banks consistently exercised discretion over access to accounts and services between 1913 and 1980." Nothing in this discussion is remotely persuasive on the issue of post-1980 discretion to deny access outright to eligible depository institutions; citing the answer to a

question from an Iowa bank in 1945 or a 1935 survey of Reserve Banks (in which several, including Kansas City, Minneapolis and San Francisco, noted that they provided access to members and nonmembers alike) is irrelevant when Congress changed the law in 1980 to expressly address the question.  The pertinent historical record starts in 1980 with passage of the Monetary Control Act.  As recounted by Custodia in its omnibus brief, Custodia Br. at 38–41, past interpretations of the Board and statements by Reserve Bank officials supported Custodia's position until a decade ago, when the Board started flexing its gatekeeping authority beyond its statutory bounds.  For example, in 1984, the Board conceded that the MCA "expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis." *Id.* at 39.  Additionally, Dr. Peter Conti-Brown, retained by Custodia as an expert legal historian, examined in his report "the nearly fifty-year history of the Monetary Control Act."  Ex. A (Conti-Brown Expert Report), ECF No. 236-1, ¶ 16.  He concluded that "the Board's claim of discretion over Master Account access does not conform to history, practice, legal context, or the public policies of the U.S. government and the Federal Reserve itself." *Id.* ¶ 9.  Yet the Kansas City Fed is so worried that the Court will consider his opinions—which are devastating to its defense—that they moved to exclude his opinions in a bench trial.

The Board's assertion (pages 10–13) that "Reserve Banks have continued to exercise discretion over accounts and services for all institutions between the enactment of the Monetary Control Act in 1980 and the present" is flawed.  No such discretion applied to access; the only discretion that the Board can point to over several decades pertains to conditions on the account itself (e.g, daily overdraft limits), Bd. Br. at 11, which are lawful as a "requirement of balances sufficient for clearing purposes" under Section 248a(c)(2), and which are not being challenged

by Custodia.  The Board also points to the 1998 version Operating Circular 1 and its statements that "master accounts are subject to Reserve Bank approval" as evidence that Reserve Banks exercised discretion.  Bd. Br. at 12.  But the application for a master account was the same one Custodia completed when it applied for a master account—a one-page form that states that a decision will be made in 5–7 business days—and Defendants cannot compel Custodia to abridge its statutory right to a master account through precatory language in what amounts to a contract of adhesion.  The reference to Reserve Bank approval meant that the applicant needed to be deemed legally eligible for a master account before it could receive one.  That determination was straightforward and, until a decade ago, master accounts were issued pro forma.  It was only then that the Federal Reserve Board claimed that Reserve Banks had discretion over master accounts. This litigation position is not supported by past practice.

### E.   Defendants Demonize Custodia and Its Business Plan.

Among its many mischaracterizations, the Reserve Bank asserts that Custodia "is not a traditional bank."  FRBKC Br. at 11.  But Custodia is a traditional bank that also provides cryptocurrency custody services.  The OCC concluded in Interpretive Letter 1170 (July 22, 2020), that "providing cryptocurrency custody services, including holding unique cryptographic keys associated with cryptocurrency, is a modern form of . . . traditional bank activities" related to custody services."  Ex. L (Interpretive Letter 1170), ECF No. 236-12.  "The OCC recognize[d] that there will likely be increasing need for banks and other service providers to leverage new technology and innovative ways to provide traditional services on behalf of customers.  By providing such services, banks can continue to fulfill the financial intermediation function they have historically played in providing payment, loan and deposit services."  *Id.*  Custodia does just that.  To show how mainstream crypto-currencies have become, on January 10, 2024, the Securities and Exchange Commission approved eleven applications for exchange-traded funds

(ETFs) that hold bitcoin, including applications from Blackrock and Fidelity.  The Bitcoin ETFs are listed and traded on registered national securities exchanges.  And established banks like BNY Mellon have long been providing digital asset custody services. *See, e.g.*, *BNY Mellon Launches New Digital Asset Custody Platform*, BNY Mellon (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html.

Defendants also fault Custodia for not having FDIC insurance.  Custodia was not required to obtain FDIC insurance to be eligible for a master account, and would not need it in any event since it is fully reserved (keeping $1.08 for every $1.00 of deposits) and has no credit risk because it does not lend money.  *See* FRBKC Br. ¶ 55 (confirming that Custodia is "eligible" for a master account); Custodia Br. ¶¶ 2, 45.  Moreover, Custodia applied for FDIC insurance but it was not available.  *Avanti Statement on its Application to Become an FDIC-Insured Bank*, Custodia (Nov. 5, 2021), https://custodiabank.com/press/avanti-statement-on-its-application-to-become-an-fdic-insured-bank/.

There are a host of other mistaken statements in Defendants' briefs.  *See* Ex. CR (Custodia Bank, Inc.'s Objections to the Federal Reserve Bank of Kansas City's Counterstatement of Undisputed Facts).  For example, they allege that the Federal Reserve did not want Custodia to apply for a master account while it was still "building its business." FRBKC Br. at 13.  This is not what the Defendants told Custodia (or Wyoming) going into the process, and it is not consistent with Defendants' own policies; nor is it consistent with what the Board's General Counsel told Custodia when he encouraged Custodia to apply to become a Fed member bank while it was still under construction.  *See infra* § II.H.  The law and Defendants' own policies allow *de novo*, still-under-construction banks to apply.  Defendants further claim

(in a footnote) that the numerous meetings between Reserve Bank officials and Wyoming banking authorities were not about the SPDI charter legislation.  FRBKC Br. at 13 n.6.  The record, however, clearly shows the contrary.  Custodia Br. ¶ 3.

### F.    The Denial of a Master Account to Custodia Constitutes Final Agency Action Under the APA.

The Board took final agency action in connection with the denial of Custodia's master account.  Although it once disclaimed any role in the decision-making process, it no longer pretends otherwise, having designated its S-Letter determination as "final agency action" for purposes of this APA challenge.  When filing the administrative record, the Board advised that: "The document with ID of A1 (Bates numbered FRB-AR-000002) is the ***final agency action*** at issue as required by Local Rule  83.6(b)(1)(A)."  Def. Bd. of Governors of the Fed. Rsrv. System's Notice of Lodging Admin. Record, ECF No. 178 (emphasis added).  The document referred to is the January 26, 2023 email from Matthew Eichner of the Board to Esther George of the Reserve Bank.  Ex. CC, ECF No. 236-81, at FRB-AR-000002.  In that email, the Board— referring to both the S-Letter and the Kansas City Fed's "pre-decisional" analysis of Custodia's request for a master account pursuant to the S-Letter (as well as the earlier-issued Guidelines)— gave the Kansas City Fed the green light to deny Custodia's master account application.  *Id.* That action indisputably affected Custodia's substantive rights, which is a hallmark of agency action.

The Board now wants to retract that statement.  It argues that the Eichner email does not meet the tests for "agency action" or "finality" as to Custodia's master account request to FRBKC, "causing Custodia's APA claim to fail."  Board Br. at 41.  Further, the Board contends that "[b]ecause Congress vested final decision-making authority over master accounts in the Reserve Banks, and Board staff consultations culminating in the Eichner email expressing 'no

concern' were just 'part of the process,' they do not constitute the final agency action necessary for Custodia to maintain an APA claim against the Board." *Id.* at 42.  The Court should take the Board at its word.  The Board itself designated the Eichner email as final agency action.  Its wish to recant that admission should be rejected.

Even assuming for the sake of argument that the Eichner email is not the Board's final agency action, the Board's participation in the master account process meets the requirement that there be final agency action.  Agency action is defined broadly "to cover comprehensively every manner in which an agency may exercise its power."  *Whitman v. Am. Trucking Ass'ns, Inc.* 531 U.S. 457, 478 (2001).  Here the Board exercised its power in many ways:

- The Board set up a "Nontraditional Account Access Workstream Structure" to assess master account applications from banks it deemed novel.  *See* Custodia Br. ¶ 16.  That NTAA Workstream focused, *inter alia*, on issues raised by SPDI charters.

- The Board issued its Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 19, 2022).  The Guidelines were issued because of "a recent uptick in novel charter types being authorized or considered by federal and state banking authorities across the country," *id.* at 51,099, and the Board finalized them the day before Defendants' motions to dismiss were due in this litigation.  The Guidelines made it all but impossible for Custodia and other Tier 3 novel banks to obtain master accounts.

- The Board linked its membership decision to the assessment of Custodia's master account application under the Guidelines.  As a result, the Kansas City Fed could not conclude its analysis of Custodia's master account application until the Board decided Custodia's membership application.  Custodia Br. ¶ 28.

- The Board circulated its S-2677 Letter to "Instruct Reserve Banks on How to Implement the Account Access Guidelines," first in draft format and later in final just before the denial of Custodia's master account application.  The S-Letter requires Reserve Banks to notify the Board when a Tier 2 or Tier 3 institution applies for a master account and to consult directly with the Board's Director of Reserve Bank Operations and Payment Services ("RBOPS") prior to communicating a decision on a Tier 2 or 3 institution's master account.  It effectively gives the Board a veto over master account decisions with which it disagrees.  Ex. AS, ECF No. 236-45, at FRB-AR-000016.

- The S-Letter also mandated information sharing with a new Board group, the Account Request Information Sharing Group ("ARISG"), which includes Board staff.  Custodia Br. ¶ 41.  President George recognized that the S-Letter "cannot be ignored," and that, as Board guidance, it supplanted Reserve Bank procedures and policies, requiring for the first time that Reserve Banks provide "pre-decisional" drafts to the Board for its review.  *Id.* ¶ 36.

- Pursuant to the S-Letter, the Reserve Banks and Board Staff developed a Handbook to implement the Guidelines, which further cemented Board control by requiring Board involvement,[2] Custodia Br. ¶¶ 38–43, in what is, in effect, an attempt to

---

[2] In addition, the Kansas City Fed has admitted that more than a dozen individuals at the Board were involved in reviewing and denying Custodia's master account request, producing a list of names at its Rule 30(b)(6) deposition.  Custodia Br. ¶ 44.  In response to questioning, the Kansas City Fed agreed that at least 10 more Board employees were involved in Custodia's master account application, edited the draft denial memo or addressed policy questions concerning Wyoming SPDI banks' access to Federal Reserve services.  *See id.*

mandate (in violation of the MCA) a Federal Reserve re-chartering process for an

applicant already chartered by its chartering authority.

Each of these steps constituted agency action.  RBOPS Director Eichner's sign-off on the

denial of Custodia's master account application was simply the culmination of a long stretch of

Board action.  There can be no question, therefore, that the Board controlled the Custodia master

account process, and that Eichner's sign-off constitutes final agency action since, under the

Supreme Court's jurisprudence, that term is defined broadly "to cover comprehensively every

manner in which an agency may exercise its power." *Whitman*, 531 U.S. at 478.

Further, the Supreme Court has "long taken" a pragmatic approach with respect to

finality. *U.S. Army Corps of Engineers v. Hawkes Co*., 578 U.S. 590, 599 (2016).  The

pragmatic inquiry is colored by the APA's embodiment of the "basic presumption of judicial

review." *Abbott Labs v. Gardner,* 387 U.S. 136, 140 (1967).  As a general matter, two

conditions must be satisfied for agency action to be final.  First, the action must mark the

consummation of the agency's decision-making process; it must not be of a merely tentative or

interlocutory nature.  And second, the action must be one by which rights or obligations have

been determined or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154,

177–178 (1997).  Both conditions are met here.  The Board's actions culminated in the denial of

the master account.  And from that action legal consequences adverse to Custodia flowed.

Defendants separately contend that there can be no judicial review under the APA's

"committed to agency discretion by law" provision.  5 U.S.C. § 701(a)(2).  That exception,

however, must be read "quite narrowly." *Weyerhaeuser Co. v. U.S. Fish and Wldlife Serv.*, 139

S. Ct. 361, 370 (2018).  It is confined to "those rare circumstances where the relevant statute is

drawn" in such a manner that the "court would have no meaningful standard against which to

judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (cleaned up). Here, because there is a concrete dispute between the parties on the statutory issue, there are clear standards for the Court to apply and the matter is not entrusted to agency discretion. The Board's actions are, therefore, reviewable; the Court may determine whether Board action violated the judicially cognizable limitations provided by Section 248a.

### G.     The Board Lacks Authority to Regulate State Banks That Are Not Members of the Federal Reserve System.

The Federal Reserve is the primary federal supervisor of state-chartered banks that have decided to join the Federal Reserve System as members. Custodia is not a member of the Federal Reserve System and is not insured by the FDIC. Therefore, the Wyoming Division of Banking, the state chartering authority, is Custodia's banking regulator. Like other State banking agencies, Wyoming's Division of Banking issues bank charters, conducts bank examinations, enforces bank regulations, and decides on proposed branch and merger applications. It also can impose sanctions such as revoking a state bank's charter, issuing cease-and-desist orders, removing bank officials and levying fines. Further, the Division regularly supervises banks chartered in the state and issues Reports of Examination documenting those examinations. By contrast, the Board does not have supervisory authority over Custodia.

By sitting in judgment on state banking authorities (through its recently promulgated Guidelines and Handbook, among other vehicles) and by asserting the right to second-guess those state banking authorities' judgments as to risk, the Board has arrogated power to itself that it simply does not have. The Supreme Court has made it clear that "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts should] typically greet its announcement with a measure of skepticism." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation marks

omitted).  Nothing in the brief of the Board establishes just where the power to second-guess

state regulatory officials comes from, and certainly not in the circumstances presented here.

Instead, the Board argues that there is no indication Congress intended to abdicate the federal

monetary policy and payments systems to the states.  There is no federal monetary policy based

on excluding Custodia (or any other SPDI, for that matter) from accessing the payments system,

particularly when Defendants can require Custodia to maintain a sufficient clearing balance in its

master account under Section 248a(c)(2), so long as those conditions also apply to members.

The position espoused by the Board, if accepted, would amount to a rejection of the dual-

banking system.  It would elevate the Board to a super-chartering authority that could restrict

direct access to the payments system to disfavored entities notwithstanding a state's chartering

decision.  Dividing banks into tiers according to risk, as the Board's Guidelines do, and second-

guessing state authorities, violate the MCA's non-discrimination charge.

### H.    Defendants' Prematurity Argument is Meritless.

Finally, Defendants raise a new argument to defeat Custodia's efforts for a master

account.  They now claim that Custodia's application was premature because Custodia was still

under construction.  FRBKC Br. ¶¶ 47–51.  But access to the Federal Reserve's payment system

does not depend on whether a bank is a *de novo* entity or an established one.  The statute does

not require an institution to be operational, and there is no basis to read such a requirement into

the statute.  Access is guaranteed by statute to all eligible depository institutions, not just

already-operating ones.

Defendants' position is incorrect for several reasons.  First, the MCA has no requirement

that applicants for master accounts be fully operational (much less profitable) when they apply.

Were it otherwise, then there would be a chicken-and-egg problem, as operating without a master

account before applying for it requires the use of a partner bank to clear transactions, which

imposes substantially greater costs and makes the applicant susceptible to the whims of its partner bank, which could be pressured to drop the relationship at any time. Defendants' position also contravenes the Federal Reserve's own policies, which define a *de novo* period as three years and do not require banks to be operational when they apply. *See, e.g.*, Ex. 15, ECF No. 274-15, at FRBKC-00015594 ████████████████████████████

████████████ ; SR 20-16 Letter from Bd. of Governors of the Fed. Rsrv. System (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm (describing that an institution is considered *de novo* until it has been operating for at least three years). Finally, their stance is at odds with the record in the case, which shows that prematurity was never mentioned and is only offered at the summary judgment stage of this litigation as a *post hoc* rationale for an impermissible agency action. Likewise, it is belied by the actions of the Board's General Counsel, Mark Van Der Weide, who encouraged Custodia, at an early date, to apply for membership as a non-operating entity, thereby paving the way to a master account. *See* Ex. AE (Long Tr.), ECF No. 236-31, at 222:21–223:22, 287:13–288:8. Thus, there is no support for the notion that Custodia (which is operational now) had to be operational before it could apply for a master account.

## III.   DEFENDANTS' ARGUMENTS ARE AN AFFRONT TO THE DUAL-BANKING SYSTEM.

The United States operates a dual-banking system that allows banks to be chartered by either the state or federal government. At the founding, almost all banks were state chartered. Banks can apply for a national charter from the Office of the Comptroller of the Currency ("OCC") or for a state charter from the relevant state's banking authority. Ex. A (Conti-Brown Expert Report), ECF No. 236-1, ¶¶ 25–26. National banks are primarily regulated by the OCC, while state banks are principally overseen by state regulators. *Id.* ¶ 26. While the dual-banking

system divides the chartering and regulatory responsibilities between the Federal and state governments, it does not create two separate systems for bank services. *Id.* ¶ 27. The Federal Reserve must provide access to the U.S. dollar payment system to eligible depository institutions on a nondiscriminatory basis. *See* 12 U.S.C. §§ 248a(c)(2), 1831d(a). Just because a bank has a state charter does not mean that it uses a state system to clear checks, transfer electronic funds, or provide other banking services. Instead, state-chartered banks have the right to use the Federal Reserve System for such banking services if they qualify as eligible depository institutions. The dual-banking system has never segregated national and state-level banking services, or given the Board a veto over state-chartered depository institutions' ability to access payment services— and there is no reason to start doing so now.

Defendants repeatedly contend that Custodia's position in this lawsuit "threatens to eviscerate many of the Federal Reserve's longstanding risk management policies and procedures." FRBKC Br. at 39. This argument is not only untrue (because Defendants did not reinterpret the MCA to find alleged power to deny certain state-chartered applicants until a decade ago), but it also ignores the role states play as the principal supervisors of state-chartered banks. In this case, the Wyoming Division of Banking spent years developing a regulatory framework for SPDIs (incorporating Defendants' feedback along the way), and then carefully considered Custodia's application before granting it a charter. Custodia Br. ¶¶ 2–5. As the Brief of Amicus Blockchain Association and Payment Systems Scholars observes: "[T]o qualify as a Wyoming SPDI a depository institution must be considerably *safer* than most banks, including national banks." Blockchain Br., ECF No. 257, at 16; *see also* Wyoming Br., ECF No. 251, at 2 (describing the SPDI regulatory regime as "carefully crafted"). Wyoming's regulatory scheme requires that an SPDI's assets be "managed prudently, consistent with safe and sound banking

practices." 021-20 Wyo. Code R. § 20-9(d). An SPDI must invest 100 percent of its U.S. dollar demand deposits in cash on hand or high-quality assets, and is prohibited from making loans. Custodia Br. ¶ 2. Custodia's model is stricter still, since it proposes to back its customers' U.S. dollar deposits with Federal Reserve master account balances, the safest of all U.S. dollar assets, and to hold reserves at 108% for its first three years. *See* Bd. of Governors of the Fed. Rsrv. Sys., Order Denying App. for Membership, at 11 (Jan. 27, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/orders20230324a1.pdf.

Custodia's plan does not require FDIC insurance; as Amicus Blockchain observed, "[b]ecause of its 100% requirement, Custodia's SPDI could not fail because of bad loans, falling bond prices, depositors' fears, or any common causes of bank failures." Blockchain Br., ECF No. 257, at 17–18. This conclusion is reinforced by the Kansas City Fed itself, which conducted a tabletop exercise after the FTX failure and Silvergate run that determined that Custodia would have survived the same crisis that took down Silvergate. Ex. BJ, ECF No. 236-62, at FRBKC-000015275 ("If I understand the exercise we went through a couple of weeks ago, Custodia wouldn't be in the same situation under the same duress?"); *see also* Ex. M, ECF No. 236-13, at FRBKC-00004964 (Kansas City Fed examiner explaining that Custodia is "not comparable to FTX" as, among many differences, the "SPDI rules require SPDI stablecoins to be backed dollar for dollar by cash.").

Defendants' actions prompted the State of Wyoming to file a second amicus brief in this case. That submission expressed "the State's existing concern that the Defendants' overwhelming bias against State-chartered banks, and those chartered by Wyoming particularly, makes any Wyoming issued SPDI charter irrelevant." Wyoming Br., ECF No. 251, at 2. As the State went on to note, "Even though it is carefully crafted, the State's regulatory banking regime

for all SPDIs is essentially nullified by the Defendants' posture and actions taken in this appeal." *Id.* Equality between federally-chartered and state-chartered banks is "firmly embedded in the statutes governing the national banking system." *First Nat. Bank in Plant City v. Dickinson,* 396 U.S. 122, 133 (1969). The Federal Reserve, however, has usurped that authority.

It is telling that neither Defendant ever identifies any state that gives out charters without careful consideration and a rigorous review process, and never suggests that Wyoming would do so. Indeed, staff at the Kansas City Fed expressed favorable views about the SPDI framework and Wyoming's supervision. *See, e.g.*, Ex. K (Nugent Tr.), ECF No. 236-11, at 36:18–38:6, 62:20–63:4 (Wyoming "took a thoughtful approach to developing the [SPDI] framework."); Ex. E (Humston Tr.), ECF No. 236-5, at 25:16–28:5 ("[M]y team found [the Wyoming Division of Banking has] examiners that would be skilled in their job."); Ex. J (George Tr.), ECF No. 236-10, at 28:14–20, 282:6–11 ("I believe [the Wyoming Division of Banking] would have been willing to share information" with the Reserve Bank). Accordingly, when Custodia applied for a master account, it had earned a charter from a qualified and competent state banking authority after rigorous risk examination, an 8-0 vote by the Wyoming State Banking Board, all pursuant to a statute that was enacted after many meetings with Federal Reserve representatives to ensure that any risks were flagged and mitigated.

Nor was the Board's eligibility review a perfunctory exercise. Once Custodia applied for a master account, the Board spent over a year evaluating Custodia, including its business plan and its eligibility for a master account, evaluating the permissibility of crypto-related banking services as well as broader policy issues and risks presented by SPDIs in general. Custodia Br. ¶¶ 8–17, 21–23. The Board convened a Board-controlled working group—the NTAA Workstream—with separate "Policy" and "Practical" workstreams that were populated largely

by Board staff. *Id.* ¶¶ 16–17.  In the meantime, Kansas City Fed examiners also reviewed

Custodia and reached favorable conclusions about its management team, business plan, and

approach. *Id.* ¶ 54.  Ultimately, just days after Chairman Powell promised Senator Lummis that

he would address the SPDI eligibility question during his Senate confirmation hearing, the

Board's General Counsel contacted Custodia to notify it that the Board had decided to deem

Custodia eligible. *Id.* ¶ 45.

Congress empowered Defendants to manage risk in two ways.  First, the Board can

manage risk as part of its eligibility determination, which can take into account whether the bank

is engaged in legally impermissible activities.  And second, the Reserve Banks can establish

terms governing master account usage for members and nonmembers, such as by requiring banks

to maintain sufficient balances in their master accounts to clear their account at the end of each

day. *See* 12 U.S.C. § 248a(c)(2).  Indeed, the Kansas City Fed was progressing with considering

Custodia's master account application with conditions through November 2022, prior to shifting

gears shortly after the FTX implosion and a meeting about Custodia's membership and master

account applications that Vice-Chair Barr held in late November 2022.  Custodia Br. ¶¶ 47, 49–

51.  What Defendants cannot do, however, is bar access to the payments system or frustrate

Section 248a by imposing conditions that functionally equate to denial.

## IV.    THE BOARD CONTROLLED THE DECISION ON CUSTODIA'S MASTER ACCOUNT APPLICATION.

There is no genuine dispute of material fact that would preclude summary judgment in

this case.  Fed. R. Civ. P. 56(a).  "A disputed fact is 'material' if it might affect the outcome of

the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Janny v. Gamez*, 8 F.4th 883,

898 (10th Cir. 2021) (citation omitted).

The Kansas City Fed's about-face once the Board issued its first draft of the Guidelines, took control over Custodia's membership exam, and faced Custodia's lawsuit starkly reveals the extent of the Board's influence on the outcome of Custodia's master account application.

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████   To the extent weaknesses were observed, everything could "be addressed." Ex. AQ, ECF No. 236-43, at 5.  After, the Board intervened, the Fed did an about-face and declared management "lack[ing]" in "depth," Ex. BS, ECF No. 236-71, at FRB-AR-000331, "risk management gaps" were "significant," *id.*, at FRB-AR-000329, there was "liquidity risk" and "lack" of a "robust capital" framework, *id.*, at FRB-AR-000331–32, Custodia was mischaracterized as having a "monoline business plan," *id.*, at FRB-AR-000326, 28, was alleged to pose "significant BSA/AML risks," *id.*, at FRB-AR-000327, and problems were "not fixable," Ex. CU, at FRBKC-00013854.  The Board essentially re-wrote history to justify its counter-narrative in the litigation, dooming Custodia's master account application.  But the Board's fingerprints are all over this, evidenced by the Board's NTAA Workstream, Guidelines, Handbook, S-Letter, edits to the Kansas City Fed denial memo, and ultimate veto power.  This conclusively answers the Court's discovery question (who did what to whom).

The Kansas City Fed responded to the facts listed in Custodia's opening brief by offering scant, one-word responses of "disputed" or "undisputed" in a chart—without any further explanation regarding what exactly the Kansas City Fed disputes versus which parts of Custodia's statements the Kansas City Fed concedes.  *See* FRBKC's Objections to Custodia's Statement of Material Facts Not In Dispute, ECF No. 274-1.  But upon closer examination, when one compares the statements of facts offered by Custodia and the Kansas City Fed, it is apparent that the core facts set forth in the attached Appendix A are not genuinely in dispute.  There is no need for a trial because Custodia is entitled to summary judgment on the statutory argument, and the facts that matter reinforce the Board's extensive involvement in the decision-making process and the Kansas City Fed's continuous deference to the Board.[3]

Defendants' arguments are largely focused on how the Court should interpret the meaning of the key facts in the case—such as the Guidelines, the S-Letter, and the Handbook—rather than the existence of the facts themselves.  It is undisputed that the Board, not the Kansas City Fed, did the following: formed the NTAA Workstream; decided whether Custodia was eligible for a master account; promulgated the Guidelines, and beyond public view issued the S-Letter and accompanying Handbook (which dictate how master account applications are

---

[3] The Kansas City Fed spends pages attacking Custodia's business model, attacking the qualifications of its personnel, and defending the alleged reasoning for the denial of Custodia's master account application.  *See* FRBKC Br. ¶¶ 24–80.  But the Court has already ruled that the reason for denial is not at issue.  *See* Order Denying Wy. Mot. for Permission to Intervene, ECF No. 162, at 5 ("The reasoning for the denial is not at issue").  Moreover, none of that is relevant to whether Section 248a entitles Custodia to a master account, which is a pure question of law, or to the question of which entity controlled the decision over Custodia's master account application.  Although Custodia vigorously contests many of the Kansas City Fed's assertions, *see* Ex. CR (Custodia Bank, Inc.'s Objections to the Federal Reserve Bank of Kansas City's Counterstatement of Undisputed Facts), those factual disputes do not prevent the Court from granting summary judgment because they do not "affect the outcome of th[is] suit."  *Janny*, 8 F.4th at 898 (citation omitted).  The Court can disregard much of the Kansas City Fed's brief.

evaluated); revised the Kansas City Fed's rationale for denying Custodia's master account application (unbeknownst to President George or her senior deputy, Tara Humston); and denied Custodia's membership application (which relegated Custodia to dead-end, Tier 3 status). *See infra*, Appendix A. In the face of this overwhelming evidence, the Kansas City Fed responds by pointing to self-serving testimony from its employees asserting that President George decided Custodia's master account application, *see* FRBKC Br. at 42–43, but the record reveals the superficial nature of those claims. To be sure, the Kansas City Fed communicated the denial decision to Custodia. FRBKC Br. ¶ 101; Custodia Br. ¶ 57. But the Board, through its actions and its policies, did not leave the decision to the unfettered discretion of the Kansas City Fed. No "rational trier of fact" who considers "the record . . . as a whole" could deny that the Board controlled the decision on Custodia's master account application given its extensive involvement. *Heard v. Dulayev*, 29 F.4th 1195, 1202 (10th Cir. 2022) (citation omitted).

### A.   The Board Controlled the Master Account Decision Via the Guidelines.

The Kansas City Fed offers the misguided argument that "Custodia brings no proof that [the Kansas City Fed] would have granted Custodia's request had the [G]uideline[s] not been issued" and therefore "failed to establish that the [Guidelines] had any impact on [the Kansas City Fed's] decision." FRBKC Br. at 45–46. Any refusal to issue a master account to Custodia would have been unlawful. *See supra* § II. But the reality is that the Kansas City Fed, with heavy editing by the Board, applied the Guidelines to Custodia's master account application in the final recommendation memo. *See* Ex. CV, at FRB-AR-000005–06; *see also* Ex. BS, ECF No. 236-71, at FRB-AR-000326 (showing where the Board directed the Kansas City Fed to include a Guidelines analysis).

The Board issued the Guidelines; the Guidelines set the framework for analyzing master account requests; at the Board's direction, the Kansas City Fed (with Board edits) applied the

Guidelines to Custodia's master account request; and then the Board used the Handbook and S-Letter to check the Kansas City Fed's work all while holding out the ability to veto any decision with which it disagreed.  These facts, all undisputed, are crucial to understanding how the Board "controll[ed] the outcome of Custodia's master account application."  MTD Order at 11.

### B.      The Board Controlled the Master Account Decision Via its Membership Decision.

Among other changes to the review process, the Guidelines elevated the importance of membership in the Federal Reserve—which the Board indisputably controlled—in the assessment of Custodia's master account application.  *See, e.g.*, FRBKC Br. ¶ 101 (Kansas City Fed conceding that the Board voted on Custodia's membership application).  As the Kansas City Fed's Judith Hazen testified, Custodia would have been analyzed as "non-routine" before the Guidelines regardless of whether it was a member of the Federal Reserve, but after the Guidelines, the tiering system made the Board's membership decision determinative of whether Custodia was in Tier 2 or Tier 3.  Ex. CW (Hazen Tr. (Vol. 2)), at 390:5–391:4.

Moreover, the Board's General Counsel, Mark Van Der Weide, urged Custodia to apply for membership.  Ex. AE (Long Tr.), ECF No. 236-31, at 222:21–223:22.  This subjected Custodia to a Board-controlled membership review.  This turned into a bait-and-switch when the Fed, in the middle of its examination, veered from a routine pre-membership exam based on Day One activities to a full-scope examination covering Custodia's entire three-year business plan and using a "complex bank" standard comparable to that used for $10 billion-plus banks.  *See* Custodia Br. ¶ 30.  This change meant that Custodia, as a *de novo* bank, was judged against an unfair standard—indeed, an illegal standard under the MCA, given that the MCA does not allow the Board to subject a bank to a membership-like review for purposes of obtaining a master account.  *See supra* §§ II–III; *see also* Ex. CX (Conti-Brown Tr.), at 286:15–288:9 (describing

the intent of the MCA framers to remove the Fed's authority to impose "membership entrance standards" for access to services).  And when Custodia remediated the issues, as it was invited to do, the Board simply ignored that work and failed to conduct a follow-up review, as it had committed to do in writing and as would have been customary.  Custodia Br. ¶¶ 32–33.

The Board's actions on membership were a pretext for denying Custodia's master account application.  As deposition testimony from Kansas City staffers shows, the Board's denial of Custodia's membership application effectively dictated the decision on Custodia's master account application.  *See* Ex. AH (May-Oder (Vol. I) Tr.), ECF No. 236-34, at 72:23–73:14 (describing that when Custodia applied for membership, "our work was – became – a lot of what they started to look at through the membership application we could also use from a master account" perspective); *id.* at 203:13–25 ("we were waiting to see . . . what the outcome of the membership was to see . . . [if Custodia] mov[ed] into a Tier 2"); Ex. N (Hazen Tr.), ECF No. 236-14, at 248:2–14 ("The timing of the membership decision and the final decision on the master account was based on the timing of the Board of Governors' decision on the membership."); Ex. E (Humston Tr.), ECF No. 236-5, at 403:16–404:12.

### C.   The Board Controlled the Master Account Decision Via the S-Letter and Revisions to the Recommendation Memo.

The Board also required Reserve Banks to implement the Guidelines via a behind-the-scenes S-Letter, which required Reserve Banks to "consult" with Board staff regarding master account applications.  Ex. AS, ECF No. 236-45, at FRB-AR-000015.  The terms of the S-Letter ensure that the Board controls master account decisions, particularly for Tier 3 institutions that are subject to the highest scrutiny.  *Id.*  There is also no dispute that "[p]ursuant to" the S-Letter, the Kansas City Fed provided its recommendation memo to Board staff.  Ex. CB, ECF No. 236-80.  Staff from four different Board divisions provided feedback on that recommendation memo

in the form of both comment bubbles and tracked changes.  FRBKC Br. ¶ 79; Custodia Br. ¶¶ 52–56.

While the parties dispute how to characterize the Board's revisions, *compare* Custodia Br. ¶¶ 52–56, *with* FRBKC Br. at 46; Bd. Br. at 36–37, nobody denies that they occurred.  They reflect far deeper involvement by the Board than Defendants previously acknowledged before discovery began.  *See* Custodia Br. ¶¶ 52–56.  In any event, there is no dispute that the Kansas City Fed shared a revised version of its recommendation memo with the Board, that the revised memo incorporated the Board's revisions, and that the Kansas City Fed did not act until after the Board confirmed it had "no concerns" with denying Custodia's master account application. FRBKC Br. ¶ 96; Custodia Br. ¶ 56.[4]

The Kansas City Fed asks "[w]hy would the Board go through" the effort to promulgate Guidelines and the S-Letter "instead of simply imposing its will."  FRBKC Br. at 48 (quotation marks omitted).  The short answer is to give a veneer of independence.  The slightly longer answer is that the Board did impose its will by issuing the Guidelines, the Handbook, and the S-Letter, and by wielding a veto that it could use at any time.

At the end of the day, "the record taken as a whole could not lead a rational trier of fact to" doubt that the Board controlled the decision over Custodia's master account application.

---

[4] The Kansas City Fed asserts that there was no "internal Board analysis regarding" Custodia's master account request.  FRBKC Br. at 47.  Notably, the Board says no such thing.  The Board only produced an administrative record covering roughly a one-month period starting in January 2023, *see* ECF No. 178, even though discovery from the Kansas City Fed revealed far more extensive and prolonged Board involvement.  The parties stipulated that the entire discovery record would be used for all purposes in this case, ECF No. 220, but Custodia was not afforded the opportunity to take discovery from the Board to learn what else existed internally about Custodia's master account application.  At any rate, the existing Administrative Record shows that the Board revised the Kansas City Fed's analysis of Custodia's master account to conform to the Board-promulgated Guidelines and S-Letter, and ultimately approved of the revised rationale.  FRBKC Br. ¶ 96; Custodia Br. ¶¶ 52–56.

*Heard*, 29 F.4th at 1202 (citation omitted).  For that reason, "there is no genuine dispute as to

any material fact."  Fed. R. Civ. P. 56(a); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales*

*Pracs. & Antitrust Litig.*, 44 F.4th 959, 980 (10th Cir. 2022).  The facts adduced in discovery are

sufficiently clear that it is not necessary to hold a trial to answer the statutory question.

## V.   EVEN IF THE KANSAS CITY FED DECIDED CUSTODIA'S MASTER ACCOUNT APPLICATION, SECTION 248A ENTITLES CUSTODIA TO RELIEF.

In its Order denying Defendants' Motions to Dismiss Amended Complaint, the Court

elected to forgo "a full statutory interpretation of the matter" at that time because it held that

"further development of important facts," particularly the roles played by the Board and the

Kansas City Fed, could inform its legal analysis.  MTD Order at 10–11.  Discovery has now

given the lie to Defendants' claim that Reserve Banks alone decide master account access

questions, especially for novel charters like SPDIs.  The facts confirm Custodia's theory of the

case:  The Board of Governors "was pulling the puppet strings behind the scenes" and

Section 248a governs the Court's analysis.  *Id.* at 10.

Even if the Court were to conclude, counterfactually, that the Kansas City Fed decided

Custodia's master account application, Section 248a still entitles Custodia to relief.  Under

Section 248a, "[a]ll Federal Reserve bank services covered by the fee schedule shall be available

to nonmember depository institutions."  Notably, the statute is written in the passive voice; while

Section 248a states that Federal Reserve services "shall be available," it does not specify the

entity responsible for making such services available.  Congress left open ***how*** the Federal

Reserve System would provide Federal Reserve Services to depository institutions; but, as

explained above (*supra* § II) and in Custodia's Opening Brief, Congress was explicit ***that*** all

eligible depository institutions would be entitled to access to Federal Reserve Services.  The

legislative history confirms this reading and is crystal clear that Congress intended for all

depository institutions to have access to such services.  Custodia Br. § I.E.  Similarly, there is a long history of both the Board and the Reserve Banks applying the MCA consistent with Congress's intent and recognizing that Federal Reserve Services are available to all eligible depository institutions.  Custodia Br. §§ I.C–D.  Courts and academics agree that Section 248a entitles all eligible depository institutions to access the Federal Reserve payments system.  Custodia Br. §§ I.F–G.  No matter how the Board and the Reserve Banks allocate responsibility for providing Federal Reserve Services, eligible depository institutions such as Custodia are unambiguously entitled to such services under Section 248a.

## VI.   CONCLUSION

For the foregoing reasons, Custodia's Petition for Review on its APA Claim and Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim should be granted and the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment should be denied.

DATED this 16th day of February, 2024.

CUSTODIA BANK, INC., Plaintiff

By:   /s/ Scott E. Ortiz
      Scott E. Ortiz, W.S.B. # 5-2550
      WILLIAMS, PORTER, DAY & NEVILLE, P.C.
      159 No. Wolcott, Suite 400
      P.O. Box 10700
      Casper, Wyoming 82602
      Telephone:   (307) 265-0700
      Email:        sortiz@wpdn.net

      -and-

      John K. Villa, *pro hac vice*
      Ryan Scarborough, *pro hac vice*
      Lauren Weinberger, *pro hac vice*
      Ian Swenson, *pro hac vice*
      Russell Mendelson, *pro hac vice*
      WILLIAMS & CONNOLLY, LLP
      680 Maine Avenue SW
      Washington, DC 20024

Telephone:     (202) 434-500
Emails:        jvilla@wc.com
               rscarborough@wc.com
               lweinberger@wc.com
               iswenson@wc.com
               rmendelson@wc.com

*Attorneys for Plaintiff*

## APPENDIX A: CORE FACTS THAT FRBKC HAS NOT DISPUTED

**1.    Wyoming Developed the SPDI Charter in Consultation with the Kansas City Fed.**

1.      In 2019, Wyoming created a charter for Special Purpose Depository Institutions ("SPDIs").  FRBKC Br. ¶ 25; Custodia Br. ¶ 2.

2.       The Kansas City Fed consulted with and provided feedback to the Wyoming Division of Banking as it developed its SPDI legislation.  FRBKC Br. ¶ 28; Custodia Br. ¶¶ 3–4.

3.      SPDIs are fully reserved (i.e., their reserves must cover 100% of deposits) and do not make loans.  FRBKC Br. ¶ 25; Custodia Br. ¶ 2.

4.      The Wyoming Division of Banking supervises SPDIs.  FRBKC Br. ¶ 27; Custodia Br. ¶ 5.

**2.    The Board Issued Guidelines that Were Applied to Custodia's Master Account Application.**

5.      In May 2021, while Custodia's master account application was pending, the Board proposed Account Access Guidelines that applied to the assessment of master account requests.  FRBKC Br. ¶ 86; Custodia Br. ¶ 18.

6.      The Kansas City Fed told Custodia that its master account application would not be decided until the Guidelines were finalized.  FRBKC Br. ¶ 92; Custodia Br. ¶ 23.

7.      The Board finalized the Guidelines in August 2022.  FRBKC Br. ¶ 92; Custodia Br. ¶ 19.

8.      The memo that sets forth the rationale for denying Custodia's master account application applied the Guidelines' framework to Custodia's master account application.  Ex. CV, at FRB-AR-000005–06.

**3.    The Board Issued an S-Letter that the Board and the Kansas City Fed Followed When Deciding Custodia's Master Account Application.**

9.      The Board issued an "S-Letter" to instruct Reserve Banks regarding how to implement the Guidelines, and finalized it days before the Custodial denial. FRBKC Br. ¶ 93; Custodia Br. ¶¶ 34, 36.

10.     The S-Letter required Reserve Banks to notify Board staff when there were new account access requests from institutions that raised novel issues.  FRBKC Br. ¶ 94; Custodia Br. ¶ 37.

11.     Accompanying the S-Letter was a "Handbook" that described to Reserve Banks how to implement the Account Access Guidelines. FRBKC Br. ¶ 97; Custodia Br. ¶ 38.

Pursuant to the Handbook, the Kansas City Fed was required to consult with Board staff regarding Custodia's master account application, and in fact did so.  Custodia Br. ¶ 41. [5]

12.     "Pursuant to" the S-Letter, the Kansas City Fed was required to consult with Board staff regarding Custodia's master account application, and in fact did so.  FRBKC Br. ¶ 95; Custodia Br. ¶ 37.

### 4.     The Board Denied Custodia Membership in the Federal Reserve.

13.     Custodia applied for membership in the Federal Reserve in 2021 at the urging of Board General Counsel Mark Van Der Weide,[6] while its master account application was pending. FRBKC Br. ¶ 98; Custodia Br. ¶¶ 24–25.

14.     The decision on Custodia's master account application was delayed while the Board considered Custodia's membership application.  FRBKC Br. ¶ 100; Custodia Br. ¶ 26.

15.     The Board made the decision to deny Custodia's membership application. FRBKC Br. ¶ 101; Custodia Br. ¶ 57.

16.     Kansas City Fed officials working on Custodia's master account application understood that they were not to get out ahead of the Board's membership decision.  FRBKC Br. ¶ 100; Custodia Br. ¶ 26.

17.     If Custodia had been granted membership, that would have meaningfully changed the assessment of Custodia's master account application. FRBKC Br. ¶ 99; Custodia Br. ¶ 26.

### 5.     The Board Was Involved in Custodia's Master Account Application Every Step of the Way.

18.     A depository institution must either open a master account or work with another institution that has a master account in order to access Federal Reserve services.  FRBKC Br. ¶ 5 & n.3; Custodia Br. ¶¶ 8–9.

---

[5] The Kansas City Fed cites a variety of paragraphs from its Counterstatement of Undisputed Facts in support of its assertion that paragraph 41 of Custodia's brief is in dispute.  *See* FRBKC's Objections to Custodia's Statement of Material Facts Not In Dispute, ECF No. 274-1, ¶ 41.  But none of the cited paragraphs contest that pursuant to the Handbook, the Kansas City Fed was required to consult with Board staff regarding Custodia's master account application or that the Kansas City Fed in fact did so.

[6] The Kansas City Fed cites a variety of paragraphs from its Counterstatement of Undisputed Facts in support of its assertion that paragraph 24 of Custodia's brief is in dispute.  *See* FRBKC's Objections to Custodia's Statement of Material Facts Not In Dispute, ECF No. 274-1, ¶ 24 (citing FRBKC Br. ¶¶ 98–101).  But none of the cited paragraphs are relevant to whether Mark Van Der Weide urged Custodia to apply for membership.

19.     Custodia submitted its master account request in October 2020.  Custodia Br. ¶ 8; FRBKC Br. ¶ 47.

20.     Custodia is "eligible" for a master account.  FRBKC Br. ¶ 55; Custodia Br. ¶ 45.

21.     The Board, not President George, established system-wide working groups to address policy issues regarding non-traditional master accounts shortly after Custodia filed its master account application. FRBKC Br. ¶ 85; Custodia Br. ¶¶ 16–17.

22.     The Kansas City Fed consulted with Board Legal regarding Custodia's eligibility for a master account, and Board Legal determined that Custodia was eligible.  FRBKC Br. ¶¶ 54–55; Custodia Br. ¶ 45.

23.     More than a dozen individuals at the Board were involved in reviewing Custodia's master account request.  Custodia Br. ¶ 44.[7]

24.     In late 2022, President George directed Kansas City Fed staff to draft a memo regarding potential actions on Custodia's master account.  FRBKC Br. ¶ 79; Custodia Br. ¶ 51.

25.     Pursuant to the S-Letter, the Kansas City Fed shared that memo with Board staff. FRBKC Br. ¶ 79; Custodia Br. ¶¶ 52–55.

26.     Staff from four different Board divisions – Supervision & Regulation (SR), Monetary Affairs (MA), Financial Stability (FS), and RBOPS – provided feedback on that recommendation memo.  FRBKC Br. ¶ 79; Custodia Br. ¶¶ 52–55.  That feedback came in the form of comment bubbles and tracked changes.  *See, e.g.*, Ex. BS, ECF No. 236-71.

27.     After implementing the Board's feedback, the Kansas City Fed shared a revised version of its recommendation memo with the Board.  FRBKC Br. ¶ 96; Custodia Br. ¶ 56.

28.     Two days later, the Board responded that it had "no concerns" with denying Custodia's master account application. FRBKC Br. ¶ 96; Ex. CC, ECF No. 236-81.

29.     Custodia's membership application was denied on January 27, 2023.  Custodia's master account application was denied later that same day.  FRBKC Br. ¶¶ 80, 101; Custodia Br. ¶ 57.

---

[7] The Kansas City Fed cites a variety of paragraphs from its Counterstatement of Undisputed Facts in support of its assertion that paragraph 44 of Custodia's brief is in dispute.  *See* FRBKC's Objections to Custodia's Statement of Material Facts Not In Dispute, ECF No. 274-1, ¶ 44.  But none of the cited paragraphs are relevant to the number of Board employees who were involved in reviewing Custodia's master account request.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served this day of February 16, 2024, addressed to:

Mark Van Der Weide
Joshua P. Chadwick
Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitutional Avenue, N.W.
Washington, DC 20551

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Billie L.M. Addleman
John P. Fritz
Erin E. Berry
HIRST APPLEGATE, LLP
P.O. Box 1083
Cheyenne, Wyoming 82003

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Andrew Michaelson
Laura Harris
KING & SPALDING, LLC
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
Emily Caroline Snell Freeman
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Angela Tarasi
Jared M. Lax
KING & SPALDING, LLP
1401 Lawrence Street
Suite 1900
Denver, Colorado 80202

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

 /s/ Scott E. Ortiz_____
Scott E. Ortiz

J.A.1401

Scott E. Ortiz, W.S.B. # 6-4254
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:          sortiz@wpdn.net

*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

CUSTODIA BANK, INC., )
)
    Plaintiff, )
)
v. )    Civil Number: 22-cv-00125-SWS
)
FEDERAL RESERVE BOARD OF )
GOVERNORS and FEDERAL RESERVE )
BANK OF KANSAS CITY, )
)
    Defendants. )

---

### DECLARATION OF RYAN SCARBOROUGH IN SUPPORT OF PLAINTIFF CUSTODIA BANK, INC.'S OMNIBUS OPPOSITION TO THE FEDERAL RESERVE BANK OF KANSAS CITY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY BRIEF IN SUPPORT OF CUSTODIA'S PETITION FOR REVIEW ON ITS APA CLAIM AND ITS MOTION FOR JUDGMENT AS A MATTER OF LAW ON ITS STATUTORY MANDAMUS CLAIM

---

I, Ryan Scarborough, declare as follows:

1.     I am an attorney at Williams & Connolly LLP, counsel for the Plaintiff in the above-captioned action.

2.     I respectfully submit this declaration in support of Plaintiff Custodia Bank, Inc's Omnibus Opposition to the Federal Reserve Bank of Kansas City's Cross-Motion for Summary Judgment and Reply Brief in Support of Custodia's Petition for Review on its APA Claim and its Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim.

**J.A.1402**

3.      Attached hereto as Exhibit CR are Custodia Bank Inc.'s Objections to the Federal Reserve Bank of Kansas City's Counterstatement of Undisputed Facts.

4.      Attached hereto as Exhibit CS is a true and accurate copy of redacted handwritten notes, dated 2021–2022, bearing a bates number that begins at FRBKC-00013891.

5.      Attached hereto as Exhibit CT is a true and accurate copy of a document entitled "DRAFT Principles Covering Access to Accounts and/or Services at Federal Reserve Banks," undated, bearing a bates number that begins at FRBKC-00003607.

6.      Attached hereto as Exhibit CU is a true and accurate copy of redacted handwritten notes, undated, bearing a bates number that begins at FRBKC-00013847.

7.      Attached hereto as Exhibit CV is a true and accurate copy of a letter from Judith Hazen and Christi May-Oder to Esther George, dated January 19, 2023, bearing a bates number that begins at FRB-AR-000004.

8.      Attached hereto as Exhibit CW is a true and accurate copy of excerpts from the deposition of Judith Hazen Vol. 2, dated November 15, 2023.

9.      Attached hereto as Exhibit CX is a true and accurate copy of excerpts from the deposition of Peter Conti-Brown, dated December 14, 2023.

10.     Attached hereto as Exhibit CY is a true and accurate copy of excerpts from the deposition of Zev Shimko, dated November 30, 2023.

11.     Attached hereto as Exhibit CZ is a true and accurate copy of excerpts from the deposition of Christi May-Oder, dated October 19, 2023.

12.     Attached hereto as Exhibit DA is a true and accurate copy of excerpts from the deposition of Esther George, dated November 9, 2023.

J.A.1403

13.    Attached hereto as Exhibit DB is a true and accurate copy of excerpts from the deposition of Judith Hazen, dated November 15, 2023.

14.    Attached hereto as Exhibit DC is a true and accurate copy of excerpts from the deposition of Jackie Nugent, dated November 15, 2023.

15.    Attached hereto as Exhibit DD is a true and accurate copy of excerpts from the deposition of Caitlin Long, dated November 29, 2023.

16.    Attached hereto as Exhibit DE is a true and accurate copy of a document entitled "Custodia BSA/AML and OFAC Program Assessment," dated October 4, 2022, bearing a bates number that begins at Custodia-00007043.

17.    Attached hereto as Exhibit DF is a true and accurate copy of excerpts from the deposition of Katie Cox, dated December 19, 2023.

18.    Attached hereto as Exhibit DG is a true and accurate copy of an email from Caitlin Long with the subject line "Re: Letter of Support for Wyoming's SPDIs Applications for the Fed's Master Accounts," dated January 25, 2021, bearing a bates number that begins at Custodia-00002097.

19.    Attached hereto as Exhibit DH is a true and accurate copy of the Bank Board Hearing transcript, dated October 6, 2020, bearing a bates number that begins at Custodia-00005946.

20.    Attached hereto as Exhibit DI is a true and accurate copy of a letter from Caitlin Long to Esther George, dated March 3, 2022, bearing a bates number that begins at Custodia-00007978.

DATED this 16th day of February, 2024.

/s/ Ryan Scarborough_____

J.A.1404

Ryan Scarborough, *pro hac vice*
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
rscarborough@wc.com
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served this day of February 16, 2024, addressed to:

| | |
|---|---|
| Mark Van Der Weide<br>Joshua P. Chadwick<br>Yvonne F. Mizusawa<br>Yonatan Gelblum<br>Katherine Pomeroy<br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM<br>20th Street and Constitutional Avenue, N.W.<br>Washington, DC 20551 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Billie L.M. Addleman<br>John P. Fritz<br>Erin E. Berry<br>HIRST APPLEGATE, LLP<br>P.O. Box 1083<br>Cheyenne, Wyoming 82003 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Andrew Michaelson<br>Laura Harris<br>KING & SPALDING, LLC<br>1185 Avenue of the Americas, 34th Floor<br>New York, New York 10036 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Jeffrey S. Bucholtz<br>Joshua N. Mitchell<br>Christine M. Carletta<br>Emily Caroline Snell Freeman<br>KING & SPALDING, LLP<br>1700 Pennsylvania Ave., N.W.<br>Washington, D.C. 20006 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |
| Angela Tarasi<br>Jared M. Lax<br>KING & SPALDING, LLP<br>1401 Lawrence Street<br>Suite 1900<br>Denver, Colorado 80202 | ☐ U.S. Mail (Postage Prepaid)<br>☐ Email<br>☐ Overnight Delivery<br>☐ Hand Delivery<br>☒ CM/ECF System |

/s/ Ryan Scarborough
Ryan Scarborough, *pro hac vice*

**J.A.1406**

# EXHIBIT CX

# [PUBLIC VERSION]

J.A.1407

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF WYOMING

2
       -------------------------------:
3   CUSTODIA BANK, INC.,              :
                                      :
4               Plaintiff,            :
                                      : Case No.
5         vs.                         : 1:22-cv-00125-SWS
                                      :
6   FEDERAL RESERVE BOARD OF          :
    GOVERNORS and FEDERAL RESERVE     :
7   BANK OF KANSAS CITY,              :
                                      :
8               Defendants.           :
       -------------------------------:
9
10            CONFIDENTIAL DEPOSITION OF
11             PETER CONTI-BROWN, PH.D.
12
13  DATE:           Thursday, December 14, 2023
14  TIME:           8:09 a.m.
15  LOCATION:       King & Spalding, LLP
                    1700 Pennsylvania Avenue, N.W.
16                  Washington, D.C. 20006
17
18  REPORTED BY:    Erick M. Thacker
                    Reporter, Notary
19
20
21            Veritext Legal Solutions
           1250 Eye Street, NW, Suite 901
22              Washington, D.C. 20005

Page 286

1    MCA, must get access to an account, right?

2         A    All legally eligible depository

3    institutions, the intent of the framers of the

4    MCA was to give them access on equal terms to

5    Federal Reserve services, yes.

6         Q    Okay.  And that once they have an

7    account, you're not precluding the possibility

8    that the Federal Reserve can conduct a risk

9    assessment concerning each institution, right?

10        A    That's -- it's correct that I'm

11   asserting that the Federal Reserve's risk

12   assessments pursuant to regulation is consistent

13   with the Fed's practices after the passage of the

14   Monetary Control Act.

15        Q    But to the extent that they restricted

16   use of any service in perpetuity, that would be

17   inconsistent with the intent behind the Monetary

18   Control Act?  That's your opinion?

19        A    The --

20             MR. SCARBOROUGH:  Objection.

21             THE WITNESS:  My opinion is that the

22   intent of the framers of the Monetary Control Act

Page 287

1    was not to give the Federal Reserve the authority

2    to impose membership entrance standards for

3    federal -- use of Federal Reserve services as it

4    had done prior to 1980, after the passage of that

5    act.

6    BY MR. MICHAELSON

7         Q    Okay.  So The Narrow Bank is a

8    state-chartered nonmember bank, right?

9         A    That's right.

10        Q    Like Custodia, right?

11        A    Chartered by the state of Connecticut,

12   where Custodia was chartered by Wyoming.

13        Q    Right.  But both are state-chartered

14   nonmember banks, right?

15        A    That's right.

16        Q    And so it's your opinion that the

17   Federal Reserve -- that the Monetary Control

18   Act's intent was to force the Federal Reserve to

19   give entities like that access to services

20   irrespective -- without the Federal Reserve being

21   powered to conduct a risk assessment?

22        A    My opinion is that the intent of the

Page 288

```
1    framers of the MCA was to require the Federal

2    Reserve to equalize access to its service

3    irrespective of Fed membership and that the

4    process for determining Fed membership, which

5    could stay consistent both before and after 1980,

6    was not to be turned into the same process for

7    granting that access, which was to be on equal

8    terms to all legally eligible depository

9    institutions.

10        Q    In your view, is it consistent with the

11   Monetary Control Act for the Federal Reserve to

12   deny access to a -- both a federally-chartered

13   and state-chartered institution that are

14   identical?

15            MR. SCARBOROUGH:  Objection to form.

16            THE WITNESS:  My opinion is that that

17   would not constitute the access intended by the

18   federal -- by the framers of the Monetary Control

19   Act.  The intent of the framers of the Monetary

20   Control Act was not that the Federal Reserve

21   could act with whatever whim that it preferred

22   for so long as it did so consistently across
```

Page 304

1        Q    Okay.  And that would include payment

2    of interest on excess reserves?

3        A    That would include the master account.

4        Q    Would it include payment of interest on

5    excess reserves?

6        A    I'd regard the application of payment

7    on interest reserves and whether it fits within

8    the statutory parameters of Section 248a to be a

9    legal question, which the Court should decide and

10   on which I offer no opinion.

11       Q    So you're -- you're -- you're not

12   offering an opinion on -- so it's potentially

13   consistent with the intent behind the MCA for the

14   Federal Reserve to grant a master account to

15   The Narrow Bank, but refuse to pay interest on

16   excess reserves?

17       A    I don't offer an opinion about -- on

18   that -- on the specific legal interpretation of

19   what the -- of what would constitute additional

20   priced services and whether the interest on

21   reserves would -- would constitute those

22   services.

Page 305

```
 1              I do express the opinion that if the
 2    Federal Reserve in granting a master account so
 3    imposes conditions on its use as to render it
 4    inert that that would be inconsistent with the
 5    intent of the framers of the MCA.  Whether, in
 6    this specific instance, the payment on interest
 7    on excess reserves would -- would render that
 8    account inoperable is not a question on which I
 9    offer an opinion.
10         Q    But you understand that TNB's business
11    model was built around receipt of interest on
12    excess reserves, right?
13         A    I don't offer an opinion on the
14    business model of The Narrow Bank in this case.
15         Q    Do you know if any employees of the
16    Federal Reserve Bank of New York were inclined to
17    the grant The Narrow Bank's request for a master
18    account?
19         A    I don't have an opinion to offer about
20    the inclinations of individual members of the --
21    or staffers or employees of the Federal Reserve
22    Bank of New York.
```

# EXHIBIT CY

# [PUBLIC VERSION]

**CONFIDENTIAL**

IN ACCORDANCE WITH A PROTECTIVE ORDER, THE ENCLOSURE(S) SHALL BE TREATED AS CONFIDENTIAL AND SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.

**J.A.1414**

*Meadors Court Reporting*

*** CONFIDENTIAL ***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

Civil Action No. 1:22-cv-00125-SWS
_____

DEPOSITION OF ZEV SHIMKO
November 30, 2023
_____

CUSTODIA BANK, INC.,

Plaintiff,

vs.

FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL
RESERVE BANK OF KANSAS CITY,

Defendants.

_____

APPEARANCES:

    WILLIAMS & CONNOLLY, LLP
        By Lauren A. Weinberger, Esq.
        Russell Mendelson, Esq. (via Zoom)
        680 Maine Avenue SW
        Washington, DC 20024
        202.434.5953
        lweinberger@wc.com
        rmendelson@wc.com
        Appearing on behalf of
        Custodia Bank, Inc.


    KING & SPALDING, LLP
        By Jared M. Lax, Esq.
        1401 Lawrence Street
        Suite 1900
        Denver, Colorado 80202
        720.535.2320
        jlax@kslaw.com
        Appearing on behalf of
        Federal Reserve Bank of Kansas City

J.A.1415

1   Custodia multiple times to open with a correspondent

2   bank?

3        A     I recall hearing something similar from

4   Caitlin, yes.

5        Q     What do you recall hearing?

6        A     I recall Caitlin providing a summary of an

7   interaction or meeting with President George where

8   President George stated something along the lines of,

9   Why doesn't Custodia just open up with a

10  correspondent bank?

11       Q     Okay.  Do you recall how Custodia's

12  responded?

13       A     I don't specifically recall how we

14  responded in that point in time.  I know that we had

15  communicated that we felt it was a disadvantage to

16  open up with a correspondent or partner bank,

17  because, for example, it does result in a higher cost

18  to us as control over the program and reliance on a

19  third party.

20       Q     Did Custodia ever open with a

21  correspondent bank?

22       A     We did.

23       Q     When was that?

24       A     We started to facilitate payments in late

25  2022 with a partner bank.  And then later in 2023 is

1    when we started to onboard external customers.

██████████████████████████████████

██████████████████████████████████

████████████

██████████████████████████████████████

████████████████████████

████████████████████████████████ at

8    one point in time, it was communicated to us that

9    they were receiving regulatory pressure and would not

10   be able to continue with the relationship.

11        Q    And when did the relationship end?

12        A    I don't recall the specific date.  I

13   believe it would have been around early 2023.

████████████████████████████████████

██████████████████

██████████████

██████████████████

████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████

██████████████████████████████

██████████████

25        Q    You could put that document aside.

# EXHIBIT DF

# [PUBLIC VERSION]

**CONFIDENTIAL**

IN ACCORDANCE WITH A PROTECTIVE ORDER, THE ENCLOSURE(S) SHALL BE TREATED AS CONFIDENTIAL AND SHALL NOT BE SHOWN TO ANY PERSON OTHER THAN THOSE PERSONS DESIGNATED IN PARAGRAPH 8.2 OF THE PROTECTIVE ORDER.

Page 1

1         IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF WYOMING

3     ---------------------------

     CUSTODIA BANK, INC.,     :

4                          :

        Plaintiff,       :

5                      :  Case No.:

     vs.                  :

6                      :  1:22-cv-00125-SWS

     FEDERAL RESERVE BOARD OF   :

7     GOVERNORS,             :

                           :

8     AND                 :

                           :

9     FEDERAL RESERVE BANK OF   :

     KANSAS CITY,         :

10                        :

        Defendants.     :

11    ---------------------------

12      "CONFIDENTIAL" DEPOSITION OF KATIE S. COX

13              Volume 1 of 2

14    DATE:          December 19, 2023

15    TIME:          8:38 a.m. to 4:15 p.m.

16    LOCATION:     King & Spalding, LLP

                 1700 Pennsylvania Ave, NW

17              Suite 900

                 Washington, DC 20006

18

19    REPORTED BY:  Felicia A. Newland, CSR

20

               Veritext Legal Solutions

21        1250 Eye Street, N.W., Suite 350

               Washington, D.C. 20005

22

J.A.1419

CONFIDENTIAL

Page 38

1            Q      Okay.  Okay.  Great.

2                   So -- okay.  So this is very helpful.

3      We were actually talking about your background, but

4      that was -- that was useful information to help me

5      orient what you've been working on.

6                   How many de novo institutions did you

7      see while you were at the Board of Governors?

8            A      I -- I don't know the number.  I was

9      there --

10           Q      Yeah.

11           A      -- 20 years.  I don't -- I don't

12     really know.

13           Q      Was it many?

14           A      I don't know the number, to tell you

15     the truth.

16           Q      Okay.  So I -- I believe Caitlin

17     testified that there were none between, for

18     example, 2008 and -- 2008 and 2018.  So would you

19     say it was an uncommon occurrence to see a de novo

20     bank?

21           A      I don't -- I don't think I'd say it

22     was uncommon.  I mean, we did see them, and

J.A.1420

Page 39

1     that's -- what dates did she provide?

2             Q     She said 2008 to 2018, there weren't

3     any.

4             A     No, that's not true.

5             Q     Okay.  There would be?  You think so?

6             A     Yeah, I can give you an example --

7             Q     Sure.

8             A     -- of a de novo.  There's a couple

9     that I worked on that had a master account.

10    They're very similar to -- it had some similar

11    characteristics, like ██████████

██  ████████████████████████████████████

██  ███████████████████████████████████████████

██  ██████████████████████████████████████████

██  ████████████████████████████████████████████

██  ████████████████████    ████████████████████████

██  █████████████████   ██████████████████████████

██  ██████████████████████████████    ████████████████

██  ██████████████

██  ██   ████████████████████████████████████████

██  ██   ████████████████████   ████████████████████

██  ████████

CONFIDENTIAL

Page 66

1     at the reserve banks.  Is that right?

2          A    So typically, yes.

3          Q    Okay.  And would you know what the

4     typical process was for handling a master account

5     request?

6          MS. WEINBERGER:  Object to form.

13    BY MS. CARLETTA:

14          Q    So I'm sorry, let me back --

15          A    Uh-huh.

16          Q    -- let me back up for a second.

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

*Counsel for Defendant Federal Reserve Bank of Kansas City*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| CUSTODIA BANK, INC.,<br><br>  *Plaintiff,*<br><br>  v.<br><br>FEDERAL RESERVE BOARD OF GOVERNORS and FEDERAL RESERVE BANK OF KANSAS CITY,<br><br>  *Defendants.* | No. 1:22-cv-00125-SWS |

**DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

J.A.1423

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ......................................................................... 1

ARGUMENT ................................................................................................... 3

I.  The Federal Reserve Act Affords Discretion Over Access to Services............................ 3

    A.  The Federal Reserve Has Always Had Discretion Over Access to Accounts and Services, and the MCA Did Not Take That Away. ........................ 4

    B.  Custodia's Proposed "Open Access" Would "Throw Open the Doors" to Risky Institutions in Ways Congress Could Not Have Intended............................. 9

    C.  Discretion Is Consistent With the Dual Banking System. .................................... 13

II.  FRBKC Exercised Discretion in Denying Custodia's Master Account Request. ............ 15

III.  Custodia Has Conceded FRBKC's List of Undisputed Facts............................................ 19

IV.  Even if This Court Finds That the Board Dictated FRBKC's Denial of Custodia's Master Account Request, Custodia Is Still Not Entitled to a Master Account. ................. 20

CONCLUSION.................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.* (*BSJI*),
  2023 WL 7111182 (S.D.N.Y. Oct. 24, 2023) ................................................................ 12

*Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*,
  262 U.S. 649 (1923) ................................................................................................ 1, 4, 6

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ........................................................................................................ 5

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ........................................................................................................ 5

*Lowe v. SEC*,
  472 U.S. 181 (1985) ........................................................................................................ 7

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ........................................................................................................ 5

*Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*,
  390 F.3d 684 (10th Cir. 2004) ........................................................................................ 5

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*,
  576 U.S. 519 (2015) ........................................................................................................ 5

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ........................................................................................................ 9

**Statutes**

12 U.S.C. § 248a ...................................................................................................... *passim*

12 U.S.C. § 248c ................................................................................................................ 6

12 U.S.C. § 342 ........................................................................................................ *passim*

12 U.S.C. § 461 .............................................................................................................. 11

12 U.S.C. § 1815 ............................................................................................................ 11

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
  Reading Law: The Interpretation of Legal Texts (2012) ............................................ 7, 8

Bd. of Governors,
    FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset
    Risks to Banking Organizations (Jan. 3, 2023), http://tinyurl.com/nhdkv56d ........................ 11

Compl.,
    *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*,
    2015 WL 5025343 (D. Colo. 2015) (No. 15-cv-1633), ECF 1 .................................................. 12

*Master Account and Services Database*, FederalReserve.gov
    (current as of Dec. 15, 2023), http://tinyurl.com/4c95xdt9 ...................................................... 7

Wilmarth, Arthur, Jr.,
    *We Must Protect Investors and Our Banking System from the Crypto Industry*,
    101 Wash. U. L. Rev. 235 (2023) ............................................................................................ 8

Wilmarth, Arthur, Jr.,
    Nat'l Cmty. Reinvestment Coal. et al., Comment Letter on
    Proposed Guidelines for Evaluating Account and Services Requests (Jan. 17, 2023),
    http://tinyurl.com/nzpc24us ..................................................................................................... 10

## PRELIMINARY STATEMENT

The parties agree that the "heart of the case is a legal issue," and there is much about the law that is not disputed. Custodia Opp. 4 (ECF 295) ("Opp.").  Before 1980, the Federal Reserve Act (the "FRA") authorized the Federal Reserve to exercise discretion over access to and use of services.  *Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 655-56 (1923) (holding that "may" in 12 U.S.C. § 342 conferred discretion).  In 1980, Congress amended the FRA by enacting the Monetary Control Act (the "MCA") to reverse a decline in Federal Reserve membership and strengthen federal control over monetary policy.  The MCA accomplished this goal by imposing uniform reserve requirements on nonmember banks and opening up services to them with non-discriminatory pricing.  That much is clear.

The legal dispute concerns whether Congress went much further than that and eliminated the Federal Reserve's long-held discretion by providing all depository institutions an absolute entitlement to services.  But we know Congress did not do that because Congress *retained* § 342's "may"—authoritatively construed by the Supreme Court as establishing a discretion-based framework—and *extended* that discretion-based framework to nonmember banks (amending § 342 to bring "other depository institutions" within its scope).  The MCA's simultaneous amendments to 12 U.S.C. § 248a forbade discrimination in pricing, but that is a far cry from conferring an absolute right to access on each and every depository institution regardless of risk.  Section 248a does not say that, and there is not a shred of evidence that anyone in Congress intended that result.

Custodia proposes that the MCA mandates "open access" to services for all depository institutions, Opp. 1, but let's be clear: what Custodia is really talking about is access *and use*.  *See* Custodia Br. 5 (ECF 234) ("Custodia Br.").  And that's the problem.  Access to *and use of* Federal Reserve services presents a panoply of risks—to Reserve Banks, to the nation's financial stability, to implementation of federal monetary policy, and, ultimately, to taxpayers—that Custodia does

not dispute.  Instead, Custodia strains to explain how such risks might be mitigated, but its attempt to do so only serves to underscore why its absolute-entitlement legal theory cannot be right.  It first claims that the risks will be mitigated by "the state chartering process," Opp. 1, but states have neither the mission nor the means to look after federal interests, nor any direction from Congress to do so.  It then claims that the risks will be mitigated by Board powers to (a) "weed[] out" illegal and/or impermissible activities and (b) "establish terms governing account usage" based on risk. Opp. 1, 34.  It is telling that even Custodia recognizes that such discretion over access to and use of services must exist.  But if it does, then § 248a cannot simultaneously mandate an absolute entitlement to them.

It is Custodia's position—not FRBKC's—that threatens to undo the nation's dual banking system.  The Federal Reserve and federal banking agencies have exercised discretion as to state-chartered institutions for over a century, and the dual banking system has been doing just fine.  But if Custodia's legal position were to hold, federal influence over the banking and payment systems would be diminished to a degree unseen since the pre-FRA era littered with bank runs and fiscal crises.  Custodia's position would turn the keys to the federal payment rails over to each of 50 competing states (as well as the territories), none tasked with protecting national interests.

The Court ordered discovery to ascertain whether FRBKC exercised discretion in denying Custodia's master account request.  ECF 164 at 10.  After exhaustive discovery, Custodia has no evidence that the Board made or dictated the denial—no document indicates as much, no witness testified that it did, and a mountain of evidence shows that it did not.  That evidence demonstrates that FRBKC (but not the Board) had policies and procedures in place to handle account requests, including "non-routine" requests like Custodia's; that FRBKC's decision-makers were "skeptical" and "concern[ed]" about Custodia from the start; that this skepticism was initially driven by the

novel nature of Custodia's business plan (*e.g.*, providing uninsured deposit accounts while concentrating on crypto transactions and stablecoin issuance); that as soon as FRBKC started to kick the tires, it quickly found under-developed plans and substantial risk management and compliance gaps; and that, with this lawsuit pending, then-President George planning to retire, and risk-management gaps and regulatory questions persisting, FRBKC acted to deny the request, ultimately doing so after the Board expressed "no concerns" with its approach and denied Custodia membership (meaning that FRBKC would not need to reassess Custodia's request to take membership into account). These facts—none of which are in dispute—demonstrate that FRBKC exercised discretion.

Custodia's principal response is conjecture. It posits that the Board must have dictated the result because FRBKC did an "about-face" that can be explained only by Board intervention. Opp. 2, 35. But there was no about-face. FRBKC's decision-makers were skeptical from the start. Custodia was never even close, and, on top of that, Custodia fails to coherently explain how or when the Board intervened to change FRBKC's direction.

Ultimately, however, this case turns on the legal question of whether § 248a affords all depository institutions an absolute, nondiscretionary entitlement to access and use the enumerated services. It does not. Therefore, regardless of whether discretion lies with the Reserve Bank or the Board and regardless of their respective roles in Custodia's case, FRBKC and the Board are entitled to judgment as a matter of law.

## ARGUMENT

### I.     The Federal Reserve Act Affords Discretion Over Access to Services.

There is no question that the FRA afforded Reserve Banks discretion to grant or deny access to the federal payment system at the time of its passage. While the MCA amended the FRA in important ways, including by adding a non-discriminatory pricing provision, its innovation was

to extend that discretionary access framework—not to scrap that framework in favor of a regime of *automatic* access for all comers regardless of risk.

### A.   The Federal Reserve Has Always Had Discretion Over Access to Accounts and Services, and the MCA Did Not Take That Away.

The fact that § 342 afforded Reserve Banks discretion to grant or deny access to the federal payment system at the time of the FRA's passage is a thorny one for Custodia. Rather than deal with it, Custodia tries to sweep it under the rug by insisting that "[t]he pertinent historical record starts in 1980 with passage of the Monetary Control Act." Opp. 21. But that view has no support in sound principles of statutory construction and runs contrary to the very canons Custodia invokes. The MCA amended the FRA, so understanding the history and interpretation of the FRA is a critical part of understanding the context and meaning of the MCA.

Before the MCA, Congress, the Supreme Court, and the Federal Reserve all consistently viewed § 342 as affording Reserve Banks discretion over access to accounts and services. In the wake of several severe bank panics, Congress passed the FRA in order to assert federal control over the regulation and supervision of banking. *See* FRBKC Br. 5 (ECF 273); Board Br. 7 (ECF 271); Ex. 2 ("Ricks Rep.") at 6-7. In *Farmers & Merchants Bank*, 262 U.S. at 655-56, the Supreme Court held that § 342 granted Reserve Banks discretion. And documented evidence shows that Reserve Banks exercised that discretion over access to the federal payment rails, including nonmember access to and use of clearing accounts. *See* Board Br. 8-10; FRBKC Br. 7-8; Ex. 3 at 365 (Chester Morrill, Sec'y, Bd. of Governors of the Fed. Rsrv. Sys., Letter X-9187 (Apr. 26, 1935)). Custodia does not address *any* of this. In fact, Custodia managed to fill nearly 100 pages of briefing without so much as mentioning *Farmers & Merchants Bank*. But ignoring Supreme Court precedent does not make it go away, and well-established canons of statutory construction refute the notion that Congress switched from a discretionary regime to automatic,

universal entitlement without changing § 342's permissive language.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, 576 U.S. 519, 536 (2015) (when Congress amends a statute without changing language that courts had previously interpreted, that "is convincing support for the conclusion that Congress accepted and ratified" the courts' interpretation). Congress's decision to amend § 342 without modifying language that *Farmers & Merchants Bank* authoritatively held was permissive is a strong indication of its intent to retain this construction rather than overrule it.

Even aside from Congress's ratification of Federal Reserve discretion in the MCA's amendment to § 342, switching from that discretionary regime to one of automatic, universal entitlement would have been a radical change.  It would have dramatically altered the federal/state balance by giving states the unilateral ability to decide which entities can access the Federal Reserve balance sheet, with no check at the federal level.  *But cf. Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (Supreme Court will not find that Congress altered federal/state balance unless Congress's intent to do so is "clear and manifest" (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))); *Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to states that could frustrate purposes of a federal statute absent evidence that Congress "plainly intended" it).  And it would have seriously threatened any number of important federal interests: without the ability to deny use of services where justified, the Federal Reserve could be limited in its ability to implement federal monetary policy, would bear greater financial risk of its own, and could even be forced to risk complicity in terrorist financing or BSA/AML violations.  *But see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (Congress does not impose mandates of great significance in "cryptic" fashion); Board Br. 29-34.

Congress did no such thing.  What the Supreme Court said a century ago remains true: both before and after the MCA, the FRA has been "drawn with great care.  Throughout the [FRA] the distinction is clearly made between what the [B]oard and the Reserve Banks 'shall' do and what they 'may' do." *Farmers & Merchs. Bank*, 262 U.S. at 663.  Section 342 continues to give Reserve Banks discretion in considering access requests, and nothing in § 248a—directed to the Board, which does not and cannot provide deposit accounts—justifies overriding the settled meaning of § 342.[1]

Custodia ascribes (Opp. 4-11) a meaning to the phrase "shall be available" that it does not have—not as a matter of plain English, and certainly not when read in light of § 342's express grant of discretion.  Section 248a(c)(2) provides that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and ... nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks."  While services are to be made *available* to members and nonmembers on a nondiscriminatory basis, that does not mean services must be *provided* to each and every requester no matter what concerns a request may raise.  Not even member banks enjoy automatic, unfettered access to these services.  *See* Board Br. 15; Ex. 5 ("OC1") ¶¶ 2.3, 2.8 (Operating Circular 1 (1998)) ("All master accounts are subject

---

[1] Congress amended the FRA in 2022 to require the Board to maintain a public database of institutions that have requested, have been denied, or have access to a "reserve bank master account and services."  12 U.S.C. § 248c(b)(1).  The amendment defines "access request" as "a request to a Federal reserve bank for access to a reserve bank master account and services" and defines "Reserve bank master account and services" as "an account in which a Federal reserve bank … receives deposits … or … provides any service under section 248a(b)."  12 U.S.C. § 248c(a)(1), (3).  Access to a "reserve bank master account" must logically be governed by the provisions of the FRA directed to Reserve Banks, such as § 342.

to Reserve Bank approval," and the Reserve Bank "may close [a member or nonmember's] master account ... at any time but will endeavor to give at least five business days' prior notice.").

FRBKC and the Board's reading harmonizes § 248a and § 342 without rendering either provision superfluous. *See, e.g.*, *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute"); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 176 (2012) (explaining that a statutory provision should not be interpreted in a manner that "renders it pointless"). In contrast, Custodia's interpretation of § 248a would put it in conflict with § 342's discretionary framework. *See* Reading Law at 180 ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."). A further defect in Custodia's position is that if § 248a eliminated discretion over nonmember access to services, then it must either have also eliminated discretion over member access or created an imbalanced world in which nonmembers have greater rights than members. Neither makes sense.

The legislative history cited by Custodia is fully consistent with the extension of the FRA's discretionary regime to nonmembers. Opp. 10; Custodia Br. § I.E; *see* Board Br. 23-24. Yes, the MCA "open[ed] access" to the federal payment rails for nonmember banks, Opp. 10-11; numerous nonmember banks now have master accounts. *See Master Account and Services Database*, FederalReserve.gov (current as of Dec. 15, 2023), http://tinyurl.com/4c95xdt9; Board Br. 21-22; *see also* Ex. 85 ("Hill") at 37 (Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (Univ. of Ala. Legal Studies Rsch. Paper No. 4048081, Mar. 30, 2022) (revised article published as *Opening a Federal Reserve Account*, 40 Yale J. on Reg. 453 (2023))) ("The legislative history supports the idea that the Monetary Control Act was designed to level the playing field between types of institutions, *rather than treat each individual bank exactly the same*

*regardless of risk.*" (emphasis added)).  It is far more telling that there is no legislative history to suggest that the MCA amendments were intended to alter the meaning of § 342 or to give every bank chartered by any state (or territory), under whatever terms, an unfettered right to access the federal payment system and the central bank's balance sheet over the Federal Reserve's objection. Such a radical change would have been discussed.  *See* Board Br. 23-24.

Interpreting the FRA to preserve discretion is also the best reading within the context of the statutes that govern the federal banking system as a whole.  *See* Reading Law at 252 ("[L]aws dealing with the same subject ... should if possible be interpreted harmoniously.").  The nation's banking system is both crucial and dangerous.  *See* Zaring Amicus Br. 5 (ECF 286).  For this reason, the fundamental tenet of the statutes governing financial regulation is the creation of "a system that relies on the ability of regulators and supervisors to exercise discretion."  *Id*. at 3; Ex. 2, Ricks Rep. 4-5.  The OCC, the Board of Governors, and the FDIC all have broad discretion in assessing risks posed by particular entities in the consideration of applications for national bank charters, membership in the Federal Reserve, deposit insurance, and other types of applications, not to mention the broad discretion inherent in the supervision of banks; "[n]o bank is entitled to [even] a conditional approval as of right."  Zaring Amicus Br. 6-7; Ex. 2, Ricks Rep. 4-5.  These federal banking agencies have substantial statutory discretion to assess and act upon risks in nearly all of the other ways they consider requests or applications from depository institutions.  Federal oversight from the Federal Reserve and FDIC of state-chartered member and nonmember banks is a core feature of the dual banking regime.  *See* FRBKC Br. 41-42; Arthur E. Wilmarth Jr., *We Must Protect Investors and Our Banking System from the Crypto Industry*, 101 Wash. U. L. Rev. 235, 322 (2023).  It would be highly anomalous for Congress to have broken with this tradition when it enacted § 248a and to have done so in a provision about pricing discrimination.  *See*

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").[2]

### B. Custodia's Proposed "Open Access" Would "Throw Open the Doors" to Risky Institutions in Ways Congress Could Not Have Intended.

When Custodia speaks of "open access," it is plainly talking about not only access to but also *use* of services. Opp. 1. It is therefore notable (though unsurprising) that Custodia declined to dispute that banks' use of Federal Reserve services presents risk to Reserve Banks, to the nation's financial stability, to implementation of monetary policy, and ultimately, to federal taxpayers. FRBKC Br. § I. Rather than refute any of this, Custodia suggests that these risks may be mitigated in other ways, but it does so only in passing. The risks are too significant to gloss over in such a manner. Custodia's half-formed attempt to contain the problems created by its absolute-entitlement interpretation of § 248a is not rooted in any statutory provision (or even legislative history) and underscores that its interpretation of § 248a cannot be right.

*First,* Custodia suggests that its interpretation of § 248a would not "throw open the doors to risky institutions because the state chartering process ensures front-end risk assessments." Opp. 1. In other words, states and territories will take care of risk on the "front end." Even setting aside for the moment that risks may arise after an entity receives both its charter and a master account, this doesn't work. In our federal system, state (and territorial) financial regulatory authorities have their own interests at stake, and rightfully so. The Wyoming Division of Banking

---

[2] Custodia's suggestion that Defendants "conceded" that Judge Bacharach's view may be the law that governs this case, Opp. 17-18, is disingenuous. As the Court knows, Defendants have been clear throughout this case that they believe Judge Bacharach's solo, non-binding opinion is incorrect. In fact, Defendants made that crystal clear at the very hearing cited by Custodia. *See, e.g.*, Mot. Dismiss Hr'g Tr. at 12:15-16 (ECF 101) ("Your Honor, I'm happy to turn to why I think you should not adopt Judge Bacharach's position."); *id.* at 23:14-21.

("WY DOB") has many purposes and aims, but protecting the *national* financial system and implementing *national* monetary policy are not among them.[3]   Indeed, the State of Wyoming submitted an amicus brief in which it declined to assume responsibility for the federal system. Rather than take on such duties, Wyoming advocates that the Federal Reserve should subject Custodia's account request "to an appropriate level of scrutiny" and that it should be "judged according to its own merits" using a "logical method based on Plaintiff's actual plan of operation." Wyoming Amicus Br. 5 (ECF 251).  FRBKC agrees.[4]  Congress could not have intended to entrust state authorities with protecting these national interests on their own, and Congress certainly could not have done so silently—without laying down rules for how the states would protect those national interests.

*Second*, Custodia claims, without so much as a nod to any statutory text, that the Board can take into account the activities a bank proposes to engage in when it determines "eligibility." Opp. 34.  In deciding "eligibility," Custodia posits, the Board can "weed[] out" institutions that

---

[3] States lack not only the mission but also the resources to protect national interests.  *See, e.g.*, Ex. 86 ("Humston Tr.") at 26:3-9.  And even if Wyoming had adequate resources, nothing would prevent a competing state from promoting a more lax supervisory regime to steal Wyoming's business.  *See* Arthur Wilmarth Jr., Nat'l Cmty. Reinvestment Coal. et al., Comment Letter on Proposed Guidelines for Evaluating Account and Services Requests (Jan. 17, 2023), http://tinyurl.com/nzpc24us (explaining that if the Federal Reserve did not have discretion over access to master accounts, that "would encourage states to use regulatory arbitrage for their gain").

[4] Custodia's suggestion that FRBKC worked hand-in-hand with Wyoming to draft the SPDI statute continues to be misleading.  Custodia relies heavily on a document referring to "weekly" meetings with Wyoming (Ex. D), but that document dates to *after* the passage of the SPDI statute, at a time when FRBKC was dealing with the fallout of the statute's passage and anticipating master account requests from newly chartered SPDIs like Custodia (August 2020).  Opp. 23-24 (citing Custodia Br. ¶ 3).  FRBKC's limited contributions to the statute *before* it was passed included reiterating to Wyoming that the Federal Reserve's view was that master accounts were discretionary (not automatic) and pressing Wyoming to make sure that SPDIs would be viable without master accounts.  Exs. 20, 21.

are "in violation of applicable law" or are engaged in "impermissible banking activities."[5]  Opp. 1, 34.  Custodia fails to explain where such authority is found in the FRA, or why such authority wouldn't contradict its supposed absolute entitlement to services.

At bottom, Custodia misconstrues what the "eligibility" determination is about.  Threshold "eligibility" refers merely to determining whether an entity is a "depository institution" within the meaning of the FRA.  Recall that both § 248a and § 342 refer to "depository institutions." "[D]epository institution" is defined in § 19(b) of the FRA to include "any bank which is *eligible* to make application to become an insured bank."  12 U.S.C. § 461(b)(1)(A)(i) (emphasis added). And § 5 of the Federal Deposit Insurance Act provides that "any depository institution which is engaged in the business of receiving deposits other than trust funds" is eligible to apply for FDIC insurance.  12 U.S.C. § 1815(a)(1).  Thus, when the Federal Reserve considered Custodia's "eligibility," it was focused solely on whether Custodia fit the threshold statutory definition of a "depository institution" in § 19(b) of the FRA.  Custodia baselessly suggests that it was deemed "eligible" only after the Board had blessed its activities as both "legal" and "permissible," Opp. 33-34, but it cites no evidence to support that view.  And as shown by the statutes governing eligibility quoted above, nothing in the applicable statutes addresses the permissibility or legality of a depository institution's planned activities—let alone the risks those activities would pose.

The limited nature of the "eligibility" determination is precisely what resulted in the *Fourth Corner* case: Fourth Corner was "eligible" for an account even though its business plan posed serious risks of violating federal law.  *See* Compl. ¶ 47, *Fourth Corner Credit Union v. Fed. Rsrv.*

---

[5] "Impermissibility" and "illegality" are distinct concepts.  For example, holding crypto on a balance sheet is legal (in that some companies may be allowed to do it), but banking authorities may deem it "legally [im]permissible" for banks.  Bd. of Governors, FDIC, Off. of Comptroller of Currency, Joint Statement on Crypto-Asset Risks to Banking Organizations at 2 (Jan. 3, 2023), http://tinyurl.com/nhdkv56d.

*Bank of Kansas City*, 2015 WL 5025343 (D. Colo. 2015) (No. 15-cv-1633), ECF 1.  It is also what resulted in *BSJI*:  BSJI was "eligible" for an account, and indeed received one, even though it ultimately was determined to present undue BSA/AML risk.  *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.* (*BSJI*), 2023 WL 7111182, at *2 (S.D.N.Y. Oct. 24, 2023).  Discretion to cut off banks engaged in illegal, impermissible, or unduly risky conduct is crucial.  Even Custodia seemingly recognizes that the Federal Reserve needs to have—and has—this discretion.  That Custodia's absolute-entitlement interpretation of § 248a would require rewriting § 19(b) to provide for such discretion is another sign that its interpretation must be wrong.

   *Third,* Custodia contends that Reserve Banks can "establish terms governing master account usage," such as requiring banks "to maintain sufficient balances in their master accounts to clear their account at the end of each day."  Opp. 34.  Here, Custodia at least points to a statutory provision—subsection (c)(2) of § 248a—but this does not square with Custodia's interpretation of that same statute as giving it an absolute entitlement to both access to a master account *and* use of all services.  *See* Custodia Br. 35.  Further, Custodia fails to articulate the scope of Reserve Banks' discretion to "establish terms" governing usage and whether such "terms" can be applied to mitigate all risks presented (including, for example, risks to financial stability and implementation of monetary policy).  If Reserve Banks can impose "terms" as necessary to address all risks (on a non-discriminatory basis), then it becomes even more clear that § 248a does not afford an absolute entitlement to services.[6]

_____

[6] Conti-Brown agreed that the Federal Reserve "has long regulated the use of its services," and he agreed that it could do so pursuant to a "regulatory framework" used for "individualized risk assessments."  Ex. 87 ("Conti-Brown Tr.") at 152:6-8, 153:6.  Conti-Brown opines that the Federal Reserve cannot impose use-based conditions to such an extent that it becomes a "rechartering" authority, but he does not articulate how he would draw the line or, more importantly, where such a line is drawn in the FRA.  *Id.* at 180:1-181:16, 271:13-272:1, 283:19-284:10.  And while Conti-

Custodia's concessions that the Federal Reserve retains discretion over illegality, impermissibility, and "use-based" conditions give up the game. Even Custodia is not willing to live in a world where every entity holding a state charter is absolutely entitled to Federal Reserve services. But if the Federal Reserve has, somewhere, the discretion Custodia suggests, then Custodia cannot have an absolute right to anything. Custodia forced itself into that corner by choosing not to challenge the basis for the denial and instead advocating an untenably absolute interpretation of § 248a; it cannot solve that problem or advance its own claim of entitlement by sourcing discretion in inapposite provisions and ignoring that such discretion could not coexist with its claimed entitlement.

## C.    Discretion Is Consistent With the Dual Banking System.

Custodia's contention that discretion is an "affront" to the "dual-banking" system, Opp. 30-34, is without basis. Dual banking simply means that charters can be provided by either state or federal authorities. Ex. 2, Ricks Rep. 6. For a century, federal banking regulators have supervised most every state-chartered bank. The Federal Reserve has had discretion over whether to accept deposits into accounts, and the dual-banking system has operated just fine. *See* FRBKC Br. 41-42. As of late 2023, all but one of the 540 institutions that have master accounts with FRBKC are both federally insured *and federally supervised*, and most were state-chartered. *See* FRBKC Br. 11 (¶ 23). Thus, history makes clear that federal discretion and state banking charters can co-exist. In contrast, it is Custodia's position that would upset the status quo, eliminating the Federal Reserve's ability to control its balance sheet and to address undue risk to the payment system while

Brown concluded that FRBKC's denial of Custodia's request fell on the wrong side of his undrawn line, he did so without having knowledge of Custodia's business. *Id.* at 283:15-286:14 (expressing lack of familiarity with Custodia's business plan and making clear his opinion is agnostic to Custodia's business).

weakening federal influence over the banking system to a degree unseen since prior to the FRA (when banking crises prompted Congress to pass the FRA to strengthen federal control to stabilize the banking and payment systems).   After all this time, abdicating all federal control over the payment rails to the states would be a very strange thing for Congress to do, and there is no indication that the MCA was intended to have such an effect.  *See* Board Br. 29-31.

Custodia claims that FRBKC denigrates the capability of the WY DOB and "ignores the role states play as the principal supervisors of state-chartered banks."  Opp. 31.  But this case is not about the virtues of Wyoming's regime.  It is about whether § 248a provides every depository institution an absolute right to services *regardless* of risks posed by the institution, the state in which it is located, or the adequacy of that state's supervisory regime.  And for all Custodia's efforts to invoke Wyoming's interests, Wyoming conspicuously refuses to endorse Custodia's legal theory.  Wyoming Amicus Br. 5 (asserting that Custodia's account request should receive "an appropriate level of scrutiny" and be "judged according to its own merits" in light of Custodia's "actual plan of operation").

Custodia, for its part, embraces and even seems to relish how its theory would upend the status quo by disempowering the Federal Reserve.  It freely acknowledges that, under its legal theory, whether it has adequate BSA/AML controls or a viable business plan or otherwise poses significant risks to the Federal Reserve and the nation's payment system is none of the Federal Reserve's business: "none of that is relevant to whether Section 248a entitles Custodia to a master account, which is a pure question of law."  Opp. 36 n.3; *see also* Ex. 88 ("Long Tr.") at 265:7-12 ("we're about to find out" whether a SPDI is entitled to a master account even if it does not have a chief compliance officer); Ex. 87, Conti-Brown Tr. 188 (agreeing that "[FRBKC] has to defer to [the WY DOB's] assessment of the risk that Custodia presents to [FRBKC]").  This absolutist

position leaves Custodia compelled to declare *BSJI* wrongly decided, Opp. 20, which (given the compliance issues described by the *BSJI* court) should set alarm bells ringing, as the Federal Reserve cannot be powerless to protect itself against complicity in federal crimes.  Congress did not blindly turn the keys to the federal payment system over to the states, mandating that every entity holding any state charter, no matter the circumstances, receive a master account and access to Federal Reserve services even when the Federal Reserve has good reasons for concern.

## II.    FRBKC Exercised Discretion in Denying Custodia's Master Account Request.

The Court ordered discovery to determine whether the Board "pull[ed] the puppet strings" and dictated the denial to such an extent that FRBKC did not exercise any discretion of its own. ECF 164 at 10.  Custodia's Opposition confirms there is no evidence of this.  It brings no proof that the Board voted to deny Custodia's request, that the Governors reached a consensus that it should be denied, or even that any individual Governor held the view that it should be opposed. FRBKC Br. 43-44.  Nor is there evidence that Board *staff* instructed FRBKC to deny the request. This makes sense given that the Board (a) does not have its own policies and procedures to handle account requests, Ex. 89 at FRBKC-0001071-72; (b) does not provide accounts or services; and (c) informed Wyoming (in 2020), Custodia (in 2021), and the public (in 2021 and 2022) that this decision would be made by FRBKC.  Ex. 90 at FRBKC-00015572; Ex. 71 at Custodia-00004601. The fact that Board staff conveyed to FRBKC, after FRBKC had already drawn its own conclusions, that it had "no concerns" with FRBKC's plan to deny hardly constitutes evidence that the Board dictated the result.[7]

---

[7] Custodia's suggestion that Board staff dictated the result through Systemwide policy discussions is unsupported by evidence.  Ex. 91 (Addendum to Custodia Ex. BB (note regarding Custodia BOG list)); Ex. 92 ("30(b)(6) Tr.") at 146-176, 332-347 (demonstrating the inaccuracies and mischaracterization of Custodia's purported list of Board staff members involved, Ex. BB, and explaining that the list includes Board staffers who participated in only general discussions of

In the absence of actual evidence, Custodia posits that a factfinder could infer that the Board controlled the outcome because FRBKC made an "about-face" that can be explained only by Board intervention.  Opp. 35.  But there was no "about-face," as FRBKC's decision-makers were uncomfortable with Custodia's request from the outset:

- In 2019 and 2020, President George expressed general concern about SPDIs even before Custodia submitted its master account request.  Ex. 93 ("George Tr.") at 65:6-66:6 (expressing to Wyoming officials that SPDIs should be viable without master accounts); FRBKC Br. 21-23 (¶¶ 59-63); Ex. 44 at FRBKC-00010932 (launching a systemwide discussion on novel issues raised by SPDIs).

- In October 2020, from the day Custodia submitted its request, FRBKC leadership was highly "skeptical," "concern[ed]," "skewed toward denying" and "leaning towards no."  FRBKC Br. 24-25 (¶ 68); *see* Ex. 93, George Tr. at 36:7-17, 92:21-93:3, 264:8-265:25.

- In November 2020 and January 2021, FRBKC expressed skepticism to Custodia during their first meetings together.  FRBKC Br. 25 (¶ 69) (President George was "noncommittal"); Ex. 54 at FRBKC-00014277-80 (FRBKC raising range of difficult policy issues presented).

- In 2021, President George's view was "no access" even before Custodia applied for membership.  FRBKC Br. 25 (¶ 70); Ex. 53 ("Hazen Tr.") at 252:3-8 (discussing drafting a denial memo before Custodia applied for membership in 2021); Ex. 54 at FRBKC-00014288, FRBKC-00014295 (discussing President George's concerns with Custodia and early draft of denial letter).

- From October 2021 through January 2022, FRBKC led an early risk assessment finding substantial risk management issues.  FRBKC Br. 23-24 (¶¶ 65-66).[8]

non-traditional account access).  Custodia brings no proof that Systemwide discussions reached conclusions that forced FRBKC to deny Custodia's request.

[8] Custodia contends that the Court should "disregard" Custodia's immaturity and risk management gaps because the reasoning for the denial is not at issue.  Opp. 36 n.3.  But this misses the point.  The fact that FRBKC led risk assessments and found gaps that contributed to President George's decision-making supports that FRBKC exercised discretion.  And Custodia's lack of readiness to conduct even its Day One activities supports that FRBKC would have easily identified risk management and compliance gaps early on (as it did), thereby undermining Custodia's "about-face" narrative.

In the face of this overwhelming evidence that FRBKC was never inclined to grant Custodia an account, Custodia mined the extensive record for any shreds of positivity.  Opp. 35. It didn't find much.  It cites two exhibits (Exs. BX and BU) from the summer of 2020 that reflect nothing more than FRBKC staffers' preliminary reaction to Custodia's self-promotional claims, in its SPDI application, about what it "will [] accomplish[]."  FRBKC had not yet even received Custodia's master account request, let alone had the opportunity to engage in substantial analysis. But even then, the FRBKC staffers had many questions and concerns.

Custodia's "about-face" story fails because these few cherry-picked quotes do not create a genuine issue of fact as to whether FRBKC pivoted from Yes to No.  And it fails for the additional reason that Custodia does not coherently explain how and when the Board (or who at the Board) intervened to prompt FRBKC's supposed pivot.  Custodia first suggests that the pivot came when

the Board "issued its first draft of the Guidelines" in May 2021.  Opp. 35.  But FRBKC was already

not inclined to grant Custodia's request (as described above), and Custodia fails to explain how or

why the initial draft Guidelines—suggesting Reserve Banks consider six general principles—

would have caused FRBKC to change course.  Custodia also contends the pivot came later, when

the Board "took control over Custodia's membership exam" and faced this lawsuit.  Opp. 35.  But

the pre-membership exam and lawsuit did not happen until mid-2022, far too late to be a pivot

point.  The "about-face" story is pure fiction.[9]

Finally, Custodia repeats its refrain that the Board controlled the result through its

membership decision, the S-Letter process, and its comments on the FRBKC denial memo.

Opp. 37-41.  But none of this demonstrates that the Board stepped in and dictated the result.[10]

Rather, what happened is straightforward:   FRBKC had a department of employees (and

procedures in place) to handle account requests, including "non-routine" requests like Custodia's.

FRBKC Br. § I.D.  When Custodia submitted its request, FRBKC leadership was skeptical, largely

due to questions surrounding its lack of FDIC insurance to protect depositors, its plan to

concentrate its business in facilitating crypto transactions and issuing a stablecoin, and the lack of

federal supervision and crypto regulation.  *Id.* § IV.C.  Consistent with its account access

procedures, FRBKC elevated questions around Custodia's "eligibility" and led multiple risk

---

[9] Custodia asserts that the Board "was not going to let the Reserve Bank reach a decision on Custodia's application for a master account with which the Board disagreed."  Opp. 3.  But as explained above, there is no evidence that FRBKC was ever heading toward a decision with which the Board disagreed.

[10] Custodia's suggestion that the Board "urged" Custodia to apply for membership and "promis[ed]" that doing so would hasten the master account approval process is inadmissible hearsay.  Opp. 2, 38; *see* Ex. 88, Long Tr. at 223 (testifying that Custodia's counsel (Derek Bush) told Ms. Long that he had had a conversation with the Board (Mark van der Weide) that Custodia's counsel "interpret[ed]" as a recommendation that Custodia apply for membership).   And regardless, if the Board invited Custodia to apply for membership, that would serve only to contradict Custodia's purported narrative that the Board orchestrated a denial.

assessments that consistently identified substantial risk management and compliance gaps.  *Id.* § IV.B, D.  It worked with others in the Federal Reserve on policy questions presented by non-traditional account requests.  *Id.* at 27-39 (¶¶ 77-78, 81, 85).  It identified ways in which Custodia planned to derive profitability from future digital asset activities contrary to federal guidance and recommendations (*e.g.*, issuing stablecoins without insurance).  *Id.* § IV.B, D.  It applied an appropriate level of scrutiny to Custodia's novel request both before and after the Board proposed Guidelines.  *Id.* at 10-11 (¶¶ 21-22), 45.  And finally, in the face of this lawsuit and President George's impending retirement, and with risk management gaps and crypto regulatory uncertainty persisting, FRBKC acted to deny Custodia's request, apprising the Board of its intention along the way.  *Id.* § IV.D.  FRBKC ultimately issued the denial after the Board indicated it had "no concerns" with FRBKC's approach and had denied Custodia's membership application (meaning that FRBKC did not need to revise its assessment to account for federal supervision).  *Id.* at 34-35 (¶¶ 96, 100-01).  Those facts are all undisputed.  From them, no reasonable fact-finder could conclude that FRBKC failed to exercise its own discretion and was merely a puppet with the Board "pull[ing] the strings."  ECF 164 at 10.

## III.    Custodia Has Conceded FRBKC's List of Undisputed Facts.

In its Cross-Motion, FRBKC presented 101 facts as undisputed, each supported by record evidence.  Local Rule 7.1(b)(2)(D) required Custodia to refute these facts on a paragraph-by-paragraph basis.  Custodia failed to do so, and the material facts set forth in FRBKC's brief should therefore be deemed undisputed.  *Id.*  Instead of refuting FRBKC's facts, Custodia submitted a revised, substantially trimmed version of its own set of facts.  Opp., A-1.  What is left of Custodia's list of supposedly undisputed facts provides no basis to conclude that the Board eliminated FRBKC's discretion over Custodia's request and, in any event, FRBKC disputes some of what remains.  *See* Ex. 94.

IV.   **Even if This Court Finds That the Board Dictated FRBKC's Denial of Custodia's Master Account Request, Custodia Is Still Not Entitled to a Master Account.**

All of Custodia's claims, against both the Board and FRBKC, turn on the "pure question of law" of whether § 248a entitles Custodia to a master account.  Opp. 36 n.3.  Because the answer to that legal question is no, Custodia's claims fail as a matter of law regardless of the respective roles of the Board and FRBKC in denying Custodia's request.[11]

## CONCLUSION

For the foregoing reasons, this Court should grant FRBKC's motion for summary judgment, deny Custodia's Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim, and dismiss Custodia's Amended Complaint with prejudice.

---

[11] Custodia's assertion that the Board conceded its "no concerns" letter constitutes final agency action, Opp. 24, 40, does not pass the straight-face test.  As the Board explained, the local rule required the Board to produce an administrative record of a decision—the denial of Custodia's master account request—that the Board did not make and to designate something as its "final agency action."  *See* Board Br. 39.  In light of the local rule and the Court's direction, it made sense for the Board to designate the last-in-time thing it did in relation to the denial of Custodia's request, and doing so cannot reasonably be construed as a concession of an allegation it has vigorously disputed.  *See* Board Br. 39-42.

Date: February 23, 2024

/s/ *Billie LM Addleman*
Billie L.M. Addleman, #6-3690
Erin E. Berry, #7-6063
HIRST APPLEGATE, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
baddleman@hirstapplegate.com
eberry@hirstapplegate.com

Andrew Michaelson (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Phone: (212) 556-2100
amichaelson@kslaw.com

Jeffrey S. Bucholtz (*pro hac vice*)
Christine M. Carletta (*pro hac vice*)
E. Caroline Freeman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Ave NW
Washington, DC 20006
Phone: (202) 737-0500
jbucholtz@kslaw.com
ccarletta@kslaw.com
cfreeman@kslaw.com

Jared Lax (*pro hac vice*)
KING & SPALDING LLP
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Phone: (720) 535-2300
jlax@kslaw.com

*Counsel for Defendant*
*Federal Reserve Bank of Kansas City*

J.A.1447

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **Reply in Support of Cross-Motion for Summary Judgment** was served upon all parties to this action pursuant to the Federal Rules of Civil Procedure via CM/ECF on February 23, 2024.

*/s/ Shannon M. Ward*
OF HIRST APPLEGATE, LLP
Attorneys for Defendant FRBKC

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

---

CUSTODIA BANK, INC.,

      Plaintiff,

  v.

FEDERAL RESERVE BOARD OF
GOVERNORS, and FEDERAL RESERVE
BANK OF KANSAS CITY,

      Defendants.

Case No. 22-CV-125-SWS

---

## ORDER ON DISPOSITIVE MOTIONS

---

Plaintiff Custodia Bank is a Wyoming-chartered depository institution. In October 2020, it applied to Defendant Federal Reserve Bank of Kansas City (FRBKC) to obtain a Federal Reserve "master account," which is essentially a bank account for banks. In January 2023, Custodia's request for a master account was denied. In this lawsuit, Custodia contends FRBKC was statutorily required to grant the master account request, and Defendant Federal Reserve Board of Governors (the Board) hijacked FRBKC's consideration of the request and forced FRBKC to improperly deny the master account.

Custodia brings one cause of action against the Board (a federal agency) for violation of the Administrative Procedures Act (APA), alleging its actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and asking the Court to compel the Board to issue a master account to Custodia (Claim I). Custodia's

J.A.1449

cause of action against FRBKC seeks a writ of mandamus compelling it to grant a master account to Custodia (Claim II).

Custodia has filed a motion for judgment as a matter of law, arguing it is entitled to a master account as a matter of statutory construction.  (ECF 233.)  FRBKC has filed a cross-motion for summary judgment, contending Custodia is not entitled to a writ of mandamus because the law does not require it to grant a master account to Custodia.  (ECF 272.)  The Board has not filed its own dispositive motion, but it opposes Custodia's motion and asks the Court to find Custodia's APA claim fails as a matter of law.  (ECF 271.)

The Court has reviewed the extensive briefing and thousands of pages of exhibits submitted by the parties, as well as the administrative record lodged by the Board as to Claim I.  (ECF 178, 234, 236, 271, 273, 274, 277, 295, 296, 310, 311.)  The Court has also considered the several amicus briefs.  (ECF 251, 257, 259, 286.)  The Court agrees with the parties that no genuine dispute of material fact precludes the Court from rendering judgment as a matter of law.  And the Court concludes Custodia's dispositive motion must be denied and Defendants are entitled to judgment as a matter of law in their favor.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Custodia is state-chartered as a Special Purpose Depository Institution (SPDI), a unique-to-Wyoming financial institution intended to facilitate cryptocurrency banking that is unlike other banks in that it is generally prohibited from extending loans.  (Am. Compl.

---

[1] While the Court cites to Custodia's amended complaint for much of this background, which is unusual at the summary-judgment stage, the parties' briefing does not raise a genuine dispute of any material fact concerning these allegations.

J.A.1450

¶¶ 36-37.[2])   "SPDI banks were designed to provide a bridge connecting crypto-asset companies to the U.S. payments system (for example, to pay their staff in U.S. dollars)." (*Id.* ¶ 37.)

> SPDI banks were also designed to provide custody services for crypto-assets via their trust departments, analogous to the custody services provided by the trust departments of custody banks for the trillions in securities held by retirement plans and mutual funds. SPDI banks allow, for example, a customer to use his or her Bitcoin held in the trust department of an SPDI bank to make a direct transfer, a purchase, or an investment, rather than having to first convert the Bitcoin into U.S. dollars.

(*Id.*)   As a state-chartered depository institution, Custodia is regulated by the Wyoming Division of Banking.  (*Id.* ¶ 36.)  And as a SPDI bank, it is not required to be insured by the Federal Deposit Insurance Corporation (FDIC), but it is eligible to seek such deposit insurance because it is authorized and expected to take deposits.  (*Id.* ¶ 40.)

In October 2020, Custodia applied to FRBKC to obtain a Federal Reserve master account (*id.* ¶ 21), which is "put simply, a bank account for banks" that "gives deposit institutions access to the Federal Reserve System's services, including its electronic payments system." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).  "Without such access, a depository institution is nothing more than a vault." *Id.* at 1053 (Moritz, J.) (internal quotation marks omitted).

> The master account is both a record of financial transactions that reflects the financial rights and obligations of an account holder and the Reserve Bank with respect to each other, and the place where opening and closing balances are determined.  For each institution, all credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to

---

[2] ECF 121.

this single master account at one Reserve Bank.

*Id.* at 1064 n.1 (Bacharach, J.). A master account also enables its holder to access various services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including wire transfer services, automated clearinghouse services, settlement services, securities safekeeping, and Federal Reserve float services. *See id.* at 1053 (Moritz, J.) (noting a master account "gives depository institutions access to the Federal Reserve System's services, including its electronic payments system").

Absent a master account, "Custodia cannot directly access the Federal Reserve and cannot offer the same custodial services for crypto-assets that incumbent banks like BNY Mellon presently provide." (Am. Compl. ¶ 2.) "Without a master account, if Custodia is able to operate at all, it is as a second-class citizen, relegated to dependency on and fealty to an intermediary bank [which does have a master account]." (*Id.*)

> Having a master account means that SPDI banks do not have to use an intermediary ["correspondent"] bank in order to access the Federal Reserve banking system for clearing U.S. dollar transactions. Eliminating the "middleman" cuts costs, lowers risk (including counterparty credit risk), and provides SPDI bank customers with more efficient and customizable payment services that can be programmed using software. It does not mean that SPDI banks hold crypto-assets within their master accounts. Custodia would hold no crypto-assets on its balance sheet or within its master account.

(*Id.* ¶ 38; *see also* ¶ 4.) For a while, and perhaps still, Custodia indeed accessed the Federal Reserve banking system through a correspondent bank with a master account. However, "[d]oing so imposes additional costs and counterparty credit risk, injects settlement risk given the inability to ensure simultaneous settlements, and exposes institutions to existential risks if the correspondent bank terminates the relationship." (ECF 234 p. 18.)

Accordingly, Custodia's own Federal Reserve master account is significantly important to its business. *See Fourth Corner*, 861 F.3d at 1053 (Moritz, J.) (noting that when plaintiff credit union was denied a master account by FRBKC in that case, it "effectively crippl[ed] the Credit Union's business operations").

In August 2021, Custodia also applied to the Board of Governors for membership in the Federal Reserve, which would subject Custodia to oversight and regulation by the Federal Reserve Board (in addition to the state's banking regulatory system). (Am. Compl. ¶ 47.) "It is not necessary to be a member bank in order to receive a master account .... Custodia, however, took this additional step to demonstrate to [FRBKC] and the Board its willingness to submit to full federal supervision and accountability." (*Id.*)

On January 27, 2023, the Board denied Custodia's application for membership into the Federal Reserve. (*Id.* ¶¶ 62-70.) A few hours later, FRBKC conveyed the denial of Custodia's master account application. (*Id.*; ECF 236-84.) In this lawsuit, Custodia has not challenged the Board's membership denial or the reasons underlying the master account denial.

## STANDARD OF ANALYSIS

Custodia's Claim I is alleged only against the Board and concerns review of administrative action with a demand to compel agency action, and Claim II is alleged only against FRBKC and concerns a request for writ of mandamus. Despite the different postures of each claim, each party seeks judgment as a matter of law in its favor (ECF 234 p. 9; ECF 271 p. 55; ECF 273 p. 11), agreeing Custodia's claims are resolved in this case based on questions of law with no genuine dispute of material fact affecting the legal

decisions. The Court agrees, finding the limited areas of disputed facts are not material to the determinations in this case. Additionally, the parties stipulated that all evidence and discovery between Custodia, FRBKC, and the Board's administrative record "may be relied upon by all parties including any court hearing in this case throughout the remainder of this litigation," and this stipulation was approved by the Court. (ECF 220.) This stipulation is logical because Custodia seeks the same relief, compelling a master account, in both Claim I and Claim II, and therefore any distinction between the APA and the Mandamus Act is ultimately irrelevant, with the only difference in this case being which Defendant must comply with the potential writ. *See Hernandez–Avalos v. I.N.S.,* 50 F.3d 842, 844 (10th Cir.) (noting that the Mandamus Act and the APA are "merely different means of compelling an agency to take action [that] by law it is required to take"), *cert. denied,* 516 U.S. 826 (1995). Accordingly, the Court does not separately analyze the matter under the APA versus the Mandamus Act. *See New Mexico Health Connections v. United States Dep't of Health & Human Servs.,* 946 F.3d 1138, 1161 (10th Cir. 2019) ("[t]he court employs summary judgment to 'decid[e], as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review") (quoting *Calloway v. Harvey,* 590 F. Supp. 2d 29, 36 (D.D.C. 2008)).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the record and all reasonable inferences that might be drawn from it in the light most favorable to the party opposing summary judgment. *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Trust,* 744 F.3d 623, 628 (10th Cir. 2014). "Cross-

J.A.1454

motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

## DISCUSSION

"To be eligible for mandamus relief, the petitioner must establish (1) that he has a clear right to relief, (2) that the respondent's duty to perform the act in question is plainly defined and peremptory, and (3) that he has no other adequate remedy." *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005) (citing *Johnson v. Rogers,* 917 F.2d 1283, 1285 (10th Cir. 1990)).  If the petitioner can establish these requirements, the Court may exercise its discretion to grant the requested writ of mandamus.  *Id.* (citing *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995)).

> The court's jurisdiction over a mandamus petition depends on the character of the government's duty to the petitioner. [*Marquez-Ramos*, 69 F.3d at 479] ("[T]he question of whether a particular act is discretionary or ministerial rises to the jurisdictional level."). "The test for jurisdiction is whether mandamus would be an appropriate means of relief." *Carpet, Linoleum & Resilient Tile Layers v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981). If the duty is "ministerial, clearly defined and peremptory," mandamus is appropriate. *Id.* at 566 (quoting *Schulke v. United States*, 544 F.2d 453, 455 (10th Cir. 1976)).

*Rios*, 398 F.3d at 1206–07. *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (a claim for mandamus under the APA "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take").

## 1.  Custodia has not challenged a final agency action of the Board of Governors and Claim I under the APA must be dismissed.

The first issue to take up concerns the Board's contention that it never took any final

agency action on Custodia's request for a master account that would be subject to judicial review and Custodia's disagreement with that contention.  (ECF 234 p. 57; ECF 271 pp. 50-53; ECF 295 pp. 30-34.)  There is no dispute that the Board of Governors is a federal agency.  The APA grants federal courts the authority to review the "final agency action" of an agency.  5 U.S.C. § 704.  Therefore, a petitioner must challenge a "final agency action" in order to have statutory (prudential) standing to seek judicial review under the APA.  The finality of an agency action is jurisdictional.  *See Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997).

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]"  5 U.S.C. § 551(13); *see also* 5 U.S.C. § 701(b)(2) (noting that "agency action" means as defined by § 551).

> In *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), we distilled from our precedents two conditions that generally must be satisfied for agency action to be "final" under the APA.  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.*, at 177–178, 117 S.Ct. 1154 (internal quotation marks and citation omitted).

*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  The petitioner has "the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)."  *Colorado Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000).  Whether an agency's conduct constitutes "final agency action" under the APA is a question of law.  *Id.*  Courts take a

J.A.1456

"pragmatic" approach to finality. *Hawkes Co.*, 578 U.S. at 599.

In this case, Custodia identifies as the final agency action an email sent from the Board to FRBKC, where the Board stated it has reviewed FRBKC's "pre-decisional analysis of Custodia Bank's request for a master account" and has "no concerns" with FRBKC's intent to deny the master account application. (ECF 234 p. 57 (citing to Administrative Record Bates Number FRB-AR-000002).) Custodia says the Board identified this no-concerns email as the relevant final agency action. (*Id.* (citing ECF 178).) In its Notice of Lodging of the Administrative Record, the Board stated the email "is the final agency action at issue as required by Local Rule 83.6(b)(1)(A), and that final agency action is followed by the three documents to which it directly refers." (ECF 178 p. 1.) Custodia relies on this statement by the Board to show it is the final agency action to be reviewed by the Court. The Board says not so fast—it lodged the administrative record and designated the last-in-time event (the no-concerns email) as the final agency action only to comply with the Court's requirements and the District of Wyoming's local civil rules, but that doesn't automatically mean the no-concerns email holds any legal significance as a "final agency action;" instead, the no-concerns email fails to meet the legal test for final agency action. (ECF 271 pp. 50-53.) Custodia responds that this no-concerns email "gave the Kansas City Fed the green light to deny Custodia's account application," which "indisputably affected Custodia's substantive rights." (ECF 295 p. 30.)

The no-concerns email does not constitute final agency action warranting judicial review under the APA for two reasons. First, the email is not an "agency action" because

it is not "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). In the similar case of *Cherry v. U.S. Dep't of Agriculture*, 13 F. App'x 886 (10th Cir. 2001), the U.S. Forest Service sent the plaintiff a letter demanding he remove his equipment from a millsite because he lacked an approved operating plan, and it warned him "that failure to remove his equipment or obtain an approved operating plan would place him in violation of 36 C.F.R. § 261.10." *Id.* at 889. The plaintiff tried to challenge the letter under the APA, but the Tenth Circuit concluded the letter was not an agency action under the § 551(13) definition because it was not a rule, order, license, sanction, relief, or the equivalent or denial thereof, or a failure to act. *Id.* at 890. Like there, the no-concerns email here cannot be said to be an agency action as defined by § 551(13).

Second, the January 26, 2023 no-concerns email constitutes only the Board of Governors' implementation decision pursuant to a broader agency plan, which is also not a final action. *See Chemical Weapons Working Group, Inc., v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997) (concluding the Army's decision to commence trial incinerations to test destruction of chemical weapons was not reviewable as a final agency action under the APA because it was instead the act of implementing its broader plan of chemical weapons disposal).

> An implementation decision is one that merely carries out a broader agency plan that marked the consummation of the relevant decision-making process. Therefore, despite being the *outcome* of some decision-making process, the decision does not represent the agency's "last word on the matter in question." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (discussing the APA's final action standard for purposes of applying the "final action" standard of § 307 of the Clean Air

J.A.1458

Act).

*County Comm'rs of County of Sierra v. United States Dep't of the Interior*, 614 F. Supp. 3d 944, 953 (D.N.M. 2022) (italics in original) (concluding a decision to translocate two wolves was an implementation decision conducted by the U.S. Fish and Wildlife Service pursuant to a broader agency plan). The no-concerns email itself points to the *Guidelines for Evaluating Account and Services Requests* previously announced by the Board on August 15, 2022 (and published on August 19, 2022, at 87 Fed. Reg. 51099), as well as S-letter 2667, a policy enacted by the Board requiring Federal Reserve Banks to consult with Board staff on certain requests for master accounts. The no-concerns email was the implementation of these *Guidelines* and S-letter as they pertained to Custodia's master account application. The no-concerns email did not decide to impose the *Guidelines* considerations or S-letter policy; those decisions were made several months before the no-concerns email. And Custodia has not challenged the *Guidelines* or S-letter 2667 in this case. The no-concerns email merely implemented these broader plans as they related to Custodia's application.[3]

    Custodia has not carried its burden of "identifying specific federal conduct and

---

[3] To be sure, "not all agency decisions made pursuant to a broader agency plan are unreviewable implementation decisions." *County Comm'rs of County of Sierra*, 614 F. Supp. 3d at 954. "When a decision has independent legal force because it substantially changes, modifies, or imposes conditions upon an agency's previous disposition of a matter, and such changes have 'clear and definite' legal consequences, the decision can no longer be viewed as 'mere implementation' and should be subjected to judicial review under the APA." *Id.* Custodia has not argued such in this case, and there is no evidence suggesting the no-concerns email substantially changed the Board's previous disposition of a matter.

J.A.1459

explaining how it is 'final agency action' within the meaning of section 551(13)."[4]

*Colorado Farm Bureau Fed'n*, 220 F.3d at 1173. Because the no-concerns email does not

constitute a final agency action, Custodia lacks standing under the APA to challenge it.

Consequently, this Court lacks jurisdiction to address the merits of Custodia's Claim I

alleged under the APA against the Board of Governors, and it must be dismissed.[5]

## 2.     Custodia is not statutorily entitled to a master account.

The Federal Reserve Act of 1913 established the Federal Reserve System, which

consists of the Board of Governors of the Federal Reserve System, the Federal Open

Market Committee (FOMC), and twelve regional Federal Reserve Banks that each serve

their respective district. *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New

York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *1 (S.D.N.Y. Oct. 27, 2023). In the

Federal Reserve Act, Congress also authorized the Federal Reserve Banks to carry out

certain banking functions, including accepting or rejecting deposits from depository

institutions (i.e., to act as a centralized bank for the depository institutions in the district).

---

[4] As an alternative argument, Custodia in its reply brief contends "the Board's participation in the master account process meets the requirement that there be final agency action" and then lists a myriad of alleged agency actions performed by the Board in an attempt to show this participation. (ECF 295 pp. 31-33.) This will not do the trick for two reasons. First, the Court has not permitted the Board to file a surreply, so the Court does not rely on this new argument found in Custodia's reply brief. *See Pippin v. Burlington Res. Oil And Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) (unless the district court allows a surreply from the non-moving party, "the court can avoid error only by not relying on the new materials and arguments in the movant's reply brief"). Second, in this spaghetti-at-the-wall tactic, Custodia does not demonstrate how any of the alleged agency actions, including the overarching claim that the Board "participated" in the master account process, are "final" because Custodia fails to explain how these actions "mark[] the consummation of the agency's decisionmaking process" or "determine[] [Custodia's] legal rights such that legal consequences will flow therefrom." *Cherry*, 13 Fed. App'x at 890.

[5] Even if Custodia was correct in alleging the Board had performed a final agency action subject to judicial review under the APA, the merits of that claim would rise and fall with Custodia's statutory-construction argument, discussed next.

*Id.*  The Federal Reserve Banks record and maintain such deposits in master accounts.  *Id.*

> The master account is both a record of financial transactions that reflects the financial rights and obligations of an account holder and the Reserve Bank with respect to each other, and the place where opening and closing balances are determined.  For each institution, all credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to this single master account at one Reserve Bank.

*Fourth Corner*, 861 F.3d at 1064 n.1 (Bacharach, J.) (quoting Bd. of Governors of the Fed.

Reserve Sys., *Reserve Maintenance Manual* 5 (Nov. 2016), available at

https://www.federalreserve.gov/monetarypolicy/files/reserve-maintenance-manual.pdf).

In this case, it is undisputed that Custodia was "eligible" to obtain a master account.

Upon Custodia's application, FRBKC consulted with the Board's legal advisors, and they

determined in January 2022 that "Custodia met the [Federal Reserve Act's] definition of a

'depository institution' and was therefore 'eligible' to request a Reserve Bank account and

services."  (ECF 273 p. 27; *see also* ECF 236-9.)

The real dispute at the heart of this case is whether FRBKC must grant a master

account to Custodia because it was legally eligible or whether FRBKC possessed the

discretion to deny Custodia's master account application despite its eligibility.  Custodia

contends that because it was legally eligible to request and obtain a master account,

FRBKC was required by law to grant the request.  FRBKC says legal eligibility is only a

threshold determination and it retains discretion under the law whether to issue master

accounts to eligible depository institutions.  The parties rely on their interpretations of

different provisions of the Federal Reserve Act to press their arguments.  Custodia has not

challenged the reasons given by FRBKC for denying its master account application in this

J.A.1461

lawsuit.

### 2.1 Dispute Concerning Which Defendant Denied Custodia's Master Account Application

Custodia applied to FRBKC for a master account.  (Am. Compl. ¶ 21.)  The master account denial was conveyed to Custodia by FRBKC, not the Board of Governors, and was signed by the then-President and CEO of FRBKC.  (ECF 236-84.)  In its amended complaint, Custodia asserted "the Board orchestrated the denial of Custodia's master account application," the Board's action "in denying Custodia's master account application" was unlawful, and the master account denial was "part of a larger effort coordinated by the Board (in conjunction with the White House) in response to its decision that de novo banks should not be permitted to engage with crypto-assets."  (Am. Compl. ¶¶ 82, 84, 62.)  In briefing, the Defendants contend FRBKC is the entity that denied the master account application, with legal and appropriate input from the Board.  (ECF 271 pp. 45-50; ECF 273 pp. 25-35.)  In response, Custodia reasserted that "the Board controlled the Custodia master account process."  (ECF 295 p. 33.)

This dispute is a question of fact.  The extensive evidence presented by the parties as part of their motions practice weighs toward a factual finding that it was FRBKC that denied Custodia's master account application.  (*See* ECF 273 pp. 36-37 and the citations to the record therein.)  Nonetheless, the Court need not make any factual determination on this dispute.  For purposes of considering Custodia's request for a writ of mandamus in Claim II alleged against FRBKC, the Court will assume without deciding that FRBKC denied the master account application.  The Court notes, though, that if Custodia is correct

that it was actually the Board that denied the application, such could amount to a final

agency action sufficient to vest jurisdiction for judicial review. And regardless, because

Custodia's bases for compelling a master account in Count I and Count II are identical—

that the Federal Reserve Act commands Custodia receive a master account—the following

statutory construction analysis would control the outcome for both causes of action.

### 2.2   **Statutory Interpretation Principles**

When construing federal statutes, the Court's goal is to "ascertain the congressional

intent and give effect to the legislative will." *Ribas v. Mukasey*, 545 F.3d 922, 929 (10th

Cir. 2008) (quotation omitted).

> In conducting this analysis, we first turn to the statute's plain language.
> *United States v. West*, 671 F.3d 1195, 1199 (10th Cir. 2012). We give
> undefined terms their ordinary meanings, considering "both the specific
> context in which the word is used and the broader context of the statute as a
> whole." *Theis*, 853 F.3d at 1181.
>
> In determining whether statutory language is ambiguous, we look to "the
> language itself, the specific context in which that language is used, and the
> broader context of the statute as a whole." *Keller Tank Servs. II, Inc. v.
> Comm'r*, 854 F.3d 1178, 1196 (10th Cir. 2017) (quotation omitted). A statute
> is ambiguous if it "is capable of being understood by reasonably well-
> informed persons in two or more different senses." *Allen v. Geneva Steel Co.
> (In re Geneva Steel Co.)*, 281 F.3d 1173, 1178 (10th Cir. 2002).

*In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018). "It is well established that 'when the

statute's language is plain, the sole function of the courts—at least where the disposition

required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S.

Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union

Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).

J.A.1463

### 2.3   <u>Statutory Analysis</u>

Custodia contends 12 U.S.C. § 248a(c)(2) requires that all legally-eligible depository institutions receive a master account. Section 248a was enacted as part of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA). As its name implies, the DIDMCA had two overarching principles:

(1)   Phase out certain restrictions on depository institutions, including state-law restrictions on interest rates because those restrictions had precluded banks from paying a market rate of interest on deposits and lenders from charging a market rate of interest on loans. *See Moyer v. Citicorp Homeowners, Inc.*, 799 F.2d 1445, 1446 (11th Cir. 1986).

(2)   Increase the Federal Reserve's control over the money supply by requiring even nonmember depository institutions to meet certain reserve requirements based on the size of their deposits. *See Texas State Bank v. United States*, 423 F.3d 1370, 1373 (Fed. Cir. 2005).

As part of the DIDMCA, § 248a, entitled "Pricing of services," provides in part:

**(a)   Publication of Pricing Principles and Proposed Schedule of Fees; Effective Date of Schedule of Fees.**
Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.

**(b)   Covered services.**
The services which shall be covered by the schedule of fees under subsection (a) are—

J.A.1464

 (1)  currency and coin services;
 (2)  check clearing and collection services;
 (3)  wire transfer services;
 (4)  automated clearinghouse services;
 (5)  settlement services;
 (6)  securities safekeeping services;
 (7)  Federal Reserve float; and
 (8)  any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds.

**(c) Criteria applicable.**
The schedule of fees prescribed pursuant to this section shall be based on the following principles:
 (1) All Federal Reserve Bank services covered by the fee schedule shall be priced explicitly.
 (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.
  …

12 U.S.C. § 248a.

Relying largely on Judge Bacharach's concurring opinion in *Fourth Corner*, Custodia contends § 248a(c)(2) requires that all legally-eligible depository institutions receive a master account. Specifically, Custodia says the language, "All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions" requires every eligible depository institution to receive a master account because it is only through a master account that a depository institution can access the identified bank services. Judge Bacharach concluded the only way the "Federal Reserve bank services covered by the fee schedule" can be made available to nonmember depository institutions is by granting them a master account. *Fourth Corner*, 861 F.3d at

J.A.1465

1071 ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks.  To purchase these services, a master account is required.  Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts.").  Custodia asserts § 248a(c)(2) "unambiguously commands Defendants to grant access to all services covered by 'the fee schedule' to 'nonmember depository institutions.'  As a nonmember depository institution deemed eligible by both the Board and the Kansas City Fed, Custodia must be granted a master account."  (ECF 234 p. 43.)

Unsurprisingly, the Defendants see it differently.  They contend the various Federal Reserve Banks have the discretion to grant or deny a master account application under 12 U.S.C. § 342, which says in part:

> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, ... deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items ....[6]

To effectuate this deposit-taking function, Federal Reserve Banks use the master account to keep a record of each depository institution's debits and credits.  No provision of the Federal Reserve Act, including § 342, "imposes upon reserve banks any obligation to receive" deposits.  *Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923).  "The act merely confers authority to do so."  *Id.*  The Supreme Court in *Farmers' and Merchants' Bank* observed that the Federal Reserve

---

[6] Relevant here, the DIDMCA amended § 342 by adding "other depository institutions" to the list of entities from which Federal Reserve Banks may receive deposits.  Public Law No. 96-221 (HR 4986), § 105, 94 Stat. 132 (1980) (codified at 12 U.S.C. § 342).

J.A.1466

Act "appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the board and the Reserve Banks 'shall' do and what they 'may' do." *Id.* at 663. The Defendants contend the discretion to receive or reject deposits necessarily carries with it the discretion to grant or deny master accounts.

Judge Bacharach's opinion in *Fourth Corner* is well-reasoned and insightful, and it offers a helpful starting point on this issue. It is, however, not controlling authority because *Fourth Corner* was a three-way split decision between the three-judge panel, and Judge Bacharach was effectively the odd man out as he voted to reverse the dismissal of the complaint while the other two judges voted to uphold the dismissal. *See Fourth Corner*, 861 F.3d at 1053; *see also Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *8 (S.D.N.Y. Oct. 27, 2023) (noting that Judge Bacharach's opinion is not controlling even in the Tenth Circuit).

Having carefully examined the relevant statutory language and considered the many arguments presented, the Court concludes § 248a does not do the lifting Custodia demands of it. The Court respectfully deviates from Judge Bacharach's opinion in *Fourth Corner* based in large part on certain legislation enacted by Congress since then, which was not available for Judge Bacharach's consideration in 2017. The Court concludes the statutory language is clear and unambiguous, and the Federal Reserve Act does not support Custodia's position for several reasons.

First, the express language of § 248a does not say anything about a master account, and it certainly does not instruct Federal Reserve Banks to grant a master account to every eligible depository institution that asks for one. The language employed by Congress in §

248a establishes that it is directed to the Board of Governors, not the Federal Reserve Banks. Subsection 248a(a) instructs "the Board" to "publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles." The remainder of Section 248a sets forth those pricing principles and provides further instruction to the Board of Governors. *See, e.g.*, § 248a(d) ("The Board shall require reductions in the operating budgets of the Federal Reserve banks ...). The plain language Congress employed in 12 U.S.C. § 248a does not expressly require anything from or provide instruction to the Federal Reserve Banks.

Second, it makes logical sense that § 248a is directed to the Board of Governors because that statute is found in Subchapter II of Chapter 3 of Title 12, and Subchapter II is titled "Board of Governors of the Federal Reserve System." Indeed, § 248 begins, "The Board of Governors of the Federal Reserve System shall be authorized and empowered: [list of duties]." 12 U.S.C. § 248. And § 248a is titled, "Pricing of services." The titles of § 248a and Subchapter II persuasively suggest Congress was instructing the Board of Governors to create a non-discriminatory pricing schedule, not instructing the Federal Reserve Banks that they must provide master accounts to all eligible depository institutions. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*, p. 221 (2012) ("The title and headings are permissible indicators of meaning."). Custodia's assertion that Congress intended to mandate Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions in a subchapter that sets forth the duties of a completely different entity (the Board of Governors) is a leap too far.

Third, the plain language of § 248a sets forth two primary directives: (1) require the

Board to establish a fee schedule for Federal Reserve Bank services that is the same for both member depository institutions and nonmember depository institutions, and (2) require the Board to ensure those services are available to both member depository institutions and nonmember depository institutions. Contrary to Custodia's position, there is no language in § 248a requiring the services be provided to *every* nonmember depository institution. *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *8 (S.D.N.Y. Oct. 27, 2023) ("the purpose of the statutory section is to prevent price discrimination when a service is offered to a nonmember institution, not to require the Federal reserve banks to provide specific services to nonmember banks") (citing *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983)). The Court finds it significant that Congress chose to include the word "all" before "Federal Reserve bank services covered by the fee schedule" but not before "nonmember depository institutions" in § 248a(c)(2). Thus, Congress did not signal its intent that all Federal Reserve bank services be available to *all* nonmember depository institutions. Indeed, by including "all" prior to "Federal Reserve bank services" but not prior to "nonmember depository institutions" within the same provision, Congress signaled it intended to treat the two phrases differently. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("We have often noted that when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning.") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also Rule of the Last Antecedent*, Black's Law Dictionary 1532–1533 (10th ed. 2014) ("qualifying words or

phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing").

> The inclusion of "all" with respect to the Federal Reserve services and exclusion of "all" regarding which depository institutions suggests that there be no discretion over which services must be priced according to the fee schedule, but that discretion remains in providing depository institutions access to such services, such as retaining discretion in granting master accounts.

(ECF 286 p. 16, Amicus Br. of Prof. David Zaring.)

Fourth, concluding the Federal Reserve Banks possess discretion to grant or deny master accounts is harmonious with recent federal legislation. In December 2022, as part of the National Defense Authorization Act for Fiscal Year 2023, Public Law 117-263, Congress enacted and the President signed into law 12 U.S.C. § 248c. That statute instructs the Board of Governors to create and maintain a public database identifying every entity that currently possesses a master account at a Federal Reserve Bank as well as every entity that has submitted an application for a master account. 12 U.S.C. § 248c(b)(1). Significantly, the Board's database must also show whether each new master account application "was approved, rejected, pending, or withdrawn." *Id.* § 248c(b)(1)(B)(ii). If Congress intended the DIDMCA to remove a Federal Reserve Bank's discretion to deny a master account application, there would be no reason for Congress to now require a public database indicating which master account applications have been granted and which have been denied. "This amendment confirms that Federal reserve banks may 'reject' applications from depository institutions ...." *Banco San Juan Internacional*, 2023 WL

J.A.1470

7111182, at *7. If, as Custodia contends, Federal Reserve Banks lack discretion to deny a master account application as a matter of law, § 248c(b)(1)(B)(ii)'s "rejected" option would be unnecessary and superfluous, but courts may not "construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous." *Bridger Coal Co./Pac. Mins., Inc. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Labor*, 927 F.2d 1150, 1153 (10th Cir. 1991). To avoid immediately rendering the "rejected" option of § 248c(b)(1)(B)(ii) meaningless, the Court must conclude the Federal Reserve Banks were not stripped of their discretion to deny master account applications.

Fifth, reading § 248a to not strip the Federal Reserve Banks of their pre-DIDMCA discretion in issuing master accounts is also consistent with the text of 12 U.S.C. § 342. As quoted above, § 342 states a Federal Reserve Bank "may receive" deposits from member banks and nonmember depository institutions. The Supreme Court has noted this confers the authority to receive such deposits on the Federal Reserve Banks, but it also vests them with the discretion to accept or reject the deposits. *Farmers' & Merchants' Bank*, 262 U.S. at 662. This discretion to receive or reject deposits necessarily carries with it the discretion to grant or deny master accounts. The Court agrees with the interpretation recently set forth by the Southern District of New York, concluding that § 342 "makes clear that Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so," and the statute "provides that Federal reserve banks 'may' open accounts, not that they shall." *Banco San Juan Internacional*, 2023 WL 7111182, at *7. Construing § 248a and § 342 in this manner reads them in harmony with each other. *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1189 (10th Cir. 2013) ("Statutes

must be read as a whole and in relation to one another.  When two related statutes appear to conflict, courts have a duty to construe them harmoniously and give each effect.") (citations omitted).

Sixth, Congress "does not ... hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).  The "no-elephants-in-mouseholes" canon of statutory construction "recognizes that Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.'" *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 680 (2020) (quoting *Whitman*, 531 U.S. at 468).  The Defendants' briefing described the Federal Reserve Banks' exercise of discretion in granting access to accounts and services dating back to the Federal Reserve Act of 1913. (ECF 271 pp. 17-21; ECF 273 pp. 14-16.)  Accepting Custodia's contention here would mean that Congress, in the DIDMCA in 1980, greatly altered the details of the regulatory scheme first initiated in 1913 by requiring Federal Reserve Banks to provide master accounts to all eligible depository institutions requesting one, and also that Congress did so in a provision (and a subchapter) directed at the Board of Governors and without expressly saying as much.  A better example of hiding an elephant in a mousehole would be difficult to find.  The Court finds it highly unlikely that Congress intended such a significant change in the Federal Reserve Banks' procedures, not to mention the access to the national banking system, via such implicit terms in a statute directed at a different entity.

Seventh and finally, important policy considerations support this construction of the relevant statutes.  If Custodia's position was correct, it would effectively mean that every

J.A.1472

depository institution chartered under the laws of a state, regardless of how soundly crafted, is entitled to a master account allowing it direct access to the federal financial system. Thus, unless Federal Reserve Banks possess discretion to deny or reject a master account application, state chartering laws would be the only layer of insulation for the U.S. financial system. And in that scenario, one can readily foresee a "race to the bottom" among states and politicians to attract business by reducing state chartering burdens through lax legislation, allowing minimally regulated institutions to gain ready access to the central bank's balance sheet and Federal Reserve services. As FRBKC accurately notes, "The Wyoming Division of Banking ('WY DOB') has many purposes and aims, but protecting the *national* financial system and implementing *national* monetary policy are not among them." (ECF 310 pp. 13-14 (emphases in original).) "States lack not only the mission but also the resources to protect national interests." (*Id.* p. 14 n.3.) The potential negative consequences associated with Custodia's proffered interpretation do not suggest Congress intended the DIDMCA to remove the discretion of Federal Reserve Banks when considering master account applications.

### 2.4    Conclusion

The plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts. Accordingly, Custodia cannot prevail on Claim II, wherein it seeks a writ of mandamus compelling the Defendants to provide Custodia a master account. "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes

J.A.1473

him a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (citing *Kerr v. United States Dist. Court*, 426 U.S. 394, 402–03 (1976)).  "The importance of the term 'nondiscretionary' cannot be overstated—the judiciary cannot infringe on decision-making left to the Executive branch's prerogative." *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995).  Having concluded the Federal Reserve Act of 1913, as amended, grants to the Federal Reserve Banks the discretion to grant or deny a master account application, the Defendants did not owe Custodia any non-discretionary duty to issue a master account upon request.  Consequently, FRBKC is entitled to judgment as a matter of law in its favor against Custodia's Claim II.[7]

## CONCLUSION AND ORDER

Claim I of Custodia's amended complaint must be dismissed because Custodia fails to challenge a final agency action as required under the APA.  As for Claim II, the relevant statutes establish that the Federal Reserve Banks possess the discretion to grant or deny master account requests.  Therefore, Custodia is not entitled to its requested writ of mandamus compelling FRBKC to issue it a master account, and summary judgment on Claim II must be granted in FRBKC's favor.

**IT IS THEREFORE ORDERED** that Plaintiff's Petition for Review on its APA Claim and its Motion for Judgment as a Matter of Law on its Statutory Mandamus Claim (ECF 233, ECF 238) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's petition for review under the APA

---

[7] If the Court possessed jurisdiction for APA review in Claim I, judgement as a matter of law would be warranted in the Board of Governors' favor based on the same reasoning.

J.A.1474

alleged against Defendant Board of Governors (Claim I) is **DISMISSED WITHOUT PREJUDICE FOR LACK OF JURISDICTION**.

**IT IS FURTHER ORDERED** that Defendant FRBKC's Cross-Motion for Summary Judgment (ECF 272) is **GRANTED**. Judgment as a matter of law is granted in Defendant FRBKC's favor and against Plaintiff on the statutory mandamus claim (Claim II).

**IT IS FURTHER ORDERED** that Plaintiff's cause of action requesting declaratory judgment (Claim III) is **DISMISSED**. The Declaratory Judgment Act offers a remedy for valid federal causes of action and does not provide an independent cause of action, and Plaintiff has not prevailed on its other causes of action.

**IT IS FURTHER ORDERED** that Defendant FRBKC's Motion to Strike Reports and Exclude Testimony of Professor Peter Conti-Brown (ECF 267) and Motion to Strike Reports and Exclude the Testimony of Katie S. Cox (ECF 269) are **DENIED AS MOOT**. The Court reviewed and considered the reports and depositions of these experts, provided as exhibits in support of Custodia's arguments (ECF 236-1, 236-26, 236-47, 296-7, 296-15), in ruling on the pending motions.

**ORDERED**: March 29, 2024.

Scott W. Skavdahl
United States District Court Judge

**J.A.1475**

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

*U.S. FILED DISTRICT COURT DISTRICT OF WYOMING*

*2024 MAR 29  PM 12: 00*

*MARGARET BOTKINS, CLERK CASPER*

CUSTODIA BANK, INC.,

      Plaintiff,

    v.

FEDERAL RESERVE BOARD OF
GOVERNORS, and FEDERAL RESERVE
BANK OF KANSAS CITY,

      Defendants.

Case No. 22-CV-125-SWS

## JUDGMENT

In conformity with the Court's Order on Dispositive Motions (ECF 317), which is fully incorporated herein by this reference,

**Judgment as a matter of law** is hereby entered in favor of Defendant Federal Reserve Bank of Kansas City and against Plaintiff Custodia Bank, Inc. on Plaintiff Custodia's cause of action seeking a writ of mandamus (Claim II).

**It is ordered and adjudged** that Plaintiff Custodia's petition for review under the Administrative Procedure Act (Claim I) asserted against Defendant Federal Reserve Board of Governors is **dismissed without prejudice for lack of jurisdiction**, and Plaintiff Custodia's cause of action for declaratory judgment under the Declaratory Judgment Act (Claim III) is **dismissed**.

**DATED:** March *29th*, 2024.

Entered:    Margaret Botkins
              Clerk of Court

By: _____
           Elayna Thorsell
           Deputy Clerk of Court

**J.A.1476**

Scott E. Ortiz, W.S.B. # 5-2550
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 No. Wolcott, Suite 400
P.O. Box 10700
Casper, Wyoming 82602
Telephone:       (307) 265-0700
Facsimile:        (307) 266-2306
Email:              sortiz@wpdn.net

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CUSTODIA BANK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Number: 22-cv-00125-SWS |
| | ) | |
| FEDERAL RESERVE BOARD OF | ) | |
| GOVERNORS and FEDERAL RESERVE | ) | |
| BANK OF KANSAS CITY, | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF CUSTODIA BANK, INC.'S NOTICE OF APPEAL

Plaintiff Custodia Bank, Inc. ("Custodia"), by and through its undersigned counsel, respectfully submits its Notice of Appeal to the Tenth Circuit Court of Appeals as to this Court's *Order on Dispositive Motions* [DOC 317] and *Judgment* [DOC 318] entered herein on March 29, 2024 (attached hereto).

**DATED** this 26th day of April, 2024.

CUSTODIA BANK, INC., Plaintiff

By:      /s/ Scott E. Ortiz
         Scott E. Ortiz, W.S.B. # 5-2550
         WILLIAMS, PORTER, DAY & NEVILLE, P.C.
         159 No. Wolcott, Suite 400
         P.O. Box 10700
         Casper, Wyoming 82602

**J.A.1477**

Telephone:      (307) 265-0700
Facsimile:      (307) 266-2306
Email:          sortiz@wpdn.net

-and-

John K. Villa, *pro hac vice*
Ryan Scarborough, *pro hac vice*
Lauren Weinberger, *pro hac vice*
Ian Swenson, *pro hac vice*
Russell Mendelson, *pro hac vice*
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone:      (202) 434-500
Emails:         jvilla@wc.com
                rscarborough@wc.com
                lweinberger@wc.com
                iswenson@wc.com
                rmendelson@wc.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served this 26th day of April, 2024, addressed to:

Mark Van Der Weide
Joshua P. Chadwick
Yvonne F. Mizusawa
Yonatan Gelblum
Katherine Pomeroy
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitutional Avenue, N.W.
Washington, DC 20551

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Billie L.M. Addleman
John P. Fritz
Erin E. Berry
HIRST APPLEGATE, LLP
P.O. Box 1083
Cheyenne, Wyoming 82003

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Andrew Michaelson
Laura Harris
KING & SPALDING, LLC
1185 Avenue of the Americas, 34th Floor
New York, New York 10036

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Jeffrey S. Bucholtz
Joshua N. Mitchell
Christine M. Carletta
Emily Caroline Snell Freeman
KING & SPALDING, LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

Angela Tarasi
Jared M. Lax
KING & SPALDING, LLP
1401 Lawrence Street
Suite 1900
Denver, Colorado 80202

☐ U.S. Mail (Postage Prepaid)
☐ Email
☐ Overnight Delivery
☐ Hand Delivery
☒ CM/ECF System

/s/ Scott E. Ortiz

J.A.1479