No. 24-8024

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

CUSTODIA BANK, INC.,

*Plaintiff–Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, ET AL.,

*Defendants–Appellees*.

_____

Appeal from the United States District Court
for the District of Wyoming
(No. 1:22-CV-125-SWS, Hon. Scott W. Skavdahl)

_____

BRIEF OF AMICUS CURIAE
AMERICANS FOR PROSPERITY FOUNDATION–WYOMING
IN SUPPORT OF APPELLANT

_____

Michael Pepson
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
571.329.4529
mpepson@afphq.org

July 3, 2024                    *Attorney for Amicus Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Americans for Prosperity Foundation is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT...................................i

TABLE OF CONTENTS............................................................................ii

TABLE OF AUTHORITIES ..................................................................iii

INTEREST OF *AMICUS CURIAE*.........................................................1

SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ........................................................................................4

    I.   Our System of Federalism Protects Liberty and Promotes State Innovation. 4

    II.  The Dual-Banking System Congress Established and Has Long Endorsed Is Modeled on Federalism ...............................................................5

    III. Wyoming's Carefully Crafted Approach to Chartering and Regulating SPDIs to Facilitate Banking in Digital Assets Showcases the Virtues and Importance of State Innovation...........................................................8

    IV. The Denial of Custodia's Master Account Application Frustrates the Dual-Banking System Congress Established ......................................11

      A.  The Decision to Arbitrarily Deny a Wyoming-Chartered SPDI Access to the Federal Reserve's Services Is An Affront to the Dual Banking System and Wyoming's Sovereign Role .......................................11

      B.  The Fed's Newly Minted Assertion of Sweeping Discretion to Deny Master Account Applications Submitted by Eligible State-Chartered Depository Institutions Is Ultra Vires and Contrary to Law .........................12

    V.  The Denial of Custodia's Master Account Application Must Be Subject to Meaningful Judicial Review.......................................................21

CONCLUSION ...................................................................................23

CERTIFICATE OF COMPLIANCE ......................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902) ............................................................... 22

*Biden v. Nebraska*,
    600 U.S. 447 (2023) ............................................................. 19

*Bond v. United States*,
    572 U.S. 844 (2014) ............................................................... 5

*Cantero v. Bank of America, N.A.*,
    144 S. Ct. 1290 (2024) ....................................................... 5, 6

*DOC v. New York*,
    139 S. Ct. 2551 (2019) .......................................................... 19

*First Nat'l Bank v. Dickinson*,
    396 U.S. 122 (1969) ............................................................... 6

*Fleming v. USDA*,
    987 F.3d 1093 (D.C. Cir. 2021) ........................................ 21, 22

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas*,
    861 F.3d 1052 (10th Cir. 2017) ................................... 12, 13, 15

*FTC v. Bunte Bros., Inc.*,
    312 U.S. 349 (1941) ............................................................. 13

*Gen. Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976) ............................................................. 15

*Greater Buffalo Press, Inc. v. Fed. Res. Bank*,
    866 F.2d 38 (2d Cir. 1989) ............................................... 15, 16

*Indep. Bankers Assoc. v. Smith*,
    534 F.2d 921 (D.C. Cir. 1976) ................................................ 6

*Jet Courier Servs., Inc. v. Fed. Res. Bank*,
    713 F.2d 1221 (6th Cir. 1983) .............................................. 16

*Lacewell v. Office of the Comptroller of the Currency, N.A.*,
　　999 F.3d 130 (2d Cir. 2021) ....................................................................6

*Loper Bright Enterprises v. Raimondo*,
　　603 U.S. ____ (2024).............................................................15, 16, 23

*Mach Mining, LLC v. EEOC*,
　　575 U.S. 480 (2015)...............................................................................22

*Marbury v. Madison*,
　　5 U.S. (1 Cranch) 137 (1803) ................................................................23

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
　　103 F.4th 830, 2024 WL 2873107 (D.C. Cir. 2024) .......................21, 22

*Miss. ex rel. Hood v. AU Optronics Corp.*,
　　571 U.S. 161 (2014)...............................................................................19

*New State Ice Co. v. Liebmann*,
　　285 U.S. 262 (1932).................................................................................5

*New York v. United States*,
　　505 U.S. 144 (1992).................................................................................4

*NFIB v. Sebelius*,
　　567 U.S. 519 (2012).............................................................................4, 5

*Printz v. United States*,
　　521 U.S. 898 (1997).................................................................................4

*Sackett v. EPA*,
　　598 U.S. 651 (2023)...............................................................................20

*Stark v. Wickard*,
　　321 U.S. 288 (1944)...............................................................................22

*United States v. Nourse*,
　　34 U.S. (9 Pet.) 8 (1835)........................................................................22

*Utility Air Regulatory Grp. v. EPA*,
　　573 U.S. 302 (2014)...............................................................................18

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................................21

**Statutes**

12 U.S.C. § 248a ..................................................................................10

12 U.S.C. § 248a(c)(2) ............................................................12, 18, 20, 21

12 U.S.C. § 248c ..............................................................................18, 21

12 U.S.C. § 248c(a)(1) ..........................................................................20

12 U.S.C. § 248c(b) ..............................................................................19

12 U.S.C. § 248c(b)(1)(A) ......................................................................20

12 U.S.C. § 248c(b)(1)(B) ......................................................................20

Wyo. Stat. Ann. §§ 13-12-101–13-12-126 ...............................................9

Wyo. Stat. Ann. § 13-12-103(c) ............................................................11

Wyo. Stat. Ann. § 13-12-105 ................................................................11

Wyo. Stat. Ann. § 13-12-111 ................................................................10

**Rules**

FRAP 29(a)(4)(E) .................................................................................1

**Federal Register**

Final Guidance, Guidelines for Evaluating Account and Services
    Requests,
    87 Fed. Reg. 51,099 (Aug. 22, 2022) ................................................21

**Other Authorities**

Antonin Scalia,
    *Foreword: The Importance of Structure in Constitutional
    Interpretation*,
    83 Notre Dame L. Rev. 1417 (2008) ..................................................4

Bd. of Governors of the Fed. Rsrv. Sys., Order Denying App. for
    Membership (Jan. 27, 2023),
    https://www.federalreserve.gov/newsevents/pressreleases/files/orders2
    0230324a1.pdf ...................................................................................................9

Cong. Rsch. Serv., Federal Preemption in the Dual Banking System: An
    Overview and Issues for the 116th Congress (May 17, 2019),
    https://sgp.fas.org/crs/misc/R45726.pdf ...............................................6

Cynthia Lummis, "The Fed Battles Wyoming on Cryptocurrency," The
    Wall Street Journal (Nov. 30, 2021), https://tinyurl.com/5xkcjpj5 ...............9, 10

Esther George, Perspectives on 150 Years of Dual Banking, Conf. of State
    Bank Supervisors (May 22, 2012),
    https://www.kansascityfed.org/documents/2644/speeches-2012-
    george-ga-csbs-05-22.pdf .....................................................................8

Federal Reserve's Key Policies for the Provision of Financial Services:
    About, Bd. of Governors of the Fed. Reserve Sys. (last updated Oct.
    28, 2016),
    https://www.federalreserve.gov/paymentsystems/pfs_about.htm ......................14

Fred H. Miller, Robert G. Ballen, & Hal S. Scott,
    *Commercial Paper, Bank Deposits and Collections, and Commercial
    Electronic Fund Transfers*,
    39 Bus. Law. 1333 (1984) ...................................................................16

Julie Andersen Hill,
    *From Cannabis to Crypto: Federal Reserve Discretion in Payments*,
    109 Iowa L. Rev. 117 (2023)................................................................10, 11, 13

Julie A. Hill,
    *Opening a Federal Reserve Account*,
    40 Yale J. Reg. 453 (2023) .................................................................16, 17

Kenneth E. Scott,
    *The Dual Banking System: A Model of Competition in Regulation*,
    30 Stan. L. Rev. 1 (1977).....................................................................7

OCC White Paper, National Banks and the Dual Banking System (Sept.
2003), https://www.occ.treas.gov/publications-and-
resources/publications/banker-education/files/pub-national-banks-and-
the-dual-banking-system.pdf ...........................................................................6, 7

Operating Circular No. 1: Account Relationships, Fed. Rsrv. Bank of
Dallas (Aug. 30, 2002), https://perma.cc/2PH5-TAYM ...................................16

Operating Circular No. 1: Account Relationships, Fed. Rsrv. Fin. Servs.,
(Sept. 2011), https://perma.cc/2A5W-VYQC .............................................16, 17

Peter Conti-Brown,
The Fed Wants To Veto State Banking Authorities. But Is That Legal?,
Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd .................................12

Policies: Principles for the Pricing of the Federal Reserve Bank Services,
Bd. of Governors of the Fed. Reserve Sys. (1980),
http://www.federalreserve.gov/paymentsystems/pfs_principles.htm.................14

Policies: Standards Related to Priced-Service Activities of the Federal
Reserve Banks, Bd. of Governors of the Fed. Reserve Sys. (1984)
(last updated November 20, 2008),
http://www.federalreserve.gov/paymentsystems/pfs_standards.htm ...........14, 15

Policies: The Federal Reserve in the Payments System, Bd. of Governors
of the Fed. Reserve Sys. (1990) (last updated August 11, 2020),
http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm...................14

Press Release, Fed. Rsrv. Bank of St. Louis (May 2, 1996),
https://perma.cc/2QFL-YBMG...........................................................................16

Tamar Frankel,
*The Dual State-Federal Regulation of Financial Institutions–A Policy
Proposal*,
53 Brook. L. Rev. 53 (1987)............................................................................7, 8

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Americans for Prosperity Foundation is a 501(c)(3) nonprofit organization operating a state chapter in Wyoming ("AFPF–WY") that advocates for long-term solutions to the country's biggest problems. Some of those key ideas include the vertical and horizontal separation of powers, federalism, and constitutionally limited government.

AFPF–WY is interested in this case because it believes the dual banking system respects States' sovereign role under our system of federalism and promotes innovation by allowing State experimentation. AFPF–WY supports the State of Wyoming's longstanding efforts to drive innovation in the financial services industry, including Wyoming's first-of-its-kind legislation authorizing and responsibly regulating Wyoming-chartered Special Purpose Depository Institutions ("SPDIs") designed to facilitate banking in digital assets like cryptocurrency. Wyoming's thoughtful and careful approach to innovation in the financial services space exemplifies the virtues of the dual banking system.

---

[1] All parties have consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), *amicus curiae* states that no counsel for a party other than *amicus curiae* authored this brief in whole or in part, and no counsel or party other than *amicus curiae* made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

AFPF–WY believes the Federal Reserve Board of Governors' ("Board") attempt to rewrite federal banking law to override Wyoming's carefully crafted statutory and regulatory scheme to exclude undisputably eligible State-chartered depository institutions like Custodia from the Federal Reserve's services not only usurps Congress's role of making policy decisions but is an affront to the dual banking system Congress has long endorsed. Nor should the Board's campaign against Custodia's application escape meaningful judicial scrutiny. The Board should not be allowed to act as a puppet master for the Federal Reserve Bank of Kansas City ("Kansas City Fed"), while shielding its actions from judicial scrutiny.

## SUMMARY OF ARGUMENT

At bottom, this case is about federalism and cuts to the heart of our dual banking system. The question here is whether Congress has endorsed a dual banking system that puts State-chartered banks on equal footing with their federally chartered counterparts or, alternatively, granted unelected federal regulators sweeping power to unilaterally override States' legislative choices and relegate State-chartered banks to third-tier status. Congress unambiguously chose the former course, empowering private banks to choose between State and federal regulatory regimes, thereby encouraging competition and innovation.

At the core of this dual banking system is the principle of competitive equality between the State and federal banking systems. This allows individual States to drive

innovation in the financial services industry through experimentation. Wyoming has long been a leader in this space. Wyoming's Special Purpose Depository Institutions Act ("SPDI Act"), and other Wyoming crypto-asset-related legislation and regulations, represent a thoughtful approach to driving innovation in banking in digital assets in a way that responsibly promotes prosperity and economic growth without risk to the financial system. For example, Wyoming-chartered SPDIs like Custodia are not only fully reserved but prohibited from lending.

Under the dual banking system Congress established, banks that are chartered and primarily regulated under state law are entitled to compete on equal terms with federally chartered national banks. Toward this end, *all* eligible depository institutions—whether State chartered or federally chartered—are statutorily entitled to access the Federal Reserve's services through a master account. Neither the Kansas City Fed nor the Board enjoy absolute and unreviewable discretion to arbitrarily decide which institutions may access the Federal Reserve's services, or to make the major policy choices involved in setting national banking policy. The Board and the Kansas City Fed may not pick and choose which State charters to respect or otherwise discriminate against State-chartered entities, as it has done here.

Because Custodia is a Wyoming-chartered SPDI that is indisputably an eligible depository institution, Custodia is statutorily entitled to a master account and access to the Federal Reserve's services on equal terms with its nationally chartered

3

counterparts. By claiming boundless discretion to make the important policy choices Congress wisely left to itself and the States, the Board has arrogated to itself powers Congress simply has not granted to it. The Board's ultra vires claim of discretion to pass judgment on Wyoming's chartering decisions should therefore be rejected.

For the foregoing reasons, the district court's decision should be reversed.

## ARGUMENT

### I.    Our System of Federalism Protects Liberty and Promotes State Innovation.

"The constitutional structure of the United States has two main features: (1) separation and equilibration of powers and (2) federalism. Each functions to safeguard individual liberty in isolation, but they provide even greater protection working together." Antonin Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417, 1418 (2008). In our constitutional Republic, "the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments." *Id.* at 1418–19.

"This separation of the two spheres is one of the Constitution's structural protections of liberty." *Printz v. United States*, 521 U.S. 898, 921 (1997). "State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992) (cleaned up). It is "a check on the power of the

Federal Government[.]" *NFIB v. Sebelius*, 567 U.S. 519, 536 (2012). "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

Importantly, federalism also drives innovation. Under our federalist system, "a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). This system, in turn, promotes competition and drives innovation. Ultimately, that is what is at issue here: Congress's longstanding decision to endorse a dual banking system in line with the principles of federalism enshrined in the Constitution, and States' ability to administer their own statutory regimes to allow non-federally regulated banks chartered and regulated under State law to operate and compete on equal footing with their federally chartered counterparts.

## II.    The Dual-Banking System Congress Established and Has Long Endorsed Is Modeled on Federalism.

Consistent with its federalist tradition, this country has long "maintain[ed] a dual system of banking, made up of parallel federal and state banking systems."[2]

---

[2] At the Founding most banks were State chartered. "The national banking system began in 1863 when Treasury Secretary (later Chief Justice) Salmon Chase proposed, Congress passed, and President Lincoln signed the National Bank Act." *Cantero*, 144 S. Ct. at 1295 (citing 12 Stat. 665; 13 Stat. 99).

*Cantero v. Bank of America, N.A.*, 144 S. Ct. 1290, 1294 (2024). Under the dual-banking system, depository institutions may be chartered by either state or federal banking authorities. This "allows privately owned banks to choose whether to obtain a charter from the Federal Government or from a state government." *Id.* at 1294. "[B]anks with national banking charters are primarily supervised by federal regulators, and banks with state charters are largely, though not exclusively, subject to state regulation." *Lacewell v. Office of the Comptroller of the Currency*, 999 F.3d 130, 135 (2d Cir. 2021); *see* Cong. Rsch. Serv., Federal Preemption in the Dual Banking System: An Overview and Issues for the 116th Congress, 5 (May 17, 2019).[3] "Those two banking systems co-exist and compete." *Cantero*, 144 S. Ct. at 1295.

"When Congress established our dual banking system it wisely placed at one cornerstone the principle of competitive equality between state and national banks." *Indep. Bankers Assoc. v. Smith*, 534 F.2d 921, 932 (D.C. Cir. 1976); *see First Nat'l Bank v. Dickinson*, 396 U.S. 122, 133 (1969) ("The policy of competitive equality is . . . firmly embedded in the statutes governing the national banking system."). "Each component of the dual banking system makes different, positive contributions to the overall strength of the U.S. banking system, and efforts to dilute the unique characteristics of one component of the system undermine the collective strength

---

[3] https://sgp.fas.org/crs/misc/R45726.pdf

that comes from the diverse contributions of the two systems." OCC White Paper, National Banks and the Dual Banking System, at 10 (Sept. 2003).[4]

As Professor Peter Conti-Brown, Associate Professor of Financial Regulation at The Wharton School of the University of Pennsylvania, has explained, "federalism [is] at the heart of the dual banking system." J.A. 747 ¶ 11; *see* OCC White Paper, *supra*, 10 (recognizing that a separate system of state banks "allows the states to serve as laboratories for innovation and change, not only in bank powers and structures, but also in the area of consumer protection"). The "very core of the dual banking system is the simultaneous existence of different regulatory options that are not alike in terms of statutory provisions, regulatory implementation and administrative policy." Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L. Rev. 1, 41 (1977).

"The main argument for the dual banking system is that it provides checks and balances to governmental power: the power to control the creation and concentration of money." Tamar Frankel, *The Dual State-Federal Regulation of Financial Institutions–A Policy Proposal*, 53 Brook. L. Rev. 53, 55 (1987). But "this system [also] permits states and federal chartering and supervisory authorities to experiment in competition with each other to drive innovation, financial inclusion,

---

[4]      https://www.occ.treas.gov/publications-and-resources/publications/banker-education/files/pub-national-banks-and-the-dual-banking-system.pdf.

and the availability of novel financial services to a dynamic economy." J.A. 747 ¶11.

"[I]t encourages regulatory innovation by pitting the state and federal government against each other. Competition may lead to better, more effective and efficient regulation." Frankel, 53 Brook. L. Rev. at 56.

Former Kansas City Fed President Esther George has echoed this sentiment: "One of the primary benefits of dual banking is that the multiple options for state and federal charters have led to considerable innovation and improvement in banking services." Perspectives on 150 Years of Dual Banking, Conf. of State Bank Supervisors (May 22, 2012).[5] "[I]n times of change, when experiments and innovations are particularly valuable, the dual banking system reduces the risk of adverse effects to the national system by limiting experiments to one state." Frankel, 53 Brook. L. Rev. at 56.

### III. Wyoming's Carefully Crafted Approach to Chartering and Regulating SPDIs to Facilitate Banking in Digital Assets Showcases the Virtues and Importance of State Innovation.

Wyoming has long been a leader in financial innovation. Wyoming's forward-looking approach to banking services with innovations in digital assets such as virtual currencies exemplifies the virtues of the dual banking system. In 2019, Wyoming enacted a banking charter for SPDIs to promote innovation by facilitating

---

[5]    https://www.kansascityfed.org/documents/2644/speeches-2012-george-ga-csbs-05-22.pdf

banking with digital assets. *See* Wyo. Stat. Ann. §§ 13-12-101–13-12-126. SPDIs are "unique-to-Wyoming financial institution[s] intended to facilitate cryptocurrency banking" that "were designed to provide a bridge connecting crypto-asset companies to the U.S. payments system (for example, to pay their staff in U.S. dollars)." J.A. 1450–51. (cleaned up). Indeed, the Federal Reserve agrees that "Wyoming specifically designed the . . . SPDI Act, and other crypto-asset-related legislation and regulations, to foster the establishment of a new type of financial institution to serve crypto-asset customers and encourage blockchain innovation." Bd. of Governors of the Fed. Rsrv. Sys., Order Denying App. for Membership, at 10 n.19 (Jan. 27, 2023).[6]

Led by the Wyoming Blockchain Taskforce, Wyoming took a thoughtful, responsible approach to crafting legislation creating SPDIs and regulating this innovative business model. *See generally* ECF 89 at 3–7 (Amicus Br. of Wyoming State Sen. Christopher Rothfuss and State Rep. Jared Olson) (providing general overview of the process by which Wyoming developed its SPDI legislation and regulatory landscape). "Wyoming checked every box, holding more than 100 meetings with the Board of Governors and Federal Reserve Bank of Kansas City. The Fed even provided input into Wyoming's comprehensive regulatory

---

[6]https://www.federalreserve.gov/newsevents/pressreleases/files/orders20230324a1.pdf.

framework[.]" Cynthia Lummis, "The Fed Battles Wyoming on Cryptocurrency," *The Wall Street Journal* (Nov. 30, 2021), https://tinyurl.com/5xkcjpj5.

Indeed, the Kansas City Fed does not appear to dispute that it "consulted with and provided feedback to the Wyoming Division of Banking as it developed its SPDI legislation." J.A. 1398. In good-faith reliance on this feedback, Wyoming revised its legislation to accommodate the Kansas City Fed's concerns, removing a provision that would empower the Wyoming Attorney General to sue if a State-chartered SPDI was, as here, denied a master account. *See* J.A. 819, 821 (Kansas City Fed 30(b)(6) Tr.). At the request of the Kansas City Fed, Wyoming also removed references to 12 U.S.C. § 248a. *See* J.A. 818–19 (Kansas City Fed 30(b)(6) Tr.).

Under Wyoming's carefully calibrated SPDI legislation, corporations must meet rigorous requirements to receive a SPDI charter, *see, e.g.*, Wyo. Stat. Ann. § 13-12-111, and are subject to extensive supervision by the Wyoming Division of Banking. *See* ECF 88 at 4–12 (Wyoming Amicus Br.). *See generally* Wyoming Division of Banking, Special Purpose Depository Institutions, https://wyomingbankingdivision.wyo.gov/banks-and-trust-companies/special-purpose-depository-institutions (collecting statutes, rules, and guidance applicable to SPDIs). Indeed, under the statute, "SPDIs have a one hundred percent reserve requirement for their U.S. dollar deposits." Julie Andersen Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, 109 Iowa L. Rev. 117, 136–37

10

(2023) (citing Wyo. Stat. Ann. § 13-12-105 (2019)). This means that if all the banks' customers simultaneously withdraw all of their assets, a SPDI must have enough cash on hand to cover those withdraws (*i.e.*, the bank's reserves must cover all of their deposits). *See* Wyo. Stat. Ann. § 13-12-105. SPDIs are not only fully reserved but also do not make loans. Wyo. Stat. Ann. § 13-12-103(c). In short, under Wyoming's statutory and regulatory scheme, SPDIs do not pose a risk to the Federal Reserve System. *See* ECF 89 at 8–22 (Amicus Br. of Wyoming State Sen. Christoper Rothfuss and State Rep. Jared Olson) (explaining why). To the contrary, SDPI's promote innovation and facilitate prosperity and economic growth.

## IV. The Denial of Custodia's Master Account Application Frustrates the Dual Banking System Congress Established.

### A. The Decision to Arbitrarily Deny a Wyoming-Chartered SPDI Access to the Federal Reserve's Services Is An Affront to the Dual-Banking System and Wyoming's Sovereign Role.

For the dual banking system to function as Congress intended, State-chartered banks must be able to access the Federal Reserve's services—and receive a master account—as a matter of right and on equal terms with federally chartered banks. If it were otherwise, the Federal Reserve could effectively veto and override State legislation by denying State-chartered banks access to services that are necessary for basic banking operations, as happened here.

The reason why is that a master account is a practical necessity for banks, and by extension States like Wyoming, to compete on equal footing with nationally

chartered banks. "A master account is, put simply, a bank account for banks." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Op. of Moritz, J.). Without a master account, a depository institution cannot even access the Federal Reserve's electronic payment system and is "nothing more than a vault." *Id.* (Op. of Moritz, J.) (cleaned up); *see* Peter Conti-Brown, The Fed Wants To Veto State Banking Authorities. But Is That Legal?, Brookings (Nov. 14, 2018), https://tinyurl.com/4pxju8jd.

The Board and Kansas City Fed's denial of Custodia's master account application is effectively a rejection of Wyoming's efforts to modernize its banking system and develop its economy. It is not only an affront to Wyoming's regulatory scheme but also an ultra vires arrogation of power in clear violation of Congress's express statutory command.

**B. The Fed's Newly Minted Assertion of Sweeping Discretion to Deny Master Account Applications Submitted by Eligible State-Chartered Depository Institutions Is Ultra Vires and Contrary to Law.**

Congress has made clear that State-chartered and federally chartered depository institutions are entitled to the same access to the Fed's services, including use of a master account. 12 U.S.C. § 248a(c)(2). The Fed is not a chartering authority and has no say in States' chartering decisions. The statute says "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule

applicable to member banks[.]" *Id.* "The statutory language does two things: It ensures universal access to certain bank services and provides uniform pricing for them." *Fourth Corner*, 861 F.3d at 1068 (Op. of Bacharach, J.). "All" means "all." "Shall" means "shall." A master account is a bank service provided by the Federal Reserve, and "§ 248a(c)(2) unambiguously entitle[s] all nonmember depository institutions to a master account." *Id.* at 1070 (Op. of Bacharach, J.).

"[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941). So too here. Until it reversed course via an amicus brief in *Fourth Corner*, the Federal Reserve uniformly recognized access to master accounts. *See Fourth Corner*, 861 F.3d at 1071 (Op. of Bacharach, J.) ("[T]he amicus brief in this case appears to be the only time that the Board . . . has doubted the right of every nonmember depository institution to access the Federal Reserve's services[.]"); *see also* J.A. 767 ¶ 59 (Conti-Brown Expert Report) ("I have found no evidence that during the period from 1980 to approximately 2015 was the Federal Reserve asserting the power to decide whether to grant priced services to legally eligible depository institutions."); Hill, 109 Iowa L. Rev. at 177–78.

Indeed, this was the Federal Reserve's contemporaneous interpretation of the Depository Institutions Deregulation and Monetary Control Act of 1980. At the time, the Federal Reserve said that "[s]ervices covered by the fee schedules" required by the Act "are available to all depository institutions." Policies: Principles for the Pricing of the Federal Reserve Bank Services, Bd. of Governors of the Fed. Reserve Sys. (1980), http://www.federalreserve.gov/paymentsystems/pfs_principles.htm.

That interpretation was also longstanding, reflecting the Federal Reserve's position for several decades. *See, e.g.*, Federal Reserve's Key Policies for the Provision of Financial Services: About, Bd. of Governors of the Fed. Reserve Sys. (last updated Oct. 28, 2016) ("Monetary Control Act of 1980 . . . gave all depository institutions access to the Federal Reserve's payment services.");[7] Policies: The Federal Reserve in the Payments System, Bd. of Governors of the Fed. Reserve Sys. (1990) (last updated August 11, 2020) ("Federal Reserve payment services are available to all depository institutions[.]");[8] Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks, Bd. of Governors of the Fed. Reserve Sys. (1984) (last updated November 20, 2008) (Act "expanded the

---

[7] https://www.federalreserve.gov/paymentsystems/pfs_about.htm

[8] http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm

Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions[.]").[9]

In short, the Federal Reserve's discovery of discretion to reject master account applications is "not a contemporaneous interpretation" and, more importantly, "flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute[.]" *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976). That, alone, suggests the Federal Reserve's assertion of discretionary authority to deny applications should be greeted skeptically. *Cf. Loper Bright Enterprises v. Raimondo*, 603 U.S. ____ (2024) (slip op., 8, 10).

On top of this, "[t]he Board of Governors' past interpretations of the statute are widely shared by officials of the regional Federal Reserve Banks, who join the chorus of officials recognizing that the 1980 Deregulation and Monetary Control Act extends Federal Reserve services to all nonmember depository institutions." *Fourth Corner*, 861 F.3d at 1072 (Op. of Bacharach, J.). The regional Federal Reserve Banks' contemporary understanding of the Act to entitle all nonmember depository institutions to a master account further underscores the statute's original public meaning. *See id.* (Op. of Bacharach, J.) (collecting statements).

Courts shared the understanding that under the 1980 Deregulation and Monetary Control Act "check clearing services were . . . to be made available to all

---

[9] http://www.federalreserve.gov/paymentsystems/pfs_standards.htm

banks, regardless of whether or not they were member banks[.]" *Greater Buffalo Press, Inc. v. Fed. Res. Bank*, 866 F.2d 38, 40 (2d Cir. 1989); *accord Jet Courier Servs., Inc. v. Fed. Res. Bank*, 713 F.2d 1221, 1223 (6th Cir. 1983). So did academics. *See* Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 Bus. Law. 1333, 1365 (1984) (Act "required the Federal Reserve, for the first time, to provide access to virtually all of its services to all depository institutions on the same terms and conditions, and to charge for such services.").

The Federal Reserve's longstanding practices further underscore that neither it nor the Kansas City Fed have discretion to deny master account applications from eligible depository institutions. *See Loper*, 603 U.S. at ____ (slip op., 8). "The Federal Reserve Banks started using the term 'master accounts' in 1998." Julie A. Hill, *Opening a Federal Reserve Account*, 40 Yale J. Reg. 453, 462 (2023) (citing Press Release, Fed. Rsrv. Bank of St. Louis (May 2, 1996), https://perma.cc/2QFL-YBMG). "Typically, this process for opening an account was quick—for many years the Federal Reserve Banks' forms suggested it could be accomplished in five to seven business days."[10] Hill, 40 Yale J. Reg. at 463; *see* Operating Circular No. 1: Account Relationships, Fed. Rsrv. Bank of Dallas, app. 1 (Aug. 30, 2002),

---

[10] "The '5-7 business day' language remained in the form until August 16, 2021." Hill, 40 Yale J. Reg. at 456 n. 12.

https://perma.cc/2PH5-TAYM (form master account agreement stating "[p]rocessing may take 5-7 business days"); Operating Circular No. 1: Account Relationships, Fed. Rsrv. Fin. Servs., app. 1 (Sept. 2011), https://perma.cc/2A5W-VYQC ("Processing may take 5-7 business days.").

For years, "[a]pplications were rarely, if ever, denied." Hill, 40 Yale J. Reg. at 463 (citing Reporter's Transcript of Oral Argument at 37-39, *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 154 F. Supp. 3d 1185 (D. Colo. 2016) (explaining that in the previous ten years, the Kansas City Fed had not denied any applications for accounts)). Indeed, after conducting an exhausting search, Professor Conti-Brown "found no instance of the Fed publicly asserting that it had discretion to deny a master account to a duly-chartered depository institution between 1998 and 2015. Instead, it repeatedly stated or suggested that such accounts would be approved after a cursory agreement was signed and submitted to the relevant Federal Reserve Bank." J.A. 766 ¶ 58.

And that makes sense. The ministerial nature of the master account application process respects federalism. "The reason for creating the Master Account as an agreement to strike between client and service provider rather than an application to be approved by a chartering authority to a supplicant goes back to the delicate balances of federalism in the dual banking system and pre-specified regulatory lanes in the federal government." J.A. 765 ¶ 56.

17

Because Custodia is a SPDI chartered under Wyoming law it is a "nonmember depository institution," albeit a novel and innovative one.[11] "[I]t is undisputed that Custodia was 'eligible' to obtain a master account." J.A. 1461. Therefore, Custodia is entitled to access it on the same terms as other "nonmember depository institutions." *See* 12 U.S.C. § 248a(c)(2).

This Court should treat the Board's newly discovered discretionary power to act as a gatekeeper to the Federal Reserve's services skeptically. *See Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). The Federal Reserve's efforts to rewrite unambiguous statutory language to claim new powers should be rebuffed. The words in statutes are not chameleons and cannot change meaning in this way.

The district court "respectfully deviate[d] from Judge Bacharach's opinion in *Fourth Corner* based in large part on" Congress's enactment of 12 U.S.C. § 248c in 2022. J.A. 1467. That was error. That statute did not sub silentio rewrite 12 U.S.C. § 248a(c)(2)'s plain language to grant sweeping, unfettered discretion on master account applications. Indeed, the district court previously recognized as much: "§248c cannot be read as Congress' imprimatur on Federal Reserve Banks holding carte blanche to grant or deny master account applications." J.A. 612.

---

[11] "Custodia is a new breed of bank—a software platform with a bank charter, built to connect digital assets with the traditional financial system in a safe and sound way." Custodia, https://custodiabank.com/.

18

To begin, Congress is presumed to be aware of existing law and legislate against that backdrop. *See Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) ("[W]e presume that Congress is aware of existing law when it passes legislation." (cleaned up)). "It is public knowledge that master account applications have been 'rejected' or denied for non-discretionary reasons in the past." J.A. 612 That held true when § 248c was enacted. *See* J.A. 621. This alone undercuts the Board's newly minted discovery of sweeping power to override State innovation in the financial services industry, such as Wyoming's SPDI legislation, by barring access to the Federal Reserve's services.

Statutory "[c]ontext also includes common sense[.]" *Biden v. Nebraska*, 600 U.S. 447, 512 (2023) (Barrett, J., concurring). And this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *DOC v. New York*, 139 S. Ct. 2551, 2575 (2019) (cleaned up). "Section 248c requires the Board of Governors to create and publish a public database that identifies every entity currently with access to a Federal Reserve master account and every entity that has applied for a master account along with whether the request was approved, rejected, pending, or withdrawn." J.A. 612 (citing 12 U.S.C. § 248c(b)). As its text makes clear, § 248c is simply a transparency statute. Its reference to "rejected" applications submitted by "entities"—which may or may not even be eligible for a master account—says

19

nothing about the Fed's discretion with respect to master account applications submitted by eligible depository institutions like Custodia.

Reading § 248c to grant new sweeping discretion to deny master accounts to State-chartered banks that meet the statutory definition of "depository institution" would significantly alter the balance of power between the States and the federal government that is a cornerstone of the dual banking system. As the Supreme Court recently reaffirmed, Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power[.]" *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (cleaned up)). By no measure does § 248c clearly grant the Board and Kansas City Fed this sweeping new power, which, in effect, would eviscerate the dual banking system Congress has endorsed for decades.

Underscoring this, § 248c is not limited to "depository institutions" eligible to receive a master account and applies to any "entity" that indicates it wants a master account. *See* 12 U.S.C. § 248c(a)(1) (defining "access request" broadly as "a request to a Federal reserve bank for access to a reserve bank master account and services, including any written documentation or formal indication that an entity intends to seek access to a reserve bank master account and services"); *id.* § 248c(b)(1)(A)–(B) (referencing "entity"). Of course, there is no obligation or authority to grant a master account to an "entity" that does not qualify as an eligible "depository institution," such as a newly formed LLC without a State or federal charter. But 12

20

U.S.C. § 248a(c)(2) does not grant discretion to deny master accounts to eligible State-chartered depository institutions, and 12 U.S.C. § 248c does not purport to change this, let alone do so clearly.

**V.     The Denial of Custodia's Master Account Application Must Be Subject to Meaningful Judicial Review.**

Regardless of which branch of government, if any, the Board and Kansas City Fed reside, their newly minted claim of authority to deny access to the Federal Reserve's services to qualified depository institutions is an exercise of governmental power affecting private rights that must be subject to meaningful judicial review.[12] *Cf. Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 2024 WL 2873107, at *7 (D.C. Cir. 2024) (rejecting Library of Congress's argument that its copyright regulation was not subject to review under the APA). And irrespective of which entity was ultimately responsible for the denial of Custodia's master account application, their gamesmanship should not be rewarded. *See* Custodia Br. 14–22, 48–50 (detailing Custodia's multi-year odyssey, as well as the Board and Kansas City Fed's actions); *see also* J.A. 677–98. These entities should not be allowed "to duck and weave [their] way out of meaningful judicial review" of their actions,

---

[12] The Board's so-called "Final Guidance, Guidelines for Evaluating Account and Services Requests," 87 Fed. Reg. 51,099 (Aug. 22, 2022), does not interpret but rather rewrites 12 U.S.C. § 248a(c)(2)'s unambiguous language to arrogate to itself the power to make major financial policy choices the Constitution reserves to Congress. *See generally West Virginia v. EPA*, 597 U.S. 697 (2022).

*Fleming v. USDA*, 987 F.3d 1093, 1111 (D.C. Cir. 2021) (Rao, J., concurring in part, dissenting in part), as they have brazenly sought to do here.[13]

As the Supreme Court has explained: "[L]egal lapses and violations occur, and especially so when they have no consequence." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015). Indeed, it is for that reason the Supreme "Court has so long applied a strong presumption favoring judicial review of administrative action." *Id.* And as the Supreme Court has said, "[t]he acts of all [government] . . . officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). That resonates here.

Courts also "have the responsibility to determine whether 'individual rights' have been infringed 'by the exertion of unauthorized administrative power.'" *Med. Imaging & Tech. All.*, 2024 WL 2873107, at *6 (quoting *Stark v. Wickard*, 321 U.S. 288, 309–10 (1944)). As Chief Justice Marshall put it, "'in a government of laws and of principle,' when an official takes an action against private rights, the affected individual should generally have an 'appeal to the laws of his country.'" *Id.* at *6 (quoting *United States v. Nourse*, 34 U.S. (9 Pet.) 8, 28–29 (1835)).

---

[13] As Custodia explains, the denial of its master account application is reviewable under both the APA and mandamus. *See* Custodia Br. 48–55.

Application of these fundamental principles to the facts and circumstances of the unlawful denial of Custodia's master account application underscores why this Court should reject any suggestion by the Board or Kansas City Fed that their decision is outside of the scope of this Court's purview and instead "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see Loper*, 603 U.S. at ____ (slip op., 7–8). Here, the law is clear: as a State-chartered depository institution, Custodia is statutorily entitled to access the Federal Reserve's services on equal footing with its federal competitors and must be granted a master account.

## CONCLUSION

For these reasons, this Court should reverse the district court's decision.

Respectfully submitted,

/s/ Michael Pepson
Michael Pepson
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
571.329.4529
mpepson@afphq.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because it contains 5,221 words. This brief also complies with the typeface and type-style requirements of FRAP 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Times New Roman 14-point font.


/s/ Michael Pepson
Michael Pepson

Dated: July 3, 2024