# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

—————————

CUSTODIA BANK, INC.,

*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS;
FEDERAL RESERVE BANK OF KANSAS CITY,

*Defendants-Appellees*.

—————————

On Appeal from the United States District Court
for the District of Wyoming
No. 22-cv-125

—————————

## BRIEF FOR AMICI CURIAE THE DIGITAL CHAMBER AND GLOBAL BLOCKCHAIN BUSINESS COUNCIL-USA IN SUPPORT OF APPELLANT AND REVERSAL

—————————

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
C. HARKER RHODES IV
KEVIN WYNOSKY*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Amici Curiae*

July 3, 2024

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1(a), The Digital Chamber certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

Under Federal Rule of Appellate Procedure 26.1(a), the Global Blockchain Business Council-USA certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES.................................................................................... iii

GLOSSARY ............................................................................................................ vii

INTEREST OF AMICI CURIAE ............................................................................. 1

SUMMARY OF ARGUMENT ................................................................................ 3

ARGUMENT ........................................................................................................... 7

I.      The Decision Below Seriously Undermines Our Federalist System.............. 8

II.     The Decision Below Raises Serious Article II Concerns ............................ 15

III.    The Critical Importance Of Master Accounts For Depository
        Institutions Magnifies Both Sets Of Constitutional Concerns ..................... 21

CONCLUSION ...................................................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*BFP v. Resolution Tr. Corp.*,
    511 U.S. 531 (1994)........................................................................13

*Bond v. United States*,
    564 U.S. 211 (2011)........................................................................15

*Bond v. United States*,
    572 U.S. 844 (2014)........................................................................13

*Braidwood Mgmt., Inc. v. Becerra*,
    2024 WL 3079340 (5th Cir. June 21, 2024) ....................................19

*Buckley v. Valeo*,
    424 U.S. 1 (1976)........................................................................6, 19

*Custodia Bank v. Fed. Rsrv. Bd. of Governors*,
    640 F.Supp.3d 1169 (D. Wyo. 2022) ..............................................19

*Edmond v. United States*,
    520 U.S. 651 (1997)................................................................ 16, 17

*FERC v. Mississippi*,
    456 U.S. 742 (1982)..........................................................................8

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*,
    861 F.3d 1052 (10th Cir. 2017)........................................ 4, 6, 22, 23

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010)........................................................ 15, 16, 17, 20

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)........................................................................13

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998)............................................................................7

*Loper Bright Enters. v. Raimondo*,
    No. 22-451, 2024 WL 3208360 (U.S. June 28, 2024).........................3

*Lucia v. SEC*,
    585 U.S. 237 (2018)..................................................................... 16, 17, 18, 19

*Me. Cmty. Health Options v. United States*,
    590 U.S. 296 (2020)............................................................................7

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932)............................................................................8

*New York v. United States*,
    505 U.S. 144 (1992)..........................................................................15

*United States v. Germaine*,
    99 U.S. 508 (1879)............................................................................18

*United States v. Lopez*,
    514 U.S. 549 (1995)............................................................................4

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)..........................................................................24

**Constitutional Provisions**

U.S. Const. art. II, §1, cl.1 .................................................................5, 15

U.S. Const. art. II, §2, cl.2 ............................................................ 5, 16, 17

U.S. Const. art. II, §3 ..................................................................... 5, 15

**Statutes**

12 U.S.C. §248(f)............................................................................ 17, 20

12 U.S.C. §248a(c)(2)...........................................................................7, 13

12 U.S.C. §341 .......................................................................... 5, 17, 18

12 U.S.C. §342.......................................................................................8

Wyo. Stat. Ann. §§13-12-101 to -126 ......................................................11

Wyo. Stat. Ann. §13-12-103 .....................................................................11

Wyo. Stat. Ann. §13-12-105 .....................................................................11

Wyo. Stat. Ann. §13-12-119 ................................................................ 11

**Other Authorities**

Appointment & Removal of Fed. Rsrv. Bank Members of the Fed.
    Open Mkt. Comm., 2019 WL 11594453 (O.L.C. Oct. 23, 2019) ..................... 21

Anthony Clarke, *How is RWA (Real World Asset) Tokenization
    Disrupting Industries?*, Nasdaq (Feb. 7, 2024, 1:27 PM),
    https://bit.ly/45Q9UL1 ................................................................... 14

Cong. Rsch. Serv., *Federal Preemption in the Dual Banking System*
    (May 17, 2019), https://bit.ly/4cxOg0y ............................................ 10

Cong. Rsch. Serv., *Federal Reserve: Master Accounts & the Payment
    System* (Dec. 8, 2022), https://bit.ly/3VxqOtl .................................. 22

Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities.
    But Is That Legal?*, Brookings (Nov. 14, 2018),
    http://tinyurl.com/569enyb5 .......................................................... 22

Thomas J. Curry, Comptroller of the Currency, *Remarks at the
    Conference of State Bank Supervisors* (May 14, 2014),
    https://bit.ly/3RAZaKN ................................................................. 10

Fed. Rsrv. Banks, Operating Circular No. 1 (2023),
    https://bit.ly/3RCnfRq .................................................................. 23

The Federalist No. 39 ......................................................................... 16

Alan Greenspan, Chairman, Fed. Rsrv. Bd., *Remarks at Annual
    Conference of State Bank Supervisors* (May 3, 1997),
    https://bit.ly/4cz8xml .................................................................... 4

Julie Andersen Hill, *Opening a Federal Reserve Account*,
    40 Yale J. Reg. 453 (2023) ............................................................. 24

Jennifer Lee, *California Law Provides More Financial Privacy*,
    New York Times (Aug. 28, 2003), https://nyti.ms/3VNoPB9 ..................... 10

Antonin Scalia, *Foreword: The Importance of Structure in
    Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417 (2008) .................. 3

Julie L. Stackhouse, *Why America's Dual Banking System Matters*,
Fed. Rsrv. Bank of St. Louis (Sept. 18, 2017),
https://bit.ly/3Xm1ngR ........................................................................ 10

Utah Dep't of Commerce, *The Benefits of Registering Your LLC as a
DAO* (Mar. 27, 2024), https://bit.ly/45SvkqX ..................................... 14

Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the
Federal Response, and the Case for Preserving the Dual Banking
System*, 58 Fordham L. Rev. 1133 (1990)......................................9, 10

*Writings of George Washington* (J. Fitzpatrick ed. 1939)....................... 16

Wyo. Div. of Banking, *Special Purpose Depository Institution
Examination Manuals* (2021), https://tinyurl.com/5n8tn8wn ...........................12

# GLOSSARY

| | |
|---|---|
| FRBKC | Federal Reserve Bank of Kansas City |
| GBBC | Global Blockchain Business Council |
| GBBC-USA | Global Blockchain Business Council-USA |
| TDC | The Digital Chamber |
| USBC | U.S. Blockchain Coalition |

The Digital Chamber ("TDC") is a leading trade association for the digital asset industry. TDC represents more than two hundred global members, including digital asset exchanges, banks, investment firms, startups, and other digital asset economy participants. TDC's leadership team and Board of Advisors includes policy and legal experts, industry pioneers, and former regulators, including two former Chairs and a Commissioner of the U.S. Commodity Futures Trading Commission and a former Commissioner of the U.S. Securities & Exchange Commission. TDC seeks to promote industry compliance with applicable law and to foster a legal and regulatory environment for digital asset users to enjoy nationwide regulatory certainty as they apply blockchain technologies to an array of commercial, technological, and social purposes. To further that mission, TDC regularly files briefs as amicus curiae in novel cases implicating digital assets and the blockchain communities.

The Global Blockchain Business Council ("GBBC"), a Switzerland-based nonprofit, is the largest and leading industry association globally for blockchain technology and the digital asset community. GBBC includes over 500 institutional

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the brief. No person other than amici, their members, and their counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

members from around the world dedicated to working with regulators, business leaders, and innovators to foster collaboration and advance blockchain adoption. The Global Business Blockchain Council-USA ("GBBC-USA") is headquartered in Washington, D.C., with a key initiative known as the U.S. Blockchain Coalition ("USBC"), the only national organization with a multi-state-focused approach in over 48 states seeking consistent policies at the state level. GBBC-USA's USBC is led by representatives from Texas, Washington, California, Florida, Virginia, Alabama, and Pennsylvania working together to highlight use cases, provide accessible education, and build relationships with industry, government, academia, entrepreneurs, and investors in an effort to meaningfully grow innovation across the country.

TDC and GBBC-USA have both a strong interest in this case and a vital perspective to provide as coalitions with substantial experience in the digital asset space. Denying state-chartered banks a dependable path to participate in the national banking scheme simply because they hold digital assets poses a direct threat not just to the trillion-dollar blockchain industry's sustained growth and success, but also to every present and future industry that may fall into disfavor with federal regulators despite operating completely within legal bounds. If the decision below is upheld, it will afford politically unaccountable federal officials effectively unreviewable power to throttle innovation by depriving legitimate businesses of vital access to the

global financial system. Those serious consequences underscore the pressing need to correct the district court's legal errors and reverse the judgment below.

## SUMMARY OF ARGUMENT

The district court concluded—despite clear statutory text commanding that Federal Reserve bank services "shall be available to nonmember depository institutions," 12 U.S.C. §248a(c)(2)—that the Federal Reserve Bank of Kansas City ("FRBKC") has unreviewable discretion to deny nonmember depository institutions a master account for any reason FRBKC chooses. For the reasons that Custodia explains in its opening brief, that interpretation cannot be reconciled with the plain statutory language or basic principles of statutory construction. But even if the text left any room for doubt, the district court's extraordinary understanding of the statute and its grant of unlimited discretion to FRBKC would run afoul of both major structural protections in our Constitution—the vertical constraint of federalism and the horizontal constraints imposed by separation of powers doctrines. That is no small matter, as "[s]tructure is everything." *Loper Bright Enters. v. Raimondo*, No. 22-451, 2024 WL 3208360, at *23 (June 28, 2024) (Thomas, J., concurring) (alteration in original) (quoting Antonin Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417, 1418 (2008)).

First, the district court's interpretation undermines fundamental principles of federalism. Since the time of the Civil War, the United States has operated a dual banking system under which banks can be chartered either by the federal government or by a State. That dual system ensures that States can exercise their sovereign authority to develop new and innovative structures for financial regulation, serving their constitutionally protected role in our federal system as "laboratories for experimentation to devise various solutions" that other States or the federal government may come to use as models. *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring). In the banking context in particular, States' authority to establish their own rules governing state-chartered banks has long "fostered a steady stream of banking innovations that have benefited consumers and bank shareholders alike"—innovations that could not have occurred under "overly zealous and rigid federal regulation and supervision." Alan Greenspan, Chairman, Fed. Rsrv. Bd., *Remarks at Annual Conference of State Bank Supervisors* (May 3, 1997), https://bit.ly/4cz8xml.

The district court's decision threatens that dual system by granting Federal Reserve Bank officials unreviewable discretion to "effectively crippl[e]" state-chartered banks operating legally. *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (op. of Moritz, J.). Without a Federal Reserve master account, a state-chartered entity cannot offer fundamental

banking services to its customers, reducing the state-chartered entity to nothing more than an elaborate safe-deposit box. Thus, the district court's reading would give federal officials the authority and unilateral discretion to effectively nullify the chartering decisions of state regulators—regulators who hold great expertise and co-equal authority under our dual banking system. Even if that interpretation could be reconciled with the statutory text (and it cannot), it flatly contradicts the basic federalism values that the dual banking system protects.

Second, the district court's interpretation exacerbates the serious Article II concerns with the highly unusual appointment and removal provisions governing Federal Reserve Bank presidents. Through appointment and removal restrictions grounded in the Executive Vesting Clause, the Appointments Clause, and the Take Care Clause, Article II ensures that executive officials with significant power and discretion will remain politically accountable and subject to democratic checks and balances. U.S. Const. art. II, §1, cl.1; *id.* §2, cl.2; *id.* §3. But the appointment and removal procedures for Federal Reserve Bank presidents are difficult to square with those democratic checks and balances, as those officers are appointed and removable by the board of directors of the bank itself (not "the President," "the Courts of Law," or "the Heads of Departments," *id.* §2, cl.2), which can "dismiss [them] at pleasure," 12 U.S.C. §341. That system might be permissible if Federal Reserve Bank presidents remained "lesser functionaries subordinate to officers of the United

States," without substantial independent authority and discretion. *Buckley v. Valeo*, 424 U.S. 1, 126 & n.162 (1976).  Under the district court's interpretation, however, Federal Reserve Bank presidents are anything but mere functionaries; they wield sweeping authority and unfettered discretion to deny state-chartered banks access to essential banking services, based solely on their own policy judgments and preferences.  That not only contravenes the text that Congress enacted, but cannot be squared with the structural protections that Article II demands for federal officials that wield substantial discretionary power.

All of those problems are compounded by the central importance of master-account access for state-chartered financial institutions.  Acquiring access to a master account is literally indispensable for a bank that intends to provide any kind of meaningful financial services; without that connection to the national banking system, "a depository institution is nothing more than a vault." *Fourth Corner*, 861 F.3d at 1053 (op. of Moritz, J.).  And while a bank without its own master account can theoretically access Federal Reserve services through a correspondent relationship with another financial institution, that relationship is itself subject to the formal or informal approval of the governing Federal Reserve Banks, meaning that (under the district court's interpretation) a state-chartered bank whose Federal Reserve Bank has arbitrarily decided to exclude it from access will generally have nowhere else to turn.

In short, the district court's interpretation affords politically unaccountable Federal Reserve Bank presidents unchecked discretion to unilaterally undermine state banking law and deprive state-chartered banks of any ability to engage in meaningful financial operations. That reading is not only contrary to the statutory text, but raises serious concerns on two distinct constitutional dimensions. This Court should reverse.

## ARGUMENT

The statutory text at issue here is straightforward: "All Federal Reserve bank services … shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks[.]" 12 U.S.C. §248a(c)(2). As Custodia explains in its opening brief, that language imposes a mandatory duty on the Federal Reserve Banks to make their services (including master accounts) available to nonmember depository institutions, and leaves no room for FRBKC to exercise unilateral and unreviewable discretion to deny Custodia a master account for whatever reason FRBKC chooses. *See, e.g.*, *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' … normally creates an obligation impervious to judicial discretion."). Nothing in the separate statutory provision declaring that Federal

Reserve Banks "may receive" deposits "from any of its member banks, or other depository institutions," 12 U.S.C. §342, undermines the mandatory nature of 12 U.S.C. §248a. This Court can accordingly reverse on the statutory text alone.

But even if the text left any room for doubt, the serious constitutional concerns that the district court's decision raises would end the matter. On both federalism grounds and Article II grounds, the decision below raises problematic questions and runs contrary to basic constitutional principles, by affording unelected and politically unaccountable federal officials sweeping discretion to effectively nullify state banking laws. Those concerns—which the district court ignored—weigh heavily against the district court's interpretation, and confirm that its reading of the statutory scheme is wrong as a matter of law.

## I.    The Decision Below Seriously Undermines Our Federalist System.

One of the "most valuable aspects of our federalism" is that it allows the States to "serve as laboratories for the development of new social, economic, and political ideas," enabling innovative experiments whose successes can then be replicated across the country. *FERC v. Mississippi*, 456 U.S. 742, 788 (1982) (O'Connor, J., concurring in the judgment in part and dissenting in part); *see, e.g.*, *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic

experiments without risk to the rest of the country."). That principle has long governed when it comes to financial institutions, for "[s]ince the early days of our Republic, the federal government and the states have shared responsibility for the regulation of banking," producing "a decentralized and unconcentrated banking system and a tradition of innovation in bank regulation." Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1152 (1990).

Indeed, throughout our Nation's history, state governments have played a leading role in supervising financial institutions. From the Founding Era up to the Civil War, state governments chartered and regulated numerous banks, while the federal government chartered only two—the First and Second Banks of the United States, each of which lasted only twenty years. *Id.* at 1153. During that period, state governments developed laws that allowed any new bank to obtain a charter upon the satisfaction of specified conditions, facilitating the development of new banks and a decentralized banking industry. *Id.* Congress followed that successful model in the National Banking Acts of 1863 and 1864, which laid the foundation for the modern dual banking system by authorizing the federal government to charter national banks but not disturbing the States' authority to continue chartering banks as well— allowing new banks to choose whether they would be chartered and supervised by federal or state authorities. *Id.*

That dual system remains in place today, allowing banks to "apply for a national charter from the Office of the Comptroller of the Currency … or a state charter from a state's banking authority." Cong. Rsch. Serv., *Federal Preemption in the Dual Banking System* (May 17, 2019), https://bit.ly/4cxOg0y. And Congress "has repeatedly acted in a manner that has preserved a central role for the states in bank regulation," Wilmarth, *supra*, at 1154, encouraging flexibility and innovation in bank regulation and empowering States to "serve as laboratories where new products and new ways of doing business are developed and tested" to "meet[] the needs of consumers, communities, businesses and the nation's economy." Thomas J. Curry, Comptroller of the Currency, *Remarks at the Conference of State Bank Supervisors* (May 14, 2014), https://bit.ly/3RAZaKN. As a result, "state banks have taken the lead in safe and sound product innovations, including variable-rate mortgages and home equity loans." Julie L. Stackhouse, *Why America's Dual Banking System Matters*, Fed. Rsrv. Bank of St. Louis (Sept. 18, 2017), https://bit.ly/3Xm1ngR. States have also innovated in ways to increase consumer protection, such as by requiring additional privacy safeguards. *See, e.g.*, Jennifer Lee, *California Law Provides More Financial Privacy*, New York Times (Aug. 28, 2003), https://nyti.ms/3VNoPB9.

Wyoming is an example of a State that has carried on that tradition of innovation. In 2019, Wyoming positioned itself on the leading edge of digital-asset-

related finance by enacting a unique statutory framework that enables it to charter a new type of financial service company: the special purpose depository institution (SPDI), which can help bridge the gap between digital assets and the traditional financial system. That statutory framework was the result of an extended legislative process that involved input from a broad array of stakeholders—including FRBKC itself, which provided comments on the proposed framework from the very beginning of the process through its eventual enactment, which entailed more than 100 meetings between state lawmakers and FRBKC or the Federal Reserve Board. *See* D.Ct.Dkt.121 (Am. Compl.) ¶41.

The statute that Wyoming enacted reflected that careful deliberative process, establishing robust and conservative requirements to ensure thorough supervision of SPDIs and minimize any potential risk from their operation. Among other things, SPDIs (unlike traditional banks) are statutorily prohibited from making loans with customer deposits and must back all customer deposits with cash on hand or high-quality liquid assets—meaning that even if every single SPDI customer were to withdraw its funds from the SPDI simultaneously, the bank would still have cash on hand to cover all withdrawals. Wyo. Stat. Ann. §§13-12-103, 13-12-105; *see id.* §§13-12-101 to -126. The statute also provides for supervision of SPDIs by the Wyoming Division of Banking, *see* Wyo. Stat. Ann. §13-12-119, which has developed a detailed 772-page examination manual to ensure proper oversight of

these institutions, *see* Wyo. Div. of Banking, *Special Purpose Depository Institution Examination Manuals* (2021), https://tinyurl.com/5n8tn8wn. The Wyoming legislative and regulatory regime thus ensures extensive scrutiny and supervision of SPDIs during and after the chartering process, providing robust protection for consumers and strong assurances of sound operation. That regime establishes clear rules of the road for SPDIs, and a rigorous system for ensuring that those institutions can serve as responsible intermediaries between the digital asset sector and traditional financial structures—a key factor in enabling the digital asset industry to continue its transformative growth.

The decision below casts all of that aside. Instead of interpreting 12 U.S.C. §248a to respect the long tradition of dual federal and state banking regulation and Wyoming's considered judgments in deciding which financial institutions to charter, the district court upended those basic federalism values completely, handing unrestrained discretion to federal officials to effectively nullify state chartering decisions at will. By allowing FRBKC to block Custodia from obtaining a master account solely because the Federal Reserve disfavors digital assets, the decision below dramatically upsets the proper balance between federal and state banking regulators, empowering unelected Federal Reserve Bank presidents to stifle disfavored state-chartered banks. And by allowing the Federal Reserve Board to impose national-level policies that disadvantage SPDIs, the decision below

effectively cuts off the development of any comparable state-level initiatives in the other 49 States, and prevents entities elsewhere from securing the kind of legal clarity that Wyoming's framework provides. That approach cannot be reconciled with the fundamental principles of federalism that our Constitution embodies and that our dual banking system has consistently respected.

Especially given the "historic powers" of the States in the area of banking regulation, it would take exceptionally clear statutory text to conclude that Congress intended to afford federal officers unlimited discretion to trample that power. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). Here, the unambiguous statutory text compels the *opposite* conclusion, using mandatory language that explicitly requires Federal Reserve Banks to make their services "available to nonmember depository institutions" and that leaves no room for contrary discretion. 12 U.S.C. §248a(c)(2). At a bare minimum, if Congress had intended to "radically readjust[] the balance of state and national authority" in the manner the decision below effects, it would have needed to make that unlikely course far more explicit. *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 544 (1994); *see, e.g.*, *Bond v. United States*, 572 U.S. 844, 858, 860 (2014) ("general" provision should not be read to displace "areas of traditional state responsibility").

Allowing FRBKC to upend the traditional balance of federal and state power without clear statutory authorization is particularly harmful in the digital asset realm,

where opportunities for policy innovation abound. For example, by creating additional pathways for state-chartered banks to hold digital assets, States can enhance consumer protection by giving citizens a safe place to store their digital assets, freeing them from the risks of loss and fraud otherwise associated with self-storing items of value. Likewise, by allowing consumers to buy and sell traditional assets with blockchain technology—a process commonly known as "real-world asset tokenization"—States can lower transaction costs and increase opportunities for fractional ownership, "broadening the pool of potential investors" and "making [investment] not just a tool for wealth preservation among the affluent but also a vehicle for wealth creation accessible to a broader population." Anthony Clarke, *How is RWA (Real World Asset) Tokenization Disrupting Industries?*, Nasdaq (Feb. 7, 2024, 1:27 PM), https://bit.ly/45Q9UL1. Or, by allowing new corporate forms built on blockchain technology—such as decentralized autonomous organizations—to access banking services on an equal footing with traditional corporations, States can embrace the enhanced transparency, security, and accessibility that those new corporate forms offer. *See, e.g.*, Utah Dep't of Commerce, *The Benefits of Registering Your LLC as a DAO* (Mar. 27, 2024), https://bit.ly/45SvkqX.

The dual banking system is designed to foster—not frustrate—those sorts of policy innovations. As associations that represent a wide variety of participants in the digital asset industry, *amici* have a "direct interest in objecting to laws that upset

the constitutional balance between the National Government and the States" in this area. *Bond v. United States*, 564 U.S. 211, 221-22 (2011). After all, if States lack adequate opportunities and incentives to develop appropriate and responsible regulatory frameworks governing this transformative new sector, it is ultimately the citizen who will bear the greatest cost. *Cf. New York v. United States*, 505 U.S. 144, 181 (1992) (recognizing that "federalism secures to citizens the liberties that derive from the diffusion of sovereign power").

By departing from core federalism values and disrupting the longstanding equilibrium of federal and state authority in this area, the district court embraced a badly mistaken interpretation of the statutory text. The Court should reverse.

## II. The Decision Below Raises Serious Article II Concerns.

The decision below raises serious constitutional problems along a second dimension as well, as it affords Federal Reserve Bank presidents preemptive powers that cannot be squared with Article II's appointment and removal requirements. Those constitutional concerns likewise weigh heavily against the district court's unlikely interpretation of the statutory text.

"Article II vests '[t]he executive Power … in a President of the United States of America,' who must 'take Care that the Laws be faithfully executed.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (alteration and omission in original) (quoting U.S. Const. art. II, §1 cl.1 & §3). Of course, "[i]n

light of '[t]he impossibility that one man should be able to perform all the great business of the State,'" Article II also "provides for executive officers to 'assist the supreme Magistrate in discharging the duties of his trust.'" *Id.* (second alteration in original) (quoting 30 *Writings of George Washington* 334 (J. Fitzpatrick ed. 1939)). In particular, Article II envisions three kinds of executive officials. *First*, there are principal officers, who "occupy a 'continuing' position established by law," exercise "significant authority pursuant to the laws of the United States," and answer directly to the President. *Lucia v. SEC*, 585 U.S. 237, 245 (2018). *Second*, there are inferior officers, who likewise occupy a continuing position and exercise significant authority but who answer to a principal officer. *See Edmond v. United States*, 520 U.S. 651, 662-63 (1997). *Third*, there are federal employees, who are "'lesser functionaries' in the Government's workforce" and do not occupy a continuing position or exercise significant authority. *See Lucia*, 585 U.S. at 244-45 & n.3.

To ensure that federal officials who exercise significant executive authority—i.e., principal and inferior officers—remain "the choice, though a remote choice, of the people themselves," Article II imposes various constraints on their appointment and removal. The Federalist No. 39 (James Madison). For example, the Appointments Clause requires principal officers to be nominated by the President and confirmed by the Senate. *See* U.S. Const. art. II, §2, cl.2. Inferior officers in turn must be appointed either by "the President," "the Courts of Law," or "the Heads

of Departments." *Id.*; *see Lucia*, 585 U.S. at 253. And given "that the executive power include[s] a power to oversee executive officers through removal," *Free Enter. Fund*, 561 U.S. at 492, the Supreme Court has held that principal officers must be removable by the President, and that inferior officers must be removable either by the President or by a principal officer. *See id.* at 510; *see also Edmond*, 520 U.S. at 664.

To the extent that Federal Reserve Bank presidents are officers of the United States—that is, to the extent that they exercise "significant authority pursuant to the laws of the United States," *Lucia*, 585 U.S. at 245—the procedures for appointing and removing them cannot be squared with Article II's constitutional requirements. Under the governing statute, Federal Reserve Bank presidents "shall be appointed by the … directors of the bank, with the approval of the Board of Governors of the Federal Reserve System, for a term of 5 years." 12 U.S.C. §341.[2] Federal Reserve Bank presidents may likewise be removed either by the "board of directors" of the bank, who may "dismiss [them] at pleasure," *id.*, or by the Board of Governors, who must communicate "the cause of such removal … in writing" to the removed president, *id.* §248(f). The upshot is that Federal Reserve Bank presidents are not

---

[2] In particular, Federal Reserve Bank presidents must be appointed by "the Class B and Class C directors of the bank," with the former representing the public and the latter being designated by the Board of Governors. 12 U.S.C. §341.

appointed by the President with the advice and consent of the Senate and removable by the President (as principal officers must be), nor are they appointed by the President, the courts of law, or the head of an executive department and removable by the President or a principal officer (as inferior officers must be). Instead, Federal Reserve Bank presidents are appointed by their bank's directors with the approval of the Board of Governors, and removable by their bank's directors or the Board of Governors.

None of that presents a problem if Federal Reserve Bank presidents are not officers of the United States. If that is the case, then Article II "cares not a whit about who named them." *Lucia*, 585 U.S. at 245; *see United States v. Germaine*, 99 U.S. 508, 509 (1879) (recognizing that federal employees may be "working for the government and paid by it … without thereby becoming its officers"). But under the district court's holding—which endows a Federal Reserve Bank president, as the "chief executive officer of the bank," 12 U.S.C. §341, with sweeping authority and unbridled discretion to deny state-chartered banks access to the Federal Reserve System—there is no plausible argument that Federal Reserve Bank presidents lack the kind of "significant authority" that makes them "Officers of the United States" and requires compliance with the Appointments Clause. *Lucia*, 585 U.S. at 244-45. Put simply, federal officials with unfettered discretion to stifle the operations of

state-chartered banks cannot be described as mere "'lesser functionaries' in the Government's workforce." *Id.* at 245 (quoting *Buckley*, 424 U.S. at 126 n.162).[3]

In fact, the district court's holding arguably renders Federal Reserve Bank presidents *principal* officers under the Appointments Clause (who must be appointed by the President and confirmed by the Senate), raising even starker constitutional concerns. To the extent the decision below affords Federal Reserve Bank presidents unbridled discretion to choose whether to approve or deny master account applications—a discretionary authority that the district court does not appear to have viewed as ultimately directed or supervised by the Federal Reserve Board of Governors, despite Custodia's contrary evidence—it strongly suggests that those officials are principal rather than inferior officers, amplifying the Article II problem. *Cf. Braidwood Mgmt., Inc. v. Becerra*, 2024 WL 3079340, at *9-10 (5th Cir. June 21, 2024) (concluding that members of the U.S. Preventive Services Task Force are

---

[3] Even the district court apparently recognized as much, as it held Custodia had plausibly alleged that FRBKC's president was an inferior officer. *Custodia Bank v. Fed. Rsrv. Bd. of Governors*, 640 F.Supp.3d 1169, 1190-92 (D. Wyo. 2022). The court instead rejected Custodia's Appointments Clause by concluding that FRBKC's president was *appointed* in accordance with the Appointments Clause, because that appointment was made "with approval of the Board of Governors" (which the court assumed was the "head" of the Federal Reserve System, which the court in turn assumed was a "department"). *Id.* at 1192-93. But the court did not attempt to explain how the *removal* provision of 12 U.S.C. §341—which allows FRBKC's directors to "dismiss at pleasure" the bank's president—could be squared with Article II's requirements. *Id.*

principal officers given the "absence of any supervision" over the "substantial power" they exercise).

The district court's decision to afford Federal Reserve Bank presidents sweeping new powers also raises another structural problem: the apparent "dual for-cause limitations" on their removal. *Free Enter. Fund*, 561 U.S. at 492. The constitutional command that the federal executive power "shall be vested" in the President, U.S. Const. art. II, §1, cl.1, forbids Congress from creating a structure with two layers of for-cause limitation on removal—that is, a structure in which an officer who is removable only for cause holds the power to remove another officer who is removable only for cause. *Free Enter. Fund*, 561 U.S. at 495-98. The district court's holding creates that dynamic here: The Federal Reserve Board of Governors, who are removable only for cause under 12 U.S.C. §242, holds the power to remove Federal Reserve Bank presidents by communicating to them in writing "the cause of such removal," *id.* §248(f). To the extent the latter provision limits removal of Federal Reserve Bank presidents to removal for cause (which requiring that "the cause … be forthwith communicated in writing" strongly suggests, *id.*), that structure is (at best) permissible only if Federal Reserve Bank presidents are not "Officers of the United States" who exercise significant authority under federal law, *Free Enter. Fund*, 561 U.S. at 506—a position that the decision below forecloses since it affords Federal Reserve Bank presidents sweeping discretionary power.

In sum, by affording Federal Reserve Bank presidents significant and largely unconstrained discretionary power, the district court's decision raises serious constitutional questions under Article II—questions that cannot be easily resolved without placing severe strain on the statutory text. *See, e.g.*, Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm., 2019 WL 11594453, at *11-14 (O.L.C. Oct. 23, 2019) (recognizing that allowing Federal Reserve Bank's directors to remove Federal Reserve Bank president under 12 U.S.C. §341 would violate the Appointments Clause, but suggesting the problem could be solved by requiring Board of Governors approval for any such removal); *id.* at *7-8 (recognizing that for-cause limitation on the removal of Federal Reserve Bank presidents would be unconstitutional, but asserting that requiring written communication for "the cause of such removal" does not impose a for-cause limitation). Those substantial and difficult questions again confirm that the district court seriously misread the statutory text when it concluded that 12 U.S.C. §248a(c)(2) allows Federal Reserve Bank presidents to exercise unfettered discretion in deciding whether to approve master account applications.

## III. The Critical Importance Of Master Accounts For Depository Institutions Magnifies Both Sets Of Constitutional Concerns.

The constitutional concerns that the decision below raises—on both federalism grounds and Article II grounds—are magnified by the indispensable nature of master-account access for state-chartered banks. A master account is what

"gives depository institutions access to the Federal Reserve System's services, including its electronic payments system." *Fourth Corner*, 861 F.3d at 1053 (op. of Moritz, J.). Without access to a master account, a bank cannot use any of the crucially important banking services that the Federal Reserve provides, such as executing debit and credit entries between institutions, clearing checks, transferring securities, and cashing savings bonds. *See id.* at 1064, 1068-69 (op. of Bacharach, J.) (explaining that the services offered by the Federal Reserve "are indispensable for all financial institutions" and "conditioned on the issuance of master accounts"). In short, without access to a master account, a state-chartered bank "is nothing more than a vault," *id.* at 1053 (op. of Moritz, J.), or "a kind of storage locker," Peter Conti-Brown, *The Fed Wants to Veto State Banking Authorities. But Is That Legal?*, Brookings (Nov. 14, 2018), http://tinyurl.com/569enyb5. And access to a master account is particularly critical for institutions like Custodia that seek to provide financial services to the digital assets industry, as Federal Reserve services are necessary "to more seamlessly transact between crypto and official currency." Cong. Res. Serv., *Federal Reserve: Master Accounts & the Payment System* 1 (Dec. 8, 2022), https://bit.ly/3VxqOtl.

Banks that are denied a master account have no easy alternative option. Absent a master account, a bank can access Federal Reserve services only through "a correspondent relationship with a financial institution that already has a master

account." *Fourth Corner,* 861 at 1053 n.2 (op. of Moritz, J.); *see id.* at 1064 (op. of Bacharach, J.) ("Without a master account, a financial institution must obtain these services through another institution serving as a 'middleman.'"). But establishing that relationship is easier said than done. And even if a bank could find another financial institution with a master account that is willing to establish a correspondent relationship, the Federal Reserve Bank for each institution must approve any direct correspondent relationship, and has effective control over indirect correspondent relationships. *See* Fed. Rsrv. Banks, Operating Circular No. 1, §2.7 (2023), https://bit.ly/3RCnfRq ("To establish a Correspondent-Respondent relationship, the Correspondent and the Respondent both must execute a 'Transaction and Service Fee Settlement Authorization Form,'" which "is subject to approval by the [Federal Reserve Bank] of the Correspondent and the [Federal Reserve Bank] of the Respondent."); Custodia.Br.13-14 n.10. As a result, a Federal Reserve Bank can deny or effectively prevent a disfavored bank from obtaining a correspondent relationship just about as easily as it can deny a disfavored bank its own master account in the first place. Even if each Federal Reserve Bank were to approve the correspondent relationship, moreover, the bank without its own master account would be able to operate only at the mercy of its middleman, placing it in a dependent position and imposing additional costs and risks.

Granting a Federal Reserve Bank president unfettered discretion to deny state-chartered financial institutions access to a master account thus effectively permits that federal official to unilaterally undermine state banking law and deprive state-chartered banks of any reliable opportunity to provide meaningful financial services. That Congress intended to authorize that outcome is all the more unlikely because, until recently, Federal Reserve Banks never claimed such expansive discretionary power. Instead, until as recently as 2015, a state-chartered bank could readily obtain its own a master account by submitting "a one-page form" that would be processed in 5-7 business days with "little independent investigation as to the riskiness of the applicant," akin to the process of individuals "opening standard bank accounts." Julie Andersen Hill, *Opening a Federal Reserve Account*, 40 Yale J. Reg. 453, 455-56 (2023). Today, however, Federal Reserve Banks make obtaining a master account "more like applying for a [second] bank charter," with applicants "languishing in an extensive risk assessment process" that sometimes "seem[s] more driven by politics than by risk." *Id.* at 456, 458. That radical shift in the Federal Reserve Banks' understanding of their authority, and late-breaking assertion of substantial new power, makes their new interpretation of the statute one that this Court should treat with a healthy "measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

But even setting that history aside, the critical importance of master accounts to state-chartered banks and the serious constitutional questions that the decision below raises make this case a paradigm example of the circumstances in which constitutional-avoidance principles should control. Allowing the decision below to stand will enable politically unaccountable federal officials to exercise broad discretion to place massive and unwarranted obstacles in the path of state-chartered financial institutions, upending the traditional balance between federal and state banking regulators and affording Federal Reserve Bank presidents expansive power without meaningful political or judicial oversight. Whether as a matter of federalism, the Appointments Clause, or both, the judgment below cannot stand.

## CONCLUSION

This Court should reverse the district court's judgment.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
C. HARKER RHODES IV
KEVIN WYNOSKY[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Amici Curiae*

July 3, 2024

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,709 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement
