# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

————————————

CUSTODIA BANK, INC.,

*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS;
FEDERAL RESERVE BANK OF KANSAS CITY,

*Defendants-Appellees*.

————————————

On Appeal from the United States District Court
for the District of Wyoming
No. 22-cv-125

————————————

## BRIEF FOR AMICUS CURIAE FORMER SENATOR PATRICK J.
## TOOMEY IN SUPPORT OF NEITHER PARTY

————————————

BRENT R. BAKER
 *Counsel of Record*
BUCHALTER
60 E. South Temple Street
Salt Lake City, UT 84111
(801) 401-8625
bbaker@buchalter.com

NICOLAS MORGAN
INVESTOR CHOICE ADVOCATES
NETWORK
453 S. Spring St., Ste 400
Los Angeles, CA 90013
(310) 849-0384
nicolas.morgan@icanlaw.org

*Counsel for Amicus Curiae*

July 3, 2024

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ........................................................................ 1

ARGUMENT ..................................................................................................... 4

I.    The History of the 2023 NDAA Amendment Makes Clear That Its Purpose Was To Achieve Transparency in the Master Account Application and Maintenance Process............................................................ 6

II.    This Court Should Reject Arguments that the 2023 NDAA Amendment Requiring Disclosure of Master Accounts Should be Construed to Imply that Congress Recognized or Affirmed that the Reserve Banks Have Substantive Discretion to Reject Master Account Applications........................................................................... 17

CONCLUSION ................................................................................................. 22

CERTIFICATE OF COMPLIANCE ..................................................................... 24

CERTIFICATE OF SERVICE .............................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Whitman v. Am. Trucking Ass'ns*,
　531 U.S. 457 (2001).........................................................................21

**Statutes**

12 U.S.C. § 248c ...............................................................................1

12 U.S.C. § 248c(b)(1)........................................................................5

12 U.S.C. § 248c(b)(1)(C) ...................................................................5

Federal Reserve Act, Pub. L. No. 117-263 § 5708, 136 Stat. 2395,
　3419.............................................................................................1

Federal Reserve Act: Public Law 63-43, 63d Congress, H.R. 7837
　(Dec. 23, 1913) ...........................................................................20

**Regulations**

12 C.F.R. § 265.20 .........................................................................21

Guidelines for Evaluating Account and Services Requests, 87 Fed.
　Reg. 68,691 (Nov. 16, 2022).........................................................10

**Constitutional Provision**

U.S. Const. art. II, § 2, cl. 2 ............................................................20

**Other Authorities**

*Bank Application Actions*, Federal Deposit Insurance Corp. (Apr. 11,
　2023), *https://www.fdic.gov/regulations/applications/actions.html* ...................11

Congressional Record—Senate, S.A. 6019 (Sep. 28, 2022),
　*https://www.congress.gov/117/crec/2022/09/28/168/157/CREC-*
　*2022-09-28-pt1-PgS5495-3.pdf* .........................................................10

*Fed. Rsrv. Bank Members*, 43 Op. O.L.C. __ ........................................20

*The Founding of the Fed*, Federal Reserve Bank of New York (last accessed Apr. 18, 2023), *https://tinyurl.com/3ayk3wu8* ....................................20

Office of the Comptroller of the Currency (last accessed Apr. 18, 2023), https://www.occ.treas.gov/publications-and-resources/tools/occ-financial-institution-search/index-occ-financial-institution-search.html ........................................................11

*State Bank Regulator Disputes KC Fed's Claim About Fintech Firm Linked to Biden Nominee Raskin*, CNBC (Feb. 15, 2022), *https://tinyurl.com/4k6jxxxd* .........................................................8

Statement of Fed. Rsrv. Bank of Kan. City (Feb. 7, 2022), *https://tinyurl.com/ya6fjp9u*...................................................7

*Toomey Wants the Fed More 'Transparent,' Subject to Oversight*, Bloomberg Law (June 30, 2022), *https://tinyurl.com/2p9h8cma*........................9

U.S. House Financial Services Committee, *Waters Secures Key Committee Provisions in 2023 National Defense and Authorization Act* (Dec. 7, 2022), *https://tinyurl.com/59x7d7c6* .............................................12

U.S. Senate Committee on Banking, Housing, and Urban Affairs, Annual Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on Master Accounts (Dec. 8, 2022), https://tinyurl.com/57d74r28 ...............................................................7

U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey Calls for Reforming the Regional Federal Reserve Banks* (Feb. 11, 2022), *https://tinyurl.com/58rs6ab3* ....................................................21

U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey on Fed's New Master Account Proposal: More Transparency Needed* (Nov. 4, 2022), *https://tinyurl.com/y4npu2vv* ...........10, 11

U.S. Senate Committee on Banking, Housing, and Urban Affairs, Toomey, Scott, Tillis, Lummis Blast Kansas City Fed for Again Stonewalling Congress on Master Account Process (June 29, 2022), https://tinyurl.com/2cy8dxv8 ....................................................9

## INTEREST OF AMICUS CURIAE[1]

Amicus Curiae former Senator Patrick J. Toomey, Jr. served in the U.S. Congress for 18 years, first as the U.S. Representative for Pennsylvania's 15th congressional district from 1999 to 2005, then as a U.S. Senator from 2011 to 2023. Senator Toomey was the principal sponsor of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 Amendment ("2023 NDAA Amendment" or "Amendment") to the Federal Reserve Act, Pub. L. No. 117-263 § 5708, 136 Stat. 2395, 3419. The Amendment requires the Board of Governors of the Federal Reserve System (the "Board of Governors" or "Board") to create and maintain a public, online, searchable database that contains a list of every entity that currently has access to a Federal Reserve System master account and services, and a list of every entity that submits an access request for a master account and services, including whether the request was approved, rejected, pending or withdrawn. 12 U.S.C. § 248c.

In addition to sponsoring the 2023 NDAA Amendment, during his 12 years on the Senate Committee on Banking, Housing, and Urban Affairs ("Senate Banking Committee"), where he ultimately served as Ranking Member, Senator Toomey

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the brief. No person other than amici, their members, and their counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

conducted significant oversight activity on issues related to the Federal Reserve System. In fact, he proposed the Amendment in response to one particular sequence of oversight activities that demonstrated to Senator Toomey and his colleagues that greater disclosure was necessary in the master account application and maintenance process: the Senate Banking Committee's inquiry into the master account application of The Reserve Trust Company ("Reserve Trust"), a Colorado-based financial technology company, which had its master account application rejected, approved and subsequently revoked by the Federal Reserve Bank of Kansas City ("Kansas City Fed"), in a short period of time.

After the Board and Kansas City Fed declined to provide the Senate or the public with information related to Reserve Trust and the circumstances surrounding its application, Senator Toomey and his colleagues drafted the Amendment to ensure this sort of important information regarding master accounts was not withheld from Congress or the public in the future. During the process of drafting the Amendment, Senator Toomey and his colleagues consulted extensively across Congress and with senior attorneys and other staff from the Board. The purpose of the Amendment was understood by those involved in its drafting to relate exclusively to increasing transparency surrounding the master account application process, and not to augment or otherwise comment on the substantive authority or discretion of the

Board, or the regional Federal Reserve Banks ("Reserve Banks") to approve or reject master account applications.

Senator Toomey takes no position on Plaintiff-Appellant's appeal, or the ultimate question of whether either the Board or Kansas City Fed possesses, and properly exercised, the discretion to reject Custodia's application for a master account. However, Senator Toomey submits this brief because the arguments advanced by the Board and the Kansas City Fed in the district court and the district court's dispositive order misconstrue the Amendment as recognizing or bolstering the discretion to reject master account applications from statutorily eligible depository institutions. As its text makes clear—and as the Board knows from conversations with legislative staff during its drafting—the Amendment was exclusively a transparency measure, requiring the Board to disclose the identity of entities that hold, or have submitted pending or rejected applications for, master accounts. The Amendment does not opine on the question of whether or not other statutory or regulatory authorities do (or do not) allow for discretion in the master account approval process—nor whether such discretion, if it does exist, resides with the Board or with the Reserve Banks.

As the Amendment's sponsor and principal drafter, Senator Toomey is well placed to explain the history, context, meaning and intent of the Amendment. Since retiring from the Senate earlier this year, Senator Toomey has closely followed the

application and interpretation of the Amendment—including in this case and in Board rulemakings—and has publicly commented on his view of the provision's proper interpretation. So too does Senator Toomey have a strong interest in ensuring that this Court interprets the Amendment in accordance with Congress's (properly limited) language and intent. For the reasons set forth below, Senator Toomey urges this Court to reject attempts, by the district court, the Board, or Kansas City Fed, to interpret the Amendment as any indicia of congressional intent to support the existence or scope of any discretion to reject master account applications, which goes to the heart of this case.

## ARGUMENT

The district court ultimately concluded Defendant-Appellee Federal Reserve Bank of Kansas City ("FRBKC") has unreviewable discretion to deny nonmember depository institutions a master account for any reason FRBKC chooses. *See* D.Ct.Dkt.317 (Order on Dispositive Motions (the "Order")) at 22. The district court reached its conclusion in part based on a finding that the Amendment provided FRBKC with discretion to deny master account applications. *Id*. at 22-23. However, prior to issuing the Order, the district court denied Defendants-Appellees' motion to dismiss Plaintiff-Appellant's complaint based in part on the exact opposite interpretation of the Amendment. Specifically, at the pleading stage, the district court concluded that the Amendment "does not, expressly or impliedly, carry the

statutory construction load the Board of Governors says it does." *See* D.Ct.Dkt.164 (Order on Defendants' Motions to Dismiss Amended Complaint (the "MTD Order")) at 12. In short, the district court's conflicting orders and analysis risk creating confusion regarding the Amendment's meaning and intent, confusion Senator Toomey submits should not exist.

Beyond the district court's orders, the record below contains other misleading interpretations of the Amendment by Defendants-Appellees that this Court should not adopt. In its motion to dismiss, the Board argued that the Amendment's recognition that master account applications can be "rejected," including from "insured depository institutions," serves as an authoritative congressional recognition of Board or Reserve Bank discretion over master account approvals, "resolv[ing]" "any doubt [] as to [its] ability to deny requests for master accounts." (Board of Governors Memorandum in Support of Motion to Dismiss ("Bd. Br."), D.Ct.Dkt.127 at 23.) The Board contended that the Amendment's requirement that it create and maintain a list of master account applications, "including whether . . . a request . . . was approved, *rejected*, pending, or withdrawn," 12 U.S.C. § 248c(b)(1) (emphasis added), and listing whether the requesting entity was "an insured depository institution," "an insured credit union," or "a depository institution that is not an insured depository institution or an insured credit union," *id.* § 248c(b)(1)(C), means that "the only way that the 2023 NDAA can be read to give effect to all of its

provisions" is to recognize broad discretion to deny master account applications from state-chartered insured depository institutions like Custodia. (Bd. Br. at 23-4.) FRBKC relatedly argued that the Amendment's definition of these accounts as "reserve bank master accounts" indicates a congressional grant of such discretion to the Reserve Banks, rather than to the Board. (FRBKC Memorandum in Support of Motion to Dismiss, Mar. 28, 2023, D.Ct.Dkt.127 at 23. 124 at 9-10.)

A plain reading of its text does not support either argument that the Amendment authorized, explicitly or implicitly, any substantive Board or Reserve Bank power or discretion to reject applications from statutorily eligible institutions. In addition, consideration of the purpose of the Amendment, and the facts and circumstances that led to its passage, likewise establishes that the Amendment is, and was drafted as, exclusively a disclosure provision.

I.    **The History of the 2023 NDAA Amendment Makes Clear That Its Purpose Was To Achieve Transparency in the Master Account Application and Maintenance Process**

The Senate Banking Committee witnessed the lack of transparency in the master account approval process first-hand in January 2022 during the Senate vetting and confirmation process for a presidential appointee nominated to serve as vice-chair for banking supervision at the Board. At that time, Senator Toomey was serving as Ranking Member on the Senate Banking Committee, which is principally tasked with vetting presidential nominees to the Board as part of the Senate's

constitutional duty to advise and consent on the appointment of principal officers of the United States. During the Senate vetting and confirmation process, Senator Toomey and his colleagues learned that Reserve Trust—a non-depository financial institution—had been denied, and then subsequently granted, a master account by the Kansas City Fed.

In late 2016, Reserve Trust applied for a master account—but the Kansas City Fed rejected its application because it "did not meet the definition of a depository institution," and thus was statutorily ineligible for a master account. (Statement of Fed. Rsrv. Bank of Kan. City ("KC Fed Statement") (Feb. 7, 2022), *https://tinyurl.com/ya6fjp9u*.) A few months later, the previous denial was rescinded, and Reserve Trust was granted a master account, becoming, according to Reserve Trust's website, "the first state chartered trust company to obtain a Federal Reserve master account, granting direct access to Federal Reserve clearing, payment, and settlement services." (U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Annual Defense Bill Includes Toomey Provision to Require Federal Reserve Transparency on Master Accounts* ("*Annual Defense Bill*") (Dec. 8, 2022), *https://tinyurl.com/57d74r28*.)

Senator Toomey began seeking information from the Kansas City Fed and the Board about Reserve Trust's application for a master account and the Kansas City Fed's reversal of its previous denial. Even after several follow-up inquiries, the

Board and Kansas City Fed largely refused to provide any relevant information. On February 7, 2022, the Kansas City Fed issued a one-page statement explaining that the master account was granted because Reserve Trust "changed its business model and the Colorado Division of Banking reinterpreted the state's law in a manner that meant [Reserve Trust] met the definition of a depository institution." (KC Fed Statement.) However, just a week later, the Colorado Division of Banking publicly disputed this narrative, stating that its analysis of the state banking laws had not changed from the time that the Kansas City Fed found Reserve Trust statutorily ineligible for a master account, and that the Kansas City Fed had "misrepresent[ed]" its role. (*State Bank Regulator Disputes KC Fed's Claim About Fintech Firm Linked to Biden Nominee Raskin*, CNBC (Feb. 15, 2022), *https://tinyurl.com/4k6jxxxd*.)

By June 2022, the Senate Banking Committee learned that the Kansas City Fed had revoked Reserve Trust's master account. (*Annual Defense Bill*, *supra*.) When Senator Toomey wrote the Kansas City Fed requesting additional information about this—second—reversal, the Kansas City Fed asserted that any information regarding its revocation of Reserve Trust's master account was confidential supervisory information and refused to turn over any relevant documentation to the Senate Banking Committee.

By this point, Senator Toomey and his colleagues on the Senate Banking Committee were concerned about the lack of transparency and accountability

represented by this episode. Senator Toomey and his colleagues wrote to the Kansas City Fed several times about these issues, and Senator Toomey raised questions to Chair of the Board Jerome Powell during public hearings. (*See, e.g.*, U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey, Scott, Tillis, Lummis Blast Kansas City Fed for Again Stonewalling Congress on Master Account Process* (June 29, 2022), *https://tinyurl.com/2cy8dxv8*.) One item Senator Toomey sought specifically from the Board during this period was a listing of each institution holding a master account; the Board refused several times to provide this information. Writing to Senator Toomey in June 2022, Chair Powell echoed the Kansas City Fed, asserting that "information regarding which institutions have requested or maintain master accounts is considered confidential business information of the requestors and the Reserve Banks . . . [which] the Federal Reserve does not disclose . . . publicly." In an interview on Bloomberg TV at the time, Senator Toomey expressed that the Board took "a position that they're not accountable to anyone," including the Congress. (*Toomey Wants the Fed More 'Transparent,' Subject to Oversight*, Bloomberg Law (June 30, 2022), *https://tinyurl.com/2p9h8cma*.)

The Board and Kansas City Fed's refusal to provide information regarding the master account approval process led Senator Toomey and several of his colleagues to consider legislation requiring greater transparency and disclosures from the Board

and/or the Reserve Banks. In September 2022, Senator Toomey introduced the first draft of what ultimately became the 2023 NDAA Amendment,[2] requiring the Board to publicly maintain a listing of institutions that hold master accounts, as well as those that have applied, been granted, and rejected for a master account. As Senator Toomey publicly stated after introducing the draft Amendment, "[e]vents and information gleaned over the last year have raised significant policy questions about the Fed's approach to awarding master accounts. Access to the Fed's payment system is a highly valuable public good, and Congress has a responsibility to taxpayers to ensure regulators give out public goods fairly, transparently, consistently, and without favoritism." (U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey on Fed's New Master Account Proposal: More Transparency Needed* (Nov. 4, 2022), *https://tinyurl.com/y4npu2vv*.)

In response to the introduction of the draft Amendment, the Board, in November 2022, announced its intention to voluntarily make public a comparatively more limited amount of information about master account holders: a list of depository institutions that currently hold a master account.[3] As Senator Toomey

---

[2] *See* Congressional Record—Senate, S.A. 6019, (Sep. 28, 2022), *https://www.congress.gov/117/crec/2022/09/28/168/157/CREC-2022-09-28-pt1-PgS5495-3.pdf*.

[3] *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 68,691 (Nov. 16, 2022).

said in a press release at that time, the Board's proposal "represent[ed] a step in the right direction, but more transparency [was] needed," since it was critically important that the taxpayers "know not only which institutions have been granted master accounts, but also which ones have been denied access." (*Id.*)  This focus—on denied and pending applications—grew out of information gleaned about Reserve Trust, which was denied a master account (only later to be granted, and eventually revoked) under opaque circumstances.  It was apparent from those events that pending and rejected applications were a source of significant public interest, and that Board and Reserve Bank transparency surrounding this process was lacking.  As Senator Toomey publicly stated at the time, his goal was to promote a regime that aligned the Federal Reserve system with other federal banking regulators:  "Just as the FDIC maintains a public database of applications for deposit insurance and the OCC maintains a public database of bank charter applications, the Fed should adopt a public database for master account applications." (*Id.*)  The FDIC and OCC databases include listings of pending and rejected applications.[4]

---

[4] *See Bank Application Actions*, Federal Deposit Insurance Corp. (Apr. 11, 2023), *https://www.fdic.gov/regulations/applications/actions.html*; *OCC Financial Institution Search*, Office of the Comptroller of the Currency (last accessed Apr. 18, 2023), *https://www.occ.treas.gov/publications-and-resources/tools/occ-financial-institution-search/index-occ-financial-institution-search.html.*

In Senator Toomey's public comments and private conversations with the Board and with his colleagues, he and his staff were clear about the purpose of the Amendment: to "provide the American people with the information about master account applications that they deserve, but which the Fed has refused to provide," and to make clear to "[t]he Fed and other regulators [] that if they won't be transparent, Congress will hold them accountable." (*Annual Defense Bill*, *supra*.) Moreover, during Senator Toomey's many conversations with colleagues, legislative staff, and with the Board, there was not a single instance in which any Member of Congress, legislative staff, or individual from the Board suggested that the Amendment was intended to, or could be interpreted as, opining on either the Board's, or the Reserve Bank's, substantive authority and discretion (or lack thereof) to grant or reject master account applications. The focus was consistently, and exclusively, on promoting transparency as to which institutions held and had applied for master accounts.

The effort to pass the Amendment was bipartisan, and it was ultimately supported by a broad range of both Republicans and Democrats across both the House and Senate, who recognized the importance of providing transparency in line with other federal regulators. (*See, e.g.*, U.S. House Financial Services Committee, *Waters Secures Key Committee Provisions in 2023 National Defense and Authorization Act* (Dec. 7, 2022), *https://tinyurl.com/59x7d7c6*.) During this period,

the Board opposed the Amendment, maintaining that it could provide transparency voluntarily and without further legislation. Chair Powell and other senior officials at the Board contacted Senator Toomey and legislative staff to express their concerns about the Amendment. Senior attorneys from the Board were also invited to engage on the text of the Amendment and offer "technical assistance" on the wording of the Amendment. One wording suggestion that the Board attorneys sought was to include the phrase "reserve bank" before the definition of a master account in the Amendment—the first reference to a master account in the Federal Reserve Act's history. The Board attorneys stated that this inclusion was necessary to properly define master accounts, because, once established, the accounts are associated with and managed by the Reserve Banks. They did not suggest that this technical phrasing would carry any substantive or policy weight in establishing whether the Reserve Banks or the Board was ultimately responsible for the approval or issuance of master accounts. The Board attorneys' suggestion was accepted, and the original Amendment was modified to include the phrase "reserve bank master account" in the definitions section.

The Amendment was consciously drafted to avoid opining on any contested questions of the Board's or Reserve Bank's authority—and was intended to garner broad bipartisan support on the less controversial matter of disclosure requirements through the establishment and maintenance of a public database of master accounts.

During the drafting and passage of the Amendment, Senator Toomey and his staff were aware of this litigation and Custodia's application for a master account, as were many of Senator Toomey's colleagues on the Senate Banking Committee. Three of them—Senators Cynthia Lummis, Steve Daines, and Kevin Cramer—filed an *amicus* brief in the district court action in opposition to Defendants-Appellees' motions to dismiss, arguing that the Board and Reserve Banks lack any discretionary authority to reject the master account applications of statutorily eligible state-chartered depository institutions. (ECF 92.) These Senators were also joined on the brief by four Members of the House of Representatives who voted for the Amendment. The 2023 NDAA, including the Amendment, passed the Senate 83 to 11 on December 15, 2022, and was signed into law by the President on December 23, 2022.

The Amendment does merely what it says it does and nothing more: it requires the Board to maintain a public database of master account holders and pending or rejected applicants, without expressing any view about the appropriate reasons for granting or rejecting a master account application. The very title of the law's section implementing the Amendment is "Section 5708. Master account and services database." The language of the Amendment is so plain and succinct that it is worth reproducing here in its entirety:

"SEC. 5708. MASTER ACCOUNT AND SERVICES DATABASE.

The Federal Reserve Act is amended by inserting after section 11B (12 U.S.C. 248b et seq.) the following:

"SEC. 11C. MASTER ACCOUNT AND SERVICES DATABASE.

"(a) Definitions.--In this section:

"(1) Access request.--The term 'access request' means a request to a Federal reserve bank for access to a reserve bank master account and services, including any written documentation or formal indication that an entity intends to seek access to a reserve bank master account and services.

"(2) Official accountholder.--The term 'official accountholder' means--

"(A) a foreign state, as defined in section 25B;

"(B) a central bank, as defined in section 25B, other than a commercial bank;

"(C) a public international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (22 U.S.C. 288 et seq.); and

"(D) any governmental entity for which the Secretary of the Treasury has directed a Federal reserve bank to receive deposits as fiscal agent of the United States under section 15.

"(3) Reserve bank master account and services.--The term 'reserve bank master account and services' means an account in which a Federal reserve bank--

"(A) receives deposits for an entity other than an official accountholder; or

"(B) provides any service under section 11A(b) to an entity other than an official accountholder.

"(b) Publishing Master Account and Access Information.--

"(1) Online database.--The Board shall create and maintain a public, online, and searchable database that contains--

"(A) a list of every entity that currently has access to a reserve bank master account and services, including the date on which the access was granted to the extent the date is knowable;

"(B) a list of every entity that submits an access request for a reserve bank master account and services after enactment of this section (or that has submitted an access request that is pending on the date of enactment of this section), including whether, and the dates on which, a request--

"(i) was submitted; and

"(ii) was approved, rejected, pending, or withdrawn; and

"(C) for each list described in subparagraph (A) or (B), the type of entity that holds or submitted an access request for a reserve bank master account and services, including whether such entity is--

"(i) an insured depository institution, as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813);

"(ii) an insured credit union, as defined in section 101 of the Federal Credit Union Act (12 U.S.C. 1752); or

"(iii) a depository institution that is not an insured depository institution or an insured credit union.

"(2) Updates.--Not less frequently than once every quarter, the Board shall update the database to add any new information required under paragraph (1).

"(3) Deadline.--Not later than 180 days after the date of enactment of this section, the Board shall publish the database with the information required under paragraph (1)".

## II. This Court Should Reject Arguments that the 2023 NDAA Amendment Requiring Disclosure of Master Accounts Should be Construed to Imply that Congress Recognized or Affirmed that the Reserve Banks Have Substantive Discretion to Reject Master Account Applications

Despite the clear language, context and purpose of the Amendment as exclusively a disclosure provision, in its briefing in the district court, the Board focused on several isolated words in the Amendment to argue that it represents congressional recognition of broad Reserve Bank discretion to deny master account applications from statutorily eligible state-chartered depository institutions like Custodia. Because, the Board argues, the Amendment requires it to issue a list of master account applications, including those "rejected," and to specify for each

application, whether the requesting entity was one of various classes of financial institution including a "a depository institution that is not an insured depository institution" like Custodia, the Board argues that the Amendment cannot be read other than as recognizing a discretionary power to reject applications like Custodia's. (Bd. Br. at 23-4).

Such a reading of the single reference to "rejected" applications is unsupported by the text of the Amendment. By its own terms, the word "rejected" says nothing of the underlying reasons animating such an action—and there is no dispute that master account applications may be denied for certain reasons, for instance, when the institution applying is not statutorily eligible. Moreover, to read this reference, in a statute designed to enhance procedural transparency, as a congressional recognition of such an important and contested substantive concept would produce an outcome plainly at odds with the language and purpose of the statute.

There is a far more logical explanation for the inclusion of these terms. As explained above, the Amendment was drafted in response to the Board's and the Kansas City Fed's refusal to answer inquiries into the master account application of Reserve Trust. It was a measure enacted to hold these institutions *more accountable* (*i.e.*, to ensure that they were exercising their authority appropriately)—not to opine on any preexisting authority Congress may have given to them, either directly in

statute or indirectly through a delegation from the Board. The Amendment's express requirement that the Board disclose information about "rejected" applications was in response to the Reserve Trust situation: one where an institution had been initially denied a master account under circumstances of significant public and congressional interest. As the Reserve Trust case exemplifies, disclosure of the fact of an application's rejection—and public awareness of such—is an entirely separate matter than the reasons for, or the legality of, such a rejection. For instance, with respect to Reserve Trust, the core of congressional interest has been that master accounts be dealt with "fairly, transparently, consistently, and without favoritism." (*Toomey on Fed's New Master Account Proposal*, *supra*.) Requiring the Board to publish information about rejected applications acknowledges that rejections have happened as a matter of fact—without commenting on whether they occur consistent with law.

So too is the phrase "reserve bank master account" in the Amendment unilluminating as to the important issues surrounding whether the Board or Reserve Banks are responsible for approving and issuing master accounts. As explained above, the words "reserve bank" were added before "master account" at the suggestion of the Board staff as a merely technical matter to reflect that, once established, these accounts are associated with the regional Reserve Bank where a master accountholder is located. Never did the Board staff suggest that this change

would have any bearing on the question of which part of the Federal Reserve System possessed any ultimate discretion over who might be legally entitled to such an account.  And read in the overall context of the Amendment, it makes no sense to attribute undue weight to the phrasing, since the Amendment clearly makes the Board—and not the individual Reserve Banks—exclusively responsible for creating and maintaining the statutory database of master account holders and rejected, pending, and accepted applications.

Moreover, as the Department of Justice has recognized, the constitutionality of the Reserve Banks depends on supervision by,[5] and subordination to,[6] the Board, a federal agency whose members are Senate-confirmed principal officers properly exercising delegated governmental powers.  This has been Senator Toomey's long-

---

[5] The Federal Reserve Act of 1913 allowed for a regional Federal Reserve System, operating under a supervisory board in Washington, D.C., by providing "for the establishment of Federal Reserve Banks, to furnish an elastic currency, to afford means of rediscounting commercial paper, to establish a more effective supervision of banking in the United States, and for other purposes."  Federal Reserve Act: Public Law 63-43, 63d Congress, H.R. 7837 (Dec. 23, 1913); *see also The Founding of the Fed*, Federal Reserve Bank of New York (last accessed Apr. 18, 2023), *https://tinyurl.com/3ayk3wu8*.)

[6] *See, e.g.*, *Fed. Rsrv. Bank Members*, 43 Op. O.L.C. __ (concluding that "Reserve Bank FOMC members are inferior officers under the Appointments Clause because they are subordinates of the Board of Governors . . . the appointments of Reserve Bank FOMC members comport with the Appointments Clause . . . [because] . . . [t]heir selections as Reserve Bank presidents are approved by the Board of Governors, which is the head of the Federal Reserve System and therefore may appoint inferior officers of the United States. U.S. CONST. art. II, § 2, cl. 2".)

held view.  (*See, e.g.*, U.S. Senate Committee on Banking, Housing, and Urban Affairs, *Toomey Calls for Reforming the Regional Federal Reserve Banks* (Feb. 11, 2022), *https://tinyurl.com/58rs6ab3*.)

Congress specifically authorized delegation of certain Board functions to the Reserve Banks, such as entering into enforcement actions, written agreements, cease-and-desist orders, and certain applications requiring Board approval.[7]  If, as the Kansas City Fed argues, Congress intended to delegate to the quasi-private Reserve Banks, or recognize a previous delegation of, primary authority over the important issue of approving master accounts, this would have been no minor matter. Congress would not have hidden such a weighty statement on the balance of power within the Federal Reserve system within two definitional words—especially ones only included after being offered by the Board staff as merely "technical" suggestions to address operational matters, and not as sources of authority or to settle any disputed matters about master account approval authority or discretion.  *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes".)

---

[7] *See* 12 C.F.R. § 265.20 (delineating the scope of various delegations to the Reserve Banks).

## CONCLUSION

As explained above, the 2023 NDAA Amendment does not—and was not intended to—grant or opine on any substantive rights of the Board, or of the Reserve Banks. The Amendment was drafted in response to the Board's, and Kansas City Fed's, refusal to address repeated Senate inquiries into the handling of Reserve Trust's master account application. It was enacted solely as a disclosure measure, meant to ensure greater transparency as to which institutions hold and seek master accounts. As laid out above, the text of the Amendment is clear on this point, as is the purpose, context, and legislative history. Accordingly, this Court should reject any arguments attempting to misread the Amendment as opining, in any way, on the substantive discretion of either the Board, or the Reserve Banks, over the requirements for, or the granting of, master accounts. This Court should reverse the district court's judgment.

Respectfully submitted,

s/ Brent R. Baker
BRENT R. BAKER
 *Counsel of Record*
BUCHALTER
60 E. South Temple Street
SALT LAKE CITY, UT 84111
(801) 401-8625
bbaker@buchalter.com

NICOLAS MORGAN
INVESTOR CHOICE ADVOCATES
NETWORK
453 S. Spring St., Ste 400
Los Angeles, CA 90013
(310) 849-0384
nicolas.morgan@icanlaw.org

*Counsel for Amicus Curiae*

July 3, 2024

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4910 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

s/Brent R. Baker
Brent R. Baker

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Brent R. Baker
Brent R. Baker