No. 24-8024

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

CUSTODIA BANK, INC.,
*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, ET AL.,
*Defendants-Appellees*,

On Appeal from the United States District Court for the District of Wyoming
No. 1:22-CV-00125, Hon. Scott W. Skavdahl

## BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION IN
## SUPPORT OF CUSTODIA BANK, INC.

Donald B. Verrilli, Jr.
Kathleen Foley
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
 Suite 500E
Washington, DC 20001
Tel: (202) 220-1100
*donald.verrilli@mto.com*

July 3, 2024                              *Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Tenth Circuit Rule 26.1, amicus curiae states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

AMICUS STATEMENT ................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT ................................................................11

I.    Digital Assets Are An Established Part of the Nation's Financial
      System...............................................................11

      A.    Digital Asset Investment and Usage are Widespread and
            Increasing. ..................................................11

      B.    Banks Have Innovated to Meet Needs of Digital Asset Users. ..........13

II.   It Is Crucial That Customers And Industry Participants Have Access
      To Safe Banking Options. ...........................................15

      A.    The Federal Reserve's Payment and Settlement Systems Were
            Designed to Make Secure, Reliable Transactions Widely
            Available. ...................................................16

      B.    Federal Reserve Master Accounts Provide Safety for Banks and
            Their Customers. .............................................18

      C.    Digital Asset Industry Participants Need Safe Banking Options........22

III.  "Debanking" Has Left Industry Participants Like Custodia With
      Fewer Banking Options. .............................................23

IV.   Bringing The Digital Asset Industry Inside The Regulatory Perimeter
      Will Reduce Risk To The Financial System And Better Protect
      Consumers And The Public Interest...................................31

CONCLUSION ................................................................32

CERTIFICATE OF COMPLIANCE...............................................33

CERTIFICATE OF DIGITAL SUBMISSION ......................................34

CERTIFICATE OF SERVICE ................................................35

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Corner Post, Inc. v. Board of Governors of the Federal Reserve
    System*,
    603 U.S. --, 2024 WL 3237691 (July 1, 2024) ................................. 10

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*,
    861 F.3d 1052 (10th Cir. 2017) ............................................... 7

*Grayscale Investments, LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023) .............................................. 13

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York*,
    866 F.2d 38 (2d Cir. 1989) .................................................. 8

*History Assocs. Inc. v. FDIC*,
    No. 24-cv-1857 (D.D.C. Jun. 27, 2024) .................................. 24, 25

*Jet Courier Servs., Inc. v. Federal Reserve Bank of Atlanta*,
    713 F.2d 1221 (6th Cir. 1983) ............................................... 8

FEDERAL STATUTES

12 U.S.C. § 248a(c)(2) ............................................. 4, 6, 7, 8, 18

12 U.S.C. § 342 ...................................................... 6, 17, 18

12 U.S.C. § 360 ........................................................... 17

12 U.S.C. § 461(b)(2)(A) .................................................. 18

Lummis-Gillibrand Payment Stablecoin Act, S. 4155, 118th Cong. §
    6(f) (2024) ............................................................. 15

STATUTES - OTHER

Neb. Rev. Stat. Ann. § 8-3009 ............................................. 15

Neb. Rev. Stat. Ann. § 8-3014 ............................................. 14

Neb. Rev. Stat. Ann. § 8-3024 .......................................... 14, 15

Wyo. Stat. Ann. § 13-12-119 ..................................................................31

Wyo. Stat. Ann. § 34-29-104 ..................................................................13

**FEDERAL REGULATIONS**

12 C.F.R. § 327.4(a) ...............................................................................30

12 C.F.R. § 327.10 ..................................................................................30

87 Fed. Reg. 21,676 (Apr. 12, 2022) ......................................................13

87 Fed. Reg. 28,848 (May 11, 2022) .......................................................13

87 Fed. Reg. 21,015 (Apr. 11, 2022) ......................................................26

88 Fed. Reg. 7848 (Feb. 7, 2023) ...........................................................27

**OTHER AUTHORITIES**

*2023 Year in Review & 2024 Year Ahead* (Dec. 12, 2023),
   https://crypto.com/research/2023-review-2024-ahead ......................................11

Aaron Smith & Monica Anderson, *New Modes of Payment and the
   'Cashless Economy'* (Dec. 19, 2016),
   https://www.pewresearch.org/internet/2016/12/19/new-modes-of-
   payment-and-the-cashless-economy/ ..................................................12

Adam M. Gilbert *et al.*, *Creating an Integrated Payment System: The
   Evolution of Fedwire*, FRBNY Economic Policy Review
   (Jul. 1997) ..........................................................................................16, 17

Armaan Joshi, *Why is the Crypto Market Rising Today?*, Forbes
   (June 10, 2024), https://www.forbes.com/advisor/in/investing/
   cryptocurrency/why-is-crypto-going-up/ ...........................................11

Bank of England, *What are stablecoins and how do they work?*
   (Nov. 6, 2023), https://www.bankofengland.co.uk/explainers/what-
   are-stablecoins-and-how-do-they-work?sf183447653=1 ...................15

Bank for International Settlements & International Organization of
   Securities Commissions, *Principles for Financial Market
   Infrastructures* (Apr. 2012), https://www.bis.org/cpmi/publ/
   d101a.pdf ............................................................................................19

*BNP Paribas Securities Services To Develop Digital Assets Custody Capabilities Through Partnerships With METACO and Fireblocks*, BNPParibas (July 20, 2022), https://securities.cib.bnpparibas/bnp-paribas-securities-services-to-develop-digital-assets-custody-capabilities-through-partnerships-with-metaco-and-fireblocks/ .......................14

*BNY Mellon Launches New Digital Asset Custody Platform* (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html ...........................................................14

Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation & Office of the Comptroller of the Currency, *Joint Statement on Crypto-Asset Risks to Banking Organizations* (Jan. 3, 2023), https://www.fdic.gov/sites/default/files/2024-03/pr23002a.pdf................................................5, 26, 27, 30

Board of Governors of the Federal Reserve System, *Federal Reserve announces that its new system for instant payments, the FedNow® Service, is now live* (July 20, 2023), https://www.federalreserve.gov/newsevents/pressreleases/other20230720a.htm...........................................................................20

Board of Governors of the Federal Reserve System, *Letter SR 22-6* (Aug. 16, 2022), https://www.federalreserve.gov/supervisionreg/srletters/SR2206.htm...............................................................................................5, 25

Board of Governors of the Federal Reserve System, *Policy Statement on Section 9(13) of the Federal Reserve Act* ( Jan. 27, 2023), https://www.federalreserve.gov/newsevents/pressreleases//a2.pdf...............5, 27

Christina Parajon Skinner, *Central Bank Digital Currency as New Public Money*, 172 U. Penn. L. Rev. 151 (2023) ...............................16

*Citi Develops New Digital Asset Capabilities for Institutional Clients* (Sept. 18, 2023), https://www.citigroup.com/global/news/press-release/2023/citi-develops-new-digital-asset-capabilities-for-institutional-clients.............................................................14

The Clearing House, *The Custody Services of Banks* (2016),
https://www.theclearinghouse.org///tch//research/articles///_tch_wh
ite_paper_the_custody_services_of_banks.pdf .....................................................3

CrunchBase, *United States Cryptocurrency Companies*
https://www.crunchbase.com/hub/united-states-cryptocurrency-
companies ...........................................................................................................22

Dan Ashmore, *An Introduction to Stablecoins*, Forbes (Aug. 17,
2022),
https://www.forbes.com/advisor/investing/cryptocurrency/stablecoi
ns/...................................................................................................................14

David H. Thompson, *et al.*, *Operation Choke Point 2.0*, Cooper &
Kirk, https://www.cooperkirk.com/content//2023/03/Operation-
Choke-Point-.0.pdf...........................................................................................29

Emily Nicole, *Deutsche Bank Links With Swiss Crypto Firm for
Custody Services*, Forbes (Sept. 14, 2023),
https://www.bloomberg.com/news/articles/2023-09-14/deutsche-
bank-links-with-swiss-crypto-firm-for-custody-services ...................................14

Ether-Based EPTs Order, Release No. 100224, 2024 WL 2746091
(SEC May 23, 2024) .........................................................................................13

FDIC, *Notification of Engaging in Crypto-Related Activities* (April 7,
2022), https://www.fdic.gov/news/financial-institution-
letters/2022/fil22016.html#letter .......................................................................25

FDIC Office of the Inspector General, *FDIC Strategies Related to
Crypto-Asset Risks* (Oct. 2023),
https://www.fdicoig.gov/sites/default/files/reports/2024-02/EVAL-
24-01-Redacted_0.pdf........................................................................................24

Federal Reserve Banks, Underhill Moore *et al.*, *Drawing Against
Uncollected Checks: II*, 45 Yale L.J. 260 (1935) ...............................................16

Federal Reserve, *Fedwire® Funds Service - Monthly Statistics* (June
27, 2024), https://www.frbservices.org/resources/financial-
services/wires/volume-value-stats/monthly-stats.html.......................................22

Federal Reserve Financial Services, *Federal Reserve Banks Operating Circular No. 4*, Appendix E (Jan. 2, 2024), https://www.frbservices.org//content/assets///rules-regulations/-operating-circular-4.pdf ...................................................................20

Federal Reserve Financial Services, *Federal Reserve Banks Operating Circular No. 8* (April 22, 2024), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/042224-operating-circular-8.pdf ...................................................20

Federal Reserve Financial Services, *Federal Reserve Banks Operating Circular No. 1* (Sept. 1, 2023), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf ......................................................19, 20, 21, 22

Federal Reserve Financial Services, *Federal Reserve Banks Operating Circular No. 3* (March 18, 2024), https://www.frbservices.org//content//crsocms//s-regulations/-operating-circular-3.pdf ...................................................................19

Federal Reserve Financial Services, *Federal Reserve Banks Operating Circular No. 7* (2024), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/050124-operating-circular-7.pdf ...................................................................21

Federal Reserve System, *The Fed Explained* (2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf ...................................................................15

Federal Reserve, *Unpacking Clearing and Settlement*, https://www.frbservices.org/financial-services//payments-education/unpacking-clearing-and-settlement.html (last visited Jun. 18, 2024) ...................................................................19

*Fedwire Funds Service*, https://www.frbservices.org/binaries/content/assets/crsocms/financial-services/wires/funds.pdf (last visited Jun. 18, 2024) ...................................................................20

*Fedwire® Securities Service*, https://www.frbservices.org/binaries/content/assets/crsocms/financial-services/securities/securities-product-sheet.pdf (last visited Jun. 18, 2024) ...................................................................21

Fin. Stability Bd., *High-Level Recommendations for the Regulation, Supervision and Oversight of Global Stablecoin Arrangements* (July 17, 2023), https://www.fsb.org/wp-content/uploads/P170723-3.pdf ........................................................................................15

Gary Gensler, Statement on the Approval of Spot Bitcoin Exchange-Traded Products ( Jan. 10, 2024), https://www.sec.gov/news/statement/gensler-statement-spot-bitcoin-011023 .............................................13

*House Passes H.J.Res. 109 with Bipartisan Support to Overturn SEC's SAB 121*, House Financial Services Committee (May 8, 2024), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=409250 ...............................................26

*HSB Survey Finds One-Third of Small Businesses Accept Cryptocurrency*, Business Wire (Jan. 15, 2020).................................................12

Joseph R. Biden Jr., *A Message to the House of Representatives on the President's Veto of H.J.Res. 109*, White House (May 31, 2024), https://www.whitehouse.gov/briefing-room/presidential-actions/2024/05/31/a-message-to-the-house-of-representatives-on-the-presidents-veto-of-h-j-res-109/ ....................................................26

Julie Andersen Hill, *From Cannabis to Crypto*, 109 Iowa L. Rev. 117 (2023).............................................................18

Konrad Alt, *Who's been toughest on fintech partner banks recently - the OCC, Federal Reserve, or FDIC?* Klaros Group (Apr. 22, 2024), https://www.klaros.com/post/who-s-been-toughest-on-fintech-partner-banks-recently-the-occ-federal-reserve-or-fdic ........................29

Merchant Directory, bitpay.com (last visited July 2, 2024), https://bitpay.com/directory/ ............................................................12

Michelle Faverio & Olivia Sidoti, *Majority of Americans Aren't Confident in the Safety and Reliability of Cryptocurrency* (April 10, 2023), https://www.pewresearch.org/short-reads/2023/04/10/majority-of-americans-arent-confident-in-the-safety-and-reliability-of-cryptocurrency/............................................................12

Nic Carter, *Operation Choke Point 2.0 Is Underway, And Crypto Is In Its Crosshairs* (Feb. 8, 2023), https://www.piratewires.com/p/crypto-choke-point ........................................... 30

Office of the Comptroller of the Currency*, Comptroller's Handbook: Custody Services* (2002), https://www.occ.gov/publications-and-resources//handbook//custody-services/index-custody-services.html .................................................................................................... 3

Office of the Comptroller of the Currency, *Interpretive Letter #1170* (July 22, 2020), https://www.occ.gov/topics/and-licensing/and-actions//.pdf ........................................................................................... 3, 24

Office of the Comptroller of the Currency, *Interpretive Letter #1172* (Sept. 21, 2020), https://occ.gov/topics/charters-and-licensing/and-actions/2020/.pdf ................................................................................... 24

Office of the Comptroller of the Currency, *Interpretive Letter #1174* (Jan. 4, 2021), https://www.occ.gov/news-issuances/news-releases//occ-2021-2a.pdf) ......................................................................... 24

Office of the Comptroller of the Currency, *Interpretive Letter #1179* (Nov. 18, 2021), https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions//.pdf ..................................... 5, 24

Order Denying Application for Membership, *Federal Reserve System Custodia Bank, Inc. Cheyenne, Wyoming*, 2023 WL 3674714 (F.R.B. Jan. 27, 2023) ....................................................................... 5

Rachel Louise Ensign & David Benoit, *Banks Are Breaking Up With Crypto During Regulatory Crackdown*, Wall St. J. (Feb. 16, 2023) ..................................................................... 5, 22, 24, 29, 30

Stephen Quinn & William Roberds, *The Evolution of the Check as a Means of Payment*, 93 Fed. Rsrv. of Atlanta Economic Review No. 4 (2008) ........................................................................................... 17

Testimony of Caitlin Long, CEO of Custodia Bank before the
 Wyoming Legislature's Select Committee on Blockchain,
 Financial Technology and Digital Innovation Technology (May 21,
 2024), https://wyoleg.gov/InterimCommittee/2024/S19-
 20240520SelectCommitteeTestimonyMay212024--
 ASSUBMITTED.pdf .......................................................................6, 28

Thomas Franck, *One in Five Adults has Invested in, Traded or Used
 Cryptocurrency, NBC News Poll Shows* (March 31, 2022),
 https://www.cnbc.com/2022/03/31/cryptocurrency-news-
 21percent-of-adults-have-traded-or-used-crypto-nbc-poll-
 shows.html#:~:text=One%20in%20five%20
 Americans%20has,at%20a%20rate%20of%2050%25......................................12

*U.S. Bank Details New Cryptocurrency Offerings* (April 27, 2021),
 https://www.usbank.com/about-us-bank/company-blog/article-
 library/us-bank-details-new-cryptocurrency-offerings.html ...........................14

United States Senate Committee on Banking, Housing, and Urban
 Affairs, Letter to Acting FDIC Chairman Gruenberg (Aug. 16,
 2022), https://www.banking.senate.gov/imo/media/doc/
 toomey_letter_to_fdic_re_whistleblower_reports.pdf .......................................28

Unites States Census, *World Population Clock*
 (July 2, 2024), https://www.census.gov/popclock/world ...................................11

The White House Briefing Room Blog, *The Administration's
 Roadmap to Mitigate Cryptocurrencies' Risks* ( Jan. 27, 2023),
 https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-
 administrations-roadmap-to-mitigate-cryptocurrencies-risks/ ......................5, 27

Wyoming Division of Banking, SPDI Examination Manuals (2021),
 https://drive.google.com/file/d/14dA8hrR59aGsKZYxAoIWQ7dV
 r32cr_Vw/view ...................................................................................................32

*Wyoming Legislature Select Committee* (May 21, 2024),
 https://www.youtube.com/live/9KCZOfCeSOc?t=5594s ...................................28

Yuegi Yang, *Crypto Needs Banks More Than Banks Need Them*,
 Bloomberg, (Feb. 7, 2023), https://www.bloomberg.com///-02-
 07/needs-banks-more-than-banks-need-them.....................................................23

Zachary Miller, *The Right Side of the Coin*, 45 Seton Hall Legis. J. 807 (2021) .......................................................................................12

**AMICUS STATEMENT**

Amicus curiae Blockchain Association (BA) is the leading nonprofit membership organization dedicated to promoting a pro-innovation policy environment for digital assets.[1]  BA endeavors to achieve regulatory clarity and to educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace.  BA represents nearly 100 member companies that reflect the diversity of the dynamic blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem.  Blockchain technology, which underlies digital assets, can foster a more equitable financial system and return control over user data to individuals instead of large corporations.  Unlike traditional payment methods, digital assets are accessible to anyone with an internet connection, enabling those who may lack financial services—or those who wish for more efficiency, transparency, and fewer fees—to join the global economy.  Although the industry is

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a), Amicus affirms that no party or counsel for a party authored this brief in whole or in part, that no party or party's counsel contributed money that was intended to fund preparation of this brief, that no person other than amicus, its members, or its counsel made any monetary contributions intended to fund the preparation or submission of this brief, and that all parties have consented to the filing of this brief.

still nascent, growth is rapid, and protecting the ability of developers and entrepreneurs to innovate through sensible regulation is key.

Amicus has an interest in ensuring an effective regulatory regime for the financial services the industry needs as it matures. In particular, as this case illustrates, it is crucial both to realizing the benefits of the public blockchain ecosystem and to protecting consumers who invest in and use digital assets that financial institutions providing services to the digital asset industry be given equal access to, and are correlatively subject to the regulatory frameworks applicable to, the national banking system.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case raises an issue of enormous importance to the nation's financial system. This country—indeed, the world—has witnessed explosive growth in the public's investment in, and usage of, digital assets. The nation's major investment companies have recently introduced exchange-traded digital asset funds, which already comprise hundreds of billions of dollars. Many leading corporations, like PayPal and Microsoft, accept payment in digital assets. And the prevalence of digital assets is likely to continue to grow rapidly in the coming years. In short, digital assets are now an important component of the nation's financial system. There is no legal basis, and no sound policy justification, for treating companies in the digital

asset ecosystem as pariahs and forcing them to operate without access to the national banking system and the regulatory frameworks that govern it.

Appellant Custodia Bank is a Special Purpose Depository Institution (SPDI) chartered under Wyoming law. It has a limited-purpose charter under a law adopted by the people of Wyoming to facilitate the provision of a limited range of banking services (other than lending), such as payments and custody services. An SPDI may serve digital-asset-involved companies if determined by the individual bank to be consistent with its business plan and if done in a safe and sound manner. As its name implies, one important set of services Custodia seeks to provide is custody services. An institution providing custody services safekeeps its customers' assets and may manage investment and the settlement of transactions with respect to the custodied assets.[2] Digital asset custodians can provide an added layer of security for users, including by safekeeping the digital keys necessary to access digital assets and by storing digital assets offline.[3]

---

[2] *See* OCC*, Comptroller's Handbook: Custody Services* 73 (2002), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/custody-services/index-custody-services.html; The Clearing House, *The Custody Services of Banks* i, 4 (2016), https://www.theclearinghouse.org/-/media/tch/documents/research/articles/2016/07/20160728_tch_white_paper_the_custody_services_of_banks.pdf.

[3] *See* OCC, *Interpretive Letter #1170* 4-5 (July 22, 2020), https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2020/int1170.pdf.

In order to fulfill its business plan and charter granted by the Wyoming Banking Board (by a 7-0 vote), Custodia applied to the Federal Reserve Bank of Kansas City (FRBKC) for a "master account" under 12 U.S.C. 248a(c)(2) (Section 248). Access to a master account is greatly important to all banks, and especially to banks providing the state-chartered services that Custodia seeks to provide. Master account access permits a bank to plug into the Federal Reserve's payment and settlement systems, thus enabling its customers to transact safely and seamlessly with the millions of people and institutions whose banks are part of that system.

Normally such an application is promptly granted as a matter of course, consistent with the longstanding policy of the Federal Reserve Board of Governors (Board) and regional Federal Reserve Banks that all depository institutions meeting the statutory criteria are entitled to master accounts. But Custodia's application lay dormant for years until FRBKC denied it in January 2023, citing various extra-statutory policy justifications to the effect that granting master accounts to Custodia and similar financial institutions could create risks to the safety and soundness of the national banking system.

Unfortunately for Custodia, its application was caught in the current of federal regulators' aggressive, coordinated efforts to "debank" the digital asset industry. Beginning in 2021, federal regulators began rolling back prior guidance that had permitted depository institutions to provide digital asset services, and imposing new

restrictions.[4]  In January 2023, all three major federal banking agencies—the Federal Reserve, FDIC, and OCC—issued a joint policy statement labeling digital assets as unsafe.[5]  The impact of that statement made banks, particularly the largest federally regulated banks, hesitant to do business with digital assets or entities involved in the digital asset ecosystem.[6]  And later that month, all in one day, the White House issued a similar statement,[7] the Federal Reserve issued another such statement,[8] and the Federal Reserve denied Custodia's applications for both a master account and membership in the Federal Reserve.  Order Denying Application for Membership, *Federal Reserve System Custodia Bank, Inc. Cheyenne, Wyoming*, 2023 WL

---

[4]    OCC, *Interpretive Letter #1179* (Nov. 18, 2021), https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/ 2021/int1179.pdf (*Interpretive Letter #1179*); https://www.fdic.gov/news/financial-institution-letters/2022/fil22016.html#letter; Board, *Letter SR 22-6* (Aug. 16, 2022), https://www.federalreserve.gov/supervisionreg/srletters/SR2206.htm.

[5] Board, FDIC & OCC, *Joint Statement on Crypto-Asset Risks to Banking Organizations* (Jan. 3, 2023) (*Joint Statement*), https://www.fdic.gov/ sites/default/files/2024-03/pr23002a.pdf.

[6] *See* Rachel Louise Ensign & David Benoit, *Banks Are Breaking Up With Crypto During Regulatory Crackdown*, Wall St. J. (Feb. 16, 2023), https://www.wsj.com/ articles/banks-are-breaking-up-with-crypto-during-regulatory-crackdown-22de1832.

[7] The White House Briefing Room Blog, *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks* ( Jan. 27, 2023), https://www.whitehouse.gov/nec/briefing-room/2023/01/27/the-administrations-roadmap-to-mitigate-cryptocurrencies-risks/.

[8] Board, *Policy Statement on Section 9(13) of the Federal Reserve Act* (Jan. 27, 2023), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230 127a2.pdf.

3674714 (F.R.B. Jan. 27, 2023); J.A.1453.  Custodia was further shut off from the Federal Reserve's systems through private regulatory pressure on its banking partners, which twice led to the closure of Custodia's accounts.[9]  Through no fault of its own, Custodia became the focus of federal banking regulators' campaign to isolate the digital asset industry from the greater national economy.

Custodia challenged FRBKC's refusal to grant its master account application, principally arguing that FRBKC lacked the statutory authority to deny the application for the discretionary policy reasons FRBKC articulated, given that Custodia meets all existing requirements for a master account and that Section 248a(c)(2) imposes a mandatory obligation on Federal Reserve Banks to grant such applications as a routine matter.  FRBKC responded that, because Section 248a(c)(2) does not expressly state that master licenses shall be granted to "all" qualified applicants, it could deny Custodia's application for newly-minted policy reasons. FRBKC also contended that 12 U.S.C. 342—which states that Federal Reserve Banks "may" accept deposits from nonmember institutions, provided further confirmation of its discretion to deny a master account to any nonmember institution

---

[9] Testimony of Caitlin Long, CEO of Custodia Bank before the Wyoming Legislature's Select Committee on Blockchain, Financial Technology and Digital Innovation Technology (May 21, 2024), https://wyoleg.gov/InterimCommittee/ 2024/S19-20240520SelectCommitteeTestimonyMay212024-- ASSUBMITTED.pdf.

based on its own discretionary policy judgments. The district court agreed with FRBKC and dismissed Custodia's complaint.

Custodia has demonstrated in its opening brief that the district court legally erred in upholding FRBKC's refusal to grant Custodia a master account. Judge Bacharach's concurring opinion in *Fourth Corner Credit Union v. FRBKC,* 861 F.3d 1052, 1064 (10th Cir. 2017), compellingly sets forth the reasons why FRBKC could not deny Custodia's application for its stated, discretionary reasons. First and foremost, the text of Section 248a(c)(2) unambiguously provides that "[a]ll Federal Reserve bank services covered by the fee schedule *shall* be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks." 12 U.S.C. 248a(c)(2) (emphasis added). As Judge Bacharach explained, this provision's purpose is to "open access to Federal Reserve services for nonmember depository institutions." *Fourth Corner*, 861 F.3d at 1068. Nor can it matter that Section 248a by its terms does not mandate the conferral of master accounts. Because the services the statute mandates be available to nonmember institutions are accessible only via a master account, the text of Section 248a effectively commands that nonmember institutions be given master accounts. That was, of course, the long-held position of the Board, along with officials of the regional Federal Reserve Banks. *Id.* at 1070-72 (collecting statements of policy indicating that "all" depository institutions were entitled to master accounts). It was

also the position of two courts of appeals. See *Greater Buffalo Press, Inc. v. FRB N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989); *Jet Courier Servs., Inc. v. FRB Atlanta*, 713 F.2d 1221, 1222-23 (6th Cir. 1983).

Two additional errors bear special emphasis. First, the district court concluded that the absence from Section 248a(c)(2) of the word "all" was especially significant. Noting that Congress "does not … hide elephants in mouseholes," J.A.1472, the district court thought that, had Congress intended to provide universal access to master accounts, it would have said so directly. Respectfully, that is exactly backwards. As noted, Custodia undisputedly met all statutory eligibility criteria for a master account. Congress could not possibly have intended to grant Federal Reserve Banks broad discretion to invoke amorphous policy concerns to deny master accounts to nonmember institutions who meet all statutory eligibility criteria merely by omitting the word "all" from Section 248a(c)(2). If anything would qualify as finding an elephant in a mousehole, it is inferring from the omission of that single word a sweeping, discretionary policy-making power respecting who may be given master accounts.

Second, the district court emphasized a congressional enactment that postdated Judge Bacharach's opinion—a December 2022 provision in the National Defense Authorization Act. J.A.1470 (discussing provision). That provision requires the Board to identify all entities that apply for master accounts and to note

whether each application was approved, rejected, pending, or withdrawn. *Id.* But it does not by its terms or fair implication confer any new power on Federal Reserve Banks or the Board to deny master accounts to disfavored institutions for broad policy reasons. To the contrary, as the provision's author Senator Pat Toomey explained, it demands transparency about the Fed's decision-making on master accounts. *See* J.A.542 (explaining, "[t]he purpose of the Amendment was understood by those involved in its drafting to relate exclusively to increasing transparency surrounding the master account application process, and not to augment or otherwise comment on the substantive authority or discretion of the Board, or the regional Federal Reserve Banks [] to approve or reject master account applications"). The provision sought to hold the Federal Reserve System "*more accountable* . . . not to opine on any preexisting authority Congress may have given to them." J.A.553-554.

Amicus will not further elaborate on Custodia's powerful legal arguments. Amicus will instead provide critical context for understanding both the importance of the banking services that banks like Custodia offer and the serious harms that befall institutions in Custodia's position when they are denied access to the national banking system through master accounts. Amicus will also explain the unwisdom of the Federal Reserve's new policies that seek to exile digital asset entities and the financial institutions that serve them. Given the enormous and growing amount of

investment in and usage of digital assets, treating financial institutions that serve entities in the industry as pariahs will increase consumer costs, place such institutions at an unfair competitive disadvantage, and increase long-run systemic risk to the banking system. Although the Federal Reserve purports to be driven by safety and soundness, its new approach has the opposite effect, depriving millions of digital asset users of safe banking options—while stifling the growth of much-needed competition. By uniformly designating digital assets as unsafe, the federal banking regulators disincentivize federally regulated banks from serving customers who either hold digital assets or operate businesses in the digital asset ecosystem. It would be much sounder for the Federal Reserve to simply do what the law unambiguously commands: bring financial institutions such as Custodia into the national banking system by giving them access to the benefits of, and subjecting them to the correlative responsibilities of, that system. And if the Monetary Control Act (MCA) "is a poor fit for modern" payment services as applied to the digital asset industry, "the solution is for Congress" to either revise the MCA or "enact a distinct" framework for the industry. *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. --, 2024 WL 3237691, at *14 (July 1, 2024) ("[T]he ball is in Congress' court.").

**ARGUMENT**

## I. Digital Assets Are An Established Part of the Nation's Financial System.

### A. Digital Asset Investment and Usage are Widespread and Increasing.

Digital asset usage is spreading, implicating ever more consumers and a more significant portion of the economy. Globally, digital asset market capitalization stands at $2.58 trillion,[10] and there are roughly 575 million digital asset users,[11] representing over 7 percent of the world's population.[12] In the United States, digital assets are even more pervasive; surveys indicate that between 17 and 21 percent of

---

[10] Armaan Joshi, *Why is the Crypto Market Rising Today?*, Forbes (June 10, 2024), https://www.forbes.com/advisor/in/investing/cryptocurrency/why-is-crypto-going-up/.

[11] *2023 Year in Review & 2024 Year Ahead*, Crypto.com (Dec. 12, 2023), https://crypto.com/research/2023-review-2024-ahead (roughly 575 million global crypto users as of November 2023).

[12] U.S. Census, *World Population Clock* (July 2, 2024), https://www.census.gov/popclock/world.

Americans have used digital assets[13]—as compared to just one percent who had used

bitcoin, the primary digital asset, as of 2015.[14]

Further evidencing digital assets' widespread adoption, numerous businesses

accept payment in digital assets. "Overstock.com, PayPal, and Microsoft all began

to accept Bitcoin as a form of payment in 2014." Zachary Miller, *The Right Side of*

*the Coin*, 45 Seton Hall Legis. J. 807, 808 (2021). A survey released in 2020

revealed that "[a]t least one-third of U.S. small and medium-sized businesses accept

cryptocurrency as payment for goods and services."[15] And through companies like

BitPay, digital asset users can spend those assets directly at hundreds of large,

nationwide retailers.[16]

---

[13] Thomas Franck, *One in Five Adults has Invested in, Traded or Used Cryptocurrency* (March 31, 2022), https://www.cnbc.com/2022/03/31/cryptocurrency-news-21percent-of-adults-have-traded-or-used-crypto-nbc-poll-shows.html#:~:text=One%20in%20five%20Americans%20has,at%20a%20rate%20of%2050%25; Michelle Faverio & Olivia Sidoti, *Majority of Americans Aren't Confident in the Safety and Reliability of Cryptocurrency* (April 10, 2023), https://www.pewresearch.org/short-reads/2023/04/10/majority-of-americans-arent-confident-in-the-safety-and-reliability-of-cryptocurrency/.

[14] Aaron Smith & Monica Anderson, *New Modes of Payment and the 'Cashless Economy'* (Dec. 19, 2016), https://www.pewresearch.org/internet/2016/12/19/new-modes-of-payment-and-the-cashless-economy/.

[15] *HSB Survey Finds One-Third of Small Businesses Accept Cryptocurrency*, Business Wire (Jan. 15, 2020), https://www.businesswire.com/news/home/20200115005482/en/HSB-Survey-Finds-One-Third-of-Small-Businesses-Accept-Cryptocurrency.

[16] Merchant Directory (last visited July 2, 2024), https://bitpay.com/directory/.

SEC, too, has accommodated this widespread interest in digital asset investment and usage. In 2022, SEC approved the listing and trading of two bitcoin futures exchange-traded products (ETPs)—one on NYSE Arca, *see* Teucrium Order, 87 Fed. Reg. 21,676 (Apr. 12, 2022), and one on the Nasdaq, *see* Valkyrie Order, 87 Fed. Reg. 28,848 (May 11, 2022). Following a successful challenge to an order denying a proposal to list a spot bitcoin ETP, *see Grayscale Investments, LLC v. SEC*, 82 F.4th 1239 (D.C. Cir. 2023), SEC approved numerous spot bitcoin and ether ETPs.[17]

### B. Banks Have Innovated to Meet Needs of Digital Asset Users.

The growth of digital assets has generated a need for associated banking services. Some banks, both in the U.S. and elsewhere, have attempted to meet those needs with specialized products while maintaining the security that all banking customers want and need.

Like owners of other assets, digital asset users need custody services, and some banks provide those. Wyoming SPDIs and banks can provide custodial services for digital assets, which are not depository liabilities or assets of the bank. Wyo. Stat. Ann. § 34-29-104. Under the Nebraska Financial Innovation Act,

---

[17] *See, e.g.*, Gary Gensler, Statement on the Approval of Spot Bitcoin Exchange-Traded Products ( Jan. 10, 2024), https://www.sec.gov/news/statement/gensler-statement-spot-bitcoin-011023; Ether-Based EPTs Order 2024 WL 2746091 (SEC May 23, 2024).

"digital asset depositories" and digital asset departments in existing banks can provide custody services for established digital assets and those issued by certain institutions. Neb. Rev. Stat. Ann. §§ 8-3014, 8-3024. BNY Mellon has worked to offer such services as well,[18] along with Citi,[19] US Bank,[20] BNP Paribas,[21] and Deutsche Bank.[22]

Digital asset customers may wish to use stablecoins, which are digital assets whose value is pegged to reference assets, like U.S. dollars.[23] Stablecoins may be used to purchase other digital assets, to protect savings in high-inflation economies,

---

[18] *BNY Mellon Launches New Digital Asset Custody Platform*, BNYMellon.com (Oct. 11, 2022), https://www.bnymellon.com/us/en/about-us/newsroom/press-release/bny-mellon-launches-new-digital-asset-custody-platform-130305.html.

[19] *Citi Develops New Digital Asset Capabilities for Institutional Clients*, citigroup.com (Sept. 18, 2023), https://www.citigroup.com/global/news/press-release/2023/citi-develops-new-digital-asset-capabilities-for-institutional-clients.

[20] *U.S. Bank Details New Cryptocurrency Offerings*, USBank.com (April 27, 2021), https://www.usbank.com/about-us-bank/company-blog/article-library/us-bank-details-new-cryptocurrency-offerings.html.

[21] *BNP Paribas Securities Services To Develop Digital Assets Custody Capabilities Through Partnerships With METACO and Fireblocks*, BNPParibas (July 20, 2022), https://securities.cib.bnpparibas/bnp-paribas-securities-services-to-develop-digital-assets-custody-capabilities-through-partnerships-with-metaco-and-fireblocks/.

[22] Emily Nicole, *Deutsche Bank Links With Swiss Crypto Firm for Custody Services*, Forbes (Sept. 14, 2023), https://www.bloomberg.com/news/articles/2023-09-14/deutsche-bank-links-with-swiss-crypto-firm-for-custody-services.

[23] Dan Ashmore, *An Introduction to Stablecoins*, Forbes (Aug. 17, 2022), https://www.forbes.com/advisor/investing/cryptocurrency/stablecoins/.

and for efficient international bank transfers.[24]  Virtually all stablecoin-regulation

proposals require that each stablecoin be 100% backed by high-quality liquid assets

held at a central bank or in government bonds.  *See, e.g.*, Fin. Stability Bd., *High-

Level Recommendations for the Regulation, Supervision and Oversight of Global

Stablecoin Arrangements* 11 (July 17, 2023), https://www.fsb.org/wp-content/

uploads/P170723-3.pdf; Lummis-Gillibrand Payment Stablecoin Act, S.4155, 118th

Cong. § 6(f) (2024); Neb. Rev. Stat. Ann. § 8-3009.  Nebraska permits digital asset

depositories and banks with digital asset departments to issue stablecoins.  Neb. Rev.

Stat. Ann. § 8-3024(2).

## II.    It Is Crucial That Customers And Industry Participants Have Access To Safe Banking Options.

In the words of the Federal Reserve, "[a]n efficient, effective, and safe U.S.

and global payment and settlement system is vital to the U.S. economy."[25]  The

Federal Reserve's payment services "keep cash, check, and electronic transactions

moving reliably through the U.S. economy on behalf of consumers, businesses, and

others participating in the economy."  *Id.* at 86.  Access to those services is as

important to digital asset industry participants as it is to other economic actors.

---

[24] *Id.*; *see* Bank of England, *What are stablecoins and how do they work?* (Nov. 6, 2023), https://www.bankofengland.co.uk/explainers/what-are-stablecoins-and-how-do-they-work?sf183447653=1.

[25] Federal Reserve System, *The Fed Explained* 85 (2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf.

### A. The Federal Reserve's Payment and Settlement Systems Were Designed to Make Secure, Reliable Transactions Widely Available.

The provision of secure and reliable payment and settlement systems is central to the Federal Reserve's function. Before the Federal Reserve Act of 1913, interbank payments of U.S. dollars within the United States were subject to exchange rates to cover the cost of shipping gold and currency, including interest lost during transit. Adam M. Gilbert *et al.*, *Creating an Integrated Payment System: The Evolution of Fedwire*, FRBNY Econ. Pol'y Rev. 1 (July 1997). Checks, too, often lost value. Before the Federal Reserve was created, "clearing checks in America was highly inefficient" because the "banking system consist[ed] of 25,000 independently chartered banks which were not permitted to operate across state lines." Christina Parajon Skinner, *Central Bank Digital Currency as New Public Money*, 172 U. Penn. L. Rev. 151, 170 (2023). As a result, "checks would frequently not be redeemed at par." *Id.*

The Federal Reserve Act of 1913 and the advent of the Federal Reserve's services enabled banks and their customers to make and receive payments without losing value. The Federal Reserve created the Gold Settlement Fund, Gilbert *et al.,* at 2, which was jointly owned by Federal Reserve Banks, Underhill Moore *et al.*, *Drawing Against Uncollected Checks: II*, 45 Yale L.J. 260, 276 (1935). Ownership in the fund was "transferred from one bank to another by mere entries in the records,"

*id.*, permitting commercial banks to transact "through book-entry transfers" and obviating the need to ship currency, Gilbert *et al*., at 2. In 1918, the Leased Wire System permitted these transfers to be effected by telegraph, and the service now known as Fedwire was born. Stephen Quinn & William Roberds, *The Evolution of the Check as a Means of Payment*, 93 Fed. Rsrv. Atlanta Econ. Rev. No. 4 at 17 (2008).

Moreover, "Sections 13 and 16 of the Federal Reserve Act authorized the Fed to directly enter the check clearing business." Quinn & Roberds, at 18; *see* 12 U.S.C. § 342 ("Any Federal reserve bank may receive from any of its member banks, or other depository institutions … checks … payable upon presentation."); 12 U.S.C. § 360 ("Every Federal reserve bank shall receive on deposit at par from depository institutions … checks," and "[t]he Board of Governors of the Federal Reserve System shall, by rule, fix the charges to be collected by the depository institutions from its patrons whose checks … are cleared through the Federal reserve Bank."). By the 1920s, the Fed dominated the check-clearing industry; "[s]ettlement of checks cleared through the Fed was free to member banks, prompt, and at par," and "[n]onmember banks were also eligible to use the Fed's services (so long as they agreed to open settlement accounts and to clear at par)." Quinn & Roberds, at 18.

Congress made clear in 1980, via the MCA, that it intended the Federal Reserve's payment and settlement services to be available to all eligible institutions.

In the 1970s, high interest rates caused low membership in the Federal Reserve; member banks had higher reserve requirements and—unlike nonmember institutions—they could not keep those reserves in interest-bearing accounts. Julie Andersen Hill, *From Cannabis to Crypto*, 109 Iowa L. Rev. 117, 167 (2023). This, in turn, affected the Fed's ability to influence money supply and monetary policy. *See id.* In the MCA, Congress mandated that all depository institutions meet federally established reserve requirements—and that they would in return gain access to the Federal Reserve's services via master accounts. *See id.* at 168-70 (reviewing legislative history and concluding that "[t]here is little doubt that Congress intended that all depository institutions would be able to use the Federal Reserve's payment systems"). Thus arose the requirement that "[e]ach depository institution shall maintain reserves against its transaction accounts as the Board may prescribe by regulation solely for the purpose of implementing monetary policy," 12 U.S.C. § 461(b)(2)(A)—and the corresponding requirement that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions," 12 U.S.C. § 248a(c)(2), from which Federal Reserve Banks "may receive" deposits, 12 U.S.C. § 342.

### B. Federal Reserve Master Accounts Provide Safety for Banks and Their Customers.

A master account enables a financial institution to access a number of crucial Federal Reserve services, including:

**Settlement of debit and credit entries between institutions.** Master account are settlement accounts that permit financial institutions to quickly and securely discharge their financial obligations to one another.[26] Settlement in central bank money—that is, through accounts held at central banks like Federal Reserve Banks—is the safest form of settlement.[27] A master account is required to access Federal Reserve settlement services.[28]

**Check services.** Through the Federal Reserve's check services, a financial institution enables its customers to securely deposit checks drawn on accounts at other institutions, and to draw checks on their own accounts for deposit at other institutions.[29] A financial institution needs access to a Federal Reserve master account to use these services.[30]

---

[26] *See* Federal Reserve, *Unpacking Clearing and Settlement*, https://www.frbservices.org/financial-services/fednow/instant-payments-education/unpacking-clearing-and-settlement.html (last visited Jun. 18, 2024).

[27] *See* Bank for International Settlements & International Organization of Securities Commissions, *Principles for Financial Market Infrastructures* 67 (Apr. 2012), https://www.bis.org/cpmi/publ/d101a.pdf.

[28] *See* Federal Reserve Financial Services, *FRB Operating Circular No. 1* §§ 2.2, 2.3 (Sept. 1, 2023) (Operating Circular No. 1), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf.

[29] *See* Federal Reserve Financial Services, *FRB Operating Circular No. 3* § 12.0 (March 18, 2024), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/031824-operating-circular-3.pdf.

[30] *See id.* § 13.1.

**Fedwire Funds Service.**  Financial institutions can use Fedwire for "critical, time-sensitive transactions," with secure, irrevocable settlement in real time.[31]  A master account is required to use Fedwire.[32]

**FedACH Services.**  Using the Fed's ACH system, a financial institution can facilitate ACH payments and use the Fed's ACH risk-monitoring services.[33]  These services are not available without access to a master account.[34]

**FedNow.**  Introduced in July 2023, FedNow is an interbank payment system that permits financial institutions to "transfer money for their customers … quickly and securely."[35]  An institution cannot use FedNow without access to a master account.[36]

---

[31] *Fedwire Funds Service*, https://www.frbservices.org/binaries/content/assets/crsocms/financial-services/wires/funds.pdf (last visited Jun. 18, 2024).

[32] Operating Circular No. 1, *supra*, § 2.1 n.3.

[33] *See* Federal Reserve Financial Services, *FRB Operating Circular No. 4*, Appendix E (Jan. 2, 2024), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/010224-operating-circular-4.pdf.

[34] *See id.* § 2.4.

[35] Board, *Federal Reserve announces that its new system for instant payments, the FedNow® Service, is now live* (July 20, 2023), https://www.federalreserve.gov/newsevents/pressreleases/other20230720a.htm.

[36] *See* Federal Reserve Financial Services, *FRB Operating Circular No. 8* § 7.2-7.4 (April 22, 2024), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/042224-operating-circular-8.pdf.

**Securities transfers.**  The Fedwire Securities Service provides a "secure and reliable electronic environment"[37] for the issuance, maintenance, transfer, and settlement of certain securities.[38]  This service is inaccessible without access to a master account.[39]

While industry participants like Custodia can access the Federal Reserve payments system through a correspondent bank, the interposition of a middleman dilutes or eliminates the safe-banking features that inhere in a master account.  The Federal Reserve permits a master account holder to "agree to act as a Correspondent and allow its Master Account to be used to settle certain transactions and service fees" for another financial institution.[40]  But partnering with a correspondent bank "imposes additional costs and counterparty credit risk, injects settlement risk[,] … and exposes institutions to existential risks if the correspondent bank terminates the relationship."  J.A.1452; *see infra* at 28.  Moreover, not all of the Federal Reserve's services are available through partner banks.  For example, Fedwire—which carries,

---

[37] *Fedwire® Securities Service*, https://www.frbservices.org/binaries/content/assets/crsocms/financial-services/securities/securities-product-sheet.pdf (last visited Jun. 18, 2024).

[38] Federal Reserve Financial Services, *FRB Operating Circular No. 7* §§ 9.0, 10.0 (2024), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/050124-operating-circular-7.pdf

[39] *Id.* §§ 5.1.2, 5.1.3.

[40] Operating Circular No. 1, *supra*, § 2.7.

on average, over $4 trillion daily[41]—is accessible only by institutions with their own master accounts.[42]  In other words, financial institutions without master accounts cannot, even through partnerships, access the same level of security and reliability available to master account holders.

### C.  Digital Asset Industry Participants Need Safe Banking Options.

Like other participants in the national economy, digital asset customers and industry participants need the security and reliability that inheres in Federal Reserve master accounts.

Digital assets are at the heart of a growing, innovative industry.  There are thousands of digital-asset-related companies in the United States,[43] all of which need to pay their employees and their bills, and to receive payment for their services.  If financial institutions like Custodia are denied access to master accounts, however, digital-asset-connected businesses are hobbled in their ability to perform those basic business tasks.[44]  Moreover, the customers of digital-asset-related companies, like

---

[41] Federal Reserve, *Fedwire® Funds Service - Monthly Statistics* (June 27, 2024), https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/monthly-stats.html.

[42] *See* Operating Circular No. 1, *supra*, § 2.1 n.3.

[43] CrunchBase, *U.S. Cryptocurrency Companies* https://www.crunchbase.com/hub/united-states-cryptocurrency-companies.

[44] *See* Ensign & Benoit, *supra*.

other investors, need ways to buy into and cash out of digital assets—and thus need reliable ties to the established financial system.[45]

The inability to open master accounts also poses existential threats. *See* J.A.1452. Absent direct access to master accounts, banks serving digital asset customers are subject to increased costs: Partnering with banks that *do* have master accounts imposes additional fees that drive up digital asset banks' operating expenses and threaten their profitability. This ultimately harms customers, who inevitably shoulder part of the increase. Worse still, partnering with other banks makes digital asset banks vulnerable to debanking. Should a partner bank elect to close a digital-asset-involved bank's account, that institution—and its customers— are out in the cold.

## III. "Debanking" Has Left Industry Participants Like Custodia With Fewer Banking Options.

Despite the digital asset industry's pressing need for banking services, federal regulators have waged a concerted, coordinated campaign to debank the industry. That effort is central to a complaint recently filed against FDIC by an affiliate of

---

[45] Yuegi Yang, *Crypto Needs Banks More Than Banks Need Them*, Bloomberg, (Feb. 7, 2023), https://www.bloomberg.com/news/newsletters/2023-02-07/crypto-needs-banks-more-than-banks-need-them.

Coinbase, the United States' largest, and only publicly-traded, digital asset trading platform,[46] and is widely acknowledged in the financial sector.[47]

The debanking effort has been building for years. On November 18, 2021, OCC issued informal guidance curtailing the ability of national banks and federal savings associations to engage with digital assets.[48] Interpretive Letter 1179 "clarified" that—despite earlier guidance permitting regulated banks to "provide cryptocurrency custody services," "hold dollar deposits serving as reserves backing stablecoins," "act as nodes" in digital asset networks "to verify customer payments," issue stablecoins, and exchange such stablecoins for fiat currency—banks already engaged in these activities had to notify OCC, and those wishing to begin these activities first needed to obtain OCC permission.[49]

---

[46] *See generally* Complaint, *History Assocs. Inc. v. FDIC*, No. 24-cv-1857 (D.D.C. Jun. 27, 2024), ECF No. 1.

[47] *See, e.g.*, Ensign & Benoit, *supra*; FDIC OIG, *FDIC Strategies Related to Crypto-Asset Risks* 13 (Oct. 2023) (OIG Report), https://www.fdicoig.gov/sites/default/files/reports/2024-02/EVAL-24-01-Redacted_0.pdf (noting feedback from "the banking and crypto-asset industries … that financial regulators have been cutting off crypto firms from accessing the banking system and stifling innovation").

[48] *Interpretive Letter #1179, supra*.

[49] *Id.* at 1-2 (citing *Interpretive Letter #1170, supra*; OCC, *Interpretive Letter #1172* (Sept. 21, 2020), https://occ.gov/topics/charters-and-licensing/interpretations-and-actions/2020/int1172.pdf; OCC, *Interpretive Letter #1174* (Jan. 4, 2021), https://www.occ.gov/news-issuances/news-releases/2021/nr-occ-2021-2a.pdf).

FDIC also took action to curtail its supervised institutions' digital-asset-related activities—action that, per the OIG, "cause[d] uncertainty for supervised institutions."[50] Between March 2022 and May 2023, FDIC issued letters to an unknown number of FDIC-regulated institutions asking them to "pause all crypto asset-related activities," or "not proceed with any crypto-asset activity."[51] On April 7, 2022, FDIC also issued a financial institution letter requesting, similarly to OCC, that regulated institutions notify FDIC of any preexisting participation in digital-asset-related activities and give advance notice of any plans to do so.[52] And on August 16, 2022, the Board likewise instructed the banking organizations it regulates to notify the Federal Reserve of any ongoing or planned digital-asset-related activities.[53]

SEC, too, made it more difficult for financial institutions to engage with digital assets. In Staff Accounting Bulletin 121, issued in April 2022, SEC required reporting entities providing digital asset custody services to record those holdings as

---

[50] OIG Report, *supra*, at 8.

[51] *Id.* at 11 (quoting letters). These letters are now the subject of a lawsuit by an affiliate of Coinbase, Inc. *See* Complaint, *History Assocs. Inc. v. FDIC*, *supra*.

[52] FDIC, *Notification of Engaging in Crypto-Related Activities* (April 7, 2022), https://www.fdic.gov/news/financial-institution-letters/2022/fil22016.html#letter.

[53] Letter SR 22-6, *supra*.

liabilities on their balance sheets,[54] affecting those entities' creditworthiness and financial ratios and creating more risk to customers who, in the case of a bankruptcy, would have their custodied assets held up in bankruptcy proceedings. SAB 121 not only departs from Generally Accepted Accounting Principles (GAAP), but creates accounting disparities between digital assets and other types of assets. Given that SEC failed to put SAB 121 through the notice-and-comment process, SAB 121 was the subject of an overwhelmingly bipartisan repeal under the Congressional Review Act[55]—but President Biden vetoed the resolution,[56] and SAB 121 stands.

The federal government's anti-digital-asset efforts crystalized in early 2023, beginning with a statement issued jointly by the Federal Reserve, OCC, and FDIC on January 3, 2023.[57] The policy statement emphasized the agencies' "significant safety and soundness concerns with business models that are concentrated in crypto-

---

[54] *See* Staff Accounting Bulletin No. 121 ("SAB 121"), 87 Fed. Reg. 21,015, 21,017 (Apr. 11, 2022).

[55] *House Passes H.J.Res. 109 with Bipartisan Support to Overturn SEC's SAB 121*, House Financial Services Committee (May 8, 2024), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID= 409250.

[56] Joseph R. Biden Jr., *Message to the House of Representatives on the President's Veto of H.J.Res. 109* (May 31, 2024), https://www.whitehouse.gov/briefing-room/ presidential-actions/2024/05/31/a-message-to-the-house-of-representatives-on-the-presidents-veto-of-h-j-res-109/.

[57] *Joint Statement*, *supra*.

asset-related activities or have concentrated exposures to the crypto-asset sector."[58] On January 27, 2023, the White House issued a statement discouraging Congress from "enact[ing] legislation that … deepens the ties between cryptocurrencies and the broader financial system."[59] The same day, the Federal Reserve released a policy statement discouraging state member banks from engaging in digital-asset-related activities.[60] Eleven days later, that policy statement was converted into a final rule without notice and comment. *See* 88 Fed. Reg. 7848 (Feb. 7, 2023). And on February 23, 2023, the three banking agencies issued another joint statement on digital assets, this one highlighting "liquidity risks associated with crypto-assets and crypto-asset sector participants."[61]

The regulatory blitz has not been entirely above board. Senator Toomey, then ranking member of the Senate Committee on Banking, Housing, and Urban Affairs, received reports in 2022 from whistleblowers and affected parties that FDIC was attempting to "deter banks from doing business with lawful cryptocurrency-related"

---

[58] *Id*. at 2.

[59] *The Administration's Roadmap to Mitigate Cryptocurrencies' Risks*, *supra*.

[60] *Policy Statement on Section 9(13) of the Federal Reserve Act,* https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20230 127a2.pdf.

[61] *Id*. at 1.

companies.[62]  FDIC reportedly asked banks to "refrain from expanding relationships with crypto-related companies, without providing any legal basis" and discouraged banks from "extending credit to crypto-related companies."[63]

Custodia's case is illustrative of how regulators' hostility to the digital-asset-banking industry operates in practice.  On January 27, 2023—the same day the White House and the Board issued anti-digital-asset policy statements—FRBKC denied Custodia's master account application.  *See* J.A.1453.[64]  And as Custodia's CEO testified to a Select Committee of the Wyoming Legislature, Custodia's partner banks—on which Custodia, lacking a master account, must rely to clear U.S. dollar payments for its customers—received private pressure from federal regulators to disassociate from Custodia.[65]  As a result, Custodia has twice had its accounts closed, leading to substantial costs, delays, and disruption to its ability to serve its customers.[66]

---

[62] U.S. Senate Committee on Banking, Housing, and Urban Affairs, Letter to Acting FDIC Chairman Gruenberg at 1 (Aug. 16, 2022), https://www.banking.senate.gov/imo/media/doc/toomey_letter_to_fdic_re_ whistleblower_reports.pdf.

[63] *Id*. at 1.

[64] That same day, FRBKC and the Board also moved to dismiss the instant suit. J.A.397.

[65] Testimony of Caitlin Long, *supra*, at 1.

[66] *Id*.; *see also Wyoming Legislature Select Committee* (May 21, 2024), https://www.youtube.com/live/9KCZOfCeSOc?t=5594s (one of these debankings "impacted 1,500,000 lines of code").

The facts of Custodia's case are, unfortunately, far too common. Banks that partnered with financial technology (fintech) firms were the subject of a disproportionate share of enforcement actions by federal regulators in 2023 and the first quarter of 2024.[67] For the estimated 149 fintech-focused banks that partnered with fintech during that period, the odds of drawing a formal enforcement order were five to eight times higher than for the roughly 4406 non-partner banks.[68]

The banking industry, predictably, has reacted to the pressure by retreating from digital assets. In 2023, Circle, "a key third party payments processor for the industry," announced that it would "stop processing ACH and wire payments for all of [its] partner companies."[69] Banks have closed even the personal accounts of individual employees of digital asset businesses.[70] Regulators have effectively made digital assets "toxic" for banks, rendering the servicing of such clients not worth the

---

[67] Konrad Alt, *Who's been toughest on fintech partner banks recently – the OCC, Federal Reserve, or FDIC?* Klaros Group (Apr. 22, 2024), https://www.klaros.com/post/who-s-been-toughest-on-fintech-partner-banks-recently-the-occ-federal-reserve-or-fdic.

[68] The Federal Reserve initiated formal enforcement action on fintech partners five times more often than on nonpartner banks. For OCC, that figure was nearly six times; for FDIC, it was over eight times. *Id.*

[69] David H. Thompson, *et al.*, *Operation Choke Point 2.0* at 11, Cooper & Kirk, https://www.cooperkirk.com/wp-content/uploads/2023/03/Operation-Choke-Point-2.0.pdf.

[70] *Id.* at 12-13; Ensign & Benoit, *supra*.

regulatory trouble.[71]  "As a consequence, the only banks willing to touch crypto at this point are smaller, less risk-averse ones"[72]—and their willingness comes at a heavy cost.  In addition to regulatory scrutiny and the potential for improper regulatory pressure, banks willing to handle digital assets or to partner with firms that do may be labeled high risk.[73]  That label, in turn, would make providing service more difficult and costly, such as through higher FDIC premiums, 12 C.F.R. §§ 327.4(a), 327.10.

Federal regulators' actions would appear to be little more than an ill-conceived form of protectionism.  Regulators' approach to the digital asset industry as a whole, and its treatment of Custodia in particular, stifles emerging competition to traditional banking alternatives.  Banks like Custodia are harmed, of course, but the ultimate loser is the customer:  By prohibiting new banks from serving digital asset customers and by erecting regulatory walls to prevent existing banks from doing so, regulators have left a growing share of the population without safe banking options—all in the name of "safety and soundness."[74]

---

[71] *See* Ensign & Benoit, *supra*; Nic Carter, *Operation Choke Point 2.0 Is Underway, And Crypto Is In Its Crosshairs* (Feb. 8, 2023) (Carter), https://www.piratewires.com/p/crypto-choke-point.

[72] Carter, *supra*.

[73] *Id.*

[74] *E.g.*, *Joint Statement, supra*, at 2.

**IV.    Bringing The Digital Asset Industry Inside The Regulatory Perimeter Will Reduce Risk To The Financial System And Better Protect Consumers And The Public Interest.**

As evidenced by the number of digital asset users and digital assets' market capitalization, *see supra* at 11-12, digital assets and related businesses are here to stay.  Rather than being ostracized and debanked, participants in the digital asset industry should be welcomed into the economic fold and regulated like similar economic actors.  Although the technology is new, the digital asset financial system does not solely rely on intermediaries and is therefore more resistant to risks faced by the traditional financial system.  But, to the extent such risks exist, financial regulators have tools to account for and mitigate them.  Applying those tools to the digital asset industry, as full participants in the national economy, would enable regulators to reduce the risks—for both the industry and the broader financial system of which the industry is an inexorable part.

Custodia is a prime example of a responsible entity that is already highly regulated and should be permitted inside the federal regulatory guardrails.  Wyoming officials consulted extensively with the Board and FRBKC while crafting the SPDI framework, J.A.675, and chartered SPDIs like Custodia are subject to regular examination by the Wyoming Division of Banking, *see* Wyo. Stat. Ann. § 13-12-119, using a supervisory examination manual built directly on—and incorporating large portions of—"existing bank supervisory manuals from the Federal Financial

Institutions Examination Council, Federal Reserve Board, and Office of the Comptroller of the Currency."[75]  As a bank that already meets or exceeds exacting standards, Custodia is eager to operate within the perimeter of federal regulation—and it should be permitted to do so.

## CONCLUSION

The decision below should be reversed, and the Court should order that Custodia's application for a master account be granted.

Dated:  July 3, 2024

Respectfully submitted,

*Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Kathleen Foley
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500E
Washington, DC 20001
Tel: (202) 220-1100
*donald.verrilli@mto.com*

*Attorneys for Amicus Curiae*

---

[75] Wyo. Div. of Banking, SPDI Examination Manuals (2021), https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view.

## <u>CERTIFICATE OF COMPLIANCE</u>

I, hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 6494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief amicus curiae complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: July 3, 2024                    By: _Donald B. Verrilli, Jr._
                                            Donald B. Verrilli, Jr.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)    the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Netskope v.114.0.11.2062 and Forcepoint One Endpoint v.23.11 Build 5662, and according to the program are free of viruses.

  DATED: July 3, 2024          By: _Donald B. Verrilli, Jr._
                             Donald B. Verrilli, Jr.

**<u>CERTIFICATE OF SERVICE</u>**

I, hereby certify that on July 3, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: July 3, 2024            By: <u>*Donald B. Verrilli, Jr.*</u>
                                           Donald B. Verrilli, Jr.