No. 24-8024

## UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

CUSTODIA BANK, INC.,

*Appellant*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, ET AL.,
*Appellees*.

Appeal from the U.S. District Court for the District of Wyoming
Honorable Scott W. Skavdahl, District Judge
Civil Case 1:22-CV-00125-SWS

## BRIEF OF THE WYOMING SECRETARY OF STATE
## AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT

ORAL ARGUMENT NOT REQUESTED

COLIN R. CROSSMAN

118 East 3rd Avenue
Cheyenne, WY 82001
(307) 207-3900
colin@crc32.com

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES.......................................................... ii

STATEMENT OF INTEREST ....................................................... 1

SUMMARY OF ARGUMENT......................................................... 2

ARGUMENT ....................................................................... 4

I.    Access to the Federal Reserve System for Eligible Non Member Depository Institutions is Statutorily Mandated........................................... 4

II.   The Creation of a Public Database of Master Account Applications Cannot Support the Power to Deny an Application ......................................... 8

III.  The District Court's Interpretation Harms Wyoming, and Grants the Federal Reserve Unilateral Authority to Abandon a Key Tenant of State Sovereignty Without Congressional Approval ................................................. 12

CONCLUSION .................................................................... 15

CERTIFICATE OF SERVICE....................................................... 17

CERTIFICATE OF COMPLIANCE .................................................. 18

CERTIFICATE OF DIGITAL SUBMISSION .......................................... 19

# TABLE OF AUTHORITIES

## Cases

*Cantero, et al. v. Bank of America, N.A.*, 602 U.S. ____ (2024) ............. 1, 3, 10, 12

*Craig v. Missouri*, 28 U.S. (4 Pet.) 410 (1830) ......................................... 5

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017)................................................................. 4, 5, 9

*Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019)................................. 4

*Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) ...................... 10

## Constitutional Provisions

U.S. Const. Art. I, Sec. 10, Cl. 1 ................................................................. 5

## Statutes

12 U.S.C. § 248a.................................................................................... 2, 4, 6

12 U.S.C. § 248c.................................................................................... 8, 10, 11

12 U.S.C. § 342 ..................................................................................... 6

Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (Mar. 31, 1980) ......................................... 13

## Rules

Fed. R. App. P. 29(a).............................................................................. 1

# STATEMENT OF INTEREST

"The United States maintains a dual system of banking, made up of parallel federal and state banking systems. That dual system allows privately owned banks to choose whether to obtain a charter from the Federal Government or from a state government."[1]

The dual banking system of the United States dates to the National Bank Act of 1863, with the modern instantiation arising from the 1913 Federal Reserve Act. Throughout the years, various other statutes have served to adjust and modify the system, but have always delicately preserved the dual banking system, explicitly eschewing field preemption and respecting the dual sovereignty afforded under the Constitution.

Fundamental to the existence of the dual banking system is access to the Federal Reserve system. The District Court's decision opens the door to unrestricted executive authority to dismantle the dual banking system and should not stand.

Accordingly, *amicus* Wyoming Secretary of State Chuck Gray files this brief in support of Appellants under Federal Rule of Appellate Procedure 29(a).[2] Secretary Gray has been charged by the Wyoming Constitution and Legislature with overseeing Wyoming's business registration framework. He also has a distinct

---

[1] *Cantero, et al. v. Bank of America, N.A.*, 602 U.S., ____ at *1-2 (2024).

[2] Statement under FRAP 29(a)(4)(E): No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person – other than amici, their members, and their counsel – contributed money intended to fund preparing or submitting this brief. This brief is filed with the consent of all parties.

interest in ensuring Wyoming's authority under our federal constitutional system is preserved and respected.

## SUMMARY OF ARGUMENT

The Federal Reserve's interpretation of 12 U.S.C. § 248a(c)(2) lacks legal or linguistic rigor, ignores the plain language of the statutes, and has the net effect of impinging on the State of Wyoming's authority under our federal constitutional system by allowing the Federal Reserve to unilaterally, and without judicial oversight, second guess the State of Wyoming's bank chartering decisions.

The plain language of 12 U.S.C. § 248a(c)(2) unambiguously requires that "**all** Federal Reserve bank services covered by the fee schedule **shall be available** to nonmember depository institutions…," (emphasis added). This directive leaves no room for discretionary denial of access to eligible institutions. The District Court's interpretation, suggesting that the Federal Reserve can selectively grant access, ignores the mandatory "shall be available" language and misinterprets the statute's clear intent. If upheld, this interpretation would effectively grant the Federal Reserve veto power over the dual banking system and state sovereignty, a result clearly not intended by Congress.

Twelve U.S.C. § 248c is fundamentally a transparency measure, not a grant of discretionary authority. This provision was enacted to enhance oversight and accountability in response to opaque practices by the Federal Reserve. It is illogical

and contrary to legislative intent to construe this transparency requirement as an implicit authorization for arbitrary denial of applications.

The District Court's interpretation undermines the dual banking system by centralizing power within the Federal Reserve. This threatens state authority to innovate and regulate within their banking systems, effectively allowing *de facto* field preemption where Congress has explicitly declined to grant *de jure* field preemption. Such an interpretation grants the Federal Reserve sweeping, unaccountable control that could stifle competition and innovation in the banking sector. Moreover, it contradicts the recent Supreme Court decision in *Cantero*, which unanimously reaffirmed the United States' commitment to the dual banking system.

Wyoming's Special Purpose Depository Institution (SPDI) charter, under which Custodia Bank operates, represents a thoughtful approach to financial innovation. The argument for a novel discretionary power to protect against "lax" state regulation is hyperbolic and ignores the robust regulatory mechanisms already in place.

The decision of the District Court should be reversed.

## ARGUMENT

### I. Access to the Federal Reserve System for Eligible Non Member Depository Institutions is Statutorily Mandated

"All Federal Reserve bank services covered by the fee schedule **shall be available** to nonmember depository institutions..."[3]

The District Court wrestled with Judge Bacharach's opinion in *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052 (10th Cir. 2017) . Unfortunately, in this context, the wrestling done by the District Court is more accurately described as "professional" than Olympic.

Building on Judge Bacharach's linguistic exegesis[4], the most natural reading[5] of "all" in § 248a(c)(2) is as a universal collective, meaning "every single one" of the covered services. But the District Court's interpretation suggests that the Federal Reserve can selectively grant access to nonmembers, ignoring the mandatory "shall be available" language. This interpretation is inherently flawed. If we invert the language by replacing "all" with "no," the resulting phrase—"No ... services ... shall be available to nonmember depository institutions"—makes it unequivocally clear that the Federal Reserve would have no discretion to selectively *include* nonmembers. This inversion demonstrates that "all ... shall" must also be non-

---

[3] 12 U.S.C. § 248a(c)(2) (2012) (emphasis added).
[4] Unlike a situation where the bank is explicitly banking illicit activity. *See Fourth Corner* at 1066.
[5] *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019) (citing *United States v. Hohri*, 482 U.S. 64, 69 (choosing the most natural reading of statutory text)).

exclusionary, reinforcing that **all** services must be available to eligible non-member institutions without discretion or discrimination.

A similar analysis was made by Justice Marshall in the 1830 case *Craig v. Missouri.*[6] In that case, Justice Marshall was interpreting the Constitutional prohibition against States issuing bills of credit: "No State shall … emit Bills of Credit….":[7]

"The prohibition is general. It extends to *all* bills of credit, not to bills of a particular description."[8]

Nearly two and a half centuries ago, the Framers did not believe there was a need to include an extraneous "all" to be understood. States thus are not entitled to discretion in emitting, for example, secured bills of credit, simply due to an absence of a second "all".

As outlined extensively by Judge Bacharach in *Fourth Corner*, the services that the Federal Reserve banks must make available to the nonmember institutions require access to a master account. Further, and continuing to echo Judge Bacharach in *Fourth Corner*, the use of the term "all" when discussing the bank services that "shall" be available, also necessarily implies the conditions precedent to accessing those services.

---

[6] 28 U.S. (4 Pet.) 410 (1830).
[7] U.S. Const. Art. I, Sec. 10, Cl. 1
[8] *Supra* note 6, at 434 (emphasis added).

Twelve U.S.C. § 342 offers no succor to the District Court's analysis. Section 342 states that Federal Reserve Banks "may" receive certain deposits from depository institutions. This provision outlines certain types of deposits Federal Reserve Banks may collect, including deposits of checks, but it does not address or grant discretion over the issuance of master accounts, nor does it address many other services mandated by § 248a, including wire services. The District Court conflates operational discretion over certain types of deposits with the statutory mandate of service provision under § 248a(c)(2).

If the Federal Reserve Banks possess the power to arbitrarily deny access to a master account to an otherwise eligible nonmember entity, then they have arrogated to themselves the power to exercise a veto of the dual banking system.

The history of the Special Purpose Depository Institutions (SPDIs) charter used by Custodia is rooted in a well-constructed and thoroughly considered framework designed to balance innovation with regulatory oversight, and is intended to fully function within the dual banking framework. The creation of the Wyoming SPDI legislation was the result of extensive legislative and regulatory efforts. This initiative included numerous public hearings, expert consultations, and significant input from both state and federal regulators.[9]

---

[9] *See* Brief of Senator Christopher Rothfuss and Representative Jared Olsen as *Amici Curiae* in Opposition to Defendants' Motions to Dismiss, (D. Wyo. May 30, 2024) ECF No. 89, *5.

The Wyoming Legislature worked closely with the Federal Reserve and other federal agencies throughout the development of the SPDI framework, holding over 100 meetings with these entities to ensure that the resulting legislation would be both innovative and compliant with federal regulatory standards.[10] This extensive collaboration led to meaningful changes in the draft legislation. For instance, and to our deep regret, a provision allowing the Wyoming Attorney General to file a civil action against the Federal Reserve was removed *at the request of the Kansas City Fed*.[11] Such a detailed and collaborative process underscores the fact that the SPDI legislation was neither rushed nor poorly considered.

Custodia Bank successfully navigated the SPDI chartering process under extreme scrutiny, resulting in their state charter being granted. The Wyoming Division of Banking subjected Custodia to the rigorous evaluation process outlined in the SPDI legislation, including public hearings and extensive reviews of their business model, internal controls, and risk management strategies. The Division of Banking's thorough examination and subsequent approval of Custodia's SPDI

---

[10] J.A.675–76.

[11] Kansas City Fed talking points, (D. Wyo. May 30, 2024) ECF No. 240-7, *2 ("We suggest remove the requirement for the attorney general of the State of Wyoming to sue the Federal Reserve Bank on behalf of a private commercial entity in bill section 13-12-107.")

charter further demonstrate the legitimacy and soundness of both Custodia's business operations and the SPDI framework itself.[12]

Now, the Federal Reserve Bank, after determining that Custodia is eligible, is second guessing both the Wyoming Legislature and Banking Commission, and impermissibly inserting its judgement above the sovereign determination of the State of Wyoming.

## II. The Creation of a Public Database of Master Account Applications Cannot Support the Power to Deny an Application

The creation of a public database of master account applications, as mandated by 12 U.S.C. § 248c, is fundamentally an additional transparency measure, rather than an affirmation or conferment of discretionary authority to deny applications for reasons other than legal eligibility or illegality of activities. The legislative history and the statute's explicit language emphasize this objective.[13] Congress aimed to illuminate the master account application process, ensuring accountability and openness, particularly in light of their past opaque practices that engendered uncertainty and mistrust.[14]

---

[12] *See* Wyoming Division of Banking, Special Purpose Depository Institution Examination Manuals (Version 1.0, January 2021) https://drive.google.com/file/d/14dA8hrR59aGsKZYxAolWQ7dVr32cr_Vw/view, accessed June 30, 2023.

[13] *See, generally,* J.A. 547, Brief of Amicus Curiae Former Senator Patrick J. Toomey in Support of Neither Party (D. Wyo. Apr. 20, 2023) ECF No. 151.

[14] *See Toomey on Fed's New Master Account Proposal: More Transparency Needed*, United States Senate Committee on Banking, Housing, and Urban Affairs,

The assertion that the Federal Reserve Banks possess discretionary authority to grant or deny master accounts, based on the requirement to maintain a public database indicating application statuses, misinterprets the statute's purpose. The statutory requirement to disclose whether an application was "approved, rejected, pending, or withdrawn" does not confer discretionary power; rather, it serves to document the outcomes of the application process. For instance, tracking the results of entities which may initially appear legally eligible, but which may be discovered to be legally ineligible during the review process (for example, if their activities would violate other Federal laws).[15] This transparency mechanism aims to ensure that stakeholders, including Congress and the public, have access to comprehensive

_____

Minority Press Releases (published November 4, 2022, accessed June 30, 2024) available at: https://www.banking.senate.gov/newsroom/minority/toomey-on-feds-new-master-account-proposal-more-transparency-needed; Steven T. Dennis, *Toomey Demands Answers From Kansas City Fed on Fintech's Account*, Bloomberg, https://www.bloomberg.com/news/articles/2022-06-09/toomey-demands-answers-from-kansas-city-fed-on-fintech-s-account (June 9, 2022 at 3:00 am, accessed June 30, 2024); Andrew Ackerman, *Kansas City Fed Rescinds Master Account for Payments Firm, GOP Senator Says*, Wall Street Journal, https://wsj.com/articles/kansas-city-fed-rescinds-master-account-for-payments-firm-gop-senator-says-11654765201 (June 9, 2022 at 5:00 am, accessed June 30, 2024); *Waters Announces Committee Victories in 2023 National Defense and Authorization Act*, U.S. House Committee on Financial Services, Democrats, https://democrats-financialservices.house.gov/news/documentsingle.aspx?DocumentID=410000 (December 8, 2022, accessed June 30, 2024).

[15] *See, i.e. Fourth Corner* at 1058 (discussing the banking of illicit activity); *and Fourth Corner* at 1066 (further discussing the banking of illicit activity).

information about the decision-making processes of the Federal Reserve Banks and whether they are acting in conformity to the law.

It is well taken that "Congress 'does not . . . hide elephants in mouseholes.' "[16] It borders on the absurd to suggest that Congress intended to grant the Federal Reserve the unilateral authority to arbitrarily exercise the authority to second guess a State's bank chartering decision in a statute that otherwise is clearly intended to function in a non-discriminatory manner. Such is Congress' prerogative alone, and as *Cantero* made clear a few weeks ago, the dual banking system is still alive and well.[17]

The Federal Reserve and the District Court also place much faith in the presence of the word "rejected," and read into that the existence of discretion. "By its own terms, the word 'rejected' says nothing of the underlying reasons animating such an action—and there is no dispute that master account applications may be denied for certain legal reasons, for instance, when the institution applying is not statutorily eligible."[18]

The legislative context in which 12 U.S.C. § 248c was enacted further supports its interpretation as a pure transparency measure and not a covert grant of

---

[16] J.A. 1472 (quoting *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001)).
[17] *See generally, Cantero, supra* note 1.
[18] J.A. 553.

discretionary authority. The legislative debates and consultations preceding its enactment underscored a pressing need for increased oversight and disclosure, driven by cases where the application process lacked clarity and consistency. The history of § 248c indicates that it was precipitated by inappropriate actions of the Federal Reserve itself.[19] This prompted a legislative response aimed at enforcing openness rather than somehow expanding the fundamental scope of the Federal Reserve Banks' authority.[20]

Thus, the establishment of a public database should be understood as a tool to promote transparency, enhance oversight, and ensure accountability. It is not an implicit endorsement of discretionary authority to deny master account applications. The statutory language, legislative history, and principles of statutory interpretation collectively support this view, affirming that the database's creation serves to inform and scrutinize rather than to empower discretionary rejection of applications.

---

[19] "One item Senator Toomey sought specifically from the Board during this period was a listing of each institution holding a master account; the Board refused several times to provide this information. Writing to Senator Toomey in June 2022, Chair Powell echoed the Kansas City Fed, asserting that 'information regarding which institutions have requested or maintain master accounts is considered confidential business information of the requestors and the Reserve Banks . . . [which] the Federal Reserve does not disclose . . . publicly.' In an interview on Bloomberg TV at the time, Senator Toomey expressed that the Board took 'a position that they're not accountable to anyone,' including the Congress." J.A. 556-7 (internal citations omitted).
[20] *Id.*

It is rather bold, and inappropriate, for the Kansas City Federal Reserve Bank and the Federal Reserve Board of Governors to claim that a regulation put in place to shed light on their own historic deficiencies and abuses somehow authorizes them to have *more* discretion.

## III.    The District Court's Interpretation Harms Wyoming, and Grants the Federal Reserve Unilateral Authority to Abandon a Key Tenant of State Sovereignty Without Congressional Approval

As was recently, and unanimously, reaffirmed by the Supreme Court in *Cantero*, the United States maintains a dual banking system. That system has been constructed to preserve the dual sovereignty of States and the Federal systems. By allowing the Federal Reserve to selectively grant or deny access to master accounts, the District Court's decision threatens to grant the Executive branch the power to unilaterally deploy a *de facto* field preemption, where Congress has explicitly declined to grant *de jure* field preemption.[21]

Under the current status quo, access to the Federal Reserve system is functionally the only way to effect final settlement of any United States Dollar transaction (with the sole exception of using physical cash notes). The District Court's interpretation implicitly, *and explicitly*, invites the Federal Reserve to exercise this discretion to relegate state-chartered institutions to the sidelines of our

---

[21] *See Cantero, supra* note 1, at *5 ("To begin, Dodd-Frank ruled out field preemption. §25b(b)(4) (federal banking law 'does not occupy the field in any area of State law').")

economy, *even where eligibility is undisputed*.[22] This discretion, if unchecked, would undermine the dual banking system by centralizing power and decision-making authority within the Federal Reserve, contrary to the legislative intent behind the Depository Institutions Deregulation and Monetary Control Act of 1980 and other Federal statutes preserving the dual system.

The Federal Reserve, as quoted in the District Court's decision, states that "'The Wyoming Division of Banking ('WY DOB') has many purposes and aims, but protecting the *national* financial system and implementing *national* monetary policy are not among them.'"[23] This entirely ignores the States' dual authority under the dual banking system to cultivate, promote, and regulate depository institutions of their own in a safe and sound manner. The essence of the dual banking system is that states can serve as laboratories of innovation, developing new banking models and regulatory frameworks that can benefit the entire financial system.[24]

The District Court's interpretation grants the Federal Reserve a sweeping, unaccountable level of control, allowing it to undermine state authority and

---

[22] *See* J.A. 1473.

[23] *Id.*, citing Defendant Federal Reserve Bank of Kansas City's Reply in Support of Its Cross-Motion for Summary Judgment (D. Wyo. Feb. 23, 2024) ECF No. 310, pp. 13-14, J.A. 2116-2117 (emphases in original, citations omitted).

[24] *See* J.A. 887, Deposition of Esther George, (when asked if she has "[r]espect for the way Wyoming Banking Commission went about supervising their charter banks," Ms. George responded "Yes. We worked closely together in the supervision of our State-chartered banks.").

innovation, and effectively nullifying the dual banking system without Congressional approval. The implications of this interpretation are profound. This centralization of power would stifle competition, discourage innovation, and ultimately harm consumers who benefit from the diverse banking options provided by the dual system.

To quote a learned jurist "[a] better example of hiding an elephant in a mousehole would be difficult to find."[25]

---

[25] J.A. 1472.

## CONCLUSION

The overarching thrust of the District Court's sentiment seems to be that States cannot be trusted with their longstanding, historical, and widely recognized power to innovate in the financial sphere. The opinion states that "in that scenario, one can readily foresee a 'race to the bottom' among states and politicians to attract business by reducing state chartering burdens through lax legislation, allowing minimally regulated institutions to gain ready access to the central bank's balance sheet and Federal Reserve services."[26]

Wyoming is the birthplace of the Limited Liability Company, the first State to grant Women's Suffrage, and is now one of the first states to enact a balanced regulatory framework for SPDIs that both protects consumers[27] and promotes innovation in modern finance. Can the Federal Reserve say with a straight face that a 772-page bank examination manual[28] for SPDIs is really a "race to the bottom," especially while the Federal Reserve itself allows such activities to take place in other banks today *without adopting any standards for banks at all*? The Special Purpose Depository Institution is a highly engineered, fully reserved, innovative

---

[26] J.A. 1473.

[27] *See* Adam J. Levitin, *Not Your Keys, Not Your Coins Unpriced Credit Risk In Cryptocurrency*, 101 Tx. Law Rev. 877, 884 (2023) ("New York and Wyoming have special cryptocurrency specific regulatory regimes, but only Wyoming's little-used regime offers any real protection for exchange customers.").

[28] *See generally* Wyoming Division of Banking, Special Purpose Depository Institution Examination Manuals, *supra* note 12.

depository institution that is designed to be more secure and resistant to failure than any depository institution currently active under the Federal Reserve system.

Arguing that the Federal Reserve System needs to find this novel discriminatory power now, to protect itself from State regulators, is hyperbole, overstating the risks while ignoring the regulatory mechanisms already in place to mitigate such concerns.

This Court should reverse the District Court's judgment.

Dated: July 3, 2024

Respectfully submitted,

/s/Colin R. Crossman
COLIN R. CROSSMAN

118 East 3rd Avenue
Cheyenne, WY 82001
(307) 207-3900
colin@crc32.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/Colin R. Crossman
COLIN R. CROSSMAN

118 East 3rd Avenue
Cheyenne, WY 82001
(307) 207-3900
colin@crc32.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

1.   This document complies with the type-volume limit of Fed. R. App. P.
     29(a)(5)(G), (a)(5), and 32(a)(7), (g) because excluding the parts of the
     document exempted by Fed. R. App. P. 32(f) this document contains 3,333
     words, which is less than the maximum of 6,500 words.

2.   This document complies with the typeface requirements of Fed. R. App. P.
     32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because
     this document has been prepared in a proportionally spaced typeface using
     Microsoft Word in 14-point Times New Roman.

Dated:  July 3, 2024

/s/Colin R. Crossman
COLIN R. CROSSMAN

118 East 3rd Avenue
Cheyenne, WY 82001
(307) 207-3900
colin@crc32.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

> (1) all required privacy redactions have been made per 10th Cir. R. 25.5;

> (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

> (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, TotalAV for MacOS, and according to the program are free of viruses.

/s/Colin R. Crossman
COLIN R. CROSSMAN

118 East 3rd Avenue
Cheyenne, WY 82001
(307) 207-3900
colin@crc32.com

*Counsel for Amicus Curiae*