No. 24-8024

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

CUSTODIA BANK, INC.,

*Plaintiff-Appellant,*

v.

FEDERAL RESERVE BOARD OF GOVERNORS;
FEDERAL RESERVE BANK OF KANSAS CITY,

*Defendants-Appellees.*

On Appeal from the U.S. District Court for the District of Wyoming
No. 1:22-cv-125-SWS, Hon. Scott W. Skavdahl

## BRIEF FOR DEFENDANT-APPELLEE BOARD OF GOVERNORS
## OF THE FEDERAL RESERVE SYSTEM

## ORAL ARGUMENT REQUESTED

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel
Yvonne F. Mizusawa, Senior Counsel
Yonatan Gelblum, Senior Counsel
Katherine Pomeroy, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835

*Attorneys for Defendant-Appellee Board of
Governors of the Federal Reserve System*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF RELATED CASES ..................................................... xii

GLOSSARY .......................................................................................... xiii

INTRODUCTION .................................................................................... 1

STATEMENT OF THE ISSUE ................................................................. 2

STATEMENT OF THE CASE .................................................................. 2

I.     The Federal Reserve System and Master Accounts ........................ 2

II.    Custodia's Account Request .......................................................... 7

III.   Procedural History ........................................................................ 8

SUMMARY OF ARGUMENT ................................................................. 9

ARGUMENT .......................................................................................... 12

I.     The Federal Reserve Act Grants Reserve Banks Account
       Discretion ..................................................................................... 12

       A.    The FRA has always stated that Reserve Banks "may"
             receive deposits, not that they "shall" or "must" do so ......... 12

       B.    In the MCA, enacted in 1980, Congress reconfirmed
             Reserve Bank discretion .......................................................... 16

       C.    In 2022, Congress again enacted legislation consistent with
             Reserve Bank discretion .......................................................... 18

D.     Consistent with their FRA authority, Federal Reserve Banks have always considered risk when providing accounts and services to depository institutions ..................21

II.   Custodia's Theory of Absolute Entitlement to a Master Account Cannot Withstand Scrutiny ..........................................28

A.     Section 248a(c)(2), enacted as part of the MCA, is a fee-setting principle; it does not support Custodia's absolute-entitlement theory ...............................................28

B.     Custodia's attempts to ignore the plain text of Section 248a(c)(2) do not withstand scrutiny ......................34

C.     In addition to the court below, two other district courts have rejected an absolute-entitlement theory .....................39

D.     Reserve Banks must be allowed to consider risks, and nothing about our dual-banking system requires them to abdicate this responsibility ................................................43

III.  Custodia's Additional Arguments Are Immaterial........................49

A.     The Board did not deny Custodia's account request ............49

B.     Constitutional arguments raised in passing have no bearing on Custodia's absolute-entitlement claim and are not before the Court.................................................................................59

CONCLUSION ..........................................................................................64

STATEMENT REGARDING ORAL ARGUMENT.................................66

STATUTORY AND REGULATORY ADDENDUM ..............................A1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

Page

## Cases

*7-Eleven, Inc. v. National Union Insurance Co. of Pittsburgh, Pa.*,
   33 F. App'x 703 (5th Cir. 2002) ...................................................... 31

*Andresen v. Maryland*,
   427 U.S. 463 (1976) ..................................................................... 31

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank of
   New York*, 700 F. Supp. 3d 86 (S.D.N.Y. 2023) .................. 34, 42–43

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..................................................................... 55

*Biden v. Texas*,
   597 U.S. 785 (2022) ..................................................................... 13

*Billings Utility Co. v. Advisory Committee Board of Governors*,
   135 F.2d 108 (8th Cir. 1943) ......................................................... 14

*BonBeck Parker, LLC v. Travelers Indemnity Co. of America*,
   14 F.4th 1169 (10th Cir. 2021) ...................................................... 60

*Cantero v. Bank of America, N.A.*,
   144 S. Ct. 1290 (2024) ............................................................ 45–46

*Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*,
   111 F.3d 1485 (10th Cir. 1997) ................................................. 51, 56

*Cherry v. USDA*,
   13 F. App'x 886 (10th Cir. 2001) .................................................... 54

*Colorado Farm Bureau Federation v. U.S. Forest Service*,
   220 F.3d 1171 (10th Cir. 2000) ................................................. 51, 53

iii

*Custis v. United States,*
    511 U.S. 485 (1994) ........................................................................ 17

*Custodia v. Federal Reserve Board of Governors,* No. 22-cv-125,
    2022 WL 18401268 (D. Wyo. Dec. 12, 2022) ................................. 57

*DHS v. MacLean,*
    574 U.S. 383 (2015) ........................................................................ 36

*Farmers & Merchants Bank v. Federal Reserve Bank of Richmond,*
    262 U.S. 649 (1923) ........................................................ 9, 13–16, 41

*Florida Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ........................................................................ 57

*Forest Grove School District v. T.A.,*
    557 U.S. 230 (2009) ........................................................................ 17

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City,*
    861 F.3d 1052 (10th Cir. 2017) .................................................. 39–41

*Fowler v. Stitt,*
    104 F.4th 770 (10th Cir. 2024)....................................................... 62

*Free Enterprise Fund v. PCAOB,*
    561 U.S. 477 (2010) ........................................................................ 61

*Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York,*
    866 F.2d 38 (2d Cir. 1989)............................................................. 31

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983) ........................................................................ 17

*In re Cooper Tire & Rubber Co.,*
    568 F.3d 1180 (10th Cir. 2009) ..................................................... 58

*In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litigation,*
    1 F. Supp. 3d 34 (E.D.N.Y. 2014)................................................... 4

iv

*In re McDaniel,*
    973 F.3d 1083 (10th Cir. 2020) ...................................................... 32

*In re TD Bank, N.A.,*
    150 F. Supp. 3d 593 (D.S.C. 2015) .................................................. 4

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta,*
    713 F.2d 1221 (6th Cir. 1983) ............................................. 30–31, 48

*Kansas ex rel. Schmidt v. Zinke,*
    861 F.3d 1024 (10th Cir. 2017) ...................................................... 55

*Loughrin v. United States,*
    573 U.S. 351 (2014) ........................................................................ 36

*Martin Marietta Materials, Inc. v. Kansas DOT,*
    810 F.3d 1161 (10th Cir. 2016) ...................................................... 64

*Merit Management Group, LP v. FTI Consulting, Inc.,*
    138 S. Ct. 883 (2018) ...................................................................... 30

*Miami Tribe of Oklahoma v. United States,*
    198 F. App'x 686 (10th Cir. 2006) .................................................. 55

*Milner v. Dep't of Navy,*
    562 U.S. 562 (2011) ........................................................................ 38

*Mooring Capital Fund, LLC v. Knight,*
    388 F. App'x 814 (10th Cir. 2010) .................................................. 61

*Navajo Nation v. Dalley,*
    896 F.3d 1196 (10th Cir. 2018) ...................................................... 33

*Nelson v. United States,*
    40 F.4th 1105 (10th Cir. 2022) ................................................ 37, 40

*Northpark National Bank v. Bankers Trust Co.,*
    572 F. Supp. 520 (S.D.N.Y. 1983) .................................................. 31

*PayServices Bank v. Federal Reserve Bank of San Francisco*,
    No. 1:23-cv-305, 2024 WL 1347094
    (D. Idaho Mar. 30, 2024) ............................................... 16–17, 41–42

*Pennington v. Northrop Grumman Space & Mission Systems Corp.*,
    269 F. App'x 812 (10th Cir. 2008) .................................... 62

*Raichle v. Federal Reserve Bank of New York*,
    34 F.2d 910 (2d Cir. 1929) ............................................... 14

*Rios v. Ziglar*,
    398 F.3d 1201 (10th Cir. 2005) ....................................... 58

*Roberts v. Sea-Land Services, Inc.*,
    566 U.S. 93 (2012) .......................................................... 36

*Russello v. United States*,
    464 U.S. 16 (1983) .......................................................... 36

*Salt Lake Tribune Publishing Co. v. Management Planning, Inc.*,
    390 F.3d 684 (10th Cir. 2004) ......................................... 46

*Sebelius v. Auburn Regional Medical Center*,
    568 U.S. 145 (2013) ........................................................ 19

*Sinclair Wyoming Refining Co., LLC v. EPA*,
    72 F.4th 1137 (10th Cir. 2023).................................... 51, 55

*Smith v. United States*,
    508 U.S. 223 (1993) ........................................................ 32

*Total Aviation Services, Inc. v. United Jersey Bank*,
    626 F. Supp. 1087 (E.D.N.Y. 1986).................................. 31

*Town of Castle Rock, Colorado v. Gonzales*,
    545 U.S. 748 (2005) ........................................................ 64

*Tufaro v. Oklahoma ex rel. Board of Regents of University of Oklahoma*,
   107 F.4th 1121 (10th Cir. 2024)................................................61–62

*Turner Brothers, Inc. v. Conley*,
   757 F. App'x 697 (10th Cir. 2018)....................................................60

*U.S. Fidelity & Guaranty Company v. Federal Reserve
   Bank of New York*, 590 F. Supp. 486 (S.D.N.Y. 1984)...................26

*United States v. Ackerman*,
   831 F.3d 1292 (10th Cir. 2016) ......................................................63

*United States v. Cusumano*,
   83 F.3d 1247 (10th Cir. 1996) ........................................................59

*United States v. Polk*,
   61 F.4th 1277 (10th Cir. 2023)......................................................19

*United States ex. rel. McLennan v. Wilbur*,
   283 U.S. 414 (1931) ........................................................................58

*Zobrest v. Catalina Foothills School District*,
   509 U.S. 1 (1993) ............................................................................60

## Statutes

5 U.S.C. § 551(13) .................................................................51, 53

5 U.S.C. § 704 .............................................................................50

5 U.S.C. § 706 .............................................................................57

12 U.S.C. § 24(first)–(seventh cl. 1) ...........................................3

12 U.S.C. § 248.............................................................................34

12 U.S.C. § 248(j) ..........................................................................5

12 U.S.C. § 248a .......................................................................28–34, 39, 41

12 U.S.C. § 248a(a) ........................................................................................29

12 U.S.C. § 248a(c) .............................................................................31–32, 36–37

12 U.S.C. § 248a(c)(1) ...................................................................................32

12 U.S.C. § 248a(c)(2) .................. 10, 28–29, 31–32, 34–35, 37, 40, 42–43

12 U.S.C. § 248a(c)(3) .............................................................................30, 32

12 U.S.C. § 248a(c)(4) ...................................................................................32

12 U.S.C. § 248c ............................................................................................20

12 U.S.C. § 248c(b)(1) ..............................................................................10, 18

12 U.S.C. § 248c(b)(1)(B) .............................................................................20

12 U.S.C. § 248c(b)(1)(C) .........................................................................18, 20

12 U.S.C. § 301 ...............................................................................................3

12 U.S.C. § 321 .............................................................................................13

12 U.S.C. § 321 *et seq.* ...................................................................................7

12 U.S.C. § 341(first-seventh) .......................................................................4

12 U.S.C. § 341(fifth) ...............................................................................61, 63

12 U.S.C. § 341(sixth) .....................................................................................3

12 U.S.C. § 341(seventh) ...........................................................................3, 63

12 U.S.C. § 342 ........ 2, 4–5, 9–10, 12–13, 15–17, 29, 33, 38, 40–42, 49, 52

12 U.S.C. § 343..................................................................2

12 U.S.C. § 347..................................................................2

12 U.S.C. § 347c................................................................2

12 U.S.C. § 347d................................................................2

12 U.S.C. § 348................................................................15

12 U.S.C. § 355(1) ..............................................................2

12 U.S.C. § 461(b)............................................................20

12 U.S.C. § 461(b)(1)(A)....................................................20

28 U.S.C. § 2412(b) ..........................................................37

U.C.C. § 3-102(c) ..............................................................27

U.C.C. § 4-103(b)..............................................................27

U.C.C. § 4A-107 ...............................................................27

Wyo. Stat. § 34.1-3-102(c)................................................27

Wyo. Stat. § 34.1-4-103(c)................................................27

Wyo. Stat. § 34.1-4.A-107 ................................................27

Banking Act of 1935, Pub. L. No. 74-305,
     49 Stat. 684................................................................23
     § 201, 49 Stat. 684, 703–04 ........................................23

Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq*, ....2, 4, 10, 12, 20–21
     ...................................................................................33, 63
     Pub. L. No. 63-43, §§ 9, 13, 38 Stat. 251, 259, 263 ............12–13, 33
     Pub. L. No. 65-25, § 4, 40 Stat. 232, 234–35 ..................21

Monetary Control Act of 1980, Pub. L. No. 96-221,
    94 Stat. 132 ....................................................................2, 16–17, 28
    § 1, 94 Stat. 132 ................................................................16
    § 105(a)(1), 94 Stat. 132, 139 .........................................16
    § 107, 94 Stat. 132, 141 ..................................................30

## Regulatory Materials

Guidelines for Evaluating Account and Services Requests,
    86 Fed. Reg. 25,865 (May 11, 2021) (Proposal) ...........................5–6
    87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice) ............5
    87 Fed. Reg. 51,099 (Aug. 19, 2022) (Guidelines) ............5–7, 20, 27

Policy Statement Regarding Risks on Large-Dollar
    Wire Transfer Systems,
    50 Fed. Reg. 21,120 (1985) .......................................................24–25

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law:
    The Interpretation of Legal Texts* (2012) ............................16, 19, 38

Board of Governors of the Federal Reserve System, Reserve
    Maintenance Manual, https://www.federalreserve.gov/monetary
    policy/reserve-maintenance-manual-account-structure.htm ..........4

Board of Governors of the Federal Reserve System, Minutes of Board
    Meeting (July 26, 1945) https://fraser.stlouisfed.org/files/
    docs/historical/nara/bog_minutes/19450726_Minutes.pdf ............24

Board of Governors of the Federal Reserve System,
    Federal Reserve Bulletin (February 1964)
    https://fraser.stlouisfed.org/title/federal-reserve-bulletin-
    62/february-1964-21350 .................................................................24

Chester Morrill, Secretary, Board of Governors of the Federal Reserve
    System, *Nonmember Bank Clearing Accounts*, Letter X-9187
    (April 26, 1935), https://fraser.stlouisfed.org/archival-collection/

mimeograph-letters-statements-board-4957/letter-secretary-
morrill-re-nonmember-bank-clearing-accounts-505912 .......... 22–23

Federal Reserve Bank Operating Circular 1, Account Relationships
(Sept. 1, 2023) https://www.frbservices.org/binaries/content/
assets/crsocms/resources/rules-regulations/090123-
operating-circular-1.pdf ................................................................ 27

Federal Reserve Bank Operating Circular 1, Account Relationships
(Jan. 2, 1998) web.archive.org/web/20000116011948/
http://www.frbservices.org/Industry/pdf/Oc1.pdf ........................... 26

Federal Reserve Board, *Interstate Branching: New Account Structure*,
https://www.federalreserve.gov/generalinfo/isb/qanda.htm .......... 22

Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and
Payment Systems* (2022 draft) ........................................................ 28

Julie Andersen Hill, *Opening a Federal Reserve Account*,
40 Yale J. on Reg. 453 (2023) ......................................................... 27

Office of the Comptroller of the Currency, OCC Interpretive
Letter No. 1082, 2007 WL 5393636 (May 17, 2007) ........................ 4

S. 4356, 117th Cong. § 702(c) (2022) ...................................................... 19

*The Federal Reserve System, The Fed Explained* (11th ed. Aug. 2021)
https://www.federalreserve.gov/aboutthefed/files/the-fed-
explained.pdf#page=8 .......................................................... 2–3, 46

xi

## STATEMENT OF RELATED CASES

There are no prior or related appeals or petitions in this matter.

# GLOSSARY

Board – Board of Governors of the Federal Reserve System

Custodia – Custodia Bank, Inc.

FRA – Federal Reserve Act

FRBKC – Federal Reserve Bank of Kansas City

MCA – Monetary Control Act

## INTRODUCTION

This case presents a simple question: whether Federal Reserve Banks must provide a deposit account and corresponding services to each and every depository institution that requests one without giving any consideration whatsoever to the risks presented. Plaintiff-Appellant Custodia Bank, Inc. ("Custodia") has staked its entire case on an affirmative answer, advancing the extraordinary proposition that federal law requires Reserve Banks to ignore any and all risks to the Reserve Bank, the public, and the U.S. financial system—no matter how extreme they may be—and automatically provide deposit accounts to any entity with a state or territorial charter. But that is wrong. Nothing in the Monetary Control Act of 1980 or otherwise demands such a result, and it defies common sense, longstanding historical precedent, the Supreme Court's definitive interpretation of the Federal Reserve Act's text, and the growing consensus of federal courts to have considered the question.

The judgment of the district court—carefully considered, rendered on a fully developed record, and correct—should be affirmed.

1

## STATEMENT OF THE ISSUE

Whether the Monetary Control Act of 1980 eliminated Reserve Bank discretion under the Federal Reserve Act of 1913 to assess risk in providing deposit accounts and services.

## STATEMENT OF THE CASE

## I.    The Federal Reserve System and Master Accounts

The Federal Reserve System, the nation's central bank, was established in 1913 by the Federal Reserve Act, 12 U.S.C. § 221 *et seq.* ("FRA"). It consists of the Board of Governors of the Federal Reserve System ("Board"), the Federal Open Market Committee, and twelve regional Federal Reserve Banks that serve financial institutions in their respective districts. *See generally The Federal Reserve System, The Fed Explained* (11th ed. Aug. 2021) ("*The Fed Explained*").[1] Among their functions, Reserve Banks serve as "banks for banks," *id.* at 11, and are directly authorized by statute to provide various banking services. *See, e.g.*, 12 U.S.C. §§ 342, 343, 347, 347c, 347d, 355(1). The Board, a federal agency and not a bank, has neither the ability nor statutory

---

[1] *Available at* https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf#page=8.

authority to receive deposits or carry out activities such as check clearing, wire transfers, automated clearing house (ACH) services, and other functions appurtenant to the business of banking that Congress vested directly in the Reserve Banks. *Id.*

Consistent with the relevant statutory authorities, Reserve Banks necessarily exercise their banking functions with due consideration of attendant risks. *See, e.g.*, 12 U.S.C. § 341(sixth) (Reserve Bank "shall" have power to prescribe bylaws "regulating the manner in which its general business may be conducted"); § 341(seventh) (granting Reserve Banks "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter"); § 301 (Reserve Banks "*may*, subject to the provisions of law and the orders of the Board of Governors of the Federal Reserve System, extend to each member bank such discounts, advancements, and accommodations as *may be safely and reasonably made*" (emphases added)).[2]

---

[2] Notably, the powers of Federal Reserve Banks under the FRA were closely modeled on powers granted to national banks (which previously served some of the functions of Reserve Banks) under the National Bank Act, *compare, e.g.*, 12 U.S.C. § 24(first)–(seventh cl. 1), *with id.*

Reserve Banks accept deposits into "master accounts," which are deposit accounts maintained by depository institutions at individual Reserve Banks. A master account "is both a record of financial transactions that reflects the financial rights and obligations of an account holder and of the Reserve Bank with respect to each other, and the place where opening and closing balances are determined."[3] As deposit accounts, master accounts are governed by FRA Section 13, codified at 12 U.S.C. § 342 ("Section 13" or "Section 342"), which provides that "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions . . . deposits of current funds in lawful money." In providing "general supervision" of the activities of the Reserve Banks, the Board may issue guidance concerning master account access, but has no ability to open or

---

§ 341(first)–(seventh), and the power granted under the latter act "to receive deposits" has been construed as "discretionary." *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 611 (D.S.C. 2015) (quoting OCC Interp. Ltr. No. 1082, 2007 WL 5393636, at *2 (May 17, 2007)); *In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 45 (E.D.N.Y. 2014) (same). Risk assessment and mitigation is a necessary feature of operations at both types of banks.

[3] Reserve Maintenance Manual, https://www.federalreserve.gov /monetarypolicy/reserve-maintenance-manual-account-structure.htm.

4

terminate a master account and does not handle the administration of any institution's master account. *See* 12 U.S.C. §§ 248(j), 342.

Consistent with its general supervisory authority, the Board routinely issues guidance to Reserve Banks and issued guidance concerning Reserve Bank master accounts and services in August 2022 after two rounds of public notice and comment. *See* 87 Fed. Reg. 51,099, Guidelines for Evaluating Account and Services Requests ("Guidelines") (Aug. 19, 2022); 87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice); 86 Fed. Reg. 25,865 (May 11, 2021) (Proposal). The Guidelines established six principles[4] for use in access decisions and created a three-tiered review framework "meant to serve as a guide to the level of due diligence and scrutiny to be applied by Reserve Banks to different types of institutions." 87 Fed. Reg. at 51,109.

---

[4] The principles articulated in the Guidelines include legal eligibility considerations; whether the provision of an account or services presents or creates undue liquidity, credit, operational, settlement, cyber or other risks to the Reserve Bank, overall payment system, or stability of the U.S. financial system; whether such provision creates undue risk to the overall economy by facilitating illicit activity such as money laundering or terrorism financing; and that such provision should not adversely affect the Federal Reserve's ability to implement monetary policy. 87 Fed. Reg. at 51,107–09.

The three tiers are: "Tier 1: Eligible institutions that are federally insured"; "Tier 2: Eligible institutions that are not federally insured but are subject (by statute) to prudential supervision by a federal banking agency"; and "Tier 3: Eligible institutions that are not federally insured and are not considered in Tier 2." *Id.* at 51,109–10. With respect to Tier 3 (which includes Custodia), the Board observed that "detailed regulatory and financial information regarding Tier 3 institutions may not exist or may be unavailable," and, "[a]ccordingly, Tier 3 institutions will generally receive the strictest level of review." *Id.* at 51,110.

The policy goals animating the Guidelines include ensuring "the safety and soundness of the banking system" and "that Reserve Banks evaluate a transparent and consistent set of factors when reviewing requests for accounts and services." 86 Fed. Reg. at 25,866. The Guidelines make clear that "[d]ecisions on individual requests for access to accounts and services are made by the Reserve Bank in whose District the requestor is located," and, consistent with the FRA, that Reserve Banks "retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment,

granting access to the institution would pose risks that cannot be sufficiently mitigated." 87 Fed. Reg. at 51,102, 51,106.[5,6]

## II.    Custodia's Account Request

Custodia submitted its master account request to the Federal Reserve Bank of Kansas City ("FRBKC") in October 2020, and later initiated a separate application process to become a member bank of the Federal Reserve System in August 2021. J.A.408, 416 (Am. Compl.) ¶¶ 21, 47. FRBKC performed a pre-membership examination of Custodia in fall 2022 under Board-delegated authority.[7] J.A.979;

---

[5] Citations to the Joint Appendix are preceded by "J.A.," and to the Supplemental Joint Appendix by "S.J.A." Citations to the district court order, appended to Appellant's brief, are preceded by "A."

[6] The Board subsequently issued S-Letter 2677 on January 17, 2023 (the "S-Letter"), which implemented the Guidelines' expectation that "Reserve Banks engage in consultation with" the Board, "as appropriate, to support consistent implementation of the Account Access Guidelines." J.A.989–92, 1007. S-Letters are sequentially numbered letters issued by the Board that provide operational guidance to Reserve Banks on various matters such as Reserve Bank administration (*e.g.*, budget and audit) and provision of financial services.

[7] Unlike accounts and services, which are functions assigned by statute to Reserve Banks, membership is a Board function that may involve administrative delegation to Reserve Banks in appropriate circumstances. *See* 12 U.S.C. § 321 *et seq.*

S.J.A.1202. On October 21, 2022, FRBKC examiners provided feedback to Custodia from the pre-membership examination. S.J.A.1195. This feedback also informed FRBKC's master account decision in an effort to reduce burden and avoid duplicative inquiries. J.A.979. Among other findings, the examiners "identified numerous exceptions to, or departures from, safe and sound banking practices in Custodia's prospective risk management program compared to the risk management practices that would typically be expected or required." S.J.A.1195–96.

On January 27, 2023, the Board issued a detailed decision denying Custodia's application for Federal Reserve membership due to various failures to satisfy established membership criteria. *See* S.J.A.1109. FRBKC subsequently informed Custodia of its president's decision to deny the master account request along with a written explanation of the reasons for the decision. J.A.1120. Custodia did not challenge FRBKC's reasons for the account denial in this litigation. A.59.

## III.  Procedural History

In June 2022, Custodia filed suit seeking a decision on its master account request. J.A.41. After FRBKC denied the request, Custodia

8

amended its complaint in February 2023. J.A.401. The district court denied subsequent motions to dismiss by the Board and FRBKC and authorized discovery as to FRBKC. *See* J.A.23–25. After discovery and comprehensive briefing, the district court concluded on March 29, 2024, that "[t]he plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts." A.79. Custodia's appeal followed.

## SUMMARY OF ARGUMENT

1.    The district court correctly concluded that the FRA permits Reserve Banks discretion as to master accounts. As the district court held, master accounts are governed by authorities in the FRA directed to Reserve Banks, notably 12 U.S.C. § 342, which states that "[a]ny Federal reserve bank *may* receive from any of its member banks . . . deposits" (emphasis added). The Supreme Court interpreted the language "may receive" in the FRA to be "words of authorization merely." *Farmers & Merchs. Bank v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 662 (1923). In 1980, Congress amended Section 342 to indicate that Reserve Banks "may receive" deposits from "other depository institutions," but did not change the permissive language of

9

the provision. And in 2022, Congress required the creation of a database documenting whether every master account request "was approved, *rejected*, pending, or withdrawn." 12 U.S.C. § 248c(b)(1) (emphasis added). Congress's consistent legislative action accords with Reserve Bank practice: the historical record demonstrates that Federal Reserve Banks have considered risk in providing their accounts and services since the passage of the FRA in 1913.

**2.** Custodia cannot overcome the plain text of the FRA. While Custodia argues that 12 U.S.C. § 248a(c)(2) ("Section 248a(c)(2)") entitles all depository institutions to Reserve Bank accounts and services, that statute would not aid Custodia even if the specific deposit-taking discretion set forth in Section 342 did not exist. By its plain terms, Section 248a(c)(2) is a "principle" to be used by the Board (not by Reserve Banks) to set a "schedule of fees" for "services." *Id.* But even if this provision could be read as an access principle regarding deposit accounts, it means only that Reserve Bank services are available to nonmember banks *as a class*, not that such services must be provided to every nonmember bank that desires access. In addition to the decision below, two other recent district court decisions support the Board's

10

reading and properly rejected the atextual absolute-entitlement theory advanced by Custodia here. The FRA plainly permits Reserve Banks to conduct necessary risk management functions in providing accounts and services, and nothing about our dual-banking system imposes a discretionless, ministerial mandate to open a master account for each and every depository institution regardless of risk.

3.      Although ultimately immaterial to the resolution of this action, the district court appropriately dismissed Custodia's APA claim against the Board because Custodia failed to identify a "final agency action" by the Board. Custodia's claim of final agency action was premised on a Board email in which Board staff expressed "no concerns" with FRBKC "communicat[ing] to Custodia Bank its decision to deny [Custodia's master account] request." As the district court properly determined, that email does not meet the definition of "agency action" set forth in the APA, and is not actionable "final agency action." A.64.

Though Custodia also mentions two constitutional issues, both are immaterial and neither aids its case. Custodia abandoned its meritless Appointments Clause theory concerning FRBKC's directors. And

Custodia has no legally cognizable property interest in a master

account, as is necessary to assert a Due Process Clause claim.

## ARGUMENT

## I. The Federal Reserve Act Grants Reserve Banks Account Discretion

### A. The FRA has always stated that Reserve Banks "may" receive deposits, not that they "shall" or "must" do so

Custodia's central argument is that the FRA requires Federal

Reserve Banks to automatically grant master accounts to all depository

institutions without any consideration of risk. Br. at 2. This argument

is foreclosed by statutory authorities directed to Reserve Banks

including Section 342, which make clear that the receipt of deposits—

central to the function of a master account—is discretionary.

As first enacted in 1913, Section 342 provided that "[a]ny Federal

reserve bank *may* receive from any of its member banks . . . deposits."

Pub. L. No. 63-43 § 13, 38 Stat. 251, 263 (emphasis added).[8] "'[M]ay'

---

[8] *Available at* https://fraser.stlouisfed.org/title/federal-reserve-act-966. State-chartered banks became "member banks" in the Federal Reserve System by "mak[ing] application to the reserve bank organization committee, . . . and thereafter to the Federal Reserve Board for the right to subscribe to the stock of the [applicable] Federal reserve bank," and the Board could decide membership based upon "such rules and

does not just suggest discretion, it *clearly* connotes it," *Biden v. Texas*, 597 U.S. 785, 802 (2022) (quotation omitted), and Reserve Banks' discretion to receive deposits necessarily includes discretion to decline to receive deposits. Thus, while Reserve Banks are authorized to accept deposits—and therefore, to grant deposit accounts to depository institutions—the FRA does not require them to do so.

This reading is consistent with judicial interpretations of Section 342. Addressing this provision shortly after its enactment in 1913, the Supreme Court rejected an argument similar to Custodia's that "the Federal Reserve Bank of Richmond is obliged to receive for collection any check upon any North Carolina state bank." *Farmers & Merchs.*, 262 U.S. at 662. Interpreting Section 342's language that, "for the purposes of exchange or of collection," a Reserve Bank "may receive from any nonmember bank . . . deposits of . . . checks," the Court held that "neither [Section 342], nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection." *Id.* The Court noted that Congress had

_____

regulations as it may prescribe." Pub. L. No. 63-43 § 9, 38 Stat. at 259 (currently codified at 12 U.S.C. § 321).

13

occasionally enlarged "[t]he class of cases" to which the Reserve Banks'
authority under Section 342 applied, "[b]ut in each amendment, as in
[Section 342], the words used were 'may receive'—words of
authorization merely." *Id*.

The Court further observed that the FRA "appears to have been
drawn with great care. Throughout the act the distinction is clearly
made between what the [B]oard and the Reserve Banks 'shall' do and
what they 'may' do." *Id*. at 663. The Court listed twenty-one provisions
of the original FRA where both "may" and "shall" were used, and
another seven where only "shall" was used, to illustrate the precision
Congress took in distinguishing actions the Board or Reserve Banks
were allowed to take from those they were required to take. *Id*. at 663
n.6; *see also Billings Utility Co. v. Advisory Comm. Bd. of Governors*,
135 F.2d 108, 111 (8th Cir. 1943) (listing provisions of the FRA in which
Congress distinguished what a Reserve Bank "may" do from what it
"must" do, and holding that the "may" provisions "seem so clearly to be
permissive as to make any other construction of them by interpretation
or construction judicial legislation"); *Raichle v. Fed. Reserve Bank of
New York*, 34 F.2d 910, 914 (2d Cir. 1929) (noting that the words used

14

in the phrase "[a]ny Federal Reserve Bank may . . . discount notes, drafts, and bills of exchange" in 12 U.S.C. § 348, "are wholly permissive").

In its brief, Custodia does not bother to cite *Farmers & Merchants*—a Supreme Court opinion interpreting the key statutory provision in this case—much less take issue with its holding that the word "may" in Section 342 is permissive. Instead, Custodia argues that "Section 342 does not address who receives an account in the first place," and instead only "addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection." Br. at 42 (quotation omitted). But Custodia ignores that the permissive "may" in Section 342 addresses *both* whom Reserve Banks "may" accept deposits from and what deposits they "may" accept: "Any Federal reserve bank *may* receive *from* [specified classes of depositors] deposits *of* [specified monetary instruments]." 12 U.S.C. § 342 (emphases added). No principle of statutory interpretation permits ignoring a clause of the statute that a party deems to be inconvenient.

Thus, the unambiguous text of Section 342, as interpreted by the Supreme Court and courts of appeals shortly after passage of the FRA,

15

makes clear that Reserve Banks are authorized to accept deposits—and therefore open deposit accounts—but are not required to do so.

### B.   In the MCA, enacted in 1980, Congress reconfirmed Reserve Bank discretion

In 1980, Congress reaffirmed Reserve Bank discretion over deposit accounts. Specifically, Congress enacted the Monetary Control Act ("MCA"), Pub. L. No. 96-221, 94 Stat. 132 (1980), with the express purpose of "facilitat[ing] the implementation of monetary policy." MCA § 1, 94 Stat. at 132. To this end, the MCA amended Section 342 by adding "or other depository institution" after "member banks" to those entities from which Reserve Banks "may receive" deposits. MCA § 105(a)(l), 94 Stat. at 139. Yet the MCA did not change Section 342's permissive "may receive" language. Because the word "may" had already been "authoritatively interpreted by the highest court"—the Supreme Court in *Farmers & Merchants*—the 1980 MCA "perpetuating that wording is presumed to carry forward that interpretation." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012). Thus, in enacting the MCA, Congress "accepted and ratified" the Supreme Court's reading of "may receive" in Section 342 as discretionary. *PayServices Bank v. Fed. Reserve Bank of San Francisco*,

16

No. 1:23-cv-305, 2024 WL 1347094, at *6 (D. Idaho Mar. 30, 2024), *appeal docketed*, No. 24-2355 (9th Cir.); *cf. Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009) ("When Congress amended [the statute] without altering the text [at issue], it implicitly adopted [the Court's] construction of the statute."); *Custis v. United States*, 511 U.S. 485, 500 (1994) (Congress's choice to leave language interpreted by appellate courts "untouched" while amending a law "cannot be disregarded"); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 385–86 (1983) ("In light of [a] well-established judicial interpretation [of a statutory provision], Congress' decision to leave [the provision] intact suggests that Congress ratified [the interpretation].").

By ratifying that Reserve Banks "may" accept deposits from other depository institutions, Congress confirmed in 1980 that there was no inviolate right to a deposit account for any institution.[9]

---

[9] Custodia seizes on language from a 1998 Board publication indicating that the MCA is "the principal statute governing access to Federal Reserve services and, by extension, the types of institutions eligible to hold a Federal Reserve account." Br. at 42. Custodia further writes that "the MCA (not Section 342) governs master accounts." *Id.* Custodia is apparently unaware that the MCA is not distinct from Section 342, as the MCA accepted and ratified the discretionary language of Section 342 while also altering that provision to expand the institutions eligible to hold an account.

### C.    In 2022, Congress again enacted legislation consistent with Reserve Bank discretion

Congress recently enacted legislation recognizing that Reserve Banks may (and in fact do) deny requests for master accounts. In 2022, Congress amended the FRA to require that the Board "create and maintain a public, online, and searchable . . . list of every entity that submits an access request for a reserve bank master account and services" including whether a request "was approved, *rejected*, pending, or withdrawn." 12 U.S.C. § 248c(b)(1) (emphasis added). The statute further indicates that each entry on the list must specify whether the requesting entity was "an insured depository institution," "an insured credit union," or "a depository institution that is not an insured depository institution or an insured credit union." 12 U.S.C. § 248c(b)(1)(C). Thus, by its plain terms, the law specifically contemplates that requests for master accounts from "a depository institution that is not an insured depository institution"—a category that includes Custodia (J.A.414, 417 ¶¶ 40, 55)—may be "rejected."[10]

---

[10] In an amicus brief, a former Senator who sponsored the 2022 provision takes issue with the Board's characterization of it, stating that it was not meant to "augment or otherwise comment" on the ability

Though Congress was aware of this (and other) litigation, Custodia's claim that it had an inviolate right to a master account, and the Board's longstanding position to the contrary, *see* Former Senator Br. at 14, it notably did not revise Section 342 to direct that master accounts be granted to every institution that wants one. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 159 (2013) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (quotation omitted)).[11]

Faced with the language of the 2022 law recognizing that master

---

of Reserve Banks to reject master account requests. Former Senator Br. at 2. However, post-enactment statements of individual legislators are not an appropriate tool of statutory construction; Congress voted on the 2022 law, not on an unenacted amicus brief authored in 2024 by a former member of Congress. *See United States v. Polk*, 61 F.4th 1277, 1281 n.6 (10th Cir. 2023); *see also* Scalia & Garner, *supra*, at 29 ("In the interpretation of legislation, we aspire to be 'a nation of laws, not of men.' This means . . . giving no effect to lawmakers' unenacted desires.").

[11] Notably, some members of Congress introduced a bill in 2022 to change the permissive "may" in Section 342 to "shall," but that bill did not advance. *See* S. 4356, 117th Cong. § 702(c) (2022).

account requests by depository institutions may be "rejected," Custodia

argues that the "rejected" language refers to situations in which an

applicant does not meet "the statutory requirements of a master

account application, including legal eligibility." Br. at 45 n.22.[12] But the

2022 law mandates inclusion on the list for three categories of

institutions, all of which meet the threshold for legal eligibility.

12 U.S.C. § 248c(b)(1)(C); *see also* 87 Fed. Reg. at 51,107 (legally eligible

institutions "meet the definition of a depository institution under

section 19(b) of the Federal Reserve Act [12 U.S.C. § 461(b)]"); 12 U.S.C.

§ 461(b)(1)(A) (defining "depository institution" to include the same

categories of institutions set forth in 12 U.S.C. § 248c(b)(1)(C)). The law

then requires indicating whether requests from these eligible

institutions are "approved, rejected, pending, or withdrawn." 12 U.S.C.

§ 248c(b)(1)(B). Thus, Custodia's suggestion that "rejected" requests

must come from ineligible institutions cannot be squared with the plain

text of Section 248c.

---

[12] Custodia does not identify where "the statutory requirements for a
master account application" above and beyond legal eligibility may be
found.

20

Custodia's protestations notwithstanding, Congress's 2022 legislation appropriately confirmed that Reserve Banks necessarily exercise discretion in deciding master account requests and that a "rejected" application is a possible outcome for eligible depository institutions—just as "approved," "pending," and "withdrawn" applications are possible outcomes.

### D. Consistent with their FRA authority, Federal Reserve Banks have always considered risk when providing accounts and services to depository institutions

Consistent with Congress's repeated affirmation of Reserve Bank discretion as to deposit accounts—and the fundamental obligation to manage risk in providing accounts and services—the Federal Reserve Banks have considered risk in providing their banking services since the passage of the FRA in 1913.

In 1917, Congress amended Section 13 of the FRA to allow limited deposit-taking accounts "solely for the purposes of exchange or of collection" from "any nonmember bank or trust company." Pub. L. No. 65-25, § 4, 40 Stat. 232, 234–35.[13] In 1935, a Reserve Bank raised with

---

[13] These limited "exchange or collection" accounts established at Reserve Banks pursuant to Section 13 were referred to as "clearing

21

the Board "a question of policy with respect to the circumstances and conditions under which clearing accounts of nonmember banks should be accepted." Chester Morrill, Secretary, Bd. of Governors of the Fed. Reserve Sys., Letter X-9187 (Apr. 26, 1935), at 365.[14] The Board surveyed Reserve Banks, and many reported that they declined to open such accounts in various circumstances. For example, the Federal Reserve Bank of Dallas reported that "in considering an application from a nonmember bank to become a clearing member we simply weigh all the facts." *Id.* at 371. The Federal Reserve Bank of Minneapolis similarly indicated that it did not automatically open clearing accounts for all nonmember banks: "We have received a number of requests recently to open accounts for non-member banks for the purpose of

_____

accounts." Beginning in 1998, the Federal Reserve no longer used the term "clearing account" and incorporated these accounts into its revised "master account" structure. *See* Federal Reserve Board, *Interstate Branching: New Account Structure*, *available at* https://www.federalreserve.gov/generalinfo/isb/qanda.htm ("All credits and debits resulting from the use of Federal Reserve services will be booked to this one account."). This unified account structure was made possible by the MCA's revision of the FRA to permit general deposit accounts for nonmember depository institutions.

[14] *Available at* https://fraser.stlouisfed.org/archival-collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-nonmember-bank-clearing-accounts-505912.

depositing idle funds with us. . . . We have not accepted these accounts and have endeavored to restrict the accounts to active non-member clearing accounts." *Id.* at 369. And the Federal Reserve Bank of Philadelphia stated that, while it had opened accounts for nonmembers in the past, it had stopped doing so. The Board in no way required that Reserve Banks open these accounts and acknowledged that such decisions were left to the discretion of the Reserve Banks, stating that "it is the Board's view that requests for the establishment of clearing accounts by non-member banks should be passed upon by your directors *in the light of all the circumstances surrounding each application.*" *Id.* at 366 (emphasis added).[15]

In a unanimous 1945 response to a question from a depository institution concerning a "nonmember clearing account," the Board indicated that it "has not prescribed specific conditions or requirements which should or should not be made by a Federal Reserve Bank in connection with the opening and maintenance of nonmember clearing

---

[15] This reference to action by directors predates the Banking Act of 1935, Pub. L. No. 74-305, 49 Stat. 684, which created the position of Reserve Bank president to serve as "chief executive officer." *Id.* § 201, 49 Stat. 703–04.

accounts," but that a Federal Reserve Bank can "*in its discretion* accept[] such an account." Minutes of Board Meeting of July 26, 1945, at 2–3 (emphasis added).[16] In a similar vein, in 1964 the Board received an inquiry about whether U.S. branches of foreign banks and private banks were "nonmember banks" eligible to open clearing accounts at Reserve Banks pursuant to Section 13. *Federal Reserve Bulletin* (Feb. 1964), at 168–69.[17] In response, the Board noted that these entities were "nonmember bank[s]" eligible for a clearing account*,* but cautioned that *the opening of such accounts was subject to the "discretion" of the Federal Reserve Bank* whose district encompassed the institution. *Id.*

The Federal Reserve's exercise of discretion to protect the financial system did not change following the enactment of the MCA in 1980. For example, in 1985, the Federal Reserve adopted policies on overdrafts that limited some depository institutions' ability to send payments via Fedwire. *See Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems*, 50 Fed. Reg. 21,120 (1985). In the

---

[16] *Available at* https://fraser.stlouisfed.org/files/docs/historical/nara/bog_minutes/19450726_Minutes.pdf.

[17] *Available at* https://fraser.stlouisfed.org/title/federal-reserve-bulletin-62/february-1964-21350.

ordinary course of business, banks may incur negative balances in their
master accounts when processing funds transfers on behalf of their
customers. The Federal Reserve was concerned "that a participant could
be unwilling or unable to settle a large net debit position," and noted
that "[a] failure of one participant to settle could seriously jeopardize
the financial positions of its net creditors on that network, with serious
repercussions spreading from those participants to their creditors." *Id.*
at 21,121. To limit the risk of overdrafts, the Federal Reserve
reaffirmed that each Reserve Bank had the power "to reject funds
transferred" when those transfers "expose[d] the Reserve Bank to
excessive risk." *Id.* at 21,124. And, in certain cases, a Reserve Bank
could "prohibit [an institution] from using Fedwire." *Id.* Thus, an
institution's "access" to this service, which is among those identified in
the MCA, was explicitly conditioned on risk in accordance with the
authority provided by Congress in the FRA.

    In 1998, the Federal Reserve Banks began issuing circulars
governing the relationship between Reserve Banks and master account
holders. These circulars make clear that a master account involves a
contract between a depository institution and the Reserve Bank, *accord*

*U.S. Fidelity & Guar. Co. v. Fed. Reserve Bank of New York*, 590 F. Supp. 486, 492 (S.D.N.Y. 1984) (Reserve Bank "Operating Circulars are treated as contracts binding on parties"), and that the Reserve Bank can terminate the relationship at any time. For example, the 1998 OC-1 "establish[es] the terms for opening, maintaining, and terminating master accounts with the Federal Reserve Bank." Operating Circular 1, Account Relationships (Jan. 2, 1998) ¶ 1.1.[18] In addition, the Circular states that "*[a]ll master accounts* are subject to Reserve Bank approval," and notes that the Reserve Bank "may close your master account . . . at any time but will endeavor to give at least five business days' prior notice." *Id.* ¶¶ 2.3, 2.8 (emphasis added). Both of these provisions are substantively similar to the comparable provisions in the most recent operating circular, reflecting the longstanding practice in which decisions about all master accounts are made by Reserve Banks based

[18] *Available at* web.archive.org/web/20000116011948/http://www.frbservices.org/Industry/pdf/Oc1.pdf.

26

on their exercise of discretion. *See* Operating Circular 1, Account Relationships (Sept. 1, 2023) ¶¶ 1.0, 2.6, 2.10.[19]

More recently, the growth of novel charters and rise of uninsured depository institutions led the Board to undertake an effort to establish more formalized processes to manage risk through its Guidelines. The Guidelines make clear that "Reserve Banks . . . retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." 87 Fed. Reg. at 51,102; *see supra* at 5–7.[20]

---

[19] *Available at* https://www.frbservices.org/binaries/content/assets/ crsocms/resources/rules-regulations/090123-operating-circular-1.pdf. Reflecting their authoritativeness, certain parts of Federal Reserve Operating Circulars have been expressly incorporated into the Uniform Commercial Code and Wyoming law. *See, e.g.*, U.C.C. § 3-102(c) & Wyo. Stat. § 34.1-3-102(c); U.C.C. § 4A-107 & Wyo. Stat. § 34.1-4.A-107; U.C.C. § 4-103(b) & Wyo. Stat. § 34.1-4-103(c).

[20] Contra this extensive history, Custodia relies on a paper from law professor Julie Hill (now of the University of Wyoming College of Law) for the proposition that account opening is purely "ministerial." Br. at 14 (citing Julie Andersen Hill, *Opening a Federal Reserve Account*, 40 Yale J. on Reg. 453 (2023)). But an earlier version of the article posted by Professor Hill in 2022 stated otherwise, observing that "*since the passage of the [MCA], the Federal Reserve Board and Reserve Banks have evaluated risks associated with providing account and payment*

As this extensive historical record makes clear, Reserve Banks have always exercised discretion to make risk-based account and services decisions consistent with their statutory authority under the FRA.

## II. Custodia's Theory of Absolute Entitlement to a Master Account Cannot Withstand Scrutiny

### A. Section 248a(c)(2), enacted as part of the MCA, is a fee-setting principle; it does not support Custodia's absolute-entitlement theory

Custodia bases its absolute-entitlement theory on Section 248a, which was enacted as part of the MCA in 1980. Specifically, Custodia focuses on language in Section 248a(c)(2) stating that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions." But by isolating that clause and reading it out of context, Custodia ignores that it is expressly designated as a *principle to be used by the Board for setting fees* for services—not for determining whether any individual institution is entitled to a master account to access Reserve Bank services.

---

*services to individual banks.*" *See* Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (2022 draft), S.J.A.2, 44 (emphasis added).

28

Section 248a requires the Board to "publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services." *Id.* § 248a(a). The statute further states:

> The schedule of fees prescribed pursuant to this section shall be based on the following principles: . . . All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

*Id.* § 248a(c)(2). On its face, Section 248a(c)(2) accomplishes two things: (1) it indicates that, *in setting the fee schedule*, the Board must take into consideration the principle that Reserve Banks would be accepting deposits from, and offering corresponding services to, a larger universe of institutions that included nonmember depository institutions in accordance with the authorization in the MCA's modification of Section 342; and (2) it indicates that, *in setting the fee schedule*, the Board must take into consideration the principle that services provided to nonmember banks must be priced using the same fee schedule applicable to member banks.

29

Three aspects of this provision bear particular mention. *First*, the enacting Congress specifically indicated in the title of Section 248a and its codification that the purpose is to govern "Pricing of Services." MCA § 107, 94 Stat. 141; *see Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) (section headings "supply cues as to what Congress intended" (quotation omitted)). Indeed, courts construing Section 248a(c) shortly after passage of the MCA found that this provision concerned explicit and equitable pricing of services and not a mandate that such services be made available to each and every entity. *See, e.g.*, *Jet Courier Servs. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983) ("What is clear [from the MCA] is that the covered services offered by Federal Reserve Banks are to be priced explicitly, are to be made available to nonmember depository institutions at the same fees charged member banks, and that 'over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services.'" (quoting Section 248a(c)(3))).[21]

---

[21] Custodia cites *Jet Courier* and three other cases in support of its argument for mandatory access. Br. at 36. But none of these cases

*Second*, Section 248a(c) contains introductory language, followed by a colon, then four enumerated items in a list. When a list is preceded by prefatory language and a colon, the prefatory language limits the scope of what follows. *See, e.g.*, *Andresen v. Maryland*, 427 U.S. 463, 481 (1976) ("[an item in] a series that follows [a colon is] limited by what precedes that colon"); *7-Eleven, Inc. v. Nat'l Union Ins. Co. of Pittsburgh, Pa.*, 33 F. App'x 703, at *5 (5th Cir. 2002) ("[a colon preceding a list] tells [readers] that everything following the colon will deal exclusively with [what precedes it]"). Thus, each of the four items that follows the colon sets forth a "principle" for the Board to apply in setting the "schedule of fees." Neither Section 248a(c)(2), nor any of the

---

presented the question of what entities may access Reserve Bank accounts and services and at best observed that 12 U.S.C. § 248a required the Board to set uniform fees for Reserve Bank services. *See Jet Courier*, 713 F.2d at 1227 (noting that Section 248a "require[ed] the Board of Governors to adopt and publish a set of pricing principles and a proposed schedule of fees"); *Greater Buffalo Press, Inc. v. Fed. Reserve Bank of New York*, 866 F.2d 38, 40 (2d Cir. 1989) (indicating that the MCA expanded the types of customers to which Reserve Banks could provide financial services to include nonmember institutions); *Total Aviation Servs., Inc. v. United Jersey Bank*, 626 F. Supp. 1087, 1090 (E.D.N.Y. 1986) (stating that Section 248a requires Reserve Banks to collect fees for check processing services); *cf. Northpark Nat. Bank v. Bankers Tr. Co.*, 572 F. Supp. 520, 523 (S.D.N.Y. 1983) (incorrectly stating that the MCA allowed "member banks" to collect fees for check processing services from new categories of banks).

other three items, are principles about access to services or deposit accounts, but instead, as the prefatory language states, they are "principles" to apply in setting a fee schedule.

The purpose of Section 248a as setting requirements for fees, rather than for mandatory provision of services, is also reflected by the nature of the other items listed in Section 248a(c). The other three listed items relate solely to pricing, requiring explicit pricing, tying fees to actual costs and interest, and basing interest charges on market rates. 12 U.S.C. § 248a(c)(1), (3), (4). The fact that every other item on this list relates solely to pricing indicates that Section 248a(c)(2) was only intended to relate to pricing of services rather than mandating access to master accounts. *See In re McDaniel*, 973 F.3d 1083, 1098 (10th Cir. 2020) (construing one phrase in a list based on its "common quality" with other list items in accordance with the canon of *noscitur a sociis*). Custodia's attempt to read Section 248a(c)(2) without regard to the prefatory language in Section 248a(c), which indicates that what follows are principles for fee-setting rather than independent mandates, violates basic principles of statutory construction. *See Smith v. United States*, 508 U.S. 223, 233 (1993) ("Just as a single word cannot be read

32

in isolation, nor can a single provision of a statute."); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (courts should seek to give effect to every part of a statute).

*Third*, Section 248a indicates that "the *Board* shall publish . . . a set of pricing principles . . . and a proposed schedule of fees based upon those principles"; the statute does not contain any commands directed to Reserve Banks. Indeed, in contrast to Section 342, which is in a part of the FRA originally titled "Powers of Federal Reserve Banks," Section 248a is in a part of the FRA originally titled "Federal Reserve Board."[22] And Congress, legislating in 1980, chose to create the new Section 248a to follow the existing section 248, which sets forth "[e]numerated powers" of "[t]he Board of Governors of the Federal Reserve System."

---

[22] Custodia claims that these headings were never enacted into law. But an examination of the original 1913 sources demonstrates that Custodia is wrong. The FRA, as originally enacted, contained headings titled "Federal Reserve Board" (within which Section 248a was placed when it was enacted in 1980), and "Powers of Federal Reserve Banks" (within which Section 342 was placed when it was enacted in 1913). *See* Pub. L. No. 63-43, at 12, 16 (1913), *available at* https://fraser.stlouisfed.org/title/federal-reserve-act-966; 38 Stat. 251, 263 (1913), *available at* https://govtrackus.s3.amazonaws.com/legislink/pdf/stat/38/STATUTE-38-Pg251a.pdf. In any event, the headings confirm what the statutory text says: Section 248a states in its text that it is directed to "the Board," and Section 342 states in its text that it is directed to "[a]ny Federal Reserve Bank."

33

12 U.S.C. § 248. Thus, Congress made the choice, both in its placement in the FRA and in the text of Section 248a itself, to make clear that it was imposing obligations on the Board, not on Reserve Banks. Because the Board cannot open or maintain master accounts, it follows that Section 248a does not concern access to master accounts. *See Banco San Juan Internacional, Inc. v. Fed. Reserve Bank of New York*, 700 F. Supp. 3d 86, 100 (S.D.N.Y. 2023) ("If Congress intended to require Federal reserve banks to provide specific services, the direction would reasonably have been found in the section dealing with the duties and powers of Federal reserve banks and not in the section dealing with fee schedules set by the Board.").

In sum, Section 248a(c)(2)'s text is unambiguous: it is an equitable fee-setting principle directed to the Board, not a mandatory access principle directed to Reserve Banks.

### B.    Custodia's attempts to ignore the plain text of Section 248a(c)(2) do not withstand scrutiny

In an attempt to overcome the plain text of Section 248a(c)(2), Custodia advances various arguments. None has merit.

*First*, Custodia claims that Section 248a(c)(2) contains a mandate that all "nonmember depository institution[s]" receive a master account.

34

Br. at 28. Setting aside the fact that the provision is a "pricing principle," Custodia does not explain why the FRA would require discretionless granting of master accounts for "nonmember depository institution[s]," *but not for member banks*. Under Custodia's reading, nonmember banks automatically would be entitled to a master account, but member banks would not because the "shall be available" language upon which Custodia relies modifies "nonmember depository institutions" only. This bizarre result is avoided by reading Section 248a(c)(2) according to its plain text, which does nothing more than require the Board to consider, in setting a fee schedule, that services would now be provided to nonmember banks as a class in addition to member banks.

 *Second*, Custodia—again operating based on the argument that Section 248a(c)(2) is a mandatory access principle—contends that the access principle applies to "all nonmember depository institutions." Br. at 32. But, as Custodia admits, that is not actually the language of the provision: the word "all" only modifies "Federal Reserve bank services." *See* Br. at 31–32; 12 U.S.C. § 248a(c)(2) ("All Federal Reserve bank services covered by the fee schedule shall be available to nonmember

35

depository institutions"). Custodia claims that the word "all" is unnecessary before a "plural noun" such as "nonmember depository institutions." But even if that were true, in the very same provision Congress did use the word "all" before a plural noun—"Federal Reserve Bank services." *See* 12 U.S.C. § 248a(c). Thus, Congress did not follow Custodia's preferred grammatical rule about "all" in one phrase within Section 248a(c)(2), and therefore there is no reason to believe that Congress decided to follow it later in the exact same sentence. Indeed, a widely recognized canon of statutory construction, emphasized time and again by the U.S. Supreme Court, is that "[w]hen Congress includes particular language in one section of a statute but omits it in another . . . courts presume that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (cleaned up); *see also Russello v. United States*, 464 U.S. 16, 23 (1983); *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 102 n.5 (2012). This presumption "applies with particular force" if the inclusion and omission occur "in close proximity—indeed [as here], in the same sentence." *DHS v. MacLean*, 574 U.S. 383, 392 (2015). The statute's text thus indicates that it at most concerns provision of "*all* Reserve bank services" to

36

nonmember banks *as a class*, not to all banks in that class. Indeed, this Court made this point in a recent controlling decision which addressed the use and omission of a qualifier comparable to "all" in the same statutory provision. *See Nelson v. United States*, 40 F.4th 1105, 1115 (10th Cir. 2022) ("The rule against surplusage . . . counsel[s] us to construe 'any statute,' in [28 U.S.C.] § 2412(b), in a different and broader manner than the provision's initial, unadorned reference to 'statute' in order to give meaning to the term 'any.'"). Custodia's desire to rewrite Section 248a(c)(2) to insert the word "all" before "nonmember depository institutions" should be rejected, and consistent with *Nelson*, the term "all" must be given effect as applying only to "Federal Reserve Bank services" but not to "nonmember depository institutions."

*Third*, Custodia claims that the Board's reading of Section 248a(c)(2) would render the phrase "shall be available" superfluous. Br. at 32–33. That is not correct. The clause beginning with "shall be available" means that, in setting the fee schedule, the Board must take into consideration the principle that Reserve Banks would be accepting deposits from, and offering corresponding services to, a larger universe of institutions that included nonmember depository institutions in

37

accordance with the amended authorization of Section 342. That concept is not captured by any other pricing principle.

*Finally*, Custodia cites to legislative history of the MCA, as well as post-enactment sources, in which there are isolated statements about making services available to "every depository institution" or to "all depository institutions." Br. at 34–38. But these statements cannot override the plain text of the MCA. *Cf. Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("We will not [allow] ambiguous legislative history to muddy clear statutory language."); Scalia & Garner, *supra*, at 383 ("The only goals inarguably sought by a legislative majority are those embodied in the statutory text."). In any event, these non-statutory statements are consistent with Reserve Banks' undisputed post-MCA *ability* to provide accounts and services to nonmember banks *as a class*, subject to equitable pricing conditions, rather than a *mandate* to provide accounts and services to every such bank regardless of risk. None of the statements speaks of eliminating the Reserve Banks' longstanding discretion over access to their accounts and services.

38

**C.**  **In addition to the court below, two other district courts have rejected an absolute-entitlement theory**

In support of its absolute-entitlement theory, Custodia relies heavily on one part of the split decision in *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), and completely ignores two recent district court decisions that rejected an absolute-entitlement theory. The single-judge opinion from *Fourth Corner* misconstrued sections 342 and 248a, however, while the two recent district court opinions properly construed them.

In *Fourth Corner*, a Colorado-chartered credit union that sought to provide banking services to marijuana-related businesses sued to compel the issuance of a master account. *Id.* at 1053, 1058. While each panel member issued a separate opinion, two panel members agreed that dismissal of the credit union's complaint was appropriate and declined to reach the question of whether there was a statutory right to a master account. *See id.* at 1058 (opinion of Judge Moritz) (declining to "decide whether the Credit Union is entitled to a master account under 12 U.S.C. § 248a"); *id.* at 1064 (opinion of Judge Matheson) (indicating that the appeal was premature). In contrast, writing for himself only, one panel member disagreed with allowing dismissal of the complaint

39

and would have decided whether the FRA required granting a master account. *Id.* at 1064 (opinion of Judge Bacharach). Judge Bacharach concluded that Section 342 "does not affect [a depository institution's] entitlement to a master account" because it "does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2)." *Fourth Corner*, 861 F.3d at 1074. But that conclusion is plainly erroneous, as it reads out the phrase "from any of its member banks, or other depository institutions" from Section 342, and does not account for the fact that *Congress chose to add the words "or other depository institutions" to Section 342 in 1980*, making clear that Reserve Banks "may" exercise discretion to accept deposits from these institutions. The opinion also gave no weight to the omission of "all" before the reference to institutions to which services are made available, *id.* at 1069–70, despite its inclusion earlier in the same sentence, which this Court's subsequent ruling in *Nelson* suggests is a material omission. *See supra* at 37. Moreover, in addition to being a minority opinion and in error, that 2017 opinion preceded the enactment of the 2022 law indicating that master account requests may

be "rejected."[23]

By contrast, two other district courts (besides the court below) have recently rejected an absolute-entitlement theory similar to that advanced by Custodia. In *PayServices*, an Idaho institution that "focuses almost exclusively on facilitating trade commodities"—by "provid[ing] payment processing to foreign merchants, buyers, and governments"—sought to compel the issuance of a master account by its regional Reserve Bank. 2024 WL 1347094, at *4. The district court applied the plain text of Section 342, the Supreme Court's decision in *Farmers & Merchants*, and the plain text of the 1980 and 2022 amendments to the FRA to conclude that "the FRA affords Federal Reserve Banks the discretion to grant or deny master accounts to depository institutions." *Id.* at *8. The court also analyzed Section 248a and indicated that it is "appropriately understood to be an anti-price discrimination provision benefitting nonmember depository institutions:

---

[23] Though the opinion expressed concern that the Board's interpretation was not entitled to respect as a "litigation position," 861 F.3d at 1071, the detailed historical record set forth in Section I.D above, as well as subsequent affirmation of Reserve Bank discretion in the Board's Guidelines (after public notice and comment and Board vote), nullifies any such concern.

it confirms that a nonmember bank with access to the Federal Reserve System will pay the same for those services as a member bank." *Id.* at *10. The court then concluded: "At bottom, § 342 makes clear that Federal Reserve Banks are authorized to accept deposits, and thus open master accounts. Critically, however, they are not required to do so. Nothing in § 248a(c)(2) upends this discretion." *Id.* at *11.

A similar holding was issued in *Banco San Juan Internacional*. In that case, a Puerto Rico depository institution sued to stop its regional Reserve Bank from terminating its account after the Reserve Bank determined that it was potentially being used to facilitate "activities such as money laundering, economic or trade sanctions violations, or other illicit activities." 700 F. Supp. 3d at 96. The district court rejected the institution's claim that it had an absolute entitlement to a master account, writing that "12 U.S.C. § 342 makes clear that Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so." *Id.* at 98. The court further noted that the 2022 amendment to the FRA "confirms that Federal reserve banks may 'reject' applications from depository institutions." *Id.* at 99. Finally, the court rejected the argument that Section 248a(c)(2) governed the dispute, noting that this

provision "is directed to the Board, not Federal reserve banks, and is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System." *Id.* at 99.

Custodia's decision not to even mention, much less discuss, the decisions in *PayServices* and *Banco San Juan Internacional* is both questionable and revealing: those decisions properly take account of the FRA's provisions allowing Reserve Bank discretion regarding master accounts and reject the rewriting of Section 248a(c)(2) that Custodia advances before this Court.

### D.    Reserve Banks must be allowed to consider risks, and nothing about our dual-banking system requires them to abdicate this responsibility

Given the fatal flaws in its statutory argument, Custodia goes to great lengths to claim that it should receive a master account for reasons separate and apart from any statutory imperative. By way of example, Custodia describes Wyoming's regime for Special Purpose Depository Institutions and how "[t]he Wyoming Division of Banking developed a robust, 772-page supervisory examination manual." Br. at 9–11. It also provides details about its business model that it claims prevent it from suffering problems faced by other institutions. *Id.* at 14–

43

15. Custodia's amici echo these themes. The brief of amicus Americans for Prosperity Foundation (at 8–10), for example, discusses the virtues of Wyoming's banking charter designed to "facilitat[e] banking with digital assets."

But none of these arguments matter under Custodia's absolute-entitlement theory. Indeed, Custodia elected not to pursue a challenge to the merits of FRBKC's decision denying its request for a master account. Rather, Custodia's operative complaint rested entirely on the premise that it, and every other depository institution chartered by a state or territory, is entitled to a master account by statute without any ability for the Reserve Bank providing the account to consider risk. J.A.428 ¶ 81. Notably, Custodia did not attach FRBKC's decision denying its master account request to its complaint, much less take issue with any of the well-reasoned bases upon which FRBKC denied the request. Rather, Custodia asked the district court, and now asks this Court, to find that every depository institution is automatically entitled to a master account, even if the institution is not subject to a robust regulatory regime or has a business model or compliance program that is fundamentally flawed and would pose tremendous risk

to the financial system.

Custodia's opening brief fails to show how Reserve Banks are supposed to control risk with respect to their provision of accounts and services. Custodia's argument appears to be that "second-guessing [of] the state-chartering authority's risk assessment" is completely forbidden because we have a dual banking system. Br. at 25. But despite the many benefits of multiple chartering authorities, nothing about the dual banking system suggests an inviolate right to Reserve Bank master accounts and services. To the contrary, the dual-banking system means simply that there are "parallel federal and state banking systems," which "allows privately owned banks to choose whether to obtain a charter from the Federal Government or from a state government." *Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1295 (2024). Banks with federal charters "are subject primarily to federal oversight and regulation," while banks with state charters, called state banks, "are subject to additional state oversight and regulation." *Id.* And "[t]hose two banking systems co-exist and compete." *Id.*

But individual states and territories have never been able to dictate which institutions have access to the Federal Reserve's balance

sheet—a significant national monetary policy tool, *see, e.g., The Fed Explained* at 13, 33–36—and indeed, when state and federal laws conflict with respect to banking, federal law governs. *See, e.g., Cantero*, 144 S. Ct. at 1300 ("If [a] state law prevents or significantly interferes with [a] national bank's exercise of its powers, the law is preempted."); *cf. Salt Lake Trib. Publ'g Co. v. Mgmt. Plan., Inc.*, 390 F.3d 684, 689 (10th Cir. 2004) (no delegation to states that could frustrate purposes of a federal statute absent evidence Congress "plainly intended" it). There is simply no inviolate right pursuant to which a state or territory can charter any type of entity it wishes and then have those institutions automatically receive a Federal Reserve Bank master account without any consideration whatsoever by the Reserve Bank.

Moreover, considering risks in providing access to Reserve Bank accounts and services is not merely an academic exercise; the failure to do so could lead to significant negative consequences to the financial system. As detailed in an expert report authored by Professor Morgan Ricks, who specializes in financial regulation at Vanderbilt University Law School, if a judicial ruling required a Federal Reserve Bank to

grant access to each and every chartered entity, regardless of risk, the

adverse consequences could be dramatic:

- A state or territory might seek to win market share in digital asset or other financial businesses by enacting a "free banking" statute with no regulatory apparatus or supervision whatsoever. In such a situation, totally unregulated institutions would gain access to Federal Reserve accounts and services, with potentially devastating consequences to financial stability, monetary policy implementation, money laundering, and terrorism financing. S.J.A.109.

- A state or territory might enact a "self-depository" statute that allowed any individual or entity, from the United States or from abroad, to establish, for a small fee, an unregulated and unsupervised "bank" subsidiary to hold its own cash. In such a situation, the Federal Reserve would be bombarded with master account requests from individuals or entities, both domestic and foreign, including anyone who wanted to use the account for illicit purposes. S.J.A.109.

- Credit risks would be significantly heightened if the Federal Reserve were put in the position of extending credit to unsound institutions. S.J.A.103–05. For example, risky institutions might incur negative balances in their master accounts when processing funds transfers on behalf of their customers, and there also may be mismatches in check clearing operations. Such conduct could lead to large losses borne by the Federal Reserve, ultimately resulting in lower earnings being remitted to the Treasury. S.J.A.104.

Professor Ricks also addresses the important adverse monetary

policy implications presented by potential new business models.

S.J.A.106. As Professor Ricks correctly concludes, "if the Fed lacked any

discretionary authority over access to master accounts and related

47

services, federal law enforcement and counterterrorism efforts could be

hindered," and there would likely be substantial "negative consequences

for the Fed, the financial system, and the American public." S.J.A.103–

04, 108.

Moreover, Custodia's alarmist claims that "[w]ithout a master

account, an institution cannot obtain access to the Fed's payment

systems," Br. at 13, and that lack of a master account is "crippling," *id.*

at 2, are divorced from the reality that many state-chartered banks

operate without a master account through other banking relationships.

Depository institutions without master accounts can and commonly do

establish relationships with commercial banks, including those with

master accounts, and access services through those relationships or

through competing service providers. *See, e.g.*, *Jet Courier*, 713 F.2d at

1227 (discussing MCA purpose of increasing "competition in bank

services by the private sector" through "banks and clearing houses

which provide both complementary and substitute systems to the

Federal Reserve" (quotations omitted)). As Custodia itself admits, it

already can access Federal Reserve services through a partnership with

an existing accountholder. J.A.403 ¶ 6.[24] The notion that a master account is a prerequisite to accessing Federal Reserve services, or that financial services providers cannot survive without one, is simply false.

At bottom, Reserve Banks do not have a discretionless, ministerial mandate to open a master account for each and every depository institution. Allowing any institution to receive and maintain a master account, regardless of the risks its presents, is an extraordinary proposition, and the only way to avoid this extreme and unsupportable result is to acknowledge that Reserve Banks can exercise discretion in providing access to accounts and corresponding services pursuant to statutory authorities in the FRA, including Section 342.

## III.  Custodia's Additional Arguments Are Immaterial

### A.    The Board did not deny Custodia's account request

Though Custodia complains that the district court's dismissal of its APA claim against the Board implicates judicial review concerns, Br.

---

[24] Custodia claims that its correspondent banking relationships have been subject to unspecified "regulatory pressure." Br. at 13 n.10. Not only is the record devoid of any details regarding this alleged "pressure," but any such alleged "pressure" has not prevented Custodia from operating. *See* Custodia's X.com Post of Aug. 11, 2023 (announcing publicly that it is serving external customers), *available at* https://x.com/custodiabank/status/1690012708513390592.

54, Custodia was the master of its complaint and has had a full measure of judicial review on its sole theory—absolute entitlement to a master account. As the district court correctly noted, any Board role or input on FRBKC's account denial pursuant to the Guidelines or otherwise is ultimately immaterial. A.69. Indeed, because "Custodia's bases for compelling a master account in Count I [APA claim against Board only] and Count II [mandamus] are identical—that the Federal Reserve Act commands Custodia receive a master account—the [court's] statutory construction analysis would control the outcome for both causes of action," *id.*, and Custodia concedes as much. Br. 26.

Nonetheless, the district court was correct in dismissing Custodia's single APA claim alleging unlawful action by the Board. A.55. The district court correctly found that Custodia's APA claim fails because Custodia has not identified any final agency action of the Board as is required for such a claim. A.61–66. The court properly reasoned that section 704 of the APA grants federal courts jurisdiction to review "final agency action," A.62 (citing 5 U.S.C. § 704), and that a plaintiff "must challenge a 'final agency action' in order to have statutory (prudential) standing to seek judicial review under the APA." A.62

50

(citing *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997)); *see also Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000) ("[p]laintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action'" as to the decision at issue); *Sinclair Wyo. Ref. Co., LLC v. EPA*, 72 F.4th 1137, 1143 (10th Cir. 2023) ("a petitioner challenging agency action must show the action is final" in order to invoke APA jurisdiction).

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." A.62 (quoting 5 U.S.C. § 551(13)). The only possible "agency action" Custodia purported to identify was a January 26, 2023 email from a Board division director to FRBKC stating that Board staff had "reviewed [FRBKC's] record documenting application of the Guidelines in evaluating [Custodia's account] access request" and had "no concerns" with FRBKC "communicat[ing] to Custodia Bank its decision to deny [Custodia's account] request."

51

J.A.1102 (the "No Concerns Email").[25] As it states, this email was sent pursuant to the Guidelines and the Board's implementing S-Letter, which set forth the "expectat[ion that] the Reserve Banks [will] consult, as appropriate, with Board staff to provide insight into application of the Guidelines to certain requests and to further support consistency in decision-making across Reserve Banks." J.A.1102.

Consistent with these goals, FRBKC staff's recommendation memo to FRBKC President Esther George, drafts of which were shared with Board staff, document FRBKC's detailed and extensive analysis of Custodia's master account request and ultimate recommendation to President George to deny the request. *See* J.A.1072–80, 1090–98. Indeed, underscoring that it was FRBKC's decision to deny the master account, on January 24, 2023, FRBKC emailed Board staff that "[p]ursuant to the recently issued S letter, we are sharing *our analysis of the master account request by Custodia Bank . . . conducted by our*

---

[25] Custodia's reference to this document as the "Board Approval Email" is a transparent misnomer. Br. at 20, 22, 23, 49–54. Nowhere in the email does the Board state that it is "approving" FRBKC's decision to deny Custodia's master account request, which the Board has no authority to do under Section 342 of the FRA, the Guidelines, or the S-Letter.

*Reserve Bank*" and that FRBKC staff "anticipate sharing *our decision to deny the request in the near future*." J.A.1100 (emphases added). Having reviewed these materials supplied by FRBKC to the Board as required by the Guidelines and S-Letter, and having consulted with FRBKC staff as appropriate, Board staff conveyed in the No Concerns Email staff's view that there were "no concerns with the Reserve Bank moving forward with *its plan* to communicate to Custodia Bank *its decision to deny the request for a master account and access to services*." J.A.1102 (emphasis added).

Having carefully reviewed this record, the district court correctly held in accordance with Tenth Circuit and Supreme Court precedent that the No Concerns Email is not final agency action or even "agency action as defined by § 551(13)" because it is not "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," A.64, but simply a response to *FRBKC's* determination to deny Custodia's master account. *Id*.; *see also Colo. Farm Bureau*, 220 F.3d at 1174 (that Colorado had "federal government consent" for its plan to reintroduce the Canadian lynx on federal land; that the plan was "agreed to, supported, and facilitated by"

53

the Forest Service; and that "Colorado allegedly worked with the Forest Service in formulating the Plan," did not constitute final agency action of the Forest Service).

In response, Custodia argues that the No Concerns Email was final agency action because it was the "culmination of the Board's extensive orchestration of the denial of Custodia's master application" by FRBKC. Br. at 49. However, the record is replete with contrary evidence demonstrating that Board staff merely consulted with FRBKC staff as appropriate and required under the Guidelines and S-Letter to ensure consistent application of the Guidelines among Reserve Banks. Stated differently, the Board's oversight and policy interests that Reserve Banks strive to give similar treatment to similarly situated entities (a goal of the Guidelines and S-Letter) is not "orchestration" of the outcome of this particular request and does not transform every master account decision by a Reserve Bank into final agency action of the Board.[26]

---

[26] Although Custodia also takes issue with the district court's reliance on this Court's unpublished decision in *Cherry v. USDA*, 13 F. App'x 886 (10th Cir. 2001), arguing that "this Court and sister circuits have consistently held that agency letters can be final agency action," Br.

Rather, as the district court correctly determined, under the test set forth in *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), which Custodia concedes is the proper test, Br. at 49, final agency action (1) "must not be of a merely tentative or interlocutory nature;" and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (cleaned up); *see* A.62. The district court was correct to conclude that no legal consequences flowed from the Board's No Concerns Email, which merely expressed a lack of concern regarding FRBKC's decision that FRBKC conveyed to Custodia the next day in its January 27, 2023 denial letter. J.A.1120– 26; *Sinclair*, 72 F.4th at 1143 ("[t]o be final, an agency action must 'itself [be] the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope' of their statutory rights or duties" (quoting *Kansas ex rel. Schmidt v. Zinke*, 861 F.3d 1024, 1034 (10th Cir. 2017)) (cleaned up)); *see also Miami Tribe v. United States*, 198 F. App'x 686, 690 (10th Cir. 2006) (agency opinion letter did not constitute "final agency action" because "Congress has vested the

---

at 51 (citing cases), Custodia misses the point. It is not whether an alleged action is in the form of a letter or otherwise that governs whether it is final agency action.

authority to decide" with" a federal commission and the agency's opinion letter "is only a part of the process that will eventually result in the final . . . action" by the commission). Here, Congress vested final decision-making authority over master accounts directly in Reserve Banks, and the No Concerns Email was just "part of the process," not final agency action necessary to maintain an APA claim.

The district court also concluded, applying controlling Tenth Circuit precedent, that "the January 26, 2023 no-concerns email constitutes only the Board of Governors' implementation decision pursuant to a broader agency plan, which is not final agency action." A.64 (citing *Chem. Weapons*, 111 F.3d at 1494). In that case, this Court held that the Department of Defense's commencement of trial burns at a chemical weapons incineration plant was not final agency action because the Army was merely implementing decisions it had made in an earlier Final Environmental Impact Statement and there was "no indication that the Army ha[d] ever revisited the question." *Id*. at 1494. Applying this precedent, the district court properly reasoned that the No Concerns Email was merely part of the process previously described in the "Guidelines and S-letter as they pertained to Custodia's master

account application" and was not final agency action under the APA. A.65.

Custodia's further claim that it is entitled to "a remand to resolve the question of disputed fact of the Board's involvement" is baseless. Br. at 53. Custodia brought an APA claim against the Board, which is a federal agency, and such claims are decided on the administrative record. *See* 5 U.S.C. § 706 ( "the court shall review the whole [administrative] record or those parts of it cited by a party"); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."); *see also Custodia v. Fed. Reserve Board of Governors*, No. 22-cv-125, 2022 WL 18401268, at *2–3 (D. Wyo. Dec. 12, 2022) (district court's order holding that "[t]he plaintiff is the master of the complaint" and "Custodia controlled how it asserted its claims. It cited to, quoted from, and relied on the APA," and the Board must therefore "prepare and submit an administrative record"). The administrative record is fully available in this case and no further factfinding or inquiry is necessary to address the Board's role.

Finally, Custodia's claim that "mandamus relief is available against the Board" even if the "Court concludes that the Board did not engage in final agency action" is incorrect. Br. at 54. A writ of mandamus is available "only where the duty to be performed is ministerial and the obligation to act peremptory and plainly defined." *United States ex. rel. McLennan v. Wilbur,* 283 U.S. 414, 420 (1931); *see also Rios v. Ziglar,* 398 F.3d 1201, 1206 (10th Cir. 2005). As discussed above, Congress did not task the Board with final decisionmaking authority over master accounts, but rather vested that authority in Reserve Banks. As a result, the Board had no statutory duty to act on Custodia's request *to FRBKC* for a master account, much less a ministerial and clearly defined duty. The district court correctly concluded that mandamus, a "drastic remedy" that "is to be invoked only in extraordinary circumstances," is unwarranted in these circumstances. *In re Cooper Tire & Rubber Co.,* 568 F.3d 1180, 1186 (10th Cir. 2009) (quotation omitted).

**B.    Constitutional arguments raised in passing have no bearing on Custodia's absolute-entitlement claim and are not before the Court**

In cursory fashion, Custodia posits a counterfactual in which judicial review is absent and suggests, with little explanation, that Appointments and Due Process Clause concerns would arise because Reserve Bank "boards [of directors] are comprised primarily of members of the public and stockholding banks." Br. at 56. But Custodia has received a full measure of judicial review in this case and seeks no relief for any purported constitutional violation. *See* Br. at 55–57. The Court therefore need not and should not reach any constitutional issues. *See United States v. Cusumano*, 83 F.3d 1247, 1250–51 (10th Cir. 1996) ("federal courts should address constitutional questions only when necessary to a resolution of the case or controversy before [them]"). In any event, Custodia's Appointments Clause claim was waived and is without support in the record. And its due process contention likewise lacks record support and does not provide an alternate basis for relief, nor raise a serious constitutional question, if Custodia is not statutorily entitled to an account.

Custodia's vague reference to the Appointments Clause and

FRBKC's directors is, at best, an improper attempt to revive a claim in

its original complaint that it abandoned below. *See BonBeck Parker,*

*LLC v. Travelers Indem. Co. of Am*, 14 F.4th 1169, 1174 (10th Cir. 2021)

(argument abandoned at any point in district court is waived); *Turner*

*Bros., Inc. v. Conley*, 757 F. App'x 697, 700 (10th Cir. 2018)

("Appointments Clause claims, and other structural constitutional

claims, have no special entitlement to review, and may be waived or

forfeited"); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7–8

(1993) (parties may waive constitutional avoidance claims). Although an

Appointments Clause count in the first complaint asserted that

"allow[ing] . . . Directors to exercise 'unreviewable authority' in

adjudicating [account requests] violates the Appointments Clause,"

J.A.78, the district court did not reach this issue based on the facts as

Custodia pled them, reasoning that the "factual allegations in

Custodia's complaint support that the master account application is

decided by the president of FRBKC as opposed to FRBKC's board of

directors." J.A.384; *see also* J.A.382 (same). Although it held that

Custodia "plausibly alleged FRBKC's president . . . exercises significant

60

authority" for purposes of the Clause, J.A.386–87, the district court held that Board approval of her appointment, 12 U.S.C. § 341(fifth), was an appointment by a "Head of Department" permitted by the Clause. J.A.389 (citing *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 512 n.13 (2010)).

Given the district court's stated reasoning, Custodia *could* have reasserted the claim it now attempts to raise concerning appointment of FRBKC's directors when given leave to amend its complaint, by adding appropriate factual allegations. But instead, it abandoned the issue by not repleading an Appointments Clause count, adding no related allegations, and expressly seeking to compel FRBKC's *president* to grant it an account. J.A.416–17; J.A.430. It also did not invoke the Clause in subsequent briefing nor proffer any supporting evidence. Where, as here, "nothing in the district court's order suggested . . . additional allegations . . . would not also cure the defect" prompting dismissal, an "amended complaint that did not include [dismissed counts] resulted in abandoning these claims." *Mooring Cap. Fund, LLC v. Knight*, 388 F. App'x 814, 824 (10th Cir. 2010); *see also Tufaro v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 107 F.4th 1121, 1137

(10th Cir. 2024) ("Although the district court dismissed this claim, Tufaro was granted leave to amend so he could cure these pleading defects [and] by failing to replead it in the First Amended Complaint, Tufaro abandoned [his] claim."); *accord Pennington v. Northrop Grumman Space & Mission Sys. Corp.*, 269 F. App'x 812, 820 (10th Cir. 2008) (argument raised in opposition to dismissal but omitted from summary judgment opposition was waived). Custodia's Appointments Clause argument is therefore not properly before this Court.

In any event, a ruling that Custodia is not entitled to a master account would have no "constitutional consequences" with respect to FRBKC director appointments, *cf.* Br. at 55, since FRBKC's president, rather than its directors, denied Custodia's account request. And Custodia waived any attacks on the district court's ruling upholding *the president's* appointment by omitting them from its opening brief on appeal. *See Fowler v. Stitt*, 104 F.4th 770, 800 (10th Cir. 2024). Here, both Custodia's allegations and the record establish that FRBKC's president, and not its directors, was the relevant decisionmaker, *e.g.*, J.A.416–17; J.A.430, J.A.1120–26, pursuant to authority the FRA

62

expressly granted her,[27] and whatever "constitutional consequences"
Custodia implies relate to the directors' appointment are simply not
implicated.

The Court also need not—and should not—address Custodia's due
process claim. First, as noted above, Custodia proffered no evidence of
any involvement by purportedly self-interested directors in considering
its request, which was Custodia's only stated basis below for claiming
that their appointments raised due process concerns. J.A.75–76. More
importantly, its due process claim would not provide alternate grounds
for relief nor raise serious constitutional questions should the Court

---

[27] The FRA permits any "duly authorized officer" of a Reserve Bank to
exercise its powers,12 U.S.C. § 341(seventh), and since 1935 has made
one such "authorized officer" the president, designated the "chief
executive officer of the bank [to whom] all other executive officers . . .
shall be directly responsible." Banking Act of 1935, Pub. L. No. 74-305,
§ 201, 49 Stat. 684, 703, *codified at* 12 U.S.C. § 341(fifth). Although an
amicus posits Article II concerns regarding appointment and removal of
Reserve Bank presidents, Dig. Chamber & Glob. Blockchain Found. Br.
at 15–21, these claims are not properly before the Court because
Custodia has forfeited them, *see United States v. Ackerman*, 831 F.3d
1292, 1299 (10th Cir. 2016) ("Amici['s] . . . functions don't include
presenting arguments forgone by the parties themselves"), and are in
any event meritless. Moreover, apart from not raising these issues on
appeal, Custodia did not contest the Board's assertions below that
FRBKC's president was appointed by a "Head of Department" and
removable by the Board at will, *see* J.A.300 (noting waiver), waiving
arguments to the contrary raised by amicus.

reject Custodia's reading of the MCA. Due process rights only attach to legally cognizable property interests, *Martin Marietta Materials, Inc. v. Kansas DOT*, 810 F.3d 1161, 1171 (10th Cir. 2016), and absent legal provisions mandating "a particular outcome . . . no [such] property interest exists." *Id.* at 1178 (citations omitted); *accord Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (discretion to deny a benefit precludes due process claims). If Custodia is not statutorily entitled to a master account, it lacks a protected interest and no due process concerns are presented.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court affirm the judgment of the district court.

DATED: August 28, 2024

Respectfully submitted,

/s/ Joshua P. Chadwick

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel
Yvonne F. Mizusawa, Senior Counsel
Yonatan Gelblum, Senior Counsel
Katherine Pomeroy, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, N.W.
Washington, D.C. 20551
Tel. No. (202) 263-4835
joshua.p.chadwick@frb.gov

*Attorneys for Defendant-Appellee Board of
Governors of the Federal Reserve System*

**STATEMENT REGARDING ORAL ARGUMENT**

The Board respectfully requests oral argument because this case raises concerns critical to the stability and soundness of the U.S. financial system.

## STATUTORY AND REGULATORY ADDENDUM

Page

12 U.S.C. § 248a ................................................................................. A2

12 U.S.C. § 248c ................................................................................. A4

12 U.S.C. § 342 .................................................................................. A7

# 12 U.S.C. § 248a Pricing of Services

## (a) Publication of pricing principles and proposed schedule of fees; effective date of schedule of fees

Not later than the first day of the sixth month after March 31, 1980, the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.

## (b) Covered services

The services which shall be covered by the schedule of fees under subsection (a) are--

**(1)** currency and coin services;

**(2)** check clearing and collection services;

**(3)** wire transfer services;

**(4)** automated clearinghouse services;

**(5)** settlement services;

**(6)** securities safekeeping services;

**(7)** Federal Reserve float; and

**(8)** any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds.

## (c) Criteria applicable

The schedule of fees prescribed pursuant to this section shall be based on the following principles:

**(1)** All Federal Reserve bank services covered by the fee schedule shall be priced explicitly.

**(2)** All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any

A2

other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

**(3)** Over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services priced, including interest on items credited prior to actual collection, overhead, and an allocation of imputed costs which takes into account the taxes that would have been paid and the return on capital that would have been provided had the services been furnished by a private business firm, except that the pricing principles shall give due regard to competitive factors and the provision of an adequate level of such services nationwide.

**(4)** Interest on items credited prior to collection shall be charged at the current rate applicable in the market for Federal funds.

## (d) Budgetary consequences of decline in volume of services

The Board shall require reductions in the operating budgets of the Federal Reserve banks commensurate with any actual or projected decline in the volume of services to be provided by such banks. The full amount of any savings so realized shall be paid into the United States Treasury.

## (e) Parity in clearing

All depository institutions, as defined in section 461(b)(1) of this title, may receive for deposit and as deposits any evidences of transaction accounts, as defined by section 461(b)(1) of this title from other depository institutions, as defined in section 461(b)(1) of this title or from any office of any Federal Reserve bank without regard to any Federal or State law restricting the number or the physical location or locations of such depository institutions.

A3

## 12 U.S.C. § 248c Master Account and Services Database

### (a) Definitions

In this section:

### (1) Access request

The term "access request" means a request to a Federal reserve bank for access to a reserve bank master account and services, including any written documentation or formal indication that an entity intends to seek access to a reserve bank master account and services.

### (2) Official accountholder

The term "official accountholder" means—

**(A)** a foreign state, as defined in section 632 of this title;

**(B)** a central bank, as defined in section 632 of this title, other than a commercial bank;

**(C)** a public international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (22 U.S.C. 288 et seq.); and

**(D)** any governmental entity for which the Secretary of the Treasury has directed a Federal reserve bank to receive deposits as fiscal agent of the United States under section 15.

### (3) Reserve bank master account and services

The term "reserve bank master account and services" means an account in which a Federal reserve bank—

**(A)** receives deposits for an entity other than an official accountholder; or

**(B)** provides any service under section 248a(b) of this title to an entity other than an official accountholder.

A4

**(b) Publishing master account and access information**

**(1) Online database**

The Board shall create and maintain a public, online, and searchable database that contains—

**(A)** a list of every entity that currently has access to a reserve bank master account and services, including the date on which the access was granted to the extent the date is knowable;

**(B)** a list of every entity that submits an access request for a reserve bank master account and services after enactment of this section (or that has submitted an access request that is pending on the date of enactment of this section), including whether, and the dates on which, a request—

**(i)** was submitted; and

**(ii)** was approved, rejected, pending, or withdrawn; and

**(C)** for each list described in subparagraph (A) or (B), the type of entity that holds or submitted an access request for a reserve bank master account and services, including whether such entity is—

**(i)** an insured depository institution, as defined in section 1813 of this title;

**(ii)** an insured credit union, as defined in section 1752 of this title; or

**(iii)** a depository institution that is not an insured depository institution or an insured credit union.

**(2) Updates**

Not less frequently than once every quarter, the Board shall update the database to add any new information required under paragraph (1).

A5

**(3) Deadline**

Not later than 180 days after December 23, 2022, the Board shall publish the database with the information required under paragraph (1).

## 12 U.S.C. § 342 Deposits; Exchange and Collection; Member and Nonmember Banks or Other Depository Institutions; Charges

Any Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items, and also, for collection, maturing notes and bills; or, solely for purposes of exchange or of collection, may receive from other Federal reserve banks deposits of current funds in lawful money, national-bank notes, or checks upon other Federal reserve banks, and checks and drafts, payable upon presentation within its district or other items, and maturing notes and bills payable within its district; or, solely for the purposes of exchange or of collection, may receive from any nonmember bank or trust company or other depository institution deposits of current funds in lawful money, national-bank notes, Federal reserve notes, checks and drafts payable upon presentation or other items, or maturing notes and bills: *Provided,* Such nonmember bank or trust company or other depository institution maintains with the Federal Reserve bank of its district a balance in such amount as the Board determines taking into account items in transit, services provided by the Federal Reserve bank, and other factors as the Board may deem appropriate: *Provided further,* That nothing in this or any other section of this chapter shall be construed as prohibiting a member or nonmember bank or other depository institution from making reasonable charges, to be determined and regulated by the Board of Governors of the Federal Reserve System, but in no case to exceed 10 cents per $100 or fraction thereof, based on the total of checks and drafts presented at any one time, for collection or payment of checks and drafts and remission therefor by exchange or otherwise; but no such charges shall be made against the Federal reserve banks.

A7

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f) and 10th Circuit Rule 32(B), this document contains 12,988 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

/s/ Joshua P. Chadwick
Joshua P. Chadwick

*Attorney for Defendant-Appellee Board of Governors of the Federal Reserve System*

# CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Joshua P. Chadwick
Joshua P. Chadwick

*Attorney for Defendant-Appellee Board of Governors of the Federal Reserve System*