**[ORAL ARGUMENT REQUESTED]**

No. 24-8024

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

CUSTODIA BANK, INC.,

*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS;
FEDERAL RESERVE BANK OF KANSAS CITY,

*Defendants-Appellees*.

On Appeal from the United States District Court for the District of
Wyoming, No. 1:22-cv-00125-SWS, Hon. Scott W. Skavdahl

## RESPONSE BRIEF FOR
## FEDERAL RESERVE BANK OF KANSAS CITY

Billie LM Addleman
Erin E. Berry
HIRST APPLEGATE, LLP
PO Box 1083
Cheyenne, WY 82003
(307) 632-0541

Jared Lax
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300

Jeffrey S. Bucholtz
Christine M. Carletta
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

Andrew Z. Michaelson
KING & SPALDING LLP
1185 Ave. of the Americas, 34th Fl.
New York, NY 10036
(212) 556-2100

*Counsel for Defendant-Appellee Federal Reserve Bank of Kansas City*

August 28, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT OF PRIOR OR RELATED APPEALS ........................... viii

GLOSSARY ................................................................................ ix

INTRODUCTION ........................................................................ 1

STATEMENT OF THE CASE .................................................... 5

I.    Reserve Banks Exercise Discretion Over Access to
      Accounts and Services to Mitigate Risk ............................ 5

      A.   Congress Empowered Reserve Banks to Provide
           Payment Services ..................................................... 5

      B.   Use of Reserve Bank Services Presents Risk to the
           Reserve Bank, the Public, and the U.S. Financial
           System ...................................................................... 8

      C.   For More Than a Century, Reserve Banks Have
           Exercised Discretion Over Access to Accounts and
           Services to Mitigate Risk ...................................... 12

II.   Custodia's Request to Access and Use Services Presented
      Unacceptable Risk ......................................................... 18

      A.   Custodia Is Not a Traditional Bank ...................... 18

      B.   Custodia Requested Access to Reserve Bank Services
           Before It Was Ready or Even Licensed to Operate ............. 22

      C.   FRBKC Evaluated the Policy Questions and Risks
           Presented by Custodia's Request .......................... 23

III.  The District Court Rejected Custodia's Attempt to Force
      Access to the Federal Payment System ........................ 28

      A.   Custodia Sued to Demand a Master Account While
           FRBKC's Review Was Still Ongoing ...................... 28

      B.     FRBKC Continued to Evaluate and Then Denied Custodia's Request ..............................................30

      C.     Custodia's Amended Complaint Abandoned Certain Claims and Advanced Only Its Absolute-Entitlement Theory ............................................................33

      D.     The District Court Rejected Custodia's Absolute-Entitlement Theory and Granted Summary Judgment to FRBKC ...........................................35

SUMMARY OF ARGUMENT ..............................................36

ARGUMENT ...............................................................40

I.     Custodia Illustrates Why Its Absolute-Entitlement Theory Is Dangerous and Could Not Have Been Intended by Congress ...............................................................40

II.    Our Nation's Dual Banking System Does Not Support Custodia's Position ..........................................47

III.   Defendants Are Not Trying to "Circumvent Judicial Review" .................................................54

CONCLUSION ............................................................59

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF DIGITAL SUBMISSION
    AND PRIVACY REDACTIONS

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Am. Bankers Ass'n v. United States,*
   932 F.3d 1375 (Fed. Cir. 2019) ........................................................ 5

*Banco San Juan Internacional, Inc.*
   *v. Fed. Rsrv. Bank of N.Y. ("BSJI"),*
   700 F. Supp. 3d 86 (S.D.N.Y. 2023) .................................. 11, 12, 46, 47

*Bd. of Governors of Fed. Rsrv. Sys.*
   *v. First Lincolnwood Corp.,*
   439 U.S. 234 (1978) ........................................................................ 51

*Bronson v. Swensen,*
   500 F.3d 1099 (10th Cir. 2007) ...................................................... 56

*Davis v. Mich. Dep't of Treasury,*
   489 U.S. 803 (1989) ........................................................................ 51

*Fourth Corner Credit Union*
   *v. Fed. Rsrv. Bank of Kansas City,*
   861 F.3d 1052 (10th Cir. 2017) .............................................. 43, 44, 46

*Headrick v. Rockwell Int'l Corp.,*
   24 F.3d 1272 (10th Cir. 1994) ........................................................ 56

*Hill v. Kemp,*
   478 F.3d 1236 (10th Cir. 2007) ...................................................... 56

*Marks v. United States,*
   430 U.S. 188 (1977) ........................................................................ 44

*New State Ice Co. v. Liebmann,*
   285 U.S. 262 (1932) ........................................................................ 49

*PayServices Bank v. Fed. Rsrv. Bank of San Francisco,*
   2024 WL 1347094 (D. Idaho Mar. 30, 2024) .............................. 46, 47

*Richison v. Ernest Grp., Inc.,*
   634 F.3d 1123 (10th Cir. 2011) ...................................................... 57

*SEC v. Ripple Labs, Inc.*,
   682 F. Supp. 3d 308, 321 (S.D.N.Y. 2023)...........................................25

*United States v. Ackerman*,
   831 F.3d 1292 (10th Cir. 2016)...........................................57

**Statutes**

12 U.S.C. § 222...........................................7

12 U.S.C. § 248a...........................................24

12 U.S.C. § 321...........................................7

12 U.S.C. § 324...........................................7

12 U.S.C. §§ 341–361...........................................5

12 U.S.C. § 342...........................................24, 33, 55

12 U.S.C. § 347d...........................................17

12 U.S.C. § 393...........................................16

12 U.S.C. § 461(b)...........................................24, 42, 53

12 U.S.C. § 1452(d)...........................................16

12 U.S.C. § 1813...........................................42

12 U.S.C. § 1815(a)(1)...........................................24

31 U.S.C. § 9101(3)(M)...........................................16

31 U.S.C. § 9107(b)...........................................16

Federal Reserve Act,
   Pub. L. No. 63-43, ch. 6, 38 Stat. 251 (1913) ...........................................5

Monetary Control Act of 1980,
   Pub. L. No. 96-221, 94 Stat. 132 (1980) ...........................................40

Wyo. Stat. Ann. § 13-1-101...........................................27

Wyo. Stat. Ann. § 13-2-103........................................................18

Wyo. Stat. Ann. § 13-2-201........................................................18

Wyo. Stat. Ann. § 13-12-103......................................................18

Wyo. Stat. Ann. § 13-12-105......................................................24

Wyo. Stat. Ann. § 13-12-107......................................................22

Wyo. Stat. Ann. § 13-12-116......................................................27

**Regulations**

12 C.F.R. § 201.1.......................................................................9

12 C.F.R. § 265.20....................................................................33

Interim Policy Statement Regarding Risks
  on Large-Dollar Wire Transfer Systems,
  52 Fed. Reg. 29,255 (Aug. 6, 1987)........................................10

Guidelines for Evaluating Account and Services Requests,
  87 Fed. Reg. 51,099 (Aug. 19, 2022).......................................17

**Other Authorities**

Barr, Michael S.,
  Howell E. Jackson, & Margaret E. Tahyar,
  Financial Regulation: Law & Policy (2d ed. 2018) .......................19, 50

Bd. of Governors,
  Federal Reserve Policy on Payment System Risk
  (as amended July 20, 2023), https://tinyurl.com/24dpa2t6........8, 9, 10

Bd. of Governors,
  *Master Account and Services Database: Database:*
  *Existing Access*, FederalReserve.gov (May 31, 2024),
  https://tinyurl.com/unh8tnsd.................................................16

Bd. of Governors,
   No. 0424, Financial Stability Report (Apr. 2024),
   https://tinyurl.com/22nh39b5 ................................................................ 11

Bd. of Governors, FDIC, & OCC,
   Joint Statement on Crypto-Asset Risks to Banking
   Organizations (Jan. 3, 2023), http://tinyurl.com/nhdkv56d.........25, 41

Brus, Brian
   *Old-Fashioned Financing:*
   *S&L Still Thriving Without FDIC Insurance*, J. Record
   (Nov. 15, 2018), http://tinyurl.com/ya5f6wcx...................................... 15

Custodia Bank
   (@custodiabank), X.com (Aug. 11, 2023),
   https://x.com/custodiabank/status/1690012708513390592................ 27

George, Esther L.
   President & CEO, FRBKC, Conference of State Bank
   Supervisors State-Federal Supervisory Forum:
   Perspectives on 150 Years of Dual Banking (May 22, 2012),
   https://tinyurl.com/2errwc43 ........................................................53, 54

Ihrig, Jane,
   Zeynep Senyuz, & Gretchen Weinbach,
   The Fed's "Ample Reserves" Approach to
   Implementing Monetary Policy (Fed. Rsrv. Bd.,
   Working Paper No. 2020-022, Feb. 19, 2020),
   https://tinyurl.com/29xuwpw8............................................................ 10

*Interstate Branching: New Account Structure*,
   FederalReserve.gov (Sept. 27, 2002),
   https://tinyurl.com/3am47864 .............................................................. 6

*Monetary Policy:*
   *Credit and Liquidity Programs and*
   *the Balance Sheet*, FederalReserve.gov (Nov. 15, 2021),
   https://tinyurl.com/2f28bcfb................................................................. 9

Press Release,
  CFTC, Release No. 8450-21, CFTC Orders Tether and
  Bitfinex to Pay Fines Totaling $42.5 Million (Oct. 15, 2021),
  https://tinyurl.com/47y3cv2j ................................................................ 24

Report on Stablecoins
  (President's Working Grp. on Fin. Mkts.,
  Working Paper, Nov. 2021), http://tinyurl.com/5225srnv ................. 25

SEC Staff Accounting Bulletin
  No. 121 (Apr. 11, 2022) ...................................................................... 26

U.S. Fed. Rsrv. Sys.,
  No. 0821, The Fed Explained: What the Central Bank Does
  (11th ed. 2021), http://tinyurl.com/a7y83ejh ................................... 5, 6

Wilmarth, Arthur E., Jr.,
  *We Must Protect Investors and Our Banking System from the*
  *Crypto Industry*, 101 Wash. U. L. Rev. 235 (2023)......................... 7, 19

WY DOB,
  WyomingBankingDivision.wyo.gov (2021),
  http://tinyurl.com/bdfsryhw ............................................................... 21

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals or petitions in this matter.

# GLOSSARY

| | |
|---|---|
| ACH | Automated Clearinghouse |
| AML | Anti-Money Laundering |
| Board | Board of Governors of the Federal Reserve |
| BSA | Bank Secrecy Act |
| CRM | Credit Risk Management department |
| FRA | Federal Reserve Act, Pub. L. No. 63-43, ch. 6, 38 Stat. 251 (1913) |
| FRBKC | Federal Reserve Bank of Kansas City |
| FRBNY | Federal Reserve Bank of New York |
| FRBSF | Federal Reserve Bank of San Francisco |
| FDIC | Federal Deposit Insurance Corporation |
| MCA | Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980), |
| OCC | Office of the Comptroller of the Currency |
| SPDI | Special Purpose Depository Institution |
| WY DOB | Wyoming Division of Banking |

## INTRODUCTION

Custodia's appeal presents a single legal question: does every depository institution have an absolute entitlement to a Federal Reserve Bank master account and services, regardless of the risk it presents or the harm such use might cause to the Reserve Bank, to the public, to the federal payment system, or to the Federal Reserve's ability to implement the nation's monetary policy? The answer is no. Custodia's position contravenes the text, structure, and purpose of the Federal Reserve Act (the "FRA") and would bring radical and destabilizing change to the banking industry.

Reserve Banks operate the federal payment system, a payment and settlement system that facilitates and clears financial transactions at all levels of the U.S. economy through designated accounts held at the Reserve Banks. To directly access and use that system, a depository institution must request, receive, and then make deposits into a "master account" at its administrative Reserve Bank. For a century, Reserve Banks have exercised discretion over which banks may have an account and use Reserve Bank payment services. If a bank presents undue risk,

the Reserve Bank can protect itself and the system by declining to provide (or terminating) a master account.

Custodia requested a master account from the Federal Reserve Bank of Kansas City ("FRBKC"). Following a detailed review, FRBKC denied the request. The reasons for the denial were many, including that Custodia's business plan was risky and ill-defined, its management lacked sufficient relevant experience, its regulatory and compliance programs were inadequate, and it planned to operate without insurance or any federal prudential supervisor—a highly unusual circumstance for a depository institution seeking direct access to the payment system. FRBKC's assessment that Custodia presents undue risk is unrebutted; Custodia chose not to challenge FRBKC's denial on the merits.

Instead, and possibly because it wanted to avoid casting a spotlight on its own infirmities and FRBKC's sound concerns, Custodia chose to advance a legal theory in this case with ramifications that extend far beyond its own request. As Custodia sees it, every state-chartered entity that meets the FRA's statutory definition of "depository institution" is absolutely entitled to access and use all Reserve Bank services. Whether Custodia presents serious and systemic risk would not matter.

2

Depository institutions presenting all manner of risk—those teetering on failure, rife with internal frauds and thefts, or engaged in illegal conduct (or all of the above)—would be entitled to open a master account, make deposits, and enjoy unfettered, unconditional use of Reserve Bank services, including by sending large-dollar wire transfers that expose the Reserve Bank (and ultimately, taxpayers) to losses. Custodia's CEO underscored the extreme nature of Custodia's legal position, testifying that this lawsuit tests whether a depository institution is automatically entitled to a master account even if it has no compliance officer.

The district court correctly rejected Custodia's position. In two other recent cases brought by other depository institutions presenting unacceptable levels of risk, the courts came out the same way. And no court has ever granted the relief requested here—forcing a Reserve Bank to provide a master account and services to an entity over the Reserve Bank's objection.

For the reasons set forth in the brief of the Board of Governors of the Federal Reserve (the "Board"), a straightforward analysis of the text, structure, and context of the FRA forecloses Custodia's position. Rather

than duplicate the Board's analysis,[1] FRBKC focuses in this brief on the facts relating to Custodia's request. Those facts show why Custodia's legal theory is dangerous as well as wrong. Adopting Custodia's absolute-entitlement theory would expose Reserve Banks and the nation's payment system—indeed, the Federal Reserve System as a whole—to serious risks in a way that Congress could not have intended.

Custodia wraps itself in a faulty federalism, contending that our country's "dual banking" system undergirds its position. But in so doing, it distorts what dual banking has always meant. Dual banking means that state and federal entities are each able to issue banking charters and regulate charter-holders. It has never meant that states are free to issue novel types of charters to uninsured depository institutions that—simply because they are state-chartered—enjoy automatic access to the federal payment system. There is no tradition of states creating novel charters that dispense with any and all federal consideration of the entity's riskiness, and there certainly is no tradition of Reserve Banks automatically providing master accounts and services to all depository

---

[1] Pursuant to Federal Rule of Appellate Procedure 28(i), FRBKC adopts the Board's arguments.

institutions irrespective of risk. Custodia's vision of "dual banking" is a dangerous fiction.

Accordingly, the Court should affirm the district court's well-reasoned decision.

## STATEMENT OF THE CASE

**I.    Reserve Banks Exercise Discretion Over Access to Accounts and Services to Mitigate Risk.**

### A.    Congress Empowered Reserve Banks to Provide Payment Services.

Congress created the Federal Reserve in 1913 "to oversee banking operations and promote greater economic stability." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019); *see* Federal Reserve Act, Pub. L. No. 63-43, ch. 6, 38 Stat. 251 (1913). Congress directly empowered the Reserve Banks to further this mission by accepting deposits from and providing payment services to depository institutions. *See* 12 U.S.C. §§ 341–361; *see also* U.S. Fed. Rsrv. Sys., No. 0821, The Fed Explained: What the Central Bank Does ("The Fed Explained") at 86 (11th ed. 2021), http://tinyurl.com/a7y83ejh. In its payment system role, a Reserve Bank serves as a "bank for banks." The Fed Explained at 11. Much like an ordinary bank provides financial services to individuals and businesses, Reserve Banks offer accounts and

payment services to depository institutions. *Id.* Today, Reserve Bank payment services include Automated Clearinghouse ("ACH") payments, check processing, instant funds transfers through Fedwire and FedNow, and real-time transfers of federal government securities. *Id.* at 4, 11, 38, 90–97.

A depository institution seeking to access these services directly must do so by submitting a request and, upon approval, making deposits with its "administrative" Reserve Bank.[2] For a time, Reserve Banks offered services through both deposit and clearing accounts, and separate accounts were required to do business in different Federal Reserve districts. In 1998, the Federal Reserve consolidated each depository institution's accounts and access to services into a single deposit account that has come to be known as a "master account." *See Interstate Branching: New Account Structure*, FederalReserve.gov (Sept. 27, 2002), https://tinyurl.com/3am47864 ("All credits and debits resulting from the use of Federal Reserve services will be booked to this one account."). A

---

[2] There are twelve Reserve Banks, each covering a unique geographical district. *See* The Fed Explained at 3. FRBKC is the Reserve Bank for the Federal Reserve's Tenth District, which encompasses Wyoming, Colorado, Kansas, Nebraska, Oklahoma, and parts of Missouri and New Mexico. *Id.*

master account is simply a single deposit account into which an institution may make deposits and through which it may access Reserve Bank services.

Reserve Banks provide access to payment services to both state-chartered "member" and "nonmember" banks. A state-chartered "member" bank is one that has applied for and received membership with the Federal Reserve and that is therefore subject to Federal Reserve supervision. 12 U.S.C. §§ 222, 321, 324. A "nonmember" bank is often a state-chartered depository institution that is not subject to Federal Reserve supervision. Virtually all nonmember banks, however, are required by their state charters to obtain deposit insurance from the Federal Deposit Insurance Corporation ("FDIC") and are thus subject to ongoing federal supervision by the FDIC. *See* Arthur E. Wilmarth, Jr., *We Must Protect Investors and Our Banking System from the Crypto Industry*, 101 Wash. U. L. Rev. 235, 322 (2023).

Depository institutions that do not have master accounts can access the federal payment system indirectly through either a correspondent banking relationship or a commercial banking relationship. *See* S.J.A. Vol. 1 at 98–102 ¶¶ 13, 16–17, & n.27. Alternatively, they can use

payment services offered by private competitors of the Federal Reserve, such as the Clearing House Interbank Payments System, which competes with the Federal Reserve's Fedwire. *See* S.J.A. Vol. 1 at 99–100 ¶ 15. And financial companies that do not accept deposits, like transaction processors, can connect to the payment system through commercial banking relationships. *See* S.J.A. Vol. 1 at 102–03 ¶¶ 18–19.

### B.   Use of Reserve Bank Services Presents Risk to the Reserve Bank, the Public, and the U.S. Financial System.

A depository institution's use of a master account and Reserve Bank services presents risks to the Reserve Bank, to the public, to the implementation of the nation's monetary policy, and to the overall federal payment system.

Risk to the Reserve Bank includes counterparty credit risk. Reserve Banks extend credit to banks in connection with the provision of payment services, so Reserve Banks are at risk of losing money owed to them by depository institutions using their services. *See* Bd. of Governors, Federal Reserve Policy on Payment System Risk, at 3–4, 15, 33 (as amended July 20, 2023), https://tinyurl.com/24dpa2t6. Ultimately, Reserve Bank losses are borne by U.S. taxpayers, so risks to the Reserve Banks are risks to

the public fisc. Private commercial banks protect themselves from counterparty credit risk by doing business only with customers deemed creditworthy, or by limiting the amount of credit extended to a customer based on an assessment of the customer's creditworthiness. Reserve Banks do the same. *See, e.g.*, 12 C.F.R. §§ 201.1 *et seq.* (establishing rules for Reserve Banks to extend credit to depository institutions); Federal Reserve Policy on Payment System Risk, at 15–35 (outlining the methods by which Reserve Banks control credit risk while providing intraday credit).

Use of payment services also presents risk to the Federal Reserve's ability to implement monetary policy. When a bank deposits money into a master account, the Reserve Bank's balance sheet reflects those deposits ("reserve balances") as liabilities. The more deposits by commercial banks, the larger the Reserve Bank's liabilities. *See Monetary Policy: Credit and Liquidity Programs and the Balance Sheet*, FederalReserve.gov (Nov. 15, 2021), https://tinyurl.com/2f28bcfb. The Federal Reserve implements monetary policy in part by using tools such as changing the interest rates paid on reserve balances to increase or decrease the amount of money banks deploy in the economy versus hold

in a master account. The Federal Reserve's ability to implement monetary policy throughout the economy is affected by the magnitude and nature of the liabilities on its balance sheet. *See* Jane Ihrig, Zeynep Senyuz, & Gretchen Weinbach, The Fed's "Ample Reserves" Approach to Implementing Monetary Policy (Fed. Rsrv. Bd., Working Paper No. 2020-022, Feb. 19, 2020), https://tinyurl.com/29xuwpw8.

Depository institutions' access to services also presents payment system risk. If a bank with a master account fails, its inability to make good on payments to customers and counterparties could result in harm to others and undermine confidence in the system. *See, e.g.*, Federal Reserve Policy on Payment System Risk, at 4–5. For example, when an institution's inability "to settle on private large-dollar payments networks cause[s its] creditors on those networks, in turn, to be unable to settle their own commitments," "[s]erious repercussions could … spread to other participants in the network, to other depository institutions not even participating in the private network, and to the nonfinancial economy generally." Interim Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems, 52 Fed. Reg. 29,255, 29,256 (Aug. 6, 1987). Those risks persist today; the Federal Reserve's

most recent financial stability report highlighted "notable" vulnerabilities in the banking and broader financial system from $21.3 trillion of "runnable money-like financial liabilities." Bd. of Governors, No. 0424, Financial Stability Report, at 35 (Apr. 2024), https://tinyurl.com/22nh39b5.

Moreover, use of the payment system in connection with money laundering, terrorism financing, or transactions that violate trade sanctions can undermine the integrity of (and erode confidence in) the federal payment system. Recently, for example, the Federal Reserve Bank of New York ("FRBNY") terminated the master account of a Puerto Rico-chartered entity that had been investigated by the FBI and whose account activity was found to present a serious risk of "activities such as money laundering, economic or trade sanctions violations, or other illicit activity." *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.* ("*BSJI*"), 700 F. Supp. 3d 86, 104 (S.D.N.Y. 2023) (quotation marks omitted). That entity sought a preliminary injunction to force FRBNY to maintain its master account, arguing the same absolute-entitlement theory as Custodia. *Id.* at 99. The district court denied relief, explaining that forcing FRBNY to continue doing business with that entity would

11

"place the public in harm's way" by "implicat[ing] the Federal Reserve in [the entity's] questionable transactions." *Id.* at 104.

### C. For More Than a Century, Reserve Banks Have Exercised Discretion Over Access to Accounts and Services to Mitigate Risk.

Reserve Banks did not recently "discover[]," Custodia Br. 25, 38 (quotation marks omitted), the ability to exercise discretion over access to deposit accounts and services. Reserve Banks have long expressed and exercised this authority. The Board's brief lists numerous examples of such discretion, including regarding whether to accept deposits from nonmember banks for check-clearing purposes (in 1935), imposing limits on large-dollar wire transfers (in 1985), and terminating master accounts (in 1998). *See* Board Br. I.D. In addition to these examples, individual Reserve Banks have promulgated procedures that demonstrate how Reserve Banks have continually exercised discretion over access to deposit accounts and services to mitigate risk.

For instance, FRBNY historically used a handbook it developed to determine when an institution requesting a master account or use of services poses high risk. *See* S.J.A. Vol. 1 at 111–14. FRBNY "conduct[ed] enhanced due diligence and a risk assessment" for such applicants and

took "steps to mitigate risks posed by the applicant." S.J.A. Vol. 1 at 112. FRBNY also published another handbook that explained how FRBNY "assesse[d], manage[d], and mitigate[d] the risks that arise in connection with its decision to provide, in its sole discretion, accounts or Federal Reserve financial services to a [f]inancial [i]nstitution." S.J.A. Vol. 1 at 118 (footnote omitted).

FRBKC has its own policies and procedures regarding access. At the time of Custodia's request, FRBKC's Credit Risk Management department's ("CRM") responsibilities included protecting the Reserve Bank from loss by monitoring and mitigating the risks that may arise from granting master account requests, accepting deposits, and providing services.[3] *See* S.J.A. Vol. 1 at 131. CRM's review was governed by its "Account Opening Approval Process." *See* S.J.A. Vol. 4 at 553–68. If CRM determines that the requesting institution is eligible for the requested account or service, CRM performs a "risk assessment (structure and safety and soundness check)" in which it evaluates factors including the requesting institution's "[c]harter type and primary regulator,"

---

[3] CRM has subsequently been renamed the Credit, Reserves, and Risk Management Department.

13

"management," "capital adequacy," "[s]upervisory issues," and "other relevant financial issues." S.J.A. Vol. 4 at 556–57. CRM also assesses the institution's compliance programs for issues including the anti-money laundering ("AML") requirements of the Bank Secrecy Act ("BSA") and requirements related to enforcing U.S. sanctions (collectively, "BSA/AML"). *See* S.J.A. Vol. 6 at 1007 (Tr. 311:9–24).

CRM classifies a request as "routine" if the depository institution is "established," if it is "examined by known regulatory partners," and if FRBKC has "access to assigned supervisory ratings" from the institution's existing supervisor—*i.e.*, established, U.S.-domiciled, federally insured banks, thrifts, and credit unions that are subject to the full suite of federal banking laws. S.J.A. Vol. 4 at 567. With routine requests, FRBKC is able to obtain the information it needs about the applicant from its prudential supervisor and generally "do[es] not need applicants to submit this information to [it] as part of an account opening request." S.J.A. Vol. 4 at 567. A routine request can be processed in about a week. S.J.A. Vol. 1 at 164 (Tr. 191:2–7); *see* Custodia Br. 16 (contending that "master account applications are routinely processed in 5–7 business days" (cleaned up)).

14

FRBKC treats a request as "non-routine" if the requesting institution is "de novo"—that is, not yet operating—or has "[n]o federal insurance." *See* S.J.A. Vol. 4 at 567. Non-routine requests have historically "received the highest level of scrutiny and review," S.J.A. Vol. 6 at 1009 (Tr. 313:9–14), and have been rare, *see* S.J.A. Vol. 2 at 200–01 (Tr. 298:19–299:2). As of November 2023, 540 institutions had master accounts with FRBKC, and all but one had *both* federal insurance *and* a federal supervisor. *See* S.J.A. Vol. 2 at 220. The sole exception was a century-old, traditional savings-and-loan association that had insurance and a federal supervisor when it first obtained a master account. S.J.A. Vol. 2 at 220; Brian Brus, *Old-Fashioned Financing: S&L Still Thriving Without FDIC Insurance*, J. Record (Nov. 15, 2018), http://tinyurl.com/ya5f6wcx. The majority of depository institutions with master accounts with FRBKC—393 of 540—were state-chartered entities with FDIC insurance; the rest, except the savings-and-loan association mentioned above, were depository institutions with federal charters and federal supervision. *See* S.J.A. Vol. 2 at 220.

Custodia asserts that "[u]ntil recently, the Fed routinely granted master accounts to institutions that were not federally insured," citing a

Federal Reserve database containing information about access to services that Custodia claims lists "430 existing master account holders that have no federal insurance, of which more than 300 have no federal regulator." Custodia Br. 9 n.4. Custodia is incorrect. For one thing, the database includes not only institutions that have master accounts, but also institutions that access Reserve Bank services by settling transactions in the master account of *another* depository institution. Bd. of Governors, *Master Account and Services Database: Database: Existing Access*, FederalReserve.gov (data current as of May 31, 2024), https://tinyurl.com/unh8tnsd. In addition, the institutions that Custodia counts as lacking federal insurance or a federal regulator include (a) government corporations and government-sponsored entities such as the Federal Home Loan Mortgage Corporation (authorized to receive Reserve Bank services by 12 U.S.C. § 1452(d)), the Tennessee Valley Authority (authorized by 31 U.S.C. §§ 9107(b) & 9101(3)(M)), and the institutions of the Farm Credit System (authorized by a separate provision of the Federal Reserve Act, section 15(3) (codified at 12 U.S.C. § 393)); (b) branches and agencies of foreign banks, which are federally supervised and have access through FRA section 13(14) (codified at 12

U.S.C. § 347d); and (c) credit unions and similar entities that are insured by entities other than the FDIC or the National Credit Union Administration.

In addition to individual Reserve Banks' policies regarding master account requests, the Board recently promulgated guidelines for Reserve Banks to enhance consistency and transparency in access to Reserve Bank accounts and services. *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099, 51,101 (Aug. 19, 2022). This guidance makes clear that Reserve Banks "retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." *Id*. at 51,106. As FRBKC's head of CRM testified, the approach described in the Guidelines is a continuation of FRBKC's preexisting practice. *See* S.J.A. Vol. 6 at 977 (Tr. 53:20–24) (explaining that Guidelines were "a way to make … our internal procedures that we had been following for many years … more transparent to the public"). Each access request is "reviewed on a case-by-case, risk-focused basis." 87 Fed. Reg. at 51,109.

## II.    Custodia's Request to Access and Use Services Presented Unacceptable Risk.

### A.    Custodia Is Not a Traditional Bank.

The traditional business of banking involves taking and holding customer deposits and earning money by making loans, with depositors protected against loss by FDIC deposit insurance backed by the full faith and credit of the U.S. government. *See, e.g.*, Wyo. Stat. Ann. §§ 13-2-201, 13-2-103 (Wyoming's traditional banking charter). Custodia does not have a traditional banking charter. Instead, it obtained a Special Purpose Depository Institution ("SPDI") charter newly created by Wyoming in 2019 to attract businesses focused on cryptocurrency.

Unlike traditional banks, SPDIs are prohibited from engaging in lending, so they must try to make money by venturing into other business practices. Wyo. Stat. Ann. § 13-12-103. And unlike traditional banks, SPDIs need not obtain deposit insurance. *See id.* § 13-2-103(a) ("All banks, *except special purpose depository institutions*, shall obtain insurance of their deposits by the United States and shall subscribe for insurance of deposit accounts by the federal deposit insurance corporation ...." (emphasis added)). Wyoming's SPDI statute departs from banking norms: before its passage, virtually every state-chartered bank

18

in the United States was required by law to obtain FDIC insurance, a requirement of which is submitting to the FDIC's ongoing supervision. *See* Wilmarth, 101 Wash. U. L. Rev. at 322; Michael S. Barr, Howell E. Jackson, & Margaret E. Tahyar, Financial Regulation: Law & Policy 173 (2d ed. 2018).[4]

Custodia envisioned operating four lines of business: (i) "core banking" (offering deposit accounts and payment services on a strictly remote basis to customers around the world); (ii) "prime services" (facilitating crypto transactions); (iii) "custody" of digital assets; and (iv) issuing "the Avit," a digital asset "akin to a stablecoin." *See* S.J.A. Vol. 4 at 581–85; S.J.A. Vol. 4 at 677; S.J.A. Vol. 6 at 1059–60 (Tr. 91–92). In stark contrast to most traditional banks, Custodia's hoped-for

---

[4] Custodia's claim that FRBKC and the Board "worked hand-in-hand with Wyoming to develop the SPDI regulatory regime, meeting approximately 100 times between 2017 and 2019," Br. 10 n.5, is misleading. *See also* Wyo. Sec'y of State Br. 7. The vast majority of FRBKC's meetings with Wyoming authorities related to subjects other than the SPDI legislation, such as FRBKC's and Wyoming's joint supervision of existing Wyoming-chartered traditional banks that are members of the Federal Reserve. *See* S.J.A. Vol. 2 at 184–85 (Tr. 38:16–39:18); S.J.A. Vol. 1 at 153–54 (Tr. 25:8–26:9). FRBKC expressed its view to Wyoming authorities in connection with the SPDI legislation's passage that FRBKC retained discretion in granting master accounts and access to services. *See* S.J.A. Vol. 2 at 223, 225.

profitability would be derived from fees associated with digital asset transactions, not lending.

Internally, Custodia compared itself to both banks and non-banks. A member of Custodia's Board of Directors stated that it was "really a [transaction] processor," like Visa or MasterCard. S.J.A. Vol. 2 at 347; S.J.A. Vol. 6 at 1092–93 (Tr. 281:14–282:23). Transaction processors typically operate without master accounts. *See supra* at 8.

Custodia's self-serving assertion that as a SPDI it "must be considerably safer than most banks," Br. 11 (emphasis omitted), is unfounded conjecture. Without the protection of deposit insurance, Custodia's customers are at risk of losing their deposits in the event of fraud, theft, or the failure of the institution.[5] And each of these risks is heightened by Custodia's need to derive profitability from fees on transactions involving the volatile cryptocurrency industry—for example, if revenue were to fall due to a decrease in transaction volume,

---

[5] Custodia claims it applied for FDIC insurance but "it was not available for de novo banks that engage in crypto-asset activities." J.A. Vol. 2 at 419 n.8. Custodia's CEO, however, testified that Custodia sought FDIC feedback on a draft application and "didn't go back to the FDIC" or submit a formal application. *See* S.J.A. Vol. 6 at 1039–41, 1042 (Tr. 60–62, 65).

Custodia might need to cut costs (increasing the risk of losses due to fraud or theft) or take on riskier customers or transactions (increasing the risk of failure or facilitating criminality). *See* S.J.A. Vol. 4 at 698–99.

In addition, Custodia's use of Reserve Bank services would present the same types of risks to the payment system as are posed by *insured* depository institutions (*e.g.*, counterparty risks, BSA/AML risks, and risks to the implementation of monetary policy), but without a federal prudential supervisor. To be sure, Custodia would be subject to supervision by the Wyoming Division of Banking ("WY DOB"). But the WY DOB, understandably, has no responsibility for protecting the federal payment system or broader financial system stability, nor for implementing federal monetary policy. *See* WY DOB, WyomingBankingDivision.wyo.gov (2021), http://tinyurl.com/bdfsryhw (WY DOB's mission is to "maintain a financial regulatory system *for Wyoming* that promotes a progressive banking environment" and that "allows for economic development *within this State*." (emphasis added)). Accordingly, risk to the federal payment system would be left unmitigated if (as Custodia urges) it could send payments across the nation and facilitate crypto transactions for a global set of customers,

counterparties, or Avit-holders, subject only to Wyoming's state-focused supervision.

Fundamentally, moreover, Custodia's legal theory magnifies these risks. If Custodia is absolutely entitled to a master account and access to Reserve Bank services, then it is not clear how FRBKC could conduct its own diligence to assess whether Custodia actually adheres to the regulatory requirements that exist on paper—including the requirement that Custodia "comply with all applicable federal laws," Wyo. Stat. Ann. § 13-12-107.

## B. Custodia Requested Access to Reserve Bank Services Before It Was Ready or Even Licensed to Operate.

Custodia requested that FRBKC provide it a master account in October 2020, one day after receiving its SPDI charter and before it had fully developed its business plans, built out its operations, or obtained the Wyoming license it required to operate. *See* J.A. Vol. 9 at 1951; S.J.A. Vol. 4 at 714.

Custodia made its request "well in advance of when [it was] ready to open." S.J.A. Vol. 4 at 764–65 (Tr. 131:22–132:4). As its CEO confessed, Custodia was still in its "construction period." S.J.A. Vol. 6 at 1080 (Tr. 144:3–9). Custodia "hadn't figured out the details" of offering its

"prime services"—"matching buyers and sellers" of crypto—such as whether to partner with a crypto exchange (and, if so, which one). S.J.A. Vol. 6 at 1052–53, 1068–70 (Tr. 80–81, 107–09). Custodia had not "built the technology platform" for its "core" custody product offering. S.J.A. Vol. 6 at 1046–47, 1050 (Tr. 74–75, 78). Nor had Custodia developed the technology, policies, procedures, or controls for the Avit. *See* S.J.A. Vol. 4 at 710. Under Custodia's theory of this case, FRBKC is required to provide accounts and services even to depository institutions that, like Custodia, were only half-formed.

## C.    FRBKC Evaluated the Policy Questions and Risks Presented by Custodia's Request.

Under FRBKC's CRM procedures, Custodia's request was considered "non-routine," S.J.A. Vol. 4 at 567, because Custodia was not yet operating and did not have federal insurance. CRM identified and analyzed issues raised by Custodia's request, including the threshold question of whether Custodia was legally eligible to obtain a master account. S.J.A. Vol. 3 at 556; S.J.A. Vol. 2 at 241 (Tr. 50:16–24); J.A. Vol. 4 at 896.[6] After consultation with FRBKC's and the Board's legal

---

[6] An entity is legally eligible to request a master account if it is a "depository institution" within the meaning of the FRA. Reserve Banks

departments, *see* S.J.A. Vol. 2 at 190 (Tr. 194:14–22), FRBKC communicated to Custodia in January 2022 that based on the information before it at that time, Custodia "satisfie[d] the threshold definition of an entity eligible to maintain a master account," S.J.A. Vol. 3 at 387.

Aside from eligibility, a second set of issues presented by Custodia's request concerned the novel structure of the SPDI charter and the effects of an uninsured institution having access to the Federal Reserve payment system. S.J.A. Vol. 2 at 266 (Tr. 106:13–21).[7] And a third set of

---

are authorized to receive deposits from "member banks, or other depository institutions." 12 U.S.C. § 342; *see also id.* § 248a(a), (c)(2) (referring to "depository institutions"). The FRA defines a "depository institution" to include "any bank which is eligible to make application to become an insured bank." 12 U.S.C. § 461(b)(1)(A)(i). And "any depository institution which is engaged in the business of receiving deposits other than trust funds" is eligible to apply for FDIC insurance. 12 U.S.C. § 1815(a)(1).

[7] Although Custodia makes much of the "strict 100% reserve requirement," Br. 3, *see* Wyo. Stat. Ann. § 13-12-105(a), that requirement cannot eliminate the risks that an uninsured institution with a master account would pose because it is not possible to guarantee that the value of reserves will actually equal or exceed the institution's liabilities. *See, e.g.,* Press Release, CFTC, Release No. 8450-21, CFTC Orders Tether and Bitfinex to Pay Fines Totaling $42.5 Million (Oct. 15, 2021), https://tinyurl.com/47y3cv2j (fining digital asset company for failing to maintain reserves as promised).

questions concerned whether Custodia's planned digital-asset services were legally permissible and "appropriate banking activity." S.J.A. Vol. 2 at 266 (Tr. 106:13–21); *see* S.J.A. Vol. 3 at 389. For example, while Custodia planned to issue a so-called stablecoin without insurance, federal authorities (including the FDIC and the Office of the Comptroller of the Currency ("OCC")) called on Congress to "require stablecoin issuers to be insured depository institutions." Report on Stablecoins, at 2 (President's Working Grp. on Fin. Mkts., Working Paper, Nov. 2021), http://tinyurl.com/5225srnv. And while Custodia planned to hold certain digital assets on its balance sheet, *see* S.J.A. Vol. 6 at 1053–54 (Tr. 81:24–82:14), the Board's view was that holding crypto assets on balance sheet is "highly likely to be inconsistent with safe and sound banking practices," Bd. of Governors, FDIC, & OCC, Joint Statement on Crypto-Asset Risks to Banking Organizations, at 2 (Jan. 3, 2023), http://tinyurl.com/nhdkv56d. Additional regulatory uncertainty concerned Custodia's plans to facilitate crypto transactions, *see generally, e.g.*, *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 321, 323–31 (S.D.N.Y. 2023) (addressing uncertainty over which digital assets constitute "securities"), and its plans to provide digital asset custody, *see* SEC Staff

25

Accounting Bulletin No. 121 (Apr. 11, 2022) (changing accounting guidance concerning digital asset custody).

As Custodia's nascent business plans developed and regulatory thinking concerning digital assets evolved, *see* S.J.A. Vol. 3 at 455–56, FRBKC led multiple risk assessments of Custodia's business, *see, e.g.*, J.A. Vol. 6 at 1289 ¶ 65; S.J.A. Vol. 5 at 864 (summer 2020); S.J.A. Vol. 5 at 867 (Oct. 2020); S.J.A. Vol. 3 at 392 (Jan. 2021); S.J.A. Vol. 5 at 881 (Mar. 2021); S.J.A. Vol. 5 at 907 (Aug. 2021); S.J.A. Vol. 3 at 395 (Oct. 2021–Jan. 2022); S.J.A. Vol. 5 at 933 (Oct. 2021–Jan. 2022); S.J.A. Vol. 4 at 694 (May 2022–Oct. 2022). After a multi-month review of Custodia's business plan that commenced in October 2021, FRBKC determined that Custodia's risk management was "immature," "substantial work remain[ed] in implementing a sound BSA/AML program," and Custodia was little more than "a business plan with some draft policies." *See generally* S.J.A. Vol. 5 at 936–37; S.J.A. Vol. 4 at 750–58 (Tr. 40–48).

By early 2022, approximately a year and a half after Custodia requested a master account, it still had only a "first draft" of its policies regarding BSA/AML compliance. *See* S.J.A. Vol. 6 at 1022–23 (Tr. 16:21–17:8). A consultant reviewed the draft and determined that it "lack[ed] …

26

specificity" and required "more granularity." *See* S.J.A. Vol. 5 at 782–83. The consultant recommended numerous program enhancements across areas from risk assessment and transaction monitoring to corporate governance and record retention. *See* S.J.A. Vol. 4 at 701.

As of spring 2022, Custodia had a SPDI charter—obtained in October 2020, *see* J.A. Vol. 9 at 1951—but did not yet have a license from Wyoming to operate. *See* Wyo. Stat. Ann. §§ 13-12-116(a), 13-1-101(a)(v) (requiring chartered institutions to obtain certificate of authority from the state banking commissioner before commencing operations).[8] Yet, notwithstanding all these issues, Custodia continued to demand that FRBKC grant its request for a master account so that it could make deposits and use Reserve Bank services.

---

[8] Custodia did not receive a certificate of authority until September 2022, nearly two years after it obtained its charter. J.A. Vol. 9 at 1951. Custodia went "live" and began to accept external deposits in July 2023. *See* Custodia Bank (@custodiabank), X.com (Aug. 11, 2023), https://x.com/custodiabank/status/1690012708513390592 ("Last month, we began to serve external customers.").

### III. The District Court Rejected Custodia's Attempt to Force Access to the Federal Payment System.

#### A. Custodia Sued to Demand a Master Account While FRBKC's Review Was Still Ongoing.

Custodia filed this lawsuit in June 2022, with its master account request still pending, asserting that "state-chartered deposit-taking institutions like Custodia *must* be allowed access to the Federal Reserve System through master accounts." J.A. Vol. 1 at 50 ¶ 27 (emphasis added).

In its original complaint, Custodia contended that the Board and FRBKC were both agencies for purposes of the Administrative Procedure Act and that both had engaged in unreasonable delay. J.A. Vol. 1 at 61–68. Custodia asked the district court to compel the Board and FRBKC to decide its master account request. *See, e.g.*, J.A. Vol. 1 at 68, 70, 72 ¶¶ 81, 91, 101. But from the start Custodia's lawsuit was predicated on an absolute-entitlement theory of section 248a of Title 12—that any entity holding any state (or territorial) charter must be granted a master account and the ability to make deposits and use services. *See, e.g.*, J.A. Vol. 1 at 43 ¶ 3 (claiming that "the statute commands" that Custodia be granted an account); J.A. Vol. 1 at 50 ¶ 26 (regarding territorial charters); J.A. Vol. 1 at 50 ¶ 27 ("Federal law mandates that state-chartered

deposit-taking institutions like Custodia must be allowed access to the Federal Reserve System through master accounts …."); J.A. Vol. 1 at 80 ¶ 137 (claiming entitlement to writ of mandamus ordering defendant to provide it a master account). Custodia also asserted claims regarding the separation of powers and due process. J.A. Vol. 1 at 70–72.

FRBKC and the Board filed motions to dismiss, which the district court granted in part and denied in part. J.A. Vol. 2 at 359. The court declined to decide certain issues at the pleading stage. It did not decide whether FRBKC was a federal agency for APA purposes, stating only that Custodia's allegation that FRBKC was an APA agency was plausible and allowing Custodia's APA claim against FRBKC to go forward on that basis. J.A. Vol. 2 at 365. Likewise, on the central legal issue of whether section 248a gives Custodia (and all other depository institutions) an absolute entitlement to a master account, the court left "for another day" "a full statutory interpretation of the matter," J.A. Vol. 2 at 374, and limited itself to finding that Custodia had adequately pleaded such an entitlement, J.A. Vol. 2 at 370.

The court also determined that Custodia had pleaded sufficient involvement by the Board in the consideration of Custodia's request to

allow Custodia's APA unreasonable-delay claim to go forward against the Board. J.A. Vol. 2 at 366, 369. Custodia alleged that FRBKC had been poised to grant it a master account before the Board intervened and prevented FRBKC from doing so. J.A. Vol. 1 at 44 ¶¶ 5–6. The court ordered discovery into the defendants' roles relating to Custodia's request, writing that if FRBKC was exercising no discretion of its own and instead the Board was "pulling the puppet strings behind the scenes," then FRBKC's belief that the law gives it discretion might not matter. J.A. Vol. 2 at 374–75.

The court dismissed Custodia's separation-of-powers claim, J.A. Vol. 2 at 378–80, its claim of a violation of due process on the theory of bias or regulation by a competitor, J.A. Vol. 2 at 381–83, and its claim that the process for deciding master account requests violates the Appointments Clause, J.A. Vol. 2 at 383–90.

### B. FRBKC Continued to Evaluate and Then Denied Custodia's Request.

FRBKC continued its work on Custodia's request, including a multi-month exam with on-site reviews in the fall of 2022. *See* S.J.A. Vol. 3 at 447–48; S.J.A. Vol. 5 at 942. By this time, Custodia had separately applied to the Board to become a Federal Reserve member

bank. Member banks are subject to prudential supervision by the Board, and the Board has the ultimate authority to decide whether to grant or deny a bank's application to become subject to its supervision. The Board routinely works with the Reserve Bank in whose district the applicant is located to evaluate a request for membership. In Custodia's case, this was FRBKC, which was already in the process of evaluating Custodia's separate request for a master account. In the summer and fall of 2022, FRBKC conducted a coordinated examination to inform its decision on the master account request and the Board's consideration of Custodia's application for membership. In connection with that review, FRBKC found that significant policy issues persisted even for Custodia's planned "day one" activities. *See* S.J.A. Vol. 4 at 696 ("Significant risk management gaps were identified specific to overall risk management, the BSA/AML … program, … and various financial areas.").

In the fall of 2022, FRBKC's then-President Esther George directed FRBKC staff to draft an internal memorandum recommending denial of the master account request and a denial letter to Custodia. S.J.A. Vol. 2 at 281 (Tr. 193:12–19); J.A. Vol. 4 at 906; S.J.A. Vol. 6 at 1003 (Tr. 307). The FRBKC memorandum recommended denial on multiple bases. *See*

31

S.J.A. Vol. 3 at 461. Consistent with internal Federal Reserve policy, FRBKC consulted with Board staff before issuing its denial of Custodia's request. *See* S.J.A. Vol. 3 at 545; S.J.A. Vol. 3 at 429 (Tr. 227:12–20). Board staff's feedback was consistent with FRBKC's assessment and did not alter the outcome. *See* S.J.A. Vol. 3 at 474; S.J.A. Vol. 3 at 487; S.J.A. Vol. 6 at 1005 (Tr. 309); S.J.A. Vol. 3 at 547.

In January 2023, FRBKC denied Custodia's request for a master account. *See* J.A. Vol. 9 at 1949–50. As President George explained in the denial letter, her decision was based on a range of risk and policy considerations, including that Custodia's "unprecedented business model" was dependent on "higher-risk business activities," that Custodia was "not subject to an established, interagency capital framework that fully addresses the relevant risks or a defined resolution process," and that Custodia's planned activities "do not currently have clarity at the federal level." J.A. Vol. 9 at 1949–50. The letter was accompanied by a summary analysis that provided further detail on FRBKC's reasons for denying the request, including BSA/AML and Office of Foreign Assets Control compliance risk; financial viability concerns; potentially insufficient capital base; counterparty risk; and the lack of federal

regulatory oversight. J.A. Vol. 9 at 1953–55. Earlier that same day, the

Board announced that it had denied Custodia's request for membership.[9]

*See* S.J.A. Vol. 6 at 1109.

### C. Custodia's Amended Complaint Abandoned Certain Claims and Advanced Only Its Absolute-Entitlement Theory.

After FRBKC denied Custodia's request, Custodia amended its

complaint. J.A. Vol. 2 at 401. The amended complaint continued to press

Custodia's absolute-entitlement theory under section 248a, contending

that mandamus should be granted against both the Board and FRBKC

to compel the issuance of a master account. J.A. Vol. 2 at 429–33. But

while Custodia contended that *the Board* had made the decision—and

---

[9] Custodia applied for membership in 2021, while its master account request was pending. *See* S.J.A. Vol. 3 at 549. The Board has authority to decide applications for membership and has delegated to Reserve Banks the authority to approve—but not to deny—such applications. *See* 12 C.F.R. § 265.20(e)(1). This is in contrast to decisions about whether to approve a request for a deposit account, which Congress authorized the Reserve Banks to make. *See* 12 U.S.C. § 342. President George was prepared to deny Custodia's master account request, but she determined that it made sense to await the membership decision. *See* S.J.A. Vol. 2 at 287 (Tr. 210:17–20). A decision by the Board to grant Custodia's membership application would have given Custodia a federal supervisor, altering FRBKC's risk analysis for Custodia's master account request. S.J.A. Vol. 2 at 284, 287–88 (Tr. 196, 210–11); S.J.A. Vol. 2 at 204–05 (Tr. 314–15).

had acted contrary to law under the APA in doing so—Custodia abandoned its previous claim that *FRBKC* was subject to the APA. J.A. Vol. 2 at 427–29. Custodia's amended complaint included only its absolute-entitlement theory; it did not include any claim against either the Board or FRBKC that challenged the denial of its master account request on the merits.

Defendants moved to dismiss and the court denied the motions, reiterating its interest in discovery into Custodia's allegation that the Board "controll[ed] the outcome" of Custodia's request. J.A. Vol. 3 at 610–11; *see also* J.A. Vol. 1 at 27 (ECF No. 197) (discovery order). President George testified that she had made the decision. S.J.A. Vol. 2 at 299, 305–06 (Tr. 254:4–10, 260:24–261:21).[10] FRBKC's decisionmakers were "skeptical" and "concern[ed]" about Custodia's proposal from the start,

---

[10] Every FRBKC employee who worked on the request and was deposed testified that President George made the decision. *See* S.J.A. Vol. 2 at 211 (Tr. 330:11–15); S.J.A. Vol. 1 at 171 (Tr. 429:7–14); S.J.A. Vol. 3 at 418 (Tr. 190:15–25); S.J.A. Vol. 6 at 1004 (Tr. 308:16–18); S.J.A. Vol. 1 at 144 (Tr. 294:6–9); S.J.A. Vol. 4 at 778 (Tr. 311:11–16); S.J.A. Vol. 3 at 502 (Tr. 218:21–25); S.J.A. Vol. 3 at 514–16 (Tr. 233:23–235:12); S.J.A. Vol. 3 at 523 (Tr. 202:13–16). And FRBKC and the Board repeatedly informed Custodia throughout the process that FRBKC was the decisionmaker. *See, e.g.*, S.J.A. Vol. 3 at 385 (Nov. 2020); S.J.A. Vol. 3 at 530–32 (Mar. 2021); S.J.A. Vol. 3 at 536 (Apr. 2021); S.J.A. Vol. 3 at 540–41 (Mar. 2022).

*see* S.J.A. Vol. 3 at 411, 435 (Tr. 156:16–19, 344:17–20), and grew more concerned as FRBKC's risk assessment revealed Custodia's un- and under-developed plans and substantial gaps in risk management and compliance. *See, e.g.*, S.J.A. Vol. 5 at 936–37; S.J.A. Vol. 4 at 750–58 (Tr. 40–48). With this suit pending, President George's retirement upcoming, and the identified risk-management gaps and policy questions persisting, FRBKC acted to deny the request, ultimately doing so after Board staff expressed "no concerns" with FRBKC's planned denial. *See* S.J.A. Vol. 4 at 696–97; S.J.A. Vol. 2 at 287–88, 291–92 (Tr. 210:17–211:17, 242:21–243:16); S.J.A. Vol. 3 at 547.[11]

### D. The District Court Rejected Custodia's Absolute-Entitlement Theory and Granted Summary Judgment to FRBKC.

The district court found that "extensive evidence … weighs toward a factual finding that it was FRBKC that denied Custodia's master account application." J.A. Vol. 7 at 1462. But the court did not need to

---

[11] A review of the document refutes Custodia's claim (at 22) that Board staff made "significant edits" to FRBKC's draft memorandum regarding FRBKC's decision to deny Custodia's request. None of the comments from Board staff had a significant impact on the memorandum's substance, *see* S.J.A. Vol. 3 at 472; S.J.A. Vol. 3 at 474; S.J.A. Vol. 3 at 484; S.J.A. Vol. 3 at 487, and certainly not on FRBKC's bottom-line conclusion to deny Custodia's request.

make detailed findings about the relative roles of FRBKC and the Board in denying Custodia's request, because the court held that Custodia's absolute-entitlement theory—the only legal theory Custodia advanced, underlying all of its claims against both FRBKC and the Board—was wrong as a matter of law.

As explained more fully in the Board's brief, the court held that "the statutory language is clear and unambiguous," J.A. Vol. 7 at 1467, and that "[t]he plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts," J.A. Vol. 7 at 1473. Because Custodia had no legal entitlement to a master account, its claim for mandamus (and its corresponding request for a declaratory judgment) against FRBKC failed and FRBKC was entitled to summary judgment.

## SUMMARY OF ARGUMENT

Section 248a, the sole provision Custodia relies on, is a uniform-pricing provision that does not provide any institution—whether member or nonmember—unconditional access to a Reserve Bank master account and services. To avoid duplication, FRBKC adopts under Rule 28(i) the Board's explanation of why Custodia's position is contrary to the text,

36

structure, context, and history of section 248a and the Federal Reserve Act.

In Section I below, FRBKC explains that Custodia's own request for a master account demonstrates why its legal position is untenable. Custodia lodged the request just *one day* after it had obtained its SPDI charter from Wyoming and *before* it had developed concrete plans for the services that it hoped would someday make it profitable (*e.g.*, facilitating digital asset transactions either through or in partnership with some yet-to-be-identified crypto exchange), *before* it had built out adequate risk management and compliance programs, and *before* it had even obtained a license from the State of Wyoming it needed to operate. Yet if Custodia's absolute-entitlement theory were to carry the day, FRBKC would have been required to provide it an account and the unfettered ability to use Reserve Bank services anyway. Neither statutory text nor legislative history—nor common sense—suggests that Congress intended this result.

Worse, if Custodia's absolute-entitlement theory were the law, Reserve Banks would be required to give master accounts and access to services to depository institutions that pose serious risks to the Reserve

Banks, the Federal Reserve System, and the integrity of the federal payment system, including risks of noncompliance with federal law. Custodia's CEO put a fine point on the extreme nature of its legal position, declaring that this case will test the proposition that a bank is entitled to a master account even if it has no chief compliance officer. It defies logic to suggest that Congress intended to require Reserve Banks to provide access to the federal payment system on a no-questions-asked basis to all comers regardless of risk.

In Section II, FRBKC explains that Custodia's claim that the nation's dual banking system supports its position is fiction. Dual banking simply means that federal and state authorities can both charter banks. It has never meant that state-chartered institutions are automatically entitled to unfettered, direct use of the federal payment system regardless of the terms of their charters, or that states can exempt their banks from scrutiny when seeking to access the federal payment system simply by omitting any requirement of federal deposit insurance. To the contrary, Reserve Banks have continuously and routinely exercised discretion over access to that system to mitigate risk, as to both federally chartered and state-chartered institutions. It is therefore

Custodia's position that misrepresents the dual banking system and would bring radical change, creating the conditions for the very race to the bottom and erosion of public confidence in the U.S. financial system that Congress enacted the FRA to prevent.

Finally, in Section III, FRBKC refutes Custodia's vague suggestion that FRBKC is trying to circumvent judicial review. This case *is* judicial review, and if the final decision in this case is that Custodia is entitled to a master account, it will get one. There is no dispute over that, so Custodia's suggestion that it would raise constitutional concerns for FRBKC to circumvent judicial review is beside the point. Beyond that, Custodia declined to challenge FRBKC's denial of its master account request on the merits, so the question of how a requestor might challenge a Reserve Bank's exercise of discretion has never been part of this case. The only issue before this Court is whether Custodia's absolute-entitlement theory is correct. As the district court below and two other courts have recently ruled in similar cases, it is not.

# ARGUMENT

## I.    Custodia Illustrates Why Its Absolute-Entitlement Theory Is Dangerous and Could Not Have Been Intended by Congress.

For the reasons set forth in the Board's brief, a straightforward analysis of the text, structure, context, and history of section 248a, section 342, and the Federal Reserve Act as amended by the Monetary Control Act of 1980 ("MCA"), Pub. L. No. 96-221, 94 Stat. 132 (1980), compels the conclusion that Custodia's absolute-entitlement theory is wrong. An analysis of the implications of Custodia's position further confirms that conclusion. If every depository institution holding any conceivable state or territorial charter had an absolute right to a master account, the doors to the federal payment system would be wide open to risky institutions in ways that Congress could not have intended.

To be clear, Custodia is not advancing its absolute-entitlement theory to obtain a master account merely for the sake of having a master account. Rather, Custodia claims that section 248a provides an unfettered right to make deposits into that account and thereafter *use* Reserve Bank services. *See* Custodia Br. 2, 24–25, 30–31. But Custodia's own request illustrates the untenable nature of the notion that all state-

chartered, nonmember depository institutions enjoy automatic access to the Federal Reserve System regardless of risk.

FRBKC's extensive review of Custodia left it with serious concerns. *See supra* at 18–27, 30–33. Custodia was not ready to execute even its day-one activities with adequate risk management and compliance controls. *See* J.A. Vol. 9 at 1951 (noting "significant risk management gaps concerning" even planned day-one activities, particularly in BSA/AML compliance). It envisioned providing digital-asset services contrary to federal guidance and emerging crypto policy. *See* Joint Statement on Crypto-Asset Risks to Banking Organizations at 2; President's Working Group Report at 2. And it had not yet figured out how it would operate the digital-asset-related business lines that it hoped would someday make it profitable. *See* S.J.A. Vol. 6 at 1046–48, 1050, 1052–53, 1068–70, 1094–95; S.J.A. Vol. 4 at 662; S.J.A. Vol. 4 at 709–10. It makes no sense to suggest that Congress intended to grant such a half-formed and problematic entity unfettered use of the federal payment system.

Custodia offers no coherent response to this fundamental problem with its position. At times, Custodia suggests that FRBKC was wrong to

conclude that it presents risk. *See, e.g.,* Custodia Br. 11 (claiming that SPDIs are "*considerably safer* than most banks"). But those are just empty words, as Custodia made the strategic choice not to challenge FRBKC's reasons for denying its request. Custodia wanted to avoid a focus on FRBKC's analysis of the many risks it poses. So it advanced only its absolute-entitlement theory, under which FRBKC's risk assessment is beside the point.

But that means Custodia is stuck with its absolutist theory, untenable implications included. Custodia's interpretation of section 248a would entitle it to a master account and use of Reserve Bank services even if everything FRBKC said about Custodia's risks were correct. Even if those risks are truly unacceptable, J.A. Vol. 9 at 1955—indeed, even if Custodia presented risks even more severe than FRBKC found—FRBKC would have to grant Custodia a master account anyway. All that would matter would be whether Custodia met the definition of a "depository institution" under the FRA. Custodia Br. 24, 26, & 29 n.16 (citing 12 U.S.C. §§ 1813, 461(b)(1)(A)); *supra* note 6.

If Custodia were correct that every state-chartered depository institution was, as such, automatically entitled to a master account and

access to Reserve Bank services, then Reserve Banks would be required to do business with banks engaged in illegal conduct. Yet this Court has already rejected that suggestion.

After Colorado legalized the distribution and sale of recreational marijuana, notwithstanding marijuana's continued prohibition under federal law, the Fourth Corner Credit Union sought to provide banking services to cannabis businesses. *See Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (op. of Moritz, J.). FRBKC denied Fourth Corner's request for a master account, in part because its business plan was premised on violating federal law. *Id.* at 1053–54. On appeal, Fourth Corner challenged that premise, arguing that it would serve cannabis businesses only to the extent permitted by federal law. *Id.* at 1056. Judge Moritz agreed with FRBKC that Fourth Corner's business plan was inconsistent with federal law, *id.* at 1055 (op. of Moritz, J.), while Judge Matheson believed that Fourth Corner should have a chance to clarify its business plan after further factual development, *id.* at 1058–59 & n.2 (op. of Matheson, J.). But both judges were clear that if Fourth Corner's business plan were inconsistent with federal law, its challenge to FRBKC's denial of its master account

Appellate Case: 24-8024   Document: 010111102170   Date Filed: 08/28/2024   Page: 54

request would fail. The panel upheld the dismissal of Fourth Corner's complaint and ordered dismissal without prejudice. *Id.* at 1053 (maj. op.) (per curiam).[12]

If Custodia's position were correct, FRBKC would have had to close its eyes to Fourth Corner's plan to violate federal law and provide it a master account and services anyway. Indeed, if Custodia's position were correct, FRBKC might not have even learned whether Fourth Corner's business would be inconsistent with federal law because, in Custodia's view, a requestor need not "work[] productively with" Reserve Bank staff to provide information about its business plan. Custodia Br. 15. After all, if a Reserve Bank has a ministerial duty to grant a master account regardless of what its due diligence might uncover, then the basis and scope of due diligence that FRBKC could conduct in the first place would be unclear.

---

[12] Judge Bacharach, unlike the other two members of the panel, would have allowed the complaint to proceed. 861 F.3d at 1053. Because Judge Bacharach advocated a disposition contrary to the Court's disposition, his solo opinion has no binding force. *Cf. Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case … the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." (cleaned up)).

Setting aside open illegality, Custodia's extreme position also leaves no room for FRBKC to deny access to a master account or Reserve Bank financial services based on risk. As Custodia's CEO put it, this case tests whether a depository institution would be entitled to a master account even if it had no chief compliance officer—which is to say, a bank operating without any employee bearing the responsibility to ensure compliance with federal law and to promulgate and enforce policies and procedures intended to safeguard customer deposits and data. S.J.A. Vol. 6 at 1089 (Tr. 265:7–12) ("[w]e're about to find out" the answer to that question).[13] Custodia's theory is that so long as a state or territory has issued a charter, a Reserve Bank must just *hope* that the depository institution's use of Reserve Bank services does not harm the Reserve Bank, the stability of the federal financial and payment systems, or the implementation of the nation's monetary policy—even if the institution

---

[13] After one of its examinations, FRBKC noted with regard to Custodia's BSA/AML compliance—which had "[n]oteworthy gaps" and "inadequate" "remediation efforts"—that "[t]here ha[d] been significant turnover in [Custodia's] BSA officer position." S.J.A. Vol. 4 at 700–01; *see also* S.J.A. Vol. 4 at 705.

is operating without deposit insurance and dedicating zero resources to compliance and risk management.[14]

In *Fourth Corner*, however, Judge Matheson voted to uphold the dismissal of Fourth Corner's suit even though he viewed whether Fourth Corner would violate federal law as an open question (rather than, like Judge Moritz, as a fait accompli). *See* 861 F.3d at 1058 (op. of Matheson, J.). Similarly, in *BSJI*, a bank denied involvement in BSA/AML violations, but the court refused to enjoin FRBNY's termination of its master account based on risks of improper conduct. *BSJI*, 700 F. Supp. 3d at 102–04. And in *PayServices Bank v. Federal Reserve Bank of San Francisco*, the Federal Reserve Bank of San Francisco ("FRBSF") denied a master account request based in part on compliance risk, and the court upheld the denial. *See* 2024 WL 1347094, at *4 (D. Idaho Mar. 30, 2024) (noting FRBSF's concerns about the bank's "unproven risk management framework"), *appeal docketed*, No. 24-2355 (9th Cir. Apr. 15, 2024).

---

[14] One of Custodia's amici makes this explicit, arguing that "when a state-chartered [bank] is in good standing with its state banking regulator, *that means* that it is … engaged in activities that are lawful under state law and not prohibited or limited by Federal law." Members of U.S. Senate Banking Committee Br. 26 (emphasis added).

46

Most entities will not openly advertise an intent to violate federal law, so it is critical for Reserve Banks to be able to assess the various risks presented by an access request and deny access based on risk concerns. And it is notable that both other courts recently presented with the same absolute-entitlement theory Custodia presses rejected that interpretation of section 248a and held that Reserve Banks may consider risk in reviewing master account access requests. *See id*. at *5–11 (rejecting PayServices' argument that "because it was eligible to receive a master account … as a state-chartered depository institution[,] FRBSF was *required* as a matter of law to issue it a master account"); *BSJI*, 700 F. Supp. 3d at 98–99. Those courts were correct. There is no reason to think Congress harbored the highly anomalous intent to jeopardize the Reserve Banks and the federal payment system by eviscerating Reserve Banks' ability to ensure that all banks with access to Reserve Bank accounts and services will comply with legal and prudential rules and practices.

## II.    Our Nation's Dual Banking System Does Not Support Custodia's Position.

Rather than grapple with the serious problems inherent in its absolute-entitlement position, Custodia repeatedly invokes a misguided

conception of our nation's dual banking system, contending that federal discretion over access to the national payment system is an affront to dual banking. *See, e.g.*, Custodia Br. 25, 39–41. Custodia is wrong. In truth, such discretion has always coexisted with our dual banking system. "Dual banking" means that *charters* may be granted by either state or federal authorities. S.J.A. Vol. 1 at 97 ¶ 12. It does not mean— and has never meant—that all state-chartered banks are absolutely entitled to Reserve Bank accounts and services.

While charters may be issued at the state or federal level (and even by territories), our nation's banking tradition is a story of joint state/federal supervision. Until just a few years ago, almost all state banking charters (including Wyoming's) required FDIC insurance, and with it, supervision by the FDIC. *See supra* at 7, 19. In addition, some state-chartered banks applied for and received membership in the Federal Reserve, and with it, supervision by the Federal Reserve. And specifically with respect to accessing the federal payment system, Reserve Banks have exercised discretion over all comers, whether federally chartered or state-chartered, member or nonmember. *See supra* at 12–17. In short, the "dual banking" system of Custodia's imagination—

48

in which states are free to create new forms of uninsured "depository institutions" that enjoy automatic and unfettered access to Reserve Bank master accounts and services, absent federal supervision and even over Reserve Bank objections—has never existed.

States, to be sure, are free to develop novel regulatory frameworks and charter innovative institutions. *See* Wyo. Sec'y of State Br. 13. But a state's decision to charter an entity has never been understood as a decree that granted that entity access to the federal payment system. States can and should "facilitate responsible innovation," Custodia Br. 41, but Custodia's position would make states the sole arbiters of what "innovation" is "responsible," while demanding that the bill for any state misjudgment be footed by the federal fisc. States are free to be laboratories of innovation when their experiments will not harm the rest of the country. *See* Americans for Prosperity Found. Br. 5 (states may "try novel social and economic experiments without risk to the rest of the country" (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)). But it would be highly anomalous for Congress to give every state (and territory) the unilateral ability to

experiment with the stability of the nation's financial system and the central bank's balance sheet without input from the Federal Reserve.

Interpreting the FRA as amended by the MCA to preserve longstanding federal discretion also comports with the broader context of the statutes that govern the federal banking and payment systems. Since the Great Depression, the dual banking system has always relied on *partnership* between the federal and state chartering and supervisory regimes. At present, there is a federal check at each entry point to the federal banking and payment systems, whether by the OCC (through review of national bank charter requests), the Board (through review of applications for membership in the Federal Reserve), the FDIC (through review of deposit insurance applications), the National Credit Union Association (through review of applications for federal credit union charters and share insurance for credit unions), or Reserve Banks (through requests for access to Reserve Bank accounts and services), not to mention the broad discretion inherent in the supervision of banks and consideration of other applications by the federal banking agencies. *See* S.J.A. Vol. 1 at 94–96 ¶¶ 8–9; Barr, Financial Regulation, *supra*, at 174. Custodia's proposed interpretation of section 248a would create an

50

anomalous gap: a way to access the federal payment system without any consideration by any federal entity.

That anomaly makes no sense within Congress's longstanding and careful statutory scheme, which grants the federal banking agencies substantial discretion to assess and act upon risks in nearly all of the other ways they consider requests or applications from depository institutions. "Congress has evinced substantial concern for the financial soundness of the banking system." *Bd. of Governors of Fed. Rsrv. Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 251 (1978). Just as "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989), so too must section 248a be read in the context of Congress's overall approach to the federal banking and payment systems.

Another pitfall for Custodia's position is that it rests on the implausible premise that Congress entrusted the protection of national interests entirely to state authorities—but without laying down any rules for how states should go about protecting those national interests. That Congress would abdicate any federal check in this area is unfathomable; that Congress would do so without doing anything to limit or guide state

51

authorities is doubly so. Without any federal rules that, for example, limit the terms of state charters to maintain the separation of banking and commerce or require robust regulatory regimes and supervision by state banking agencies, the upshot would be that states could go as far as they like in creating novel charters with fewer protections for customers or counterparties, with whatever form or degree of supervision they wish, knowing that Reserve Banks would be required to ignore risks and provide access to the federal payment system.[15]

That dynamic would risk a race to the bottom among states, as the district court explained. J.A. Vol. 7 at 1472–73. But it cannot be the case that Congress intended such a result, since protecting *against* this concern was a driving impetus for the FRA (as well as the creation of the

---

[15] Notably, the State of Wyoming in its filings below declined to dispute that Reserve Banks should have discretion over access to the payment system. The State argued that Custodia's request "should be judged according to its own merits" and that SPDIs should be "subject to an appropriate level of scrutiny." J.A. Vol. 5 at 1133. While the State defends its regulatory regime, *see* J.A. Vol. 5 at 1129–30; Wyoming Br. 8, the facts of this case involved only the denial of *Custodia's* individual request and not any broader determination about Wyoming's regulatory regime, and Custodia opted to pursue only a theory of absolute entitlement. Wyoming's concern therefore is not implicated. Indeed, for that reason, the district court denied the State's motion to intervene (while permitting it to participate as an amicus). *See* ECF Nos. 162, 250 (J.A. Vol. 1 at 23, 32).

FDIC). S.J.A. Vol. 1 at 97–98 ¶¶ 12–13. Congress wanted to ensure a minimum level of federal supervision to dam the constant stream of bank panics and collapses that plagued the nation. S.J.A. Vol. 1 at 97–98 ¶¶ 12–13; *contra* Custodia Br. 39. And nothing in the MCA's text or legislative history suggests that Congress intended the MCA to undermine this central purpose of the FRA. To the contrary, Congress enacted the MCA to *strengthen* federal oversight. *See* S.J.A. Vol. 1 at 99 ¶ 14; 12 U.S.C. § 461(b)(2)(A) (imposing uniform reserve requirements on nonmember banks to eliminate incentive for banks to forgo Federal Reserve membership).

To rebut such concerns, Custodia cites a 2012 speech by then–FRBKC President Esther George regarding why the dual banking system did not inevitably create a race to the bottom. *See* Br. 40 (quoting Esther L. George, President & CEO, FRBKC, Conference of State Bank Supervisors State-Federal Supervisory Forum: Perspectives on 150 Years of Dual Banking (May 22, 2012), https://tinyurl.com/2errwc43). But President George was referring to the dual banking system that exists in reality—with FDIC supervision over FDIC-insured banks and a federal check on access to the payment system—and not the dual banking

system of Custodia's imagination. President George contrasted our system with "single regulator models." George, Perspectives, at 6. The backdrop for her speech was a world where state charters virtually always required FDIC insurance and thus federal supervision. *See supra* at 7, 19; S.J.A. Vol. 2 at 236 (Tr. 31:12–21) ("all state-chartered institutions come with federal supervision in the current legal and regulatory framework").

Custodia has no support for its ahistorical suggestion that the dual banking system's health depends on state-chartered banks operating without any federal oversight. Its position would upend decades of accepted practice—and decades of stability. The only conclusion faithful to our dual banking system is the district court's ruling that Reserve Banks have discretion to reject payment system access requests and are not automatically required to provide access to every depository institution holding any state (or territorial) charter, irrespective of risk.

## III. Defendants Are Not Trying to "Circumvent Judicial Review."

The final section of Custodia's brief is puzzling. Custodia appears to be worried that even if the Court rules that section 248a gives it an absolute entitlement to a master account, FRBKC and the Board may

54

"circumvent judicial review" in a way that Custodia believes would raise constitutional concerns. Custodia Br. 55–57. That worry is baseless. Custodia has had plenty of judicial review. The reason it lost this lawsuit is that its absolute-entitlement theory is wrong as a matter of law, not that the district court was somehow prevented from deciding that question.

Custodia mentions, but does not seek any relief under, the Appointments Clause and the Due Process Clause. Br. 55–57. Its concern seems to be that if it is right that the Board is required to give it a master account under section 248a, then the Board "cannot circumvent [that alleged] statutory requirement" by "delegating" it to FRBKC only to have FRBKC "[r]el[y] on the unique nature of the Federal Reserve System to shield [that] master account decision[] from judicial review." Br. 55, 56.

Custodia's apparent concern is misplaced on multiple levels. First, Reserve Banks have authority by statute to exercise discretion regarding whether to accept deposits from an eligible depository institution. 12 U.S.C. § 342. That authority was granted by Congress, not "delegat[ed]" by the Board. Second, again, no one is "circumvent[ing]" anything. If the final decision in this lawsuit is that Custodia is entitled

to a master account, then Custodia will get a master account. Because Appellees do not contend that the "unique nature of the Federal Reserve System" would allow them to deny Custodia a master account if Custodia ultimately prevails in this litigation, Custodia Br. 55, there is no constitutional issue before this Court.[16]

More broadly, Custodia's amici miss the mark in their refrain about purportedly "absolute and unreviewable discretion." Americans for Prosperity Br. 3; *see also, e.g.*, Digital Chamber Br. *passim*; Members of U.S. Senate Banking Committee Br. 3; Wyo. Sec'y of State Br. 12–13. Custodia made the informed strategic decision not to assert any claim asking the district court to review FRBKC's exercise of discretion in

---

[16] If Custodia were to try in its reply brief to turn these puzzling, undeveloped gestures at constitutional issues into an actual constitutional argument, that would be improper. Arguments raised for the first time in reply are forfeited. *See Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277–78 (10th Cir. 1994) (noting that allowing such late arguments would be unfair to the appellee and would risk an improvident decision without the benefit of the adversarial process); *Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) ("[T]o avoid error, we are dependent on the full development of issues through the adversarial process … ."). Merely hinting at an issue without developing an argument, as Custodia has done, is inadequate. *See Bronson v. Swensen*, 500 F.3d 1099, 1104–05 (10th Cir. 2007) (holding that appellants' "cursory statements" in opening brief regarding alleged unconstitutionality of statute "fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine").

denying its request. Instead, Custodia opted to assert only its all-or-nothing theory that FRBKC has no discretion and Custodia (along with every other "depository institution") has an absolute entitlement to a master account. As a result, questions about the extent of FRBKC's discretion or the avenues or contours of potential judicial review of its exercise of such discretion—in a world where, *contra* Custodia, such discretion exists—are not before the Court.[17]

"Our adversarial system endows the parties with the opportunity—and duty—to craft their own legal theories for relief in the district court." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). Amici, as non-parties, cannot inject issues into a case. *See United States v. Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016) ("Amici['s] … functions don't include presenting arguments forgone by the parties themselves ….").

---

[17] For example, Custodia opted not to include any APA claim against FRBKC in its amended complaint even though the district court allowed its initial APA claim against FRBKC to proceed and deferred to a later stage—which, because of Custodia's amended complaint, was never reached—the question whether FRBKC is an "agency" subject to suit under the APA. *See supra* at 29, 33–34. As a result, that question is not presented here.

Custodia and amici also hint at "discriminat[ion]" against state-chartered banks. *See, e.g.*, Custodia Br. 2, 58; Americans for Prosperity Br. 3. But again, no such claim is in this case. Custodia has never claimed that the denial of its master account request was discriminatory. Instead, throughout this litigation it has relied solely on its theory that it has an absolute legal entitlement to a master account. *See* J.A. Vol. 1 at 27 (ECF No. 197) (discovery order) ("At issue is if [FRBKC] is statutorily required to grant Plaintiff a master account. The soundness and correctness of that decision is not at issue …. [D]iscrimination is not at issue ….").

Because Custodia chose not to assert that FRBKC (or the Board) treated Custodia unfairly or misjudged the risks posed by Custodia's request, the sole question on appeal is whether section 248a dictates that *every* depository institution is *automatically* entitled to an account and access to Reserve Bank services, no matter how serious the risks that access poses to a Reserve Bank, to depositors, to the integrity of the payment system, or—by extension—to U.S. taxpayers. To ask that question should be to answer it.

## CONCLUSION

For the reasons set forth above, this Court should affirm the judgment of the district court.

Respectfully submitted,

/s/ Jeffrey S. Bucholtz

| | |
|---|---|
| Billie LM Addleman | Jeffrey S. Bucholtz |
| Erin E. Berry | Christine M. Carletta |
| HIRST APPLEGATE, LLP | E. Caroline Freeman |
| PO Box 1083 | KING & SPALDING LLP |
| Cheyenne, WY 82003 | 1700 Pennsylvania Avenue NW |
| (307) 632-0541 | Washington, DC 20006 |
| | (202) 737-0500 |
| Jared Lax | jbucholtz@kslaw.com |
| KING & SPALDING LLP | |
| 1401 Lawrence Street | Andrew Z. Michaelson |
| Suite 1900 | KING & SPALDING LLP |
| Denver, CO 80202 | 1185 Ave. of the Americas, 34th Fl. |
| (720) 535-2300 | New York, NY 10036 |
| | (212) 556-2100 |

*Counsel for Defendant-Appellee Federal Reserve Bank of Kansas City*

August 28, 2024

59

## STATEMENT REGARDING ORAL ARGUMENT

FRBKC respectfully requests oral argument because this appeal presents an issue critical to the stability and soundness of the U.S. financial system.

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

Under the court's CM/ECF User's Manual, I certify that:

1) all required privacy redactions have been made per 10th Cir. R. 25.5;

2) hard copies of this pleading that may have to be submitted are exact copies of the ECF filing; and

3) the ECF submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender and according to the program, is free of viruses.

Date: August 28, 2024

/s/ *Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Federal Reserve*
*Bank of Kansas City*

## CERTIFICATE OF COMPLIANCE

I certify this brief complies with the type-volume limitation of 10th Cir. R. 32(a)(7) because it contains 11,982 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point, proportionally spaced typeface using Microsoft Word.

Date: August 28, 2024

*/s/ Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Federal Reserve
Bank of Kansas City*