## No. 24-8024

_____

# In the
# United States Court of Appeals for the Tenth Circuit

**CUSTODIA BANK, INC.,**

*Plaintiff-Appellant,*

v.

**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM and FEDERAL RESERVE BANK OF KANSAS CITY,**

*Defendants-Appellees.*

_____

Appeal from the U.S. District Court for the District of Wyoming
Hon. Scott W. Skavdahl, U.S. District Judge
Civil No. 22-CV-00125-SWS

**BRIEF OF AMICUS CURIAE
PROFESSOR DAVID ZARING
IN SUPPORT OF DEFENDANTS-APPELLEES**

_____

David Oscar Markus
MARKUS/MOSS PLLC
40 N.W. Third Street, Penthouse One
Miami, Florida 33128
305-379-6667
dmarkus@markuslaw.com

*Attorney for Amicus Curiae
Professor David Zaring
in support of Defendants-Appellees*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICUS CURIAE ...........................................................1

INTRODUCTION ....................................................................................2

ARGUMENT ...........................................................................................4

I.      BANKS MAY NOT OPEN AS A MATTER OF RIGHT ...............................5

II.     BANKS, ONCE OPEN, ARE SUBJECT TO HIGHLY DISCRETIONARY SUPERVISION .....................................................................9

III.    PAYMENT PROCESSING MUST BE SUPERVISED IN THE SAME WAY THAT DEPOSIT TAKING AND LENDING IS SUPERVISED .................14

IV.     REQUIRING THE FED TO GIVE MASTER ACCOUNTS TO NOVEL FINANCIAL INSTITUTIONS AS A MATTER OF RIGHT WOULD MEAN THAT THE FED COULD BE FORCED TO DO BUSINESS WITH BAD ACTORS OR INSOLVENT BANKS ...........................................................16

V.      BANKING INVOLVES A BARGAIN THAT CUSTODIA IS UNWILLING TO MAKE………………………………………………………………….20

VI.     THE PLAIN LANGUAGE OF THE MONETARY CONTROL ACT DOES NOT REQUIRE THE FED TO AWARD CUSTODIA A MASTER ACCOUNT ...................................................................................22

CONCLUSION .........................................................................................25

CERTIFICATE OF COMPLIANCE ........................................................26

CERTIFICATE OF SERVICE ................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York,* No. 23-CV-6414 (JGK), 2023 WL 7111182 (S.D.N.Y. Oct. 27, 2023). ..............................................24

*Cantero v. Bank of Am., N. A.,* 144 S. Ct. 1290, 1295, (2024).....................17, 21,22

**Statutes**

2 C.F.R. § 5.20(e)(i) ....................................................................................................4

12 U.S.C. § 248a(c)(2) ................................................................................22, 23, 24

12 U.S.C. § 342 ...........................................................................................23, 24

12 U.S.C. § 1815(a)..................................................................................................4

Wyo. Stat. Ann. § 40-22-104(vi) (West 2021) ......................................................16

**Other Authorities**

Gene Ambrocio and Iftekhar Hasan, *What Drives Discretion in Bank Lending? Some Evidence and a Link in Private Information*, 106 J. of Banking & Finance 323 (July 11, 2019)................................................................................................................10

Derek Andersen, *Protego's Conditional National Bank Status Expired Without Approval: Report*, CoinTelegraph, Mar. 17, 2023, https://cointelegraph.com/news/protego-s-conditional-national-bank-status-expired-without-approval-report..........................................................................8, 9

*Applying For Deposit Insurance A Handbook for Organizers of De Novo Institutions*, Fed. Dep. Ins. Corp. (April 2017), https://www.fdic.gov/regulations/applications/handbook.pdf. .................................8

Mehrsa Baradaran, *The ILC and the Reconstruction of U.S. Banking*, 63 SMU L.Rev. 1143, 1145 (2010).................................................................................21, 22

Michael S. Barr, et. al., *Financial Regulation: Law & Policy* 168 (2d ed. 2018) ..... 6

*Basic Examination Concepts and Guidelines*, Fed. Dep. Ins. Corp. (March 2023), https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/section1-1.pdf. ............................................................................. 11

*Common Questions About the FedNow Service*, FedNow.org (2023), https://explore.fednow.org/common-questions ......................................................... 15

Penny Crosman, *Mission-Driven Varo Money Secures $45 Million from Investors*, AM. Banker (Jan. 18, 2018, 9:00 AM), https://www.americanbanker.com/news/mission-driven-varo-money-secures-45-million-from-investors ............................................................................................. 7

*Exploring Special Purpose National Bank Charters for Fintech Companies*, *Office of the Comptroller of the Currency (Dec. 2016)* ....................................................... 4

*Fed. Deposit Ins. Corp., Credit Card Activities Manual*, Ch. VII – Underwriting and Loan Approval Process (2007) available at https://www.fdic.gov/regulations/examinations/credit_card/ch7.html .................... 10

FDIC, *Proposed Guidance on Stress Testing for Banking Organizations With More Than $10 Billion in Total Consolidated Assets*, 76 Fed. Reg. 35,072, 35,074 (June 15, 2011) ................................................................................................................ 13

FDIC, *Re: Varo Bank, NA*, www.fdic.gov/regulations/laws/bankdecisions/depins/varo-bank-na-draper-utah.pdf (Feb. 7, 2020) ........................................................................................ 7

FRB, *FAQs, How Can I Start A Bank?* https://www.federalreserve.gov/faqs/banking_12779.html ...................................... 21

*Federal Reserve Board Releases Hypothetical Scenarios for Second Round of Bank Stress Tests*, The Federal Reserve, Sept. 17, 2020, available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20200917a.html ................................................................................................................................... 13

Federal Reserve Board, *Fedwire Funds Services*, https://www.federalreserve.gov/paymentsystems/fedfunds_about.html ................. 15

iii

Julie Andersen Hill, *When Bank Examiners Get It Wrong: Financial Institution Appeals of Material Supervisory Determinations*, 92 WASH. U.L. REV. 1101, 1127, 1137 (2015) ...........................................................................................................14

Robert C. Hockett, Saule T. Omarova*, The Finance Franchise*, 102 Cornell L. Rev. 1143, 1195 (2017) ..........................................................................................20

Kathryn Judge, *Three Discount Windows*, 99 Cornell L. Rev. 795, 797 (2014) .....20

Faisal Khan, *How to Get Money Transmitter License Coverage for Your Startup*?, Blog Faisal Khan (Sept. 9, 2016), https://blog.faisalkhan.com/money-transmitter-licenseapplication-d9dd32286871 [https://perma.cc/MJ2U-XRB6] ......................16

Charles Kindleberger, *Manias, Panics, and Crashes: A History of Financial Crises* (8ᵗʰ Ed. 2023).................................................................................................5

OCC, Preliminary Conditional Approval 1205 of the De Novo Charter Application for the Proposed Varo Bank, National Association, Salt Lake City, UT (Charter Number 25147), https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/2018/ca1205.pdf (Sep. 2018) .........................7

Off. of The Comptroller of the Currency, Considering Charter Applications From Financial Technology Companies (2018), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/pub-considering-charter-apps-from-fin-tech-co.pdf..............................................................................4

Office of The Comptroller of the Currency, Comptroller's Licensing Manual: Charters 4 at 3 (2021), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/licensing-booklet-charters.html................................................................................................8

*Expert Report of Morgan Ricks*, Doc. 240-91, filed Dec. 22, 2023........................17

Kate Rooney, *Fintech Varo Gets One Step Closer to Becoming an Actual Bank: 'We See It as a Pretty Big Moat'*, CNBC (Feb. 11, 2020) https://www.cnbc.com/2020/02/11/start-up-bank-varo-gets-approval-to-become-a-full-scale-bank.html................................................................................................7

Steven L. Schwarcz, Essay, *Markets, Systemic Risk, and the Subprime Mortgage Crisis*, 61 SMU L. REV. 209, 210 (2008) ...............................................................10

Andrew P. Scott and Marc Labonte, *Bank Capital Requirements: A Primer and Policy Issues*, Cong. Rsch. Serv. (March 9, 2023), https://crsreports.congress.gov/product/pdf/R/R47447 ............................................5

Julie Stackhouse, *CAMELS Ratings: Capital Adequacy,* Federal Reserve Bank of St. Louis (Aug. 22, 2018), https://www.stlouisfed.org/on-the-economy/2018/august/camels-ratings-capital-adequacy .......................................12

Julie Stackhouse, *The ABCs of CAMELS,* Federal Reserve Bank of St. Louis (July 24, 2018), https://www.stlouisfed.org/on-the-economy/2018/july/abcs-camels ......................................................................................................................12, 13

*Stress Tests and Capital Planning*, The Federal Reserve, Aug. 10, 2020, available at https://www.federalreserve.gov/supervisionreg/stress-tests-capital-planning.html ......................................................................................................................13

Ken Sweet & Stan Choe, *'A Bank Sprint, Not a Bank Run': These Days, Depositors' Mass Fear Can Go Viral Faster Than Regulators are Able to Respond,* CHI. TRIB. March 17, 2023 .......................................................................................................3

Margaret E. Tahyar, *Are Bank Regulators Special?* The Clearing House (Jan. 1, 2018), https://www.theclearinghouse.org/banking-perspectives/2018/ 2018-q1-banking-perspectives/articles/ are-bank-regulators-special.......................................6

Kevin V. Tu, *Regulating the New Cashless World*, 65 ALA. L. REV. 77, 82 (2013) ......................................................................................................................15

David Zaring, *A Lack of Resolution*, 60 EMORY L.J. 97, 134 (2010) ......................20

David Zaring, *Modernizing the Bank Charter*, 61 Wm. & Mary L. Rev. 1397 (2020) ......................................................................................................................1, 6

David Zaring, *Rebuilding the Regulatory Perimeter*...................................................1

David Zaring, *Skinny Charters: Rebuilding The Banking Regulatory Perimeter*, 50 J. CORP.L. ___ (forthcoming 2025) ..........................................................................19

David Zaring, *The Corporatist Foundations of Financial Regulation*, 108 IOWA L. REV. 1304 (2023)..........................................................................................5

## INTEREST OF AMICUS CURIAE[1]

David Zaring is a professor at the Wharton School of the University of Pennsylvania. He is a scholar of financial regulatory institutions, has authored over fifty articles on administrative law and financial regulation, and is currently writing an article on novel charters and new entrants in the banking market, *Rebuilding the Regulatory Perimeter.* He has studied the Office of the Comptroller of the Currency (OCC)'s chartering practices, including the special purpose charter program for financial technology (fintech) companies that is a federal version of the state charter that Custodia received from the State of Wyoming.[2]  He is one of the twenty most cited active scholars of administrative law in general, and one of the ten most cited in financial regulation. Before entering the academy and winning tenure at Wharton, he served as a litigator in the Federal Programs Branch of the Department of Justice. His background provides a unique perspective on the financial system and the risks presented if Custodia's requested relief is granted. He has no financial interest in the outcome of this case.

---

[1] All parties have consented to this filing. No party's counsel authored this brief in whole or in part, and no person or entity, other than Amicus or his counsel, made a monetary contribution intended to fund the brief's preparation or submission.

[2] *See* David Zaring, *Modernizing the Bank Charter*, 61 WM. & MARY L. REV. 1397 (2020).

## INTRODUCTION

This case is about statutory interpretation — Custodia contends that the Monetary Control Act gives the Federal Reserve Banks and Board no discretion in deciding whether to allow Custodia, or any other state chartered bank or fintech, access to the payment rails run by the Fed (Professor Zaring will not distinguish between the Board and the Reserve Bank for the purposes of this brief, although the Reserve Bank and the Board have different roles with regard to master accounts). Because such an argument is inconsistent with the way that financial regulation works and could lead to adverse outcomes if adopted as a generalized rule, Professor Zaring writes in support of the position of the Federal Reserve Bank of Kansas City and the Board of Governors.  The statute cannot leave the Fed with no choice in the matter.

We would situate the question of master account access within the broader context of financial regulation. This regulatory framework depends on the discretion exercised by regulators and supervisors—mandatory obligations imposed on regulators by the regulated industry are rare, and for good reason. Regulators must have the discretion to act because banks, while providing essential services, are

inherently risky entities. Banks can fail in a matter of days, if not hours, with repercussions that may affect other banks and the broader economy.[3]

Regulators must have the ability to identify and address these types of risks. It would be both surprising and contrary to the regulatory framework if the government, which possesses near-complete discretion over decisions such as whether to charter a bank, provide it with deposit insurance, oversee its operations, and assess its risk levels after it commences business, were compelled to allow a bank to process payments through the government's master account system regardless of the bank's purpose or financial stability.

---

[3] We saw just how quickly a bank could fail only last year. Ken Sweet & Stan Choe, *'A Bank Sprint, Not a Bank Run': These Days, Depositors' Mass Fear Can Go Viral Faster Than Regulators are Able to Respond,* CHI. TRIB. March 17, 2023 ("What made the failure of Silicon Valley Bank unique compared to past failures of large banks was how quickly it collapsed.").

## ARGUMENT

Banks are financial intermediators: they take deposits, use those deposits to make loans, and facilitate payments between clients.[4] In each of these functions, supervisors have — and, indeed, require if they are to do their job properly — the discretion to permit and subsequently supervise these banking practices. Banks that want to hold deposits, other than trust funds, must establish to the satisfaction of the Federal Deposit Insurance Corporation that they are safe enough to warrant deposit insurance, and then must undergo regular examinations to ensure that the deposits they do hold are safe and sound.[5] Banks that want to issue loans must establish that

---

[4] 2 C.F.R. § 5.20(e)(i); *see* OFF. OF THE COMPTROLLER OF THE CURRENCY, CONSIDERING CHARTER APPLICATIONS FROM FINANCIAL TECHNOLOGY COMPANIES (2018), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/pub-considering-charter-apps-from-fin-tech-co.pdf (stating that special purpose national banks must engage in at least one of the "core banking functions of taking deposits, paying checks, or lending money").

[5] *See* 12 U.S.C. § 1815(a) (titled "Application to Corporation Required," and providing, in subsection 1, that "any depository institution which is engaged in the business of receiving deposits other than trust funds…, upon application to and examination by the Corporation and approval by the Board of Directors, may become an insured depository institution). *See also Exploring Special Purpose National Bank Charters for Fintech Companies*, OFFICE OF THE COMPTROLLER OF THE CURRENCY (Dec. 2016) ("[A] fintech company with a special purpose national charter that does not take deposits, and therefore is not insured by the Federal Deposit Insurance Corporation (FDIC), would not be subject to laws that apply only to insured depository institutions.").

they are prudently managed to get a bank charter, and then must comply with balance sheet analyses designed to ensure that they are holding sufficient capital against those loans, which in turn are "risk weighted" by regulators.[6]  It would be terribly surprising if supervisors had no discretion to decide whether new entrants into the business of banking were ready to take on the third core activity in banking – processing payments.

The basis for this discretion lies in the dangerous nature of banking, which, although an invaluable service, has, throughout the nation's history, led to financial crisis after financial crisis.[7]  In financial regulation, regulators cannot be expected to open the full suite of banking services to new entrants as of right.

I.     **Banks May Not Open as a Matter of Right.**

Consider the process involved in determining whether to charter a bank. While corporate charters can be acquired from states in a matter of minutes, the procedure for obtaining a bank charter is far more intricate. Banks must submit extensive

---

[6] *See* Andrew P. Scott and Marc Labonte, *Bank Capital Requirements: A Primer and Policy Issues*, CONG. RSCH. SERV. (March 9, 2023), https://crsreports.congress.gov/product/pdf/R/R47447 (reviewing the measures financial regulators take to ensure that banks have adequate capital to issue loans).

[7] *See generally* CHARLES KINDLEBERGER, MANIAS, PANICS, AND CRASHES: A HISTORY OF FINANCIAL CRISES (8TH ED. 2023). *See also* David Zaring, *The Corporatist Foundations of Financial Regulation*, 108 IOWA L. REV. 1304 (2023) ("[B]anking is weirdly dangerous and is accordingly regulated weirdly.").

applications to regulators who historically have had nearly complete discretion in deciding whether to approve or deny the applicant's license to operate as a bank. Courts, acknowledging the necessity of regulatory discretion and expertise, afford the OCC "extraordinary deference" when reviewing its chartering decisions.[8] As Margaret Tahyar has observed, "a generation has grown to accept that the granting of bank charters is so up to the discretion of the bank regulators that the regulator need not even give reasons for a denial."[9]

For example, the OCC, after the last financial crisis, decided to radically limit the issuance of bank charters, presumably because it wanted to be sure that the banking sector had stabilized before it opened the doors to new institutions. The FDIC took a similar approach to applications for deposit insurance. During the decade between 2007 and 2017, the OCC only issued six bank charters, and the FDIC accepted even fewer deposit insurance applications – and during that period, at least 800 banks disappeared.[10] Regulators never took the perspective that they

---

[8] MICHAEL S. BARR, ET. AL., FINANCIAL REGULATION: LAW & POLICY 168 (2d ed. 2018).

[9] Margaret E. Tahyar, *Are Bank Regulators Special?* THE CLEARING HOUSE (Jan. 1, 2018), https://www.theclearinghouse.org/banking-perspectives/2018/ 2018-q1-banking-perspectives/articles/ are-bank-regulators-special.

[10] David Zaring, *Modernizing the Bank Charter*, 61 WM. & MARY L. REV. 1397, 1399 n.4 (2020) (citing MICHAEL S. BARR, ET. AL., FINANCIAL REGULATION: LAW & POLICY 168 (2d ed. 2018)).

were obligated to issue charters to new entrants into the banking system, or that they

had an obligation to replace old banks with new ones.

When federal regulators felt comfortable enough to reopen the application

process, charter applicants were met with searching and lengthy reviews. Novel

kinds of banks, like the online-only bank Varo, spent years and millions of dollars

seeking a national bank charter.[11]  After receiving a conditional approval from the

OCC, the FDIC took three years and multiple rounds of applications before issuing

its own order conditionally approving Varo's application for deposit insurance.[12]

---

[11] *See* OCC, Preliminary Conditional Approval 1205 of the De Novo Charter Application for the Proposed Varo Bank, National Association, Salt Lake City, UT (Charter Number 25147), https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/2018/ca1205.pdf (Sep. 2018); Penny Crosman, *Mission-Driven Varo Money Secures $45 Million from Investors*, AM. BANKER (Jan. 18, 2018, 9:00 AM), https://www.americanbanker.com/news/mission-driven-varo-money-secures-45-million-from-investors (Varo's CEO observed that "[t]he OCC is not going to relax their standards, so it's been a rigorous process.").

[12] Kate Rooney, *Fintech Varo Gets One Step Closer to Becoming an Actual Bank: 'We See It as a Pretty Big Moat'*, CNBC (Feb. 11, 2020) https://www.cnbc.com/2020/02/11/start-up-bank-varo-gets-approval-to-become-a-full-scale-bank.html. ("After three years and multiple rounds of applications, the FDIC approved the fintech company's national bank charter application"). *See also* FDIC, *Re: Varo Bank, NA*, www.fdic.gov/regulations/laws/bankdecisions/depins/varo-bank-na-draper-utah.pdf (Feb. 7, 2020).

Moreover, this protracted initial application process does not get the bank all the way toward opening.[13] The OCC ordinarily extracts a Capital Assurance and Liquidity Maintenance Agreement and a Capital Liquidity and Support Agreement from conditionally improved applicants. [14]  It also imposes capital raising requirements on the bank before it will let the bank open for business, even after issuing the conditional approval.[15] The FDIC has its own set of requirements that must be met before a conditional approval becomes a final one permitting the bank to open for business.[16]  No bank is entitled to a conditional approval as of right, nor are banks that receive conditional approvals entitled to final approvals permitting them to open.  In fact, the cryptocurrency trust Protego – a business not unlike Custodia – has still not received a final approval from the OCC, although it did obtain a conditional approval on February 5, 2021.[17]

---

[13] *See* OFFICE OF THE COMPTROLLER OF THE CURRENCY, COMPTROLLER'S LICENSING MANUAL: CHARTERS 4 at 3 (2021), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/licensing-booklet-charters.html.

[14] *Id.* at 30, 59.

[15] *See id.*

[16] *See Applying For Deposit Insurance A Handbook for Organizers of De Novo Institutions*, FED. DEP. INS. CORP. (April 2017), https://www.fdic.gov/regulations/applications/handbook.pdf.

[17] Derek Andersen, *Protego's Conditional National Bank Status Expired Without Approval: Report*, COINTELEGRAPH, Mar. 17, 2023,

A state could in theory issue charters absent any of this federal scrutiny, and, under Custodia's view, the Fed would be obligated to give it a master account anyway.

## II. Banks, Once Open, Are Subject to Highly Discretionary Supervision.

Once open for business, banks are subject to an even more discretionary and searching regular review of their business practices.

Consider lending – a core aspect of the business of banking, although not Custodia's business. All banks, whether chartered by a state or federal regulator, must justify their lending decisions in ways that comply with capital rules that require the bank to calculate how much capital it must hold against each loan it makes.[18] Banks inherently assume significant credit risk, which is the risk that a borrower may default on a loan and fail to repay the bank. To mitigate this risk, banks are required to hold sufficient capital reserves against their loans. Regulators closely monitor the composition of a bank's loan portfolio and will intervene if the bank's lending practices could lead to excessive exposure to any single aspect of the market in which it lends, on the assumption that this sort of unbalanced lending

---

https://cointelegraph.com/news/protego-s-conditional-national-bank-status-expired-without-approval-report.

[18] Scott and Labonte, *supra* note 6.

might lead to too many loans failing simultaneously. This kind of overexposure contributed to the failures of many financial institutions during the housing crisis that precipitated the last major financial crisis.[19]

For example, in its "Underwriting and Loan Approval Process" guide, the FDIC's Division of Supervision and Consumer Protection provides a list of a dozen factors that might signal elevated risk worthy of follow up for loan underwriters and approvers, but notes that "[t]hese lists are not exhaustive, and examiners must exercise discretion in determining the expanse and depth of examination procedures to apply. If examiners identify significant concerns, they should expand procedures accordingly."[20]  Banks cannot make loans as of right and must expect that regulators will scrutinize their loan books regularly.

Just as the asset side of a bank's balance sheet, specifically its lending activities, is subject to rigorous regulatory oversight involving significant discretion,

---

[19] Steven L. Schwarcz, Essay, *Markets, Systemic Risk, and the Subprime Mortgage Crisis*, 61 SMU L. REV. 209, 210 (2008) (pointing to the mortgage crisis as a trigger in the 2008 financial crisis). Naturally, this regulatory discretion is matched by bank lending discretion – no one is entitled to a bank loan as of right. *See generally* Gene Ambrocio and Iftekhar Hasan, *What Drives Discretion in Bank Lending? Some Evidence and a Link in Private Information*, 106 J. OF BANKING & FINANCE 323 (July 11, 2019) (discussing how the level of discretion used by banks has varied across time and type of lending institution).

[20] *Fed. Deposit Ins. Corp.,* Credit Card Activities Manual, Ch. VII – Underwriting and Loan Approval Process (2007) available at https://www.fdic.gov/regulations/examinations/credit_card/ch7.html.

the liability side—primarily deposits—undergoes similar scrutiny. The Federal Deposit Insurance Corporation (FDIC) exists to safeguard depositors against the risk of bank failure, ensuring that depositors are compensated if the bank is unable to meet its obligations. This insurance has produced many positive effects, including increased confidence in the banking system. However, because the government is ultimately responsible for covering losses from bank failures, FDIC examiners meticulously ensure that the bank maintains a sufficient capital buffer, whether from shareholders or other creditors, to minimize the likelihood of drawing on the insurance fund. Here again, discretion is a key principle. FDIC examiners often embed themselves within the bank, conducting thorough reviews of the bank's balance sheet to ensure its financial health.[21] They also look to see if there are other signs of trouble and how the bank is operated as well.[22]

More generally, banking regulators assess banks pursuant to its CAMELS rating system. CAMELS – which stands for capital adequacy, asset quality,

---

[21] *Basic Examination Concepts and Guidelines*, FED. DEP. INS. CORP. (March 2023), https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/section1-1.pdf ("Given the fundamental reasons for conducting examinations, regulatory personnel must have access to all records and employees of a bank during an examination.").

[22] *Id.* ("[B]ank examinations play a key role in the supervisory process by helping the FDIC identify the cause and severity of problems at individual banks and emerging risks in the financial-services industry. The accurate identification of existing and emerging risks helps the FDIC develop effective corrective measures for individual institutions and broader supervisory strategies for the industry.")

management, earnings, liquidity, and sensitivity to market risk – is a rating system that allows banking regulators to monitor the health of banks and compare bank health over time with peers.[23] Banks are rated on each element from 1 ("strong") to 5 ("critically deficient"), and a composite rating for each bank is determined based on all six components.[24] However, this overall composite score is not based on the average of the ratings for each individual component. Instead "some components are weighed more heavily than others based on examiner judgment of risk."[25] For example, due to the size of the loan portfolio at community banks, the "asset quality" rating is the most important.[26] When it comes to assessing capital, "examiners also compare a bank's capital ratios with those of similar banks" – regulators may come to different views about similar amounts of capital if one bank looks like its peer group, while another one does not.[27] This rating, though confidential, is hugely

---

[23] Julie Stackhouse, *The ABCs of CAMELS,* FEDERAL RESERVE BANK OF ST. LOUIS (July 24, 2018), https://www.stlouisfed.org/on-the-economy/2018/july/abcs-camels.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Julie Stackhouse, *CAMELS Ratings: Capital Adequacy,* FEDERAL RESERVE BANK OF ST. LOUIS (Aug. 22, 2018), https://www.stlouisfed.org/on-the-economy/2018/august/camels-ratings-capital-adequacy.

important to the supervision of the bank by regulators, as if a bank's CAMELS composite rating is a 3, 4 or 5, bank supervisors will require the bank's board of directors to enter into an agreement to correct the issues identified by supervisors.[28]

Moreover, many banks are, if large enough, subjected to an additional discretionary review under the federal government's stress testing regime.[29] Stress tests require banks to evaluate not only their ability to withstand current real-world conditions but also their potential responses in hypothetical scenarios, such as a sharp increase in interest rates or an abrupt economic recession.[30] Traditionally, supervisors devise different kinds of stress tests each time they impose the requirement on banks, and they have in the past not let the banks know what kind of a test they will impose in any particular year.[31] Discretion remains the watchword here, as no bank is automatically entitled to pass a stress test.

---

[28] Julie Stackhouse, *The ABCs of CAMELS,* FEDERAL RESERVE BANK OF ST. LOUIS (July 24, 2018), https://www.stlouisfed.org/on-the-economy/2018/july/abcs-camels.

[29] The larger the bank, the more frequent the test. For explanation of testing, *see Stress Tests and Capital Planning*, THE FEDERAL RESERVE, Aug. 10, 2020, available at https://www.federalreserve.gov/supervisionreg/stress-tests-capital-planning.htm.

[30] For examples of hypothetical scenarios used by the Federal Reserve, *see Federal Reserve Board Releases Hypothetical Scenarios for Second Round of Bank Stress Tests*, THE FEDERAL RESERVE, Sept. 17, 2020, available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20200917a.htm.

[31] "Stress tests usually vary in design and complexity."  FDIC, *Proposed Guidance on Stress Testing for Banking Organizations With More Than $10 Billion in Total Consolidated Assets*, 76 Fed. Reg. 35,072, 35,074 (June 15, 2011).

Unsurprisingly, courts have recognized the necessity of this discretionary oversight in areas such as deposit taking, lending, and overall financial resilience. Consequently, they have tended to review appeals of supervisory decisions by banking regulators with considerable deference.[32]

Custodia wants to go through none of this – although it could apply for a bank charter whenever it liked, and, of course, appeal any decision adverse to its application to the federal courts. It wants a master account with none of the scrutiny by any federal actor that other master account holders face.

### III. Payment Processing Must Be Supervised in the Same Way that Deposit-Taking and Lending is Supervised

Beyond accepting deposits and extending loans, banks play a crucial role in facilitating payments. The Federal Reserve has historically supported banks in this function. Discretion is also prevalent in this area. The Fed's traditional payment system, Fedwire, is accessible only to a select group of financial institutions and is

---

[32] Julie Andersen Hill's 2015 study found in examining over a decade of appeals that against the OCC, the "appealing bank was the clear winner in only 20% of appeals," and through the Fed's appeals process, in only 8% of the appeals was the examiner determination reversed. Julie Andersen Hill, *When Bank Examiners Get It Wrong: Financial Institution Appeals of Material Supervisory Determinations*, 92 WASH. U.L. REV. 1101, 1127, 1137 (2015).

certainly not open to commercial enterprises.[33] Its new service, FedNow, is an optional way to settle payments more quickly.[34] Banks have the discretion to decide whether they wish to adopt the new service, and the Fed has indicated that not everyone who wishes to sign up for FedNow will be entitled to do so as a matter of right.[35]

This regulatory scrutiny does not differ for other financial institutions that process payments. These entities are required to obtain money transmitter licenses (MTLs) in each state where they operate, and they are certainly not granted these licenses as a matter of right. Complying with these consumer protection and "safety and soundness" laws can be a lengthy and costly process.[36] In describing this process, Faisal Khan observed that "[o]btaining money transmitter licenses is no easy feat. It involves a large amount of paperwork, money and time. It can take up

---

[33] Federal Reserve Board, *Fedwire Funds Services*, https://www.federalreserve.gov/paymentsystems/fedfunds_about.htm (describing the institutions eligible to participate in Fedwire) (last updated June 25, 2024).

[34] *See Common Questions About the FedNow Service*, FEDNOW.ORG (2023), https://explore.fednow.org/common-questions.

[35] *See id.* ("As with current Federal Reserve Bank services, the FedNow Service is available to depository institutions eligible to hold accounts at the Federal Reserve Banks under applicable federal statutes and Federal Reserve rules, policies and procedures.").

[36] Kevin V. Tu, *Regulating the New Cashless World*, 65 ALA. L. REV. 77, 82 (2013)

to two years to amass all 50 state licenses."[37] Wyoming does not require Special Purpose Depositary Charter holders to acquire MTL licenses..[38] Custodia's position is that the Fed would lack the discretion to evaluate its application if a state imposed no regulation on a state-chartered institution's payment practices at all.

Master accounts allow access to the Fed's best in class payment rails. The idea that Custodia should have access to those payment rails as of right is entirely inconsistent with the bargain that banks have struck with their regulators.

### IV. Requiring the Fed to Give Master Accounts to Novel Financial Institutions as a Matter of Right Would Mean That the Fed Could Be Forced to Do Business with Bad Actors or Insolvent Banks.

The financial regulatory system does not grant banks any inherent rights; instead, it relies on the informed judgment of regulators to ensure that only safe and sound institutions provide banking services to the public. It retains a federal role for the supervision of all aspects of the business of banking, and does not cut the federal government out of oversight when it comes to the way that novel state-chartered

---

[37] Faisal Khan, *How to Get Money Transmitter License Coverage for Your Startup*?, BLOG FAISAL KHAN (Sept. 9, 2016), https://blog.faisalkhan.com/money-transmitter-licenseapplication-d9dd32286871 [https://perma.cc/MJ2U-XRB6].

[38] *See* WYO. STAT. ANN. § 40-22-104(vi) (West 2021) (stating the "[b]uying, selling, issuing, or taking custody of payment instruments or stored value in the form of virtual currency or receiving virtual currency for transmission to a location within or outside the United States by any means" is exempted from the state's Money Transmitter Law).

financial institutions use the payment system. *Cantero v. Bank of Am., N. A*., 144 S. Ct. 1290, 1295, 218 L. Ed. 2d 664 (2024) (noting that banks are ordinarily subject to supervision by at least one federal regulator, while state banks are subject to "*additional* state oversight" (emphasis added)).

It would be perplexing if regulators, who exercise broad discretion in evaluating the credit risk banks assume in lending, safeguarding depositors' funds, and ensuring the ongoing safety and soundness of banks, were somehow stripped of this discretion when it comes to permitting banks to access the Federal Reserve's payment systems.

Such a rule would have risky consequences, as Morgan Ricks observed in his expert report submitted to the district court.[39] If a state chartered a bank or developed a novel kind of bank charter and awarded it to a firm that risked violating federal law, it cannot be the case that federal regulators would be obligated to allow that bank to access the payment rails.

One could imagine institutions using special-purpose charters to evade recordkeeping rules with which they would otherwise have to comply. Nor does it seem in any way logical to permit a financial institution about which federal regulators had real doubts about insolvency to send as much money as it liked to

---

[39] *See* Expert Report of Morgan Ricks, Doc. 240-91, filed Dec. 22, 2023, at 12-19 (S.J.A. at 90-110).

17

whatever destination it chose, with the support of the Fed. It is similarly inconceivable that the Fed would be required to continue access to the payment rails for banks engaged with international financial institutions in opposition to the United States' interests. Custodia's position, if generalized, would mean that states could play politics with their charters, and force the famously apolitical Fed to go along. Some states might devise special purpose charters designed to cater to any kind of interest group across the political spectrum at the exclusion of others, and the Fed would be obligated to support them.

None of this is meant to reflect at all on the merits of plaintiff's application — it is only to note that, as a statutory matter, the way banking regulation works cannot possibly entitle Custodia to payment services as a matter of right.

In fact, Professor Zaring is on record supporting the OCC's efforts to develop a financial technology charter of which special-purpose banks like Custodia could avail themselves.[40] Federal regulators should be open to innovative new entrants — and perhaps should afford those institutions' aspects to so-called "skinny charters" – charters that would allow federal regulators to oversee financial institutions that only lend, only process payments, or only hold client money without lending it out.

_____

[40] Perhaps peer-to-peer lenders could obtain a lending-only charter from the federal government and evade the need for deposit insurance. Or perhaps payments processors should be allowed to have a federal charter that would obviate the need for them to obtain money transmitter licenses in every state in which they do business.

*See* David Zaring, *Skinny Charters: Rebuilding The Banking Regulatory Perimeter*, 50 J. CORP.L. ___ (forthcoming 2025). The charter that Custodia received from Wyoming looks like one variant of these skinny charters. This sort of innovation could create more competition in banking and authorize institutions that could expand access to financial services and simplify the ability of Americans to save and invest. But while these novel charters may offer potential benefits to the financial industry, it remains essential that federal regulators not be obligated to provide payment services to such novel charter-holders as a matter of right. Instead, such access should be granted only after the same thorough review that characterizes banking regulation in every other context.

Professor Zaring will go further – his interest in Custodia's business model led him to invite the firm's Chief Executive Officer to address a group of financial regulation scholars in June 2021. He left the presentation with the impression that the company was under the guidance of a capable leader.

However, this dispute is not about the merits of Custodia's project; it is fundamentally a matter of statutory interpretation. The Monetary Control Act, along with the broader financial regulatory framework, does not grant Custodia or any other applicant an automatic right to a master account.

**V.      Banking Involves a Bargain that Custodia Is Unwilling to Make.**

Another way to think about the question presented by this appeal is that the ability to offer banking services is a bargain between the bank and the government. Banks get the cheap financing that government guaranteed deposits represent.[41] They get the backstop offered by emergency lending from the Fed when needed (but only with appropriate collateral).[42]  And they get access to the Fed's best-in-class payment system.

Those are substantial benefits, but they require a give, as well as a take. Banks who want these benefits must agree to safety and soundness regulation designed to ensure that they do not hurt the economy. They must conform with the government's priorities that the banking system not subsidize money-laundering, lending to American enemies, or other illegal activities.   Their lending choices must not put the government's deposit insurance resources at risk.[43]

---

[41] Robert C. Hockett, Saule T. Omarova, *The Finance Franchise*, 102 CORNELL L. REV. 1143, 1195 (2017) ("[b]ecause federal deposit insurance puts the U.S. government's full faith and credit directly behind banks' deposit liabilities, deposits are the cheapest and most stable source of funding for financial institutions…so long as they can provide adequate collateral").

[42] Kathryn Judge, *Three Discount Windows*, 99 CORNELL L. REV. 795, 797 (2014) ("By providing liquidity to banks in need of it, the Discount Window helps banks avoid value-destroying fire sales and can calm financial panics.").

[43] *See* David Zaring, *A Lack of Resolution*, 60 EMORY L.J. 97, 134 (2010) (discussing "the benefit of the bargain for which resolution authority is a cost").

Custodia does not want to take this deal. It wants a part of the upside of the bargain that banks strike with the government — access to those best in class payment rails that a master account offers — with no federal government supervision of any kind. Custodia has tried to create a business that has no scrutiny by the FDIC over how it handles deposits, and, depending on the resolution of this case, no power of the Fed to review to whom it sends money.

Earlier this year, the Supreme Court explained that "[b]anks with federal charters, called national banks, are subject primarily to federal oversight and regulation. And banks with state charters, called state banks, are subject to *additional* state oversight and regulation." *Cantero*, 144 S. Ct. at 1295 (emphasis added). Custodia is, to be sure, not a national bank. But it is structured in a way that avoids any federal oversight and is only subject to supervision by Wyoming's regulators (and, as far as that goes, not even the supervision afforded by Wyoming's money transmitter license regime). Ordinarily, state chartered banks must obtain federal deposit insurance before they open. [44] So must state-chartered industrial loan companies. [45] It is only novel state charters like Custodia's that have been structured

---

[44] FRB, *FAQs, How Can I Start A Bank?* https://www.federalreserve.gov/faqs/banking_12779.htm ("the proposed [state] bank must obtain approval for deposit insurance from the Federal Deposit Insurance Corporation").

[45] "ILCs are state-chartered banks and 'state nonmember banks,' and their primary federal banking supervisor is the FDIC, pursuant to the Federal Deposit Insurance

to avoid any review by any federal agency. There would only be state regulation – it would be exclusive, rather than additional. If Custodia's interpretation of the Monetary Control Act were to prevail, there would be no federal role to play other than to extend that institution, and any institution like it, no matter what its business purpose or plan, a master account. The *Cantero* Court understood that this sort of arrangement is not the way that bank regulation works.

### VI.   The Plain Language of the Monetary Control Act Does Not Require the Fed to Award Custodia a Master Account.

Professor Zaring will leave most of the statutory interpretation arguments in the case to the litigants. But as the Board's and the Reserve Bank's briefs explain in greater detail, the Monetary Control Act's plain language hardly requires the defendants to award master accounts to any and all applicants who seek them. In its attempt to level the playing field between financial institutions, the Monetary Control Act states that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks…"[46]

The purpose of the statute and fee schedule is to prevent price discrimination for services with an associated cost between member and non-member institutions.

---

Act." Mehrsa Baradaran, *The ILC and the Reconstruction of U.S. Banking*, 63 SMU L. Rev. 1143, 1145 (2010).

[46] 12 U.S.C. § 248a(c)(2).

But providing access with no assessment of risk cannot be what the statute requires. Having access to a master account is not a service on the fee schedule for which non-member and member institutions have been charged different and discriminatory prices, it is a status granted in accordance with the Federal Reserve's discretion. Furthermore, regardless of what services § 248a(c)(2) covers, the statute does not guarantee such services to any depository institution without discretion, as the statute does not require that "[a]ll…services" be provided to *all* depository institutions. The inclusion of "all" with respect to the Federal Reserve services and exclusion of "all" regarding which depository institutions suggests that there be no discretion over which services must be priced according to the fee schedule, but that discretion remains in providing depository institutions access to such services, such as retaining discretion in granting master accounts.

As the Board and the Reserve Bank explain, the Fed's discretion here is also consistent with the text of 12 U.S.C. § 342. That statute provides that "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items, and also, for collection, maturing notes and bills…."[47] By using "may," Congress intended to provide discretion to the Federal Reserve

---

[47] 12 U.S.C. § 342.

Banks in who and how they received money from.  As Judge Koeltl of the Southern District of New York concluded, "12 U.S.C. § 342 makes clear that Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so."[48]

The only reasonable conclusion is that that the Federal Reserve has discretion under § 342 to receive deposits by granting access to Fed master accounts, and that if granted such access, under § 248a(c)(2) these nonmember institutions must have access to the fees covered by the fee schedule at the same prices as available to member banks.  As Judge Koeltl observed, § 248a(c)(2) "is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System."[49]

---

[48] Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York, No. 23-CV-6414 (JGK), 2023 WL 7111182, at *7 (S.D.N.Y. Oct. 27, 2023).

[49] *Id.*

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street
Penthouse One
Miami, Florida 33128
Tel: (305) 379-6667
Fax: (305) 379-6668
markuslaw.com

By:    /s/ David Oscar Markus
David Oscar Markus
dmarkus@markuslaw.com

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 5,532 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point font

Dated: September 4, 2024.

/s/ David Oscar Markus
David Oscar Markus

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing was e-filed on September 4, 2024 through the 10th Circuit electronic filing system.

/s/ David Oscar Markus
David Oscar Markus