No. 24-8024

IN THE

# United States Court of Appeals for the Tenth Circuit

CUSTODIA BANK, INC.,

Plaintiff-Appellant,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
For the District of Wyoming
The Honorable Judge Scott W. Skavdahl
D.C. No. 1:22-CV-125-SWS

**BRIEF FOR *AMICI CURIAE* INDEPENDENT COMMUNITY
BANKERS OF AMERICA, CONSUMER BANKERS ASSOCIATION,
AND AMERICAN BANKERS ASSOCIATION
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

JENNA BURKE
INDEPENDENT COMMUNITY
  BANKERS OF AMERICA
1615 L Street, NW, Suite 900
Washington, DC 20036
(202) 821-4380

DAVID POMMEREHN
CONSUMER BANKERS ASSOCIATION
1225 I Street, N.W., #550
Washington, D.C.  20005
(202) 552-6368

September 4, 2024

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street N.W., Suite 1000
Washington, DC  20001
(202) 662-0466

CHARLOTTE KELLY
NORTON ROSE FULBRIGHT US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, TX 78205
(210) 270-9329

*Counsel for Amici Curiae*

*(Additional Counsel Listed on Inside Cover)*

ANDREW DOERSAM
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave NW
Washington, DC 20036
(202) 663-5035

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae*, by and through their undersigned counsel, hereby certify the following:

1.      The Independent Community Bankers of America certifies that it has no parent corporation and that no publicly traded company owns 10% or more of its stock.

2.      The Consumer Bankers Association certifies that it has no parent corporation and that no publicly traded company owns 10% or more of its stock.

3.      The American Bankers Association certifies that it has no parent corporation and that no publicly traded company owns 10% or more of its stock.

September 4, 2024                         */s/ Jonathan S. Franklin*
                                         Jonathan S. Franklin

                                         *Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................................. iii

GLOSSARY ...................................................................................................... viii

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................................1

SUMMARY OF ARGUMENT ...............................................................................3

ARGUMENT ..........................................................................................................6

    I.     WHETHER TO GRANT OR DENY A MASTER ACCOUNT
          IS WITHIN FEDERAL RESERVE BANKS' STATUTORY
          DISCRETION. ............................................................................6

    II.    STRIPPING FEDERAL RESERVE BANKS OF THEIR
          DISCRETION REGARDING MASTER ACCOUNTS
          WOULD UNDERMINE THE SAFETY AND INTEGRITY
          OF FEDERAL RESERVE SERVICES AND THE FEDERAL
          RESERVE SYSTEM. ..................................................................10

          A.    Mandating The Provision Of Master Accounts To Every
                 "Novel" State-Chartered Institution Would Strip Reserve
                 Banks Of Their Ability To Ensure That Such Institutions
                 Do Not Pose A Threat To The Safety And Integrity Of
                 The Federal Banking System. ....................................................10

          B.    Novel State-Chartered Institutions Are Not Subject To
                 The Comprehensive Regulation Applicable To Federally
                 Regulated Banks. ......................................................................15

          C.    Allowing Automatic Access To Master Accounts Will
                 Undermine The Integrity And Carefully Crafted
                 Protections Of Our Financial System. ......................................20

CONCLUSION ......................................................................................................29

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 700 F.
    Supp. 3d 86 (S.D.N.Y. 2023)............................................................8

*Biden v. Texas*, 597 U.S. 785 (2022) ........................................................7

*Farmers' & Merchants' Bank of Monroe v. Fed. Rsrv. Bank of
    Richmond*, 262 U.S. 649 (1923) ............................................7

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861
    F.3d 1052 (10th Cir. 2017) ............................................9

*PayServices Bank v. Fed. Rsrv. Bank of San Francisco*, No. 23-cv-
    00305, 2024 WL 1347094 (D. Idaho Mar. 30, 2024), *appeal filed*,
    No. 24-2355 (9th Cir. Apr. 15, 2024) ....................................7

**Statutes, Regulations, and Rules:**

12 C.F.R. § 3.1(a)....................................................................23

12 C.F.R. § 3.10......................................................................23

12 C.F.R. § 4.6(a)....................................................................16

12 C.F.R. § 4.6(c)....................................................................16

12 C.F.R. §§ 6.1-.25.................................................................23

12 C.F.R. §§ 30.1-.6.................................................................25

12 C.F.R. § 50.10.....................................................................22

12 C.F.R. § 50.40(a).................................................................22

12 C.F.R. § 50.40(c).................................................................22

12 C.F.R. § 208.3(d)(1).............................................................25

12 C.F.R. §§ 208.40-.45.............................................................23

12 C.F.R. § 208.64(a) ........................................................................17

12 C.F.R. § 217.1(a) .........................................................................23

12 C.F.R. § 217.10 ...........................................................................23

12 C.F.R. § 249.10 ...........................................................................22

12 C.F.R. § 249.40(a) ........................................................................22

12 C.F.R. § 249.40(c) ........................................................................22

12 C.F.R. § 324.1(a) .........................................................................23

12 C.F.R. § 324.10 ...........................................................................23

12 C.F.R. §§ 324.401-.405 ...................................................................23

12 C.F.R. § 329.10 ...........................................................................22

12 C.F.R. § 329.40(a) ........................................................................22

12 C.F.R. § 329.40(c) ........................................................................22

12 C.F.R. §§ 364.100-.101 ...................................................................25

12 U.S.C. § 222 ..............................................................................15

12 U.S.C. § 248a(a) ...........................................................................8

12 U.S.C. § 248a(c)(2) ..................................................................... 7-10

12 U.S.C. § 248c(b)(1)(B)(ii) ..............................................................9, 10

12 U.S.C. § 321 ..............................................................................17

12 U.S.C. § 325 ..............................................................................17

12 U.S.C. § 342 .......................................................................... 6-10

12 U.S.C. § 481 ..............................................................................16

12 U.S.C. § 1813(a)(1) .......................................................................11

12 U.S.C. § 1813(c)(1)................................................................11

12 U.S.C. § 1818..........................................................................26

12 U.S.C. § 1820(d)................................................................16, 17

12 U.S.C. § 1831o..........................................................................23

12 U.S.C. § 1831o(h)(3)...............................................................26

12 U.S.C. § 1831p-1.....................................................................25

12 U.S.C. § 1841(c)(1)..................................................................19

12 U.S.C. § 1844(c)(2)(A)(ii)........................................................18

15 U.S.C. § 6801(b)......................................................................24

15 U.S.C. § 6805..........................................................................24

Federal Reserve Act, 38 Stat. 251 (1913)......................................7

Fed. R. App. P. 29(a)(4)(E)............................................................1

Monetary Control Act of 1980, 94 Stat. 132 (1980).......................7

Wyo. Admin. Code 021.0002.20.05132021 § 2(a)........................23

Wyo. Admin. Code 021.0002.20.05132021 § 9(a)........................22

Wyo. Admin. Code 021.0002.20.05132021 § 9(a)(v)....................22

**Other Authorities:**

Bank Pol'y Inst., *Fed Account Access for Nonbanks: An Analysis of the Policy Implications and Potential Risks to the U.S. Financial System* (June 2021) (https://tinyurl.com/yzr9arau)...........................25

Bank Pol'y Inst., *FinTech Access to Fed Accounts and the Nation's Payments Systems: A Primer* (May 11, 2021) (https://tinyurl.com/y85tchje) ............................................................4

Bd. of Govs. of Fed. Rsrv. Sys., *Bank Holding Company Supervision Manual* (Feb. 2023) ......................................................26

Bd. of Govs. of Fed. Rsrv. Sys., *Commercial Bank Examination Manual* (Oct. 2023)............................................................26

Michael del Castillo, *A Bitcoin Bastion in the Wild West* (https://tinyurl.com/mr7ewhk2) (Sept. 13, 2021)................................13

FDIC, *Basic Examination Concepts and Guidelines* (Mar. 2022) ..........................17

FDIC, *Formal and Informal Enforcement Actions Manual* (July 2022)................26

Fed. Rsrv. Banks, Operating Circular No. 1 (Account Relationships) (eff. Sept. 1, 2023) ............................................................12

Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* (Aug. 2021) (https://tinyurl.com/pnxbzn2x) ................................18, 19

Raj Gnanarajah, Cong. Rsch. Serv., IF10055, *Bank Failures and the FDIC* (Mar. 23, 2023)....................................................21, 23

Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 19, 2022) ...................................... 2, 10, 12, 14, 21, 24-25, 28

Michael J. Hsu, Acting Comptroller of the Currency, *Preventing the Next Great Blurring* (Feb. 21, 2024) (https://tinyurl.com/dujxzw76)...............19

Marc Labonte, Cong. Rsch. Serv., IN12031, *Federal Reserve: Master Accounts and the Payment System* (Dec. 8, 2022) ..............................11

Marc Labonte & David W. Perkins, Cong. Rsch. Serv., IF11055, *Introduction to Bank Regulation: Supervision* (2018) ......................................15

Marc Labonte, Cong. Rsch. Serv., R44918, *Who Regulates Whom? An Overview of the U.S. Financial Regulatory Framework* (2023) ............15, 17, 18

Adam J. Levitin, Consumer Finance: Markets and Regulation (2018)...................18

Liquidity Coverage Ratio: Liquidity Risk Measurement Standards, 79 Fed. Reg. 61,440 (Oct. 10, 2014) ........................................................22

OCC, *Comptroller's Handbook*, *Examination Process*, *Bank Supervision Process* (Sept. 2019) (https://tinyurl.com/ydmderuk) ..............16, 25

OCC, *Comptroller's Handbook*, *Safety and Soundness*, *Liquidity* (May 25, 2023) (https://tinyurl.com/yckysd9m) .................................................22

OCC, PPM 5310-3, *Bank Enforcement Actions and Related Matters* (May 25, 2023) (https://tinyurl.com/2jwvv9m4)...........................................16, 26

Christopher K. Odinet, *Predatory Fintech and the Politics of Banking*, 106 Iowa L. Rev. 1739 (2021).....................................................................17, 18

David W. Perkins, Cong. Rsch. Serv., IF10809, *Introduction to Bank Regulation: Leverage and Capital Ratio Requirements* (2019).........................23

David W. Perkins, Cong. Rsch. Serv., R46648, *Bank Supervision by Federal Regulators: Overview and Policy Issues* (Dec. 28, 2020) ......................2

*Restoring Order in Crypto's Wild West*, The FinReg Blog (Apr. 6, 2021) (https://tinyurl.com/396b4hyu)....................................................................13

Andrew P. Scott, Cong. Rsch. Serv., R47014, *An Analysis of Bank Charters and Selected Policy Issues* (2022).......................................................15

Wyo. Div. of Banking, *Special Purpose Depository Institutions* (July 7, 2021) (https://tinyurl.com/22b89akx)..........................................................23

Wyo. Legislature Blockchain Task Force, *Summary of Proceedings* (https://tinyurl.com/3v8c9t9k) ......................................................................13

# GLOSSARY

| | |
|---|---|
| ABA | American Bankers Association |
| AML | Anti-Money Laundering |
| CBA | Consumer Bankers Association |
| FDIC | Federal Deposit Insurance Corporation |
| *FMBM* | *Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923) |
| FRA | Federal Reserve Act |
| FRBKC | Federal Reserve Bank of Kansas City |
| ICBA | Independent Community Bankers of America |
| LCR | Liquidity Coverage Ratio |
| MRAs | Matters Requiring Attention |
| MRIAs | Matters Requiring Immediate Attention |
| OCC | Office of the Comptroller of Currency |

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The Independent Community Bankers of America ("ICBA") has one mission: to create and promote an environment where community banks flourish. ICBA is a national trade association that powers the potential of the nation's community banks through effective advocacy, education, and innovation.  As local and trusted sources of credit, America's community banks leverage their relationship-based business model and innovative offerings to channel deposits into the neighborhoods they serve, creating jobs, fostering economic prosperity, and fueling their customers' financial goals and dreams.[1]

The Consumer Bankers Association ("CBA") is the only national financial trade group focused exclusively on retail banking and personal financial services—banking services geared toward consumers and small businesses.  CBA provides leadership, education, research, and federal representation for its members. CBA members include the nation's largest bank holding companies as well as regional and super-community banks that collectively hold two-thirds of the total assets of depository institutions.

---

[1]    No counsel for a party authored this brief in whole or in part and no person other than *amici*, their members, or their counsel has made any monetary contributions intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E).  All parties have consented to the filing of this brief.

The American Bankers Association ("ABA") is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $23.7 trillion banking industry and its 2.1 million employees. ABA members provide banking services in all fifty States and the District of Columbia. Among them are banks, savings associations, and non-depository trust companies of all sizes.

*Amici* have a strong interest in this case, which asks whether Federal Reserve Banks have discretion to consider the safety or soundness of a depository institution before providing that entity a "master account" that effectively gives it direct access to the Nation's banking system. *Amici* believe that Reserve Banks have that statutory discretion. The banks *amici* represent are subject to a plethora of federal regulation and oversight that, under guidelines promulgated by the Federal Reserve System (the "Fed"), facilitate a more streamlined master account application process. *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099, 51,100 (Aug. 19, 2022) (the "Guidelines"). But institutions like appellant Custodia Bank, Inc. ("Custodia"), which are not federally insured and not subject to the supervision of a "federal prudential regulator,"[2] are

---

[2]    The federal prudential regulators are the Fed, the Office of the Comptroller of the Currency ("OCC"), and the Federal Deposit Insurance Corporation ("FDIC"). David W. Perkins, Cong. Rsch. Serv., R46648, *Bank Supervision by Federal Regulators: Overview and Policy Issues* 1 (Dec. 28, 2020).

not generally subject to that extensive regulation and oversight. As a result, Custodia's argument that it—and any depository institution chartered under any state law—is automatically entitled to a master account on a no-questions-asked basis would, in *amici*'s view and that of the Fed, potentially subject the federal banking system to undue risk.

## SUMMARY OF ARGUMENT

The U.S. federal banking system is the largest, most reliable, and most trusted financial system in the world. Businesses and individuals alike depend on that system each day to safely and efficiently hold trillions of dollars in assets and process billions of dollars' worth of transactions. In turn, the reliability, safety, and soundness of that banking system is preserved by a vast overlapping web of federal laws, regulation, and agency oversight. The "master accounts" at issue here are a critical part of that network, as they are the way banks and other depository institutions can directly access the myriad financial services that allow the federal banking system to operate. Access to such accounts is controlled by the twelve Federal Reserve Banks under guidelines issued by the Fed of which they form a part, which is controlled by its Board of Governors ("Board"). The Reserve Banks seek to ensure that such accounts are given only to institutions that are found, on an ongoing basis, to have the financial and operational ability to safely and securely have direct access to the federal banking network.

3

*Amici* are pre-eminent banking associations whose thousands of members—including both federally and state-chartered institutions—are subject to that extensive federal regulation and oversight because of their charters, federal deposit insurance coverage, holding company structure, or other reasons. Custodia, by contrast, is a special-purpose depository institution ("SPDI"), chartered by the State of Wyoming and subject to no direct federal prudential examination or oversight. Custodia is a "novel" depository institution—an institution whose charter "authorizes [it] to engage in some, but typically not all, of the[] core banking activities" of deposit-taking, lending, and payments[3] that is not federally insured and has no federal agency overseeing its structure, operations, finances, or soundness.

*Amici* take no position on whether appellee the Federal Reserve Bank of Kansas City ("FRBKC") correctly exercised its discretion to deny Custodia's application for a master account,[4] or whether other novel institutions should or should not receive such access depending on their individual characteristics. But

---

[3]     Bank Pol'y Inst., *FinTech Access to Fed Accounts and the Nation's Payments Systems: A Primer* at 1 (May 11, 2021) (https://tinyurl.com/y85tchje).

[4]     Custodia contends that both the Board and FRBKC denied its application for a master account. *See, e.g.*, Appellant's Br. 22. The Board asserts that FRBKC alone denied Custodia's master account application. Board's Br. 49-58. *Amici* assume for purposes of this brief that FRBKC alone denied Custodia's application.

*amici* believe, as the district court correctly held, that Reserve Banks have statutory discretion to grant or deny master account access and are not mandated to automatically grant such access—no-questions-asked—to any novel, state-chartered depository institution that applies for one. Not only does the statutory language unambiguously preserve such discretion, but the soundness of the Nation's unparalleled banking system would be compromised if Custodia's contrary view were accepted. Under the Fed's guidelines, no institution is automatically entitled to master account access. Federally insured and regulated banks, such as *amici's* members, are subject to a streamlined application process because the comprehensive, ongoing, and in some cases continuous federal regulation and oversight to which they are subject gives the Fed assurance that they will not compromise the safety or integrity of the federal banking system. But with novel institutions like Custodia, the Fed has no such assurance, and its Reserve Banks must therefore be able to carefully scrutinize such institutions' business models, along with their underlying soundness, safety, and security, before effectively giving them the keys to the palace that is our banking system. The mere fact that Custodia may be "eligible" to obtain a master account, *cf*. J.A. 1461, does not entitle it to one. *Amici* accordingly urge the Court to affirm the district

court's well-reasoned decision that FRBKC was not statutorily mandated to provide Custodia automatic master account access on a no-questions-asked basis.[5]

## ARGUMENT

### I.  WHETHER TO GRANT OR DENY A MASTER ACCOUNT IS WITHIN FEDERAL RESERVE BANKS' STATUTORY DISCRETION.

The district court correctly held that the "plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts," and that FRBKC "did not owe Custodia any non-discretionary duty to issue a master account upon request." J.A.1473-74.

At issue in this case are two provisions of the Federal Reserve Act ("FRA"). The first provides that "[a]ny Federal reserve bank *may* receive from any of its member banks, or other depository institutions, . . . deposits of current funds in lawful money[.]"  12 U.S.C. § 342 ("Section 342") (emphasis added).  The second provides that "[a]ll Federal Reserve bank services" covered by a Board-created fee schedule "shall be available to nonmember depository institutions," and, subject to

---

5    *Amici* do not address (1) whether Custodia is entitled to mandamus relief against the Board and FRBKC, (2) whether the Board allegedly violated the Administrative Procedure Act, or (3) whether Custodia is entitled to declaratory relief.  *See* Appellant's Br. 4-5, 46-57.

certain exceptions, "such services shall be priced at the same fee schedule applicable to member banks." 12 U.S.C. § 248a(c)(2).

Section 342 makes clear that Federal Reserve Banks have the discretion—not obligation—to issue master accounts. Under that section, a Federal Reserve Bank "*may* receive" deposits. 12 U.S.C. § 342 (emphasis added). "[T]he word may *clearly* connotes discretion." *Biden v. Texas*, 597 U.S. 785, 802 (2022) (internal quotation marks and citation omitted). And, as the Supreme Court explained in *Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923) ("*FMBM*"), Section 342 does not "impose[] upon reserve banks any obligation to receive checks for collection" but "merely confers authority to do so." *Id.* at 662.[6]

Although Custodia, albeit begrudgingly, acknowledges that Section 342 vests Federal Reserve Banks with discretion regarding deposits, *cf.* Appellant's Br. 43-44, it fails to address the contradictory nature of its own position. Under Custodia's interpretation, a Reserve Bank must provide it with a master account

---

[6] Section 342's discretionary language existed when the FRA was enacted, *see* ch. 6, § 13, 38 Stat. 251, 263 (1913), and went untouched by Congress even after the U.S. Supreme Court decided *FMBM* in 1923, *see, e.g.*, Monetary Control Act of 1980, § 105, 94 Stat. 132, 139-40 (1980). As another court has correctly observed, this suggests that Congress ratified *FMBM*'s interpretation of Section 342. *See PayServices Bank v. Fed. Rsrv. Bank of San Francisco*, No. 23-cv-00305, 2024 WL 1347094, at *6 (D. Idaho Mar. 30, 2024), *appeal filed*, No. 24-2355 (9th Cir. Apr. 15, 2024).

but may nevertheless reject deposits into that account.  That interpretation makes no sense.  Section 342 provides Federal Reserve Banks with discretion to deny (or grant) master accounts and does not require them to carry out their important mission of ensuring the security and soundness of the federal banking system by attempting the impossible task of individually scrutinizing every deposit made by every bank.  Accordingly, the district court correctly determined that the discretion conferred by Section 342 "to receive or reject deposits necessarily carries with it the discretion to grant or deny master accounts."  J.A.1471.

The district court likewise correctly determined that Section 248a, an anti-price-discrimination provision directed at the Board, does not require Federal Reserve Banks to issue master accounts to nonmember depository institutions.  *See* J.A.1467-69.  Custodia argues that this approach "renders the term 'shall be available' superfluous."  Appellant's Br. 32.  But Section 248a merely "instructs the Board to 'put into effect a schedule of fees' for certain services based on certain principles."  *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 700 F. Supp. 3d 86, 99 (S.D.N.Y. 2023) (quoting 12 U.S.C. § 248a(a)).  One such principle is that "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks[.]"  *Id.* at 99 (citing 12 U.S.C. § 248a(c)(2)).  In other words, the services covered by the fee schedule

8

"shall be available" to nonmember depository institutions at the same prices applicable to members.

Unlike Section 342, which grants Reserve Banks discretion to deny depository access to "any" institution—Section 248a(c)(2) nowhere says that "all" or "any" depository institution must be allowed to access the listed services. It merely states that those services will generally be "available" to "nonmember depository institutions" under the "the same fee schedule applicable to member banks." 12 U.S.C. § 248a(c)(2). When read together with Section 342, Section 248a(c)(2) states that nonmember entities that are otherwise allowed to access the listed services through the Reserve Banks' discretionary authority under Section 342 will be charged the same fees that apply to member banks.

Further, in 2022, Congress amended the FRA to specifically require the Fed to maintain a database of every institution that has submitted an "access request" for a master account and whether that request was approved, withdrawn or "rejected[.]" 12 U.S.C. § 248c(b)(1)(B)(ii). *See* J.A.1470-71. This statute runs counter to Custodia's automatic-access interpretation, as Congress clearly contemplated that there must always be a "request" for such access—which itself indicates discretion—and that Reserve Banks may deny such requests.

Custodia relies heavily on Judge Bacharach's non-binding opinion in *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th

Cir. 2017), asserting that, because Section 248a(c)(2) purportedly requires Reserve Banks to make covered services available to nonmember depository institutions and a "master account is ***required***" to access those services, nonmember depository are entitled to master accounts.  Appellant's Br. 28-29.  As noted above, this interpretation overreads Section 248a(c)(2).  Further, Judge Bacharach's opinion predated (1) the Board's August 19, 2022 Guidelines, 87 Fed. Reg. at 51,099, and (2) Congress's December 2022 amendment to the FRA, which specifically requires a database of master account "access request[s]" and whether such requests were approved, withdrawn or "rejected[.]"  12 U.S.C. § 248c(b)(1)(B)(ii).

Accordingly, the Court should affirm the district court's holding that Section 248a(c)(2) does not override the discretion expressly granted by Section 342 and does not require Federal Reserve Banks to automatically grant master account access to any depository institution on a no-questions-asked basis.

## II.    STRIPPING FEDERAL RESERVE BANKS OF THEIR DISCRETION REGARDING MASTER ACCOUNTS WOULD UNDERMINE THE SAFETY AND INTEGRITY OF FEDERAL RESERVE SERVICES AND THE FEDERAL RESERVE SYSTEM.

### A.    Mandating The Provision Of Master Accounts To Every "Novel" State-Chartered Institution Would Strip Reserve Banks Of Their Ability To Ensure That Such Institutions Do Not Pose A Threat To The Safety And Integrity Of The Federal Banking System.

Sound policy reasons justify Federal Reserve Banks' statutory discretion to grant or deny master accounts.  If Custodia's argument is accepted, then every

Reserve Bank would be obligated to automatically grant master accounts to any state-chartered "bank" that receives deposits, no matter how novel its business and without any understanding or consideration given to its safety or soundness. *Cf.* 12 U.S.C. § 1813(a)(1) (defining "bank"), (c)(1) (defining "depository institution"). And the Fed and its Reserve Banks would at no point have the ability to assess whether these entities pose safety and soundness risks that threaten the nation's financial system, rendering an application process or "access request" moot. *See, e.g.*, Marc Labonte, Cong. Rsch. Serv., IN12031, *Federal Reserve: Master Accounts and the Payment System* 2 (Dec. 8, 2022).

This position is contrary not only to the governing statute, but also to the fundamental policies that underlie the entire system of federal banking regulation. Our Nation's federal banking system is the largest and most trusted in the world because federal law and the federal prudential agencies carefully regulate, on an ongoing basis, institutions that have access to that system to ensure these institutions do not, and will not, pose any appreciable threat to the soundness, safety, and integrity of a financial system that must efficiently and reliably process billions of transactions every day. Master accounts are critical to that system, as they are the means through which entities holding them are able to access all of the Fed's services, including electronic payments. *E.g.*, J.A.1451.

11

Under the Fed's Guidelines, no institution is guaranteed master account access. *See* 87 Fed. Reg. at 51,106-07. Institutions supervised by federal agencies under federal law—such as *amici*'s members—generally receive a streamlined review because the comprehensive federal regulations and oversight that they are subject to assures the Federal Reserve Banks that they will not pose an undue threat to the safety or integrity of the banking system. *See id.* at 51,109. Most state-chartered banks fall into that category as well, as they are subject to federal regulation by virtue of their being federally insured or for other reasons. *See id.* ("Tier 1" banks, which consist of "federally insured" banks, are subject to "a less intensive and more streamlined" master-account review because they are "already subject to a standard, strict, and comprehensive set of federal banking regulations," and "detailed regulatory and financial information would in most cases be readily available").

Like every other company in the country, Custodia can efficiently access the Nation's banking system through an intermediary, or "correspondent" bank that itself has master account access.[7] *See, e.g.*, Fed. Rsrv. Banks, Operating Circular

---

[7] Despite claiming to have lost "indirect correspondent" relationships due to what Custodia describes as "regulatory chokeholds" or "regulatory pressure," Appellant's Br. 13-14 & n.10, Custodia fails to acknowledge that at the inception of this suit (and possibly still), it accessed the Federal Reserve System via a correspondent bank. *See* J.A.1452.

No. 1 (Account Relationships) § 2.7 (eff. Sept. 1, 2023).  Yet Custodia now argues

that it must automatically be granted direct access to a master account merely

because it has convinced a state (Wyoming) to give it a "novel" SPDI charter.  *Cf.*

Appellant's Br. 3.  That cannot be sufficient, especially given how new SPDIs like

Custodia are, and how their chartering laws may have been enacted.  *See* J.A.1450;

Appellant's Br. 9-10 (SPDI laws enacted in 2019).  Indeed, Custodia's CEO,

Caitlin Long, appears to have been involved in lobbying for what eventually

became Wyoming's SPDI act.  *See* Wyo. Legislature Blockchain Task Force,

*Summary of Proceedings* 4 (https://tinyurl.com/3v8c9t9k); Michael del Castillo, *A*

*Bitcoin Bastion in the Wild West* (https://tinyurl.com/mr7ewhk2) (Sept. 13, 2021);

*Restoring Order in Crypto's Wild West*, The FinReg Blog (Apr. 6, 2021)

(https://tinyurl.com/396b4hyu).

Although Custodia obtained a "novel" Wyoming charter, it is not otherwise

subject to direct, ongoing, or continuous federal prudential regulation, supervision,

or oversight.  And because such institutions are not subject to such checks, the Fed

and its Reserve Banks cannot have the confidence, without evaluating their

business models and fundamental soundness, that they will not jeopardize the

world's largest and most trusted banking system.  As the Fed has explained, these

"Tier 3" institutions, which "are not federally insured and not subject to prudential

supervision by a federal banking agency" may have "a supervisory or regulatory

13

framework that is substantially different from, and possibly weaker than, the supervisory and regulatory framework that applies to federally-insured institutions, and as a result may pose the highest level of risk." 87 Fed. Reg. at 51,101. Indeed, "[d]etailed regulatory and financial information regarding Tier 3 institutions may not exist or may be unavailable." *Id*. Accordingly, these institutions "will generally receive the strictest level of review." *Id*. at 51,110.

While *amici* take no position on whether Federal Reserve Banks should or should not grant Custodia, or any other novel state-chartered depository institution, a master account, *amici* believe that the Reserve Banks must have the ability to scrutinize such institutions before granting such access and the ability to deny it to institutions that they believe pose undue risk to the financial system. If these less-regulated companies are to have the same direct access to the federal banking system that *amici*'s prudentially regulated and/or federally insured members have, then they should demonstrate, through an application and review process, that they do not pose undue risk to the financial system or the thousands of banks operating in it that are subject to the full panoply of federal prudential regulation and supervision. Granting every such institution automatic, no-questions-asked access would pose intolerable risks to the entire banking system upon which all of us rely every day and render the purpose of an application or "access request"

meaningless, as no deniable application or review would ever be necessary to gain access to the Nation's unparalleled payments system.

**B.      Novel State-Chartered Institutions Are Not Subject To The Comprehensive Regulation Applicable To Federally Regulated Banks.**

Custodia's desired outcome would leave the carefully constructed banking regulatory system at the mercy of novel institutions that have little to no federal oversight.  "Banks are supervised by a primary regulator, which is determined by a bank's charter type and whether the bank is a member of the Federal Reserve System."  Marc Labonte & David W. Perkins, Cong. Rsch. Serv., IF11055, *Introduction to Bank Regulation: Supervision* 1 (2018).  For federally insured banks, the primary regulators are: (1) the Fed; (2) the OCC; and (3) the FDIC.  *Id.*

Under our "dual banking system," the regulation a depository institution (such as a bank) is subject to depends on whether the institution is state or federally chartered.  *See* Marc Labonte, Cong. Rsch. Serv., R44918, *Who Regulates Whom? An Overview of the U.S. Financial Regulatory Framework* 12-13 (2023).  Banks chartered under federal law (specifically, the National Bank Act of 1864) are "national banks."  Andrew P. Scott, Cong. Rsch. Serv., R47014, *An Analysis of Bank Charters and Selected Policy Issues* 3 & n.4 (2022).  National banks are regulated and supervised by the OCC, *id.* at 3, and they must become members of the Federal Reserve System, *id.*; *see also* 12 U.S.C. § 222 ("Every national bank in

15

any State shall . . . become a member bank of the Federal Reserve System . . . .").
National banks' deposits generally must be FDIC-insured.  Scott, *supra*, at 3.

For OCC-supervised banks, the OCC must conduct a "full-scope, on-site examination of every national bank . . . at least once during each 12-month period," but it can conduct more frequent examinations if necessary.  12 C.F.R. § 4.6(a), (c); *see also* 12 U.S.C. §§ 481 (requiring Comptroller of Currency to appoint examiners of national banks), 1820(d) (requiring examinations of insured depository institutions).  This 12-month period (or 18-month period, in some cases) is referred to as a "supervisory cycle."  OCC, *Comptroller's Handbook*, *Examination Process*, *Bank Supervision Process* at 12 (Sept. 2019) (https://tinyurl.com/ydmderuk) ("*Bank Supervision Process*").  Examinations of "specialty areas," including, *inter alia*, IT, asset management, the Bank Secrecy Act, anti-money laundering, and the Community Reinvestment Act, are "integrated within supervisory cycles of all banks."  *Id.* at 16; *see also id.* at 16-21 (discussing specialty areas).  The OCC uses "matters requiring attention," or MRAs, to "communicate concerns about a bank's deficient practices."  *Id.* at 46. Additionally, the OCC "uses enforcement actions to require a bank's board and management to take timely actions to correct a bank's deficiencies."  *Id.* at 49; *see also, e.g.*, OCC, PPM 5310-3, *Bank Enforcement Actions and Related Matters* at

4-6, 18-24 (May 25, 2023) (https://tinyurl.com/2jwvv9m4) (setting forth formal and informal bank enforcement actions).

A state-chartered bank is, as its name suggests, a bank chartered under an individual state's law. *See* Scott, *supra*, at 2-3. State-chartered banks may apply to become members of the Federal Reserve System, but they are not required to do so. *See* 12 U.S.C. § 321; Labonte, *Who Regulates Whom?*, *supra*, at 16. State-chartered, FDIC-insured banks that are not members of the Federal Reserve System are primarily regulated by the FDIC.[8] Christopher K. Odinet, *Predatory Fintech and the Politics of Banking*, 106 Iowa L. Rev. 1739, 1767 (2021). As with national banks, and state-chartered Federal Reserve member banks, state-chartered, FDIC-insured nonmember banks are subject to rigorous—and in some cases, continuous—examinations. *See, e.g.*, 12 U.S.C. § 1820(d); *see also* FDIC, *Basic Examination Concepts and Guidelines* 1.1-6 (Mar. 2022) (describing requirements of a full-scope examination). An FDIC-insured, state-chartered bank that is a Federal Reserve System member is also subject to examination by the Fed. *See* Odinet, 106 Iowa L. Rev. at 1767; 12 U.S.C. § 325; 12 C.F.R. § 208.64(a) (Fed must "conduct a full-scope, on-site examination of every insured member bank at least once during each 12-month period."). But a state-chartered bank that is

---

[8]     Custodia, without explanation, asserts that it "applied for FDIC insurance, but it was not available." Appellant's Br. 18 n.13.

17

neither a Federal Reserve System member nor FDIC-insured is a "novel" entity regulated only by the relevant state authority, with no direct federal prudential oversight.  *Cf.* Odinet, 106 Iowa L. Rev. at 1767 ("For a state bank that is a member of neither [the Fed nor the FDIC], the state regulator is the uncontested primary regulator.") (citing Adam J. Levitin, Consumer Finance: Markets and Regulation 133-36 (2018)).

Finally, "[b]anks are often owned or controlled by another company, called a bank holding company (BHC)."  Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* at 64 (Aug. 2021) (https://tinyurl.com/pnxbzn2x).  And "[t]he Federal Reserve has supervisory and regulatory authority for all BHCs, regardless of whether subsidiary banks of the holding company are national banks, state 'member' banks, or state 'nonmember banks.'" *Id.*  Pursuant to this authority, the Board may "make examinations" of BHCs and their subsidiaries in order to, *inter alia*, "monitor the compliance of the [BHC] and the subsidiary with" the relevant laws.  12 U.S.C. § 1844(c)(2)(A)(ii).

Accordingly, regardless of whether a bank is state or federally chartered, there is normally extensive federal prudential regulation and supervision by one or multiple federal prudential regulators.  This makes sense, given that these regulatory and supervisory systems are essential to the stability and safety of the financial system as a whole.  *See, e.g.*, Labonte, *Who Regulates Whom?*, *supra*, at

14 ("Banks also play a central role in the payment system, the financial system, and the broader economy.  As a result, banks are subject to safety and soundness (prudential) regulation that most other financial firms are not subject to at the federal level.").  Indeed, the Fed "was created in 1913 to promote greater financial stability and help avoid banking panics, such as those that had plunged the country into deep economic contractions in the late nineteenth and early twentieth centuries." *The Fed Explained*, *supra*, at 47.

But some institutions—such as Custodia—utilize "novel" state charters that allow them to elude federal prudential supervision entirely.  *See, e.g.*, Michael J. Hsu, Acting Comptroller of the Currency, *Preventing the Next Great Blurring* at 13-14 (Feb. 21, 2024) (https://tinyurl.com/dujxzw76).  These novel institutions (of which there are only a few) are not subject to the same federal prudential oversight required of thousands of other national or state chartered banks because they are neither insured depository institutions nor uninsured institutions that are part of a bank holding company and are not "banks" for purposes of the Bank Holding Company Act.  *See* 12 U.S.C. § 1841(c)(1).  Though these novel institutions may be subject to state regulations, that they fall outside the purview of federal prudential supervision makes their safety and soundness effectively unknown to the Fed and its Reserve Banks where, as here, the novel institution seeks a master account in order to directly access the Nation's banking system.

19

Accordingly, the district court's decision is not "antithetical to the dual-banking system" that allows for both federal- and state-chartered banks. *See* Appellant's Br. 25. Access to master accounts is a purely federal function. Yet while *amici*'s members—including numerous state-chartered banks—are subject to a panoply of direct, mandatory federal prudential regulation, Custodia is, at best, indirectly subject to such regulation, at the discretion of its state bank regulator.

### C. Allowing Automatic Access To Master Accounts Will Undermine The Integrity And Carefully Crafted Protections Of Our Financial System.

As noted above, the federal examination process involves rigorous, and in some cases, continuous, measuring and monitoring of the risks associated with a particular bank and, if necessary, remedial enforcement to minimize or remove those risks. Under Custodia's interpretation of the FRA, however, a Federal Reserve Bank would have to automatically issue a master account, without any prior review, to any state-chartered institution regardless of the risks (such as insolvency or lack of security) that it may pose. Though Custodia attempts to frame its argument as one in favor of preserving the dual-banking system, *cf. id.* at 39-40, its interpretation of the FRA ignores the critical role of the Federal Reserve Banks in protecting the integrity of the nation's financial system.

Under the Fed's guidelines for master accounts, Federal Reserve Banks' analysis of an application for a master account is governed by six fundamental

20

principles: (1) whether the applicant has "a well-founded, clear, transparent, and enforceable legal basis for its operations," and if it does, that provision of a master account and associated services should not create (2) "undue credit, operational, settlement, cyber or other risks to the Reserve Bank," (3) "undue credit, liquidity, operational, settlement, cyber or other risks to the overall payment system," (4) "undue risk to the stability of the U.S. financial system," (5) "undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity," or (6) "adversely affect the Federal Reserve's ability to implement monetary policy."  87 Fed. Reg. at 51,107-09.  Yet if Custodia's position were adopted, the Reserve Banks would be forced to provide a master account to every novel, state-chartered institution without evaluating any of these concerns.  They would therefore be unable to assess, *inter alia*, whether allowing that institution access to a master account and Fed services "could have a deleterious effect on U.S. financial stability."  87 Fed. Reg. at 51,108.

Most bank failures "trace back to the management of bank resources, resulting in a bank's inability to meet liquidity or capital requirements."  Raj Gnanarajah, Cong. Rsch. Serv., IF10055, *Bank Failures and the FDIC* 1 (Mar. 23, 2023).  "Liquidity is the ability of a bank to meet cash flow needs, including deposit withdrawals by its customers."  *Id.*  Because the "repercussions of

21

inadequate liquidity risk management can be immediate and dire," *see* OCC,

*Comptroller's Handbook*, *Safety and Soundness*, *Liquidity* at 3 (May 25, 2023)

(https://tinyurl.com/yckysd9m), there are numerous federal prudential regulations

governing liquidity management—none of which directly apply to Custodia.[9]

      For example, the OCC, Board, and FDIC have adopted "liquidity coverage

ratio" ("LCR") requirements for certain institutions within their purview.  *See*

Liquidity Coverage Ratio: Liquidity Risk Measurement Standards, 79 Fed. Reg.

61,440 (Oct. 10, 2014); *see also, e.g.*, 12 C.F.R. §§ 50.10 (LCR for OCC-regulated

institutions), 249.10 (LCR for Board-regulated institutions), 329.10 (LCR for

FDIC-regulated institutions).  These institutions must notify their governing

authority if the LCR falls short of the minimum requirement, 12 C.F.R.

§§ 50.40(a), 249.40(a), 329.40(a), and the OCC, FDIC, and Board have the ability

to "take additional supervisory or enforcement actions to address noncompliance,"

*id.* §§ 50.40(c), 249.40(c), 329.40(c).

---

9     Custodia notes that, under Wyoming law, it "must invest 100% of its U.S. dollar demand deposits in either cash-on-hand or high-quality liquid assets." Appellant's Br. 11.  But these assets can be "[o]ther investments which are determined by the Commissioner to be substantially similar" to the assets described in [Wyo. Admin. Code 021.0002.20.05132021 § 9(a)], *see* Wyo. Admin. Code 021.0002.20.05132021 § 9(a)(v), essentially giving SPDIs the ability to fulfill their liquidity obligation with any asset class approved by the Commissioner.

Another area subject to comprehensive federal regulation is capital.  "Capital (equity) is the difference between assets and liabilities."  Gnanarajah, *supra*, at 1. "[C]apital gives the bank the ability to absorb losses while continuing to meet its rigid obligations on liabilities and avoid failure."  David W. Perkins, Cong. Rsch. Serv., IF10809, *Introduction to Bank Regulation: Leverage and Capital Ratio Requirements* 1 (2019).  The OCC, Board, and FDIC require certain institutions to satisfy "minimum capital requirements and overall capital adequacy standards." 12 C.F.R. §§ 3.1(a), 3.10 (OCC), 217.1(a), 217.10 (Board), 324.1(a), 324.10 (FDIC).  By contrast, capital requirements for Wyoming SPDIs are ultimately subject to the Wyoming Division of Banking's discretion and "will vary from institution to institution."  *See, e.g.*, Wyo. Div. of Banking, *Special Purpose Depository Institutions* 2 (July 7, 2021) (https://tinyurl.com/22b89akx); *see also* Wyo. Admin. Code 021.0002.20.05132021 § 2(a).  FDIC-insured banks are also subject to the "prompt corrective action" framework, which increases restrictions on a bank's activities as the bank's capital level decreases.  *See* 12 U.S.C. § 1831o; *see also* 12 C.F.R. §§ 6.1-.25 (OCC-regulated institutions), 208.40-.45 (Board-regulated institutions), 324.401-.405 (FDIC-regulated institutions).

Yet under Custodia's interpretation, Federal Reserve Banks would be statutorily mandated to bypass the application and "access" process that numerous other banks have navigated to date and instead provide master accounts to novel

state-chartered entities without the ability to even inquire about any of these issues and then take action to deny access to institutions that pose undue risks. The potential risks to the Nation's banking system of such an interpretation are palpable. An institution that is not subject to capital requirements (as federally insured institutions and all of *amici's* members are) could "more easily expand its balance sheet during times of stress," which would create a "particularly large" "potential for sudden and significant deposit inflows into that institution." 87 Fed. Reg. at 51,109. This, in turn, "could disintermediate other parts of the financial system, greatly amplifying stress." *Id.* Reserve Banks manage risks like these by individually assessing applicants for them and rejecting applications from high-risk entities. Requiring Reserve Banks to issue master accounts to any eligible institution, regardless of an institution's solvency, security, safety, or illicit-finance risk management, would deprive Reserve Banks of their ability to protect themselves, the payment systems they operate, the U.S. financial system, and the U.S. economy from undue risks posed by otherwise-eligible institutions. Additionally, this would allow a single state, like Wyoming, to dictate the federal policies that govern access to the Nation's banking system. Fortunately, as explained above, Congress did not impose any such statutory requirement.

Banks also must adhere to data privacy and information security standards, *see* 15 U.S.C. §§ 6801(b), 6805, and are required to comply with certain "safety

and soundness" standards, *see* 12 U.S.C. § 1831p-1; *see also* 12 C.F.R. §§ 30.1-.6, 364.100-.101, 208.3(d)(1).  The safety and soundness standards address internal controls and information systems, internal audits, loan documentation, credit underwriting, interest rate exposure, asset growth, asset quality, earnings, compensation, fees and benefits.  Without supervision and regulation regarding IT systems and cybersecurity, it could be possible for bad actors to "disrupt the payment system either by denying service or destroying or disrupting data."  Bank Pol'y Inst., *Fed Account Access for Nonbanks: An Analysis of the Policy Implications and Potential Risks to the U.S. Financial System* 7 (June 2021) (https://tinyurl.com/yzr9arau); *see also Bank Supervision Process* at 16 (explaining governing sources for IT examinations of certain types of banks).[10]

Finally, federal banking regulators have broad enforcement authority regarding the institutions they supervise.  This authority includes the ability to: (1) issue MRAs; (2) issue matters requiring immediate attention ("MRIAs"); (3) issue cease-and-desist orders; (4) suspend, remove, and prohibit personnel;

---

[10]    Further, because it is unclear what reporting obligations, if any, Custodia and other novel entities are held to, the risk of illicit financing (or pursuing a novel charter specifically to evade anti-money laundering ("AML") laws) increases.  *See* 87 Fed. Reg. at 51,109.  Although Custodia argues that Wyoming banking regulators work in "collaboration with the federal government on AML," *see* Appellants' Br. 10, under its interpretation no Federal Reserve Bank could ensure that any such collaboration exists or is meaningful before granting Custodia or any other novel institutions automatic master account access.

(5) assess civil money penalties; (6) suspend or terminate federal deposit insurance; (7) initiate civil litigation; and (8) initiate conservatorship and receivership.  *See* 12 U.S.C. §§ 1818, 1831o(h)(3); *see also, e.g.*, OCC, PPM 5310-3 at 3-6, 18-24 (describing MRAs and formal and informal bank enforcement actions); FDIC, *Formal and Informal Enforcement Actions Manual* 1-5-6 (July 2022) (describing formal and informal enforcement actions); Bd. of Govs. of Fed. Rsrv. Sys., *Bank Holding Company Supervision Manual* §§ 1075.0.1-.7 (Feb. 2023) (describing corrective actions available to the Board for BHCs); Bd. of Govs. of Fed. Rsrv. Sys., *Commercial Bank Examination Manual* §§ 1001.1, 1050.1 (Oct. 2023) (discussing MRAs, MRIAs, and formal and informal supervisory actions).  Yet under Custodia's interpretation, Federal Reserve Banks would be required to provide any state-chartered, non-federally-insured institution automatic master account access without even being able to assess that applicant institution's risk or protect the system by denying high-risk applications.

Custodia contends that such concerns are overblown because depository institutions allegedly "must be ***considerably safer*** than most banks" to qualify as Wyoming SPDIs, Appellant's Br. 11, and Custodia purportedly "employs a 'safe banking' or 'full reserve' business model," *id.* at 15.  But this is no answer.  First, under Custodia's interpretation, Federal Reserve Banks would be unable to even verify an applicant's business model before providing master account access.

26

Second, and more broadly, Custodia's no-questions-asked interpretation would apply to *every* institution seeking a master account, including those that pose different and more concerning liquidity risks. And third, as explained above, the classic "run on the bank" is far from the only risk that the Fed and other federal bank supervisors are concerned with. Under Custodia's interpretation, Federal Reserve Banks would be precluded from even inquiring about any of those risks, including those relating to solvency, money laundering, and data privacy, before granting master account access.

Finally, and contrary to Custodia's assertions, the district court's concern about no-questions-asked master account access resulting in a "race to the bottom" among states to provide less-restrictive chartering requirements does not "amount[] to a frontal attack on the premise that undergirds the dual-banking system created by Congress." Appellant's Br. 39-40. According to Custodia, the dual-banking system "reflects the presumption" that state and federal regulators are equally competent, and failing to require automatic master account access suggests a lack of "respect[]" for state regulators. *Cf. id.* at 39-41. But as the Fed has cogently explained, where—as with Custodia—a state-chartered entity is not federally insured and not otherwise subject to federal regulation or oversight, the mere fact that it may have some form of state regulation is insufficient because it may have "a supervisory or regulatory framework that is substantially different from, and

possibly weaker than, the supervisory and regulatory framework that applies to federally-insured institutions, and as a result may pose the highest level of risk." 87 Fed. Reg. at 51,101. Thus, while it might be theoretically possible for a state, by itself, to provide the sort of robust regulatory oversight akin to the comprehensive federal regulation to which *amici*'s members are subject, Federal Reserve Banks must have the ability to ensure that that is so before providing direct access to the federal banking system. Yet under Custodia's mandatory-access interpretation, that critical inquiry cannot occur. Far from upholding the dual-banking system, Custodia's approach would have this Court strip the Fed and its Reserve Banks of their ability to protect the federal financial system they are tasked with overseeing.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

Respectfully submitted,

*/s/ Jonathan S. Franklin*

Jenna Burke
INDEPENDENT COMMUNITY
  BANKERS OF AMERICA
1615 L Street, NW, Suite 900
Washington, DC 20036
(202) 821-4380

Jonathan S. Franklin
NORTON ROSE FULBRIGHT US LLP
799 9th Street N.W.
Suite 1000
Washington, DC 20001
(202) 662-0466

David Pommerehn
CONSUMER BANKERS
  ASSOCIATION
1225 I Street, N.W., #550
Washington, D.C.  20005
(202) 552-6368

Charlotte Kelly
NORTON ROSE FULBRIGHT US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, TX 78205
(210) 270-9329

Andrew Doersam
AMERICAN BANKERS
  ASSOCIATION
1333 New Hampshire Ave NW
Washington, DC 20036
(202) 663-5035

*Counsel for Amici Curiae*

September 4, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit via the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

September 4, 2024                         */s/ Jonathan S. Franklin*
                                          Jonathan S. Franklin

                                          *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. Rule 32(B), this brief contains 6330 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman typeface.

September 4, 2024                              */s/ Jonathan S. Franklin*
                                              Jonathan S. Franklin

                                              *Counsel for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

Pursuant to Section II.J of this Court's CM/ECF User's Manual, I hereby certify that:

1.     All required privacy redactions have been made in accordance with Fed. R. App. P. 25(a)(5) and 10th Cir. R. 25.5;

2.     Any hard copies of this brief required to be submitted shall be exact copies of this electronically filed version, which was submitted to the Clerk of the United States Court of Appeals for the Tenth Circuit using the CM/ECF system; and

3.     This brief has been scanned for viruses with the most recent version of the commercial virus scanning program CrowdStrike Falcon Malware Scan, and no viruses were detected.

September 4, 2024                          */s/ Jonathan S. Franklin*
                                          Jonathan S. Franklin

                                          *Counsel for Amici Curiae*