No. 24-8024

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

CUSTODIA BANK, INC.,
*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, ET AL.,
*Defendants-Appellees*,

On Appeal from the United States District Court for the District of Wyoming
No. 1:22-CV-00125, Hon. Scott W. Skavdahl

## BRIEF OF *AMICI CURIAE* FEDERAL RESERVE BANKS IN SUPPORT OF DEFENDANTS-APPELLEE AND AFFIRMANCE

Jonathan K. Youngwood
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
jyoungwood@stblaw.com

*Attorney for Amici Curiae*

i

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that none of the *amici* have any parent corporations or subsidiaries. Each Federal Reserve Bank is a corporation incorporated under the laws of the United States pursuant to the Federal Reserve Act of 1913, 12 U.S.C § 221 et seq. Although stock of Federal Reserve Banks is held by member commercial banks within their respective Federal Reserve Districts, none of the stockholders controls the Reserve Banks. Stock of Federal Reserve Banks, unlike stock in a private corporation, is not acquired for investment purposes or purposes of control. Rather, such stock is acquired because its ownership is a condition of membership in the Federal Reserve System. Unlike owners of a private corporation, Federal Reserve Bank stockholders do not possess a residual equity interest in Federal Reserve Bank assets. That interest remains always with the United States.

Date: September 4, 2024

Jonathan K. Youngwood

/s/ *Jonathan K. Youngwood*
Jonathan K. Youngwood
*Attorney for Amici Curiae*

# **TABLE OF CONTENTS**

AMICI STATEMENT ........................................................................1

SUMMARY OF ARGUMENT ...........................................................3

ARGUMENT .....................................................................................4

I.    Federal Reserve Banks' Discretion Over Access To Federal Reserve Bank Master Accounts and Services Is Essential to Their Ability to Manage Risks to Themselves and the Financial System................................4

    A.    The FRA Entrusts Federal Reserve Banks with Protecting the Stability of the U.S. Financial System ...................................................4

    B.    The Risks Associated with Master Account and Financial Services Access Make the Discretion to Deny Such Access Essential...............................................................................7

        1.    Federal Reserve Banks Manage Credit Risk by Denying Master Account Access........................................................9

        2.    Federal Reserve Banks Exercise Discretion Over Reserve Bank Master Accounts and Financial Services to Protect the U.S. Financial System from Illicit Activity .......................11

CONCLUSION ..................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Bankers Ass'n v. United States*,
   932 F.3d 1375 (Fed. Cir. 2019) ...............................................................6

*Banco San Juan Internacional, Inc. v. FRB of N.Y.*,
   700 F. Supp. 3d 86 (S.D.N.Y. 2023) ................................... 4, 15, 16, 17

*Berini v. FRB*,
   420 F. Supp. 2d 1021 (E.D. Mo. 2005) ...................................................6

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*,
   2024 U.S. Dist. LEXIS 76822 (D. Wyo. Mar. 29, 2024) .......................4

*FBME Bank Ltd. v. Mnuchin*,
   249 F. Supp. 3d 215 (D.D.C. 2017) ............................................... 14, 15

*Fed. Res. Bank v. Metrocentre Improv. Dist. #1*,
   657 F.2d 183 (8th Cir. 1981) ...................................................................5

*Fed. Reserve Bank of St. Louis v. Metrocentre Improvement Dist.*,
   492 F. Supp. 353 (E.D. Ark. 1980) .........................................................1

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*,
   861 F.3d 1052 (10th Cir. 2017) ............................................................18

*PayServices Bank v. Fed. Rsrv. Bank of San Francisco*,
   2024 WL 1347094 (D. Idaho Mar. 30, 2024).......................................17

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*,
   906 F.Supp.2d 202 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir.
   2014) ........................................................................................................5

*Starr Int'l Co. v. United States*,
   856 F.3d 953 (Fed. Cir. 2017) .................................................................7

*United States v. Martin*,
   320 F.3d 1223 (11th Cir. 2003) ............................................................14

**Statutes**

12 U.S.C. § 221 ...................................................................................................1

12 U.S.C. § 222 ...................................................................................................2

12 U.S.C. § 248a(b) .............................................................................................8

12 U.S.C. § 290 .................................................................................................13

12 U.S.C. § 342 ...................................................................................................2

**Regulations**

49 Fed. Reg. 13186 (1984) ..................................................................................7

87 Fed. Reg. 51,099 (Aug. 19, 2022)......................................................... 9, 10, 14

Policy on Payments System Risk, 73 Fed. Reg. 12417 (Mar. 7, 2008)............ 11, 12

**Regulatory Materials**

Off. of Terrorist Financing and Financial Crimes, U.S. Dep't of the
    Treasury, 2022 National Money Laundering Risk Assessment (3d
    ed. Feb. 2022) .............................................................................................16

Off. of the Comptroller of Currency, U.S. Dep't of the Treasury,
    Comptroller's Handbook (Sept. 2019) ...........................................................11

Banking Act of 1933, Pub. L. No. 66-73, 48 Stat. 162 (1933)..................................6

Bd. of Governors, Discount Window Lending (Jun. 28, 2024) .............................11

Bd. of Governors, Federal Reserve Policy on Payment System Risk
    (as amended July 20, 2023) ..........................................................................10

Bd. of Governors, Reserve Maintenance Manual: Account Structure
    (Nov. 19, 2018)...........................................................................................12

Bd. of Governors, The Twelve Federal Reserve Districts (Apr. 24,
    2017) .........................................................................................................2

Department of Treasury, *Illicit Finance Risk Assessment of Non-*
    *Fungible Tokens* at 1 (May 2024) ..................................................................13

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).................................................................7

Federal Reserve Act of 1913, Pub. L. No. 63-43, ch. 6, 38 Stat. 251 .......................6

THE FEDERAL RESERVE SYSTEM, *The Fed Explained: What the Central Bank Does* (11th ed. Aug. 2021) ...............................................................8

## AMICI STATEMENT

*Amici* Federal Reserve Bank of Atlanta, Federal Reserve Bank of Boston, Federal Reserve Bank of Chicago, Federal Reserve Bank of Cleveland, Federal Reserve Bank of Dallas, Federal Reserve Bank of Minneapolis, Federal Reserve Bank of New York, Federal Reserve Bank of Philadelphia, Federal Reserve Bank of Richmond, Federal Reserve Bank of San Francisco, and Federal Reserve Bank of St. Louis submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2).[1]

The Federal Reserve Banks were established pursuant to the Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq*. ("FRA").  The Federal Reserve Banks serve as the operating arm of the nation's central bank and are uniquely authorized by statute to act as "bankers' banks." *Fed. Reserve Bank of St. Louis v. Metrocentre Improvement Dist.*, 492 F. Supp. 353, 355 (E.D. Ark. 1980) (quoting H.R. Report No. 69, 63d Cong., 1st Sess. 16 (1913)).  As set forth in the FRA, there are twelve Federal Reserve Districts across the country, each spanning multiple states and each with its own responsible Federal Reserve Bank.  *See* 12 U.S.C. § 222; Bd. of Governors, The Twelve Federal Reserve Districts (Apr. 24, 2017), http://www.federalreserve.gov/otherfrb.htm.  Collectively, the Federal Reserve

---

[1]  Pursuant to Local Rule 29, amici state that this brief was authored by them, and was not authored or funded by any party to this action.  All parties have consented to this filing.

Banks carry out the nationwide, operational responsibilities of the nation's central bank.

The Federal Reserve Banks have a strong interest in this case because it concerns a provision of the FRA that vests them with an essential risk management tool. That provision, 12 U.S.C. § 342, confers Federal Reserve Banks with discretion to deny a depository institution access to a Federal Reserve Bank deposit account (currently referred to as a master account) and Federal Reserve Bank financial services. This discretion is essential because such access can pose unacceptable levels of risk to Reserve Banks and the U.S. financial system.

Appellant Custodia Bank, Inc. ("Custodia") asks this Court to reach the dangerous conclusion—contrary to the plain language of the FRA and decades of Federal Reserve Bank practice—that Reserve Banks are *required* to provide account access to  any entity that meets the definition of a "depository institution" under the FRA, regardless of the risks the institution poses. Appellant's extreme argument is that it—and every other depository institution—is automatically entitled to a master account on a no-questions-asked basis. If the Court were to become the first to adopt this misplaced position, it would strip Federal Reserve Banks of a critical authority necessary to both manage their own risks and to carry out the central bank's statutory mandate to promote the safety and stability of the U.S. financial system.

## SUMMARY OF ARGUMENT

Over 100 years ago, Congress vested Federal Reserve Banks with discretion over depository institutions' access to Reserve Bank deposit accounts and financial services.  This longstanding discretion is critical, as it provides Federal Reserve Banks with a necessary risk-management tool and allows them to carry out the central bank's mandate to safeguard the U.S. financial system.  Removing this tool, as Custodia requests in this appeal, would expose Federal Reserve Banks, the U.S. payments system, and the broader economy to significant, disruptive risks— including liquidity risk, credit risk, operational risk, settlement risk, cyber risk, and the risks of facilitating money laundering and terrorism financing.  Unmitigated by Reserve Bank discretion, these risks would destabilize the financial system and erode its integrity, and would interfere with the central bank's ability to implement monetary policy.

Custodia's position is that Federal Reserve Banks have no discretion at all to deny access to Reserve Bank master accounts and financial services, regardless of the risk a financial institution presents.  Not only would accepting this proposition be contrary both to the FRA and common sense, it would represent a sea change in how Federal Reserve Banks have been making access decisions since 1913.  Accordingly, the Court should reject Custodia's position and affirm the District

Court's well-reasoned decision holding that the FRA affords Federal Reserve

Banks discretion to deny account access.

## ARGUMENT

I. **Federal Reserve Banks' Discretion Over Access To Federal Reserve Bank Master Accounts and Services Is Essential to Their Ability to Manage Risks to Themselves and the Financial System**

As the District Court correctly held, FRA Section 342 provides the Federal

Reserve Banks with discretion to reject deposits and, accordingly, depository

account access. *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 2024 U.S.

Dist. LEXIS 76822, at \*32-33 (D. Wyo. Mar. 29, 2024). *See also Banco San Juan*

*Internacional, Inc. v. FRB of N.Y.*, 700 F. Supp. 3d 86, 98 (S.D.N.Y. 2023)

("BSJI's statutory claim fails because 12 U.S.C. § 342 makes clear that Federal

reserve banks are authorized to maintain Master Accounts, but are not required to

do so."). Federal Reserve Banks have long relied on this discretion to manage the

significant risks that account access can present to themselves, the federal

payments system and the U.S. financial system. This discretion is not a matter of

happenstance or convenience; it is essential to the Federal Reserve Banks' ability

to protect themselves and the broader financial system and economy.

> A. **The FRA Entrusts Federal Reserve Banks with Protecting the Stability of the U.S. Financial System**

Since the FRA was enacted in 1913, the Federal Reserve Banks have been

"charged with vitally important statutory responsibilities," which include

"preserving the stability of the nation's banking system" and implementing monetary policy. *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F.Supp.2d 202, 215, 232 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014); *Fed. Res. Bank v. Metrocentre Improv. Dist. #1*, 657 F.2d 183, 185 (8th Cir. 1981) ("[The Reserve Banks] conduct important governmental functions regarding the issuance of currency, general fiscal duties of the United States, and, in general, regulate the financial structure, either directly or indirectly, of both federal and state banks.").

Congress established the Federal Reserve System as the nation's central bank "to oversee banking operations and promote [] greater economic stability." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019). As the operating arms of the central bank, the Federal Reserve Banks "were established directly by Congressional legislation for the public purpose of increased control of the nation's currency and banking system." *Berini v. FRB*, 420 F. Supp. 2d 1021, 1024 (E.D. Mo. 2005).

Congress has repeatedly reaffirmed the central bank's duty to safeguard the stability of the U.S. financial system. *See, e.g.*, Federal Reserve Act of 1913, Pub. L. No. 63-43, ch. 6, 38 Stat. 251 (establishing the Federal Reserve Banks to "furnish a more elastic means of currency" and "to establish a more effective means for supervision of banking in the United States"); Banking Act of 1933, Pub. L. No. 66-73, 48 Stat. 162 (1933) (amending the FRA "[t]o provide for the

safer and more effective use of the assets of banks"); Dodd-Frank Wall Street

Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010)

(amending the FRA to, among other things, "promote the financial stability of the

United States by improving accountability and transparency in the financial

system"). *See also Starr Int'l Co. v. United States*, 856 F.3d 953, 984 (Fed. Cir.

2017) (noting that "the Federal Reserve Act was designed to prevent or mitigate

significant financial crises.").

The Federal Reserve Banks' administration of a safe and effective global

payment and settlement system is a critical component of the central bank's

Congressional mandate to safeguard the U.S. economy. Indeed, "the Federal

Reserve's responsibility for the implementation of monetary policy, as well as its

responsibility as a bank supervisor, requires the preservation of a safe and efficient

payments mechanism." 49 Fed. Reg. 13186, 13187 (1984). The Federal Reserve

Banks, among other things, provide various financial services to certain master

account holders, including payment, clearing, and settlement functions, such as

clearing checks and operating the Fedwire Funds Service® (which effectuates

funds transfers). *See* 12 U.S.C. § 248a(b) (listing services). These functions help

keep cash, check, and electronic transactions moving reliably through the U.S.

economy on behalf of consumers, businesses, and market participants. *See* The

Federal Reserve System, *The Fed Explained: What the Central Bank Does* (11th

6

ed. Aug. 2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf.  For that reason, the Federal Reserve Banks monitor risks to the payment systems, "engage in payment system research," and "act as catalysts to improve the safety and efficiency of the payment system." *Id.* at 86.

> **B.    The Risks Associated with Master Account and Financial Services Access Make the Discretion to Deny Such Access Essential**

Federal Reserve Banks manage and mitigate the significant risks described above by exercising their statutory discretion to deny access to Federal Reserve Bank master accounts and financial services.

The host of risks that Federal Reserve Banks encounter and consider in determining whether to provide master accounts and financial services to depository institutions is detailed in the Guidelines for Evaluating Account and Services Requests (the "Guidelines) published by the Board of Governors of the Federal Reserve System.  *See* 87 Fed. Reg. 51,099, 51,101 (Aug. 19, 2022). Specifically, the Guidelines enumerate six categories of risk that Federal Reserve Banks should consider when exercising their discretion to grant or deny account access, stating that financial institutions:

1) must be legally eligible for an account and services, and have a clear, transparent and enforceable legal basis for its operations;

2) should not present or create undue credit, operational settlement cyber, or other risks to the Federal Reserve Bank;

3) should not present or create undue credit, liquidity, operational, settlement, cyber, or other risk to the overall payment system;

4) should not create undue risk to the stability of the U.S. financial system;

5) should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity; and

6) should not adversely affect the Federal Reserve's ability to implement monetary policy. *Id.* at 51,099-100.

These risks are not tenuous or hypothetical; they present concrete concerns that could significantly burden Federal Reserve Banks and expose the financial system to harm or disruption. For example, among other things, there are risks of cybersecurity attacks, operational failures, price volatility, regulatory uncertainty, and vulnerability to geopolitical or other external events. Each of these can result in the actual or perceived "reduction, deterioration, or breakdown of services" at the impacted institution, resulting in a classic bank run. *See* Bd. of Governors, Federal Reserve Policy on Payment System Risk, at 5 (as amended July 20, 2023), https://www.federalreserve.gov/paymentsystems/files/psr_policy.pdf. And because financial institutions are connected through Federal Reserve payment and settlement systems, the contagion can quickly spread. [2]

---

[2]  *See, e.g.*, 87 Fed. Reg. 51,099, 51,108 ("The Reserve Bank should consider the extent to which, especially in times of financial or economic stress, liquidity or other strains at the institution may be transmitted to other segments of the financial system.").

*Amici* offer two concrete examples below—one related to credit risk, and one related to the risks associated with facilitating money laundering and other illicit activity.

### 1. Federal Reserve Banks Manage Credit Risk by Denying Master Account Access

As the Guidelines acknowledge, Federal Reserve Banks take on credit risk when they permit depository institutions to access Federal Reserve Bank master accounts and financial services.

Credit risk arises "any time bank funds are extended, committed, invested, or otherwise exposed through actual or implied contractual agreements, whether reflected on or off the balance sheet." Off. of the Comptroller of Currency, U.S. Dep't of the Treasury, Comptroller's Handbook (Sept. 2019), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/bank-supervision-process/pub-ch-bank-supervision-process.pdf. As the operating arms of the nation's central bank, Reserve Banks' credit exposure at any given time may be significant. *See, e.g.*, Policy on Payments System Risk, 73 Fed. Reg. 12417, 12420 (Mar. 7, 2008) ("data show that Reserve Banks' credit exposure has increased over time in real terms despite Reserve Banks charging fees. On certain days, the peak overdraft of the banking system can exceed $210 billion."); *id.* at 12418 ("[T]he Board believes that significant further steps are appropriate to mitigate the growing credit exposures of the Reserve Banks.").

Temporary credit risk—like the exposure created through an institution's use of the Federal Reserve Banks' payment services—is a significant component of a Reserve Bank's risk profile.  To use these payment services, a depository institution makes deposits into a master account, which is held by its regional Federal Reserve Bank.  *See* Bd. of Governors*, Reserve Maintenance Manual: Account Structure* (Nov. 19, 2018), https://www.federalreserve.gov/ monetarypolicy/reserve-maintenance-manual-account-structure.htm ("[A]ll credits and debits resulting from the use of Federal Reserve services at any Federal Reserve office are booked to this single master account.").  Because master account deposits are liabilities of the Federal Reserve, affording master account access and related services to uncreditworthy depository institutions could disrupt the nation's payments system, weaken the Federal Reserve's financial condition, and destabilize the broader U.S. economy.

While all banks manage credit risk, Federal Reserve Banks have a unique, statutory mandate to "support[] the liquidity and stability of the banking system and the effective implementation of monetary policy."  Bd. of Governors*, Discount Window Lending* (Jun. 28, 2024), https://www.federalreserve.gov/regreform/discount-window.htm.  Accordingly, Federal Reserve Banks rely on their discretion over master account access to proactively "manage[] the credit risk posed by the institution's use of Federal

Reserve services."  Reserve Maintenance Manual: Account Structure, *supra* at 10.

This benefits both the financial system and the U.S. taxpayer, since Federal

Reserve Banks are required under the Federal Reserve Act to remit their excess

earnings annually to the United States Treasury.  12 U.S.C. § 290.

Under Custodia's proposed approach, however, Reserve Banks would have

*no* discretion to decide who to bank, no matter how uncreditworthy.  Neither the

plain language of the Federal Reserve Act nor common sense countenance that

extreme result, which would burden Federal Reserve Banks with the immense risks

associated with extending credit to institutions they have deemed unable or

unlikely to be able to meet their obligations.

> ### 2.    Federal Reserve Banks Exercise Discretion Over Reserve Bank Master Accounts and Financial Services to Protect the U.S. Financial System from Illicit Activity

Among other things, the Guidelines also require Federal Reserve Banks to

ensure that the "[p]rovision of an account and services to an institution should not

create undue risk to the overall economy by facilitating activities such as money

laundering, terrorism financing, fraud, cybercrimes, or other illicit activity."  87

Fed. Reg. 51,099.

As the U.S. Department of the Treasury's ("Treasury") Financial Crimes

Enforcement Network ("FinCEN") recently warned, money laundering "has

devastating social consequences" and "can erode the integrity of our nation's

financial systems."  *See, e.g., United States v. Martin*, 320 F.3d 1223, 1227 (11th

Cir. 2003) ("The harm from . . . a [money-laundering] transaction does not

generally fall upon an individual, but falls upon society in general."); *FBME Bank

Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 230 (D.D.C. 2017) (noting the "public's

interest in protecting the U.S. financial system from illicit activity such as money

laundering").  Treasury has also warned that novel business models can be

especially susceptible to fraud, terrorist financing, or other criminal transactions.

*See* Department of Treasury, Illicit Finance Risk Assessment of Non-Fungible

Tokens at 1 (May 2024), https://home.treasury.gov/system/files/136/Illicit-

Finance-Risk-Assessment-of-Non-Fungible-Tokens.pdf  ("[S]ome NFT firms and

platforms lack appropriate internal controls to mitigate risks to market integrity,

money laundering and terrorist financing, and sanctions evasion.").

     These risks are not merely theoretical, and they are not specific to the crypto

industry.  Federal Reserve Banks have already seen how providing certain

financial institutions with master accounts could facilitate money laundering and

other illicit activities.

     For example, in *Banco San Juan Internacional* a high-risk financial

institution that had been raided by the FBI in an investigation into its transactions

and compliance with U.S. anti-money laundering laws, Banco San Juan

Internacional, Inc. ("BSJI"), sought to block the Federal Reserve Bank of New

12

York ("FRBNY") from closing its master account. 700 F. Supp. at 93, 101. The Department of Treasury had recently publicly warned that, due to their offshore business model and resource constraints of their local regulator, financial institutions with BSJI's charter type "are attractive money laundering vehicles" that "potentially allow[] nefarious actors to misuse them to facilitate illicit financial activity" and "present money laundering vulnerabilities to the U.S. financial system." *See* Off. of Terrorist Financing and Financial Crimes, U.S. Dep't of the Treasury, 2022 National Money Laundering Risk Assessment at 68-69 (3d ed. Feb. 2022), https://home.treasury.gov/system/files/136/2022-National-Money-Laundering-Risk-Assessment.pdf. FRBNY had conducted an extensive review that found that many of BSJI's transactions bore the hallmarks of money laundering, and determined that "BSJI pose[d] undue risk" to FRBNY and the broader economy. *Banco San Juan Internacional*, 700 F. Supp. 3d at 94. The review identified numerous concerning transactions totaling millions of dollars that had multiple red flags for money laundering, much of which involved transactions among BSJI's owner's family members. *Id.* at 104.

In rejecting BSJI's contention that it was entitled to a master account under the FRA, the court noted that the risks of facilitating money laundering exposed "the FRBNY and the financial system to risk. This harm is not just to the FRBNY, but to the fiscal system, because 'federal reserve banks are not operated for the

profit of shareholders; rather, they were created and are operated in furtherance of the national fiscal policy.'" *Id.* at 104 . Keeping BSJI's account open would thus "place the public in harm's way." *Id.*

In a similar vein, the Federal Reserve Bank of San Francisco ("FRBSF") recently denied a request for a master account after determining the financial institution, an Idaho-chartered online-only bank that sought to facilitate high-risk cross-border transactions, had an "unproven risk management framework" that was insufficient to address heightened money laundering and terrorism financing risks associated with its business model. *See PayServices Bank v. Fed. Rsrv. Bank of San Francisco*, 2024 WL 1347094 at *4 (D. Idaho Mar. 30, 2024), *appeal docketed*, No. 24-2355 (9th Cir.).  "Most notably, the significant risks and concerns in the areas of [Bank Secrecy Act]/[Anti-Money Laundering] and [Office of Foreign Assets Control] risk management, credit and settlement process and controls, cyber and information security risk management . . . and the limited banking and bank-specific risk management experience among management," presented undue risk .  *See PayServices Bank v. Fed. Rsrv. Bank of San Francisco*, Case No. 1:23-cv-305, Dkt. No. 22, Exhibit A (Aug. 14, 2023).

As these examples illustrate, the Federal Reserve Banks' discretion to deny account access is not just consistent with the plain text of the FRA but is also essential to the Reserve Banks' fulfillment of their  duty to protect the U.S.

14

financial system from risk, including risks associated with processing illicit transactions. Yet Custodia's position would prevent Reserve Banks from even *considering* whether a depository institution is likely to process illicit transactions, is vulnerable to external threats, has adequately mitigated its operational risks, or has a business model that furthers violations of federal law (a situation that Federal Reserve Banks have been presented with and may face again in the future).[3] That is not and should not be the law. Reserve Banks cannot turn a blind eye to risks that could harm them or the U.S. financial system, in contravention of the central bank's mission and mandate.

## CONCLUSION

The ability to deny access to deposit accounts and financial services is a fundamental and universal risk-management tool inherent in banking. For the Federal Reserve Banks, the discretion set forth in Section 342 of the FRA is critical because Congress entrusted them with safeguarding the U.S. financial system, Custodia asks the Court to upset this established framework by stripping the Federal Reserve Banks of their account access discretion, despite the fact that the

---

[3] For example, a financial institution that planned to service the marijuana industry, in violation of federal law, sought access to a master account at the Federal Reserve Bank of Kansas City ("FRBKC"). The dispute was dismissed on ripeness grounds, *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017). But in Custodia's view, the FRA compelled FRBKC to provide account access even under those circumstances.

FRA's text plainly affords it to them and that the significant risks at issue here, in the context of the central bank,  are orders of magnitude higher than those faced by commercial banks.  Custodia's position finds no support in law or logic, and the Court should reject it.

For the foregoing reasons, amici respectfully request that the Court affirm the lower court's well-reasoned decision.

/s/ Jonathan K. Youngwood
Jonathan K. Youngwood
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
jyoungwood@stblaw.com

Attorney for Amici Curiae

16

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

29(a)(5) because it contains 3,409 words, excluding the parts of the brief exempted

by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B)

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5)(A) and the type style requirements of Rule 32(a)(6)

because it has been prepared in a proportionally spaced typeface using 14- point

font.

 Dated: September 4, 2024

*/s/ Jonathan K. Youngwood*
Jonathan K. Youngwood
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
jyoungwood@stblaw.com

*Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was e-filed on

September 4, 2024 through the 10th Circuit electronic filing system

*/s/ Jonathan K. Youngwood*
Jonathan K. Youngwood
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
jyoungwood@stblaw.com

*Attorney for Amici Curiae*
