No. 24-8024

IN THE
# United States Court of Appeals for the Tenth Circuit

_____

CUSTODIA BANK, INC.,

Plaintiff-Appellant,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court
For the District of Wyoming
The Honorable Judge Scott W. Skavdahl
D.C. No. 1:22-CV-125-SWS

_____

**MOTION FOR LEAVE
TO FILE *AMICUS CURIAE* BRIEF
WYOMING BANKERS ASSOCIATION**

_____

**Greyson E. Tuck
Gerrish Smith Tuck, P.C.
700 Colonial Rd., Suite 200
Memphis, TN 38117
Email: gtuck@gerrish.com**

*Counsel for Amicus Curiae*

September 4, 2024

COMES NOW, Wyoming Bankers Association, by and through its undersigned counsel, and, pursuant to Rule 29(a)(3), respectfully requests leave to submit a brief as *amicus curiae* in support of Appellees in this matter.

Pursuant to Rule 29(a)(2), a party may file an amicus brief if all parties have consented to its filing or with leave of the court. Wyoming Bankers Association has requested the permission of all parties to file its amicus brief, but to date has not yet heard from counsel of Custodia Bank, Inc.

Therefore, pursuant to Rule 29, Wyoming Bankers Association moves this Court to grant its motion for leave to file its amicus brief, a copy of which is attached to this motion.

Respectfully submitted,

*/s/ Greyson E. Tuck, Esq.*

Greyson E. Tuck
Gerrish Smith Tuck, P.C.
700 Colonial Road, Suite 200
Memphis, TN 38117
(901) 767-0900
gtuck@gerrish.com

No. 24-8024

IN THE
# United States Court of Appeals for the Tenth Circuit

_____

CUSTODIA BANK, INC.,

Plaintiff-Appellant,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court
For the District of Wyoming
The Honorable Judge Scott W. Skavdahl
D.C. No. 1:22-CV-125-SWS

_____

**BRIEF FOR *AMICUS CURIAE*
WYOMING BANKERS ASSOCIATION**

**IN SUPPORT OF APPELLEES**

_____

**Greyson E. Tuck**
**Gerrish Smith Tuck, PC**
**700 Colonial Road, Suite 200**
**Memphis, TN 38117**
**Phone: (901) 767-0900**
**Email:gtuck@gerrish.com**

*Counsel for Amicus Curiae*

September 4, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus curiae*, by and through its undersigned counsel, hereby certifies that it has no parent corporation and that no publicly traded company owns 10% or more of its stock.

# TABLE OF
# CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF CONTENTS......................................................................................ii

TABLE OF AUTHORITIES...............................................................................iii

IDENTITY AND INTEREST OF *AMICUS CURIAE*...........................................1

SUMMARY OF ARGUMENT.............................................................................3

ARGUMENT.........................................................................................................6

    I.     The Federal Reserve Act Grants Reserve Banks Discretion on Applications for Master Accounts............................................6

    II.    Unconditional Rights to A Master Account Would Undermine the Safety, Soundness, and Integrity of The United States Banking System and Impose Undue Risks on the Federal Reserve System.................................................................10

        A.  Reserve Banks Have Always Assessed Risks Posed by Institutions on the Federal Banking System to Ensure Against Threats to the Soundness and Integrity of the Federal Banking System.................................................10

        B.  Novel State Chartered Institutions Like Custodia Are Not Subject to the Comprehensive Regulation and Supervision Applicable to Federally Regulated Bank...........................13

        C.  Allowing Automatic Access to Master Accounts Would Undermine the Soundness and Integrity of the Federal Banking System as a Whole.............................................18

CONCLUSION ...................................................................................................22

CERTIFICATE OF SERVICE ...........................................................................23

CERTIFICATE OF COMPLIANCE....................................................................24

CERTIFICATE OF DIGITAL SUBMISSION....................................................25

## TABLE OF AUTHORITIES

**Cases Page(s)**

*Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Reserve Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923)................................................................7

*Biden v. Texas*, 597 U.S. 785, 802 (2022)..........................................................7

**Statutes**

12 U.S.C. § 342 ..................................................................................................6

12 U.S.C. § 248a(c)(2) .......................................................................................6

12 U.S.C. § 248a(a) ...........................................................................................8

12 U.S.C. § 248c(b)(1)(B)(ii)............................................................................9

12 U.S.C. § 4.6(a)............................................................................................14

12 U.S.C. § 325 ...............................................................................................14

12 U.S.C. § 1820(d)........................................................................................14

12 U.S.C. § 1841(c)(1).....................................................................................15

12 U.S.C. § 1831o............................................................................................15

12 U.S.C. § 1831p-1.........................................................................................16

12 U.S.C. § 1818…..........................................................................................17

## Rules

Fed. R. App. 32(a)(7)(B)...........................................................................24

Fed. R. App. 32(f)......................................................................................24

Fed. R. App. 32(a)(5).................................................................................24

Fed. R. App. 32(a)(6).................................................................................24

Fed. R. App. P. 25.......................................................................................25

Fed. R. App. P. 25(a)(5).............................................................................25

## Regulations

12 C.F.R. § 3.1(a)......................................................................................15

12 C.F.R. § 3.10(OCC)..............................................................................15

12 C.F.R. § 217.1(a)...................................................................................15

12 C.F.R. § 217.10......................................................................................15

12 C.F.R. § 324.1(a)...................................................................................15

12 C.F.R. § 324.10......................................................................................15

12 C.F.R. § 6.1-.25......................................................................................15

12 C.F.R. § 208.40-.45...............................................................................15

12 C.F.R. § 364...........................................................................................16

12 C.F.R. § 50.10........................................................................................20

12 C.F.R. § 50.40(a)...................................................................................20

12 C.F.R. § 50.40(c)...................................................................................20

12 C.F.R. § 249.40(a).................................................................................20

12 C.F.R. § 329.40(a).................................................................................20

12 C.F.R. § 329.40(c).................................................................................20

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus*, the Wyoming Bankers Association, is the professional and trade association for Wyoming's commercial and savings banks. Established in 1908, *Amicus* serves, represents and advocates the interests of its members, enhancing their ability to be preeminent providers of financial services. Through *Amicus*, hundreds of Wyoming bankers volunteer each year to serve on boards, committees, task forces and take part in combating fiscal illiteracy by educating Wyoming's consumers.

The association constantly monitors the provision of financial services in the State of Wyoming, watchful for new ideas and approaches to help Wyoming's financial institutions respond to an ever-changing environment. *Amicus* strives to respond quickly to events that impact its member institutions.

Membership in the association signifies a financial institution's commitment to the principles of banking and the belief that more can be accomplished collectively than individually. Full membership is open to state and nationally chartered commercial banks and Federal savings banks chartered or operating in the State of Wyoming.

---

1.      No counsel for a party authored this brief in whole or in part, and no person other than *Amicus*, its members, or its counsel has made any monetary contributions intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

*Amicus* has a strong interest in this case, as its member banks are principally located in the State of Wyoming, which created the special purpose depository institution ("SPDI") charter issued to Custodia, which asks whether Federal Reserve Banks ("Reserve Banks") have discretion to consider the safety or soundness of a depository institution before providing that entity a master account that effectively gives it direct access to the banking system of the United States. *Amicus* believes that Reserve Banks have that statutory discretion.

The banks *Amicus* represents are subject to a plethora of federal regulation and oversight by at least one of the three primary federal regulators, either the Federal Reserve System ("Fed"), the Federal Deposit Insurance Corporation ("FDIC"), or the Office of the Comptroller of the Currency ("OCC"). The federal regulation and oversight of *Amicus*'s member banks serves the primary purpose of ensuring the safety and soundness of the banks and the federal banking system at large. In turn, under guidelines promulgated by the Board of Governors of the Federal Reserve ("Board"), this oversight and regulation facilitates a more streamlined master account application process. *See Guidelines for Evaluating Account and Services Requests,* 87 Fed. Reg. 51,099–100 (Aug. 19, 2022) ("Guidelines").

In contrast, institutions like Appellant, Custodia Bank, Inc. ("Custodia"), which are not federally insured and not subject to the supervision of a federal

prudential regulator, are not generally subject to the extensive regulation and oversight to which banks represented by *Amicus* are subject.  As a result, Custodia's argument that it—and any depository institution chartered under any state law—is unconditionally entitled to a master account would, in *Amicus*'s view, and that of the Appellees, potentially subject the federal banking system to undue risks to which federal banking regulators are charged with safeguarding against.

## SUMMARY OF ARGUMENT

The reliability, safety, soundness, and overall integrity of the United States federal banking system is preserved by a vast overlapping web of federal laws, regulation, and oversight by federal prudential regulators (the Fed, FDIC, and OCC). It is through this federal oversight that the federal banking system's payment services is not undermined by risks, which would otherwise undermine the reliability and reputation of banking in the United States.

The master accounts at issue are a critical part of the federal banking system, as they are the way banks and other depository institutions access the financial services that allow the federal banking system's payment services to operate. Access to such accounts is controlled by the twelve Reserve Banks under Guidelines issued by the Board.  Under the Guidelines, Reserve Banks are required to ensure that such accounts are only provided to institutions that have the financial

and operational ability to access the federal banking system in a safe, secure, and sound manner. 87 Fed. Reg. 51,099–100.

*Amicus* is an association of banks in the State of Wyoming whose members include both federally and state-chartered institutions that are subject to extensive federal regulation and oversight because of their bank charters, federal deposit insurance coverage, or holding company structure. By contrast, Custodia is a SPDI, chartered by the State of Wyoming, and is not federally insured or subject to direct examination or oversight by any of the three federal bank regulators of its structure, operations, or soundness on an on-going basis.

*Amicus* takes no position on whether appellee, the Federal Reserve Bank of Kansas City ("FRBKC"), correctly exercised its discretion to deny Custodia's application for a master account, or whether institutions like Custodia should or should not receive such access depending on their individual characteristics. Instead, *Amicus*'s primary contention and belief is that Reserve Banks have statutory discretion to grant or deny master account access and are not required to *automatically* and *unconditionally* grant such access to any depository institution that applies for one. The statutes in question here are unambiguous and preserve this discretion, and the integrity and soundness of the federal banking system's payment services would be compromised and undermined if Custodia's arguments are accepted.

Under the Guidelines, no institution is automatically entitled to master account access. *Amicus's* member institutions are subject to the same Guidelines and application process. The primary difference between *Amicus's* member banks and Custodia is the fact that *Amicus's* members are subject to a comprehensive, ongoing, and in some cases continuous federal regulation and oversight, which provides for a more streamlined process, but not a lower level of due diligence, and gives the Fed assurance that they will not compromise the safety or integrity of the federal banking system's payment services. But with institutions like Custodia, there is no such assurance due to the lack of federal oversight and regulations, and it is up to the Reserve Banks to carefully scrutinize such institutions' operations, soundness, safety, and security, before giving them unfettered access to the federal banking system.

Accordingly, *Amicus* urges this Court to affirm the district court's decision that the FRBKC was not statutorily required to automatically grant Custodia's application and provide Custodia a master account.[2]

---

2.      *Amicus* does not address (1) whether Custodia is entitled to mandamus relief, (2) whether the Board allegedly violated the Administrative Procedure Act, or (3) whether Custodia is entitled to declaratory relief. *See* Appellant's Br. 46–57.

## ARGUMENT

## I. THE FEDERAL RESERVE ACT GRANTS RESERVE BANKS DISCRETION ON APPLICATIONS FOR MASTER ACCOUNTS

The district court correctly held that the "relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts," and that FRBKC "did not owe Custodia any non-discretionary duty to issue a master account upon request."  J.A. 1474.

One question posed to this Court, and which is the only question *Amicus*'s brief addresses, is whether the Federal Reserve Act ("FRA") grants Reserve Banks discretion in handling applications for master accounts.  At issue are two provisions of the FRA, primarily 12 U.S.C. § 342 ("Section 342") and 12 U.S.C. § 248a(c)(2) ("Section 248a").  Section 342, in relevant part, provides that "[a]ny Federal reserve bank *may* receive from any of its member banks, or other depository institutions, . . . deposits of current funds in lawful money[.]" 12 U.S.C. § 342.  Section 248a, in contrast, provides "[a]ll Federal Reserve bank services" covered by a Board-created fee schedule "shall be available to nonmember depository institutions," and, subject to certain exceptions, "such services shall be priced at the same fee schedule applicable to member banks."  12 U.S.C. § 248a(c)(2).

Appellees contend that Section 342 provides Reserve Banks with discretion on applications for master accounts. Appellees' Br. 12.  In contrast, Custodia

contends that Section 248a's language mandates that all legally-eligible depository institutions receive a master account since it is only through a master account that a depository institution can access the identified bank services provided by Reserve Banks. Appellant's Br. 8–9; *see also* J.A. 1465.

For the reasons set forth below, *Amicus* contends, as the district court held and as contended by Appellees, "[t]he plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts." J.A. 1473.

Section 342 provides, in relevant part:

> Any Federal reserve bank may receive from any of its member banks, or other depository institutions, . . . deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items . . . .

12 U.S.C. § 342.  In order to carry out this function, Reserve Banks use the master account to keep a record of debits and credits of each depository institution.  As correctly noted by the district court below, "[n]o provision of the Federal Reserve Act, including § 342, 'imposes upon reserve banks any obligation to receive' deposits. 'The act merely confers authority to do so.'"  J.A. 1466 (citing *Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Reserve Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923); *see also Biden v. Texas*, 597 U.S. 785, 802 (2022) ("[T]he word may clearly connotes discretion.")).

As contended by Appellees, the discretion to receive or reject deposits as indicated in Section 342 necessarily carries with it the discretion to grant or deny master accounts through which the deposit activity is conducted. Appellees' Br. 13; *see also Biden v. Texas*, 597 U.S. 785, 802 (2022) (highlighting that the use of "may does not just suggest discretion, it clearly connotes it.") (quotation omitted). In contrast, Custodia's contention is that Section 248a mandates a Reserve Bank to provide it with a master account. Appellant's Br. 43-44. Such contention misses the mark primarily by the operation and application of Section 342 and Section 248a. The primary command of Section 248a instructs the Board, not the Reserve Banks, to publish "a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions." 12 U.S.C. § 248a(a). Simply put, Section 248a does not require anything from or provide instruction to the Reserve Banks; instead, the primary purpose of Section 248a commands the Board to set a pricing schedule of fees in a manner that does not discriminate between member banks and nonmember depository institutions. *See, e.g.*, *Banco San Juan Interacional, Inc. Fed. Reserve Bank of N.Y.*, 700 F. Supp. 3d 86, 100 (S.D.N.Y. 2023) ("If Congress intended to require Federal reserve banks to provide specific services, the direction would reasonably have been found in the section dealing with the duties and

powers of Federal reserve banks and not in the section dealing with fee schedules set by the Board.").  As the district court below correctly concluded:

> Custodia's assertion that Congress intended to mandate Federal Reserve Banks to automatically grant master accounts to all eligible nonmember institutions in a subchapter that sets forth the duties of a completely different entity (the Board of Governors) is a leap too far.

J.A. 1468.

In contrast, Section 342 is specifically directed to Reserve Banks and their deposit activities conducted through master accounts.  When Section 342 and Section 248a are read together, it is clear that Section 248a merely states that nonmember institutions that are otherwise allowed to access the listed services through the Reserve Banks' discretionary authority under Section 342 will be charged the same fees that apply to member banks.

As pointed out by Appellees, the district court below, and other *Amicus Curiae* in support of Appellees, the discretionary authority Reserve Banks have over master account access is further supported by (i) the Board's implementation of the Guidelines in August of 2022; and (ii) Congress's 2022 amendments to the FRA, specifically requiring the Fed to maintain a database of every institution that has submitted an access request for a master account and whether the request was approved, withdrawn, or rejected.  *See* 12 U.S.C. § 248c(b)(1)(B)(ii).

Accordingly, the Court should affirm the district court's holding that Section 248a does not override the discretion expressly granted by Section 342, and

Section 248a does not require Reserve Banks to automatically grant master account access to any depository institution upon request.

## II.    UNCONDITIONAL RIGHTS TO A MASTER ACCOUNT WOULD UNDERMINE THE SAFETY, SOUNDNESS, AND INTEGRITY OF THE UNITED STATES BANKING SYSTEM AND IMPOSE UNDUE RISKS ON THE FEDERAL RESERVE SYSTEM

### A.    Reserve Banks Have Always Assessed Risks Posed By Institutions On The Federal Banking System To Ensure Against Threats To The Soundness And Integrity Of The Federal Banking System.

As highlighted by Appellees, Reserve Banks have continually assessed risks posed on the federal banking system's payment services by exercising discretion as to deposit accounts and providing banking services since the FRA was enacted in 1913.  Appellees' BR. 21.  In furtherance of this effort, and in light of the growth in charter types offered at the federal level and states across the country, the Board sought to formalize its processes on how Reserve Banks assess and manage risks regarding access to master accounts pursuant to the Board's Guidelines. *See* 87 Fed. Reg. 51, 099.

The Guidelines established a tiered framework for the level of scrutiny applied during review of requests or applications for different types of institutions. Tier 1 consists of eligible institutions that are federally insured; Tier 2 consists of eligible institutions that are not federally-insured but are subject to federal prudential supervision at the institution and, if applicable, at the holding company level; and Tier 3 consists of eligible institutions that are not federally insured and

not subject to prudential supervision by a federal banking agency at the institution

or holding company level. *Id.* at 109–10. Concerning Tier 3, which includes

institutions like Custodia, the Board recognized

> Tier 3 institutions may be subject to a supervisory or regulatory
> framework that is substantially different from, and possibly weaker
> than, the supervisory and regulatory framework that applies to
> federally-insured institutions, and as a result may pose the highest
> level of risk.

*Id.* at 51, 101. However, in responding to commenters, who suggested that the

Reserve Banks not grant access requests from institutions with novel charters, the

Board responded that it did not believe it to be "appropriate to categorically

exclude all novel charters from access to accounts and services," and that the

Guidelines, as adopted, "provide a robust framework for [Reserve Banks]

analyzing and mitigating risks" regardless of whether requests come from "novel"

or "more traditional charters." *Id.* at 51, 103.

Under these Guidelines, no institution is guaranteed master account access,

and all eligible depository institutions are subject to Reserve Banks assessing risks

and its discretion on whether certain risks are presented that cannot be sufficiently

mitigated. *See id.* at 51, 106–07. The institutions among *Amicus*'s members,

which are supervised by federal banking regulators and are federally insured,

generally receive a more streamlined review due to the comprehensive federal

regulations and oversight they are already subject to on an on-going basis.

However, for institutions, such as Custodia, that are not subject to such comprehensive federal regulations and oversight, the Reserve Banks must be able to perform due diligence review and assess certain risks prior to granting such institution access to the federal banking system's payment services. It is through this risk assessment and discretion that Reserve Banks are able to ensure that the safety and soundness of the federal banking system's payment services is not, and will not be, undermined and its participants can have confidence in deposit activities and banking services offered by Reserve Banks.

Interestingly, Custodia does not challenge FRBKC's reasons for why its application for master account access was denied. Appellees' Br. 44. Instead, Custodia contends that Reserve Banks cannot deny eligible institutions access to master accounts, regardless of the risks such institution may pose on the federal banking system's payment services. While *Amicus* takes no position on whether Reserve Banks should or should not grant institutions such as Custodia a master account, it is *Amicus*'s primary contention that Reserve Banks have, and they must continue to have, the power to review and assess the risks such institutions may pose prior to granting access to the federal banking system and the discretion to deny any request that Reserve Banks believe pose undue risk to the federal banking system's payment services. If institutions who lack federal regulatory oversight and federal insurance are to have direct access to the federal banking system's

12

payment services to the same extent as *Amicus*'s members, who are federally

regulated and insured, then such institutions should first demonstrate to the

Reserve Bank's that they do not pose undue risks to the federal banking system's

payment services and the thousands of banks operating in it, each of whom are

subject to comprehensive federal regulations, oversight, and supervision.

> **B.    Novel State Chartered Institutions Like Custodia Are Not Subject To The Comprehensive Regulation and Supervision Applicable To Federally Regulated Banks**

As highlighted above, one of the primary reasons the Board implemented the

Guidelines is because of the growth in "novel" and specially-chartered institutions

that are not subject to a similar system of regulations, oversight, and supervision

that their federally regulated counterparts (such as *Amicus*'s members) are subject

to on an on-going basis.  *See* 87 Fed. Reg. at 51, 101.  The Nation's dual-banking

system imposes a system of regulation for depository institutions based whether an

institution is chartered at the state or federal level. *See* Marc Labonte, Cong. Rsch.

Serv., R44918, *Who Regulates Whom? An Overview of the U.S. Financial*

*Regulatory Framework* 12–13 (2023).  It is under this dual-banking system that *de*

*novo* institutions decide the set of regulations, laws, and oversight it will have.  In

general, banks are charted under either federal law or a specific state's laws, and

within the state charter options a bank decides whether it will be a member of the

Federal Reserve System or a state-chartered, non-member bank.  *Amicus*'s

membership is open to state and federally chartered commercial banks and federally chartered savings banks, each of whom are subject to on-going federal regulation, oversight, and supervision by at least one or more of the federal prudential regulators (the Fed, OCC, or FDIC).

Regardless of which federal banking regulator oversees *Amicus*'s members, all of its members are subject to rigorous and on-going federal supervision and compliance touching every aspect of their operations, management, and safety and soundness, including at least one, full scope, on-site examination every twelve-month or eighteen-month period. *See* 12 U.S.C. § 4.6(a), (c) (discussing examinations conducted by the OCC for national banks); 12 U.S.C. § 325 (discussing examination requirements for every insured member of the Federal Reserve System banks); 12 U.S.C. § 1820(d) (discussing examination requirements for FDIC supervised depository institutions). Yet, the extensive regulation and oversight *Amicus*'s members are subject to is prudent and essential to the overall safety and stability of the federal banking system.

In contrast to the traditional charter options, there has been a recent growth in institutions utilizing "novel" state charters that allow them to evade federal regulation, oversight and supervision altogether. *See, e.g.*, Michael J. Hsu, Acting Comptroller of the Currency, *Preventing the Next Great Blurring* at 13–14 (Feb. 21, 2024) (https://tinyurl.com/dujxzw76). This is primarily because such

institutions are neither insured depository institutions, which would subject them to

the supervision of a federal regulator, nor uninsured institutions that are part of a

bank holding company and are not banks pursuant to the Bank Holding Company

Act, which would subject them to the Fed's supervision.  *See* 12 U.S.C. §

1841(c)(1).  Instead, these institutions are only overseen by the state issuing their

charters and the operational rules in place governing such charter, which may be

substantially different than the vast regulatory system in place for federally

supervised depository institutions. 87 Fed. Reg. at 51, 108.

By way of example, one aspect of the comprehensive federal regulation and

oversight to which *Amicus*'s member banks are subject concerns capital, which

gives the bank the ability to absorb losses while continuing to meet its obligations

on liabilities. The OCC, Board, and FDIC each require its supervised institutions to

satisfy "minimum capital requirements and overall capital adequacy standards."

12 C.F.R. §§ 3.1(a), 3.10 (OCC), 217.1(a), 217.10 (Board), 324.1(a), 324.10

(FDIC). By contrast, capital requirements for Wyoming SPDIs are ultimately

subject to the Wyoming Division of Banking's Discretion and "will vary from

institution to institution."  *See, e.g.*, *Special Purpose Depository Institutions*, Wyo.

Division of Banking 2 (July 7, 2021) (https://tinyurl.com/22b89akx); *see also* Wyo.

Admin. R. 021.0002.20.05132021 § 2(a). FDIC-insured banks are also subject to

the "prompt corrective action" framework, which increases restrictions on a bank's

activities as the bank's capital level decreases.  *See* 12 U.S.C. § 1831o; *see also* 12 C.F.R. §§ 6.1–.25 (OCC-regulated institutions), 208.40–.45 (Board-regulated institutions), 324.401–.405 (FDIC-regulated institutions).  *Amicus*'s member banks are also subject to the comprehensive "safety and soundness" standards that seek to ensure there are standards for identifying risks and how they may be mitigated.  *See* 12 U.S.C. § 1831p-1; *see also* 12 C.F.R. §§ 30.1–.6, 364.100–.101, 208.3(d)(1).  These safety and soundness standards address internal controls and information systems, internal audits, loan documentation, credit underwriting, interest rate exposure, asset growth, asset quality, earnings, compensation, fees and benefits. *See, e.g.*, 12 C.F.R. § 364 (Appendix A).

Lastly, federally regulated institutions are subject to rigorous "specialty examinations" in the areas of Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT), Bank Secrecy Act, Information Technology, Risk Management, the Community Reinvestment Act (CRA), and others.  *See generally* OCC, *Comptroller's Handbook*, *Examination Process*, *Bank Supervision Process* at 12 (Sept. 2019).  Together with such institutions' full-scope examination and the standards for safety and soundness, this rigorous and continuous oversight ensures that such institutions are operating in a manner that does not pose a risk to the financial system as a whole.  And, when such federally regulated institutions are identified as deficient in certain areas, the federal prudential regulators have the

16

ability to take informal or formal enforcement action requiring a supervised institution's board and management to take timely actions to correct such deficiencies. *See* 12 U.S.C. §§ 1818, 1831o(h)(3); *see also generally* Bd. of Govs. of Fed. Reserve Sys.*, Bank Holding Company Supervision Manual* §§ 1075.0.1–.7 (Feb. 2023) (describing corrective actions available to the Board for BHCs); FDIC, *Formal and Informal Enforcement Actions Manual: Overview and Administrative Matters* 1-5–6 (July 2022) (describing formal and informal enforcement actions); OCC*, Comptroller's Handbook, Examination Process, Bank Supervision Process* at 49 (Sept. 2019).

While it may be the case that SPDIs, like Custodia, are subject to some type of regulatory oversight carried out by their chartering states, the robust and comprehensive federal regulatory system of standards, examination, and supervision entails a continuous function of oversight and monitoring of the risks associated with a particular institution and remedial enforcement to minimize or remove those risks if needed. As applicable here, it ensures that institutions do not pose undue risk on Reserve Banks, the payment systems they operate, its participants, and the federal banking system as a whole prior to granting them access to master accounts. Under Custodia's interpretation and "absolute entitlement theory," Reserve Banks would be statutorily required to bypass such process and provide master accounts to any state-chartered institution without the

ability to inquire or review its risk profile and whether such institution posed any threat to the federal banking system such as liquidity, insolvency, or security. *See* Appellees' Br. 44–45. Though Custodia attempts to frame its argument as one in favor of preserving the dual-banking system, Appellant's Br. 39–40, its interpretation of the FRA ignores the critical role of Reserve Banks in protecting the integrity of the federal banking system.

> **C.    Allowing Automatic Access to Master Accounts Would Undermine The Soundness And Integrity Of The Federal Banking System As A Whole.**

As noted throughout, the federal examination process, standards, and overall supervision to which Amicus's member banks are subject to ensures risks that threaten the soundness and integrity of the federal banking system are continuously monitored and mitigated to minimize or remove those risks.  Under Custodia's interpretation, Reserve Banks would have to automatically issue a master account to any state-chartered institution without any prior review or understanding of the risks that may exist with regard to such institution or the risks that may be introduced to the federal banking system's payment services.

Under the Guidelines, a Reserve Bank's review and analysis of an application for a master account is governed by the following six principles: (1) each institution should have "a well-founded, clear, transparent, and enforceable legal basis for its operations," and the "provision of an account and services to an

institution should not present or create" (2) "undue credit, operational, settlement, cyber or other risks to the Reserve Bank," (3) "undue credit, liquidity, operational, settlement, cyber or other risks to the overall payment system," (4) "undue risk to the stability of the U.S. financial system," (5) "undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity," or (6) "adversely affect the Federal Reserve's ability to implement monetary policy." 87 Fed. Reg. at 51,107–09. Yet if Custodia's position were adopted, the Reserve Banks would be unable to assess whether allowing such institution access to a master account and Fed services "could have a deleterious effect on U.S. financial stability." *Id.* at 51,108.

As the Board specifically highlighted in issuing the Guidelines regarding Tier 3 institutions, "detailed regulatory and financial information . . . may not exist or may be unavailable" for such institutions who "may be subject to a regulatory framework that is substantially different from the regulatory framework that applies to federally-insured institutions." *Id.* at 51, 110. It is because of this fact that the Board highlighted that Tier 3 institutions would generally receive the "strictest level of review." *Id.* This makes sense due to institutions, such as Custodia, having different business models and regulatory requirements than federally insured institutions subject to federal oversight.

19

As the federal banking system has seen, "[b]anks fail for many reasons, although most trace back to the management of bank resources, resulting in a bank's inability to meet liquidity or capital requirements."   Raj Gnanarajah, Cong. Rsch. Serv., IF10055, *Bank Failures and the FDIC* 1 (Mar. 23, 2023).  "Liquidity is the ability to meet cash and collateral obligations at a reasonable cost." FDIC, *Risk Management Manual of Examination Policies: Section 6.1: Liquidity and Funds Management* 6.1–2 (April 2024).  Due to the importance of liquidity and liquidity risk management, there are numerous federal regulations governing supervised institutions' liquidity management.  Most notably is the fact that the OCC, Board, and the FDIC have each adopted "liquidity coverage ratio" ("LCR") requirements for their supervised institutions.  *See* 12 C.F.R. §§ 50.10 (LCR for OCC-regulated institutions), 249.10 (LCR for Board-regulated institutions), 329.10 (LCR for FDIC-regulated institutions).  An institution's LCR is essentially the proportion of highly liquid assets that the institution must hold to ensure that it can meet obligations, despite any disruptions in the market; when a supervised institution's LCR falls short of the minimum requirement, such institution must notify their federal regulator who in turn has the authority to take supervisory or enforcement actions to address noncompliance.  *See* 12 C.F.R. §§ 50.40(a), (c), 249.40(a), (c), 329.40(a), (c).

Due to the impact liquidity concerns can have on an institution and the financial system as a whole, the Guidelines direct Reserve Banks to "confirm that the institution has an effective risk management framework and governance arrangements for managing liquidity, credit, and other risks that may arise in times of financial or economic stress" and the extent to which such strains on liquidity "may be transmitted to other segments of the financial system." 87 Fed Reg. at 51, 108. However, under Custodia's interpretation, Reserve Banks would be required to blindly issue master accounts to institutions without assessing whether any disruptions in the market would cause the institution's liquidity problems to spread across the financial system as a whole.

Under Custodia's interpretation, Reserve Banks authority of assessing risks and requiring mitigation of such risks would be reduced by a statutory mandate to issue master accounts to all institutions, regardless of the risks that any given institution may pose on the financial system. As directly indicated in the Guidelines, an institution that is not "subject to capital requirements similar to a federally-insured institution . . . can more easily expand its balance during times of stress." *Id.* at 51, 109. As a result, "the potential for sudden and significant deposit inflows into that institution is particularly large, which could disintermediate other parts of the financial system, greatly amplifying stress." *Id.* Yet, this type of stress testing is one way in which Reserve Banks are able to assess institutions applying

for master accounts and reject applications from institutions that present undue risks.  This type of risk management and risk mitigation is fundamental to not only the specific Reserve Bank but to the financial system as a whole.

In sum, requiring Reserve Banks to issue master accounts to any eligible institution, regardless of an institution's capital, solvency, security, safety, or risk management, would deprive Reserve Banks of their ability to protect themselves, the payment systems they operate, and the participants operating on such systems (such as *Amicus*'s member banks who are subject to all of these risks assessments) from undue risks posed by otherwise eligible institutions.  Fortunately, such statutory requirement does not exist, and Congress directly provided such discretion to Reserve Banks when considering an institution's application for a master account.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

Respectfully submitted,

*/s/Greyson E. Tuck*
Greyson E. Tuck
Gerrish Smith Tuck, PC
Counsel to Wyoming Bankers
   Association
700 Colonial Road, Suite 200
Memphis, TN 38117
Phone: (901) 767-0900
Email: gtuck@gerrish.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit via the Court's CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

September 4, 2024                    */s/Greyson E. Tuck*
                                     Greyson E. Tuck
                                     *Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. Rule 32(B), this brief contains less words than the maximum imposed.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface.


September 4, 2024                          */s/Greyson E. Tuck*
                                          Greyson E. Tuck

                                          *Counsel for Amicus Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

Pursuant to Fed. R. App. P. 25, 10th Cir. R. 25.3, and Section II.J of this Court's CM/ECF User's Manual, I hereby certify that:

1.     All required privacy redactions have been made in accordance with Fed. R. App. P. 25(a)(5) and 10th Cir. R. 25.5;

2.     Any hard copies of this brief required to be submitted shall be exact copies of this electronically filed version, which was submitted to the Clerk of the United States Court of Appeals for the Tenth Circuit using the CM/ECF system; and

3.     This brief has been scanned for viruses, and no viruses were detected.


September 4, 2024                    */s/Greyson E. Tuck*
                                    Greyson E. Tuck

                                    *Counsel for Amicus Curiae*