No. 24-8024

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

CUSTODIA BANK, INC.,
*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BOARD OF GOVERNORS, ET AL.,
*Defendants-Appellees*.

---

On Appeal from the United States District Court for the
District of Wyoming, No. 1:22-CV-125-SWS (Skavdahl, J.)

---

## BRIEF FOR THE BANK POLICY INSTITUTE AND THE CLEARING HOUSE ASSOCIATION L.L.C. AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

---

Mark W. Mosier
Randy Benjenk
Jeffrey Luther
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1(a), The Bank Policy Institute certifies that it is not a subsidiary of any other corporation. BPI is a non-profit trade group and has no shares or securities that are publicly traded.

Under Federal Rule of Appellate Procedure 26.1(a), The Clearing House Association L.L.C. certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS ............................................................................................ ii

STATEMENT OF INTEREST .................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 2

ARGUMENT ............................................................................................................. 6

I.   Reserve Bank Discretion in Deciding Whether to Grant Access Requests is Established by Statute and Consistent with Longstanding Federal Reserve and Reserve Bank Practices .................................................. 6

II.  Reserve Banks Must Have the Ability to Protect the Banking and Payment Systems from the Risks Master Account Applicants May Present .......................................................................................................... 8

    A.   The U.S. Financial System Depends on Well-Functioning Interbank Payment Services, like the Fedwire Funds Service. ............ 9

    B.   Master Accountholders Pose Significant Risks to the Financial System. ...................................................................................................11

        1.   Overdrafts in Master Accounts Create Credit Risk that Can Cause Losses to Taxpayers. ...................................................... 12

        2.   A Broad Cyberattack Against Master Accountholders Can Cause Significant Disruption to the Payment System and the Financial System. ............................................................... 13

        3.   A Master Accountholder Without Appropriate Controls Can Facilitate Criminal Activity Through the Fedwire Funds Service and Other Payment Systems, Creating Reputational Risk for Reserve Banks and the Services They Provide. ....................................................................... 16

III. The Guidelines Appropriately Provide for Reserve Banks to Consider Whether an Institution Is Subject to Comprehensive Federal Supervision. .................................................................................................. 18

A.    Tier 1 Institutions Are Subject to Credit, Liquidity, and Capital Requirements and Reviews That Directly Address the Risk of Default. ........................................................................................... 22

B.    Tier 1 Institutions Are Subject to Cybersecurity Examinations That Mitigate Cybersecurity Risks. ....................................................... 24

C.    Tier 1 Institutions Are Subject to Stringent Examinations for Controls to Mitigate the Risk of Facilitating Illicit Financial Transactions. ......................................................................................... 25

IV.    The District Court's Decision Does Not Frustrate the Dual Banking System. .............................................................................................................. 26

CONCLUSION ......................................................................................................... 29

CERTIFICATE OF COMPLIANCE ....................................................................... 30

CERTIFICATE OF SERVICE ................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

12 U.S.C. § 248(j) ......................................................................................................2

12 U.S.C. § 289(a)(3).................................................................................................13

12 U.S.C. § 290 .........................................................................................................13

12 U.S.C. § 342 ...........................................................................................................6

12 U.S.C. § 1820(d) ...................................................................................................19

Bank Secrecy Act, 35 U.S.C. § 5311 *et seq*...........................................................25

Monetary Control Act of 1980, Pub. L. No. 96-221.................................................7

**Regulations**

12 C.F.R. § 204.10 ..............................................................................................8, 27

12 C.F.R. Part 210, Subpart B .................................................................................15

12 C.F.R. § 304.3 .....................................................................................................23

**Other Authorities**

1 Banking Law § 1.04 (2024). ..................................................................................26

Ann Saphir, *Fedwire resumes operations after hourslong disruption*
(Feb. 24, 2021), https://www.reuters.com/technology/fedwire-
resumes-operations-after-hourslong-disruption-2021-02-24/ ...........................10

Antonis Kotidis & Stacey L. Schreft, *Cyberattacks and Financial
Stability: Evidence from a Natural Experiment*, Federal Reserve
Board (Mar. 23, 2022),
https://www.federalreserve.gov/econres/feds/files/2022025pap.pdf. ..........14, 15

Board of Governors of the Federal Reserve System, *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* (Dec. 2010), https://www.federalreserve.gov/ paymentsystems/files/psr_2011_guide.pdf..........................................................13

Board of Governors of the Federal Reserve System, *Commercial Bank Examination Manual* § 5300.1 (Dec. 31, 2017), https://www.federalreserve.gov/publications/supervision_cbem.htm...............23

Board of Governors of the Federal Reserve System, Expansion of Fedwire Funds Service and National Settlement Service Operating Hours,
89 Fed. Reg. 39,613 (May 9, 2024)...................................................................17

Board of Governors of the Federal Reserve System, Guidelines for Evaluating Account and Service Requests,
87 Fed. Reg. 51,099 (Aug. 19, 2022) ........................................................4, 7, 18

Board of Governors of the Federal Reserve System, *Federal Reserve Payments Study* (last visited Sept. 4, 2024), https://www.federalreserve.gov/paymentsystems/fr-payments-study.htm..............................................................................................10

Board of Governors of the Federal Reserve System, *Federal Reserve Policy on Payment System Risk* (July 20, 2023), https://www.federalreserve.gov/paymentsystems/files/psr_policy.pdf..............12

Board of Governors of the Federal Reserve System, *Fedwire Funds Services*, (last visited Sept. 4, 2024), https:// www.federalreserve.gov/paymentsystems/fedfunds_about.htm ...................9, 10

Board of Governors of the Federal Reserve System, *Master Account and Services Database: Requests for Access* (last visited Sept. 4, 2024), https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm ...................................21, 28

Board of Governors of the Federal Reserve System, *Understanding Federal Reserve Supervision* (last visited Sept. 4, 2024), https://www.federalreserve.gov/supervisionreg/understanding-federal-reserve-supervision.htm .........................................................................19

Board of Governors of the Federal Reserve System & Federal Deposit Insurance Corporation, Request for Information on Application of Uniform Financial Institutions Rating System, 84 Fed. Reg. 58,383 (Oct. 31, 2019) ...................................................................22

Brian Fung, *Cyberattacks are the Number-one Threat to the Global Financial System, Fed Chair Says*, CNN (Apr. 12, 2021), https://www.cnn.com/2021/04/12/business/jerome-powell-cyberattacks-global-threat/index.html .................................................................13

Chester Morrill, Secretary, Board of Governors of the Federal Reserve System, Letter X-9187 (Apr. 26, 1935) .................................................................7

Expert Report of Morgan Ricks, *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, No. 1:22-cv-00125-SWS (Feb. 2, 2024). ....................................28

Federal Deposit Insurance Corporation, *Banker Resource Center: Information Technology (IT) and Cybersecurity* (last visited Sept. 4, 2024), https://www.fdic.gov/resources/bankers/information-technology/ ..........................................................................................................24

Federal Deposit Insurance Corporation, *Risk Management Manual of Examination Policies* (July 19, 2024), https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/ .........................................................25

Federal Reserve, *Fedwire Funds Service – Annual Statistics* (last updated Jan. 26, 2024), https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/annual-stats.html .........................................10

Federal Reserve, *Fedwire Funds Service Disclosure* (Dec. 1, 2023), https://www.frbservices.org/binaries/content/assets/crsocms/financial-services/wires/funds-service-disclosure.pdf.................................................24

Federal Reserve, *Financial Services* (last visited Sept. 4, 2024), https://www.frbservices.org/financial-services .........................................8

Federal Reserve, *Operating Circular 5* (May 1, 2024), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/050124-operating-circular-5.pdf ......................................15

Federal Reserve, *Operating Circular 6* (July 1, 2023), https://www.frbservices.org/binaries/content/assets/crsocms/resour ces/rules-regulations/070123-operating-circular-6.pdf .....................................15

FFIEC, *BSA/AML Examination Manual* (last visited Sept. 4, 2024), https://bsaaml.ffiec.gov/manual ...........................................................................25

FFIEC, *IT Examination Handbook Infobase* (last visited Sept. 4, 2024), https://ithandbook.ffiec.gov/ ..............................................................................24

FFIEC, *Reporting Forms* (last visited Sept. 4, 2024), https://www.ffiec.gov/ffiec_report_forms.htm....................................................23

Joshua Hammer, *The Billion-Dollar Bank Job*, The New York Times (May 3, 2018), https://www.nytimes.com/interactive/2018/05/03/magazine/money -issue-bangladesh-billion-dollar-bank-heist.html...............................................15

Thomas Lee Hazen, 6 Law. Sec. Reg. § 22:29 (2024) ............................................17

## STATEMENT OF INTEREST[1]

***The Bank Policy Institute ("BPI")***.   BPI is a nonpartisan public policy, research, and advocacy group that represents universal banks, regional banks, and the major foreign banks doing business in the United States.  BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues.

***The Clearing House Association L.L.C. ("Association")***.   Established in 1853, the Association is a nonpartisan advocacy organization that represents the interests of its member banks by developing and promoting policies to support a safe, sound, and competitive banking system that serves customers, communities, and economic growth.  Its sister company, The Clearing House Payments Company L.L.C., operates core payments system infrastructure in the U.S. that clears and settles more than $2 trillion each business day.

*Amici* have an interest in the appeal because it presents important issues concerning access to master accounts at Federal Reserve Banks, master accounts which many of *amici*'s members hold.

---

[1]     No party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money intended to fund preparing or submitting the brief.  No person other than *amici*, their members, and their counsel contributed money intended to fund preparing or submitting this brief.  All parties have consented to the filing of this brief.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Both as a matter of law and sound public policy, Reserve Banks have discretion to grant or deny a master account.[2] This discretion is no accident. It reflects Congress's recognition that master accountholders receive several important privileges and that their direct access to Reserve Bank payment services, such as the Fedwire Funds Service, can serve as a risk transmission channel to the Reserve Banks and other participants in the payment system.

First, a master account enables an entity to deposit funds directly with a Reserve Bank without relying on an intermediary depository institution. These deposits are considered central bank money, are free of all credit and liquidity risk, and are subject to the full faith and credit of the U.S. government. The payment of interest on master account balances is one of the primary mechanisms by which the Federal Reserve implements monetary policy, expanding or contracting the monetary supply as necessary to promote its twin mandates of full employment and low inflation. Certain financial institutions seeking master accounts may attempt to use a Reserve Bank master account and services in novel ways that could pose threats to the Federal Reserve's ability to implement monetary policy.

---

[2]     The term "Reserve Bank" refers to the twelve reserve banks that act as the operating arm of the Federal Reserve System. The term "Federal Reserve" refers to the Board of Governors of the Federal Reserve System. The Federal Reserve exercises general supervision over the Reserve Banks. 12 U.S.C. § 248(j).

Master accounts also serve as the operating accounts for master accountholders, allowing them to directly send and receive payments with other participants in the Reserve Bank payment systems. Some of these payment services are systemically important to the efficient functioning of the U.S. economy. For example, the Fedwire Funds Service is a central component of the complex infrastructure of the U.S. financial system and, in 2023, facilitated the transfer of over one *quadrillion* dollars' worth of transactions.

A master accountholder can access services at a Reserve Bank directly. This means that a master accountholder's access to Reserve Bank services like the Fedwire Funds Service is unmediated by another financial institution. Improper use of these payment services can expose the Reserve Banks and others to numerous risks, including credit risk, cybersecurity risk, and significant reputational risk, among others.

A master account and the Reserve Bank services accessible through the account are federal resources and technologies. Value created by these resources accrues to taxpayers, but losses are also borne by taxpayers. As a matter of sound public policy, the Reserve Banks must endeavor to protect taxpayers from the risk of losses that may arise from master accountholders.

Thus, not only is the law clear that the Reserve Banks have statutory discretion to decide whether to grant master account access, it is imperative from a policy

standpoint that the Reserve Banks have this discretion. This discretion is necessary to protect the Reserve Banks, their payment services, taxpayers, and the financial system from undue risk.

This discretion also is consistent with historical practice—the Reserve Banks have long exercised discretion in deciding whether to give financial institutions access to the accounts and services they administer, rather than granting access as a matter of right. More recently, the Federal Reserve adopted Guidelines highlighting the risks that Reserve Banks should consider in exercising their discretion when evaluating applications for master accounts and direct access to Reserve Bank services.[3] The Guidelines are reasonably designed to ensure that such applications are evaluated consistently across the Reserve Banks.

Finally, contrary to the plaintiff-appellant's arguments, ensuring that Reserve Banks maintain discretion over Access Requests does not frustrate the dual banking system. While it is important for the Reserve Banks to exercise their discretion in decisioning master account applications—from both national banks and state-

---

[3]    The term "Guidelines" refers to the Guidelines for Evaluating Account and Service Requests approved by the Board of Governors of the Federal Reserve System on August 19, 2022. 87 Fed. Reg. 51,099 (Aug. 19, 2022). The term "Access Request" refers to requests for access to accounts and services at a Reserve Bank. While not at issue in the current case, the Guidelines apply to requests from non-accountholder institutions seeking to use Reserve Bank services directly rather than through an intermediary. Guidelines at 51,106 n.1.

chartered institutions—institutions that do not have direct access to a master account are not foreclosed from using services provided by Reserve Banks.[4]  Rather, these institutions are able to use services indirectly through a traditional correspondent banking relationship with a correspondent that has a master account.[5]  This well-established, frequently used structure ensures that risks that certain institutions may pose to the Reserve Banks and the accounts and services they offer are mitigated by the additional layer of risk management policies, procedures, and controls in place at the correspondent bank.

In sum, this Court should conclude that the District Court got it right.  In addition to being consistent with federal law and well-established practice for over one hundred years, it is critically important that Reserve Banks have discretion to deny master account applications that pose undue risks to the Reserve Banks, their payment services, end users, taxpayers, and financial stability.

---

[4] As noted in footnote 3, the Guidelines apply equally to requests by non-accountholders to access Reserve Bank services directly as a customer of a Reserve Bank and settling for those direct services through another master accountholder (what the Federal Reserve refers to as a settlement correspondent).  For purposes of this brief, *amici* assume that the Reserve Banks would reject such a request on the same grounds as the request for the master account given that the Guidelines are the same for both types of access requests.

[5] Under a traditional correspondent banking relationship, the correspondent bank (rather than the Reserve Bank) is providing services to the respondent bank.

## ARGUMENT

**I.     Reserve Bank Discretion in Deciding Whether to Grant Access Requests is Established by Statute and Consistent with Longstanding Federal Reserve and Reserve Bank Practices.**

As the defendants-appellees have highlighted in their briefing, Reserve Banks have statutory discretion to grant or deny access to master accounts and Reserve Bank services.  Section 342 of the Federal Reserve Act states that a Reserve Bank "may receive" deposits from member banks and nonmember depository institutions.[6]  Through this discretionary language, Congress clearly and necessarily vested the Reserve Banks with substantial discretion to grant or deny access to master accounts and Reserve Bank services.

A long historical record confirms this understanding.  As the Federal Reserve notes, "[s]ince the enactment of the [Federal Reserve Act in 1913], the Federal Reserve Banks have exercised discretion in granting access to Reserve Bank accounts and services."[7]  Further, "[t]his longstanding exercise of discretion is rooted in Congress's general grant of banking authority to Reserve Banks," as well as the Federal Reserve Act.[8]

---

[6]     12 U.S.C. § 342.

[7]     Br. for the Def. Bd. of Governors of the Fed. Rsrv. Sys.'s Opp. to Pl.'s Pet. for Administrative Procedure Act Review at 18, *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, No. 1:22-cv-00125-SWS, 2024 WL 1788900 (D. Wyo. Jan. 26, 2024) (hereinafter "FRB APA Brief").

[8]     *Id.*

For example, a survey conducted by the Federal Reserve in 1935 found that Reserve Banks routinely exercised discretion in deciding whether to open clearing accounts for nonmember banks.[9]  And as noted by the Federal Reserve, there are well-documented examples of Reserve Banks continuing to exercise this discretion through the present day, including after the enactment of the Monetary Control Act, which, among other things, made state banks that are not members of the Federal Reserve System eligible to apply for accounts at Reserve Banks, but did not provide for automatic eligibility or cabin the Reserve Banks' discretion.[10]

The Reserve Banks have also long exercised discretion in how they serve accountholders by imposing conditions on use that mitigate the risks discussed above.  These conditions may include "establishing a cap on the amount of balances held in the account."[11]  In addition, the Federal Reserve could "authorize a Reserve Bank to pay a different rate of interest on balances held in the account or [] limit the amount of balances in the account that receive interest."[12]

---

[9]     Chester Morrill, Secretary, Board of Governors of the Federal Reserve System, Letter X-9187 (Apr. 26, 1935), at 365–71; *see also* FRB APA Brief at 19–20.

[10]    *See* FRB APA Brief at 20–24.

[11]    Guidelines at 51,107 n.4.

[12]    *Id.*

Considering the risks that master accountholders can pose to the system, it makes perfect sense that Congress gave the Reserve Banks discretion to deny Access Requests.  Reserve Banks, as the entities that administer master accounts and the payment systems, including the Fedwire Funds Service, are uniquely positioned to assess the risks posed by a given entity to the critical components of the financial market infrastructure.

## II. Reserve Banks Must Have the Ability to Protect the Banking and Payment Systems from the Risks Master Account Applicants May Present.

A master account at a Reserve Bank provides the holder several benefits.  A master accountholder may directly access the various services provided by Reserve Banks, including the Fedwire Funds Service.  These payment services allow accountholders to directly send and receive payments with other financial institutions.[13]  Master accountholders may also deposit funds into their account, which earn interest.[14]

Entities with direct access to a master account and the related Reserve Bank services potentially pose broad risks to other financial institutions, the financial system, end users (including consumers), and taxpayers.  For example, overdrafts in

---

[13]    *See* Federal Reserve, *Financial Services* (last visited Sept. 4, 2024), https://www.frbservices.org/financial-services.

[14]    12 C.F.R. § 204.10.

master accounts may generate losses that are borne by taxpayers. A cybersecurity attack that affects a master accountholder may disrupt the Fedwire Funds Service and other parts of the financial system, with ripple effects throughout the economy. And a master accountholder may facilitate criminal activity through access to Reserve Bank payment services.

The discretion given to the Reserve Banks by statute with respect to Access Requests is necessary to balance competing interests. Reserve Banks must balance the need to provide a broad array of financial institutions with direct access to Reserve Bank services against the need to protect these services from undue risk. The Reserve Banks strike this balance by evaluating the potential risks that master account applicants may pose to the payment and financial systems. Applicants that pose undue risk must be denied access.

### A.    The U.S. Financial System Depends on Well-Functioning Interbank Payment Services, like the Fedwire Funds Service.

One of the key payment services offered by the Reserve Banks is the Fedwire Funds Service. The Fedwire Funds Service is a system through which financial institutions electronically transfer funds between themselves.[15] Funds transfers

---

[15]    Board of Governors of the Federal Reserve System, *Fedwire Funds Services* (last visited Sept. 4, 2024), https://www.federalreserve.gov/paymentsystems/fedfunds_about.htm.

made through the Fedwire Funds Service are "immediate, final, and irrevocable."[16]

The Fedwire Funds Service is a critical component of the infrastructure of the financial markets: in 2021, over 204 million transactions were originated through the Fedwire Funds Service, representing approximately $992 trillion worth of transfers.[17]  To put this into perspective, transfers made using the automated clearing house networks ("ACH") were the next most common form of noncash payment.  In 2021, the total value of transfers made via ACH was $92 trillion, one-tenth of the value transferred via the Fedwire Funds Service.[18]

It is essential that the Fedwire Funds Service be highly resilient.  Any disruption in the Fedwire Funds Service could lead to turmoil in the broader financial system.[19]  The immediate effect of any disruption in the Fedwire Funds Service is a payment backlog at banks.  These backlogs could take hours or even days to clear.

---

[16]    *Id.*

[17]    Federal Reserve, *Fedwire Funds Service – Annual Statistics* (last updated Jan. 26, 2024), https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/annual-stats.html.

[18]    Board of Governors of the Federal Reserve System, *Federal Reserve Payments Study* (last visited Sept. 4, 2024), https://www.federalreserve.gov/paymentsystems/fr-payments-study.htm.

[19]    *See, e.g.*, Ann Saphir, *Fedwire resumes operations after hourslong disruption*, Reuters (Feb. 24, 2021), https://www.reuters.com/technology/fedwire-resumes-operations-after-hourslong-disruption-2021-02-24/ (discussing an hours long outage in the Fedwire Funds Service and other payments services in 2021 that caused significant disruption throughout the economy).

And as banks do not receive anticipated payments from counterparties over the Fedwire Funds Service, they may face liquidity issues, requiring them to borrow either from the Reserve Banks or other banks. Furthermore, as backlogs build at banks and banks themselves experience liquidity issues, the consumer and business customers of these banks could be prevented from sending and receiving time-sensitive payments, resulting in a series of cascading liquidity issues for businesses and consumers across the country.

**B.    Master Accountholders Pose Significant Risks to the Financial System.**

Because master accountholders have direct, unmediated access to Reserve Bank services, including the Fedwire Funds Service, they can pose risks to the financial system. These risks include, but are not limited to, credit risk, cybersecurity risk, and reputational risk. Each of these risks, if left unmitigated, can cause disruption throughout the financial system and macroeconomy. Therefore, it is imperative that the Reserve Banks evaluate these as well as other risks that the applicant may pose to the financial system through the exercise of discretion in granting or denying access to master accounts. A decision to deny access to a master account is in essence a decision by a Reserve Bank that the best way to mitigate the risks posed by the applicant is to require the applicant to use Reserve Bank services through a correspondent bank, that is likely federally regulated and supervised.

### 1. Overdrafts in Master Accounts Create Credit Risk that Can Cause Losses to Taxpayers.

Eligible master accountholders may obtain credit from Reserve Banks in the form of overdrafts to their accounts.[20]  Overdrafts in master accounts serve "an important role in providing intraday balances and credit to foster the smooth operation of the payment system."[21]  But these overdrafts entail credit risk to a Reserve Bank, and inherent in any extension of credit is the risk of loss.

As the Federal Reserve has noted, "[i]f an institution were to fail after sending a funds transfer, for example, that left its account in an overdraft position, the Federal Reserve may be obligated to cover the payment and bear any resulting losses.  The

---

[20]    There are two types of overdrafts relevant to master accounts: daylight overdrafts and overnight overdrafts.  *See generally* Board of Governors of the Federal Reserve System, *Federal Reserve Policy on Payment System Risk* (July 20, 2023),    https://www.federalreserve.gov/paymentsystems/files/psr_policy.pdf. Daylight overdrafts occur when a master accountholder's account is in a negative position during the business day. *Id.* at 15.  Overnight overdrafts occur when there is a negative balance in the account at the close of the business day. *Id.* at 4.  The Reserve Banks discourage overnight overdrafts. *Id.*  In addition, a Reserve Bank may decide to deny access to daylight overdrafts to an institution.  For example, "[i]nstitutions that may pose special risks to the Reserve Banks, such as those without regular access to the discount window, those incurring daylight overdrafts in violation of [Federal Reserve policies], those that are ineligible for intraday credit based on their supervisory rating and [capital categories], or those that are otherwise in weak financial condition" are generally denied access to daylight overdrafts. *Id.* at 26.

[21]    *Id.* at 4.

Federal Reserve's exposure in such instances could be significant."[22]  When credit

is extended to a privately owned entity by a federal entity such as a Reserve Bank,

any loss may ultimately be borne by U.S. taxpayers.[23]  To mitigate these risks, it is

essential that only creditworthy institutions subject to regulatory capital

requirements have access to master accounts that may have these overdrafts.

> ### 2.    A Broad Cyberattack Against Master Accountholders Can Cause Significant Disruption to the Payment System and the Financial System.

Central bankers and economists have routinely highlighted the risk to the

financial system posed by cyberthreats.[24]  Absent effective cybersecurity risk

management, financial institutions can experience disruptions, outages, and other

---

[22]    Board of Governors of the Federal Reserve System, *Guide to the Federal Reserve's Payment System Risk Policy on Intraday Credit* 6 (Dec. 2010), https://www.federalreserve.gov/paymentsystems/files/psr_2011_guide.pdf.

[23]    Under Section 7 of the Federal Reserve Act, "the aggregate amount of the surplus funds of the [Reserve Banks] may not exceed $6,825,000,000." 12 U.S.C. § 289(a)(3)(A).  To the extent the surplus funds of the Reserve Banks exceed this limit, such amounts "shall be transferred to the [Federal Reserve] for transfer to the Secretary of the Treasury for deposit in the general fund of the Treasury." 12 U.S.C. § 289(a)(3)(B).  The Federal Reserve Act expressly stipulates how these transferred amounts may be used, including for "reduction of the outstanding bonded indebtedness of the United States." 12 U.S.C. § 290.  Therefore, to the extent a Reserve Bank incurs a loss on an overdraft, the federal government may ultimately levy higher taxes or borrow more money to recoup this loss.

[24]    *See, e.g.,* Brian Fung, *Cyberattacks are the Number-one Threat to the Global Financial System, Fed Chair Says*, CNN (Apr. 12, 2021), https://www.cnn.com/2021/04/12/business/jerome-powell-cyberattacks-global-threat/index.html (reporting that Federal Reserve Chairman Jerome Powell viewed cyberattacks as the "foremost risk to the global financial system").

stress that may impact their ability to operate.  Further, a broad cyberattack against master accountholders, particularly those without effective cybersecurity risk management, may cause contagion within the financial system.  This risk is not merely theoretical.

A recent study by the Federal Reserve on this topic is instructive.  In the study, researchers at the Federal Reserve analyzed the disruptions caused by an actual multi-day cyberattack against a technology service provider that provided services to multiple banks.[25]  As a result of this cyberattack, a large number of banks lost the ability to send payments over the Fedwire Funds Service.[26]  These researchers were able to document that even banks that were not victims of the cyberattack were affected, receiving fewer payments than they otherwise would have.[27]  This created a liquidity shortage in the payment system, leaving banks across the financial system with too few reserves to send their own payments.  The cyberattack ultimately did not destabilize the financial system because of intervention by the Federal Reserve.[28]

---

[25]    *See generally* Antonis Kotidis & Stacey L. Schreft, *Cyberattacks and Financial Stability: Evidence from a Natural Experiment*, Board of Governors of the Federal Reserve System (Mar. 23, 2022), https://www.federalreserve.gov/econres/feds/files/2022025pap.pdf.

[26]    *Id.* at 1–2.

[27]    *Id.* at 3–4, 10.

[28]    *Id.* at 3–4.

But, as the researchers noted, the impact "could have been significantly larger if the cyberattack had hit a more dominant [service provider] or more or larger banks."[29]

This real-world example illustrates the risk that cyberattacks pose to the payment system and the broader financial system. A large cyberattack on a substantial number of master accountholders can disrupt the efficiency of the payment system and create liquidity issues throughout the financial system. If a master accountholder lacks adequate cybersecurity risk management practices or business continuity planning, then it may be more affected by a cyberattack and its ability to send and receive payments with other financial institutions may be significantly impaired.

Of equal concern is that a successful cyberattack may result in the initiation of unauthorized or altered payments that will appear to be legitimate payments of the bank subject to the attack.[30] The terms of the Fedwire Funds Service do not appear to include fraud detection services that would identify and prevent these unauthorized or altered payments.[31] Even more worrying is the possibility that a

---

[29]     *Id.* at 4.

[30]     *See* Joshua Hammer, *The Billion-Dollar Bank Job*, The New York Times (May 3, 2018), https://www.nytimes.com/interactive/2018/05/03/magazine/money-issue-bangladesh-billion-dollar-bank-heist.html.

[31]     *See, e.g.*, 12 C.F.R. Part 210, Subpart B (setting forth the legal framework for funds transfers through the Fedwire Funds Service); Federal Reserve, *Operating Circular 5* (May 1, 2024),

successful cyberattack at a master accountholder results in the transmission of a virus or other malware to a Reserve Bank or the Fedwire Funds Service itself. Such an event could potentially close the Fedwire Funds Service for all customers.

Therefore, Reserve Banks must have the ability to evaluate an applicant's cybersecurity controls to minimize the likelihood that a substantial number of its master accountholders would be affected by an industrywide cyberattack.

### 3. A Master Accountholder Without Appropriate Controls Can Facilitate Criminal Activity Through the Fedwire Funds Service and Other Payment Systems, Creating Reputational Risk for Reserve Banks and the Services They Provide.

A master accountholder has direct access to a deposit account at a Reserve Bank and payment technologies such as the Fedwire Funds Service that allow for the swift transfer of funds across the financial system. Given that a key privilege afforded to master accountholders is access to the Fedwire Funds Service, it is essential that accountholders comply with laws and regulatory standards related to anti-money laundering, sanctions, and terrorist financing.

---

https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/050124-operating-circular-5.pdf (providing the terms under which an institution may access Reserve Bank services); Federal Reserve, *Operating Circular 6* (July 1, 2023), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/070123-operating-circular-6.pdf (providing the terms and services for using the Fedwire Funds Service). Correspondent banks are more likely to have robust fraud detection programs designed to prevent the initiation of fraudulent payments before such payments reach a Reserve Bank payment system.

Absent adequate compliance controls, "[w]ire transfers pose particular problems for anti-money laundering efforts."[32]  This is because wire transfers, particularly those made through the Fedwire Funds Service, are used to transfer large sums across the United States and across the world in very short order.  Even a single failure could mean the transfer of millions of dollars to fund illicit activity, including terrorism, human trafficking, and the drug trade.[33]  Funding illicit activity through the payment system harms the victims of the underlying criminal acts and the reputation of the Reserve Banks and the services they provide, including the Fedwire Funds Service.

Any institution with this type of direct access poses a heightened risk that it or its customers may facilitate financial criminal activities.  Reserve Banks appropriately strive to minimize this risk, both to mitigate harm from criminal acts and to protect their reputations as stewards of the payment system and the reputation of the services they provide thereunder.  Therefore, it is essential that Reserve Banks evaluate the compliance controls over anti-money laundering for a master account applicant.

---

[32]    Thomas Lee Hazen, 6 Law. Sec. Reg. § 22:29 (2024).

[33]    Financial institutions with access to the Fedwire Funds Service can "send and receive individual funds transfers up to one penny less than $10 billion in value." Board of Governors of the Federal Reserve System, Expansion of Fedwire Funds Service and National Settlement Service Operating Hours, 89 Fed. Reg. 39,613, 39,614 (May 9, 2024).

III.    **The Guidelines Appropriately Provide for Reserve Banks to Consider Whether an Institution Is Subject to Comprehensive Federal Supervision.**

The Federal Reserve issued the Guidelines pursuant to its general supervision authority over the Reserve Banks.[34]  The Guidelines highlight the various risks that Reserve Banks should evaluate in exercising their discretion to grant requests for access to a Reserve Bank master account and services.  A key component of the Guidelines is its tiered review methodology.  Under this methodology, institutions that are federally insured and federally supervised (*i.e.*, Tier 1 institutions) are subject to a less intensive and more streamlined review.  In contrast, institutions that do not have deposit insurance and are not subject to a comprehensive federal regulatory framework or routine supervision by a federal banking agency (*i.e.*, Tier 3 institutions) receive the strictest level of review.

As the discussion above illustrates, there are important risks that must be considered in granting access to a Reserve Bank master account and services.  The Federal Reserve appropriately recognized that the primary indicator for identifying the institutions that pose the greatest risk is the presence of direct federal supervision and regulation or the lack thereof.  Federally supervised institutions are subject to a comprehensive regulatory framework and direct supervision and examination by federal agencies for compliance with this framework.   Through routine and

---

[34]    *See* Guidelines at 51,106.

expansive examination by federal banking agencies, the federal bank supervisory framework imposes a comprehensive system of legal, compliance, and risk management obligations on institutions. This framework addresses areas such as credit risk, cybersecurity controls, and financial crimes controls. The federal banking agencies examine financial institutions for compliance with such obligations and if necessary, take enforcement action against such institutions to ensure adherence to their obligations.

Examinations by federal banking agencies are conducted at least once every 12 to 18 months[35] and for large institutions occur virtually continuously. Indeed, bank supervision is highly specialized, and examiners "work to understand banks' operations, major risks, how well banks manage those risks and whether banks have sufficient financial and managerial resources."[36] In addition, examiners continually receive centralized training and aim to apply consistent standards and best practices learned from the oversight of thousands of other federally supervised institutions across the country.[37]

---

[35]     12 U.S.C. § 1820(d).

[36]     Board of Governors of the Federal Reserve System, *Understanding Federal Reserve Supervision* (last visited Sept. 4, 2024), https://www.federalreserve.gov/supervisionreg/understanding-federal-reserve-supervision.htm.

[37]     The federal banking agencies routinely share these insights with each other through the Federal Financial Institutions Examination Council (the "FFIEC"), an

The existing robust supervisory framework to which Tier 1 institutions are subject addresses each of the key risk areas that master accountholders may pose to Reserve Banks and the payment system. This supervisory framework gives the Reserve Banks a baseline assurance that Tier 1 institutions are subject to a stringent, uniform regulatory framework. This framework also provides Reserve Banks with assurance that, once granted access to a master account and Reserve Bank services, these institutions will be subject to ongoing supervision that enforces compliance with the framework.

The Federal Reserve appropriately concluded, therefore, that Tier 1 institutions pose the least risk to the Reserve Banks, the Reserve Bank payment system, and the financial system broadly. Even with this robust framework in place, applications for master accounts by Tier 1 institutions are still subject to scrutiny by Reserve Banks, tailored to the risks that each institution may pose. These institutions, like any master account applicant, are not provided master accounts as a matter of right.

The Federal Reserve also appropriately concluded that Tier 3 institutions are more likely to pose a higher degree of risk to these systems and the Reserve Banks.

---

interagency body empowered by Congress to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions.

Therefore, these institutions warrant greater scrutiny when they apply for a master account.

Some states may or may not develop supervisory frameworks that are substantially equivalent to the federal supervision to which Tier 1 institutions are subject. However, as discussed below, the state-level supervisory framework for Tier 3 institutions in many states may be far less robust than the federal supervision that applies to Tier 1 institutions. The Reserve Banks are provided no guarantee that existing state regimes will not be weakened by political or competitive pressures or resource constraints at state banking agencies. In addition, state supervisors of Tier 3 institutions may not have the ability to apply best practices and learnings from thousands of institutions across the country, as federal banking agencies have.

Given the lack of consistent and uniform supervision, it is incumbent on the Reserve Banks to scrutinize Tier 3 institutions more closely to ensure that such institutions do not pose undue risks by holding a master account.[38]

---

[38] Furthermore, contrary to Custodia's claims, applications from Tier 3 institutions are not "presumptively denied." Appellant's Opening Br. On the Merits, *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, No. 24-8024, at 18–19 (10th Cir. June 26, 2024). In fact, Tier 3 institutions have been able to obtain master accounts from Reserve Banks both before and after implementation of the Guidelines. *See, e.g.*, Board of Governors of the Federal Reserve System, *Master Account and Services Database: Requests for Access* (last visited Sept. 4, 2024), https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm (reporting the Federal Reserve Bank of New York's

As described further below, the Guidelines appropriately recognize that Tier 1 institutions are subject to robust requirements and oversight with respect to the risks they may present if granted access to a Reserve Bank master account and services. These risks include credit risk, cybersecurity risk, and financial crime risk. The Guidelines therefore correctly recognize that Tier 1 institutions require less stringent review of these risks in considering applications from such entities. The Guidelines also recognize that Tier 3 institutions are not subject to the same degree of requirements and oversight and therefore require greater scrutiny.

A.     **Tier 1 Institutions Are Subject to Credit, Liquidity, and Capital Requirements and Reviews That Directly Address the Risk of Default.**

Tier 1 institutions are subject to stringent regulatory capital, liquidity, and asset composition requirements. The federal banking agencies conduct extensive examinations that address capital, liquidity, and asset composition every 12 to 18 months.[39] Further, the federal banking agencies monitor the capital, liquidity, and

---

approval of an access request by an uninsured Connecticut de novo bank, a Tier 3 institution).

[39]     The federal banking agencies examine financial institutions using the Uniform Financial Institutions Rating System, which was adopted by the FFIEC in 1979. *See* Board of Governors of the Federal Reserve System & Federal Deposit Insurance Corporation, Request for Information on Application of Uniform Financial Institutions Rating System, 84 Fed. Reg. 58,383, 58,384 (Oct. 31, 2019). This system is commonly referred to as the CAMELS rating system, which is an acronym for the following six evaluation components: Capital, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk. *Id.*

assets of Tier 1 institutions quarterly through required financial report filings.[40]  This framework, the periodic examinations, and ongoing monitoring are designed to ensure that Tier 1 institutions are financially sound and do not pose undue risk of default on the credit they may be extended through a master account.

Furthermore, federal banking agencies have procedures specifically targeted at some of the credit risks associated with master accounts discussed above, including daylight overdrafts and overnight overdrafts within a master account.[41]  As such, the procedures performed by federal banking agencies mitigate the credit risk that Reserve Banks are exposed to through overdrafts.

Tier 3 institutions may be subject to similar reviews by state supervisors. However, these reviews vary significantly by state and may not consider the risks that an institution may pose if given access to a Reserve Bank master account and other services.

---

[40]     *See* 12 C.F.R. § 304.3 (requiring all insured depository institutions to file every quarter a report (referred to as a Call Report) setting forth detailed information on an institution's assets, liabilities, capital, and earnings); *accord* FFIEC, *Reporting Forms* (last visited Sept. 4, 2024), https://www.ffiec.gov/ffiec_report_forms.htm (setting forth detailed Call Report reporting requirements).

[41]     *See, e.g.*, Board of Governors of the Federal Reserve System, *Commercial Bank Examination Manual* § 5300.1, at 29 (Dec. 31, 2017), https://www.federalreserve.gov/publications/supervision_cbem.htm     ("When reviewing ACH activities, examiners should evaluate the following: . . . the credit policy and effectiveness of procedures to control intraday and overnight overdrafts[.]").

### B.    Tier 1 Institutions Are Subject to Cybersecurity Examinations That Mitigate Cybersecurity Risks.

Federally regulated institutions are subject to IT examinations pursuant to the FFIEC's Information Technology Handbook, which includes modules for, among other IT areas, authentication and access controls, encryption, and testing.[42]  A key part of IT examinations is to ensure that banks "maintain diligence in identifying, assessing, and mitigating cybersecurity risks" to address "the increasing volume and sophistication of cyber threats."[43]   As noted by the Federal Reserve, "the overwhelming majority of Fedwire Funds Service participants are supervised financial institutions that follow the FFIEC guidance on cybersecurity."[44]   This "helps ensure that direct Fedwire Funds Service participants have taken steps to protect the security of their connections with their customers[.]"[45]

In addition, this framework includes extensive business continuity planning requirements to ensure that, if an institution is the victim of a cyberattack, then it is

---

[42]    FFIEC, *IT Examination Handbook Infobase* (last visited Sept. 4, 2024), https://ithandbook.ffiec.gov/.

[43]    Federal Deposit Insurance Corporation, *Banker Resource Center: Information Technology (IT) and Cybersecurity* (last visited Sept. 4, 2024), https://www.fdic.gov/resources/bankers/information-technology/.

[44]    Federal Reserve, *Fedwire Funds Service Disclosure* at 82 (Dec. 1, 2023), https://www.frbservices.org/binaries/content/assets/crsocms/financial-services/wires/funds-service-disclosure.pdf.

[45]    *Id.* at 82–83.

able to quickly recover its operations.  This planning helps avoid the potential for contagion spreading throughout the financial system and payment system in the event of a large-scale cyberattack.

In contrast, Tier 3 institutions' IT systems are not subject to this comprehensive federal supervision and may or may not be subject to examination by state bank supervisors.

### C.     Tier 1 Institutions Are Subject to Stringent Examinations for Controls to Mitigate the Risk of Facilitating Illicit Financial Transactions.

Tier 1 institutions are subject to stringent examinations to address compliance with anti-money laundering requirements imposed by the U.S. Bank Secrecy Act ("BSA/AML") and requirements imposed by the Office of Foreign Asset Control ("OFAC").[46]  These extensive, regular examinations are performed to ensure that financial institutions have adequate controls and reasonably tailored compliance systems in place to avoid the facilitation of illicit financial activity, including threats to U.S. national security.

Tier 3 institutions are generally subject to BSA/AML and OFAC requirements as well, but this does not mean that they are necessarily subject to examination with

---

[46]     *See, e.g.,* Federal Deposit Insurance Corporation, *Risk Management Manual of Examination Policies* § 8.1 (July 8, 2024), https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/; FFIEC, *BSA/AML Examination Manual* (last visited Sept. 4, 2024), https://bsaaml.ffiec.gov/manual.

respect to these requirements.  This distinction is critical because ongoing examination of Tier 1 institutions ensures that federal banking agencies routinely confirm the adequacy of Tier 1 institutions' compliance systems.  In contrast, lack of such ongoing examination for Tier 3 institutions increases the risk that Tier 3 institutions may facilitate criminal activity because they lack effective controls for preventing financial crimes.

IV.     **The District Court's Decision Does Not Frustrate the Dual Banking System.**

In the United States, "banks may be regulated by the federal government, a state government, or both."[47]  Some banks are chartered by the federal government pursuant to the National Bank Act or the Home Owners' Loan Act.[48]  Other banks are chartered by state governments pursuant to state banking laws.[49]  This is referred to as the "dual banking system."  And this dual banking system does not require that all institutions have access to a master account without consideration of the risks that they pose and the way they are regulated and supervised.

Indeed, many state-chartered banks have master accounts because the Federal Reserve has determined that they do not pose undue risks to the Reserve Banks, the Fedwire Funds Service, or other institutions.  The vast majority of state chartered

---

[47]     1 Banking Law § 1.04 (2024).

[48]     *Id.*

[49]     *Id.*

banks are subject to comprehensive federal regulation and supervision, as well as state regulation and supervision, because they have elected to be insured, and any parent holding company of such bank is also subject to such regulation and supervision.  As a result, these institutions are Tier 1 institutions.  State chartered banks, like national banks, are subject to review by the Reserve Banks for the same risks when applying for a master account.  Therefore, the discretion provided to Reserve Banks is not tantamount to a prohibition on state-chartered banks obtaining master accounts—indeed, hundreds of state chartered banks have master accounts.

Furthermore, and of critical importance, financial institutions without master accounts are still able to use Reserve Bank services indirectly through traditional correspondent banking relationships.  For example, a respondent bank may instruct its correspondent bank to send a payment on its behalf using the Fedwire Funds Service.  In such a case the respondent is not a customer of a Reserve Bank and is not receiving services directly from a Reserve Bank.  Similarly, a correspondent may maintain balances in its master account on behalf of a respondent and pass the interest paid on such balances to the respondent.[50]   Indeed, even some Tier 1

---

[50]    12 C.F.R. § 204.10(c).

institutions do not have master accounts and instead use correspondent banks, finding that structure more convenient than a master account.[51]

Correspondent banking relationships have been in use for over a century. As highlighted by a scholar of banking law, "the fact that state nonmember banks existed all around the country between 1913 and 1980—when none of them had Fed accounts—conclusively demonstrates" that Reserve Bank discretion in granting Access Requests will not frustrate the dual banking system or prevent institutions from indirectly using Reserve Bank services.[52]

In light of the risks certain depository institutions could pose to Reserve Banks and the financial system were they to have direct access to a master account, allowing those institutions to use Reserve Bank services indirectly through the correspondent-respondent structure helps preserve the safety and security of the financial and payment systems. When a respondent bank sends a payment instruction on behalf of its customer, the correspondent bank's own policies, procedures, and controls—which have likely been examined by federal agencies—are in place and operating with regard to the payment instruction. This structure

---

[51]    *See Master Account and Services Database: Requests for Access supra* note 38 (indicating that seven FDIC-insured banks and five NCUA-insured credit unions had pending or withdrawn Access Requests).

[52]    Expert Report of Morgan Ricks ¶16, *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, No. 1:22-cv-00125-SWS, 2024 WL 1788900 (D. Wyo. Feb. 2, 2024).

adds an additional layer of oversight, control, and accountability by a correspondent bank that is typically a federally supervised institution, which ultimately protects the Reserve Banks and other payment system participants against the credit risk, cyber risk, and reputational risk that a bank without federal supervision may pose.

Therefore, the discretion vested in the Reserve Banks to approve or deny master account requests does not frustrate the dual banking system or prevent institutions from using the services they provide.

## CONCLUSION

For these reasons, the Court should affirm the District Court's decision.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 6,467 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief amicus curiae complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: September 4, 2024      By:    */s/Mark W. Mosier*
                                   Mark W. Mosier

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By:     */s/Mark W. Mosier*
        Mark W. Mosier